Edward O. Sassower, P.C. (*pro hac vice* pending)
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INTELSAT S.A., *et al.*,[1] | ) | Case No. 20-32299 (KLP) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

# DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION WAGES, COMPENSATION, AND BENEFIT OBLIGATIONS AND (II) CONTINUE EMPLOYEE COMPENSATION AND BENEFITS PROGRAMS, AND (B) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):[2]

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/intelsat. The location of the Debtors' service address is: 7900 Tysons One Place, McLean, VA 22102.

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of David Tolley, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Intelsat S.A., in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion and incorporated by reference herein. Capitalized terms used but not immediately defined have the meanings given to them elsewhere in this Motion or in the First Day Declaration, as applicable.

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order"), (a) authorizing, but not directing, the Debtors to continue to honor their obligations on account of the Employee Compensation and Benefits (as defined below) postpetition in the ordinary course of business including payment of prepetition obligations related thereto and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing with regard to the relief requested herein approximately twenty-one days from the Petition Date.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

## Background

5. The Debtors (together with their non-Debtor affiliates, the "Company") operate one of the world's largest satellite services businesses, providing a critical layer in the global communications infrastructure. As the foundational architects of satellite technology, the Company operates the largest satellite fleet and connectivity infrastructure in the world.

6. Through its global and extra-terrestrial network of satellites and teleports, the Company provides diversified communications services to the world's leading media companies, fixed and wireless telecommunications operators, data networking service providers for enterprise and mobile applications in the air and on the seas, multinational corporations and internet service providers in the most challenging and remote locations across the globe. The Company is also the leading provider of commercial satellite communication services to the U.S. government and other select military organizations and their contractors. The Company's administrative headquarters are in McLean, Virginia, and the Company has extensive operations spanning across the United States, Europe, South America, Africa, the Middle East, and Asia.

7. On May 13, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).

## The Debtors' Workforce

8. As of the Petition Date, the Company directly and indirectly employs a workforce of approximately 1,200 individuals, both on a full and part-time basis, spread across approximately

20 countries and 21 legal entities, with most of the workforce concentrated in the United States.[3] Approximately 1,000 individuals (the "Employees") are employed by the Debtors, of which approximately 200 Employees are compensated on an hourly or daily basis, while approximately 800 Employees are salaried. Approximately 920 of the Debtors' Employees work in the United States (the "U.S. Employees") and approximately 80 work outside the United States (the "Non-U.S. Employees"). None of the Employees are represented by a union or employed pursuant to a collective bargaining agreement.

9. As discussed in the First Day Declaration, these chapter 11 cases and the clearance of the C-band represent a transformative moment in the Debtors' corporate life. The Debtors' Employees are vital to their efforts to implement their financial restructuring through these chapter 11 cases while simultaneously implementing the extremely complex and technically challenging effort to clear the C-band for the deployment of nation-wide 5G coverage, as described in the First Day Declaration, all in the face of the global COVID-19 pandemic which has significantly affected the Employees, the Debtors' key suppliers, and many of the Debtors' important customers in the airline, cruise ship, and media industries. The Employees perform a wide variety of corporate and other job functions—including operational services on the Debtors' satellites and managerial, legal, financial, commercial, administrative, and other support services—that are critical to the Debtors' business operations, including the C-band clearance efforts, and the administration of these chapter 11 cases. In many instances, the Employees are highly skilled personnel intimately familiar with the Debtors' infrastructure, processes, projects, and systems, many of which are highly technical and require unique training and experience. Without the continued, uninterrupted

[3] For the avoidance of doubt, the relief sought under this Motion includes payments made only to individuals that are paid by Debtor entities.

services of the Employees, the ability of the Debtors to maintain and administer their estates and to clear the C-band will be materially impaired.

10. In addition to the Employees, the Debtors from time to time rely on specialized individuals on a temporary or project basis, including independent contractors and labor subcontractors (collectively, the "Independent Contractors") to fulfill duties similar to the job functions listed above in furtherance of the Debtors' business. As of the Petition Date, the Debtors retained approximately 20 Independent Contractors across all business segments. The Independent Contractors are critical to the operation of the Debtors' business and support the efforts of their Employees. As part of this Motion, the Debtors also seek authorization, but not direction, to honor amounts owed on account of their Independent Contractors and costs incidental to maintaining their Employees.

11. The Employees and Independent Contractors rely on their compensation and benefits to pay their daily living expenses. These individuals could experience significant hardship if the Court does not permit the Debtors to continue paying their compensation and providing them with health and other benefits, particularly in light of the pressures and disruption caused by the COVID-19 pandemic. The Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

**Employee Compensation and Benefits**

12. The Debtors seek to minimize the personal hardship Employees and Independent Contractors would suffer if prepetition Employee- and Independent Contractor-related obligations are not paid or remitted when due or as expected. The Debtors, therefore, seek authorization, but not direction, to (a) pay and honor certain prepetition claims on a postpetition basis, as applicable, relating to: Wage Obligations, Independent Contractor Obligations, Additional Compensation Obligations (including the Sales Incentive Program, the Retention Plans, and Other Additional

Compensation), Withholding and Deduction Obligations, Employer Payroll Taxes, Reimbursable Expenses, Relocation Benefits, Paid Vacation Benefits, Health and Welfare Coverage and Benefits, Workers' Compensation Program, Retirement Programs, U.S. Severance Policy, Wage and Benefit Service Providers and certain other benefits that the Debtors provide in the ordinary course (each as defined below, and collectively, the "Employee Compensation and Benefits"),[4] in the estimated amounts due on an interim basis and final basis, as summarized in the following chart; and (b) continue to honor obligations related to or on account of the Employee Compensation and Benefits on a postpetition basis:

[4] The descriptions of the Employee Compensation and Benefits set forth in this Motion constitute a summary only. The actual terms of the agreements, contracts, plans, programs, and manuals governing the Employee Compensation and Benefits will govern in the event of any inconsistency with the description in this Motion. The Debtors request authority to honor obligations related to Employee Compensation and Benefits in the ordinary course of business consistent with prepetition practices, regardless of whether the Debtors inadvertently fail to include a particular benefit or aspect of compensation in the defined term "Employee Compensation and Benefits," and any such omitted benefit or aspect of compensation is hereby included in the defined term "Employee Compensation and Benefits" as used herein and in the Interim Order and Final Order.

| Relief Sought | Interim Amount[5] | Final Amount |
|---|---|---|
| Compensation, Withholding and Deduction and Expense Reimbursement | **$12,284,000** | **$12,359,000** |
| Wage Obligations | $2,100,000 | $2,100,000 |
| Independent Contractor Obligations | $390,000 | $390,000 |
| Sales Incentive Plan | $1,000,000 | $1,000,000 |
| Retention Plans[6] | (Final Order Only) | N/A |
| Equity Incentive Plan | N/A | N/A |
| Other Additional Compensation | N/A | N/A |
| Withholding and Deduction Obligations | $875,000 | $875,000 |
| Employer Payroll Taxes | $174,000 | $174,000 |
| Reimbursable Expenses | $40,000 | $40,000 |
| Relocation Benefits | $75,000 | $150,000 |
| Paid Vacation Benefits | $7,630,000[7] | $7,630,000[8] |
| Health and Welfare Coverage and Benefits | **$831,000** | **$1,122,000** |
| U.S. Medical Plans | $590,000 | $590,000 |
| U.S. Dental Plan | $130,000 | $130,000 |
| U.S. Vision Plan | $22,000 | $22,000 |
| Foreign Sponsored Health Plans | $28,000 | $28,000 |
| FSAs and HSAs | $49,000 | $340,000 |
| Life and AD&D Insurance Coverage | $0 | $0 |
| Other Health and Welfare Benefits | $12,000 | $12,000 |
| Worker's Compensation Program | **$0** | **$0** |
| Retirement Programs | **$640,000** | **$126,735,000** |
| 401(k) Plan | $10,000 | $1,020,000 |
| Supplemental Retirement Plan | (Final Order Only) | $525,000[9] |

[5] The Debtors have estimated the obligations that will come due within the first thirty days following the Petition Date (the "Interim Period").

[6] The Debtors seek authorization, but not direction, to continue the Retention Plans on a postpetition basis and honor their obligations accruing thereunder, including with respect to employment periods beginning prior to the Petition Date. A condition to receiving any payment under the Retention Plan is the eligible Employees' continued employment through the applicable payment date. Accordingly, no amounts are included in this relief chart with respect thereto.

[7] The Debtors do not, as of the Petition Date, anticipate the need to pay any amounts due with respect to earned but unused Paid Vacation Benefits during the Interim Period. However in the event of termination of an Employee during the Interim Period, prepetition earned but unused Paid Vacation Benefits would become due within the Interim Period. Accordingly, the Debtors seek authorization, but not direction, to pay prepetition amounts in respect of earned but unused Paid Vacation Benefits, should they become due, by applicable law or otherwise, during the Interim Period.

[8] The final amount with respect to Paid Vacation Benefits reflects the aggregate liability of the Debtors if every Employee's employment were terminated immediately, and all accrued and untaken Paid Vacation Benefits were paid in accordance with the Debtors' practices and applicable law.

[9] The final amount with respect to Supplemental Retirement Plan reflects the aggregate liability of the Debtors if every participating Employee's employment were terminated immediately.

| | | |
|---|---|---|
| Staff Retirement Plan | $420,000 | $76,700,000[10] |
| Restoration Plan | (Final Order Only) | $8,300,000[11] |
| Foreign Retirement Plans | $10,000 | $390,000[12] |
| Retiree Medical Plans | $200,000 | $39,800,000[13] |
| Severance Obligations | **$12,000** | **$12,000** |
| U.S. Severance Policy | $12,000 | $12,000 |
| Wage and Benefit Service Providers | **$160,000** | **$160,000** |
| **TOTAL** | **$13,927,000** | **$140,388,000** |

13. Subject to Court approval, the Debtors intend to continue their applicable prepetition Employee Compensation and Benefits in the ordinary course. Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, discontinue any of their Employee Compensation and Benefits, and to implement new programs, policies, and benefits in the ordinary course of business on a postpetition basis in the Debtors' sole discretion and without the need for further Court approval, subject to applicable law.

## I. Compensation, Withholding and Deduction, and Expense Reimbursement.

### A. Wage Obligations.

14. In the ordinary course, the Debtors incur payroll obligations for base wages and salaries owed to Employees (the "Wage Obligations"). Employees are paid over various time periods ranging from biweekly to monthly.

15. The Debtors incur a monthly average of approximately $10,000,000 on account of Wage Obligations. As of the Petition Date, the Debtors estimate that they owe approximately

[10] The final amount represents an actuarial estimate of the total benefits payable to eligible participants over the life of the Staff Retirement Plan, net of plan assets.

[11] The final amount represents an actuarial estimate of the total benefits payable to eligible participants over the life of the Restoration Plan. For the avoidance of doubt, the final amount does not take into account the value of any plan assets.

[12] The final amount includes an actuarial estimate of the total benefits payable under the U.K. Individual Plan (as defined below), which plan is not funded as of the Petition Date.

[13] The final amount represents an actuarial estimate of the total benefits payable to eligible participants over the life of the Retiree Medical Plans, which plans not funded as of the Petition Date.

$2,100,000 on account of accrued but unpaid Wage Obligations, all of which will become due and owing during the Interim Period. For the avoidance of doubt, as of the Petition Date, the Debtors do not believe they owe Wage Obligations to any Employee in excess of the statutory cap of $13,650 set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

16. The Debtors believe the authorization to pay Wage Obligations and continue paying their Employees is critical to maintaining and administering their estates. Accordingly, the Debtors seek authorization, but not direction, to continue to satisfy amounts incurred on account of the Wage Obligations (including any prepetition amounts that may be outstanding) in the ordinary course of business on a postpetition basis. In the event that prepetition amounts owed to any Employee on account of Wages are in excess of $13,650, the Debtors seek authorization to pay such amounts solely pursuant to the Final Order.

**B. Independent Contractor Obligations.**

17. The Employees and the Independent Contractors work side by side with respect to all of the Debtors' business operations, as described above. The Debtors incur a monthly average of approximately $390,000 (the "Independent Contractor Obligations") on account of payments to Independent Contractors. As of the Petition Date, the Debtors estimate that they owe approximately $390,000 to Independent Contractors on account of accrued but unpaid Independent Contractor Obligations, all of which will become due and owing during the Interim Period.

18. The Debtors believe the authorization to pay Independent Contractor Obligations and continue paying their Independent Contractors is critical to maintaining and administering their estates. Accordingly, the Debtors seek authorization, but not direction, to continue to satisfy amounts incurred on account of the Independent Contractor Obligations (including any prepetition amounts that may be outstanding) in the ordinary course of business on a postpetition basis.

**C. Additional Compensation Obligations.**

19. The Debtors provide various forms of additional compensation (collectively, "Additional Compensation Obligations") to certain non-Insider Employees, as described below. [14]

**a. Sales Incentive Plan.**

20. The Debtors provide additional compensation (the "Sales Incentives") to approximately 50 non-Insider Employees who work in sales positions for the Debtors, pursuant to the 2020 Sales Incentive Plan (the "Sales Incentive Plan"). The Sales Incentives are earned and measured on a quarterly basis, generally based on achievement of quotas for the relevant quarterly period. Each eligible Employee must remain employed through the last date of the relevant quarterly period to receive a Sales Incentive payment; provided that if an eligible Employee's employment is terminated involuntarily on a not-for-cause basis prior to the last date of a quarterly period, such Employee may be eligible for a prorated advance payment of such Employee's Sales Incentive payment for such quarterly period. The Sales Incentive payment amount for a given quarter is based on individual Employee achievement of specified quotas; however, each Employee participating in the Sales Incentive Plan is entitled to a minimum Sales Incentive amount equal to 25% of such Employee's total annual Sales Incentive target amount (the "Guaranteed Amounts"), provided that the Employee remains employed through the date of payment of the applicable Sales Incentive payment.

[14] The relief sought under this Motion with respect to the Additional Compensation Obligations and U.S. Severance Policy (each as defined herein) does not include the payment of any obligation to any "insider" as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors shall not make any non-ordinary course bonus, incentive, or severance payments to any Insiders without further order of this Court. For the avoidance of doubt, the Debtors reserve all rights with respect to the classification of any Employee as an "Insider," and no description of any Employee Compensation and Benefits hereunder indicating that such Employee Compensation and Benefits covers or is made available to "Insiders" or "non-Insiders" shall be construed as an admission or concession by the Debtors that any Employee of the Debtors is an "Insider."

21. The Sales Incentives comprise a significant and integral part of the total compensation for the Debtors' sales workforce, and the Debtors' sales workforce is critical to their continued financial and operational success. In particular, given the Debtors' efforts to transition their C-band customers, their sales workforce is vital to ensuring continuing stable and productive relationships with their customers. The Debtors' failure to honor their Sales Incentive obligations could result in a severe strain on the Debtors' relationship with their sales workforce and may jeopardize the Debtors' ability to conduct business as usual during these chapter 11 cases.

22. The Sales Incentives for the quarterly period ending March 31, 2020 are scheduled to be paid on or after May 29, 2020, which may fall during the Interim Period, in respect of which the Debtors estimate approximately $1,000,000 in Sales Incentives will have been earned by Employees. Sales Incentives for the quarterly periods ending June 30, 2020, September 30, 2020, and December 31, 2020 are scheduled to be paid promptly following the determination of the achievement of sales quotas for such quarterly periods. The Debtors estimate that approximately $1.2 million in Sale Incentives will have been earned by Employees in respect of each such quarterly period inclusive of the Guaranteed Amounts. The Debtors seek authorization, but not direction, to continue to satisfy amounts incurred on account of the Sales Incentive Plan (including any prepetition amounts that may be outstanding) to non-Insider Employees, in the ordinary course of business on a postpetition basis. For the avoidance of doubt, the Debtors will not seek to pay any outstanding amounts incurred on account of the Sales Incentive Plan in advance of the date they come due.

**b. Employee Retention Plans (Final Order Only).**

23. As of the Petition Date, the Debtors maintain a quarterly employee retention plan generally for non-Insider, non-sales Employees (the "Valued Employee Retention Plan"). Approximately 10 non-Insider sales Employees participate in both the Sales Incentive Plan and

the Valued Employee Retention Plan. Valued Employee Retention Plan payments are made to participating Employees following the end of each quarterly period, subject to such Employee's continued employment by the Debtors through the date on which the payment in respect of such quarterly period is made.[15] Substantially all of the Debtors' approximately 950 non-Insider, non-sales Employees are eligible for payments under the Valued Employee Retention Plan. The Debtors estimate that the payments to eligible Debtor Employees under the Valued Employee Retention Plan for the remaining three quarterly periods in 2020 will be in the aggregate approximately $18.3 million.

24. As of the Petition Date, the Debtors also maintain a key employee retention plan for certain non-Insider Employees who possess valuable and hard to replace knowledge and skills (the "Key Employee Retention Plan"). Eligible Employees who remain employed by the Debtors through April 30, 2021 will be eligible for a lump sum payment at such time. Approximately 60 of the Debtors' non-Insider Employees are eligible for payments under the Key Employee Retention Plan, and the total cost of the Key Employee Retention Plan for the Debtors' Employees is estimated to be approximately $2.8 million.

25. In addition to the Valued Employee Retention Plan and the Key Employee Retention Plan, as of the Petition Date, the Debtors provide a limited number of individual retention plans to certain Employees possessing particularly unique and valuable skills, which make their replacement especially difficult (the "Individual Retention Plans" and, together with the Valued Employee Retention Plan and Key Employee Retention Plan, the "Retention Plans"),

[15] The remaining 2020 Valued Employee Retention Plan payments are scheduled to be paid as follows: no later than August 31, 2020 in respect of the quarterly period ending June 30, 2020, no later than November 30, 2020 in respect of the quarterly period ending September 30, 2020, and no later than February 28, 2021 for the quarterly period ending December 31, 2020. Payments in respect of quarterly periods after 2020, if any, are scheduled to be made within sixty days following the end of the applicable quarterly period.

including with respect to a limited number of Employees involved in the Debtors' C-band clearance process. The Individual Retention Plan payments are estimated to total approximately $1.6 million in the aggregate over the next four years.

26. The Debtors seek authorization, but not direction, to continue the Retention Plans on a postpetition basis and honor their obligations accruing thereunder, including with respect to employment periods beginning prior to the Petition Date, solely upon entry of the Final Order, to non-Insider Employees, in the ordinary course of business on a postpetition basis. For the avoidance of doubt, the Debtors will not seek to pay any outstanding amounts incurred on account of the Retention Plans in advance of the date they come due.

**c. Equity Incentive Plan.**

27. The Debtors have historically granted restricted stock units to certain Employees under a long-term incentive program (the "Equity Incentive Plan"), as authorized by the compensation committee of the board of directors of Intelsat S.A., with the input of the Company's management. Approximately 150 Employees on average have historically been eligible for awards under the Equity Incentive Plan. The restricted stock units have both time-vesting and performance-vesting components, and generally vest over a three-year period. In prepetition periods, the time-vesting portion of the annual grants generally have vested in three substantially equal installments in March of each year, while the performance-vesting portion vested in March at the end of the applicable three-year performance period based upon the achievement of certain performance metrics. Certain outstanding restricted stock units granted in respect of new hires and promotions vest according to different schedules. While the Equity Incentive Plan does not involve any cash payment by the Debtors to participating Employees, the Debtors withhold and pay applicable Withholding and Deduction Obligations and Employer Payroll Taxes (each as defined below) as the restricted stock units vest. While the Debtors seek authority to allow

outstanding unvested restricted stock unit grants to vest as usual, the Debtors have determined to delay the settlement of restricted stock unit vesting until at the earliest May 30, 2021. Accordingly, the Debtors submit the continued vesting of the grants should be authorized.

**d. Other Additional Compensation.**

28. The Debtors also provide certain other additional compensation (collectively, the "Other Additional Compensation") to their Employees as further described below.

29. The Debtors maintain two discretionary employee recognition programs (collectively the "Recognition Programs"): one program whereby business division managers may award well-performing Employees in their division with "points" which can be redeemed on an online platform for various gifts (the "Points Program"), and a second program whereby Employees are nominated by their colleagues on an annual basis for recognition under the program and the Debtors' management evaluates and selects approximately 50 award recipients from amongst the nominees (the "Annual Award Program"). Gifts for the Points Program are paid for in advance by the Debtors, and no liability under such program is outstanding as of the Petition Date. The Annual Award Program nominations have been submitted, and the Debtors' management is currently in the process of evaluating nominations and selecting award recipients. Annual Award Program award recipients receive a cash payment and points for use in the Points Program.

30. The Debtors also provide certain awards to Employees who refer candidates with certain skills or knowledge to the Debtors and are ultimately hired by the Debtors to fill certain roles (the "Referral Awards"). In 2019, the Debtors paid Referral Awards of approximately $32,500 in the aggregate to approximately 20 Employees. As of the Petition Date, the Debtors are increasing recruitment and hiring efforts to ensure they have the workforce necessary to clear the

C-band spectrum, and the Referral Awards program is an important part of the Debtors' recruitment efforts.

31. While the Debtors do not believe that they have any liabilities on account of Other Additional Compensation as of the Petition Date, the Debtors nonetheless seek authorization, but not direction, to continue to satisfy amounts incurred on account of Other Additional Compensation (including any prepetition amounts that may be outstanding), in the ordinary course of business on a postpetition basis. For the avoidance of doubt, the Debtors will not seek to pay any outstanding amounts incurred on account of the Referral Awards in advance of the date they come due.

**D. Withholding and Deduction Obligations.**

32. Certain federal and state laws require that the Debtors withhold certain amounts from U.S. Employees' gross pay related to federal, state, and local income taxes for remittance to the appropriate federal, state, or local taxing authorities or as required by statute including for garnishments, child support, and Social Security and Medicare taxes (the "U.S. Withholding Obligations"). On average, the Debtors withhold and subsequently remit approximately $2.3 million per month on account of U.S. Withholding Obligations for their Employees in the United States.

33. The Debtors also have obligations to foreign taxing authorities for certain Non-U.S. Employees, including on account of payroll-related taxes and pension contributions, (the "Foreign Withholding Obligations," and together with the U.S. Withholding Obligations, the "Withholding Obligations"). On average, the Debtors withhold and subsequently remit approximately $200,000 per month on account of the Foreign Withholding Obligations.

34. The Debtors also routinely deduct certain amounts from Employees' paychecks, including pre-tax and after-tax deductions payable pursuant to certain employee benefit plans

discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, 401(k) contributions, voluntary credit checks, parking payments, and miscellaneous deductions (collectively, the "Deductions") and forward such amounts to various third-party recipients or retain such amounts for any self-insured benefit programs. On average, the Debtors withhold and remit approximately $2 million per month on account of Deductions in the United States (the "U.S. Deductions"), and approximately $50,000 per month on account of Deductions outside the United States (the "Foreign Deductions" and together with the U.S. Deductions and the Withholding Obligations, the "Withholding and Deduction Obligations").

35. As of the Petition Date, the Debtors believe that they have deducted but not yet remitted to the appropriate third-party payees approximately $875,000 in Withholding and Deduction Obligations, all of which must be remitted during the Interim Period.

36. The Debtors believe that any amounts held by the Debtors on account of the Withholding and Deduction Obligations generally are held in trust by the Debtors and are not property of their estates. As such, the Debtors do not believe they need authorization to remit such payments to the appropriate third-parties. In an abundance of caution, by this Motion, the Debtors request authorization to remit all outstanding prepetition amounts deducted on account of the Withholding and Deduction Obligations and to continue to deduct and remit the Withholding and Deduction Obligations on a postpetition basis in the ordinary course of business consistent with their prepetition practices.

**E. Employer Payroll Taxes.**

37. In addition to the Withholding and Deduction Obligations described above, the Debtors are required by applicable statutory authority to match from their own funds Social Security and Medicare taxes, social insurance payments, contributions to government regulated pension plans and other similar statutory obligations in the U.S., the United Kingdom,

Luxembourg, and Japan (the "Employer Payroll Taxes"), for remittance to the appropriate federal, state and local taxing authorities. On average, the Debtors remit approximately $750,000 per month on account of the Employer Payroll Taxes.

38. The Debtors estimate that as of the Petition Date approximately $174,000 of accrued but unpaid Employer Payroll Taxes have not been remitted to the appropriate governmental authorities, all of which will become due and owing during the Interim Period. The Debtors seek authorization, but not direction, to remit the Employer Payroll Taxes and to continue to honor and process the Employer Payroll Taxes on a postpetition basis in the ordinary course of business and consistent with past practices.

**F. Reimbursable Expenses.**

39. Certain ordinary course expenses that Employees incur in performing their job functions, including, but not limited to, expenses for parking, travel expenses, meals, client entertainment, and recruitment expenses (the "Reimbursable Expenses") are reimbursable by the Debtors. The Debtors maintain Company-sponsored credit cards administered by Bank of America for U.S. Employees, which comprises the vast majority of the program, and American Express for a limited number of foreign Employees, including a program in which Employees are issued Bank of America or American Express corporate cards, as applicable (the "Employee-Pay Card Programs"). Approximately 100 cards under the Employee-Pay Card Programs are currently active. Bank of America and American Express, as applicable, send account statements directly to Employees in the Employee-Pay Card Programs, who apply for reimbursement by submitting an expense report. The Debtors incur a monthly average of approximately $260,000 on account of Reimbursable Expenses. As of the Petition Date, the Debtors estimate that they owe approximately $40,000 on account of Reimbursable Expenses, all of which will become due and owing during the Interim Period.

40. The Debtors' inability to reimburse Reimbursable Expenses could impose a hardship on Employees where such individuals incurred Reimbursable Expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed. Accordingly, the Debtors seek authorization, but not direction to continue to satisfy amounts incurred on account of the Reimbursable Expenses (including any prepetition amounts that may be outstanding), in the ordinary course of business on a postpetition basis.[16] For the avoidance of doubt, the Debtors will not seek to pay any outstanding amounts incurred on account of the Reimbursable Expenses in advance of the date they come due.

**G. Relocation Benefits.**

41. The Debtors provide relocation benefits to Employees that were transferred from their current residence in connection with their employment, and provide housing for certain Non-U.S. Employees (collectively, the "Relocation Benefits"). The Debtors determine Employee eligibility for Relocation Benefits on an individual, case-by-case basis, based on the evaluation of business needs. Relocation Benefits are currently provided through third-party service providers Crown Relocations and NEI Global Relocation Company. At the time the Debtors determine Relocation Benefits are necessary with respect to an eligible Employee, the third-party service provider provides an estimate of such Relocation Benefits. As expenses are actually incurred, the third-party service provider submits an invoice for such expenses which are paid by the Debtors. On average, the Debtors annually pay approximately $725,000 in Relocation Benefits. As of the Petition Date, the Debtors have estimated and accrued a total of approximately $150,000 payable

[16] The Employee-Pay Card Programs comprise two of the "Credit Card Programs" described in the Cash Management Motion. To the extent not granted in the Cash Management Motion, the Debtors seek authorization to continue the use of the cards issued under the Employee-Pay Card Programs and the reimbursement for Reimbursable Expenses incurred thereunder.

to Employees in respect of Relocation Benefits, of which the Debtors estimate $75,000 may become due and owing during the Interim Period.

42. The Debtors believe that continuation of the Relocation Benefits is essential to ensure the uninterrupted continuation of the Debtor's international operations. The Debtors' inability to satisfy obligations incurred on account of Relocation Benefits could impose a hardship on Employees where such individuals made a move with the understanding that such expenses would be covered by the Debtors. Accordingly, the Debtors seek authorization, but not direction, to continue to satisfy amounts incurred on account of the Relocation Benefits (including any prepetition amounts that may be outstanding), in the ordinary course of business on a postpetition basis. For the avoidance of doubt, the Debtors will not seek to pay any outstanding amounts incurred on account of the Relocation Benefits in advance of the date they come due.

**H. Time Off Benefits.**

43. The Debtors provide paid time off to certain Employees for vacation days annually, the amount of which increases, up to a cap, with the length of such Employees' service with the Company (the "Paid Vacation Benefits"). Employees are paid their regular hourly or salaried rate when they elect to use Paid Vacation Benefits. Terminated Employees, either voluntary or involuntary, are paid for earned but unused Paid Vacation Benefits, and any vacation days taken that exceed the vacation days earned are deducted from their final paycheck.

44. Due to the outbreak of COVID-19 and related social distancing policies and government-mandated "Stay-At-Home" orders, the rate at which Employees have elected to use Paid Vacation Benefits has significantly decreased. Accordingly, the Debtors have experienced an increase in their accrued liability for Paid Vacation Benefits relative to historic levels. As of the Petition Date, the Debtors estimate the accrued liability for Paid Vacation Benefits to be

approximately $7.63 million.[17] The Debtors do not, as of the Petition Date, anticipate the need to pay any amounts due with respect to earned but unused Paid Vacation Benefits during the Interim Period. However, in the event of termination of an Employee during the Interim Period, prepetition earned but unused Paid Vacation Benefits would become due within the Interim Period. The Debtors seek authorization, but not direction, to pay any prepetition amounts due with respect to earned but unused Paid Vacation Benefits, including if such amounts become due and payable, by applicable law or otherwise, during the Interim Period, for terminated Employees, and continue the Paid Vacation Benefits policies in the ordinary course of business on a postpetition basis, as may be affected by COVID-19 and the Debtors' response thereto.

45. The Debtors also provide paid leave benefit programs (the "Paid Leave Benefits") for eligible Employees. U.S. Employees are eligible to be paid only for specific types of leave, including medical leave, U.S. military leave, parental leave, bereavement, and jury duty or witness leave, and other types of leave authorized or required by law. Generally, U.S. Employees have the option to use accrued vacation days concurrently with leave and do not receive a payment for any unused leave days at the end of the year or at termination unless required by law. The Debtors generally provide leave days in foreign jurisdictions as well, including Luxembourg, the United Kingdom, Japan, the United Arab Emirates and Mexico, in each case in accordance with local customs and statutory requirements. The Debtors seek authorization, but not direction, to honor all fully earned obligations under the Paid Leave Benefits and to continue the Paid Leave Benefits in the ordinary course of business on a postpetition basis.

[17] This amount reflects the Debtors' aggregate liability if all accrued and untaken Paid Vacation Benefits were paid in accordance with the Debtors' practices and applicable law.

**II. Health and Welfare Coverage and Benefits.**

46. The Debtors offer health and welfare benefits to eligible Employees for medical, prescription, dental, and vision care coverage and certain other welfare benefits, including life, accidental death and dismemberment insurance, and other insurance benefits (collectively, the "Health and Welfare Coverage and Benefits"). Failure to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship and make it difficult to retain the Employees, maintenance of the Health and Welfare Coverage Benefits is especially important given the public health concerns around the COVID-19 pandemic.

47. The Debtors believe they are authorized to continue the Health and Welfare Coverage and Benefits in the ordinary course; however, out of an abundance of caution the Debtors seek authorization, but not direction, to continue the Health and Welfare Coverage and Benefits on a postpetition basis in the ordinary course of business (including honoring any prepetition obligations that may be outstanding) and consistent with their prepetition practices.

**A. Medical and Prescription Coverage.**

48. The Debtors offer medical and prescription drug benefit programs to U.S. Employees, primarily through self-insured plans administered by UnitedHealthcare and prescription drug coverage through Express Scripts, Inc., while Employees in Hawaii may also enroll in a fully-insured plan administered by Hawaii Medical Services Association ("HMSA") (collectively, the "U.S. Medical Plans"). Approximately 810 U.S. Employees are enrolled in the U.S. Medical Plans, under which participants and their eligible dependents receive coverage for, among other things, preventative care, doctor visits, hospital care, prescription drugs, and wellness. Claims under the self-insured plans are invoiced by UnitedHealthcare and paid by the Debtors on a weekly basis, subject to a quarterly reconciliation process. The Debtors incur a monthly average of approximately $1.1 million on account of the U.S. Medical Plans, of which approximately

$300,000 is offset by deductions from participating eligible U.S. Employees as applicable. As of the Petition Date, the Debtors have estimated and accrued in the aggregate approximately $590,000 on account of the U.S. Medical Plans, all of which will become due and owing during the Interim Period.

**B. Dental and Vision Insurance Coverage.**

49. The Debtors provide eligible U.S. Employees dental insurance coverage through a plan administered by MetLife (the "U.S. Dental Plan"), and vision insurance coverage through a plan administered by VSP (the "U.S. Vision Plan"), each of which are self-insured plans. Approximately 850 U.S. Employees are enrolled in the U.S. Dental Plan and approximately 800 in the U.S. Vision Plan. Claims under the U.S. Dental Plan and U.S. Vision Plan are invoiced by MetLife and VSP, as applicable, and paid by the Debtors on a monthly basis. The Debtors incur a monthly average of approximately $70,000 on account of premium payments for the U.S. Dental Plan, of which approximately $40,000 is offset by deductions from participating eligible U.S. Employees, and a monthly average of approximately $100,000 in respect of claims under the U.S. Dental Plan. As of the Petition Date, the Debtors have estimated and accrued approximately $130,000 on account of the U.S. Dental Plan, inclusive of both net premium payments and prepetition claims, all of which will become due and owing during the Interim Period. Premiums for the U.S. Vision Plan are funded in part through Debtor-contribution and in part through U.S. Employee Deductions, however the Debtors incur a monthly average of approximately $25,000 in respect of claims under the U.S. Vision Plan. As of the Petition Date, the Debtors have estimated and accrued approximately $22,000 on account of the U.S. Vision Plan, all of which will become due and owing during the Interim Period.

**C. Foreign Health Plans.**

50. The Debtors' Non-U.S. Employees are generally offered similar medical, prescription and dental coverage under either Debtor-sponsored fully-insured programs (the "Foreign Sponsored Health Plans") or government sponsored programs. Approximately 65 Non-U.S. Employees are enrolled for Foreign Sponsored Health Plans, administered by various providers. As of the Petition Date, the Debtors have estimated and accrued approximately $28,000 on account of the Foreign Sponsored Health Plans, all of which will become due and owing during the Interim Period.

**D. FSAs and HSAs.**

51. The Debtors provide U.S. Employees with the opportunity to make pre-tax contributions to flexible spending accounts (the "FSAs") administered by MyCafeteriaPlan, which may be used for eligible medical expenses for participating Employees, medical expenses or child care for such Employees' dependents, and parking or commuter expenses. The Debtors also provide U.S. Employees with the opportunity make pre-tax contributions to a health savings accounts (the "HSAs") administered by Optum Bank. The Debtors make contributions to the HSAs for eligible Employees in amounts based on the type of coverage the Employee elects to receive. All contributions are made on a monthly basis. The Debtors deduct an average of approximately $160,000 from participating U.S. Employee's Wage Obligations on account of the U.S. Employee contributions to the FSA and the HSA on a monthly basis. Currently, approximately 165 U.S. Employees contribute to an FSA and approximately 430 U.S. Employees contribute to an HSA. As of the Petition Date, the Debtors estimate that they are obligated to remit approximately $340,000 of Employee FSA and HSA withholdings and matching contributions, in the aggregate, to Employees on account of the FSA and HSA, approximately $49,000 of which is expected to come due during the Interim Period.

**E. Life and AD&D Insurance Coverage.**

52. The Debtors provide or sponsor, as applicable (a) basic fully-insured life insurance, AD&D insurance, long- and short-term disability insurance, to all active eligible U.S. Employees on a Debtor-paid basis, which is administered by Cigna; (b) spouse and child life insurance offered to U.S. Employees on a voluntary Employee-paid basis, which is also administered by Cigna; (c) fully-insured life insurance for Non-U.S. Employees, on a Debtor-paid basis, administered by various parties including: Zurich International Life, UNUM, and Metlife Alico; (d) supplemental life insurance for certain eligible Employees, on a Debtor-paid basis, administered by Pacific Life; and (e) fully-insured life insurance coverage for one retired individual, on a Debtor-paid basis, administered by Ameritas Life Insurance (collectively, the "Life Insurance Coverage"). The Debtors also provide Life Insurance Coverage on a Debtor-paid basis to 55 retired former Employees of the Debtors, which is administered by Cigna as part of a legacy program that was grandfathered into the current Life Insurance Coverage program. As of the Petition Date, retiring Employees of the Debtors are generally not provided Life Insurance Coverage. As of the Petition Date, the Debtors do not believe they have any liability in respect of the Life Insurance Coverage.

**F. Other Health and Welfare Benefits.**

53. The Debtors provide certain other benefits (collectively, the "Other Health and Welfare Benefits"). The type and amount of Other Health and Welfare Benefits varies by geographic region. Some Other Health and Welfare Benefits are paid for, in whole or in part, by Debtor contributions, including: an onsite wellness clinic at their Ellenwood, Georgia facility; a child care program; business travel medical coverage and benefits; a diabetes and hypertension management program; a tobacco cessation program; a well-being program; health assessment, health coaching, and biometric screening programs; a student loan management program, a tuition reimbursement program; an employee advocacy program for the Debtors' non-U.S. Employees;

meal vouchers for Employees in Luxembourg; annual physical exams for certain eligible Employees; and financial planning services for certain eligible Employees. The Debtors also provide cell phone devices and plans to approximately 540 Employees, which are managed by Ovation Wireless Management.

54. Certain Other Health and Welfare Benefits are sponsored by the Debtors, but paid for by participating Employees including: a "cycle-to-work" program, identity theft protection, critical illness insurance, auto and home insurance, pet insurance, and commuter and parking benefits.

55. The Debtors incur a monthly average of approximately $12,000 in the aggregate on account of the Other Health and Welfare Benefits, including approximately $7,000 on account of the Debtor-provided cell phone devices and plans. As of the Petition Date, the Debtors have estimated and accrued a total liability of $12,000 in respect of Other Health and Welfare Benefits, all of which will become due and owing during the Interim Period. The Other Health and Welfare Benefits are important to the livelihood, morale, and well-being of the Debtors' Employees, and therefore the continuation of such Other Health and Welfare Benefits is critical to maintain stability in the Debtors' workforce throughout the pendency of these chapter 11 cases.

**III. Workers' Compensation Program.**

56. The Debtors maintain workers' compensation insurance for their U.S. Employees and similar insurance for their non-U.S. Employees (collectively, the "Workers' Compensation Program") with Hartford Financial Services Group in the U.S. and American International Group, Inc. in foreign jurisdictions. The Workers' Compensation Program is a "guaranteed cost"

insurance program with no deductible or direct Debtor liability for any claims under the Workers' Compensation Program (collectively "Workers' Compensation Claims").[18]

57. State laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in certain states. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases. As of the Petition Date, there is one open claim under the Workers' Compensation Claim; however, the Debtors do not ultimately have any liability with respect to such Workers' Compensation Claim because the Workers' Compensation Program is a "guaranteed cost" insurance program, as described above.

58. On average, the Debtors annually pay approximately $150,000 in plan premium payments for the Workers' Compensation Program. While the Debtors do not anticipate that any plan premium payments will become due and owing during the Interim Period, the Debtors seek authorization, but not direction, to continue to pay plan premium payment amounts due towards the Workers' Compensation Program and to continue this program in the ordinary course of business on a postpetition basis.[19,] Furthermore, the Debtors seek authority to modify the automatic stay with regards to the Workers' Compensation Claims as described herein.

[18] The Debtors have also sought relief to pay premium payments in respect of the Workers' Compensation Program in the Insurance & Surety Bond Motion. To the extent not granted in the Insurance & Surety Bond Motion, the Debtors seek authorization, but not direction, to continue to pay premium payments in the ordinary course of business in respect of the Workers' Compensation Program.

[19] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this Motion, the Debtors request authorization to continue the Workers' Compensation Program postpetition, including making any changes to current policies and practices that become necessary.

**IV. Retirement Programs.**

59. The Debtors provide current and former Employees with certain retirement benefits. The following provides a brief description of the various retirement benefits the Debtors make available to such current and former Employees.

**A. 401(k) Plan.**

60. As of the Petition Date, the Debtors maintain a retirement savings plan for the benefit of their full-time U.S. Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is administered by T. Rowe Price and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set forth in the Internal Revenue Code.

61. The Debtors make annual fixed, matching and, performance-based contributions to the 401(k) Plan. The Debtors make a fixed contribution of 2% of all eligible Employees' annual pay into the 401(k) Plan if the Employee is employed on December 31 of that year. Additionally, the Debtors may make contributions up to 5% of an eligible Employee's annual pay based on Employee contributions to the 401(k) Plan. Finally, the Debtors may also contribute up to an additional 4% of an eligible Employee's annual pay as a performance-based contribution, subject to the achievement of certain annual performance metrics. In addition to contributions, the Debtors make loans to eligible Employees upon requests against their 401(k) Plan accounts, which are offset against future 401(k) Plan contributions. The Debtors' contributions to the 401(k) Plan, and any loans made to Employees in connection with the 401(k) Plan, are subject in all cases to the restrictions set forth in the Internal Revenue Code and the Employee Retirement Income Security Act.

62. As of the Petition Date, the Debtors have estimated and accrued a total liability of $1,020,000 in respect of 401(k) Plan contributions, approximately $10,000 of which will become

due and owing during the Interim Period. The Debtors seek authorization, but not direction, to continue to satisfy amounts incurred on account of the 401(k) Plan (including any prepetition amounts that may be outstanding) in the ordinary course of business on a postpetition basis.

**B. Supplemental Retirement Plan (Final Order Only).**

63. As of the Petition Date, Debtor Intelsat US LLC ("Intelsat US") maintains a nonqualified deferred compensation plan (the "Supplemental Retirement Plan") covering approximately 15 Employees. The Debtors make annual contributions to the Supplemental Retirement Plan on behalf of eligible Employees to make whole such Employees for contributions the Debtors would have made to the 401(k) Plan on behalf of such Employees, but for Internal Revenue Code contribution limits restricting the Debtors from doing so. As of the Petition Date, the value of the Debtors' contributions to the Supplemental Retirement Plan is approximately $525,000. Funds in the Supplemental Retirement Plan are held in an investment account, which funds are payable to the Employees within 90 days following their death or separation from the Debtors' employment.

64. The Employees participating in the Supplemental Retirement Plan are critical to the Debtors' continued financial and operational success. Intelsat US's failure to honor its Supplemental Retirement Plan obligations could result in a severe strain on the Debtors' relationship with such Employees and may jeopardize the Debtors' ability to conduct business as usual during these chapter 11 cases. Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation to generate growth and to be positioned for long term success.

65. By this Motion, the Debtors seek authorization, but not direction, to remit all outstanding prepetition amounts incurred on account of the Supplemental Retirement Plan and request authorization to continue making contributions to the Supplemental Retirement Plan,

solely upon entry of the Final Order, on a postpetition basis in the ordinary course of business consistent with their prepetition practices.

**C. Staff Retirement Plan.**

66. As of the Petition Date, the Debtors maintain a legacy noncontributory qualified defined benefit retirement plan covering approximately 780 Employees and former Employees, which includes substantially all of the Company's Employees hired prior to July 19, 2001 (the "Staff Retirement Plan"). The Staff Retirement Plan was frozen to new entrants in July 2001 and, in the first quarter of 2015, was amended to cease the accrual of additional benefits for the remaining active participants, effective March 31, 2015. Of the Staff Retirement Plan participants, approximately 140 are current Employees, approximately 105 are former Employees with deferred benefits and approximately 545 are former Employees with immediate benefits. Among the active participants, the average monthly accrued benefit is approximately $3,060. Among the inactive participants with deferred benefits, the average monthly benefit is approximately $1,350. Among the inactive participants with immediate benefits, the average monthly benefit is approximately $3,870. The Staff Retirement Plan is partially funded by assets held in a trust established for the benefit of eligible participants. Taking into account such assets, as of the Petition Date, the Debtors estimate that they have a net liability in respect of the Staff Retirement Plan of approximately $75 million, which amount represents an actuarial estimate of the total benefits payable to eligible participants over the life of the plan. The Debtors' aggregate annual obligation in respect of a contribution to plan assets for 2020 is projected to be between $4 million and $5 million, of which the Debtors estimate approximately $420,000 will become due and owing during the Interim Period.

67. The Staff Retirement Plan covers many of the Company's most critical and vital operational Employees, including many of its satellite engineers. Stability in this portion of the

Debtors' workforce is particularly crucial to their financial and operational success throughout the pendency of these chapter 11 cases, especially given the role such Employees have in the Debtors' efforts to clear the C-band spectrum. Moreover, the Debtors understand that they may be required by applicable employment and labor law to continue honoring obligations under the Staff Retirement Plan and, further, that these benefits could arguably be considered "retiree benefits" under section 1114 of the Bankruptcy Code that cannot be terminated absent separate court authority.[20]

68. By this Motion, the Debtors seek authorization, but not direction, to continue to satisfy amounts incurred on account of the Staff Retirement Plan (including any prepetition amounts that may be outstanding) in the ordinary course of business on a postpetition basis. For the avoidance of doubt, the Debtors will not seek to pay any outstanding amounts incurred on account of the Staff Retirement Plan in advance of the date they come due.

**D. Restoration Plan (Final Order Only).**

69. As of the Petition Date, the Debtors maintain a legacy noncontributory, nonqualified defined benefit retirement plan (the "Restoration Plan") covering approximately 30 former Employees whose participation in the Staff Retirement Plan was restricted due to Internal Revenue Code compensation limits. The Restoration Plan provides for certain defined benefits intended to restore the benefits such Employees would have received under the Staff Retirement Plan, but for such Internal Revenue Code compensation limits. As of the Petition Date, the Debtors estimate they have a total liability in respect of Restoration Plan benefits of approximately $8.3 million, which amount represents an actuarial estimate of the total benefits

---

[20] The Debtors expressly reserve their right to contest any claim that any benefits provided under the Staff Retirement Plan constitute "retiree benefits" under section 1114 of the Bankruptcy Code.

payable to eligible participants over the life of the plan. The Restoration Plan is partially funded by assets held in a "rabbi" trust established for the benefit of the Restoration Plan participants and administered by SEI Private Trust Company, which are valued as of the Petition Date at approximately $3.7 million.

70. By this Motion, the Debtors seek authorization, but not direction, to continue the Restoration Plan, solely upon entry of the Final Order, on a postpetition basis in the ordinary course of business consistent with their prepetition practices.[21] For the avoidance of doubt, the Debtors will not seek to pay any outstanding amounts incurred on account of the Restoration Plan in advance of the date they come due.

**E. Foreign Retirement Plans.**

71. As of the Petition Date, the Debtors maintain retirement plans covering all of the Debtors' approximately 50 Employees in the United Kingdom (the "U.K. Retirement Plan"). Under the U.K. Retirement Plan the Debtors contribute a minimum of 6% of each participating Employees' annual pay to the plan. Participating Employees may make voluntary contributions, which are matched by the Debtors up to an amount equal to 3% of such Employees' annual pay. As of the Petition Date, the Debtors have estimated and accrued approximately $10,000 on account of the U.K. Retirement Plan, all of which is expected to become due and owing during the Interim Period. The Debtors also provide an annual non-qualified pension payment, which is annually adjusted for cost of living, to one retired former Employee in the United Kingdom (the "U.K. Individual Plan"). The U.K. Individual Plan payment has already been made for 2020 in the amount of approximately $56,000. As of the Petition Date, the Debtors estimate that that they

[21] For the avoidance of doubt, the Debtors will not pay any amounts that may come due during the Interim Period pending further order of the Court.

have an aggregate liability in respect of the U.K. Individual Plan of approximately $380,000, which amount represents an actuarial estimate of the total benefits payable to the covered individual over the life of the plan. The Debtors seek authorization, but not direction, to continue to satisfy amounts incurred on account of the U.K. Retirement Plan and the U.K. Individual Plan (including any prepetition amounts that may be outstanding) in the ordinary course of business on a postpetition basis.

**F. Retiree Health Coverage.**

72. As of the Petition Date, the Debtors maintain certain retirement health plans for the benefit of their retired former Employees to provide continued access to Health and Welfare Coverage and Benefits (collectively, the "Retiree Medical Plans"). As of July 2001, the Retiree Medical Plans were closed to new entrants. Certain benefits under the Retiree Medical Plans are provided under plan documents adopted by the Debtors, and the remaining benefits under the Retiree Medical Plans are provided pursuant to a consent decree resulting from a settlement reached by the Debtors and certain retired former Employees receiving benefits under the Retiree Medical Plans. The benefits provided under both schemes are the same, but the benefits provided under plan documents may be terminated, amended or modified at the Debtors' discretion. Benefits under the Retiree Medical Plans for retired former Employees and their dependents who are ineligible for Medicare include a choice of UnitedHealthcare "preferred provider organization" and "exclusive provider organization" plans, which include dental, vision and prescription drug benefits. The Retiree Medical Plans for retired former Employees and their dependents who are eligible for Medicare is provided through a private market exchange offering benefit plans for which Debtors provide an annual health retirement plan contribution. Certain supplemental benefits are provided to retired former Employees covered by the consent decree.

73. The Debtors also directly reimburse three former Employees who are covered by the Company's Retiree Medical Plans for additional amounts in respect of such Employees' Medicare Part B costs and reimburse two other former Employees for claims not covered by dental insurance. These amounts are paid regularly as the former Employees submit claims for reimbursement and are *de minimis* in the aggregate.

74. The Retiree Medical Plans cover approximately 330 retired former Employees, 260 of such retired former Employees' spouses and children, and approximately 25 current Employees employed prior to July 2001 whose benefits will begin upon retirement from the Debtors' employment. 490 current and retired former Employees and their dependents, in the aggregate, are subject to the terms of the consent decree. As of the Petition Date, the Debtors estimate that that they have an aggregate liability in respect of the Retiree Medical Plans of approximately $39.8 million, which amount represents an actuarial estimate of the total benefits payable to eligible participants over the life of the plans. The Debtors estimate that a total of approximately $2.8 million may be due to plan participants in 2020, of which the Debtors estimate approximately $80,000 will become due and owing during the Interim Period.

75. The Debtors understand that they may be required by applicable employment and labor law to continue honoring Retiree Medical Plans obligations and, further, that certain of these benefits could arguably be considered "retiree benefits" under section 1114 of the Bankruptcy Code that cannot be terminated absent separate court authority.[22] The Debtors seek authorization, but not direction to continue to pay amounts incurred on account of Retiree Medical Plans and to continue these programs in the ordinary course of business on a postpetition basis.

---

[22] The Debtors expressly reserve their right to contest any claim that any benefits provided under the Retiree Medical Plans constitute "retiree benefits" under section 1114 of the Bankruptcy Code.

**V. Severance Obligations.**

76. The Debtors maintain a severance policy, which provides for a one-time payment at termination (each a "Severance Payment"), depending on the Employee's tenure, for certain Employees in the United States (the "U.S. Severance Policy"). As of the Petition Date, the Debtors estimate they owe approximately $12,000 in respect of a Severance Payment to one employee, all of which will become due and owing during the Interim Period. The Debtors seek authorization, but not direction, to continue the U.S. Severance Policy on a postpetition basis in the ordinary course of business consistent with their prepetition practices and honor their prepetition obligation to one former Employee. For the avoidance of doubt, the Debtors do not request authorization to continue the U.S. Severance Policy with regard to any Insiders.

**VI. Wage, Benefit, and Employee Management Service Providers.**

77. The Debtors work with several firms that handle human resources-related administrative functions, including payroll processing, withholding, remittance, reporting of payroll taxes (including the Employer Payroll Taxes) for the Employees, and the administration of their benefits and retirement plans and programs including claims processing and tax reporting (collectively, the "Wage and Benefit Service Providers"). The Debtors also work with several providers that provide, among other functions, employee management, timekeeping, workforce evaluation and data analytics, background checks, employee training, and recordkeeping systems and services (collectively, the "Employee Management Service Providers," and together with the Wage and Benefit Service Providers, the "Employee Administration Service Providers").

78. These relationships with the Employee Administration Service Providers allow the Debtors to realize substantial cost savings with respect to the administration of their employee payroll and benefits by not having to employ additional human resources professionals and administer payroll and benefit programs internationally, and allow the Debtors to offer better and

broader benefits to their Employees at significantly reduced rates relative to the costs of participating in those programs without third-party intermediaries like the Employee Administration Service Providers. The use of the Employee Administration Service Providers allows the Debtors' human resource professionals to manage a large, global workforce in an efficient and cost-effective manner, and the inability to use the systems and services provided by the Employee Administration Service Providers would significantly impair such professionals to perform their normal duties.

79. As of the Petition Date, the Debtors estimate they owe approximately $160,000 in the aggregate to the Employee Administration Service Providers, all of which will become due and owing during the Interim Period. The Debtors intend to continue to use the Employee Administration Service Providers during these chapter 11 cases and seek authorization, but not direction, to pay all outstanding prepetition amounts due to the Employee Administration Service Providers, to continue to make all payments in the ordinary course of business on a postpetition basis, and to continue their practice of evaluating and engaging or terminating Employee Administration Service Providers, as the case may be, in the ordinary course of business on a postpetition basis.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

#### A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.

80. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle much of the Employee Compensation and Benefits to priority treatment, to the extent such payments do not exceed $13,650 for each individual as provided for under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code. As priority claims, the Debtors are required to pay these claims in full to

confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). To the extent that an Employee receives no more than $13,650 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. Although an Employee may receive more than $13,650 on account of certain Employee Compensation and Benefits, the Debtors submit that satisfaction of their full obligations is warranted under section 363(b)(1) of the Bankruptcy Code and the doctrine of necessity as set forth below.

81. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties and reduces the risk of Employee attrition that would inevitably result if payment were to cease. As noted above and in the First Day Declaration, this is a transformative moment in the Debtors' corporate life, and the continuation, dedication, and hard work of their Employees is vital to accomplish a financial restructuring and clearance of the C-band for the deployment of nation-wide 5G coverage. In the current environment, maintaining and motivating the Debtors' Employee workforce is vital. Furthermore, finding, attracting, and training new qualified talent would be extremely difficult and would create significant disruption to the detriment of the Debtors and their estates.

**B. Payment of Certain Employee Compensation and Benefits Is Required by Law.**

82. The Debtors seek authorization to pay the Withholding and Deduction Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the

Employees' paychecks. Indeed, certain Withholding and Deduction Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding and Deduction Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding and Deduction Obligations on account of the Employees to the proper parties in the ordinary course of business. *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998).

83. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in certain states. Payment of all Workers' Compensation Program amounts due is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring. The Debtors therefore request that the Court authorize the Debtors to maintain the Workers' Compensation Program.

## II. Payment of the Employee Compensation and Benefits Is Warranted Under Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

84. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's

going-concern value. *See, e.g.*, *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105(a)] the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

85. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales.") (citing *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (collecting cases); *see also Armstrong World*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)).

86. Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See Just for Feet*, 242 B.R. at 825−26.

87. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g.*, *In re United Am., Inc.*, 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (acknowledging the doctrine of necessity "is a necessary deviation because otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its pre-petition claim"); *Ionosphere Clubs*, 98 B.R. at 176 (noting that the necessity of payment rule recognizes the judicial power to authorize a debtor to pay prepetition claims where such payment would be essential to the continued operation of the debtor's business); *In re Lehigh & New England Ry. Co.*, 657 F.2d 570 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)). Indeed, at least one court has recognized that there are instances when a debtor's fiduciary

duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ*, 273 B.R. at 497.

88. These standards are satisfied here. The Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003. Paying prepetition compensation, benefits, and similar items to Employees and Independent Contractors will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption.

89. The majority of Employees and Independent Contractors rely exclusively on the Employee Compensation and Benefits to satisfy their daily living expenses. Consequently, Employees and Independent Contractors will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations related thereto. Moreover, failure to satisfy such obligations will jeopardize morale and loyalty at a time when Employee and Independent Contractors support is critical to the Debtors' business. Furthermore, if this Court does not authorize the Debtors to honor their various obligations under the benefit and insurance programs described herein, Employees will not receive health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied. The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency. This is especially the case during a global health pandemic as caused by the COVID-19 virus.

90. Additionally, the Debtors believe that without the relief requested herein, Employees or Independent Contractors may seek alternative employment opportunities, perhaps

with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their business. The loss of valuable Employees and Independent Contractors and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wages, benefits, and related obligations, including the prepetition Employee Compensation and Benefits.

91. The importance of a debtor's employees to its operations has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein. *See, e.g.*, *In re Chinos Holdings, Inc.*, No. 20-32181 (KLP) (Bankr. E.D. Va. May 5, 2020) (authorizing payments of wages and certain employee benefits on an interim basis); *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. Mar. 13, 2020) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); *In re LeClair Ryan, PLLC*, No. 19-34574 (Bankr. E.D. Va. Oct. 25, 2019); *In re Gymboree Group Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. Feb. 21, 2019) (same); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017) (same); *In re Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017) (same); *In re Penn Virginia Corporation,* No. 16-32395 (KLP) (Bankr. E.D. Va. June 9, 2016) (same).[23] Accordingly, the Debtors respectfully request that the Court authorize, but not direct, the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee

[23] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Compensation and Benefits and to continue the Employee Compensation and Benefits on a postpetition basis in the ordinary course of business consistent with past practices.

## III. Continuation of the Additional Compensation Obligations Is Justified by the Facts and Circumstances of these Chapter 11 Cases.

92. Section 503(c)(3) of the Bankruptcy Code generally prohibits certain transfers made outside of the ordinary course to officers, managers, consultants, and others that are not justified by the facts and circumstances of the case. See 11 U.S.C. § 503(c)(3). Importantly, section 503(c)(3)'s "facts and circumstances" justification test "creates a standard no different than the business judgment standard under section 363(b) of the Bankruptcy Code." *In re Borders Grp., Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) (citations omitted); *see In re Nobex Corp.*, No. 05-20050 (MFW), 2006 WL 4063024, at *3 (Bankr. D. Del. Jan. 19, 2006) (concluding that the standard under section 503(c)(3) reiterates the business judgment standard).

93. The Debtors respectfully submit that none of the Additional Compensation Obligations constitute transfers outside of the ordinary course of business. In any case, continuation of the Additional Compensation Obligations is justified by the facts and circumstances of these cases. The Debtors' Employees are vital to their efforts to implement their financial restructuring through these chapter 11 cases while simultaneously implementing the extremely complex and technically challenging effort to clear the C-band for the deployment of nation-wide 5G coverage, all in the face of the global COVID-19 pandemic. Disruption in the Additional Compensation Obligations would negatively impact the Company's ability to preserve and maximize value for the benefit of stakeholders. Because implementation and continuation of the Additional Compensation Obligations would likely mitigate disruption in the Debtors' workforce, such programs are justified by the facts and circumstances of these chapter 11 cases and are a sound exercise of the Debtors' business judgment. *See, e.g., In re Mesa Air Grp., Inc.*,

No. 10-10018 (MG), 2010 WL 3810899, *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (holding that bonus payments are "'justified by the facts and circumstances of the case' under section 503(c)(3) [where] they are within the 'sound business judgment' of the Debtors") (citation omitted).

**IV. Section 503(c)(1) of the Bankruptcy Code Is Inapplicable to the Sales Incentive Plan, Retention Plans and the U.S. Severance Policy.**

94. Section 503(c)(1) of the Bankruptcy Code generally restricts payments to "insiders" made for the sole or primary purpose of inducing the "insider" to remain with a Debtor's business, unless certain statutory requirements are met. 11 U.S.C. § 503(c)(1). Section 101(31) of the Bankruptcy Code provides that where a debtor is a corporation, insiders include any "(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor . . . or [iv] relative of a . . . director, officer or person in control of the debtor." 11 U.S.C. § 101(31)(B). By its terms, section 503(c)(1) does not apply where, as here, employees in a retention-based program are not Insiders. *See, e.g.*, *Global Home*, 369 B.R. at 784 (noting that section 503(c)(1) only applies "if a bankruptcy court is asked to authorize payments to insiders for the purpose of inducing insiders to remain in a debtor's employ"). And, as a general matter, the Bankruptcy Code's distinction between "insiders" and "non-insiders" is intended to draw a line between those individuals who exercise control over corporate activities and corporate policy, and those that do not.

95. Certain of the Employees participating in the Sales Incentive Plan and Retention Plans and covered by the U.S. Severance Policy have job titles identifying such individuals as "director" or "vice president." The Debtors respectfully submit that such titles are not dispositive of those individuals' substantive role in the Debtors' organization and that such titles do not cause section 503(c)(1) to apply here. *See In re Foothills Texas, Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009) ("[T]he mere title of a person does not end the inquiry."). In determining whether a particular employee is an "insider," courts consider not only an employee's job title but also the

employee's role with the debtor. *See, e.g.*, *In re Global Aviation Holdings, Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) ("[T]itles such as 'vice president' are not determinative."); *Borders Group*, 453 B.R. at 468–69 (holding that an individual's title, by itself, is insufficient to establish insider status under section 101(31) of the Bankruptcy Code (citing *In re Longview Aluminum, LLC*, 419 B.R. 351, 355 (Bankr. N.D. Ill. 2009) ("[I]t is not simply the title 'director' or 'officer' that renders an individual an insider; rather, it is the set of legal rights that a typical corporate director or officer holds."); *NMI Sys. v. Pillard (In re NMI Sys.,)*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995))). Thus, a particular job title might create the presumption that an individual is an "insider" under section 101(31) of the Bankruptcy Code, but this presumption may be rebutted by a showing that the individual in question does not exercise material levels of management control over a debtor or its operations as a whole. *Cf. Foothills Texas*, 408 B.R. at 583.

96. This analysis focuses on, among other things, whether the employee at issue has the authority to implement company policy or whether the employee reports directly to a company's board of directors, *see Borders Group*, 453 B.R. at 469, such that there is a plausible concern that the employee could have gained an "unfair advantage" by virtue of their position, *see Foothills Texas*, 408 B.R. at 583. In short, the determination as to whether any particular employee is an "insider" requires an analysis as to whether the individual in question "is taking part in the management of the debtor." *Id.* at 579.

97. No Employee participating in the Sales Incentive Plan or Retention Plans or covered by the U.S. Severance Policy as of the Petition Date is a current "insider" by this measure. More specifically, no Employee: (a) controls or directs the operations of any of the Debtors, *see NMI Systems*, 179 B.R. at 370 ("[Employee] was still in charge of a unit of [a] division . . . . But [the employee's] position was not one in the inner circle making the company's critical []

decisions."); (b) has executive oversight authority for the Debtors' operations as a whole, *see Global Aviation*, 478 B.R. at 148 ("[A] vice president was not an insider because he was conferred the title 'for purposes of marketing' only . . . ."); (c) has broad responsibilities over a large portion of the Debtors' business, *cf. Foothills Texas*, 408 B.R. at 584 ("Given their broad responsibilities over significant aspects of the Debtors' business as well as the fact that they report directly to the Debtors' President, both men are clearly participating in the management of the Debtors."); or (e) has direct input into the governance or direction of the Debtors' operations or a material component of their assets, *cf. In re Kunz*, 489 F.3d 1072, 1077 (10th Cir. 2007) ("[A]s it is used in the statutory definition of 'insider,' the term plainly means a person who is a member of the governing board of the corporation and participates in corporate governance.").

98. In sum, the Employees participating in the Sales Incentive Plan and Retention Plans, and covered by the U.S. Severance Policy, although critical to the Debtors' operations, do not have the type of broad responsibility or control to make strategic decisions, set company policy, or develop employee compensation. Accordingly, section 503(c)(1) of the Bankruptcy Code does not apply to these programs.

## V. The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers' Compensation Claims.

99. Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

100. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit Employees to proceed with their Workers' Compensation Claims in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in certain states. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

101. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor-in-possession financing, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks, ACH, or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks, ACH, or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, ACH, or wire transfer requests in respect of the relief requested in this Motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

102. Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." The Debtors believe an orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested would disrupt the Debtors' operations

and cause irreparable harm. The Employees and Independent Contractors would suffer significant hardship and may immediately seek alternative employment opportunities if the relief requested herein is delayed, irreparably jeopardizing the viability of the Debtors' ongoing operations. Further, failure to receive the requested relief at the outset of these chapter 11 cases would disrupt the "business as usual" message that is critical to the Debtors' ability to stabilize their operations and maintain Employee and Independent Contractors confidence during this process. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

103. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Waiver of Memorandum of Points and Authorities**

104. The Debtors respectfully request that this Court treat this Motion as a written memorandum of points and authorities or waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

**Reservation of Rights**

105. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant

to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) an implication or admission that any benefits described in this Motion are "retiree benefits" under section 1114 of the Bankruptcy Code; or (h) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

106. The Debtors will provide notice of this Motion via first class mail, facsimile or email (where available) to: (a) the Office of the United States Trustee for the Eastern District of Virginia, Attn: Kenneth N. Whitehurst III, B. Webb King, Shannon F. Pecoraro, and Kathryn R. Montgomery; (b) the holders of the 40 largest unsecured claims against the Debtors (on a consolidated basis); (c) the notes trustee for the Intelsat S.A. Senior Convertible Notes and counsel thereto; (d) the notes trustee for the Intelsat Luxembourg 7.75% Senior Notes and counsel thereto; (e) the notes trustee for the Intelsat Luxembourg 8.125% Senior Notes and counsel thereto; (f) the notes trustee for the Intelsat Luxembourg 12.5% Senior Notes and counsel thereto; (g) the notes trustee for the Intelsat Connect Finance 9.5% Senior Notes and counsel thereto; (h) the notes trustee for the Intelsat Jackson 9.5% Senior Notes and counsel thereto; (i) the notes trustee for the Intelsat Jackson 8% Senior Notes and counsel thereto; (j) the notes trustee for the Intelsat Jackson 5.5% Senior Notes and counsel thereto; (k) the notes trustee for the Intelsat Jackson 9.75% Senior Notes and counsel thereto; (l) the notes trustee for the Intelsat Jackson 8.5% Senior Notes and counsel thereto; (m) the administrative agent and collateral trustee for the Intelsat Jackson credit agreement and counsel thereto; (n) Akin Gump Strauss Hauer & Feld LLP as counsel to an ad hoc

group of certain holders of the Debtors' secured term loan and secured notes (the "Intelsat Jackson Ad Hoc Group"); (o) Jones Day as counsel to an ad hoc group of term loan lenders and noteholders; (p) Brown Rudnick, LLP as counsel to an ad hoc group of noteholders; (q) Paul, Weiss, Rifkind, Wharton & Garrison LLP and Loyens & Loeff Luxembourg Sarl as counsel to a noteholder; (r) Orrick, Herrington & Sutcliffe LLP as counsel to an ad hoc group of noteholders; (s) the United States Attorney's Office for the Eastern District of Virginia; (t) the National Association of Attorneys General; (u) the Internal Revenue Service; (v) the offices of the attorneys general for the states in which the Debtors operate; (w) the Securities and Exchange Commission; (x) the Federal Communications Commission; (y) the Pension Benefit Guaranty Corporation; and (z) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

107. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Richmond, Virginia
Dated: May 14, 2020

*<u>/s/ Michael S. Condyles</u>*
**LOCAL COUNSEL**
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
Email: Michael.Condyles@KutakRock.com
Peter.Barrett@KutakRock.com
Jeremy.Williams@KutakRock.com
Brian.Richardson@KutakRock.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C. (*pro hac vice* pending)
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: edward.sassower@kirkland.com
steven.serajeddini@kirkland.com
anthony.grossi@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

# Exhibit A

**Proposed Interim Order**

Edward O. Sassower, P.C. (*pro hac vice* pending)
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| INTELSAT S.A., *et al.*,[1] | ) | Case No. 20-32299 (KLP) |
| Debtors. | ) | (Joint Administration Requested) |

**INTERIM ORDER**
**(A) AUTHORIZING THE DEBTORS TO**
**(I) PAY PREPETITION WAGES, COMPENSATION, AND BENEFIT OBLIGATIONS AND (II) CONTINUE EMPLOYEE COMPENSATION AND BENEFITS PROGRAMS AND (B) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order") (a) authorizing, but not directing, the Debtors to (i) to pay and honor prepetition claims on a postpetition basis, as applicable, relating to the Employee Compensation and Benefits; (ii) continue to honor their obligations on account of the Employee Compensation and Benefits, including payment of

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/intelsat. The location of the Debtors' service address is: 7900 Tysons One Place, McLean, VA 22102.

[2] Capitalized terms used in this Interim Order but not immediately defined have the meanings given to them in the Motion.

employee compensation and benefits in the ordinary course of business postpetition; (b) granting related relief; and (c) scheduling a final hearing to consider approval of the Motion on a final basis; all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984, and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth in this Interim Order.

2. The final hearing (the "Final Hearing") on the Motion shall be held on _________, 2020, at__:__ _.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _________, 2020. In the event no objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3. The Debtors are authorized, but not directed, on an interim basis, to: (a) continue to administer the Employee Compensation and Benefits currently in effect and honor any undisputed prepetition obligations related thereto, in each case in the ordinary course of business consistent with their prepetition practices and (b) continue, modify, replace, or terminate the Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

4. Pending entry of the Final Order, the Debtors shall not pay or honor, and nothing herein shall be deemed to authorize the payment of any prepetition Wages that exceed the priority amounts set forth in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, except upon further order of this Court.

5. The Debtors shall not pay or honor, and nothing herein shall be deemed to authorize the payment of any amounts pursuant to any of the Debtors' Retention Plans, the Supplemental Retirement Plan, or the Restoration Plan, pending further order of the Court.

6. Nothing herein shall be deemed to authorize the payment of any amounts in satisfaction of bonus or severance obligations which may implicate or be subject to section 503(c) of the Bankruptcy Code; *provided* that nothing in this Interim Order shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

7. The Debtors are authorized to continue the programs associated with the Reimbursable Expenses, including with respect to the Employee-Pay Card Programs, on a prepetition and postpetition basis, subject to the limitations of this Interim Order and any interim and final order(s) of this Court granting the Cash Management Motion.

8. Pursuant to section 362(d) of the Bankruptcy Code, (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program, and the Debtors are authorized to pay all undisputed prepetition amounts relating thereto in the ordinary course of business and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program, and any such claims must be pursued in accordance with the applicable Workers' Compensation Program. Payment on account of any recoveries obtained in connection with a claim brought pursuant to this paragraph is limited to the terms and conditions of the applicable Workers' Compensation Program, including with regard to any policy limits or caps.

9. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

10. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order.

11. Nothing in this Interim Order authorizes the Debtors to accelerate any payments not otherwise due prior to the date of the Final Hearing.

12. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (g) an implication or admission that any benefits described in this Motion are "retiree benefits" under section 1114 of the Bankruptcy Code; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

13. Notwithstanding the relief granted herein or any action taken hereunder, nothing contained in this Interim Order shall create any rights in favor of or enhance the status of any claim held by any party in interest.

14. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

15. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

16. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

17. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

18. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

19. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: ___________, 2020
Richmond, Virginia

________________________________________
United States Bankruptcy Judge

WE ASK FOR THIS:

/s/ *Michael S. Condyles*
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
Michael A. Condyles (VA 27807)

- and -

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Steven N. Serajeddini, P.C. (*pro hac vice* admission pending)
Anthony R. Grossi (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT**
**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Michael S. Condyles*

# **Exhibit B**

**Proposed Final Order**

Edward O. Sassower, P.C. (*pro hac vice* pending)
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
Anthony R. Grossi (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| INTELSAT S.A., *et al.*,[1] | ) | Case No. 20-32299 (KLP) |
| Debtors. | ) | (Jointly Administered) |

**FINAL ORDER
(A) AUTHORIZING THE DEBTORS TO
(I) PAY PREPETITION WAGES, COMPENSATION, AND BENEFIT
OBLIGATIONS AND (II) CONTINUE EMPLOYEE COMPENSATION
AND BENEFITS PROGRAMS AND (B) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order") (a) authorizing, but not directing, the Debtors to (i) to pay and honor prepetition claims on a postpetition basis, as applicable, relating to the Employee Compensation and Benefits; (ii) continue to honor their obligations on account of the Employee Compensation and Benefits, including payment of

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/intelsat. The location of the Debtors' service address is: 7900 Tysons One Place, McLean, VA 22102.

[2] Capitalized terms used in this Final Order but not immediately defined have the meanings given to them in the Motion.

employee compensation and benefits in the ordinary course of business postpetition; (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984, and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth in this Final Order.

2. The Debtors are authorized, but not directed, on a final basis, to: (a) continue to administer the Employee Compensation and Benefits currently in effect and honor any undisputed prepetition obligations related thereto, in each case in the ordinary course of business consistent with their prepetition practices and (b) continue, modify, replace, or terminate the Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary

course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

3. Nothing herein shall be deemed to authorize the payment of any amounts in satisfaction of bonus or severance obligations, or which may implicate or be subject to section 503(c) of the Bankruptcy Code; *provided* that nothing in this Final Order shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

4. The Debtors are authorized to continue the programs associated with the Reimbursable Expenses, including with respect to the Employee-Pay Card Programs, on a prepetition and postpetition basis, subject to the limitations of this Final Order and any final order(s) of this Court granting the Cash Management Motion.

5. Pursuant to section 362(d) of the Bankruptcy Code, (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program, and the Debtors are authorized to pay all undisputed prepetition amounts relating thereto in the ordinary course of business and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program and any such claims must be pursued in accordance with the applicable Workers' Compensation Program. Payment on account of any recoveries obtained in connection with a claim brought pursuant to this paragraph is limited to the terms and conditions of the applicable Workers' Compensation Program, including with regard to any policy limits or caps.

6. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored

as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

7. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order.

8. Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (g) an implication or admission that any benefits described in this Motion are "retiree benefits" under section 1114 of the Bankruptcy Code; or (h) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

9. Notwithstanding the relief granted herein or any action taken hereunder, nothing contained in this Final Order shall create any rights in favor of or enhance the status of any claim held by any party in interest.

10. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

11. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

12. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

13. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

14. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

15. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

Dated: ___________, 2020
Richmond, Virginia

________________________________________
United States Bankruptcy Judge

WE ASK FOR THIS:

/s/ *Michael S. Condyles*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

- and -

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Steven N. Serajedinni, P.C. (*pro hac vice* admission pending)
Anthony R. Grossi (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT**
**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Michael S. Condyles*