Edward O. Sassower, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

Michael A. Condyles  (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams  (VA 77469)
Brian H. Richardson (VA 92477)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:    (804) 644-1700
Facsimile:    (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INTELSAT S.A., *et al.*,[1] | ) | Case No. 20-32299 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF**
**SECOND AMENDED DISCLOSURE STATEMENT**
**FOR THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF INTELSAT S.A. AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE THAT** on February 12, 2021, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Disclosure Statement for the Joint Chapter 11 Plan of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 1468] (the "Original Disclosure Statement").

**PLEASE TAKE NOTICE THAT** on August 24, 2021, the Debtors filed the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 2693] (the "Amended Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file the *Second Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Intelsat S.A. and*

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/intelsat. The location of the Debtors' service address is: 7900 Tysons One Place, McLean, VA 22102.

*Its Debtor Affiliates* (the "Second Amended Disclosure Statement"),[2] attached hereto as **Exhibit A**.

PLEASE TAKE FURTHER NOTICE THAT a comparison of the Second Amended Disclosure Statement to the Amended Disclosure Statement is attached hereto as **Exhibit B**.

PLEASE TAKE FURTHER NOTICE THAT the Debtors have filed their *Second Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* (the "Second Amended Plan") and their amended form of order with respect to the motion[3] approving the Second Amended Disclosure Statement (the "Second Amended Disclosure Statement Order") contemporaneously herewith.

PLEASE TAKE FURTHER NOTICE THAT the Debtors will seek entry of the Second Amended Disclosure Statement Order, including with respect to approval of the Second Amended Disclosure Statement, on **September 1, 2021 at 11:00 a.m. (prevailing Eastern Time)** before the Honorable Keith L. Phillips, United States Bankruptcy Judge, United States Bankruptcy Court, 701 East Broad Street, Courtroom 5100, Richmond, Virginia 23219 (the "Disclosure Statement Hearing"). Unless ordered otherwise, the Disclosure Statement Hearing shall be conducted by remote video, as directed by the court. Additional information regarding procedures for hearings before the Court, including telephonic and/or videoconference hearings consistent with the Protocol in Response to Public Health Emergency, in light of the ongoing public response to COVID-19 is available by visiting the Court's website at: https://www.vaeb.uscourts.gov/.

PLEASE TAKE FURTHER NOTICE THAT copies of the pleadings filed in the above-captioned chapter 11 cases, including the Second Amended Disclosure Statement, the Second Amended Plan, and the Second Amended Disclosure Statement Order may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/intelsat. You may also obtain copies of any pleadings by visiting the Court's website at https://www.vaeb.uscourts.gov/ in accordance with the procedures and fees set forth therein.

[*Remainder of page intentionally left blank.*]

---

[2]    Capitalized terms not otherwise defined herein shall have the same meanings set forth in the Second Amended Disclosure Statement or the Second Amended Plan, as applicable.

[3]    On February 12, 2021, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation Procedures with Respect to Confirmation of the Debtors' Proposed Chapter 11 Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief* [Docket No. 1469] (the "Disclosure Statement Motion"), seeking to, among other things: (a) schedule dates and deadlines in connection with confirmation of a plan of reorganization and (b) establish certain protocols in connection those proceedings.

Richmond, Virginia
Dated: August 31, 2021

/s/ Brian H. Richardson

| | |
|---|---|
| **KUTAK ROCK LLP** | **KIRKLAND & ELLIS LLP** |
| Michael A. Condyles (VA 27807) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Peter J. Barrett (VA 46179) | Edward O. Sassower, P.C. (admitted *pro hac* vice) |
| Jeremy S. Williams (VA 77469) | Steven N. Serajeddini, P.C. (admitted *pro hac* vice) |
| Brian H. Richardson (VA 92477) | Aparna Yenamandra (admitted *pro hac* vice) |
| 901 East Byrd Street, Suite 1000 | 601 Lexington Avenue |
| Richmond, Virginia 23219-4071 | New York, New York 10022 |
| Telephone:     (804) 644-1700 | Telephone:    (212) 446-4800 |
| Facsimile:     (804) 783-6192 | Facsimile:    (212) 446-4900 |
| Email:     Michael.Condyles@KutakRock.com | Email:       Edward.Sassower@Kirkland.com |
|            Peter.Barrett@KutakRock.com |              Steven.Serajeddini@Kirkland.com |
|            Jeremy.Williams@KutakRock.com |              Aparna.Yenamandra@Kirkland.com |
|            Brian.Richardson@KutakRock.com | |

*Co-Counsel to the Debtors*
*and Debtors in Possession*

*Co-Counsel to the Debtors*
*and Debtors in Possession*

## EXHIBIT A

**Second Amended Disclosure Statement**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INTELSAT S.A., *et al.*,[1] | ) | Case No. 20-32299 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## SECOND AMENDED DISCLOSURE STATEMENT
## FOR THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF INTELSAT S.A. AND ITS DEBTOR AFFILIATES

| | |
|---|---|
| Edward O. Sassower, P.C. (admitted *pro hac vice*) | Michael A. Condyles (VA 27807) |
| Steven N. Serajeddini, P.C. (admitted *pro hac vice*) | Peter J. Barrett (VA 46179) |
| Aparna Yenamandra (admitted *pro hac vice*) | Jeremy S. Williams (VA 77469) |
| **KIRKLAND & ELLIS LLP** | Brian H. Richardson (VA 92477) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KUTAK ROCK LLP** |
| 601 Lexington Avenue | 901 East Byrd Street, Suite 1000 |
| New York, New York 10022 | Richmond, Virginia 23219-4071 |
| Telephone:    (212) 446-4800 | Telephone:  (804) 644-1700 |
| Facsimile:    (212) 446-4900 | Facsimile:    (804) 783-6192 |

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  August 31, 2021

---

[1]    Due to the large number of Debtors in these Chapter 11 Cases, for which joint administration has been granted, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/intelsat.

The location of the Debtors' service address is:  7900 Tysons One Place, McLean, VA 22102.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF INTELSAT S.A. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE AMENDED PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE DEBTORS URGE HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE AMENDED PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE AMENDED PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE AMENDED PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE AMENDED PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS OR ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE AMENDED PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE AMENDED PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE AMENDED PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE AMENDED PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE AMENDED PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE AMENDED PLAN, WHO VOTE TO REJECT THE AMENDED PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE AMENDED PLAN) WILL BE BOUND BY THE TERMS OF THE AMENDED PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE AMENDED PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE AMENDED PLAN. THERE IS NO ASSURANCE THAT THE AMENDED PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE AMENDED PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE AMENDED PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE AMENDED PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE AMENDED PLAN.

SUMMARIES OF THE AMENDED PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE AMENDED PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE AMENDED PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE AMENDED PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONSUMMATION OF THE AMENDED PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77A4, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT") OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES ISSUED UNDER THE AMENDED PLAN CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES IN COMPLIANCE WITH THE FEDERAL SECURITIES LAWS AND ANY

**APPLICABLE "BLUE SKY" LAWS.    THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF SUCH SECURITIES.**

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.    THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.    FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT:**

- THE DEBTORS' BUSINESS STRATEGY;

- THE DEBTORS' TECHNOLOGY;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE DEBTORS' LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- THE DEBTORS' FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- THE OVERALL HEALTH OF THE SATELLITE TELECOMMUNICATIONS INDUSTRY;

- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;

- THE AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- COSTS OF CONDUCTING THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- GOVERNMENTAL REGULATION AND TAXATION OF THE SATELLITE TELECOMMUNICATIONS INDUSTRY;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- RISKS IN CONNECTION WITH ACQUISITIONS;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE.   THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.   THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE AMENDED PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE AMENDED PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES;  THE IMPACT OF THE COVID-19 PANDEMIC ON THE DEBTORS' BUSINESS; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

**TABLE OF CONTENTS**

<div align="right">Page</div>

I.      INTRODUCTION ...................................................................................................................1

II.     PRELIMINARY STATEMENT .............................................................................................1

      A.      FCC Order ....................................................................................................................2
      B.      DIP Negotiations and Chapter 11 Filing .....................................................................3
      C.      Plan Negotiations ........................................................................................................4
      D.      Judicial Mediation .......................................................................................................5
      E.      Special Committee Review and Settlement of Certain Intercompany Matters ...................6
      F.      Amended Plan Support Agreement and Amended Plan ................................................7

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
      PLAN ......................................................................................................................................9

      A.      What is chapter 11? .....................................................................................................9
      B.      Why are the Debtors sending me this Disclosure Statement? .....................................9
      C.      Am I entitled to vote on the Amended Plan? ...............................................................9
      D.      What will I receive from the Debtors if the Amended Plan is consummated? .................10
      E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim,
             DIP Facility Claim, or a Priority Tax Claim? .............................................................20
      F.      How do I know if I have a Convenience Claim and what does that mean for my General
             Unsecured Claim if I do? ............................................................................................21
      G.      Are any regulatory approvals required to consummate the Amended Plan? ...................21
      H.      What happens to my recovery if the Amended Plan is not confirmed or does not go
             effective? .....................................................................................................................23
      I.       If the Amended Plan provides that I get a distribution, do I get it upon Confirmation or
             when the Amended Plan goes effective, and what is meant by "Confirmation," "Effective
             Date," and "Consummation?" .....................................................................................23
      J.       Why is the Bankruptcy Court holding a Confirmation Hearing? ................................23
      K.      What is the purpose of the Confirmation Hearing? .....................................................23
      L.      What are the sources of Cash and other consideration required to fund the Amended
             Plan? ............................................................................................................................23
      M.      Are there risks to owning the New Common Stock upon emergence from chapter 11? ...23
      N.      Is there potential litigation related to the Amended Plan? ...........................................24
      O.      What is the Management Incentive Plan and how will it affect the distribution I receive
             under the Amended Plan? .............................................................................................25
      P.      How will the preservation of the Causes of Action impact my recovery under the
             Amended Plan? ............................................................................................................27
      Q.      Will there be releases and exculpation granted to parties in interest as part of the
             Amended Plan? ............................................................................................................27
      R.      What impact does the Claims Bar Date have on my Claim? ........................................32
      S.      What is the deadline to vote on the Amended Plan? ....................................................32
      T.      How do I vote for or against the Amended Plan? ........................................................32
      U.      How do I opt out of the granting of releases? .............................................................32
      V.      What is the effect of the Amended Plan on the Debtors' ongoing businesses? ...............33
      W.      Will any party have significant influence over the corporate governance and operations of
             the Reorganized Debtors? ...........................................................................................33
      X.      Who do I contact if I have additional questions with respect to this Disclosure Statement
             or the Amended Plan? ..................................................................................................33
      Y.      Do the Debtors recommend voting in favor of the Amended Plan? .............................34

IV.     THE DEBTORS' PLAN ........................................................................................................34

      A.      The Amended Plan .......................................................................................................34

    B.    Summary of Value Allocation .................................................................................49

V.    **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.56**

    A.    Intelsat's Corporate History .................................................................................56
    B.    Intelsat's Business Operations .............................................................................57
    C.    The C-Band Clearing Process ..............................................................................60
    D.    The Debtors' Prepetition Capital Structure.........................................................62

VI.    **EVENTS LEADING TO THE CHAPTER 11 FILINGS ......................................................65**

    A.    Additional Capital Required to Comply with the FCC's February 28, 2020 C-Band Order.66
    B.    The COVID-19 Pandemic......................................................................................66
    C.    Contingency Planning...........................................................................................67
    D.    Establishment of the Special Committees and Appointment of the Disinterested Directors 67
    E.    Entry into the Grace Period, the Guarantee Releases, and Related Asserted Claims........67
    F.    DIP Financing ......................................................................................................71

VII.    **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES ............................................................................................................................72**

    A.    First and Second Day Relief and Other Case Matters ........................................72
    B.    Appointment of Official Committee of Unsecured Creditors................................72
    C.    Schedules and Statements, Claims Bar Date and Exclusivity Extension ...........73
    D.    Operational Achievements....................................................................................73
    E.    Gogo Commercial Aviation Purchase .................................................................74
    F.    SES Claims ...........................................................................................................76
    G.    Engagement and Negotiations with Stakeholders................................................76
    H.    Original Plan Support Agreement ........................................................................77
    I.    Judicial Mediation ...............................................................................................78
    J.    Convert Ad Hoc Group Standing Motion and SES' Intervention Motion..............79
    K.    Settlement of Certain Debtor Intercompany Claims............................................80
    L.    The Guarantee Claims Standstill .........................................................................99
    M.    The Amended Plan Support Agreement .............................................................102
    N.    Non-TopCo Plan .................................................................................................102

VIII.    **RISK FACTORS .......................................................................................................102**

    A.    Bankruptcy Law Considerations........................................................................102
    B.    Risks Related to Recoveries Under the Amended Plan .......................................108
    C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses.........115
    D.    Risks Related to Regulation................................................................................118

IX.    **CERTAIN SECURITIES LAW MATTERS...............................................................120**

    A.    1145 Securities...................................................................................................120
    B.    4(a)(2) Securities................................................................................................122
    C.    New Common Stock & Management Incentive Plan. ..........................................125

X.    **SOLICITATION AND VOTING PROCEDURES....................................................125**

    A.    Holders of Claims Entitled to Vote on the Amended Plan ..................................125
    B.    Voting Record Date ............................................................................................125
    C.    Voting on the Amended Plan...............................................................................126
    D.    Ballots Not Counted...........................................................................................126

XI.    **CONFIRMATION OF THE AMENDED PLAN.......................................................126**

    A.    Requirements for Confirmation of the Amended Plan ........................................126

B.    Best Interests of Creditors/Liquidation Analysis.............................................................127
C.    Feasibility..........................................................................................................................127
D.    Acceptance by Impaired Classes ......................................................................................128
E.    Confirmation Without Acceptance by All Impaired Classes............................................128
F.    Valuation of the Debtors....................................................................................................129

XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX AND LUXEMBOURG TAX
        CONSEQUENCES OF THE AMENDED PLAN ........................................................................130
A.    Introduction........................................................................................................................130
B.    Certain U.S. Federal Income Tax Consequences of the Amended Plan to the Debtors and
      the Reorganized Debtors....................................................................................................132
C.    Certain Luxembourg Tax Consequences of the Amended Plan to the Debtors and the
      Reorganized Debtors..........................................................................................................136
D.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims
      Entitled to Vote .................................................................................................................136
E.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims..........153
F.    Certain Luxembourg Tax Consequences to Holders of New Common Stock, Reorganized
      S.A. Common Stock, New Warrants or CVRs ..................................................................153
G.    U.S. Information Reporting and Withholding ...................................................................157
H.    FATCA ...............................................................................................................................158

XIII.    RECOMMENDATION OF THE DEBTORS ............................................................................159

## EXHIBITS[2]

EXHIBIT A      Amended Plan of Reorganization

EXHIBIT B      Corporate Structure of the Debtors

EXHIBIT C      Liquidation Analysis

EXHIBIT D      Financial Projections

EXHIBIT E      Valuation Analysis

EXHIBIT F      Plan Allocation of Distributable Value by Debtor

EXHIBIT G      Amended Plan Support Agreement

---

[2]    Each Exhibit is incorporated herein by reference.

## I.     INTRODUCTION

Intelsat S.A. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors," and, together with Intelsat S.A.'s non-Debtor affiliates, the "Company"), submit this disclosure statement (including all exhibits hereto and as may be amended or modified from time to time and including all exhibits and supplements thereto, in accordance with its terms, the "Disclosure Statement") pursuant to sections 1125 and 1126 of the Bankruptcy Code in connection with the solicitation of acceptances with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* (as may be amended or modified from time to time and including all exhibits and supplements thereto, in accordance with its terms, the "Amended Plan"). A copy of the Amended Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[1] Each Debtor is a proponent of the Amended Plan within the meaning of section 1129 of the Bankruptcy Code. While the Amended Plan constitutes a single plan of reorganization for all Debtors, the Amended Plan does not contemplate substantive consolidation of any of the Debtors. Reference is made to this Disclosure Statement for a discussion of the Debtors' history, business, properties, operations, projections, risk factors, a summary and description of the Amended Plan, and certain related matters.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE AMENDED PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE AMENDED PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE AMENDED PLAN.**

## II.    PRELIMINARY STATEMENT

The Company operates the world's largest satellite fleet and connectivity infrastructure and provides diversified communications services to many of the world's leading media companies, telecommunications operators, and Internet service providers, as well as the U.S. government and military. Since its inception in the early 1960s, the Company has played a critical part in many of history's most epic moments, including broadcasting the first moonwalk to the world, providing the hotline between the Pentagon and the Kremlin during the Cold War, and broadcasting World Cups, the Olympic Games, and Super Bowls to billions of people worldwide. Every day, the Company's fleet of over fifty satellites, which covers 99 percent of the earth's populated regions, enables people in remote villages and locations to stay connected to the Internet and to each other.

The Company uses its satellites as relay stations in space for the transmission of voice, video, and data communications. The Company's satellites primarily send and receive signals in one of three high-frequency radio "bands" (*i.e.*, ranges within the radio/electromagnetic spectrum): Ku-band, Ka-band, and C-band.

The "C-band" refers to certain portions of the electromagnetic spectrum that were historically allocated to fixed satellite services ("FSS"). For over 40 years, the Company has invested in and built a C-band business in reliance on C-band licenses held by Intelsat License LLC ("License"), which have

---

[1]   Capitalized terms used but not immediately defined in this Disclosure Statement have the meanings ascribed to such terms in the Amended Plan or subsequently in this Disclosure Statement. Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Amended Plan. **Any summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Amended Plan, is qualified in its entirety by reference to the Amended Plan, the exhibits, and other materials referenced in the Amended Plan, the Plan Supplement, and the documents being summarized. In the event of any inconsistencies between the terms of this Disclosure Statement and the Amended Plan, the Amended Plan shall govern.**

routinely been renewed.  The Company operates a significant portion of its business based on License's rights to the C-band and the expectation that the FCC would continue to license C-band spectrum for use by License in perpetuity.  Based on these rights and expectations, the Company and other satellite operators have invested over $50 billion to design, manufacture, and launch satellites, and make long-term contractual commitments to their customers.

As of the Petition Date, the Debtors had approximately $15 billion in total funded debt obligations, consisting of approximately $3.1 billion in aggregate principal amount outstanding under a secured term loan credit facility (the "Term Loan Facility"); approximately $1.8 billion in aggregate principal amount outstanding of secured notes (the "First Lien Notes"); approximately $6.8 billion in aggregate principal amount outstanding of the Jackson Senior Notes (as defined below); approximately $1.4 billion of unsecured notes for which Intelsat (Luxembourg) S.A. is the primary obligor (the "LuxCo Senior Notes"); approximately $1.2 billion of unsecured notes for which Intelsat Connect Finance S.A. is the primary obligor (the "Connect Senior Notes"); and approximately $402.5 million of convertible senior notes for which Intelsat S.A. is the primary obligor (the "Convertible Senior Notes").

In early 2020, the Debtors retained Kirkland & Ellis LLP ("K&E") and PJT Partners ("PJT") to assist them in navigating the complex interaction between the requirements under the anticipated FCC Order (defined below) and their liquidity situation, and began to seek alternative capital sources, including financing from third parties.  The Debtors and their advisors explored all potential avenues to effectuate a liability management transaction, including by identifying and approaching potentially interested strategic investors with whom the Debtors could negotiate a potential value-maximizing out-of-court transaction.

### A.    FCC Order

On March 3, 2020, the Federal Communications Commission (the "FCC") issued its final order (the "FCC Order") regarding the reallocation of the C-band for use by new fifth-generation ("5G") terrestrial wireless networks.  As a result of the FCC Order, the Company will be required to "clear" the lower 300 MHz of this spectrum over the continental United States (*i.e.*, cease its communications via those radio frequencies and move incumbent users into the upper 200 MHz of the C-band) no later than December 5, 2025.  Furthermore, to be eligible for approximately $4.87 billion in "Accelerated Relocation Payments" authorized by the FCC to existing licensees, the Company will be required to clear the lowest 120 MHz (3700–3820 MHz) of the spectrum by December 5, 2021, and to clear the remaining 180 MHz (3820–4000 MHz) range no later than December 5, 2023.  Meeting the deadlines imposed by the FCC Order to obtain the Accelerated Relocation Payments is a complex and technically challenging effort across all 48 contiguous United States that will take three years to complete.  The cost of launching the new satellites and other expenses associated with clearing the C-band spectrum is more than $1 billion through 2021.  Although under the FCC Order the Company's clearing costs will be reimbursed in arrears, the Company does not expect to begin to receive reimbursements until late-2021 for work that has already begun.

The C-band clearing process has required and will continue to require the Debtors to incur significant costs related to clearing activities well in advance of receiving reimbursement for such costs.  Given the Debtors' existing financial leverage, the requirements of the FCC Order, and the Debtors' current and future business prospects, particularly as adjusted for the impact of COVID-19, the Debtors began to explore the possibility of seeking chapter 11 relief and debtor-in-possession ("DIP") financing.  In March 2020, the Debtors retained Alvarez & Marsal North America LLC ("A&M") to assist in these analyses.

In an effort to conserve liquidity as the Debtors assessed their strategic alternatives, the Company elected to withhold a $125 million interest payment that was due on April 15, 2020 on account of the Jackson 8.5% Senior Notes Indenture due 2024 and entered into a 30-day grace period.  The grace period

enabled the Debtors to preserve liquidity as the Company continued to engage with key stakeholders and progressed discussions regarding financing and restructuring options.

### B.    DIP Negotiations and Chapter 11 Filing

In May 2020, despite their efforts to conserve liquidity, the Debtors and their advisors realized that chapter 11 proceedings may be required to address the Debtors' liquidity requirements and leveraged capital structure while meeting the requirements of the FCC Order on a timeline sufficient to earn the Accelerated Relocation Payments.  Accordingly, the Debtors began a robust and competitive marketing process for postpetition financing.  The Debtors received five preliminary proposals for DIP financing from third-party financial institutions in addition to multiple proposals from certain of the Debtors' prepetition creditors.  Among these proposals was a $1 billion superpriority senior secured priming multi-draw term loan credit facility proposed by an ad hoc group of certain prepetition secured parties represented by Akin Gump Strauss Hauer & Feld LLP and Centerview Partners LLC (the "Jackson Ad Hoc Group").  The Debtors ultimately reached agreement with both the Jackson Ad Hoc Group and a crossover ad hoc group of term loan lenders and noteholders represented by Jones Day and Houlihan Lokey Capital, Inc. (the "Jackson Crossover Ad Hoc Group") on the terms of the joint DIP facility provided by each group's constituents (the "DIP Facility") to Intelsat Jackson Holdings S.A. ("Jackson"), as borrower, with Jackson's obligations guaranteed by various of its subsidiaries.

With the DIP Facility negotiated, the Debtors were determined to meet the requirements imposed by the FCC Order and earn the Accelerated Relocation Payments of approximately $5 billion.  On May 13, 2020 (the "Petition Date"), the Debtors commenced their Chapter 11 Cases in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").  The Debtors smoothly transitioned into chapter 11 and obtained authority from the Bankruptcy Court to operate their business in a manner that is substantially consistent with their prepetition practices through a variety of "first day motions" and related court orders.[2]  Critically, on June 9, 2020, the Bankruptcy Court authorized the Debtors to enter into the DIP Credit Agreement [Docket No. 285].  The DIP Credit Agreement contained a sizable investment basket, which, as subsequently amended, allowed the Debtors to consummate the Gogo Transaction, as defined and described more fully herein.

On May 26, 2020, License filed the "Accelerated Relocation Election of Intelsat License LLC" pursuant to 47 C.F.R. § 27.1412(c), the FCC Order and the Wireless Telecommunication Bureau's May 11, 2020, public notice.  On August 14, 2020, License filed the "Intelsat C-Band Clearing Transition Plan" (the "Transition Plan") reflecting revisions made in response to comments received from the FCC and interested parties.  Following the Transition Plan, the Company finalized all of its required contracts with satellite manufacturers and launch vehicle providers to meet the accelerated C-band spectrum clearing timelines.  On October 28, 2020, License filed a second updated Transition Plan.  To date, the Debtors have made substantial progress toward clearing the C-band, and while meeting the requirements in the FCC Order to remain eligible for the nearly $5 billion in Accelerated Relocation Payments is challenging, License's C-band clearing plan remains on schedule.

As the Debtors stabilized operations in chapter 11 and began engaging with creditors regarding a restructuring transaction, the Company remained focused on long-term growth.  On August 31, 2020, Jackson and Gogo Inc. (the "Seller") entered into a purchase agreement (the "Purchase Agreement") with

---

[2]    The Debtors have continued to successfully operate their business throughout these cases, both on an ordinary-course basis and through other transactions, including: (a) obtaining approval from the Bankruptcy Court to release certain liens in order to enhance the value of the Debtors' investment in Spaceflight Industries; (b) entering into a long-term commercial agreement with Speedcast Communications Inc.; (c) entering into a new joint venture with JSAT International Inc.; and (d) undertaking a comprehensive review of and implementing a strategy for value maximization with respect to Executory Contracts and Unexpired Leases.

respect to the Seller's commercial aviation business ("Gogo CA") for $400 million in cash, subject to customary adjustments (the "Gogo Transaction"). Jackson funded the purchase price of the Gogo Transaction with proceeds from the DIP Facility and cash on hand. In connection with the Gogo Transaction, Jackson entered into an amendment to the credit agreement governing the DIP Facility to permit the transactions contemplated by the Purchase Agreement, which was approved by the Court in the *Order (I) Authorizing the Debtors to (A) Consummate a Proposed Transaction and (B) Enter into an Amendment to the DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 720] on August 31, 2020. On December 1, 2020, the Gogo Transaction closed, allowing the Debtors, as the world's largest satellite operator, to combine with the leading provider of commercial inflight broadband and entertainment services to deliver unprecedented innovation and long-term value to commercial airlines.

### C.    Plan Negotiations

While devoting significant time and effort to C-band clearing efforts and the Gogo Transaction, to facilitate the meaningful participation of the Debtors' key constituents in the formulation of a plan of reorganization, the Debtors devoted significant time and resources to provide substantial amounts of diligence to the Debtors' key stakeholders, including the official committee of Unsecured Creditors (the "Creditors' Committee"), the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, the ad hoc group of noteholders and equity holders represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Ducera Partners LLC (the "HoldCo Creditor Ad Hoc Group"), and holders of primarily Convertible Senior Notes and equity represented by Stroock & Stroock & Lavan LLP (the "Convert Ad Hoc Group"). Among other things, the Debtors have provided voluminous information regarding historical intercompany transactions and various foreign and domestic tax issues and considerations—topics that were critical to the negotiation of the *Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 1467] (the "Original Plan") and the Amended Plan and were therefore critical for the various interested parties to understand.

Beginning in mid-October 2020, the Debtors entered into nondisclosure agreements with several of their key creditor constituencies in order to share the Debtors' go-forward business plan (the "Business Plan"). Members of the Creditors' Committee, the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Convert Ad Hoc Group all received confidential information and attended presentations with the Debtors' management related to the Business Plan and have been kept apprised of any adjustments made in light of material changes since mid-October.

Engagement on the Debtors' Business Plan soon turned to engagement regarding the terms of a restructuring transaction. Beginning in November 2020, the Debtors and their primary creditor constituencies agreed to expand the scope and duration of the applicable confidentiality agreements to allow the parties to engage in direct plan negotiations. These negotiations continued in earnest from November 2020 until mid-February 2021, with each of the restricted parties, including certain members of the ad hoc group of first lien noteholders, represented by Wilmer Cutler Pickering Hale and Dorr LLP (the "Jackson First Lien Noteholder Group"), who became restricted in early February 2021, agreeing to extend their confidentiality agreements multiple times. In particular, the parties spent significant time discussing complex issues related to, among other things, intercompany transactions, foreign and domestic tax issues, and the value of the Debtors' business, including rights related to the FCC Order.

Following this lengthy process of extensions and negotiations, the efforts of the Debtors, the Jackson Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group culminated in the formulation and execution of a plan support agreement that outlined the terms of the Debtors' proposed restructuring (the "Original Plan Support Agreement"). The Original Plan Support Agreement embodied a resolution of certain complex issues in these Chapter 11 Cases and was incorporated into the Original Plan.

After the Debtors filed the Original Plan and the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 1468] (the "Original Disclosure Statement") on February 12, 2021, they continued to engage with their stakeholders in these Chapter 11 Cases to build greater consensus for the Company's restructuring. In particular, on March 19, 2021, certain members of the Jackson Crossover Ad Hoc Group agreed to sign non-disclosure agreements and become restricted from trading in order to facilitate open and productive plan discussions. The Jackson Crossover Ad Hoc Group and the Convert Ad Hoc Group were not parties to the Original Plan Support Agreement and did not support the Original Plan. Negotiations continued for weeks and included negotiations between the Debtors' advisors and the advisors to the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group. Then, the Company's management and advisors engaged directly with certain principals of the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group, which ultimately led to a revised bid from the Jackson Crossover Ad Hoc Group (the "Crossover Proposal"). The Debtors' advisors then took that bid to the advisors for the HoldCo Creditors Ad Hoc Group in an effort to build as much consensus as possible. Certain principals of the HoldCo Creditor Ad Hoc Group then agreed to execute nondisclosure agreements and become restricted to facilitate the ongoing negotiation.

Though the Crossover Proposal narrowed the issues between the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group, the parties in interest had not yet reached agreement on a set of terms for a restructuring that each could support. After consultation with their key economic stakeholders, the Debtors determined that pursuing a judicial mediation, focused primarily on the open issues between the Crossover Proposal and the Original Plan, filed with the support of the parties to the Original Plan Support Agreement, was the path most likely to reach a more consensual plan of reorganization.

On April 6, 2021, the Debtors filed a motion requesting the court to compel mediation, which the court granted on April 21, 2021 in the *Order Compelling Mediation of Plan and Confirmation-Related Disputes and Appointing Judicial Mediator* [Docket No. 2049] (the "Mediation Order"). The Mediation Order appointed the Honorable Frank J. Santoro, Chief Judge for the United States Bankruptcy Court of the Eastern District of Virginia as the judicial mediator (the "Mediator") with full authority to settle these matters and to enter any order necessary in furtherance of the settlement efforts, which were to focus on certain Plan and confirmation related issues (the mediation process described herein, the "Mediation"). The Mediation was expanded to include every party in interest who requested to partake in the Mediation, including, among others: (a) the Debtors; (b) the Jackson Crossover Ad Hoc Group; (c) the HoldCo Creditor Ad Hoc Group; (d) the Jackson Ad Hoc Group; (e) the Convert Ad Hoc Group; (f) U.S. Bank National Association, in its capacity as Indenture Trustee for the Jackson Senior Notes ("U.S. Bank"); (g) the Committee; (h) the ad hoc group of equity holders of Intelsat S.A. (the "Ad Hoc Equity Group"); and (i) SES Americom Inc. ("SES").

### D.    Judicial Mediation

The Mediation began with the Mediator rapidly getting up to speed on the various complex issues in these Chapter 11 Cases and the positions of the Mediation parties with respect thereto, through conversations with and presentations from the Mediation parties. Numerous in-person Mediation sessions were held between mid-April and the date of the filing of this Disclosure Statement, including on June 30 and July 1, 2021, when certain principals of the Mediation parties and their advisors met in-person—for the first time in these Chapter 11 Cases—in Richmond, Virginia for Mediation sessions with the Mediator and each other, and again on July 15, 2021 in Richmond, Virginia.

After the in-person Mediation sessions, the Debtors and their major stakeholders continued to negotiate the terms of a restructuring, including by sharing multiple proposals outlining the key economic terms for a potential chapter 11 plan. The Debtors and these key stakeholders were in active discussions with each other, both directly and through the Mediator in the weeks that followed. Ultimately, these

continued good-faith negotiations culminated in agreement among the Debtors, the HoldCo Creditors Ad Hoc Group, the Jackson Ad Hoc Group, the Jackson First Lien Noteholder Group, and the Jackson Crossover Ad Hoc Group regarding the terms of a restructuring that each was willing to support. After hard-fought, good-faith negotiations, each party entered into a plan support agreement (the "Amended Plan Support Agreement"), which outlined the terms of the Debtors' proposed restructuring.  In parallel, the Debtors worked with these parties to formulate the Amended Plan, as contemplated by the Amended Plan Support Agreement and with the support of each party thereto.

### E.    Special Committee Review and Settlement of Certain Intercompany Matters

The boards of directors of Debtors Intelsat S.A.,[3] Intelsat (Luxembourg) S.A. ("LuxCo"), Intelsat Envision Holdings LLC ("Envision"), Intelsat Connect Finance S.A. ("ICF"), and Jackson each established special committees (the "Special Committees") and appointed disinterested directors (the "Disinterested Directors") to serve as independent fiduciaries on each of the Special Committees.  The Special Committees also retained independent advisors to advise them with respect to their duties.  The Special Committees were authorized to determine whether a conflict exists between the applicable Debtor and its stakeholders with regard to any matter (matters with such conflicts, the "Conflicts Matters").  In the event that the Special Committees determine that a matter constitutes a Conflicts Matter, the Special Committees are authorized to take any and all actions with respect to any review, discussion, consideration, deliberation, examination, investigation, analysis, assessment, evaluation, exploration, response, and negotiation on behalf of the applicable Debtor of the terms and conditions of any restructuring transaction, including to (a) review and evaluate any restructuring transaction and consider whether or not it is fair to and in the best interests of the applicable Debtor, its subsidiaries, and their respective stakeholders; (b) consult with management and the applicable Debtor's advisors with respect to discussions and negotiations regarding the terms and conditions of a restructuring transaction; and (c) consider such other matters as may be requested by the applicable Debtor or its board of directors.

The Special Committees, as independent fiduciaries for their respective estates, expended significant time and effort gathering voluminous data and information regarding a multitude of complex issues in the Chapter 11 Cases, including:  potential claims that may exist in connection with certain historical and ongoing intercompany transactions and relationships, among other transactions; the allocation of payment of certain of the administrative expenses in these Chapter 11 Cases; various foreign and domestic tax issues, including the value of and entitlement to tax attributes such as net operating losses held by that certain Luxembourg fiscal unity formed by certain of the Debtors (the "Tax Unity"), as well as other tax attributes held outside of the Tax Unity; the Accelerated Relocation Payments and which Debtor or Debtors should be entitled to receive them; and the Debtors' Business Plan and enterprise valuation.  The advisors to the Special Committees were given access to substantially the same data and information, including data and information that had been made available to advisors for the Creditors' Committee, the Jackson Ad Hoc Group, the Ad Hoc Group of Secured Noteholders, the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Convert Ad Hoc Group.

The Special Committees evaluated the Original Plan, including the consideration to be provided thereunder and its resolution of numerous Claims that may have constituted Conflicts Matters.  After substantial review, analysis, and consultation with their independent advisors, each Special Committee authorized its respective Debtor to enter into the Original Plan Support Agreement, pursuant to its terms and conditions and subject to each Special Committee's ongoing investigations and analyses.

After the filing of the Original Plan, the Special Committees continued to assess and evaluate the merits of these potential claims in light of developing facts and circumstances, including:  (a) briefing filed

---

[3]    References in this Disclosure Statement to "Intelsat" refer to Intelsat S.A., unless otherwise noted.

by parties in interest in these cases related to which Debtor entity may be entitled to the Accelerated Relation Payments; (b) updates to the tax modeling regarding the estimated present value of the net-operating losses (the "NOLs") held by the Tax Unity and considerations with respect to the non-Tax Unity NOLs at Intelsat Investment Holdings S.à.r.l. ("Holdings SARL") and Intelsat S.A. (collectively with Holdings SARL, Holdings, Investments, LuxCo, Envision, and ICF, the "HoldCos"); (c) pleadings[4] filed with respect to the release of certain guarantees by certain of the Debtors before the Petition Date; (d) facts related to approximately six months of further business performance progress; (e) progress made by the Debtors in satisfying the requirements for payment of the Accelerated Relocation Payments; and (f) other legal and factual developments in the chapter 11 cases, including the Mediation.

As a result, the Amended Plan is premised on a global settlement of certain claims and causes of action between the Debtors, which will avoid the need for lengthy, value-destructive litigation through releases of claims and causes of action such as potential fraudulent transfer, avoidance, preference, recharacterization and derivative actions on account of historical acts, covenants to support the necessary transactions to implement a restructuring for all of the Debtors, and other agreements to support a restructuring that will inure to the benefit of the Debtors' estates. As described in greater detail below, the Settlement will resolve issues regarding: (a) the post-emergence organizational structure; (b) numerous highly complex considerations regarding the Luxembourg tax profile of the Debtors, including, among other things, (i) preservation of the Tax Unity and potential alternative restructuring outcomes that would not have preserved the Tax Unity and (ii) the use of Tax Unity tax attributes; (c) the recipient and allocation of any Accelerated Relocation Payments; (d) intercompany transactions that arose in the course of the Debtors' business prior to the Petition Date—including certain transactions and/or balances that could potentially be the subject of fact intensive and time consuming fraudulent transfer or preference litigation; (e) intercompany balances that have accumulated after the Petition Date; and (f) allocation of certain administrative expenses.

### F.    Amended Plan Support Agreement and Amended Plan

The Amended Plan provides for the reorganization of the Debtors as a going concern with a deleveraged capital structure and sufficient liquidity to fund the Debtors' post-emergence Business Plan and continue clearing activities to enable the Debtors to be eligible for the Accelerated Relocation Payments.

Specifically, the Amended Plan provides the Debtors with a New Capital Structure consisting of $7.125 billion in New Debt, which may include New Term Loans and New Notes that may be fully backstopped by the Backstop Parties.

Pursuant to and in accordance with the Amended Plan Support Agreement and Amended Plan, upon consummation of the Restructuring Transactions, the Debtors will fully repay the DIP Facility with proceeds from the New Debt. The Equity Issuer will issue 96.0 percent of the authorized but unissued New Common Stock to Holders of Allowed Jackson Unsecured Claims and 4.0 percent to Holders of ICF Unsecured Claims, each subject to dilution in accordance with Dilution Principles. The Equity Issuer will also issue 100.0 percent of the Series A Warrants and approximately 46.4 percent of the Series B Warrants to Holders of ICF Unsecured Claims, approximately 6.3 percent of the Series B Warrants to Holders of S.A. Unsecured Claims, and approximately 47.3 percent of the Series B Warrants to Holders of Envision Unsecured Claims. Any New Common Stock issued upon the exercise of the New Warrants shall be subject

---

[4]    No fewer than five parties in interest have collectively filed (a) numerous proofs of claim; (b) two objections to the Jackson Parent Guarantee Claims and one objection to the Lux Parent Guarantee Claims; (c) five responses to the objections, (d) two motions for partial summary judgment; and (e) two objections to the motions for partial summary judgment and cross-motion for partial summary judgment.

to dilution pursuant to the Dilution Principles.  The CVR Issuer will issue 100 percent of the Series A CVRs and 67.5 percent of the Series B CVRs to Holders of Jackson Unsecured Claims, and 32.5 percent of the Series B CVRs to the Holders of ICF Unsecured Claims.

The Amended Plan Support Agreement attached hereto as **Exhibit G** also includes agreement on a standstill on the prosecution of such Guarantee Claims by and among each of the Parent Guarantors (as defined herein), the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group.

Additionally, the Amended Plan contains customary release, exculpation, and injunction provisions, which will facilitate the Debtors' successful reorganization by providing certainty in connection with the Amended Plan to the Reorganized Debtors and each of the Debtors' stakeholders.

In the event that the Plan is not confirmed as to Holdings SARL and/or Intelsat S.A. (a "Plan Toggle Event"), the Debtors shall immediately seek, and the Parties to the Amended Plan Support Agreement shall support, the Confirmation of the "Non-TopCo Plan" without the need to resolicit votes on the Non-TopCo Plan.  Upon conversion to the Non-TopCo Plan, all references in the Amended Plan to the "Plan" and any references herein to the "Amended Plan" shall be deemed to refer to the Non-TopCo Plan. Any references to the Debtors shall be deemed to refer to all of the Debtors other than whichever (or both) of Intelsat S.A. and Holdings SARL that a Plan Toggle Event occurs with respect to.  The Non-TopCo Plan shall be consistent in all respects with the terms of the Amended Plan (including, for the avoidance of doubt, the treatment of Claims provided under the Plan for all classes of creditors other than creditors of Holdings SARL and/or Intelsat S.A.).  The Non-TopCo Plan may differ from the Amended Plan as required to remove Holdings SARL and/or Intelsat S.A. from the Amended Plan and which shall (unless waived in accordance with the Amended Plan Support Agreement) still require that the Settlement Agreement Order be entered as a condition precedent to confirmation of the Non-TopCo Plan, and otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Unsecured Creditors.

The Debtors believe that the Amended Plan (including the Non-TopCo Plan, if applicable) is in the best interests of the Debtors' estates and represents the best path forward at this time.  Given the Debtors' core strengths, including their experienced management team and robust satellite fleet, the Debtors are confident that they can implement the restructuring embodied in the Amended Plan to ensure the Debtors' long-term viability.  For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote or reject the Amended Plan vote to accept the Amended Plan.

Notwithstanding any other provision in this Disclosure Statement or an order approving this Disclosure Statement (the "Disclosure Statement Order"), the Bankruptcy Court makes no finding or ruling in the Disclosure Statement Order, other than with respect to the adequacy of the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, with respect to (a) the negotiations, reasonableness, business purpose, or good faith of the Settlement Agreement or the Amended Plan, or as to the terms of the Settlement Agreement or the Amended Plan (or the treatment of any class of Claims thereunder and whether those Claims are or are not impaired) for any purpose, (b) whether the Amended Plan satisfies any of the requirements for confirmation under section 1129 of the Bankruptcy Code, or (c) the standard of review or any factor required for approval of the Settlement Agreement or Confirmation of the Amended Plan. Any objections or requests served in connection with the Settlement Agreement and/or the Amended Plan are hereby reserved and not waived by entry of the Disclosure Statement Order; provided, however, that nothing in the Disclosure Statement or the Disclosure Statement Order shall preclude the Debtors or any other party in interest that is the subject of such objection or discovery requests from seeking to overrule such objections or limit or otherwise overrule such discovery requests.

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim entitled to vote to accept or reject the Amended Plan.  **Prior to voting on the Amended Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure**

**Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Article VIII of this Disclosure Statement, entitled "Risk Factors."**

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

A.    **What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any Person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other Entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtors' liabilities in accordance with the terms of the confirmed plan.

B.    **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Amended Plan. Before soliciting acceptances of the Amended Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Amended Plan and to share such disclosure statement with all Holders of Claims or Interests whose votes on the Amended Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

C.    **Am I entitled to vote on the Amended Plan?**

Your ability to vote on, and your distribution under, the Amended Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Amended Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| | | *Unclassified Non-Voting Claims* | |
| N/A | DIP Claims | N/A | N/A |
| N/A | Administrative Claims | N/A | N/A |
| N/A | Priority Tax Claims | N/A | N/A |
| | | *Other Claims and Interests* | |
| A1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

9

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| A2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| A3 | Debtor Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| A4 | Non-Debtor Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| A5 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| A6 | Term Loan Facility Claims | Impaired | Entitled to Vote |
| A7 | 8.00% First Lien Notes Claims | Impaired | Entitled to Vote |
| A8 | 9.50% First Lien Notes Claims | Impaired | Entitled to Vote |
| A9 | Convenience Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| *Jackson* | | | |
| B1 | Unsecured Claims | Impaired | Entitled to Vote |
| *Jackson Subsidiaries* | | | |
| C1 | Unsecured Claims | Impaired | Entitled to Vote |
| *ICF* | | | |
| D1 | Unsecured Claims | Impaired | Entitled to Vote |
| *Envision* | | | |
| E1 | Unsecured Claims | Impaired | Entitled to Vote |
| *LuxCo* | | | |
| F1 | Unsecured Claims | Impaired | Entitled to Vote |
| *Intelsat Investments S.A.* | | | |
| G1 | Unsecured Claims | Impaired | Entitled to Vote |
| *Intelsat Holdings S.A.* | | | |
| H1 | Unsecured Claims | Impaired | Entitled to Vote |
| *Intelsat Investment Holdings S.à.r.l.* | | | |
| I1 | Unsecured Claims | Impaired | Entitled to Vote |
| I2 | TopCo Guarantee Claims | Impaired | Entitled to Vote |
| *Intelsat S.A.* | | | |
| J1 | Unsecured Claims | Impaired | Entitled to Vote |
| J2 | TopCo Guarantee Claims | Impaired | Entitled to Vote |
| J3 | Intelsat Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

D.      **What will I receive from the Debtors if the Amended Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Amended Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Amended Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Amended Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE**

10

**DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE AMENDED PLAN.[5]**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Amended Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of an Allowed Claim or Allowed Interest, as applicable.

| SUMMARY OF EXPECTED RECOVERIES | | | | | | |
|---|---|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
| *Unclassified Non-Voting Claims* | | | | | | |
| N/A | DIP Claims | Each Holder of an Allowed DIP Claim shall receive payment in full in Cash. | N/A | N/A | N/A | N/A |
| N/A | Administrative Claims | Each Holder of an Allowed Administrative Claim shall receive payment in full in Cash. | N/A | N/A | N/A | N/A |
| N/A | Priority Tax Claims | Each Holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A | N/A | N/A | N/A |
| *Other Claims and Interests* | | | | | | |
| A1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s) (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either: (a) payment in full | $22,486,945 | 100% | $22,486,945 | 100% |

---

[5]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

[6]   Values determined based on the midpoint of the estimated range of the Debtors' Enterprise Value (as defined and estimated by PJT in the Valuation Analysis, attached to this Disclosure Statement as **Exhibit E**).

[7]   As described in greater detail below, SES has filed a proof of claim against each of the Debtors in the amount of $1.8 billion. SES asserts, among other things, that the Debtors owe or will owe SES approximately $420 million from the Accelerated Relocation Payments that the Debtors are eligible to receive. SES has further argued that it is entitled to punitive damages of three times the $420 million of compensatory damages allegedly owed. The Debtors believe these arguments are without merit but reflect the impact on recoveries if such arguments were successful for illustrative purposes only.

11

| | | SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
| | | in Cash; (b) delivery of collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | | | |
| A2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s) (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either: (a) payment in full in Cash; or (b) such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $1,098 | 100% | $1,098 | 100% |
| A3 | Debtor Intercompany Claims | Each Allowed Debtor Intercompany Claim shall, at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either on or after the Effective Date, be: (a) Reinstated; or (b) distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), without any distribution on account of such Claims. | $18,536,061,882 | N/A | $18,536,061,882 | N/A |

12

| | | SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
| A4 | Non-Debtor Intercompany Claims | Subject to the terms of the Settlement Agreement and the Settlement Order, except to the extent otherwise provided in the Restructuring Steps Memorandum or the Plan, each Allowed Non-Debtor Intercompany Claim shall, at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either on or after the Effective Date, be: (a) Reinstated; or (b) distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), without any distribution on account of such Claims. | $52,723,938 | N/A | $52,723,938 | N/A |
| A5 | Intercompany Interests | Except to the extent otherwise provided in the Restructuring Steps Memorandum, on the Effective Date, Intercompany Interests shall, at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Consenting HoldCo Creditors), either be: (a) Reinstated; or (b) discharged, canceled, released, and extinguished and of no further force or effect without any distribution on account of such Interests. | N/A | N/A | N/A | N/A |
| A6 | Term Loan Facility Claims | Except to the extent that a Holder of an Allowed Term Loan Facility Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Term Loan Facility Claim, each Holder of an Allowed Term Loan Facility Claim shall receive payment in full in Cash as compromised in accordance with the Term Loan Facility Claims Settlement; *provided, however*, for the avoidance of doubt, no distributions to Holders of Allowed Term Loan Facility Claims shall be made out of the deposit accounts of the HoldCos. | $3,095,000,000 | 99.67% | $3,095,000,000 | 99.67% |

13

| | | | | | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
|---|---|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | | |
| | | **SUMMARY OF EXPECTED RECOVERIES** | | | | |
| A7 | 8.00% First Lien Notes Claims | Except to the extent that a Holder of an Allowed 8.00% First Lien Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 8.00% First Lien Notes Claim, each Holder of an Allowed 8.00% First Lien Notes Claim shall receive payment in full in Cash of its Pro Rata share of (x) the full amount of all 8.00% First Lien Notes Claims as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; *provided, however,* that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the Holders of Allowed 8.00% First Lien Notes Claims as Unimpaired and the Holders of Allowed 8.00% First Lien Notes Claims shall receive payment in full, in Cash of: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including any premium or makewhole amounts and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render the 8.00% First Lien Notes Claims Unimpaired (and, for the avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the 8.00% First Lien Notes Claims Unimpaired | $1,380,371,550 | 99.49% | $1,380,371,550 | 99.49% |

14

| | | | | | Estimated |
|---|---|---|---|---|---|
| | | | | | Recovery |
| | | | | Projected | Under Plan |
| | | | | Amount of | If SES Is |
| | | | | Claims If SES | Successful in |
| | | | Estimated | Is Successful in | Prosecuting |
| | | | Recovery | Prosecuting | Each of Its |
| | | Projected | Under | Each of Its | $1.8 Billion |
| Class | Claim / Interest | Treatment of Claim / Interest | Amount of Claims | Plan[6] | $1.8 Billion Claims[7] | Claims[7] |

| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
|---|---|---|---|---|---|---|
| | | shall be expressly reserved and preserved), with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; *provided, further, however*, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; *provided, further, however*, for the avoidance of doubt, no distributions to Holders of Allowed 8.00% First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos. | | | | |
| A8 | 9.50% First Lien Notes Claims | Except to the extent that a Holder of an Allowed 9.50% First Lien Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 9.50% First Lien Notes Claim, each Holder of an Allowed 9.50% First Lien Notes Claim shall receive payment in full in Cash of its Pro Rata share of (x) the full amount of all 9.50% First Lien Notes Claims as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; *provided, however*, that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the Holders of Allowed 9.50% First Lien Notes Claims as Unimpaired and the Holders of Allowed 9.50% First Lien Notes Claims shall receive payment in full, in | $608,879,106 | 95.51% | $608,879,106 | 95.51% |

15

| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
|---|---|---|---|---|---|---|
| | SUMMARY OF EXPECTED RECOVERIES | | | | | |
| | | Cash of: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including any premium or makewhole amounts and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render the 9.50% First Lien Notes Claims Unimpaired (and, for the avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the 9.50% First Lien Notes Claims Unimpaired shall be expressly reserved and preserved), with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; *provided, further, however*, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; *provided, further, however*, for the avoidance of doubt, no distributions to Holders of Allowed 9.50% First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos. | | | | |
| A9 | Convenience Claims[8] | Each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash. | $4,551,249 | 100% | $4,551,249 | 100% |
| | *Jackson* | | | | | |
| B1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Jackson agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Jackson, each Holder of an Allowed Unsecured Claim against Jackson shall receive its Pro Rata share of the Jackson Unsecured Recovery. | $7,057,077,327 | 11.20% | $8,868,716,560 | 6.18% |

---

[8]   Recoveries on account of the Allowed Convenience Claims may modestly dilute the recoveries to Holders of Allowed Claims depending on the ultimate reconciliation of the Allowed Convenience Claims.

16

| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
|---|---|---|---|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** | | | | | | |
| *Jackson Subsidiaries* | | | | | | |
| C1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Jackson Subsidiaries agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Jackson Subsidiaries, each Holder of an Allowed Unsecured Claim against Jackson Subsidiaries shall receive its Pro Rata share of the Jackson Unsecured Recovery. | $7,151,305,565 | 44.77% | $8,962,944,798 | 35.83% |
| *ICF* | | | | | | |
| D1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against ICF agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against ICF, each Holder of an Allowed Unsecured Claim against ICF shall receive its Pro Rata share of the ICF Unsecured Recovery. | $1,298,821,049 | 22.54% | $3,110,460,282 | 14.90% |
| *Envision* | | | | | | |
| E1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Envision agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Envision, each Holder of an Allowed Unsecured Claim against Envision shall receive its Pro Rata share of the Envision Unsecured Recovery. | $1,708,765,694 | 4.29% | $3,520,404,927 | 3.15% |
| *LuxCo* | | | | | | |
| F1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against LuxCo agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against | $2,655,689,106[8] | 0.04%[9] | $4,467,328,339[8] | 0.03%[8] |

---

9   The estimated Allowed Unsecured Claims Against LuxCo include Claims held by Holders of Connect Senior Notes. Recoveries to Holders of Unsecured Claims Against LuxCo exclude any recoveries on account of the Connect Senior Notes and there shall be no distribution of any portion of the LuxCo Unsecured Recovery on account of Connect Senior Notes Claims Against LuxCo.

| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
|---|---|---|---|---|---|---|
| | | LuxCo, each Holder of an Allowed Unsecured Claim against LuxCo shall receive its Pro Rata share of the LuxCo Unsecured Recovery; *provided*, for the avoidance of doubt, that there shall be no distribution of any portion of the LuxCo Unsecured Recovery on account of (i) the Intercompany Senior Notes Claims and (ii) the Connect Senior Notes Claims, in each instance as a result of the settlements and compromises set forth in the Plan and Plan Support Agreement. | | | | |
| | | ***Intelsat Investments S.A.*** | | | | |
| G1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Investments agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Investments, each Holder of an Allowed Unsecured Claim against Investments shall receive its Pro Rata share of the Investments Unsecured Recovery. | $0 | N/A | $1,811,639,233 | 0.02% |
| | | ***Intelsat Holdings S.A.*** | | | | |
| H1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Holdings agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Holdings, each Holder of an Allowed Unsecured Claim against Holdings shall receive its Pro Rata share of the Holdings Unsecured Recovery. | $0 | N/A | $1,811,639,233 | 0.00% |
| | | ***Intelsat Investment Holdings S.à.r.l.*** | | | | |
| I1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Holdings SARL agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Holdings SARL, each Holder of an Allowed Unsecured Claim against Holdings SARL shall receive its Pro Rata share of the Holdings SARL Unsecured Recovery. | $0 | N/A | $1,811,639,233 | 0.00% |
| I2 | TopCo Guarantee | Except to the extent that a Holder of an | N/A | N/A | N/A | N/A |

18

| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
|---|---|---|---|---|---|---|
| | | **SUMMARY OF EXPECTED RECOVERIES** | | | | |
| | Claims | Allowed TopCo Guarantee Claim against Holdings SARL agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each TopCo Guarantee Claim against Holdings SARL, each Holder of an Allowed TopCo Guarantee Claim against Holdings SARL shall receive its Pro Rata share of the Holdings SARL Unsecured Recovery. | | | | |
| | | *Intelsat S.A.* | | | | |
| J1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Intelsat agrees to less favorable treatment of its Allowed Claim (including, for the avoidance of doubt, the HoldCo Creditor Ad Hoc Group Waiver), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Intelsat, each Holder of an Allowed Unsecured Claim against Intelsat shall receive its Pro Rata share of the S.A. Unsecured Recovery. | $410,061,305 | 6.88% | $2,221,700,538 | 2.29% |
| J2 | TopCo Guarantee Claims | Except to the extent that a Holder of an Allowed TopCo Guarantee Claim against Intelsat agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each TopCo Guarantee Claim against Intelsat, each Holder of an Allowed TopCo Guarantee Claim against Intelsat shall receive its Pro Rata share of the S.A. Unsecured Recovery; *provided* that 30 percent (30%) of any distributions made on account of TopCo Guarantee Claims against Intelsat to the Jackson Senior Notes Trustees shall be gifted Pro Rata to Holders of Connect Senior Notes Claims in consideration for the covenants, compromises, releases, and other benefits provided by the members of the HoldCo Creditor Ad Hoc Group pursuant to the Plan Support Agreement; *provided* that the aggregate value of such gift shall not exceed $6 million. | N/A | N/A | N/A | N/A |
| J3 | Interests | No distributions shall be made under the Plan in respect of Interests in Intelsat. On the Effective Date, Holders of Interests in Intelsat | N/A | N/A | N/A | N/A |

| | | | | | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
|---|---|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | | |
| | | shall have their Interests in Intelsat diluted and extinguished by the equity distributions made pursuant to the Plan and shall receive no distribution on account of their Interests. | | | | |

**SUMMARY OF EXPECTED RECOVERIES**

### E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Facility Claim, or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Amended Plan.

#### 1.  *DIP Claims*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment; (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Credit Agreement and the DIP Order, and (iv) all other DIP Obligations as provided for in the DIP Credit Agreement other than Contingent DIP Obligations, which shall otherwise survive the Effective Date and shall be paid in full in Cash as soon as reasonably practicable after they become due and payable under the DIP Documents.  Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall receive on the Effective Date payment in full in Cash of such Holder's Allowed DIP Claim.  All reasonable and documented unpaid fees and expenses of the DIP Agent, including reasonable and documented fees, expenses, and costs of its advisors, shall be paid in Cash on the Effective Date.  Contemporaneously with the foregoing receipt of payment in full in Cash of the Allowed DIP Claims, except with respect to Contingent DIP Obligations under the DIP Credit Agreement (which contingent obligations shall survive the Effective Date and shall continue to be governed by the DIP Credit Agreement), the DIP Facility, the DIP Credit Agreement, and all related loan documents shall be deemed canceled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders.  The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.  For the avoidance of doubt, no DIP Claims shall be paid out of the deposit accounts of the HoldCos.

20

### 2.   *Administrative Claims*

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, or as otherwise set forth in an order of the Bankruptcy Court (including pursuant to the procedures specified therein), as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than ninety days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

### 3.   *Priority Tax Claims*

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each Holder of an Allowed Priority Tax Claim will, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) receive Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) otherwise be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### 4.   *Statutory Fees*

The Debtors shall pay any outstanding fees owed pursuant to 28 U.S.C. § 1930(a), including U.S. Trustee fees, in full on or before the Effective Date.  The Debtors, the Reorganized Debtors, and/or the Distribution Agent[10] shall continue to pay such fees until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

The Debtors shall continue complying with monthly reporting requirements through the Effective Date as required under the Local Bankruptcy Rules.  After the Effective Date, the Reorganized Debtors and/or the Distribution Agent shall file quarterly reports consistent with Local Bankruptcy Rule 2015-(a)-1. The Reorganized Debtors and/or the Distribution Agent shall no longer have the obligation to file quarterly reports with respect to a Debtor once such Debtor's case is converted, dismissed or a final decree has been entered by the Court.

---

[10]   The Distribution Agent may be the Reorganized Debtors, one of the Debtors' already retained professionals, or another third party, including, if applicable each of the Indenture Trustees.  In the event that the Debtors engage a third party which has not yet been retained in these Chapter 11 Cases, the Debtors will disclose the terms of that engagement, which disclosure shall be included in the Plan Supplement in the event that the Debtors engage a third party to serve as the Distribution Agent prior to the filing of the Plan Supplement.

21

**F.      How do I know if I have a Convenience Claim and what does that mean for my General Unsecured Claim if I do?**

Any Holder of a General Unsecured Claim in an Allowed amount that is greater than $0 but less than or equal to the Convenience Claim Threshold, or in excess of the Convenience Claim Threshold for which the Holder of such Claim timely elects on a Convenience Claim Opt-In Form to have such Claim irrevocably reduced to the Convenience Claim Threshold and treated as a Convenience Claim in full and final satisfaction of such Claim, will be entitled to the treatment provided for Holders of Allowed Claims in Class A9.  In other words, Holders of Allowed Convenience Claims, including those who timely elect on a Convenience Claim Threshold to have such Claim reduced to the Convenience Claim Threshold, will be entitled to receive payment in full in Cash, in full and final satisfaction of such Claim.

**G.      Are any regulatory approvals required to consummate the Amended Plan?**

Yes, regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Amended Plan, and they must be obtained prior to the Effective Date.

The Amended Plan and associated Restructuring Transactions may constitute a transfer of control, requiring prior FCC approval.  If such approval is required, the Debtors may be required to submit applications that provide information concerning their current and proposed ownership, information regarding how the transaction will occur, and an explanation of how the transfer of control benefits the public interest.  These applications may take 45 days or longer for the FCC to approve, request additional information, or deny.

Ownership by foreign persons of the Reorganized Debtors could also result in review by the Committee on Foreign Investment in the United States ("CFIUS"), if such ownership is accompanied by control or other rights, which review would focus on the national security implications of any such foreign ownership upon emergence.  CFIUS is authorized to review any investment, acquisition, merger, takeover, or other transaction that (A) would result in foreign control (as such term is defined for CFIUS purposes) of a U.S. business or (B) involves a foreign person making a noncontrolling investment in a U.S. business that affords it specific rights that make its investment non-passive. CFIUS may impose mitigation measures (*i.e.*, conditions to clearance) on any pending transaction or in rare cases recommend that the President block a pending transaction or order divestiture for a completed transaction.  Depending on the ultimate foreign ownership of the New Common Stock or governance rights afforded to the holders of the New Common Stock, submitting a declaration or notice to CFIUS may be advisable, if not required.  If a CFIUS filing is required or advisable, it could take three or four months (or longer) for the filing to be prepared and submitted and for CFIUS to complete its review.  The CFIUS assessment is separate from, but complementary to, the national security review conducted by Team Telecom that is described in further detail in section VIII.D.3.

Ownership or control by foreign persons of certain of the Reorganized Debtors could require changes to a Proxy Agreement dated June 7, 2017 to which certain of the Reorganized Debtors, Intelsat General Corporation ("IGC"), and the U.S. Department of Defense are parties.  The Proxy Agreement is administered by the Defense Counterintelligence and Security Agency ("DCSA") and mitigates foreign ownership, control, or influence ("FOCI") under the National Industrial Security Program Operating Manual to allow IGC to maintain the requisite security clearances to perform certain government contracts.

The U.S. Department of State administers the International Traffic in Arms Regulations, (the "ITAR"), which set forth export control requirements regarding defense articles and defense services.  One of the Debtors, Intelsat US LLC, is currently registered under the ITAR. As an ITAR registrant, Intelsat US LLC would need to notify the U.S. State Department's Directorate of Defense Trade Controls ("DDTC") at least 60 days prior to emergence with respect to the consummation of the Amended

22

Plan, as required by the ITAR, if emergence will result in the transfer to a foreign person of ownership or control (as such terms are defined under the ITAR).  Regardless of whether this notice is required, no approval would be required from DDTC (though the U.S. State Department is a CFIUS member agency).  Moreover, and in any event, Intelsat US LLC will need to submit a material change notice under the ITAR to DDTC within five days following closing.

Additionally, filings under certain non-United States foreign direct investment ("FDI") regimes may be advisable or required.  Analysis regarding jurisdictions in which such filings may be required or advisable is ongoing.

Finally, antitrust-related notifications and observations of the statutory waiting period under the Hart-Scott-Rodino Antitrust Improvement Acts of 1976, as amended (the "HSR Act") under certain non-United States antitrust/merger control regulatory regimes may be required for consummation of the Restructuring Transactions.  Analysis regarding jurisdictions in which such notifications may be required or advisable is ongoing.

**H.    What happens to my recovery if the Amended Plan is not confirmed or does not go effective?**

In the event that the Amended Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Amended Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XI.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit C**.

**I.    If the Amended Plan provides that I get a distribution, do I get it upon Confirmation or when the Amended Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Amended Plan refers to approval of the Amended Plan by the Bankruptcy Court.  Confirmation of the Amended Plan does not guarantee that you will receive the distribution indicated under the Amended Plan.  After Confirmation of the Amended Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Amended Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Amended Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Amended Plan.  *See* Article XI of this Disclosure Statement, entitled "Confirmation of the Amended Plan," for a discussion of the conditions precedent to Consummation of the Amended Plan.

**J.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Amended Plan and recognizes that any party in interest may object to Confirmation of the Amended Plan.  The Confirmation Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**K.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any Person acquiring property under a plan of reorganization, any creditor or interest holder of a debtor, and any other Person or entity as may be ordered by the bankruptcy

court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**L.      What are the sources of Cash and other consideration required to fund the Amended Plan?**

The Reorganized Debtors shall fund distributions under the Amended Plan with (a) the issuance and distribution of New Common Stock; (b) distribution of the New Warrants; (c) CVRs; (d) proceeds of the New Debt; (e) Reorganized S.A. Common Stock and (f) Cash on hand.

**M.      Are there risks to owning the New Common Stock upon emergence from chapter 11?**

Yes. *See* Article VIII of this Disclosure Statement, entitled "Risk Factors."

**N.      Is there potential litigation related to the Amended Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Amended Plan as well. Objections potentially could give rise to litigation. *See* Article VIII.C.6 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Amended Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Amended Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Amended Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Amended Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Amended Plan."

On March 31, 2021, SES filed *SES Americom, Inc.'s Objection to Debtors' Motion for Approval of the Disclosure Statement* [Docket No. 1752] (the "SES Disclosure Statement Objection"). The SES Disclosure Statement Objection asserts, among other things, that the Original Plan was unconfirmable because, among other things it: (a) was not proposed in good faith; (b) fails to satisfy the best interests of the creditors test; (c) improperly classifies SES's claim with other general unsecured claims; and (d) violates the absolute priority rule. Additionally, SES has alleged that the Original Plan was unconfirmable because, SES alleges, (a) that management of the Company has conflicts of interest with respect to US LLC, (b) because of such alleged conflicts of interest, US LLC should have appointed a special committee to investigate and take actions with respect to Conflicts Matters, and (c) the board of directors of US LLC breached its fiduciary duties to its stakeholders. Additionally, SES has asserted that it believes its asserted claim should be allowed in full against each Debtor, and placed into its own class because it is not substantially similar to other unsecured claims against the Debtors. If SES's claim were allowed and placed into its own class, SES argues that it may render the Amended Plan unconfirmable in the event that SES votes to reject the Amended Plan.

On April 7, 2021, the Convert Ad Hoc Group filed its *Omnibus Objection of Ad Hoc Group of Convertible Noteholders to Debtors' Motions (I) for Disclosure Statement Approval and Related Relief and (II) to Extend Exclusivity* [Docket No. 1808] (the "Convert Ad Hoc Group's Disclosure Statement Objection"). The Convert Ad Hoc Group's Disclosure Statement Objection asserts, among other things, that the Original Plan was unconfirmable because, as it alleges, (a) conflicts of interests exist and (b) the settlements contemplated in the Amended Plan are improper. Additionally, the Convert Ad Hoc Group has

24

asserted that it believes that a plan cannot be confirmed at Intelsat S.A. without its constituents voting to accept it.

The Debtors believe that the arguments regarding the confirmability of the Amended Plan asserted by SES and the Convert Ad Hoc Group lack merit, and the Debtors intend to prove that the Amended Plan satisfies the requirements of applicable law and is confirmable at the Confirmation Hearing. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court disagrees with the Debtors' position, the Amended Plan may not be confirmed.

On February 5, 2021, the Convert Ad Hoc Group filed the *Motion of Ad Hoc Group of Convertible Noteholders for Entry of an Order: (I) Granting Standing to Prosecute Intercompany Claims on Behalf of Debtor Intelsat S.A.; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [Docket No. 1439] (the "Standing Motion"). The Standing Motion asserts, among other things, that (a) the Convert Ad Hoc Group should be granted standing to prosecute a proposed adversary complaint on behalf of the estate of Intelsat S.A., alleging that Jackson is not entitled to the Accelerated Relocation Payments and Intelsat S.A. is entitled to such Accelerated Relocation Payments; (b) the Convert Ad Hoc Group should be granted limited authority to settle intercompany claims; and (c) the automatic stay should be modified to allow the Convert Ad Hoc Group to prosecute the claims in their proposed adversary proceeding.

On March 3, 2021, SES filed its *Motion (I) To Intervene in the Accelerated Relocation Payments Litigation and/or (II) For Derivative Standing to Prosecute Intercompany Claims on Behalf of Debtor Intelsat US LLC* [Docket No. 1552] (the "Intervention Motion"). By the Intervention Motion, SES seeks either to (a) intervene in the "accelerated relocation payments litigation," initiated by the Convert Ad Hoc Group in the Standing Motion or (b) obtain standing to prosecute claims on behalf of Intelsat US LLC ("US LLC"). Specifically, SES seeks standing to prosecute claims that US LLC is entitled to receipt of the Accelerated Relocation Payments—not Intelsat S.A., as asserted by the Convert Ad Hoc Group, or as was determined by the Debtors.

Because the Standing Motion and the Intervention Motion challenge which Debtor entities are entitled to the Accelerated Relocation Payments that was embodied in the Original Plan, the Debtors believed that it would be most appropriate to consider such matters in the appropriate context—at confirmation. Accordingly, the Debtors filed a motion (the "Scheduling Motion") [Docket No. 1568] seeking to adjourn those matters until June 14, 2021, in conjunction with confirmation of the Original Plan. On March 15, 2021, the Bankruptcy Court granted the Scheduling Motion and entered an order [Docket No. 1630] adjourning the Standing Motion and Intervention Motion to June 14, 2021 and establishing a related schedule for discovery and other pre-trial matters related to the Standing Motion and Intervention Motion. Consistent with the prior scheduling order, the Convert Ad Hoc Group and SES agreed to modify the discovery and trial schedule to remain consistent with the schedule for confirmation of the Amended Plan. To do so, on June 3, 2021, the Debtors, with the consent of the Convert Ad Hoc Group and SES, filed the *Notice of Modified Dates Relating to the Standing Motion and the Intervention Motion* [Docket No. 2291], which adjourned, without dates, the pre-trial schedule and trial schedule for the Standing Motion and the Intervention Motion until a mutually agreeable pre-trial schedule and future trial date is proposed, at or before the hearing on the adequacy of this Disclosure Statement.

In addition, as described in further detail in sections VI.E and VII.L herein, numerous pleadings have been filed on account of certain Guarantee Claims, which could have a material impact on voting and recovery under any chapter 11 plan. Certain of the parties to litigation regarding the Guarantee Claims have reached an agreement regarding a standstill of certain litigation regarding the Guarantee Claims, but certain of the Guarantee Claims remain subject to an ultimate resolution. If certain of the Guarantee Claims are fully allowed recoveries of Holders of Claims against some or all of the Parent Guarantors could be diluted.

25

**O.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Amended Plan?**

The Management Incentive Plan (the "MIP") shall provide for terms consistent with the Management Incentive Plan Term Sheet (the "MIP Term Sheet").

As described more fully in the MIP Term Sheet, the MIP will be subject to the following key terms:

- The MIP equity pool (the "MIP Pool") will consist of shares of New Common Stock representing 3.26 percent of New Common Stock as of the Effective Date, determined on a fully diluted and fully distributed basis (*i.e.*, assuming conversion of all outstanding convertible securities and full distribution of the MIP Pool and hereinafter referred to as "Fully Diluted Basis"), and the long-term cash incentive pool will provide for $18 million in long-term cash incentive awards (the "Cash LTIP Pool").

- On the Effective Date, the Equity Issuer will grant (i) a number of restricted stock units ("RSUs") and performance stock units ("PSUs") collectively representing 2.32% of New Common Stock at target as of the Effective Date and determined on a Fully Diluted Basis (with such RSUs and PSUs having the potential to collectively represent up to 2.99% of New Common Stock as of the Effective Date and determined on a Fully Diluted Basis, if such PSUs vest at their maximum), and (ii) a portion of the Cash LTIP Pool in the form of long term cash incentive awards.

- The eight most senior executives of the Company (the "Management Committee") will receive emergence grants representing approximately 1.32 percent of New Common Stock at target as of the Effective Date and determined on a Fully Diluted Basis (with such RSUs and PSUs having the potential to collectively represent up to 1.99% of New Common Stock as of the Effective Date and determined on a Fully Diluted Basis, if such PSUs vest at their maximum), with the emergence grants (i) 50% in the form of RSUs and (ii) 50% in the form of PSUs. Other key employees will receive (i) emergence grants representing approximately 1.00 percent of New Common Stock as of the Effective Date on a Fully Diluted Basis consisting of 100 percent RSUs, and (ii) long-term cash incentive awards. The portion of the MIP Pool that has not previously been granted and all shares of New Common Stock subject to the emergence grants or subsequent awards that have been forfeited before vesting may be granted following the Effective Date, in the form of RSUs or PSUs (or their full value equivalent), at the discretion of and on terms and conditions determined by the board of the Equity Issuer or the compensation committee thereof.

- RSUs and long-term incentive cash awards will vest in equal 33⅓ percent installments on each of the first three anniversaries of the Effective Date, and the PSUs will vest upon an Exit Event (as described in definitive documentation governing the MIP) based on the equity value of the Equity Issuer achieved as of the Exit Event, as follows: (a) if the equity value of the Equity Issuer is $4,350,000,000, 50 percent of the target number of PSUs will vest; (b) if the equity value of the Equity Issuer is $7,250,000,000 or more, 200 percent of the target number of PSUs will vest; and (c) if the equity value of the Equity Issuer is in between $4,350,000,000 and $7,250,000,000, the percentage of the target number of PSUs that vests will be determined using straight-line interpolation. Notwithstanding anything to the contrary in the foregoing, if no Exit Event occurs prior to the fourth anniversary of the Effective Date, the equity value of the Equity Issuer will be measured on each of the fourth and fifth anniversaries of the Effective Date (each, a "Valuation Event"), and the PSUs will vest in accordance with the framework set forth above based on the equity value of the Equity Issuer as of such Valuation Events.

26

- Upon a qualifying termination (*i.e.*, a termination of employment (x) by the Company without "cause," (y) due to the participant's death or "disability" or (z) by the participant for "good reason," solely to the extent the participant is party to an employment agreement with a "good reason" concept), emergence grants will vest in accordance with the terms specified in the MIP Term Sheet.  For qualifying terminations of members of the Management Committee prior to the third anniversary of the Effective Date, the next installment of RSUs will vest as of such participant's qualifying termination date.  If a Management Committee member's qualifying termination occurs within the first 18 months of the Effective Date, none of their PSUs will vest.  If a Management Committee member's qualifying termination occurs on or after the eighteen (18)-month anniversary of the Effective Date, such participant's PSUs will remain outstanding and eligible to vest upon the occurrence of an Exit Event or the Valuation Events, in each case, based on actual performance achieved in connection therewith, and the number of PSUs that will vest based on such performance achievement will be pro-rated, as described in the MIP Term Sheet.  In addition, the portion of the Management Committee members' qualifying termination emergence grants that remains unvested following the treatment set forth above will remain outstanding for six (6) months following their qualifying termination date (the "Tail Period") and eligible to vest upon the occurrence of an Exit Event during the Tail Period.  If an Exit Event occurs during the Tail Period, 100% of the their unvested emergence grants will vest upon such Exit Event, provided, that the percentage of PSUs that vests will be determined based on achievement of the performance criteria set forth above.  For qualifying terminations of other key employees of the Company that occur prior to the third anniversary of the Effective Date, the RSUs and long-term cash incentive awards will vest pro-rata as described in the MIP Term Sheet.  Upon any participant's qualifying termination that occurs following a "change in control," 100 percent of the participant's unvested emergence grants will accelerate and vest.

If you are a Holder of an Allowed Claim who receives New Common Stock or the New Warrants under the Amended Plan, the value of your New Common Stock or New Common Stock purchased pursuant to the New Warrants will be diluted by any New Common Stock distributed pursuant to the MIP.

**P.     How will the preservation of the Causes of Action impact my recovery under the Amended Plan?**

The Amended Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Amended Plan Supplement; and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than (1) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Amended Plan, including in Article VIII of the Amended Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date and (2) the Causes of Action released by the Debtors pursuant to the Settlement Agreement, following entry of the Settlement Order and upon the effective date of such Settlement Agreement.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Amended Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all**

**available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Amended Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

> **Q.** **Will there be releases and exculpation granted to parties in interest as part of the Amended Plan?**

Yes, Article VIII of the Amended Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtor Releases, Third-Party Releases, and Exculpation provisions included in the Amended Plan are an integral part of the Debtors' overall restructuring efforts and are an essential element of the negotiations among the Debtors and various parties in interest in obtaining their support for the Amended Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Amended Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Further, the Amended Plan embodies a settlement of claims and causes of action between the Debtors and the parties to the Amended Plan Support Agreement and incorporates the settlement and releases in the Settlement.  To effectuate the settlement contemplated in the Settlement, the Settlement Agreement, and the Amended Plan Support Agreement and embodied in the Amended Plan, the Amended Plan includes Debtor and Third-Party Releases, an exculpation provision, and an injunction provision.  These consensual release and exculpation provisions comply with the Bankruptcy Code and prevailing law because, among other reasons, they are the product of extensive good-faith, arm's-length negotiations, were material inducements for the Consenting Creditors to enter into the Amended Plan Support Agreement, the Settlement, and the settlement embodied in the Amended Plan, and are supported by the Debtors and the parties to the Amended Plan Support Agreement.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE AMENDED PLAN OR FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE AMENDED PLAN BY THE AMENDED PLAN OBJECTION DEADLINE (WHICH OBJECTION SHALL AUTOMATICALLY CONSTITUTE AN OPT OUT FROM THE RELEASES) WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION SET FORTH IN ARTICLE VIII OF THE AMENDED PLAN AGAINST THE DEBTORS AND THE RELEASED PARTIES.**

**IF YOU DO NOT TAKE ONE OF THE FOREGOING ACTIONS, YOU WILL BE DEEMED TO HAVE GIVEN THE THIRD PARTY RELEASE DESCRIBED IMMEDIATELY BELOW AND IN ARTICLE VIII.E OF THE AMENDED PLAN.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE AMENDED PLAN.**

The Debtors believe that the releases and exculpations in the Amended Plan are necessary and appropriate and meet the requisite legal standard.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Amended Plan are copied in pertinent part below.

28

1.   *Releases by the Debtors*

In addition to any release provided in the Settlement Order, effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, any intercompany transactions, the DIP Facility, the DIP Order, the Term Loan Facility, the First Lien Notes, the Senior Notes, the Indentures, the Chapter 11 Cases, the matters settled pursuant to the Settlement, including the Historical Intercompany Transaction Claims, Claims related to the Debtors' tax attributes, including the 2018 Reorganization Claims, the Accelerated Relocation Payment Claims, any preference, fraudulent transfer, or other avoidance, recovery, or preservation claim pursuant to sections 544, 547, 548, 550, or 551 of the Bankruptcy Code and applicable state and foreign laws, the Plan Support Agreement, the Secured Creditor Settlement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Disclosure Statement, the New Debt Documents, the Backstop Commitment Agreement, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the New Debt Documents, the Backstop Commitment Agreement, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan or (2) any retained Causes of Action. Notwithstanding anything in this Article VIII.D to the contrary, if the Plan Toggle Event occurs: (a) nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of (i) any TopCo Guarantee Claims or (ii) any Causes of Action against the TopCos that are not released pursuant to the Settlement; and (b) nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims. Nothing in this Article VIII.D shall operate to release, discharge, or enjoin any Entity's rights with respect to the Secured Creditor Claims

29

Litigation (subject to the Debtors' obligations with respect to the Secured Creditor Settlement and the Secured Creditor Settlement Motion).

### 2. *Third-Party Releases*

Effective as of the Effective Date, in each case except for Claims arising under, or preserved by, the Plan, each Releasing Party (other than the Debtors or the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Facility, the DIP Order, the Term Loan Facility, the First Lien Notes, the Senior Notes, the Indentures, the Chapter 11 Cases, the matters settled pursuant to the Settlement, including the Historical Intercompany Transaction Claims, Claims related to the Debtors' tax attributes, including the 2018 Reorganization Claims, the Accelerated Relocation Payment Claims, any preference, fraudulent transfer, or other avoidance, recovery, or preservation claim pursuant to sections 544, 547, 548, 550, or 551 of the Bankruptcy Code and applicable state and foreign laws, the Plan Support Agreement, the Secured Creditor Settlement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Disclosure Statement, the New Debt Documents, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the New Debt Documents, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan. Notwithstanding anything in this Article VIII.E to the contrary, if the Plan Toggle Event occurs: (a) nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of (i) any TopCo Guarantee Claims or (ii) any Causes of Action against the TopCos that are not released pursuant to the Settlement; and (b) nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims. Nothing in this Article VIII.E shall operate to release, discharge, or enjoin any Entity's rights with respect to the Secured

**Creditor Claims Litigation (subject to the Debtors' obligations with respect to the Secured Creditor Settlement and the Secured Creditor Settlement Motion).**

### 3. *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Chapter 11 Cases, the Disclosure Statement, the New Debt Documents, the Backstop Commitment Agreement, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 4. *Injunction*

In addition to any injunction provided in the Settlement Order, effective as of the Effective Date, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has filed a motion requesting the right to

31

**perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan. Notwithstanding the foregoing, all Entities are permanently enjoined and prohibited from taking any action (i) to adversely impact, reduce or diminish the Debtors' or Reorganized Debtors' net operating losses or other tax assets or attributes, or (ii) otherwise taking any action (including in the United States or any foreign jurisdiction) that is intended or is reasonably likely to directly or indirectly prevent, impede, hinder, adversely affect, and/or delay any of the Restructuring Transactions or any actions or efforts of the Debtors and Reorganized Debtors and/or their ability to consummate the Plan. Notwithstanding anything in this Article VIII.G to the contrary, if the Plan Toggle Event occurs: (a) nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of (i) any TopCo Guarantee Claims or (ii) any Causes of Action against the TopCos that are not released pursuant to the Settlement; and (b) nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims. Nothing in this Article VIII.G shall operate to release, discharge, or enjoin any Entity's rights with respect to the Secured Creditor Claims Litigation (subject to the Debtors' obligations with respect to the Secured Creditor Settlement and the Secured Creditor Settlement Motion).**

For more detail, *see* Article VIII of the Amended Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

### R.      What impact does the Claims Bar Date have on my Claim?

The Bankruptcy Court established September 9, 2020, at 5:00 p.m., prevailing Eastern Time, as the general Claims bar date (the "Bar Date") in the Chapter 11 Cases. Entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, must have filed proofs of claim on or before the Bar Date as, and to the extent, required by the Bar Date Order.

In accordance with Bankruptcy Rule 3003(c)(2), if any Person or Entity that is required, but failed, to File a Proof of Claim on or before the Bar Date: (1) such Person or Entity is forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a Proof of Claim with respect thereto); (2) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such Person or Entity will not receive any distribution in the Chapter 11 Cases on account of that Claim; and (4) such Person or Entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which proofs of claim are Filed on or before the Bar Date.

### S.      What is the deadline to vote on the Amended Plan?

The Voting Deadline is October 18, 2021, at 5:00 p.m. (prevailing Eastern Time).

### T.      How do I vote for or against the Amended Plan?

Detailed instructions regarding how to vote on the Amended Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote on the Amended Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your

ballot or a master ballot including your vote is **actually received** by the Debtors' Solicitation Agent, Stretto, **on or before the Voting Deadline, *i.e.*, October 18, 2021, at 5:00 p.m. prevailing Eastern Time**. *See* Article X of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

### U.      How do I opt out of the granting of releases?

The ballots distributed to Holders of Claims or Interests that are entitled to vote on the Amended Plan contain an option to opt out of granting the releases.  You must check the box indicating your desire to opt out of granting the releases and return the ballot so that it is **actually received** by the Solicitation Agent **on or before the Voting Deadline, *i.e.*, October 18, 2021, at 5:00 p.m. prevailing Eastern Time**. Holders of Claims or Interests may also opt out of granting the releases by objecting to the Amended Plan releases before the Confirmation Objection Deadline of October 18, 2021, at 5:00 p.m. prevailing Eastern Time.

Holders of Claims or Interests that are not entitled to vote on the Amended Plan will receive an Opt Out Form, which must be signed and returned in the accompanying pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery so that it is **actually received** by the Solicitation Agent **on or before the Opt-Out Deadline, *i.e.*, October 18, 2021, at 5:00 p.m. prevailing Eastern Time**.

### V.      What is the effect of the Amended Plan on the Debtors' ongoing businesses?

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be liquidated or forced to go out of business. Following Confirmation, the Amended Plan will be consummated on the Effective Date.  Except as otherwise provided in the Amended Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Amended Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Amended Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On or after the Effective Date, and unless otherwise provided in the Amended Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Amended Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### W.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?

The New Board shall be appointed pursuant to the terms of the Corporate Governance Term Sheet. Corporate governance for the Reorganized Debtors, including the New Corporate Governance Documents, shall be consistent with the Corporate Governance Term Sheet and section 1123(a)(6) of the Bankruptcy Code.

As set forth in the Amended Plan, to the extent known, the Debtors will disclose at or prior to the Confirmation Hearing the identity and affiliations of any person proposed to serve on the Equity Issuer Board.  The Equity Issuer Board shall include the CEO and shall be comprised of seven (7) members. *See* Am. Plan Art. IV.O.

As set forth in the Corporate Governance Term Sheet, which is attached as Exhibit E to the Amended Plan Support Agreement, which is attached as Exhibit G to the Amended Disclosure Statement, three (3) directors shall be designated by Pacific Investment Management Company LLC, one (1) director shall be designated by Appaloosa LP and related funds, one (1) director shall be designated by Davidson

Kempner Capital Management KLP, one (1) director shall be designated by CarVal Investors and related funds, and the then-serving Chief Executive Officer of the Reorganized Debtors shall serve as a director.

### X.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Amended Plan?

If you have any questions regarding this Disclosure Statement or the Amended Plan, please contact the Debtors' Solicitation Agent, Stretto, via one of the following methods:

> *By mail or hand delivery at*:
> Stretto
> Attn: Intelsat S.A., et al., Ballot Processing
> c/o Stretto
> 410 Exchange, Suite 410
> Irvine, CA 92602
>
> *By electronic mail at*:
> Intelsatinquiries@stretto.com
>
> *By telephone (toll free) at*:
> (855) 489-1434
>
> *By telephone (international) at*:
> (949) 561-0347

Copies of the Amended Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://cases.stretto.com/intelsat (free of charge) or the Bankruptcy Court's website at http://www.vaeb.uscourts.gov (for a fee).

### Y.   Do the Debtors recommend voting in favor of the Amended Plan?

Yes.  The Debtors believe that the Amended Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative.  The Debtors believe that the Amended Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Amended Plan.

## IV.   THE DEBTORS' PLAN

### A.   The Amended Plan

The Amended Plan contemplates, among other things, the payment in Cash in full of the DIP Claims, Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Secured Claims and Other Priority Claims from proceeds of the New Debt and Cash on hand.  In addition, the Amended Plan includes the following key terms:

34

### 1.   *Issuance of New Common Stock*

The Equity Issuer will issue 96.0 percent of the authorized but unissued New Common Stock to Holders of Allowed Unsecured Claims Against Jackson and the Jackson Subsidiaries and 4.0 percent to Holders of Allowed Unsecured Claims Against ICF, each subject to dilution in accordance with the Dilution Principles set forth in the Amended Plan.

All of the shares or units of New Common Stock issued pursuant to the Amended Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Common Stock under the Amended Plan shall be governed by the terms and conditions set forth in the Amended Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the New Common Stock shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the New Common Stock on a recognized U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents.

### 2.   *New Capital Structure*

Prior to the Effective Date, certain members of the Jackson Crossover Ad Hoc Group and HoldCo Creditor Ad Hoc Group, among others determined by the Jackson Crossover Ad Hoc Group with the reasonable consent of the Debtors (which consent is not to be unreasonably withheld, conditioned, or delayed), may backstop the New Term Loans and New Notes on terms set forth in a backstop commitment agreement, to be provided in advance of the Confirmation Hearing.  The New Capital Structure will provide for (i) $7.125 billion of the New Term Loans and New Notes and a revolving credit facility for up to $500 million of availability, which availability may be increased up to $750 million with the consent of the Required Consenting Jackson Crossover Group Members.

Prior to the Effective Date, the Debtors may use commercially reasonable efforts (including, for the avoidance of doubt, conducting a solicitation process for financing proposals that will provide superior economic terms to the terms to be set forth in the Backstop Commitment (as defined in the Amended Plan)) to secure commitments to fund the New Capital Structure.  The New Capital Structure may include a combination of the New Term Loan and/or New Notes, and may be secured by a lien on substantially all of the assets of the Reorganized Debtors and their subsidiaries.

The New Term Loans and New Notes shall be 100 percent backstopped by the Backstop Parties, and the Backstop Parties shall be obligated to fund the New Term Loans and New Notes in accordance with the terms and conditions of the Backstop Commitment Agreement.  Subject to, and in accordance with the Backstop Commitment Agreement, as consideration for the Backstop Commitments, the Backstop Parties shall receive a Backstop Premium, which will be payable on, and as a condition to, the Effective Date in Cash in amount equal to 2.5 percent of the aggregate amount of the New Term Loans and New Notes, and shall be fully earned on the Effective Date.

On the Effective Date, the net Cash proceeds of the New Term Loans and New Notes, as applicable, will be used to pay in full in Cash Allowed DIP Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, executory contract and unexpired lease Cure Claims, and other Claims, as and to the extent that any such Claims are required to be paid in Cash under this Plan, and distributed to Holders of Allowed Claims entitled to a Cash distribution in accordance with Article III of this Plan.

Confirmation of the Plan shall be deemed (a) approval of the New Revolver, New Term Loans, and New Notes, as applicable, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the New Revolver, New Term Loans, and issue the New Notes, as applicable, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to obtain the New Revolver and the New Term Loans and issue the New Notes, as applicable.

On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New Revolver, New Term Loans and/or New Notes, as applicable: (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the collateral securing the New Revolver, New Term Loans, and/or New Notes, as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law, the Plan, and the Confirmation Order; and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the New Revolver, New Term Loans, and/or New Notes, as applicable, are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

The Debtors and Reorganized Debtors shall take all actions necessary to permit the New Notes to be eligible for resale under rule 144(a) of the Securities Act, and the Plan and Confirmation Order shall authorize all such action by the Debtors and Reorganized Debtors.

### 3.  *General Settlement of Claims and Interests*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

The Amended Plan Support Agreement incorporates the terms of Term Loan Claims Settlement, to be approved by the Bankruptcy Court pursuant to the Confirmation Order, and the Amended Plan incorporates the terms of the Settlement, each of which to be approved by the Bankruptcy Court pursuant to the Confirmation Order or a separate order approving the Settlement Agreement.

### 4.  *CVRs*

On the Effective Date, the CVR Issuer will issue the CVRs only to the extent required to provide for distributions to the applicable Holders of Claims in exchange for their Claims pursuant to Article III.B of the Amended Plan.  All of the CVRs issued pursuant to the Amended Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.

The CVRs shall have a term that shall automatically terminate on the earlier of (i) the date on which the holders of CVRs have received the maximum amount of distributions on the CVR permitted under the CVR Agreements and (ii) the later of (a) the Outside Date and (b) the date on which there is no obligation remaining pursuant to an Additional Acceleration Contract to pay Further Acceleration Payments to any Debtor or Reorganized Debtor or any of their respective Affiliate (as defined in the CVR Term Sheet).  The CVRs shall entitle the holder of such CVRs to such holder's pro rata share of cash equal to 100 percent of the Initial Further Acceleration Payments or the Subsequent Further Acceleration Payments (each as defined in the CVR Term Sheet), as applicable.  In the event that Jackson receives a Minimum Payment of $4,865,366,000 and the Debtors actually receive Further Acceleration Payments before the Effective Date, then the initial allocation of cash issued on the Effective Date shall be adjusted to provide certain holders of Allowed Claims the amount of cash they would have received had the CVRs been issued at the time that such Further Acceleration Payments were received.  The CVRs shall survive any change of control transaction (including a sale of all or substantially all of the assets of the CVR Issuer).

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the CVRs shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the CVRs on a recognized U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents.

### 5.  *New Warrants*

On the Effective Date, the Equity Issuer will issue 100.0 percent of the Series A Warrants and approximately 46.4 percent of the Series B Warrants to Holders of ICF Unsecured Claims, approximately 6.3 percent of the Series B Warrants to Holders of S.A. Unsecured Claims, and approximately 47.3 percent of the Series B Warrants to Holders of Envision Unsecured Claims.  All of the New Warrants issued pursuant to the Amended Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.  Any New Common Stock issued upon the exercise of the New Warrants shall be subject to dilution pursuant to the Dilution Principles and shall, when so issued and upon payment of the exercise price in accordance with the terms of the New Warrants, be duly authorized, validly issued, fully paid, and non-assessable.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the New Warrants (including any New Common Stock issued upon the exercise of the New Warrants) shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the New Warrants (including any New Common Stock issued upon the exercise of the New Warrants) on a recognized

U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents.

### 6.  *Reorganized S.A. Common Stock*

The Confirmation Order shall authorize the issuance of the Reorganized S.A. Common Stock, as necessary, in one or more issuances without the need for any further corporate action, and the Debtors or Reorganized Debtors, as applicable, are authorized to take any action necessary or appropriate in furtherance thereof.  By the Effective Date for Debtor Intelsat, applicable Holders of Claims shall receive approximately 100 percent (subject to the extinguishment of Intelsat Interests) of shares or units of the Reorganized S.A. Common Stock in exchange for their Claims pursuant to Article III.B and consistent with the Restructuring Steps Memorandum.

All of the shares or units of Reorganized S.A. Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the Reorganized S.A. Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  For the avoidance of doubt, the Reorganized S.A. Common Stock may constitute Interests in Intelsat, which may retain its Interests in Holdings SARL or take other actions under applicable nonbankruptcy law to retain any assets of Holdings SARL, except for Interests in Holdings, which may be owned by or become the Equity Issuer.

### 7.  *Releases*

Article VIII of the Amended Plan contains certain releases (as described more fully in Article III.Q of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Amended Plan?").

### 8.  *Secured Creditor Settlement*

**Settlement/Allowance**.  Pursuant to Bankruptcy Rule 9019, in settlement and compromise of any disputes between the certain of the Debtors and the Holders of the First Lien Claims regarding the allowance, classification and treatment of the First Lien Claims, the Debtors shall seek entry of an Order, which provides that the First Lien Claims are Allowed and settled as follows  (the settlement described herein, "Secured Creditor Settlement" and an order approving the Secured Creditor Settlement, the "Secured Creditor Settlement Order"):

(a)    8.00% First Lien Notes Claims Allowance:  Allowed against all of the obligors and guarantors under the 8.00% First Lien Notes Indenture in the amount equal to: (i) full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate (it being understood and agreed that until the Effective Date the Debtors shall continue to pay interest on the principal amount in accordance with the Final DIP Order); and (iii) $23,634,033.54 on account of prepayment premium and/or makewhole amounts payable under the 8.00% First Lien Notes Indenture (which amount represents 77% of the aggregate amount of any prepayment premium and/or makewhole amounts payable under the 8.00% First Lien Notes Indenture, along with interest thereon at the contractual rate, through the Effective Date)[11]

---

[11]    This amount assumes an Effective Date of 12/31/21, and the interest component thereof is subject to change based on actual Effective Date.

(the "Settled/Allowed 8.00% First Lien Notes Claims").  In the event the Secured Creditor Settlement Order is not entered or does not remain in effect, 8.00% First Lien Notes Claims shall be allowed in an amount equal to:  (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through and including the Effective Date at the contractual rate; and (iii) such additional amounts as many be determined in a Final Order sufficient to render the 8.00% First Lien Notes Claims Unimpaired.  For the avoidance of doubt, in the event that the Secured Creditor Settlement Order is not entered or does not remain in effect, the 8.00% First Lien Notes Claims shall be treated as Unimpaired and holders of 8.00% First Lien Notes Claims shall not be bound by the Secured Creditor Settlement and shall be entitled to seek allowance in full of their 8.00% First Lien Notes Claims in an amount sufficient to render the 8.00% First Lien Notes Claims Unimpaired, including to seek interest (at the contractual rate) on, or as part of, such Claims until such Claims are paid in full, and all parties' rights are reserved in connection with any such litigation.

(b)     8.00% First Lien Notes Claims Treatment:  Except to the extent that a Holder of a Settled/Allowed 8.00% First Lien Notes Claim agrees to less favorable treatment of its Settled/Allowed 8.00% First Lien Notes Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Settled/Allowed 8.00% First Lien Notes Claim, each Holder of a Settled/Allowed 8.00% First Lien Notes Claim shall receive payment in full in Cash of its Pro Rata share of (x) the full amount of all First Lien Notes Claims as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; provided, however, that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the Holders of Allowed 8.00% First Lien Notes Claims as Unimpaired and the Holders of Allowed 8.00% First Lien Notes Claims shall receive payment in full, in Cash of: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including all premium or makewhole amounts, and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render such 8.00% First Lien Notes Claims Unimpaired (and, for the avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the First Lien Notes Claims Unimpaired shall be expressly reversed and preserved),, with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; provided, further, however, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; provided, further, however, for the avoidance of doubt, no distributions to Holders of Settled/Allowed 8.00% First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos.

(c)     9.50% First Lien Notes Claims Allowance: Allowed against all of the obligors and guarantors under the 9.50% First Lien Notes Indenture in the amount equal to: (i) full

39

outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate (it being understood and agreed that until the Effective Date the Debtors shall continue to pay interest on the principal amount in accordance with the Final DIP Order); and (iii) $91,536,911.35 on account of prepayment premium and/or makewhole amounts payable under the 9.50% First Lien Notes Indenture (which amount represents 77% of the aggregate amount of any prepayment premium and/or makewhole amounts payable under the 9.50% First Lien Notes Indenture, along with interest thereon at the contractual rate, through the Effective Date)[12] (the "Settled/Allowed 9.50% First Lien Notes Claims" and, together with the Settled/Allowed 9.50% First Lien Notes Claims, the "Settled/Allowed First Lien Notes Claims").  In the event the Secured Creditor Settlement Order is not entered or does not remain in effect, 9.50% First Lien Notes Claims shall be allowed in an amount equal to: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through and including the Effective Date at the contractual rate; and (iii) such additional amounts as many be determined in a Final Order sufficient to render such 9.50% First Lien Notes Claims Unimpaired.  For the avoidance of doubt, in the event that the Secured Creditor Settlement Order is not entered or does not remain in effect, the 9.50% First Lien Notes Claims shall be treated as Unimpaired and holders of 9.50% First Lien Notes Claims shall not be bound by the Secured Creditor Settlement and shall be entitled to seek allowance in full of their 9.50% First Lien Notes Claims in an amount sufficient to render the 9.50% First Lien Notes Claims Unimpaired, including to seek interest (at the contractual rate) on, or as part of, such Claims until such Claims are paid in full, and all parties' rights are reserved in connection with any such litigation.

(d)      9.50% First Lien Notes Claims Treatment:  Except to the extent that a Holder of a Settled/Allowed 9.50% First Lien Notes Claim agrees to less favorable treatment of its Settled/Allowed 9.50% First Lien Notes Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Settled/Allowed 9.50% First Lien Notes Claim, each holder of a Settled/Allowed 9.50% First Lien Notes Claim shall receive payment in full in Cash of its Pro Rata share of (x) the full amount of all First Lien Notes Claims as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; provided, however, that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the Holders of Allowed First Lien Notes Claims as Unimpaired and the Holders of Allowed First Lien Notes Claims shall receive payment in full, in Cash of: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including all premium or makewhole amounts and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render such 9.50% First Lien Notes Claims Unimpaired (and, for the

---

[12]   This amount assumes an Effective Date of 12/31/21, and the interest component thereof is subject to change based on actual Effective Date.

avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the 8.00% First Lien Notes Claims Unimpaired shall be expressly reserved and preserved), with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; *provided, further, however*, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; *provided, further, however*, for the avoidance of doubt, no distributions to Holders of Settled/Allowed 9.50% First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos.

(e)    First Lien Notes Claims Classification:  Each of the 8.00% First Lien Notes Claims and 9.50% First Lien Notes Claims shall be separately classified under the Plan from other First Lien Claims.  The 8.00% First Lien Notes Claims and 9.50% First Lien Notes Claims shall be Impaired and entitled to vote to accept or reject the Plan.

**Settlement/Allowance of Term Loan Facility Claims:**  Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 1123(b)(3), in settlement and compromise of any disputes regarding the allowance, classification, and treatment of the Term Loan Facility Claims, the Plan shall provide that Term Loan Facility Claims are Allowed and settled as follows:

(a)    Term Loan Facility Claims Allowance:  Allowed against all of the obligors and guarantors under the Term Loan Facility in the amount equal to: (i) full outstanding principal amount; (ii) any accrued interest through the Effective Date at the contractual rate applicable to ABR Loans (in the case of Tranche B-3 Term Loans and Tranche B-4 Term Loans) and applicable to Fixed Rate Loans (in the case of Tranche B-5 Term Loans); and (iii) 90% of the accrued default interest through the Effective Date on the ABR Loans and Fixed Rate Loans (the "Settled/Allowed Term Loan Facility Claims").  Any payments of interest made during the Chapter 11 Cases are characterized as payments of allowed interest.

(b)    Term Loan Facility Claims Treatment: Except to the extent that a Holder of a Settled/Allowed Term Loan Facility Claim agrees to less favorable treatment of its Settled/Allowed Term Loan Facility Claim, on the Effective Date, in settlement and compromise of any disputes regarding the allowance, classification and treatment of Term Loan Facility Claims, each holder of a Settled/Allowed Term Loan Facility Claim shall receive payment in full in Cash solely to the extent of its Settled/Allowed Term Loan Facility Claim; provided, however, for the avoidance of doubt, no distributions to holders of Settled/Allowed Term Loan Facility Claims shall be made out of the deposit accounts of the HoldCos.

(c)    Term Loan Facility Claims Classification:  The Term Loan Facility Claims shall be separately classified under the Plan from other First Lien Claims.  Term Loan Facility Claims shall be Impaired and entitled to vote to accept or reject the Plan.

Pursuant to the Amended Plan Support Agreement, the Jackson Crossover Ad Hoc Group shall be permitted to prosecute the Secured Creditor Claims Litigation (as defined in the Amended Plan Support Agreement), and challenge or contest the First Lien Notes Claims Settlement or the treatment of the First Lien Notes Claims on any basis (it being understood and agreed that the full amount of principal and all accrued but unpaid interest at the applicable contract rates on the First Lien Notes are, in all circumstances, Allowed and not subject to any dispute and shall be paid in full in Cash on the Effective Date).  Additionally, pursuant to the Amended Plan Support Agreement, the Debtors shall be required to support the Secured

41

Creditor Settlement, including by (i) filing the Secured Creditor Settlement Motion within fourteen (14) days of the effective date of the Amended Plan Support Agreement, seeking approval of the Secured Creditor Settlement Motion at the Confirmation Hearing, (ii) objecting to any request not to have the Secured Creditor Settlement Motion approved at the Confirmation Hearing (iii), objecting to or defending against any Secured Creditor Claims Litigation, and (iv) seeking approval of the Term Loan Facility Claims Settlement in connection with Confirmation of the Plan.  The Jackson Ad Hoc Group and the First Lien Noteholders Group shall be permitted to support and/or prosecute the Secured Creditor Settlement. Additionally, the rights of all parties (including the Jackson Ad Hoc Group, the First Lien Noteholders Group, the Jackson Crossover Ad Hoc Group, and the Creditors' Committee) to appeal any order entered in respect of the Secured Creditor Claims Litigation (including in respect of the allowed amount or treatment of the First Lien Claims or related to the Secured Creditor Settlement) shall be expressly reserved and preserved; *provided, however*, that the Debtors and Reorganized Debtors, as applicable, shall (a) defend any appeal of the Secured Creditor Settlement Order or (b) appeal and support the reversal on appeal of an order denying approval of the Secured Creditor Settlement; *provided, further, however*, that such appeal of the Secured Creditor Claims Order shall not seek to stay the Confirmation Order or otherwise stay consummation of the Plan.

### 9.  *Implementation of Settlement of Certain Debtor Intercompany Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Amended Plan incorporates the Settlement set forth in the Settlement Agreement and as shall be approved by the Settlement Order (which may be the Confirmation Order).  In consideration for the distributions and other benefits provided pursuant to the Settlement Agreement and the Amended Plan, the provisions of the Settlement Agreement and the Amended Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a party to the Settlement Agreement may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

### 10.  *Guarantee Claims Standstill*

Pursuant to the Amended Plan Support Agreement, the Jackson Crossover Group will not seek entry of an order allowing a HoldCo Guarantee Claim (whether on a temporary or final basis), or seek a distribution from any of the HoldCo Guarantors on account of any HoldCo Guarantee Claims, and neither the HoldCo Creditor Ad Hoc Group nor any Company Party shall prosecute any objection or participate in any challenge to the Guarantee Claims, in each case at any time when (1) the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group (in each case in a percentage amount required for the effectiveness of the Amended Plan Support Agreement pursuant to Section 2 of the Amended Plan Support Agreement) are parties to the Amended Plan Support Agreement or a plan support agreement that provides (a) treatment for Jackson Senior Notes Claims against all Debtors that is no less favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement and (b) treatment for the HoldCo Senior Notes Claims that is no more favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement, and (2) no plan of reorganization has been filed by any person or entity having a right to file a plan that (a) provides treatment to Jackson Senior Notes Claims against any Debtor that is less favorable than the treatment of such claims specified in the Amended Plan Support Agreement or (b) provides treatment to any HoldCo Senior Notes Claim that is more favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement; *provided*, that this clause (2) shall not apply to any plan filed by the Jackson Crossover Ad Hoc Group.

Pursuant to the Plan Support Agreement, to the extent that the conditions in the preceding paragraph (the "Standstill Conditions") cease to exist at any time before the Bankruptcy Court enters the Confirmation Order, the HoldCo Creditor Ad Hoc Group and the Debtors agree that they will consent to and support the

42

adjournment of the Confirmation Hearing by twenty-one (21) days to permit the Jackson Crossover Ad Hoc Group to seek the temporary allowance for voting purposes of the Guarantee Claims (and with such period to be extended solely to the extent necessary for any requisite solicitation to occur following the Bankruptcy Court's ruling with respect to such temporary allowance, including with respect to the HoldCo Guarantee Claims) before the Confirmation Hearing commences or resumes, as applicable; *provided*, that nothing in this paragraph shall prevent or limit the Jackson Crossover Ad Hoc Group from immediately seeking any relief with respect to the Guarantee Claims at any time after the Standstill Conditions cease to exist.

Nothing in the Amended Plan Support Agreement shall prevent the Jackson Crossover Ad Hoc Group from (1) seeking entry of an order allowing a Guarantee Claim (whether on a temporary or final basis) against, or seeking a distribution from, the TopCo Guarantors or (2) defending any Guarantee Claim asserted against the HoldCo Guarantors or TopCo Guarantors against objections or challenges from any party; *provided* that (i) any hearing regarding the merits of any Guarantee Claim against any TopCo Guarantor shall occur contemporaneously with the Confirmation Hearing, and in no event shall any such hearing occur prior to the Confirmation Hearing, (ii) no hearing regarding the merits of any Guarantee Claim against any HoldCo Guarantor may occur until after the Confirmation Hearing (except as provided in Section 7.05(h)), and (iii) the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Company Parties (as defined in the Amended Plan Support Agreement) will each support the Bankruptcy Court's entry of the Guarantee Litigation Scheduling Order.

Pursuant to the Amended Plan Support Agreement, in the event (x) any hearing**,** other than the September 1, 2021 hearing scheduled pursuant to the Initial Guarantee Litigation Scheduling Stipulated Order, concerning the merits or temporary allowance of any Guarantee Claim is scheduled by the Bankruptcy Court for a date prior to the Confirmation Hearing or (y) the Bankruptcy Court does not enter the Guarantee Litigation Scheduling Order prior to the commencement of the Disclosure Statement Hearing, then (1) the standstill provided in the Amended Plan Support Agreement shall automatically terminate, (2) the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group shall each be permitted to take any and all actions with respect to the Guarantee Claims as each may deem appropriate (including, for the avoidance of doubt, participating in any hearing or briefing with respect to such hearing) concerning the merits or temporary allowance of any Guarantee Claim that is set to occur on or prior to the Confirmation Hearing, (3) the Required Consenting Jackson Crossover Group Members and Required Consenting HoldCo Creditors may each terminate the Amended Plan Support Agreement, *provided*, that the Required Consenting Jackson Crossover Group Members and Required Consenting HoldCo Creditors may only terminate the Amended Plan Support Agreement within 7 days (except as may be extended by the Required Consenting Unsecured Creditors) of: (i) the time at which a hearing concerning the merits or temporary allowance of any Guarantee Claim is scheduled by the Bankruptcy Court for a date prior to the Confirmation Hearing; (ii) the time that the Bankruptcy Court determines that it will not enter the Guarantee Litigation Scheduling Order; or (iii) the occurrence of the Disclosure Statement Hearing without the Bankruptcy Court having previously entered the Guarantee Litigation Scheduling Order; and (4) upon such termination of the Amended Plan Support Agreement by either the Required Consenting Jackson Crossover Group Members or the Required Consenting HoldCo Creditors pursuant to clause (3) of this sentence, the Debtors shall (A) immediately amend the Plan (and the Non-TopCo Plan) to provide that the Guarantee Claims shall not be (i) released or waived against any Guarantor unless consented to in writing by the Required Consenting Jackson Crossover Group Members or (ii) Allowed in any amount against any HoldCo unless consented to in writing by the Required HoldCo Creditors or otherwise ordered by the Bankruptcy Court or other court of competent jurisdiction, and (B) make any other amendments to the Plan (and the Non-TopCo Plan) necessary to effectuate the amendments in the foregoing clauses (i) and (ii) and to ensure that the Plan does not prejudice either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group's rights and defenses with respect to the Guarantee Claims (including the right to seek a disputed claims reserve with respect to the Guarantee Claims). For the avoidance of doubt, the

43

amendments to the plan contemplated by clause (4) of the preceding sentence, under the circumstances contemplated therein, are hereby consented to by the Parties to the Amended Plan Support Agreement.

Pursuant to the Amended Plan Support Agreement, notwithstanding anything to the contrary therein, it shall not be a violation of the Standstill Conditions, and each Party shall otherwise be entitled under the Amended Plan Support Agreement, to take any actions and make any filings with the Bankruptcy Court necessary to comply with the Initial Guarantee Claims Litigation Stipulation unless or until the Guarantee Claims Litigation Order is entered by the Bankruptcy Court.

No ruling, order, or judgment issued by any court with respect to an objection or challenge by another party to the TopCo Guarantee Claims, or with respect to a motion for temporary allowance of the TopCo Guarantee Claims, in which the HoldCo Creditor Ad Hoc Group is prevented by Section 7.05 of the Amended Plan Support Agreement from participating, shall have res judicata, collateral estoppel, or any other precedential effect against either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group in any proceeding seeking to enforce or challenge the HoldCo Guarantee Claims.

Pursuant to the Amended Plan Support Agreement, all Guarantee Claims against the HoldCo Guarantors will be withdrawn with prejudice and are not entitled to any distribution under the Plan (or the Non-TopCo Plan, as applicable) and will be released on the Effective Date; provided, that, this condition shall not be required to be satisfied, and the Plan shall be automatically amended to remove this condition, if, at the time of entry of the Confirmation Order or prior thereto, either of the following events have occurred: (a) Consenting Creditors that hold at least two-thirds (2/3) of the ICF Connect Senior Notes (excluding any Connect Senior Notes held by the Debtors) cease to be party to this Agreement or (b) the Required Consenting HoldCo Creditors have terminated this Agreement.  For the avoidance of doubt, the TopCo Guarantee Claims shall not be withdrawn, enjoined, or released on the Effective Date.

During the effective period of the Amended Plan Support Agreement, all Consenting Creditors shall use reasonable best efforts to direct the Trustees to support the Guarantee Litigation Scheduling Order and the matters set forth in Section 7.05 of the Amended Plan Support Agreement, provided that this shall not require any Consenting Creditor to provide any indemnification to, or incur any other out-of-pocket cost to, any Trustee.

The Debtors shall not settle, seek to settle, or support any settlement of, any Guarantee Claim without the prior written consent of the Required Consenting Unsecured Creditors; *provided, however*, that the Required Consenting HoldCo Creditors shall be deemed to consent to any such settlement at any time after the HoldCo Guarantee Claims have been withdrawn with prejudice.

Pursuant to the Amended Plan, upon the occurrence of the Effective Date, (i) each Holder of an Allowed TopCo Guarantee Claim against Holdings SARL shall receive its Pro Rata share of the Holdings SARL Unsecured Recovery and each Holder of an Allowed TopCo Guarantee Claim against Intelsat S.A. shall receive its Pro Rata share of the S.A. Unsecured Recovery as applicable; and (ii) 30 percent of any distributions made on account of TopCo Guarantee Claims against Intelsat to the Jackson Senior Notes Trustees shall be distributed Pro Rata to Holders of Connect Senior Notes Claims in consideration for the covenants, compromises, releases, and other benefits provided by the members of the HoldCo Creditor Ad Hoc Group pursuant to the Amended Plan Support Agreement; *provided* that the aggregate value of such distribution shall not exceed $6 million.

### 11. *Management Incentive Plan*

On the Effective Date, the Equity Issuer shall institute the MIP, enact and enter into related policies and agreements, and distribute the New Common Stock to participants consistent with the terms and allocations set forth in the MIP Term Sheet; *provided* that the form and substance of the Management

Incentive Plan shall be consistent with the PSA Definitive Document Requirements.  The Required Consenting Jackson Crossover Group Members and the Debtors shall negotiate the terms of the definitive MIP documentation in good faith prior to the Effective Date.

### 12. *Restructuring Expenses*

Pursuant to Amended Plan, Restructuring Expenses means, collectively, the reasonable and documented fees and expenses, whether incurred before, on, or after the Effective Date, of (a) the Jackson Ad Hoc Group (including all fees and expenses of Akin Gump Strauss Hauer & Feld LLP (including, for an avoidance of doubt, whether incurred before, on, or after the Effective Date, all fees and expenses related to any Secured Creditor Claims Litigation and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation) and Centerview Partners), the First Lien Noteholders Group (including all fees and expenses of Wilmer Cutler Pickering Hale and Dorr, LLP (including, for an avoidance of doubt, whether incurred before, on, or after the Effective Date, all fees and expenses related to any Secured Creditor Claims Litigation and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation)), (b) the Jackson Crossover Ad Hoc Group (including all fees and expenses of the Jackson Crossover Ad Hoc Group Advisors (including, for the avoidance of doubt, whether incurred before, on, or after the Effective Date, (x) all fees and expenses related to any Secured Creditor Claims Litigation, and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation, or the Guarantee Claims, and (y) fees and expenses set forth in the Houlihan Engagement Letter)), (c) the HoldCo Creditor Ad Hoc Group (including all fees and expenses of the HoldCo Creditor Ad Hoc Group Advisors), and (d) the professionals to be paid by the Company Parties pursuant to the Plan Support Agreement or as adequate protection pursuant to the DIP Order.

In particular, the fees and expenses of the Jackson Ad Hoc Group, the First Lien Noteholders Group, the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group, including professionals retained for these Chapter 11 Cases are being paid as a component of the cumulative consideration agreed to by the parties in the Amended Plan Support Agreement.  Payment of Restructuring Expenses is an integral component of the overall deal struck among the Debtors and the Consenting Creditors and is consistent with numerous other chapter 11 cases where comparable professional fees and expenses were paid by the estates of chapter 11 debtors as consideration for supporting a restructuring support agreement and a plan.  Further, the Debtors have already been authorized and directed to pay a significant portion of the Restructuring Expenses, including certain reasonable and documented fees of the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group, by the Bankruptcy Court pursuant to the Final DIP Order.

### 13. *Indenture Trustee Fees*

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay in Cash all reasonable and documented unpaid Indenture Trustee Fees that are required to be paid under the Indentures. From and after the Effective Date, the Reorganized Debtors shall pay in Cash all reasonable and documented Indenture Trustee Fees, including, all Indenture Trustee Fees incurred in connection with distributions made pursuant to the Amended Plan or the cancellation and discharge of the Notes or the Indentures.

If the Debtors dispute any requested Indenture Trustee Fees, the Debtors or Reorganized Debtors, as applicable, shall (1) pay the undisputed portion of Indenture Trustee Fees and (2) notify the applicable Indenture Trustee of such dispute within ten (10) Business Days after presentment of the invoices by the applicable Indenture Trustee.  Upon such notification, the applicable Indenture Trustee may submit such dispute for resolution by the Bankruptcy Court; *provided*, *however*, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the applicable Indenture.  Nothing herein shall in any way affect or diminish the right of the Indenture Trustees to exercise

45

their respective Indenture Trustee Charging Liens against distributions on account of the Notes Claims with respect to any unpaid Indenture Trustee Fees, as applicable.

## 14. *Treatment of Employee and Retiree Benefits*

As of the Petition Date, the Debtors maintain the Retiree Medical Plans for the benefit of certain retired former employees (the "Retirees") to provide continued access to health and welfare benefits coverage. As of July 2001, the Retiree Medical Plans were closed to new entrants. Certain benefits under the Retiree Medical Plans are provided under plan documents adopted by the Debtors, and the remaining Retirees receive benefits pursuant to a 2007 consent decree entered as a result of a settlement reached by the Debtors and certain retired former employees in *Morales et al. v. Intelsat Global Service Corp.*, 04-cv-1044 (D. D.C.) (the "Consent Decree"). The Consent Decree incorporates by reference a benefits plan document (the "Consent Plan").

The Consent Plan permits Intelsat to periodically propose changes to the retirees' medical benefits, subject to the retirees' right to object. If a sufficient number of retirees object to any proposed change, the validity of the change is referred to a neutral expert to determine whether the proposed change reduces the value of the medical benefits, taken as a whole. If it does not, the change may be implemented by Intelsat. The neutral expert's decision is final and binding on the parties.

In September 2018, Intelsat notified retirees of a proposed change. Rather than self-insure, as Intelsat previously had done, Intelsat now funds a Health Reimbursement Arrangement ("HRA") for each eligible retiree (the "Current Plan"). The HRAs, together with the retirees' required monetary contribution, are sufficient to permit retirees to purchase medigap plans in the marketplace. These medigap plans are secondary to the retirees' Medicare coverage, as was the prior Intelsat self-insured plan.

In October 2018, a minority (but sufficient number) of eligible retirees objected to the proposed change (the "Objectors") and sought to preliminarily enjoin its implementation. Judge Chutkan of the District Court for the District of Columbia denied the Objectors' preliminary injunction motion and referred assessment of the proposed change to the neutral expert, as required by the Consent Plan. In denying the preliminary injunction motion, the court held that Objectors failed to demonstrate irreparable harm and any entitlement to relief would be to monetary damages, not injunctive relief. The Objectors did not appeal the denial of their preliminary injunction motion.

In December 2018, the neutral expert reviewed the proposed change and found that it did not reduce the value of the medical benefits, taken as a whole. The Objectors sought the district court's review of the expert's decision, and the court, viewing the application as a renewed preliminary injunction motion, again denied Objectors' request (the "December Order").

In January 2019, Objectors filed a renewed motion to enforce the Consent Decree, along with a motion for a permanent injunction, and for reconsideration of the December Order. The district court denied the reconsideration motion by order dated January 3, 2019 (the "January Order"). The Objectors sought review of both the December and January Orders in the District of Columbia Circuit Court of Appeals, which appeal was denied and the case remanded. Shortly before the Debtors commenced the Chapter 11 Cases, the Objectors filed a renewed motion to enforce the Consent Decree and for a permanent injunction.

The Debtors believe that the Current Plan satisfies all of the Debtors' obligations to their retirees under applicable law, including the Consent Decree. The Debtors intend to assume their obligations under the Retiree Medical Plans; in particular, the Debtors will continue providing medical benefits to those Retirees covered by the Consent Decree pursuant to the Current Plan after the Effective Date. Confirmation of the Amended Plan and entry of the proposed Confirmation Order will constitute a finding that the

Amended Plan satisfies the Debtors' obligations to retirees under the Consent Decree and, accordingly, that the Debtors have satisfied the requirements of 11 U.S.C. § 1129(a)(13).

### 15. *Treatment of Executory Contracts and Unexpired Leases*

#### (a)      Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Amended Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Amended Plan, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed by the Debtors or Reorganized Debtors, as applicable, including the Amended Plan Support Agreement, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease (1) was assumed, assumed and assigned, or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease Schedule.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Amended Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Amended Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Amended Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

#### (b)      Claims Based on Rejection of Executory Contracts or Unexpired Leases

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Amended Plan and the Rejected Executory Contract and Unexpired Leases List, as applicable.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Amended Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than 30 days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Amended Plan, notwithstanding anything in a Proof of Claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as an Unsecured Claim pursuant to Article III.B of the Amended Plan and may be objected to in accordance with the provisions of Article VII of the Amended Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Notwithstanding anything to the contrary in the Amended Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including 30 days after the Effective Date.

### (c)    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Amended Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Amended Plan.

### (d)    Reservation of Rights

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

For more detail, *see* Article V of the Amended Plan, entitled "Treatment of Executory Contracts and Unexpired Leases," which is incorporated herein by reference.

### 16. *Non-TopCo Plan*

In the event that a Plan Toggle Event occurs, for any reason, then the Debtors shall immediately seek, and the Consenting Creditors shall support, Confirmation of the Non-TopCo Plan without the need to resolicit votes on the Non-TopCo Plan. Upon conversion to the Non-TopCo Plan, all references in the Amended Plan to the "Plan" and any references herein to the "Amended Plan" shall be deemed to refer to the Non-TopCo Plan. Any references to the Debtors shall be deemed to refer to all of the Debtors other than whichever (or both) of Intelsat S.A. and Holdings SARL that a Plan Toggle Event occurs with respect to. The Non-TopCo Plan shall be consistent in all respects with the terms of the Amended Plan (including, for the avoidance of doubt, the treatment of Claims provided under the Plan for all classes of creditors other than creditors of Holdings SARL and/or Intelsat S.A.). The Non-TopCo Plan may differ from the Amended Plan only to the extent required to remove Holdings SARL and/or Intelsat S.A. from the Amended Plan and which shall (unless waived in accordance with the Amended Plan Support Agreement) still require that the Settlement Agreement Order be entered as a condition precedent to confirmation of the Non-TopCo Plan, and otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Unsecured Creditors.

### 17. *Disputed and Contingent Claims Reserve*

On or after the Effective Date, the Debtors, the or Reorganized Debtors, as applicable, will establish one or more reserves for Claims, including the Secured Creditor Claims Disputed Distribution Reserve, that are contingent or have not yet been Allowed, and including any Guarantee Claims that have not been withdrawn with prejudice or disallowed by a Final Order, in an amount or amounts as reasonably determined by the applicable Debtors (with the consent of the Required Consenting Jackson Crossover

Group Members and, solely with respect to any Claims against any HoldCo, the Required Consenting HoldCo Creditors) or Reorganized Debtors, as applicable, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim. To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim. Notwithstanding anything to the contrary in the Plan (including this Section VII.F), the reserve established for Guarantee Claims that have not been released or disallowed by a Final Order shall be established in such amount assuming that such Guarantee Claims are Allowed in full, or as otherwise agreed between the Debtors or Reorganized Debtors, as applicable, and the Required Consenting Jackson Crossover Group Members.

To the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), then until such time as the Disputed portions of the 8.00% First Lien Notes Claims and 9.50% First Lien Notes Claims are Allowed (or otherwise required to be paid for the First Lien Notes Claims to be Unimpaired), and all such amounts are paid in full in Cash, or disallowed, pursuant to a Final Order, the Debtors and Reorganized Debtors, as applicable, shall maintain the Secured Creditor Claims Disputed Distribution Reserve in the amount of the portion of such Claims that constitute Disputed Claims (including interest thereon at the applicable contractual rates). Any modifications to the Secured Creditor Claims Distribution Reserve following the Effective Date shall be (a) mutually agreed upon by the Debtors or Reorganized Debtors, as applicable, the Required First Lien Consenting First Lien Noteholders, and the Required Consenting Jackson Crossover Group Members or (b) pursuant to separate Bankruptcy Court order.

SES contends that the Debtors or Reorganized Debtors, as applicable should establish a Cash reserve in the amount of SES's asserted constructive trust claim, to the extent that such Claim remains a Disputed Claim as of the Effective Date. SES further contends that the Debtors or Reorganized Debtors, as applicable, should reserve sufficient authorized but unissued New Common Stock (and other consideration) to which SES may be entitled on account of any of its unsecured claims against the Debtors, to the extent that such Claims remained Disputed Claims as of the Effective Date. The Debtors and Reorganized Debtors currently contemplate establishing Disputed and Contingent Claims reserves as set forth in the prior paragraphs of this section IV.A.17. SES and all other parties' rights to argue and seek alternative and incremental forms of reserves at confirmation (or that no reserves should be established) are reserved.

### B.   Summary of Value Allocation

For purposes of the Amended Plan, A&M created a "natural recovery model" (the "Base Recovery Model") to allocate the Debtors' distributable value (as opposed to liquidation value—the threshold required by section 1129 of the Bankruptcy Code), including the value of any interest that the Debtors may hold in non-Debtor affiliates, across each Debtor entity. The Base Recovery Model then calculates creditor recoveries on a waterfall basis according to creditors' respective claims under section 1129(b)'s "absolute priority rule." This allocation of value will be described in detail in an expert report (the "A&M Allocation Expert Report") to be prepared in advance of the Confirmation Hearing pursuant to a schedule that the Debtors will propose for entry by the Bankruptcy Court, but is summarized for illustrative purposes below.

#### 1.   *Allocation of Distributable Value*

For purposes of the Base Recovery Model, the Debtors estimated the total distributable value at $11.278 billion. This estimate was comprised of three parts: (1) the midpoint of the estimated enterprise value of the Debtors; (2) plus the projected balance sheet cash at December 31, 2021 (the estimated

emergence date); (3) less the minimum cash required to operate the Debtors on a post-emergence basis, as outlined in the table below:

| Component | Distributable Value ($ millions) |
|---|---|
| Debtors' Enterprise Value | $11,000[13] |
| Plus Balance Sheet Cash @ 12/31/2021 (Estimated Emergence) | $494[14] |
| Less Minimum Cash | $216[15] |
| **TOTAL DISTRIBUTABLE VALUE** | **$11,278** |

First, A&M allocated certain discrete assets to the Debtor entity that owns and/or will receive those assets, including: (i) the Accelerated Relocation Payments; (ii) receivables for capital and expense reimbursements related to the C-band relocation initiative; (iii) the Company's investments in the acquired Gogo Commercial Aviation business; (iv) other investments; and (v) certain other assets, including certain tax attributes (collectively, "Discrete Assets").   After allocating the Discrete Assets, which total approximately $6.331 billion, A&M allocated the remaining approximately $4.947 billion of value (the "Net Satellite Operations Value") to specific legal entities *pro rata* based on each legal entity's relative contribution of 2021 adjusted earnings before interest and taxes[16] ("Adjusted EBIT") pursuant to the Debtors' latest forecast, subject to further adjustments below.

This allocation methodology implements certain existing and in-force intercompany agreements between Jackson and certain subsidiaries, which agreements will be assumed.   These intercompany agreements include:  (i) that certain Master Intercompany Services Agreement, effective as of July 2, 2018 (the "MISA") and (ii) that certain Bilateral Agreement (including all amendments thereto, the "Bilateral Agreement") among US LLC, Intelsat Alliance LP ("Alliance"), and Intelsat Ventures S.à r.l. ("Ventures").   The Bilateral Agreement treats both Ventures and its direct and indirect subsidiaries ("Ventures Group") and US LLC and its direct and indirect subsidiaries ("US LLC Group") as two distinct operating units, and consequently aggregates materially all of the Company's Adjusted EBIT between them.[17]   In order to accommodate an equitable value allocation within the Ventures Group and US LLC Group, the Base Recovery Model further distributes value within each group based on the net book value[18] ("NBV") of certain assets of certain legal entities as of the Debtors' June 30, 2021 trial balances and the estimated external revenue[19] of certain legal entities for 2021 pursuant to the Debtors' latest forecast.  This

---

[13]   *See* Valuation Analysis, **Exhibit E**.

[14]   *See* Financial Projections, **Exhibit D**.

[15]   *See* Financial Projections, **Exhibit D**.

[16]   Excluding ASC 606 deferred revenue.

[17]   Further detail on the Bilateral Agreement is included in section VII.K(c) herein.

[18]   Excludes goodwill, intercompany assets, funded debt, liabilities subject to compromise, ASC 606 deferred revenue, and certain line items on the balance sheet related to the Discrete Assets described herein.

[19]   Excludes ASC 606 deferred revenue.

is further described in section IV.B.4, entitled "Net Satellite Operations Value," and will be described in more detail in the A&M Allocation Expert Report.

### 2. *Allocation of Accelerated Relocation Payments*

The Base Recovery Model recognizes that the Debtors will receive the Accelerated Relocation Payments if they meet the deadlines set forth in the FCC Order. The Base Recovery Model also takes into account the relevant intercompany agreements that relate to the Accelerated Relocation Payments and profit sharing.

Among other things, without the FCC licenses owned by License, there would be no ability to participate in the accelerated clearing process and accordingly no Accelerated Relocation Payments. License elected to participate in the accelerated clearing process and submitted an accelerated relocation election form pursuant to the FCC Order and the Wireless Telecommunications Bureau's May 11, 2020 Public Notice detailing the form of accelerated relocation election to be filed on FCC Docket No. 18-122. Moreover, with the approval of the FCC, License will receive the Accelerated Relocation Payments pursuant to a contract executed with the clearinghouse appointed by the FCC. For these and other reasons, the Debtors believe that License is the appropriate recipient of any Accelerated Relocation Payments that the Debtors earn through their efforts to clear the C-band in the continental United States.

While the Debtors contend that the appropriate recipient of the Accelerated Relocation Payments from the FCC is License, certain intercompany agreements dictate that the proceeds must then be divided among License, Jackson, and US LLC. Certain of the Debtors are members of Alliance, a limited partnership formed as part of the Company's 2018 restructuring. Specifically, Intelsat Genesis GP, LLC ("Genesis GP") is the general partner of Alliance, and Jackson and Intelsat Genesis Inc. ("GenesisCo") are limited partners in Alliance. Prior to the formation of Alliance, Jackson, through various direct and indirect subsidiaries, owned substantially all of the Company's assets, including the Company's rights to operate in the C-band. Pursuant to the partnership agreement of Alliance (including all amendments thereto, the "Partnership Agreement"), Jackson directly or indirectly contributed substantially all of its assets, except its rights to the first 100 MHz of C-band spectrum used by License in the continental United States (the "C-Band Monetization Property") to Alliance. At all relevant times before and after the Company's 2018 restructuring, including as of the Petition Date, License held substantially all of the Company's FCC issued licenses to operate within the C-band.

In connection with the formation of Alliance, Alliance and the partners therein also entered into that certain nominee agreement (the "Nominee Agreement") to clarify the enforcement mechanism for the C-Band Monetization Property. Specifically, the Nominee Agreement provided that, to the extent that Alliance or a subsidiary thereof received C-Band Monetization Property, it would hold such C-Band Monetization Property as an agent for the benefit of Jackson and the C-Band Monetization Property would be treated as if it had always been beneficially owned by Jackson.

The FCC Order provides for the distribution of Accelerated Relocation Payments following the clearing of specific segments of the C-band as outlined below:

*($ in millions)*

| Phase | Spectrum Band | Milestone Date | ARPs [1] |
|---|---|---|---|
| Phase I | 0 - 120 MHz [2] | December 5, 2021 | $ 1,198 |
| Phase II | 120 - 300 MHz [3] | December 5, 2023 | 3,668 |
| **Total Gross Value** | | | **$ 4,865** |

*Note:*

*1) ARPs assume no delay in clearing spectrum by milestone date*

*2) Includes 46 of top 50 partial economic areas for 0-120 MHz band*

*3) Includes all other partial economic areas for 0-120 MHz band*

The Company believes that it is reasonable to allocate the Accelerated Relocation Payments based on (1) the results of the FCC's C-band spectrum auction, which concluded in February 2021 and (2) by allocating value pro rata to the Alliance partnership for its contribution of guard band (281-300 MHz), which was required to be cleared but was not included in the auction (collectively, the "Auction Proceeds Methodology"). Under the Auction Proceeds Methodology, the Accelerated Relocation Payments are allocated as follows:[20]

*($ in millions)*

| Spectrum Band | Adj. ARPs [1] | % Share |
|---|---|---|
| 0 - 100 MHz | $ 1,703 | *35%* |
| 101 - 300 MHz | 3,162 | *65%* |
| **Total Gross Value** | **$ 4,865** | *100%* |

*Note:*

*1) Adjusted based on Auction Proceeds Methodology*

Because Jackson has retained the right to monetize the first 100 MHz of the C-band, the Debtors believe that, if the Auction Proceeds Methodology is utilized, Jackson is entitled to anticipated Accelerated Relocation Payments in the gross amount of approximately $1.703 billion, and License is entitled to the remaining approximately $3.162 billion gross amount attributable to anticipated Accelerated Relocation Payments.

Pursuant to the Bilateral Agreement, 7.8 percent, or approximately $247 million of the approximate $3.162 billion gross share of the Accelerated Relocation Payments allocated to License—a subsidiary of Ventures and party to the Bilateral Agreement—should be paid by Ventures to US LLC. Ventures' ability to satisfy this obligation is premised on License distributing such an amount to Ventures, which leaves License with approximately $2.916 billion in gross Accelerated Relocation Payments, and results in the following allocation of gross value across the three legal entities entitled to Accelerated Relocation Payments:

---

[20] Prior Company filings with the FCC, as well as certain other Company filings, have allocated 45 percent of the amount to Phase I and 55 percent of the amount to Phase II. Nevertheless, based on the latest market data, the Debtors believe that allocating the Accelerated Relocation Payments in accordance with the Auction Proceeds Methodology is reasonable, which will be described in further detail in the A&M Allocation Expert Report.

*($ in millions)*

|  | Jackson | License | US LLC | Total |
|---|---|---|---|---|
| Adj. ARPs | $ 1,703 | $ 2,916 | $ 247 | $ 4,865 |
| | | | | |
| Spectrum Band | 0 - 100 MHz | 101 - 300 | 101 - 300 | |
| % Allocation | *100.0%* | *92.2%* | *7.8%* | |

These gross amounts of Accelerated Relocation Payments must be converted from a gross basis to a net basis to reflect the actual value received by the Company. The first step to convert Accelerated Relocation Payments from a gross basis to a net basis is to value them on an after-tax basis (assuming that projected specified tax attributes in existence at the end of 2021 are not available to offset such payments) at the present value of the Phase I Amount and the Phase II Amount.[21] Because the Debtors anticipate receiving the Phase I Amount earlier than the Phase II Amount, the payments were discounted to their present value using different discount factors. Additionally, the tax payable related to each Phase I and Phase II Amounts depends on the fiscal year's projected losses pursuant to the Business Plan. The after-tax, present-value adjustments reduced the total value of Accelerated Relocation Payments as follows:

*($ in millions)*

|  | Jackson | License | US LLC | Total |
|---|---|---|---|---|
| Adj. ARPs | $ 1,703 | $ 2,916 | $ 247 | $ 4,865 |
| Net ARPs Pre-Exp. | $ 1,491 | $ 1,898 | $ 161 | $ 3,550 |

The final step to convert Accelerated Relocation Payments from a gross basis to a net basis is to make certain adjustments for non-reimbursable C-band spend. First, pursuant to the definition of C-Band Monetization Property in the Partnership Agreement, the Accelerated Relocation Payments' value is further reduced by $160 million for the amount of spend required to complete the C-band relocation that is not anticipated to be reimbursed. This reduction is applied pro rata across Jackson, License and US LLC based on the after-tax, present-value of Accelerated Relocation Payments noted above, reducing Jackson's value of Accelerated Relocation Payments from $1.491 billion to $1.424 billion, License from $1.898 billion to $1.813 billion and US LLC from $161 million to $153 million.

Next, $111 million of this reduction is added back to US LLC related to the non-reimbursable spend projected to be incurred through the expected emergence date of December 31, 2021 ("Pre-Emergence Non-Reimbursables"). The remaining $49 million of the reduction is related to non-reimbursable spend projected to be incurred after the emergence date ("Post-Emergence Non-Reimbursables"), and remains an offset to the Accelerated Relocation Payments' value. The impact of non-reimbursable C-band spend results in the following net after-tax, present value for Accelerated Relocation Payments, which comprises the final legal entity allocation of distributable value for plan value allocation purposes:

---

[21]  As noted above, such attributes were valued and allocated separately, and a significant component of the value attributed to them is their use in offsetting taxable income attributable to the Accelerated Relocation Payments.

*($ in millions)*

|  | Jackson | License | US LLC | Total |
|---|---|---|---|---|
| **Net ARPs Pre-Exp.** | $ 1,491 | $ 1,898 | $ 161 | $ 3,550 |
| Less: Total Non-Reimb. | (67) | (85) | (7) | (160) |
| Subtotal | $ 1,424 | $ 1,813 | $ 153 | $ 3,390 |
| Plus: Pre-Emrg. Non-Reimb. | - | - | 111 | 111 |
| **Net ARPs Dist. Value** | $ 1,424 | $ 1,813 | $ 264 | $ 3,501 |
| *Net ARPs Dist. Value (%)* | *40.7%* | *51.8%* | *7.6%* | *100.0%* |

The Convert Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and SES have asserted that the Debtors' methodology for allocating value has improperly diverted value away from the HoldCos and US LLC, respectively. These assertions are premised primarily on assertions that a majority, if not all, of the Accelerated Relocation Payments should be allocated to the Debtor of their preference. Specifically, the Convert Ad Hoc Group has asserted that all or a material portion of the value of the Accelerated Relocation Payments should be allocated to Intelsat S.A. The HoldCo Creditor Ad Hoc Group has asserted that all or a material portion of the value of the Accelerated Relocation Payments should be allocated to ICF, Envision, LuxCo, and Intelsat S.A., though such assertions are settled pursuant to the Amended Plan. SES has asserted that all or significantly more of the Accelerated Relocation Payments should be allocated to US LLC.

The Debtors disagree with the assertions made by each of the Convert Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and SES, respectfully, and believe the allocation of distributable value under the Amended Plan to be reasonable. At the Confirmation Hearing, the Bankruptcy Court may agree with the Debtors, may agree with the Convert Ad Hoc Group, may agree with SES, or may adopt a different Base Recovery Model or make changes to the Debtors' Base Recovery Model. If the Bankruptcy Court adopts changes to the Base Recovery Model under the Amended Plan for any reason, then such changes will have an impact on the recovery to Holders of Claims, and the allocation of value among the Debtors will be adjusted consistent with the Bankruptcy Court's determinations. The Amended Plan may still be confirmed with a revised Base Recovery Model without resolicitation. Therefore, Holders of Claims entitled to vote on the Amended Plan should take into account the possibility of changes to the Base Recovery Model at confirmation when determining whether to vote in favor of the Amended Plan.

### 3. *FCC Order Reimbursement Payments*

The Debtors anticipate receiving approximately $1.106 billion in reimbursement payments on account of their costs incurred to clear the spectrum through the expected emergence date of December 31, 2021. Of these reimbursement payments, approximately $828 million are expected to be attributable to capital expenditures and expenses incurred by Satellite and approximately $278 million are expected to be attributable to capital expenditures and expenses incurred by US LLC. Accordingly, the anticipated value of the reimbursement expenses has been allocated to Satellite and US LLC in an amount equal to the receivable amount each entity is estimated to have on its balance sheet on the expected emergence date.

### 4. *Net Satellite Operations Value*

The $4.947 billion of Net Satellite Operations Value is allocated primarily based on the 2021 Adjusted EBIT of each legal entity. To accommodate an equitable value allocation to the subsidiaries of certain legal entities, NBV and external revenue are also considered.

Allocable value to each legal entity is determined by (1) allocating 2021 Adjusted EBIT pursuant to the Debtors' latest forecast by legal entity *pro rata* based on the Debtors' December 31, 2020 full-year

54

trial balances; (2) introducing intercompany revenues and expenses to accommodate the MISA and the profit split between US LLC and Ventures as set forth in the Bilateral Agreement; (3) allocating Net Satellite Operations Value by legal entity *pro rata* based on Adjusted EBIT for legal entities with positive Adjusted EBIT values;[22] (4) each legal entity within the US LLC Group is allocated value equal to that of its NBV; (5) remaining value allocated to the US LLC Group from step 3 less the allocated value in step 4 is allocated *pro rata* to US LLC and IGC based on 2021 external revenue pursuant to the Debtors' latest forecast; (6) within the ventures group, IGSM is allocated value based on the relative external revenue to that of US LLC; and (7) remaining value allocated to the Ventures Group from step 3 less the allocated value in step 6 is allocated *pro rata* to legal entities within the Ventures Group, excluding IGSM, based on relative NBV.

Construction-in-process assets unrelated to the C-band relocation initiative are allocated based on net book values and legal entity ownership forecasted as of the expected emergence date of December 31, 2021 pursuant to the Debtors' latest forecast. Construction-in-process assets total $407 million, of which $360 million is allocated to Satellite LLC as the owner of certain space assets and $46 million is related to certain ground assets and infrastructure, of which $42 million is allocated to US LLC as the owner of those assets.

### 5. *Waterfall*

To determine the recovery to unsecured creditors at each legal entity, the plan value allocation waterfall, which distributes value to creditors according to Section 1129 of the Bankruptcy Code's absolute priority rule, incorporates the following key assumptions and adjustments to the Base Recovery Model.

- Allocation of $306 million of value that would otherwise be reflected at Jackson to the HoldCos to account for the settlement of claims reflected in the Amended Plan and the Settlement Agreement;

- Inclusion and satisfaction of all of post-petition intercompany administrative amounts funded directly or indirectly pursuant to the Cash Management Order.[23] This includes approximately $430 million in administrative amounts indirectly funded by Jackson to US LLC to repay funds transferred to US LLC for the purpose of acquiring Gogo Commercial Aviation and for general operating expenses thereafter;

- Secured claims include DIP Claims of $1.5 billion, which includes a $500 million upsize to the existing facility that is expected to close before the Debtors' projected emergence from chapter 11, as well as the Debtors' prepetition credit facilities, which include the First Lien Credit Agreement and the First Lien Notes. The Base Recovery Model assumes the DIP Facility receives recoveries based on Total Collateral Value available for distribution pro rata by Debtor. Prepetition secured claims then receive recoveries based on remaining collateral value pro rata by Debtor. Secured claims are fully satisfied and result in no deficiency claims.

- For purposes of calculating creditor recoveries under the Base Recovery Model, the Debtors estimated that the value of the collateral of the DIP Claims, Term Loan Facility Claims, 8.00% First Lien Notes Claims, and 9.50% First Lien Notes Claims at $10.333 billion in the aggregate

---

[22] Certain legal entities outside of the Ventures Group, US LLC Group, and Jackson and its parent entities were allocated value equal to that of its respective NBV.

[23] "Cash Management Order" means the *Final Order (A) Authorizing the Debtors to (I) Continue to Operate Their Cash Management System, (II) Maintain Existing Business Forms and Books and Records, and (III) Perform Intercompany Transactions and Granting Administrative Status to Intercompany Transactions and (B) Granting Related Relief* [Docket No. 260].

(the "Collateral Value"). The remaining distributable value is assumed to be unencumbered (the "Unencumbered Value"), consisting primarily of cash at the holding company level, unencumbered real estate held at a specific legal entity, value of certain joint ventures, and the value redistributed from Jackson to the HoldCos to account for the Settlement noted above.

| Value | Amount ($ millions) |
|---|---|
| Total Collateral Value | $10,333[24] |
| Total Unencumbered Asset Value | $946 |
| **Total Distributable Value** | **$11,278** |

For each Debtor, recoveries to general unsecured creditors were determined by dividing the amount of distributable value remaining to satisfy unsecured claims by the amount of unsecured claims held against such Debtor.

A table setting forth the estimated amount of allowed unsecured claims and associated anticipated recoveries, organized by Debtor, is attached hereto as **Exhibit F**.

### 6.   *SES Claims*

As discussed in greater detail herein, SES has filed proofs of a claim against each of the Debtors in the amount of $1.8 billion.  SES asserts that it is entitled to $450 million of the Accelerated Relocation Payments that the Debtors may receive pursuant to the FCC Order.  It also asserts that it is entitled to an additional $1.35 billion against each Debtor as punitive damages (calculated as three-times its alleged compensatory damages of $450 million).

The Debtors have objected to each of SES's proofs of claim.  The Debtors' Amended Plan assumes that the proof of claims filed by SES relating to the Accelerated Relocation Payments are disallowed.  The Debtors have also assumed that no amount of the Accelerated Relocation Payments will be held in constructive trust for SES.  In the event that SES's claim is allowed against one or more Debtors, it may have the effect of diluting recoveries to other creditors of those Debtors.  Additionally, if any portion of the Accelerated Relocation Payments are deemed to be held in constructive trust for SES, the value distributable to the Debtors entitled to receive such payments could be diminished and/or certain distributions to creditors could be delayed.

---

[24]   SES argues that the Accelerated Relocation Payments are not collateral encumbered by perfected liens held by the Prepetition Secured Parties.  SES contends that the Accelerated Relocation Payments are postpetition revenue, as to which the Debtors did not have an entitlement on the Petition Date, and that they are, therefore, not Cash Collateral because they are not "proceeds, products, offspring or profits" of prepetition collateral.  SES argues that they arise exclusively from the postpetition clearing work performed by US LLC and, therefore, are unencumbered unless and until, pursuant to the terms of the DIP Order, the Prepetition Secured Parties can demonstrate that there was a diminution in value in their Prepetition Collateral caused by the Debtors' use thereof.  SES further contends that no diminution in value has occurred.  If SES succeeds and the Base Recovery Model must be revised to treat the Accelerated Relocation Payments as assets unencumbered by prepetition liens, these changes may impact recoveries to Holders of Claims.  All parties rights are reserved in connection with any such arguments.

If the Bankruptcy Court determines that the Accelerated Relocation Payments are not collateral encumbered by perfected liens held by the Prepetition Secured Parties, the Plan Support Agreement and the Settlement Agreement might not remain in force without modification, and the Plan might not be confirmable without resolicitation of votes.

SES has also asserted that the Debtors have diverted value away from US LLC so as to limit SES's recovery on its claims. The Debtors disagree and have allocated value among the Debtors, including US LLC, in accordance with the methodology described herein. If SES succeeds on its claims on the merits and succeeds on its claims that the Accelerated Relocation Payments should be allocated more heavily or exclusively to US LLC, creditors' recoveries would be diluted as set forth herein and as set forth in **Exhibit F**, attached hereto.

## V.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   Intelsat's Corporate History

In 1964, inspired by President John F. Kennedy's address to the United Nations General Assembly, in which he proposed "a global system of communications satellite linking the whole world in telegraph and telephone and radio and television," a group of nations signed an interim agreement establishing an intergovernmental organization to create a global satellite communication system. The member states party to the agreement designated certain entities as signatories to market and use the intergovernmental organization's communications system within their territories and to hold an investment share in the organization. An interim agreement was finalized in 1971, when 85 nations entered into an establishing and operating agreement creating the International Telecommunications Satellite Organization, INTELSAT, which was charged with operating and providing access to international telecommunications satellites on a commercial basis. Over the ensuing decades, INTELSAT grew to include more than 200 member states and territories, of which, by the year 2000, 70 relied on the system for all international communications, and 40 utilized the system for national telecommunications.

Nonetheless, as a public intergovernmental organization, INTELSAT's business was subject to various restrictions, which began to inhibit INTELSAT's ability to compete effectively in the expanding marketplace for satellite telecommunications.

Responding to these trends, in March 2000, Congress passed, and President Clinton signed, the Open Market Reorganization for the Betterment of International Telecommunications Act—the "ORBIT" Act—which provided for INTELSAT's privatization by July 31, 2001. On July 18, 2001, the INTELSAT agreement was amended by its member nations to privatize INTELSAT—by transferring substantially all assets, liabilities, and operations to a private company known as Intelsat, Ltd., and its satellites and corresponding operating licenses to a Delaware-incorporated subsidiary and U.S. licensee, Intelsat LLC.

The privatized company continued to expand its global communications infrastructure through investments and acquisitions of other satellite service providers. In March 2004, the Company purchased five satellites and related assets from Loral Space & Communications Corporation, which enabled Intelsat to provide full satellite coverage for North America, and expanded its customer base in the broadcasting, cable television, and corporate networking sectors. Then, in January 2005, a consortium of private equity investors acquired Intelsat for total Cash consideration of approximately $3.2 billion and approximately $1.9 billion of pre-acquisition debt remaining outstanding after the transaction. In 2006, the reorganized company acquired the equity of PanAmSat Holding Corporation ("PanAmSat") for $3.2 billion and assumed or refinanced PanAmSat's $3.2 billion in debt. The acquisition added PanAmSat's video market expertise, advanced satellite fleet, and blue-chip media customer base to Intelsat's portfolio and nearly doubled the company's fleet of satellites, establishing the company as the largest provider of satellite services worldwide.

On February 4, 2008, another consortium of private equity investors led by BC Partners and Silver Lake Partners acquired Intelsat. On April 23, 2013, Intelsat S.A. completed an initial public offering on the New York Stock Exchange (the "NYSE"), issuing approximately 22.2 million shares of common

stock at $18.00 per share. Intelsat S.A.'s shares were traded on the NYSE until May 19, 2020, shortly after the commencement of these Chapter 11 Cases.

### B.     Intelsat's Business Operations

As discussed above, the Company operates the world's largest satellite fleet and connectivity infrastructure, and provides diversified communications services to many of the world's leading media companies, telecommunications operators, Internet service providers, and the U.S. government and military. The Company has approximately 1,200 employees and maintains its corporate administrative headquarters in McLean, Virginia, with local sales and marketing support offices in sixteen countries across the globe. The Company operates over fifty satellites and eight owned satellite ground stations connecting its satellite network to terrestrial networks, covering 99 percent of the world's populated regions and providing a critical layer in the global communications infrastructure. The Company also operates over a significant terrestrial network, which completes the system's connectivity worldwide.

In simplified terms, the Company uses its satellites as relay stations in space for the transmission of voice, video, and data communications. The satellites allow communications to bypass existing ground-based infrastructure, which is often limited and unreliable in many parts of the world. This satellite-based communications system typically involves four steps. First, an "uplink" station or other ground-based equipment transmits the desired communications signal to one of the Company's satellites. Second, the satellite amplifies the incoming signal, and changes the radio frequency of the signal. Third, the satellite transmits the signal back to earth, where in the final step it is received by one or more specialized "downlink" station(s) or other ground-based equipment. For two-way applications, the ground-based equipment can reverse the transmission path.

The Company's satellites primarily send and receive signals in one of three high-frequency radio "bands" (*i.e.*, ranges within radio/electromagnetic spectrum): C-band, Ku-band, and Ka-band. Higher-frequency radio waves—that is, radio waves with a smaller wavelength—are ideal for use by radar, communication satellites, and cable and satellite television broadcasting because the smaller wavelength of the radio waves in these bands allow the waves to be directed in narrow beams to and from satellites to specific ground locations with a high degree of precision.

The Company uses its extensive satellite and telecommunications network to provide diversified communications services to the world's leading media companies; fixed and wireless telecommunications operators; data networking service providers for enterprise and mobile applications; multinational corporations; and Internet service providers. Approximately 200 countries and territories receive Intelsat's services and, based upon the position of the Company's satellites and beams, most of the Company's on-network revenue aligns to emerging regions. Additionally, the Company is developing coverage that is more comprehensive over developed regions, such as the continental United States and Europe, as well as ocean routes.

The Company operates primarily across four customer sectors: media, enterprise and wireless, mobility, and government.

- *Media*. Approximately 43 percent of the Company's revenue originates from its media sector. Through its media sector, the Company provides direct-to-home television, distributes television programming, and broadcasts events worldwide on behalf of its customers, which include the BBC, 21st Century Fox, TimeWarner, the Walt Disney Company, and Discovery Incorporated. In total, the Company distributes approximately 5,500 video channels and 1,600 HD video channels, including CBS, ABC, Fox, ESPN, BBC World News, HBO, and the Discovery Channel. In addition, the Company frequently distributes broadcast events to worldwide audiences. On February 2, 2020, the approximately 160 million people who

58

watched Patrick Mahomes lead the Kansas City Chiefs to a Super Bowl victory over the San Francisco 49ers were receiving the broadcast through the Company's satellite network, which has also been used to broadcast video from the *Tour de France*, the World Cup, the 2018 North Korea-United States Singapore Summit, and coverage from Prince Harry's and Meghan Markle's Royal Wedding.

- ***Enterprise and Wireless***.  The Company's enterprise and wireless sector, which represented approximately $500 million (24 percent) of the Company's 2019 revenues, provides services to fixed and wireless telecommunications companies, such as Verizon, Vodafone, Orange, and America Movil.  The Company provides the satellite and telecommunications services necessary to create the wireless networks (such as the 2G, 3G, and 4G networks) that millions of people around the world use to make cell phone calls and access the Internet.  The Company also provides services for private corporate networks, and broadband for remote communities lacking traditional, terrestrial communications networks.  For example, through a recent partnership with Africa Mobile Networks, the Company has enabled mobile connectivity for over 3.5 million people living in remote African villages.

- ***Mobility***.  The Company's mobility sector, which represented approximately $270 million (13 percent) of the Company's 2019 revenue, provides industry leading broadband services for aviation, maritime, and land mobility applications.  For example, the Company is a leader in the market for in-flight Internet connectivity, allowing millions of passengers around the world to access the Internet while in the air via customers such as Global Eagle Entertainment and Panasonic Avionics Corporation.  The Company is also a leader in providing Internet access for commercial ships, including most of the world's largest cruise vessels.  The Debtors anticipate substantial growth in this sector of their business, in part due to the synergistic acquisition of Gogo CA, which the Debtors believe will provide strategic enhancements to the Debtors' existing mobility business, complement the Debtors' existing strategic plans to develop new customer relationships and consumer-facing capabilities, and potentially become the Debtors' core mobility solutions business unit.

- ***Government***.   The Company is also the leading provider of commercial satellite communications services to the United States government and other select military and civilian organizations and their contractors, for intelligence, surveillance and reconnaissance missions, as well as in-flight communications for government officials, troops, and cargo aircraft. Representative customers in this business sector include the U.S. Department of Defense, U.S. Department of State, and Australian Defence Force.  Moreover, as part of this business, which constituted approximately $380 million (18 percent) of the Company's 2019 revenue, the Company distributes the global satellite feed for the American Forces Network, which provides entertainment options, such as access to broadcasts of March Madness and the Super Bowl, to the more than one million U.S. service members who are stationed around the world at U.S. military bases and on U.S. naval ships.  The Company's government-contracting subsidiary, Intelsat General Communications LLC, is not a Debtor in these bankruptcy cases.

The Company is also positioned to stabilize its revenue and thereafter return to growth by continuing its commitment to innovation and investments in new technologies that will keep its network competitive and cost-efficient.  It will invest in a next generation software-defined network: a high-performance space and ground network that leverages software-defined satellites, ground infrastructure, various types of operational flexibility (coverage, frequency, radio-frequency performance) and software technologies to generate superior network performance and cost efficiencies, while enabling a future-proofed network and backwards compatibility with globally deployed, existing ground infrastructure.  The Company also has recently begun investing in a new Intelsat 40e satellite, which

features North American coast-to-coast high-throughput coverage and is particularly well designed for mobility applications.

Nonetheless, the Company's business is capital intensive, and over the past five years has required capital expenditures of between $225 million and $725 million annually.  These capital expenditures largely fund the construction and launch of multiple new satellites, upgrades to ground networks, and new technologies.  The Company expects to launch at least four new satellites over the next several years (not including the additional satellites launched as part of the C-band spectrum clearing program).  Upgrading and launching new and next generation satellites, including the Debtors' upcoming NextGen Satellite Program, (*i.e.*, to ultimately build and launch at least two next-generation satellites that would contain the latest and most advanced software-defined satellite technology) is essential to maintaining the quality of the Company's network, enabling new services, and maintaining the Company's competitive position against existing and new competitors who are likewise constantly reinvesting in and improving their own networks and service capabilities.

### C. The C-Band Clearing Process

In its business, the Company uses its satellites as relay stations in space for the transmission of voice, video, and data communications.  The Company's satellites primarily send and receive signals in one of three high-frequency radio "bands" (*i.e.*, ranges within radio/electromagnetic spectrum), including the C-band.  The "C-band" refers to certain portions of the radio/electromagnetic spectrum that were historically allocated by the International Telecommunications Union ("ITU") table of allocations exclusively for FSS and certain point-to-point terrestrial services (other "Fixed Services").  The ITU rules permit certain regions to allow for other terrestrial use pursuant to each administration's rule.  The FCC, pursuant to its regulatory jurisdiction under the Communications Act of 1934, administers the telecommunications licenses for services in the United States and has historically limited the use of the C-band for FSS and Fixed Services only.  Ever since Intelsat began operations, the FCC has allocated the 3700–4200 MHz band for use by commercial satellite services for downlinks (communications from space-based satellites to ground stations) and the 5925–6425 MHz band for uplinks (communications from ground stations to satellites).  Most of the Company's FSS operations within the C-band spectrum involve broadcasting downlink signals to FCC-licensed earth stations, which then deliver the received television and radio programming to cable TV head-ends or other terrestrial retransmission sites.  The world's largest media programmers currently use the C-band to deliver leading content to cable television distributors, television broadcast affiliates, radio stations, and private video and data networks for customers across the United States.

For over 40 years, Intelsat has been utilizing C-band radio frequencies to build its comprehensive network of communications satellites and ground infrastructure.  During this time, the Company has invested in and built a C-band business in the United States in reliance on the licenses that have been issued by the FCC and perennially renewed.  The Company operates a significant portion of its business based on License's rights to the C-band to provide services in the United States.  The Company (along with other satellite operators) expected the FCC, pursuant to its consistent practice, to continue to license the spectrum for use by satellite operators in perpetuity.  Based on these rights and expectations, the Company and other satellite operators have invested over $50 billion to design, manufacture, and launch satellites, and make long-term contractual commitments to their customers.

In 2017, the FCC issued a Notice of Inquiry ("NOI") exploring reallocating portions of the C-band spectrum currently licensed to satellite operators in order to accommodate the deployment of critical 5G

wireless services in the continental United States.[25]  Beginning in 2017, in response to the FCC's NOI, the Company worked collaboratively with other satellite operators and with customer groups, associations, and other stakeholders to propose a market-based solution to the reallocation suggested by the FCC.  The proposal put forth by the Company and other satellite operators supported the FCC's stated goals of clearing a large portion of spectrum, quickly, while also protecting incumbent services, through a private auction facilitated by a committee of satellite operators to assist in the transition.  In the summer of 2018, the FCC issued a Notice of Proposed Rulemaking ("NPRM") that specifically addressed the market-based proposal put forth by Intelsat as a method of reallocating the spectrum and sought comment on the market-based approach and other potential approaches.  After the FCC issued the NPRM, US LLC formed a consortium with other satellite operators (the "C-Band Alliance" or "CBA") for the purpose of designing and implementing a private auction and independent clearing procedure to reallocate existing satellite operations from a portion of the C-band spectrum for new 5G wireless applications.

Members of the CBA worked collaboratively with the FCC over the course of 2018 and 2019 to address the issues raised by various parties to make the private auction path the approach taken in the final FCC Order.  On November 18, 2019, however, the FCC's chairman suggested that the FCC would pursue a public auction of the C-band spectrum, a dramatic change from the private market approach supported by the CBA.  On February 7, 2020, the FCC issued its draft order reflecting this shift to a public auction construct in the C-band proceeding.  On March 3, 2020, the FCC made this order final.

The FCC Order does not tie compensation to any satellite operator to the estimated value of the spectrum.  Instead, the FCC Order provides for at-cost reimbursement for relocating customer services to the upper part of the C-band (capital expenditures for new satellites and ground equipment), and certain Accelerated Relocation Payments if licensees clear their portions of the spectrum quickly: one incentive for partial clearing by December 5, 2021 and a second incentive for full clearing by December 5, 2023.  For the Company, these Accelerated Relocation Payments are capped at approximately $4.87 billion.

The FCC's change of direction significantly affected the Company's market capitalization.  On November 1, 2019, Intelsat had an equity market capitalization of approximately $3.8 billion.  From the beginning of November through November 18, 2019, the share price of Intelsat dropped rapidly and by over 75 percent, wiping out approximately $2.9 billion in equity market capitalization.

The Accelerated Relocation Payments present an important opportunity for the Company to earn billions of dollars of proceeds that would increase the Company's value, help meet capital investment needs, and continue to enable the Company to improve technologies for delivering enhanced, new and more cost-efficient communications services.  To be eligible to receive the Accelerated Relocation Payments, per the FCC Order, License elected in May 2020 to clear its portion of the C-band spectrum on the FCC's accelerated time frame.  If successful, License would expect to receive a payment of approximately $1.20 billion in 2022 after clearing the 3700–3820 MHz portion of the spectrum by December 5, 2021.  If the Company successfully clears the remaining portion of the spectrum (3820–4000 MHz) by December 5, 2023, License would expect to receive a payment of approximately $3.67 billion in 2024.

To meet these deadlines, the Company needed to promptly commence work to clear the spectrum.  The Company's existing satellites were created to access the entire C-band spectrum (3700–4200 MHz)—that is, the Company's existing satellites were constructed with a portion of their transponders configured exclusively to use the now-reallocated portion of the C-band.  The Company must transition customers, who historically have uploaded content to one of the twenty-four C-band transponders on the Company's satellites, which then download content to affiliated cable facilities for distribution within a franchise area.

---

[25]    The C-band is uniquely suited to help facilitate the transition to 5G, as it offers a balance of higher speeds with reliable signal propagation that will help network operators provide expansive 5G coverage.

Following C-band clearance, only nine transponders per satellite will be available for upload and download, thereby significantly reducing the Company's ability to provide services to its customers. While these existing satellites will still be able to operate in the 4000–4200 MHz portion of the spectrum, their overall effectively available capacity will be significantly reduced.

To address the reduced capacity of its existing satellites resulting from compliance with the FCC Order, the Company has finalized agreements for the manufacture and launch of seven additional satellites to maintain the Company's current satellite communications operations. In addition to the costs for the manufacturing of new satellites, launch contracts, and associated insurance and project management costs, the Company is advancing three other major initiatives (a) installing approximately 20,000 radio frequency filters on an estimated 22,500 antennas in about 10,500 different earth station locations for over 70 content distribution customers; (b) relocating and consolidating several existing urban ground station sites by constructing and bringing into use only two new rural locations; and (c) funding and coordinating upgrades to compression technology to provide service continuity while significantly reducing bandwidth consumed, to ten or more of the Company's largest C-band customers.

The Debtors have made substantial progress toward clearing the C-band, and the Company is on track to meet all requirements set forth in the FCC Order to remain eligible for the nearly $5 billion in Accelerated Relocation Payments. On August 14, 2020, License filed its Transition Plan reflecting revisions made in response to comments received from the FCC and interested parties. On September 17, 2020, the Company announced that it had finalized all required contracts with satellite manufacturers and launch-vehicle providers to move forward and meet the accelerated C-band spectrum clearing timelines established by the FCC. As of July 31, 2021, the Debtors had incurred C-band clearing related costs and expenses of $1.038 billion, of which $971 million is expected to be reimbursable under the FCC Order. On October 28, 2020, License filed a revised version of its final C-band spectrum transition plan with the FCC.

On December 8, 2020, the FCC began the C-band auction as contemplated by the FCC Order. The clock phase of the auction recently closed with gross proceeds of approximately $80.9 billion. The assignment phase of the auction commenced February 8, 2021, and concluded on February 24, 2021, yielding over $81 billion in gross proceeds.

**D.    The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors had approximately $14.8 billion of third-party funded debt obligations, with an annual interest expense of approximately $1.13 billion. The following simplified organizational chart and table depicts the Debtors' prepetition capital structure as of the Petition Date:

62

| Obligation | Maturity | Approximate Annual Interest Expense | Approximate Principal Amount Outstanding |
|---|---|---|---|
| Intelsat S.A. 4.5% Convertible Senior Notes | June 2025 | $18.1 million | $402.5 million |
| 2021 Lux Senior Notes | June 2021 | $32.6 million | $421.2 million |
| 2023 Lux Senior Notes | June 2023 | $72.2 million | $888.3 million |
| 2024 Lux Senior Notes | Nov. 2024 | $13.1 thousand | $0.1 million |
| 2023 Connect Senior Notes | Feb. 2023 | $118.8 million | $1.25 billion |
| 2023 Jackson Senior Notes | Aug. 2023 | $109.2 million | $1.985 billion |
| 2024 Jackson Senior Notes | Oct. 2024 | $250.8 million | $2.95 billion |
| 2025 Jackson Senior Notes | July 2025 | $183.8 million | $1.885 billion |
| 8.00% First Lien Notes | Feb. 2024 | $108.0 million | $1.3497 billion |
| 9.50% First Lien Notes | Sept. 2022 | $46.6 million | $490 million |
| Intelsat Jackson LIBOR + 3.75% Senior Secured First Lien Term Loan – Tranche B-3 | Nov. 2023 | $113.6 million[26] | $2.0 billion |
| Intelsat Jackson LIBOR + 4.5% Senior Secured First Lien Term Loan – Tranche B-4 | Jan. 2024 | $25.4 million[27] | $395 million |
| Intelsat Jackson 6.625% Senior Secured Term Loan – Tranche B-5 | Jan. 2024 | $46.4 million | $700 million |
| **Total:** | | **$1.13 billion** | **$14.8 billion** |

---

[26]   Based on LIBOR of 1.932%, pursuant to the Company's hedging contracts prior to the Petition Date.

[27]   Based on LIBOR of 1.932%, pursuant to the Company's hedging contracts prior to the Petition Date.

### Simplified Structure Chart

| Outstanding Third Party Debt | | | |
|---|---|---|---|
| **Convertible Senior Notes** | | | |
| 4.5% | Senior Convertible Notes due | 2025 | $402.5mm |
| **LuxCo Senior Notes** | | | |
| 7.75% | Senior Notes due | 2021 | $421.2mm |
| 8.125% | Senior Notes due | 2023 | $888.3mm |
| **LuxCo Senior Notes** | | | |
| 12.5% | Senior Notes due | 2024 | $.01mm |
| **Connect Senior Notes** | | | |
| 9.5% | Senior Notes due | 2023 | $1,250.0mm |
| **Jackson Senior Secured Notes** | | | |
| 9.5% | Senior Secured Notes due | 2022 | $490.0mm |
| 8% | Senior Secured Notes due | 2024 | $1,349.7mm |
| **Jackson Senior Notes** | | | |
| 5.5% | Senior Notes due | 2023 | $1,985.0mm |
| 8.5% | Senior Notes due | 2024 | $2,950.0mm |
| 9.75% | Senior Notes due | 2025 | $1,885.0mm |
| **Jackson Secured Credit Agreement** | | | |
| B-3 | Tranche Term Loan due | 2023 | $2,000.0mm |
| B-4 | Tranche Term Loan due | 2024 | $395.0mm |
| B-5 | Tranche Term Loan due | 2024 | $700.0mm |

**Total Enterprise Debt = $14,716.8mm**

★   **Primary Obligor**



64

### 1. *Prepetition First Lien Credit Facility*

As of the Petition Date, the Prepetition Obligors were jointly and severally indebted and liable to the Term Loan Facility Lenders in an aggregate amount of approximately $3,114,786,736, which consisted of (x) approximately $3,095,000,000 in principal amount of term loans advanced under the Prepetition Credit Agreement, plus (y) approximately $19,786,736 on account of accrued and unpaid interest thereon as of the Petition Date.

### 2. *Prepetition First Lien Notes*

As of the Petition Date, the Prepetition Obligors were jointly and severally indebted and liable to (a) the holders of 9.50% First Lien Notes in the aggregate amount of approximately $495,560,139, which consisted of (x) approximately $490,000,000 in principal amount, plus (y) approximately $5,560,139 on account of accrued and unpaid interest thereon as of the Petition Date and (b) holders of 8.00% First Lien Notes in the aggregate amount of approximately $1,376,071,703, which consisted of (x) approximately $1,349,678,000 in principal amount of 8.00% First Lien Notes, plus (y) no less than approximately $26,393,703 on account of accrued and unpaid interest thereon as of the Petition Date.

### 3. *Jackson Senior Notes*

On June 5, 2013, Intelsat Jackson issued $2.0 billion in aggregate principal amount of senior notes under the 2023 Jackson Senior Notes Indenture. As of the Petition Date, there was approximately $1.985 billion in principal outstanding under the 2023 Jackson Senior Notes. As of the Petition Date, approximately $30,980,000 in interest has accrued.

On September 19, 2018, Intelsat Jackson issued $2.25 billion in aggregate principal amount of senior notes under the 2024 Jackson Senior Notes Indenture. As of the Petition Date, there was approximately $2.95 billion in principal outstanding under the 2024 Jackson Senior Notes. As of the Petition Date, approximately $144,870,000 in interest has accrued.

On July 5, 2017, Intelsat Jackson issued $1.5 billion in aggregate principal amount of senior notes under the 2025 Jackson Senior Notes Indenture. In October 2018, Intelsat Jackson completed an add-on offering of $400 million in aggregate principal amount of the 2025 Jackson Senior Notes. As of the Petition Date, there was approximately $1.885 billion in principal outstanding under the 2025 Jackson Senior Notes. As of the Petition Date, approximately $60,240,000 in interest has accrued.

### 4. *Connect Senior Notes*

On August 16, 2018, ICF issued $1.25 billion in aggregate principal amount of senior notes under the Connect Senior Notes Indenture. Pursuant to the Connect Senior Notes Indenture, the Connect Senior Notes bear interest at a rate of 9.5 percent per year, payable semi-annually on June 15 and December 15 of each year, and will mature on February 15, 2023. As of the Petition Date, there was approximately $1.25 billion in principal outstanding under the Connect Senior Notes. As of the Petition Date, approximately $48,820,000 in interest has accrued.

### 5. *LuxCo Senior Notes*

On April 5, 2013, LuxCo issued three separate senior notes under the Intelsat Lux Multi Senior Notes Indenture. Under the Intelsat LuxCo Multi Senior Notes Indenture, LuxCo issued: (a) $500 million in aggregate principal amount of notes bearing interest at a rate of 6.75 percent per year, payable semi-annually on June 1 and December 1 of each year that would have matured on June 1, 2018; (b) $2 billion in aggregate principal amount of notes bearing interest at a rate of 7.75 percent per year,

65

payable semi-annually on June 1 and December 1 of each year that will mature on June 1, 2021; and (c) $1 billion in aggregate principal amount of notes bearing interest at a rate of 8.125 percent per year, payable semi-annually on June 1 and December 1 of each year that will mature on June 1, 2023.  In May 2018, LuxCo redeemed certain of the notes under the Intelsat LuxCo Multi Senior Notes Indenture.  As of the Petition Date, there was approximately $421.2 million in principal outstanding under the 2021 LuxCo Senior Notes and $900 million in principal outstanding on the 2023 LuxCo Senior Notes.  As of the Petition Date, approximately $14,690,000 in interest has accrued under the 2021 LuxCo Senior Notes and approximately $32,480,000 in interest has accrued under the 2023 LuxCo Senior Notes.

On January 6, 2017, LuxCo issued approximately $403.3 million in aggregate principal amount of senior notes under the 2024 LuxCo Senior Notes Indenture.  As of the Petition Date, approximately $6,950,000 in interest has accrued.  Pursuant to the 2024 LuxCo Senior Notes Indenture, the 2024 Intelsat LuxCo Senior Notes bear interest at a rate of 12.5 percent per year, payable semi-annually on November 15 and May 15 of each year, and will mature on November 15, 2024.  The majority of the 2024 LuxCo Senior Notes are held intercompany by certain of the Debtors.

On August 16, 2018, Intelsat Luxembourg S.A. issued approximately $1.579 billion in aggregate principal amount of senior notes to ICF and Envision.  As of the Petition Date, there was approximately $1.579 billion in principal outstanding under the 2026 LuxCo Senior Notes.  As of the Petition Date, approximately $371,000,000 in interest has accrued on the 2026 LuxCo Senior Notes.  The 2026 LuxCo Senior Notes are held intercompany by ICF and Envision.

### 6.  *Convertible Senior Notes*

On June 18, 2018, Intelsat S.A. issued $402.5 million in aggregate principal amount of convertible senior notes under an indenture dated as of June 18, 2018, by and among Holdings, as issuer, Envision, as guarantor, and U.S. Bank, as trustee.  Pursuant to the Convertible Senior Notes Indenture, the Convertible Senior Notes bear interest at a rate of 4.5 percent per year, payable semi-annually on June 15 and December 15 of each year, and will mature on June 15, 2025.  Subject to certain adjustments, holders may convert their Convertible Senior Notes into common shares at a ratio of 55.0085 common shares per $1,000 principal amount of Convertible Senior Notes.  As of the Petition Date, there was approximately $402.5 million in principal outstanding under the 2025 Convertible Senior Notes.

### 7.  *Intelsat S.A. Prepetition Common Stock*

Intelsat S.A.'s certificate of incorporation authorizes the board of directors to issue any class of shares.  As of the Petition Date, the Debtors had approximately 142,085,774 shares of common stock outstanding.  The number of common stock outstanding includes the Series A Preferred Shares issued in the Company's IPO, which were converted to common equity in May 2016.  The Debtors have never declared or paid any Cash dividends to holders of Intelsat S.A. common stock.

## VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

The Debtors commenced these Chapter 11 Cases to efficiently access capital and engage with stakeholders through a chapter 11 process.  The Debtors required access to capital to meet two unexpected, external challenges: (a) the requirement to clear the C-band in order to obtain up to $4.87 billion in Accelerated Relocation Payments and (b) address the significant reduction in revenue and Cash flow associated with the global COVID-19 pandemic.  The Debtors' ability to meet these challenges was limited by the Debtors' prepetition capital structure, which, as discussed, includes approximately $14.8 billion in total outstanding funded debt obligations, with annual debt service payments totaling approximately $1.13 billion.

66

## A.    Additional Capital Required to Comply with the FCC's February 28, 2020 C-Band Order

The C-Band Alliance was formed to enable a private auction of C-band spectrum.   Various economic analyses estimated the value of the portion of the spectrum that the FCC proposed to be reallocated to be between $43 billion and $77 billion.   Based on these estimates, the C-Band Alliance proposed to the FCC that existing operators should receive at least half the value of the total auction proceeds for vacating it for 5G use—in the Company's case, at least $20 billion.

Unfortunately, the FCC Order—which provided for a fundamentally different public sale process in which the C-Band Alliance would play no role, with limited compensation available to current C-band licensees—dramatically reduced the amount the Debtors expected to receive and imposed significant delay on the Debtors' ability to obtain reimbursement for the costs associated with their C-band clearing efforts.

The Debtors estimate the total cost of their endeavors to meet the FCC's Accelerated Relocation Payment deadlines and clear the C-band spectrum will ultimately total $1.6 billion, of which approximately $1.2 billion will be spent through December 2021.   The cost of building and launching the required new satellites alone totals over $1 billion.

Significantly, while the FCC Order provides that the Debtors' clearing costs will eventually be reimbursed, those reimbursements are not expected to begin until late-2021.   Until that time, the Debtors have and will continue to incur hundreds of millions of dollars in unreimbursed cumulative clearing costs. The Debtors would have been unable to fund their respective portions of these necessary clearing expenses while servicing their current debt obligations, maintaining their financial covenants, and meeting their operating requirements.

## B.    The COVID-19 Pandemic

In addition to the working capital challenges posed by the FCC Order, the Debtors (like many businesses) face additional operating and financial pressure from the impacts of the COVID-19 pandemic. The COVID-19 pandemic has had a devastating impact on the worldwide economy, and particularly on many of the Debtors' important customers in the airline, maritime, energy, and media industries.   As a result of both the spread of COVID-19 and the various governmental responses, consumer travel declined precipitously in 2020.   The Debtors, among other things, are one of the largest providers of broadband services to airlines and cruise ship customers for passenger Internet connectivity, and revenues from those businesses, and businesses in the energy industry, have declined accordingly.   Similarly, the Debtors' media business has been a leader in broadcasting occasional use events such as live sports and concerts. Government restrictions on such events have reduced the Debtors' associated broadcast revenue dramatically.   Notably, the pandemic, and the attendant economic contraction, was a material factor in the chapter 11 filings of at least three of the Debtors' customers, distributors, or other stakeholders.

Despite these conditions, the Debtors have continued to deliver critical satellite communications to the end users of its customers' services, whether first responders and emergency service providers or people who unavoidably must travel by air or sea as a result of the COVID-19 pandemic.   However, the Debtors revenue and cash flows have been materially impacted in 2020 and 2021 as a result of the COVID-19 pandemic.   The global pandemic will put even greater pressure on the cash flows and working capital the Debtors need to fund their ordinary operations, meet their debt service obligations, and clear the C-band spectrum in accordance with the FCC Order.

67

C.      **Contingency Planning**

In February and March 2020, the Debtors retained K&E, PJT, and A&M to assist them in navigating the complex interaction of the requirements under the FCC Order and their liquidity situation, and began to seek alternative capital sources, including financing from third parties.

The Debtors and their advisors exhaustively surveyed and explored all potential avenues to effectuate a liability management transaction, including by identifying and approaching numerous potentially interested strategic investors in the telecommunications, aerospace and defense, satellite services, and emerging space sectors with whom the Debtors could negotiate a potential value-maximizing out-of-court transaction.  Given the Debtors' existing financial leverage, the nature of the FCC Order, and the Debtors' current and future business prospects, particularly as adjusted for the impact of COVID-19, the Debtors also began exploring the possibility of accessing chapter 11 relief and DIP financing to address their liquidity needs.

Realizing that chapter 11 proceedings may be required to enable the Debtors to restructure their operations and to obtain access to the capital required to clear the C-band spectrum on the FCC's expedited timeline, the Debtors began to evaluate the required size of a postpetition financing facility for the proceedings, identified potential sources of postpetition funding, and began a robust and competitive marketing process for postpetition financing, with the aim of achieving the best terms possible.

D.      **Establishment of the Special Committees and Appointment of the Disinterested Directors**

The boards of directors of Intelsat S.A., LuxCo, Envision, ICF, and Jackson each established a Special Committee and appointed Disinterested Directors to serve on each respective Special Committee.

Each applicable board of directors delegated to its Special Committee the authority to investigate and determine, in the Special Committee's business judgment, whether any matter involves a Conflict Matter, including any conflict of interest between the applicable Debtor and any Related Party, including, affiliates, equity holders, subsidiaries, directors, and managers.

Each applicable board of directors delegated to its Special Committee the authority to take any action with respect to the Conflict Matters, as determined in the sole judgment of the Disinterested Directors, including, any release or settlement of potential Claims or Causes of Action of the applicable Debtor or its subsidiaries, if any, and any other transaction implicating the Company or its subsidiaries.

The Special Committees are authorized and empowered, at the expense of the applicable Debtors, to retain and employ legal, financial, and other advisors to advise and assist it in connection with fulfilling its duties.  Each of the Special Committees retained separate advisors from those representing the Debtors.

E.      **Entry into the Grace Period, the Guarantee Releases, and Related Asserted Claims**

In an effort to conserve liquidity as the Debtors assessed their strategic alternatives, on April 15, 2020, Intelsat and certain of its affiliates elected to withhold a $125 million interest payment due April 15, 2020, on the Jackson 8.5% Senior Notes Indenture Due 2024 and entered into a 30-day grace period, provided for in the applicable indenture, to preserve liquidity as the Company continued to engage with key stakeholders and further progress discussions regarding financing and restructuring options.

Prior to filing voluntary bankruptcy petitions, Intelsat S.A., Holdings SARL, Holdings, Investments, LuxCo, and ICF (collectively, the "Parent Guarantors") elected to release their guarantees (the "Parent Guarantees") of five prepetition funded debt instruments (the releases, collectively, the "Guarantee Releases") pursuant to section 10.01(k) of each applicable indenture.  Section 10.01(k) of

68

each indenture is substantially identical and provides in relevant part: "Any Guarantee given by any Parent of the Issuer may be released at any time upon written notice to the Trustee from such Parent of the Issuer." Specifically:

- Intelsat S.A. released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; (iii) Jackson 9.75% Senior Notes due 2025; (iv) LuxCo 7.75% Senior Notes due 2021; and (v) LuxCo 8.125% Senior Notes due 2023;

- Holdings SARL released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; (iii) Jackson 9.75% Senior Notes due 2025; (iv) LuxCo 7.75% Senior Notes due 2021; and (v) LuxCo 8.125% Senior Notes due 2023;

- Holdings released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; (iii) Jackson 9.75% Senior Notes due 2025; (iv) LuxCo 7.75% Senior Notes due 2021; and (v) LuxCo 8.125% Senior Notes due 2023;

- Investments released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; (iii) Jackson 9.75% Senior Notes due 2025; (iv) LuxCo 7.75% Senior Notes due 2021; and (v) LuxCo 8.125% Senior Notes due 2023;

- LuxCo released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; and (iii) Jackson 9.75% Senior Notes due 2025;

- ICF released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; and (iii) Jackson 9.75% Senior Notes due 2025.

Notwithstanding the Guarantee Releases, U.S. Bank, in its capacity as indenture trustee under the Jackson 5.5% Senior Notes due 2023, the Jackson Senior Notes due 2024, and the Jackson 9.75% Senior Notes due 2025 (collectively, the "Jackson Senior Notes"), filed proofs of claim against S.A., Holdings SARL, Holdings, Investments, LuxCo, and ICF for the full outstanding amount under the Jackson Senior Notes (the "Jackson Parent Guarantee Claims"). Additionally, Delaware Trust Company ("Delaware Trust"), in its capacity as indenture trustee under the LuxCo Senior Notes filed proofs of claim against S.A., Holdings SARL, Holdings, and Investments for the full outstanding amount under the LuxCo Senior Notes (the "LuxCo Parent Guarantee Claims," and together with the Jackson Parent Guarantee Claims, the "Guarantee Claims").

On February 10, 2021, the Convert Ad Hoc Group filed the *Objection of Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by U.S. Bank National Association, as Indenture Trustee* [Docket No. 1455] (the "Converts' Jackson Notes Objection") and the *Objection of Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by the Delaware Trust Company, as Successor Trustee* [Docket No. 1463] (the "Converts' LuxCo Notes Objection" and together with the Jackson Parent Guarantee Claim Objection, the "Converts' Objections"). In the Converts' Objections, the Convert Ad Hoc Group asserted that the Guarantee Releases were valid under the terms of each of the governing indentures and applicable law and not subject to avoidance and, therefore, the Guarantee Claims do not assert valid claims, in so far as they assert claims against certain of the Parent Guarantors[28] on the basis of any alleged obligation to guarantee the Jackson Senior Notes or the LuxCo Senior Notes.

---

[28]    The Convert Ad Hoc Group objected to the Guarantee Claims filed against S.A., Investments, Holdings, and Holdings SARL, but did not object to the Guarantee Claims filed against LuxCo or ICF.

69

The Converts' Objections were initially scheduled for a hearing on March 17, 2021. Then, on March 9, 2021, the Convert Ad Hoc Group agreed to adjourn the Converts' Objections until June 14, 2021, which was the anticipated date of the Debtors' Confirmation Hearing at the time, and reserved the right to seek another hearing on the Converts' Objections, should the need arise.

On March 12, 2021, U.S. Bank filed the *Response of U.S. Bank National Association, as Indenture Trustee for the Jackson Unsecured Notes, to the Objection of the Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by U.S. Bank National Association, as Indenture Trustee* [Docket No. 1622] and the Jackson Crossover Ad Hoc Group filed the *Opposition of the Jackson Crossover Group to the Objection of the Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by U.S. Bank National Association, as Trustee* [Docket No. 1623] (together, the "Responses to the Converts' Jackson Notes Objection"). The Responses to the Converts' Jackson Notes Objection each dispute the validity of the Guarantee Releases, asserting that they may have been prohibited by the terms of the governing indentures or applicable law and that they may be subject to avoidance. The Responses to the Converts' Jackson Notes Objections also indicate that U.S. Bank and the Jackson Crossover Ad Hoc Group intend to seek discovery in connection with, among other things, the purpose of the Parent Guarantees and the circumstances of the Guarantee Releases.

Then, on March 17, 2021 U.S. Bank and the Jackson Crossover Ad Hoc Group filed the *Joint Motion of U.S. Bank National Association, as Indenture Trustee for the 2024 Notes, and the Jackson Crossover Group for Partial Summary Judgment of the Objection of the Ad Hoc Group of Convertible Noteholders to Proof of Claim Filed by U.S. Bank National Association, as Indenture Trustee* [Docket No. 1680] (the "Motion for Partial Summary Judgment on the Converts' Jackson Notes Objection"). In the Motion for Partial Summary Judgment on the Converts' Jackson Notes Objection, U.S. Bank and the Jackson Crossover Ad Hoc Group sought judgement as a matter of law that the Debtors were in material breach of the indentures for the Jackson Senior Notes because (a) the Debtors had entered into a 30-day grace period after failing to make payment on April 15, 2020 under the 8.5% Jackson Senior Notes due 2024 (the "Jackson 2024 Notes") and (b) the board decision authorizing the commencement of these Chapter 11 Cases, prior to missing the April 15, 2020 interest payment, constitutes a material anticipatory breach of the indenture for the 2024 Notes. Ultimately, the Motion for Partial Summary Judgment on the Converts' Jackson Note Objection seeks denial of the Converts Ad Hoc Group's request to disallow the Guarantee Claims filed against the Parent Guarantors in connection with their guarantees of the Jackson 2024 Notes. U.S. Bank and the Jackson Crossover Ad Hoc Group originally scheduled the Motion for Partial Summary Judgment on the Converts' Jackson Notes Objection for hearing on April 14, 2021.

Then, on March 19, 2021, the HoldCo Creditor Ad Hoc Group filed the *Objection of the Ad Hoc Committee of Parent Company Creditors to Proofs of Claim Filed by U.S. Bank National Association, as Jackson Unsecured Notes Trustee for the Jackson Unsecured Notes* [Docket No. 1700] (the "HoldCo Creditors' Objection," and together with the Converts' Objections, the "Guarantee Claims Objections"). In the HoldCo Creditors' Objection, the HoldCo Creditor Ad Hoc Group joined the Converts' Jackson Note Objection with respect to Intelsat S.A., Investments, Holdings, and Holdings SARL and objected to the Guarantee Claims asserted against ICF and LuxCo in connection with the Jackson Senior Notes on substantially the same bases as were asserted in the Converts' Objections. The HoldCo Creditor Ad Hoc Group originally scheduled the HoldCo Creditors' Objection for a hearing on May 13, 2021.

In response to the HoldCo Creditors' Objection, on March 24, 2021, the Jackson Crossover Group filed the *Opposition of the Jackson Crossover Ad Hoc Group to the Objection of the Ad Hoc Committee of Parent Company Creditors to Proofs of Claim Filed by U.S. Bank National Association as Jackson Unsecured Notes Trustee for the Jackson Unsecured Notes* [Docket No. 1727] and U.S. Bank filed the *Response of U.S. Bank National Association as Indenture Trustee for the Jackson Unsecured Notes, to the Objection of the Ad Hoc Committee of Parent Company Creditors to Proofs of Claim Filed by U.S. Bank*

70

*National Association, as Jackson Unsecured Notes Trustee for the Jackson Unsecured Notes* [Docket No. 1726] (together, the "Responses to the HoldCo Creditors' Objection," and together with the Responses to the Converts' Jackson Notes Objection, the "Objection Responses"). Shortly thereafter, on March 24, 2021, the Jackson Crossover Ad Hoc Group and U.S. Bank filed the *Joint Motion of U.S. Bank National Association, as Indenture Trustee for the 2024 Notes, and the Jackson Crossover Group for Partial Summary Judgment on the Objection of the Ad Hoc Committee of Parent Company Creditors to Proofs of Claim Filed by U.S. Bank National Association, as Jackson Unsecured Notes Trustee for the Jackson Unsecured Notes* (the "Motion for Partial Summary Judgment on the HoldCo Creditors' Objection," and together with the Motion for Partial Summary Judgment on the Converts' Jackson Notes Objection, the "Motions for Partial Summary Judgment"). The Responses to the HoldCo Creditors' Objections and the Motion for Partial Summary Judgment on the HoldCo Creditors' Objection each made arguments that are substantially similar to arguments asserted in the responses and motion for partial summary judgement filed by U.S. Bank and the Jackson Crossover Ad Hoc Group regarding the Converts' Jackson Note Objection. U.S. Bank and the Jackson Crossover Group originally scheduled the Motion for Partial Summary Judgement on the HoldCo Creditors' Objection for a hearing on April 14, 2021.

In response to the March 24, 2021 joint motions filed by the Jackson Crossover Ad Hoc Group and U.S. Bank, on March 31, 2021, the Convert Ad Hoc Group filed the *Ad Hoc Group of Convertible Noteholders' (I) Objection to Joint Motion of U.S. Bank National Association, as Indenture Trustee for the 2024 Notes, and the Jackson Crossover Group for Partial Summary Judgment and (II) Cross-Motion for Partial Summary Judgment on the Objection to Proofs of Claim Filed by U.S. Bank National Association, as Indenture Trustee* [Docket No. 1769] (the "Convert Cross Motion").

On April 7, 2021, the HoldCo Creditor Ad Hoc Group filed *The Ad Hoc Committee of Parent Company Creditors' (A) Objection to the Joint Motions of the Jackson Unsecured Notes Trustee and the Jackson Crossover Group for Partial Summary Judgment on the Guarantee Claims Objections and (B) Cross-Motion for Entry of An Order Granting (I) Partial Summary Judgment and (II) Related Relief* [Docket No. 1805] (the "HoldCo Cross Motion" and, together with the Convert Cross Motion, the "Cross Motions") in response to the March 24, 2021 joint motions filed by the Jackson Crossover Ad Hoc Group and U.S. Bank as well as a joinder to the Convert Ad Hoc Group's March 31, 2021 objection and cross-motion for partial summary judgment [Docket No. 1807].

On April 13, 2021, the court entered the *Stipulated Order Adjourning Guarantee-Related Motions and Cross-Motions for Summary Judgement and Regarding Anticipated Motion of the Jackson Crossover Group for Temporary Allowance* [Docket No. 1852] (the "Stipulated Order"), which adjourned the various guarantee-related pleadings without a date. Additionally, the Stipulated Order provided that the Jackson Crossover Ad Hoc Group would file a motion for temporary allowance of certain of the claims filed by U.S. Bank no later than 14 days before the hearing on the adequacy of the Disclosure Statement, to be heard at such hearing.

On April 21, 2021, Delaware Trust filed the *Response of Delaware Trust Company to Objection of Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by Delaware Trust Company as Successor Trustee* [Docket No. 2045]. This Response disputes the validity of the Guarantee Releases, asserting that they may have been prohibited by the terms of the governing indentures or applicable law and that they may be subject to avoidance. It also incorporates by reference the arguments raised by U.S. Bank with respect to the Jackson Notes by incorporating by reference the Responses to the Converts' Jackson Notes Objection.

On August 16, 2021, the Convert Ad Hoc Group filed a joinder to the HoldCo Creditor Ad Hoc Group's April 7 objection and cross-motion for partial summary judgment [Docket No. 1805].

Finally, on August 17, 2021, the Debtors filed *the Debtors' Objection to the Joint Motion of U.S. Bank National Association, Indenture Trustee for the 2024 Notes, and the Jackson Crossover Group for Partial Summary Judgment on the Objection of the Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by U.S. Bank National Association, as Indenture Trustee* [Docket No. 2622].  In their objection, the Debtors requested that the court deny the Motions for Partial Summary Judgment and instead grant the Cross Motions.

In the face of substantial and good-faith disagreement set forth in the numerous pleadings described above and the material impact that the Guarantee Claims have on voting and recovery under any chapter 11 plan, the relevant parties engaged in negotiation on a consensual resolution to the Guarantee Claims in the context of the broader Mediation and Amended Plan negotiations.  Such a resolution could obviate the need for time-consuming and value destructive litigation, while also serving as a potential cornerstone for a broader consensual plan of reorganization.

Ultimately, the Debtors, the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group reached a resolution that would, among other things, provide for the adjournment of any litigation concerning the Guarantee Claims and, upon consummation of the Amended Plan, the withdrawal with prejudice of the HoldCo Guarantee Claims.  To the extent that the standstill set forth in the Amended Plan Support Agreement remains in effect, the Jackson Crossover Ad Hoc Group agreed to cease prosecuting, and direct U.S. Bank to cease prosecuting, the Guarantee Claims against Holdings, Investments, LuxCo and ICF and such claims will be ultimately withdrawn.  The parties agreed that 30 percent of any distributions made on account of TopCo Guarantee Claims against Intelsat to the Jackson Senior Notes Trustees shall be distributed Pro Rata to Holders of Connect Senior Notes Claims in consideration for the covenants, compromises, releases, and other benefits provided by the members of the HoldCo Creditor Ad Hoc Group pursuant to the Plan Support Agreement; *provided* that the aggregate value of such distribution shall not exceed $6 million.

Nothing in the Amended Plan Support Agreement shall prevent the Jackson Crossover Ad Hoc Group from (1) seeking entry of an order allowing a Guarantee Claim (whether on a temporary or final basis) against, or seeking a distribution from, the TopCo Guarantors or (2) defending any Guarantee Claim asserted against the HoldCo Guarantors or TopCo Guarantors against objections or challenges from any party; *provided*, that (i) any hearing regarding the merits of any Guarantee Claim against any TopCo Guarantor shall occur contemporaneously with the Confirmation Hearing, and in no event shall any such hearing occur prior to the Confirmation Hearing, (ii) no hearing regarding the merits of any Guarantee Claim against any HoldCo Guarantor may occur until after the Confirmation Hearing (except as provided in Section 7.05(h)), and (iii) the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Company Parties will each support the Bankruptcy Court's entry of the Guarantee Litigation Scheduling Order.

### F.    DIP Financing

As the COVID-19 pandemic deepened, and realizing that chapter 11 proceedings may be required to address the Debtors' liquidity needs and capital structure, the Debtors, with the assistance of their advisors, began to evaluate the required size of a postpetition financing facility for the Chapter 11 Cases, identified potential sources of postpetition funding, and began a robust and competitive marketing process for postpetition financing.

Prior to the Petition Date, the Debtors and their advisors solicited interest from ten (10) financial institutions to determine the extent to which third parties may be willing to provide DIP financing to the Debtors.  Of these financial institutions eight (8) executed confidentiality agreements and received private information about the Debtors' business, operations, and liquidity position.  The Debtors received multiple proposals for DIP financing, including for the DIP Facility, a $1 billion superpriority senior secured priming

multi-draw term loan credit facility proposed by the Jackson Ad Hoc Group.  After weeks of negotiation and analysis, the Debtors and their advisors determined that the DIP Facility was the best option available to the Debtors.  During the time between the Petition Date and entry of the Final DIP Order on June 9, the Debtors were able to build complete consensus around the DIP Facility.  As of the Petition Date, the DIP Facility was to be provided by the Jackson Ad Hoc Group, but following robust negotiations and certain modifications to the terms of the DIP Facility, the Debtors ultimately reached agreement with both the Jackson Ad Hoc Group and the Jackson Crossover Ad Hoc Group on the terms of the DIP Facility, which was ultimately provided by the constituents of each group.  The Debtors also engaged with, and gained the support for the DIP Facility of, the HoldCo Creditor Ad Hoc Group, the U.S. Trustee, and the Creditors' Committee.

The DIP Facility has provided the capital necessary for Jackson and its subsidiaries to pay for the clearing costs, maintain the adequate Cash balance given the capital-intensive nature of the Company's businesses, and—because of the sizable investment basket contained in the DIP Credit Agreement, as amended—enabled it to pursue strategic opportunities during these Chapter 11 Cases, such as the Gogo Transaction.

## VII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.   First and Second Day Relief and Other Case Matters

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of David Tolley, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Intelsat S.A. in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 6].  At a hearing on May 15, 2020, the Bankruptcy Court granted all of the relief initially requested in the First Day Motions.[29]

On June 9, 2020, the Debtors held their second day hearing, at which the Bankruptcy Court granted certain of the first day relief on a final basis, including authority  to continue to pay employee wages and benefits, pay certain Taxes, continue the cash management system, and pay certain vendor claims in the ordinary course.

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of these Chapter 11 Cases and ease administrative burdens, including certain retention applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including K&E as legal counsel to the Debtors, Kutak Rock LLP as co-counsel to the Debtors, PJT as investment banker to the Debtors, A&M as restructuring advisor to the Debtors, and legal and financial advisors to the Special Committees, among others.

### B.   Appointment of Official Committee of Unsecured Creditors

On May 27, 2020, the U.S. Trustee Filed a notice [Docket No. 193] appointing the Creditors' Committee.  The Committee is currently composed of the following members: The Boeing Company; the PBGC; Delaware Trust Company; Tysons Corner Office I, LLC; U.S. Bank, National Association, BOKF,

---

[29]   The First Day Motions, the First Day Declaration, and all orders for relief granted in these cases can be viewed free of charge at https://cases.stretto.com/Intelsat.

N.A.; and JSAT International, Inc.  The Committee has retained Milbank LLP as its legal counsel, Hunton Andrews Kurth LLP as Virginia counsel, FTI Consulting as its financial advisor, and Moelis & Company as investment banker.

## C.    Schedules and Statements, Claims Bar Date and Exclusivity Extension

On July 11, 2020, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs.

On June 9, 2020, the Bankruptcy Court entered an order (the "Bar Date Order") establishing August 17, 2020 as the general claims bar date and November 16, 2020 as the governmental claims bar date [Docket No. 518].  On or before July 15, 2020, the Debtors served notice of the bar dates in accordance with the Bar Date Order.  On or before July 15, 2020, the Debtors published notice of the bar dates in accordance with the Bar Date Order.

Any party required to file a Proof of Claim under the Bar Date Order that failed to do so before the applicable bar date is forever barred, estopped, and enjoined from asserting such claim against the Debtors and the Debtors will be forever discharged from any indebtedness or liability relating to such claim.  Such party will not be permitted to vote to accept or reject the Amended Plan or receive any recovery under the Amended Plan.

On September 2, 2021, the Bankruptcy Court entered an order extending the Debtors exclusive periods (a) to file a chapter 11 plan for each Debtor through and including February 15, 2021 and (b) to solicit acceptances thereof through and including April 12, 2021 [Docket No. 735].

On April 21, 2021, the Bankruptcy Court entered an order extending the Debtors exclusive periods (a) to file a chapter 11 plan for each Debtor through and including August 13, 2021 and (b) to solicit acceptances thereof through and including October 13, 2021 [Docket No. 2047].

On August 13, 2021, the Debtors file a motion seeking entry of an order further extending the Debtors exclusive periods (a) to file a chapter 11 plan for each Debtor through and including November 13, 2021 and (b) to solicit acceptances thereof through and including January 13, 2021 [Docket No. 2606].

## D.    Operational Achievements

During the course of these Chapter 11 Cases, the Debtors have continued to successfully manage their business, both on an ordinary-course basis and through other transactions, including:

- *Lien Release Motion* [Docket No. 190].  Obtaining authorization from the Bankruptcy Court to release certain liens and amend the Spaceflight Loan Agreement, which was a prerequisite to execute the sale of Spaceflight, Inc. to Mitsui & Co. (U.S.A.), Inc.—a transaction that enhanced the value of the Debtors' investment in Spaceflight Industries, Inc. and certain of its subsidiaries;

- *Speedcast 9019 Motion* [Docket No. 461].  Entering into a mutually beneficial long-term commercial agreement with long-time customer Speedcast Communications Inc., which provided for, among other things, the release of the Company's general unsecured claim in Speedcast's chapter 11 cases, and coordinating its approval in these and Speedcast's chapter 11 cases;

74

- *Horizons-4 Joint Venture* [Docket No. 833].  Entering into a new joint venture and agreement with long-time business partner, JSAT International, Inc. for replacing the Horizons-1/Galaxy 13 satellite, which must be addressed as part of the C-band clearing process with a Ku-band payload on the Galaxy 37 satellite;

- *Executory Contracts and Unexpired Leases* [Docket Nos. 1003, 1123, 1077, 1133, 1134, 1141, 1349, and 2160].[30]  To date, the Debtors have finalized or are in process of finalizing decisions with respect to their ongoing agreements that constitute "Executory Contracts" or "Unexpired Leases" within the meaning of the section 365 of the Bankruptcy Code.  The Debtors have filed notices rejecting certain executory agreements [Docket Nos. 1123, 1134] and filed notices assuming certain executory agreements [Docket Nos. 1003, 1077, 1133, 1141, 1349, and 2160]; and

- *SD Satellite Contract* [Docket No. 1268].  Entering into the "SD Satellite Contract" to manufacture two software-defined satellites which are expected to satisfy future customer demand primarily in the mobility sector across the Continental United States, North Atlantic, and other western hemisphere regions.

### E.    Gogo Commercial Aviation Purchase

#### 1.    *The Transaction*

As the Company stabilized its operations in chapter 11 and began engaging with creditors regarding a restructuring a transaction, it remained focused on returning the business to long-term growth.  On August 31, 2020, Jackson and the Seller entered into the Purchase Agreement with respect to the Gogo Commercial Aviation business for $400 million in cash, subject to customary adjustments.  Jackson funded the purchase price of the Gogo Transaction with proceeds from the DIP Facility and cash on hand.  In connection with the Gogo Transaction, Jackson entered into an amendment to the credit agreement governing the DIP Facility to permit the transactions contemplated by the Purchase Agreement, which was approved by the Court in the *Order (I) Authorizing the Debtors to (A) Consummate a Proposed Transaction and (B) Enter Into an Amendment to the DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 720] on August 31, 2020.

Pursuant to the Purchase Agreement, Jackson agreed to acquire 100 percent of the equity of Gogo LLC and Gogo International Holdings, which, together with their respective subsidiaries, comprised

---

[30]  On May 10, 2021, the Debtors filed the *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 2160] (the "Rejection Notice") to reject certain contracts between Intelsat US LLC and Space-Communication Ltd. ("Spacecom").  The contracts listed in the notice of rejection include (i) that certain Coordination Agreement dated June 6, 2013  (the "Coordination Agreement"), and (ii) that certain Satellite Network Agreement dated June 6, 2013 (the "Satellite Network Agreement" and with the Coordination Agreement, collectively, the "Spacecom Agreements").

On May 24, 2021, Spacecom filed its *Objection and Reservation of Rights of Space-Communication Ltd. with Respect to Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 2247] (the "Spacecom Objection").  Spacecom argues that the Satellite Network Agreement is not an executory contract because, Spacecom alleges the only remaining obligation is Intelsat US LLC's obligation to pay the annual coordination fee of $650,000.00.  Additionally, Spacecom alleges that the harm inflicted on third parties by the rejection of the Spacecom Agreements warrants the application of the public interest standard rather than the usual business judgement standard for contract rejection.  Regardless, Spacecom argues that the rejection of the Spacecom Agreements does not meet either standard.

No hearing has been set on the Rejection Notice or the Spacecom Objection.  Though a final resolution is outstanding, for purposes of the Amended Plan and this Disclosure Statement, the Debtors have assumed that Spacecom is entitled to a rejection damages claim in the amount of $5.2 million, attributable to the annual coordination fee ($650,000) multiplied by the number of years remaining on the Spacecom Agreements (8).

75

Gogo CA.  On September 11, 2020, Jackson assigned its rights and obligations arising under the Purchase Agreement to Aviation AcquisitionCo, an indirect subsidiary of Jackson.  After satisfaction of the closing conditions set forth in the Purchase Agreement, including the receipt of regulatory approvals from CFIUS and the FCC, the Gogo Transaction was consummated on December 1, 2020, and ownership of Gogo CA— the leading provider of commercial inflight broadband and entertainment services—was transferred to the Company.

### 2.  *The Marketing Process and Creditor Engagement*

The Seller engaged in a private sale process for Gogo CA in which it pursued bids from multiple financial and strategic bidders (the "Sale Process").  The Debtors understand that the Seller was advised by a number of external advisors, including an investment bank and legal counsel, to facilitate and manage the Sale Process.

On June 24, 2020, the Seller formally invited the Debtors to submit a preliminary, non-binding indication of interest for Gogo CA by June 26, 2020.  The Debtors ultimately submitted a non-binding indication of interest on July 2, 2020, and were selected to participate in the next phase of the Sale Process.  The Debtors understand that multiple other bidders also submitted non-binding indications of interest and were selected to participate in the next phase of the Sale Process.  During that phase, the Debtors received access to more detailed information from the Seller, including various accounting, finance, human resources, legal, and technical information regarding Gogo CA, as well as additional time with Gogo CA's management.

On July 8, 2020, the Seller delivered a process letter to the Debtors setting forth guidelines for the submission of a final proposal for the acquisition of Gogo CA.  The process letter contemplated that the final proposal would be due July 27, 2020.

On July 27, 2020, the Debtors submitted a revised non-binding indication of interest for Gogo CA to the Seller, subject to ongoing diligence, which included a proposal for a period of exclusivity for the Debtors, and the Seller to work on an expedited basis to complete the diligence process and negotiate the terms of the definitive documentation for the Gogo Transaction.  The Debtors understand that at this stage the Seller also received indications of interest from multiple other bidders.  Notably, in connection with its second quarter 2020 earnings release, the Seller publicly disclosed on August 10, 2020, that it had retained investment bankers and was in a process to sell Gogo CA, which provided an opportunity for any potential interested purchasers to come forward with higher and better proposals.

On August 16, 2020, the Seller granted the Debtors an exclusivity period through August 31, 2020, during which the Debtors completed their due diligence, continued to work through the key economic terms of the Gogo Transaction with the Seller, and the parties finalized definitive documentation of the Gogo Transaction with the Seller.

On August 31, 2020, following receipt of approval from the Bankruptcy Court, Jackson and the Seller executed the Purchase Agreement.

During the entirety of the Sale Process, the Debtors coordinated with the key stakeholders in these Chapter 11 Cases, including: (i) the Creditors' Committee; (ii) the Jackson Ad Hoc Group; (iii) the Jackson Crossover Ad Hoc Group; and (iv) the HoldCo Creditor Ad Hoc Group, as well as the U.S. Trustee.  The Debtors initially engaged with advisors to these stakeholders regarding the potential for the Gogo Transaction in mid-July 2020.  Their advisors were provided access to certain information on Gogo CA and the Sale Process to enable them to conduct their own diligence.  Additionally, the Debtors and their advisors had multiple telephone conferences with and gave several presentations to the advisors to these stakeholders on a variety of topics related to the Transaction.  On or about August 19, 2020, certain creditors, within

each of the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group, became restricted to receive confidential information regarding the Gogo Transaction.  After their review, each of the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group ultimately supported the Gogo Transaction.

### F.      SES Claims

On July 14, 2020, SES filed a proof of claim in the amount of $1.8 billion against each of the Debtors.  SES asserts that the Debtors owe money (or will owe money) to SES as a result of a consortium agreement between Debtor US LLC, SES, and other satellite operators (the "Consortium Agreement").  SES alleges it is entitled to 50 percent of the combined accelerated relocation payments that may eventually be payable to the Debtors and SES pursuant to the FCC Order, which provides for Accelerated Relocation Payments subject to the satisfaction of certain deadlines and other conditions set forth therein.  SES' proof of claim alleges that the Debtors breached the Consortium Agreement, breached fiduciary duties to SES, and also alleges unjust enrichment.  SES seeks compensatory and punitive damages.  The Debtors dispute the allegations in the proofs of claim and believe that no claim by SES should be allowed.  On October 19, 2020, the Debtors filed an objection to the SES proofs of claim.

To the extent that any portion of SES's claim is allowed, the Debtors believe that it would appropriately be classified as an unsecured claim against US LLC, as SES has no security interest or other basis for priority.  To the extent that any portion of SES's claim is allowed, the Debtors have requested that the Court equitably subordinate such claim based on SES's misconduct.  Contrary to the Debtors' view, SES has asserted in the SES Disclosure Statement Objection that it believes its claim should be allowed in full, against each Debtor and should be placed into its own class, and SES has asserted that its claim is not substantially similar to other unsecured claims against Jackson Subsidiaries.  *See* SES Disclosure Statement Obj. ¶¶ 16, 94.  If SES's claim were allowed and placed into its own class, it may render the Amended Plan unconfirmable over an objection from SES.  Further, SES asserts that the Amended Plan may be unable to satisfy the absolute priority rule, in the event that its claim is classified separately from unsecured claims. The Debtors disagree with SES's assertions.

The Debtors believe that these arguments by SES are without merit and that SES will ultimately receive no claim.  However, if the Debtors are incorrect and SES is entitled to a claim against any Debtor or multiple Debtors in any amount near the $1.8 billion figure that SES asserts, recoveries to creditors may be substantially diluted by SES's claim.  Additionally, in the event that any of the Accelerated Relocation Payments are deemed to be held in constructive trust on behalf of SES, such payments may not become assets of the Debtors and ultimately may not become distributable to the Debtors' other stakeholders, ultimately reducing the recoveries of stakeholders other than SES.  In either case, such an outcome may render the Amended Plan, as drafted, unconfirmable.

### G.      Engagement and Negotiations with Stakeholders

Even while devoting significant time and effort to the Gogo Transaction and the C-band clearing process, in the early days of the Chapter 11 Cases, to facilitate the meaningful participation of the Debtors' key constituents in the formulation of a chapter 11 plan, the Debtors actively engaged and informed their constituents on the complex issues in the Chapter 11 Cases.  To that end, the Debtors devoted significant time and resources to providing substantial diligence and document production to the Debtors' key stakeholders, including the Creditors' Committee, the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Convert Ad Hoc Group related to the Company's historic and go-forward operations to facilitate negotiation of the Amended Plan.  In particular, the Debtors have provided voluminous information regarding historical intercompany transactions and various tax issues and considerations.

In total, the Debtors have given virtual data room access to approximately 200 professionals across over 30 professional advisor firms or other institutions, other than the Debtors' retained professionals. The Debtors have provided a massive amount of primary material to interested parties, but have also taken steps to ensure that interested parties are able to take advantage of the analyses already performed by the Debtors and their advisors, so as to avoid the unnecessary duplication of efforts at the estates' expense. By maintaining a strong flow of information to parties in interest, the Debtors received varying perspectives and insights that assisted the Debtors' successful Plan negotiations. The Debtors believe their cooperation with diligence requests and their proactive approach to information sharing was instrumental to negotiating a mutually beneficial and consensual Plan.

In addition to diligence related to tax and intercompany issues, beginning in mid-November 2020, the Debtors entered into nondisclosure agreements with several of their key creditor constituencies, who became restricted from trading, so the Debtors could share their Business Plan, including the benefits of the Gogo Transaction, and allow creditors to analyze related diligence. In particular, members of the Creditors' Committee, the Jackson Ad Hoc Group, Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Convert Ad Hoc Group all received confidential information and attended presentations with the Debtors' management related to the Business Plan.

Following the Debtors' distribution of their go-forward Business Plan, the Debtors and many of their key economic constituents, including the HoldCo Creditor Ad Hoc Group, the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, and the Creditors Committee as well as the Convert Ad Hoc Group, were in constant dialogue regarding many of the key issues in these Chapter 11 Cases and in the Amended Plan, including intercompany transactions, foreign and domestic tax issues, and the value of the Debtors' business, including rights related to the FCC Order. Engagement between these creditor groups and the Debtors regarding the Business Plan soon progressed to engagement regarding the terms of a restructuring transaction.

Later, in November 2020, the Debtors and their primary creditor constituencies agreed to expand the scope and duration of the applicable confidentiality agreements to allow the parties to engage in direct negotiations regarding a plan of reorganization. The parties have stayed restricted through the filing of this Disclosure Statement in a good faith effort to negotiate the terms of the Amended Plan. The Debtors and these stakeholders have exchanged multiple rounds of term sheet proposals, culminating in the Amended Plan filed by the Debtors. Additionally, the parties spent significant time discussing complex issues related to, among other things, intercompany transactions, foreign and domestic tax issues, and the value of the Debtors' business, including rights related to the FCC Order.

### H.    Original Plan Support Agreement

Following this lengthy process of extensions of confidentiality agreements and negotiations, the efforts of the Debtors and the Consenting Creditors culminated in the formulation and execution of the Original Plan Support Agreement, which outlined the terms of and committed the Consenting Creditors to support the restructuring transactions contemplated by the Original Plan. Holders of approximately 73.0 percent of the Connect Senior Notes Claims, approximately 37.3 percent of the LuxCo Senior Notes Claims, approximately 36.1 percent of the of First Lien Notes claims, approximately 34.9 percent of the Term Loan Facility Claims, approximately 32.1 percent of the Convertible Notes Claims, and approximately 7.6 percent of the Jackson Senior Notes Claims were all party to the Original Plan Support Agreement as of February 12, 2021. In achieving the agreements reflected in the Original Plan Support Agreement, the Debtors and the Consenting Creditors had to resolve several contentious deal terms, each of which required considerable compromises.

The Original Plan Support Agreement and its corresponding plan term sheet (the "Original Plan Term Sheet") attached to the Original Plan as Exhibit B resolved three key issues between the Debtors, the Jackson Ad Hoc Group, and the Jackson First Lien Noteholder Group: (a) the amount of the "makewhole" under the Prepetition 9.50% First Lien Notes Indenture; (b) the prepayment premium on the Prepetition 8.00% First Lien Notes Indentures; and (c) the rate at which postpetition interest on the three term loan tranches under the Term Loan Facility should accrue.

In addition, after extensive arm's length negotiations, on February 11, 2021, the Debtors and the HoldCo Creditor Ad Hoc Group agreed to the terms of a settlement regarding the treatment of claims against the HoldCos. Specifically, the Original Plan Support Agreement and the Original Plan Term Sheet resolved key issues between the Debtors and the HoldCo Creditor Ad Hoc Group, including, among others, (i) disputes over the Debtors' Business Plan and the valuation of the Debtors; (ii) the ownership of the Debtors' Lux NOLs, including intercompany and tax-related claims related to the Debtors' 2018 reorganization;[31] (iii) intercompany Claims by and among the HoldCos related to other historical intercompany transactions; and (iv) the claims related to the Accelerated Relocation Payments.

On February 12, 2021, the Debtors filed the Original Plan, which was consistent with the Original Plan Support Agreement. As of the date that the Original Disclosure Statement was filed, each of the Debtors, including the Special Committees, as applicable, supported the Plan.[32]

## I.    Judicial Mediation

After the Original Plan was filed, the Debtors continued to work with all major stakeholders, including the parties to the Original Plan Support Agreement to build greater consensus for a restructuring transaction. Though these efforts narrowed the issues between the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group, the parties in interest had not yet reached agreement on the terms for a restructuring that each could support. After consultation with their key economic stakeholders, the Debtors determined that pursuing a judicial mediation, focused primarily on the open issues between the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group was the path most likely to reach a more consensual plan of reorganization.

On April 6, 2021, the Debtors filed a motion requesting the court to compel mediation, which the court granted on April 21, 2021. The Mediation Order appointed the Honorable Frank J. Santoro, Chief Judge for the United States Bankruptcy Court of the Eastern District of Virginia, as the judicial mediator with full authority to settle matters within the scope of the Mediation Order and to enter any order necessary in furtherance of the settlement efforts, which were to focus on certain Plan and confirmation related issues.

The Mediation was expanded to include every party in interest who requested to partake in the Mediation, including, among others: (a) the Debtors; (b) the Jackson Crossover Ad Hoc Group; (c) the HoldCo Creditor Ad Hoc Group; (d) the Jackson Ad Hoc Group; (e) the Convert Ad Hoc Group; (f) U.S. Bank; (g) the Committee; (h) the Ad Hoc Equity Group; and (i) SES. The Mediation began with the Mediator rapidly getting up to speed on the various complex issues in these Chapter 11 Cases and the positions of the Mediation parties with respect thereto, through conversations with and presentations from the Mediation parties. Numerous in-person Mediation sessions were held between mid-April and the date of this Disclosure Statement, including on June 30 and July 1, 2021, when certain principals of the Mediation parties and their advisors met in-person—for the first time in these Chapter 11 Cases—in

---

[31]   *See Statement of Financial Affairs for Intelsat Ventures S.A. R.L.*, July 11, 2020, Case No. 20-32312 (KLP) [Docket No. 6] p. 48.

[32]   SES has asserted that the Original Plan was not filed in good faith. The Debtors disagree.

79

Richmond, Virginia for Mediation sessions with the Mediator and each other, and again on July 15, 2021 in Richmond, Virginia.

After the in-person mediation sessions concluded, the Debtors and their major stakeholders continued to vigorously negotiate the terms of a restructuring, including by sharing multiple proposals outlining proposed key economic terms for a potential chapter 11 plan.  The Debtors and these key stakeholders were in active discussions with each other, both directly and through the Mediator in the weeks that followed.  Ultimately, these continued good-faith negotiations, culminated in agreement among the Debtors and their major future equity holders.  In particular, the Debtors, the HoldCo Creditor Ad Hoc Group, and the Jackson Crossover Ad Hoc Group reached an agreement regarding a restructuring that each was willing to support.  After hard-fought, good faith negotiations to document the Amended Plan Support Agreement, each such party entered into the Amended Plan Support Agreement, which outlines the terms of the Debtors' proposed restructuring.  In parallel, the Debtors worked with the other parties to the Amended Plan Support Agreement to formulate the Amended Plan, as contemplated by the Amended Plan Support Agreement, with the support of each party thereto.

### J.    Convert Ad Hoc Group Standing Motion and SES' Intervention Motion

On February 5, 2021, the Convert Ad Hoc Group filed the Standing Motion.  The Standing Motion asserts, among other things, that (a) the Convert Ad Hoc Group should be granted standing to prosecute a proposed adversary complaint on behalf of the estate of Intelsat S.A., alleging that Jackson is not entitled to the Accelerated Relocation Payments and Intelsat S.A. is entitled to such Accelerated Relocation Payments; (b) the Convert Ad Hoc Group should be granted limited authority to settle intercompany claims; and (c) the automatic stay should be modified to allow the Convert Ad Hoc Group to prosecute the claims in their proposed adversary proceeding.

Then, on March 3, 2021, SES, the Debtors' largest competitor and a former member of the C-Band Alliance, filed the Intervention Motion.  By the Intervention Motion, SES seeks to either (a) intervene in the "accelerated relocation payments litigation," initiated by the Convert Ad Hoc Group in the Standing Motion or (b) to obtain standing to prosecute claims on behalf of US LLC.  Specifically, SES seeks standing to prosecute claims that US LLC is entitled to receipt of the Accelerated Relocation Payments—not Intelsat S.A. as asserted by the Convert Ad Hoc Group or License and Jackson, as was determined by the Debtors.

As noted in section III.N herein, the Debtors believed that it would be most appropriate to consider such matters in the appropriate context—at the Confirmation Hearing.  Accordingly, the Debtors filed the Scheduling Motion, seeking to adjourn those matters until June 14, 2021, in conjunction with confirmation of the Original Plan.  On March 15, 2021, the Bankruptcy Court entered an order granting the Scheduling Motion, which adjourned the Standing Motion and Intervention Motion to June 14, 2021 and established a related schedule for discovery and other pre-trial matters related to the Standing Motion and Intervention Motion.

On April 14, 2021, the Debtors filed their objection to the Intervention Motion [Docket No. 1931] and, with the Special Committee of Intelsat S.A., jointly filed an objection to the Standing Motion [Docket No. 1929].  The Intervention Motion was also objected to by the HoldCo Creditor Ad Hoc Group [Docket No. 1911], the Jackson Ad Hoc Group [Docket No. 1913], the Jackson Crossover Ad Hoc Group [Docket No. 1916], the Ad Hoc Group of Secured Noteholders [Docket No. 1923], U.S. Bank [Docket No. 1925], and the Convert Ad Hoc Group [Docket No. 1932].  The Standing Motion was also Objected to by the HoldCo Creditor Ad Hoc Group [Docket No. 1911], the Jackson Ad Hoc Group [Docket No. 1913], the Jackson Crossover Ad Hoc Group [Docket No. 1915], and U.S. Bank [Docket No. 1925].

On April 29, 2021, consistent with the Scheduling Order, the Debtors, with the consent of the Convert Ad Hoc Group and SES, filed the *Notice of Modified Dates Relating to the Standing Motion and*

80

*the Intervention Motion* [Docket No. 2126], which set forth a modified discovery and trial schedule for the Standing Motion and the Intervention Motion to remain consistent with the schedule for confirmation of the Amended Plan, and providing for the issues raised by those motions to be set to be heard by the Bankruptcy Court at the Confirmation Hearing.

The Debtors' position is that Intelsat License LLC, as holder of the FCC Licenses that are subject to the FCC Order, is the most appropriate recipient of the Accelerated Relocation Payments. Among other things, neither Intelsat S.A. nor US LLC has a viable claim to the Accelerated Relocation Payments, because (a) they have no right to broadcast in the C-band—the Debtors' rights to do so belong to Intelsat License LLC and (b) they do not own substantial satellites broadcasting in the C-band—those belong primarily to Intelsat Satellite LLC and its subsidiaries. Without the licenses, there would be no Accelerated Relocation Payments. In addition, License is the entity that elected to participate in the accelerated clearing process, and License is the entity that will receive the payments from the FCC-designated clearinghouse pursuant to an agreement with the Clearinghouse. Accordingly, the Debtors believe that neither Intelsat S.A. nor US LLC would likely succeed in the arguments advanced by SES and the Convert Ad Hoc Group that they are entitled to the Accelerated Relocation Payments, which the FCC Order expressly provides will go to "incumbent space station operators," which are the "operators authorized to provide service to any part of the contiguous U.S. pursuant to an FCC-issued license as of June 21, 2018"—that entity is License.[33]

Further, the Special Committees believe that the theory advanced by certain members of the Convert Ad Hoc Group that Intelsat S.A. is entitled to the Accelerated Relocation Payments, because they are in consideration for early relinquishment of an FCC forbearance from imposing sanctions on the Company's operations in the C-band until December 5, 2025, is not credible. First, the FCC Order does not suggest that incumbent C-band operators' rights to operate have already been terminated. Additionally, the FCC could fine various Debtors—not just Intelsat S.A.—were the Company operating in the C-band without authorization. However, the Special Committees, including the Special Committee at Intelsat S.A., zealously advanced these arguments and were able to leverage them for additional consideration in the settlement embodied in the Amended Plan.

### K.   Settlement of Certain Debtor Intercompany Claims

#### 1.   *Special Committee Appointment and Investigation*

As discussed above, the boards of certain of the Debtors delegated to their Special Committees the authority to investigate and determine, in such Special Committees' own business judgment, whether any matter involves a Conflict Matter, including any conflict of interest between the applicable Debtor and any related party. Each applicable board also delegated to its Special Committee the authority to take any action with respect to the Conflict Matters, as determined in the sole judgment of the Disinterested Directors, including: (a) any release or settlement of potential Claims or Causes of Action of the applicable Debtor against any related party, (b) any decision regarding all or part of a restructuring transaction to the extent it constitutes a Conflict Matter; and (c) any other transaction implicating the applicable Debtor in which a related party has an interest.

After spending the early months of these Chapter 11 Cases diligently gathering and analyzing information related to the complex issues posed by the Debtors' complex and unique capital structure, including tax, corporate, and other intercompany issues, and, where applicable, building on analysis already performed by the Debtors and their advisors, the Special Committees, with the support of their individually retained professional advisors, as applicable, negotiated an arm's-length, good-faith settlement of certain

---

[33]   FCC Order ¶ 115.

81

intercompany issues, which was incorporated into the Original Plan, which formed the basis for the Original Plan.

Pursuant to the Mediation Order, the Debtors, certain stakeholders, including the Ad Hoc Groups, undertook vigorous negotiations under the Mediator's supervision.  Concurrently with the Mediation, the Debtors, as fiduciaries of their estates, and the Special Committees, continued analyzing and investigating claims and causes of action, including in light of certain changed facts and circumstances surrounding these Chapter 11 Cases.

After substantial review, analysis, and consultation with their independent advisors, the Disinterested Directors of each Special Committee authorized its respective Debtor to enter into the Amended Plan Support Agreement, inclusive of the Settlement, pursuant to its terms and conditions.  Such authorization is subject to each Special Committee's ability to continue and complete its investigation into Conflicts Matters and the resolution of such investigation, and is without any prejudice to the Fiduciary Out of each Debtor set forth in the Amended Plan Support Agreement.

### 2.   *Debtor Intercompany Claims Resolved by the Settlement.*

The resolution embodied in the Settlement resolves a multitude of complex, legally uncertain, and fact-intensive issues, including many intercompany issues, many of which involve the application of foreign law or prospective events.  Litigation of the issues resolved pursuant to the Settlement would involve lengthy, value-destructive litigation, which is avoided by the Settlement through releases of discrete claims and causes of action such as potential fraudulent transfer, avoidance, preference, recharacterization, or other derivative actions on account of historical acts, covenants to support the necessary transactions to implement a restructuring for all of the Debtors, and other agreements to support a restructuring that will inure to the benefit of the Debtors' estates.

Specifically, the Settlement resolves (a) the post-emergence organizational structure; (b) numerous highly complex considerations regarding the Luxembourg tax profile of the Debtors, including, among other things, (i) preservation of the Tax Unity and associated value allocation theories regarding potential alternative restructuring outcomes that would not have preserved the Tax Unity, (ii) the use of Tax Unity tax attributes by its members, (iii) numerous highly complex considerations regarding the Luxembourg tax profile of the Debtors; (c) intercompany transactions that arose in the course of the Debtors' business prior to the Petition Date—including certain transactions and/or balances that could potentially be the subject of fact intensive and time consuming fraudulent transfer or preference litigation; (d) intercompany balances that have accumulated after the Petition Date; and (e) allocation of certain administrative expenses.  A more fulsome description of the issues resolved is set forth below:

### (a)   Emergence Considerations.

The Debtors explored numerous post-emergence organizational structures—both public and private—and have analyzed the various tax, corporate, and restructuring considerations associated therewith.  Many of these structures presented unique challenges given the interplay of U.S. and Luxembourg law, and the Debtors worked closely with their Luxembourg advisors to understand a complex array of international issues and carefully assess the viability of effectuating each structure in an effort to design a value-maximizing post-emergence structure for the Debtors.

### (i)   Luxembourg Law Issues.

Because under Luxembourg law, Luxembourg courts have exclusive jurisdiction in insolvency matters with respect to companies that have their principal offices in Luxembourg, there is a significant risk that Luxembourg courts will not recognize a U.S. court order.  Accordingly, even if Jackson alone were to

emerge pursuant to a plan of reorganization confirmed by the Court, creditors and other stakeholders could attempt to seek relief in Luxembourg courts if such plan was not consummated in accordance with Luxembourg law.  Challenges in Luxembourg could include attempts to unwind a confirmed plan in order to effectuate alternative restructuring transactions under Luxembourg bankruptcy laws.  Further, Luxembourg corporate tax law formalities vary from those in the United States.

### (ii) Jackson-Only Emergence.

In the course of negotiations with creditors, several proposals arose regarding a "Jackson-only" emergence structure in which Jackson and its subsidiaries would confirm a chapter 11 plan without the other Debtors (or, potentially, together with Holdings but without the other HoldCos in an effort to preserve the Tax Unity without global consensus) in the emergence structure.  Based on rigorous analysis, the Debtors believe that any such emergence could be costly and risky from an implementation standpoint; accordingly, the Debtors believe that it is preferable to seek confirmation of a plan of reorganization that provides for the emergence of all Debtors, or, in the event of a Plan Toggle Event, a chapter 11 plan that provides for the emergence of all Debtors except Holdings SARL and/or Intelsat S.A.

### (b) Tax Matters.

Issues related to the Debtors' tax profile—and, in particular, the ability to utilize and ascribe value to the Debtors' Luxembourg net operating losses (the "Lux NOLs")—have consistently been a source of contention and disagreement among all constituencies over the course of the case.  These issues include, among other things, the perceived value associated with preserving the Tax Unity (which is influenced by many considerations, including the Debtors' historical and go-forward tax treatment of various transactions, including the 2018 Reorganization (as defined herein) and tax positions and the possibility of tax reform (both in the U.S. and abroad)); the perceived value to the HoldCos of *not* preserving the Tax Unity and instead going their own way; and potential claims related to the consumption of NOLS of the Tax Unity (the "Tax Unity NOLs") and movement of other tax assets in the 2018 Reorganization.

It is important to put the following arguments into broader context.  Most (though not all) of the arguments below fundamentally go to one basic question:  How much value should be delivered to the HoldCos based on the value associated with preserving the Reorganized Debtors' access to the Tax Unity NOLs that, under Luxembourg tax rules, essentially resides at Holdings?  To preserve those benefits for Jackson going forward, Jackson must remain a member of the Tax Unity, which fundamentally means that, directly or indirectly, Jackson must continue to be 95 percent owned by Holdings.

In evaluating this fundamental value distribution question, over the course of these Chapter 11 Cases, the Debtors' advisors have conducted extensive tax modeling with respect to the Tax Unity NOLs, and this modeling has, in turn, contributed to further analyses performed by other advisors.  This modeling has been performed on a "with and without" basis:  It has compared the expected Luxembourg taxes that would be paid by Jackson if the Tax Unity is preserved ("with") to the expected Luxembourg taxes that would be paid by Jackson if the Tax Unity is not preserved ("without"), and the difference between those two figures has been reduced to an expected value (after being subject to discounting, because the value is expected to be received over a long period of time).

As with any modeling exercise, the Luxembourg tax modeling that underlies this value determination is only as good as the inputs that feed into it.  Those inputs include, among other things, (a) anticipated go-forward tax positions and company performance, overlaid with essentially unknowable "change in law" risk that is particularly pronounced right now, at a time when "tax reform is in the air"; (b) the appropriate discount rate for tax savings that reach past 2040; and (c) questions with respect to whether "with and without" is even the right basis to value the Lux NOLs.

83

Various parties in the case have made assertions regarding the Luxembourg tax modeling performed by the Debtors' advisors. Unsurprisingly, some of those arguments would have, if accurate, increased the value of preserving the Tax Unity, while other arguments (generally asserted by the Jackson stakeholders) would have, if accurate, reduced the value of preserving the Tax Unity. Also unsurprisingly, each side asserts that the other's arguments are incorrect.

In evaluating the Settlement, the Special Committees considered all of the widely diverging views on these issues, along with certain related issues, in addressing the fundamental question of how much the HoldCo stakeholders should receive for the value being brought to the table by preserving the Tax Unity. The following litany of tax issues are among the issues that were considered. The prospect of *actually litigating these widely ranging tax issues and their impact on value*, and the costs associated with doing that, are as crystal clear an example as any that the Settlement is within the range of reasonableness required by rule 9019 of the Bankruptcy Rules.

### (i)    Tax Unity Preservation.

In 2010, certain Debtors domiciled in Luxembourg formed the Tax Unity for the purposes of consolidating taxable income and/or losses attributable to each member in the Tax Unity. The current Tax Unity members are Holdings, which is the head of the Tax Unity, Investments, LuxCo., ICF, Jackson, Intelsat Align S.à.r.l, and Ventures (which joined in 2019 following its formation in 2018) (each, a "Debtor Member" and collectively, the "Debtor Members"). In addition, Envision, Alliance, and several entities below Ventures in the Company's corporate structure are transparent from a Luxembourg tax perspective. As a result, their income is attributed to the Debtor Members of the Tax Unity. Under Luxembourg law, net operating losses that one member generates while part of a tax fiscal unity can be used to offset the taxable income of other fiscal unity members in the same tax year such Lux NOLs are generated, or in future tax years if the Lux NOLs are carried forward.

Generally, a company with a taxable presence in Luxembourg generates Lux NOLs if its operating expenses exceed its revenues during a single tax year (similar to how losses are treated under U.S. tax law). A company may apply, or "carry forward," Lux NOLs to reduce future Luxembourg tax payments (subject to certain conditions, including, in some cases, a time period in which the Lux NOLs must be used before they expire). In the case of a Luxembourg tax fiscal unity, Lux NOLs that one member generates can generally be used to offset the taxable income of other members of the fiscal unity in either the tax year the Lux NOLs are generated or in future tax years if carried forward.

Once an entity is a member of a Luxembourg tax fiscal unity for five complete tax years, Lux NOLs generated by that entity are permanently vested in the tax unity at the end of each tax year. If an entity that generates Lux NOLs that are "swept" into the tax unity in this way subsequently leaves the tax unity, it does not take any portion of the Lux NOLs with it (though it does keep any Lux NOLs for the year it departs, because departure from the tax unity is retroactive to the beginning of the year of departure). For example, Jackson has been a member of the Tax Unity for more than five years, so the Lux NOLs that it generated on a standalone basis in 2020 have, by operation of law, vested with the Tax Unity, and if it were to depart the Tax Unity, it would no longer have access to the Tax Unity's Lux NOLs (including the Lux NOLs it generated in 2020), but it would keep any Lux NOLs generated in 2021 (assuming it departs the Tax Unity in 2021).

Different rules apply to entities that have not been members of a Luxembourg tax fiscal unity for five years. If an entity leaves a Luxembourg tax fiscal unity within five years of joining it, the entity is, in essence, treated as if it had never joined, and the unused Lux NOLs generated by such entity individually revest with that entity (or, if the entity, standing alone, would have had a tax liability, the entity will owe that amount). Because of this, if Ventures were to depart the Tax Unity, it would take with it Lux NOLs

attributable to it (along with the tax basis in assets transferred to it in connection with the 2018 restructuring).

These issues have grounds for fulsome argument and negotiation. For example, the Jackson stakeholders advocated for a lower overall valuation of the Lux NOLs, asserting that potential changes in U.S. tax rules (whether through tax reform legislation or regulatory action), shifts in the enforcement of existing U.S. tax rules, and changes in international tax norms as a result of ongoing Organisation for Economic Co-operation and Development ("OECD") negotiations could result in the reduction of the value of the Tax Unity NOLs, or potentially, increase U.S. taxation to such an extent that the Debtors would restructure in a manner that would reduce or eliminate their future Luxembourg taxable income (and thus, the value of the Tax Unity NOLs that could be used to offset such income). The Intelsat S.A. stakeholders argued that Intelsat S.A. was entitled to the Lux NOLs because it had indirect ownership and control of Holdings, where the Lux NOLs reside as a matter of Luxembourg tax law. The LuxCo and ICF stakeholders advocated for value allocation on account of LuxCo's role in creating the applicable tax attributes and generating Lux NOLs in the past that would be used to offset income before Lux NOLs that were generated subsequently. Certain of these issues are discussed in greater detail below.

### (ii)    Tax Claims Related to 2018 Reorganization.

In July 2018, the Debtors implemented a series of internal transactions and related steps that reorganized the ownership of certain of their assets among entities in order to enhance their ability to efficiently transact business (such transactions, collectively, the "2018 Reorganization"). Certain key steps of the 2018 Reorganization were as follows:

- Jackson formed two new subsidiaries: GenesisCo, a Delaware corporation, and Ventures, a Luxembourg corporation. Genesis also formed a new subsidiary, Genesis GP, a Delaware limited liability company.

- Jackson transferred all of its equity interests in Intelsat Corporation ("Corporation") to Genesis, and all of its equity interests in Intelsat Global Sales and Marketing Limited ("IGSM"), as well as certain other assets, to Ventures.

- Corporation transferred all of its equity interests in PanAmSat Satellite Europe Limited ("PSEL"), as well as its liabilities arising under a number of pre-existing intercompany debts, to Genesis. Corporation kept its employees and the majority of its assets and operations, and was then converted into a Delaware limited liability company that is now known as Intelsat US LLC.

- Certain other pre-existing intercompany debts were rationalized, either by being set off against each other to reduce the net amounts owing, or canceled entirely by way of the creditor contributing its receivable to the debtor.

- US LLC and Ventures entered into the Bilateral Agreement, pursuant to which they agreed that the profits of the global Intelsat business would be split based on the relative contributions made by US LLC and its subsidiaries (on the one hand) and Ventures and its subsidiaries (on the other hand) to the global business.

- Alliance, a Delaware limited partnership, was formed between Jackson and Genesis (as limited partners) and Genesis GP (as the general partner). Both Jackson and Genesis contributed certain assets to Alliance in exchange for their partnership interests in Alliance. Jackson's contribution comprised its equity interests in Ventures and certain other assets, and Genesis'

85

contribution was its equity interests in US LLC.  When Alliance was formed, the partnership interests of Jackson and Genesis were documented as 92.2 percent and 7.8 percent respectively, although these were retrospectively amended to 92.5 percent and 7.5 percent, respectively, on December 7, 2018.

- Alliance contributed to Ventures certain assets that it received from Jackson as part of Jackson's partnership contribution in exchange for an interest free loan (the "IFL") issued by Ventures to Alliance.  The amount of the IFL was $13,286,195,000.  This loan was initially documented in a single Interest Free Loan Agreement, and was subsequently split into two separate Interest Free Loan Agreements in the amounts of $11,256,195,000 and $2,030,000,000,[34] with the receivable in respect of the smaller loan being transferred from Alliance to US LLC, with US LLC subsequently transferring it to Intelsat US Finance LLC ("US Finance").

- US LLC, Ventures, and certain subsidiaries of US LLC and Ventures entered into the MISA, pursuant to which certain services are provided among the subsidiaries.[35]  The MISA also established the role of Intelsat Clearinghouse LLC ("Clearinghouse"), which acts as a payment intermediary among entities receiving and providing services under the MISA.

The Debtors, through their Special Committees, evaluated a number of claims with respect to the 2018 Reorganization and their impact on the value of preserving of the Tax Unity, including use of Tax Unity NOLs and the transfer of other tax attributes in connection with the 2018 Reorganization.

(1)      2018 Use of Tax Attributes.

As described above, the net effect of the 2018 Reorganization essentially transformed $5 billion of Tax Unity NOLs (together with approximately $1 billion of NOLs generated by Jackson in 2018 that otherwise would have been "swept" to the Tax Unity) into tax attributes of Ventures.  If not for the 2018 Reorganization, even if Jackson had subsequently left the Tax Unity in 2021, the attributes used in the 2018 Reorganization would have remained property of the remaining Tax Unity members (*i.e.*, the HoldCos) because these NOLs had been generated by Debtors who had been members of the Tax Unity for at least five years.  The 2018 Reorganization provided for the use of those NOLs in connection with generating future tax deductions at Ventures, which has been a member of the Tax Unity for fewer than five years and can, accordingly, depart the Tax Unity while "taking with it" those tax attributes (which would no longer be utilizable by the HoldCos).  No tax sharing or other agreement existed at the time of the 2018 Reorganization.

The Special Committees evaluated whether the transfer transaction could be subject to clawback under potential fraudulent conveyance, unjust enrichment, and violation of fiduciary duty claims under both Luxembourg and U.S. law—claims that are particularly significant as Jackson's position as to the value of preserving the Tax Unity has depended, in part, on Ventures' ownership of those tax attributes.  The HoldCo Creditor Ad Hoc Group has asserted (a) that the transfer of the attributes constituted an actual fraudulent transfer, characterizing the transaction as an "insider transaction" that bore many traditional "badges of fraud"; (b) that the 2018 Reorganization could have been accomplished in a non-taxable manner, meaning that it was not necessary to utilize Tax Unity NOLs to offset the gain; (c) that the Debtors' directors are

---

[34]   The balances of these Intercompany Loan Agreements have subsequently been reduced by partial repayments.

[35]   The 2018 MISA replaced a certain *Amended and Restated Master Intercompany Services Agreement*, dated as of January 12, 2011, as amended from time to time, in order to reflect changes in intercompany services relationships resulting from the 2018 Reorganization.

liable for a violation of their duties under Luxembourg law because the transaction did not provide benefits to the HoldCos or their creditors; and (d) various other additional additional arguments regarding the 2018 Reorganization.[36]   In response, Jackson stakeholders have asserted that (a) the HoldCos stakeholders' arguments were generally based on "tax sharing" litigation theories that are not applicable in light of (i) the absence of a tax sharing agreement, (ii) lack of ability for the HoldCos to independently monetize the Tax Unity NOLs (a point that stakeholders of the HoldCos dispute), (iii) the fact that the HoldCos were likely solvent at the time of transfer, (iv) the fact that Jackson used fewer NOLs in the 2018 Reorganization than it had contributed to the Tax Unity at that time, and (v) the Tax Unity NOLs are a joint asset of the entire Tax Unity for so long as the Tax Unity remains; (b) that there was no way to carry out the 2018 Reorganization in a completely tax-free manner while achieving the corporate economic objectives of the 2018 Reorganization; that (c) there is no reasonable basis on which to assert that the directors would be personally liable for a transaction that was (i) thoroughly vetted and evaluated by advisors, (ii) cleared by advisors at a time when there were no plans to split the Tax Unity, and (iii) designed to accomplish multiple important goals that were entirely unrelated to obtaining a "step-up" in the assets transferred to Ventures; and (d) that the various other additional arguments that have been raised with respect to the 2018 Reorganization have no merit.

Stakeholders of the HoldCos also asserted that they did not receive reasonably equivalent value in exchange for the transfer of the tax attributes.  In response, Jackson stakeholders asserted that the Debtors' entire enterprise, including the HoldCos, benefited from the 2018 Reorganization, including the step-up in value resulting from the 2018 Reorganization being at least partially taxable, which essentially converted Tax Unity NOLs, some of which may have expired before they could be used with future tax attributes whose expiration timeline had not yet started, by, among other things, (i) aligning the Debtors' international operations into a "profit split" structure, which is viewed more favorably than historic "cost-plus" arrangements and (ii) simplifying operational complications of the old structure; while benefits were most directly received at the Jackson level, the changes increasing value in Jackson increased the value of the HoldCos as well.

Finally, various additional arguments have been asserted with respect to the consequences of the 2018 Reorganization, all of which are addressed by the Settlement.

### (iii)      Potential Tax Reform.

On May 28, 2021, the U.S. Treasury Department released the "Greenbook," a 114-page explanation of certain potential tax changes provided in the Biden Administration's FY 2022 budget.  The "Greenbook" contains various potential tax reform proposals that could, hypothetically, negatively impact the Debtors' go-forward ability to utilize the Tax Unity NOLs—likely on an indirect basis (by, *e.g.*, increasing U.S. tax exposure that reduces the net tax savings associated with the Tax Unity NOLs).  An ongoing process at the OECD looks to fundamentally overhaul the taxation of multinational corporations.

Separately from the "Greenbook" proposals, there is proposed legislation and potential regulatory action that could similarly affect the value attributable to the Tax Unity NOL going forward, either directly or by having such a substantial influence on the Debtors' tax profile that a fundamental restructuring that would reduce the value of the Tax Unity NOLs could be necessitated.

---

[36]   Public disclosure of certain other arguments raised by the HoldCo Creditor Ad Hoc Group is precluded by the *Confidentiality Agreement and Stipulated Protective Order* [Docket No. 737] (the "Protective Order").  Parties wishing to receive information related to these arguments may contact Debtors' counsel, complete a copy of the declaration attached to the Protective Order as Exhibit A (which Debtors' counsel will provide upon request), indicating consent to be bound by the terms of the Protective Order, and return to Debtors' counsel.

In evaluating the Settlement, the Special Committees carefully considered these possibilities in evaluating whether the value ascribed to the Tax Unity NOLs should be materially reduced.

**(c)        Accelerated Relocation Payments.**

*Factual Background:* On February 28, 2020, the FCC adopted the FCC Order reallocating a significant portion of the mid-band radio frequency spectrum, the 3700 to 4200 MHz range of the C-band, for new 5G terrestrial wireless networks.  In previous decades, the Debtors had used the C-band spectrum for satellite communication networks, which had enabled the delivery of broadcast television and radio network content to over 100 million U.S. households, supported government and public safety operations, provided critical links to remote and underserved areas, and ensured communications systems' availability during disasters when terrestrial services fail.

Pursuant to 47 C.F.R. § 27.1412(d), and as a result of the FCC Order, License and other eligible space station operators are required to clear their transponders from the 3.7-4.0 GHz band of the C-band spectrum by December 2025 and to migrate the existing services of incumbent earth stations in the contiguous United States to the 4.0-4.2 GHz band.  Additionally, to incentivize early clearance of the 3.7-4.0 GHz band of the C-band spectrum, the FCC arranged for License and other eligible space station operators to be eligible for compensation in the form of Accelerated Relocation Payments if they clear on an accelerated timeframe, including clearing the 3.7-3.82 GHz range of the C-band by December 2021[37] and the 3.82-4.0 GHz range of the C-band by December 2023.

The clearing will require, among other things, multiple new satellites to be procured and launched into service, and the purchase of new video compression technology and radio frequency filters.  The changes needed to facilitate the clearing come at a substantial initial expense to the Debtors.  That said, the Debtors anticipate clearing C-band spectrum in accordance with the earliest phase I and phase II deadlines and becoming eligible to receive Accelerated Relocation Payments.  Accordingly, the question remains how the Accelerated Relocation Payment funds will be distributed among certain of the Debtors if the Debtors achieve the FCC Order's accelerated timeframe.

License is an indirect subsidiary of Jackson and the holder of orbital slot licenses from the FCC that allow it to operate certain Company satellites at certain orbital locations with coverage of North America and to send and receive signals to and from those satellites using certain portions of C-band spectrum, specifically at radio frequencies of 3.7-4.2 GHz.  All of these licenses were listed as property of License LLC on its schedule of assets and liabilities filed on July 11, 2020 [Docket No. 7].  No other debtor entity possesses similar licenses with North America coverage or listed any similar assets on its schedule of assets and liabilities.[38]  License is also the entity that submitted an Accelerated Relocation Election pursuant to 47 C.F.R. § 27.1412(c), the FCC Order, and the Wireless Bureau's May 11, 2020 Public Notice, and, with the approval of the FCC, License will receive the Accelerated Relocation Payments pursuant to a contract with the Relocation Payment Clearinghouse (as defined in the FCC Order) appointed by the FCC.

Additionally, allocation of the Accelerated Relocation Payments is subject to certain existing and in-force intercompany agreements, which will be assumed, including the MISA and the Bilateral Agreement.  As noted in further detail in section IV.B herein, certain of the Debtors are members of Alliance (as defined above), which limited partnership was formed as part of the 2018 Reorganization.  Genesis GP is the general partner of Alliance, and Jackson and Genesis are limited partners in Alliance.  As

---

[37]    The final 20 MHz of the Phase I clearing is a temporary "guard band" while the Phase II clearing is performed.  Once Phase II is complete, the unused "guard band" shifts to the final 20 MHz in the cleared range.

[38]    Debtor legal entity PanAmSat Europe Corporation has a $4 million carrying value for orbital slot licenses on its balance sheet as of March 31, 2021.  These orbital slot licenses do not provide coverage of North America.

discussed above, pursuant to the Partnership Agreement and the relevant contribution agreements effecting the transfer of assets in connection with this restructuring (the "Contribution Agreements"), Jackson directly or indirectly contributed substantially all of its assets, except the C-Band Monetization Property (*i.e.*, the rights to the first 100 MHz of C-band spectrum used by License in the United States) to Alliance. Then, Alliance, Genesis, Jackson, and Genesis GP entered into the Nominee Agreement to clarify the enforcement mechanism for the carveout of the C-Band Monetization Property.  Specifically, the Nominee Agreement provided that, to the extent that Alliance or a subsidiary thereof received Jackson C-Band Monetization Property, it would hold such C-Band Monetization Property as an agent for the benefit of Jackson and the C-Band Monetization Property would be treated as if it had always been beneficially owned by Jackson.

Separately, US LLC, among other Debtors including Alliance and Ventures, is party to the Bilateral Agreement which provides for a split of the US LLC Group and Ventures Group profits and losses, and therefore is applicable to License's share of the Accelerated Relocation Payments.  Prior to the 2018 Reorganization, US LLC provided services to Jackson (and the other Intelsat entities) on a "cost-plus" model.  However, in connection with the 2018 Reorganization, as discussed above, (a) US LLC was contributed to Alliance by the then-newly-formed GenesisCo, and GenesisCo received approximately 7.5 percent of the equity of Alliance in exchange for US LLC; (b) Jackson received the remaining 92.5 percent of Alliance for the transfer of its assets (except for the C-Band Monetization Property);[39] and (c) US LLC was shifted from being a "cost-plus" service provider to being a joint entrepreneur in the Alliance enterprise, losing the right to receive a cost-plus payment for its services to most entities (including Ventures, License, and Intelsat Satellite LLC), but obtaining rights to 7.8 percent of the enterprise's profits pursuant to the Bilateral Agreement.[40]

The Debtors analyzed the legal issues associated with the Debtors' allocation of Accelerated Relocation Payments including:  (a) which Debtors hold the Company's licenses to operate in the C-band and related, historical intercompany transactions, (b) which Debtors own the Company's C-band operating satellites and other related assets, (c) which Debtors provide the services and employees that support the Company's C-band operations and agreements that govern such services, (d) the FCC's draft and final Order, and (e) the effect of the intercompany agreements described herein on the allocation of the Accelerated Relocation Payments.  The Accelerated Relocation Payments are most appropriately divided between License, US LLC, and Jackson, for the following reasons, among others:

***FCC Order.***  Pursuant to the FCC Order, the FCC created a clearinghouse to process payments relating to the repurposing of the C-band.  The clearinghouse will enter into an agreement with License related to those payments and the payments will be made to License under the terms of the FCC Order and that agreement.

Relatedly, the FCC Order establishes "two Accelerated Relocation Deadlines . . . for incumbent space station operators that voluntarily relocate on an accelerated schedule (with additional obligations and

---

[39] The split was determined based on a go-forward calculation of the value of the services being provided by US LLC, along with certain other intangibles and assets that it provided to the Company business.  This valuation analysis was premised, in meaningful part, on the view that the C-Band Monetization Property (which, at the time, was thought to be the only portion of the C-band that would be subject to any kind of clearing for 5G) was held outside of Alliance.  Without the holdback, Jackson's ownership of Alliance would have been higher.

[40] More specifically, the Bilateral Agreement contemplates a profit split that applies generally to the "Business Operating Income" of the "Business,"  through which the profits and losses of Alliance and its subsidiaries are pooled, and then 7.8 percent of the profits, net the losses, are distributed to US LLC.  The 7.8 percent profit share is subject to periodic re-evaluation, which is likely to occur as a result of the acquisition of Gogo by US LLC, but the Debtors do not believe there is a basis to re-evaluate the profit split with respect to rights regarding an asset, the C-Band, that existed at the time the 2018 Reorganization was implemented.

incentives for such operators).”  The FCC Order characterizes the Accelerated Relocation Payments as providing an incentive to encourage incumbent licensees to voluntarily clear the lower C-band as quickly as possible.  The payments are designed to encourage entities with the *right* to broadcast in the C-band to relinquish that *right* by specific early deadlines *prior to* the otherwise-applicable deadline.

Thus, the FCC Order explicitly provides that the Accelerated Relocation Payments will go to the "incumbent space station operators," which are the "operators authorized to provide service to any part of the contiguous U.S. *pursuant to an FCC-issued license* as of June 21, 2018."  FCC Order ¶ 115 (emphasis added).  Other portions of the Final Order also use similar language to refer to the entities that are eligible to receive accelerated relocation payments, describing them as "incumbent C-band users," *id.* ¶ 46; "existing C-band FSS [fixed satellite services] users," *id.* ¶ 113; "eligible space station operators," *id.* ¶ 169; "satellite incumbents," *id.* ¶ 187; and "incumbent licensees," *id.* ¶ 196.  All of these terms most naturally refer to the entities that actually hold the FCC license, not entities higher up the corporate chain.  License is the only Debtor entity authorized to provide service pursuant to an FCC-issued license.

Additionally, as discussed, License is the entity that elected to comply with the FCC's accelerated relocation deadlines by submitting an accelerated relocation election form pursuant to the FCC Order and the Wireless Telecommunications Bureau's May 11, 2020 Public Notice.  License is thus the entity responsible for ensuring that the accelerated relocation deadlines are met.  Accordingly, the Debtors believe that License is the rightful recipient of all Accelerated Relocation Payments that the Debtors earn through their efforts to clear the C-band, except for those attributable to the clearing of the first 100 MHz, of which Jackson is the beneficial owner by operation of the Contribution Agreement, the Partnership Agreement, and the Nominee Agreement, and except as such proceeds are otherwise distributed pursuant to the intercompany agreements.

*Phase Allocation.*  In determining the relative value between phase I and phase II, the FCC forecasted the relative value of (a) the lower 100 MHz of spectrum band in the top 46 Partial Economic Areas ("PEAs") plus a temporary 20 MHz guard band until phase II milestones are complete, and (b) the upper 180 MHz of spectrum band in the top 46 PEAs plus the total 280 MHz in all other PEAs.  While satisfaction of phase I is tied to a milestone of the Debtors clearing 120 MHz, the underlying value of the contingent payment for this milestone is the lower 100 MHz of spectrum band.  There are varying ways to consider how much of the value attributable to clearing the first 120 MHz band in Phase I should be allocated to the first 100 MHz (as defined for purposes of what constitutes the C-Band Monetization Property that was retained by Jackson).  In one view, because the full 120 MHz must be cleared to satisfy Phase I obligations and the last 20 MHz of this represents a "guard band" that is required to facilitate the use of the first 100 MHz, the full value of Phase I should be viewed as attributable to the first 100 MHz.  Alternatively, because the "guard band" will ultimately shift to the final 20 MHz of the cleared portion of the spectrum, 5/6 of Phase I could be allocated to the first 100 MHz (and therefore considered part of Jackson's C-Band Monetization Property).  The Debtors take the latter view.

While the FCC Order divides the Accelerated Relocation Payments between December 2021 and December 2023 (approximately 25 percent of the total in the first payment and 75 percent in the second payment), actual market values for each phase may be imputed from the results of the C-band auction, which were announced via a public notice dated February 24, 2021.  Based on market data, 37 percent ($1.819 billion) of the total net value is properly allocated to clearing the first 120 MHz, and 63 percent ($3.047 billion) of the total gross value is properly allocated to clearing the incremental 101-280 MHz spectrum band.[41]

---

[41]   The Debtors themselves previously proposed in a letter to the FCC that approximately 45 percent of the Accelerated Relocation Payment should be allocated to Phase I and approximately 55 percent of the Accelerated Relocation Payment should be allocated to Phase II, resulting in 37.5 percent of the total Accelerated Relocation Payment being treated as C-Band

Based on Jackson's right to monetize the first 100 MHz of the C-band (*i.e.*, Jackson's beneficial ownership, by operation of the Partnership Agreement and the Nominee Agreement), and utilizing the split derived by the above-stated market values for each phase set forth above, for purposes of determining entity-by-entity entitlement to recoveries with respect to the Accelerated Relocation Payments, Jackson is properly allocated 37 percent of the gross Accelerated Relocation Payments.  License is entitled to the remaining 63 percent of the gross Accelerated Relocation Payments, subject to Ventures' obligations under the 7.8 percent profit split with US LLC incorporated into the Bilateral Agreement.  Accordingly, US LLC is entitled to 7.8 percent of the 63 percent allocated to License LLC (by virtue of the obligation of Ventures under the Bilateral Agreement), or approximately 4.9 percent of the gross Accelerated Relocation Payments received.  Importantly, the Bilateral Agreement operates on a GAAP profit-based methodology and it is possible that, for example, if there are unreimbursed expenses associated with obtaining the Accelerated Relocation Payments, the amount to be distributed to US LLC would decline as a result.

These amounts must be adjusted from a gross basis to a net basis to reflect the actual value received by the Company.  The first step to convert Accelerated Relocation Payments from a gross basis to a net basis is to value them on an after-tax basis (assuming that projected specified tax attributes in existence at the end of 2021 are not available to offset such payments).[42]  Because the Debtors anticipate receiving the Phase I Amount earlier than the Phase II Amount, the payments were discounted to their present value using different discount factors.  Additionally, the tax payable related to each Phase I and Phase II Amounts receipt depends on the fiscal year's projected losses pursuant to the Business Plan.  The after-tax, present-value adjustments (prior to any adjustment for non-reimbursable C-band spend) reduces the total value of Accelerated Relocation Payments as follows:  Jackson is entitled to $1.566 billion, License to $1.829 billion, and US LLC is entitled to $155 million in present-value Accelerated Relocation Payments.  The next step to convert Accelerated Relocation Payments from a gross basis to a net basis is to make certain adjustments for non-reimbursable C-band spend pursuant to the definition of C-Band Monetization Property in the Partnership Agreement.  The Accelerated Relocation Payments' value is properly further reduced by $157 million for the amount of spend required to complete the C-band relocation that is not anticipated to be reimbursed, which reduction is applied pro rata across Jackson, License and US LLC based on the after-tax, present-value of Accelerated Relocation Payments noted above, reducing Jackson's value of Accelerated Relocation Payments from $1.566 billion to $1.496 billion, License from $1.829 billion to $1.747 billion and US LLC from $155 million to $148 million.  Next, $111 million of this reduction is properly added back to US LLC related to the Pre-Emergence Non-Reimbursables.  The remaining $49 million of the reduction is related to Post-Emergence Non-Reimbursables, and remains an offset to the Accelerated Relocation Payments' value.

The result of the above analysis is that Jackson is properly allocated a value of approximately $1.496 billion (approximately 42.7 percent of the net present distributable value of the Accelerated Relocation Payments), License receives a value of approximately $1.747 billion (approximately 49.9 percent of the net present distributable value of the Accelerated Relocation Payments), and US LLC receives a net present distributable value of approximately $259 million (approximately 7.4 percent of the present value of the Accelerated Relocation Payments).

---

Monetization Property allocable to Jackson (subject to reduction for certain unreimbursed fees) and 62.5 percent should be allocated to Alliance.  That allocation has been utilized for certain filings and other purposes.  Based on the market data set forth above, the Debtors believe it is reasonable to allocate value based on the Auction Proceeds Methodology described herein as between phase I and phase II.

[42]   As noted above, such attributes were valued and allocated separately, and a significant component of the value attributed to them is their use in offsetting taxable income attributable to the Accelerated Relocation Payments.

Certain stakeholders have asserted that they disagree with the Debtors' allocation methodology. They have suggested that US LLC alone[43] or S.A. alone[44] or the HoldCos alone or with certain other entities should rightfully receive of the Accelerated Relocation Payments; these positions have been contested in various Debtor pleadings, which are incorporated herein by reference.[45]   The Bankruptcy Court will determine these allocation issues at the Confirmation Hearing.

### (d)      Administrative Expenses.

Over the course of these Chapter 11 Cases, the Debtors have accrued significant expenses, including for estate professionals retained by the Debtors, which likely constitute administrative expenses. Because certain of these professionals provide services on behalf of all the Debtors, the proportional responsibility of each Settling Debtor for payment of such expenses and the methodology for determination of the allocation, could be subject to subject to dispute.

The Debtors' proposed plan of reorganization allocated fees for professionals retained by the Debtors based on the distributable cash before fees at each of the entities, resulting in 23 percent of Debtor professionals' fees being allocated as HoldCo expenses (subject to allocation among the HoldCos based on distributable cash before fees), and 77 percent of the fees being allocated as Jackson expenses.

### (e)      Intercompany Transactions.

Well over one hundred historical intercompany transactions were reviewed by the Special Committees, including, among many others, transactions that fell into the following categories: (a) dividends originating from Jackson and ending with LuxCo; (b) the creation of ICF; (c) the creation of Envision; (d) a cash contribution from ICF to Jackson; (e) a notes contribution from ICF to Jackson; and (f) other smaller transactions including loans, a one-off cash dividend, non-cash dividends, guarantee releases, and others.[46]

### (i)      Dividends.

*Factual Background*:  Since May 2014, Jackson has paid a total of approximately $2.16 billion in dividends to LuxCo.  LuxCo used the vast majority of these dividends to fund its regularly-scheduled interest obligations on LuxCo debt.  Because of this, Jackson typically paid the dividends to LuxCo a few days before LuxCo's regularly-scheduled interest obligations were owed.

---

[43]   *See Motion of SES Americom to Intervene in the Accelerated Relocation Payments Litigation and/or for Derivative Standing to Prosecute Intercompany Claims on Behalf of Debtor Intelsat US LLC* [Docket No. 1552].

[44]   *See Motion of Ad Hoc Group of Convertible Noteholders for Entry of an Order: (I) Granting Standing to Prosecute Intercompany Claims on Behalf of Intelsat S.A.; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [Docket No. 1439].

[45]   *See Objection of the Debtors to the Motion of SES Americom, Inc. to Intervene in Accelerated Relocation Payments Litigation and/or for Derivative Standing to Prosecute Intercompany Claims On Behalf of Debtor Intelsat US LLC* [Docket No. 1930] (the "Objection to SES Standing Motion"); *Objection of the Debtors and the Special Committee of the Board of Intelsat S.A. to the Ad Hoc Group of Convertible Noteholders' Motion for an Order (I) Granting Standing to Prosecute Intercompany Claims on Behalf of Debtor Intelsat, S.A.; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [Docket No. 1929] (the "Objection to Converts' Standing Motion").  The arguments set forth in the Objection to SES Standing Motion and the Objection to Converts' Standing Motion are incorporated herein by reference.

[46]   *The Special Committees' review was broad-ranging, covering well over 100 transactions and net balances.  The list of categories of transactions included herein is illustrative and not exhaustive and focuses on transactions that the Special Committees determined posed the greatest litigation risk.*

Prior to the formation of ICF and Envision, Jackson sent the cash dividends directly to LuxCo. After the formation of ICF, Jackson paid the dividends to ICF, and ICF in turn paid the entire amount of the dividend to LuxCo. After the formation of Envision, Jackson paid the dividends to ICF, ICF paid the entire amount of the dividend to Envision, and Envision in turn paid the entire amount of the dividend to LuxCo. When the dividends moved through ICF and Envision before arriving at LuxCo, the entire amount of the dividends moved through the chain, and neither ICF nor Envision kept any portion of the dividend payments.[47]

The Jackson board of directors (and the ICF and Envision boards once these entities were in the chain) approved each dividend payment. Generally, the boards reviewed a memorandum and presentation prepared by the Vice President of Finance, which (i) described the purpose of the dividend, (ii) confirmed that the applicable entity's relevant covenant obligations did not prohibit the entity from paying the dividend, and (iii) provided a balance sheet test (for Jackson and ICF) and a solvency analysis (for Envision) confirming the entities would remain solvent after the issuance of the dividends. In addition, the Jackson and ICF boards also generally received a report from PricewaterhouseCoopers Luxembourg ("PwC Lux"), which confirmed that (i) Jackson's and ICF's interim accounts were free of material misstatements, (ii) Jackson and ICF would have distributable profits after the distribution and nothing caused PwC Lux to believe otherwise, and (iii) other conditions of Luxembourg law were satisfied to distribute to dividends.

***Potential Claims Evaluated by Special Committees***:  The Special Committees evaluated whether the dividends could be subject to potential constructive fraudulent transfer claims under §548 and §544(b). With respect to potential §544(b), the threshold issue will be which jurisdiction's claims apply. "The place of the wrong for choice of law purposes is the place where the last event necessary to make an actor liable for an alleged tort takes place." *McCarthy v. Giron*, 2014 WL 2696660, at *10 (E.D. Va. 2014). With respect to the dividend payments, there are potential arguments that New York, Virginia, or Luxembourg law could apply. Given the difference in the lookback periods between these jurisdictions, the choice of law will impact the size of the potential claim.

Specifically, there is an argument that New York law applies because the "last act" for wiring money is the location of the receiving bank. *Terry v. June*, 420 F. Supp. 2d 493, 505-06 (W.D. Va. 2006). Here, the cash dividends were transferred through bank accounts located in New York. New York has a six-year lookback period. Thus, assuming New York law applies, the total value of the claim is $2.16 billion.

There is also an argument that Virginia law applies. Intelsat's headquarters are in McLean, Virginia, and the relevant actions by Jackson, ICF, Envision, and LuxCo in accounting for the intercompany transfers occurred in Virginia. Where "the Debtor is a Virginia entity headquartered in Virginia . . . , it is reasonable to infer that the last events necessary to create liability, the transfers of the Debtor's assets, occurred in Virginia." *In re Rescue Rangers, LLC*, 576 B.R. 521, 529–30 (Bankr. E.D. Va. 2017). Virginia's look-back period is five years. Thus, assuming Virginia law applies, the total value of the claim is approximately $1.87 billion.

Finally, there could be an argument that Luxembourg law applies since the "last necessary act" arguably occurred in Luxembourg where the board approvals were made, *see Cole v. Champion Enterps., Inc.*, 305 F. App'x 122, 128 n.8 (4th Cir. 2008) ("last act essential" in contract case was board meeting in Michigan for choice of law purposes), or where a Luxembourg accountant recorded book entries of transfers. Furthermore, the majority of the dividend payments were made from one Luxembourg entity to another Luxembourg entity, with the relevant U.S. contacts being the banks used. *Cf. In re FAH Liquidating*, 572 B.R., 117, 124–25 (Bankr. D. Del. 2017) (applying German law for transaction to German

---

[47]  Approximately $970 million went through ICF, and around $537 million also went through Envision.

company for project in Germany, despite transfers originating in U.S.); *In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017).  If the "last act" is found to be in Luxembourg, there will be no avoidance under § 544(b) and only the § 548 two-year look-back will apply.  Thus, the total value of the claim would be around $683.1 million.

Regardless of which law applies, dividends are generally deemed *not* an exchange of reasonably equivalent value.  Thus, the constructive fraud analysis will hinge on solvency, which remains a contested issue.  While at the time the dividends were made, the boards reviewed balance sheet analyses and PwC Lux reports that generally evidenced sufficient liquidity to issue the dividend payments, other market-based evidence, including the trading price of Jackson's debt, the overall debt at Jackson, the overall debt of the enterprise as a whole, and the market cap of the enterprise as a whole could be used to argue that Jackson was not solvent during portions of the time period since May 2014.  Litigating whether Jackson was solvent during multiple portions of a six-year period will be time consuming and expensive (especially given the necessity of utilizing expert testimony).

In addition, while the ICF and Envision Special Committees have raised the "mere conduit" defense to shield the entity from liability against Jackson, such a defense may not be applicable.  *See In re Railworks Corp.*, 700 F.3d 398, 403 (4th Circ. 2014).  When ICF and Envision were in the chain, Jackson dividends passed through these entities' banks before reaching LuxCo.  However, the dividends did not remain in the ICF and Envision bank accounts for long and neither entity ever redirected those funds for any other purpose.  On that basis, ICF and Envision could argue that, even if the Jackson dividends were fraudulent conveyances, ICF and Envision should not be liable because they were "mere conduits" rather than initial transferees.

Courts analyzing this defense have analyzed whether the recipient (i) had "legal dominion and control" over the funds, and (ii) exercised such legal dominion and control.  *Id.*; *see also In re Presidential Airways Inc.*, 228 B.R. 594, 600 (Bankr. E.D.Va. 1999).  The recipient generally has legal dominion and control if it can put the money to its own use.  *See In re Excello Press, Inc.*, 104 B.R. 924 (Bankr. N.D.Ill. 1989), *aff'd in part, rev'd in part on other grounds*, 120 B.R. 938 (N.D. Ill. Oct. 18, 1990).  Courts adopting this test have held that, where the ultimate recipient of the funds had direct business relationships with the debtor, entities acting as "mere fiduciaries" or agents of the ultimate recipient had no legal dominion and control of the funds.  Here, ICF and Envision were not fiduciaries or agents of LuxCo, but were independent entities.  If the "mere conduits" defense does not apply, Jackson could potentially recover from not only LuxCo, but from ICF and/or Envision as well.

### (ii)    Creation of ICF.

*Factual Background:*  At the end of 2016, Intelsat evaluated several options to address the upcoming maturity date of the LuxCo 2018 Notes.  While LuxCo had a certain amount of cash to assist with the LuxCo 2018 maturity, there was going to be a significant shortfall.  And while the existing indentures of Jackson permitted dividends for LuxCo's ordinary course interest payments (as discussed above), there was a question regarding whether the dividends could legally be used to pay the principal of the LuxCo Notes at maturity.  Intelsat was also looking at options to redeem the notes at a discount from the third party noteholders.  After evaluating several options, Intelsat created ICF to carry out the goal of redeeming the LuxCo Notes.

Upon its creation, LuxCo contributed $50,000 cash to ICF in exchange for 50,000 ICF shares and became its sole shareholder.  Subsequently, LuxCo and ICF were party to two agreements that had the overall effect of transferring cash and ownership of Jackson from LuxCo to ICF in order to effectuate the removal of LuxCo 2018 Notes and replace them with ICF 2022 Notes and LuxCo 2024 Notes.

On December 2, 2016, S.A., LuxCo, ICF, and certain third-party noteholders of the LuxCo 2018 Notes, LuxCo 2021 Notes, and LuxCo 2023 Notes entered into a Support and Exchange Agreement. Under the terms of the Support and Exchange Agreement, for every $1000 of LuxCo 2018 Notes purchased, ICF paid the third-party LuxCo 2018 noteholders $450 in newly issued 12.5% ICF 2022 Notes and $600 in cash, plus the cash value of all accrued and unpaid interest on the LuxCo notes.[48]  The Support and Exchange Agreement further detailed how ICF was to be capitalized by LuxCo in order to effectuate these transfers, which included a transfer from LuxCo to ICF of (i) cash, (ii) the remaining LuxCo 2018 notes held by LuxCo, and (iii) equity in Jackson.  ICF would then use the interest payments received as the holder of the LuxCo 2018 Notes to fund its new obligations under the ICF 2022 Notes.

On December 22, 2016, LuxCo and ICF entered into the Contribution to Reserves Agreement, which formalized the terms of the Support and Exchange Agreement that discussed the capitalization of ICF.  Pursuant to the Amended Plan Support Agreement, LuxCo contributed to ICF:

i.    100 percent of LuxCo's equity interests in Jackson (with a book value of approximately $2.3 billion at the time of the transfer in December 2016);

ii.   All LuxCo 2018 Notes still owned by LuxCo (with a fair market value of approximately $20.5 million as of December 13, 2016); and

iii.  Cash totaling approximately $307 million.

LuxCo and ICF approved this transaction in their respective December 5, 2016 board meetings.  As part of these meetings, information was provided to the board from Guggenheim Securities LLC, the Vice President of Corporate & Securities, the Vice President of Treasury & Tax, and the Vice President and Controller.

Following ICF's initial buy-up of LuxCo 2018 Notes from third party noteholders, ICF and LuxCo executed an exchange of the LuxCo 2018 Notes for 12.5% LuxCo 2024 Notes on a one-for-one basis.  In total, as part of this exchange, ICF exchanged $402.6 million of LuxCo 2018 Notes for $402.6 million of LuxCo 2024 Notes.  This second exchange was not only detailed in the Support and Exchange Agreements, but also approved by both ICF and LuxCo in their respective board meetings on December 20, 2016.

***Potential Claims Evaluated by Special Committees***:  The Special Committees analyzed several legal issues associated with the creation of ICF including (i) whether LuxCo received reasonably equivalent value for its contribution of cash, notes, and Jackson shares to ICF; (ii) whether LuxCo received reasonably equivalent value for its exchange with ICF of LuxCo 2018 Notes for LuxCo 2024 Notes; and (iii) whether LuxCo was solvent at the time of these transfers.

Whether reasonably equivalent value was exchanged will be a contested issue.  Specifically, LuxCo may argue that it did not receive any benefit from ICF's repurchase of the LuxCo 2018 Notes because not only were the LuxCo notes subordinated by the newly created ICF notes, but the repurchased LuxCo 2018 Notes were also not retired.  Instead, following the repurchase, the LuxCo 2018 Notes were held by ICF to whom LuxCo was then obligated to pay interest.  As a result, any discount captured from ICF's repurchase of the LuxCo Notes was not a benefit that LuxCo received.  Finally, LuxCo may argue that they did not receive any benefit from the exchange of LuxCo 2018 Notes for LuxCo 2024 Notes because the interest rate was nearly double (6.75 percent vs. 12.5 percent).  On the other hand, ICF may argue that LuxCo did receive a significant benefit from the transaction because there was no other way for LuxCo to address the

---

[48]  The Support and Exchange Agreements entered with the 2021 and 2023 LuxCo Noteholders had similar breakdowns of purchasing their respective notes for a mixture of cash and ICF 2022 Notes.

95

upcoming maturity of its LuxCo 2018 Notes.  Further, although the exchanged LuxCo 2024 Notes did have a higher interest rate than the LuxCo 2018 Notes, it allowed LuxCo to fully address the upcoming maturity date and extend it with a maturity date six years later.

Whether LuxCo was solvent at the time of the transfer will also be a contested issue.  As with the dividends, there are a number of market factors that could be used to argue LuxCo was insolvent.  However, litigating solvency would be an expensive and time consuming exercise.

### (iii)      Creation of Envision.

*Factual Background*:   In response to Intelsat S.A.'s stock price increase in May 2018, Intelsat S.A. management—with the assistance of Intelsat S.A.'s advisors—were looking into a number of potential transactions to raise equity and debt financing for Intelsat S.A. to strengthen its balance sheet and address upcoming maturities.  After reviewing several options, it was decided that Intelsat S.A. would issue common shares and convertible notes and use the proceeds of both issuances to repurchase LuxCo 2021 Notes.  In order to facilitate the issuance of convertible notes, Intelsat S.A. needed both an entity to support the issuance as a guarantor and a mechanism to fund the coupon payments.  Thus, Envision was created on June 6, 2018, to carry out both purposes.

Upon creation, LuxCo contributed its 50,000 shares in ICF to Envision at a book value of $1 per share.  Simultaneously, the Transaction Committee of the Intelsat S.A. board of directors approved the issuance common shares and of the 4.5% S.A. Convertible Notes with Envision as Guarantor of the notes.  The Pricing Term Sheet of the notes confirmed that S.A. expected to "loan and/or contribute all or a portion of the net proceeds from the sale of the notes to the guarantor [Envision]," and that the proceeds would be used to purchase LuxCo 2021 Notes.  As detailed in The Pricing Term Sheet, the proceeds of both the common share issuance and the 4.5% S.A. Notes were contributed down from Intelsat S.A. to Envision— in the form of a $460 million cash contribution and a $150 million intercompany note—for Envision to repurchase LuxCo debt.

The $460 million cash contribution was to be contributed down through the chain of entities between S.A. and Envision.  On or about June 13, 2018, the board of directors of each entity in the chain (including LuxCo, Holdings SARL, Holdings, Investments, and LuxCo) adopted resolutions, which acknowledged (i) Intelsat S.A.'s offer and sale of convertible senior unsecured bonds and issuance of common shares for the purpose of raising capital to be loaned and/or contributed, directly or indirectly, through the entities down to Envision, and (ii) that it was in the best interests of each entity to contribute the proceeds down the chain of entities to Envision.  These entities subsequently entered into a Payment Instruction Agreement on June 18, 2018, where Intelsat S.A. was instructed to pay the $460 million directly to Envision to "satisfy and fully pay" the contribution payables agreed to at each entity in the chain.  Thus, the $460 million cash contribution went directly from Intelsat S.A. bank accounts to Envision bank accounts.

The $150 million loan from Intelsat S.A. to Envision came in the form of a note, with an interest rate of 12.5 percent and a maturity date of 2026.  The interest Intelsat S.A. earned from this note was used to fund Intelsat S.A.'s interest obligations on its 4.5% Convertible Notes.  A written resolution of the LuxCo board of directors reviewed and approved, as the sole shareholder of Envision, the loan from S.A. to Envision.  The board found that the terms of the $150 million loan were not materially less favorable to Envision than those that could have been obtained in a comparable transaction by Envision with an unrelated person or entity and that it was advisable and in the best interests of Envision to enter into the $150 million loan with Intelsat S.A.  Since the issuance of the loan, Envision has paid Intelsat S.A. $27,708,333 in interest.

96

Overall, Envision used the proceeds from the cash contribution and loan to repurchase approximately $600 million aggregate principal amount of the LuxCo 2021 Notes from third party noteholders.  S.A. was a Guarantor of the LuxCo 2021 Notes.  Following Envision's purchase of the LuxCo 2021 Notes, Envision and LuxCo entered into an exchange whereby Envision exchanged its $600 million of LuxCo 2021 Notes for $600 million of 13.5% LuxCo 2026 Notes.  Intelsat S.A. was not a Guarantor of the LuxCo 2026 Notes.  As a result, through this transaction Intelsat S.A. removed its guarantor obligations from LuxCo's notes.

*Potential Claims Evaluated by Special Committees*:  The Special Committees analyzed several legal issues associated with the Creation of Envision including (i) whether S.A. received reasonably equivalent value for the contribution of cash; (ii) whether the intercompany loan was made with commercially reasonable terms and/or could be subject to a recharacterization claim; (iii) whether Intelsat S.A. was solvent at the time of the transfers; (iv) whether the entities between Intelsat S.A. and Envision have potential claims associated with the $460 million cash contribution; and (v) whether LuxCo received reasonably equivalent value for its exchange with Envision of LuxCo 2021 Notes for LuxCo 2026 Notes.

Overall, the creation of Envision ultimately benefited Intelsat S.A. and LuxCo.  Intelsat S.A.'s loan and contributions to Envision allowed Envision to repurchase LuxCo 2021 Notes from third-party noteholders.  The subsequent exchange of LuxCo 2021 Notes (which S.A. was a Guarantor) for LuxCo 2026 Notes (which Intelsat S.A. was *not* a Guarantor) effectively removed Intelsat S.A.'s guarantor obligations.  LuxCo further benefited from addressing the maturity of its LuxCo 2021 Notes through the exchange for notes with a longer maturity date.

### (iv)      ICF Cash Contribution to Jackson.

*Factual Background*:   In August 2018, ICF issued 9.5% Senior Notes due 2023 ("ICF 2023 Notes"), which raised $1.25 billion and was guaranteed by Envision and LuxCo.  ICF used the net proceeds of the notes offering for two primary purposes:  (i) to repurchase or redeem all $731.9 million aggregate principal amount outstanding of the ICF 2022 Notes, and (ii) to contribute $482 million to Jackson so that Jackson could repurchase and cancel approximately $448.0 million aggregate principal amount of the Jackson 2020 Notes and approximately $30 million aggregate principal amount for the Jackson 2023 Notes and the Jackson 2025 Notes.  At the time of ICF's contribution to Jackson, it was a Guarantor of the Jackson 2020 Notes, the Jackson 2023 Notes, and the Jackson 2025 notes.

ICF's contribution was approved by the ICF board of directors via a Written Resolution on August 1, 2018.  Similarly, Jackson's board of directors approved the receipt of the contribution and the use of the funds to repurchase Jackson debt via a Written Resolution on August 15, 2018.

*Potential Claims Evaluated by Special Committees*:  The Special Committees analyzed several legal issues associated with ICF's cash contribution to Jackson including (i) whether ICF received reasonably equivalent value for the cash contribution; and (ii) whether ICF was solvent at the time of the contribution.  There is an argument that reasonably equivalent value was given because the notes that Jackson repurchased with the ICF cash contribution were notes under which ICF was a Guarantor.  Thus, ICF arguably received value because the transaction resulted in the removal of its guarantee obligations.  Further, while market-based evidence, including the trading price of ICF's debt, the overall debt at ICF, the overall debt of the enterprise as a whole, and the market cap of the enterprise as a whole indicate that ICF was likely solvent at the time of the cash contributions.  However, uncertainty still exists with respect to any likely results of litigation.

**(v)        ICF Notes Contribution to Jackson.**

*Factual Background*:  As of December 2018, ICF held approximately $112 million aggregate principal amount of the LuxCo 2023 Notes, approximately $403 million aggregate principal amount of the LuxCo 2024 Notes, and approximately $979 million aggregate principal amount of the LuxCo 2026 Notes. The interest earned on these notes enabled ICF to service its debt, as well as address the maturity of the LuxCo 2021 Notes.  However, recent debt refinancing transactions gave ICF alternative paths to address the LuxCo 2021 Notes at maturity.  In addition, holding LuxCo Notes in excess of $1.25 billion created a wealth tax expense (that was valued at approximately $1.3 million annually at the time) that could be avoided if ICF contributed a portion of its LuxCo notes to Jackson.

After consideration and discussion, the ICF board of directors approved the contribution of LuxCo notes to Jackson.  The parties thereafter entered into a Contribution Agreement, which provided for the contribution of $111,663,000 of the LuxCo 2023 Notes and $220,610,000 of the LuxCo 2024 Notes.  Since this contribution, Jackson has received approximately $36.6 million in interest from LuxCo.

*Potential Claims Evaluated by Special Committees*:  The Special Committees analyzed several legal issues associated with ICF's notes contribution to Jackson including: (i) whether ICF received reasonably equivalent value for the notes contribution and (ii) whether ICF was solvent at the time of the contribution.  ICF arguably received reasonably equivalent value from the notes contribution due to the tax savings received because of the contribution.  However, there is a potential argument that reasonably equivalent value was not provided because the alleged tax savings was less than the amount ICF would have received in interest from LuxCo if ICF kept the notes.  Further, if the initial transaction is successfully challenged, it is possible the $36.6 million in interest Jackson has received post-contribution would also be challenged as well.

With respect to solvency, as discussed above, the market-based evidence indicates ICF was likely solvent at the time of the contribution, but the process of litigating the issue could provide for legally uncertain outcomes.

**(vi)        Other Transactions.**

The Special Committees further reviewed a series of other intercompany transactions, which included the following:

TopCo Services Agreement:  On October 1, 2016, S.A. and several of its subsidiary entities (including Holdings, Holdings SARL, Investments, and Jackson) entered into a Services Agreement (the "TopCo Services Agreement"), through which the "Service Providers" (the non-Jackson entities) agreed to provide a collection of services to the "Service Recipient" (Jackson).  Jackson was, in turn, responsible for paying the parent entities back at cost.  The services included professional services, insurance, legal services, equity-based compensation, and board fees.  The boards of directors of each of the parties to the TopCo Services Agreement reviewed the terms and purpose of the agreement, and ultimately approved it.  Given Jackson likely was the sole beneficiary of many of the services under the Amended Plan Support Agreement (given certain of the other TopCo entities had no employees) and that the services were billed at cost, there likely is sufficient reasonably equivalent value exchange for the payments related to the Amended Plan Support Agreement, but the result of any related litigation is legally uncertain.  The total amount paid under the TopCo Services Agreement was $42.6 million.

ICF to LuxCo One-Time Dividend Payment:  On May 30, 2018, a dividend of $49,952,375 was paid directly from ICF to LuxCo.  This dividend did not originate from Jackson, but instead was cash ICF had on hand from interest payments received on the LuxCo notes that ICF held.  The purpose of the dividend was to assist LuxCo with redeeming the outstanding portion of its LuxCo 2018 Notes.  The dividend was

98

approved via a board resolution, where the board reviewed (i) a presentation describing the purpose of the dividend and a balance sheet testing showing the total capital reserves of ICF before and after the proposed dividends, indicating that ICF will remain solvent after the dividend payment; (ii) the relevant covenant obligations, which did not prohibit the dividend; and (iii) a report from PwC Lux that confirmed ICF's interim account was free of material misstatement, that ICF would have distributable profits after the distribution, and that the other conditions of Luxembourg law had been satisfied.  Given dividends are generally presumed to be *not* for reasonably equivalent value, this transaction will likely hinge on solvency.

Grant of Management LLC Shares:  Investments held all outstanding LLC interests in Intelsat Management LLC ("Management LLC"), a Delaware limited liability company, which served the primary corporate function of holding four employment contracts of certain key management executives of Intelsat S.A. and paying all amounts due to the executives pursuant to the terms and obligations set forth in their contracts.  Prior to November 2016, these payments were made through the dividends Investments received from LuxCo.  However, LuxCo was no longer able to declare dividends up the chain due to insufficient distributable reserves at LuxCo resulting from the incurrence of a Luxembourg GAAP accounting impairment charge.  Thus, Investments proposed to contribute the shares of Management LLC to Jackson (via LuxCo) to enable Management LLC to continue to meet its payment obligations.  The value of the shares was deemed to be $1.00 (US).  The parties entered into an agreement memorializing the contribution.  Jackson held Management LLC from November 2016 until July 2018.  In July 2018, Jackson contributed it down to one of its subsidiaries, Intelsat Alliance LP, which later merged with Intelsat US LLC in December 2018.

Non-Cash Dividends:  On several occasions from 2014–2016, non-cash dividends moved between the entities, including Jackson, LuxCo, Investments, Holdings, and Holdings SARL.  One subset of non-cash dividends originated at Jackson, Holdings, or Holdings SARL, and were generally in the form of intercompany receivables from S.A.  The non-cash dividends ranged from $8–10 million, and were generally contributed up the chain to S.A.  The non-cash dividends went through the same review and approval process as the cash dividends.

Historical Jackson-Holdings Loan:  In October 2013, Holdings made a loan of $28.3 million to Jackson with a 3.5 percent interest rate.  The purpose of the loan was to avoid wealth tax obligations at Holdings due to the excess of assets that were held at Holdings at that time.  The board unanimously approved a resolution to loan Holdings' net recorded equity to Jackson.  Jackson paid $19.8 million in interest and principal on the loan from October 2013 through May 2016.

LIBOR Note:  In 2005, Intelsat Subsidiary Holdings Company (succeeded by Jackson) and Intelsat Ltd. (succeeded by Investments) entered into an agreement to settle their outstanding intercompany debts through the issuance of a note, with an interest rate of LIBOR-plus-two-percent.  The two defining characteristics of this note are that (1) there is no set maturity date, but they are payable on demand; and (2) through successive board resolutions since at least 2015, Jackson agreed to "advance" the interest that Investments owed to Jackson by adding the "accrued" interest to the principal versus being paid.  The note is now worth approximately $572 million, with annually accruing interest rate at approximately $25 million.  As of April 1, 2020, Jackson had paid nearly $100 million in interest on the LIBOR note.

### 3.  *Settlement Terms*

The intercompany issues described above, including (a) claims relating to historic intercompany transactions between and among the Debtors, the series of internal transactions and related steps that the Debtors implemented in July 2018 that reorganized the ownership of certain of their assets among Entities, and the Accelerated Relocation Payments; (b) claims and Causes of Action against any of the Debtors' directors, managers, officers, and other related Entities; and (c) the covenants and actions required of each party hereto to support the foregoing and to effectuate a tax value maximizing transaction, are settled

pursuant to the Settlement, through releases, covenants to support, and value for the creditors at the HoldCos under the Amended Plan. The terms of the Settlement shall be set forth in greater detail in the Settlement Agreement and shall be subject to Bankruptcy Court approval through the Confirmation Order or by separate order.

### L. The Guarantee Claims Standstill

#### 1. *The Guarantee Claims*

As discussed in further detail in section VI.E hereto, in an effort to conserve liquidity as the Debtors assessed their strategic alternatives, on April 15, 2020, Intelsat and certain of its affiliates elected to withhold a $125 million interest payment due April 15, 2020, on the Jackson 8.5% Senior Notes Indenture Due 2024 and entered into a 30-day grace period, provided for in the applicable indenture, to preserve liquidity as the Company continued to engage with key stakeholders and further progress discussions regarding financing and restructuring options.

Prior to filing voluntary bankruptcy petitions, each of the Parent Guarantors elected to initiate Guarantee Releases pursuant to section 10.01(k) of each applicable indenture, resulting in Parent Guarantors releasing its guarantees of the Jackson 5.5% Senior Notes due 2023, the Jackson 8.5% Senior Notes due 2024, the Jackson 9.75% Senior Notes due 2025, the LuxCo 7.75% Senior Notes due 2021, and/or the LuxCo 8.125% Senior Notes due 2023, as further detailed in VI.E hereto.

Certain stakeholders have argued that these Guarantee Releases were ineffective or improper and therefore that the Guarantee Claims should be allowed, as discussed in further detail in section VI.E herein, generating substantial litigation. As of the date hereof, five well-funded, independently advised parties in interest have pursued: (a) numerous proofs of claim; (b) two objections to the Jackson Parent Guarantee Claims and one objection to the Lux Parent Guarantee Claims; (c) five responses to the objections; (d) two motions for partial summary judgment; and (e) two objections to the motions for partial summary judgment and cross-motion for partial summary judgment. While the Debtors believe that the Guarantee Claims lack merit, litigating the fact-intensive claims and causes of action asserted by various stakeholders would be extremely costly and time-consuming.

Based on the substantial and good faith disagreement set forth in the numerous pleadings described above, many of the parties thereto engaged in months of good faith and hard-fought negotiations regarding a consensual resolution to the Guarantee Claims and related claims and causes of action. These conversations resulted in an agreement regarding the Guarantee Claims by and among each of the Parent Guarantors, the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, U.S. Bank, and Delaware Trust, which is included in the Amended Plan Support Agreement. The Amended Plan Support Agreement includes an agreement on a standstill on the prosecution of the Guarantee Claims, the pleadings related thereto, and other related potential causes of action, as described in greater detail herein and in the Amended Plan Support Agreement attached hereto as **Exhibit G**.

#### 2. *The Standstill*

Pursuant to the Amended Plan Support Agreement, the Jackson Crossover Group will not seek entry of an order allowing a HoldCo Guarantee Claim (whether on a temporary or final basis), or seek a distribution from any of the HoldCo Guarantors on account of any HoldCo Guarantee Claims, and neither the HoldCo Creditor Ad Hoc Group nor any Company Party shall prosecute any objection or participate in any challenge to the Guarantee Claims, in each case at any time when (1) the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group (in each case in a percentage amount required for the effectiveness of the Amended Plan Support Agreement pursuant to Section 2 of the Amended Plan Support Agreement) are parties to the Amended Plan Support Agreement or a plan support agreement that provides

(a) treatment for Jackson Senior Notes Claims against all Debtors that is no less favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement and (b) treatment for the HoldCo Senior Notes Claims that is no more favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement, and (2) no plan of reorganization has been filed by any person or entity having a right to file a plan that (a) provides treatment to Jackson Senior Notes Claims against any Debtor that is less favorable than the treatment of such claims specified in the Amended Plan Support Agreement or (b) provides treatment to any HoldCo Senior Notes Claim that is more favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement; *provided*, that this clause (2) shall not apply to any plan filed by the Jackson Crossover Ad Hoc Group.

Pursuant to the Plan Support Agreement, to the extent that the Standstill Conditions cease to exist at any time before the Bankruptcy Court enters the Confirmation Order, the HoldCo Creditor Ad Hoc Group and the Debtors agree that they will consent to and support the adjournment of the Confirmation Hearing by twenty-one (21) days to permit the Jackson Crossover Ad Hoc Group to seek the temporary allowance for voting purposes of the Guarantee Claims (and with such period to be extended solely to the extent necessary for any requisite solicitation to occur following the Bankruptcy Court's ruling with respect to such temporary allowance, including with respect to the HoldCo Guarantee Claims) before the Confirmation Hearing commences or resumes, as applicable; *provided*, that nothing in this paragraph shall prevent or limit the Jackson Crossover Ad Hoc Group from seeking any relief with respect to the Guarantee Claims at any time after the Standstill Conditions cease to exist.

Nothing in the Amended Plan Support Agreement shall prevent the Jackson Crossover Ad Hoc Group from (1) seeking entry of an order allowing a Guarantee Claim (whether on a temporary or final basis) against, or seeking a distribution from, the TopCo Guarantors or (2) defending any Guarantee Claim asserted against the HoldCo Guarantors or TopCo Guarantors against objections or challenges from any party; *provided*, that (i) any hearing regarding the merits of any Guarantee Claim against any TopCo Guarantor shall occur contemporaneously with the Confirmation Hearing, and in no event shall any such hearing occur prior to the Confirmation Hearing, (ii) no hearing regarding the merits of any Guarantee Claim against any HoldCo Guarantor may occur until after the Confirmation Hearing (except as provided in Section 7.05(h)), and (iii) the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Company Parties will each support the Bankruptcy Court's entry of the Guarantee Litigation Scheduling Order.

Pursuant to the Amended Plan Support agreement, in the event (x) any hearing other than the September 1, 2021 hearing scheduled pursuant to the Initial Guarantee Litigation Scheduling Stipulated Order concerning the merits or temporary allowance of any Guarantee Claim is scheduled by the Bankruptcy Court for a date prior to the Confirmation Hearing or (y) the Bankruptcy Court does not enter the Guarantee Litigation Scheduling Order prior to the commencement of the Disclosure Statement Hearing, then (1) the standstill provided in the Amended Plan Support Agreement shall automatically terminate, (2) the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group shall each be permitted to take any and all actions with respect to the Guarantee Claims as each may deem appropriate (including, for the avoidance of doubt, participating in any hearing or briefing with respect to such hearing) concerning the merits or temporary allowance of any Guarantee Claim that is set to occur on or prior to the Confirmation Hearing, (3) the Required Consenting Jackson Crossover Group Members and Required Consenting HoldCo Creditors may each terminate the Amended Plan Support Agreement, *provided*, that the Required Consenting Jackson Crossover Group Members and Required Consenting HoldCo Creditors may only terminate the Amended Plan Support Agreement within seven (7) days (except as may be extended by the Required Consenting Unsecured Creditors) of: (i) the time at which a hearing concerning the merits or temporary allowance of any Guarantee Claim is scheduled by the Bankruptcy Court for a date prior to the Confirmation Hearing; (ii) the time that the Bankruptcy Court determines that it will not enter the Guarantee Litigation Scheduling Order; or (iii) commencement of the Disclosure Statement Hearing as

101

set forth in clause (y) of this paragraph and (4) upon such termination of the Amended Plan Support Agreement by either the Required Consenting Jackson Crossover Group Members or the Required Consenting HoldCo Creditors pursuant to clause (3) of this sentence, the Debtors shall (A) immediately amend the Plan (and the Non-TopCo Plan) to provide that the Guarantee Claims shall not be (i) released or waived against any Guarantor unless consented to in writing by the Required Consenting Jackson Crossover Group Members or (ii) Allowed in any amount against any HoldCo unless consented to in writing by the Required HoldCo Creditors or otherwise ordered by the Bankruptcy Court or other court of competent jurisdiction, and (B)  make any other amendments to the Plan (and the Non-TopCo Plan) necessary to effectuate the amendments in the foregoing clauses (i) and (ii) and to ensure that the Plan does not prejudice either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group's rights and defenses with respect to the Guarantee Claims (including the right to seek a disputed claims reserve with respect to the Guarantee Claims).  For the avoidance of doubt, the amendments to the plan contemplated by clause (4) of the preceding sentence, under the circumstances contemplated therein, are hereby consented to by the Parties to the Amended Plan Support Agreement.

Pursuant to the Amended Plan Support Agreement, notwithstanding anything to the contrary therein, it shall not be a violation of the Standstill Conditions, and each Party shall otherwise be entitled under the Amended Plan Support Agreement, to take any actions and make any filings with the Bankruptcy Court necessary to comply with the Initial Guarantee Litigation Stipulation unless or until the Guarantee Claims Litigation Order is entered by the Bankruptcy Court.

No ruling, order, or judgment issued by any court with respect to an objection or challenge by another party to the TopCo Guarantee Claims, or with respect to a motion for temporary allowance of the TopCo Guarantee Claims, in which the HoldCo Creditor Ad Hoc Group is prevented by Section 7.05 of the Amended Plan Support Agreement from participating, shall have res judicata, collateral estoppel, or any other precedential effect against either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group in any proceeding seeking to enforce or challenge the HoldCo Guarantee Claims.

Pursuant to the Amended Plan Support Agreement, all Guarantee Claims against the HoldCo Guarantors will be withdrawn with prejudice and are not entitled to any distribution under the Plan (or the Non-TopCo Plan, as applicable) and will be released on the Effective Date; provided, that, for the avoidance of doubt, the TopCo Guarantee Claims shall not be withdrawn, enjoined, or released on the Effective Date.

During the effective period of the Amended Plan Support Agreement, all Consenting Creditors shall use reasonable best efforts to direct the Trustees to support the Guarantee Litigation Scheduling Order and the matters set forth in Section 7.05 of the Amended Plan Support Agreement, provided that this shall not require any Consenting Creditor to provide any indemnification to, or incur any other out-of-pocket cost to, any Trustee.

It shall not be a violation of the Standstill Conditions, and each Party shall otherwise be entitled under this Agreement, to take any actions and make any filings with the Bankruptcy Court necessary to comply with the Initial Guarantee Claims Litigation Stipulation unless or until the Guarantee Claims Litigation Order is entered by the Bankruptcy Court.

For the avoidance of doubt, before the Confirmation Hearing, the Debtors shall not settle, seek to settle, or support any settlement of, any Guarantee Claim without the prior written consent of the Required Consenting Unsecured Creditors; *provided, however*, that the Required Consenting HoldCo Creditors shall be deemed to consent to any such settlement at any time after the HoldCo Guarantee Claims have been withdrawn with prejudice.

Pursuant to the Amended Plan, upon the occurrence of the Effective Date, (i) each Holder of an Allowed TopCo Guarantee Claim against Holdings SARL shall receive its Pro Rata share of the Holdings

SARL Unsecured Recovery; and (ii) 30 percent of any distributions made on account of TopCo Guarantee Claims against Intelsat to the Jackson Senior Notes Trustees shall be gifted Pro Rata to Holders of Connect Senior Notes Claims in consideration for the covenants, compromises, releases, and other benefits provided by the members of the HoldCo Creditor Ad Hoc Group pursuant to the Amended Plan Support Agreement; provided that the aggregate value of such gift shall not exceed $6 million.

### M.      The Amended Plan Support Agreement

As discussed in further detail in section II.F, following months of continued, active, good-faith negotiation, the Debtors and their major stakeholders, the Debtors, the HoldCo Creditors Ad Hoc Group, the Jackson Ad Hoc Group, the Jackson First Lien Noteholder Group, and the Jackson Crossover Ad Hoc Group reached agreement on the terms of a restructuring that each was willing to support and entered into the Amended Plan Support Agreement, which outlines the terms of the Debtors' proposed restructuring. In parallel, the Debtors worked with the other parties to the Amended Plan Support Agreement to formulate the Amended Plan, which is consistent with the Amended Plan Support Agreement and enjoys the support of each party thereto. As noted in further detail herein, the Amended Plan Support Agreement provides for signatories' commitment to support the Settlement under Bankruptcy Rule 9019 amongst certain parties to the Amended Plan Support Agreement to be reflected the Settlement Agreement to be approved by the Court through the Confirmation Order or by separate order. This Settlement resolves certain key issues in the case, paving the way for the consensual restructuring reflected in the Amended Plan.

### N.      Non-TopCo Plan

In the event that a Plan Toggle Event occurs, for any reason, the Debtors shall immediately seek, and the Parties to the Amended Plan Support Agreement shall support, the Confirmation of the Non-TopCo Plan without the need to resolicit votes on the Non-TopCo Plan. Upon conversion to the Non-TopCo Plan, all references in the Amended Plan to the "Plan" and any references herein to the "Amended Plan" shall be deemed to refer to the New-TopCo Plan. Any references to the Debtors shall be deemed to refer to all of the Debtors other than whichever (or both) of Intelsat S.A. and Holdings SARL that a Plan Toggle Event occurs with respect to. The Non-TopCo Plan shall be consistent in all respects with the terms of the Amended Plan (including, for the avoidance of doubt, the treatment of Claims provided under the Plan for all classes of creditors other than creditors of Holdings SARL and/or Intelsat S.A.). The Non-TopCo Plan may differ from the Amended Plan only to the extent required to remove Holdings SARL and/or Intelsat S.A. from the Amended Plan and which shall still (unless waived in accordance with the Amended Plan Support Agreement) require that the Settlement Agreement Order be entered as a condition precedent to confirmation of the Non-TopCo Plan, and otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Unsecured Creditors.

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Amended Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Amended Plan and its implementation.

### A.      Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Amended Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Amended Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.  *Parties in Interest May Object to the Amended Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Amended Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.  *The Conditions Precedent to the Effective Date of the Amended Plan May Not Occur*

As more fully set forth in Article IX of the Amended Plan, the Effective Date of the Amended Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place.

3.  *The Debtors May Fail to Satisfy Voting Requirements*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Amended Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Amended Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Amended Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Amended Plan.

4.  *The Debtors May Not Be Able to Satisfy Voting Requirements if SES's Claim Is Placed into Its Own Class and SES Votes to Reject the Amended Plan.*

SES has asserted that it believes its claim should be allowed in full, against each Debtor, and placed into its own class, and SES has asserted that its claim is not substantially similar to other unsecured claims against Jackson Subsidiaries.  *See* SES Disclosure Statement Obj. ¶¶ 16, 94.  The Debtors disagree with all of SES's assertions, including its assertions that (a) its claim should be allowed in full; (b) it should be allowed against any Debtor; and (c) to the extent SES is determined to have a valid claim, it should be placed into its own class.  If SES's claim were allowed and placed into its own class, the Debtors may be unable to obtain confirmation of the Amended Plan without SES voting to accept it or, if confirmed, recoveries under the Amended Plan could be materially impacted.  The Debtors may also seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Amended Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Amended Plan.

5.  *The Debtors May Not Be Able to Satisfy Voting Requirements if the Convert Ad Hoc Group Votes to Reject the Plan at Intelsat S.A.*

The Convert Ad Hoc Group has argued that the Amended Plan is not confirmable at Intelsat S.A. without the Convert Ad Hoc Group's voting to accept the Amended Plan.  *See* the Convert Ad Hoc Group's Disclosure Statement Obj. ¶ 51.  As mentioned above, if votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Amended Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Amended Plan.  In the event that sufficient votes are not

received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Amended Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Amended Plan.

### 6.   *Absolute Priority Rule*

SES has asserted that it believes its alleged Claim should be allowed and placed into its own class. *See* SES Disclosure Statement Obj. ¶¶ 16, 94. If SES is successful in prosecuting its alleged Claim, and it is placed into its own class, a vote to reject the Amended Plan from SES may render the Amended Plan unconfirmable under the absolute priority rule of section 1129(b). Section 1129(b) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than the requirement that the plan has been accepted by all impaired classes, a plan may be confirmed so long as it does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes. The Debtors believe that the Amended Plan satisfies section 1129(b) and intend to prove so at Confirmation. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 7.   *The Debtors May Not Be Able to Secure Confirmation of the Amended Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims or equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Amended Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Amended Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Amended Plan, reserve the right to modify the terms and conditions of the Amended Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Amended Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Amended Plan or no distribution whatsoever under the Amended Plan.

### 8.   *The Plan May Not Be Confirmed With Respect to the TopCo Debtors*

The Amended Plan is a single plan of reorganization for all of the Debtors; however, pursuant to section 7.06 of the Amended Plan Support Agreement, under certain facts and circumstances, the Debtors

may bifurcate the Amended Plan, seeking confirmation of the Non-TopCo Plan[49] separately from a plan of reorganization for Holdings SARL and Intelsat S.A. If this toggle occurs and the Non-TopCo Plan is separately confirmed, then a plan of reorganization may not be confirmed at Holdings SARL or Intelsat S.A. and there could be an impact on the recovery to Holders of Claims at the Debtors. The Non-TopCo Plan may still be confirmed based on tabulation of votes for the Amended Plan without resolicitation. Therefore, Holders of Claims entitled to vote on the Amended Plan should take into account the possibility of confirmation of the Non-TopCo Plan alone when determining whether to vote in favor of the Amended Plan.

### 9. *Nonconsensual Confirmation*

In the event that any impaired class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Amended Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Amended Plan may result in, among other things, increased expenses relating to professional compensation.

### 10. *Proposed in Good Faith*

Section 1129(a)(3) of the Bankruptcy Code provides that a court shall confirm a plan only if the plan has been proposed in good faith and not by any means forbidden by law. The Convert Ad Hoc Group and SES allege that the Original Plan was not proposed in good faith. The Debtors believe that the Amended Plan was proposed in good faith and otherwise complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 11. *Best Interests of Creditors Test*

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or an equity Interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the Debtors liquidated under chapter 7.

SES has asserted that the creditors of US LLC may receive more in a liquidation than is provided to such creditors under the Original Plan, because the Original Plan allocated only some of the value of the Accelerated Relocation Payments to US LLC, while SES alleges all of such value should be allocated exclusively to US LLC. *See* SES Disclosure Statement Obj. ¶¶ 16, 77. The Debtors believe that the allocation of distributable value provided for in the Amended Plan reflects the correct allocation of the Debtors' assets, including any Accelerated Relocation Payments that they may receive, among the Debtors, which would apply during a liquidation as well. Accordingly, the Debtors disagree that any creditor would

---

[49] "Non-TopCo Plan" means a single plan of reorganization for all of the Debtors other than Holdings SARL and Intelsat S.A., as discussed above.

receive a greater amount in a liquidation. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Convert Ad Hoc Group has also argued that the Amended Plan does not satisfy the best interests test because the Amended Plan does not attribute any value to Intelsat S.A. on account of the Accelerated Relocation Payments. The Debtors disagree with the assertions made by the Convert Ad Hoc Group and believe the allocation of the value of the Accelerated Relocation Payments under the Amended Plan to be reasonable. As further described in section IV.B.2 of this Disclosure Statement, entitled "Allocation of Accelerated Relocation Payments," the Debtors have allocated the value of the anticipated Accelerated Relocation Payments, taking into account, among other things, that License holds the relevant FCC Licenses and the effect of certain intercompany agreements on certain Debtors' rights to receive value on account of any Accelerated Relocation Payments received. In sum, the Debtors believe, and the Amended Plan assumes, that Jackson is entitled to 42.7 percent of the value associated with the anticipated receipt of Accelerated Relocation Payments, License is entitled to 49.9 percent, and US LLC is entitled to 7.4 percent.

The Convert Ad Hoc Group has argued that the Amended Plan does not satisfy the best interests test because the Amended Plan fails to consider certain intercompany claims held by Intelsat S.A. against Envision and held by Envision against LuxCo. As provided in the Amended Plan, claims among the Debtors, including those raised by the Convert Ad Hoc Group, are being settled pursuant to the Amended Plan, which Settlement is the product of arm's-length good faith negotiations, and provides reasonable value to all Debtors under the circumstances.

## 12. *Continued Risk upon Confirmation*

Even if the Amended Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for satellite services, changes in satellite technology, and increasing expenses. *See* Article VII.M of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Amended Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Amended Plan and prohibits creditors and others from proposing a plan. The Debtors currently have the exclusive right to propose the Amended Plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Amended Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Amended Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

## 13. *The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7

of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate such debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing the business in a controlled manner; (b) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 14. *One or More of the Chapter 11 Cases May Be Dismissed*

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases. In such event, the Debtors would be unable to confirm the Amended Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Amended Plan.

### 15. *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Amended Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Amended Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 16. *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will, in fact, occur.

### 17. *Risk that Foreign Courts Will Not Enforce the Confirmation Order*

After the Effective Date, the Reorganized Debtors will maintain business operations in certain foreign jurisdictions, including the Grand Duchy of Luxembourg—where many of the Debtors are incorporated—and the United Kingdom. Additionally, implementation of the Amended Plan and the Restructuring Transactions contemplated thereunder may require certain actions to be taken by and/or with respect to certain of the Debtors or Reorganized Debtors incorporated in certain foreign jurisdictions, including the Grand Duchy of Luxembourg. There is a risk that the courts in these jurisdictions will not enforce the Confirmation Order, which may affect the Reorganized Debtors' ability to effectuate certain relief granted pursuant to the Confirmation Order.

### 18. *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

Article VIII of the Amended Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The Convert Ad Hoc Group and SES have alleged that these provisions may be improper because they are too broad, fails to give an opportunity for a party voting in favor of the Amended Plan to opt out of the releases, and was negotiated among "insiders." The releases, injunctions, and exculpations provided in the Amended Plan are subject to objection by all parties in interest and may not be approved. The Debtors believe that the releases, injunctions, and exculpations

provided in the Amended Plan are consensual or otherwise proper, and intend to prove so at Confirmation. If the releases are not approved, certain Released Parties may withdraw their support for the Amended Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Amended Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Further, the Amended Plan embodies a settlement of claims and causes of action between the Debtors and their stakeholders. To effectuate the settlement embodied in the Amended Plan, the Amended Plan includes Debtor and third-party releases, an exculpation provision, and an injunction provision. These provisions comply with the Bankruptcy Code and prevailing law because, among other reasons, they are the product of extensive good-faith, arm's-length negotiations, were material inducements for the Consenting Creditors to enter into the Amended Plan Support Agreement and the Settlement embodied in the Amended Plan, and are supported by the Debtors and the signatories to the Amended Plan Support Agreement.

### 19. *The Secured Creditor Settlement is Subject to Potential Dispute*

The Debtors are pursuing the Secured Creditor Settlement, which, as described in greater detail in Section IV of this Disclosure Statement and in the Secured Creditor Settlement Term Sheet, provides for a settlement of the First Lien Claims. Approval of the Secured Creditor Settlement will be sought pursuant to a motion separate from the Amended Plan. The Jackson Crossover Ad Hoc Group does not support the Secured Creditor Settlement and has reserved their right to challenge it and it may be subject to challenge from other parties in interest in these Chapter 11 Cases as well. If the Secured Creditor Settlement is challenged, the ultimate amount of the consideration provided to the Holders of First Lien Claims could be higher or lower based on the outcome of any litigation brought to challenge the Secured Creditor Settlement. That litigation could continue after Confirmation of the Amended Plan, in which case the Debtors may establish a reserve account to reserve the Secured Creditor Claims Disputed Distribution Reserve (as defined in the Plan). The Debtors believe that the secured creditor settlement is a fair and reasonable resolution of potential disputes around the First Lien Claims and is the best interests of their estates. Nonetheless, the outcome of this litigation may impact the timing and amounts of recoveries for the Holders of First Lien Claims and Holders entitled to vote should consider this when determining whether to vote to approve or reject the Amended Plan.

### 20. *The Convert Ad Hoc Group's Standing Motion or SES's Intervention Motion May Be Granted*

In the event that the Standing Motion or the Intervention Motion is granted, depending on the nature of the ruling, the Debtors' Chapter 11 Cases may be prolonged due to litigation stemming from the Standing Motion or Intervention Motion and related adversary proceedings which would otherwise be resolved by the Amended Plan.

### B. Risks Related to Recoveries Under the Amended Plan

### 1. *The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results*

The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry sectors in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure

Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

## 2.   *The Reorganized Debtors Do Not Intend to Offer to Register or to Exchange the New Common Stock, New Warrants, or CVRs*

Upon emergence, the New Common Stock, New Warrants or CVRs will not be registered under the Securities Act or any state securities laws.  As a result, until the Reorganized Debtors (i) register the New Common Stock, New Warrants, or CVRs under the Securities Act or (ii) offer to exchange the New Common Stock, New Warrants, or CVRs in an exchange offer registered under the Securities Act, the New Common Stock, New Warrants, and CVRs generally may be transferred or re-sold only in transactions exempt from the securities registration requirements of federal and applicable state laws, including pursuant to the exemption set forth in section 1145 of the Bankruptcy Code. *See* Article IX to this Disclosure Statement entitled "Certain Securities Law Matters," which begins on page 113.   In addition, the Reorganized Debtors will not be subject to the reporting requirements of the Securities Act, and holders of the New Common Stock, New Warrants or CVRs will not be entitled to any information except as may be expressly required in the applicable New Corporate Governance Documents.

## 3.   *There is No Established Market for the Shares of New Common Stock, New Warrants, or CVRs and One May Not Develop*

The New Common Stock, New Warrants (including any shares of New Common Stock issuable upon the exercise of the New Warrants), and CVRs will be a new issuance of Securities, and there is no established trading market for those Securities.  The Reorganized Debtors do not intend to apply to list the New Common Stock, New Warrants, or CVRs on a national securities exchange.  You may not be able to sell your New Common Stock, New Warrants, or CVRs at a particular time or at favorable prices.  As a result, the Debtors cannot assure you as to the liquidity of any trading market for the New Common Stock, New Warrants, or CVRs.  Accordingly, you may be required to bear the financial risk of your ownership of the New Common Stock, New Warrants, or CVRs indefinitely.  The liquidity of any market for shares of New Common Stock, New Warrants, or the CVRs will depend upon, among other things, the number of Holders of shares of New Common Stock, New Warrants, and CVRs, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Common Stock, New Warrants, or CVRs will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New Common Stock, New Warrants, or CVRs may be substantially limited and the price of the New Common Stock, New Warrants, or CVRs may decline.

## 4.   *The Trading Price for the Shares of New Common Stock, New Warrants, CVRs, or the New Debt May Be Depressed Following the Effective Date*

Assuming that the Effective Date occurs, shares of New Common Stock, New Warrants, and/or CVRs will be issued to Holders of certain Classes of Claims.  Following the Effective Date of the Amended Plan, shares of New Common Stock or New Warrants may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, Holders of Claims that receive shares of New Common Stock, New Warrants, and/or CVRs may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New Common Stock available for trading could cause the

trading price for the shares of New Common Stock, New Warrants, and/or CVRs to be depressed, particularly in the absence of an established trading market for the New Common Stock, the New Warrants, and/or CVRs. In addition, the New Debt, which is consideration for various Classes of Claims under the Amended Plan, may trade at prices below par.

5. ***If the New Warrants Are Exercised, the Underlying Shares of New Common Stock Could Be Eligible for Future Resale, Which Could Lead to "Market Overhang," Resulting in Dilution and Potentially Depressing the Trading Price of the New Common Stock***

If the New Warrants are exercised or, a substantial number of additional shares of New Common Stock could be eligible for resale, which could depress the trading price of the New Common Stock. The Reorganized Debtors also may grant options and equity awards pursuant to the MIP and may grant additional options, warrants, or other convertible securities in the future. The exercise or conversion of the New Warrants or other options or convertible or derivative securities will dilute the percentage ownership of other Holders of the New Common Stock. If Holders of the New Common Stock sell substantial amounts of New Common Stock, shares issued upon the exercise of the New Warrants or other outstanding options or convertible or derivative securities, it could create a circumstance commonly referred to as an "overhang," in anticipation of which the trading price of the New Common Stock could fall. An overhang may adversely affect the Reorganized Debtors' ability to obtain financing on reasonable and acceptable terms whether or not sales have occurred or are occurring.

6. ***Certain Holders of New Common Stock, New Warrants, or CVRs May Be Restricted in Their Ability to Transfer or Sell Their Securities***

To the extent that shares of the New Common Stock, New Warrants, or CVRs issued under the Amended Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; *provided*, *however*, shares of such securities will not be freely tradable if, at the time of transfer, the Holder is an "affiliate" of the Equity Issuer or the issuer of the CVRs, as applicable, as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer. Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act. Resales by Holders of Claims who receive New Common Stock or New Warrants pursuant to the Amended Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The Reorganized Debtors do not intend to register or apply to list the New Common Stock, New Warrants, or CVRs on a national securities exchange. However, such New Common Stock, New Warrants or, CVRs may be listed in the future, though there can be no assurance that such securities will be listed promptly or at all.

The Debtors make no representation regarding the right of any holder of New Common Stock, New Warrants, or CVRs to freely resell such securities (including, as applicable, shares issuable thereunder). *See* Article IX to this Disclosure Statement entitled "Certain Securities Law Matters," which begins on page 113.

**7.** ***Restricted Securities Issued under the Amended Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies***

To the extent that securities issued pursuant to the Amended Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.  Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period.  An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144.  Further, Holders of New Common Stock, New Warrants, or CVRs who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities.  Resale restrictions are discussed in more detail in Article IX to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 113.

**8.** ***Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date***

Assuming that the Effective Date occurs, Holders of Claims and Interests who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock, including, as applicable, shares issued under the New Warrants ("Large Holders") may be in a position to influence matters requiring approval from the Holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.  These Large Holders may have interests that differ from those of the other Holders of shares of New Common Stock and may vote in a manner adverse to the interests of other Holders of shares of New Common Stock.  This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Stock or New Warrants.  In addition, subject to the provisions of the New Corporate Governance Documents, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of New Common Stock or New Warrants.  A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors.  Such actions by Holders of a significant number of shares of New Common Stock may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

9.  ***The Rights and Responsibilities of Holders of New Common Shares Are Governed by Luxembourg Law***

The rights and responsibilities of Holders of New Common Stock (including, as applicable, shares of New Common Stock issuable under the New Warrants) are governed by Luxembourg law and differ in some respects from the rights and responsibilities of shareholders under other jurisdictions, including the United States.  Equity Issuer's corporate affairs will be governed by its articles of association, as amended from time to time, the New Corporate Governance Documents, and by the laws governing companies incorporated in Luxembourg.  The rights of Equity Issuer's shareholders and the responsibilities of its board of directors under Luxembourg law may not be as clearly established as they are under the laws of other jurisdictions.  Equity Issuer may hold all of its shareholder meetings in Luxembourg.  The Holders of the New Common Shares may have more difficulty in protecting their interests in the face of actions by Equity Issuer's board of directors than if Equity Issuer were incorporated in the United States.  However, the Shareholders Agreement will be governed by Delaware law.

10. ***Because Equity Issuer Will Be Incorporated Under the Laws of Luxembourg, Holders of New Common Shares May Face Difficulty Protecting Their Interests, and Their Ability to Protect Their Rights Through Other International Courts, Including Courts in the United States, May Be Limited***

Equity Issuer will be a public limited liability company incorporated under the laws of Luxembourg, and as a result, it may be difficult for investors to effect service of process within the United States upon Equity Issuer or to enforce both in the United States and outside the United States judgments against it obtained in United States courts in any action, including actions predicated upon the civil liability provisions of the federal securities laws of the United States.  In addition, a majority of Equity Issuer's directors may be residents of jurisdictions other than the United States, and all or a substantial portion of the assets of those Persons may be located outside the United States.  As a result, it may be difficult for investors to effect service of process within the United States on certain of these directors or to enforce against them judgments obtained in United States courts, including judgments predicated upon the civil liability provisions of the federal securities laws of the United States.  There is uncertainty as to whether the courts of Luxembourg would (a) enforce judgments of United States courts obtained against the Equity Issuer or the issuer of the CVRs predicated upon the civil liability provisions of the federal securities laws of the United States or (b) entertain original actions brought in Luxembourg courts against the Equity Issuer or the issuer of the CVRs predicated upon the federal securities laws of the United States.

11. ***The Value of the CVRs Is Speculative and May Be Zero***

Assuming that the Effective Date occurs, CVRs will be issued to Holders of certain Classes of Claims, which will entitle the recipients of such CVRs to such recipients' pro rata share of cash equal to 100 percent of the Initial Further Acceleration Payments or the Subsequent Further Acceleration Payments (each as defined in the CVR Term Sheet), as applicable.  The CVRs shall have a term that expires on the Outside Date; *provided* that any payments agreed (if any) to prior to the relocation deadline shall constitute additional C-band proceeds regardless of whether such payments are received after the relocation deadline.  The Debtors and Reorganized Debtors may be unable to obtain any additional C-band proceeds, which would have an adverse effect on the value of the CVRs.  The tax treatment of the CVRs is discussed in Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax and Luxembourg Tax Consequences of the Amended Plan."

**12.** *Issuance of New Common Stock Pursuant to the Management Incentive Plan or Exercise of the New Warrants may Dilute Holdings of New Common Stock*

The Amended Plan provides for potential issuance of New Common Stock pursuant to the MIP, and for the issuance of New Warrants, which, if exercised, will permit Holders thereof to purchase shares of New Common Stock.  Consistent with the Dilution Principles set forth in the Amended Plan, issuance of New Common Stock pursuant to the MIP or the exercise of the New Warrants would have a dilutive effect on the New Common Stock issued pursuant to the Amended Plan.

**13.** *Certain Tax Implications of the Amended Plan*

Holders of Allowed Claims should carefully review Article XII of this Disclosure Statement, entitled "Certain United States Federal Income Tax and Luxembourg Tax Consequences of the Amended Plan," to determine how the tax implications of the Amended Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

**14.** *The Debtors May Not Be Able to Accurately Report Their Financial Results*

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations to the extent applicable and the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

**15.** *Contingencies Could Affect Allowed Claims Classes*

The distributions available to Holders of Allowed Claims under the Amended Plan can be affected by a variety of contingencies, including, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Amended Plan.

**16.** *Potential Dilution of Claims*

On July 14, 2020, SES filed a proof of Claim in the amount of $1.8 billion against each of the Debtors.  SES asserts that the Debtors owe money (or will owe money) to SES pursuant to certain alleged contractual and fiduciary obligations arising from the Consortium Agreement between Debtor US LLC, SES, and other satellite operators.

114

The Debtors dispute the allegations in the proof of Claim and on October 19, 2020, filed an objection to the Claim.  To the extent that any portion of SES's Claim is allowed, the Debtors have requested that the Court equitably subordinate such Claim based on SES's conduct in matters related to the Consortium Agreement.  While the ultimate resolution of the Claim is not currently predictable, if there is an adverse ruling, the ruling could have the effect of significantly diluting the recoveries of Holders of Claims against the Debtors.  Further, SES asserts that the Accelerated Relocation Payments that it claims entitlement to should be held in a constructive trust on its behalf.  If any portion of the Accelerated Relocation Payments are deemed to be held in constructive trust for SES, the value distributable to the Debtors entitled to receive such payments would be diminished, which in turn would diminish recoveries to Holders of Clams against such Debtors.

Similarly, the Guarantee Claims were filed by U.S. Bank and Delaware Trust in the aggregate amounts of approximately $8.1 billion against Intelsat S.A., Holdings SARL, Holdings S.A., and Investments S.A. and approximately $6.8 billion against LuxCo and ICF.  U.S. Bank asserts that each of the foregoing Debtors is obligated to guarantee the obligations of Jackson under the Jackson Senior Notes.  Similarly, Delaware Trust asserts that Intelsat S.A., Holdings SARL, Holdings S.A., and Investments S.A. are obligated to guarantee the obligations of LuxCo under the LuxCo Senior Notes.  The Amended Plan Support Agreement includes a resolution of certain Guarantee Claims, the pleadings related thereto, and other related potential causes of action, including, as described in greater detail herein and in the Amended Plan Support Agreement attached hereto as **Exhibit G**, an agreement on a standstill on the prosecution of such Guarantee Claims.  To the extent that the Bankruptcy Court does not approve the resolution of the Guarantee Claims as set forth in the Amended Plan Support Agreement, the ruling could have the effect of: (a) if certain of the Guarantee Claims are fully allowed, significantly diluting either the recoveries of Holders of Claims against the Parent Guarantors or (b) if certain of the Guarantee Claims are disallowed, significantly reducing the recoveries of Holders of Guarantee Claims, as applicable.

Additionally, the Debtors continue to evaluate their options respect to their ongoing agreements that constitute "Executory Contracts" or "Unexpired Leases" within the meaning of the section 365 of the Bankruptcy Code.  The Debtors may seek to reject certain agreements, including the Spacecom Agreements (as defined herein).  In the event that the Debtors reject agreements, and Unsecured Claims that may be asserted in connection therewith may dilute the recoveries to be expected by other Holders of Unsecured Claims against the applicable Debtors.  The size of any rejection damages Claim could be subject to dispute and litigation with the applicable Executory Contract or Unexpired Lease counterparty.  In the event of such litigation, it is possible that the resulting rejection damages Claim could be allowed in amount exceeding any amount estimated by the Debtors.

Therefore, Holders of Claims entitled to vote on the Amended Plan should take into account the possibility of dilution of their expected recoveries when determining whether to vote in favor of the Amended Plan.

### 17. *Risks Related to Plan Value Allocation.*

The Convert Ad Hoc Group and SES have asserted that the Debtors' methodology for allocating value has improperly diverted value away from Intelsat S.A. and US LLC, respectively.  These assertions are premised primarily on assertions that a majority, if not all, of the Accelerated Relocation Payments should be allocated to the Debtor of their preference.  The Debtors disagree with these assertions made by each of the Convert Ad Hoc Group and SES, respectfully, and believe the allocation of distributable value under the Amended Plan to be correct.  The Bankruptcy Court at the Confirmation Hearing may agree with the Debtors, may agree with the Convert Ad Hoc Group, may agree with SES, or may adopt a different Base Recovery Model or make changes to the Debtors' Base Recovery Model.  If the Bankruptcy Court adopts changes to the Base Recovery Model under the Amended Plan for any reason, then such changes will have an impact on the recovery to Holders of Claims, and the allocation of value among the Debtors

will be adjusted consistent with the Bankruptcy Court's determinations.  The Amended Plan may still be confirmed with a revised Base Recovery Model without resolicitation.  Therefore, Holders of Claims entitled to vote on the Amended Plan should take into account the possibility of changes to the Base Recovery Model at confirmation when determining whether to vote in favor of the Amended Plan.

SES disputes the Debtors' characterization of SES's position regarding the proper Debtor that is entitled to the Accelerated Relocation Payments.  SES asserts that it is not a mere preference of SES.  Rather, SES's position that US LLC is the sole Debtor entitled to ownership of the Accelerated Relocation Payment is based on, among other things, (1) language in the FCC Order stating that "[i]ncumbent space station operators are not 'selling' their spectrum usage rights," but rather the FCC has "set an accelerated relocation payment that fairly incentivizes incumbent space station operators to expedite the transition," *id.* ¶ 214; and (2) the fact that Intelsat US is the entity primarily responsible for performing the work required to meet the Debtors' obligations under the FCC Order to clear the C-Band on an accelerated basis.  The Debtors disagree.  SES maintains that if it succeeds in obtaining an order from the Bankruptcy Court that the Accelerated Relocation Payments must be reallocated to US LLC in the Base Recovery Model, the Plan Support Agreement and the Settlement Agreement might not remain in force without modification and the Plan might not be confirmable without resolicitation of votes.  All parties rights are preserved with respect to such arguments.

## C.     Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 1.   *The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness*

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of Cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness upon emergence.

### 2.   *The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases*

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Amended Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn

116

could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3.   *Financial Results May Be Volatile and May Not Reflect Historical Trends*

The Financial Projections attached hereto as **Exhibit D** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Amended Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Term Loan, New Notes, and New Common Stock, and the ability of the Debtors to make payments with respect to their indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors financial results may be volatile as restructuring activities and expenses, contract terminations and rejections, and Claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the Business Plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' Business Plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their Business Plan. Any deviations from the Debtors' existing Business Plan would necessarily cause a deviation.

### 4.   *The Debtors' Substantial Liquidity Needs May Impact Revenue*

The Debtors operate in a capital-intensive industry.  If the Debtors' Cash flow from operations remains depressed or decreases, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the Cash necessary to fund ongoing operations, the Debtors have incurred significant Professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant Professional fees and costs throughout the remainder of the Chapter 11 Cases.  The Debtors cannot guarantee that Cash on hand, Cash flow from operations, and Cash provided by the DIP Facility will

be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of the DIP Order; (b) their ability to maintain adequate Cash on hand; (c) their ability to develop, confirm, and consummate the Amended Plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that Cash on hand, Cash flow from operations, and Cash provided under the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 5. *The Debtors' Business Is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business*

The Debtors' operations are subject to foreign and United States federal laws and regulations, including those governing the satellite and telecommunications industries and the health and safety of employees. Sanctions for noncompliance may include revocation of licenses or permits, corrective action orders, administrative or civil penalties, and criminal prosecution. These liabilities and costs could have an adverse effect on the business, financial condition, results of operations, and Cash flows of the Reorganized Debtors.

### 6. *The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases*

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Amended Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 7. *The Loss of Key Personnel Could Adversely Affect the Debtors' Operations*

The Debtors' Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

**8.** ***Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations***

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the Amended Plan (a) would be subject to compromise and/or treatment under the Amended Plan and/or (b) would be discharged in accordance with the terms of the Amended Plan.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

**D.**     **Risks Related to Regulation**

The Debtors can provide no assurance that the required regulatory and government consents will be obtained in connection with the Restructuring Transactions.  In addition, even if all required regulatory and other governmental consents are obtained and the closing conditions are satisfied, no assurance can be given as to the terms, conditions, and timing of the approvals or clearances.

**1.** ***The Debtors' Business Depends upon Licenses Issued by the FCC, and If Licenses Are Not Renewed or the Reorganized Debtors Are Out of Compliance with FCC Regulations and Policies, the Reorganized Debtors' Business Could Be Impaired***

The Debtors are subject to regulation by the FCC under the Communications Act of 1934, as amended.  The majority of the Debtors' satellites are licensed and regulated by the FCC.  The Debtors' business depends upon maintaining their FCC licenses, which include authorization for the use of spectrum and are renewable upon timely application to the FCC.  Interested parties may challenge a renewal application.  The FCC has authority to revoke licenses or not grant renewal applications.  The Debtors cannot be certain that the Reorganized Debtors' future renewal applications will be approved, or that the renewals will not include conditions or qualifications that could adversely affect the Reorganized Debtors' operations, could result in impairment, and could adversely affect the Reorganized Debtors' liquidity and financial condition.

FCC rules governing the Debtors' regulated service offerings impose costs on their operations, and changes in those rules could have an adverse effect on the Reorganized Debtors' business.  Moreover, governmental regulations and policies may change over time, and the changes may have an adverse impact upon the Reorganized Debtors' businesses, financial condition, and results of operations.

**2.** ***There Will Be FCC Approval Requirements in Connection with Emergence from Chapter 11***

FCC prior approval is required for any proposed transaction, including a chapter 11 reorganization, that involves the assignment or transfer of control of FCC licenses, and the FCC has discretion to impose conditions that serve the public interest on grant of any application to assign or transfer control of FCC licenses.

The Debtors' emergence from bankruptcy pursuant to the Amended Plan will require prior consent of the FCC to effectuate an assignment or transfer of control of the FCC licenses from the debtor-in-possession licensees to the Reorganized Debtors.  The FCC will determine whether the proposed transaction serves the public interest, convenience, and necessity; this entails a public proceeding whereby the FCC

119

will seek comment on the applications related to the Amended Plan.  It is not possible to guarantee the FCC's grant of the application by any particular date.

The Debtors are in the process of determining the direct and indirect voting and equity interests in Debtor entities that are anticipated to be held by foreign individuals or entities.[50]  The FCC may refer the FCC applications to "Team Telecom" (a group of Executive Branch agencies, including the Departments of Justice and Homeland Security and the Federal Bureau of Investigation) for coordination and recommendations on national security and foreign policy issues raised by the transaction because Intelsat is currently subject to a Team Telecom mitigation agreement and the FCC may want Team Telecom to confirm whether the existing agreement should be continued, amended, or terminated.  In the event Team Telecom review is required, the timeline to receive the FCC Approvals for the Company's emergence may be lengthened.

### 3. *There May Be CFIUS, DSS, DDTC/ITAR, or FDI Approval Requirements in Connection with Emergence from Chapter 11*

Depending on ultimate foreign ownership of the Reorganized Debtors and specific governance rights afforded to foreign holders of New Common Stock after emergence, it is possible that obtaining regulatory review from CFIUS would be advisable, if not required.  CFIUS looks at various indicia of control or certain minority rights when assessing the potential national security threats posed by an investment in or acquisition of a U.S. business by a foreign individual or entity.  If a CFIUS filing is required or advisable, it could take three or four months (or longer) for the filing to be prepared and submitted and for CFIUS to complete its review.  The CFIUS assessment process is separate from, but complementary to, the national security review conducted by Team Telecom that is described above.

Certain of the contracts from which the Debtors obtain revenue are classified contracts held by IGC.  IGC holds a facility security clearance and certain of its employees hold personal security clearances pursuant to a Proxy Agreement administered by DCSA to mitigate FOCI.  Depending on the ultimate foreign ownership or control by foreign persons of certain of the Reorganized Debtors after emergence, DCSA may require changes to the Proxy Agreement or the overall FOCI mitigation strategy.  Failure to reach and/or maintain an appropriate agreement with the DCSA regarding the appropriate FOCI mitigation arrangement could result in invalidation or termination of the security clearances, which in turn would mean that IGC could not perform classified contracts and the Reorganized Debtors would not obtain the benefits of those contracts or future classified contracts.  In addition, changes to the ultimate foreign ownership or control by foreign persons of certain of the Reorganized Debtors after emergence may impinge on the Debtors' ability to negotiate with DCSA future modifications to the overall FOCI mitigation strategy, which could hamper the Debtors' ability to improve business operations and reduce certain redundancies with respect to the performance of classified contracts.

The U.S. Department of State administers the ITAR, which set forth export control requirements regarding defense articles and defense services.  One of the Debtors, Intelsat US LLC, is currently registered under the ITAR.  As an ITAR registrant, Intelsat US LLC would need to notify DDTC at least 60 days prior to emergence with respect to the consummation of the Amended Plan, as required by the ITAR, if emergence will result in the transfer to a foreign person of ownership or control (as such terms are defined under the ITAR).  Regardless of whether this notice is required, no approval would be required from DDTC (though the U.S. State Department is a CFIUS member agency).  Moreover, and in any event, Intelsat US LLC will need to submit a material change notice under the ITAR to the DDTC within five days following closing.

---

[50]   Foreign individuals mean non-U.S. Persons.

Additionally, filings under the certain FDI regimes outside of the United States may be advisable or required.  Analysis regarding jurisdictions in which such filings may be required or advisable is ongoing.

**4.** ***There May Be Regulatory Requirements under U.S. and Foreign Antitrust and Merger Control Regimes with Emergence from Chapter 11.***

Consummation of the Restructuring Actions may require antitrust-related notifications under the HSR Act and certain non-United States antitrust/merger control regulatory regimes.  Failure by any governmental authority to grant a necessary approval or to permit a statutory waiting period to expire could delay or prevent consummation of the Restructuring Transactions.  Analysis regarding jurisdictions in which such notifications may be required or advisable is ongoing.

**5.** ***The Debtors May Fail to Meet One or More of the C-Band Clearing Requirements of the FCC Order and Therefore Be Unable to Realize the Full Value of the Anticipated Accelerated Relocation Payments***

The Debtors will only be entitled to receive the full value of the Accelerated Relocation Payments if they successfully clear the C-band and satisfy certain other requirements of the FCC Order, including those related to customer migration, while adhering to the schedule set forth by the FCC.  In the event that the Debtors are unable to meet one or more of the requirements of the FCC Order, they would likely be unable to realize the full value of the Accelerated Relocated Payments.

## IX.    CERTAIN SECURITIES LAW MATTERS

The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Common Stock, New Warrants (and any New Common Stock issuable upon exercise of the New Warrants), and CVRs issuable pursuant to the Amended Plan and any New Debt (to the extent issued in the form of bonds), will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon either (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder.  The New Common Stock underlying the MIP will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

The following discussion of the issuance and transferability of the New Common Stock, New Warrants, and CVRs, relates solely to matters arising under federal and state securities laws.  The rights of Holders of New Common Stock, New Warrants, and CVRs, including the right to transfer such interests, will also be governed by the New Organizational Documents, which will be filed with the Plan Supplement.

### A.    1145 Securities

As discussed herein, the Amended Plan provides for the offer, issuance, sale, and distribution of the 1145 Securities.

Section 1145 of the Bankruptcy Code provides that section 5 of the Securities Act and any state law requirements for the issuance of a Security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a Claim against, an interest in, or Claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a Claim against or interest in a debtor or are issued principally in such exchange or partly for Cash and property.  The Debtors believe that the issuance of the 1145 Securities in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code (except with respect to an underwriter as described below).

121

Accordingly, no registration statement is expected to be filed under the Securities Act or any state securities laws.  Recipients of the New Common Stock, New Warrants, and CVRs are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

### 1. *Subsequent Transfers*

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Amended Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (a) purchases a Claim against, interest in, or Claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any Security received or to be received in exchange for such a Claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities (*i.e.*, affiliates).  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, Holders of 1145 Securities who are deemed to be "underwriters" may be entitled to resell their 1145 Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements, and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the 1145 Securities, would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an

"underwriter" with respect to the 1145 Securities and, in turn, whether any Person may freely resell 1145 Securities.

You should confer with your own legal advisors to determine whether or not you are an "underwriter," an "issuer" or an "affiliate."

### B. 4(a)(2) Securities

#### 1. *Issuance*

Section 4(a)(2) of the Securities Act provides that the issuance of securities, including the New Debt (to the extent issued in the form of bonds) (together with any New Common Stock, New Warrants, and CVRs to the extent under section 1145(a) of the Bankruptcy Code is unavailable, including shares issuable thereunder, collectively, the "4(a)(2) Securities"), by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.

The Debtors believe that the 4(a)(2) Securities will be issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S. Section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of a Security in connection with transactions not involving any public offering. Rule 506 of Regulation D provides nonexclusive safe harbor conditions with respect to the exemption provided by section 4(a)(2). Regulation S provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of securities made outside of the United States to any non-U.S. Person (within the meaning of Regulation S). Any securities issued in reliance on section 4(a)(2), including in compliance with Rule 506 of Regulation D and/or Regulation S will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act, including the "safe harbor" exemptions provided by Rule 144 or Rule 144A under the Securities Act to the extent available, and other applicable law.

The New Debt issued in the form of bonds will not be registered under the Trust Indenture Act. Pursuant to the Trust Indenture Act, securities owned by the obligor or affiliates of the obligor are disregarded for the purpose of directing the conduct of remedies by the trustee, or the exercise of trust powers by the trustee, and consenting to waivers of default. Therefore, affiliates of the Debtors who purchase New Debt issued in the form of bonds will be able to exercise rights and remedies as Holders of such debt.

#### 2. *Subsequent Transfers*

Unlike the 1145 Securities, the 4(a)(2) Securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, including the exemptions provided by Rule 144 or Rule 144A under the Securities Act, to the extent available.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period

123

whether or not there is current public information regarding the issuer.  Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, during the twelve months preceding the sale of the restricted securities.  If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available.

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available.  The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of one percent of the outstanding securities of the same class being sold and, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction.  The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations.  Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

You should confer with your own legal advisors to determine whether or not you are an "underwriter," an "issuer" or an "affiliate."

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Effective Date. Accordingly, holders of 4(a)(2) Securities will be required to hold the 4(a)(2) Securities for at least six months and, thereafter, to sell the 4(a)(2) Securities only in accordance with the applicable requirements of Rule 144, unless such 4(a)(2) Securities are registered under the Securities Act or are otherwise exempt.

In addition, the 4(a)(2) Securities may also be subject to restrictions in the New Organizational Documents and to certain regulatory restrictions, such as those set forth in the rules of the FCC.

The Debtors and Reorganized Debtors shall take all actions necessary to permit the issuance of the New Notes to settle through the facilities of DTC and for the New Notes to be eligible for resale under Rule 144A of the Securities Act, and the Plan and Confirmation Order shall authorize all such action by the Debtors and Reorganized Debtors.

<div align="center">****</div>

*Legend*.  To the extent certificated or issued by way of direct registration on the records of the Issuer's transfer agent, certificates evidence the 4(a)(2) Securities, as applicable, upon exercise of their rights will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOTE BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR ANY OTHER APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR

AN   AVAILABLE   EXEMPTION   FROM   REGISTRATION
THEREUNDER.

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonable require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities.  The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.  All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell, or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

**\*\*\*\***

**PERSONS WHO RECEIVE SECURITIES UNDER THE AMENDED PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES.  WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.   IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE AMENDED PLAN.**

**SHOULD THE REORGANIZED DEBTORS ELECT ON OR AFTER THE EFFECTIVE DATE TO REFLECT ANY OWNERSHIP OF THE SECURITIES TO BE ISSUED UNDER THE PLAN THROUGH THE FACILITIES OF DTC, THE REORGANIZED DEBTORS NEED NOT PROVIDE ANY FURTHER EVIDENCE OTHER THAN THE PLAN OR THE CONFIRMATION ORDER WITH RESPECT TO THE TREATMENT OF THE SECURITIES TO BE ISSUED UNDER THE PLAN UNDER APPLICABLE SECURITIES LAWS. DTC SHALL BE REQUIRED TO ACCEPT AND CONCLUSIVELY RELY UPON THE PLAN AND CONFIRMATION ORDER IN LIEU OF A LEGAL OPINION REGARDING WHETHER THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE EXEMPT FROM REGISTRATION AND/OR ELIGIBLE FOR DTC BOOK-ENTRY   DELIVERY,   SETTLEMENT,   AND   DEPOSITORY   SERVICES. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO ENTITY (INCLUDING, FOR THE AVOIDANCE OF DOUBT, DTC) MAY REQUIRE A LEGAL OPINION REGARDING THE VALIDITY OF ANY TRANSACTION CONTEMPLATED BY THE PLAN,**

125

INCLUDING, FOR THE AVOIDANCE OF DOUBT, WHETHER THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE EXEMPT FROM REGISTRATION AND/OR ELIGIBLE FOR DTC BOOK-ENTRY DELIVERY, SETTLEMENT, AND DEPOSITORY SERVICES.

### C.      New Common Stock & Management Incentive Plan.

The Confirmation Order shall authorize the board of Equity Issuer to adopt and enter into the MIP, which shall reserve exclusively for management employees 3.26 percent of the New Common Stock on a fully diluted, fully distributed basis which will be reserved and issued as set forth in the Amended Plan. Grants of such New Common Stock from the MIP Pool will dilute all of the New Common Stock outstanding at the time of such issuance.  The New Common Stock is also subject to dilution in connection with the conversion of any other options, warrants, convertible securities or other securities that may be issued post-emergence.  The New Common Stock from the MIP Pool will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

### X.      SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Amended Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Amended Plan.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.      Holders of Claims Entitled to Vote on the Amended Plan

Under the provisions of the Bankruptcy Code, not all Holders of Claims against or Interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Amended Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the Holder's Claim or Interest) under the Amended Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Amended Plan only from Holders of Claims or Interests in Classes B1, B2, B3, B4, C1, C2, C3, C4, D1, E1, F1, G1, H1, I1, I2, J1, and J2 (the "Voting Classes").  The Holders of Claims or Interests in the Voting Classes are Impaired under the Amended Plan and may, in certain circumstances, receive a distribution under the Amended Plan. Accordingly, Holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Amended Plan.  The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes A1, A2, A3, A4, A5, A9, or J3.

### B.      Voting Record Date

**The Voting Record Date is August 25, 2021**.  The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Amended Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Amended Plan as the holder of a Claim or Interest.

126

### C.      Voting on the Amended Plan

**The Voting Deadline is October 18, 2021, at 5:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Amended Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.

**To vote, complete, sign, and date your ballot and return it (with an original signature)** *promptly* **via electronic mail to Intelsatinquiries@stretto.com with "Intelsat Vote" in the subject line.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (888) 909-0100 OR VIA ELECTRONIC MAIL TO Intelsatinquiries@stretto.com.**

### D.      Ballots Not Counted

**A ballot will not be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of such Claim or Interest; (2) it is cast by any Entity that does not hold a Claim or Interest in a Voting Class; (3) it is cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim or Interest shall be entitled to vote in the amount of $1.00); (4) it is unsigned or lacking an original signature (for the avoidance of doubt, a ballot submitted via Stretto online balloting portal shall be deemed an original signature); (5) it is not marked to accept or reject the Amended Plan or marked both to accept and reject the Amended Plan; (6) it is submitted by any Entity not entitled to vote pursuant to the procedures described herein; and (7) it is submitted by improper means.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Amended Plan.**

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL-FREE AT +1 (855) 489 1434. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED. [51]**

## XI.     CONFIRMATION OF THE AMENDED PLAN

### A.      Requirements for Confirmation of the Amended Plan

Among the requirements for Confirmation of the Amended Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Amended Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Amended Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Amended Plan is feasible; and (3) the Amended Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Amended Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Amended Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan

---

[51]  For any ballot cast via electronic mail, a format of the attachment must be found in the common workplace and industry standard format (*i.e.*, industry-standard PDF file) and a received date and time in the Solicitation Agent's inbox will be used as a timestamp for a receipt.

confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan Confirmation; and (3) the Amended Plan has been proposed in good faith.

### B.      Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the Debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Amended Plan. Consequently, the Debtors and their management believe that Confirmation of the Amended Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Amended Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Amended Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Amended Plan.

SES has asserted that, based on its view that US LLC is entitled to certain assets, including the Accelerated Relocation Payments, the creditors of US LLC may receive more in a liquidation.  *See* SES Disclosure Statement Obj. ¶¶ 16, 77.  Similarly, the Convert Ad Hoc Group has asserted that, based on its view that Intelsat S.A. is entitled to certain assets, including the Accelerated Relocation Payments, the creditors of Intelsat S.A. may receive more in a liquidation.  The Debtors believe that the allocation of distributable value provided for in the Amended Plan reflects a reasonable allocation of the Debtors assets among the Debtors, which would apply during a liquidation as well.  For these and many other reasons, the Debtors disagree with SES's and the Convert Ad Hoc Group's assertions.

### C.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

**To determine whether the Amended Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under**

128

**the Amended Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections").  Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors." for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.**

The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Amended Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to Confirmation, except as described in the following section, that each class of Claims or equity Interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[52]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired Claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in a number of Allowed Claims in that class, counting only those Claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Amended Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Amended Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity Interests as acceptance by Holders of at least two-thirds in amount of Allowed Interests in that class, counting only those Interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Amended Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Amended Plan actually cast their ballots in favor of acceptance.

If a Class contains Holders of Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Amended Plan, the Amended Plan shall be presumed accepted by the Holders of such Claims or Interests in such class.

### E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of Claims or equity interests that is impaired under, and has not accepted, the plan.

---

[52]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

If any Impaired Class rejects the Amended Plan, the Debtors reserve the right to seek to confirm the Amended Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Amended Plan or is deemed to have rejected the Amended Plan, the Debtors may request Confirmation of the Amended Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Amended Plan or any Plan Supplement document, including the right to amend or modify the Amended Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.   *No Unfair Discrimination*

The "unfair discrimination" test applies to classes of Claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."   In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of Claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.   *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of Claims receive more than 100 percent of the amount of the Allowed Claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of Claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Amended Plan pursuant to section 1129(b) of the Bankruptcy Code, the Amended Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Amended Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Amended Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Amended Plan and the treatment of all Classes of Claims or Interests under the Amended Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Amended Plan.

### F.   Valuation of the Debtors

In conjunction with formulating the Amended Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  Accordingly, the Debtors, with the assistance of PJT, produced the Valuation Analysis that is set forth in **Exhibit E** attached hereto and incorporated herein by reference.  As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations.  Accordingly, the Valuation Analysis further supports the Debtors conclusion that the treatment of Classes under the Amended Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for Confirmation.

**XII.   CERTAIN UNITED STATES FEDERAL INCOME TAX AND LUXEMBOURG TAX CONSEQUENCES OF THE AMENDED PLAN**

**A.     Introduction**

The following discussion is a summary of certain United States ("U.S.") federal income and Luxembourg tax consequences of the consummation of the Amended Plan to the Debtors, Reorganized Debtors, and to certain holders of Allowed Claims.  The following summary does not address the U.S. federal income or Luxembourg tax consequences to holders of Claims or Interests not entitled to vote to accept or reject the Amended Plan.

The summary of the U.S. federal income tax consequences of the consummation of the Amended Plan is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  The summary of the Luxembourg tax consequences of the consummation of the Amended Plan is based on the laws of the Grand-Duchy of Luxembourg, including the Income Tax Law of December 4, 1967, ("ITL"), the Municipal Business Tax Law of December 1, 1936, and the Net Wealth Tax Law of October 16, 1934, including the regulations promulgated thereunder, and published judicial decisions rendered by Luxembourg administrative jurisdictions that may be relevant to the Amended Plan and administrative pronouncements, each as amended and in effect on the date hereof and is subject to any change in law or regulations or changes in interpretation or application thereof (and which may possibly have a retroactive effect).  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained.  The Debtors have not requested and do not intend to request a ruling from the IRS, the Luxembourg tax authorities ("LTA"), or any other taxing authority regarding any of the other tax consequences of the Amended Plan discussed below.  The discussion below is not binding upon the IRS, the LTA, the courts, or any other tax authority.  No assurance can be given that the IRS, the LTA, or any other tax authority would not assert, or that a court would not sustain, a different position than any position discussed herein.

Unless specifically provided for in this summary, this discussion does not purport to address all aspects of U.S. federal income or Luxembourg taxation that may be relevant to the Debtors, Reorganized Debtors, or to certain holders of Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to such holders of Claims subject to special treatment under the U.S. federal income or Luxembourg tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, holders of Claims that hold more than 10.0 percent or more of the equity of the Debtors or that will hold 10.0 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Amended Plan, holders of Claims who are themselves in bankruptcy, and regulated investment companies or funds and those holding, or who will hold, Claims, or the New Common Stock, New Series A Warrants, New Series B Warrants, CVRs, or any other consideration to be received under the Amended Plan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. (other than Luxembourg) taxation is addressed.  Furthermore, this summary assumes that holders of Claims hold only Claims in a single Class and hold Claims as "capital assets" (within the meaning of section 1221 of the IRC).  This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any

131

ramifications such arrangements may have on the treatment of a Holder under the Amended Plan). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income and Luxembourg tax purposes in accordance with their form.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

As used herein, a "Luxembourg individual holder" means an individual resident in Luxembourg who is subject to personal income tax (impôt sur le revenu) on his or her worldwide income from Luxembourg or foreign sources.

In addition, a "Luxembourg corporate holder" means a corporation or other entity taxable as a corporation (that is organized under the laws of Luxembourg under Article 159 of the Luxembourg Income Tax Act ITL) resident in Luxembourg subject to corporate income tax (impôt sur le revenu des collectivités) and municipal business tax (impôt commercial communal) on its worldwide income from Luxembourg or foreign sources. A Luxembourg corporate holder is also subject to net wealth tax (impôt sur la fortune) on its worldwide wealth.

For purposes of this summary, Luxembourg individual holders and Luxembourg corporate holders are collectively referred to as "Luxembourg Holders." A "Non-Luxembourg Holder" means any investor in New Common Stock, New Warrants, or CVRs other than a Luxembourg Holder.

If a partnership (or other entity treated as a pass-through entity for U.S. federal income or Luxembourg tax purposes) is a holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) of such entity generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims or Interest should consult their respective tax advisors regarding the U.S. federal income and Luxembourg tax consequences of the Amended Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME AND LUXEMBOURG TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U. S. FEDERAL, STATE, LOCAL, LUXEMBOURG AND NON-U.S. TAX CONSEQUENCES OF THE AMENDED PLAN.**

B.      **Certain U.S. Federal Income Tax Consequences of the Amended Plan to the Debtors and the Reorganized Debtors**

1.  *In General*

As a general matter, Jackson and its direct subsidiary, GenesisCo, are both currently subject to U.S. federal income tax. The Debtors expect that both entities will continue to be subject to U.S. federal income tax following the Restructuring Transactions. The Debtors that are the direct and indirect owners of Jackson are not currently subject to U.S. federal income tax, and the Debtors expect that such Debtors will not be subject to U.S. federal income tax immediately following the Restructuring Transactions.

The discussion below indicates that the consummation of the Amended Plan may be subject to section 351 of the IRC if, as expected, Holders of Allowed Claims hold more than 80 percent of the New Common Stock. In the event that the Restructuring Transactions set forth in the Restructuring Steps Memorandum contemplate that the Equity Issuer will issue New Common Stock at more than one point of time, and Holders of Claims collectively hold less than 80 percent of the New Common Stock after an earlier issuance but held more than 80 percent of the New Common Stock after the Amended Plan is fully consummated, there is meaningful uncertainty with respect to whether section 351 of the IRC would apply to each issuance of New Common Stock (on the basis that the implementation of the Restructuring Transactions should be viewed as a single transaction for purposes of section 351) or if, instead, each separate issuance should be independently evaluated, in which case earlier issuances (immediately after which Holders held less than 80 percent of the stock) would not be eligible for tax-deferred treatment under section 351 and would, instead, be taxable under section 1001 of the IRC (or potentially subject to recapitalization treatment under section 354 of the IRC if the Equity Issuer is the Lux Issuer (as defined below) of the applicable Claim). Holders of Claims should consult their own tax advisors regarding the potential implication of these rules.

2.  *Effects of the Restructuring Transactions on Tax Attributes of Debtors*

(a)      **Preservation of Tax Attributes and Cancellation of Indebtedness Income ("COD Income")**

As a result of the Restructuring Transactions, the U.S. tax attributes of Jackson may, depending on certain factors, be reduced by the amount of its excluded COD Income. Because Jackson and GenesisCo are the only Debtors subject to U.S. federal income tax that are regarded for U.S. federal income tax purposes, and GenesisCo is not the issuer of any third-party debt (and any Intercompany Claims against GenesisCo are expected to be Reinstated) the Debtors expect any reduction of their U.S. tax attributes to only be relevant with respect to Jackson, and only to the extent any excluded COD Income is attributable to its "trade or business within the United States" as described in section 864(b) of the IRC (Jackson's "U.S. Trade or Business").

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (X) the amount of Cash paid, (Y) the issue price of any new indebtedness of the debtor issued, and (Z) the fair market value of any new consideration, in each case, given in satisfaction of such indebtedness at the time of the satisfaction. Unless an exception or exclusion applies, COD Income constitutes taxable income like any other item of taxable income.

Pursuant to section 108 of the IRC, a debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of indebtedness occurs pursuant to that proceeding. Instead, as

133

a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  In general, the tax attributes of a debtor will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers (d) capital loss carryovers; (e) tax basis in assets (subject to the Asset Tax Basis Floor, as described below); (f) passive activity loss and credit carryovers; and (g) foreign tax credits.  A debtor with COD Income may elect to first reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the Debtors will make this election.  The reduction in tax attributes occurs only after the taxable income (or loss) for the taxable year of the debt discharge has been determined and any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The aggregate tax basis of Jackson in its assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that Jackson will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor").  Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of the COD Income (if any) that will be realized by the Debtors will not be determinable until after the consummation of the Amended Plan.  In addition, there is significant uncertainty regarding the application of the above COD Income rules in the case of a non-U.S. entity, like Jackson, that is subject to the COD Income rules in connection with its U.S. Trade or Business.  Accordingly, the Debtors are currently unable to determine the precise effect that the COD Income rules will have on the U.S. tax attributes of Jackson.

### (b)      Limitation of NOL Carryforwards and Other Tax Attributes under Sections 382 and 383 of the IRC

After giving effect to the reduction in tax attributes from excluded COD Income (if any), the ability of Jackson and GenesisCo to use any tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

### (i)      General Sections 382 and 383 Annual Limitations

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and NOL carryforwards, disallowed business interest carryovers under section 163(j) of the IRC ("163(j) Carryovers"),[53] tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) and deductions recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net

---

[53]   In the case of the Debtors, 163(j) Carryovers refers both to "current law" limitations on the deductibility of interest on third-party debt, as well as limitations under prior law that applied only to certain intercompany arrangements among the Debtors.

unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of sections 382 and 383 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Amended Plan will result in one or more "ownership changes" of the Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the IRC applies.

#### (ii)        General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the "ownership change" occurs: 1.58 percent for August 2021).  The 382 Limitation may be increased, up to the amount of any net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[54] Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if subsequent to an ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

There is significant uncertainty regarding the application of the 382 Limitation in the case of a non-U.S. entity, like Jackson or GenesisCo, that is subject to the 382 Limitation rules in connection with its U.S. Trade or Business.  Accordingly, the Debtors are currently unable to determine the precise effect that the 382 Limitation will have on the U.S. tax attributes of Jackson or GenesisCo.

#### (iii)       Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOLs, NOL carryforwards, and 163(j) Carryovers will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Debtors undergo another

---

[54] Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation.  However, proposed regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area.  Accordingly, the Debtors do not expect the proposed regulations to apply to them or to the Reorganized Debtors with respect to the "ownership change" that will occur pursuant to the Amended Plan.

"ownership change" within two years after the Effective Date, then the Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety. If the Debtors were to undergo another "ownership change" after the expiration of this two year period, the resulting 382 limitation would be determined under the regular rules for ownership changes. It is possible that certain transactions occurring less than two years prior to the Restructuring Transactions will result in an "ownership change" for purposes of section 382 of the IRC occurring immediately prior to the Restructuring Transactions. If these transactions are considered to constitute a separate "ownership change" for purposes of section 382 and the 382(l)(5) Exception applies, the Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for the 382(l)(5) Exception or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule for determining the 382 Limitation, which requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception because the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors do not currently know whether they are eligible for the 382(l)(5) Exception, and regardless of whether the 382(l)(5) Exception is available, the Reorganized Debtors may decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies. Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, though, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

**3.** ***Impact of the Restructuring Transactions on the Future Taxable Income of the Debtors***

**(c)** **Tax Treaty Application**

Because the Reorganized Debtors will not be publicly traded in 2021 or at the Effective Date, the historic basis for the Debtors' ability to rely on certain applicable tax treaty provisions that currently impact the tax treatment of the Debtors' global income may no longer apply beginning in 2022. If the Reorganized Debtors determine that they are unable to continue to rely on such tax treaty provisions, the taxation of the Debtors' future global income may differ meaningfully from the historic taxation of the Debtors' income which could, among other things, affect the projections and valuation reflected elsewhere in this Disclosure Statement. The Debtors currently intend that the Reorganized Debtors will continue to be eligible in 2022 for the benefits of the relevant tax treaty provisions.

**(d)** **Restructuring of the Debtors**

The Debtors are evaluating the possibility of engaging in certain substantial reorganization steps in connection with the Restructuring Transactions such that the structure of the Debtors and their affiliates may change meaningfully. Such reorganization steps may include transactions that may be treated as taxable exchanges of assets in the applicable tax jurisdictions, potentially resulting in taxable gain being

136

attributed to the Debtors.  The tax consequences, if any, of such Restructuring Transactions are not currently known.

### C.   Certain Luxembourg Tax Consequences of the Amended Plan to the Debtors and the Reorganized Debtors

The Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting could result in significant changes to the tax laws and practices in multiple jurisdictions, including Luxembourg, after the date of this discussion and could therefore have an impact on this discussion.  In addition, considering the recent adoption of the Luxembourg law implementing Council Directive (EU) 2017/952 of 29 May 2017 amending Directive (EU) 2016/1164 as regards hybrid mismatches with third countries ("ATAD II"), there is little precedent on its application.  Luxembourg Holders and Non-Luxembourg Holders are urged to consult their tax advisors regarding the potential application of these rules.

Certain of the Debtors ("Lux Issuers") and their shareholders ("Lux HoldCos") that are parties to the Amended Plan, including Intelsat, the Debtors' ultimate parent company, are Luxembourg-incorporated entities.  The Luxembourg tax consequences of the Amended Plan to the Debtors and the Reorganized Debtors will depend, among other things, on the transaction steps used to complete the restructuring contemplated by the Amended Plan (the "Restructuring Steps"), which remain subject to ongoing analysis and review.  Although not free from doubt, the Debtors expect that the Restructuring Steps used to complete the restructuring contemplated by the Amended Plan will not give rise to materially adverse Luxembourg tax consequences to the Debtors or Reorganized Debtors.  The Debtors currently do not anticipate recognizing COD Income for purposes of Luxembourg Generally Accepted Accounting Principles ("Luxembourg GAAP") or Luxembourg tax that would substantially limit the Debtors' or Reorganized Debtors' Lux NOLs.  The Debtors' conclusion with respect to the recognition of COD Income for Luxembourg purposes remains subject to the finalization of the Restructuring Steps, which shall be provided in the Plan Supplement, and the Debtors cannot guarantee this anticipated result or that the LTA will not challenge any position taken by the Debtors or Reorganized Debtors under the Amended Plan.

### D.   Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Entitled to Vote

#### 1.   *General Considerations*

##### (a)   Treatment of Debt as a Security

In certain cases discussed below, the treatment of the consummation of the Amended Plan to U.S. Holders of Allowed Claims will depend on whether a Claim constitutes a "security" of the Debtor issuing consideration in exchange for such a Claim.  Neither the IRC nor the Treasury Regulations define the term "security."  Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  The Debtors expect that the Convertible Senior Notes, the 2021 Lux Senior Notes, the 2023 Lux

Senior Notes, the 2024 Lux Senior Notes, the First Lien Notes, the 2023 Jackson Senior Notes, the 2024 Jackson Senior Notes, the 2025 Jackson Senior Notes, and the Term Loan Facility will each be treated as a "security" for U.S. federal income tax purposes, while each other Claim will not be treated as a "security" for U.S. federal income tax purposes.

### (b)    Bifurcation of Recoveries

Certain Holders of Allowed Claims against entities other than Intelsat may receive a combination of New Common Stock, New Series A Warrants and New Series B Warrants issued by the Equity Issuer, forms of consideration issued or distributed by an entity other than the Equity Issuer, including Cash and the CVRs, and certain other forms of consideration issued with respect to a guarantor of such Claims. Although not free from doubt, the Debtors intend to treat such Holders of Allowed Claims as exchanging Claims in multiple separate transactions, pursuant to which (a) in one transaction, Holders transfer a portion of their Claim to the Equity Issuer in exchange for, as applicable, the New Common Stock, New Warrants, and, if Jackson is the Equity Issuer, the CVRs, which amount will generally be all of such Claims other than the amounts specified with respect to clauses (b) and (c) of this paragraph; (b) in a separate transaction, Holders transfer a specified portion of their Claims directly to the relevant entity issuing consideration other than the consideration being issued by the Equity Issuer (including the CVRs from Jackson, in the event that Jackson is not the Equity Issuer), which amount will generally be equal to the value of the consideration being received from such subsidiary, and (c) in a separate transaction, Holders receive consideration attributable to their guarantee claims against Intelsat pursuant to a mechanism to be set forth in the Restructuring Transactions Memorandum.

Certain Holders of Claims against Intelsat will receive New Series B Warrants issued by entities other than Reorganized S.A., in addition to Cash at Intelsat and Reorganized S.A. Common Stock. Although not free from doubt, the Debtors intend to treat such Holders of Allowed Claims as exchanging Claims in multiple separate transactions, pursuant to which (a) in one transaction, Holders transfer a portion of their Claim to the Equity Issuer in exchange for New Series B Warrants, (b) in a separate transaction, Holders transfer a specified portion of their Claim to any entity whose Cash is funding relevant distributions under the Plan, and (c) in a separate transaction, Holders transfer other Claims to Reorganized S.A. in exchange for Reorganized S.A. Common Stock, which amount will generally be all of such Claims other than the amounts specified with respect to clauses (a) and (b) of this paragraph.

In the event the above "bifurcation" approach was not respected, the tax consequences of the consummation of the Amended Plan could be materially different than described below. In particular, a Holder of a Claim could be required to recognize gain, but be prohibited from recognizing losses, in certain circumstances, or other differences in tax treatment could apply. Holders of Claims should consult their own tax advisors regarding the treatment of consideration under the Amended Plan.

### (c)    Treatment of Reallocation of Consideration from Guarantee Claims against Intelsat to Holders of other Claims

The Plan provides that the ICF Unsecured Recovery will include a portion of consideration that would otherwise be distributed to the Jackson Senior Notes Trustees with respect to TopCo Guarantee Claims. Although not free from doubt, the Debtors intend to take the position that (a) to the extent such recovery consists of consideration issued by the Equity Issuer or any Debtor other than Intelsat, the Holder of such Claim shall be treated as receiving such consideration directly in respect of its underlying Claim (as set forth in the bifurcation discussion, above); and (b) to the extent such recovery consists of Cash at

138

Intelsat and Reorganized S.A. Common Stock, the receipt of such consideration will be treated as occurring in a separate transaction pursuant to steps set forth in the Restructuring Transactions Memorandum.

### 2. *U.S. Federal Income Tax Consequences to U.S. Holders of First Lien Claims*[55]

Pursuant to the Amended Plan, in exchange for full and final satisfaction of the First Lien Claims the Holders of such Claims shall receive Cash.

The Debtors expect that the transactions in which the U.S. Holders of First Lien Claims exchange such Claims for Cash will be treated as a fully taxable exchange under section 1001 of the IRC. A U.S. Holder of a Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the amount of Cash received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the First Lien Claim exchanged therefor. A U.S. Holder's adjusted tax basis in its First Lien Claim would be equal to the amount paid therefor, increased by any accrued original issue discount ("OID") and any market discount and reduced by any amortizable bond premium previously taken into account. Assuming a U.S. Holder of a First Lien Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year. The treatment of accrued interest and market discount is discussed below.

### 3. *U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims against Jackson and Unsecured Claims against Jackson Subsidiaries*

Pursuant to the Amended Plan, in exchange for full and final satisfaction of the Unsecured Claims against Jackson and Unsecured Claims against Jackson Subsidiaries, the Holders of such Claims shall receive New Common Stock, CVRs, and Cash.

As a general matter, to the extent an Unsecured Claim against Jackson Subsidiaries constitute guarantee Claims with respect to the same debt instrument that constitutes an Unsecured Claim against Jackson, any recovery received in respect of such guarantee will, for U.S. federal income tax purposes, be combined with any recovery received in respect of the primary Claim against Jackson. The following discussion assumes this treatment is respected.

Additionally, certain Unsecured Claims against Jackson or Unsecured Claims against Jackson Subsidiaries (*e.g.*, trade claims of Jackson Subsidiaries) may not be treated as having been contributed to the Equity Issuer. In such case, although not free from doubt, the Debtors expect that the transactions in which the U.S. Holders of such Claims exchange such Claims for New Common Stock, CVRs, and Cash will be treated as a fully taxable exchange under section 1001 of the IRC. A U.S. Holder of a such a Claim should recognize gain or loss equal to the difference between (i) the amount of Cash plus the fair market value of the New Common Stock and CVRs received, in each case, that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the applicable Claim exchanged therefor. A U.S. Holder's adjusted tax basis in its Claim exchanged would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account. Assuming a U.S. Holder of a Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the

---

[55]   This discussion applies collectively to Claims (including primary Claims against Jackson, guarantee Claims against Jackson's subsidiaries, and guarantee Claims against ICF (collectively, and for purposes of this tax disclosure only, the "First Lien Claims")).

Claim at the time of the Restructuring Transactions exceeds one year.  The treatment of accrued interest and market discount is discussed below.

**(i)        Treatment if the Equity Issuer is Not Jackson**

If the Equity Issuer is not Jackson, other than with respect to any Claims not treated as contributed to the Equity Issuer as set forth above, the Debtors expect that the transactions in which the U.S. Holders of Unsecured Claims against Jackson and Unsecured Claims against Jackson Subsidiaries contribute a portion of such Claims in exchange for New Common Stock will qualify as an exchange under section 351 of the IRC.

While section 351 of the IRC, when applicable, generally prevents recognition of both gains and losses, section 367 of the IRC overrides the gain (but not the loss) deferral provisions of section 351 of the IRC where the corporation issuing stock is a non-United States corporation.  Section 367(a)(1) of the IRC and the Treasury Regulations promulgated thereunder specifically provide for the recognition of gain (but not loss) in exchanges that would otherwise qualify for tax-deferred treatment pursuant to section 351 of the IRC, but for the transfer of property to a non-United States corporation.  Thus, if the contribution of a Claim in exchange for New Common Stock qualifies as an exchange under section 351 of the IRC, a U.S. Holder of such Claim should recognize gain, but not loss, for United States federal income tax purposes in connection with the Restructuring Transactions.  The amount of such gain recognized by a U.S. Holder of a Claim should equal the excess of (i) the fair market value of the New Common Stock received and (ii) such U.S. Holder's adjusted tax basis in the Claim contributed in exchange for such New Common Stock.

In certain circumstances, a U.S. Holder of a Claim may be able to avoid current recognition of gain under section 367 of the IRC pursuant to section 367(a)(2) of the IRC and the Treasury Regulations promulgated thereunder.  Specifically, if a U.S. Holder of a Claim contributes "stock or securities" to the Equity Issuer in exchange for New Common Stock, and if such U.S. Holder either owns less than 5 percent of the New Common Stock immediately after the transfer, or, if a U.S. Holder of a Claim owns 5 percent or more of the New Common Stock immediately after the transfer and such U.S. Holder enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under section 367 of the IRC, such U.S. Holder can avoid current recognition of gain under section 367 of the IRC as long as certain other conditions are met.  U.S. Holders are urged to consult their tax advisors regarding the availability of gain deferral under the exceptions outlined in this paragraph.

If section 351 of the IRC does not apply to the receipt of New Common Stock by a U.S. Holder in exchange for a Claim, such exchange may be fully taxable and such a U.S. Holder may recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the fair market value of the New Common Stock received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim contributed in the exchange therefor.  A U.S. Holder's adjusted tax basis in its Claim contributed in the exchange would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account.  Such a U.S. Holder's adjusted tax basis in the New Common Stock would equal the fair market value of such New Common Stock, and its holding period in the New Common Stock would begin on the day after the day of the Restructuring Transactions.  Assuming a U.S. Holder of a Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.

The U.S. federal income tax treatment of the rights to the proceeds from the CVRs is unclear, and U.S. Holders who receive such rights are urged to consult their own tax advisors regarding such treatment.  Treatment of the CVRs will depend in part on whether the receipt of such rights is a "closed transaction" or an "open transaction" and whether the rights are treated as rights to payment under a contract or as a debt

140

instrument for U.S. federal income tax purposes.  However, as treatment as a debt instrument is unlikely, the discussion below does not address the tax consequences of such a characterization.  Open transaction treatment should apply only if the fair market value of the CVRs cannot be ascertained at the time of the exchange, and the IRS has taken the position that only in "rare and extraordinary circumstances" is the fair market value of property so uncertain that open transaction treatment is available.  The IRS is not bound by any position taken by the Debtors, and may characterize the CVRs as a debt instrument or otherwise.  If the IRS disagrees with any position taken by the Debtors, the tax treatment to U.S. Holders receiving the CVRs in exchange for Claims may be materially different from the treatment described below.

Assuming closed transaction treatment applies with respect to a U.S. Holder's receipt of the CVRs, to the extent that a U.S. Holder of a Claim exchanges a portion of its Claim with an entity other than the Equity Issuer for CVRs and Cash, the Debtors expect that such U.S. Holder will be treated as receiving such distributions under the Amended Plan in a fully taxable exchange under section 1001 of the IRC.  Such U.S. Holder should recognize gain or loss equal to the difference between (i) the amount of Cash and the fair market value of any CVRs received in exchange for its Claim and (ii) such U.S. Holder's adjusted tax basis, if any, in its Claim exchanged therefor.  Assuming a U.S. Holder holds its Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.

A U.S. Holder of a Claim should obtain a tax basis in the CVRs, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the fair market value thereof as of the date such property is distributed to such U.S. Holder.  The holding period for any such CVRs should begin on the day following the Effective Date.

The tax basis of any CVRs determined to be received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest.  The holding period for any such CVRs should begin on the day following the Effective Date.

However, if open transaction treatment applies to a U.S. Holder's receipt of the CVRs because the value cannot be "reasonably ascertained" as of the Effective Date, such U.S. Holder generally would not take the CVRs into account on the Effective Date for purposes of determining gain with respect to the exchange, generally would take no tax basis in the CVRs (and accordingly would generally realize gain only as they receive any payments pursuant to the CVRs in excess of their adjusted tax basis in the Claims contributed in exchange therefore) and generally would not recognize any loss until the receipt of final payments under, or other disposition of, the CVRs.

(ii)     **Treatment if the Equity Issuer is Jackson**

If the Equity Issuer is Jackson, the consummation of the Amended Plan may be subject to treatment as a recapitalization under section 354 of the IRC, rather than the rules of section 351 described above.  The anticipated treatment of U.S. Holders of Unsecured Claims against Jackson and Unsecured Claims against Jackson Subsidiaries in such a circumstance is expected to be essentially the same as the treatment described above, with the exception that (a) section 367 of the IRC will generally not require a U.S. Holder of such a Claim to recognize gain and (b) gain, but not loss, would be recognized with respect to any Cash and CVRs received from the Equity Issuer.

4.   *U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims against ICF*

Pursuant to the Amended Plan, in exchange for full and final satisfaction of the Unsecured Claims against ICF, the holders of such Claims shall receive their *pro rata* share of Cash, New Common Stock,

141

New Warrants, and Series B CVRs. In addition, holders of such Claims will receive a portion of the distributions that would otherwise be made to certain Holders of the Jackson Senior Notes Guarantee Claims against Intelsat.

**The U.S. federal income tax treatment of the receipt of consideration in respect amounts that otherwise would have been received by certain Holders of the Jackson Senior Notes Guarantee Claims against Intelsat is uncertain, will depend, in part, on the transactions set forth in the Restructuring Transaction Memorandum with respect to the receipt of such consideration, and is not discussed below. Holders of Claims should consult their own tax advisors with respect to such treatment.**

(a)     Treatment if Equity Issuer is Not ICF.

Although not free from doubt, if the Equity Issuer is not ICF, other than with respect to any Claims not treated as contributed to the Equity Issuer as set forth above, the Debtors expect that the transactions in which the U.S. Holders of such Claims contribute such Unsecured Claims against ICF in exchange for New Common Stock, New Warrants will qualify as an exchange under section 351 of the IRC.

If the contribution of Claims in exchange for New Common Stock, New Warrants qualifies as an exchange under section 351 of the IRC, a U.S. Holder of a Claim should recognize gain, but not loss, for United States federal income tax purposes with respect to such contribution pursuant to section 367(a) of the IRC. The amount of such gain recognized by a U.S. Holder of a Claim should equal the excess of (i) the fair market value of the New Common Stock, New Warrants received over (ii) such U.S. Holder's adjusted tax basis in the Claims contributed in exchange for such New Common Stock, New Warrants. However, a U.S. Holder of a Claim may be able to avoid current recognition of gain under section 367 of the IRC if the Claims contributed in exchange for New Common Stock are considered "stock or securities" and if such U.S. Holder either owns less than 5 percent of the New Common Stock immediately after the transfer, or, if a U.S. Holder owns 5 percent or more of the New Common Stock immediately after the transfer, such U.S. Holder enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under section 367 of the IRC, as long as certain other conditions are met.

The Debtors do not expect the New Warrants to be considered "stock" for purposes of section 351 of the IRC, and expect the New Warrants received by a U.S. Holder of a Unsecured Claim against ICF in exchange for its Claim to be considered "boot" for purposes of section 351 of the IRC. Accordingly, if a U.S. Holder of an Unsecured Claim against ICF meets the requirements to avoid gain recognition under section 367 of the IRC, such U.S. Holder should recognize gain, but not loss, to the extent of the lesser of (i) the fair market value of the of New Warrants received and (ii) the excess of (A) the fair market value of the New Common Stock, New Warrants received over (B) such U.S. Holder's adjusted tax basis in the Claims contributed in exchange for such New Common Stock, New Warrants. U.S. Holders of Claims are urged to consult their tax advisors regarding the availability of gain deferral under the exceptions outlined in the preceding two paragraphs.

If the contribution of the Claims in exchange for consideration does not qualify as an exchange under section 351 of the IRC, a U.S. Holder of such a Claim may recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the fair market value of the consideration received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim contributed in the exchange therefor. The adjusted tax basis of a U.S. Holder's Claim contributed in the exchange would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account. The Holder's adjusted tax basis in the consideration received would equal the fair market value of such consideration, and its holding period in the consideration would begin on the day after the day of

142

the Restructuring Transactions.  Assuming a U.S. Holder holds its Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.

The U.S. federal income tax treatment of the rights to the proceeds from the Series B CVRs is unclear, and U.S. Holders who receive such rights are urged to consult their own tax advisors regarding such treatment.  Treatment of the Series B CVRs will depend in part on whether the receipt of such rights is a "closed transaction" or an "open transaction" and whether the rights are treated as rights to payment under a contract or as a debt instrument for U.S. federal income tax purposes.  However, as treatment as a debt instrument is unlikely, the discussion below does not address the tax consequences of such a characterization.  Open transaction treatment should apply only if the fair market value of the Series B CVRs cannot be ascertained at the time of the exchange, and the IRS has taken the position that only in "rare and extraordinary circumstances" is the fair market value of property so uncertain that open transaction treatment is available.  The IRS is not bound by any position taken by the Debtors, and may characterize the Series B CVRs as a debt instrument or otherwise.  If the IRS disagrees with any position taken by the Debtors, the tax treatment to U.S. Holders receiving the Series B CVRs in exchange for Claims may be materially different from the treatment described below.

Assuming closed transaction treatment applies with respect to a U.S. Holder's receipt of the Series B CVRs, to the extent that a U.S. Holder of a Claim exchanges a portion of its Claim with an entity other than the Equity Issuer for Cash and Series B CVRs, the Debtors expect that such U.S. Holder will be treated as receiving such distributions under the Amended Plan in a fully taxable exchange under section 1001 of the IRC.  Such U.S. Holder should recognize gain or loss equal to the difference between (i) the amount of Cash and the fair market value of any Series B CVRs received in exchange for its Claim and (ii) such U.S. Holder's adjusted tax basis, if any, in its Claim exchanged therefor.  Assuming a U.S. Holder holds its Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.

A U.S. Holder of a Claim should obtain a tax basis in the Series B CVRs, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the fair market value thereof as of the date such property is distributed to such U.S. Holder.  The holding period for any such Series B CVRs should begin on the day following the Effective Date.

The tax basis of any Series B CVRs determined to be received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest.  The holding period for any such Series B CVRs should begin on the day following the Effective Date.

However, if open transaction treatment applies to a U.S. Holder's receipt of the Series B CVRs because the value cannot be "reasonably ascertained" as of the Effective Date, such U.S. Holder generally would not take the Series B CVRs into account on the Effective Date for purposes of determining gain with respect to the exchange, generally would take no tax basis in the Series B CVRs (and accordingly would generally realize gain only as they receive any payments pursuant to the Series B CVRs in excess of their adjusted tax basis in the Claims contributed in exchange therefore) and generally would not recognize any loss until the receipt of final payments under, or other disposition of, the Series B CVRs.

The treatment of accrued interest and market discount is discussed below.

**(b)**        **Treatment if the Equity Issuer is ICF.**

If the Equity Issuer is ICF, the contribution of the applicable Claim in exchange for New Common Stock, New Warrants may be subject to treatment as a recapitalization under section 354 of the IRC, rather than the rules of section 351 described above.  The anticipated treatment of U.S. Holders of Unsecured Claims against ICF in such a circumstance is expected to be essentially the same as the treatment described above, including with respect to the application of section 367 of the IRC, with the exception that (i) the New Warrants should not constitute "boot," (ii) gain, but not loss, would be required to be recognized with respect to any Cash and Series B CVRs received, and (iii) section 367 of the IRC will generally not require the U.S. Holders of Claims in such circumstances to recognize gain, in each case, to the extent section 354 of the IRC, rather than section 351, applies to such exchange.

**5.**    *U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims against Envision*

Pursuant to the Amended Plan, in exchange for full and final satisfaction of the Unsecured Claims, the holders of such Claims shall receive their *pro rata* share of Cash and New Series B Warrants.

Although not free from doubt, the Debtors expect that the transactions in which the U.S. Holders of Claims exchange such Claims for Cash and New Series B Warrants will be treated as a fully taxable exchange under section 1001 of the IRC.  A U.S. Holder of a Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the amount of Cash plus the fair market value of the New Series B Warrants received, in each case, that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim exchanged therefor.  A U.S. Holder's adjusted tax basis in its Unsecured Claim exchanged would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account.  Assuming a U.S. Holder of a Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.  The Treatment of accrued interest and market discount is discussed below.

**6.**    *U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims against LuxCo, Investments, Holdings, and Holdings SARL*

Pursuant to the Amended Plan, in exchange for full and final satisfaction of Unsecured Claims against LuxCo, Investments, Holdings, and Holdings SARL, the holders of such Claims shall receive their *pro rata* share of Cash.

With respect to Unsecured Claims against Holdings SARL that are attributable to Holdings SARL guarantees of debt issued by other entities, the tax treatment is uncertain and will be subject to the Restructuring Transactions, which are subject to ongoing analysis.  **The below discussion does not apply to the receipt of consideration from Holdings SARL that is attributable to a guarantee claim related to a debt instrument issued by an entity other than Holdings SARL (*e.g.*, the below discussion does not apply to Jackson Senior Notes Guarantee Claims), and Holders of such Claims should consult their own tax advisors regarding such consequences.**

The Debtors expect that the transactions in which the U.S. Holders of Claims exchange such Claims for Cash will be treated as a fully taxable exchange under section 1001 of the IRC.  A U.S. Holder of a Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the amount of Cash received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim exchanged therefor.  A U.S. Holder's adjusted tax basis in its Claim

144

exchanged would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account.  Assuming a U.S. Holder of a Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.  The Treatment of accrued interest and market discount is discussed below.

**7.   *U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims against Intelsat***

Pursuant to the Amended Plan, in exchange for full and final satisfaction of the Unsecured Claims against Intelsat, the holders of such Claims shall receive their *pro rata* share of Cash, New Series B Warrants, and Reorganized S.A Common Stock.

With respect to Unsecured Claims against Intelsat that are attributable to Intelsat guarantees of debt issued by other entities, while not free from doubt, the receipt of any New Common Stock or Series B Warrants should be subject to, and treated as part of, the recoveries received in respect of such underlying debt instrument, rather than being treated as having been separately received from Intelsat as a payment on a guarantee.  However, with respect to any recoveries in respect of such guarantees received directly from Intelsat or Reorganized S.A., the tax treatment is uncertain and will be subject to the Restructuring Transactions, which are subject to ongoing analysis.  **The below discussion does not apply to the receipt of consideration from Intelsat that is attributable to a guarantee claim related to a debt instrument issued by an entity other than Intelsat (*e.g.*, the below discussion does not apply to Jackson Senior Notes Guarantee Claims), and Holders of such Claims should consult their own tax advisors regarding such consequences.**

**(a)   Treatment of the Receipt of Reorganized S.A. Common Stock and Cash at Intelsat**

**(i)   Treatment if Reorganized S.A. is not Intelsat**

Although not free from doubt, if Reorganized S.A. is not Intelsat, the Debtors expect that the transactions in which the U.S. Holders of Unsecured Claims against Intelsat contribute such Claims in exchange for Reorganized S.A. Common Stock, will qualify as an exchange under section 351 of the IRC.

If the contribution of Unsecured Claims against Intelsat in exchange for Reorganized S.A. Common Stock qualifies as an exchange under section 351 of the IRC, a U.S. Holder of such a Claim should recognize gain, but not loss, for United States federal income tax purposes with respect to such contribution pursuant to section 367(a) of the IRC.  The amount of such gain recognized by a U.S. Holder of a Claim who is subject to this treatment should equal the excess of (i) the fair market value of the Reorganized S.A. Common Stock received over (ii) such U.S. Holder's adjusted tax basis in the Claims contributed in exchange for such Reorganized S.A. Common Stock.  However, a U.S. Holder of a Claim may be able to avoid current recognition of gain under section 367 of the IRC if the Claims contributed in exchange for Reorganized S.A. Common Stock are considered "stock or securities" and if such U.S. Holder either owns less than 5 percent of the Reorganized S.A. Common Stock immediately after the transfer, or, if a U.S. Holder owns 5 percent or more of the Reorganized S.A. Common Stock immediately after the transfer, such U.S. Holder enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under section 367 of the IRC, as long as certain other conditions are met.

The Debtors expect the Cash received from Intelsat by a U.S. Holder of an Unsecured Claim against Intelsat in exchange for its Claim to be considered "boot" for purposes of section 351 of the IRC.

Accordingly, if a U.S. Holder of such a Claim meets the requirements to avoid gain recognition under section 367 of the IRC, such U.S. Holder should recognize gain, but not loss, to the extent of the lesser of (i) the amount of such Cash received and (ii) the excess of (A) the fair market value of the Reorganized S.A. Common Stock and such Cash received over (B) such U.S. Holder's adjusted tax basis in the Claims contributed in exchange for such Reorganized S.A. Common Stock and Cash received from Intelsat. U.S. Holders of Unsecured Claims against Intelsat are urged to consult their tax advisors regarding the availability of gain deferral under the exceptions outlined in the preceding two paragraphs.

If the contribution of the Unsecured Claims in exchange for Reorganized S.A. Common Stock does not qualify as an exchange under section 351 of the IRC, then such exchange should be subject to section 1001 of the IRC, and a U.S. Holder of such a Claim should recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the amount of Cash and fair market value of the Reorganized S.A. Common Stock received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim contributed in the exchange therefor. The adjusted tax basis of a U.S. Holder's Claim contributed in the exchange would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account. The Holder's adjusted tax basis in the Reorganized S.A. Common Stock would equal the fair market value of such Reorganized S.A. Common Stock, and its holding period in the Reorganized S.A. Common Stock would begin on the day after the day of the Restructuring Transactions. Assuming a U.S. Holder holds its Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.

### (ii)    Treatment if Reorganized S.A. is Intelsat

If Reorganized S.A. is Intelsat, the contribution of an Unsecured Claim against Intelsat in exchange for Reorganized S.A. Common Stock may be subject to treatment as a recapitalization under section 354 of the IRC, rather than the rules of section 351 described above. The anticipated treatment of U.S. Holders of such Claims in such a circumstance is expected to be essentially the same as the treatment described above, including with respect to the application of section 367 of the IRC, with the exception that section 367 of the IRC will generally not require the U.S. Holders of such Claims in such circumstances to recognize gain, in each case, to the extent section 354, rather than section 351, applies to such exchange.

### (b)    Treatment of the Receipt of Property Other than Reorganized S.A. Common Stock and Cash at Intelsat

Although not free from doubt, the Debtors expect that the transactions in which the U.S. Holders of Unsecured Claims against Intelsat exchange such Claims for Cash other than at Intelsat and New Series B Warrants will be treated as a fully taxable exchange under section 1001 of the IRC. A U.S. Holder of a Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the amount of Cash other than at Intelsat plus the fair market value of the New Series B Warrants received, in each case, that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Unsecured Claim exchanged therefor. A U.S. Holder's adjusted tax basis in its Unsecured Claim against Intelsat exchanged would be equal to the amount paid therefor, increased by any accrued OID and any market discount, and reduced by any amortizable bond premium previously taken into account. Assuming a U.S. Holder of an Unsecured Claim against Intelsat holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year. The treatment of accrued interest and market discount is discussed below.

146

#### 8.    *Receipt of Interests in Distribution Reserves*

As will be described in the Plan and Plan Supplement, reserves may be established by either the Debtors or the Reorganized Debtors for the distribution of additional consideration after the Effective Date for Claims that are contingent or have not yet been Allowed.  As will be provided in the Plan Supplement, certain U.S. Holders of Claims may receive a share of such reserves.

Such a U.S. Holder would recognize gain or loss equal to the difference between (a) the fair market value of the interests in any reserve for Claims that are contingent or have not yet been Allowed ("Distribution Reserve Interests") received (subject to accrued interest described below) and (b) the U.S. Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.

#### (a)    **Liquidating Trust Treatment.**

Although not free from doubt and subject to further analysis by the Debtors, any reserve for Claims that are contingent or have not yet been Allowed may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the IRC to the Holders of relevant Claims.  In such case, any beneficiaries of such a reserve would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of such reserve and then contributed such undivided interest to such reserve.  If this treatment applies, the administrator of the reserve shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of any reserve pursuant to the Plan and Plan Supplement and not unduly prolong its duration.  Any reserve would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Plan Supplement.

Other than with respect to any assets of any reserve for Claims that are contingent or have not yet been Allowed that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to such reserve should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

Other than with respect to any assets of any reserve that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on any reserve with respect to earnings generated by the assets held by it.  Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by any reserve, even if no distributions are made.  Allocations of taxable income with respect to any reserve shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, such reserve had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from such reserve.  Similarly, taxable losses of any reserve will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.  The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles

147

prescribed by the applicable provisions of the IRC, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any Holder of a beneficial interest in any reserve for Claims that are contingent or have not yet been Allowed, and the ability of such Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the Holder.  Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in any reserve and not as income or loss with respect to such beneficiary's applicable Claim.  In the event any tax is imposed on any reserve, the administrator of such reserve shall be responsible for payment, solely out of the assets of any reserve, of any such taxes imposed on any reserve.

The administrator of any such reserve shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan, the Plan Supplement or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income.  To the extent that a reserve for Claims that are contingent or have not yet been Allowed is properly treated as a "liquidating trust" as described above, the administrator of such reserve will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that such reserve is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations.  As soon as reasonably practicable after the close of each calendar year, the administrator of such reserve will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

**(b)      Disputed Ownership Fund Treatment.**

With respect to any of the assets of any reserve for Claims that are contingent or have not yet been Allowed that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).  To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred.  Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

Additional discussion of the expected tax consequences related to the receipt of any Distribution Reserve Interests shall be provided in the Plan Supplement, as applicable.

**9.    *Distributions Attributable to Accrued Interest (and OID)***

To the extent that any amount received by a U.S. Holder of a Claim exchanged under the Amended Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the exchanged Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder).  Conversely, a U.S. Holder of an exchanged Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt

instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.  The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID).  The holding period for such non-Cash consideration should begin on the day following the receipt of such property.

The extent to which the consideration received by a U.S. Holder of an exchanged Claim will be attributable to accrued interest on the debt constituting the exchanged Claim is unclear.  Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The Amended Plan provides that amounts paid to U.S. Holders of Claims will be allocated first to unpaid principal and then to unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Amended Plan.  U.S. Holders of Claims are urged to consult their tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### 10. *Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the exchanged Claim.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instruments were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include such market discount in its income as the market discount accrued).  To the extent that a U.S. Holder exchanged Claims that were acquired by the U.S. Holder with market discount in exchange for other property pursuant to a tax-free or other reorganization transaction (other than a transaction described in section 351 of the IRC) for other property, any market discount that accrued on such exchanged Claims and was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized by the U.S. Holder on the subsequent sale, exchange, redemption, or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.  To the extent that a U.S. Holder exchanged Claims that were acquired by the U.S. Holder with market discount in exchange for other property pursuant to an exchange described in section 351 of the IRC, such U.S. Holder may be required to recognize gain treated as ordinary income on such exchange to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.

### 11. *Net Investment Income Tax*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends, and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of debt of, and equity interests in, the Debtors and Reorganized Debtors.

### 12. *Limitations on Use of Capital Losses*

A U.S. Holder of a Claim or Interest who recognizes capital losses as a result of the exchanges under the Amended Plan will be subject to limits on the use of such capital losses.  For a non-corporate

U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

13. *Ownership and Disposition of New Common Stock or Reorganized S.A. Common Stock*

(a)     **Dividends on New Common Stock or Reorganized S.A. Common Stock**

Any distributions made on account of the New Common Stock or Reorganized S.A. Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the applicable Reorganized Debtors as determined under U.S. federal income tax principles.  Certain qualified dividends received by a non-corporate taxpayer are taxed at preferential rates.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.  It is uncertain whether dividends from the Reorganized Debtors will constitute qualified dividends for the purposes of these rules.

Distributions that constitute dividends for U.S. federal income tax purposes which are paid to U.S. Holders that are corporations should not be eligible for the dividends-received deduction generally applicable to U.S. corporations with respect to dividends received from other U.S. corporations.

(b)     **Sale, Redemption, or Repurchase of New Common Stock or Reorganized S.A. Common Stock**

Unless a non-recognition provision of the IRC applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock or Reorganized S.A. Common Stock received pursuant to the Amended Plan.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the applicable New Common Stock or Reorganized S.A. Common Stock for more than one year.  Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.  Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on such dispositions of the New Common Stock or Reorganized S.A. Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for New Common Stock or Reorganized S.A. Common Stock.

(c)     **PFIC Status**

The Equity Issuer or Reorganized S.A. would be classified as a passive foreign investment company ("PFIC") for any taxable year if, after the application of certain look-through rules, either: (1) 75 percent or more of its gross income for such year is "passive income" as defined in the relevant provisions of the IRC, or (2) 50 percent or more of the value of its assets, determined on the basis of a

quarterly average, during such year is attributable to assets that produce or are held for the production of passive income. In determining whether the Equity Issuer or Reorganized S.A. is a PFIC, it will be treated as owning its proportionate share of the assets, and earning its proportionate share of the income (which may be reduced in each case by certain intercompany transactions pursuant to reliance upon Proposed Treasury Regulations section 1.1297-2(c)), of any other corporation in which it owns, directly or indirectly, 25 percent or more (by value) of the stock. However, the Equity Issuer's or Reorganized S.A.'s status as a PFIC in any taxable year requires a factual determination that depends on, among other things, the composition of its income, assets, and activities in each year, and can only be made annually after the close of each taxable year. Therefore, there can be no assurance that the Equity Issuer (or any Reorganized Debtor that is a non-U.S. corporation, including Reorganized S.A.) will not be classified as a PFIC for the taxable year in which the Restructuring Transactions occur, or for any future taxable year after the Restructuring Transactions. Moreover, the determination of whether the Equity Issuer or any other Reorganized Debtor that is a non-U.S. corporation, including Reorganized S.A. will be classified as a PFIC for the taxable year in which the Restructuring Transactions occur or any other year in which the New Common Stock or Reorganized S.A. is not publicly traded for the entirety of such year may depend in substantial part on whether such Equity Issuer or Reorganized Debtor is classified as a "controlled foreign corporation" (a "CFC") for U.S. federal income tax purposes for those years. The Debtors do not currently know whether the Equity Issuer or the other Reorganized Debtors which are non-U.S. corporations, including Reorganized S.A., will be classified as CFCs for U.S. federal income tax purposes. However, based on certain estimates of the Reorganized Debtors' gross income, the value of their assets, and the adjusted tax basis of their assets (including goodwill), the Debtors do not expect any of the Reorganized Debtors to be considered PFICs for the taxable year in which the Restructuring Transactions occur.

If the Equity Issuer or Reorganized S.A. is treated as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock or Reorganized S.A. Common Stock, the U.S. Holder would be subject to additional U.S. information return filing requirements. Additionally, if the Equity Issuer or Reorganized S.A. is treated as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock or Reorganized S.A. Common Stock, such U.S. Holder may be subject to adverse tax consequences upon a sale, exchange, or other disposition of such New Common Stock or Reorganized S.A. Common Stock, or upon the receipt of distributions in respect of the New Common Stock or Reorganized S.A. Common Stock. Under the "default PFIC regime," in general, an "excess distribution" is any distribution to a U.S. Holder that is greater than 125 percent of the average annual distributions received by the U.S. Holder (including return of capital distributions) during the three preceding taxable years or, if shorter, a U.S. Holder's holding period. If the Equity Issuer or Reorganized S.A. is classified as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock or Reorganized S.A. Common Stock, gains from the sale or other disposition of, and "excess distributions" with respect to, the New Common Stock or Reorganized S.A. Common Stock should be allocated ratably over a U.S. Holder's entire holding period and taxed at the highest ordinary income tax rate in effect for each such taxable year (subject to certain exceptions). Moreover, interest should be charged retroactively at the rate applicable to underpayments of tax (with respect to each such tax year's ratable allocation) through the date of gains from the sale or other disposition of, and "excess distributions" with respect to, the New Common Stock or Reorganized S.A. Common Stock.

The Debtors cannot provide any assurances that they will assist investors in determining whether the Equity Issuer or any Reorganized Debtor, including Reorganized S.A. is a PFIC for any taxable year. Additionally, the tax consequences that would apply if the Equity Issuer or Reorganized S.A. is classified as a PFIC would also be different from those described above if a U.S. Holder that holds New Common Stock or Reorganized S.A. Common Stock, as applicable, were able to make a valid election to treat the Equity Issuer or Reorganized S.A., as applicable, as a "qualified electing fund" (such election, a "QEF Election"). At this time, the Debtors do not expect to provide U.S. Holders with the information necessary to make and maintain a valid QEF Election and therefore U.S. Holders should assume that a QEF

151

Election will not be available.  U.S. Holders should consult their tax advisors about the potential application of the PFIC rules to their ownership of New Common Stock or Reorganized S.A. Common Stock.  A U.S. Holder can also avoid certain of the adverse rules described above where a mark-to-market election is available with respect to its New Common Stock or Reorganized S.A. Common Stock, as applicable.  The mark-to-market election is only available where the New Common Stock or Reorganized S.A. Common Stock, as applicable, is "marketable."  Each of the New Common Stock and Reorganized S.A. Common Stock will be marketable if it is "regularly traded" on a "qualified exchange" or other market within the meaning of applicable Treasury Regulations.  The New Common Stock will not be "regularly traded" on a "qualified exchange" for this purpose and therefore, the mark-to-market election would not be available to a U.S. Holder of the New Common Stock if the Equity Issuer becomes a PFIC.  It is unclear whether the Reorganized S.A. Common Stock will be "regularly traded" on a "qualified exchange" for this purpose and therefore, it is unclear whether the mark-to-market election would be available to a U.S. Holder of the Reorganized S.A. Common Stock if Reorganized S.A. becomes a PFIC.

### 14. *Ownership, Exercise, and Disposition of the New Warrants*

#### (a)      Certain Deemed Distributions with Respect to the New Warrants

Under section 305 of the IRC, certain transactions that have the effect of increasing the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder or warrant holder in respect of such "stock" interest.  Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the U.S. Holder in connection with such distribution.

#### (b)      Exercise of the New Warrants

A U.S. Holder that elects to exercise the New Warrants will generally be treated as purchasing, in exchange for its New Series A Warrants or New Series B Warrants and the amount of cash funded by the U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants, as applicable.  In each case, such purchase will generally be treated as the exercise of an option under general tax principles and the U.S. Holder therefore should not recognize income, gain or loss for U.S. federal income tax purposes.  A U.S. Holder's aggregate tax basis in the New Common Stock received upon exercise of a New Warrant will generally equal the sum of (a) the amount of cash paid by the U.S. Holder to exercise its New Warrant, as applicable, plus (b) such U.S. Holder's tax basis in its New Warrant, as applicable, immediately before such New Warrant is exercised.  A U.S. Holder's holding period in the New Common Stock received on the exercise of the New Warrants will begin on the day after the exercise date of the New Warrants, as applicable.

#### (c)      Lapse or Other Disposition of the New Warrants

A U.S. Holder that elects not to exercise the New Warrants and instead allows the New Warrants to lapse may be entitled to claim a capital loss upon expiration of the New Warrants in an amount equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses.  Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants.  Additionally, in the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will generally recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants, as applicable.  Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New

Common Stock to which the New Warrants relate, respectively, would have had in the hands of the U.S. Holder if such New Common Stock had been acquired by the U.S. Holder upon exercise.  If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held its New Warrants, as discussed above.

### 15. *Ownership and Disposition of the CVRs*

#### (a)      Payments with respect to the CVRs

If closed transaction treatment applies to a U.S. Holder's receipt of the CVRs, future payments in respect of the CVRs would likely reduce the U.S. Holder's basis in its CVRs (but not below zero) and thereafter result in gain to the U.S. Holder.  If no payment is made in respect of the CVRs, or if the final payment in respect of the CVRs is less than the U.S. Holder's tax basis in its CVRs, the U.S. Holder generally should recognize a loss.  Assuming the receipt of the CVRs is treated as a closed transaction, the character of any gain or loss recognized by a U.S. Holder in a future taxable year with respect to the CVRs generally is unclear.

In addition, a deferred payment given as consideration in exchange for certain property generally must provide for adequate stated interest or a portion of the payment will be characterized as interest for U.S. federal income tax purposes.  Generally, section 483 of the IRC applies to contracts for the sale or exchange of property if the contract provides for one or more contingent payments.  Contingent payments are accounted for when payment is made.  Under section 483, a portion of a contingent payment equal to the amount of "unstated interest" is treated as interest, and the rest of the payment is treated as a receipt of consideration. "Unstated interest" represents the excess of (x) the total deferred payments (i.e., all payments due more than one year after the date of the sale or exchange) over (y) the aggregate present value of all deferred payments (using a discount rate equal to the applicable Federal rate under section 1274(d) of the IRC) plus any stated interest.  The U.S. Holder must include this interest in taxable income in the taxable year in which the payment is made.  Accordingly, if the exchange of Claims and CVRs is characterized as a closed transaction and the CVR is characterized as the receipt of a deferred payment obligation (rather than the receipt of property), a U.S. Holder may be required to treat a portion of any payments received with respect to the CVRs as imputed interest in the year of receipt.

If open transaction treatment applies to a U.S. Holder's receipt of the CVRs, future payments in respect of the CVRs would be subject to tax as such payments are made or deemed made in accordance with the U.S. Holder's regular method of accounting.  The U.S. Holder generally would treat a portion of such payments as interest income under section 483 of the IRC, then as recovery of tax basis in the U.S. Holder's Claims (reduced by the amount of the Cash received in respect of such Claims), and the balance as gain.  To the extent the U.S. Holder has unrecovered tax basis in its Claims after receipt of all payments pursuant to the CVRs, the U.S. Holder generally should recognize a loss.  Any recognized gain or loss generally should be capital or ordinary depending on the nature of the U.S. Holder's interest in its Claims.

#### (b)      Sale, Redemption or Repurchase of CVRs

Unless a non-recognition provision of the IRC applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of CVRs received pursuant to the Amended Plan.  Such capital gain will be long term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the applicable CVRs for more than one year.  Long term capital gains of a non-corporate taxpayer

generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.

### E.      Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims

The Debtors do not anticipate that there will be material U.S. federal income tax consequences to Non-U.S. Holders of Claims, because neither the Equity Issuer nor Reorganized is domiciled in the United States.  Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

### F.      Certain Luxembourg Tax Consequences to Holders of New Common Stock, Reorganized S.A. Common Stock, New Warrants or CVRs

#### 1.   *Tax Regime Applicable to Luxembourg Holders upon the Exchange of Claims against New Common Stock, Reorganized S.A. Common Stock New Warrants or CVRs or upon the Exchange of New Warrants against New Common Stock*

According to Articles 22(5) and 102(1a) ITL and the related parliamentary comments, an exchange of assets shall be treated as the sale of an asset for valuable consideration followed by the acquisition of the asset received in exchange for valuable consideration and thus may lead to the realization of any profit or loss in the hands of the Holders.  However, the transfer price of the asset given in exchange is its *valeur estimée de réalisation* (fair market value) as defined by Article 27(2) ITL as the price that would be obtained in an arm's length transfer of the asset, taking into account all the circumstances and conditions affecting the price, except abnormal or personal circumstances or conditions.  The acquisition price of the asset received in exchange also corresponds, according to Article 25(1) ITL, to its fair market value.

If the fair market value of the exchanged assets are the same, the Luxembourg Holders should not realize for Luxembourg tax purposes any gain or loss upon the exchange of their Claims against New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs or upon the exchange of New Warrants against New Common Stock.

#### 2.   *Tax Regime Applicable to Realized Capital Gains*

##### (a)      Luxembourg Holders

###### (i)      Luxembourg Individual Holders

A Luxembourg individual holder will be subject to Luxembourg income taxes for capital gains in the following cases: if the New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs (x) represent the assets of a business or (y) were acquired for speculative purposes (i.e., disposed of within six months after acquisition), in which case any capital gain will be levied at ordinary income tax rates (including unemployment fund contributions), and subject to dependence insurance contribution.

If the New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs do not represent the assets of a business, and the Luxembourg individual has disposed of them more than six months after their acquisition, then any capital gains realized by such individual should in principle be tax exempt unless the New Common Stock or Reorganized S.A. Common Stock, belongs or New Warrants or CVRs are deemed to belong to a substantial participation within the meaning of Article 100 ITL (i.e., a direct or indirect participation representing more than 10.0 percent of the share capital, owned by the Luxembourg resident individual (alone or together with his or her spouse or partner and underage children) at any time during the five years preceding the disposal), in which case, any capital gains should be taxable

154

at half of the overall tax rate (including unemployment fund contributions) of the relevant individual.  In this case, the capital gains would also be subject to dependence insurance contribution.

### (ii)      Luxembourg Corporate Holders

Capital gains realized upon the disposal of New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs by a fully-taxable resident Luxembourg corporate holder (without benefiting from a special tax regime) will, in principle, be subject to corporate income tax and municipal business tax.

An exemption from such taxes may be available to a Luxembourg corporate holder pursuant to Article 166 of the ITL and the Grand-Ducal Decree of December 21, 2001 (as amended) provided that (x) the Luxembourg corporate holder of New Common Stock or Reorganized S.A. Common Stock, holds such New Common Stock or Reorganized S.A. Common Stock, at the time of the disposal representing at least 10 percent of the total share capital of the relevant Luxembourg Debtor or has a cost price of at least €6,000,000 and (y) such qualifying shareholding has been held for an uninterrupted period of at least twelve (12) months (the "participation exemption regime" or "LPER").  However, under the Luxembourg recapture rules, any capital gain realized on the disposal of a subsidiary that otherwise qualifies for the LPER is taxable up to the sum of any amount corresponding to expenses related to the shareholding and any write-down recorded on the qualifying shareholding that reduced the taxable basis of the company in the year of the disposal and/or in the previous financial years (subject however to the use of NOLs).  The amount of taxation cannot exceed the amount of the capital gain.

If the New Warrants qualify as a preferential subscription right within the meaning of the case law of the Luxembourg Administrative Court of Appeal number 28919C dated 16 February 2012 (the "2012 Case-Law"), the disposal of such preferential subscription right should be considered as a partial disposal of the underlying shares to which New Warrants are attached and thus any capital gain realized upon the disposal of such New Warrants should be tax exempt provided the conditions of the participation exemption regime (mentioned above) are met.  If the Holder of New Warrants does not hold underlying shares to which New Warrants are attached the participation exemption regime should not apply.

Capital gains remain taxable for the amount of expenses related to the participation and write-downs in the value of the New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs previously deducted or deducted in the year of disposal of the New Common Stock New Warrants.

### (iii)      Non-Luxembourg Holders

Subject to any applicable tax treaty, an individual who is a Non-Luxembourg Holder of New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs (and who does not have a permanent establishment, a permanent representative, or a fixed place of business in Luxembourg to which the New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs are attributable) will, except for certain former Luxembourg individual holders and Non-Luxembourg individual holders realizing within a period of 6 months after acquisition of a substantial participation within the meaning of Article 100 ITL, not be subject to Luxembourg taxation on capital gains arising upon disposal of such New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs.

Subject to any applicable tax treaty, a corporate Non-Luxembourg Holder of New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs (which does not have a permanent establishment, a permanent representative, or a fixed place of business in Luxembourg to which New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs are attributable) will, except for certain former Luxembourg corporate holders and Non-Luxembourg corporate holders realizing within a period of 6 months after acquisition a substantial participation within the meaning of Article 100 ITL, be

tax exempt on any capital gain realized upon the disposal of New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs.

### 3. *Tax Regime Applicable to Distributions*

#### (a) **Luxembourg Withholding Tax**

A Luxembourg withholding tax of 15.0 percent (17.65 percent if the dividend tax is not charged to the shareholder) is due on dividends and similar distributions to the Reorganized Debtor's shareholders (subject to the exceptions discussed below under "Exemption from Luxembourg Withholding Tax" and "Reduction of Luxembourg Withholding Tax"). Absent an exception, the Reorganized Debtors will be required to withhold at such rate from distributions to the shareholder and pay such withheld amounts to the LTA.

#### (b) **Exemption from Luxembourg Withholding Tax**

Dividends and similar distributions paid to Reorganized Debtor's Luxembourg and Non-Luxembourg Holders may be exempt from Luxembourg dividend withholding tax if: (i) the shareholder is a qualifying corporate entity holding a stake representing at least 10.0 percent of the total share capital of the Reorganized Debtors or acquired the New Common Stock or Reorganized S.A. Common Stock for at least €1,200,000 (or its equivalent amount in a foreign currency); and (ii) the shareholder has either held this qualifying stake in the capital of the Reorganized Debtors for an uninterrupted period of at least twelve (12) months at the time of the payment of the dividend or undertakes to continue to own such qualifying shareholding until such time as it has held the New Common Stock or Reorganized S.A. Common Stock for an uninterrupted period of at least twelve (12) months. If a payment is made within the twelve (12) month-period, the withholding tax must be paid and then is refunded. Examples of qualifying corporate shareholders are taxable Luxembourg companies, certain taxable companies resident in other European Union member states, capital companies resident in Switzerland subject to income tax without benefiting from an exemption, and companies fully subject to a tax corresponding to Luxembourg corporate income tax that are resident in countries that have concluded a treaty for the avoidance of double taxation with Luxembourg.

The application of the Luxembourg dividend withholding tax exemption to taxable companies resident in other EU member states or to their EU permanent establishments is not granted if the income allocated is part of a tax avoidance scheme (special anti-abuse rule).

Under current Luxembourg tax law, payments to shareholders in relation to a reduction of share capital (and associated share premium as the case may be) are not subject to Luxembourg dividend withholding tax if certain conditions are met, including that the repayment of capital is motivated by sound business reasons, which would be deemed not to be the case if the Reorganized Debtors have distributable reserves or profits at the time of the capital reduction. In the absence of sound business reasons at the time of the payment to shareholders with respect to their New Common Stock or Reorganized S.A. Common Stock, a distribution of share capital (and associated share premium as the case may be) will be re-characterized for Luxembourg tax purposes as a distribution of such reserves or earnings subject to withholding tax.

#### (c) **Reduction of Luxembourg Withholding Tax**

Residents of countries that have concluded a treaty for the avoidance of double taxation with Luxembourg may claim application of a reduced rate on or exemption from Luxembourg dividend withholding tax, depending on the terms of the relevant tax treaty, as amended by the Multilateral

Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting, if applicable.

**(d)**     **50% Dividend Exemption—for Luxembourg Holders and Credit of Luxembourg Withholding Tax on Dividends and Other Distributions**

**(i)**     **Luxembourg Holders**

Subject to the satisfaction of certain conditions and assuming, in the case of fully taxable corporate Luxembourg Holders, that the participation exemption does not apply, only half of the gross amount of a dividend distributed to a fully taxable corporate Luxembourg Holder or an individual Luxembourg Holder will be subject to Luxembourg corporate income tax or Luxembourg income tax, respectively.  All or part of the withholding tax levied can in principle be credited against the applicable tax by the (fully taxable) Luxembourg Holder.

**(ii)**     **Non-Luxembourg Holders**

Withholding tax levied may be credited by Non-Luxembourg resident Holders depending on the rule applicable in their own jurisdictions.

**4.  *Net Wealth Tax***

**(a)**     **Luxembourg Holders**

Luxembourg net wealth tax will not be levied on a Luxembourg individual holder holding New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs.

Luxembourg net wealth tax will be levied on Luxembourg corporate holders not entitled to a specific net wealth tax exemption based on Luxembourg domestic law with respect to their New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs.

Net wealth tax is levied annually at a rate of 0.5 percent on the net wealth of enterprises resident in Luxembourg on an amount of unitary value as determined for net wealth tax purposes up to and excluding €500.0 million.  When the unitary value exceeds the aforementioned threshold, net wealth tax is levied at 0.5 percent on the first €500.0 million and at 0.05 percent on the portion of the unitary value exceeding €500.0 million.  The New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs (provided the New Warrants or CVRs qualify as preferential subscription rights within the meaning of the 2012 Case-Law) may be exempt from net wealth tax subject to the conditions set forth by Paragraph 60 of the Law of October 16, 1934 on the valuation of assets (Bewertungsgesetz), as amended.

**(b)**     **Non-Luxembourg Holders**

Luxembourg net wealth tax will not be levied on a Non-Luxembourg Holder with respect to the New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs held unless they are

attributable to an enterprise or part thereof which is carried on through a permanent establishment, a fixed place of business, or a permanent representative in Luxembourg of a Non-Luxembourg corporate holder.

**5.** *Registration, Estate and Gift Taxes*

No registration tax or stamp duty will be payable by a holder of New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs in Luxembourg upon the disposal thereof.

No estate or inheritance tax is levied on the transfer of New Common Stock, New Warrants or CVRs upon the death of a holder thereof in cases where the deceased was not a resident of Luxembourg for inheritance tax purposes and no gift tax is levied upon a gift of New Common Stock if the gift is not passed before a Luxembourg notary or recorded in a deed registered in Luxembourg.  Where a holder of New Common Stock is a resident of Luxembourg for tax purposes at the time of his death, the New Common Stock is included in its taxable basis for inheritance tax or estate tax purposes.

**THE LUXEMBOURG TAX CONSIDERATIONS SUMMARIZED ABOVE ARE FOR GENERAL INFORMATION ONLY.  EACH HOLDER OF NEW COMMON STOCK, NEW WARRANTS OR CVRs IS URGED TO CONSULT ITS, HIS OR HER TAX ADVISOR AS TO THE PARTICULAR CONSEQUENCES THAT MAY APPLY TO SUCH HOLDER.**

**G.      U.S. Information Reporting and Withholding**

The Debtors, Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Amended Plan or in connection with payments made on account of consideration received pursuant to the Amended Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments under the Amended Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Amended Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders of Claims subject to the Amended Plan are urged to consult their tax advisors regarding these regulations and whether the transactions

158

contemplated by the Amended Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

### H.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or could be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common Stock or Reorganized S.A. Common Stock), and, subject to the paragraph below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Stock or Reorganized S.A. Common Stock). FATCA withholding could apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that were previously scheduled to take effect on January 1, 2019 would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Holder.

**THE FEDERAL INCOME AND LUXEMBOURG TAX CONSEQUENCES OF THE AMENDED PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION AND LUXEMBOURG TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE AMENDED PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

[*Remainder of page intentionally left blank.*]

## XIII.   RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Amended Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Amended Plan vote to accept the Amended Plan and support Confirmation of the Amended Plan.

Dated:  August 31, 2021                          INTELSAT S.A.
                                                 on behalf of itself and all other Debtors


                                                 */s/ David Tolley*
                                                 David Tolley
                                                 Chief Financial Officer and Co-Chief
                                                 Restructuring Officer
                                                 Intelsat S.A.

**Exhibit A**

**Plan of Reorganization**

[Filed Separately]

**Exhibit B**

**Corporate Structure**



**Outstanding Third Party Debt**

**Intelsat S.A. Convertible Senior Notes**

Intelsat S.A. 4.5% Convertible Senior Notes

**Intelsat (Luxembourg) S.A. Senior Notes**

LuxCo 7.75% Senior Notes

LuxCo 8.125% Senior Notes

**LuxCo Senior Notes**

LuxCo 12.5% Senior Notes

**Intelsat Connect Finance S.A. Senior Notes**

ICF 9.5% Senior Notes

**Intelsat Jackson Holdings S.A. Senior Notes**

Intelsat Jackson  5.5% Senior Notes

Intelsat Jackson 8.5% Senior Notes

Intelsat Jackson 9.75% Senior Notes

**Jackson Senior Secured Notes**

Intelsat Jackson 9.5% Senior Secured First Lien Notes

Intelsat Jackson 8% Senior Secured First Lien Notes

**Jackson Secured Credit Agreement**

Intelsat Jackson LIBOR + 3.75% Senior Secured First Lien Term Loan - Tranche B-3

Intelsat Jackson LIBOR + 4.5% Senior Secured First Lien Term Loan - Tranche B-4

Intelsat Jackson 6.625% Senior Secured Term Loan - Tranche B-5

 Primary Obligor

**Entity Key**





**Exhibit C**

**Liquidation Analysis**

**EXHIBIT C**

**Liquidation Analysis**

**1)     Introduction**

Often referred to as the "<u>Best Interest of Creditors Test</u>" or the "<u>Best Interest Test</u>,"[1] section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to confirmation of the Amended Plan, that each Holder of an impaired Claim or Interest must either (a) accept the Amended Plan or (b) receive or retain under the Amended Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors' assets were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  In determining whether the Best Interest Test has been met, the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in a chapter 7 proceeding must be determined.

This liquidation analysis ("<u>Liquidation Analysis</u>") was prepared by the Debtors with assistance from their financial advisors and represents the Debtors' best estimate of the cash proceeds, net of liquidation-related costs, that would be available for distribution to the Holders of Claims and Interests if the Debtors' estates were to be liquidated in cases under chapter 7 of the Bankruptcy Code.

To conduct the Liquidation Analysis, the Debtors and their advisors have:

- estimated the cash proceeds (the "<u>Liquidation Proceeds</u>") that a chapter 7 trustee (the "<u>Trustee</u>") would generate if each Debtor's chapter 11 case were converted to a chapter 7 case on December 31, 2021 (the "<u>Liquidation Date</u>"), and the assets of such Debtor's estate were liquidated;

- determined the distribution (the "<u>Liquidation Distribution</u>") that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7 of the Bankruptcy Code; and

- compared each Holder's Liquidation Distribution to the estimated distribution under the Amended Plan ("<u>Plan Distribution</u>") that such Holders would receive if the Amended Plan were confirmed and consummated.

As the Liquidation Analysis is a hypothetical analysis based on certain assumptions, certain aspects may vary from the Amended Plan, as discussed in the Disclosure Statement, including asset values.  The Liquidation Analysis is based upon estimates and assumptions discussed herein and in the Disclosure Statement.  The Liquidation Analysis should be read in conjunction with the Disclosure Statement and the Amended Plan in their entirety.

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, to which this Liquidation Analysis is attached as **Exhibit C** or the Amended Plan attached to the Disclosure Statement as **Exhibit A**.

**THE INFORMATION SET FORTH IN THIS LIQUIDATION ANALYSIS IS PRELIMINARY AND IS SUBJECT TO MODIFICATION AND SUPPLEMENTATION BY THE DEBTORS AT ANY TIME UP TO THE CONFIRMATION HEARING. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION UNDER CHAPTER 7, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED HERE.**

### 2)      Basis of Presentation

The Liquidation Analysis has been prepared assuming that the Debtors' chapter 7 liquidation would commence on or about the Liquidation Date, which is an estimate of when the Debtors' chapter 11 cases would convert to chapter 7 cases absent confirmation of the Amended Plan. The pro forma values referenced herein are projected as of the Liquidation Date. The Liquidation Analysis was prepared on an individual legal entity basis for each Debtor and summarized into a consolidated report.

The Liquidation Analysis represents an estimate of recovery values and percentages based on a hypothetical liquidation if a Trustee were appointed by the Bankruptcy Court to convert assets into cash. Determining the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving numerous estimates and assumptions that, although considered reasonable by the Debtors' management team and their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management team.

The Liquidation Analysis contemplates facts and conditions known and existing as of August 20, 2021. Events and conditions subsequent to this date, including updated Financial Projections, as well as other factors, could have a substantial effect upon the Liquidation Analysis. All forward-looking statements attributable to the Debtors or persons acting on their behalf apply only as of the date of the Disclosure Statement, and are expressly qualified in their entirety by the cautionary statements included in this document. Changes that may affect the value of assets may occur between the date of the filing of the Disclosure Statement and the assumed Liquidation Date. The Debtors undertake no obligation to update or revise statements to reflect events or circumstances that arise after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events.

For liquidating legal entities, the Liquidation Analysis assumes a timeline in which:

I.      The Debtors' satellite constellation, excluding C-Band satellites operating within the continental United States ("CONUS"), will be sold through one or more asset sales of satellite clusters based on each satellite's customer type and technology. Satellite clusters are assumed to include select satellites and each satellite's orbital slot license(s) as well as underlying customer contracts (collectively, the "Space Assets"). The analysis assumes Space Assets sale(s) would be completed by September 30, 2022 (the "Asset Sale Period").

2

II.      In the "High Case" scenario intended to represent the largest potential distributable value achievable in a hypothetical liquidation, the Trustee is assumed to progress with the FCC C-Band clearing plan as described in the FCC Order (such clearing plan, the "C-Band Clearing").  The estate is assumed to have completed Phase I milestones by the Liquidation Date and will receive the corresponding C-Band Accelerated Relocation Payment for Phase I during the Asset Sale Period.  The assets related to C-Band CONUS operations that are required to satisfy Phase II milestones pursuant to the FCC Order, which include on-orbit C-Band CONUS satellites and corresponding orbital slot licenses and customer contracts, seven satellites under construction, supporting terrestrial infrastructure, and the rights to Phase II accelerated relocation payments and reimbursements from the FCC clearinghouse earned by completing the requirements set forth in the FCC Order (collectively, the "C-Band Clearing Assets"), are assumed to be sold through an asset sale.  The analysis assumes the C-Band Clearing Assets sale would be completed by September 30, 2022.

In the "Low Case" scenario, the estate is assumed to have completed the Phase I milestones by the Liquidation Date and is expected to receive the C-Band Accelerated Relocation Payment for Phase I during the Asset Sale Period consistent with the High Case.  However, the Trustee is assumed to abandon the remaining FCC C-Band Clearing plan for Phase II because of risks associated with the uncertainty of being able to monetize these assets.  The Low Case also assumes no further reimbursements related to C-Band clearing efforts after the Liquidation Date.  On-orbit satellites operating within CONUS are assumed to be sold per the timeline described in Section 2(I).

III.     The liquidation of assets from all other operations (*e.g.*, residual fixed assets, investments, real estate, accounts receivable, etc.) is assumed to occur during the Asset Sale Period, with a remaining 15-month period to complete the administrative wind-down of the estate (the "Wind-Down Period").

The commercial aviation division purchased from Gogo ("Commercial Aviation") is included in the liquidation of the Debtors' other operations rather than being sold as a going concern because of the near term high cash burn associated with that business—estimated at $10–$15 million per month—which the Trustee would likely be reluctant to continue funding while pursuing an uncertain sale process.

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under the Amended Plan, absent a liquidation.  Examples of these kinds of claims include various potential employee claims (for items such as severance), pension termination claims, unpaid chapter 11 administrative claims, and unexpired lease rejection and guarantee claims.  Some of these claims could be significant and may be entitled to priority in payment over general unsecured claims.  The Liquidation Analysis estimates the tax consequence related to the receipt of the C-Band Accelerated Relocation Payment for Phase I consistent with the Valuation Analysis that is set forth in Exhibit E.  The Liquidation Analysis does not include estimates for any other U.S. federal, state, local, or non-U.S. tax consequences, if any, that may be triggered upon the liquidation and sale events of assets in the manner described above.  Such tax

3

consequences, if any, may be material.  Finally, the Liquidation Analysis assumes recoveries for potential preferences but does not include recoveries resulting from fraudulent transfer, or other litigation or avoidance actions.

**3)      Liquidation Process**

The Debtors' liquidation would be conducted pursuant to chapter 7 of the Bankruptcy Code, with the Trustee managing the bankruptcy estate (the "Estate") to maximize recovery in an expedited process.  The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of entity-specific assets for distribution to creditors.  The three major components of the liquidation are as follows:

I.      Generation of cash proceeds:

- Sale of Space Assets;

- Receipt of C-Band Accelerated Relocation Payment for Phase I;

- Sale of C-Band Clearing Assets (*e.g.*, remaining Phase II opportunity and related CONUS assets);

- Liquidation of the remaining portion of assets not accompanying Space Assets or C-Band Clearing Assets, such as third-party investments, buildings, vehicles, antenna, technological hardware, etc.; and

- Collection of working capital (*e.g.*, accounts receivable).

II.     Costs related to the liquidation process, such as corporate support, personnel retention/severance costs, and trustee and professional fees.

III.    Distribution of net proceeds generated from asset sales to claimants in accordance with the priority scheme under chapter 7 of the Bankruptcy Code.

**4)      Distribution of Net Proceeds to Claimants**

Any available net proceeds would be allocated to Holders of Claims against, and Interests in, the Debtors in accordance with section 726 of the Bankruptcy Code—*i.e.*, the priority scheme applicable in a chapter 7 proceeding.

- ***Debtor in Possession Financing (the "DIP Facility") Claims:*** The facility loan provided by Credit Suisse as Agent, consisting of a $1.5 billion multi-draw term loan credit facility, which includes a $500 million upsize to the existing facility that is expected to close before the projected Liquidation Date.  DIP Facility Claims also include chapter 11 professional fees pursuant to carve-out and creditor adequate protection provisions in the DIP Order.

4

- ***Secured Claims:*** Claims arising under the Debtors' prepetition secured credit facilities, which include the Jackson First Lien Credit Agreement and Jackson First Lien Notes.

- ***Chapter 11 Administrative & Priority Claims:*** Including but not limited to claims as a result of (i) postpetition accounts payable & customer prepayments, (ii) prepetition income, sales, and use tax, (iii) postpetition taxes, (iv) postpetition intercompany claims, (v) pension termination claims, (vi) contract rejection claims arising from contracts assumed postpetition but prior to the Liquidation Date, and (vii) claims arising under section 503(b)(9) of the Bankruptcy Code.

- ***General Unsecured Claims:*** Including but not limited to (i) Convertible Senior Notes, (ii) LuxCo Senior Notes, (iii) Connect Senior Notes, (iv) Jackson Senior Notes, (v) prepetition intercompany Claims, (vi) contract rejection Claims, (vii) prepetition trade payables, and (viii) certain other legal Claims and Claims held by current and former employees.

## 5)   Non-Debtor Affiliates

The Liquidation Analysis assumes all of the Debtors' non-Debtor affiliates would undertake parallel liquidations, whereby the proceeds of such liquidations would be distributed in accordance with the priority of Claims asserted against such entities on an entity-by-entity basis. The Liquidation Analysis assumes that any recoveries from the liquidation of non-Debtor affiliates are used to satisfy (i) the wind-down costs arising from the monetization of those assets; and (ii) indebtedness outstanding with respect to those interests or claims against those entities. The material assumptions of the non-Debtor affiliates' hypothetical liquidation analyses are substantially consistent with the assumptions underlying the liquidation of the Debtors.

## 6)   Conclusion

The Debtors have determined, as summarized in the following analysis, upon the Effective Date, the Amended Plan will provide all Holders of Claims and Interests with a recovery (if any) that is not less than what such Holders would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and as such believe that the Amended Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

*[Remainder of page intentionally left blank.]*

## Recovery Comparison

The following table compares estimated Amended Plan versus Liquidation recoveries by Amended Plan class:

| Claim Interest | Base Recovery Model | | |
| --- | --- | --- | --- |
| | Hypothetical Liq. (High Case) | Plan of Reorganization | Variance |
| DIP Claims | 100.00% | 100.00% | - |
| Term Loan Facility Claims [1] | 100.00% | 99.67% | N/A |
| 8.00% First Lien Notes Claims [1] | 100.00% | 99.49% | N/A |
| 9.50% First Lien Notes Claims [1] | 100.00% | 95.51% | N/A |
| Administrative Claims | 74.70% | 100.00% | 25.30% |
| Priority Tax Claims | - | 100.00% | 100.00% |
| Intelsat S.A. - Unsecured Claims | 2.64% | 6.88% | 4.25% |
| Intelsat Investment Holdings S.a.r.l - Unsecured Claims | - | - | - |
| Intelsat Holdings S.A. - Unsecured Claims | - | - | - |
| Intelsat Investments S.A. - Unsecured Claims | - | - | - |
| Intelsat (Luxembourg) S.A. - Unsecured Claims | - | 0.04% | 0.04% |
| Intelsat Envision Holdings LLC - Unsecured Claims | 3.00% | 4.29% | 1.29% |
| Intelsat Connect Finance S.A. - Unsecured Claims | 3.86% | 22.54% | 18.68% |
| Intelsat Jackson Holdings S.A. - Unsecured Claims | 1.32% | 11.20% | 9.88% |
| Intelsat Jackson Subsidiaries - Unsecured Claims | 7.36% | 44.77% | 37.41% |

**Notes:**

[1]: Represents settled amounts with secured creditors

| Intelsat Jackson Subsidiaries - Unsecured Claims | Hypothetical Liq. (High Case) | Plan of Reorganization | Variance |
| --- | --- | --- | --- |
| Intelsat UK Financial Services, Ltd. | - | - | - |
| Intelsat Align S.a.r.l | 0.00% | 0.01% | 0.01% |
| Intelsat License Holdings LLC | - | - | - |
| Intelsat Subsidiary (Gibraltar) Limited | 0.00% | 0.00% | 0.00% |
| Intelsat Holdings LLC | - | - | - |
| Intelsat Finance Bermuda Ltd. | 0.00% | 0.00% | 0.00% |
| Intelsat Satellite LLC | 0.00% | 10.15% | 10.14% |
| Intelsat License LLC | 6.74% | 24.81% | 18.07% |
| Intelsat Ventures S.a r.l. | 0.24% | 5.64% | 5.39% |
| Intelsat Virginia Holdings LLC | 0.24% | 0.41% | 0.17% |
| Intelsat Global Sales & Marketing Ltd. | 0.10% | 0.80% | 0.70% |
| Intelsat US LLC (fka Intelsat Corporation) | 0.02% | 3.07% | 3.05% |
| Intelsat International Systems, LLC | - | 0.07% | 0.07% |
| PanAmSat International Holdings LLC | - | - | - |
| Intelsat International Employment LLC | - | - | - |
| PanAmSat Europe Corporation | - | 0.02% | 0.02% |
| Intelsat Service and Equipment LLC | - | - | - |
| Southern Satellite LLC | - | - | - |
| Southern Satellite Licensee LLC | - | - | - |
| PanAmSat International Sales LLC | 0.00% | 0.02% | 0.02% |
| Intelsat Genesis GP LLC | - | - | - |
| Intelsat Genesis Inc. | - | 0.25% | 0.25% |
| Intelsat Alliance LP | - | - | - |
| Intelsat US Finance LLC | - | - | - |
| Intelsat Asia Carrier Services, LLC | - | - | - |
| PanAmSat India LLC | - | - | - |
| PanAmSat India Marketing L.L.C. | - | - | - |

6

## Consolidated Debtor Waterfall

($ in millions)

| | Low | | High | | Notes |
|---|---|---|---|---|---|
| **Net Distributable Value including Intercompany** | $ | **4,611** | $ | **9,480** | 1 - 13 |
| Total DIP Facility Claims: | $ | 1,581 | $ | 1,581 | 14 |
| Estimated DIP Facility Recovery ($) | $ | 1,581 | $ | 1,581 | |
| Estimated DIP Facility Recovery (%) | | 100% | | 100% | |
| **Net Estimated Proceeds Available for Distribution** | $ | **3,030** | $ | **7,899** | |
| Total Secured Claims: | $ | 4,935 | $ | 4,935 | 15 |
| Estimated Secured Recovery ($) | $ | 2,430 | $ | 4,935 | |
| Estimated Secured Recovery (%) | | 49% | | 100% | |
| **Net Estimated Proceeds Available for Distribution** | $ | **600** | $ | **2,964** | |
| Total Chapter 11 Administrative / Priority Claims: | $ | 4,987 | $ | 4,972 | 16 |
| Estimated Chapter 11 Administrative / Priority Recovery ($) | $ | 400 | $ | 2,039 | |
| Estimated Chapter 11 Administrative / Priority Recovery (%) | | 8% | | 41% | |
| **Net Estimated Proceeds Available for Distribution** | $ | **200** | $ | **926** | |
| Total Unsecured Claims: | $ | 31,728 | $ | 29,185 | 17 |
| Estimated Unsecured Recovery ($) | $ | 199 | $ | 902 | |
| Estimated Unsecured Recovery (%) | | 1% | | 3% | |

## Notes to the Consolidated Debtor Waterfall

- The Liquidation Analysis assumes that the Debtors' chapter 11 cases are converted to chapter 7 cases on December 31, 2021.

- The Liquidation Analysis is based on the liquidation of legal entities on an individual basis. The consolidated waterfall shown in this analysis is based on an aggregation of the individual Debtor liquidation claims and recoveries.

7

### Gross Liquidation Proceeds

| Summary of Gross Distributable Value | | | |
|---|---|---|---|
| ($ in millions) | Low | High | Note |
| Space Assets | $ 1,897 | $ 2,097 | 1 |
| C-Band Contingency Payments [1] | 1,162 | 2,816 | 2 |
| C-Band Satellites | 339 | 473 | 2 |
| C-Band Spend Reimbursements | - | 125 | 2 |
| Cash at Conversion | 474 | 474 | 3 |
| Accounts Receivable | 158 | 174 | 4 |
| Real Estate | 103 | 131 | 5 |
| Non-Controlling Interests | 47 | 86 | 5 |
| Ground Assets | 26 | 70 | 5 |
| Other | 47 | 103 | 5 |
| **Total** | **$ 4,252** | **$ 6,549** | |
| **Redistributable Value [2]** | | | |
| Postpetition Intercompany Balance Recoveries | $ 245 | $ 1,841 | 6 |
| Prepetition Intercompany Balance Recoveries | 83 | 170 | 6 |
| Equity Recoveries (Unencum. from Non-Debtor Subs.) | 0 | 0 | 6 |
| Equity Recoveries (Encum. from Debtor Subs.) | 1 | 23 | 6 |
| **Total Redistributable Value** | **$ 329** | **$ 2,035** | |
| **Gross Distributable Value** | **$ 4,581** | **$ 8,584** | |

**Notes:**

**[1]:** Includes value distribution for costs required for C-Band Clearing plan that are not expected to be reimbursable

**[2]:** Does not reflect additional value available for third party distribution

## Basis of Projections

- Except as otherwise noted herein, the Liquidation Analysis is based on the unaudited balance sheets of the Debtors as of June 30, 2021.  Certain asset values were adjusted on a pro forma basis to the Liquidation Date based on the Debtors' projected balance sheet as of December 31, 2021.  Certain assets were also assumed to be sold on a going concern basis at assumed discounted valuations.  In addition, other than assuming recoveries for potential preference actions, currently no value is being ascribed to other avoidance actions not enumerated.

## Note 1 – Space Assets

- The Space Assets sale has been valued utilizing a discounted cash flow ("DCF") methodology, with the following key assumptions:

  – Business Plan revenue projections through 2026, with a 5% annual decline thereafter. Additionally:

    – The Low Case scenario assumes a 25% discount to revenue and the High Case assumes a 15% discount to revenue due to a distressed chapter 7 transaction.

8

- The High Case scenario assumes certain prepaid customer contracts are renegotiated to generate incremental cash revenue in a sale transaction.

- Certain revenue has been excluded due to expected non-renewals during the Asset Sale Period and the risk of certain buyers not being able to service certain types of revenue that requires the scale and consolidated technological platform of the Debtor.

- Inclined on-orbit ("IOO") satellites generating de minimis revenue are assumed to have value equal to that of the underlying orbital slot license.

- Customer contracts are assumed to be bundled in the asset sale(s) with their corresponding satellite(s).

- Regulatory approval(s) are assumed to be received for sale of satellite clusters, including corresponding orbital slot licenses and customer contract novation.

- As of the Liquidation Date, the Debtors estimate that all Space Assets are encumbered by liens of Holders of DIP and First Lien Claims.

## Note 2 – C-Band Clearing Assets

- The C-Band Clearing Assets sale has been valued utilizing a DCF methodology and includes certain assumptions related to the ability to meet deadlines for C-Band Clearing outlined in the FCC Order.

- Key assumptions for the High Case include:

- Accelerated Relocation Payment for Phase I is assumed net of tax consequences consistent with the Valuation Analysis that is set forth in Exhibit E.

- Accelerated Relocation Payment for Phase II is assumed to receive a 50% discount due to the distressed nature of the chapter 7 transaction and incremental risks associated with ability of a buyer to collect these contingent payments.

- Based on certain of the Debtors' intercompany agreements, value for Accelerated Relocation Payments is allocated 47% to Intelsat Jackson Holdings S.A. ("Jackson"), 45% to Intelsat License LLC ("License") and 8% to Intelsat US LLC ("US LLC").

- The Debtors' expense reimbursements from the Debtors' C-Band Clearing efforts are received through the end of the Asset Sale Period from the FCC clearinghouse.

- The Debtors' right to receive the remaining unpaid expense reimbursements from the Debtors' C-Band Clearing efforts are sold as part of the asset sale at an assumed discount of 25% due to the distressed nature of the chapter 7 transaction and incremental risks associated with ability of a buyer to collect these reimbursements.

9

- CONUS on-orbit satellites that are part of the C-Band Clearing Assets are assumed to be sold consistent with the assumptions for Space Assets.

- Key assumptions for the Low Case include:

  - Accelerated Relocation Payment for Phase I is assumed net of tax consequences consistent with the Valuation Analysis that is set forth in Exhibit E.

  - Based on certain Debtors' intercompany agreements, value for Accelerated Relocation Payments is allocated 95% to Jackson and 5% to US LLC.

  - Assumes no value from the Accelerated Relocation Payment for Phase II.

  - Assumes no reimbursements related to Debtors' C-Band Clearing efforts after the Liquidation Date.

  - CONUS on-orbit satellites that are part of the C-Band Clearing Assets are assumed to be sold consistent with the assumptions for Space Assets.

- As of the Liquidation Date, the Debtors estimate that all C-Band Clearing Assets are encumbered by liens of Holders of DIP and First Lien Claims.

### Note 3 – Cash Balance at Conversion

- Cash as of December 31, 2021 is an estimate based on the Debtors' projected balance sheet. As of the Liquidation Date, the Debtors estimate that a majority of cash is encumbered by liens of Holders of DIP and First Lien Claims.

### Note 4 – Accounts Receivable

- Accounts receivable (exclusive of intercompany balances) as of December 31, 2021 is an estimate based on the Debtors' projected balance sheet. Estimated proceeds from accounts receivable balances are assumed to be 70%–77% of gross receivables. This is in part because accounts receivable balances reflect gross balances and exclude the allowance for doubtful accounts, which if included would negatively impact recoveries. Furthermore, there would be inevitable difficulties in collecting receivables and concessions would likely be required to facilitate the collection of certain accounts receivable.

- As of the Liquidation Date, the Debtors estimate that all accounts receivable are encumbered by liens of Holders of DIP and First Lien Claims.

### Note 5 – Other Assets

- Represents liquidated non-controlling investments and certain investments in affiliates, real estate properties, and discontinued fixed assets net of recovery costs (includes buildings, vehicles, antenna, technological hardware, etc.).

- Key assumptions to valuation include:

10

- Assumes recovery of $103 million to $131 million for real estate.  Values are based on projected asset sale proceeds for office space property and two teleports, and liquidation of remaining five teleports.  Proceeds are assumed to be unencumbered assets.

- Assumes recovery of $47 million to $86 million for non-controlling investments, which incorporates discounts to book value primarily due to potential difficulties monetizing and certain investment companies no longer receiving preferred services from Intelsat under a liquidation scenario.

- Assumes recovery of $26 million to $70 million for fixed assets including antenna, technological hardware, etc.

- Assumes recovery of $47 million to $103 million for fixed assets related to Commercial Aviation, preference recoveries assuming a recovery range of 5%-10% on payments made in the 90-days prior to the chapter 11 filing excluding but not limited to employee and benefit payments, payments that create new value to the estate, and payments to lenders and professional services firms, other assets including marginal recovery on other ledger accounts, as well as netting of foreign non-Debtor payables satisfied with local distributable value prior to satisfying Pension Benefit Guaranty Corporation ("PBGC") claims or intercompany redistribution.

- As of the Liquidation Date, the Debtors estimate that all other assets are encumbered by liens of Holders of DIP and First Lien Claims, except for value of $431 million in the Low Case and $484 million in the High Case comprised of cash held at legal entities above Intelsat Jackson Holdings S.A., cash held at non-Debtor legal entities, real estate value as previously described, equity recoveries from non-debtor subsidiaries, and certain other titled assets (*e.g.*, automobiles), the latter of which has de minimis value.

**Note 6 – Redistributable Value**

- The Liquidation Analysis assumes that liquidation value is cycled among the Debtors and their non-Debtor affiliates to satisfy Intercompany Claims, which in turn may alter the liquidation value available to satisfy third-party claims at each entity.  The results of the individual entity-by-entity analysis have been consolidated for a combined total liquidation value as presented herein.  The amounts received and distributed are presented on a gross basis.

11

**Net Distributable Value**

| Summary of Net Distributable Value | | | |
|---|---|---|---|
| ($ in millions) | **Low** | **High** | **Note** |
| Gross Distributable Value | $ 4,581 | $ 8,584 | |
| ( + ) Post-Conversion Cash Flow | 268 | 1,284 | 7 |
| ( - ) Retention Costs | (39) | (39) | 8 |
| ( - ) Severance Costs | (52) | (52) | 9 |
| ( - ) Professional Fees | (105) | (187) | 10 |
| ( - ) Ch. 7 Trustee Fees | (42) | (75) | 11 |
| ( - ) Contract Cures | - | (35) | 12 |
| **Net Distributable Value** | **4,611** | **9,480** | 13 |

### Note 7 – Post-Conversion Cash Flow

- Represents cash collections generated by the Debtors throughout the Asset Sale Period. Cash collections are projected based on the revenue forecast described in Note 1 for Space Assets.

- The High Case scenario assumes the reimbursement for capital expenditures and operating expenses for the Debtors' C-Band Clearing efforts that are deemed eligible in the FCC Order are received through the Asset Sale Period. Correspondingly, additional capital expenditures and operating expenses are assumed to continue as the Trustee progresses with the C-Band Clearing plan.

- Additionally, Post-Conversion Cash Flow includes estate wind-down costs that represent the cost of operations that would be required to keep Space Assets and C-Band Clearing Assets as going concerns through the Asset Sale Period (includes earth station operations, space segment costs, and third-party capacity). Estate wind-down costs also represents the cost of corporate support functions that would be required to facilitate asset sales and commence wind-down of the estate during the Asset Sale Period and costs associated with maintaining a reduced workforce thereafter to wind-down the remaining operations and satisfy final liabilities of the Company during the Wind-Down Period.

- As part of Space Assets and C-Band Clearing Assets sales, the buyer may require a transition services agreement ("TSA") to migrate ownership. In such a scenario, certain wind-down costs may be increased beyond the assumed values. However, it is correspondingly assumed the buyer would remunerate the estate for any incremental costs incurred related to a TSA.

### Note 8 – Retention Costs

- To maximize recoveries on remaining assets, minimize number of claims, and generally oversee an orderly liquidation, the Trustee would need to continue to employ a substantial number of the Debtors' employees for the liquidation period.

12

- The assumptions contemplate a retention bonus of 50% of base salary.

**Note 9 – Severance Costs**

- The Liquidation Analysis assumes that the Trustee would reduce employee headcount to a minimum staff from current levels over the 24-month liquidation timeframe.  This includes assuming 2 months of severance for all employees.

**Note 10 – Professional Fees**

- Represents fees to professionals necessary to effectuate an orderly sale and liquidation of the Debtors.

- Assumes professional fees of 2.5% of Gross Distributable Value excluding cash plus post-conversion cash flow for the 9-month monetization period; fees could be significantly more or less depending on the complexity and length of the liquidation process.

**Note 11 – Chapter 7 Trustee Fees**

- Trustee fees necessary to facilitate the sale of the Debtors' businesses are assumed to represent 1% of Gross Distributable Value excluding cash plus post-conversion cash flow. These fees would be used for developing marketing materials and facilitating the solicitation process for the parties, in addition to general administrative expenses, such as the Trustee's compensation.

**Note 12 – Contract Cures**

- The High Case scenario includes amounts to cure contracts required to continue the C-Band Clearing plan.

**Note 13 – Net Distributable Value**

- Represents the full external liquidation value of the Debtors' assets before liquidation adjustments.

[*Remainder of page intentionally left blank.*]

13

## Claims and Claim Recoveries

### Note 14 – DIP Facility Claims

| Summary of DIP Facility Claims | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total Claims | | Estimated Recovery $ | | Estimated Recovery % | | |
| ($ in millions) | Low | High | Low | High | Low | High | Note |
| **DIP Facility Claims** | | | | | | | |
| DIP Term Loan | $ 1,500 | $ 1,500 | $ 1,500 | $ 1,500 | 100% | 100% | 14 |
| Carveout Claim | 81 | 81 | 81 | 81 | 100% | 100% | 14 |
| Creditor Adequate Protection | 0 | 0 | 0 | 0 | 100% | 100% | 14 |
| **Subtotal** | $ 1,581 | $ 1,581 | $ 1,581 | $ 1,581 | **100%** | **100%** | |

- Includes any outstanding amounts under the DIP Facility.

- Includes accrued chapter 11 professional fees pursuant to carve-out provisions in the DIP Order.

- Includes accrued professional fees for secured creditor advisors pursuant to adequate protection provisions in the DIP Order.

### Note 15 – Secured Claims

| Summary of Secured Claims | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total Claims | | Estimated Recovery $ | | Estimated Recovery % | | |
| ($ in millions) | Low | High | Low | High | Low | High | Note |
| **Secured Claims** | | | | | | | |
| Jackson Secured Credit Agreement | $ 3,095 | $ 3,095 | $ 1,524 | $ 3,095 | 49% | 100% | 15 |
| Jackson Senior Secured Notes | 1,840 | 1,840 | 906 | 1,840 | 49% | 100% | 15 |
| **Subtotal** | $ 4,935 | $ 4,935 | $ 2,430 | $ 4,935 | **49%** | **100%** | |

- First Lien Claims include:

  – Term Loan Facility Claims

  – First Lien Notes Claims

### Note 16 – Chapter 11 Administrative & Priority Claims

| Summary of Chapter 11 Administrative / Priority Claims | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Total Claims | | Estimated Recovery $ | | Estimated Recovery % | | |
| ($ in millions) | Low | High | Low | High | Low | High | Note |
| **Chapter 11 Administrative / Priority Claims** | | | | | | | |
| Postpetition Intercompany Claims | $ 4,707 | $ 4,707 | $ 245 | $ 1,841 | 5% | 39% | 16 |
| Postpetition Accounts Payable | 8 | 8 | 0 | 6 | 5% | 70% | 16 |
| PBGC Claim | 146 | 146 | 146 | 146 | 100% | 100% | 16 |
| Admin Real Estate Claims | 60 | 60 | 6 | 25 | 10% | 42% | 16 |
| Postpetition C-band Clearing Contracts | 15 | - | 0 | - | 2% | N/A | 16 |
| Other Claims | 46 | 46 | 0 | 16 | 1% | 36% | 16 |
| **Subtotal** | $ 4,987 | $ 4,972 | $ 400 | $ 2,039 | **8%** | **41%** | |

14

- Administrative & Priority Claims include:

  - **Postpetition Intercompany Claims:** Represents the postpetition intercompany payable balances among the Company's legal entities.  The balance for the postpetition period is forecast by legal entity primarily based on (i) run rate activity through June 30, 2021 extrapolated through the Liquidation Date, or (ii) as forecasted in the Business Plan for certain legal entity relationships that are driven more by large projected capital expenditure purchases that are funded through intercompany transactions.  Other intercompany balances with Intelsat Clearinghouse LLC ("Clearinghouse") assume a run rate to the Liquidation Date based on actual postpetition activity from July 31, 2020 through November 30, 2020, which is most representative of normal-course intercompany activity.

  - **Postpetition Accounts Payable**: Postpetition accounts payable related to vendors and certain customer disputes are assumed to be outstanding on day one of the wind-down.  Trade accounts payable obligations incurred during the wind-down period are not included in this balance, as they are assumed to be paid in the ordinary course.

    Postpetition accounts payable also includes certain postpetition taxes related to income tax, transaction tax, property tax and payroll tax are assumed to be outstanding on day one of the wind-down.  Tax obligations incurred during the wind-down period are not included in this balance, as they are assumed to be paid in the ordinary course.  Liabilities related to the continuing operations assumed to transfer to buyer.

  - **Pension Termination Claims:** The Intelsat pension plan would go through a distressed termination process, thereby ceding control/management to the PBGC.  This represents the estimated claim PBGC would assert in a chapter 7 liquidation.

  - **Assumed Real Estate/Contract Claims:** Represents remaining obligations related to leases assumed on a postpetition basis, as well as unpaid cure amounts relating to contracts assumed prior to the Liquidation Date.  These assumed leases/contracts would be terminated in the event of a hypothetical liquidation.

  - **Postpetition C-Band Clearing Contracts**: Postpetition contracts related to manufacturers are assumed to be outstanding on day one of the wind-down.

  - **Prepetition Taxes**: The Debtors may have prepetition taxes outstanding at the time of the Liquidation Date.

## Note 17 – General Unsecured Claims

| Summary of Unsecured Claims | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total Claims | | Estimated Recovery $ | | Estimated Recovery % | | | |
| ($ in millions) | Low | High | Low | High | Low | High | | Note |
| **Unsecured Claims** | | | | | | | | |
| Secured Claims Deficiency Claim | $ 2,505 | $   - | $   39 | $   - | 2% | N/A | | 17 |
| Intelsat S.A. Convertible Senior Notes | 410 | 410 | 11 | 23 | 3% | 6% | | 17 |
| Intelsat (Luxembourg) S.A. Senior Notes | 1,357 | 1,357 | - | - | 0% | 0% | | 17 |
| Luxco Senior Notes | 0 | 0 | - | - | 0% | 0% | | 17 |
| Intelsat Connect Finance S.A. Senior Notes | 1,299 | 1,299 | 53 | 89 | 4% | 7% | | 17 |
| Intelsat Jackson Holdings S.A. Senior Notes | 7,057 | 7,057 | 9 | 610 | 0% | 9% | | 17 |
| Prepetition Intercompany Claims | 18,817 | 18,817 | 83 | 170 | 0% | 1% | | 17 |
| PBGC Deficiency Claim | - | - | - | - | N/A | N/A | | 17 |
| Other GUC Claims | 284 | 245 | 4 | 10 | 1% | 4% | | |
| **Subtotal** | $ 31,728 | $ 29,185 | $   199 | $   902 | 1% | 3% | | |

- **Deficiency Claims:** Represents any portion of unpaid secured prepetition debt irrespective of partial recoveries at other legal entities, unless the secured prepetition debt is cumulatively paid in full across all guarantors.

- **Unsecured Notes** include:

  – Jackson Senior Notes

  – LuxCo Senior Notes

  – Connect Senior Notes

  – Convertible Senior Notes

- **Prepetition Intercompany Payables:** Represents all prepetition intercompany payables per the Company's books and records.

- **Other General Unsecured Claims** include:

  – **Prepetition Accounts Payable Claims:** Represents estimated unpaid prepetition vendor claims as of the Liquidation Date.

  – **Contract Rejection Claims:** Represents costs associated with rejecting operating contracts and purchase agreements for any business not sold as a going concern.

  – **Legal Claims:** Represents estimates for ongoing litigation and legal-related liabilities.

*[Remainder of page intentionally left blank.]*

16

**<u>Exhibit D</u>**

**Financial Projections**

**Exhibit D**

**Financial Projections**[1]

As a condition to Confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that Confirmation is not likely to be followed by either a liquidation or the need to further reorganize the Debtors (and together with their non-Debtor affiliates, the "Company").  In accordance with this condition and in order to assist each holder of a Claim in determining whether to vote to accept or reject the Amended Plan, the Company's management team ("Management"), with the assistance of their advisors, developed financial projections (the "Financial Projections") for the fiscal years 2022 through 2026 (the "Forecast Period") to support the feasibility of the Amended Plan.

The Financial Projections were prepared by Management with the assistance of various professionals, including their financial advisors, and are based on a number of assumptions made by Management, within the bounds of their knowledge of their business and operations, with respect to the future performance of the Company's operations.  Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, there can be no assurance that such assumptions will be realized.

The Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information.  An independent auditor has not examined, compiled, or performed any procedures with respect to the prospective financial information contained in this Exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability.  The Debtors' independent auditor assumes no responsibility for, and denies any association with, the prospective financial information.

*Safe Harbor Under the Private Securities Litigation Reform Act of 1995*

The Financial Projections contain certain statements that are "forward-looking" within the meaning of the Private Securities Litigation Reform Act of 1995.  Forward-looking statements in the Financial Projections include the intent, belief, or current expectations of the Debtors and Management with respect to the timing of, completion of, and scope of the current restructuring, Amended Plan, Debtors' business plan, and market conditions, and the Debtors' future liquidity, as well as the assumptions upon which such statements are based.  While the Debtors believe that the expectations are based upon reasonable assumptions within the bounds of their knowledge of their business and operations, parties-in-interest are cautioned that any such forward-looking statements are not guarantees of future performance, involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

*Accounting Policies*

The Financial Projections have been prepared using accounting policies that are consistent with those applied in the Debtors' historical financial statements.

Upon emergence from chapter 11, the Reorganized Debtors will implement "fresh start" reporting pursuant to Accounting Standards Codification ("ASC") Topic 852, "Reorganization."  The main principles of fresh start reporting require that the reorganization value of the emerging entity be allocated to all of the entity's assets and liabilities in accordance with the guidance in ASC Topic 805, "Business Combinations."  Any

---

[1]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, to which this Financial Projections is attached as **Exhibit D** or the Amended Plan attached to the Disclosure Statement as **Exhibit A**.

portion of the reorganization value not attributable to specific tangible or identifiable intangible assets or liabilities of the emerging entity is required to be reported as goodwill. The Financial Projections may not reflect all the adjustments necessary to implement fresh start reporting.

### Summary of Significant Assumptions

The Debtors, with the assistance of various professionals, including their financial advisors, prepared the Financial Projections for the fiscal years 2022 through 2026. The Financial Projections are based on a number of assumptions with respect to the future performance of the Reorganized Debtors' operations. Note that the Financial Projections include the projected future performance of the entire Company, which includes the Debtors as well as their non-Debtor affiliates.

### General Assumptions

The Company operates on a calendar year and the Financial Projections assume that the Effective Date will be December 31, 2021 and that the Reorganized Debtors will continue to conduct operations substantially similar to their current businesses. In addition, the Financial Projections take into account the current market environment in which the Debtors compete, including many economic and financial forces that are beyond the control of the Debtors and Management. The Debtors operate in the satellite communications industry, providing diversified communications services to the world's leading media companies, fixed and wireless telecommunications operators, data networking service providers for enterprise and mobile applications in the air and on the seas, multinational corporations and internet service providers. The Company is also the leading provider of commercial satellite capacity to the U.S. government and other select military organizations. Economic growth or slowdowns on a global, national or regional basis may impact the Reorganized Debtors' revenues and expenses. In addition, general trends or legislation may impact performance.

The budget process is led by business unit financial planning leaders with input from the corporate financial planning & analysis team. These financial planning leaders collaborate with relevant business owners to develop the operational and financial projections for each of the key drivers of the business. Key drivers include, among others, customer acquisition/renewal assumptions, satellite and ground capital investments, known initiatives, and historical trends. These inputs are projected by segment and summarized into a consolidated financial view that is reviewed by the senior leadership team and, ultimately, the Board of Directors.

### Risk Factors

Although these Financial Projections have been prepared in good faith and are believed to be reasonable, it is important to note that the Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Debtors' management team's control. Many factors could cause actual results, performance, or achievements to differ materially from any future results, performance, or achievements expressed or implied by these forward-looking statements. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in Article VIII of the Disclosure Statement and the assumptions described herein.

There may be other factors that may cause the Reorganized Debtors' actual results to differ materially from these forward-looking statements. All forward-looking statements attributable to the Debtors or persons acting on their behalf apply only as of the date of this Disclosure Statement, and are expressly qualified in their entirety by the cautionary statements included in this document. The Debtors undertake no obligation to update or revise forward-looking statements to reflect events or circumstances that arise after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events.

*Projected Statements of Operations*

"Adjusted EBITDA" or "AEBITDA" is defined as earnings before interest, taxes, depreciation and amortization, adjusted to exclude merger and integration costs, restructuring charges, share-based compensation and certain other costs.  AEBITDA is a key measure of the Company's operational performance, and Management, including the chief operating decision-maker(s), uses AEBITDA consistently for all purposes, including internal reporting, the evaluation of business objectives, opportunities and performance, and the determination of management compensation.  AEBITDA is not a measure of financial performance under Generally Accepted Accounting Principles ("GAAP") and should not be considered as a substitute for measures of financial performance prepared in accordance with GAAP.

"Segments" The Company's business operations primarily consist of five segments: (i) Media, (ii) Networks, (iii) Mobility, (iv) Government, and (v) Satellite Related Services ("SRS").

[*Remainder of the page intentionally left blank.*]

**Intelsat S.A. Consolidated**

**Projected Statement of Operations (Unaudited)**

| (millions in USD) | | **Fiscal Year Ending 12/31:** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **2022** | | **2023** | | **2024** | | **2025** | | **2026** |
| **Revenue** | | | | | | | | | | |
| Media | $ | 700 | $ | 626 | $ | 613 | $ | 594 | $ | 574 |
| Networks | | 394 | | 352 | | 338 | | 304 | | 283 |
| Mobility | | 525 | | 716 | | 866 | | 936 | | 977 |
| Government | | 377 | | 407 | | 407 | | 424 | | 433 |
| SRS | | 31 | | 28 | | 27 | | 27 | | 27 |
| **Total Revenue** | $ | **2,027** | $ | **2,129** | $ | **2,252** | $ | **2,285** | $ | **2,294** |
| Direct Cost of Revenue | | (490) | | (538) | | (486) | | (464) | | (438) |
| Operating Expenses | | (647) | | (675) | | (765) | | (791) | | (810) |
| Other Income / Expense | | 17 | | 17 | | 17 | | 17 | | 13 |
| **AEBITDA** | $ | **906** | $ | **932** | $ | **1,017** | $ | **1,046** | $ | **1,060** |
| *Year-Over-Year Growth* | | *n/a* | | *3%* | | *9%* | | *3%* | | *1%* |
| *% of Revenue* | | *45%* | | *44%* | | *45%* | | *46%* | | *46%* |

**Notes to Projected Statement of Operations**

*Revenue*

Media

The Media segment is experiencing secular declines as a result of channel reduction, C-band compression, and pre-planned consolidation of key direct-to-home ("DTH") customers, and as a result includes a 5% compound annual decline rate over the forecast period. While the Media segment is declining, it remains a stable business driven by approximately 37 premium distribution neighborhoods, 30 DTH platforms, 300 media customers, and 2 billion viewers worldwide. Satellite consolidation and compression technology advancements drive volume reductions in the segment, with a significant portion of the revenue decline over the period attributable to planned DTH consolidation (particularly in Latin America). C-band relocation efforts are forecasted to create volume and revenue compression but creates long-term contractual commitments with major North American customers.

Networks

The Networks segment assumes an 8% compound annual decline rate over the forecast period. The revenue losses in the forecast period are driven primarily by yield pressure. Lack of inventory in key markets leaves the Company exposed to pricing pressures with limited volume upside until a fleet refresh in years 2024–2026. Additionally, the Networks segment has experienced 10% declines over the last five years, a trend that will largely continue in the Financial Projections at least until new satellites are in service.

Mobility

The Mobility segment is the primary driver of growth in the business over the forecast period. This segment is forecasted to be the largest business unit of the Company by 2026 (~43% of total revenue). Mobility is

split across several sub-segments: wholesale transponder services, and certain managed services, including Commercial Aviation, FlexMaritime, and FlexMove.

The growth in Commercial Aviation is driven by the acquisition of Gogo Commercial Aviation, which closed in December 2020. The Financial Projections assume the Commercial Aviation sub-segment will maintain its market share over the Forecast Period. This market share is coupled with a recovery in the market for in-flight connectivity during the Forecast Period, which drives the increase in revenue. FlexMaritime growth is driven largely by expansion of connected vessels through the Forecast Period. The Company is forecasted to capture a sizeable share of this growth through deep channel coverage with key distributors and expansion within certain key verticals.

Government

The Company is a trusted partner of the United States government with significant market share, high renewal rates, durable customer relationships, and over $100 million per annum in multi-year sole sourced contracts. The segment is split between wholesale capacity contracts, managed end-to-end solutions, and emerging new managed services. Revenue is forecasted to increase between 2022 and 2026 ($377 million and $433 million, respectively), driven by a robust backlog of legacy contracts with stable yield and growth in the FlexGround managed service.

SRS

The forecast for SRS includes moderate decreases over the forecast period, driven by reduction in Tracking, Telemetry, and Command ("TT&C") revenue and a steady launch schedule related to transfer orbit & in–orbit test revenue.

*Expenses*

Direct Cost of Revenue

The largest components of direct cost of revenue are third party capacity costs. These costs are expected to decrease over time as additional on-net capacity is added in key markets. In addition, declines in direct costs as a percentage of revenue are primarily driven by (i) grooming of third party capacity costs (either not re-bidding low gross margin business or more competitive sourcing), and (ii) the roll off of satellite useful life extension costs.

Operating Expenses

The Financial Projections contemplate an increase in recurring cash operating expenses over the forecast period, primarily driven by:

- Commercial Aviation: Operating expenses for Commercial Aviation are the largest driver of the growth in operating expenses. The Commercial Aviation business unit is forecasted to add operating expenses largely in the operations group, which will support the revenue growth strategy detailed herein.

- NextGen Software Defined Network: contemplated recurring development and operating support for the NextGen infrastructure including monitoring site leases, circuit costs, maintenance expenses for teleports, server rack rental, software development costs, and incremental personnel required to support the platform;

- Operations group:  primarily additional teleports and ground leases to support infrastructure growth, transition to global network operations centers, and software & professional fees to support special projects (e.g., new enterprise resource planning systems and human resource initiatives);

- Commercial & segment-level operating expenses:  primarily normalized third party marketing spend, and headcount additions to support Flex services.

[*Remainder of the page intentionally left blank.*]

**Intelsat S.A. Consolidated**

**Pro Forma Balance Sheet**

| (millions in USD) | Pre-Effective Estimated | Adjustments Reorganization | Fresh Start | Emergence Pro Forma | Notes |
|---|---|---|---|---|---|
| **CURRENT ASSETS** | | | | | |
| Cash and Cash Equivalents | $ 494 | $ (278) | $ - | $ 216 | (a) |
| Restricted Cash | 10 | - | - | 10 | |
| Accounts Receivable, net | 1,301 | - | - | 1,301 | |
| Other Current Assets | 297 | - | - | 297 | |
| **Total Current Assets** | **2,103** | **(278)** | **-** | **1,824** | |
| **NON-CURRENT ASSETS** | | | | | |
| Net Property, Plant and Equipment | 5,147 | - | - | 5,147 | |
| Goodwill | 2,696 | - | 1,254 | 3,950 | (b) |
| Other Intangible Assets, net | 2,544 | - | - | 2,544 | |
| Other Non-Current Assets | 701 | - | - | 701 | |
| **Total Non-Current Assets** | **11,088** | **-** | **1,254** | **12,342** | |
| **Total Assets** | **$ 13,190** | **$ (278)** | **$ 1,254** | **$ 14,166** | |
| **CURRENT LIABILITIES** | | | | | |
| Accounts Payable & Accrued Expenses | $ 263 | $ (109) | $ - | $ 154 | (c) |
| Deferred Satellite Performance Incentives | 53 | (17) | - | 36 | (d) |
| Contract Liabilities | 148 | - | - | 148 | |
| Current Portion of Long-Term Debt | 6,435 | (6,435) | - | - | (e) |
| Other Current Liabilities | 151 | - | - | 151 | |
| **Total Current Liabilities** | **7,051** | **(6,561)** | **-** | **489** | |
| **NON-CURRENT LIABILITIES** | | | | | |
| Long Term Debt | - | 7,375 | - | 7,375 | (f) |
| Deferred Satellite Performance Incentives, Net of Current Portion | 123 | - | - | 123 | |
| Contract Liabilities, Net of Current Portion | 2,082 | - | - | 2,082 | |
| Accrued Retirement Benefits | 115 | - | - | 115 | |
| Other Long Term Liabilities | 357 | - | - | 357 | |
| Liabilities Subject to Compromise | 10,169 | (10,169) | - | - | (g) |
| **Total Non-Current Liabilities** | **12,846** | **(2,794)** | **-** | **10,052** | |
| **Total Liabilities** | **19,897** | **(9,355)** | **-** | **10,541** | |
| **Total Shareholders' Equity** | **(6,706)** | **9,077** | **1,254** | **3,625** | (h) |
| **Total Liabilities & Shareholders' Equity** | **$ 13,190** | **$ (278)** | **$ 1,254** | **$ 14,166** | |

*Notes to Projected Pro Forma Consolidated Balance Sheet*

The pro forma balance sheet adjustments contained herein account for (i) the reorganization and related adjustments pursuant to the Amended Plan and (ii) the estimated impact from the implementation of fresh start accounting pursuant to ASC Topic 852, "Reorganization."

The Debtors have not yet completed their fresh start reporting analysis. However, for purposes of preliminary fresh start reporting, the Financial Projections incorporate estimates of the effect of fresh start reporting which are based upon a stipulated Equity Value of $3.6 billion. The reorganized value ultimately used by the Debtors in implementing fresh start reporting may differ from this estimate. Likewise, the Debtors' allocation of the reorganized value to individual assets and liabilities is based upon preliminary estimates that are subject to change upon the formal implementation of fresh start reporting and could result in material differences to the allocated values included in these Financial Projections. For purposes of estimating the impact of fresh start accounting, the Debtors' have assumed that the book value of all of their assets approximates fair market value. Reorganization value that differs from liabilities and tangible assets

is shown as a change in the "Fresh Start Adjustment."  The Debtors have not estimated the change in deferred tax assets or liabilities that may result from the reorganization.

(a)  Reflects payments pursuant to the Amended Plan;

(b)  The book value of the Reorganized Debtors' assets may change in the future due to fresh start accounting adjustments and have been illustratively written up as a proxy until that exercise is undertaken (adjustments included in Goodwill);

(c)  Reflects payment of accrued professional fees and transaction fees associated with the reorganization;

(d)  Reflects rejection of certain executory contracts for deferred satellite performance incentives;

(e)  Reflects the paydown of any amounts outstanding under the DIP Facility and prepetition secured debt;

(f)  Assumed indebtedness outstanding on the exit facilities;

(g)  All liabilities subject to compromise will be treated in accordance with the terms of the Amended Plan;

(h)   Represents the net gain from completion of the reorganization, as well as adjustments to the equity value of the Reorganized Debtors

*[Remainder of page intentionally left blank.]*

**Intelsat S.A. Consolidated**

**Projected Balance Sheet (Unaudited)**

| | | Fiscal Year Ending 12/31, | | | | |
|---|---|---|---|---|---|---|
| (millions in USD) | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
| **CURRENT ASSETS** | | | | | | |
| Cash and Cash Equivalents | $ 216 | $ 813 | $ 710 | $ 1,485 | $ 1,778 | $ 2,169 |
| Restricted Cash | 10 | 10 | 10 | 10 | 10 | 10 |
| Accounts Receivable, net | 1,301 | 271 | 232 | 244 | 256 | 261 |
| Other Current Assets | 297 | 258 | 233 | 235 | 228 | 227 |
| **Total Current Assets** | **1,824** | **1,352** | **1,185** | **1,974** | **2,273** | **2,666** |
| **NON-CURRENT ASSETS** | | | | | | |
| Net Property, Plant and Equipment | 5,147 | 5,394 | 5,309 | 5,225 | 4,828 | 4,392 |
| Goodwill | 3,950 | 3,950 | 3,950 | 3,950 | 3,950 | 3,950 |
| Other Intangibles Assets, net | 2,544 | 2,499 | 2,458 | 2,422 | 2,388 | 2,355 |
| Other Non-Current Assets | 701 | 685 | 672 | 606 | 604 | 600 |
| **Total Non-Current Assets** | **12,342** | **12,528** | **12,390** | **12,203** | **11,770** | **11,298** |
| **Total Assets** | **$ 14,166** | **$ 13,881** | **$ 13,574** | **$ 14,177** | **$ 14,043** | **$ 13,964** |
| **CURRENT LIABILITIES** | | | | | | |
| Accounts Payable & Accrued Expenses | $ 154 | $ 141 | $ 153 | $ 147 | $ 144 | $ 146 |
| Deferred Satellite Performance Incentives | 36 | 33 | 29 | 24 | 20 | 16 |
| Contract Liabilities | 148 | 138 | 120 | 103 | 90 | 78 |
| Other Current Liabilities | 151 | 151 | 151 | 151 | 151 | 151 |
| **Total Current Liabilities** | **489** | **464** | **453** | **426** | **406** | **392** |
| **NON-CURRENT LIABILITIES** | | | | | | |
| Long Term Debt | 7,375 | 5,927 | 5,927 | 3,199 | 3,199 | 3,199 |
| Deferred Satellite Performance Incentives, Net of Current Portion | 123 | 114 | 98 | 83 | 69 | 57 |
| Contract Liabilities, Net of Current Portion | 2,082 | 1,980 | 1,937 | 692 | 608 | 531 |
| Accrued Retirement Benefits | 115 | 106 | 93 | 79 | 65 | 51 |
| Other Long Term Liabilities | 357 | 357 | 357 | 357 | 357 | 357 |
| **Total Non-Current Liabilities** | **10,052** | **8,484** | **8,413** | **4,411** | **4,299** | **4,196** |
| **Total Liabilities** | **10,541** | **8,949** | **8,866** | **4,837** | **4,705** | **4,587** |
| **Total Shareholders' Equity** | **3,625** | **4,932** | **4,708** | **9,340** | **9,338** | **9,376** |
| **Total Liabilities & Shareholders' Equity** | **$ 14,166** | **$ 13,881** | **$ 13,574** | **$ 14,177** | **$ 14,043** | **$ 13,964** |

**Intelsat S.A. Consolidated**

**Projected Free Cash Flow (Unaudited)**

| (millions in USD) | | Fiscal Year Ending 12/31: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2022 | | 2023 | | 2024 | | 2025 | | 2026 |
| **AEBITDA** | $ | 906 | $ | 932 | $ | 1,017 | $ | 1,046 | $ | 1,060 |
| Capital Expenditures, excluding C-band | | (442) | | (499) | | (544) | | (253) | | (193) |
| ASC 606 Revenue | | (87) | | (98) | | (107) | | (108) | | (105) |
| Deferred Revenue | | (84) | | (125) | | (120) | | (98) | | (89) |
| Other | | (76) | | (47) | | (160) | | (103) | | (91) |
| **Unlevered Free Cash Flow** | | 217 | | 162 | | 87 | | 483 | | 581 |
| C-Band Receipts | | 2,568 | | 130 | | 3,681 | | - | | - |
| C-Band Disbursements | | (373) | | (67) | | (10) | | (10) | | (10) |
| **Unlevered Free Cash Flow After C-Band** | | 2,412 | | 226 | | 3,758 | | 474 | | 571 |
| Long-Term Debt Repayments | | (1,448) | | - | | (2,728) | | - | | - |
| Cash Interest Paid | | (367) | | (329) | | (255) | | (181) | | (181) |
| **Change in Cash** | $ | 597 | $ | (103) | $ | 775 | $ | 293 | $ | 391 |

**Notes to Projected Free Cash Flow**

*Capital Expenditures*

The Company's fleet is aging and requires replacement satellites that employ the latest technology during the forecast period. The Company has an average fleet age of 10.3 years, operating many satellites with a higher cost per bit of capacity than more recent builds. $1.3 billion of the capital expenditures in the forecast period are attributable to new satellites. This reinvestment in space segment is necessary to execute the long-term business plan as growth in managed services is predicated on software defined and high throughput technologies. Commercial Aviation alone is expected to require more on-net capacity within the Forecast Period than exists in the entire network today. Capacity in service is forecasted to more than double by 2026. Updates to network infrastructure include significant investment in terrestrial infrastructure to support advanced software defined networks (*e.g.*, teleports, antennas, virtual hub equipment, datacenters, etc.).

*ASC 606 Revenue*

The Company recognizes revenue in accordance with the ASC 606 standard, effective January 2018. The adoption of the standard impacts the total consideration for prepayment contracts, accounting of incremental costs for obtaining a contract, allocation of the transaction price to performance obligations and accounting for contract modification. Specifically, the Company recognizes a certain amount of non–cash revenue and offsetting non-cash interest expense associated with features built into prepayment contracts considered to have a specific financing component. The Company removes this revenue in calculation of Free Cash Flow as there is no cash impact.

*Deferred Revenue*

Historically, the Company has engaged in certain transactions where a significant amount of the cash payments were received in advance of the GAAP revenue recognition. These transactions resulted in deferred revenue liabilities on the balance sheet, which are amortized into revenue as the appropriate

revenue recognition standards are satisfied.  The forecast assumes few prepayment contracts are signed post-2020.  The negative cash flow impact associated with deferred revenue is a result of the run-off of legacy prepayment contracts.

### Other

The Financial Projections assume the Reorganized Debtors' working capital accounts, including accounts receivable, inventory, accounts payable and others, continue to perform according to the historical relationships with respect to revenue and expense activity.

The Financial Projections assume that the forecasted receipts of Accelerated C-band Clearing Proceeds create significant United States Federal taxable income in years 2022 and 2024.  Outside of those years, the Company is assumed to have annual cash tax expenses ranging from $10–$35 million.

The Company is subject to satellite construction contracts which include an element of deferred consideration to satellite manufacturers referred to as deferred performance incentives payments ("PIPs").  These are milestone-based payments which the Company is contractually obligated to pay, provided the satellites continue to operate in accordance with contractual specifications.

The Financial Projections also contemplate cash disbursements for expenses that are added back for purposes of calculating AEBITDA.  These adjustments reflect certain incentive-based compensation for management, non-recurring legal and professional fees, severance and retention costs, and costs of non-recurring research and development projects.

### C-Band Receipts / Disbursements

On February 28, 2020, the FCC finalized its report and order reallocating a significant portion of the mid-band radio frequency spectrum (the "3700 to 4200 MHz range," or "C-band") in which the Company operates in the U.S. for use by new 5G terrestrial wireless networks.  For the last 40 years, the Company, like other satellite operators, has been utilizing the C-band spectrum for its satellite communication networks.

As a result of the FCC's C-band order, the Company will "clear" the lower 300 MHz of this spectrum (*i.e.*, cease its communications via those radio frequencies and move incumbent users into the upper 200 MHz of the C-band ) no later than December 5, 2025.  Furthermore, to be eligible for approximately $4.9 billion in "Accelerated Relocation Payments" authorized by the FCC to existing licensees, the Company intends to cease utilizing the lowest 120 MHz (3700–3820 MHz) of the spectrum by December 5, 2021, and to cease utilizing the entire 3700– 4000 MHz range no later than December 5, 2023.

The relocation process requires multiple new satellites to be procured and launched into service as well as the purchase and installation of sophisticated video compression technology and tens of thousands of radio frequency filters.

The Financial Projections contemplate the impacts of this C-band clearing program through approximately $1.8 billion of expenditures, of which $1.5 billion is expected to be reimbursed.  The Financial Projections also contemplate receipt of Accelerated Relocation Payments in the amount of $1.2 billion and $3.7 billion in the years 2022 and 2024, respectively, which assumes that the Company successfully completes its obligations within the timeframe provided in the FCC Order.  Note that the Financial Projections assume the Company receives the maximum Accelerated Relocation Payments allocated to the Company in the FCC's Order.

***Long-Term Debt Repayments and Cash Interest Paid***

The Financial Projections assume total debt of $7.4 billion at emergence with a blended interest rate of approximately 5.5%.

[*Remainder of page left intentionally blank.*]

**Exhibit E**

**Valuation Analysis**

## Exhibit E

## Valuation Analysis[1]

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES AND/OR FUNDED DEBT TO BE ISSUED PURSUANT TO THE AMENDED PLAN.   THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE AMENDED PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE AMENDED PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for the purposes of the Amended Plan and this Disclosure Statement, PJT, as investment banker to the Debtors, has estimated a range of total enterprise value (the "Enterprise Value") and implied equity value (the "Equity Value") for the Reorganized Debtors pro forma for the transactions contemplated by the Amended Plan (the "Valuation Analysis").   The Valuation Analysis utilizes certain financial and other information provided by the Debtors' management, as well as the Financial Projections, attached to this Disclosure Statement as **Exhibit D**, and information provided by other sources.  The Valuation Analysis is as of December 31, 2021, with an assumed Effective Date of December 31, 2021.  The valuation estimates set forth herein represent valuation analyses of the Reorganized Debtors utilizing customary valuation techniques to the extent deemed appropriate by PJT.

In preparing the Valuation Analysis, PJT considered a variety of financial analyses, including (1) comparable companies analysis; (2) discounted cash flow analysis; and (3) precedent transaction analysis.

Based on the aforementioned analyses, and other information described herein and solely for purposes of the Amended Plan, the estimated range of Enterprise Value of the Reorganized Debtors, collectively, as of December 31, 2021, is approximately $10,250 million to approximately $11,750 million with a midpoint of approximately $11,000 million.

In addition, based on the estimated range of Enterprise Value of the Reorganized Debtors and other information described herein and solely for purposes of the Amended Plan, PJT estimated a potential range of total Equity Value of the Reorganized Debtors, which consists of the Enterprise Value, less the New Debt on the Effective Date.  PJT has assumed that the Reorganized Debtors will have, as of the Effective Date, New Debt of $7,375 million, inclusive of the New Term Loans, the New Notes and the New Revolver.  Therefore, PJT estimated that the potential range of Equity Value for the Reorganized Debtors, collectively, as of December 31, 2021, is between

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, to which this Valuation Analysis is attached as **Exhibit E** or the Amended Plan attached to the Disclosure Statement as **Exhibit A**.

approximately $2,875 million and approximately $4,375 million with a midpoint of approximately $3,625 million.

The Valuation Analysis contemplates facts and conditions known and existing as of August 18, 2021. Events and conditions subsequent to this date could have a substantial effect upon the value of the Reorganized Debtors. Among other things, failure to consummate the Amended Plan in a timely manner may have a materially negative effect on the Reorganized Debtors' Enterprise Value.

For purposes of this valuation, PJT has assumed that no material changes that would affect value will occur between the date of the Disclosure Statement and the assumed Effective Date (*i.e.* December 31, 2021). The Debtors undertake no obligation to update or revise statements to reflect events or circumstances that arise after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events. PJT assumed that no material changes that would affect estimated value will occur between the date of filing of the Disclosure Statement and the Effective Date. PJT's Valuation Analysis does not constitute an opinion as to the fairness from a financial point of view or otherwise of the consideration to be received or paid under the Amended Plan, of the terms and provisions of the Amended Plan, or with respect to any other matters.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY PJT ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE DEBTORS AVAILABLE TO PJT AS OF AUGUST 18, 2021. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY HAVE AFFECTED OR MAY AFFECT PJT'S CONCLUSIONS, PJT DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM THE VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

PJT DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT PJT USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS OR THEIR ASSETS OTHER THAN THE VALUATION ANALYSIS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH. THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE AMENDED PLAN, DISCLOSURE STATEMENT, AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES OR FUNDED DEBT TO BE ISSUED PURSUANT TO THE AMENDED PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUE OF THE REORGANIZED DEBTORS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE VALUATION

ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, PJT, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES AND/OR FUNDED DEBT IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES OR FUNDED DEBT AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES OR DEBT HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT IMMEDIATELY RATHER THAN HOLD THEIR INVESTMENT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO THE EMPLOYEE INCENTIVE PLAN, THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO THE NEW WARRANTS, THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO THE CONTINGENT VALUE RIGHT AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES AND/OR FUNDED DEBT.

The Debtors' management team advised PJT that the Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors.  If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on the valuation of the company and the Enterprise Value thereof.

In preparing the Valuation Analysis for the Reorganized Debtors, PJT, among other things: (1) reviewed certain historical financial information of the Debtors for recent years and interim periods; (2) discussed the Debtors' performance, future prospects, and industry observations with certain members of the Debtors' senior management; (3) considered certain economic and industry information relevant to the Debtors' operating businesses; (4) reviewed certain publicly available financial data for public companies that PJT deemed generally relevant in analyzing the value of the Reorganized Debtors; (5) reviewed certain publicly available data for, precedent transactions in the satellite services industry involving companies comparable in certain respects to the Reorganized Debtors; and (6) considered certain economic and industry information that PJT deemed generally relevant to the Reorganized Debtors.  PJT assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any Holder of Allowed Claims or any other person as to how such person should vote or otherwise act with respect to the Amended Plan.  PJT has not been requested to, and does not express any view as to, the potential trading value of the Reorganized Debtors' securities and/or funded debt on issuance or at any other time.

For purposes of this Valuation Analysis, for several reasons, including the application of the cancellation of indebtedness rules and the application of section 382 of the Internal Revenue Code,

PJT has assumed that none of the Debtors' existing U.S. tax attributes (such as net operating losses, capital losses, or carryforwards under section 163(j) of the Internal Revenue Code) will be usable after the restructuring.  PJT has also assumed that that the Debtors' existing Luxembourg tax attributes, including tax attributes that are attributable to the existing Luxembourg tax unity, will be preserved and able to utilized by the Reorganized Debtors following the restructuring.  Additionally, PJT has not estimated any changes to protected tax depreciation or amortization that will result from the implementation of the restructuring.  Any changes to these assumptions, or a change in the structure utilized to consummate the reorganization, could materially impact the conclusions reached in the Valuation Analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY PJT.  THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION.  THE VALUATION ANALYSIS PERFORMED BY PJT IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

PJT IS ACTING AS INVESTMENT BANK TO THE DEBTORS AND HAS NOT AND WILL NOT BE RESPONSIBLE FOR, AND HAS NOT AND WILL NOT PROVIDE, ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE TO THE DEBTORS OR ANY OTHER PARTY IN CONNECTION WITH THE DEBTORS' CHAPTER 11 CASES, THE AMENDED PLAN OR OTHERWISE.

[*Remainder of page intentionally left blank.*]

<u>**Exhibit F**</u>

**Plan Allocation of Distributable Value by Debtor**

**Exhibit F**

**Plan Allocation of Distributable Value by Debtor**

| Debtor | Base Recovery Model | | | SES $1.8B Claim at Each Debtor [1] | | |
|---|---|---|---|---|---|---|
| | Unsec. Claims | Unsec. Recovery ($) | Unsec. Recovery (%) | Unsec. Claims | Unsec. Recovery ($) | Unsec. Recovery (%) |
| Intelsat S.A. | $ 410 | $ 28 | 6.88% | $ 2,222 | $ 51 | 2.29% |
| Intelsat Investment Holdings S.À.R.L. | - | - | - | 1,812 | 0 | 0.00% |
| Intelsat Holdings S.A. | - | - | - | 1,812 | 0 | 0.00% |
| Intelsat Investments S.A. | - | - | - | 1,812 | 0 | 0.02% |
| Intelsat (Luxembourg) S.A. | 2,656 | 1 | 0.04% | 4,467 | 1 | 0.03% |
| Intelsat Envision Holdings LLC | 1,709 | 73 | 4.29% | 3,520 | 111 | 3.15% |
| Intelsat Connect Finance S.A. | 1,299 | 293 | 22.54% | 3,110 | 463 | 14.90% |
| Intelsat Jackson Holdings S.A. | 7,057 | 790 | 11.20% | 8,869 | 548 | 6.18% |
| Intelsat Alliance LP | 7,057 | - | - | 8,869 | - | - |
| Intelsat License LLC | 7,057 | 1,751 | 24.81% | 8,869 | 1,737 | 19.59% |
| Intelsat Satellite LLC | 7,147 | 725 | 10.15% | 8,959 | 714 | 7.97% |
| Intelsat US LLC | 7,059 | 217 | 3.07% | 8,871 | 210 | 2.37% |
| Intelsat Ventures S.À R.L. | 7,057 | 398 | 5.64% | 8,869 | 448 | 5.05% |
| Intelsat Global Sales & Marketing Ltd. | 7,058 | 56 | 0.80% | 8,870 | 55 | 0.63% |
| Intelsat US Finance LLC | 7,057 | - | - | 8,869 | - | - |
| Intelsat Genesis Inc. | 7,057 | 18 | 0.25% | 8,869 | 12 | 0.13% |
| PanAmSat International Sales, LLC | 7,057 | 1 | 0.02% | 8,869 | 1 | 0.02% |
| Intelsat International Systems, LLC | 7,057 | 5 | 0.07% | 8,869 | 5 | 0.06% |
| PanAmSat Europe Corporation | 7,057 | 1 | 0.02% | 8,869 | 1 | 0.01% |
| Intelsat Holdings LLC | 7,057 | - | - | 8,869 | - | - |
| Intelsat Subsidiary (Gibraltar) Limited | 7,057 | 0 | 0.00% | 8,869 | 0 | 0.00% |
| Intelsat Service and Equipment LLC | 7,057 | - | - | 8,869 | - | - |
| Intelsat License Holdings LLC | 7,057 | - | - | 8,869 | - | - |
| Intelsat Align S.À R.L. | 7,057 | 1 | 0.01% | 8,869 | 1 | 0.01% |
| Intelsat Finance Bermuda Ltd. | 7,057 | 0 | 0.00% | 8,869 | 0 | 0.00% |
| PanAmSat International Holdings LLC | 7,057 | - | - | 8,869 | - | - |
| Intelsat International Employment LLC | 7,057 | - | - | 8,869 | - | - |
| Intelsat Virginia Holdings LLC | 7,057 | 29 | 0.41% | 8,869 | 27 | 0.31% |
| Intelsat Genesis GP LLC | 7,057 | - | - | 8,869 | - | - |
| Intelsat UK Financial Services Ltd. | 7,057 | - | - | 8,869 | - | - |
| Intelsat Asia Carrier Services, LLC | - | - | - | - | - | - |
| Southern Satellite Licensee LLC | 7,057 | - | - | 8,869 | - | - |
| Southern Satellite LLC | 7,057 | - | - | 8,869 | - | - |
| PanAmSat India LLC | - | - | - | - | - | - |
| PanAmSat India Marketing L.L.C. | - | - | - | - | - | - |

[1] Assumes SES successfully asserts claims against each Debtor in the amount of $1.8 billion plus $12 million of expenses.

[2] The estimated Allowed Unsecured Claims Against LuxCo include Claims held by Holders of Connect Senior Notes.
    Recoveries to Holders of Unsecured Claims Against LuxCo exclude any recoveries on account of the Connect Senior Notes and
    there shall be no distribution of any portion of the LuxCo Unsecured Recovery on account of Connect Senior Notes Claims Against LuxCo

**Exhibit G**

**Plan Support Agreement**

*Execution Version*

THIS CHAPTER 11 PLAN SUPPORT AGREEMENT IS NOT AND SHALL NOT BE CONSTRUED AS AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  EXCEPT AS EXPRESSLY PROVIDED HEREIN, NOTHING CONTAINED IN THIS CHAPTER 11 PLAN SUPPORT AGREEMENT SHALL BE, OR CONSTRUED AS, AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

### *CHAPTER 11 PLAN SUPPORT AGREEMENT*

This CHAPTER 11 PLAN SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 15.02, and as may be amended, supplemented, or otherwise modified from time to time in accordance with Section 14, this "**Agreement**") is made and entered into as of August 24, 2021 (the "**Execution Date**"), by and among the following parties, as applicable (each of the following described in sub-clauses (i) through (vi) of this preamble, collectively, the "**Parties**"):[1]

i. Intelsat S.A., a company incorporated under the Laws of the Grand Duchy of Luxembourg, and each of its direct and indirect subsidiaries listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Creditors (collectively, the "**Company Parties**");

ii. the undersigned holders of, or solely to the extent set forth on a signature page hereto,  investment advisors, sub-advisors, or managers of discretionary accounts that hold Jackson Senior Notes that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Jackson Senior Notes Creditors**");

iii. the undersigned holders of, or solely to the extent set forth on a signature page hereto, investment advisors, sub-advisors, or managers of discretionary accounts that hold First Lien Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting First Lien Creditors**");

iv. the undersigned holders of, or solely to the extent set forth on a signature page hereto, investment advisors, sub-advisors, or managers of discretionary accounts that hold Connect Senior Notes that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel

---

[1] Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them elsewhere herein.

to the Company Parties (collectively, the "**Consenting Connect Senior Notes Creditors**");

v.    the undersigned holders of, or solely to the extent set forth on a signature page hereto, investment advisors, sub-advisors, or managers of discretionary accounts that hold Lux Senior Notes that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Lux Senior Notes Creditors**"); and

vi.    the undersigned holders of, or solely to the extent set forth on a signature page hereto, investment advisors, sub-advisors, or managers of discretionary accounts that hold Convertible Senior Notes that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Convertible Senior Notes Creditors**" and, together with the Consenting Jackson Senior Notes Creditors, the Consenting Connect Senior Notes Creditors, the Consenting Lux Senior Notes Creditors, and the Consenting First Lien Creditors, the "**Consenting Creditors**").[2]

## *RECITALS*

**WHEREAS**, on May 13, 2020 (the "**Petition Date**"), certain of the Company Parties commenced the Chapter 11 Cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**");

**WHEREAS**, the Company Parties and the Consenting Creditors have in good faith and at arm's length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure as well as agreements and claims allowance settlements on the terms set forth in this Agreement and as specified in the Plan attached as **Exhibit B** hereto (such transactions and the Settlement Agreement, as described in the Plan and implemented in accordance with the terms of this Agreement and the Plan (or the Non-TopCo Plan, as applicable), the "**Restructuring Transactions**"), subject to agreement on definitive documentation and approval by the Bankruptcy Court;

**WHEREAS**, the Company Parties will implement the Restructuring Transactions on the terms and conditions set forth in this Agreement; and

**WHEREAS**, the Parties desire to express their mutual support and commitment in respect of the Restructuring Transactions, including through the consummation of the Plan (or the Non-TopCo Plan, as applicable) and the Settlement Agreement.

---

[2]    For the avoidance of doubt, the terms "Consenting Convertible Senior Notes Creditors," "Consenting Connect Senior Notes Creditors," and "Consenting Lux Senior Notes Creditors" shall exclude all Company Parties notwithstanding any HoldCo Senior Notes held by any Company Parties.

**NOW, THEREFORE**, in consideration of the representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.** *Definitions and Interpretation.*

1.01.  Definitions.  The following terms shall have the following definitions:

"**2018 Reorganization Claims**" means any and all Claims, Causes of Action and other challenges related to the series of transactions and related steps that the Debtors (or their affiliates) implemented in and around June - July 2018 (or related transactions that took place thereafter) that reorganized (or assisted or were intended to assist in the reorganization of) the ownership of certain of the assets of the Debtors and their affiliates (including transactions effecting changes in tax and accounting attributes).

"**2021 and 2023 Lux Senior Notes Trustee**" means Delaware Trust Company, solely in its capacity as Trustee under the Lux Multi Senior Notes Indenture, and any predecessor or successor thereto.

"**2021 Lux Senior Notes**" means those certain 7.75% senior notes due 2021, issued by LuxCo, in an original aggregate principal amount of $2,000,000,000, pursuant to the Lux Multi Senior Notes Indenture.

"**2023 Jackson Senior Notes**" means those certain 5.50% senior notes due 2023, issued by Jackson, in an original aggregate principal amount of $2,000,000,000, pursuant to the 2023 Jackson Senior Notes Indenture.

"**2023 Jackson Senior Notes Indenture**" means that certain indenture, dated as of June 5, 2013, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the 2023 Jackson Senior Notes, by and among Jackson, as issuer, certain of the Debtors, as guarantors, and 2023 Jackson Senior Notes Trustee, as Trustee.

"**2023 Jackson Senior Notes Trustee**" means U.S. Bank National Association, solely in its capacity as Trustee under the 2023 Jackson Senior Notes Indenture, and any predecessor or successor thereto.

"**2023 Lux Senior Notes**" means those certain 8.125% senior notes due 2023, issued by LuxCo, in an original aggregate principal amount of $1,000,000,000, pursuant to the Lux Multi Senior Notes Indenture.

"**2024 Jackson Senior Notes**" means those certain 8.50% senior notes due 2024, issued by Jackson, in an original aggregate principal amount of $2,250,000,000, with a subsequent issuance in an aggregate principal amount of $700,000,000, for a total aggregate principal amount of $2,950,000,000, pursuant to the 2024 Jackson Senior Notes Indenture.

"**2024 Jackson Senior Notes Indenture**" means that certain indenture, dated as of September 19, 2018, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the 2024 Jackson Senior Notes, by and among Jackson, as issuer, certain of the Debtors, as guarantors, and 2024 Jackson Senior Notes Trustee, as Trustee.

"**2024 Jackson Senior Notes Trustee**" means U.S. Bank, National Association, solely in its capacity as Trustee under the 2024 Jackson Senior Notes Indenture, and any predecessor or successor thereto.

"**2024 Lux Senior Notes**" means those certain 12.50% senior notes due 2024, issued by LuxCo, in an original aggregate principal amount of $403,325,000, pursuant to the 2024 Lux Senior Notes Indenture.

"**2024 Lux Senior Notes Indenture**" means that certain indenture, dated as of January 6, 2017, by and among LuxCo, as issuer, and the 2024 Lux Senior Notes Trustee, as Trustee, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

"**2024 Lux Senior Notes Trustee**" means Delaware Trust Company, solely in its capacity as Trustee under the 2024 Lux Senior Notes Indenture, and any predecessor or successor thereto.

"**2025 Jackson Senior Notes**" means those certain 9.75% senior notes due 2025, issued by Jackson, in an original aggregate principal amount of $1,500,000,000, with a subsequent issuance in an aggregate principal amount of $400,000,000, for a total aggregate principal amount of $1,900,000,000, pursuant to the 2025 Jackson Senior Notes Indenture.

"**2025 Jackson Senior Notes Indenture**" means that certain indenture, dated as of July 5, 2017, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the 2025 Jackson Senior Notes, by and among Jackson, as issuer, certain of the Debtors, as guarantors, and 2025 Jackson Senior Notes Trustee, as Trustee.

"**2025 Jackson Senior Notes Trustee**" means U.S. Bank, National Association, solely in its capacity as Trustee under the 2025 Jackson Senior Notes Indenture, and any predecessor or successor thereto.

"**8.00% First Lien Notes**" means those certain 8.00% senior secured first lien notes due 2024, issued by Jackson, in an original aggregate principal amount of $1,250,000,000, with a subsequent issuance in an aggregate principal amount of $99,700,000, for a total aggregate principal amount of $1,349,700,000, pursuant to the 8.00% First Lien Notes Indenture.

"**8.00% First Lien Notes Claims**" means Claims arising under the 8.00% First Lien Notes and the 8.00% First Lien Notes Indenture.

"**8.00% First Lien Notes Indenture**" means that certain indenture, dated as of March 29, 2016, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the 8.00% First Lien Notes, by and among Jackson, as issuer, ICF and the other

guarantors from time to time party thereto, as guarantors, and 8.00% First Lien Notes Trustee, as Trustee.

"**8.00% First Lien Notes Trustee**" means Wilmington Trust, National Association, solely in its capacity as Trustee under the 8.00% First Lien Notes Indenture, and any predecessor or successor thereto.

"**9.50% First Lien Notes**" means those certain 9.50% senior secured first lien notes due 2022, issued by Jackson, in an original aggregate principal amount of $490,000,000, pursuant to the 9.50% First Lien Notes Indenture.

"**9.50% First Lien Notes Claims**" means Claims arising under the 9.50% First Lien Notes and the 9.50% First Lien Notes Indenture.

"**9.50% First Lien Notes Indenture**" means that certain indenture, dated as of June 30, 2016, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the 9.50% First Lien Notes, by and among Jackson, as issuer, ICF and the other guarantors from time to time party thereto, as guarantors, and 9.50% First Lien Notes Trustee, as Trustee.

"**9.50% First Lien Notes Trustee**" means Wilmington Trust, National Association, solely in its capacity as Trustee under the 9.50% First Lien Notes Indenture, and any predecessor or successor thereto.

"**ABR Loans**" has the meaning set forth in the DIP Order.

"**Accelerated Relocation Payments**" means those certain accelerated relocation payments as described in the C-Band Order allocated to the Debtors and/or Reorganized Debtors in an amount of $4,865,366,000.

"**Accelerated Relocation Payment Claims**" means any and all Claims or Causes of Action, held by any Entity, related to the Accelerated Relocation Payments or Expense Reimbursements that the Debtors or the Reorganized Debtors may receive, including any Claims or Causes of Action with respect to which Debtor(s) or Reorganized Debtor(s) is entitled to receive any Accelerated Relocation Payments or Expense Reimbursements.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Agents/Trustees**" means, collectively, each of the Agents and Trustees.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto (including the Plan) in accordance with Section 15.02.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Allocation Event**" means (i) a Final Order entered by the Bankruptcy Court or any other court of competent jurisdiction determining that the Expense Reimbursements and/or Accelerated Relocation Payments, or any portion thereof, are not the exclusive property of the Jackson Debtors, or (ii) any settlement entered into by the Debtors (a) providing that the Expense Reimbursements and/or Accelerated Relocation Payments, or any portion thereof, are not the exclusive property of the Jackson Debtors or (b) providing compensation of any kind to any person or entity other than a Jackson Debtor on account of any dispute or controversy concerning the ownership or any entitlement to any Expense Reimbursements and/or Accelerated Relocation Payment Claims under the C-Band Order (other than as set forth in the Plan and Settlement Agreement), unless, in either such event, such settlement has been approved in writing by the Required Consenting Unsecured Creditors.

"**Allowed**" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan (or the Non-TopCo Plan, as applicable), under the Bankruptcy Code, or by a Final Order, as applicable.

"**Alternative Restructuring Proposal**" means any plan, inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, tender offer, rights offering, exchange offer, consent solicitation, recapitalization, plan of reorganization, share exchange, business combination, joint venture, contingent value rights issuance, or similar transaction involving any one or more Company Parties or the debt, equity, or other Interests in any one or more Company Parties, in each case, other than the Restructuring Transactions (including, without limitation, the Settlement Agreement).

"**Announcement**" has the meaning set forth in Section 15.22 herein.

"**Applicable Intelsat Recipients**" shall have the meaning ascribed to it in the CVR Term Sheet.

"**Backstop Commitment**" means the commitment, on the terms as may be set forth in the Backstop Commitment Agreement, of the Backstop Parties to backstop the New Term Loans and New Notes.

"**Backstop Commitment Agreement**" means that certain agreement that may be entered into by and among the Backstop Parties and the Debtors, as may be amended, supplemented, or modified from time to time, setting forth, among other things, the payment of the Backstop Premium and the terms and conditions of the Backstop Commitment.

"**Backstop Parties**" means those certain parties that commit to backstop the New Term Loans and the New Notes and are signatories to the Backstop Commitment Agreement, solely in their capacities as such, to the extent provided in the Backstop Commitment Agreement.  An Entity

6

may become a Backstop Party only if:  (a) such Entity is (i) a Jackson Crossover Ad Hoc Group Member or (ii) a Consenting HoldCo Creditor, solely to the extent of such Consenting HoldCo Creditor's pro-rata holdings of Jackson Senior Notes (based upon the aggregate amount of Jackson Senior Notes held by all Holders of Jackson Senior Notes),[3] or (b) the Required Consenting Jackson Crossover Group Members, in their sole discretion, otherwise permit, in writing, such entity to become a Backstop Party with the Debtors' consent, not to be unreasonably withheld, conditioned, or delayed.

"**<u>Backstop Premium</u>**" means that certain backstop premium payable in cash to the Backstop Parties as consideration for the Backstop Commitment in the amount of 2.50% of the principal amount of New Term Loans and the New Notes backstopped pursuant to the Backstop Commitment Agreement and on the other terms that may be set forth in the Backstop Commitment Agreement.

"**<u>Backstop Proposal</u>**" means that certain proposal that may be made by certain of the Jackson Crossover Ad Hoc Group Members to backstop the issuance of all or a portion of the New Term Loans and the New Notes.

"**<u>Bankruptcy Code</u>**" has the meaning set forth in the recitals to this Agreement.

"**<u>Bankruptcy Court</u>**" has the meaning set forth in the recitals to this Agreement.

"**<u>Business Day</u>**" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

"**<u>Bankruptcy Rules</u>**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

"**<u>C-Band Order</u>**" means that certain Report and Order and Order of Proposed Modification issued by the FCC on March 3, 2020 in *In the Matter of Expanding Flexible Use of the 3.7 to 4.2 GHz Band*, GN Docket No. 18-122 (as may be amended or modified).

"**<u>Cause of Action</u>**" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise (including under foreign law).  Causes of Action include:  (a) all rights of setoff,

---

[3]   For the avoidance of doubt, a Consenting HoldCo Creditor shall be entitled to (i) an initial allocation of the Backstop Commitment based on such Consenting HoldCo Creditor's pro-rata holdings of Jackson Senior Notes (calculated as a percentage of the aggregate amount of Jackson Senior Notes held by all Holders of Jackson Senior Notes), and (ii) any unsubscribed portion of the Backstop Commitment not committed by other Entities entitled to participate in the Backstop Commitment based on such Consenting HoldCo Creditor's pro-rata holdings of Jackson Senior Notes (calculated as a percentage of the aggregate amount of Jackson Senior Notes held by all Holders of Jackson Senior Notes).

counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) any claim pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

"**Chapter 11 Cases**" means the cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered under Case No. 20-32299 (KLP) in the Bankruptcy Court.

"**Claim**" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not assessed or Allowed.

"**Company Claims**" means any Claim against a Company Party.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement; *provided, however*, that any Company Party that exercises its rights pursuant to Section 9.01 shall not be a Company Party.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation**" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.  For the avoidance of doubt, the Confirmation Order shall not contain any provision approving the First Lien Notes Claims Settlement.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan (or the Non-TopCo Plan, as applicable).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan (or the Non-TopCo Plan, as applicable) under section 1129 of the Bankruptcy Code.

"**Connect Senior Notes**" means those certain 9.50% senior notes due 2023, issued by ICF, in an original aggregate principal amount of $1,250,000,000, pursuant to the Connect Senior Notes Indenture.

"**Connect Senior Notes Claims**" means Claims arising under the Connect Senior Notes Indenture.

"**Connect Senior Notes Indenture**" means that certain indenture, dated as of August 16, 2018, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the Connect Senior Notes, by and among ICF, as issuer, Envision and LuxCo, as guarantors, and the Connect Senior Notes Trustee.

"**Connect Senior Notes Trustee**" means Wilmington Savings Fund Society, FSC, solely in its capacity as Trustee under the Connect Senior Notes Indenture, and any predecessor or successor thereto.

"**Consenting Connect Senior Notes Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting First Lien Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting First Lien Group Members**" means Consenting Creditors that are members of either the Jackson Ad Hoc Group or the First Lien Noteholders Group.

"**Consenting HoldCo Creditors**" means Consenting Creditors that are members of the HoldCo Creditor Ad Hoc Group.

"**Consenting Jackson Senior Notes Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Lux Senior Notes Creditors**" has the meaning set forth in the preamble to this Agreement.

"**Convertible Senior Notes**" means those certain 4.50% convertible senior notes due 2025, issued by Intelsat S.A., in an original aggregate principal amount of $402,500,000, pursuant to the Convertible Senior Notes Indenture.

"**Convertible Senior Notes Claims**" means any Claim arising under the Convertible Senior Notes and the Convertible Senior Notes Indenture.

"**Convertible Senior Notes Indenture**" means that certain indenture, dated as of June 18, 2018, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the Convertible Senior Notes, by and among Intelsat S.A., as issuer, Envision, as guarantor, and the Convertible Senior Notes Trustee, as Trustee.

"**Convertible Senior Notes Trustee**" means BOKF, National Association, solely in its capacity as Trustee under the Convertible Senior Notes Indenture, and any predecessor or successor thereto.

"**Corporate Governance Term Sheet**" means that certain corporate governance term sheet setting forth certain corporate governance terms attached hereto as **Exhibit E**.

"**Creditors' Committee**" means the official committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases on May 27, 2020.

"**CVR Agreements**" means, collectively, the Series A CVR Agreement and the Series B CVR Agreement.

"**CVRs**" means, collectively, the Series A CVRs and the Series B CVRs.

"**CVR Term Sheet**" means that certain term sheet setting forth terms and conditions of the CVRs attached hereto as **Exhibit F**.

"**Debt Documents**" means the (i) DIP Credit Agreement and any amendments, modifications, or supplements thereto, as well as any and all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection the DIP Credit Agreement; (ii) First Lien Credit Agreement and any amendments, modifications, or supplements thereto, as well as any and all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection therewith; (iii) First Lien Notes Indentures and any amendments, modifications, or supplements thereto, as well as any all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection therewith; and (iv) Senior Notes Indentures and any amendments, modifications, or supplements thereto, as well as any and all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection therewith.

"**Debtors**" means the Company Parties that have commenced Chapter 11 Cases.

"**Debtor Intercompany Claim**" means any Claim held by a Debtor against another Debtor.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Agent**" means Credit Suisse AG, Cayman Islands Branch in its capacity as administrative agent and collateral agent under the DIP Credit Agreement.

"**DIP Backstop Agreement**" means that certain amended and restated backstop commitment agreement, dated June 1, 2020 among the DIP Borrower and certain of the Prepetition Secured Parties.

"**DIP Borrower**" means Jackson.

"**DIP Claim**" means any Claim arising under, derived from or based upon the DIP Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under the DIP Credit Agreement.

"**DIP Credit Agreement**" means that certain Superpriority Secured Debtor In Possession Credit Agreement, dated as of June 17, 2020, among the DIP Debtors, the DIP Agent, and Credit Suisse Loan Funding LLC, as lead arranger, as amended, amended and restated, supplemented, or modified from time to time.

"**DIP Debtors**" means collectively, the DIP Borrower and the DIP Guarantors.

"**DIP Documents**" means the DIP Credit Agreement and any amendments, modifications, or supplements thereto, as well as any and all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection the DIP Credit Agreement, and the DIP Backstop Agreement.

"**DIP Facility**" means that certain $1 billion new money multi-draw debtor-in-possession term loan credit facility provided by the DIP Lenders on the terms of, and subject to the conditions set forth in, the DIP Credit Agreement and approved by the Bankruptcy Court pursuant to the DIP Order.

"**DIP Guarantors**" means the Debtors and their affiliates that unconditionally guaranteed, on a joint and several basis, the DIP Borrower's obligations in connection with the DIP Facility.

"**DIP Lenders**" means, collectively, the banks, financial institutions, and other lenders party to the DIP Credit Agreement from time to time, each solely in their capacity as such.

"**DIP Obligations**" has the meaning given to the defined term "Credit Agreement Obligations" in the DIP Credit Agreement.

"**DIP Order**" means the *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Superpriority Administrative Expense Claims, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* entered by the Bankruptcy Court in the Chapter 11 Cases on June 9, 2020 at docket number 285.

"**Disclosure Statement**" means the disclosure statement for the Plan (and the Non-TopCo Plan), as may be amended, modified, revised, or supplemented, from time to time, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"**Disclosure Statement Hearing**" means the hearing to consider the Disclosure Statement Motion.

"**Disclosure Statement Motion**" means the motion seeking, among other things, (a) approval of the Disclosure Statement, (b) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and the Non-TopCo Plan and for filing objections to the Plan and the Non-TopCo Plan, and (c) to schedule the Confirmation Hearing.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials.

"**Disinterested Directors and Managers**" means the disinterested directors and managers of Jackson, ICF, Envision, LuxCo, and Intelsat S.A.

11

"**Disputed**" means, with respect to any Claim or Interest, any Claim or Interest, or any portion thereof, (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code, or (b) for which a proof of claim or proof of interest or a motion for payment has been timely filed with the Bankruptcy Court, to the extent the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.

"**Effective Date**" means the date on which all conditions to consummation of the Plan (or the Non-TopCo Plan, as applicable) have been satisfied in full or waived, in accordance with the terms of the Plan (or the Non-TopCo Plan, as applicable), and the Plan (or the Non-TopCo Plan, as applicable) becomes effective.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Envision**" means Intelsat Envision Holdings LLC, a limited liability company formed under the Laws of the state of Delaware.

"**Equity Interests**" or "**Interests**" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and any Claim against or interest in the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

"**Equity Issuer**" shall be, if either the Plan or Non-TopCo Plan is confirmed, Holdings or (with the consent of the Required Consenting Unsecured Creditors) any successor or assign, by merger, consolidation, reorganization, or otherwise, unless the Required Consenting Unsecured Creditors and the Debtors (excluding, if the Non-TopCo Plan is confirmed, Intelsat S.A. and Intelsat Investments Holdings S.a.r.l.) agree to designate a different Entity.

"**Equity Issuer Board**" the board of directors (or other applicable governing body) of the Equity Issuer, selected in accordance with the Corporate Governance Term Sheet.

"**Estate**" means the estate created on the Petition Date for any Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

12

"**Expense Reimbursements**" means payments received by the Debtors or Reorganized Debtors (or their affiliates) on account of compensable relocation costs as described in the C-Band Order.

"**FCC**" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor Governmental Unit performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

"**Fiduciary Out**" has the meaning set forth in Section 9.01.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument, or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and such time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Bankruptcy Rule 8002; *provided*, that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules may be filed relating to such order, shall not cause an order not to be a Final Order.

"**First Lien Agent**" means Bank of America, N.A., acting through such of its affiliates or branches as it may designate, in its capacity as administrative agent under the First Lien Credit Agreement, or any successor administrative agent or collateral agent as permitted by the terms set forth in the First Lien Credit Agreement.

"**First Lien Claim**" means any Claim on account of the Term Loan Facility or the First Lien Notes.

"**First Lien Credit Agreement**" means that certain credit agreement, dated as of January 12, 2011, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, by and among Jackson, as borrower, ICF (as successor to LuxCo), as guarantor, the First Lien Lenders, and the First Lien Agent.

"**First Lien Creditors Consent Right**" means the Required Consenting First Lien Creditors' right to consent to or approve the form and substance of any of the Definitive Documents (or any amendments, modifications or supplements thereto), which consent may be given or withheld in their discretion; *provided, however*, that such consent shall not be unreasonably withheld, conditioned or delayed; *provided, further*, that, other than with respect to the Plan, the Confirmation Order, the Disclosure Statement, the order of the Bankruptcy Court

approving the Disclosure Statement and the other Solicitation Materials, and the Secured Creditor Settlement, the Required Consenting Jackson Ad Hoc Group Members and the Required Consenting First Lien Noteholders shall have the right to consent to and approve the form and substance of the Definitive Documents solely to the extent of any provision of such Definitive Documents that:  (a) adversely affects the economic rights proposed to be granted to the holders of First Lien Claims as identified in the Plan (or the Non-TopCo Plan, as applicable) (including through the treatment (or change to the treatment) under the Plan (or the Non-TopCo Plan, as applicable) of any claim or interest held by such holder of First Lien Claims), other than, as to a Consenting First Lien Creditor, such different economic rights that may be consented to by that Consenting First Lien Creditor, or (b) materially and adversely affects the obligations that (i) the Consenting First Lien Creditors may have pursuant to this Agreement or (ii) the holders of First Lien Claims may have pursuant to the Plan (or the Non-TopCo Plan, as applicable).

"**First Lien Lenders**" means, collectively, the banks, financial institutions, and other lenders party to the First Lien Credit Agreement from time to time, each solely in their capacity as such.

"**First Lien Noteholders**" means, collectively, the banks, financial institutions, and other holders of the First Lien Notes, each solely in their capacity as such.

"**First Lien Noteholders Group**" means the ad hoc group of certain creditors represented by Wilmer Cutler Pickering Hale and Dorr LLP.

"**First Lien Noteholders Group Member**" means a Consenting Creditor that is a member of the First Lien Noteholders Group.

"**First Lien Notes**" means, collectively, the 8.00% First Lien Notes and the 9.50% First Lien Notes.

"**First Lien Notes Claims**" means Claims arising under the First Lien Notes and First Lien Notes Indentures.

"**First Lien Notes Claims Settlement**" means the compromise and settlement regarding the allowance and treatment of First Lien Notes Claims set forth in the Secured Creditor Term Sheet.

"**First Lien Notes Indentures**" means, collectively, the 8.00 % First Lien Notes Indenture and the 9.50% First Lien Notes Indenture.

"**Fixed Rate Loans**" has the meaning set forth in the DIP Order.

"**Further Acceleration Payments**" shall have the meaning ascribed to it in the CVR Term Sheet.

"**Guarantee Claims**" means, collectively, the HoldCo Guarantee Claims and the TopCo Guarantee Claims.

14

"**Guarantee Litigation Scheduling Order**" means an order of the Bankruptcy Court, which shall be in form and substance acceptable to the Company Parties and the Required Consenting Unsecured Creditors, providing that (i) subject to the provisions of Section 7.05 (including Section 7.05(h)), any hearing regarding the merits or temporary allowance of any Guarantee Claim against any TopCo Guarantor shall occur contemporaneously with (or after) the Confirmation Hearing, (ii) in no event shall any such hearing occur prior to the Confirmation Hearing, (iii) the HoldCo Creditor Ad Hoc Group shall not participate in any such hearing, (iv) the Company Parties shall not initiate such hearing or take any legal positions either supporting or challenging the positions taken by the Jackson Crossover Ad Hoc Group in such hearing or briefing related thereto, and (v) no hearing regarding the merits of any Guarantee Claim against any HoldCo Guarantor may occur until after the Confirmation Hearing.

"**Historical Intercompany Transaction Claims**" means any and all Claims and Causes of Action related to all outstanding disputes between the Debtors regarding the historic intercompany transactions including transactions that fall into the following categories:  (a) dividends made by Jackson or any HoldCo, on one hand, to any other HoldCo, on the other hand; (b) the creation of ICF; (c) the creation of Envision; (d) any contributions, whether consisting of cash or other consideration, made by any HoldCo to Jackson; and (e) other smaller transactions including loans, one-off cash dividends, non-cash dividends, guarantee releases, and others that occurred before, and intercompany balances that existed as of, the Petition Date or accumulated during these Chapter 11 Cases.

"**HoldCo Creditor Ad Hoc Group**" means the ad hoc group of certain creditors represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and advised by Ducera Partners LLC.

"**HoldCo Creditor Ad Hoc Group Advisors**" means Paul, Weiss, Rifkind, Wharton & Garrison, LLP, Whiteford, Taylor & Preston L.L.P., Ducera Partners LLC, Loyens & Loeff Luxembourg S.à.r.l., Ernst & Young LLP, and Covington & Burling LLP.

"**HoldCo Creditor Ad Hoc Group Member**" means a Consenting Creditor that is a member of the HoldCo Creditor Ad Hoc Group.

"**HoldCo Creditor Group Consent Right**" means the Required Consenting HoldCo Creditors' right to consent to or approve the form and substance of any of the Definitive Documents (or any amendments, modifications or supplements thereto), which consent may be given or withheld in their discretion; *provided*, *however*, that, other than with respect to the Plan (or the Non-TopCo Plan, as applicable), the Confirmation Order, the New Warrant Agreements, the New Corporate Governance Documents, the CVR Agreements, the Settlement Agreement and all pleadings or documents in connection with the Settlement Agreement, including the Settlement Order, any material disclosure documents related to the issuance of the New Warrants or the CVRs, the Restructuring Steps Memorandum, and the Guarantee Litigation Scheduling Order, the Required Consenting HoldCo Creditors shall have the right to consent to or approve the form and substance of the Definitive Documents solely to the extent of any provision of such Definitive Documents that:  (a) materially affects the rights proposed to be granted to the holders of HoldCo Senior Notes as identified in the Plan (or the Non-TopCo Plan, as applicable),

including any and all exhibits, annexes, schedules, ballots, solicitation procedures, and other documents and instruments related to the Plan (or Non-TopCo Plan, as applicable), or Definitive Documents (as they exist on the Execution Date) or (b) materially affects the obligations that (i) the Consenting HoldCo Creditors have pursuant to this Agreement or the Definitive Documents (as they exist on the Execution Date) or (ii) the holders of HoldCo Senior Notes may have pursuant to the Plan (or the Non-TopCo Plan, as applicable), including any and all exhibits, annexes, schedules, ballots, solicitation procedures, and other documents and instruments related to the Plan (or the Non-TopCo Plan, as applicable), or the Definitive Documents (as they exist on the Execution Date); *provided, further,* that the Required Consenting HoldCo Creditors' consent to any term or condition expressly stated in this Agreement shall not be unreasonably withheld or delayed.

"**HoldCo Guarantee Claims**" means the claims asserted against the HoldCo Guarantors in the proofs of claim filed in the Chapter 11 Cases by the Jackson Senior Notes Trustees and the Lux Senior Notes Trustees (including Proofs of Claim numbered 553, 554, 555, 556, 585, 586, 587, 588, 617, 618, 619, 620, 784, 791, 795, 796, 898, 904, 905, 906, and any pleading filed with the Bankruptcy Court in connection therewith).

"**HoldCo Guarantors**" means, collectively, ICF, LuxCo, Intelsat Investments S.A., and Holdings, each in its capacity as guarantor under the applicable Senior Notes Indentures.

"**HoldCo Senior Notes**" means the Convertible Senior Notes, the Connect Senior Notes, and the Lux Senior Notes.

"**HoldCo Senior Notes Claims**" means Claims arising under the Convertible Senior Notes Indenture, the Connect Senior Notes Indenture, and the Lux Senior Notes Indentures.

"**HoldCos**" means each of ICF, Envision, LuxCo, Intelsat Investments S.A., Holdings, Intelsat Investment Holdings S.a.r.l., and Intelsat S.A.

"**Holder**" means an Entity holding a Claim against or an Interest in any Debtor.

"**Holdings**" means Intelsat Holdings S.A., a *société anonyme* organized under the Laws of the Grand Duchy of Luxembourg.

"**Houlihan Engagement Letter**" means that certain letter agreement dated as of April 8, 2020 and executed on August 24, 2021, between Houlihan Lokey Capital, Inc., Intelsat Jackson Holdings S.A., and the other parties thereto.

"**ICF**" means Intelsat Connect Finance S.A., a *société anonyme* organized under the Laws of the Grand Duchy of Luxembourg.

"**Initial Guarantee Litigation Scheduling Stipulated Order**" means the *Stipulated Order Adjourning Guarantee-Related Motions and Cross-Motions for Summary Judgment and Regarding Anticipated Motion of the Jackson Crossover Group for Temporary Allowance* [Docket No. 1852] entered by the Bankruptcy Court on April 13, 2021.

16

"**Intercompany Senior Notes Claim**" means any Senior Notes Claim that is held by a Debtor.

"**Jackson**" means Intelsat Jackson Holdings S.A., a *société anonyme* organized under the Laws of the Grand Duchy of Luxembourg.

"**Jackson Ad Hoc Group**" means the ad hoc group of certain creditors represented by Akin Gump Strauss Hauer & Feld LLP and advised by Centerview Partners LLC.

"**Jackson Ad Hoc Group Member**" means a Consenting Creditor that is a member of the Jackson Ad Hoc Group.

"**Jackson Crossover Ad Hoc Group**" means the ad hoc group of certain creditors represented by Jones Day and advised by Houlihan Lokey Capital, Inc.

"**Jackson Crossover Ad Hoc Group Advisors**" means Jones Day, Houlihan Lokey Capital, Inc., Compensation Advisory Partners LLC, and AKD Luxembourg SARL.

"**Jackson Crossover Ad Hoc Group Consent Right**" means the Required Consenting Jackson Crossover Group Members' right to consent to or approve the form and substance of any of the Definitive Documents (or any amendments, modifications or supplements thereto) with the exception of the Secured Creditor Settlement Term Sheet, which consent may be given or withheld in their discretion; *provided*, *however*, the Required Consenting Jackson Crossover Group Members' consent to any term or condition expressly stated in this Agreement shall not be unreasonably withheld or delayed.

"**Jackson Crossover Ad Hoc Group Member**" means a Consenting Creditor that is a member of the Jackson Crossover Ad Hoc Group.

"**Jackson Debtors**" means, collectively, Jackson and any Debtor that is a subsidiary of Jackson.

"**Jackson Senior Notes**" means, collectively, the 2023 Jackson Senior Notes, the 2024 Jackson Senior Notes, and the 2025 Jackson Senior Notes.

"**Jackson Senior Notes Claims**" means Claims arising under the Jackson Senior Notes Indentures.

"**Jackson Senior Notes Indentures**" means, collectively, the 2023 Jackson Senior Notes Indenture, the 2024 Jackson Senior Notes Indenture, and the 2025 Jackson Senior Notes Indenture.

"**Jackson Senior Notes Indenture Trustees**" means, collectively, the 2023 Jackson Senior Notes Indenture Trustee, the 2024 Jackson Senior Notes Indenture Trustee, and the 2025 Jackson Senior Notes Indenture Trustee.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit D**.

17

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court or the Grand Duchy of Luxembourg).

"**Lux Multi Senior Notes Indenture**" means that certain indenture, dated as of April 5, 2013, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for, among others, the 2021 Lux Senior Notes and the 2023 Lux Senior Notes, by and among LuxCo, as issuer, Intelsat S.A., as guarantor, and the 2021 and 2023 Lux Senior Notes Trustee, as Trustee.

"**Lux Senior Notes**" means, collectively, the 2021 Lux Senior Notes, the 2023 Lux Senior Notes, and the 2024 Lux Senior Notes.

"**Lux Senior Notes Indentures**" means, collectively, the Lux Multi Senior Notes Indenture and the 2024 Lux Senior Notes Indenture.

"**Lux Senior Notes Trustees**" means, collectively, the 2021 and 2023 Lux Senior Notes Trustee and the 2024 Lux Senior Notes Trustee.

"**LuxCo**" means Intelsat (Luxembourg) S.A., a *société anonyme* organized under the Laws of the Grand Duchy of Luxembourg.

"**Management Incentive Plan**" means the management incentive plan implemented by the Equity Issuer on the Effective Date, which shall have terms consistent with the terms of the Management Incentive Plan Term Sheet.  The Required Consenting Jackson Crossover Group Members and the Debtors shall negotiate the terms of the definitive Management Incentive Plan documentation in good faith prior to the Effective Date; *provided* that, the requirement that the Management Incentive Plan documentation be completed prior to the Effective Date may be waived by written agreement between the Required Consenting Jackson Crossover Group Members and the Debtors.

"**Management Incentive Plan Term Sheet**" means that certain management incentive plan term sheet setting forth the terms of the Management Incentive Plan attached hereto as **Exhibit G.**

"**Milestones**" means the milestones set forth in Section 4.

"**New Capital Structure**" means the capital structure for the Reorganized Debtors and their subsidiaries, which shall be obtained through the Debtors' commercially reasonable efforts prior to the Effective Date (including, for the avoidance of doubt, conducting a solicitation process for financing proposals that will provide the highest or otherwise best terms available under the circumstances) and which shall provide for (i) $7.125 billion of New Term Loans and New Notes and (ii) a New Revolver; *provided* that the Company may increase the amount of New Term Loans and New Notes above $7.125 billion by decreasing the amount of availability on the New Revolver by an equal amount.

"**New Common Stock**" means the common stock of the Equity Issuer to be issued upon the Effective Date in accordance with the Plan (or the Non-TopCo Plan, as applicable), including any common stock to be issued on account of the New Warrants.

"**New Corporate Governance Documents**" means the amended and restated or new applicable corporate governance documents (including, without limitation, the certificate or articles of incorporation, limited liability company agreement, partnership agreement, stockholders agreement, registration rights agreement or such other applicable formation documents or governance documents (if any) of the Equity Issuer and the Reorganized Debtors, forms of which shall be included in the Plan Supplement, and all of which shall be in form and substance acceptable to the Required Consenting Jackson Crossover Group Members, the Required Consenting HoldCo Creditors, and the Debtors.

"**New Debt**" means collectively, the New Revolver, the New Term Loans, and the New Notes, as applicable, issued as part of the New Capital Structure.

"**New Debt Agreements**" means the indentures or loan agreements governing the New Debt, the form of which shall be included in the Plan Supplement, and which shall be in form and substance acceptable to the Required Consenting Jackson Crossover Group Members and the Debtors.

"**New Debt Documents**" means, collectively, the New Debt Agreements, and all other agreements, documents, and instruments evidencing or securing the New Debt, to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents), each of which shall be consistent with Section 3 herein.

"**New Notes**" means, collectively, those certain first lien notes, those certain second lien notes, and/or those certain unsecured notes, as applicable, constituting part of the New Capital Structure, which may be funded on the Effective Date pursuant to the Plan (or the Non-TopCo Plan, as applicable) and the New Debt Documents; *provided* that any makewhole provisions in the New Notes are to be negotiated at market terms and in good faith among the Required Consenting Jackson Crossover Group Members and the Debtors, and subject to the consultation rights provided herein.

"**New Revolver**" means that certain revolving credit facility for up to $500 million of availability, which may be increased to $750 million with the consent of the Required Consenting Jackson Crossover Group Members, to be issued pursuant to the Plan and the New Debt Documents, and which will be secured by a first lien on substantially all of the Reorganized Debtors' assets (*pari passu* with the other first lien New Debt), subject to customary exclusions, which may be issued on a first out basis relative to all other secured New Debt at the election of the Company Parties.

"**New Series A Warrant Agreement**" means that certain agreement setting forth the full terms and conditions of the New Series A Warrants, the form of which shall be acceptable to the

19

Company Parties and the Required Consenting Unsecured Creditors and included in the Plan Supplement.

"**New Series A Warrants**" means warrants issued pursuant to the Plan (or the Non-TopCo Plan, as applicable) and the New Series A Warrant Agreement and consistent with the terms set forth in the New Warrants Term Sheet.

"**New Series B Warrant Agreement**" means that certain agreement setting forth the full terms and conditions of the New Series B Warrants, the form of which shall be acceptable to the Company Parties and the Required Consenting Unsecured Creditors and included in the Plan Supplement.

"**New Series B Warrants**" means warrants issued pursuant to the Plan (or the Non-TopCo Plan, as applicable) and the New Series B Warrant Agreement and consistent with the terms set forth in the New Warrants Term Sheet.

"**New Term Loans**" means, those certain secured term loan facilities, if applicable, constituting part of the Reorganized Debtors' New Capital Structure, which may be funded on the Effective Date pursuant to the Plan (or the Non-TopCo Plan, as applicable) and the New Debt Documents.

"**New Warrants**" means, collectively, the New Series A Warrants and the New Series B Warrants.

"**New Warrants Agreements**" means, collectively, the New Series A Warrant Agreement and the New Series B Warrant Agreement.

"**New Warrants Term Sheet**" means that certain term sheet setting forth certain terms of the New Warrants and attached hereto as **Exhibit H**.

"**Non-Debtor Intercompany Claim**" means any Claim held by a non-Debtor Affiliate of the Debtors against a Debtor.

"**Non-TopCo Plan**" means the joint chapter 11 plan, in the form attached hereto as **Exhibit B**, (and any exhibits thereto) for all Debtors other than Intelsat Investment Holdings S.à.r.l. and/or Intelsat S.A., which shall otherwise be consistent in all respects with the terms of the Plan (including, for the avoidance of doubt, the treatment of Claims provided under the Plan for all classes of creditors other than creditors of Intelsat Investment Holdings S.à.r.l. and/or Intelsat S.A.), and may differ from the Plan only to the extent required to remove Intelsat Investment Holdings S.à.r.l. and/or Intelsat S.A. from the Plan (including related modifications to the release and exculpation provisions set forth therein (provided, for the avoidance of doubt, that no releases or exculpation shall be granted to Intelsat Investment Holdings S.a.r.l. and/or Intelsat S.A., or, without limitation, their officers, directors, creditors, or equity holders (each in their capacity as such), with respect to any Claims or Causes of Action that are not released by or against Intelsat Investment Holdings S.a.r.l. or Intelsat S.A., respectively, under the Settlement), and which shall require that the Settlement Agreement Order be entered as a condition precedent to confirmation of the Non-TopCo Plan (unless such condition precedent is waived in accordance

with the terms of the Non-TopCo Plan), and otherwise be in form and substance acceptable to the Debtors and the Required Consenting Unsecured Creditors.

"**Outside Date**" means the date that is one hundred and eighty (180) days from the Agreement Effective Date (the "**Initial Outside Date**"); *provided* that (a) the Initial Outside Date may be extended for a necessary period of time to obtain regulatory or other approval of a governmental unit (including the FCC) but no more than an additional one hundred and twenty (120) days solely to the extent that the Company Parties have otherwise complied with the terms of the Definitive Documents and all other events and actions necessary for the occurrence of the Effective Date have occurred other than the receipt of regulatory or other approval of a governmental unit (including the FCC) necessary for the occurrence of the Effective Date and (b) the Parties shall negotiate in good faith for a further reasonable extension of the Outside Date if the Parties have otherwise complied with the terms of the Definitive Documents and all other events and actions necessary for the occurrence of the Effective Date have occurred other than the receipt of regulatory or other approval of a governmental unit (including the FCC) necessary for the occurrence of the Effective Date by the Outside Date as extended pursuant to clause (a) of this definition.  Notwithstanding the foregoing, the Outside Date shall not be extended to or beyond the Maturity Date (as defined in the DIP Credit Agreement) of the DIP Facility.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims who meets the requirements of Section 10.01.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Plan**" means the amended joint plan of reorganization to be filed by the Debtors under chapter 11 of the Bankruptcy Code, in the form attached hereto as **Exhibit B,** which includes the Non-TopCo Plan.

"**Plan Supplement**" means the compilation of documents and forms and/or term sheets of documents, agreements, schedules, and exhibits to the Plan (or the Non-TopCo Plan, as applicable) that will be filed by the Debtors with the Bankruptcy Court prior to the Effective Date, each of which shall be consistent in all material respects with this Agreement (to the extent applicable) and subject to the consent rights set forth in Section 3.

"**Prepetition Secured Parties**" means, collectively, the First Lien Lenders and the First Lien Noteholders.

"**Priority Tax Claim**" means any Claim of a Governmental Unit (as defined in section 101(27) the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**Professional Fee Claims**" shall have the meaning ascribed to it in the Plan.

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from

customers and sell to customers Company Claims (or enter with customers into long and short positions in Company Claims), in its capacity as a dealer or market maker in Company Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Reinstate**," "**Reinstated**," or "**Reinstatement**" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

"**Reorganized Debtor**" means a Debtor, or any successor or assign thereto, by merger, reorganization, consolidation, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including the Equity Issuer; *provided* that the term "Reorganized Debtor" shall not include Intelsat S.A. and/or Intelsat Investments Holdings S.à.r.l. in the event the Non-TopCo Plan is confirmed.

"**Reorganized S.A.**" means, in a scenario where the Plan (and not the Non-TopCo Plan) is confirmed, Intelsat S.A. or any successor or assign, by merger, consolidation, reorganization, or otherwise on or after the Effective Date.

"**Reorganized S.A. Common Stock**" means, in a scenario where the Plan (and not the Non-TopCo Plan) is confirmed, the common stock of Reorganized S.A. to be issued upon the Effective Date in accordance with the Restructuring Steps Memorandum.

"**Replacement/Incremental DIP Facility**" means a debtor-in-possession credit facility that refinances or replaces the DIP Facility, or is incremental to the DIP Facility, which will be provided by certain members of the Jackson Ad Hoc Group and Jackson Crossover Ad Hoc Group and which facility shall have terms consistent with the terms of the Replacement/Incremental DIP Facility Term Sheet attached hereto as **Exhibit K**, subject to definitive documentation to be reasonably acceptable to the Debtors, the Jackson Ad Hoc Group, and the Jackson Crossover Ad Hoc Group and which definitive documentation shall be on terms substantially similar to the existing DIP Credit Agreement and DIP Order.

"**Replacement/Incremental DIP Facility Order**" means the order approving the Replacement/Incremental DIP Facility, which order shall be reasonably acceptable to the Debtors, the Jackson Ad Hoc Group, and the Jackson Crossover Ad Hoc Group and which order may (but shall not be required to) incorporate the Term Loan Facility Claims Settlement as adequate protection.

"**Replacement/Incremental DIP Facility Term Sheet**" means the term sheet for a debtor-in-possession credit facility that refinances or replaces the DIP Facility, or is incremental to the DIP Facility attached hereto as **Exhibit J**.

"**Required Consenting Creditors**" means, collectively, the Required Consenting First Lien Creditors and the Required Consenting Unsecured Creditors.

"**Required Consenting First Lien Creditors**" means, collectively, the Required Consenting First Lien Noteholders and the Required Consenting Jackson Ad Hoc Group Members.

"**Required Consenting First Lien Noteholders**" means, as of the relevant date, those First Lien Noteholders Group Members holding at least 50.01% of the aggregate principal amount of First Lien Notes Claims held by all First Lien Noteholders Group Members; *provided* that with respect to any terms or conditions that relate to the implementation or approval of the Secured Creditor Settlement or the treatment and allowance of the First Lien Claims under the Plan (or the Non-TopCo Plan, as applicable), such parties' consent rights shall be governed by Section 7.02 herein.

"**Required Consenting HoldCo Creditors**" means, as of the relevant date, those HoldCo Creditor Ad Hoc Group Members holding at least 50.01% of the aggregate principal amount of HoldCo Senior Notes held by all HoldCo Creditor Ad Hoc Group Members.

"**Required Consenting Jackson Ad Hoc Group Members**" means, as of the relevant date, those Jackson Ad Hoc Group Members holding at least 50.01% of the aggregate principal amount of Term Loan Facility Claims held by all Jackson Ad Hoc Members.

"**Required Consenting Jackson Ad Hoc Group Noteholders**" means, as of the relevant date, those Jackson Ad Hoc Group Members holding at least 50.01% of the aggregate principal amount of First Lien Notes Claims held by all Jackson Ad Hoc Group Members.

"**Required Consenting Jackson Crossover Group Members**" means, as of the relevant date, those Jackson Crossover Ad Hoc Group Members holding at least 60.01% of the aggregate principal amount of Jackson Senior Notes held by all Jackson Crossover Ad Hoc Group Members.

"**Required Consenting Unsecured Creditors**" means, collectively, the Required Consenting Jackson Crossover Group Members and the Required Consenting HoldCo Creditors.

"**Restructuring Expenses**" means, collectively, the reasonable and documented fees and expenses, whether incurred before, on, or after the Effective Date, of (a) the Jackson Ad Hoc Group (including all fees and expenses of Akin Gump Strauss Hauer & Feld LLP (including, for an avoidance of doubt, whether incurred before or after the Effective Date, all fees and expenses related to any Secured Creditor Claims Litigation and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation) and Centerview Partners), the First Lien Noteholders Group (including all fees and expenses of Wilmer Cutler Pickering Hale and Dorr, LLP (including, for an avoidance of doubt, whether incurred before or after the Effective Date, all fees and expenses related to any Secured Creditor Claims Litigation and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation)), (b) the Jackson Crossover Ad Hoc Group (including all fees and expenses of the Jackson Crossover Ad Hoc Group Advisors (including, for the avoidance of doubt, whether incurred before or after the Effective Date, all (x) fees and expenses related to any Secured Creditor Claims Litigation, and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation, or the Guarantee Claims and (y) fees and expenses set forth in the Houlihan Engagement Letter)), (c) the HoldCo Creditor Ad Hoc Group (including all fees and expenses of the HoldCo Creditor Ad Hoc Group Advisors), and (d) the professionals to be paid by the Company Parties pursuant to this Agreement or as adequate protection pursuant to the DIP Order.

23

"**Restructuring Steps Memorandum**" means the summary of transaction steps to complete the restructuring contemplated by the Plan (or the Non-TopCo Plan, as applicable), which shall be included in the Plan Supplement and shall be in form and substance acceptable to the Required Consenting Unsecured Creditors and the Company Parties.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Secured Claim**" means a Claim:  (a) secured by a valid, perfected, and enforceable lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

"**Secured Creditor Claims Disputed Distribution Amount**" means (i) 100 percent (100%) of the aggregate amount of the premium and/or makewhole amounts that the First Lien Noteholders Group, the Jackson Ad Hoc Group, or the First Lien Notes Trustee claim became payable under the 8.00% First Lien Notes Indenture and the 9.50% First Lien Notes Indenture as of the Petition Date, along with interest thereon at the contractual rate from the Petition Date through and including the Effective Date; *provided, however*, that amounts in the Secured Creditor Claims Disputed Distribution Reserve shall continue to accrue interest at the contractual rate under the applicable debt instruments (with such contractual interest to be deposited by the Reorganized Debtors into such reserve in periodic intervals following the Effective Date) until paid in accordance with any Final Order, *provided* that any accrual of interest in respect of the Secured Creditor Claims Disputed Distribution Reserve, or deposit of such interest therein, shall not be an admission, finding or decision as to the appropriate interest rate in respect thereof, and all parties' rights are expressly reserved and preserved in connection therewith (*provided, however*, that the Debtors and Reorganized Debtors shall support the Secured Creditor Settlement, as otherwise provided in this Agreement and the Plan); *provided*, *further*, *however*, for the avoidance of doubt, no payments in connection with the Secured Creditor Settlement shall be made out of the deposit accounts of the HoldCos.

"**Secured Creditor Claims Disputed Distribution Reserve**" means, in the event the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date, as determined by the Debtors or Reorganized Debtors with the consent (not to be unreasonably withheld) of the Required Consenting Jackson Crossover Group Members, the Required Consenting Jackson Ad Hoc Group Noteholders, and the Required Consenting First Lien Noteholders, either (a) a reserve that shall be established on the Effective Date or (b) the Secured Creditor Claims Disputed Distribution Trust Account that shall be established on the Effective Date, in each case funded by the Debtors with cash in the amount of the Secured Creditor Claims Disputed Distribution Amount; *provided*, that no Secured Creditor Claims Disputed Distribution Reserve shall be established or maintained after the Secured Creditor Settlement Order has become a Final Order on or before the Effective Date or a Secured Creditor Claims Order has become a Final Order on or before the Effective Date and all amounts required to be paid to the holders of First Lien Notes thereunder have been paid in full in cash.

"**Secured Creditor Claims Disputed Distribution Trust Account**" means an interest-bearing account funded by the Debtors with cash on or before the Effective Date in an amount equal to the Secured Creditor Claims Disputed Distribution Amount, which shall be maintained in trust solely for the Holders of First Lien Notes Claims and for no other Entities until any Claims Allowed pursuant to a Final Order entered with respect to the Secured Creditor Claims Litigation have been irrevocably paid in full to the Holders of First Lien Notes Claims; *provided* that other than as set forth in the Plan, no Liens, claims, or interests shall encumber the Secured Creditor Claims Disputed Distribution Trust Account or Cash held in the Secured Creditor Claims Disputed Distribution Trust Account in any way.  Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

"**Secured Creditor Claims Litigation**" means any litigation or proceeding (including, without limitation, any contested matter or adversary proceeding), brought by the Jackson Crossover Ad Hoc Group, the Creditors' Committee, or any other party in interest (other than the Debtors) challenging the Allowance or treatment of, or asserting challenge to the First Lien Notes Claims Settlement, the 8.00% First Lien Notes Claims, and/or the 9.50% First Lien Notes Claims, or any portion thereof relating to any premium or makewhole amount or interest thereon, (it being understood and agreed that the full amount of principal and all accrued but unpaid interest at the applicable contract rates on the First Lien Notes are, in all circumstances, Allowed and not subject to any dispute), including the *Objection of the Official Committee of Unsecured Creditors to Jackson Secured Creditors' Claims to Make-Whole Premiums and Postpetition Interest at Default Rate* [Docket No. 1476].

"**Secured Creditor Claims Order**" means an order of the Bankruptcy Court entered in respect of the Secured Creditor Claims Litigation, other than the Secured Creditor Settlement Order.

"**Secured Creditor Settlement**" means, collectively, the First Lien Notes Claims Settlement and the Term Loan Facility Claims Settlement.  For the avoidance of doubt, the First Lien Notes Claims Settlement has not been approved or consented to by the Jackson Crossover Ad Hoc Group.

"**Secured Creditor Settlement Motion**" means the motion to be filed by the Debtors with the Bankruptcy Court seeking approval of the First Lien Notes Claims Settlement pursuant to Bankruptcy Rule 9019, which motion shall be heard at the Confirmation Hearing.

"**Secured Creditor Settlement Order**" means an order of the Bankruptcy Court that has not been stayed approving the relief requested in the Secured Creditor Settlement Motion, which order shall be in form and substance reasonably acceptable to the Required Consenting First Lien Creditors and the Company Parties.  For the avoidance of doubt, the Secured Creditor Settlement Order shall not be the Confirmation Order.

"**Secured Creditor Settlement Term Sheet**" means that certain term sheet setting forth certain terms of the Secured Creditor Settlement attached hereto as **Exhibit I**, which, for the avoidance of doubt, has not been approved or consented to by the Jackson Crossover Ad Hoc Group or the Creditors' Committee.

"**Securities**" has the meaning set forth in section 2(a)(1) of the Securities Act (including, for the avoidance of doubt, the New Common Stock, New Notes, New Warrants, CVRs or other securities that may be received in exchange for any Company Claims during the Agreement Effective Period and prior to the Effective Date).

"**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"**Senior Notes**" means, collectively, the: (i) Jackson Senior Notes; (ii) Lux Senior Notes; (iii) Connect Senior Notes; and (iv) Convertible Senior Notes.

"**Senior Notes Claim**" means any Claim arising under the Senior Notes Indentures.

"**Senior Notes Indentures**" means, collectively, the: (i) Jackson Senior Notes Indentures; (ii) Lux Senior Notes Indentures; (iii) Connect Senior Notes Indenture; and (iv) Convertible Senior Notes Indenture.

"**Series A CVR Agreement**" means that certain agreement setting forth the full terms and conditions of the Series A CVRs, the form of which shall be included in the Plan Supplement, consistent with the terms set forth in the CVR Term Sheet, and in form and substance acceptable to the Company Parties and the Required Consenting Unsecured Creditors.

"**Series A CVRs**" means those certain contingent value rights issued pursuant to the Plan (or the Non-TopCo Plan, as applicable) and the Series A CVR Agreement and consistent with the terms set forth in the CVR Term Sheet.

"**Series B CVR Agreement**" means that certain agreement setting forth the full terms and conditions of the Series B CVRs, the form of which shall be included in the Plan Supplement, consistent with the terms set forth in the CVR Term Sheet, and in form and substance acceptable to the Company Parties and the Required Consenting Unsecured Creditors.

"**Series B CVRs**" means those certain contingent value rights issued pursuant to the Plan (or the Non-TopCo Plan, as applicable) and the Series B CVR Agreement and consistent with the terms set forth in the CVR Term Sheet.

"**Settlement**" means (a) the compromise and settlement by and among the Company Parties, as reflected in the Settlement Agreement, of: (i) the Debtor Intercompany Claims, including, the Historical Intercompany Transaction Claims, the 2018 Reorganization Claims, and the Accelerated Relocation Payment Claims (including, without limitation, any claims with respect to which Debtor or Reorganized Debtor is entitled to receive any payments or reimbursements pursuant to the C-Band Order); and (ii) claims and Causes of Action against any of the Debtors' directors, managers, or officers, and other related Entities; and (b) the covenants and actions required of each party hereto to support the foregoing and to effectuate the Restructuring Transactions in a manner that maximizes tax asset value (but in all events consistent with the Plan (or the Non-TopCo Plan, as applicable) and the exhibits thereto (including the Corporate Governance Term Sheet)).

"**Settlement Agreement**" means that certain settlement agreement by and among the Debtors reflecting the Settlement, which will be filed in the Plan Supplement, and as approved by the Settlement Order, which agreement shall be in form and substance acceptable to the Company Parties and the Required Consenting Unsecured Creditors and, for the avoidance of doubt, shall not modify the treatment of Claims and Interests set forth in the Plan (or the Non-TopCo Plan, as applicable), the approval of which (by entry of the Settlement Order) shall be a condition precedent to Confirmation of the Plan (or the Non-TopCo Plan, as applicable) (unless such condition precedent is waived in accordance with the terms of the Plan or Non-TopCo Plan (as applicable)).

"**Settlement Order**" means either an order of the Bankruptcy Court that is not stayed approving the Settlement Agreement pursuant to Bankruptcy Rule 9019 or the Confirmation Order, approving the Settlement Agreement pursuant to Bankruptcy Rule 9019, which order shall be in form and substance acceptable to the Company Parties and the Required Consenting Unsecured Creditors and, for the avoidance of doubt, shall not modify the treatment of Claims and Interests set forth in the Plan (or the Non-TopCo Plan, as applicable) and entry of which shall be a condition precedent to Confirmation of the Plan (or the Non-TopCo Plan, as applicable) (unless such condition precedent is waived in accordance with the terms of the Plan or the Non-TopCo Plan (as applicable)).

"**Solicitation Materials**" means the ballots, provisional ballots, and other related materials drafted in connection with the solicitation of acceptances of the Plan (or the Non-TopCo Plan, as applicable), including, if applicable, a letter from the Creditors' Committee in support of the Plan (or the Non-TopCo Plan, as applicable).

"**Special Meeting**" means any annual, extraordinary or other general meeting of the shareholders (or equivalent meeting or convention of equity- or security-holders) of Intelsat S.A. or any of its Affiliates to, among other things, (i) authorize additional share capital as may be necessary or advisable to effectuate the Restructuring Transactions; (ii) authorize or amend the New Corporate Governance Documents, their predecessor documents, or similar governing document of Intelsat S.A. or any of its Affiliates as may be necessary or advisable to effectuate the Restructuring Transactions; (iii) accept the resignation of existing directors; (iv) elect new directors as set forth in the Corporate Governance Term Sheet; or (v) approve any other proposals that the Debtors deem necessary or advisable in connection therewith or otherwise in order to effectuate the Restructuring Transactions.

"**Standstill Conditions**" has the meaning set forth in Section 7 of this Agreement.

"**Term Loan Facility**" means that certain prepetition first lien term loan facility provided for under the First Lien Credit Agreement.

"**Term Loan Facility Claims**" means Claims arising under the Term Loan Facility and the First Lien Credit Agreement.

"**Term Loan Facility Claims Settlement**" means the compromise and settlement regarding the allowance and treatment of the Term Loan Facility Claims set forth in the Secured Creditor Term Sheet.

"**Termination Date**" means, as to any Party, the date on which termination of this Agreement as to such Party is effective in accordance with Sections 13.01, 13.02, 13.03, 13.04, or 13.05, 13.06, 13.07, or 13.08.

"**TopCo Guarantee Claims**" means the claims asserted against the TopCo Guarantors in the proofs of claim filed in the Chapter 11 Cases by the Trustees for the Jackson Senior Notes and the Trustees for the Lux Senior Notes (including proofs of claim numbered 551, 552, 583, 584, 615, 616, 785, 788, 793, 794, 902, 903, 907, 910 and any pleadings filed with the Bankruptcy Court in connection therewith).

"**TopCo Guarantors**" means, together, Intelsat Investment Holdings S.à.r.l., and Intelsat S.A., each in its capacity as guarantor under the applicable Senior Notes Indentures.

"**Tranche B-3 Term Loans**" has the meaning set forth in the DIP Order.

"**Tranche B-4 Term Loans**" has the meaning set forth in the DIP Order.

"**Tranche B-5 Term Loans**" has the meaning set forth in the DIP Order.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar Entity under the First Lien Notes or the Senior Notes, in its capacity as such.

"**U.S.-Luxembourg Tax Treaty**" means the Convention between the Government of the United States of America and the Government of the Grand Duchy of Luxembourg for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, signed at Luxembourg on April 3, 1996, as amended from time to time, including pursuant to the Protocol signed May 20, 2009, and including all technical explanations, letters, and interpretations related thereto.

1.02.   Interpretation.  For purposes of this Agreement:

(a)   in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)   capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; *provided, however*, that nothing contained in this section shall or shall be construed to modify the Jackson Crossover Ad Hoc Group Consent Right or the HoldCo Creditor Group Consent Right;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement; *provided, however,* that any capitalized terms herein that are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not;

(j)      the phrase "counsel to the Consenting Creditors" refers in this Agreement to each counsel specified in Section 15.10 other than counsel to the Company Parties;

(k)      the use of "writing," "written" and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form; and

(l)      any particular Company Party's consideration of its fiduciary duties in respect of this Agreement and/or the Restructuring Transactions, including whether to exercise the Fiduciary Out applicable to it pursuant to Section 9, shall be a consideration with respect to such Company Party and shall not be based upon (i) any actual or potential facts, circumstances, or transactions to the extent that they affect the interests of another Company Party, including the actual or potential inability of such other Company Party to confirm the Plan (or the Non-TopCo Plan, as applicable) as to itself; or (ii) any changes to the Company Party's projections of business performance (including, the impact of any potential tax liabilities), in and of themselves and whether taken individually or as a whole, as of the date of the Execution Date, unless such changes would be reasonably likely to render, as to such particular Company Party, the Plan (or the Non-TopCo Plan, as applicable) infeasible under section 1129(a)(11) of the Bankruptcy Code.

29

**Section 2.** *Effectiveness of this Agreement.* This Agreement shall become effective and binding upon each of the Parties as of 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a) each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b) holders of Jackson Senior Notes Claims holding at least two-thirds of the aggregate outstanding principal amount of Jackson Senior Notes shall have executed and delivered counterpart signature pages of this Agreement;

(c) holders of HoldCo Senior Notes Claims holding at least two-thirds of the aggregate outstanding principal amount of Connect Senior Notes shall have executed and delivered counterpart signature pages of this Agreement; and

(d) holders of First Lien Claims holding at least two-thirds of the aggregate outstanding principal amount of either (i) the 8.00% First Lien Notes Claims, (ii) the 9.50% First Lien Notes Claims, or (iii) the Term Loan Facility Claims shall have executed and delivered counterpart signature pages of this Agreement.

**Section 3.** *Definitive Documents.*

3.01. The Definitive Documents governing the Restructuring Transactions shall include the following: (A) the Plan (and the Non-TopCo Plan) and the Plan Supplement (and, in each case, any and all exhibits, annexes, schedules ballots, solicitation procedures, and other documents and instruments related thereto); (B) the Confirmation Order; (C) the Disclosure Statement; (D) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (E) the New Debt Documents; (G) the Backstop Commitment Agreement; (H) the New Warrants Agreements; (I) the CVR Agreements; (J) any and all documentation required to implement, issue, and distribute the New Common Stock, New Debt, CVRs, or New Warrants, including any material disclosure documents related thereto; (K) the Management Incentive Plan; (L) the New Corporate Governance Documents; (M) the Settlement Agreement and all pleadings or documents in connection with the Settlement Agreement, including the Settlement Order; (N) the Secured Creditor Settlement Term Sheet; (O) the Restructuring Steps Memorandum; (P) the Guarantee Litigation Scheduling Order; and (Q) any and all other material documents, deeds, agreements, filings, notifications, letters or instruments necessary or required to consummate the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

3.02. The Definitive Documents not executed or not in a form attached to this Agreement as of the Execution Date remain subject to good faith negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as this Agreement may be modified, amended, or supplemented in accordance with Section 14.

Further, subject to and without limiting any additional or different consent or approval rights of the Parties specified elsewhere in this Agreement, the Definitive Documents not executed or not in a form attached to this Agreement as of the Execution Date, including any amendments to the Definitive Documents (including, for the avoidance of doubt, any amendments to the Definitive Documents that are executed as of the Execution Date and/or in the form attached to this Agreement), shall be in form and substance (x) acceptable to (a) the Company Parties,  (b) the Required Consenting Jackson Crossover Group Members subject to the Jackson Crossover Ad Hoc Group Consent Right, and (c) the Required Consenting HoldCo Creditors subject to the HoldCo Creditor Group Consent Right, and (y) reasonably acceptable to the Required Consenting First Lien Creditors, solely to the extent provided under the First Lien Creditors Consent Right; *provided* that the Required Consenting HoldCo Creditors shall have the right to consult in respect of the negotiation of the "makewhole" provisions in the New Debt Documents concerning the New Term Loans and New Notes; *provided, further* that (A) the Guarantee Litigation Scheduling Order shall be in form and substance acceptable only to the Company Parties and the Required Consenting Unsecured Creditors and (B) the Backstop Commitment Agreement shall be in form and substance acceptable only to the Company Parties and the Required Consenting Jackson Crossover Group Members; *provided, further*, that the Secured Creditor Settlement Term Sheet shall be in form and substance acceptable only to the Company Parties and the Required Consenting First Lien Creditors.

3.03.    The Company Parties acknowledge and agree that they will provide advance initial draft copies of the Definitive Documents to counsel for the Consenting Creditors as soon as reasonably practicable and will use commercially reasonable efforts to provide such documents no later than five (5) calendar days prior to the date when any Company Party intends to file the applicable Definitive Document with the Bankruptcy Court or otherwise finalize such document; *provided*, that the Company Parties shall use their best efforts to ensure that no Definitive Document is filed with the Bankruptcy Court or finalized unless the consent rights set forth in Section 3.02 of this Agreement have been satisfied.  The Company Parties further acknowledge and agree that they will provide advance initial draft copies of any substantive pleadings other than the Definitive Documents to counsel for the Consenting Creditors and shall exert commercially reasonable efforts to provide such documents no less than three (3) Business Days, and, in all events, shall provide such documents no later than two (2) days (which shall include at least one (1) Business Day) prior to the date when any Company Party intends to file the applicable substantive pleadings with the Bankruptcy Court or otherwise finalize such document.

**Section 4.**      *Milestones.*

4.01.    During the Agreement Effective Period, the Company Parties shall implement the Restructuring Transactions in accordance with the following milestones, as applicable, unless extended or waived in writing (which may be electronic mail between applicable counsel) by the Required Consenting Creditors.

(a)      no later than one (1) day after the Agreement Effective Date, the Company Parties shall have filed with the Bankruptcy Court the Plan and the Disclosure Statement;

(b)      no later than forty-five (45) days after the Execution Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

(c)      no later than one hundred (100) days after the Execution Date, the Confirmation Hearing shall have occurred;

(d)      no later than one hundred and twenty (120) days after the Execution Date, the Bankruptcy Court shall have entered the Confirmation Order and the Settlement Order; and

(e)      no later than the Outside Date, all conditions to the occurrence of the Effective Date shall have either been satisfied or waived in accordance with this Agreement and the Effective Date shall have occurred.

**Section 5.      *Commitments of the Consenting Creditors.***

5.01.   General Commitments, Forbearances, and Waivers.

(a)      During the Agreement Effective Period, each Consenting Creditor, severally, and not jointly, agrees, in respect of any Company Claims, to:

(i)      support the Restructuring Transactions and, subject to Section 5.02 of this Agreement, vote and use commercially reasonable efforts to exercise any powers or rights available to it (including in any board, or creditors', or shareholders' meeting (including any Special Meeting), including by proxy vote or otherwise, or in any other process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent reasonably requested and necessary to implement the Restructuring Transactions;

(ii)      support the Settlement Agreement and entry of the Settlement Order, and not object to or otherwise seek to challenge the Settlement Agreement or entry of the Settlement Order;

(iii)      as it pertains to the Jackson Crossover Ad Hoc Group and Jackson Ad Hoc Group, use commercially reasonable efforts to negotiate and finalize the Replacement/Incremental DIP Facility, as contemplated by the Replacement/Incremental DIP Facility Term Sheet, support the approval of the Replacement/Incremental DIP Facility and entry of the Replacement/Incremental DIP Facility Order, including, but not limited to, filing any pleadings or other documents with the Bankruptcy Court in support of the Replacement/Incremental DIP Facility and not objecting to, nor encouraging any other person or entity to, object to, delay, or impede or take any other action to delay, impede, or interfere with approval of the Replacement/Incremental DIP Facility or entry of the Replacement/Incremental DIP Facility Order;

(iv)      support the entry of the Guarantee Litigation Scheduling Order, and not object to or otherwise seek to challenge the entry of Guarantee Litigation Scheduling Order (or the motion seeking entry thereof);

32

(v)      use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders; *provided, however*, that this paragraph shall not require (1) any Jackson Crossover Ad Hoc Group Member to agree to anything that directly or indirectly changes in any way whatsoever the treatment of the Jackson Senior Notes Claims under the Plan (or the Non-TopCo Plan, as applicable), (2) any HoldCo Creditor Ad Hoc Group Member to agree to anything that directly or indirectly changes in any way whatsoever the treatment of the HoldCo Senior Notes Claims under the Plan (or the Non-TopCo Plan, as applicable) or (3) subject to Section 7.02, any First Lien Noteholders Group Member or Jackson Ad Hoc Group Member to agree to anything that directly or indirectly changes in any way whatsoever the treatment of the First Lien Notes Claims or the Term Loan Facility Claims under the Plan (or the Non-TopCo Plan, as applicable);

(vi)      use commercially reasonable efforts to oppose (or join the Company Parties in opposing) any party or person from taking any actions contemplated in Section 5.02(b);

(vii)      give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring Transactions, in each case in form and substance acceptable to the applicable Consenting Creditors;

(viii)      negotiate in good faith the Definitive Documents that are consistent with this Agreement to which it is required to be a party;

(ix)      negotiate in good faith any appropriate additional provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, or delay the consummation of the Restructuring Transactions; *provided* that, for the avoidance of doubt, subject to Section 7.02 herein, no Consenting Creditor shall be required to consent to any provisions or agreements that would result in any change that is adverse to such Consenting Creditor's rights or treatment as set forth in this Agreement, the Plan, the Settlement Agreement, or the Secured Creditor Settlement.

(x)      with respect to any Consenting Creditor that is expected to receive any Securities of the Equity Issuer in connection with the Restructuring Transactions, use commercially reasonable efforts to support any motion filed by any Company Party in furtherance of obtaining necessary or desirable regulatory approvals for the Restructuring Transactions; and

(xi)      use commercially reasonable efforts to (1) support any action by the Company Parties to obtain regulatory approvals required or desirable for the consummation of the Restructuring Transactions and (2) provide any and all reasonably requested and needed information to effectuate such regulatory approvals (subject to reasonable and customary exclusions for privilege and confidentiality).

(b)      During the Agreement Effective Period, each Consenting Creditor, severally, and not jointly, agrees, in respect of any Securities issued in connection with the Restructuring Transactions, to use commercially reasonable efforts to exercise any powers or rights available to it (including in any board, or creditors', or shareholders' meeting (including any Special Meeting),

including by proxy vote or otherwise, or in any other process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent reasonably requested and necessary to implement the Restructuring Transactions; *provided, however*, that such commitment shall not extend for more than one (1) Business Day after the Effective Date.

(c)      During the Agreement Effective Period, each Consenting Creditor, severally, and not jointly, agrees, in respect of all of its Company Claims, that it shall not directly or indirectly:

(i)      object to, delay, impede, or take any other action to interfere with, acceptance, consummation, or implementation of the Restructuring Transactions or the Secured Creditor Settlement, except solely as to the Jackson Crossover Ad Hoc Group through the Secured Creditor Claims Litigation;

(ii)      publicly propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement, the Guarantee Litigation Scheduling Order that is entered by the Bankruptcy Court, or the Plan (or the Non-TopCo Plan, as applicable); *provided* that nothing in Section 5 shall prevent any Consenting Creditor from complying with the terms of the Initial Guarantee Litigation Scheduling Order pending entry of the Guarantee Litigation Scheduling Order or if the Guarantee Litigation Scheduling Order is not entered;

(iv)      initiate, or direct any other person to initiate on its behalf, any litigation or proceeding against any other Party that is inconsistent with this Agreement;

(v)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Interests in the Company Parties unless any such action is (1) consistent with this Agreement, (2) in accordance with the Definitive Documents, or (3) permitted by the DIP Order;

(vi)      object to, delay, impede, or take any other action to interfere with (1) the Settlement Agreement and the approval thereof and entry of the Settlement Order, (2) the Guarantee Litigation Scheduling Order and the entry thereof, or (3) the efforts of the Company Parties to seek confirmation of the Plan (or the Non-TopCo Plan, as applicable); or

(vii)      take or fail to take any action (except to the extent expressly contemplated by the Plan (or the Non-TopCo Plan, as applicable) or this Agreement) if such action or failure to act would cause a change to the tax classification of any Company Party or would reasonably be expected to cause, individually or in the aggregate, a material adverse tax consequence to the Company Parties without the prior written consent of the Required Consenting Unsecured Creditors, unless required by applicable Law or accounting standards.

(d)      For the avoidance of doubt, nothing in this Agreement shall (i) require any Consenting Creditor to consent to, acquiesce in, vote for, support, or not object to any Alternative

Restructuring Proposal or any portion thereof, or (ii) limit the right of any Consenting Creditor hereto to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document.

5.02.   Commitments with Respect to Chapter 11 Cases.

(a) During the Agreement Effective Period, each Consenting Creditor that is entitled to vote to accept or reject the Plan (or the Non-TopCo Plan, as applicable) pursuant to its terms agrees that it shall, subject to the receipt by such Consenting Creditor of the Solicitation Materials:

(i)      vote each of its Company Claims to accept the Plan (or the Non-TopCo Plan, as applicable) by delivering its duly executed and completed ballot accepting the Plan (or the Non-TopCo Plan, as applicable) on a timely basis following the commencement of the solicitation of the Plan (or the Non-TopCo Plan, as applicable) and its actual receipt of the Solicitation Materials and the ballot;

(ii)     to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan (or the Non-TopCo Plan, as applicable), elect not to opt out of the releases set forth in the Plan (or the Non-TopCo Plan, as applicable) by timely delivering its duly executed and completed ballot(s) indicating such election;

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above at any time before entry of the Confirmation Order; and

(iv)     support the Settlement Agreement, including entry of the Settlement Order.

(b)    During the Agreement Effective Period, each Consenting Creditor, in respect of each of its Company Claims, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with, any motion or other pleading or document filed by a Company Party in the Bankruptcy Court to the extent of any relief sought therein that is required to further the terms of this Agreement.

(c)    Notwithstanding any other provisions of this Agreement, including this 5.02(c), nothing in this Agreement shall require any Consenting Creditor to incur any material expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, grants of any liens or security interests, or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Creditor or its affiliates.

**Section 6.      *Additional Provisions Regarding the Consenting Creditors' Commitments.***

6.01.   Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:  (a) be construed to prohibit any Consenting Creditor from appearing as a party in interest and filing papers in any matter to be adjudicated in the Chapter 11 Cases, in each case to the extent consistent with this Agreement; (b) affect the ability of any Consenting Creditor to consult or negotiate with any other Consenting Creditor, the Company Parties, or any other party in interest in the Chapter 11 Cases (including the United States Trustee and other creditors that are not

35

Consenting Creditors); (c) impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions or the Chapter 11 Cases, including the rights of the Jackson Crossover Ad Hoc Group or any Consenting Creditor to pursue, or direct another Entity to pursue, the Secured Creditor Claims Litigation or object on any basis to a proposed replacement or incremental debtor-in-possession financing (other than the Replacement/Incremental DIP Facility); (d) prevent any Consenting Creditor from enforcing this Agreement or any other Definitive Document, or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, such document(s), or exercising its rights or remedies specifically reserved herein or in any of the Definitive Documents; (e) obligate a Consenting Creditor to deliver a vote to support the Plan (or the Non-TopCo Plan, as applicable) or prohibit a Consenting Creditor from withdrawing such vote, in each case from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date); *provided* that upon the withdrawal of any such vote after the Termination Date (other than a Termination Date as a result of the occurrence of the Effective Date), such vote shall be deemed void *ab initio* and such Consenting Creditor shall have the opportunity to change its vote at any time before entry of the Confirmation Order; (f) (i) prevent any Consenting Creditor from taking any action which is required by applicable Law, or (ii) require any Consenting Creditor to take any action that is prohibited by applicable Law or to waive or forego the benefit of any applicable legal or other professional or business professional privilege; (g) prevent any Consenting Creditor by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like that are required by applicable Law; (h) prevent any Consenting Creditor from enforcing its rights or the Debtors' obligations under the DIP Order or other order of the Bankruptcy Court; (i) prevent any Consenting Creditor from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence or priority of its Company Claims (including, without limitation, the filing of a proof of claim against any Company Party); *provided* that the prosecution of any Guarantee Claims shall be subject to the Guarantee Litigation Scheduling Order and Section 7.05; (j) prohibit any Consenting Creditor from taking any action that is not inconsistent with this Agreement; (k) impair or diminish the Jackson Crossover Ad Hoc Group Consent Right or the HoldCo Creditor Group Consent Right; (l) subject to the requirements set forth in Section 5.01(a)(iii) of this Agreement, prevent any Consenting Creditor from supporting the entry into, and approval of, any proposed replacement or incremental debtor-in-possession financing; or (m) prohibit the Jackson Crossover Ad Hoc Group from commencing and/or prosecuting a contested matter(s), adversary proceeding(s) or other proceeding(s) in respect of the Secured Creditor Claims Litigation.

6.02.    For the avoidance of doubt, the right of the Jackson Crossover Ad Hoc Group to object to the First Lien Notes Claims Settlement and prosecute the Secured Creditor Claims Litigation is expressly reserved and preserved, including the right to commence and prosecute a contested matter(s), adversary proceeding(s) or other proceeding(s) in respect of the Secured Creditor Claims Litigation and seek to have such contested matter(s), adversary proceedings(s), or other proceeding(s) heard at a hearing before, during, or after the Confirmation Hearing.

**Section 7.      *Additional Provisions.***

7.01.   Backstop of New Term Loans and New Notes.

36

(a)      The Jackson Crossover Ad Hoc Group Members shall have the option, at any time prior to seven (7) days before the deadline to file a reply or brief in support of Confirmation, to submit the Backstop Proposal to the Debtors.  The Required Consenting Jackson Crossover Group Members may, in their sole discretion, permit other parties (that are not already entitled to be Backstop Parties under this Agreement) to become Backstop Parties and participate in the Backstop Proposal; subject to the consent of the Company Parties, not to be unreasonably withheld, delayed, or conditioned.

(b)      If the Backstop Parties submit a Backstop Proposal on terms that are reasonably acceptable to the Debtors, subject to entry into the Backstop Commitment Agreement, the Debtors shall pay the Backstop Parties the Backstop Premium (as provided for in the executed Backstop Commitment Agreement).  The Debtors or Reorganized Debtors (as applicable) shall pay the Backstop Premium to the Backstop Parties at the time and in the manner set forth in the Backstop Commitment Agreement.

(c)      The Parties agree that any Backstop Commitment Agreement executed by the Company Parties and the Backstop Parties shall be executed (unless otherwise agreed in writing between the Required Consenting Jackson Crossover Group Members and the Company Parties) no later than seven (7) days prior to the commencement of the Confirmation Hearing, and that the Backstop Parties shall remain obligated in respect of the Backstop Commitment set forth therein for no more than twenty-eight (28) days after the execution of the Backstop Commitment Agreement, *provided*, that each Backstop Party may agree to extend its Backstop Commitment to a later date in its discretion.  The Parties agree that the Backstop Commitment Agreement shall provide that the Backstop Parties shall reserve the right to modify the terms of the Backstop Commitment Agreement if the commencement or conclusion of the Confirmation Hearing is materially delayed.

(d)      For the avoidance of doubt, nothing in this Agreement obligates any Party to either (a) submit a Backstop Proposal or (b) fund any amounts in respect of the New Debt.

7.02.   Secured Creditor Claims Litigation.

(a)      Notwithstanding anything to the contrary herein, nothing shall prevent (i) the Jackson Crossover Ad Hoc Group from prosecuting the Secured Creditor Claims Litigation, or challenging or contesting the First Lien Notes Claims Settlement or the treatment of the First Lien Notes Claims on any basis, (ii) the Company Parties from seeking approval of the Secured Creditor Settlement, including by filing the Secured Creditor Settlement Motion, or (iii) the Jackson Ad Hoc Group or the First Lien Noteholders Group from supporting or prosecuting the Secured Creditor Settlement and from defending against any Secured Creditor Claims Litigation and, in the event of any vacating or reversal of the Secured Creditor Settlement Order, of seeking payment of all amounts necessary for the First Lien Notes to be unimpaired under section 1124 of the Bankruptcy Code.  Any modification to the Plan (or the Non-TopCo Plan, as applicable) necessary or desirable to implement or reflect the terms of the, as applicable, Secured Creditor Settlement Order or Secured Creditor Claims Order, to the extent that such order becomes a Final Order, and the form of such modification, shall be negotiated in good faith amongst the Parties; *provided*, *however*, that no such modification to reflect the terms of the Secured Creditor Claims Order shall

in any way modify the unimpaired status and treatment set forth in the Plan of the First Lien Notes Claims in the event that the Secured Creditor Settlement Order is not entered.  For the avoidance of doubt, the First Lien Claims shall not be satisfied from any HoldCo cash.

(b)    The Secured Creditor Settlement shall provide that the rights of all parties (including the Jackson Ad Hoc Group, the First Lien Noteholders Group, the Jackson Crossover Ad Hoc Group, and the Creditors' Committee) to appeal any order entered in respect of the Secured Creditor Claims Litigation (including in respect of the allowed amount or treatment of the First Lien Claims or related to the First Lien Notes Claims Settlement) shall be expressly reserved and preserved; *provided, however*, that the Company Parties and Reorganized Debtors, as applicable, shall (a) defend any appeal of the Secured Creditor Settlement Order or (b) appeal and support the reversal on appeal of an order denying approval of the Secured Creditor Settlement; *provided, further, however*, that any appeal by any party shall not seek to stay the Confirmation Order or otherwise stay consummation of the Plan.  In the event that the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, the First Lien Noteholders shall be paid on the Effective Date all amounts payable to them under the Secured Creditor Settlement, subject to recoupment or supplementation by the Reorganized Debtors in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order; *provided, however*, that in no event shall (i) the full outstanding principal amount of the First Lien Notes or (ii) any accrued and unpaid interest on the principal of the First Lien Notes amount through the Effective Date at the contractual rate be subject to recoupment or supplementation.  In the event that the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date, the First Lien Noteholders shall be paid on the Effective Date all principal and accrued but unpaid interest thereon (but not any disputed makewhole or premium amounts and interest on such makewhole or premium amounts) at the applicable contract rate on the First Lien Notes, and the Debtors and/or Reorganized Debtors shall establish the Secured Creditor Claims Disputed Distribution Reserve; *provided, however*, that irrespective of the amount of interest that may be earned on the amounts deposited in such disputed claims reserve after the Effective Date, the holders of First Lien Notes Claims and the trustee under the First Lien Notes Indentures shall be entitled to assert a claim for all amounts required so that the First Lien Notes are unimpaired under Section 1124 of the Bankruptcy Code, including a claim for all premium or makewhole amounts and interest thereon from and after the Effective Date at the contract rates specified in the First Lien Indentures, and all rights of the Jackson Crossover Ad Hoc Group and the Creditors' Committee to object to any such claim (including with respect to the appropriate interest rate (if any)) shall be preserved.

(c)    The Parties agree that (a) the Confirmation Order shall not contain any provision approving the First Lien Notes Claims Settlement and (b) in exercising appellate rights in respect of any court order relating to the First Lien Notes Claims Settlement or Secured Creditor Claims Litigation, any party exercising such appellate rights shall not be subject to the doctrine of equitable mootness or any other similar doctrine, and the Parties waive all arguments regarding such doctrines.

(d)    Notwithstanding anything to the contrary in this Agreement (including this Section 7.02), except as a direct result of a breach by the Jackson Crossover Ad Hoc Group of its obligations set forth in Section 5.01(a)(iii) (which, for the avoidance of doubt, shall not include

38

non-performance of any obligations after a termination of this Agreement by the Jackson Crossover Ad Hoc Group), if the Replacement/Incremental DIP Facility is not approved by the Bankruptcy Court, then this Agreement and the Plan (and the Non-TopCo Plan, as applicable) shall be modified such that (i) the Term Loan Facility Claims and Term Loan Facility Claims Settlement shall be treated (including with respect to treatment under the Plan (and the Non-TopCo Plan, as applicable)) in a manner substantially similar to the First Lien Notes Claims and the First Lien Notes Claims Settlement (including with respect to modifications to Article III of the Plan (and the Non-TopCo Plan, as applicable) and modifications to Section 6.02, this Section 7.02 and the term "Secured Creditor Claims Litigation" (and other applicable terms and provisions used in this Agreement)), (ii) the Jackson Crossover Ad Hoc Group's rights to challenge the Term Loan Facility Claims and Term Loan Facility Claims Settlement shall be reserved and preserved to the same extent that the Jackson Crossover Ad Hoc Group's rights to challenge the First Lien Notes Claims and First Lien Notes Claims Settlement are reserved and preserved herein, and (iii) the Required Consenting Jackson Crossover Group Members shall have a right to terminate this agreement as provided for in Section 13.01(aa).

7.03. <u>Support for Settlement Agreement</u>. During the Agreement Effective Period, each Party shall (i) support, consent to, and take all reasonable steps necessary to negotiate and document the definitive terms of the Settlement as shall be set forth in the Settlement Agreement, and (ii) seek approval of the Settlement and Settlement Agreement, including supporting entry of the Settlement Order as a condition precedent to Confirmation of the Plan (or the Non-TopCo Plan, as applicable); *provided* that such condition precedent may be waived with the consent of each of the Required Consenting Jackson Crossover Group Members, the Required Consenting HoldCo Creditors, and the Company Parties.

7.04. <u>HoldCo Creditor Ad Hoc Group Waiver</u>.

(a)     During the Agreement Effective Period, (a) to the extent the aggregate value to be distributed under the Plan to holders of Convertible Senior Notes Claims on account of such claims increases in excess of $49 million up to $145 million (excluding the value attributable to Reorganized S.A. Common Stock (if any)), HoldCo Creditor Ad Hoc Group Members shall not receive any distribution on account of such incremental recovery except for distributions of Reorganized S.A. Common Stock (if any) and (b) to the extent the aggregate value to be distributed under the Plan to holders of Convertible Senior Notes Claims on account of such claims exceeds $145 million (excluding the value attributable to Reorganized S.A. Common Stock (if any)), the HoldCo Creditor Ad Hoc Group Members shall be entitled to recover, *pro rata*, in such excess distributable value; *provided* that the HoldCo Creditor Ad Hoc Group Members shall not receive any value in respect of their receipt (if any) of the Reorganized S.A. Common Stock other than value attributable to the net operating losses or other tax attributes (that are held outside of the Debtors' Luxembourg tax unity) of Intelsat S.A. or Intelsat Investments Holdings S.a.r.l.

(b)     In the event the Company Parties implement the Restructuring Transactions pursuant to the Non-TopCo Plan, the HoldCo Creditor Ad Hoc Group Waiver described in this Section 7.04 shall not apply to any distributions from Intelsat S.A. upon the Effective Date of the Non-TopCo Plan, unless such distributions are funded by Reorganized Jackson, any of its subsidiaries or any holders of Jackson Senior Notes.

39

7.05.   Guarantee Claim Matters.

(a)      The Jackson Crossover Group will not seek entry of an order allowing a HoldCo Guarantee Claim (whether on a temporary or final basis, but subject to Sections 7.05(b), (c) and (d)), or seek a distribution from any of the HoldCo Guarantors on account of any HoldCo Guarantee Claims, and neither the HoldCo Creditor Ad Hoc Group nor any Company Party shall prosecute any objection or participate in any challenge to the Guarantee Claims, in each case at any time when (1) the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group (in each case in a percentage amount required for the effectiveness of this Agreement pursuant to Section 2) are parties to a plan support agreement that provides (a) treatment for Jackson Senior Notes Claims against all Debtors that is no less favorable in any respect than the treatment of such claims specified in this Agreement and (b) treatment for the HoldCo Senior Notes Claims that is no more favorable in any respect than the treatment of such claims specified in this Agreement, and (2) no plan of reorganization has been filed by any person or entity having a right to file a plan that (a) provides treatment to Jackson Senior Notes Claims against any Debtor that is less favorable than the treatment of such claims specified in this Agreement or (b) provides treatment to any HoldCo Senior Notes Claim that is more favorable in any respect than the treatment of such claims specified in this Agreement; *provided*, that this clause (2) shall not apply to any plan filed by the Jackson Crossover Ad Hoc Group.

(b)      For greater certainty, nothing in Section 7.05(a) shall prevent the Jackson Crossover Ad Hoc Group from (1) seeking entry of an order allowing a Guarantee Claim (whether on a temporary or final basis) against, or seeking a distribution from, the TopCo Guarantors or (2) defending any Guarantee Claim asserted against the HoldCo Guarantors or TopCo Guarantors against objections or challenges from any party; *provided*, that (i) any hearing regarding the merits of any Guarantee Claim against any TopCo Guarantor shall occur contemporaneously with (or after) the Confirmation Hearing, and in no event shall any such hearing occur prior to the Confirmation Hearing, (ii) no hearing regarding the merits of any Guarantee Claim against any HoldCo Guarantor may occur until after the Confirmation Hearing (except as provided in Section 7.05(h)), and (iii) the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Company Parties will each support the Bankruptcy Court's entry of the Guarantee Litigation Scheduling Order.

(c)      Notwithstanding anything to the contrary herein, in the event (x) any hearing, other than the September 1, 2021 hearing scheduled pursuant to the Initial Guarantee Litigation Scheduling Stipulated Order, concerning the merits or temporary allowance of any Guarantee Claim is scheduled by the Bankruptcy Court for a date prior to the Confirmation Hearing or (y) the Bankruptcy Court does not enter the Guarantee Litigation Scheduling Order prior to the commencement of the Disclosure Statement Hearing, then (1) the standstill provided in Section 7.05(a) shall automatically terminate, (2) the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group shall each be permitted to take any and all actions with respect to the Guarantee Claims as each may deem appropriate (including, for the avoidance of doubt, participating in any hearing (or briefing with respect to such hearing) concerning the merits or temporary allowance of any Guarantee Claim that is set to occur on or prior to the Confirmation Hearing), (3) the Required Consenting Jackson Crossover Group Members and Required Consenting HoldCo Creditors may each terminate this Agreement (*provided*, that the Required

40

Consenting Jackson Crossover Group Members and Required Consenting HoldCo Creditors may only terminate this Agreement within seven (7) days (except as may be extended by the Required Consenting Unsecured Creditors) of:  (i) the time at which a hearing concerning the merits or temporary allowance of any Guarantee Claim is scheduled by the Bankruptcy Court for a date prior to the Confirmation Hearing; (ii) the time that the Bankruptcy Court determines that it will not enter the Guarantee Litigation Scheduling Order; or (iii) the occurrence of the Disclosure Statement Hearing without the Bankruptcy Court having previously entered the Guarantee Litigation Scheduling Order, and (4) upon such termination of this Agreement by either the Required Consenting Jackson Crossover Group Members or the Required Consenting HoldCo Creditors pursuant to Section 7.05(c)(3), the Debtors shall (A) immediately amend the Plan (and the Non-TopCo Plan) to provide that the Guarantee Claims shall not be (i) released or waived against any HoldCo or TopCo unless consented to in writing by the Required Consenting Jackson Crossover Group Members or (ii) Allowed in any amount against any HoldCo unless consented to in writing by the Required HoldCo Creditors or otherwise ordered by the Bankruptcy Court or other court of competent jurisdiction, and (B)  make any other amendments to the Plan (and the Non-TopCo Plan) necessary to effectuate the amendments in the foregoing clauses (i) and (ii) and to ensure that the Plan does not prejudice either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group's rights and defenses with respect to the Guarantee Claims (including the right to seek a disputed claims reserve with respect to the Guarantee Claims).  For the avoidance of doubt, the amendments to the Plan (and the Non-TopCo Plan, as applicable) contemplated by Section 7.05(c)(4), under the circumstances contemplated by Section 7.05(c)(4), are hereby consented to by the Parties to this Agreement.

(d)      The Disclosure Statement Order shall provide for the provisional solicitation of the TopCo Guarantee Claims.

(e)      No ruling, order, or judgment issued by any court with respect to an objection or challenge by another party to the TopCo Guarantee Claims, or with respect to a motion for temporary allowance of the TopCo Guarantee Claims, in which the HoldCo Creditor Ad Hoc Group is prevented by this Section 7.05 from participating, shall have res judicata, collateral estoppel, or any other precedential effect against either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group in any proceeding seeking to enforce or challenge the HoldCo Guarantee Claims.

(f)      It shall be a condition precedent to the Effective Date that all Guarantee Claims against the HoldCo Guarantors are withdrawn with prejudice and not entitled to any distribution under the Plan (or the Non-TopCo Plan, as applicable) and released on the Effective Date; *provided*, that this condition shall not be required to be satisfied, and the Plan shall be automatically amended to remove this condition, if, at the time of entry of the Confirmation Order or prior thereto, either of the following events have occurred:  (a) Consenting Creditors that hold at least two-thirds (2/3) of the Connect Senior Notes (excluding any Connect Senior Notes held by the Debtors) cease to be party to this Agreement or (b) the Required Consenting HoldCo Creditors have terminated this Agreement.  For the avoidance of doubt, the TopCo Guarantee Claims shall not be withdrawn, enjoined, or released on the Effective Date.

(g)     During the Agreement Effective Period, all Consenting Creditors shall use reasonable best efforts to direct the Trustees to support the Guarantee Litigation Scheduling Order and the matters set forth in this Section 7.05, *provided* that this shall not require any Consenting Creditor to provide any indemnification to, or incur any other out-of-pocket cost to, any Trustee.

(h)     To the extent that the conditions in clause (1) or (2) of Section 7.05(a) (the "**Standstill Conditions**") cease to exist at any time before the Bankruptcy Court enters the Confirmation Order, the HoldCo Ad Hoc Creditor Group and the Debtors agree that they will consent to and support the adjournment of the Confirmation Hearing by twenty-one (21) days  to permit the Jackson Crossover Ad Hoc Group to seek the temporary allowance for voting purposes of the Guarantee Claims (with such period to be extended solely to the extent necessary for any requisite solicitation to occur following the Bankruptcy Court's ruling with respect to such temporary allowance, including with respect to the HoldCo Guarantee Claims) before the Confirmation Hearing commences or resumes, as applicable; *provided*, that nothing in this paragraph shall prevent or limit the Jackson Crossover Ad Hoc Group from immediately seeking any relief with respect to the Guarantee Claims at any time after the Standstill Conditions cease to exist.

(i)     Notwithstanding anything to the contrary in this Section 7.05, it shall not be a violation of the Standstill Conditions, and each Party shall otherwise be entitled under this Agreement, to take any actions and make any filings with the Bankruptcy Court necessary to comply with the Initial Guarantee Litigation Scheduling Stipulated Order unless or until the Guarantee Litigation Scheduling Order is entered by the Bankruptcy Court.

(j)     The Company Parties shall not settle, seek to settle, or support any settlement of, any Guarantee Claim without the prior written consent of the Required Consenting Unsecured Creditors; *provided, however*, that the Required Consenting HoldCo Creditors shall be deemed to consent to any such settlement at any time after the HoldCo Guarantee Claims have been withdrawn with prejudice.

7.06.   Non-TopCo Plan Matters.

(a)     In the event that the Plan is not confirmed as to Intelsat Investment Holdings S.à.r.l., and/or Intelsat S.A., for any reason, then the Company Parties shall immediately seek, and the Consenting Creditors shall support, Confirmation of the Non-TopCo Plan without the need to resolicit votes on the Non-TopCo Plan.

(b)     As a condition precedent to the effectiveness of the Non-TopCo Plan, the Bankruptcy Court shall have entered the Settlement Order approving, among other things, the Settlement Agreement, pursuant to which, among other things, Jackson shall make a $37.5 million settlement payment to Intelsat S.A's bankruptcy estate on the Effective Date of the Non-TopCo Plan; *provided* that such condition may be waived as set forth in the Non-TopCo Plan.

(c)     In the event that the Plan is not confirmed as to Intelsat Investment Holdings S.à.r.l., and/or Intelsat S.A., for any reason, and the TopCo Guarantee Claims have not been released or disallowed by Final Order, then all Consenting Creditors entitled to vote on any subsequent plan

42

for Intelsat Investment Holdings S.à.r.l., and/or Intelsat S.A. that provides for a distribution of Reorganized S.A. Common Stock (or other consideration, including cash and any or all of the value attributable to the net operating losses or other tax attributes (that are held outside of the Debtors' Luxembourg tax unity) of Intelsat S.A. or Intelsat Investments Holdings S.à.r.l.) shall only vote to accept such plan with the consent of the Required Consenting Jackson Crossover Group Members.

7.07.   Top-Co Matters.  The Company Parties shall not amend or modify the Plan to revise any distribution provided to holders of Claims against or interests in Intelsat Investment Holdings S.à.r.l. and/or Intelsat S.A. (including the distribution of cash or the Reorganized S.A. Common Stock (or other consideration that includes any or all of the value attributable to the net operating losses or other tax attributes (that are held outside of the Debtors' Luxembourg tax unity) of Intelsat S.A. or Intelsat Investments Holdings S.à.r.l.)) unless consented to by the Required Consenting Jackson Crossover Group Members in a prior writing.  For the avoidance of doubt, in addition to any other remedies that may be available under this Agreement (including specific performance), the Required Consenting Jackson Crossover Group Members may terminate this Agreement with respect to the Jackson Crossover Ad Hoc Group Members if the Debtors file a revised version of the Plan after the Agreement Effective Date that changes such distribution provisions in a manner that is not acceptable to the Required Consenting Jackson Crossover Group Members.

**Section 8.**      *Commitments of the Company Parties.*

8.01.   Affirmative Commitments.  Except as set forth in Section 9, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable (including in any board, or creditors', or shareholders' meeting (including any Special Meeting), including by proxy vote or otherwise, or in any other process requiring voting or approval to which they are legally entitled to participate) to (i) consummate the Restructuring Transactions in accordance with this Agreement, (ii) obtain entry of the Disclosure Statement Order and the Confirmation Order, (iii) elect to seek and prosecute confirmation of the Plan (and the Non-TopCo Plan, as applicable) over any non-accepting class, (iv) prosecute and defend any appeals relating to the Confirmation Order, and (v) comply with each Milestone set forth in this Agreement;

(b)     support the Secured Creditor Settlement, including (i) file the Secured Creditor Settlement Motion within fourteen (14) days of the Agreement Effective Date (which Secured Creditor Settlement Motion shall be in form and substance reasonably acceptable to the Required Consenting First Lien Noteholders), seek approval of the Secured Creditor Settlement Motion at the Confirmation Hearing, object to any request not to have the Secured Creditor Settlement Motion approved at the Confirmation Hearing, object to or defend against any Secured Creditor Claims Litigation, defend any approval by the Bankruptcy Court of the Secured Creditor Settlement in the event of any appeal from such approval, appeal and support the reversal on appeal of any order denying approval of the Secured Creditor Settlement, and (ii) seek approval of the Term Loan Facility Claims Settlement in connection with Confirmation of the Plan;

43

(c)      support and take all steps reasonably necessary and desirable to obtain entry of the Guarantee Litigation Scheduling Order; *provided* that nothing in Section 8 shall prevent any Company Parties from complying with the terms of the Initial Guarantee Litigation Scheduling Stipulated Order pending entry of the Guarantee Litigation Scheduling Order;

(d)      to the extent any legal, tax, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, support and take all steps reasonably necessary and desirable, and consistent with the Definitive Documents, to address any such impediment;

(e)      use commercially reasonable efforts to obtain any and all required or advisable governmental, regulatory, and/or third-party approvals for the Restructuring Transactions (including, as applicable, Bankruptcy Court approvals);

(f)      negotiate in good faith and, where applicable, execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(g)      actively oppose and object to the efforts of any person or Entity seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions or the Secured Creditor Settlement (including, if applicable, the filing of timely objections or written responses);

(h)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from other material stakeholders to the extent reasonably prudent and to the extent the Company Parties receive any Joinders or Transfer Agreements, notify the Consenting Creditors of such Joinders and Transfer Agreements; but in any event, without making any changes to the Plan (or the Non-TopCo Plan, as applicable) that are not approved in accordance with this Agreement;

(i)      operate their business in the ordinary course, taking into account the Restructuring Transactions and the Chapter 11 Cases, including continuing to perform their obligations under the DIP Order;

(j)      timely file a formal objection, after consultation in good faith with counsel to the Consenting Creditors, to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable, (ii) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (iii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iv) dismissing any of the Chapter 11 Cases;

(k)      promptly pay any and all Restructuring Expenses, in each case for which an invoice has been received by the Company Parties; *provided* that this obligation shall not alter the allocation of Restructuring Expenses and Professional Fee Claims set forth in the Plan (and the Non-TopCo Plan, as applicable) and shall not be construed to permit or require any Debtor to

44

advance funds to or for the benefit of any other Debtor that is unable to promptly repay the payor Debtor; *provided*, *further*, that any Restructuring Expenses of the Required Consenting First Lien Noteholders that are incurred, invoiced, and unpaid on the date the Confirmation Order is entered shall be satisfied in accordance with this Agreement substantially contemporaneously with the entry of the Confirmation Order; *provided, further*, that the Company Parties agree that the applicable Company Parties' obligations under the Houlihan Engagement Letter are administrative expenses of the Company Parties;

(l)  provide the HoldCo Creditor Ad Hoc Group and Jackson Crossover Ad Hoc Group access to all reporting (including, without limitation, reporting related to financial performance and progress related to C-Band clearing) provided to any other creditors, including, without limitation, the DIP Lenders, in the Chapter 11 Cases;

(m)  consult with the Consenting Creditors (including using commercially reasonable efforts to provide advance drafts of material documents) with respect to the regulatory approvals required or advisable to consummate the Restructuring Transactions, and keep the Consenting Creditors reasonably updated of the status of the regulatory approval process;

(n)  notify the advisors to the Consenting Creditors of any material governmental or third-party complaints, litigations, inquiries, orders to show cause, cease and desist orders, notices of violation, notice of apparent inability, orders of forfeiture, investigations, or hearings (or communications indicating that any of the foregoing is contemplated or threatened) that are reasonably likely to impede the consummation of the Restructuring Transactions;

(o)  consult with the advisors to the Consenting Creditors regarding the implementation of the Restructuring Transactions;

(p)  if this Agreement is validly terminated by either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group in accordance with Section 13.01, to (i) not object to any effort by the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group to withdraw its votes for the Plan, (ii) adjourn the Confirmation Hearing for no less than 14 days following such valid termination, and (iii) comply with the provisions set forth in Section 7.05(h);

(q)  upon reasonable request of a Consenting Creditor, inform the advisors to such Consenting Creditors as to:  (i) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (ii) the status of obtaining any necessary or desirable authorizations (including any consents) from each Consenting Creditor, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body;

(r)  inform counsel to the Consenting Creditors as soon as reasonably practicable after becoming aware of:  (i) any event or circumstance that has occurred that would permit any Party to terminate, or would result in the termination of, this Agreement; (ii) any matter or circumstance which they know to be a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) any notice of any commencement of any material involuntary insolvency proceedings of the Company Parties or their Affiliates; (iv) any notice of any legal suit

45

for payment of debt or securement of security from or by any person in respect of any Company Party, in each case, which they know to be a material impediment to the implementation or consummation of the Restructuring Transactions; (v) a material breach of this Agreement by any Company Party; and (vi) any representation or statement made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made;

(s)     promptly upon receipt, but in all events, no later than 24 hours after such receipt, provide a copy of any Alternative Restructuring Proposal received by any Company Party to counsel to the Consenting Creditors;

(t)     keep the advisors to the Jackson Crossover Ad Hoc Group and Jackson Ad Hoc Group reasonably informed regarding the status of the litigation, and any settlement negotiations, concerning the claims and causes of action asserted by SES Americom, Inc. in connection with the Chapter 11 Cases (including promptly informing the advisors to the Jackson Crossover Ad Hoc Group and Jackson Ad Hoc Group of any settlement received, or proposed to be made, by the Company Parties);

(u)     use commercially reasonable efforts to (i) ensure that the Debtors receive the maximum amount of Accelerated Relocation Payments made available through the C-Band Order; and (ii) obtain Further Acceleration Payments; *provided* that nothing in this covenant shall alter the requirement that no Further Acceleration Payments shall exist until the Applicable Intelsat Recipients receive the Minimum Payment (as defined in the CVR Term Sheet);

(v)     take all actions necessary or desirable to ensure that the Reorganized Debtors (i) shall emerge from the Chapter 11 Cases as a private company on the Effective Date and the New Common Stock shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the New Common Stock on a recognized U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents;

(w)     use best efforts to take all actions necessary or desirable to ensure that the Company Parties qualify at all times, for the benefits of the U.S.-Luxembourg Tax Treaty, including any actions necessary or desirable to ensure that the Company Parties qualify for benefits under Art. 24(3) of the U.S.-Luxembourg Tax Treaty; *provided* that, for the avoidance of doubt, the Company Parties shall emerge as private companies on the Effective Date and shall not, except as required pursuant to the New Corporate Governance Documents, be required to list equity on any public stock exchange or otherwise qualify as publicly traded pursuant to Art. 24(2)(d) of the U.S.-Luxembourg Tax Treaty;

(x)     use commercially reasonable efforts to obtain Bankruptcy Court approval of the Replacement/Incremental DIP Facility on substantially the same terms as the Replacement/Incremental DIP Facility Term Sheet and the existing DIP Credit Agreement and DIP Order, and entry of the Replacement/Incremental DIP Facility Order; *provided, however,* that for the avoidance of doubt, the Company Parties shall retain the right to pursue, consider, evaluate, and prosecute any higher or otherwise better alternative debtor-in-possession financing proposals in an exercise of their business judgment.  The Company Parties and the members of the Jackson

Ad Hoc Group and Jackson Crossover Ad Hoc Group shall cooperate and in good faith negotiate final documentation for the Replacement/Incremental DIP Facility contemplated by the Replacement/Incremental DIP Facility Term Sheet and to seek Bankruptcy Court approval of such Replacement/Incremental DIP Facility.  Additionally, the Company Parties, the Jackson Ad Hoc Group and the Jackson Crossover Ad Hoc Group shall cooperate in good faith to amend the Plan as may be necessary to incorporate the Replacement/Incremental DIP Facility; and

(y)      ensure that any debtor-in-possession financing facility that is authorized by the Bankruptcy Court reflects the highest or otherwise best terms available under the circumstances in an exercise of the applicable Company Parties' reasonable business judgment and as required by section 364(d) of the Bankruptcy Code and is not otherwise materially inconsistent with the Restructuring Transactions, contemplated by this Agreement; *provided, however*, that for the avoidance of doubt, nothing in this Agreement shall in any way limit the rights of any Consenting Creditor to object to any debtor-in-possession financing proposed by the Debtors (other than the Replacement/Incremental DIP Facility) or in any way limit the ability of any Party, including the Jackson Ad Hoc Group and the Jackson Crossover Ad Hoc Group, to propose any alternative debtor-in-possession financing in the event that the Replacement/Incremental DIP Facility is not consummated, even if such alternative financing is opposed by another Party to this Agreement.

8.02.   Negative Commitments.  Except as set forth in Section 9 or with the prior written consent of the Required Consenting Creditors, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly, and shall cause their respective subsidiaries not to:

(a)      object to, delay, impede, or take any other action to interfere with or that is inconsistent with or is intended or could reasonably be expected to interfere with, delay, or impede the acceptance, approval, implementation, or consummation of the Restructuring Transactions or approval of the Secured Creditor Settlement;

(b)      take or fail to take any action (except to the extent expressly contemplated by the Plan (or the Non-TopCo Plan, as applicable)) if such action or failure to act would cause a change to the tax classification of any Company Party or would reasonably be expected to cause, individually or in the aggregate, a material adverse tax consequence to the Company Parties without the prior written consent of the Required Consenting Unsecured Creditors, unless required by applicable Law or accounting standards;

(c)      modify the Plan (or the Non-TopCo Plan, as applicable) or any Definitive Document, in whole or in part, in a manner that is not consistent with this Agreement in any respect;

(d)      withdraw or revoke the Plan (or the Non-TopCo Plan, as applicable) or express orally or in writing to any Consenting Creditor its intention not to pursue the Plan (or the Non-TopCo Plan, as applicable) or to delay in any way the pursuit of confirmation of the Plan (or the Non-TopCo Plan, as applicable);

(e)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement (including complying with the consent rights of any Consenting Creditor set forth herein as to the form and substance of such motion, pleading, or other Definitive Document), the Plan (or the Non-TopCo Plan, as applicable), or the Definitive Documents;

(f)      commence, support, or join any litigation or adversary proceedings against any Consenting Creditor not otherwise permitted by this Agreement;

(g)      make or accept any settlement offer in respect of the claims and causes of action asserted by SES Americom, Inc. (or any of its affiliates) in connection with the Chapter 11 Cases without the prior written consent of the Required Consenting Jackson Crossover Group Members not to be unreasonably withheld;

(h)      amend or propose to amend its respective certificate or articles of incorporation, bylaws, or comparable organizational documents in a manner inconsistent with this Agreement or the Plan (or the Non-TopCo Plan, as applicable); or

(i)      (i) take any legal positions either supporting or opposing the Allowance or disallowance of any Guarantee Claim or (ii) seek or support approval of any settlement of the Guarantee Claims without the prior written consent of the Required Consenting Unsecured Creditors; *provided, however*, that the Required Consenting HoldCo Creditors shall be deemed to consent to any such settlement at any time after the HoldCo Guarantee Claims have been withdrawn with prejudice.

## Section 9.      *Additional Provisions Regarding Company Parties' Commitments.*

9.01.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 1.02), nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party (including any Disinterested Directors and Managers), after consulting with their respective counsel and following the conclusion of any applicable investigation, to take any action or to refrain from taking any action with respect to the Restructuring Transactions or the Plan (or the Non-TopCo Plan, as applicable), to the extent taking or failing to take such action is or would be inconsistent with applicable Law, or the exercise of its respective fiduciary obligations under applicable Law and any such action or inaction pursuant to this Section 9.01 shall not be deemed to constitute a breach of this Agreement (the foregoing, the "**Fiduciary Out**"); *provided* that no Company Party shall exercise its Fiduciary Out from the commencement of the Confirmation Hearing until such time that the Bankruptcy Court either (i) enters a written order regarding confirmation of the Plan (or the Non-TopCo Plan, as applicable), which may be the Confirmation Order, or (ii) determines on the record at the Confirmation Hearing that the Plan is not-confirmable; *provided, further*, that if the Bankruptcy Court determines the Plan is not confirmable solely as to Intelsat Investments Holdings S.a.r.l. and/or Intelsat S.A., the provisions set forth herein and in the Plan regarding pursuit of the Non-TopCo Plan shall be triggered.  For the avoidance of doubt, upon the occurrence of either prong

48

(i) or (ii) of the foregoing, each Company Party shall have the ability to exercise the Fiduciary Out, in accordance with the terms herein (including Section 1.02).

9.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 9.01 and Section 1.02), each Company Party and their respective directors (including any Disinterested Directors and Managers), officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including, but subject to Section 5.01(c)(ii), any Consenting Creditor), any other party in interest in the Chapter 11 Cases (including the Creditors' Committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.

9.03.    At all times prior to the date on which the Company Parties enter into a definitive agreement in respect of an Alternative Restructuring Proposal, the Company Parties shall provide counsel to the Jackson Crossover Ad Hoc Group and counsel to the HoldCo Creditor Ad Hoc Group reasonably detailed updates on the status of discussions or negotiations regarding any Alternative Restructuring Proposal (including the terms thereof subject to any applicable confidentiality restrictions) within one (1) Business Day of the Company Parties' or their advisors' receipt of any such Alternative Restructuring Proposal.  The Company Parties and/or the Company Parties' advisors will make themselves reasonably available for separate weekly status update calls with (i) on the one hand, counsel to the Jackson Crossover Ad Hoc Group, and (ii) on the other hand, counsel to the HoldCo Creditor Ad Hoc Group, in each case, with respect to the foregoing.

9.04.    Nothing in this Agreement shall:  (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 10.    *Transfer of Company Claims.***

10.01.  During the Agreement Effective Period, no Consenting Creditor shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    in the case of any Company Claims, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Creditor; and

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties within five (5) Business Days of the Transfer, a fully executed Transfer Agreement or (ii) the transferee is a Consenting Creditor or an affiliate thereof and the transferee provides notice of such Transfer and the identification of the purchasing Consenting Creditor (including the amount and type of Company Claim Transferred) to counsel to the Company Parties within five (5) Business Days of the Transfer and such transferee agrees in writing prior to, or contemporaneous with, such Transfer to be bound by all terms of the Agreement with respect to any and all Company Claims, including any such Company Claims held prior to or after the Transfer.

10.02.  Upon compliance with the requirements of Section 10.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations, with the exception of any obligations arising from any breach occurring prior to such transfer) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims.  Any Transfer in violation of Section 10.01 shall be void *ab initio*.

10.03.  This Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Company Claims or any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims; *provided* that (a) such additional Company Claims shall automatically and immediately upon acquisition by a Consenting Creditor be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Creditors) and (b) such Consenting Creditor must, upon request from the Company Parties, provide notice of such acquisition (including the amount and type of Company Claim acquired) to counsel to the Company Parties within five (5) Business Days of the later to occur of (1) such request or (2) such acquisition.

10.04.  This Section 10 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Creditor to Transfer any of its Company Claims.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement that remain in effect following the entry of this Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

10.05.  Notwithstanding Section 10.01, a Qualified Marketmaker that acquires any Company Claims with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims if (i) such Qualified Marketmaker subsequently transfers such Company Claims (by purchase, sale assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an Entity that is not an affiliate, affiliated fund, or affiliated Entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 10.01; and (iii) the Transfer otherwise is a transfer permitted under Section 10.01. For the avoidance of doubt, to the extent Section 10.01 is applicable to such Transfer, the ultimate Permitted Transferee must deliver a properly-executed Joinder to the Company Parties in accordance with Section 15.10, unless such Permitted Transferee is a Consenting Creditor as of

50

the date of the Transfer.  To the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims that the Qualified Marketmaker acquires from a holder of the Company Claims who is not a Consenting Creditor without complying with the first sentence of this Section 10.05.

10.06. Notwithstanding anything to the contrary in this Section 10, the restrictions on Transfer set forth in this Section 10 shall not apply (i) to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests or (ii) with respect to any Consenting Creditor that is a private equity fund, hedge fund or similar vehicle (including any investment fund or managed account), to any Transfer of general or limited partnership or other similar interest in such Entity, or the change of or change in control of any general partner, manager or similar person of such Entity; *provided that* any such transfer shall not relieve the relevant Consenting Creditor of its obligations under this Agreement.

**Section 11.    *Representations and Warranties of Consenting Creditors.*** Each Consenting Creditor severally, and not jointly, represents and warrants that, as of the date such Consenting Creditor executes and delivers this Agreement and on the Effective Date:

(a)     (x) it is the beneficial or record owner of the face amount of the Company Claims or (y) solely to the extent set forth on such Consenting Creditor's signature page to this Agreement or a Transfer Agreement, is the nominee, investment manager, or advisor for beneficial holders of the Company Claims reflected in, and, having made reasonable inquiry (but without violating any Confidentiality Agreement or requiring inquiry of any public-side or unrestricted holder of Company Claims or any portfolio manager or other personnel thereof), is not the beneficial or record owner of any Company Claims other than those reflected in, such Consenting Creditor's signature page to this Agreement or a Transfer Agreement (other than DIP Claims), as applicable (as may be updated pursuant to Section 10);

(b)     it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims;

(c)     such Company Claims are free and clear of any pledge, lien, security interest, charge, Claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that prohibit such Consenting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     it has the full power to vote, approve changes to, and transfer all of its Company Claims referable to it as contemplated by this Agreement subject to applicable Law;

(e)     solely with respect to holders of Company Claims/Interests, it acknowledges that (i) the offer and sale of any securities will not be registered under the Securities Act and (ii) the offering and issuance of any securities is intended to be exempt from registration under the

51

Securities Act pursuant to (A) section 1145 of the Bankruptcy Code or (B) Section 4(a)(2) of the Securities Act and/or Regulation D thereunder; and

(f)      solely with respect to holders of Company Claims, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any Securities acquired by the Consenting Creditor in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 12.**    *Mutual Representations, Warranties, and Covenants*.    Each of the Parties severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the Effective Date:

(a)      it shall not directly or indirectly initiate, or direct any other person to initiate, any litigation or proceeding against any Party that is inconsistent with this Agreement;

(b)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(c)      except as expressly provided in this Agreement, the Plan (or the Non-TopCo Plan, as applicable), and the Bankruptcy Code, no consent or approval is required by any other person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(d)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(e)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(f)      except as expressly provided by this Agreement, it is not party to any restructuring support or similar agreements or arrangements relating to the Company Parties with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 13.**    *Termination Events.*

13.01.  Consenting Creditors' Termination Events.  This Agreement may be terminated (a) solely as to the Jackson Ad Hoc Group Members by the Required Consenting Jackson Ad Hoc Group Members, (b) solely as to the First Lien Noteholders Group Members by the Required

52

Consenting First Lien Noteholders Group Members, (c) solely as to the Jackson Crossover Ad Hoc Group Members by the Required Consenting Jackson Crossover Group Members, and (d) solely as to the Consenting HoldCo Creditors, by the Required Consenting HoldCo Creditors, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 15.10 hereof upon the occurrence of the following events:

(a)    the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Creditors seeking termination pursuant to this provision and (ii) remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Creditors transmit a written notice in accordance with Section 15.10 hereof detailing any such breach;

(b)    any of the Milestones set forth in Section 4.01 (as may be extended or waived in accordance with this Agreement) has not been achieved by the date specified for such Milestone; *provided that* if written notice has not been delivered within fourteen (14) days from the non-occurrence of a Milestone that remains uncured, such termination option shall be deemed waived;

(c)    the circumstances giving rise to the termination events set forth in Section 7.05(c)(3) occur; *provided, however,* that this termination right may not be exercised by any Party that sought or requested such hearing in contravention of this Agreement or who did not oppose the request of another party; *provided, further,* that upon the exercise of such termination event, the Debtors shall (i) not object to any effort by the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group to withdraw its vote for the Plan, (ii) adjourn the Confirmation Hearing for no less than 14 days following such valid termination (and in all events for a period sufficient to allow for any hearing concerning the Guarantee Claims to take place prior to the Confirmation Hearing; *provided* that the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group must request such a hearing to occur no more than fourteen (14) days after a termination event is exercised pursuant to Section 7.05(c)(3), and (iii) comply with the provisions set forth in Section 7.05(h);

(d)    at any time during which the Standstill Conditions are in effect, the HoldCo Creditor Ad Hoc Group or the Debtors initiate any hearing or take any legal position either supporting or challenging the positions taken by the Jackson Crossover Ad Hoc Group in such hearing or briefing related thereto with respect to the TopCo Guarantee Claims, including by advocating for the Allowance or disallowance of such TopCo Guarantee Claims or taking any position adverse to the Jackson Crossover Ad Hoc Group in connection with such hearing (including in briefing); *provided, however,* that this termination right may be exercised only by the Required Consenting Jackson Crossover Group Members;

(e)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fourteen (14) Business Days after such terminating Consenting Creditors transmit a written notice in accordance with Section 15.10 hereof detailing any such issuance; *provided, however,* that this

53

termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(f)     the Bankruptcy Court denies Confirmation of the Plan (or the Non-TopCo Plan, as applicable) or any material provision thereof; *provided*, *however*, that the denial of Confirmation of the Plan solely as to Intelsat Investment Holdings S.à.r.l., and/or Intelsat S.A. shall not be a termination event and the Parties shall implement the Restructuring Transactions pursuant to the Non-TopCo Plan, in accordance with Section 7.06(a);

(g)     the Bankruptcy Court does not enter the Settlement Order;

(h)     (i) any order approving the Plan (or the Non-TopCo Plan, as applicable) or the Disclosure Statement is reversed, stayed, dismissed, vacated, or reconsidered without the prior written consent of the Required Consenting Creditors or is modified or amended (1) in a manner that is inconsistent with this Agreement and adverse to the Consenting Creditors seeking termination pursuant to this provision and (2) remains uncured for five (5) Business Days after the terminating Consenting Creditors transmit a written notice in accordance with Section 15.10 hereof detailing any such breach or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and (1) such motion seeks relief that is inconsistent with this Agreement and is adverse to the Consenting Creditors seeking termination pursuant to this provision and (2) the Company Parties have failed to timely object to such motion;

(i)     the making public, modification, amendment, or filing of any Definitive Document by any Company Party in a manner not expressly permitted or contemplated by this Agreement (including with respect to the treatment of any Claim under the Plan (or Non-TopCo Plan, as applicable)) without the consent of any applicable Consenting Creditor(s) as provided for in Section 3 (i) in a manner that is adverse to, or that adversely affects any rights of, such Consenting Creditor(s) seeking termination pursuant to this provision and (ii) remains uncured for the earlier of two (2) days or the time at which such Definitive Document is being considered by the Bankruptcy Court for approval, after such applicable Consenting Creditor(s) transmit a written notice in accordance with Section 15.10 hereof detailing any such breach;

(j)     any Company Party (i) files, waives, amends, or modifies, or files a pleading seeking approval of any Definitive Document (including any waiver of any term or condition therein) in a manner that constitutes a breach of this Agreement (or violates the consent rights set forth in this Agreement), in either case, in a manner that is adverse to the Consenting Creditors seeking termination pursuant to this provision, (ii) withdraws the Plan (or the Non-TopCo Plan, as applicable) without the prior written consent of the Required Consenting Creditors, (iii) publicly announces its intention not to support the Restructuring Transactions or to take any such acts listed in the foregoing clauses, or (iv) files, publicly announces, executes a definitive written agreement with respect to an Alternative Restructuring Proposal;

(k)     the Bankruptcy Court grants relief that is materially inconsistent with this Agreement or the Plan (or the Non-TopCo Plan, as applicable) (in each case, with such amendments and modifications as have been effected in accordance with the terms hereof) in a manner that is adverse to the Consenting Creditors seeking termination pursuant to this provision'

54

*provided* that the only termination events arising from the Bankruptcy Court's granting of relief that is inconsistent with Section 7.05 shall be the termination events set forth in Section 7.05(c)(3);

(l)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Creditors) (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a chapter 11 trustee in one or more of the Chapter 11 Cases of a Company Party, (iii) dismissing one or more of the Chapter 11 Cases, or (iv) rejecting this Agreement, *provided, however*, that in the event the Non-TopCo Plan is confirmed, the entry of such an order, or the filing of such a motion or application, solely with respect to Intelsat Investment Holdings S.à.r.l., and/or Intelsat S.A. shall not be a Termination Event;

(m)      the Bankruptcy Court enters an order not approving the Secured Creditor Settlement; *provided* that the entry of such an order shall be a termination event solely for the Consenting First Lien Creditors, and not for the Jackson Crossover Ad Hoc Group Members or the Consenting HoldCo Creditors;

(n)      (1) the occurrence of any Event of Default under the DIP Documents or the DIP Order, as applicable, that has not been cured (if susceptible to cure) or waived by the applicable percentage of DIP Lenders, as applicable, in accordance with the Terms of the DIP Documents and DIP Order, as applicable or (2) the Bankruptcy Court enters an order vacating the DIP Order (except to the extent in connection with the approval of a Replacement/Incremental DIP Facility);

(o)      any Company Party makes any determination or takes any action or refrains from taking an action pursuant to a determination, of the kind described in section 9.01 hereof, or enters into, or advises any Creditor Party orally or in writing of any final determination to enter into an Alternative Restructuring Proposal;

(p)      the Bankruptcy Court enters an order granting the Debtors authority to sell any material assets without the prior written consent of the Required Consenting Creditors;

(q)      the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of any Company Party or that would materially and adversely affect any Company Party's ability to operate their businesses in the ordinary course;

(r)      any Company Party supports, without having received the prior written consent of the Required Consenting Unsecured Creditors, the entry by the Bankruptcy Court of an order Allowing any Claim, or approving any Claim settlement, in excess of $1 million that negatively affects the recoveries set forth in the Plan (or the Non-TopCo Plan, as applicable); *provided, however*, that this paragraph shall not apply to the Secured Creditor Settlement;

(s)      (i) any Company Party, or any of their respective Affiliates, enters into or otherwise publicly discloses an agreement, or files any motion or pleading with a court of competent

jurisdiction (including, without limitation, the Bankruptcy Court), in each case, that is (x) not consistent with this Agreement and (y) in a manner that is adverse to the Consenting Creditors seeking termination pursuant to this provision, and (ii) such agreement, motion or pleading has not been terminated, modified or withdrawn within the earlier of two (2) Business Days or the time at which such agreement, motion, or pleading is being considered by the Bankruptcy Court for approval of such Company Party receiving written notice from the terminating Consenting Creditors that such agreement, motion or pleading is inconsistent with this Agreement;

(t)      any Company Party asserts in any communication, whether oral or written, to any person or entity that such Company Party is not bound by any provision of this Agreement by reason of the absence of an order of the Bankruptcy Court approving this Agreement or otherwise;

(u)      the occurrence of an Allocation Event;

(v)      any Company Party takes any action or refrains from taking an action in breach of its commitments under Section 8.01(b) or advises any Creditor party orally or in writing of any final determination to take any action or to refrain from taking any action in breach of its commitments under Section 8.01(b); *provided*, that this termination event shall be exercisable only by the Jackson Ad Hoc Group Members and the First Lien Noteholders Group Members;

(w)      any Company Party terminates this Agreement pursuant to Section 13.02(d);

(x)      the Required Consenting Jackson Crossover Group Members, or the Required Consenting HoldCo Creditors terminate this Agreement pursuant to this Section 13.01;

(y)      any Company Party settles any Guarantee Claim without the consent of the Required Consenting Unsecured Creditors;

(z)      any Debtor or any Company Party amends or revises the Plan, or files any new plan, that modifies any distribution provided to holders of Claims against or interests in Intelsat Investment Holdings S.à.r.l. and/or Intelsat S.A. (including the distribution of cash or the Reorganized S.A. Common Stock (or other consideration that includes any or all of the value attributable to the net operating losses or other tax attributes (that are held outside of the Debtors' Luxembourg tax unity) of Intelsat S.A. or Intelsat Investments Holdings S.a.r.l.)) in a manner that is not acceptable to the Required Consenting Jackson Crossover Group Members; *provided*, that this termination event shall be exercisable only by the Jackson Crossover Ad Hoc Group Members; or

(aa)      the Bankruptcy Court (i) does not enter an order approving the Replacement/Incremental DIP Facility by a date that is thirty (30) days following the Agreement Effective Date or (ii) enters an order denying approval of the Replacement/Incremental DIP Facility; *provided* that such termination event shall apply solely to the Required Consenting Jackson Ad Hoc Group Members.

13.02. <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to such Company Party with respect to any of the Consenting First Lien Group Members, the Consenting HoldCo Creditors, and/or the Jackson Crossover Ad Hoc Group

Members, upon prior written notice to any such Party in accordance with Section 15.10 hereof upon the occurrence of any of the following events (but solely to the extent set forth below):

(a)     the breach in any material respect by Consenting HoldCo Creditors that, collectively, hold more than one-third of the aggregate outstanding principal amount of HoldCo Senior Notes held by all Consenting HoldCo Creditors, in each case with respect to any of the representations, warranties, or covenants of such Consenting HoldCo Creditors set forth in this Agreement and which breach remains uncured for a period of five (5) Business Days after the receipt by the applicable Consenting HoldCo Creditor from the Company Parties of written notice of such breach, which written notice will set forth the alleged breach; *provided*, that any such termination by the Company Parties pursuant to this Section 13.02(a) shall result in the termination of this Agreement solely as to the breaching Consenting HoldCo Creditors;

(b)     the breach in any material respect by Jackson Crossover Ad Hoc Group Members that, collectively, hold more than one-third of the aggregate outstanding principal amount of Jackson Senior Notes held by all Jackson Crossover Ad Hoc Group Members, in each case with respect to any of the representations, warranties, or covenants of such Jackson Crossover Ad Hoc Group Members set forth in this Agreement and which breach remains uncured for a period of five (5) Business Days after the receipt by the applicable Jackson Crossover Ad Hoc Group Member from the Company Parties of written notice of such breach, which written notice will set forth the alleged breach; *provided*, that any such termination by the Company Parties pursuant to this Section 13.02(b) shall result in the termination of this Agreement solely as to the breaching Jackson Crossover Ad Hoc Group Members;

(c)     the breach in any material respect by Consenting First Lien Group Members that would result in non-breaching Consenting First Lien Creditors holding less than two-thirds of the aggregate outstanding principal amount of First Lien Claims, in each case with respect to any of the representations, warranties, or covenants of such Consenting First Lien Group Members set forth in this Agreement and which breach remains uncured for a period of five (5) Business Days after the receipt by the applicable Consenting First Lien Group Member from the Company Parties of written notice of such breach, which written notice will set forth the alleged breach; *provided*, that any such termination by the Company Parties pursuant to this Section 13.02(c) shall result in the termination of this Agreement solely as to the breaching Consenting First Lien Group Members; *provided, further*, that for the avoidance of doubt, the termination of this Agreement by any Consenting First Lien Group Member as to itself pursuant to Section 13.05 hereof shall not constitute a breach of this Agreement for purposes of this Section 13.02(c);

(d)     the board of directors, board of managers, or such similar governing body of any Company Party (including any Disinterested Directors and Managers) exercises its Fiduciary Out, in accordance with, and subject to, Section 9 and Section 1.02;

(e)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 15.10 hereof detailing any such issuance; *provided*, that the Company

57

Parties have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement; *provided, further*, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(f)      the Bankruptcy Court enters an order denying Confirmation of the Plan (or the Non-TopCo Plan, as applicable) and such order remains in effect for five (5) Business Days after entry of such order; *provided, however*, that the entry of such an order solely with respect to Intelsat Investment Holdings S.à.r.l., or Intelsat S.A. shall not be a Termination Event and the Parties shall seek to implement the Restructuring Transactions pursuant to the Non-TopCo Plan, in accordance with Section 7.06(a).

13.03.   <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Creditors; and (b) each Company Party.

13.04.   <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Effective Date.

13.05.   <u>Consenting First Lien Creditor Termination</u>.  This Agreement may be terminated by a Consenting First Lien Creditor (in which case it shall no longer be a Consenting First Lien Creditor and none of the terms of this Agreement shall continue to apply to it), solely as to itself, in each case, by the delivery to the Company Parties of a written notice in accordance with Section 15.10 hereof, if any amendment, modification, waiver or supplement of or to the terms of the Secured Creditor Settlement is made, in accordance with Section 14(b) hereof, negatively affecting the treatment and allowance of any First Lien Claims held by such Consenting First Lien Creditor, to which such Consenting First Lien Creditor has not itself expressly consented in writing, other than any amendment or modification of the Plan (or the Non-TopCo Plan, as applicable), which shall be governed as set forth in Section 7.02(a).

13.06.   <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date in the circumstances permitted by this Agreement as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims, Interests or Causes of Action (including challenging any proposed classification, treatment, or impaired/unimpaired status of any and all Claims and Interests); *provided* that the foregoing shall not release any Party from liability for any breach hereof prior to the Termination Date; *provided, further*, that (x) the commitment of the Consenting Creditors set forth in Section 7.06(c) of this Agreement and (y) any other provision of this Agreement (including Section 10 (including with respect to transferees thereunder)) to the extent necessary to effectuate the provisions set forth in Section 7.06(c) of this Agreement, shall survive the occurrence of the Effective Date (with respect to the Non-TopCo Plan), as long as the Effective Date of the Non Top-Co Plan occurs.  Upon the occurrence of a Termination Date as to a Party prior to the

58

Confirmation Order being entered by a Bankruptcy Court, any and all consents, agreements, undertakings, waivers, forbearances, votes, or ballots tendered by such Party subject to such termination before such Termination Date shall be deemed, for all purposes, to be null and void from the first instance, without regard to any impact of the automatic stay under section 362 of the Bankruptcy Code, and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise and such consents or ballots may be changed or resubmitted prior to the Confirmation Date regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Company Parties allowing such change or resubmission).  Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of any Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party.  No purported termination of this Agreement shall be effective under this Section 13.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.  Nothing in this Section 13.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 13.02(d).  The obligations of the Company Parties and the Reorganized Debtors, as applicable, to (x) satisfy the Restructuring Expenses that come due after the Effective Date and (y) defend any appeal of any order approving the Secured Creditor Settlement and appeal and support the reversal on appeal of any order denying approval of the Secured Creditor Settlement, in each case, survive the Effective Date in accordance with this Agreement and the Plan.

13.07.  Limitations.  No Party may terminate this Agreement on account of a Termination Event if the occurrence of such Termination Event was primarily caused by, or primarily resulted from, such Party's own actions (or failure to act) in breach of the terms of this Agreement; *provided* that an individual Consenting Creditor's action (or failure to act) shall not be imputed to the Consenting Creditors as a group or any other individual Consenting Creditor.

13.08.  Intelsat S.A.; Intelsat Investments Holdings S.à.r.l.  In the event that any termination event under Section 13.01 is (x) exercisable solely due to an act by, or other occurrence in respect of, Intelsat S.A. and/or Intelsat Investments Holdings S.à.r.l. (and no other Debtor) and (y) such termination is exercisable only against Intelsat S.A. and/or Intelsat Investments Holdings S.à.r.l. (and no other Debtor), then the Consenting Creditors (a) shall only be permitted to exercise such termination event against Intelsat S.A. and Intelsat Investments Holdings S.à.r.l., as applicable (and no other Debtor), and (b) shall seek to implement the Restructuring Transactions pursuant to the Non-TopCo Plan, in accordance with Section 7.06.

**Section 14.    *Amendments and Waivers.***

(a)    This Agreement (including as to the required content of and consent rights with respect to any Definitive Document) may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b)      Subject to the consent rights set forth in Section 3 and Section 7.02 herein, this Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each applicable Company Party, and (b) the following Parties, solely with respect to any modification, amendment, waiver or supplement that affects the rights or obligations of such Parties and unless otherwise expressly specified in this Agreement:  (i) for any modification, amendment, waiver or supplement that affects the rights or obligations of the Jackson Ad Hoc Group Members or the First Lien Noteholders Group Members, the Required Consenting Jackson Ad Hoc Group Members or the Required Consenting First Lien Noteholders, as applicable, (ii) for any modification, amendment, waiver or supplement that affects the rights or obligations of the Jackson Crossover Ad Hoc Group Members, the Required Consenting Jackson Crossover Group Members, and (iii) for any modification, amendment, waiver or supplement that affects the rights or obligations of the Consenting HoldCo Creditors, the Required Consenting HoldCo Creditors; *provided*, *however*, that (x) if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims held by a Consenting Creditor (as compared to other Consenting Creditors holding Company Claims within the same class as provided for in the Plan (or the Non-TopCo Plan, as applicable)), then the consent of each such affected Consenting Creditor shall also be required to effectuate such modification, amendment, waiver or supplement and (y) notwithstanding anything to the contrary in this Agreement (but subject to Section 7.02), no modification, amendment, waiver, or supplement may be made to the terms of the Secured Creditor Settlement without the consent of (1) Consenting First Lien Creditors holding at least 66.67% of the aggregate principal amount of Term Loan Facility Claims held by all Consenting First Lien Creditors with respect to any modifications, amendments, waivers or supplements regarding the treatment and allowance of Term Loan Facility Claims under the Secured Creditor Settlement; *provided, however*, that such Consenting First Lien Creditors must also include the Required Jackson Ad Hoc Group Members, (2) Consenting First Lien Creditors holding at least 66.67% of the aggregate principal amount of 8.00% First Lien Notes Claims held by all Consenting First Lien Creditors with respect to any modifications, amendments, waivers or supplements regarding the treatment and allowance of 8.00% First Lien Notes Claims under the Secured Creditor Settlement, and (3) Consenting First Lien Creditors holding at least 66.67% of the aggregate principal amount of 9.50% First Lien Notes Claims held by all Consenting First Lien Creditors with respect to any modifications, amendments, waivers or supplements regarding the treatment and allowance of 9.50% First Lien Notes Claims under the Secured Creditor Settlement. For the avoidance of doubt, nothing in this Section 14 shall provide any Party with consent rights in respect of any Definitive Document that are different than those consent rights set forth in Section 3 hereof.

(c)      To the extent that the DIP Facility is refinanced or replaced by a Replacement/Incremental DIP Facility, the Parties agree that the references to the DIP Facility and related provisions in this Agreement shall be amended as appropriate to refer to such Replacement/Incremental DIP Facility.

(d)      Any proposed modification, amendment, waiver or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

60

(e)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

(f)      Any consent or waiver contemplated in this Agreement may be provided by electronic mail from counsel to the relevant Parties.

**Section 15.**     *Miscellaneous.*

15.01.  Acknowledgement.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.  The Parties understand and acknowledge that this Agreement may be disclosed and filed with the U.S. Securities and Exchange Commission; *provided* that such filing shall not include any signature pages hereto.

15.02.  Exhibits Incorporated by Reference; Conflicts.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

15.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to use commercially reasonable efforts to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as are necessary and not inconsistent with this Agreement or any of the Definitive Documents, or as are required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions in accordance with the Definitive Documents, as applicable.

15.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.  For the avoidance of doubt, this Agreement supersedes and replaces in full that certain *Chapter 11 Plan Support Agreement*, dated as of February 11, 2021, by and among the Company Parties and the other parties thereto, which was attached as Exhibit G to the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates* [Docket No. 1468].

15.05. GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of, or related to, this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

15.06. TRIAL BY JURY WAIVER. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15.07. Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

15.08. Rules of Construction. This Agreement is the product of negotiations among the Company Parties and the Consenting Creditors, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

15.09. Successors and Assigns; Third Parties. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or Entity, except as expressly permitted in Section 10 hereof, and any such attempted assignment, delegation, or transfer shall be void *ab initio*.

15.10. Notices. All notices and deliveries hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

Intelsat S.A.

62

C/O Intelsat US LLC
7900 Tysons One Place,
McLean, Virginia 22102
Attn:   Michelle Bryan
Email: Michelle.Bryan@Intelsat.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn:   Edward Sassower, Steven Serajeddini, and Aparna Yenamandra
Email: ESassower@Kirkland.com;
        Steven.Serajeddini@Kirkland.com;
        Aparna.Yenamandra@Kirkland.com

(b)     if to a Jackson Ad Hoc Group Member, to:

Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, DC 20006
Attn:   Scott Alberino, Brad Kahn
Email: salberino@akingump.com
        bkahn@akingump.com

(c)     if to a First Lien Noteholders Group Member, to:

Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Attn:   Philip Anker, Benjamin Loveland
Email: philip.anker@wilmerhale.com
        benjamin.loveland@wilmerhale.com

(d)     if to a Jackson Crossover Ad Hoc Group Member, to:

Jones Day
250 Vesey Street
New York, NY 10281
Attn:   Bruce Bennett, Michael Schneidereit, and Nicholas Morin

63

Email: bbennett@jonesday.com
mschneidereit@jonesday.com
nmorin@jonesday.com

and

(e)      if to a HoldCo Creditor Ad Hoc Group Member, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:   Paul Basta and Kyle Kimpler
Email: pbasta@paulweiss.com
kkimpler@paulweiss.com

Any notice given by delivery, mail, or courier shall be effective when received.

15.11. <u>Independent Due Diligence and Decision Making</u>.   Each Consenting Creditor hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

15.12. <u>Enforceability of Agreement</u>.  Each of the Parties hereby acknowledges and agrees: (i) that the provisions of any notice or exercise of any rights or remedies under this Agreement are not prohibited by the automatic stay provisions of the Bankruptcy Code, (ii) each Party, to the extent enforceable, waives any right to assert that the exercise of any termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising notice and termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required, (iii) that they shall not take a position to the contrary of this Section 15.12 in the Bankruptcy Court or any other court of competent jurisdiction, and (iv) they will not initiate, or assert in, any litigation or other legal proceeding that this Section 15.12 is illegal, invalid, or unenforceable, in whole or in part.

15.13. <u>Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights; *provided*, *however*, that neither the failure to consummate the Restructuring Transactions, nor the termination of this Agreement, shall affect any order of a court of competent jurisdiction resolving the Secured Creditor Claims Litigation; *provided, further*, that (x) the commitment of the Consenting Creditors set forth in Section 7.06(c) of this Agreement and (y) any other provision of this Agreement (including Section 10 (including with respect to transferees thereunder)) to the extent necessary to effectuate the provisions set forth in Section 7.06(c) of this Agreement, shall survive the occurrence of the Effective Date (with respect to the Non-TopCo Plan), as long as the

64

Effective Date of the Non Top-Co Plan occurs.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

15.14.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover any money damages whatsoever, including any punitive, special, indirect or consequential damages or damages for lost profits.

15.15.  Several, Not Joint, Claims.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

15.16.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

15.17.  Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

15.18.  Capacities of Consenting Creditors.  Each Consenting Creditor has entered into this Agreement on account of the Company Claims listed on its signature page to this Agreement (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims.  For the avoidance of doubt, the Company Parties each acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of such Consenting Creditor that principally manages and/or supervises the Consenting Creditor's Company Claims, and shall not apply to any other affiliate, trading desk or business group of such Consenting Creditor.

15.19.  Email Consents.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 14, or otherwise, including a written approval by the Company Parties or the Required Consenting Creditors, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance,

65

approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

15.20.  <u>Relationship Among Parties</u>.

(a)      Notwithstanding anything to the contrary herein, the duties and obligations of the Consenting Creditors under this Agreement shall be several, not joint.  None of the Consenting Creditors shall have by virtue of this Agreement any fiduciary duty or any other duty of trust or confidence in any form to each other, any Consenting Creditor, any Company Party or affiliate thereof, or any of the Company Party's or their respective affiliates' creditors or other stakeholders. None of the Consenting Creditors shall have by virtue of this Agreement any duties or responsibilities to each other, any Consenting Creditor, any Company Party or affiliate thereof, or any of the Company Party's or their respective affiliates' creditors or other stakeholders, and there are no commitments among or between the Consenting Creditors, except as expressly set forth in this Agreement.  It is understood and agreed that any Consenting Creditor may trade in any debt or equity Securities of any Company Parties without the consent of the Company Parties or any Consenting Creditor, subject to Section 10 and applicable securities Laws.  No prior history, pattern or practice of sharing confidence among or between any of the Consenting Creditors, and/or the Company Parties shall in any way affect or negate this understanding and agreement. The Parties acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any Securities of any of the Company Parties and shall not be deemed, as a result of its entering into and performing its obligations under this Agreement, to constitute a "group" within the meaning of Section 13(d)(3) of the Exchange Act or Rule 13d-5 promulgated thereunder.  For the avoidance of doubt:  (1) each Consenting Creditor is entering into this Agreement directly with the Company Parties and not with any other Consenting Creditor, (2) no other Consenting Creditor shall have any right to bring any action against any other Consenting Creditor with respect this Agreement (or any breach thereof), other than in accordance with this Agreement, and (3) no Consenting Creditor shall, nor shall any action taken by a Consenting Creditor pursuant to this Agreement, be deemed to be acting in concert or as any group with any other Consenting Creditor with respect to the obligations under this Agreement, nor shall this Agreement create a presumption that the Consenting Creditors are in any way acting as a group. All rights under this Agreement are separately granted to each Consenting Creditor by the Company Parties and vice versa, and the use of a single document is for the convenience of the Parties.  Each Party's decision to commit to enter into the transactions contemplated by this Agreement has been made independently and is based upon its own business judgment with the understanding that no Company Party has made any representations or warranties as to the success of the Restructuring Transactions or, ultimately, the Confirmation of the Plan (or the Non-TopCo Plan, as applicable).

(b)      The Company Parties understand that the Consenting Creditors are engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Company Parties acknowledge and agree that the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of the Consenting Creditors that principally manage and/or supervise the Consenting Creditor's investment in the Company Parties, and shall not apply to any other trading desk or business group of the Consenting Creditor so long as they are not

66

acting at the direction or for the benefit of such Consenting Creditor and so long as confidentiality is maintained consistent with any applicable confidentiality agreement.

15.21. <u>No Recourse</u>.  This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this Agreement).  All claims or Causes of Action (whether in contract, tort, equity, or any other theory) that may be based upon, arise out of, or relate to this Agreement, or the negotiation, execution, or performance of this Agreement, may be made only against the Persons that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein).  No past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling person, agent, attorney, or other representative of any party hereto (including any person negotiating or executing this Agreement on behalf of a party hereto), nor any past, present, or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, affiliate, controlling person, agent, attorney, or other representative of any of the foregoing (other than any of the foregoing that is a party hereto) (any such Person, a "No Recourse Party"), shall have any liability with respect to this Agreement or with respect to any proceeding (whether in contract, tort, equity, or any other theory that seeks to "pierce the corporate veil" or impose liability of an Entity against its owners or affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution, or performance of this Agreement.

15.22. <u>Publicity</u>.

(a)     The Company Parties will submit to Akin Gump Strauss Hauer & Feld LLP, Centerview Partners LLC, Wilmer, Cutler, Pickering Hale and Dorr LLP, Jones Day, Houlihan Lokey Capital, Inc., Paul, Weiss, Rifkind, Wharton & Garrison LLP, and Ducera Partners LLC all press releases, public filings, public announcements or other communications with any news media, in each case, to be made by any of the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof (each, an "**Announcement**") and will make reasonable best efforts to submit any such Announcement at least three (3) days before the public disclosure of such Announcement and with respect to which such parties shall have consultation rights.

(b)     Except as required by applicable Law, no Party or its advisors shall use the name of any Consenting Creditor in any public manner (including in any Announcement or press release) or disclose to any person or Entity (including, for the avoidance of doubt, any other Consenting Creditor), other than legal, accounting, financial, and other advisors to the Company Parties who need to know such information in connection with the implementation of the Restructuring Transactions, the principal amount or percentage of Company Claims (or related debt/equity instruments) held by the applicable Consenting Creditor without such Consenting Creditor's prior written consent; *provided, however*, that (a) if such disclosure is required by Law, subpoena or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Creditor a reasonable opportunity to review and comment before such disclosure and shall take all reasonable measures to limit such disclosure, (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Company Claims held by all Consenting Creditors collectively, or with respect to any particular ad hoc group, and (c) any Party may

disclose information requested by a U.S. federal or state regulatory authority with jurisdiction over its operations to such authority after, subject to applicable law, providing the relevant Party a reasonable opportunity to review and comment under the circumstances before such disclosure is made.  Any public filing or other disclosure of this Agreement shall not include executed signature pages to this Agreement with respect to the holdings and identity of each Consenting Creditor, which shall be held on file with the Company.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company Parties' Signature Pages to
the Chapter 11 Plan Support Agreement**


**[on file with the Company]**

**Consenting Creditor Signature Page to
the Chapter 11 Plan Support Agreement**

**[CONSENTING CREDITOR]**

_____

Name:

Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Term Loan Facility | |
| 8.00% First Lien Notes | |
| 9.50% First Lien Notes | |
| Jackson Senior Notes | |
| Connect Senior Notes | |
| Lux Senior Notes | |
| Convertible Senior Notes | |
| Interests | |

## EXHIBIT A

### Company Parties

- Intelsat (Luxembourg) S.A.
- Intelsat Connect Finance S.A.
- Intelsat Envision Holdings LLC
- Intelsat Jackson Holdings S.A.
- Intelsat S.A.
- Intelsat Holdings S.A.
- Intelsat Investment Holdings S.a.r.l.
- Intelsat Investments S.A.
- Intelsat Ventures S.a.r.l.
- Intelsat Align S.a.r.l.
- Intelsat Finance Bermuda ltd.
- Intelsat Global Sales and Marketing Ltd.
- Intelsat Subsidiary (Gibraltar) Limited
- Intelsat UK Financial Services Limited
- Intelsat Genesis Inc.
- Panamsat Europe Corporation
- Intelsat Genesis GP LLC
- Intelsat Alliance LP
- Intelsat Holdings LLC
- Intelsat Satellite LLC
- Intelsat Virginia Holdings LLC
- Intelsat License Holdings LLC
- Intelsat License LLC
- Intelsat US Finance LLC
- Intelsat US LLC
- Panamsat International Holdings LLC
- Intelsat International Systems, LLC
- Panamsat International Sales, LLC
- Intelsat Asia Carrier Services, LLC
- Southern Satellite Licensee LLC
- Intelsat International Employment LLC
- Southern Satellite LLC
- Intelsat Service and Equipment LLC
- Panamsat India Marketing L.L.C.
- Panamsat India LLC

**<u>EXHIBIT B</u>**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| INTELSAT S.A., *et al.*,[1] | ) | Case No. 20-32299 (KLP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF INTELSAT S.A. AND ITS DEBTOR AFFILIATES**

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE,  COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST.**

**YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

**THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER  CUSTOMARY CONDITIONS.  THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

| | |
|---|---|
| Edward O. Sassower, P.C. (admitted *pro hac vice*) | Michael A. Condyles (VA 27807) |
| Steven N. Serajeddini, P.C. (admitted *pro hac vice*) | Peter J. Barrett (VA 46179) |
| Aparna Yenamandra (admitted *pro hac vice*) | Jeremy S. Williams (VA 77469) |
| **KIRKLAND & ELLIS LLP** | Brian H. Richardson (VA 92477) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KUTAK ROCK LLP** |
| 601 Lexington Avenue | 901 East Byrd Street, Suite 1000 |
| New York, New York 10022 | Richmond, Virginia 23219-4071 |
| Telephone:     (212) 446-4800 | Telephone:    (804) 644-1700 |
| Facsimile:     (212) 446-4900 | Facsimile:    (804) 783-6192 |

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  August 24, 2021

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/intelsat. The location of the Debtors' service address is:  7900 Tysons One Place, McLean, VA 22102.

**TABLE OF CONTENTS**

                                                                                                          **Page**

**INTRODUCTION** ................................................................................................................1

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME,
       GOVERNING LAW, AND OTHER REFERENCES** .................................................1
    A.    *Defined Terms* ..........................................................................................*1*
    B.    *Rules of Interpretation* .............................................................................*24*
    C.    *Computation of Time* ...............................................................................*25*
    D.    *Governing Law*.........................................................................................*25*
    E.    *Reference to Monetary Figures* ................................................................*25*
    F.    *Reference to the Debtors or the Reorganized Debtors* .............................*25*
    G.    *Controlling Documents* ............................................................................*25*
    H.    *Consent Rights* ........................................................................................*25*

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS** ...........................................**25**
    A.    *DIP Claims*...............................................................................................*26*
    B.    *Administrative Claims*..............................................................................*26*
    C.    *Professional Fee Claims* ..........................................................................*26*
    D.    *Priority Tax Claims* .................................................................................*29*

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS29**
    A.    *Classification of Claims and Interests* .....................................................*29*
    B.    *Treatment of Classes of Claims and Interests* ..........................................*32*
    C.    *Special Provision Governing Unimpaired Claims* ....................................*40*
    D.    *Elimination of Vacant Classes* .................................................................*40*
    E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes* ................*40*
    F.    *Subordinated Claims*................................................................................*40*
    G.    *Intercompany Interests*.............................................................................*41*
    H.    *Controversy Concerning Impairment* .......................................................*41*
    I.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*....*41*

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN**.........................................**41**
    A.    *General Settlement of Claims and Interests*.............................................*41*
    B.    *Settlement Agreement*...............................................................................*42*
    C.    *Term Loan Facility Claims Settlement* ....................................................*42*
    D.    *Restructuring Transactions*......................................................................*42*
    E.    *Sources of Consideration for Plan Distributions* .....................................*43*
    F.    *Exemption from Registration Requirements* .............................................*45*
    G.    *Corporate Existence*.................................................................................*46*
    H.    *Corporate Action* .....................................................................................*46*
    I.    *FCC Licenses and Regulatory Applications*.............................................*47*
    J.    *Vesting of Assets in the Reorganized Debtors* ..........................................*47*
    K.    *Cancellation of Notes, Instruments, Certificates, and Other Documents*.........................*47*
    L.    *Effectuating Documents; Further Transactions* ........................................*48*
    M.    *Exemptions from Certain Taxes and Fees* .................................................*48*
    N.    *New Corporate Governance Documents* ...................................................*48*
    O.    *Directors and Officers* .............................................................................*49*
    P.    *Management Incentive Plan* ......................................................................*49*
    Q.    *Payment of Indenture Trustee Fees* ..........................................................*49*
    R.    *Preservation of Causes of Action*.............................................................*50*
    S.    *Non-TopCo Plan* .....................................................................................*50*

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ........50
    A.    *Assumption of Executory Contracts and Unexpired Leases* ...............................*50*
    B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases* .....................*51*
    C.    *Cure of Defaults and Objections to Cure and Assumption* ...............................*51*
    D.    *Insurance Policies* .............................................................................*52*
    E.    *Indemnification Provisions* ..................................................................*53*
    F.    *Director, Officer, Manager, and Employee Liability Insurance* ........................*53*
    G.    *Employee and Retiree Benefits* ............................................................*53*
    H.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements* ..............*54*
    I.    *Reservation of Rights* .......................................................................*54*
    J.    *Nonoccurrence of Effective Date.* ..........................................................*55*
    K.    *Contracts and Leases Entered Into After the Petition Date* ............................*55*

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ...............................................**55**
    A.    *Timing and Calculation of Amounts to Be Distributed* ..................................*55*
    B.    *Distributions on Account of Obligations of Multiple Debtors* ............................*55*
    C.    *Distribution Agent* ..........................................................................*55*
    D.    *Rights and Powers of Distribution Agent* .................................................*55*
    E.    *Delivery of Distributions* ....................................................................*56*
    F.    *Manner of Payment* .........................................................................*57*
    G.    *Compliance Matters* .........................................................................*57*
    H.    *No Postpetition or Default Interest on Claims* ...........................................*58*
    I.    *Allocation Between Principal and Accrued Interest* ......................................*58*
    J.    *Setoffs and Recoupment* ....................................................................*58*
    K.    *Claims Paid or Payable by Third Parties* .................................................*58*

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,  AND
DISPUTED CLAIMS** .............................................................................**59**
    A.    *Allowance of Claims* ........................................................................*59*
    B.    *Claims Administration Responsibilities.* ..................................................*59*
    C.    *Adjustment to Claims Without Objection* .................................................*59*
    D.    *Time to File Objections to Claims or Interests* ...........................................*59*
    E.    *Estimation of Claims* ........................................................................*59*
    F.    *Disputed and Contingent Claims Reserve* .................................................*60*
    G.    *Disallowance of Claims* .....................................................................*60*
    H.    *Amendments to Proofs of Claim* ...........................................................*61*
    I.    *Reimbursement or Contribution* ...........................................................*61*
    J.    *No Distributions Pending Allowance* ......................................................*61*
    K.    *Distributions After Allowance* .............................................................*61*

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ........**61**
    A.    *Compromise and Settlement of Claims, Interests, and Controversies* ..................*61*
    B.    *Discharge of Claims* .........................................................................*62*
    C.    *Release of Liens* .............................................................................*62*
    D.    *Debtor Release* ..............................................................................*63*
    E.    *Third-Party Release* .........................................................................*64*
    F.    *Exculpation* .................................................................................*64*
    G.    *Injunction* ...................................................................................*65*
    H.    *Protection Against Discriminatory Treatment* ............................................*66*
    I.    *Recoupment* .................................................................................*66*
    J.    *Reimbursement or Contribution* ...........................................................*66*
    K.    *Term of Injunctions or Stays* ..............................................................*66*
    L.    *Document Retention* ........................................................................*66*

**ARTICLE IX. CONDITIONS TO CONFIRMATION AND THE EFFECTIVE DATE** ...................**66**
    A.    *Conditions Precedent to the Confirmation Date.* .........................................*66*

ii

B.      *Conditions Precedent to the Effective Date.* ...........................................................67
C.      *Waiver of Conditions to the Confirmation Date and the Effective Date* ...........................68
D.      *Substantial Consummation* ...........................................................68
E.      *Effect of Non-Occurrence of Conditions to Consummation* ...........................................68

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** .................**69**
A.      *Modification of Plan* ...........................................................69
B.      *Effect of Confirmation on Modifications* ...........................................................69
C.      *Revocation or Withdrawal of Plan* ...........................................................69

**ARTICLE XI. RETENTION OF JURISDICTION** .................................................**69**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** .................................................**72**
A.      *Immediate Binding Effect* ...........................................................72
B.      *Additional Documents* ...........................................................72
C.      *Dissolution of the Committee* ...........................................................72
D.      *Statutory Fees* ...........................................................72
E.      *Payment of Certain Fees and Expenses* ...........................................................72
F.      *Reservation of Rights* ...........................................................72
G.      *Successors and Assigns* ...........................................................73
H.      *Service of Documents* ...........................................................73
I.      *Entire Agreement* ...........................................................74
J.      *Plan Supplement Exhibits* ...........................................................74
K.      *Non-Severability* ...........................................................74
L.      *Votes Solicited in Good Faith* ...........................................................74
M.      *Waiver or Estoppel* ...........................................................75
N.      *Closing of Chapter 11 Cases* ...........................................................75

**INTRODUCTION**

Intelsat S.A. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (each a "Debtor" and, collectively, the "Debtors") propose (a) this joint plan of reorganization (together with the documents comprising the Plan Supplement, the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors and (b) the Non-TopCo Plan for the resolution of the outstanding Claims against and Interests in all Debtors other than the Non-TopCo Debtors, in each case pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Debtor, as applicable, for the purpose of receiving distributions pursuant to this Plan. While the Plan constitutes a single plan of reorganization for all Debtors, the Plan does not contemplate substantive consolidation of any of the Debtors. In the event that the Plan is not capable of being confirmed with respect to a TopCo Debtor, but is capable of being confirmed as to Non-TopCo Debtors, then the Non-TopCo Plan may be confirmed as a single plan of reorganization for all Non-TopCo Debtors. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties, operations, projections, risk factors, a summary and description of this Plan, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES**

*A.      Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*1145 Securities*" means, collectively, the New Common Stock, the CVRs, the New Warrants (including New Common Stock issued upon exercise of the New Warrants), and the Reorganized S.A. Common Stock issued in reliance upon section 1145 of the Bankruptcy Code to the fullest extent the issuance of such securities pursuant to section 1145 of the Bankruptcy Code is permitted under applicable law.

2.      "*2018 Reorganization Claims*" means any and all Claims, Causes of Action and other challenges related to the series of transactions and related steps that the Debtors (or their affiliates) implemented in and around June–July 2018 (or related transactions that took place thereafter) that reorganized (or assisted or were intended to assist in the reorganization of) the ownership of certain of the assets of the Debtors and their affiliates (including transactions effecting changes in tax and accounting attributes).

3.      "*2021 and 2023 Lux Senior Notes Trustee*" means Delaware Trust Company, solely in its capacity as trustee under the Lux Multi Senior Notes Indenture, and any predecessor or successor thereto.

4.      "*2021 Lux Senior Notes*" means those certain 7.75% senior notes due 2021, issued by LuxCo, in an original aggregate principal amount of $2,000,000,000, pursuant to the Lux Multi Senior Notes Indenture.

5.      "*2021 Lux Senior Notes Claims*" means any Claim arising under the Lux Multi Senior Notes Indenture relating to the 2021 Lux Senior Notes.

6.      "*2023 Jackson Senior Notes*" means those certain 5.50% senior notes due 2023, issued by Jackson, in an aggregate principal amount of $2,000,000,000, pursuant to the 2023 Jackson Senior Notes Indenture.

7.      "*2023 Jackson Senior Notes Indenture*" means that certain indenture, dated as of June 5, 2013, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the 2023 Jackson Senior Notes, by and among Jackson, as issuer, certain of the Debtors, as guarantors, and 2023 Jackson Senior Notes Trustee, as trustee.

8.    "*2023 Jackson Senior Notes Trustee*" means U.S. Bank, National Association, solely in its capacity as trustee under the 2023 Jackson Senior Notes Indenture, and any predecessor or successor thereto.

9.    "*2023 Lux Senior Notes*" means those certain 8.125% senior notes due 2023, issued by LuxCo, in an original aggregate principal amount of $1,000,000,000, pursuant to the Lux Multi Senior Notes Indenture.

10.    "*2023 Lux Senior Notes Claims*" means any Claim arising under the Lux Multi Senior Notes Indenture relating to the 2023 Lux Senior Notes.

11.    "*2024 Jackson Senior Notes*" means those certain 8.50% senior notes due 2024, issued by Jackson, in an original aggregate principal amount of $2,250,000,000, with a subsequent issuance in an aggregate principal amount of $700,000,000, for a total aggregate principal amount of $2,950,000,000, pursuant to the 2024 Jackson Senior Notes Indenture.

12.    "*2024 Jackson Senior Notes Indenture*" means that certain indenture, dated as of September 19, 2018, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the 2024 Jackson Senior Notes, by and among Jackson, as issuer, certain of the Debtors, as guarantors, and 2024 Jackson Senior Notes Trustee, as trustee.

13.    "*2024 Jackson Senior Notes Trustee*" means U.S. Bank, National Association, solely in its capacity as trustee under the 2024 Jackson Senior Notes Indenture, and any predecessor or successor thereto.

14.    "*2024 Lux Senior Notes*" means those certain 12.50% senior notes due 2024, issued by LuxCo, in an original aggregate principal amount of $403,325,000, pursuant to the 2024 Lux Senior Notes Indenture.

15.    "*2024 Lux Senior Notes Claims*" means any Claim arising under the 2024 Lux Senior Notes Indenture relating to the 2024 Lux Senior Notes.

16.    "*2024 Lux Senior Notes Indenture*" means that certain indenture, dated as of January 6, 2017, by and among LuxCo, as issuer, and the 2024 Lux Senior Notes Trustee, as trustee, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

17.    "*2024 Lux Senior Notes Trustee*" means Delaware Trust Company, solely in its capacity as trustee under the 2024 Lux Senior Notes Indenture, and any predecessor or successor thereto.

18.    "*2025 Jackson Senior Notes*" means those certain 9.75% senior notes due 2025, issued by Jackson, in an original aggregate principal amount of $1,500,000,000, with a subsequent issuance in an aggregate principal amount of $400,000,000, for a total aggregate principal amount of $1,900,000,000, pursuant to the 2025 Jackson Senior Notes Indenture.

19.    "*2025 Jackson Senior Notes Indenture*" means that certain indenture, dated as of July 5, 2017, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the 2025 Jackson Senior Notes, by and among Jackson, as issuer, certain of the Debtors, as guarantors, and 2025 Jackson Senior Notes Trustee, as trustee.

20.    "*2025 Jackson Senior Notes Trustee*" means U.S. Bank, National Association, solely in its capacity as trustee under the 2025 Jackson Senior Notes Indenture, and any predecessor or successor thereto.

21.    "*2026 Envision Intercompany Note*" means that certain intercompany promissory note due 2026, issued by Envision to Intelsat on June 18, 2018 in an aggregate principal amount of $150,000,000.

22.    "*2026 Envision Intercompany Note Claims*" means any Claim arising on account of the 2026 Envision Intercompany Note.

2

23.     "*2026 Lux Senior Notes*" means those certain 13.5% senior notes due 2026, issued by LuxCo to ICF and Envision on August 16, 2018, in the aggregate principal amount of $1,578,781,000.

24.     "*2026 Lux Senior Notes Claims*" means any Claim arising on account of the 2026 Lux Senior Notes.

25.     "*8.00% First Lien Notes*" means those certain 8.00% senior secured first lien notes due 2024, issued by Jackson, in an original aggregate principal amount of $1,250,000,000, with a subsequent issuance in an aggregate principal amount of $99,700,000, for a total aggregate principal amount of $1,349,700,000, pursuant to the 8.00% First Lien Notes Indenture.

26.     "*8.00% First Lien Notes Claim*" means any Claim arising under the 8.00% First Lien Notes and 8.00% First Lien Notes Indenture.

27.     "*8.00% First Lien Notes Indenture*" means that certain indenture, dated as of March 29, 2016, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the 8.00% First Lien Notes, by and among Jackson, as issuer, ICF and the other guarantors from time to time party thereto, as guarantors, 8.00% First Lien Notes Trustee, as trustee, and the Prepetition Collateral Trustee as Collateral Trustee.

28.     "*8.00% First Lien Notes Trustee*" means Wilmington Trust, National Association, solely in its capacity as trustee under the 8.00% First Lien Notes Indenture, and any predecessor or successor thereto.

29.     "*9.50% First Lien Notes*" means those certain 9.50% senior secured first lien notes due 2022, issued by Jackson, in an original aggregate principal amount of $490,000,000, pursuant to the 9.50% First Lien Notes Indenture.

30.     "*9.50% First Lien Notes Claim*" means any Claim arising under the 9.50% First Lien Notes and 9.50% First Lien Notes Indenture.

31.     "*9.50% First Lien Notes Indenture*" means that certain indenture, dated as of June 30, 2016, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the 9.50% First Lien Notes, by and among Jackson, as issuer, ICF and the other guarantors from time to time party thereto, as guarantors, 9.50% First Lien Notes Trustee, as trustee, and the Prepetition Collateral Trustee as Collateral Trustee.

32.     "*9.50% First Lien Notes Trustee*" means Wilmington Trust, National Association, solely in its capacity as trustee under the 9.50% First Lien Notes Indenture, and any predecessor or successor thereto.

33.     "*ABR Loans*" has the meaning set forth in the DIP Order.

34.     "*Accelerated Relocation Payment Claims*" means any and all Claims or Causes of Action, held by any Entity, related to the payments that the Debtors or the Reorganized Debtors may receive pursuant to that certain Report and Order and Order of Proposed Modification, FCC Docket Number 20-22, released by the FCC on March 3, 2020 in *In the Matter of Expanding Flexible Use of the 3.7 to 4.2 GHz Band*, GN Docket No. 18-122, including any Claims or Causes of Action with respect to which Debtor(s) or Reorganized Debtor(s) is entitled to receive any payments and reimbursements pursuant to such order.

35.     "*Administrative Claim*" means a Claim against a Debtor for the costs and expenses of administration of the Chapter 11 Cases arising on or prior to the Effective Date pursuant to sections 328, 330, or 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) Allowed Professional Fee Claims.

36.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be

3

30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

37.    "*Administrative Claims Objection Bar Date*" means the deadline for filing objections to requests for payment of Administrative Claims, which shall be the later of (a) 60 days after the Effective Date and (b) 60 days after the Filing of the applicable request for payment of an Administrative Claim; *provided that* the Administrative Claims Objection Bar Date may be extended by order of the Bankruptcy Court.

38.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

39.    "*Allowed*" means, with respect to any Claim, except as otherwise provided herein:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or such other date as agreed by the Debtors pursuant to the Bar Date Order) or a request for payment of an Administrative Claim Filed by the Administrative Claims Bar Date, as applicable (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order, a Proof of Claim or request for payment of Administrative Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to such Claim, no objection to the allowance thereof is filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so filed and the Claim has been allowed by a Final Order.

40.    "*Articles of Association*" has the meaning set forth in the Corporate Governance Term Sheet.

41.    "*Backstop Commitment*" means the commitment, on the terms as may be set forth in the Backstop Commitment Agreement, of the Backstop Parties to backstop the New Term Loans and New Notes.

42.    "*Backstop Commitment Agreement*" means that certain agreement that may be entered into by and among the Backstop Parties and the Debtors, as may be amended, supplemented, or modified from time to time, setting forth, among other things, the payment of the Backstop Premium and the terms and conditions of the Backstop Commitment.

43.    "*Backstop Parties*" means those certain parties that commit to backstop the New Term Loans and the New Notes and are signatories to the Backstop Commitment Agreement, solely in their capacities as such, to the extent provided in the Backstop Commitment Agreement.  An Entity may become a Backstop Party only if: (a) such Entity is (i) a Jackson Crossover Ad Hoc Group Member or (ii) a Consenting HoldCo Creditor, solely to the extent of such Consenting HoldCo Creditor's pro-rata holdings of Jackson Senior Notes (based upon the aggregate amount of Jackson Senior Notes held by all Holders of Jackson Senior Notes),[2] or (b) the Required Consenting Jackson Crossover Group Members otherwise permit, in writing, such Entity to become a Backstop Party with the Debtors' consent, not to be unreasonably withheld, conditioned, or delayed.

44.    "*Backstop Premium*" means that certain backstop premium payable in Cash to the Backstop Parties as consideration for the Backstop Commitment in the amount of 2.50% of the principal amount of New Term Loans and New Notes backstopped pursuant to the Backstop Commitment Agreement on the terms that may be set forth in the Backstop Commitment Agreement.

---

[2]    For the avoidance of doubt, a Consenting HoldCo Creditor shall be entitled to (i) an initial allocation of the Backstop Commitment based on such Consenting HoldCo Creditor's pro-rata holdings of Jackson Senior Notes (calculated as a percentage of the aggregate amount of Jackson Senior Notes held by all Holders of Jackson Senior Notes), and (ii) any unsubscribed portion of the Backstop Commitment not committed by other Entities entitled to participate in the Backstop Commitment based on such Consenting HoldCo Creditor's pro-rata holdings of Jackson Senior Notes (calculated as a percentage of the aggregate amount of Jackson Senior Notes held by all Holders of Jackson Senior Notes).

4

45.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

46.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 157, the United States District Court for the Eastern District of Virginia.

47.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

48.     "*Business Day*" means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

49.     "*C-Band Order*" means that certain Report and Order and Order of Proposed Modification issued by the FCC on March 3, 2020 in *In the Matter of Expanding Flexible Use of the 3.7 to 4.2 GHz Band,* GN Docket No. 18-122 (as may be amended or modified).

50.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

51.     "*Cause of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise (including under foreign law).  Causes of Action include:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) any claim pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

52.     "*Certificate*" means any document, instrument, or other writing evidencing a Claim against or an Interest in the Debtors.

53.     "*CEO*" means Chief Executive Officer of the Equity Issuer.

54.     "*Chapter 11 Cases*" means the cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered under Case No. 20-32299 (KLP) in the Bankruptcy Court.

55.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors, whether or not assessed or Allowed.

56.     "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Solicitation Agent.

57.     "*Class*" means a category of Holders of Claims or Interests as set forth in Article III pursuant to section 1122(a) of the Bankruptcy Code.

58.     "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code, as it may be reconstituted from time to time.

5

59.    "*Company Parties*" means Intelsat, and each of its direct and indirect subsidiaries listed on Exhibit A to the Plan Support Agreement that have executed and delivered counterpart signature pages to the Plan Support Agreement to counsel to the Consenting Creditors.

60.    "*Confirmation*" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

61.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

62.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, including any adjournments thereof, at which the Bankruptcy Court will consider confirmation of the Plan.

63.    "*Confirmation Objection Deadline*" means the deadline by which objections to confirmation of the Plan must be received by the Debtors.

64.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.  For the avoidance of doubt, the Confirmation Order shall not contain any provision approving the First Lien Notes Claims Settlement.

65.    "*Connect Senior Notes*" means those certain 9.50% senior notes due 2023, issued by ICF, in an original aggregate principal amount of $1,250,000,000, pursuant to the Connect Senior Notes Indenture.

66.    "*Connect Senior Notes Claims*" means any Claim arising under the Connect Senior Notes and the Connect Senior Notes Indenture.

67.    "*Connect Senior Notes Indenture*" means that certain indenture, dated as of August 16, 2018, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the Connect Senior Notes, by and among ICF, as issuer, Envision and LuxCo, as guarantors, and the Connect Senior Notes Trustee.

68.    "*Connect Senior Notes Trustee*" means Wilmington Savings Fund Society, FSC, solely in its capacity as trustee under the Connect Senior Notes Indenture, and any predecessor or successor thereto.

69.    "*Consenting Creditors*" means the Holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold Claims that have executed and delivered counterpart signature pages to the Plan Support Agreement, a joinder thereto, or a Transfer Agreement to counsel to the Company Parties.

70.    "*Consenting HoldCo Creditor*" has the meaning set forth in the Plan Support Agreement.

71.    "*Consummation*" means the occurrence of the Effective Date.

72.    "*Contingent DIP Obligations*" means all of the Debtors' obligations under the DIP Credit Agreement and the DIP Order that are contingent and/or unliquidated as of the Effective Date, other than DIP Claims that are paid in full in Cash as of the Effective Date and contingent indemnification obligations as to which a Claim has been asserted as of the Effective Date.

73.    "*Convert Ad Hoc Group*" means the ad hoc group of certain creditors represented by Stroock & Stroock & Lavan and Boies Schiller Flexner LLP and advised by Lazard Ltd.

74.    "*Convertible Senior Notes*" means those certain 4.50% convertible senior notes due 2025, issued by Intelsat, in an original aggregate principal amount of $402,500,000, pursuant to the Convertible Senior Notes Indenture.

75.     "*Convertible Senior Notes Claims*" means any Claim arising under the Convertible Senior Notes and the Convertible Senior Notes Indenture.

76.     "*Convertible Senior Notes Indenture*" means that certain indenture, dated as of June 18, 2018, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, for the Convertible Senior Notes, by and among Intelsat, as issuer, Envision, as guarantor, and the Convertible Senior Notes Trustee, as trustee.

77.     "*Convertible Senior Notes Trustee*" means BOKF, National Association, solely in its capacity as trustee under the Convertible Senior Notes Indenture, and any predecessor or successor thereto.

78.     "*Corporate Governance Term Sheet*" means that certain term sheet setting forth certain terms to be included in the New Corporate Governance Documents and attached to the Plan Support Agreement as Exhibit E.

79.     "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

80.     "*CVR Agreements*" means, collectively, the Series A CVR Agreement and the Series B CVR Agreement.

81.     "*CVR Term Sheet*" means that certain term sheet setting forth certain terms and conditions of the CVRs and attached to the Plan Support Agreement as Exhibit F.

82.     "*CVRs*" means, collectively, the Series A CVRs and the Series B CVRs.

83.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") maintained by the Debtors as of the Petition Date for liabilities against any of the Debtors' current or former directors, managers, and officers, and all agreements, documents, or instruments relating thereto.

84.     "*Debt Documents*" means the (i) DIP Credit Agreement and any amendments, modifications, or supplements thereto, as well as any and all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection the DIP Credit Agreement; (ii) First Lien Credit Agreement and any amendments, modifications, or supplements thereto, as well as any and all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection therewith; (iii) First Lien Notes Indentures and any amendments, modifications, or supplements thereto, as well as any all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection therewith; and (iv) Senior Notes Indentures and any amendments, modifications, or supplements thereto, as well as any and all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection therewith.

85.     "*Debtor Intercompany Claim*" means any Claim held by a Debtor against another Debtor, including all Intercompany Senior Notes Claims.

86.     "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.D of the Plan.

87.     "*Definitive Documents*" means (i) the Plan and the Plan Supplement (and all exhibits, annexes, schedules, ballots, solicitation procedures, and other documents and instruments related thereto), including any "Definitive Documents" as defined in the Plan Support Agreement; (ii) the Confirmation Order; (iii) the Disclosure Statement; (iv) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (v) the New Debt Documents; (vi) the Backstop Commitment Agreement; (vii) the New Warrants Agreements; (viii) the CVR Agreements; (ix) any and all documentation required to implement, issue, and distribute

the New Common Stock, New Debt, CVRs, or New Warrants, including any material disclosure documents related thereto; (x) the Management Incentive Plan; (xi) the New Corporate Governance Documents, (xii) the Settlement Agreement and all pleadings or documents in connection with the Settlement Agreement, including the Settlement Order; (xiii) the Secured Creditor Settlement Term Sheet; (xiv) the Restructuring Steps Memorandum; and (xv) any and all other material documents, deeds, agreements, filings, notifications, letters or instruments necessary or required to consummate the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements made from time to time thereto), in each case consistent with this Plan, the Plan Support Agreement, and the PSA Definitive Document Requirements; *provided, however*, for the avoidance of doubt, the Jackson Crossover Ad Hoc Group (i) shall not have any consent rights as it pertains to the Secured Creditor Settlement Term Sheet and (ii) does not consent to the Secured Creditor Settlement Term Sheet as it pertains to the First Lien Notes Claims Settlement.

88.　"*Dilution Principles*" means the following principles setting forth the dilutive effect of consideration issued pursuant to the Plan: (a) New Common Stock issued on the Effective Date pursuant to the Plan shall be subject to dilution of (i) up to nine percent (9.0%) by shares of New Common Stock issued pursuant to the exercise of the New Series A Warrants, (ii) up to two and a half percent (2.5%) by shares of New Common Stock issued pursuant to the exercise of the New Series B Warrants, and (iii) 3.26 percent (3.26%) by shares of New Common Stock issued pursuant to the Management Incentive Plan; (b) New Common Stock issued pursuant to the exercise of the New Series A Warrants shall be subject to dilution of (i) up to two and a half  percent (2.5%) by shares of New Common Stock issued pursuant to the exercise of the New Series B Warrants and (ii) 3.26 percent (3.26%) by shares of New Common Stock issued pursuant to the Management Incentive Plan; (c) New Common Stock issued pursuant to the exercise of the New Series B Warrants shall be subject to dilution of 3.26 percent (3.26%) by shares of New Common Stock issued pursuant to the Management Incentive Plan; and (d) New Common Stock issued pursuant to the Management Incentive Plan shall not be subject to any dilution.

89.　"*DIP Agent*" means Credit Suisse AG, Cayman Islands Branch in its capacity as administrative agent and collateral agent under the DIP Credit Agreement.

90.　"*DIP Backstop Agreement*" means that certain amended and restated backstop commitment agreement, dated June 1, 2020 among the DIP Borrower and certain of the Prepetition Secured Parties.

91.　"*DIP Borrower*" means Jackson.

92.　"*DIP Claim*" means any Claim arising under, derived from or based upon the DIP Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising under the DIP Credit Agreement.

93.　"*DIP Credit Agreement*" means that certain Superpriority Secured Debtor In Possession Credit Agreement, dated as of June 17, 2020, among the DIP Debtors, the DIP Agent, and Credit Suisse Loan Funding LLC, as lead arranger, as amended, amended and restated, supplemented, or modified from time to time.

94.　"*DIP Debtors*" means collectively, the DIP Borrower and the DIP Guarantors.

95.　"*DIP Documents*" means the DIP Credit Agreement and any amendments, modifications, or supplements thereto, as well as any all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection the DIP Credit Agreement, and the DIP Backstop Agreement.

96.　"*DIP Facility*" means that certain $1 billion new money multi-draw debtor-in-possession term loan credit facility provided by the DIP Lenders on the terms of, and subject to the conditions set forth in, the DIP Credit Agreement and approved by the Bankruptcy Court pursuant to the DIP Order.

97.　"*DIP Guarantors*" means the Debtors and their affiliates that unconditionally guaranteed, on a joint and several basis, the DIP Borrower's obligations in connection with the DIP Facility.

98. "*DIP Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the DIP Credit Agreement from time to time, each solely in their capacity as such.

99. "*DIP Obligations*" has the meaning given to the defined term "Credit Agreement Obligations" in the DIP Credit Agreement.

100. "*DIP Order*" means the *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Superpriority Administrative Expense Claims, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* entered by the Bankruptcy Court in the Chapter 11 Cases on June 9, 2020 at docket number 285.

101. "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

102. "*Disinterested Directors and Managers*" means the disinterested directors and managers of Jackson, ICF, Envision, LuxCo, and Intelsat.

103. "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest, or any portion thereof, (a) to the extent neither Allowed nor disallowed under the Plan or a Final Order nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code, or (b) for which a Proof of Claim or Proof of Interest or a motion for payment has been timely filed with the Bankruptcy Court, to the extent the Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, or the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order.

104. "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity or Entities designated by the Reorganized Debtors to make or to facilitate distributions that are to be made pursuant to the Plan, including, if applicable, each of the Indenture Trustees.

105. "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

106. "*Distribution Record Date*" means, other than with respect to Securities of the Debtors deposited with DTC, the record date for determining which Holders of Allowed Claims and Allowed Interests are eligible to receive distributions pursuant to the Plan, which date shall be the date determined by the Debtors with the consent of the Required Consenting Jackson Crossover Group Members and, with respect to distributions to the HoldCos, the consent of the Required Consenting HoldCo Creditors.  The Distribution Record Date shall not apply to the Notes or any Securities of the Debtors deposited with DTC, the holders of which shall receive a distribution in accordance with Article VI of the Plan and, as applicable, the customary procedures of DTC.

107. "*DTC*" means the Depository Trust Company.

108. "*Effective Date*" means the date on which all conditions to Consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective.

109. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

110. "*Envision*" means Intelsat Envision Holdings LLC, a limited liability company formed under the laws of the state of Delaware.

111. "*Envision Unsecured Recovery*" means:  (i) after payment of Restructuring Expenses and funding of the Professional Fee Escrow Account for the payment of Professional Fee Claims allocated in accordance with this

9

Plan, all remaining Cash at Envision, *provided*, *however*, that (a) seventy percent (70%) of such Cash shall be distributed Pro Rata to Holders of the Connect Senior Notes Claims and (b) thirty percent (30%) of such Cash shall be distributed Pro Rata to Holders of the Convertible Senior Notes Claims; and (ii) 47.301 percent (47.301%) of the New Series B Warrants; *provided*, *further* that the New Series B Warrants issued in respect of (ii) shall be subject to dilution pursuant to the Dilution Principles.  For the avoidance of doubt, (a) the Envision Unsecured Recovery incorporates the value that would have been received by Envision attributable to any and all Intercompany Claims, including any Intercompany Senior Notes Claims, as if such Intercompany Claim was settled, and (b) Holders of Intercompany Claims shall not receive any distribution from the Envision Unsecured Recovery.

112.     "*Equity Issuer*" means the Entity that shall be if either the Plan or Non-TopCo Plan is confirmed, Holdings or (with the consent of the Required Consenting Unsecured Creditors) any successor or assign, by merger, consolidation, reorganization, or otherwise, unless the Required Consenting Unsecured Creditors and the Debtors (excluding, if the Non-TopCo Plan is confirmed, Intelsat and Holdings SARL) agree to designate a different Entity.

113.     "*Equity Issuer Board*" means the board of directors (or other applicable governing body) of the Equity Issuer as set forth in the Plan Supplement and selected in accordance with the Corporate Governance Term Sheet.

114.     "*ERISA*" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1462 as amended, and the regulations promulgated thereunder.

115.     "*Estate*" means the estate created on the Petition Date for any Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtor after the Petition Date through and including the Effective Date.

116.     "*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the First Lien Lenders; (d) each of the First Lien Noteholders; (e) the First Lien Agent; (f) each of the Indenture Trustees; (g) the Prepetition Collateral Trustee; (h) the DIP Agent; (i) each of the DIP Lenders; (j) the Jackson Ad Hoc Group, and each member thereof; (k) the HoldCo Creditor Ad Hoc Group, and each member thereof; (l) the Jackson First Lien Noteholder Group, and each member thereof; (m) the Jackson Crossover Ad Hoc Group, and each member thereof; (n) each Consenting Creditor; (o) each Backstop Party; (p) each current and former Affiliate of each Entity in clause (a) through the following clause (q); and (q) each Related Party of each Entity in clause (a) through this clause (q).

117.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

118.     "*FCC*" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor Governmental Unit performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

119.     "*FCC Applications*" means, collectively, each requisite application, petition, or other request filed or to be filed with the FCC in connection with the Restructuring Transactions or this Plan.

120.     "*FCC Approval*" means the FCC's grant of the FCC Applications.

121.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Solicitation Agent.

122.     "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

123.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument, or

10

rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and such time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Bankruptcy Rule 8002; *provided*, that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules may be filed relating to such order, shall not cause an order not to be a Final Order.

124.    "*First Lien Agent*" means Bank of America, N.A., acting through such of its affiliates or branches as it may designate, in its capacity as administrative agent under the First Lien Credit Agreement, or any successor administrative agent or collateral agent as permitted by the terms set forth in the First Lien Credit Agreement.

125.    "*First Lien Claims*" means, collectively, the First Lien Notes Claims and the Term Loan Facility Claims.

126.    "*First Lien Credit Agreement*" means that certain credit agreement, dated as of January 12, 2011, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, by and among the Jackson as borrower, ICF (as successor to LuxCo), as guarantor, the First Lien Lenders, the First Lien Agent, and the Prepetition Collateral Trustee.

127.    "*First Lien Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the First Lien Credit Agreement from time to time, each solely in their capacity as such.

128.    "*First Lien Noteholders*" means, collectively, the banks, financial institutions, and other holders of the First Lien Notes, each solely in their capacity as such.

129.    "*First Lien Notes*" means, collectively, the 8.00% First Lien Notes and the 9.50% First Lien Notes.

130.    "*First Lien Notes Claim*" means any Claim arising under the First Lien Notes and First Lien Notes Indentures.

131.    "*First Lien Notes Claims Settlement*" means that certain compromise and settlement regarding the allowance and treatment of the First Lien Notes Claims set forth in the Secured Creditor Settlement Term Sheet.

132.    "*First Lien Notes Indentures*" means, collectively, the 8.00% First Lien Notes Indenture and the 9.50% First Lien Notes Indenture.

133.    "*First Lien Notes Trustees*" means, collectively, the 8.00% First Lien Notes Trustee and the 9.50% First Lien Notes Trustee.

134.    "*Fixed Rate Loans*" has the meaning set forth in the DIP Order.

135.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

136.    "*Guarantee Claims*" means, collectively, the HoldCo Guarantee Claims and the TopCo Guarantee Claims.

137.    "*Historical Intercompany Transaction Claims*" means any and all Claims and Causes of Action related to all outstanding disputes between the Debtors regarding the historic intercompany transactions including transactions that fall into the following categories:  (a) dividends made by Jackson or any HoldCo, on one hand, to any other HoldCo, on the other hand; (b) the creation of ICF; (c) the creation of Envision; (d) any contributions, whether consisting of Cash or other consideration, made by any HoldCo to Jackson; and (e) other smaller transactions including loans, one-off Cash dividends, non-cash dividends, guarantee releases, and others that occurred before, and intercompany balances that existed as of, the Petition Date or accumulated during these Chapter 11 Cases.

11

138.     "*HoldCo Creditor Ad Hoc Group*" means the ad hoc group of certain creditors represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and advised by Ducera Partners LLC.

139.     "*HoldCo Creditor Ad Hoc Group Advisors*" means Paul, Weiss, Rifkind, Wharton & Garrison, LLP, Whiteford, Taylor & Preston L.L.P., Ducera Partners LLC, Loyens & Loeff Luxembourg S.à.r.l., Ernst & Young LLP, and Covington & Burling LLP.

140.     "*HoldCo Creditor Ad Hoc Group Waiver*" means (a) to the extent the aggregate value to be distributed under the Plan to Holders of Convertible Senior Notes Claims on account of such Claims increases in excess of $49 million up to $145 million (excluding the value attributable to Reorganized S.A. Common Stock, if any), the HoldCo Creditor Ad Hoc Group Members shall not receive any distribution on account of such incremental recovery except for distributions of Reorganized S.A. Common Stock (if any) and (b) to the extent the aggregate value to be distributed under the Plan to Holders of Convertible Senior Notes Claims on account of such Claims exceeds $145 million (excluding the value attributable to Reorganized S.A. Common Stock, if any), the HoldCo Creditor Ad Hoc Group Members shall be entitled to a recovery, Pro Rata, in such excess distributable value; *provided* that the HoldCo Creditor Ad Hoc Group Members shall not receive any value in respect of their receipt (if any) of the Reorganized S.A. Common Stock other than value attributable to the net operating losses or other tax attributes (that are held outside of the Debtors' Luxembourg tax unity) of Intelsat or Holdings SARL; *provided, further*, that in the event the Restructuring Transactions are implemented pursuant to the Non-TopCo Plan, the HoldCo Creditor Ad Hoc Group Waiver shall not apply to any distributions from Intelsat upon the Effective Date of the Non-TopCo Plan, unless such distributions are funded by Reorganized Jackson, any of its subsidiaries, or any Holders of Jackson Senior Notes Claims.

141.     "*HoldCo Creditor Ad Hoc Group Members*" has the meaning set forth in the Plan Support Agreement.

142.     "*HoldCo Guarantee Claims*" means the claims asserted against the HoldCo Guarantors in the proofs of claim filed in the Chapter 11 Cases by the Jackson Senior Notes Trustees and the Lux Senior Notes Trustees (including Proofs of Claim numbered 553, 554, 555, 556, 585, 586, 587, 588, 617, 618, 619, 620, 784, 791, 795, 796, 898, 904, 905, 906, and any pleading filed with the Bankruptcy Court in connection therewith).

143.     "*HoldCo Guarantors*" means, collectively, ICF, LuxCo, Holdings, and Investments, each in its capacity as guarantor under the applicable Senior Notes Indentures.

144.     "*HoldCo Senior Notes*" means, collectively, the: (i) Lux Senior Notes; (ii) Connect Senior Notes; and (iii) Convertible Senior Notes.

145.     "*HoldCos*" means, each of ICF, Envision, LuxCo, Investments, Holdings, Holdings SARL, and Intelsat.

146.     "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

147.     "*Holdings*" means Intelsat Holdings S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg.

148.     "*Holdings SARL*" means Intelsat Investment Holdings S.à.r.l., a *société à responsabilité limitée* organized under the laws of the Grand Duchy of Luxembourg.

149.     "*Holdings SARL Unsecured Recovery*" means any remaining Cash at Holdings SARL.

150.     "*Holdings Unsecured Recovery*" means any remaining Cash at Holdings.

151.     "*Houlihan Engagement Letter*" means that certain letter agreement dated as of April 8, 2020 and executed on August 24, 2021 between Houlihan Lokey Capital, Inc., Intelsat Jackson Holdings S.A., and the other parties thereto.

12

152.    "*ICF*" means Intelsat Connect Finance S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg.

153.    "*ICF Unsecured Recovery*" means (i) after payment of Restructuring Expenses and funding of the Professional Fee Escrow Account for the payment of Professional Fee Claims allocated in accordance with this Plan, all remaining Cash at ICF, (ii) thirty two and one-half percent (32.5%) of the Series B CVRs, (iii) four percent (4.0%) of New Common Stock, (iv) one hundred percent (100%) of the New Series A Warrants, (v) 46.447 percent (46.447%) of the New Series B Warrants, and (vi) thirty percent (30%) of any distributions made by Intelsat on account of TopCo Guarantee Claims (*i.e.* Claims in Class J2) to the Jackson Senior Notes Trustees, which shall be gifted by the Trustees in consideration for the covenants, compromises, releases, and other benefits provided by the members of the HoldCo Creditor Ad Hoc Group pursuant to the Plan Support Agreement; *provided* that the aggregate value of any gift made to Holders of Connect Senior Notes Claims on account of TopCo Guarantee Claims against Intelsat (*i.e.* Claims in Class J2) shall not exceed $6 million; *provided*, *further* that the New Common Stock issued in respect of each of (iii)–(vi) shall be subject to dilution pursuant to the Dilution Principles.  For the avoidance of doubt, (a) the ICF Unsecured Recovery incorporates the value that would have been received by ICF attributable to any and all Intercompany Claims, including any Intercompany Senior Notes Claims, as if such Intercompany Claim was settled and (b) Holders of Intercompany Claims shall not receive any distribution from the ICF Unsecured Recovery.

154.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

155.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions in place immediately prior to the Effective Date whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or contracts for the current and former directors, officers, managers, employees, equityholders, attorneys, other professionals, and agents.

156.    "*Indentures*" means, collectively, the Senior Notes Indentures and the First Lien Notes Indentures.

157.    "*Indenture Trustees*" means, collectively, the Senior Notes Indenture Trustees and the First Lien Notes Trustees.

158.    "*Indenture Trustee Charging Lien*" means any Lien or other priority of payment to which an Indenture Trustee is entitled under its respective Indenture(s), or any other ancillary documents, instruments, or agreements executed in connection therewith or pursuant thereto, against distributions to be made to Holders of Claims under the applicable Indenture, for payment of any Indenture Trustee Fees.

159.    "*Indenture Trustee Fees*" means all reasonable compensation, costs, advances, fees, expenses disbursements and claims for indemnity, subrogation, and contribution, including, without limitation, attorneys' and agents' fees, expenses, and disbursements, incurred by or owed to an Indenture Trustee under its respective Indenture(s), or any other ancillary documents, instruments, or agreements executed in connection therewith or pursuant thereto, including, if applicable, in their capacities as collateral agent, paying agent, transfer agent, or security registrar under its respective Indenture(s), whether before or after the Petition Date or before or after the Effective Date.

160.    "*Intelsat*" means Intelsat S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg.

161.    "*Intercompany Claims*" means, collectively, the Debtor Intercompany Claims and the Non-Debtor Intercompany Claims.

162.    "*Intercompany Interest*" means any Interest held by a Debtor or an Affiliate of a Debtor.

163.    "*Intercompany Senior Notes Claim*" means the 2026 Lux Senior Notes Claims, the 2026 Envision Intercompany Note Claims, and any Senior Notes Claim that is held by a Debtor, including, for the avoidance of doubt, any 2024 Lux Senior Notes Claim.

13

164.    "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor, and any claim against or interest in the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

165.    "*Investments*" means Intelsat Investments S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg.

166.    "*Investments Unsecured Recovery*" means any remaining Cash at Investments.

167.    "*Jackson*" means Intelsat Jackson Holdings S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg.

168.    "*Jackson Ad Hoc Group*" means the ad hoc group of certain creditors represented by Akin Gump Strauss Hauer & Feld LLP and advised by Centerview Partners LLC.

169.    "*Jackson Crossover Ad Hoc Group*" means the ad hoc group of certain creditors represented by Jones Day and advised by Houlihan Lokey Capital, Inc.

170.    "*Jackson Crossover Ad Hoc Group Advisors*" means Jones Day, Houlihan Lokey Capital, Inc., Compensation Advisory Partners LLC, and AKD Luxembourg SARL.

171.    "*Jackson Debtors*" means, collectively, Jackson and Jackson Subsidiaries.

172.    "*Jackson First Lien Noteholder Group*" means the ad hoc group of certain creditors represented by Wilmer Cutler Pickering Hale and Dorr LLP.

173.    "*Jackson Senior Notes*" means, collectively, the 2023 Jackson Senior Notes, the 2024 Jackson Senior Notes, and the 2025 Jackson Senior Notes.

174.    "*Jackson Senior Notes Claim*" means any Claim arising under the Jackson Senior Notes Indentures.

175.    "*Jackson Senior Notes Indentures*" means, collectively, the 2023 Jackson Senior Notes Indenture, the 2024 Jackson Senior Notes Indenture, and the 2025 Jackson Senior Notes Indenture.

176.    "*Jackson Senior Notes Trustees*" means, collectively, the 2023 Jackson Senior Notes Trustee, the 2024 Jackson Senior Notes Trustee, and the 2025 Jackson Senior Notes Trustee.

177.    "*Jackson Subsidiaries*" means any Debtor that is a subsidiary of Jackson.

178.    "*Jackson Unsecured Recovery*" means, in accordance with the Value Allocation as may be modified by order of the Bankruptcy Court, (i) ninety-six percent (96%) of New Common Stock, (ii) one hundred percent (100%) of the Series A CVRs, (iii) sixty-seven and one-half percent (67.5%) of the Series B CVRs, (iv) $625 million of the Cash proceeds of the New Term Loans and/or New Notes; *provided* that the New Common Stock issued in respect of (i) shall be subject to dilution pursuant to the Dilution Principles.  For the avoidance of doubt, (a) the Jackson Unsecured Recovery incorporates the value that would have been received by Jackson attributable to any and all Intercompany Claims, including any Intercompany Senior Notes Claims, as if such Intercompany Claim was settled and (b) Holders of Intercompany Claims shall not receive any distribution from the Jackson Unsecured Recovery.

179.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

14

180. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

181. "*Lux Multi Senior Notes Indenture*" means that certain indenture, dated as of April 5, 2013, by and among LuxCo, as issuer, Intelsat, as guarantor, and the 2021 and 2023 Lux Senior Notes Trustee, as trustee, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time prior to the Petition Date.

182. "*Lux Senior Notes*" means, collectively, the 2021 Lux Senior Notes, the 2023 Lux Senior Notes, and the 2024 Lux Senior Notes.

183. "*Lux Senior Notes Claims*" means any Claim arising under the Lux Senior Notes Indentures.

184. "*Lux Senior Notes Indentures*" means, collectively, the Lux Multi Senior Notes Indenture and the 2024 Lux Senior Notes Indenture.

185. "*Lux Senior Notes Trustees*" means, collectively, the 2021 and 2023 Lux Senior Notes Trustee and the 2024 Lux Senior Notes Trustee.

186. "*LuxCo*" means Intelsat (Luxembourg) S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg.

187. "*LuxCo Unsecured Recovery*" means, subject to payment of Restructuring Expenses and funding of the Professional Fee Escrow Account for the payment of Professional Fee Claims allocated in accordance with this Plan, (i) all remaining Cash at LuxCo and (ii) $10 million of the Cash proceeds of the New Debt. For the avoidance of doubt, (a) the LuxCo Unsecured Recovery incorporates the value that would have been received by LuxCo attributable to any and all Intercompany Claims, including any Intercompany Senior Notes Claims, as if such Intercompany Claim was settled and (b) Holders of Intercompany Claims and Connect Senior Notes Claims shall not receive any distribution from the LuxCo Unsecured Recovery.

188. "*Management Incentive Plan*" means the management incentive plan implemented by the Equity Issuer on the Effective Date, which shall have terms consistent with the terms of the Management Incentive Plan Term Sheet. The Required Consenting Jackson Crossover Group Members and the Debtors shall negotiate the terms of the definitive Management Incentive Plan documentation in good faith prior to the Effective Date; *provided* that the requirement that the Management Incentive Plan documentation be completed prior to the Effective Date may be waived by written agreement between the Required Consenting Jackson Crossover Group Members and the Debtors.

189. "*Management Incentive Plan Term Sheet*" means that certain management incentive plan term sheet setting forth the terms of the Management Incentive Plan and attached to the Plan Support Agreement as Exhibit G.

190. "*New Capital Structure*" means the capital structure for the Reorganized Debtors and their subsidiaries, which shall be obtained through the Debtors' commercially reasonable efforts prior to the Effective Date (including, for the avoidance of doubt, conducting a solicitation process for financing proposals that will provide the highest or otherwise best terms available under the circumstances) and which shall provide for (i) $7.125 billion of New Term Loans and New Notes and (ii) a New Revolver; *provided* that the Company may increase the amount of New Term Loans and New Notes above $7.125 billion by decreasing the amount of availability on the New Revolver by an equal amount.

191. "*New Common Stock*" means the common stock of the Equity Issuer to be issued upon the Effective Date in accordance with the Plan, including any common stock to be issued on account of the New Warrants or in connection with the Management Incentive Plan.

192. "*New Corporate Governance Documents*" means the amended and restated or new applicable corporate governance documents (including, without limitation, the Articles of Association, Shareholders Agreement, Registration Rights Agreement, and such other bylaws, limited liability company agreements, partnership agreements, and any other applicable formation documents or governance documents (if any) of the Equity Issuer and the

Reorganized Debtors, forms of which shall be included in the Plan Supplement, and all of which shall be in form and substance consistent with the PSA Definitive Document Requirements and the Corporate Governance Term Sheet.

193.   "*New Debt*" means collectively, the New Revolver, the New Term Loan, and the New Notes, as applicable, issued as part of the New Capital Structure, of which the New Term Loan and New Notes may be backstopped (in whole or in part) by the Backstop Parties.

194.   "*New Debt Agreements*" means the indentures or loan agreements governing the New Debt, the form of which shall be included in the Plan Supplement, and which shall be in form and substance consistent with the PSA Definitive Document Requirements.

195.   "*New Debt Documents*" means, collectively, the New Debt Agreements, and all other agreements, documents, and instruments evidencing or securing the New Debt, to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents), each of which shall be consistent in all respects with the Plan Support Agreement and the PSA Definitive Document Requirements.

196.   "*New Notes*" means, collectively, those certain first lien notes, those certain second lien notes, and/or those certain unsecured notes, as applicable, constituting part of the New Capital Structure, which may be funded on the Effective Date pursuant to the Plan and the New Debt Documents; *provided* that any makewhole provisions in the New Notes are to be negotiated at market terms and in good faith among the Required Consenting Jackson Crossover Group Members and the Debtors, and subject to the consultation rights provided in the Plan Support Agreement.

197.   "*New Revolver*" means that certain revolving credit facility for up to $500 million of availability, which may be increased to $750 million with the consent of the Required Consenting Jackson Crossover Group Members, to be issued pursuant to the Plan and the New Debt Documents, and which will be secured by a first lien on substantially all of the Reorganized Debtors' assets (*pari passu* with the other first lien New Debt), subject to customary exclusions, which may be issued on a first out basis relative to all other secured New Debt at the election of the Company.

198.   "*New Securities*" means, collectively, the New Common Stock, the New Notes, if applicable, the CVRs, and the New Warrants.

199.   "*New Series A Warrant Agreement*" means that certain agreement setting forth the full terms and conditions of the New Series A Warrants, the form of which shall be included in the Plan Supplement and be in form and substance consistent with the PSA Definitive Document Requirements.

200.   "*New Series A Warrants*" means warrants issued pursuant to the Plan and the New Series A Warrant Agreement and consistent with the terms set forth in the New Warrants Term Sheet.

201.   "*New Series B Warrant Agreement*" means that certain agreement setting forth the full terms and conditions of the New Series B Warrants, the form of which shall be included in the Plan Supplement and be in form and substance consistent with the PSA Definitive Document Requirements.

202.   "*New Series B Warrants*" means those certain warrants issued pursuant to the Plan and the New Series B Warrant Agreement and consistent with the terms set forth in the New Warrants Term Sheet.

203.   "*New Term Loans*" means, those certain secured term loan facilities, if applicable, constituting part of the Reorganized Debtors' New Capital Structure, which may be funded on the Effective Date pursuant to the Plan and the New Debt Documents.

204.   "*New Warrants*" means, collectively, the New Series A Warrants and the New Series B Warrants.

16

205.    "*New Warrants Agreements*" means, collectively the New Series A Warrant Agreement and the New Series B Warrant Agreement.

206.    "*New Warrants Term Sheet*" means that certain term sheet setting forth certain terms of the New Warrants.

207.    "*Non-Debtor Intercompany Claim*" means any Claim held by a non-Debtor Affiliate of the Debtors against a Debtor.

208.    "*Non-TopCo Debtors*" means all Debtors other than Intelsat and/or Holdings SARL.

209.    "*Non-TopCo Plan*" means this joint plan of reorganization (together with the documents comprising the Plan Supplement) solely as to the Non-TopCo Debtors.

210.    "*Notes*" means, collectively, the First Lien Notes and the Senior Notes.

211.    "*Notes Claims*" means, collectively, the Connect Senior Notes Claims, the Convertible Senior Notes Claims, the First Lien Notes Claims, the Jackson Senior Notes Claims, and the Lux Senior Notes Claims.

212.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

213.    "*Other Secured Claim*" means any Secured Claim, other than a DIP Claim and a First Lien Claim.

214.    "*PBGC*" means the Pension Benefit Guaranty Corporation.

215.    "*Pension Plan*" means the Staff Retirement Plan as defined in the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Prepetition Wages, Compensation, and Benefit Obligations and (II) Continue Employee Compensation and Benefits Programs, and (B) Granting Related Relief* [Docket No. 9].

216.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

217.    "*Petition Date*" means May 13, 2020.

218.    "*Plan Supplement*" means the compilation of documents and forms and/or term sheets of documents, agreements, schedules, and exhibits to the Plan that will be Filed by the Debtors with the Bankruptcy Court, each of which shall be consistent in all respects with the PSA Definitive Document Requirements.

219.    "*Plan Support Agreement*" means that certain plan support agreement, dated as of August 24, 2021 (as may be further amended, supplemented or modified pursuant to the terms thereof), by and among the Company Parties and the Consenting Creditors.

220.    "*Plan Toggle Event*" means a determination either by (i) the Bankruptcy Court or (ii) the Debtors and the Required Consenting Unsecured Creditors that Confirmation cannot be achieved solely as to either of the TopCo Debtors.

87.    "*Prepetition Collateral Agency and Intercreditor Agreement*" means that certain collateral agency and intercreditor agreement, dated January 12, 2011 (as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time) by and among Wilmington Trust, National Association, as collateral trustee, Bank of America, N.A., as first lien agent, each Indenture Trustee, as first lien representatives, and the other parties from time to time party thereto.

221.    "*Prepetition Collateral Trustee*" means, Wilmington Trust, National Association, in its capacity as collateral trustee under the applicable Prepetition First Lien Debt Documents.

17

222.    "*Prepetition First Lien Debt Documents*" means (i) the First Lien Credit Agreement and any amendments, modifications, or supplements thereto, including all Credit Documents (as defined therein, including the Prepetition Collateral Agency and Intercreditor Agreement) as well as any all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection therewith; and (ii) the First Lien Notes Indentures and any amendments, modifications, or supplements thereto including all Credit Documents (as defined therein, including the Prepetition Collateral Agency and Intercreditor Agreement), as well as any all agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) delivered or executed in connection therewith.

223.    "*Prepetition Secured Parties*" means, collectively, the First Lien Lenders and the First Lien Noteholders.

224.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

225.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class or the proportion of the Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, unless otherwise indicated.

226.    "*Professional*" means an Entity:  (a) retained in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

227.    "*Professional Fee Claims*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Confirmation Date that the Bankruptcy Court has not denied by Final Order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

228.    "*Professional Fee Escrow Account*" means an interest-bearing account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Professional Fee Escrow Amount.

229.    "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.C of the Plan.

230.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases by the applicable Claims Bar Date.

231.    "*Proof of Interest*" means a proof of Interest filed in any of the Debtors in the Chapter 11 Cases.

232.    "*PSA Definitive Document Requirements*" means that the Definitive Documents shall be subject to the respective consent rights of the Debtors and the applicable Consenting Creditors as set forth in the Plan Support Agreement.

233.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

234.    "*Rejected Executory Contract and Unexpired Lease List*" means the list as determined by the Debtors or the Reorganized Debtors, as applicable, of certain Executory Contracts and Unexpired Leases to be rejected

18

by the Reorganized Debtors pursuant to the Plan, which list, as may be amended from time to time, shall be included in the Plan Supplement.

235.   "*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or special committee member or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

236.   "*Released Parties*" means collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the First Lien Lenders; (d) each of the First Lien Noteholders; (e) the First Lien Agent; (f) each Indenture Trustee; (g) the Prepetition Collateral Trustee; (h) the DIP Agent; (i) each of the DIP Lenders; (j) the Jackson Ad Hoc Group, and each member thereof; (k) the HoldCo Creditor Ad Hoc Group, and each member thereof; (l) the Jackson First Lien Noteholder Group and each member thereof; (m) the Jackson Crossover Ad Hoc Group, and each member thereof; (n) each Consenting Creditor; (o) each Backstop Party; (p) each current and former Affiliate of each Entity in clause (a) through the following clause (q); and (q) each Related Party of each Entity in clause (a) through this clause (q); *provided* that any Holder of a Claim or Interest that opts out of the releases shall not be a "Released Party."

237.   "*Releasing Parties*" means, collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the First Lien Lenders; (d) each of the First Lien Noteholders; (e) the First Lien Agent; (f) each Indenture Trustee; (g) the Prepetition Collateral Trustee; (h) the DIP Agent; (i) each of the DIP Lenders; (j) the Jackson Ad Hoc Group, and each member thereof; (k) the HoldCo Creditor Ad Hoc Group, and each member thereof; (l) the Jackson First Lien Noteholder Group and each member thereof; (m) the Jackson Crossover Ad Hoc Group, and each member thereof; (n) each Consenting Creditor; (o) each Backstop Party; (p) all Holders of Impaired Claims who voted to accept the Plan; (q) all Holders of Impaired Claims who abstained from voting on the Plan or voted to reject the Plan; (r) all Holders of Unimpaired Claims; (s) all Holders of Interests; (t) each current and former Affiliate of each Entity in clause (a) through the following clause (u); and (u) each Related Party of each Entity in clause (a) through this clause (u); *provided* that an Entity shall not be a Releasing Party if, in the cases of clauses (q) through (s) and each current and former Affiliates thereof, such Entity elects to opt out of the releases contained in the Plan or timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order.

238.   "*Reorganized Debtor*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including the Equity Issuer, other than the TopCo Debtors upon Consummation of the Non-TopCo Plan.

239.   "*Reorganized S.A.*" means, in a scenario where the Plan is confirmed for Intelsat, collectively Intelsat or any successor or assign, by merger, consolidation, reorganization, or otherwise on or after the Effective Date.

240.   "*Reorganized S.A. Common Stock*" means, in a scenario where the Plan is confirmed for Intelsat, the common stock of Reorganized S.A. to be issued upon the Effective Date for Debtor Intelsat in accordance with the Restructuring Steps Memorandum.

241.   "*Required Consenting Creditors*" has the meaning set forth in the Plan Support Agreement.

242.   "*Required Consenting First Lien Creditors*" has the meaning set forth in the Plan Support Agreement.

243.   "*Required Consenting First Lien Noteholders*" has the meaning set forth in the Plan Support Agreement.

244.   "*Required Consenting HoldCo Creditors*" has the meaning set forth in the Plan Support Agreement.

245.   "*Required Consenting Jackson Ad Hoc Group Noteholders*" has the meaning set forth in the Plan Support Agreement.

246.   "*Required Consenting Jackson Crossover Group Members*" has the meaning set forth in the Plan Support Agreement.

247.   "*Required Consenting Unsecured Creditors*" has the meaning set forth in the Plan Support Agreement.

248.   "*Restructuring Expenses*" means, collectively, the reasonable and documented fees and expenses, whether incurred before, on, or after the Effective Date, of (a) the Jackson Ad Hoc Group (including all fees and expenses of Akin Gump Strauss Hauer & Feld LLP (including, for an avoidance of doubt, whether incurred before, on, or after the Effective Date, all fees and expenses related to any Secured Creditor Claims Litigation and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation) and Centerview Partners), the First Lien Noteholders Group (including all fees and expenses of Wilmer Cutler Pickering Hale and Dorr, LLP (including, for an avoidance of doubt, whether incurred before, on, or after the Effective Date, all fees and expenses related to any Secured Creditor Claims Litigation and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation)), (b) the Jackson Crossover Ad Hoc Group (including all fees and expenses of the Jackson Crossover Ad Hoc Group Advisors (including, for the avoidance of doubt, whether incurred before, on, or after the Effective Date, (x) all fees and expenses related to any Secured Creditor Claims Litigation, and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation, or the Guarantee Claims, and (y) fees and expenses set forth in the Houlihan Engagement Letter)), (c) the HoldCo Creditor Ad Hoc Group (including all fees and expenses of the HoldCo Creditor Ad Hoc Group Advisors), and (d) the professionals to be paid by the Company Parties pursuant to the Plan Support Agreement or as adequate protection pursuant to the DIP Order.

249.   "*Restructuring Steps Memorandum*" means the summary of transaction steps to complete the restructuring contemplated by the Plan, which shall be included in the Plan Supplement and shall be in form and substance consistent with the PSA Definitive Document Requirements.

250.   "*Restructuring Transactions*" means the transactions described in Article IV of the Plan; *provided*, that such transactions shall be in form and substance consistent with the PSA Definitive Document Requirements.

251.   "*Retiree Medical Plans*" means, collectively, (a) that certain medical plan provided by the Debtors for the benefit of certain of their retired former employees pursuant to medical plan documents adopted by the Debtors and (b) that certain medical plan provided by the Debtors for the benefit of certain of their retired former employees pursuant to a consent decree in *Morales et al. v. Intelsat Global Service Corp.*, 04-cv-1044 (D. D.C.).

252.   "*S.A. Unsecured Recovery*" means (i) any remaining Cash at Intelsat, (ii) $37.5 million in Cash from the proceeds of the New Debt, in each case subject to the payment of Restructuring Expenses and funding of the Professional Fee Escrow Account for the payment of Professional Fee Claims allocated in accordance with this Plan, and (iii) 6.252 percent (6.252%) of the New Series B Warrants, *provided* that the New Series B Warrants issued in respect of (iii) shall be subject to dilution pursuant to the Dilution Principles; and (iv) 100 percent (100%) of the Reorganized S.A. Common Stock.  For the avoidance of doubt, (a) the S.A. Unsecured Recovery incorporates any value that would have been received by Intelsat attributable to any and all Intercompany Claims, including any Intercompany Senior Notes Claims, as if such Intercompany Claim was settled and (b) Holders of Intercompany Claims shall not receive any distribution from the S.A. Unsecured Recovery.

253.   "*SEC*" means the United States Securities and Exchange Commission.

20

254.     "*Secured Claim*" means a Claim:  (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

255.     "*Secured Creditor Claims Disputed Distribution Amount*" means (i) 100 percent (100%) of the aggregate amount of the premium and/or makewhole amounts that the First Lien Noteholders Group, the Jackson Ad Hoc Group, or the First Lien Notes Trustee claim became payable under the 8.00% First Lien Notes Indenture and the 9.50% First Lien Notes Indenture as of the Petition Date, along with interest thereon at the contractual rate from the Petition Date through and including the Effective Date; *provided, however*, that amounts in the Secured Creditor Claims Disputed Distribution Reserve shall continue to accrue interest at the contractual rate under the applicable debt instruments (with such contractual interest to be deposited by the Reorganized Debtors into such reserve in periodic intervals following the Effective Date) until paid in accordance with any Final Order, *provided* that any accrual of interest in respect of the Secured Creditor Claims Disputed Distribution Reserve, or deposit of such interest therein, shall not be an admission, finding or decision as to the appropriate interest rate in respect thereof, and all parties' rights are expressly reserved and preserved in connection therewith; *provided, however,* the Debtors and Reorganized Debtors shall support the Secured Creditor Settlement, as otherwise provided in the Plan and the Plan Support Agreement; *provided*, *further*, *however*, for the avoidance of doubt, no payments in connection with the Secured Creditor Settlement shall be made out of the deposit accounts of the HoldCos.

256.     "*Secured Creditor Claims Disputed Distribution Reserve*" means, in the event the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date, as determined by the Debtors or Reorganized Debtors with the consent (not to be unreasonably withheld) of the Required Consenting Jackson Crossover Group Members, the Required Consenting Jackson Ad Hoc Group Noteholders, and the Required Consenting First Lien Noteholders, either (a) a reserve that shall be established on the Effective Date or (b) the Secured Creditor Claims Disputed Distribution Trust Account that shall be established on the Effective Date, in each case funded by the Debtors with Cash in the amount of the Secured Creditor Claims Disputed Distribution Amount.

257.     "*Secured Creditor Claims Disputed Distribution Trust Account*" means an interest-bearing account funded by the Debtors with Cash on or before the Effective Date in an amount equal to the Secured Creditor Claims Disputed Distribution Amount, which shall be maintained in trust solely for the Holders of First Lien Notes Claims and for no other Entities until any Claims Allowed (or required to be paid so that all Allowed Claims of the First Lien Notes are Unimpaired) pursuant to a Final Order entered with respect to the Secured Creditor Claims Litigation have been irrevocably paid in full to the Holders of First Lien Notes Claims; *provided* that other than as set forth in the Plan, no Liens, claims, or interests shall encumber the Secured Creditor Claims Disputed Distribution Trust Account or Cash held in the Secured Creditor Claims Disputed Distribution Trust Account in any way.  Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

258.     "*Secured Creditor Claims Litigation*" means any litigation or proceeding (including, without limitation, any contested matter or adversary proceeding), brought by the Jackson Crossover Ad Hoc Group, the Creditors' Committee, or any other party in interest (other than the Debtors) challenging the Allowance or treatment of, or asserting challenge to the First Lien Notes Claims Settlement, the 8.00% First Lien Notes Claims, and/or the 9.50% First Lien Notes Claims, or any portion thereof relating to any premium or makewhole amount or interest thereon, (it being understood and agreed that the full amount of principal and all accrued but unpaid interest at the applicable contract rates on the First Lien Notes are, in all circumstances, Allowed and not subject to any dispute and shall be paid in full in Cash on the Effective Date), including the *Objection of the Official Committee of Unsecured Creditors to Jackson Secured Creditors' Claims to Make-Whole Premiums and Postpetition Interest at Default Rate* [Docket No. 1476].

259.     "*Secured Creditor Settlement*" means that certain compromise and settlement by and among the Debtors and certain Prepetition Secured Parties consisting of the First Lien Notes Claims Settlement and the Term Loan Facility Claims Settlement as set forth in the Secured Creditor Settlement Term Sheet.

260.     "*Secured Creditor Settlement Motion*" means the motion to be filed by the Debtors with the Bankruptcy Court seeking approval of the First Lien Notes Claims Settlement pursuant to Bankruptcy Rule 9019, which motion shall be heard at the Confirmation Hearing.

21

261.    "*Secured Creditor Settlement Order*" means an order of the Bankruptcy Court that has not been stayed approving the relief requested in the Secured Creditor Settlement Motion, which order shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting First Lien Creditors.  For the avoidance of doubt, the Secured Creditor Settlement Order shall not be the Confirmation Order.

262.    "*Secured Creditor Settlement Term Sheet*" means that certain term sheet, attached to the Plan Support Agreement, setting forth certain terms and conditions of the Secured Creditor Settlement.

263.    "*Secured Tax Claim*" means any Secured Claim that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

264.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, or any similar federal, state, or local law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

265.    "*Security*" has the meaning set forth in section 2(a)(1) of the Securities Act.

266.    "*Senior Notes*" means, collectively, the:  (i) Jackson Senior Notes; (ii) Lux Senior Notes; (iii) Connect Senior Notes; and (iv) Convertible Senior Notes.

267.    "*Senior Notes Claim*" means any Claim arising under the Senior Notes Indentures.

268.    "*Senior Notes Indenture Trustees*" means, collectively, the 2021 and 2023 Lux Senior Notes Trustee, the Connect Senior Notes Trustee, the 2023 Jackson Senior Notes Trustee, the 2024 Jackson Senior Notes Trustee, the 2024 Lux Senior Notes Trustee, the 2025 Jackson Senior Notes Trustee, and the Convertible Senior Notes Trustee.

269.    "*Senior Notes Indentures*" means, collectively, the: (i) Jackson Senior Notes Indentures; (ii) Lux Senior Notes Indentures; (iii) Connect Senior Notes Indenture; and (iv) Convertible Senior Notes Indenture.

270.    "*Series A CVR Agreement*" means that certain agreement setting forth the full terms and conditions of the Series A CVRs, the form of which shall be included in the Plan Supplement, consistent with the terms set forth in the CVR Term Sheet, and in form and substance consistent with the PSA Definitive Document Requirements.

271.    "*Series A CVRs*" means those certain contingent value rights issued pursuant to the Plan and the Series A CVR Agreement and consistent with the terms set forth in the CVR Term Sheet.

272.    "*Series B CVR Agreement*" means that certain agreement setting forth the full terms and conditions of the Series B CVRs, the form of which shall be included in the Plan Supplement, consistent with the terms set forth in the CVR Term Sheet, and in form and substance consistent with the PSA Definitive Document Requirements.

273.    "*Series B CVRs*" means those certain contingent value rights issued pursuant to the Plan and the Series B CVR Agreement and consistent with the terms set forth in the CVR Term Sheet.

274.    "*Settlement*" means the compromise and settlement by and among the Debtors, as reflected in the Settlement Agreement, of:  (a) the Debtor Intercompany Claims, including, the Historic Intercompany Transaction Claims, the 2018 Reorganization Claims and the Accelerated Relocation Payment Claims (including, without limitation, any claims with respect to which Debtor or Reorganized Debtor is entitled to receive any payments pursuant to the C-Band Order); (b) Claims and Causes of Action against any of the Debtors' directors, managers, or officers, and other related Entities; and (c) the covenants and actions required of each party thereto to support the foregoing and to effectuate the Restructuring Transactions in a manner that maximizes tax asset value (but in all events consistent with this Plan (or the Non TopCo Plan, as applicable) and the exhibits to the Plan Support Agreement (including the Corporate Governance Term Sheet)).

275.    "*Settlement Agreement*" means that certain settlement agreement by and among the Debtors reflecting the Settlement, which will be filed in the Plan Supplement, and as approved by the Settlement Order, which agreement shall be in form and substance consistent with the PSA Definitive Document Requirements and, for the avoidance of doubt, shall not modify the treatment of Claims and Interests set forth in the Plan (or the Non-TopCo Plan, as applicable) and the approval of which (by entry of the Settlement Order) shall be a condition precedent to Confirmation of the Plan (or the Non-TopCo Plan, as applicable), unless such condition has been waived pursuant to Article IX.C.

276.    "*Settlement Order*" means either an order of the Bankruptcy Court that is not stayed approving the Settlement Agreement pursuant to Bankruptcy Rule 9019 or the Confirmation Order, approving the Settlement Agreement pursuant to Bankruptcy Rule 9019, which order shall be in form and substance consistent with the PSA Definitive Document Requirements and, for the avoidance of doubt, shall not modify the treatment of Claims and Interests set forth in the Plan and the entry of which shall be a condition precedent to Confirmation of the Plan (or the Non-TopCo Plan, as applicable), unless such condition has been waived pursuant to Article IX.C.

277.    "*Shareholders Agreement*" has the meaning set forth in the Corporate Governance Term Sheet.

278.    "*Solicitation Agent*" means Bankruptcy Management Solutions, Inc. d/b/a Stretto, the notice, claims, and solicitation agent retained by the Debtors for the Chapter 11 Cases.

279.    "*Solicitation Materials*" means the ballots, provisional ballots, and other related materials drafted in connection with the solicitation of acceptances of the Plan, including, if applicable, a letter from the Creditors' Committee in support of the Plan.

280.    "*Special Meeting*" means any annual, extraordinary or other general meeting of the shareholders (or equivalent meeting or convention of equity- or securityholders) of Intelsat or any of its Affiliates to, among other things, (i) authorize additional share capital as may be necessary or advisable to effectuate the Restructuring Transactions; (ii) authorize or amend the New Corporate Governance Documents, their predecessor documents, or similar governing document of Intelsat or any of its Affiliates as may be necessary or advisable to effectuate the Restructuring Transactions; (iii) accept the resignation of existing directors; (iv) elect new directors as set forth in the Corporate Governance Term Sheet; or (v) approve any other proposals that the Debtors deem necessary or advisable in connection therewith or otherwise in order to effectuate the Restructuring Transactions.

281.    "*Taxes*" means any and all U.S. federal, state or local, or foreign, income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever (including any assessment, duty, fee or other charge in the nature of or in lieu of any such tax) and any interest, penalty, or addition thereto, whether disputed or not, imposed on the Debtors or Reorganized Debtors, as applicable, resulting from the Restructuring Transactions.

282.    "*Term Loan Facility*" means that certain prepetition first lien term loan facility provided for under the First Lien Credit Agreement.

283.    "*Term Loan Facility Claim*" means any Claim arising under the Term Loan Facility and the First Lien Credit Agreement.

284.    "*Term Loan Facility Claims Settlement*" means the compromise and settlement regarding the allowance and treatment of the Term Loan Facility Claims set forth in the Secured Creditor Settlement Term Sheet.

285.    "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article VIII.E of the Plan.

286.    "*TopCo Debtors*" means Intelsat and/or Holdings SARL, as applicable.

23

287.    "*TopCo Guarantee Claims*" means the claims asserted against the TopCo Guarantors in the proofs of claim filed in the Chapter 11 Cases by the Trustees for the Jackson Senior Notes and the Trustees for the Lux Senior Notes (including proofs of claim numbered 551, 552, 583, 584, 615, 616, 785, 788, 793, 794, 902, 903, 907, 910 and any pleading filed with the Bankruptcy Court in connection therewith).

288.    "*TopCo Guarantors*" means, together, Holdings SARL and Intelsat, each in its capacity as guarantor under the applicable Senior Notes Indentures.

289.    "*Tranche B-3 Term Loans*" has the meaning set forth in the DIP Order.

290.    "*Tranche B-4 Term Loans*" has the meaning set forth in the DIP Order.

291.    "*Tranche B-5 Term Loans*" has the meaning set forth in the DIP Order.

292.    "*Transfer Agreement*" means an executed form of the transfer agreement providing among other things, that a transferee is bound by the terms of the Plan Support Agreement.

293.    "*U.S. Trustee*" means the Office of the United States Trustee for the Eastern District of Virginia.

294.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

295.    "*Unimpaired*" means a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

296.    "*Unsecured Claim*" means any Claim that is not an Administrative Claim, DIP Claim, Secured Claim, Secured Tax Claim, Other Secured Claim, Priority Tax Claim, Other Priority Claim, Intercompany Claim, Guarantee Claim, or Intercompany Senior Notes Claim.

297.    "*Value Allocation*" means that certain allocation of value among each Jackson Debtor set forth in <u>Exhibit A</u>, attached hereto, which may be amended, supplemented, or modified from time to time, including by order of the Bankruptcy Court in connection with Confirmation or otherwise.

B.      *Rules of Interpretation*

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) except as otherwise provided in the Plan, any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan or the Confirmation Order, as applicable; (c) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan; (d) unless otherwise stated herein, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (f) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (g) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (h) any capitalized term used herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (i) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (j) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (k) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; and (l) any effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Reorganized Debtors in their sole

discretion in a manner consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### C.        *Computation of Time*

Unless otherwise specifically stated in the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed in the Plan.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

### D.        *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

### E.        *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided herein.

### F.        *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

### G.        *Controlling Documents*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control.  In the event of any inconsistency between any of the Plan, Plan Supplement, or the Disclosure Statement on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

### H.        *Consent Rights*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the Plan Support Agreement set forth in the Plan Support Agreement with respect to the form and substance of this Plan, the Definitive Documents, all exhibits to the Plan and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents and to the Plan Support Agreement, and any consents, waivers, or other deviations under or from any such documents and the Plan Support Agreement, shall be incorporated herein by this reference (including to the applicable definitions in Article I, Section A hereof) and be fully enforceable as if stated in full herein and, for the avoidance of doubt, the Definitive Documents shall be required to comply with the PSA Definitive Document Requirements.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan.

25

*A.      DIP Claims*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment, (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Credit Agreement and the DIP Order, and (iv) all other DIP Obligations as provided for in the DIP Credit Agreement other than Contingent DIP Obligations, which shall otherwise survive the Effective Date and shall be paid in full in Cash as soon as reasonably practicable after they become due and payable under the DIP Documents.  Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall receive on the Effective Date payment in full in Cash of such Holder's Allowed DIP Claim.  All reasonable and documented unpaid fees and expenses of the DIP Agent, including reasonable and documented fees, expenses, and costs of its advisors, shall be paid in Cash on the Effective Date.  Contemporaneously with the foregoing receipt of payment in full in Cash of the Allowed DIP Claims, except with respect to Contingent DIP Obligations under the DIP Credit Agreement (which contingent obligations shall survive the Effective Date and shall continue to be governed by the DIP Credit Agreement), the DIP Facility, the DIP Credit Agreement, and all related loan documents shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders.  The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.  For the avoidance of doubt, no DIP Claims shall be paid out of the deposit accounts of the HoldCos.

*B.      Administrative Claims*

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, or as otherwise set forth in an order of the Bankruptcy Court (including pursuant to the procedures specified therein), as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than ninety days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

*C.      Professional Fee Claims*

**1.      Professional Fee Escrow Account**

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow

Account in any way.  Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## 2.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than forty-five (45) days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The amount of the Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

Following the Effective Date, the Disinterested Directors and Managers shall retain authority solely with respect to matters related to Professional Fee Claim requests by Professionals acting at their direction in accordance with the terms of the Plan.  Further, the Disinterested Directors and Managers, in such capacity, shall not have any of their respective privileged and confidential documents, communications or information transferred (or deemed transferred) to the Reorganized Debtors.

The funding of the Professional Fee Escrow Amount for Allowed Professional Fee Claims and the payment of any unpaid Restructuring Expenses shall be paid from the Cash on hand at the Debtors on the Effective Date.

The HoldCos shall fund the Professional Fee Escrow Account for the estimated remaining aggregate Professional Fee Claims and shall pay Restructuring Expenses according to the following allocation (the "HoldCo Allocation"):

- one hundred percent (100%) of Allowed Professional Fee Claims for Professionals (i) retained by the HoldCos' Disinterested Directors and Managers, and (ii) retained by the Debtors exclusively for the benefit of the HoldCos; provided, that such Allowed Professional Fee Claims shall be paid (a) first from any Cash on hand on the Effective Date of the HoldCos (x) that retained such professional or (y) for whose exclusive benefit such Professional was retained, (b) second, to the extent of any remaining unsatisfied Allowed Professional Fee Claims, from any Cash on hand on the Effective Date of any other HoldCo that was a co-obligor of the HoldCo Senior Notes issued by the HoldCos (x) that retained such professionals or (y) for whose exclusive benefit such Professional was retained, and (c) third, to the extent of any remaining unsatisfied Allowed Professional Fee Claims, pro rata from the Cash on hand on the Effective Date of any other HoldCos;

- one hundred percent (100%) of the Restructuring Expenses of the HoldCo Creditor Ad Hoc Group; provided that such expenses shall be paid pro rata from Cash on hand on the Effective Date at Envision and ICF; and

- twenty-three percent (23%) of (i) Allowed Professional Fee Claims for Professionals retained by the Debtors (other than (1) Allowed Professional Fee Claims allocated pursuant to the previous two bullets or (2) any Professionals for which the Jackson Debtors are solely responsible for payment), and (ii) Allowed Professional Fee Claims for professionals retained by the Committee; provided that such expenses shall be paid pro rata from Cash on hand on the Effective Date of the HoldCos.

27

For purposes of determining any "pro rata" payment of Allowed Professional Fee Claims and Restructuring Expenses from Cash on hand at the HoldCos on the Effective Date, (i) payment shall be allocated based on the amount of Cash on hand at each applicable HoldCo on the Effective Date and (ii) such Cash on the Effective Date shall include, in the case of Intelsat, LuxCo, Envision, and ICF, as applicable, the proceeds of the New Debt provided for in the S.A. Unsecured Recovery, LuxCo Unsecured Recovery, Envision Unsecured Recovery, and ICF Unsecured Recovery, respectively (if any).  For example, if Envision has $10, ICF has $5, and Intelsat has $5, then Envision's pro rata share shall be 50%, ICF's pro rata share shall be 25% and Intelsat's *pro rata* share shall be 25%.  For the avoidance of doubt, no other professional fees and expenses shall be paid from Cash on hand at the HoldCos.

For the avoidance of doubt, if one HoldCo (the "Payor") pays or otherwise satisfies the Professional Fee Claims of another HoldCo (the "Obligor") pursuant to this HoldCo Allocation (such payment or other satisfaction, the "Allocation Payment"), the Payor shall not be entitled to seek contribution, indemnification, subrogation, or to otherwise assert a Claim against the Obligor on account of such Allocation Payment.

Jackson shall fund the Professional Fee Escrow Account for the estimated remaining aggregate Professional Fee Claims and shall pay Restructuring Expenses according to the following allocation:

- one hundred percent (100%) of Allowed Professional Fee Claims for Professionals (i) retained by the Jackson Debtors' Disinterested Directors and Managers, and (ii) retained by the Debtors exclusively for the benefit of the Jackson Debtors;

- one hundred percent (100%) of the Restructuring Expenses of the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, and the Jackson First Lien Noteholder Group; and

- seventy-seven percent (77%) of (i) Allowed Professional Fee Claims for Professionals retained by the Debtors (other than (1) Allowed Professional Fee Claims allocated pursuant to the previous two bullets or (2) any Professionals for which the HoldCos are solely responsible for payment) and (ii) Allowed Professional Fee Claims for professionals retained by the Committee.

For the avoidance of doubt, the allocation set forth in the foregoing clauses in Article II.C.2. of the Plan shall apply to any Professional Fee Claims and Restructuring Expenses incurred during the Chapter 11 Cases through the Effective Date.  To the extent any Professional Fee Claims or Restructuring Expenses paid during the Chapter 11 Cases does not comply with the foregoing allocation, then there shall be a proportional rebalancing of Cash on hand between the applicable Debtors, so that the aggregate Professional Fee Claims and Restructuring Expenses paid during the Chapter 11 Cases match the foregoing allocation.

Notwithstanding the foregoing allocations, solely to the extent any fees and expenses of the Convert Ad Hoc Group are required to be paid by a Final Order, such fees and expenses shall be paid (i) first from Cash on hand at Intelsat on the Effective Date (including the $37.5 million included in the S.A. Unsecured Recovery), and (ii) second, to the extent of any remaining amounts, (a) one-hundred percent (100%) by the HoldCos for such remaining fees and expenses incurred on or prior to June 30, 2021, and (b) fifty percent (50%) by the HoldCos and fifty percent (50%) by Jackson for such remaining fees and expenses incurred after June 30, 2021.

3.      **Professional Fee Escrow Amount**

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than ten days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors shall estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtors shall use Cash on hand to increase the

28

amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

    **4.**    **Post-Confirmation Date Fees and Expenses.**

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable, consistent with the allocation set forth in Article II.C.2. of the Plan.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable, as well as all reasonable and documented fees and expenses of the Consenting Creditors, in accordance with the terms and conditions of the Plan Support Agreement.  If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

*D.*    *Priority Tax Claims*

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each Holder of an Allowed Priority Tax Claim will, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) receive Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) otherwise be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

*A.*    *Classification of Claims and Interests*

This Plan constitutes a single Plan for all of the Debtors.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

29

The following represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

1.      **Class Identification for Other Claims or Interests**

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against, and Interests in, the Debtors pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| A1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| A2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| A3 | Debtor Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| A4 | Non-Debtor Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| A5 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| A6 | Term Loan Facility Claims | Impaired | Entitled to Vote |
| A7 | 8.00% First Lien Notes Claims | Impaired | Entitled to Vote |
| A8 | 9.50% First Lien Notes Claims | Impaired | Entitled to Vote |

2.      **Class Identification for Jackson**

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against Jackson pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| B1 | Unsecured Claims | Impaired | Entitled to Vote |

3.      **Class Identification for Jackson Subsidiaries**

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against Jackson Subsidiaries pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| C1 | Unsecured Claims | Impaired | Entitled to Vote |

4.      **Class Identification for ICF**

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against ICF pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| D1 | Unsecured Claims | Impaired | Entitled to Vote |

**5.** **Class Identification for Envision**

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against Envision pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| E1 | Unsecured Claims | Impaired | Entitled to Vote |

**6.** **Class Identification for LuxCo**

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against LuxCo pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| F1 | Unsecured Claims | Impaired | Entitled to Vote |

**7.** **Class Identification for Investments**

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against Investments pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| G1 | Unsecured Claims | Impaired | Entitled to Vote |

**8.** **Class Identification for Holdings**

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against Holdings pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| H1 | Unsecured Claims | Impaired | Entitled to Vote |

**9.** **Class Identification for Holdings SARL**

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against Holdings SARL pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| I1 | Unsecured Claims | Impaired | Entitled to Vote |
| I2 | TopCo Guarantee Claims | Impaired | Entitled to Vote |

**10.** **Class Identification for Intelsat**

Subject to Article III.D of the Plan, the following chart represents the classification of certain Claims against, and Interests in, Intelsat pursuant to the Plan.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| J1 | Unsecured Claims | Impaired | Entitled to Vote |

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| J2 | TopCo Guarantee Claims | Impaired | Entitled to Vote |
| J3 | Intelsat Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Classes of Claims and Interests*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

**Other Claims**

1.      **Class A1 — Other Secured Claims**

(a)      *Classification*:  Class A1 consists of any Other Secured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s) (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either:

(i)      payment in full in Cash;

(ii)      delivery of collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

(iii)      Reinstatement of such Allowed Other Secured Claim; or

(iv)      such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class A1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.      **Class A2 — Other Priority Claims**

(a)      *Classification*:  Class A2 consists of any Other Priority Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s) (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either:

(i)      payment in full in Cash; or

32

(ii)    such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class A2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    **Class A3 — Debtor Intercompany Claims**

(a)    *Classification*:  Class A3 consists of any Debtor Intercompany Claims.

(b)    *Treatment*:  Each Allowed Debtor Intercompany Claim shall, at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either on or after the Effective Date, be:

(ii)    Reinstated; or

(iii)   distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), without any distribution on account of such Claims.

(c)    *Voting*:  Subject to the terms of the Settlement Agreement and the Settlement Order, Holders of Allowed Debtor Intercompany Claims are either Unimpaired and are conclusively presumed to have accepted the Plan under section 1126(f) or Impaired and are conclusively presumed to have rejected the Plan pursuant to section 1126(g).  Holders of Allowed Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

4.    **Class A4 — Non-Debtor Intercompany Claims**

(a)    *Classification*:  Class A4 consists of any Non-Debtor Intercompany Claims.

(b)    *Treatment*:  Subject to the terms of the Settlement Agreement and the Settlement Order, except to the extent otherwise provided in the Restructuring Steps Memorandum or the Plan, each Allowed Non-Debtor Intercompany Claim shall, at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either on or after the Effective Date, be:

(i)    Reinstated; or

(ii)   distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), without any distribution on account of such Claims.

(c)    *Voting*:  Holders of Allowed Non-Debtor Intercompany Claims are either Unimpaired and are conclusively presumed to have accepted the Plan under section 1126(f) or Impaired and are conclusively presumed to have rejected the Plan pursuant to section 1126(g).  Holders

33

of Allowed Non-Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

5.     **Class A5 — Intercompany Interests**

(a)     *Classification*:  Class A5 consists of any Intercompany Interests.

(b)     *Treatment*:   Except to the extent otherwise provided in the Restructuring Steps Memorandum, on the Effective Date, Intercompany Interests shall, at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Consenting HoldCo Creditors), either be:

   (i)     Reinstated; or

   (ii)     discharged, cancelled, released, and extinguished and of no further force or effect without any distribution on account of such Interests.

(c)     *Voting*:  Holders of Allowed Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject the Plan.

6.     **Class A6 — Term Loan Facility Claims**

(a)     *Classification*:  Class A6 consists of any Term Loan Facility Claims.

(b)     *Allowance*:  Term Loan Facility Claims shall be Allowed against all of the obligors and guarantors under the Term Loan Facility in accordance with the Term Loan Facility Claims Settlement.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Term Loan Facility Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Term Loan Facility Claim, each Holder of an Allowed Term Loan Facility Claim shall receive payment in full in Cash as compromised in accordance with the Term Loan Facility Claims Settlement; *provided, however*, for the avoidance of doubt, no distributions to Holders of Allowed Term Loan Facility Claims shall be made out of the deposit accounts of the HoldCos.

(d)     *Voting*:  Class A6 is Impaired under the Plan.  Holders of Allowed Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

7.     **Class A7 — 8.00% First Lien Notes Claims**

(a)     *Classification*:  Class A7 consists of any 8.00% First Lien Notes Claims.

(b)     *Allowance*:  8.00% First Lien Notes Claims shall be Allowed against all of the obligors and guarantors under the 8.00% First Lien Notes Indenture (x) in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect and (y) in the event the Secured Creditor Settlement Order has not been entered or does not remain in effect, in an amount equal to:  (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through and including the Effective Date at the contractual rate; and (iii) such additional amounts as may be determined in a Final Order sufficient to render the 8.00% First Lien Notes Claims Unimpaired.  For the avoidance of doubt, in the event that the Secured Creditor Settlement

34

Order has not been entered or does not remain in effect, the 8.00% First Lien Notes Claims shall be treated as Unimpaired and Holders of 8.00% First Lien Notes Claims shall not be bound by the Secured Creditor Settlement and shall be entitled to seek allowance in full of their 8.00% First Lien Notes Claims in an amount sufficient to render the 8.00% First Lien Notes Claims Unimpaired, including to seek interest (at the contractual rate) on, or as part of, such Claims until such Claims are paid in full, and all parties' rights are reserved in connection with any such litigation.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed 8.00% First Lien Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 8.00% First Lien Notes Claim, each Holder of an Allowed 8.00% First Lien Notes Claim shall receive payment in full in Cash of its Pro Rata share of (x) the full amount of all 8.00% First Lien Notes Claims as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; *provided, however*, that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the Holders of Allowed 8.00% First Lien Notes Claims as Unimpaired and the Holders of Allowed 8.00% First Lien Notes Claims shall receive payment in full, in Cash of:  (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including any premium or makewhole amounts and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render the 8.00% First Lien Notes Claims Unimpaired (and, for the avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the 8.00% First Lien Notes Claims Unimpaired shall be expressly reserved and preserved), with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; *provided, further, however*, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; *provided, further, however*, for the avoidance of doubt, no distributions to Holders of Allowed 8.00% First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos.

(d)     *Voting*:  Class A7 is Impaired under the Plan.  Holders of Allowed 8.00% First Lien Notes Claims are entitled to vote to accept or reject the Plan.

**8.     Class A8 — 9.50% First Lien Notes Claims**

(a)     *Classification*:  Class A8 consists of any 9.50% First Lien Notes Claims.

(b)     *Allowance*:  9.50% First Lien Notes Claims shall be Allowed against all of the obligors and guarantors under the 9.50% First Lien Notes Indenture (x) in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect and (y) in the event the Secured Creditor Settlement Order has not been entered or does not remain in effect, in an amount equal to:  (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through and including the Effective Date at the contractual rate; and (iii) such additional amounts as may be determined in a Final Order sufficient to render the 9.50% First Lien Notes Claims

35

Unimpaired.  For the avoidance of doubt, in the event that the Secured Creditor Settlement Order has not been entered or does not remain in effect, the 9.50% First Lien Notes Claims shall be treated as Unimpaired and Holders of 9.50% First Lien Notes Claims shall not be bound by the Secured Creditor Settlement and shall be entitled to seek allowance in full of their 9.50% First Lien Notes Claims in an amount sufficient to render the 9.50% First Lien Notes Claims Unimpaired, including to seek interest (at the contractual rate) on, or as part of, such Claims until such Claims are paid in full, and all parties' rights are reserved in connection with any such litigation.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed 9.50% First Lien Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 9.50% First Lien Notes Claim, each Holder of an Allowed 9.50% First Lien Notes Claim shall receive payment in full in Cash of its Pro Rata share of (x) the full amount of all 9.50% First Lien Notes Claims as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; *provided, however*, that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the Holders of Allowed 9.50% First Lien Notes Claims as Unimpaired and the Holders of Allowed 9.50% First Lien Notes Claims shall receive payment in full, in Cash of:  (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including any premium or makewhole amounts and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render the 9.50% First Lien Notes Claims Unimpaired (and, for the avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the 9.50% First Lien Notes Claims Unimpaired shall be expressly reserved and preserved), with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; *provided, further, however*, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; *provided, further, however*, for the avoidance of doubt, no distributions to Holders of Allowed 9.50% First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos.

(d)    *Voting*:  Class A8 is Impaired under the Plan.  Holders of Allowed 9.50% First Lien Notes Claims are entitled to vote to accept or reject the Plan.

**Claims against Jackson**

9.    **Class B1 — Unsecured Claims against Jackson**

(a)    *Classification*:  Class B1 consists of any Unsecured Claims against Jackson.

(b)    *Allowance*:  Unsecured Claims against Jackson shall be Allowed in an amount which includes $7,056,881,021 on account of Jackson Senior Notes Claims.

(c)    *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Claim against Jackson agrees to less favorable treatment of its Allowed Claim, in full and final

satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Jackson, each Holder of an Allowed Unsecured Claim against Jackson shall receive its Pro Rata share of the Jackson Unsecured Recovery.

(d)   *Voting*:   Class B1 is Impaired under the Plan.  Holders of Allowed Unsecured Claims against Jackson are entitled to vote to accept or reject the Plan.

**Claims against Jackson Subsidiaries**

10.   **Class C1 — Unsecured Claims against Jackson Subsidiaries**

(a)   *Classification*:  Class C1 consists of any Unsecured Claims against Jackson Subsidiaries.

(b)   *Allowance*:  Unsecured Claims against Jackson Subsidiaries shall be Allowed in an amount which includes $7,056,881,021 on account of Jackson Senior Notes Claims.

(c)   *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Claim against Jackson Subsidiaries agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Jackson Subsidiaries, each Holder of an Allowed Unsecured Claim against Jackson Subsidiaries shall receive its Pro Rata share of the Jackson Unsecured Recovery.

(d)   *Voting*:   Class C1 is Impaired under the Plan.  Holders of Allowed Unsecured Claims against Jackson Subsidiaries are entitled to vote to accept or reject the Plan.

**Claims against ICF**

11.   **Class D1 —Unsecured Claims against ICF**

(a)   *Classification*:  Class D1 consists of any Unsecured Claims against ICF.

(b)   *Allowance*:  Unsecured Claims against ICF shall be Allowed in an amount which includes $1,298,819,444 on account of Connect Senior Notes Claims.

(c)   *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Claim against ICF agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against ICF, each Holder of an Allowed Unsecured Claim against ICF shall receive its Pro Rata share of the ICF Unsecured Recovery.

(d)   *Voting*:   Class D1 is Impaired under the Plan.  Holders of Allowed Unsecured Claims against ICF are entitled to vote to accept or reject the Plan.

**Claims against Envision**

12.   **Class E1 — Unsecured Claims against Envision**

(a)   *Classification*:  Class E1 consists of any Unsecured Claims against Envision.

(b)   *Allowance*:  Unsecured Claims against Envision shall be Allowed in an amount which includes $1,298,819,444 on account of Connect Senior Notes Claims and $409,946,250 on account of Convertible Senior Notes Claims.

(c)   *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Claim against Envision agrees to less favorable treatment of its Allowed Claim, in full and final

37

satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Envision, each Holder of an Allowed Unsecured Claim against Envision shall receive its Pro Rata share of the Envision Unsecured Recovery.

(d)     *Voting*:   Class E1 is Impaired under the Plan.   Holders of Allowed Unsecured Claims against Envision are entitled to vote to accept or reject the Plan.

## Claims against LuxCo

13.     **Class F1 — Unsecured Claims against LuxCo**

(a)     *Classification*:  Class F1 consists of any Unsecured Claims against LuxCo.

(b)     *Allowance*:   Unsecured Claims against LuxCo shall be Allowed in an amount which includes (i)(A) $435,909,013 on account of the 2021 Lux Senior Notes Claims, (B) $920,816,822 on account of the 2023 Lux Senior Notes Claims, and (C) $111,490 on account of the 2024 Lux Senior Notes Claims, and (ii) $1,298,819,444 on account of Connect Senior Notes Claims.

(c)     *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Claim against LuxCo agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against LuxCo, each Holder of an Allowed Unsecured Claim against LuxCo shall receive its Pro Rata share of the LuxCo Unsecured Recovery; *provided*, for the avoidance of doubt, that there shall be no distribution of any portion of the LuxCo Unsecured Recovery on account of (i) the Intercompany Senior Notes Claims and (ii) the Connect Senior Notes Claims, in each instance as a result of the settlements and compromises set forth in the Plan and Plan Support Agreement.

(d)     *Voting*:   Class F1 is Impaired under the Plan.   Holders of Allowed Unsecured Claims against LuxCo are entitled to vote to accept or reject the Plan.

## Claims against Investments

14.     **Class G1 — Unsecured Claims against Investments**

(a)     *Classification*:  Class G1 consists of any Unsecured Claims against Investments.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Claim against Investments agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Investments, each Holder of an Allowed Unsecured Claim against Investments shall receive its Pro Rata share of the Investments Unsecured Recovery.

(c)     *Voting*:   Class G1 is Impaired under the Plan.   Holders of Allowed Unsecured Claims against Investments are entitled to vote to accept or reject the Plan.

## Claims against Holdings

15.     **Class H1 — Unsecured Claims against Holdings**

(a)     *Classification*:  Class H1 consists of any Unsecured Claims against Holdings.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Unsecured Claim against Holdings agrees to less favorable treatment of its Allowed Claim, in full and final

38

satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Holdings, each Holder of an Allowed Unsecured Claim against Holdings shall receive its Pro Rata share of the Holdings Unsecured Recovery.

(c) *Voting*: Class H1 is Impaired under the Plan. Holders of Allowed Unsecured Claims against Holdings are entitled to vote to accept or reject the Plan.

## Claims against Holdings SARL

16. **Class I1 — Unsecured Claims against Holdings SARL**

(a) *Classification*: Class I1 consists of any Unsecured Claims against Holdings SARL.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Unsecured Claim against Holdings SARL agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Holdings SARL, each Holder of an Allowed Unsecured Claim against Holdings SARL shall receive its Pro Rata share of the Holdings SARL Unsecured Recovery.

(c) *Voting*: Class I1 is Impaired under the Plan. Holders of Allowed Unsecured Claims against Holdings SARL are entitled to vote to accept or reject the Plan.

17. **Class I2 — TopCo Guarantee Claims against Holdings SARL**

(a) *Classification*: Class I2 consists of any TopCo Guarantee Claims against Holdings SARL.

(b) *Treatment*: Except to the extent that a Holder of an Allowed TopCo Guarantee Claim against Holdings SARL agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each TopCo Guarantee Claim against Holdings SARL, each Holder of an Allowed TopCo Guarantee Claim against Holdings SARL shall receive its Pro Rata share of the Holdings SARL Unsecured Recovery.

(c) *Voting*: Class I2 is Impaired under the Plan. Holders of Allowed TopCo Guarantee Claims against Holdings SARL are provisionally entitled to vote to accept or reject the Plan pending final allowance of such Claims.

## Claims against Intelsat

18. **Class J1 — Unsecured Claims against Intelsat**

(a) *Classification*: Class J1 consists of any Unsecured Claims against Intelsat.

(b) *Allowance*: Unsecured Claims against Intelsat shall be Allowed in an amount which includes $409,946,250 on account of Convertible Senior Notes Claims.

(c) *Treatment*: Except to the extent that a Holder of an Allowed Unsecured Claim against Intelsat agrees to less favorable treatment of its Allowed Claim (including, for the avoidance of doubt, the HoldCo Creditor Ad Hoc Group Waiver), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Intelsat, each Holder of an Allowed Unsecured Claim against Intelsat shall receive its Pro Rata share of the S.A. Unsecured Recovery.

(d)     *Voting*:  Class J1 is Impaired under the Plan.  Holders of Allowed Unsecured Claims against Intelsat are entitled to vote to accept or reject the Plan.

**19.     Class J2 — TopCo Guarantee Claims against Intelsat**

(a)     *Classification*:  Class J2 consists of any TopCo Guarantee Claims against Intelsat.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed TopCo Guarantee Claim against Intelsat agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each TopCo Guarantee Claim against Intelsat, each Holder of an Allowed TopCo Guarantee Claim against Intelsat shall receive its Pro Rata share of the S.A. Unsecured Recovery; *provided* that 30 percent (30%) of any distributions made on account of TopCo Guarantee Claims against Intelsat to the Jackson Senior Notes Trustees shall be gifted Pro Rata to Holders of Connect Senior Notes Claims in consideration for the covenants, compromises, releases, and other benefits provided by the members of the HoldCo Creditor Ad Hoc Group pursuant to the Plan Support Agreement; *provided* that the aggregate value of such gift shall not exceed $6 million.

(c)     *Voting*:  Class J2 is Impaired under the Plan.  Holders of Allowed TopCo Guarantee Claims against Intelsat are provisionally entitled to vote to accept or reject the Plan pending final allowance of such Claims.

**20.     Class J3 — Interests in Intelsat**

(a)     *Classification*:  Class J3 consists of all Interests in Intelsat.

(b)     *Treatment*:  No distributions shall be made under the Plan in respect of Interests in Intelsat. On the Effective Date, Holders of Interests in Intelsat shall have their Interests in Intelsat diluted and extinguished by the equity distributions made pursuant to the Plan and shall receive no distribution on account of their Interests.  Holders of Interests may receive a *de minimis* Cash payment in lieu of any fractional interest retained.

(c)     *Voting*:  Class J3 is Impaired under the Plan.  Holders of Allowed Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Interests in Intelsat are not entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

40

E.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be presumed to have accepted the Plan.

F.      *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, and subject to the Plan Support Agreement (including all consent rights therein), the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

G.      *Intercompany Interests*

To the extent Reinstated under the Plan, such Reinstatement and any distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests, but for the purposes of administrative convenience and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to provide management services to certain other Debtors and Reorganized Debtors and to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations as set forth in the Plan of certain other Debtors and Reorganized Debtors to the Holders of certain Allowed Claims and Allowed Interests.  For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right (subject to the PSA Definitive Document Requirements) to alter, amend, or modify the Plan, or any document in the Plan Supplement in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including (subject to the PSA Definitive Document Requirements) by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.      *General Settlement of Claims and Interests*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

41

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.      *Settlement Agreement*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates the Settlement set forth in the Settlement Agreement and as shall be approved by the Settlement Order.  In consideration for the distributions and other benefits provided pursuant to the Settlement Agreement and this Plan, the provisions of the Settlement Agreement and this Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a party to the Settlement Agreement may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest; *provided that,* notwithstanding anything to the contrary herein, no party to the Settlement Agreement shall be deemed to have compromised or settled any Claims, Interests, or controversies against any other party to the Settlement Agreement that has not mutually compromised or settled such Claims, Interests, or controversies.

C.      *Term Loan Facility Claims Settlement*

The Term Loan Facility Claims Settlement, as set forth in the Secured Claims Settlement Term Sheet, is incorporated herein by reference.

D.      *Restructuring Transactions*

On or before the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions set forth in the Restructuring Steps Memorandum (as agreed and in accordance with the Plan Support Agreement and subject to the applicable consent and approval rights thereunder) and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan and the Plan Support Agreement, which transactions may include, in each case if and as agreed in accordance with the Plan Support Agreement and subject to the applicable consent and approval rights thereunder, as applicable:  (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, dissolution, or other certificates or documentation pursuant to applicable law; (d) the execution and delivery of the New Debt Documents, and any filing related thereto; (e) the issuance of the New Common Stock; (f)  the execution and delivery of the New Warrants Agreement, and any filing related thereto, and the issuance of the New Warrants thereunder; (g) the execution and delivery of the CVR Agreements, and any filing related thereto, and the issuance of the CVRs thereunder; (h) the execution and delivery of the New Corporate Governance Documents, and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); (i) the execution and delivery of the Backstop Commitment Agreement, and any filings related thereto, and the payment of the Backstop Premium; (j) the filing of any required FCC Applications and any other applications or documents necessary to obtain requisite regulatory approvals; (k) the issuance of the Reorganized S.A. Common Stock; and (l) all other actions that the applicable Reorganized Debtors determine to be necessary or advisable, including making filings or recordings that may be required by applicable law in connection with the Plan.  All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including

42

any and all agents thereof, shall prepare, execute, and deliver any agreements or documents, including any subscription agreements, and take any other actions as the Debtors and the Required Consenting Unsecured Creditors may jointly determine are necessary or advisable, including by voting and/or exercising any powers or rights available to such Holder, including at any board, or creditors', or shareholders' meeting (including any Special Meeting), to effectuate the provisions and intent of the Plan.

The Confirmation Order shall and shall be deemed to, pursuant to sections 1123 and 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions, including, for the avoidance of doubt, any and all actions required to be taken under applicable nonbankruptcy law, including the laws of the Grand Duchy of Luxembourg and any other applicable domicile.

### E.      *Sources of Consideration for Plan Distributions*

The Debtors shall fund distributions under the Plan, as applicable, with (i) the issuance of the New Common Stock; (ii) the issuance of the New Warrants; (iii) the issuance of the CVRs; (iv) the issuance of or borrowings under the New Debt; (v) the issuance of Reorganized S.A. Common Stock; and (vi) Cash on hand.  Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Prior to the Effective Date, the Debtors shall use commercially reasonable efforts to raise the New Debt and obtain the optimal capital structure for the Reorganized Debtors, which capital structure shall provide for (a) $7.125 billion of New Term Loan and New Notes and (b) a revolving credit facility for up to $500 million of availability, which availability may be increased for up to $750 million of availability with the consent of the Require Consenting Jackson Crossover Group Members.

Subject to the consent of the Required Consenting Unsecured Creditors, the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their distribution obligations under the Plan, as set forth in Article III of the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers (a) will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices, and in a manner that is acceptable to the Required Consenting Unsecured Creditors and (b) will not violate the terms of the Plan.  For the avoidance of doubt, nothing in this Article IV.E shall in any way change the distributions to Claims and Interests, or the amount or type of consideration to be received by any Claim or Interest, as set forth in Article III of the Plan.

#### 1.        **New Common Stock**

The Confirmation Order shall authorize the issuance of the Equity Issuer's New Common Stock in one or more issuances without the need for any further corporate action, and the Debtors or Reorganized Debtors, as applicable, are authorized to take any action necessary or appropriate in furtherance thereof.  By the Effective Date, applicable Holders of Claims shall receive shares or units of the New Common Stock in exchange for their Claims pursuant to Article III.B.

All of the shares or units of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the New Common Stock shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the New Common Stock

43

on a recognized U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents.

The Articles of Association, Shareholders Agreement, and any other applicable limited liability company agreement, partnership agreement, stockholders agreement or other similar agreement of the Equity Issuer shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of New Common Stock, including holders that receive such New Common Stock on account of the New Warrants shall be deemed bound thereby.

### 2. New Warrants

On the Effective Date, the Equity Issuer will issue the New Warrants only to the extent required to provide for distributions to applicable Holders of Claims in exchange for their Claims pursuant to Article III.B.  All of the New Warrants issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.  Any New Common Stock issued upon the exercise of the New Warrants shall be subject to dilution pursuant to the Dilution Principles and shall, when so issued and upon payment of the exercise price in accordance with the terms of the New Warrants, be duly authorized, validly issued, fully paid, and non-assessable.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the New Warrants (including any New Common Stock issued upon the exercise of the New Warrants) shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the New Warrants (including any New Common Stock issued upon the exercise of the New Warrants) on a recognized U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents.

### 3. CVRs

On the Effective Date, the Reorganized Debtors will issue the CVRs only to the extent required to provide for distributions to applicable Holders of Claims in exchange for their Claims pursuant to Article III.B.  All of the CVRs issued pursuant to the Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the CVRs shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the CVRs on a recognized U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents.

### 4. New Debt

Prior to the Effective Date, the Debtors may use commercially reasonable efforts to secure commitments to fund the New Capital Structure.  The New Capital Structure may include a combination of the New Term Loan and/or New Notes, and may be secured by a lien on substantially all of the assets of the Reorganized Debtors and their subsidiaries.

The New Term Loan and New Notes may be backstopped (in whole or in part) by the Backstop Parties, and the Backstop Parties shall be obligated to fund the New Term Loan and New Notes in accordance with the terms and conditions of the Backstop Commitment Agreement.  Subject to, and in accordance with the Backstop Commitment Agreement, as consideration for the Backstop Commitments, the Backstop Parties shall receive the Backstop Premium, which shall be paid in Cash by the Debtors or Reorganized Debtors (as applicable) to the Backstop Parties at the time and in the manner set forth in the Backstop Commitment Agreement.  The funding of the New Term Loan and New Notes as contemplated by the Backstop Commitment Agreement may be structured as a debtor-in-possession

financing facility to be funded (in whole or in part) prior to the Effective Date, or an exit facility to be funded (in whole or in part) on or after the Effective Date.

On the Effective Date (or earlier, if provided in an order of the Bankruptcy Court), the net Cash proceeds of the New Term Loan and New Notes, as applicable, will be used to pay in full in Cash Allowed DIP Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, executory contract and unexpired lease Cure Claims, and other Claims, as and to the extent that any such Claims are required to be paid in Cash under this Plan, and distributed to Holders of Allowed Claims entitled to a Cash distribution in accordance with Article III of this Plan.

Confirmation of the Plan shall be deemed (a) approval of the New Revolver, New Term Loan, and New Notes, as applicable, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements (including the Backstop Commitment Agreement) necessary or appropriate to pursue or obtain the New Revolver, New Term Loan, and issue the New Notes, as applicable, and incur and pay any fees, premiums and expenses in connection therewith (including the Backstop Premium), and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to obtain the New Revolver and the New Term Loan and issue the New Notes, as applicable.

On the Effective Date (or earlier, if provided in an order of the Bankruptcy Court), all Liens and security interests granted pursuant to, or in connection with the New Revolver, New Term Loan and/or New Notes, as applicable: (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the collateral securing the New Revolver, New Term Loan, and/or New Notes, as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law, the Plan, and the Confirmation Order; and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the New Revolver, New Term Loan, and/or New Notes, as applicable, are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.      **Reorganized S.A. Common Stock**

The Confirmation Order shall authorize the issuance of the Reorganized S.A. Common Stock, as necessary, in one or more issuances without the need for any further corporate action, and the Debtors or Reorganized Debtors, as applicable, are authorized to take any action necessary or appropriate in furtherance thereof. By the Effective Date for Debtor Intelsat, applicable Holders of Claims shall receive approximately 100 percent (subject to the extinguishment of Intelsat Interests) of shares or units of the Reorganized S.A. Common Stock in exchange for their Claims pursuant to Article III.B and consistent with the Restructuring Steps Memorandum.

All of the shares or units of Reorganized S.A. Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the Reorganized S.A. Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, the Reorganized S.A. Common Stock may constitute Interests in Intelsat, which may retain its

45

Interests in Holdings SARL or take other actions under applicable nonbankruptcy law to retain any assets of Holdings SARL, except for Interests in Holdings, which may be owned by or become the Equity Issuer.

*F.     Exemption from Registration Requirements*

All 1145 Securities will be issued in reliance upon section 1145 of the Bankruptcy Code to the fullest extent permitted under applicable law.  The New Common Stock, the New Warrants, the New Common Stock to be issued upon exercise of the New Warrants, and the CVRs to be issued under the Plan (1) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act and (2) will be freely tradable and transferable in the United States by a recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer. Notwithstanding the foregoing, the 1145 Securities remain subject to compliance with applicable securities laws and any rules and regulations of the SEC, among other governmental authorities, if any, applicable at the time of any future transfer of such securities and subject to any restrictions in the New Corporate Governance Documents. The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

To the extent issuance under section 1145(a) of the Bankruptcy Code is unavailable, the 1145 Securities will be issued without registration under the Securities Act in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S, and similar registration exemptions applicable outside of the United States. Any securities issued in reliance on section 4(a)(2), including in compliance with Rule 506 of Regulation D, and/or Regulation S, will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law and subject to any restrictions in the New Corporate Governance Documents or regulatory restrictions.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the 1145 Securities to be issued under the Plan through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the 1145 Securities to be issued under the Plan under applicable securities laws.  DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the 1145 Securities to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

The New Notes will be issued without registration under the Securities Act in reliance upon the exemption set forth in Section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S, and similar registration exemptions applicable outside of the United States. Any securities issued in reliance on Section 4(a)(2), including in compliance with Rule 506 of Regulation D, and/or Regulation S will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law and subject to any restrictions in the New Corporate Governance Documents or regulatory restrictions.

The Debtors and Reorganized Debtors shall take all actions necessary to permit the issuance of the New Notes to settle through the facilities of DTC and for the New Notes to be eligible for resale under Rule 144A of the Securities Act, and the Plan and Confirmation Order shall authorize all such action by the Debtors and Reorganized Debtors.

*G.     Corporate Existence*

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and

pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan, the New Corporate Governance Documents, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### H.   Corporate Action

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including:  (1) the applicable Debtors' and/or Reorganized Debtors' entry into, delivery of, and performance under the New Corporate Governance Documents; (2) selection of the directors, managers, and officers for the Reorganized Debtors consistent with the Corporate Governance Term Sheet; (3) distribution of the New Common Stock, New Warrants, CVRs, New Debt, and Reorganized S.A. Common Stock; (4) implementation of the Restructuring Transactions; (5) the applicable Reorganized Debtors' entry into, delivery, and performance under the New Debt Documents, New Warrants Agreements, and CVR Agreements; (6) the applicable Debtors' and/or Reorganized Debtors' entry into, delivery, and performance under the Backstop Commitment Agreement, and the payment of the Backstop Premium; and (7) all other actions contemplated under the Plan or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions (whether to occur before, on, or after the Effective Date), provided such actions are consistent with the Plan Support Agreement and the consent rights therein.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, New Warrants and New Common Stock issuable thereunder, CVRs, New Debt, the New Corporate Governance Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

### I.   FCC Licenses and Regulatory Applications

The required FCC Applications and any other applications that may be necessary for any other regulatory approvals shall be filed as promptly as practicable.  The Debtors shall diligently prosecute the FCC Applications and shall promptly provide such additional documents or information requested by the FCC in connection with its review of the FCC Applications.  All Holders of Claims and Interests receiving distributions pursuant to the Plan and all other necessary parties in interest, including any and all agents thereof, shall (a) provide any and all information as may be reasonably requested by the Debtors, and (b) use commercially reasonable efforts to take any other actions as the Debtors may reasonably determine are necessary or advisable to effectuate any applicable regulatory approvals.

### J.   Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the New Debt Documents and Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any).  On and after the Effective Date, except as otherwise provided herein, and subject to compliance with the applicable provisions of the Communications Act and any other applicable regulatory regime, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

K.      *Cancellation of Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except as otherwise specifically provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, all notes, bonds, indentures, Certificates, Securities, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of the Debtors giving rise to any rights or obligations relating to Claims against the Debtors (except with respect to any Claim that is Reinstated pursuant to the Plan), including the Notes and the Indentures, shall be contributed and set off consistent with the Restructuring Steps Memorandum, and upon such contribution and set-off, shall be deemed cancelled and surrendered without further action or approval of the Bankruptcy Court or any Holder, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged, and each of the Indenture Trustees, and their respective agents, successors and assigns, shall each be automatically and fully released and discharged of and from all duties and obligations thereunder, as applicable; *provided that*, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in the Plan or Confirmation Order, Confirmation, or the occurrence of the Effective Date, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim, including the Indentures, shall continue in effect solely for purposes of:  (1) preserving the rights of all parties in connection with any litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation, subject to the Debtors' obligations with respect to the Secured Creditor Settlement Motion and the Secured Creditor Settlement; (2) allowing Holders to receive distributions as specified under the Plan; and (3) allowing and preserving the rights of the First Lien Agent, Prepetition Collateral Trustee, Indenture Trustees, DIP Agent, or any other Distribution Agent, as applicable, to make distributions as specified under the Plan on account of Allowed Claims, as applicable, including allowing the First Lien Agent, Prepetition Collateral Trustee, Indenture Trustees, and DIP Agent to submit invoices to the Debtors or Reorganized Debtors for any amount and enforce any obligation owed to them under the Plan to the extent authorized or allowed by the applicable Debt Documents.  Notwithstanding the foregoing, the First Lien Agent, Prepetition Collateral Trustee, and each Indenture Trustee is authorized and directed to, at the sole cost and expense of the Reorganized Debtors, execute (and take any reasonable additional steps at the sole cost and expense of the Reorganized Debtors necessary to give effect to) any applicable documents required to consummate the Plan, and to effectuate the contribution and set-off pursuant to the Plan in accordance and consistent with the Restructuring Steps Memorandum.

L.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the New Debt Documents, the Backstop Commitment Agreement, the New Corporate Governance Documents, the New Warrants Agreements, CVR Agreements, and the New Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

M.      *Exemptions from Certain Taxes and Fees*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, including the New Securities; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, sales or use tax,

48

regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*N.      New Corporate Governance Documents*

The New Corporate Governance Documents shall, among other things: (1) contain terms consistent with the documentation set forth in the Plan Supplement; (2) authorize the issuance, distribution, and reservation of the New Securities to the Entities entitled to receive such issuances, distributions and reservations under the Plan; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and limited as necessary to facilitate compliance with non-bankruptcy federal laws, prohibit the issuance of non-voting equity Securities.

On or immediately before the Effective Date, the Debtors or Reorganized Debtors, as applicable, will file their New Corporate Governance Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of its respective state of incorporation or formation, to the extent required for such New Corporate Governance Documents to become effective. After the Effective Date, each of the Reorganized Debtors may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its jurisdiction of formation and the terms of such documents. The New Corporate Governance Documents shall be in form and substance consistent with the PSA Definitive Document Requirements.

*O.      Directors and Officers*

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the Debtors will disclose at or prior to the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the Equity Issuer Board. The Equity Issuer Board shall include the CEO and shall be comprised of seven (7) members. The members of the Equity Issuer Board shall be determined in accordance with the Corporate Governance Term Sheet.

By the Effective Date, the terms of the current members of the Intelsat board of directors shall expire, and the Equity Issuer Board will include those directors set forth in the list of directors of the Equity Issuer included in the Plan Supplement selected in accordance with the Corporate Governance Term Sheet. By the Effective Date, the officers and overall management structure of the Equity Issuer, and all officers and management decisions with respect to Equity Issuer (and/or any of its direct or indirect subsidiaries), compensation arrangements, and affiliate transactions shall only be subject to the approval of the Equity Issuer Board.

By and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents and the New Corporate Governance Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation. To the extent that any such director or officer of the Reorganized Debtors is an "insider" pursuant to section 101(31) of the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

*P.      Management Incentive Plan*

On the Effective Date, the Equity Issuer shall institute the Management Incentive Plan, enact and enter into related policies and agreements, and distribute the New Common Stock to participants consistent with the terms and allocations set forth in the Management Incentive Plan Term Sheet; *provided* that the form and substance of the Management Incentive Plan shall be consistent with the PSA Definitive Document Requirements. The Required Consenting Jackson Crossover Group Members and the Debtors shall negotiate the terms of the definitive Management Incentive Plan documentation in good faith prior to the Effective Date; *provided* that the requirement

that the Management Incentive Plan documentation be completed prior to the Effective Date may be waived by written agreement between the Required Consenting Jackson Crossover Group Members and the Debtors.

Q.      *Payment of Indenture Trustee Fees*

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay in Cash all reasonable and documented unpaid Indenture Trustee Fees that are required to be paid under the Indentures.  From and after the Effective Date, the Reorganized Debtors shall pay in Cash all reasonable and documented Indenture Trustee Fees, including, without limitation, all Indenture Trustee Fees incurred in connection with distributions made pursuant to the Plan or the cancellation and discharge of the Notes or the Indentures.

If the Debtors dispute any requested Indenture Trustee Fees, the Debtors or Reorganized Debtors, as applicable, shall (1) pay the undisputed portion of Indenture Trustee Fees and (2) notify the applicable Indenture Trustee of such dispute within ten (10) Business Days after presentment of the invoices by the applicable Indenture Trustee.  Upon such notification, the applicable Indenture Trustee may submit such dispute for resolution by the Bankruptcy Court; *provided*, *however,* that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the applicable Indenture.  Nothing herein shall in any way affect or diminish the right of the Indenture Trustees to exercise their respective Indenture Trustee Charging Liens against distributions on account of the Notes Claims with respect to any unpaid Indenture Trustee Fees, as applicable.

R.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all of the Debtors' rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than (1) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date and (2) the Causes of Action released by the Debtors pursuant to the Settlement Agreement, following entry of the Settlement Order and upon the effective date of such Settlement Agreement.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity (other than such Causes of Action specifically released pursuant to the Plan).**  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Notwithstanding any provisions regarding the release or exculpation of Claims or Causes of Action set forth in the Plan (including Article VIII of the Plan), if the Plan Toggle Event occurs, nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims.  If the Plan Toggle Event occurs, nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims.

S.      *Non-TopCo Plan*

Upon the occurrence of a Plan Toggle Event, the Plan shall immediately and automatically convert to the Non-TopCo Plan, and any references herein to the "Plan" or to the "Debtors" shall be deemed to refer to the Non-TopCo Plan and the Non-TopCo Debtors, respectively.  For greater certainty, following a Plan Toggle Event, references herein to the "Plan" will not encompass plans of reorganization for the TopCo Debtors, nor will references

50

to the "Debtors" encompass the TopCo Debtors; further, upon a Plan Toggle Event, any plan of reorganization for the TopCo Debtors will be filed separately.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed by the Debtors or Reorganized Debtors, as applicable, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease: (1) was assumed, assumed and assigned, or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease Schedule.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan and the Rejected Executory Contract and Unexpired Leases List, as applicable.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as an Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

51

Notwithstanding anything to the contrary in the Plan, the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely as to any Executory Contract or Unexpired Lease to which a HoldCo is a party, the Required Consenting HoldCo Creditors), or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

C.      *Cure of Defaults and Objections to Cure and Assumption*

Unless otherwise agreed upon in writing by the Debtors or Reorganized Debtors, as applicable, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount including pursuant to the Plan must be filed, served, and actually received by the counsel to the Debtors and the U.S. Trustee on the Confirmation Objection Deadline or other deadline that may be set by the Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.  **For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease is proposed to be assumed in the Plan and the Assumed Executory Contract and Unexpired Lease List is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease.**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount (if any) in Cash on the Effective Date or in the ordinary course of business or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

The cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption in the event of a dispute regarding: (1) the amount of any payments to cure such a default; (2) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption.

The Debtor (with the consent of the Required Consenting Jackson Crossover Group Members and, solely as to any Executory Contract or Unexpired Lease to which a HoldCo is a party, the Required Consenting HoldCo Creditors) or the Reorganized Debtor, as applicable, shall be authorized to reject any executory contract or unexpired lease to the extent the Debtor (with the consent of the Required Consenting Jackson Crossover Group Members and, solely as to any Executory Contract or Unexpired Lease to which a HoldCo is a party, the Required Consenting HoldCo Creditors) or the Reorganized Debtor, as applicable, in the exercise of its sound business judgment, concludes that the amount of the cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the applicable Debtor's Estate or the Reorganized Debtor.  Such rejected contracts, if any, shall be deemed as listed on the Rejected Executory Contract and Unexpired Lease List, if any.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

D.      *Insurance Policies*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims. Except as set forth in Article V.F of the Plan, nothing in this Plan, the Plan Supplement, the Disclosure Statement, the

52

Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

E.      *Indemnification Provisions*

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' New Corporate Governance Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, equityholders, and agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted; *provided*, that the Reorganized Debtors shall not indemnify any Person for any Cause of Action arising out of or related to any act or omission that is determined pursuant to a Final Order to be a criminal act or to constitute actual fraud, gross negligence, bad faith, or willful misconduct.  None of the Debtors, or the Reorganized Debtors, as applicable, will amend and/or restate their respective governance documents before or after the Effective Date to amend, terminate, or adversely affect any of the Debtors' or the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', equityholders' or agents' indemnification rights.

On and as of the Effective Date, any of the Debtors' Indemnification Provisions with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases, other than any Indemnification Provision set forth in an Executory Contract or Unexpired Lease rejected in the Chapter 11 Cases (including pursuant to the Plan).

F.      *Director, Officer, Manager, and Employee Liability Insurance*

On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all of the D&O Liability Insurance Policies (including, if applicable, any "tail policy") and any agreements, documents, or instruments relating thereto.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such policies (including, if applicable, any "tail policy").

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring as of the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

G.      *Employee and Retiree Benefits*

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the Equity Issuer Board under the Debtors' respective formation and constituent documents, the Reorganized Debtors shall:  (1) amend, adopt, assume, and/or honor in the ordinary course of business any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for,

among other things, compensation, including any incentive plans, retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date (the "Compensation and Benefits Programs"); and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.  For the avoidance of doubt, the Debtors shall continue the Retiree Medical Plans in effect as of the Petition Date, and continuation of the Retiree Medical Plans in effect as of the Petition Date shall be deemed to satisfy section 1129(a)(13) of the Bankruptcy Code.  For further avoidance of doubt, upon confirmation of the Plan, Reorganized Debtors shall assume and continue to maintain the Pension Plan.  The Pension Plan is intended to be a tax-qualified defined benefit pension plan covered by Title IV of ERISA.  On and after the Effective Date, the Reorganized Debtors will contribute to the Pension Plan the amounts necessary to satisfy the minimum funding standards under section 302 of ERISA, 29 U.S.C. § 1082, and section 412 of the Internal Revenue Code, 26 U.S.C. § 412.  Notwithstanding any other provision hereof, nothing in the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) shall be construed as discharging, releasing, or relieving any Debtor, the Reorganized Debtors, or Party, in any capacity, from any liability with respect to the Pension Plan under any law, government policy, or regulatory provision.  The PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any Debtor, the Reorganized Debtors, or any Party with such liability or responsibility as a result of any provisions for satisfaction, release, injunction, and exculpation in the Plan and Confirmation Order.

Notwithstanding anything to the contrary in the Plan, none of the Restructuring Transactions or any other action or event occurring in connection with the Plan (including any action or event occurring pursuant to the previous paragraph), shall, or shall be deemed to, trigger any applicable change of control, immediate vesting, termination, or similar provisions set forth in any Compensation and Benefits Program.  Any counterparty to a Compensation and Benefits Program shall otherwise have the same rights under any such Compensation and Benefits Program as were applicable immediately prior to the Reorganized Debtors' adoption, assumption and/or honoring of such Compensation and Benefits Program pursuant to the Plan, except that, if any Compensation and Benefits Program is adopted, assumed, and/or honored pursuant to the Plan and such Compensation and Benefits Program provides for an award or potential award of Interests in the Debtors, such Compensation and Benefits Program shall not be adopted, assumed, and/or honored solely to the extent of such provisions relating to Interest awards.

## H.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## I.      *Reservation of Rights*

Neither the assumption of any Executory Contract or Unexpired Lease pursuant to the Plan nor exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have thirty calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.  The deemed assumption provided for herein shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtor following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

*J.      Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

*K.      Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.      Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the next Distribution Date that such Claim becomes an Allowed Claim or Interest, or as soon as reasonably practicable thereafter) each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class and in the manner provided in the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Interests, distributions on account of any such Disputed Claims or Interests shall be made pursuant to the provisions set forth in Article VII.  Except as otherwise provided in the Plan, Holders of Claims and Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  The Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

*B.      Distributions on Account of Obligations of Multiple Debtors*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed claim plus applicable interest, if any.

*C.      Distribution Agent*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

*D.      Rights and Powers of Distribution Agent*

**1.      Powers of the Distribution Agent**

55

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof; *provided*, *however*, that such Distribution Agent shall waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent.

### 2. Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Distribution Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable, actual, and documented attorney and/or other professional fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

### E. *Delivery of Distributions*

### 1. Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Record Date by the Distribution Agent, as appropriate: (a) to the signatory set forth on any Proof of Claim or Proof of Interest filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Proof of Interest is filed or if the Debtors have not been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors or the applicable Distribution Agent, as appropriate, after the date of any related Proof of Claim or Proof of Interest; or (c) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors with the consent of the Required Consenting Unsecured Creditors. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for fraud, gross negligence, or willful misconduct.

Except as otherwise determined by the Debtors or reasonably requested by the respective Indenture Trustee, all distributions made under the Plan on account of the Allowed Claims of the Holders of Notes Claims shall be deemed completed when made to the respective Indenture Trustee. As soon as practicable in accordance with the requirements set forth in this Article VI, the respective Indenture Trustee shall arrange to deliver such distributions to or on behalf of its Holders, subject to the respective Indenture Trustee Charging Liens.

Notwithstanding any policies, practices, or procedures of DTC, DTC shall cooperate with and take all actions reasonably requested by the Debtors or the Distribution Agent to facilitate distributions to Holders of Allowed Claims without requiring that such distributions be characterized as repayments of principal or interest. No Distribution Agent or Indenture Trustee shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC.

### 2. Delivery of Distributions on the First Lien Notes Claims

Except as otherwise provided in the Plan, determined by the Debtors, or reasonably requested by the First Lien Notes Trustees, all distributions to Holders of Allowed First Lien Notes Claims shall be deemed completed when made to the respective First Lien Notes Trustee. The First Lien Notes Trustees shall hold or direct such distributions for the benefit of the respective Holders of Allowed First Lien Notes Claims. As soon as practicable in accordance with the requirements set forth in this Article VI, the First Lien Notes Trustees shall arrange to deliver such distributions to or on behalf of such Holders in accordance with the First Lien Notes Indentures, subject to the rights of the First Lien Notes Trustees to assert its charging lien. If the First Lien Notes Trustees are unable to make, or

56

consent to the Distribution Agent making such distributions, the Distribution Agent with the cooperation of the First Lien Notes Trustees, shall make such distributions to the extent practicable. The First Lien Notes Trustees shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors, the Reorganized Debtors and/or the Distribution Agent, as applicable, shall use reasonably commercial efforts to seek the cooperation of DTC so that any distribution on account of an Allowed First Lien Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made to the extent possible through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The First Lien Notes Trustees shall retain all rights under the First Lien Notes Indentures to exercise its charging lien against distributions to their respective Holders.

### 3.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Distribution Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Effective Date and (b) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged of and forever barred.

### 4.      No Fractional Distributions

No fractional notes or shares, as applicable, of the New Securities shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts; *provided* that fractional Intelsat Interests may receive a *de minimis* cash payment for the purpose of extinguishing such Interests pursuant to applicable non-bankruptcy law. When any distribution pursuant to the Plan on account of an Allowed Claim or Interest would otherwise result in the issuance of a number of units or amounts of New Securities that is not a whole number, the actual distribution of units or amounts of New Securities shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized units or amounts of New Securities shall be adjusted as necessary to account for the foregoing rounding.

### 5.      Minimum Distributions

Holders of Allowed Claims entitled to distributions of $100 or less shall not receive distributions, and each Claim to which this limitation applies shall be discharged pursuant to Article VIII of this Plan and its Holder shall be forever barred pursuant to Article VII of this Plan from asserting that Claim against the Reorganized Debtors or their property.

### F.      *Manner of Payment*

At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check, wire transfer, automated clearinghouse, or as otherwise required or provided in applicable agreements.

### G.      *Compliance Matters*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve

57

the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

H.     *No Postpetition or Default Interest on Claims*

Unless otherwise specifically provided for in the Plan (including (a) the Term Loan Facility Claims Settlement and (b) to the extent provided in the First Lien Notes Claims Settlement or any Final Order resolving the Secured Creditor Claims Litigation), the DIP Order, or the Confirmation Order, and notwithstanding any documents that govern the Debtors' prepetition indebtedness to the contrary, (1) postpetition and/or default interest shall not accrue or be paid on any Claims and (2) no Holder of a Claim shall be entitled to: (a) interest accruing on or after the Petition Date on any such Claim; or (b) interest at the contract or default rate, as applicable.

I.     *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, on such Allowed Claim accrued through the Petition Date.

J.     *Setoffs and Recoupment*

Unless otherwise provided in the Plan or the Confirmation Order, each Debtor and each Reorganized Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled as of the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off or recoup any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.

K.     *Claims Paid or Payable by Third Parties*

1.     **Claims Paid by Third Parties**

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent that a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return, or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.     **Claims Payable by Third Parties**

The availability, if any, of insurance policy proceeds for the satisfaction of an Allowed Claim shall be determined by the terms of the insurance policies of the Debtors or Reorganized Debtors, as applicable. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the

58

extent of any agreed upon satisfaction on the Claims Register by the Solicitation Agent without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

> **3.** **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of an applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED,
## AND DISPUTED CLAIMS

*A.*     *Allowance of Claims*

Except as otherwise set forth in the Plan, after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as specifically provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

*B.*     *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority to:  (1) File, withdraw, or litigate to judgment, objections to Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Article IV.R of the Plan.

*C.*     *Adjustment to Claims Without Objection*

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or deemed disallowed by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Bankruptcy Court.

*D.*     *Time to File Objections to Claims or Interests*

Any objections to Disputed Claims shall be Filed on or before the later of (1) the first Business Day following the date that is 180 days after the Effective Date and (2) such later date as may be specifically fixed by the Bankruptcy Court.  For the avoidance of doubt, the Bankruptcy Court may extend the time period to object to Disputed Claims and Disputed Interests.

*E.*     *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party in interest previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection; *provided* that the Debtors or Reorganized Debtors may not seek to estimate any Guarantee Claims without the consent of the

59

Required Consenting Unsecured Creditors. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

F.      *Disputed and Contingent Claims Reserve*

On or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, will establish one or more reserves for Claims, including the Secured Creditor Claims Disputed Distribution Reserve, that are contingent or have not yet been Allowed, and including any Guarantee Claims that have not been withdrawn with prejudice or disallowed by a Final Order, in an amount or amounts as reasonably determined by the applicable Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely with respect to any Claims against any HoldCo, the Required Consenting HoldCo Creditors) or Reorganized Debtors, as applicable, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim. To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim. Notwithstanding anything to the contrary in the Plan (including this Section VII.F), the reserve established for Guarantee Claims that have not been released or disallowed by a Final Order shall be established in such amount assuming that such Guarantee Claims are Allowed in full, or as otherwise agreed between the Debtors or Reorganized Debtors, as applicable, and the Required Consenting Jackson Crossover Group Members.

To the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), then until such time as the Disputed portions of the 8.00% First Lien Notes Claims and 9.50% First Lien Notes Claims are Allowed (or otherwise required to be paid for the First Lien Notes Claims to be Unimpaired), and all such amounts are paid in full in Cash, or disallowed, pursuant to a Final Order, the Debtors and Reorganized Debtors, as applicable, shall maintain the Secured Creditor Claims Disputed Distribution Reserve in the amount of the portion of such Claims that constitute Disputed Claims (including interest thereon at the applicable contractual rates). Any modifications to the Secured Creditor Claims Distribution Reserve following the Effective Date shall be (a) mutually agreed upon by the Debtors or Reorganized Debtors, as applicable, the Required First Lien Consenting First Lien Noteholders, and the Required Consenting Jackson Crossover Group Members or (b) pursuant to separate Bankruptcy Court order.

G.      *Disallowance of Claims*

Any Claims held by Entities from which the Bankruptcy Court has determined that property is recoverable under section 542, 543, 547, 548, 549, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer that the Bankruptcy Court has determined is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and the full amount of such obligation to the Debtors has been paid or turned over in full.

All Proofs of Claim Filed on account of an indemnification obligations shall be deemed satisfied and disallowed as of the Effective Date to the extent such indemnification obligations is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the

60

Bankruptcy Court.  All Proofs of Claim Filed on account of an employee benefit shall be deemed satisfied and disallowed as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed to by the Reorganized Debtors in their sole discretion, any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

H.      *Amendments to Proofs of Claim*

On or after the Effective Date, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Proof of Claim or Interest Filed that is not so authorized before it is Filed shall be deemed Disallowed in full without any further action.

I.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

J.      *No Distributions Pending Allowance*

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  Until such time as the 8.00% First Lien Notes Claims and 9.50% First Lien Notes Claims are Allowed pursuant to a Final Order, no distribution shall be made on account of any portion of any such Claim that constitutes a Disputed Claim.   Notwithstanding anything to the contrary in this Plan, in the event that the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, the Holders of First Lien Notes Claims shall be paid on the Effective Date all amounts payable to them under the Secured Creditor Settlement, subject to recoupment and reduction, or supplementation and increase, by the Reorganized Debtors in the event of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order.

K.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Distribution Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

**ARTICLE VIII.
SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall

61

constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

The Plan incorporates the Settlement, to be approved by the Bankruptcy Court pursuant to the Settlement Order.

B.      *Discharge of Claims*

Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims or Non-Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action held by any Entity of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtors or any of their assets (including net operating losses and other tax assets or attributes) or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, and all actions taken to effectuate the Plan, including by Indenture Trustees or First Lien Agent, shall be given the same effect as if such actions were performed under the applicable nonbankruptcy laws under which the Debt Documents are governed. Notwithstanding anything in this Article VIII.B to the contrary, if the Plan Toggle Event occurs: (a) nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims and (b) nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims. Nothing in this Article VIII.B shall operate to release, discharge, or enjoin any Entity's rights with respect to the Secured Creditor Claims Litigation (subject to the Debtors' obligations with respect to the Secured Creditor Settlement and the Secured Creditor Settlement Motion).

C.      *Release of Liens*

**Except with respect to the Liens securing the New Debt or Other Secured Claims that are Reinstated pursuant to the Plan, or as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns in each case, without any further approval or order of the Bankruptcy Court and without any action or filing required to be taken or made. To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan (or any agent for such Holder) has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors or the Reorganized Debtors that are reasonably necessary or desirable to record or effectuate**

the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.  To the extent any such Holders of such security interests, the First Lien Agent or the Prepetition Collateral Trustee require authority or direction to do so, the Plan and Confirmation Order shall be deemed to be such authorization or direction, as applicable.  Unless the Secured Creditor Claims Disputed Distribution Reserve takes the form of the Secured Creditor Claims Disputed Distribution Trust Account, the First Lien Notes Trustees shall be granted a perfected, first-priority security interest and Lien on the Secured Creditor Claims Disputed Distribution Reserve, as described in Article III herein in the event the Secured Creditor Settlement Order is not entered or does not remain in effect; *provided* that such Lien shall be released at such time when the portion of such First Lien Notes Claims that were not paid on the Effective Date are (1) Allowed (or otherwise authorized for payment) by Final Order (whether before, on, or after the Effective Date) and paid in full (to the extent Allowed), including all interest thereto (to the extent Allowed), in Cash or (2) disallowed by Final Order; *provided*, *further*, for the avoidance of doubt, no other security interest or Lien (including any Lien securing the New Debt or Other Secured Claims that are Reinstated pursuant to the Plan) shall attach to the Secured Creditor Claims Disputed Distribution Reserve.

D.      *Debtor Release*

        In addition to any release provided in the Settlement Order, effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, any intercompany transactions, the DIP Facility, the DIP Order, the Term Loan Facility, the First Lien Notes, the Senior Notes, the Indentures, the Chapter 11 Cases, the matters settled pursuant to the Settlement, including the Historical Intercompany Transaction Claims, Claims related to the Debtors' tax attributes, including the 2018 Reorganization Claims, the Accelerated Relocation Payment Claims, any preference, fraudulent transfer, or other avoidance, recovery, or preservation claim pursuant to sections 544, 547, 548, 550, or 551 of the Bankruptcy Code and applicable state and foreign laws, the Plan Support Agreement, the Secured Creditor Settlement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Disclosure Statement, the New Debt Documents, the Backstop Commitment Agreement, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the New Debt Documents, the Backstop Commitment Agreement, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan or (2) any retained Causes of Action.

**Notwithstanding anything in this Article VIII.D to the contrary, if the Plan Toggle Event occurs:  (a) nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of (i) any TopCo Guarantee Claims or (ii) any Causes of Action against the TopCos that are not released pursuant to the Settlement; and (b) nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims.  Nothing in this Article VIII.D shall operate to release, discharge, or enjoin any Entity's rights with respect to the Secured Creditor Claims Litigation (subject to the Debtors' obligations with respect to the Secured Creditor Settlement and the Secured Creditor Settlement Motion).**

E.      *Third-Party Release*

**Effective as of the Effective Date, in each case except for Claims arising under, or preserved by, the Plan, each Releasing Party (other than the Debtors or the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Facility, the DIP Order, the Term Loan Facility, the First Lien Notes, the Senior Notes, the Indentures, the Chapter 11 Cases, the matters settled pursuant to the Settlement, including the Historical Intercompany Transaction Claims, Claims related to the Debtors' tax attributes, including the 2018 Reorganization Claims, the Accelerated Relocation Payment Claims, any preference, fraudulent transfer, or other avoidance, recovery, or preservation claim pursuant to sections 544, 547, 548, 550, or 551 of the Bankruptcy Code and applicable state and foreign laws, the Plan Support Agreement, the Secured Creditor Settlement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Disclosure Statement, the New Debt Documents, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the New Debt Documents, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan.  Notwithstanding anything in this Article VIII.E to the contrary, if the Plan Toggle Event occurs: (a) nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of (i) any TopCo Guarantee Claims or (ii) any Causes of Action against the TopCos that are not released pursuant to the Settlement; and (b) nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims.  Nothing in this Article VIII.E shall operate to release, discharge, or enjoin any Entity's rights with respect to the Secured Creditor Claims Litigation (subject to the Debtors' obligations with respect to the Secured Creditor Settlement and the Secured Creditor Settlement Motion).**

*F.     Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Chapter 11 Cases, the Disclosure Statement, the New Debt Documents, the Backstop Commitment Agreement, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*G.     Injunction*

In addition to any injunction provided in the Settlement Order, effective as of the Effective Date, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan.  Notwithstanding the foregoing, all Entities are permanently enjoined and prohibited from taking any action (i) to adversely impact, reduce or diminish the Debtors' or Reorganized Debtors' net operating losses or other tax assets or attributes, or (ii) otherwise taking any action (including in the United States or any foreign jurisdiction) that is intended or is reasonably likely to directly or indirectly prevent, impede, hinder, adversely affect, and/or delay any of the Restructuring Transactions or any actions or efforts of the Debtors and Reorganized Debtors and/or their ability to consummate the Plan.  Notwithstanding anything in this Article VIII.G to the contrary, if the Plan Toggle Event occurs:  (a) nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the

**prosecution of (i) any TopCo Guarantee Claims or (ii) any Causes of Action against the TopCos that are not released pursuant to the Settlement; and (b) nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims. Nothing in this Article VIII.G shall operate to release, discharge, or enjoin any Entity's rights with respect to the Secured Creditor Claims Litigation (subject to the Debtors' obligations with respect to the Secured Creditor Settlement and the Secured Creditor Settlement Motion).**

H.      *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

J.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as noncontingent, or (2) the relevant Holder of a Claim has filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

K.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

L.      *Document Retention*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## ARTICLE IX.
## CONDITIONS TO CONFIRMATION AND THE EFFECTIVE DATE

A.      *Conditions Precedent to the Confirmation Date.*

It shall be a condition to the Confirmation Date that the Bankruptcy Court shall have entered the Settlement Order unless such condition has been waived pursuant to Article IX.C.

66

B.      *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.C:

1.    the Bankruptcy Court shall have entered the Confirmation Order with respect to each Debtor, which shall (i) authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan, (ii) authorize the Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions; (b) make all distributions and issuances as required under the Plan; and (c) enter into any agreements, transactions, and sales of property, including the New Debt Documents, the Backstop Commitment Agreement (including paying the Backstop Premium), New Warrants Agreements, CVR Agreements, and Management Incentive Plan, and (iii) authorize the implementation of the Plan in accordance with its terms, and the Effective Date shall occur for each Debtor simultaneously;

2.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions, including the Plan, the Plan Support Agreement shall remain in full force and effect with respect to each Debtor for which the Plan was confirmed;

3.    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan and the PSA Definitive Document Requirements, and the Definitive Documents shall comply with the PSA Definitive Document Requirements;

4.    all HoldCo Guarantee Claims shall be withdrawn with prejudice and not entitled to any distribution under the Plan; *provided* that this condition shall not be required to be satisfied, and the Plan shall be automatically amended to remove this condition, if, at the time of entry of the Confirmation Order or prior thereto, either of the following events have occurred:  (a) Consenting Creditors that hold at least two-thirds (2/3) of the Connect Senior Notes (excluding any Connect Senior Notes held by the Debtors) cease to be party to the Plan Support Agreement or (b) the Required Consenting HoldCo Creditors have terminated the Plan Support Agreement;

5.    the documentation related to the New Debt shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the New Debt shall have been satisfied or duly waived in writing in accordance with the terms of the New Debt;

6.    the closing of the New Revolver and the New Term Loans and/or the issuance of the New Notes, as applicable, shall have occurred;

7.    the New Warrants Agreements and CVR Agreements shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of the New Warrants Agreements and CVR Agreements shall have been satisfied or duly waived in writing in accordance with the terms thereof;

8.    the definitive documentation concerning the Management Incentive Plan shall have been completed; *provided* that this condition may be waived by written agreement between the Required Consenting Jackson Crossover Group Members and the Debtors;

9.    the New Common Stock, New Warrants, CVRs, and Reorganized S.A. Common Stock shall have been issued and distributed, and any Cash on hand at the HoldCos shall have been distributed, in accordance with the Plan;

10.   the DIP Claims shall have been indefeasibly paid in full in Cash;

67

11. all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units, in accordance with applicable laws;

12. all Professional Fee Claims of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the Bankruptcy Court's approval of such Professional Fee Claims;

13. the Settlement Order shall have been entered and not subject to any stay, and the Accelerated Relocation Payment Claims shall have been resolved pursuant to an order not subject to any stay, on the terms set forth in this Plan (or such other terms that are acceptable to the Required Consenting Jackson Crossover Group Members);

14. the Value Allocation shall not have changed from the version of the Value Allocation filed with the Disclosure Statement on August 24, 2021 in a manner that either (a) allocates any value to any Entity that is not an obligor (or guarantor) in respect of the Jackson Senior Notes or (b) increases by more than five percent (5%) or decreases by more than five percent (5%) the recovery percentage at any Jackson Debtor, unless (in either case) the Required Consenting Jackson Crossover Group Members have approved such changes in writing; and

15. (x) all unpaid Restructuring Expenses, (y) the Backstop Premium, and (z) all amounts payable by the Debtors pursuant to the DIP Order and the Plan Support Agreement shall have been indefeasibly paid in full in Cash.

For the avoidance of doubt, the conditions precedent to the Effective Date enumerated above shall apply to each Debtor on an individual basis, and the Effective Date for any individual Debtor may occur prior to the Effective Date of any other individual Debtor.

C.      *Waiver of Conditions to the Confirmation Date and the Effective Date*

Other than to the extent specifically set forth in Article IX, and subject to the limitations contained in and the other terms of the Plan Support Agreement, each condition to (i) the Confirmation Date set forth in Article IX.A and (ii) the Effective Date set forth in Article IX.B may be waived in whole or in part at any time by the Debtors, with the consent of the Required Consenting Unsecured Creditors (such consent not to be unreasonably withheld) without an order of the Bankruptcy Court; *provided* that, solely to the extent that the waiver of any condition would impact the Allowed amount or treatment of the First Lien Notes Claims or Term Loan Facility Claims, such waiver shall also be subject to the consent (not to be unreasonably withheld) of the Required Consenting Jackson Ad Hoc Group Noteholders and the Required Consenting First Lien Noteholders (with respect to the First Lien Notes Claims) and the Required Consenting Jackson Ad Hoc Group Members (with respect to the Term Loan Facility Claims); *provided*, *further*, *however*, the condition in Article IX.B.3 of the Plan may be waived with respect to a particular Definitive Document only to the extent that such waiver conforms to the applicable consent rights in the Plan Support Agreement; *provided*, *further*, with respect to the condition in Article IX.A:  (a) for the avoidance of doubt, if a Debtor is not party to the Settlement Agreement, such Debtor's consent shall not be needed to waive such condition and (b) the consent of the Required Consenting Creditors and (applicable) Debtors to waive such condition may be withheld or granted in each of the Debtors' and Required Consenting Creditors' sole discretion.

D.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

E.      *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur with respect to any particular Debtor, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtor; (2) prejudice in any manner the rights of such Debtor, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an

68

admission, acknowledgment, offer, or undertaking by such Debtor, any Holders, or any other Entity in any respect. Notwithstanding the foregoing, upon the occurrence of a Plan Toggle Event, the Plan shall immediately and automatically convert to the Non-TopCo Plan, and any references herein to the "Plan" or to the "Debtors" shall be deemed to refer to the Non-TopCo Plan and the Non-TopCo Debtors, respectively.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.      *Modification of Plan*

The Debtors reserve the right (subject to the terms of the Plan Support Agreement, and the consents required therein, including the PSA Definitive Document Requirements) to modify the Plan prior to Confirmation and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights (subject to the terms of the Plan Support Agreement, and the consents required therein, including the PSA Definitive Document Requirements) to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and (subject to the terms of the Plan Support Agreement, and the consents required therein, including the PSA Definitive Document Requirements), to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Notwithstanding anything to the contrary herein, the Debtors or the Reorganized Debtors, as applicable, shall not amend or modify the Plan in a manner inconsistent with the Plan Support Agreement or the PSA Definitive Document Requirements.  If, prior to entry of the Confirmation Order, either of the following events occur, then the Plan shall be automatically amended to provide that the HoldCo Guarantee Claims shall not be released pursuant to the Plan, and instead the HoldCo Guarantee Claims may be asserted against each and every HoldCo:  (a) Consenting Creditors that hold at least two-thirds (2/3) of the Connect Senior Notes (excluding any Connect Senior Notes held by the Debtors) cease to be party to the Plan Support Agreement or (b) the Required Consenting HoldCo Creditors have terminated the Plan Support Agreement.

### B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C.      *Revocation or Withdrawal of Plan*

Subject to the Plan Support Agreement (including the PSA Definitive Document Requirements), the Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan (other than the Settlement Agreement, to the extent embodied in an agreement other than the Plan), assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.  decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.  resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.  ensure that distributions to Holders of Allowed Claims and Interests (as applicable) are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5.  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.  enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

7.  enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.  grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.  adjudicate, decide, or resolve any and all matters related to the Restructuring Transactions;

10. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, including any action to adversely impact, reduce or diminish the Debtors' or Reorganized Debtors' net operating losses or other tax assets or attributes, or any action (including in the United States or any foreign jurisdiction) that is intended or is reasonably likely to directly or indirectly prevent, impede, hinder, adversely affect, and/or delay any of the Restructuring Transactions or any actions or efforts of the Debtors and Reorganized Debtors and/or their ability to consummate the Plan;

11. hear and determine any dispute in connection with the exercise of any Indenture Trustee Charging Lien;

12. resolve any cases, controversies, suits, disputes, Causes of Action, or any other matters that may arise in connection with the Consummation, interpretation, or enforcement of the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions, or any Entity's obligations incurred in connection with the foregoing, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Transactions;

70

13. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VI.K.1 of the Plan; (b) with respect to the releases, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and, subject to any applicable forum selection clauses, contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications to the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile or clarify any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court; and

19. hear any other matter not inconsistent with the Bankruptcy Code;

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against or Interests in the Debtors that arose prior to the Effective Date.

Notwithstanding the foregoing, on and after the Effective Date, the Bankruptcy Court shall not retain jurisdiction over matters arising out of or related to each of the New Debt Documents, New Warrant Agreements, CVR Agreements, and New Corporate Governance Documents, and the New Debt Documents, New Warrant Agreements, CVR Agreements, and New Corporate Governance Documents shall be governed by the respective jurisdictional provisions therein.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims against and Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, and consistent in all respects with the terms of the Plan Support Agreement (including the consent rights set forth therein), the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Plan Support Agreement; *provided* that such agreements and other documents shall be consistent with the PSA Definitive Document Requirements.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims and Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, including any subscription agreements, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Dissolution of the Committee*

On the Effective Date, the Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases; *provided* that the Committee shall be deemed to remain in existence solely with respect to, and shall not be heard on any issue except, applications filed by the Professionals pursuant to sections 330 and 331 of the Bankruptcy Code.  From and after the Effective Date, none of the Debtors or the Reorganized Debtors shall be responsible for paying any fees or expenses incurred after the Effective Date by the members of or advisors to the Committee.

D.      *Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the applicable Reorganized Debtors for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized Debtor is converted, dismissed, or closed, whichever occurs first.

E.      *Payment of Certain Fees and Expenses*

Without any further notice to or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall pay on the Effective Date all then-outstanding reasonable and documented unpaid fees and expenses incurred on or before the Effective Date by all of the attorneys, advisors, and other professionals payable under the Plan and the Plan Support Agreement.  Any such costs and expenses that are attorneys' fees and expenses shall be submitted to the Debtors or the Reorganized Debtors in the form of summary invoices of the relevant law firms.

F.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court has entered the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement

72

shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

G.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

H.      *Service of Documents*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Reorganized Debtors:**

Intelsat S.A.
7900 Tysons One Place
McLean, Virginia 22102
Attention:  Michelle Bryan
E-mail:  Michelle.Bryan@Intelsat.com

With copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
Attention:   Edward Sassower, P.C.; Steven Serajeddini, P.C.; and Aparna Yenamandra
E-mail: ESassower@Kirkland.com; Steven.Serajeddin@Kirkland.com;
Aparna.Yenamandra@Kirkland.com

and

Kutak Rock LLP
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:  (804) 644-1700
Facsimile:  (804) 783-6192
Attention: Michael A. Condyles (VA 27807); Peter J. Barrett (VA 46179);
Jeremy S. Williams (VA 77469); Brian H. Richardson (VA 92477)
Email:  Michael.Condyles@KutakRock.com; Peter.Barrett@KutakRock.com;
Jeremy.Williams@KutakRock.com; Brian.Richardson@KutakRock.com

73

**If to the Committee:**

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:   Dennis Dunne, Andrew Leblanc, Matthew Brod
E-mail: ddunne@milbank.com; aleblanc@milbank.com; mbrod@milbank.com

After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to Entities that continue to receive documents pursuant to Bankruptcy Rule 2002 requiring such Entity to file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

I.      *Entire Agreement*

Except as otherwise indicated, and without limiting the effectiveness of the Plan Support Agreement (including the consent rights set forth therein), the Plan (including, for the avoidance of doubt, the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

J.      *Plan Supplement Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan, *provided*, for the avoidance of doubt, all such exhibits and documents shall comply with the PSA Definitive Document Requirements.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from https://cases.stretto.com/intelsat or the Bankruptcy Court's website at www.vaeb.uscourts.gov/bankruptcy.  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, the Plan Supplement shall control, *provided*, for the avoidance of doubt, all such exhibits and documents shall comply with the PSA Definitive Document Requirements.  The documents considered in the Plan Supplement are an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

K.      *Non-Severability*

Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions, and the Definitive Documents, are mutually dependent and non-severable. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan and the Definitive Documents are:  (1) valid and enforceable pursuant to their terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors and the Required Consenting Creditors consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

L.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Consenting Creditors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

74

*M.      Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

*N.      Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Dated:  August 24, 2021

Intelsat S.A.
on behalf of itself and all other Debtors

*/s/ Draft*
David Tolley
Chief Financial Officer and Co-Chief Restructuring
Officer
Intelsat S.A.

**Exhibit C**

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Chapter 11 Plan Support Agreement, dated as of August 24, 2021 (the "**Agreement**"),[1] by and among Intelsat S.A. and its affiliates and subsidiaries bound thereto and the Consenting Creditors, including the transferor to the Transferee of any Company Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Creditor" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein applicable to a Consenting Creditor as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:

Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| Term Loan Facility | |
| 8.00% First Lien Notes | |
| 9.50% First Lien Notes | |
| Jackson Senior Notes | |
| Connect Senior Notes | |
| Lux Senior Notes | |
| Convertible Senior Notes | |
| Interests | |

---

[1]  Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

**Exhibit D**

**Joinder Agreement**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Chapter 11 Plan Support Agreement, dated as of August 24, 2021 (the "**Agreement**"),[1] by and among Intelsat S.A. and its affiliates and subsidiaries bound thereto and the Consenting Creditors, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "Consenting Creditor" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof and any further date specified in the Agreement, in each case, applicable to such class of Consenting Creditor.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Term Loan Facility | |
| 8.00% First Lien Notes | |
| 9.50% First Lien Notes | |
| Jackson Senior Notes | |
| Connect Senior Notes | |
| Lux Senior Notes | |
| Convertible Senior Notes | |
| Interests | |

---

[1]     Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT E

**Corporate Governance Term Sheet**

*Execution Version*

**REORGANIZED INTELSAT CORPORATE GOVERNANCE TERM SHEET**

The following term sheet (this "**Term Sheet**") presents certain material terms in respect of the corporate governance of the Equity Issuer (the "**Company**") and the Reorganized Debtors upon the consummation of the Restructuring Transactions.  Capitalized terms used but not immediately defined shall have the meanings ascribed to such terms in the Plan, the Plan Support Agreement, or as otherwise defined herein, as applicable.  The agreements set forth herein will be further and definitively documented in the New Corporate Governance Documents, to be entered into on the Effective Date of the Plan (or the Non-TopCo Plan, as applicable).

| | |
|---|---|
| **General** | The Company (i) shall emerge from the Chapter 11 Cases as a private company on the Effective Date and the New Common Stock shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the New Common Stock on a recognized U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents. |
| **New Corporate Governance Documents** | The New Corporate Governance Documents, which shall be reasonably acceptable to the Required Consenting Unsecured Creditors, shall include, among other documents, the Equity Issuer's articles of association, governed by Luxembourg law (the "**Articles of Association**"), and a shareholders agreement, governed by Delaware law (the "**Shareholders Agreement**"). |
| | The Board nomination rights and minority shareholder protections set forth in this Term Sheet shall be set forth in both the Articles of Association and the Shareholders Agreement. |
| | Notwithstanding anything to the contrary contained herein, the New Corporate Governance Documents will permit all transactions contemplated by the Plan (including the issuance of any New Common Stock issuable pursuant to the Management Incentive Plan, the New Warrant Agreements, and the CVR Agreements). |
| **Board of Directors:** | <u>Composition/Designation</u>: The size of the Board of Directors of the Company (the "**Board**") will at all times be seven (7) directors (each, a "**Director**"), unless the Board is increased to a greater number of directors as set forth herein. At the time of the Effective Date, each Director must be a citizen of the United States. The Board shall be selected as follows: |
| | **<u>A Directors:</u>** |
| | (i)    three (3) Directors designated by Pacific Investment Management Company LLC ("**PIMCO**", and such directors, the "**PIMCO Directors**"); <u>provided</u>, that at least one of the PIMCO Directors shall not be an employee or member of the board of managers or other governing body of PIMCO or any of its affiliates (such director, the "**Non-Employee PIMCO Director**"), <u>provided</u>, <u>further</u>, that such Non-Employee PIMCO Director shall have experience in one of the following industries: (a) space, |

(b) satellite, (c) technology, (d) communication, (e) aerospace and defense and (f) military/government.

**B Directors:**

(i)      one (1) Director designated by Appaloosa LP (together with its affiliates and related funds, "**Appaloosa**", and such director, the "**Appaloosa Director**");

(ii)     one (1) Director designated by Davidson Kempner Capital Management LP (together with its affiliates and related funds, "**DK**", and such director, the "**DK Director**"), provided, that the DK Director shall not be an employee or member of any governing body of DK, and provided, further, that such DK Director shall have relevant industry experience;

(iii)    one (1) Director designated by CarVal Investors (together with its affiliates and related funds, "**CarVal**", and together with Appaloosa and DK, the "**Minority Investors**," and such director, the "**CarVal Director**" and together with the Appaloosa Director and the DK Director, the "**Minority Directors**"), provided, that the CarVal Director shall not be an employee or member of any governing body of CarVal, and provided, further, that such CarVal Director shall have relevant industry experience; and

(iv)     the then-serving Chief Executive Officer of the Reorganized Debtors ("**CEO**").

Limitation on Director Appointment Rights. Notwithstanding any other provision herein, no shareholder (including its Affiliates) shall be entitled to appoint more than three (3) Directors to the Board at any time, notwithstanding the amount of shares of New Common Stock owned by such shareholder and its Affiliates.

Director Removal/Replacement: A Director may be removed and/or replaced at any time, with or without cause, as determined by the shareholder(s) entitled to designate or appoint such Director, which right of removal and replacement shall be a contractual right set forth in the Shareholders Agreement (for purposes of Luxembourg law, such removed Director shall resign at the request of such shareholder). Step-down provisions at 20% (for 3 Directors, from 3 Directors to 2 Directors), 15% (for 2 Directors, from 2 Directors to 1 Director) and 5% (for 1 Director, from 1 Director to no Directors) of the then-outstanding shares of New Common Stock, calculated in accordance with the Dilution Principles, and such board designation rights to be transferrable in connection with sales of equity, subject to the transferee (together with its affiliates) meeting the thresholds set forth above. In the event a shareholder loses the right to appoint a Director pursuant to the step-down provisions, such shareholder will promptly remove its Director(s) and such vacancy will be filled by a majority vote of the then existing Board and such new Director must (i) be unaffiliated with any existing shareholder holding more than 5% of the then-outstanding shares of New Common Stock (calculated in accordance with the Dilution Principles) and (ii) satisfy the independence requirements of the New York Stock Exchange rules.

Chairperson:  The Chairperson will be selected by the PIMCO Directors; provided, that, such person is acceptable to at least two of the three Minority Directors; provided, further, that after the first year following the Effective Date, the Chairperson will be selected by majority vote of the Board on an annual basis.

Quorum:  The quorum for Board meetings shall require (a) a majority of the Board, and (b) for so long as (i) the Minority Investors have the right to appoint three (3) Minority Directors, two (2) such Minority Directors, and (ii) the Minority Investors have the right to appoint two (2) Minority Directors, one (1) such Minority Director; provided, that the quorum requirements set forth in clause (b) above will not apply as to a properly called meeting if such Minority Directors fail to appear at such meeting and a subsequent properly called meeting in adjournment thereof is held for substantially the same purposes between three (3) and ten (10) business days after the first meeting (in which case quorum will be assumed at such second properly called meeting, assuming the quorum requirement of a majority of the Board is satisfied). Notwithstanding the foregoing, the quorum of any portion of a Board meeting where a Major Consent Matter or Supermajority Board Matter (each as defined below) will be considered shall require, in addition to that set forth in the immediately preceding sentence, each of the Minority Directors appointed by the Minority Investors; provided that such special quorum requirements will not apply as to a properly called meeting if (i) a Minority Director fails to appear at a properly called meeting and the same Minority Director fails to appear at a subsequently properly called meeting in adjournment thereof held between three (3) and ten (10) business day after the first meeting (in which case quorum will be assumed at such second properly called meeting, assuming the quorum requirement of a majority of the Board is satisfied) and (ii) any of the Minority Directors fails to appear at a properly called meeting and any of the other Minority Directors fails to appear at a subsequently properly called meeting in adjournment thereof held between three (3) and ten (10) business days after the second meeting (in which case quorum will be assumed at the following properly called meeting (that is, the third meeting), assuming the quorum requirement of a majority of the Board is satisfied) provided that, in each case, the terms of the particular Major Consent Matter or Supermajority Board Matter remain substantially consistent for each meeting and adjournment thereof.  For the avoidance of doubt, quorum will be achieved with a majority of the Directors regardless of whether any Minority Directors are present at a third properly called meeting where a Major Consent Matter or Supermajority Board Matter will be considered in accordance with the foregoing.   In addition, the special quorum requirements set forth in the immediately preceding two sentences shall only apply to the portion of the Board meeting relating to the Major Consent Matter or Supermajority Board Matter at issue, and all regular business at the Board meeting may still be conducted even if the special quorum requirements are not satisfied at such Board meeting (but subject to the quorum requirements set forth in the first sentence of this section entitled "**Quorum**").

Voting: Each Director will have one vote with respect to each matter to be decided upon by the Board.  All matters will be decided by the affirmative vote or consent of a majority of the Directors present or represented and voting at a Board meeting,

| | |
|---|---|
| | except with respect to each of the Major Consent Matters and Supermajority Board Matters as set forth below. Unanimous consent of all of the Directors in writing will be further permitted.<br><br>Observer Rights:  Each shareholder that has the right to appoint a Director (including, prior to any step-down as provided herein, each Minority Investor) shall have the right to appoint a non-voting observer (each, an "**Observer**") to attend all meetings of the Board and to receive all materials provided, or made available, to the Directors, subject to customary limitations to protect privilege.<br><br>Board Fees & Expenses / D&O Insurance and Indemnification:  The New Corporate Governance Documents shall provide for Director and officer indemnification and exculpation to the maximum extent provided by applicable law.  The Articles of Association shall include (i) the board nomination rights set forth above, (ii) director indemnification provisions reasonably acceptable to the Required Consenting Unsecured Creditors, subject to applicable law, and (iii) customary expense reimbursement for Directors, subject to applicable law. The Company shall maintain from and after the Effective Date D&O insurance on customary terms for the industry and size of the Company.<br><br>Transferability:  Each shareholder shall be permitted to transfer all or a portion of its shares of New Common Stock; provided, that any of its rights, if any, with respect to the appointment and/or approval of Directors and Observers in connection with any permitted transfer of its New Common Stock shall be transferable so long as the number of shares of New Common Stock so transferred is equal to or in excess of any applicable threshold number of shares required to exercise such rights; provided, that the rights to designate an Observer shall not be transferable separate from the right to appoint or approve a Director.<br><br>Meetings of the Board: A meeting of the Board may be called at any time by (i) the Chairman, (ii) the CEO or (iii) two (2) of the Minority Directors.<br><br>Details regarding the frequency and conduct of the Board meetings shall be set forth in the New Corporate Governance Documents. |
| **Major Consent Matters:** | The Articles of Association shall require that Major Consent Matters require approval of either (x)(a) at least 66-2/3% (5 of 7) Directors and (b) at least 55% of the then-outstanding shares of New Common Stock or (y) at least 85% (6 of 7) Directors.<br><br>"**Major Consent Matters**" shall mean each of the following:<br><br>(i)  any voluntary dissolution or liquidation of the Company or Jackson;<br><br>(ii)  any sale of the Company (including any change in control of the majority of voting interests in the Company, other than any transfer by shareholders of the Company in compliance with the tag-along rights set forth below to the extent that the Company or its subsidiaries are not involved in such transaction in a capacity other than implementing the transfer of equity securities in connection therewith and other actions ancillary thereto) or all or substantially all of its assets; |

-4-

(iii)   conversion of the Company to another form of entity (other than in connection with an initial public offering);

(iv)   any redemption or repurchase of equity securities other than (x) pursuant to a pro rata offer to all holders of such class of equity securities or (y) of equity securities owned by employees of the Company in connection with termination of employment;

(v)   any election of the Company to be taxed in a different manner (including any change to the Company's jurisdiction of organization);

(vi)   any amendment to the Articles of Association, including, without limitation, any amendment to the Articles of Association that would create additional authorized share capital, provided, however, that 20% share capital (in addition to share capital reserved for issuance pursuant to the Management Incentive Plan, the New Warrant Agreements and the CVR Agreement) shall be authorized but unissued on the Effective Date and issuable pursuant to a Non-Conforming Issuance;

(vii)   any suppression of statutory pre-emption rights, provided, however, that the Company may issue 20% of its authorized but unissued shares of New Common Stock without honoring shareholders' preemptive rights if the Board determines (as a Supermajority Board Matter) that such shares must be issued before the Company could comply with such preemptive rights (such issuance, the "**Non-Conforming Issuance**"), provided, further, that upon any Non-Conforming Issuance, the Company shall make a subsequent true-up offering to give effect to preemptive rights within 30 days (a "**True-Up Offering**");

(viii)   the issuance of equity securities, options or other rights to acquire such equity securities, or convertible/exchangeable indebtedness, of the Company or any of its subsidiaries; other than a Non-Conforming Issuance;

(ix)   any change in the size, voting or composition of the Board; provided that such change shall not (a) reduce the size of the Board to less than 7 members, (b) modify the consent or quorum rights of any Directors, or (c) modify the voting thresholds specified in this Term Sheet; and

(x)   any amendment, modification, or supplement to the Shareholders Agreement or the organizational documents of the Company (other than the Articles of Association) with respect to any of the foregoing matters, or to any provision related to preemptive rights, transfer restrictions, tag-along rights, drag-along rights, information rights, registration rights or anti-takeover protection, or any waiver of any provision related to any of the foregoing, in each case to the extent such amendment, modification, or supplement is material and adverse to shareholders (other than PIMCO and its affiliates).

For the avoidance of doubt, nothing herein shall limit the rights of shareholders under Luxembourg Law to approve extraordinary shareholder resolutions.

-5-

| Supermajority Board Matters | The following "**Supermajority Board Matters**" shall require the affirmative vote of at least 66-⅔% (5 of 7) of the Directors: |
|---|---|
| | (i)  any voluntary bankruptcy of the Company or Jackson; |
| | (ii)  a Non-Conforming Issuance; |
| | (iii)  Any dividend or distribution on or repurchase or redemption of equity securities of the Company or any of its subsidiaries, other than (a) dividends and distributions from a wholly-owned subsidiary of the Company to the Company or another wholly-owned subsidiary thereof and (b) redemptions of equity securities of the Company owned by employees of the Company in connection with termination of employment; |
| | (iv)  Amendments to the New Corporate Governance Documents, to the extent not a Major Consent Matter; |
| | (v)  Consummation of an initial public offering; |
| | (vi)  Incurring material debt, including any guarantees, incurrence or prepayment thereof by the Company or any of its subsidiaries (other than drawdown of revolving debt previously approved and trade debt incurred in the ordinary course of business); |
| | (vii)  Hiring and firing of senior officers of the Company or any of its subsidiaries; |
| | (viii)  Commencement or settlement of any litigation or dispute with an expected value of more than $50 million; |
| | (ix)  Any change in auditor or change in significant tax or accounting policy other than as required by GAAP; |
| | (x)  Any acquisition or disposition of assets or liabilities, or merger, consolidation, share exchange, business combination, joint venture or similar transaction involving the Company or any of its subsidiaries outside the ordinary course of business, in a transaction that involves consideration (including assumed debt) or investments in excess of 10% of the consolidated total assets of the Company and its subsidiaries, to the extent not a Major Consent Matter; |
| | (xi)  Any material transaction of the Company or any of its subsidiaries involving spectrum rights (including transferring the use of spectrum rights or receiving proceeds from spectrum clearances) outside the ordinary course of business; |
| | (xii)  adopting, approving or revising any equity incentive plan; |
| | (xiii)  entry into any new line of business or termination of any material existing line of business, or any other material change in the nature or scope of the business of the Company and its subsidiaries; |
| | (xiv)  approving any annual budget of the Company and its subsidiaries, provided, that to the extent that a budget has not been approved by year-end, |

|  | until a new budget is approved, the Company will be permitted to operate on the prior year's budget with a variance of up to 10% on a consolidated basis (which shall include a variance of no more than 10% on line items for capital expenditures and operating expenses); and |
|  | (xv)    any capital expenditures by the Company or any of its subsidiaries in excess of $500 million in the aggregate during any 12-month period. |
|  | Prior to finalizing the New Corporate Governance Documents, the parties thereto shall work in good faith to adjust the Majority Consent Matters and the Supermajority Board Matters as to Intelsat US LLC and its subsidiaries to the extent required to account for applicable regulatory requirements. |
| **Transfer/Resale Restrictions:** | <u>General</u>:  The New Common Stock (including any New Common Stock issuable pursuant to the Management Incentive Plan, the New Warrant Agreements, or the CVR Agreements), the New Warrants, and the CVRs issued pursuant to the Plan will be exempt from registration under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), pursuant to, and to the fullest extent permitted under, section 1145 of the U.S. Bankruptcy Code.<br><br><u>Transfer Restrictions</u>:  There shall be no restrictions on the transfer of shares of New Common Stock, New Warrants, or CVRs, except as expressly set forth herein (including the Anti-takeover provisions set forth below), except that no transfer of New Common Stock, New Warrants, or CVRs shall be made in violation of the Securities Act or any applicable U.S. federal or state securities laws or shall result in any requirement that the Company register the New Common Stock or any of its other capital stock under Section 12(g) of the Securities Exchange Act of 1934, as amended. For the avoidance of doubt, the New Corporate Governance Documents will not include any ROFR, ROFO, ROFN or similar restrictions.<br><br><u>Conditions</u>:  Any transferee (other than an existing party to such agreement) will be required to execute a customary joinder to the Shareholders Agreement, New Warrant Agreement, or CVR Agreements, as applicable, (which joinder shall not require any countersignature from the Company) in connection with a permitted transfer.  The Company will use commercially reasonably efforts to notate its books and records reflecting the trade within seven (7) business days from receipt of any joinder (or notice of trade, as applicable). |
| **Preemptive Rights:** | In addition to any applicable statutory preemptive rights provided under Luxembourg law (subject to item (vii) under Major Consent Matters), shareholders shall have *pro rata* preemptive rights, subject to customary exceptions, with respect to any (a) new equity issuances (including options or other rights to acquire equity securities), and (b) new debt issuances offered to any other shareholder or any of its affiliates; <u>provided</u>, <u>however</u>, that nothing herein shall prevent the Company from making a Non-Conforming Issuance with a subsequent True-Up; <u>provided</u>, <u>further</u>, that all such preemptive rights shall expire upon the effectiveness of an initial public offering of the Company. |
| **Tag-Along Rights:** | In the event that any shareholder or group of shareholders intends to transfer at least 25% of the then-outstanding shares of New Common Stock in any single transaction or series of related transactions (other than to an affiliate, in a |

| | |
|---|---|
| | Drag-Along Sale, or pursuant to its registration rights), each other shareholder may participate in such sale by transferring a *pro rata* portion of its shares of New Common Stock upon the same terms and conditions; provided, however, that such tag-along rights shall expire upon the effectiveness of an initial public offering of the Company. |
| **Drag-Along Rights:** | If any shareholder or group of shareholders holding in the aggregate more than 50% of the then outstanding shares of New Common Stock (collectively, a "**Drag-Along Holder**") proposes to transfer at least 75% of their then-outstanding shares of New Common Stock (other than to an Affiliate or in connection with an IPO), or to otherwise effect a sale of the Company, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets, or otherwise, in each case to an unaffiliated third party purchaser or acquirer, such Drag-Along Holder may require each other shareholder (a "**Dragged Seller**") to participate in such transaction (a "**Drag-Along Sale**") on a pro rata basis (except that, at the election of the Drag-Along Holder, a Dragged Seller may be required to include all of its equity in such Drag-Along Sale if such Dragged Seller, together with its affiliates, holds less than 1% of the Company's then-outstanding common equity or, if such Dragged Seller is an employee of the Company or any of its subsidiaries, rollover in customary amounts) if, and only if, (x) the Drag Threshold (as defined below) has been met and (y) at least 75% of the consideration for the Drag-Along Sale is paid in cash and/or publicly traded securities; provided, however, that such drag-along rights shall expire upon the effectiveness of an initial public offering of the Company.  In connection with such Drag-Along Sale, each shareholder will (i) consent to, vote in favor of, raise no objection to and waive and refrain from exercising any appraisal or dissenter's rights claim or any claim of fiduciary breach (but not any claim that such Drag-Along Sale is not being effected in accordance with the terms set forth in the New Corporate Governance Documents) and (ii) obtain any required consents and take any and all reasonably necessary action in furtherance of the Drag Along Sale at the Company's expense and subject to other customary terms and conditions (including, but not limited to, limitation of liability in excess of consideration received, pro rata indemnification and no non-compete restrictions) reasonably acceptable to the Required Consenting Unsecured Creditors.  Management of the Company shall not be required to agree to any non-compete, non-solicit or similar restrictive covenants in connection with a Drag-Along Sale that are more restrictive in any manner than those (in scope, duration or otherwise) to which management is then subject. "**Drag Threshold**" shall mean the approval of at least (i)(a) 66-⅔% (5 of 7) Directors and (b) 55% of the then-outstanding shares of New Common Stock or (ii) 85% (6 of 7) Directors. |
| **Anti-Takeover Restrictions:** | No shareholder (including affiliates or other entities acting in coordination together) (an "**Acquiring Shareholder**") may acquire (whether through acquisition, issuance, merger, or otherwise) shares of the Company that would result in such Acquiring Shareholder holding more than 45% of the outstanding shares of New Common Stock unless: |
| | (i)      the Acquiring Shareholder offers to purchase all other outstanding shares |

| | |
|---|---|
| | of New Common Stock on the same terms; |
| | (ii) the Acquiring Shareholder's offer to other shareholders is approved by a majority of disinterested directors; and |
| | (iii) the Acquiring Shareholder's offer to other shareholders is approved by shareholders holding a majority of all outstanding shares of New Common Stock (excluding all shares held by the Acquiring Shareholder). |
| **Information Rights:** | All shareholders shall be entitled to customary information rights including financial reports, subject to restrictions for disclosure of budgets and Board materials to competitors. In person meetings to be customarily limited. Information rights shall expire upon the effectiveness of an initial public offering of the Company. |
| **No Non-*Pro Rata* Dividends:** | No non-pro rata dividends shall be permitted (other than in connection with redemptions for any aggregator vehicle related to a management incentive plan). |
| **Luxembourg Fiduciary Duties** | Any duties that are owed by a board of directors of an S.A. to an S.A. under Luxembourg law shall be owed by the Board to the Company (which shall be an S.A.); provided that this shall not grant any rights to the Company or any other person that would not be afforded under Luxembourg law (including, without limitation, with respect to rights that are afforded under Luxembourg law only to holders of 10% of more of the shares of New Common Stock). |
| **Affiliate Transactions:** | Any transaction or series of related transactions between the Company or any of its subsidiaries, on the one hand, and any affiliate or director of the Company or any portfolio company of PIMCO or the Minority Investors, on the other hand, shall require approval from a majority of the disinterested Directors. |
| **Registration Rights:** | The New Corporate Governance Documents shall include a registration rights agreement (the "**Registration Rights Agreement**"), governed by Delaware law, providing as follows: |
| | (i) the Company shall use reasonable efforts to pursue public listing of its common stock after shareholder demand made at any time on or after the fourth (4th) anniversary of the Effective Date, by either (a) PIMCO or (b) a majority of the shares of New Common Stock held by the non-PIMCO shareholders; |
| | (ii) the Company is required (subject to customary exceptions) to (a) go public no later than the fifth (5th) anniversary of the Effective Date, and (b) confidentially furnish, if permitted by the rules of the SEC at the time of submission, a preliminary registration statement with the SEC relating thereto at least 180 days before the fifth (5th) anniversary of the Effective Date; provided, that, the sole remedy for breaching such obligations shall be specific performance, including injunctive relief in support of specific performance; |
| | (iii) holders of 5% or more of the outstanding shares of New Common Stock on the Effective Date to receive customary unlimited piggyback registration rights, subject to customary cutbacks; |

|  |  |
|---|---|
|  | (iv) Large Holders (the definition of which is to be determined in the Registration Rights Agreement) will receive customary demand registration rights following the Company's public listing, in a number of demands to be determined in the Registration Rights Agreement, with such number of demands not to exceed two in a twelve month period;<br><br>(v) Large Holders shall be entitled to make a demand only if the total offering price of the shares to be sold in such offering (including piggyback shares and before deduction of underwriting discounts) is reasonably expected to exceed, in the aggregate, $50 million;<br><br>(vi) holders of registration rights will agree to customary underwriter lockup provisions in connection with underwritten offerings by the Company or pursuant to the Registration Rights Agreement;<br><br>(vii) registration rights with respect to any registrable securities shall terminate when such securities have been disposed of pursuant to Rule 144 promulgated under the Securities Act (or any successor provision); and<br><br>(viii) the Registration Rights Agreement will contain other customary terms, including with respect to indemnification and costs borne by the Company in connection with registered offerings.<br><br>In connection with the Company's initial listing or initial public offering, the shareholders shall work in good faith to adjust the Board composition and the Director designation rights described above under "**Board of Directors**" to the extent required to satisfy applicable securities laws and stock exchange listing requirements. |
| **No Side Agreements:** | All shareholders shall represent in the Shareholders Agreement that, as of the Effective Date, all agreements with respect to the governance of the Company are as set forth in the New Corporate Governance Documents, and no other agreements or understandings (whether oral or written) with respect to any such matters or the relationship between or among the Company, its Directors and any shareholder have been entered into or made. |
| **Calculations:** | For purposes of determining satisfaction of any holder thresholds in the New Corporate Governance Documents, the New Common Stock held by any shareholder will be (a) calculated without giving effect to any management incentive dilution (whether as a result of actually issued and outstanding shares of New Common Stock or contingent instruments (e.g., options)) or dilution from other future-issued securities (including the New Warrants or CVRs) and (b) aggregated with shares of New Common Stock held by its and its affiliates' related funds, investment vehicles and managed accounts; provided, however, that if the Company makes a Non-Conforming Issuance, any determination made on or before the True-Up Offering shall exclude any shares issued in connection with such Non-Conforming Issuance (the "**Dilution Principles**"). |
| **Term Sheet Amendments** | Any amendments to this Term Sheet shall require approval of the Required Consenting Unsecured Creditors, in addition to any other consents required by the PSA. |

-10-

## **EXHIBIT F**

**CVR Term Sheet**

*Execution Version*

## CONTINGENT VALUE RIGHT TERM SHEET

The following term sheet (this "**Term Sheet**") presents certain preliminary terms in respect of the CVRs set forth in the Plan.  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Plan Support Agreement.[1]

| | |
|---|---|
| **Issuer** | The CVR Issuer will issue the CVRs. |
| **Term** | The CVRs shall automatically terminate on the earlier of:  (a) the date on which the holders of the CVRs have received the maximum amount of distributions on account of the CVRs permitted hereunder, and (b) the later of (i) the Outside Date, and (ii) the date on which there is no obligation remaining pursuant to any Additional Acceleration Contract to pay Further Acceleration Payments to any Debtor or Reorganized Debtor (or any of their respective Affiliates (as defined herein)). |
| **CVR Distributions** | The Series A CVRs shall entitle the holder of such Series A CVRs to such holder's *pro rata* share (based on the number of Series A CVRs held by such holder as compared to the number of Series A CVRs issued on the Effective Date) of cash equal to one hundred percent (100%) of the Initial Further Acceleration Payments.  The aggregate consideration distributed in respect of the Series A CVRs (including, for the avoidance of doubt, any cash distributed on account of Pre-Effective Date Further Acceleration Payments) shall not exceed the amount of the Initial Further Acceleration Payments. Pursuant to the Plan, the Series A CVRs shall be issued *pro rata* to the Holders of Jackson Senior Notes Claims. |
| | The Series B CVRs shall entitle the holder of such Series B CVRs to such holder's *pro rata* share (based on the number of Series B CVRs held by such holder as compared to the number of Series B CVRs issued on the Effective Date) of cash equal to one hundred percent (100%) of the Subsequent Further Acceleration Payments.  The aggregate consideration distributed in respect of the Series B CVRs (including, for the avoidance of doubt, any cash distributed on account of Pre-Effective Date Further Acceleration Payments) shall not exceed the amount of the Subsequent Further Acceleration Payments.  Pursuant to the Plan, the Series B CVRs shall be issued in the following proportion: |
| | • 67.5% of the Series B CVRs shall be issued *pro rata* to the Holders of Jackson Senior Notes Claims; and |
| | • 32.5% of the Series B CVRs shall be issued *pro rata* to |

---

[1] "Plan Support Agreement" means the Chapter 11 Plan Support Agreement to which this Term Sheet is attached.

the Holders of Connect Senior Notes Claims.

No later than sixty (60) days after the Applicable Intelsat Recipients' receipt of funds pursuant to an Additional Acceleration Contract that, but for the Applicable Intelsat Recipients' receipt of the Minimum Payment, would constitute Further Acceleration Payments, the Debtors or Reorganized Debtors shall deposit cash to satisfy such CVRs (solely to the extent of funds already received) in an escrow account for the benefit of holders of CVRs, and the amount of cash distribution, upon the Applicable Intelsat Recipients' receipt of the Minimum Payment, shall bear interest at a rate per annum at the standard rate applicable to such escrow account from the time such deposit is made until such time that the Reorganized Debtors distribute such cash to the holders of CVRs. Any distribution of such escrowed cash to the CVR holders shall be reduced by the costs associated with such escrow. Upon the Applicable Intelsat Recipients' receipt of the Minimum Payment, the CVR Issuer shall make an initial distribution equal to the cumulative amount of escrowed cash on a *pro rata* basis, first to holders of Series A CVRs, and second, to the holders of Series B CVRs (such distribution, the "Initial Distribution"). Following the Initial Distribution, upon the receipt of any Further Acceleration Payments, the CVR Issuer shall make any subsequent distributions *pro rata* to all applicable holders of CVRs.

The CVR Issuer may engage a transfer agent to facilitate the tracking of the holders of the CVRs and the provision of notices to such holders.

Following receipt of Further Acceleration Payments, the CVR Issuer shall provide notice to the holders of CVRs, which may be through a transfer or similar agent, setting forth in reasonable detail the Board of Directors' calculation of the Further Acceleration Payments (including any appropriate adjustments for tax issues) and the amount of cash to be distributed. Promptly following delivery of such notice and any determinations as set forth in the next paragraph, the CVR Issuer shall distribute the applicable cash to the CVR holders pursuant to such determinations; *provided, however,* that the CVR Issuer shall distribute any cash on a pro rata basis as set forth above.

All determinations with respect to the calculation of the amount of Further Acceleration Payments (including any appropriate adjustments for tax issues) and cash to be distributed shall be reasonably made by the Board of Directors in good faith, and such determinations shall be binding on the holders of the CVRs absent manifest error; provided, that in the event that holders of CVRs holding at least 20% of the outstanding CVRs of any series disagree with such determination, such holders may engage an independent third-party financial, accounting, valuation,

2

| | |
|---|---|
| | appraisal or other advisor that is reasonably acceptable to the Board of Directors (an "**Independent Advisor**") to conduct its own determination of the amount of the Further Acceleration Payments (including any appropriate adjustments for tax issues). The Board of Directors will consider any comments from the Independent Advisor in good faith.  The CVR Issuer will bear fifty percent (50%) of the cost and expense of the Independent Advisor. |
| **No Interest** | Except as set forth above with respect to the cash distribution escrow account, prior to the Applicable Intelsat Recipient's receipt of the Minimum Payment, interest shall not accrue on any amounts that may be payable to a holder of a CVR. |
| **Exemption from Registration with the SEC; Not an Equity Security** | The CVRs shall be issued pursuant to section 1145 of the Bankruptcy Code (to the extent that such exemption under section 1145 of the Bankruptcy Code is unavailable, the CVRs will be issued pursuant to any other available exemptions from registration).<br><br>The CVRs shall not have any rights common to stockholders (e.g., dividends and voting) and will not represent an equity interest in the Equity Issuer or the CVR Issuer, if different. |
| **Transferability; Registration** | The CVRs shall not be subject to any transfer restrictions except as may be required by law, and will be transferrable/tradeable independent of New Common Stock. |
| **Receipt of Further Acceleration Payments Prior to the Effective Date** | In the event that (x) Jackson actually receives the Minimum Payment before the Effective Date and (y) the Debtors actually receive Further Acceleration Payments before the Effective Date (the "**Pre-Effective Date Further Acceleration Payments**"), then holders of CVRs shall receive, on the Effective Date, an amount of cash that such holders would have received had the CVRs been issued at the time that such Pre-Effective Date Further Acceleration Payments were actually received. |
| **Merger** | Upon any consolidation, amalgamation, merger or combination involving the Equity Issuer or CVR Issuer, the surviving entity in such merger shall assume all applicable obligations under the CVRs, including the obligation to provide to each holder of such CVRs cash in accordance with the requirements hereof. |
| **Change of Control** | The CVRs shall survive any change of control transaction (including a sale of all or substantially all of the assets of the CVR Issuer), entitling each holder of such CVRs to cash in accordance with the requirements hereof. |

| | |
|---|---|
| **Reporting and Disclosure** | The CVRs shall entitle the holders thereof to receive any information provided to minority shareholders of the Equity Issuer pursuant to the Equity Issuer's New Corporate Governance Documents (including the Articles of Association and Shareholders Agreement), subject to customary confidentiality provisions. |
| **Efforts to Obtain Further Acceleration Payments** | The CVR Agreement will include a covenant that the CVR Issuer and the Equity Issuer use commercially reasonable efforts to obtain Further Acceleration Payments; provided that nothing in this covenant shall alter the requirement that no Further Acceleration Payments shall exist until the Applicable Intelsat Recipients (on an aggregate basis) have received the Minimum Payment. |
| **Amendments; Consent** | Any waiver under, consent to or amendment of the CVR Agreement in respect of any series of CVRs shall require the consent of (i) the Board of Directors, including 3 of the 4 B Directors, (ii) with respect to the Series A CVRs, holders of the Series A CVRs holding at least a majority of the outstanding Series A CVRs, and (iii) with respect to the Series B CVRs, holders of the Series B CVRs holding at least 75% of the outstanding Series B CVRs (in each case, with customary amendments not requiring consent of any holders or requiring the consent of each affected holder, including amendments related to the amount of cash payable pursuant to such series of CVR). |
| **Condition Precedent to Issuance of CVRs** | For the avoidance of doubt, the CVRs shall not be issued prior to the satisfaction of all other conditions precedent to the Effective Date of the Plan (or waiver of such conditions in accordance with the terms of the Plan), including the condition precedent that the Settlement Order (as defined in the Plan) shall have been entered and not subject to any stay, and the Accelerated Relocation Payment Claims (as defined in the Plan) shall have been resolved pursuant to an order not subject to any stay, on the terms set forth in the Plan (or such other terms that are acceptable to the Required Consenting Jackson Crossover Group Members). |
| **Governing Law** | Delaware |

4

**DEFINITIONS**

| Term | Definition |
|---|---|
| **Accelerated Relocation Payments** | Those certain accelerated relocation payments as described in the C-Band Order allocated to the Debtors and/or Reorganized Debtors in an amount of $4,865,366,000. |
| **Additional Acceleration Contract** | A written contract between any Debtor or Reorganized Debtor (or any of their respective Affiliates), on the one hand, and any Private Entity, on the other hand, that provides for the payment of Applicable Consideration, and that is entered into prior to the Outside Date. |
| **Affiliate** | "Affiliate" of any specified Entity means any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity.  For purposes of this definition, "control," as used with respect to any Entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition and Term Sheet, the terms "controlling," "controlled by" and "under common control with" have correlative meanings. Notwithstanding the foregoing, and for the avoidance of doubt, no Entity shall be an Affiliate of the Debtors, Reorganized Debtors, or Equity Issuer solely because (a) it is a holder of New Common Stock of the Equity Issuer or (b) it is controlled by a holder of New Common Stock of the Equity Issuer. |

5

| | |
|---|---|
| **Applicable Consideration** | Any and all consideration, without duplication, that is actually received by any Debtor or Reorganized Debtor (or any of their respective Affiliates) from time to time from a Private Entity, solely to the extent such consideration is in connection with or directly related to private negotiations authorized by the FCC in footnote 497 of the C-Band Order to accomplish earlier clearing than the deadlines established by the FCC in the C-Band Order of the 3.7-4.0 GHz band in the contiguous United States, licenses for which were auctioned by the FCC on December 8, 2020 through February 17, 2021 in Auction 107 (the "Cleared Spectrum") and specifically excluding any other radio frequencies or locations outside the contiguous United States; provided such consideration (A) must be incremental to and in excess of the receipt of $4,865,366,000 (i.e., the maximum amount of potential Accelerated Relocation Payments currently provided under the C-Band Order) by the Applicable Intelsat Recipients (on an aggregate basis), whether received pursuant to the C-Band Order as Accelerated Relocation Payments or from a third party as compensation for the Applicable Intelsat Recipient's efforts to clear the Cleared Spectrum (such receipt of $4,865,366,000 by the Applicable Intelsat Recipients, the "Minimum Payment"), (B) shall not include any Expense Reimbursements, (C) shall be calculated on an after-tax, "with-and-without" basis, with the utilization of tax attributes to be treated as a tax cost, subject to appropriate adjustment provisions to account for any subsequent audit adjustment affecting such calculation, and (D) shall be reduced by all reasonable documented costs and expenses incurred by any Applicable Intelsat Recipient in seeking, obtaining or procuring such consideration. <br><br> For the avoidance of doubt, the term "Applicable Consideration" shall not include any portion of (a) the Accelerated Relocation Payments, or (b) any accelerated relocation payments provided under the C-Band Order to any other space station operator, including SES Americom, Inc., Eutelsat S.A., Telesat Canada, Star One S.A., or any of such entities' Affiliates and subsidiaries (collectively, the "Other FSS Operators") upon any consolidation, amalgamation, merger or combination involving the Debtors and/or Reorganized Debtors (or any of their respective Affiliates) and the Other FSS Operators. |
| **Applicable Intelsat Recipients** | "Applicable Intelsat Recipients" shall mean (i) prior to the Effective Date, Jackson, and (ii) on and after the Effective Date, the Equity Issuer and its Affiliates. |
| **Board of Directors** | The Equity Issuer Board (as defined in the Plan Support Agreement). |
| **C-Band Order** | That certain Report and Order and Order of Proposed Modification issued by the FCC on March 3, 2020 in *In the Matter of Expanding Flexible Use of the 3.7 to 4.2 GHz Band*, GN Docket No. 18-122, as may be amended or modified with respect to the clearing of the Cleared Spectrum. |
| **CVRs** | Collectively, the Series A CVRs and the Series B CVRs. |

6

| | |
|---|---|
| **CVR Agreement** | That certain agreement (or agreements) setting forth the full terms and conditions of the CVRs, the form of which shall be included in the Plan Supplement and acceptable to the Debtors, the Required Consenting Jackson Crossover Group Members, and the Required Consenting HoldCo Creditors. |
| **CVR Issuer** | That certain Reorganized Debtor or Reorganized Debtors that issue the CVRs and are obligated under the CVR Agreement.[2] |
| **Expense Reimbursements** | The payments received by the Debtors or Reorganized Debtors (or their affiliates) on account of compensable relocation costs as described in the C-Band Order. |
| **Further Acceleration Payments** | Any and all Applicable Consideration, without duplication, that is actually received, after the Applicable Intelsat Recipients (on an aggregate basis) have received the Minimum Payment, by any Debtor or Reorganized Debtor (or any of their respective Affiliates) pursuant to an Additional Acceleration Contract, not to exceed $420,000,000. <br><br> For the avoidance of doubt, any Applicable Consideration actually received, after the Applicable Intelsat Recipients (on an aggregate basis) have received the Minimum Payment, by any Debtor or Reorganized Debtor (or any of their respective Affiliates) pursuant to an Additional Acceleration Contract shall constitute Further Acceleration Payments regardless of whether such payments are received before or after the Outside Date. |
| **Initial Further Acceleration Payments** | The first $65,000,000 in Further Acceleration Payments received, after the Applicable Intelsat Recipients (on an aggregate basis) have received the Minimum Payment, by the Debtors or Reorganized Debtors (or any of their Affiliates). |
| **Jackson** | Collectively, Intelsat Jackson Holdings S.A. and all of its direct and indirect subsidiaries, prior to the Effective Date. |
| **New Common Stock** | The new common equity securities of the Equity Issuer. |
| **Outside Date** | The earlier of (i) the date on which the Debtors' or Reorganized Debtors', as applicable, Certification of Accelerated Relocation for Phase II is validated pursuant to the C-Band Order, and (ii) December 5, 2025, or such later deadline for clearing of the 3.7-4.0 GHz band as may be extended pursuant to the C-Band Order. |

---

[2] The specific Reorganized Debtor or Reorganized Debtors issuing the CVRs shall be determined in the Definitive Documents, with such Reorganized Debtor or Reorganized Debtors being acceptable to the Required Consenting Jackson Crossover Group Members, the Required Consenting HoldCo Creditors and the Debtors.

| | |
|---|---|
| **Private Entity** | An entity that is not a governmental unit (as defined in the Bankruptcy Code) and that is not the clearinghouse contemplated by the C-Band Order or any other comparable administrative entity selected by the FCC. Notwithstanding the foregoing, and for the avoidance of doubt, to the extent the Debtors or Reorganized Debtors (or their respective Affiliates) enter into an Additional Acceleration Contract with a Private Entity, and the parties agree to utilize a governmental entity or administrative clearinghouse for processing payments earned under such Additional Acceleration Contract, such payments shall be deemed to have been made by a "Private Entity"; *provided*, for greater clarity, the term "Applicable Consideration" shall not include any portion of the Accelerated Relocation Payments. |
| **Series A CVRs** | The Series A CVRs described in this Term Sheet. |
| **Series B CVRs** | The Series B CVRs described in this Term Sheet. |
| **Subsequent Further Acceleration Payments** | The first $355,000,000 in Further Acceleration Payments received, after the Applicable Intelsat Recipients (on an aggregate basis) have received the Minimum Payment, by the Debtors or Reorganized Debtors (or any of their Affiliates) in excess of the Initial Further Acceleration Payments. |

8

## EXHIBIT G

**Management Incentive Plan Term Sheet**

*Execution Version*

## INTELSAT S.A.

## MANAGEMENT INCENTIVE PLAN

The following (this "Term Sheet") summarizes the management incentive plan (the "MIP") to be established for executives and other key employees (each, a "Participant") of the Equity Issuer[1] (the "Company" or "Holdco") and its affiliates.

| | |
|---|---|
| *Overview:* | General.  The Company will institute the MIP, enact and enter into related policies and agreements and distribute the Awards (as defined below) to Participants, consistent with the terms and allocations set forth herein (*provided* that the form and substance of the MIP shall be consistent with the PSA Definitive Document Requirements (as defined in the Plan)), on the effective date of Holdco's chapter 11 plan of reorganization (the "Emergence Date").

The Required Consenting Jackson Crossover Group Members and the Debtors shall negotiate the terms of the definitive MIP documentation in good faith prior to the Emergence Date.  It shall be a condition precedent to the Effective Date of the Plan that the definitive documentation concerning the MIP shall be completed, *provided*, that such condition precedent may be waived by written agreement between the Required Consenting Jackson Crossover Group Members and the Debtors.

The MIP may be amended following the Emergence Date (and the issuance of the Emergence Grants (as defined below)) to have such other terms and conditions applicable to future issuances under the MIP as determined at the discretion of the Equity Issuer Board, but not inconsistent with the terms and conditions of this Term Sheet.  For the avoidance of doubt, such amendments will not apply to the Emergence Grants.

MIP and Cash LTIP Pools.  Holdco will reserve exclusively for Participants (i) a pool (such reserve, the "MIP Pool") of shares of common stock of Holdco ("Holdco Common Stock") representing 3.26% of Holdco Common Stock as of the Emergence Date, determined on a fully diluted and fully distributed basis (*i.e.*, assuming conversion of all outstanding convertible securities and full distribution of the MIP Pool and hereinafter referred to as "Fully Diluted Basis"), and (ii) $18 million in cash (the "Cash LTIP Pool").

Emergence Grants.

On the Emergence Date, Holdco will grant (i) a number of restricted stock units ("RSUs") and performance stock units ("PSUs") collectively representing 2.32% of Holdco Common Stock at target as of the Emergence Date and determined on a Fully Diluted Basis (with such RSUs and PSUs having the potential to collectively represent up to 2.99% of Holdco Common Stock as of the Emergence Date and determined on a Fully Diluted Basis, if such PSUs vest at their maximum, as described below), and (ii) a portion of the Cash LTIP Pool in the form of long-term cash incentive awards (such awards, the "Cash LTIP Awards"), in each case, in accordance with this Term Sheet (the "Emergence Grants" and, along with any other grant made under the MIP, an "Award").

• **Management Committee**.  The eight (8) most senior executives (the "Management Committee") will receive Emergence Grants representing 1.32% of Holdco Common |

---

[1]   Each capitalized term used but not defined herein shall have the meaning ascribed to such term in the Plan Support Agreement to which this Term Sheet is attached.

|  | Stock at target as of the Emergence Date and determined on a Fully Diluted Basis (with such RSUs and PSUs having the potential to collectively represent up to 1.99% of Holdco Common Stock as of the Emergence Date and determined on a Fully Diluted Basis, if such PSUs vest at their maximum, as described below), with the Emergence Grants (i) 50% in the form of RSUs and (ii) 50% in the form of PSUs.  The allocations of the Emergence Grants to the Management Committee will be indicated in Exhibit A to this Term Sheet, which will be completed prior to the Emergence Date.<br><br>• **Key Employees.**  Other key employees (the "Key Employees") will receive (i) Emergence Grants representing 1.00% of Holdco Common Stock as of the Emergence Date on a Fully Diluted Basis, 100% in the form of RSUs, and (ii) Cash LTIP Awards.  The allocation of the Emergence Grants to Key Employees will be determined by the CEO, substantially consistent with past practice, and as approved by the current Compensation Committee of the Intelsat S.A. Board of Directors.<br><br>Future Grants.  The Remaining MIP Pool (as defined below) may be granted following the Emergence Date, in the form of RSUs or PSUs (or their full value equivalent), at the discretion of and on terms and conditions determined by the Equity Issuer Board or the compensation committee thereof.  For this purpose, the "Remaining MIP Pool" means the portion of the MIP Pool that has not previously been granted and all shares of Holdco Common Stock subject to the Emergence Grants or subsequent Awards that have been forfeited before vesting.  For the avoidance of doubt, the compensation committee of the Equity Issuer Board will determine future grants, consistent with market benchmarks, and the Company will not have any obligation to allocate or issue any unallocated or unissued portion of the Remaining MIP Pool upon an exit event (as described in the definitive documentation governing the MIP, an "Exit Event") or otherwise. The Remaining MIP Pool will be available for, without limitation, Awards to new hires and Awards made in connection with promotions.<br><br>Any portion of the Cash LTIP Pool not granted on or about the Emergence Date, as well as amounts underlying Cash LTIP Awards forfeited (in whole or in part) without payment thereunder, may be granted following the Emergence Date, as determined by the CEO in consultation with the compensation committee of the Equity Issuer Board.<br><br>RSUs and PSUs will have dividend equivalent rights ("DERs"), including, without limitation, with respect to any cash or other distributions made on account of the CVRs. The DERs will be paid in cash (without interest) when such RSUs or PSUs fully vest, as applicable. |
| *Vesting:* | Normal Vesting.  Subject, except as set forth below, to a Participant's continued employment through the applicable vesting date, the Emergence Grants will vest as follows:<br><br>• **RSUs and Cash LTIP**.  The RSUs and Cash LTIP Awards will vest in equal 33⅓% installments (each, an "Installment") on each of the first three (3) anniversaries of the Emergence Date.<br><br>• **PSUs**. The PSUs will vest upon an Exit Event based on the equity value of Holdco achieved as of the Exit Event, as follows: |

- if the equity value of Holdco is $4,350,000,000, 50% of the target number of PSUs will vest;

- if the equity value of Holdco is $7,250,000,000 or more, 200% of the target number of PSUs will vest; and

- if the equity value of Holdco is in between $4,350,000,000 and $7,250,000,000, the percentage of the target number of PSUs that vests will be determined using straight-line interpolation.

- Notwithstanding anything to the contrary in the foregoing, if no Exit Event occurs prior to the fourth anniversary of the Emergence Date, the equity value of Holdco will be measured on each of the fourth and fifth anniversaries of the Emergence Date (each, a "Valuation Event"), and the PSUs will vest in accordance with the framework set forth above based on the equity value of Holdco as of such Valuation Events (*e.g.*, if the equity value of Holdco is $4,350,000,000 as of the first Valuation Event, 50% of the target number of PSUs will vest as of the fourth anniversary of the Emergence Date, and if the equity value of Holdco increases to $7,250,000,000 as of the second Valuation Event, an additional 150% of the target number of PSUs will vest as of the fifth anniversary of the Emergence Date). An independent third party appraiser shall determine Holdco's equity value in connection with each Valuation Event.

Accelerated Vesting Upon Termination. If a Participant's employment with the Company or its affiliates is terminated (i) by the Company without Cause, (ii) by such Participant for Good Reason (applicable only if the Participant is party to an employment agreement with a Good Reason concept) or (iii) due to such Participant's death or Disability during employment (any such termination, a "Qualifying Termination"), a portion of the Emergence Grants will vest or remain outstanding and eligible to vest, as applicable, as follows:

- **Management Committee.**

- **RSUs.** If the Participant's Qualifying Termination occurs prior to the third anniversary of the Emergence Date, the next Installment of the RSUs will vest as of the Participant's Qualifying Termination date.

- **PSUs.** If the Participant's Qualifying Termination occurs within the first eighteen (18) months of the Emergence Date, none of the PSUs will vest (subject to any tail period vesting described below). If the Participant's Qualifying Termination occurs on or after the eighteen (18)-month anniversary of the Emergence Date, the Participant's PSUs will remain outstanding and eligible to vest upon the occurrence of an Exit Event or the Valuation Events, in each case, based on actual performance achieved in connection therewith, and the number of PSUs that will vest based on such performance achievement will be pro-rated, with the pro-ration determined by multiplying (i) the total number of PSUs that would have vested had the Participant's employment not terminated prior to such Exit Event or Valuation Events by (ii) a fraction, the numerator of which is the total number of days that the Participant was employed by the Company or

its affiliates from the Emergence Date through the Participant's Qualifying Termination date, and the denominator of which is one thousand ninety-five (1,095).

- **Tail Period Vesting.** The portion of a Participant's Emergence Grants that remains unvested following the treatment set forth above will remain outstanding for six (6) months following the Participant's Qualifying Termination date (the "Tail Period") and eligible to vest upon the occurrence of an Exit Event during the Tail Period. If an Exit Event occurs during the Tail Period, 100% of the Participant's unvested Emergence Grants will vest upon such Exit Event, provided, that the percentage of PSUs that vests will be determined based on achievement of the performance criteria set forth above.

- **Key Employees.** If the Participant's Qualifying Termination occurs prior to the third anniversary of the Emergence Date, the Participant will vest in a pro-rata portion of the Participant's RSUs and Cash LTIP Award, with such pro-ration determined by multiplying (i) the total number of RSUs and the total amount of the Cash LTIP Award by (ii) a fraction, the numerator of which is the total number of days that the Participant was employed by the Company or its affiliates from the Emergence Date through the Participant's Qualifying Termination date, and the denominator of which is one thousand ninety-five (1,095) (*e.g.*, if the Participant's Qualifying Termination date occurs on the six (6)-month anniversary of the Emergence Date, the Participant will vest in 16⅔% of each of the RSUs and the Cash LTIP Award, in each case, as of the Participant's Qualifying Termination date).

Accelerated Vesting Upon a Change in Control.

Upon a Participant's Qualifying Termination on or following the occurrence of a Change in Control, 100% of the Participant's unvested RSU Emergence Grants will accelerate and vest. For the avoidance of doubt, vesting of the PSU Emergence Grants will be determined at the time of the Change in Control.

| | |
|---|---|
| *Restrictive Covenants:* | Award agreements will contain restrictive covenants no more restrictive than those set forth in the employment agreement by and between the Company and the Participant, if applicable. For those Management Committee members who are entering into employment agreements effective as of the Emergence Date, as set forth below, the award agreements will contain restrictive covenants no more restrictive than those set forth in such employment agreements. |
| *Existing Obligations:* | All existing employment agreements by and between the Company and the Participants, and any obligations arising thereunder, shall be assumed and unaltered (other than with respect to any obligations therein that provide for an award or potential award of equity interests of any kind in the Debtors, which provisions shall not be adopted, assumed or honored under the Plan). With respect to those Management Committee members who currently are not party to employment agreements because they became Management Committee members after the Company's chapter 11 filing, the Company will enter into employment agreements with such individuals effective as of the Emergence Date to satisfy the Company's commitment in their offer letters that they would receive employment agreements similar to those in existence on the Company's chapter 11 filing date, and such |

|  | employment agreements will be in the form used for Management Committee members already party to employment agreements. |
| --- | --- |
| *Definitions:* | For Participants party to an employment agreement (as well as the Management Committee members who are entering into employment agreements effective as of the Emergence Date as set forth above), Cause, Good Reason and Disability will each have the meaning set forth in the Participant's employment agreement, and if Good Reason is not defined therein, any Good Reason-related concepts will not apply.  For Participants not party to an employment agreement, Cause and Disability will have the meaning set forth in the Intelsat S.A. 2013 Equity Incentive Plan, and any Good Reason-related concepts will not apply.  Change in Control will be defined in a manner reasonable and customary for a public company style equity incentive plan and generally in line with the definition set forth in the Intelsat S.A. 2013 Equity Incentive Plan (provided that references to "30%" in prongs (i) and (iv) of such definition shall be replaced with "50%" and such definition will contain customary carve-outs regarding post-emergence shareholders). |
| *Other Provisions:* | Management Committee members will have customary tag-along rights with respect to any shares of Holdco Common Stock that are delivered to them.

The Company will obtain an independent third party valuation of the Holdco Common Stock on at least an annual basis, with the first such valuation to be dated as of the first anniversary of the Emergence Date. |
| *Final Documentation:* | The final documentation related to the Emergence Grants will not contain any material restrictions, limitations or additional obligations that are not set forth herein or in a Participant's employment agreement as in effect as of the Emergence Date. |

# EXHIBIT A

## MIP POOL ALLOCATIONS

### Management Committee

**[*To come.*]**

## **EXHIBIT H**

**New Warrants Term Sheet**

*Execution Version*

# WARRANT TERM SHEET

The following term sheet (this "Term Sheet") presents certain material terms in respect of the Series A Warrants and Series B Warrants (the "Warrants") set forth in the Plan.  Capitalized terms used but not immediately defined shall have the meanings ascribed to such terms in the Plan Support Agreement[1] or as otherwise defined herein, as applicable.

| | |
|---|---|
| **Issuer** | The Equity Issuer |
| **Term** | The Warrants will be exercisable until the date which is the fifth anniversary of the Effective Date (the "Expiration Time"). Each Warrant not exercised prior to the Expiration Time shall become void and all rights thereunder and all rights in respect thereof under the applicable Warrant Agreement shall cease as of such time. |
| **Series A Warrants** | The Series A Warrants shall entitle the holders thereof to purchase, at the Exercise Price (defined below), in the aggregate, a number of shares of New Common Stock representing 9.0% of the total New Common Stock of the Equity Issuer issued and outstanding as of the Effective Date (assuming the exercise of all Series A Warrants, but not the Series B Warrants) (the "Series A Pro Forma Ownership").<br><br>The Series A Pro Forma Ownership shall be subject to dilution for (i) shares of New Common Stock issued pursuant to the exercise of the Series B Warrants; (ii) shares of New Common Stock issued pursuant to the CVR Agreement; and (iii) shares of New Common Stock issued pursuant to the Management Incentive Plan. |
| **Series B Warrants** | The Series B Warrants shall entitle the holders thereof to purchase, at the Exercise Price (defined below), in the aggregate, a number of shares of New Common Stock representing 2.5% of the total New Common Stock of the Equity Issuer issued and outstanding as of the Effective Date (assuming the exercise of all Series A Warrants and all Series B Warrants) (the "Series B Pro Forma Ownership").<br><br>The Series B Pro Forma Ownership shall be subject to dilution for (i) shares of New Common Stock issued pursuant to the CVR Agreement; and (ii) shares of New Common Stock issued pursuant to the Management Incentive Plan. |
| **Initial Exercise Price** | Series A Warrants:  $4,350,000,000 divided by the applicable number of outstanding shares of New Common Stock on the Effective Date, subject to the provisions regarding dilution set forth above (the "Series A Warrant Initial Exercise Price").<br><br>Series B Warrants:  $5,437,500,000 divided by the applicable number of shares of outstanding New Common Stock on the Effective Date, subject to the provisions regarding dilution set forth above (the "Series B Warrant Initial Exercise Price" and together with the Series A Warrant Initial Exercise Price, the "Initial Exercise Prices"). |

---

[1] "Plan Support Agreement" means the Chapter 11 Plan Support Agreement to which this Term Sheet is attached.

| **Payment of Exercise Price** | The issuance of New Common Stock pursuant to the exercise of any Warrants shall be subject to payment in full by the holder of such Warrant of the applicable Initial Exercise Price (as adjusted, as applicable, pursuant to the anti-dilution provisions herein, the "Exercise Price") by delivery of a certified or official bank check or by wire transfer of immediately available funds in the amount of the aggregate Exercise Price for such New Common Stock. The Equity Issuer, the Required Consenting Jackson Crossover Group Members, and the Required Consenting HoldCo Creditors will explore mechanisms that provide for periodic "cashless" exercise of the warrants in Luxembourg; *provided*, that the implementation of any such mechanisms shall be subject to the consent of the Required Consenting Jackson Crossover Group Members and shall not have any materially adverse impact on the Equity Issuer or the New Common Stock of the Equity Issuer. |
|---|---|
| | To the extent permitted under applicable law, the cashless exercise of Warrants may be undertaken by issuing new shares of New Common Stock on exercise of the Warrants at par value, such par value to be paid up in cash by the Warrant holders. The difference between the Exercise Price payable for such Warrants and the par value paid in cash will be settled between the Warrant holder and the Company by means of cancellation of unexercised Warrants with the same economic value as such difference in Exercise Price. Such a mechanism to implement a cashless exercise of Warrants shall be authorized by the general meeting and specifically referenced in the applicable approvals needed for the creation of the authorized share capital, to be created in the articles of association to enable the Company to fulfil its obligations under the Warrants. |
| | For purposes of determining the per share value of New Common Stock to be surrendered in connection with any cashless exercise, at any time at which the New Common Stock is not listed on a United States securities exchange, such value shall be determined by the board of directors of the Equity Issuer (the "Board of Directors") within five (5) business days following a notice of exercise; provided, that if the holder does not agree with such value such value shall be determined by an independent and nationally recognized investment banking or valuation firm jointly selected by the Board of Directors and holder, such investment banking or valuation firm to be engaged no more than once per twelve-month period on behalf of any or all Warrant holders. The fees and expenses of such investment banking or valuation firm shall be paid by the Equity Issuer. |
| **Anti-Dilution** | The Warrant Agreements shall provide customary proportional anti-dilution adjustments to the exercise price and/or the number of shares of New Common Stock for which the Warrants are exercisable with respect to (i) any subdivision, combination, stock split or other reclassification, conversion or exchange of equity interests (whether by merger or otherwise), and (ii) any dividend paid to holders of equity interests in shares of equity interests, rights to acquire equity interests or securities convertible or exchangeable into equity interests, cash or other property. For the avoidance of doubt, the Warrants shall not be entitled to any economic anti-dilution provisions, other than as set forth above. |

2

| Sale of the Company | The Warrant Agreements shall include Black-Scholes protection and treatment in the event of certain change of control, merger, asset sale of all or substantially all of the assets of the Company or sale transactions (each, a "Fundamental Transaction"). |
|---|---|
| | The Black-Scholes Value, if elected by the Warrant holder, will be determined by an independent and nationally recognized investment banking or valuation firm jointly selected by the Board of Directors and a majority of electing holders of Warrants using the Black Scholes Option Pricing Model for a "call" option, subject to the following assumptions: |
| | • Current Price:  Fundamental Transaction consideration per share |
| | • Strike:  Exercise Price in effect |
| | • Maturity:  Remaining term of warrant |
| | • Volatility:  To be determined by the independent financial expert as of the date of determination and pursuant to customary practices for calculating such volatility but in any event no more than 45% and no less than 20% (provided, however, that such range will not be disclosed to the independent financial expert) |
| | • Risk-Free Interest Rate:  Interpolated rate on the United States Treasury securities with a maturity closest to the remaining term of the Warrant as of the date of consummation of the applicable Fundamental Transaction |
| **Section 1145** | The Warrants, and the New Common Stock issuable thereunder, will be exempt from registration under the Securities Act of 1933 pursuant to Section 1145 of the Bankruptcy Code.  To the extent that such exemption under Section 1145 of the Bankruptcy Code is unavailable, the Warrants, and the New Common Stock issuable thereunder, will be issued pursuant to any other available exemptions from registration, as applicable. |
| **Transferability** | The Warrants shall not be subject to transfer restrictions except as set forth in the New Corporate Governance Documents or as required by law.  From and after such time the New Common Stock is listed on a recognized U.S. stock exchange, the Equity Issuer shall use commercially reasonable efforts to list the warrants on a recognized U.S. stock exchange; *provided*, that such obligation shall terminate on the fourth (4th) anniversary of the Effective Date. The Warrants shall be tradeable and transferrable independently of New Common Stock and the CVRs. |
| | Any New Common Stock issued upon exercise of a Warrant shall be subject to the transfer restrictions set forth in the New Corporate Governance Documents (including the Articles of Association and Shareholders Agreement (as defined in the Corporate Governance Term Sheet) and as may be required by law.  Prior to receiving any New Common Stock issued upon exercise of a Warrant, such Warrant holder shall be required to execute the Shareholders Agreement. |
| | In addition, upon the listing of the New Common Stock, certain Large Holders (the definition of which is to be determined in the registration rights |

3

| | |
|---|---|
| | agreement) shall have registration rights with respect to their New Common Stock issued upon exercise of their Warrants in accordance with the registration rights agreement and New Corporate Governance Documents (including the Articles of Association and Shareholders Agreement). |
| **Non-Voting; No Dividends** | The Warrants shall not have any rights common to stockholders (e.g., dividends and voting) and will not represent an equity interest in the Equity Issuer.<br><br>Holders of New Common Stock issued upon exercise of a Warrant shall be required to execute the Shareholders Agreement prior to receiving such New Common Stock. |
| **Reporting** | The Warrants shall entitle the holders thereof to receive any information provided to minority stockholders of the Equity Issuer pursuant to the Equity Issuer's New Corporate Governance Documents (including the Articles of Association and Shareholders Agreement), subject to customary confidentiality protections. |
| **ERISA Eligibility** | By accepting a Warrant, each holder will be deemed to represent that either (i) it does not hold "plan assets" subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") or (ii) its acquisition, holding and exercise of Warrants will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Code. |
| **Amendments** | Each Warrant Agreement may be amended by the affirmative vote of, or a written consent signed by, the holders of the applicable Warrants holding at least a majority of the then outstanding applicable Warrants (with customary amendments not requiring consent of such holders or requiring the consent of each affected holder). |
| **Governing Law** | Delaware |

4

**DEFINITIONS**

| Term | Definition |
|---|---|
| **Series A Warrant Agreement** | That certain agreement providing for, among other things, the issuance of the Series A Warrants, which shall include anti-dilution protections and Black-Scholes protections in the event of certain change of control or sale transactions and be in form and substance reasonably acceptable to the Debtors, the Required Consenting Jackson Crossover Group Members, and the Required Consenting HoldCo Creditors. |
| **Series A Warrants** | The warrants issued pursuant to the Plan and the Series A Warrant Agreement. |
| **Series B Warrant Agreement** | That certain agreement providing for, among other things, the issuance of the Series B Warrants, which shall include anti-dilution protections and Black-Scholes protections in the event of certain change of control or sale transactions and be in form and substance reasonably acceptable to the Debtors, the Required Consenting Jackson Crossover Group Members, and the Required Consenting HoldCo Creditors. |
| **Series B Warrants** | The warrants issued pursuant to the Plan and the Series B Warrant Agreement. |
| **New Common Stock** | The new common equity securities of the Equity Issuer. |
| **Warrant Agreements** | Collectively, the Series A Warrant Agreement and the Series B Warrant Agreement |
| **Warrants** | Collectively, the Series A Warrants and the Series B Warrants. |

5

## EXHIBIT I

**Secured Creditor Settlement Term Sheet**

*Execution Version*

## JACKSON SECURED CREDITOR SETTLEMENT TERM SHEET

This term sheet (the "Term Sheet") sets forth certain settlement terms related to (i) the allowance and treatment of the First Lien Notes Claims (as defined below) under rule 9019 of the Bankruptcy Rules, and (ii) the allowance and treatment of the Term Loan Facility Claims in connection with the Plan, to be proposed and prosecuted by Intelsat S.A. and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the chapter 11 cases (the "Chapter 11 Cases") before the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").

This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the Plan, the Secured Creditor Settlement Order (as defined below), or definitive documents relating to or necessary to effectuate the Secured Creditor Settlement (as defined below), each of which remain subject to negotiation and completion and which shall be in form and substance reasonably acceptable to the Required Consenting First Lien Creditors (as defined below). The Definitive Documents shall not contain any terms or conditions that are inconsistent with this Term Sheet.

| ALLOWANCE AND TREATMENT OF FIRST LIEN CLAIMS | |
|---|---|
| **Settlement/Allowance of First Lien Claims** | Pursuant to Bankruptcy Rule 9019, in settlement and compromise of any disputes between the Company Parties and the holders of the First Lien Notes Claims regarding the allowance, classification and treatment of the First Lien Notes Claims, the Company Parties shall seek entry of a Secured Creditor Settlement Order, which provides that the First Lien Claims are Allowed and settled as follows:<br><br>• 8.00% First Lien Notes Claims: Allowed against all of the obligors and guarantors under the 8.00% First Lien Notes Indenture in the amount equal to: (i) full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate (it being understood and agreed that until the Effective Date the Debtors shall continue to pay interest on the principal amount in accordance with the Final DIP Order); and (iii) $23,634,033.54 on account of premium and/or makewhole amounts payable under the 8.00% First Lien Notes Indenture (which amount represents 77% of the aggregate amount of any premium and/or makewhole amounts payable under the 8.00% First Lien Notes Indenture, along with interest thereon at the contractual rate, through the Effective Date) [1] (the "Settled/Allowed 8.00% First Lien Notes Claims"). In the event the Secured Creditor Settlement Order is not entered or does not remain in effect, 8.00% First Lien Notes Claims shall be allowed in an amount equal to: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through and including the Effective Date at the contractual rate; and (iii) such additional amounts as many be determined in a Final Order sufficient to render the 8.00% First Lien Notes Claims Unimpaired. For the avoidance of doubt, in the event that the Secured Creditor Settlement Order is not entered or does not |

---

[1] This amount assumes an Effective Date of 12/31/21, and the interest component thereof is subject to change based on actual Effective Date.

remain in effect, the 8.00% First Lien Notes Claims shall be treated as Unimpaired and holders of 8.00% First Lien Notes Claims shall not be bound by the Secured Creditor Settlement and shall be entitled to seek allowance in full of their 8.00% First Lien Notes Claims in an amount sufficient to render the 8.00% First Lien Notes Claims Unimpaired, including to seek interest (at the contractual rate) on, or as part of, such Claims until such Claims are paid in full, and all parties' rights are reserved in connection with any such litigation.

- 9.50% First Lien Notes Claims: Allowed against all of the obligors and guarantors under the 9.50% First Lien Notes Indenture in the amount equal to: (i) full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate (it being understood and agreed that until the Effective Date the Debtors shall continue to pay interest on the principal amount in accordance with the Final DIP Order); and (iii) $91,536,911.35 on account of premium and/or makewhole amounts payable under the 9.50% First Lien Notes Indenture (which amount represents 77% of the aggregate amount of any premium and/or makewhole amounts payable under the 9.50% First Lien Notes Indenture, along with interest thereon at the contractual rate, through the Effective Date) [2] (the "Settled/Allowed 9.50% First Lien Notes Claims" and, together with the Settled/Allowed 9.50% First Lien Notes Claims, the "Settled/Allowed First Lien Notes Claims"). In the event the Secured Creditor Settlement Order is not entered or does not remain in effect, 9.50% First Lien Notes Claims shall be allowed in an amount equal to: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through and including the Effective Date at the contractual rate; and (iii) such additional amounts as many be determined in a Final Order sufficient to render such 9.50% First Lien Notes Claims Unimpaired. For the avoidance of doubt, in the event that the Secured Creditor Settlement Order is not entered or does not remain in effect, the 9.50% First Lien Notes Claims shall be treated as Unimpaired and holders of 9.50% First Lien Notes Claims shall not be bound by the Secured Creditor Settlement and shall be entitled to seek allowance in full of their 9.50% First Lien Notes Claims in an amount sufficient to render the 9.50% First Lien Notes Claims Unimpaired, including to seek interest (at the contractual rate) on, or as part of, such Claims until such Claims are paid in full, and all parties' rights are reserved in connection with any such litigation.

Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 1123(b)(3), in settlement and compromise of any disputes regarding the allowance, classification, and treatment of the Term Loan Facility

---

[2] This amount assumes an Effective Date of 12/31/21, and the interest component thereof is subject to change based on actual Effective Date.

2

| | |
|---|---|
| | Claims, the Plan shall provide that Term Loan Facility Claims are Allowed and settled as follows:<br><br>• Term Loan Facility Claims: Allowed against all of the obligors and guarantors under the Term Loan Facility in the amount equal to: (i) full outstanding principal amount; (ii) any accrued interest through the Effective Date at the contractual rate applicable to ABR Loans (in the case of Tranche B-3 Term Loans and Tranche B-4 Term Loans) and applicable to Fixed Rate Loans (in the case of Tranche B-5 Term Loans); and (iii) 90% of the accrued default interest through the Effective Date on the ABR Loans and Fixed Rate Loans (the "Settled/Allowed Term Loan Facility Claims").[3]  Any payments of interest made during the Chapter 11 Cases are characterized as payments of allowed interest. |
| **Implementation** | The Debtors shall file a motion with the Bankruptcy Court seeking approval of the First Lien Notes Claims Settlement pursuant to Bankruptcy Rule 9019 (the "Secured Creditor Settlement Motion").   The Secured Creditor Settlement Motion and Secured Creditor Settlement Order shall be consistent with the provisions of this Term Sheet in all respects.   The Debtors shall request that the Bankruptcy Court consider the Secured Creditor Settlement Motion on the Secured Creditor Settlement Order contemporaneously with confirmation of the Plan.<br><br>The Term Loan Facility Claims Settlement shall be incorporated into the Plan and shall be approved in connection therewith. |
| **Treatment Under the Plan of Settled/Allowed Term Loan Facility Claims** | Except to the extent that a holder of a Settled/Allowed Term Loan Facility Claim agrees to less favorable treatment of its Settled/Allowed Term Loan Facility Claim, on the Effective Date, in settlement and compromise of any disputes regarding the allowance, classification and treatment of Term Loan Facility Claims, each holder of a Settled/Allowed Term Loan Facility Claim shall receive payment in full in cash solely to the extent of its Settled/Allowed Term Loan Facility Claim; *provided, however*, for the avoidance of doubt, no distributions to holders of Settled/Allowed Term Loan Facility Claims shall be made out of the deposit accounts of each of Intelsat Connect Finance S.A., Intelsat Envision Holdings LCC, Intelsat (Luxembourg) S.A., Intelsat  Investments S.A., Intelsat Holdings S.A., Intelsat Investment Holdings S.à.r.l., and Intelsat S.A. (together, the "HoldCos").<br><br>The Term Loan Facility Claims shall be separately classified under the Plan from other First Lien Claims.<br><br>Term Loan Facility Claims shall be Impaired and entitled to vote to accept or reject the Plan |

---

[3] Capitalized terms used in this sub-bullet that are not otherwise defined herein shall have the meanings ascribed to them in the First Lien Credit Agreement or the Final DIP Order, as applicable.

3

| | |
|---|---|
| **Treatment Under the Plan of Settled/Allowed First Lien Notes Claims** | Except to the extent that a holder of a Settled/Allowed 8.00% First Lien Notes Claim or Settled/Allowed 9.50% First Lien Notes Claim agrees to less favorable treatment of its Settled/Allowed First Lien Notes Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Settled/Allowed First Lien Notes Claim, each holder of a Settled/Allowed First Lien Notes Claim shall receive payment in full in cash of its *pro rata* share of (x) the full amount of all 8.00% First Lien Notes Claims or 9.50% First Lien Notes Claims, as applicable, as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; provided, however, that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the holders of Allowed First Lien Notes Claims as Unimpaired and the holders of Allowed First Lien Notes Claims shall receive payment in full, in cash of: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including any premium or makewhole amounts, and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render such First Lien Notes Claims Unimpaired (and, for the avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the First Lien Notes Claims Unimpaired shall be expressly reversed and preserved), with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; *provided, further, however*, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; *provided, further, however*, for the avoidance of doubt, no distributions to holders of Settled/Allowed First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos.<br><br>Each of the 8.00% First Lien Notes Claims and 9.50% First Lien Notes Claims shall be separately classified under the Plan from other First Lien Claims.<br><br>The 8.00% First Lien Notes Claims and 9.50% First Lien Notes Claims shall be Impaired and entitled to vote to accept or reject the Plan. |
| **Secured Creditor Settlement Order** | The settlements and compromises set forth in this Term Sheet and any related definitive documentation shall be incorporated into the Secured Creditor Settlement Order and the Plan, as applicable, in form and substance reasonably acceptable to the holders of First Lien Claims that are signatory |

<table>
<tr><td></td><td>to the Plan Support Agreement (the "<u>Consenting First Lien Creditors</u>").

Notwithstanding anything to the contrary in this Term Sheet or the Plan Support Agreement, no modification, amendment, waiver, or supplement may be made to the terms of the Secured Creditor Settlement without the consent of (1) Consenting First Lien Creditors holding at least 66.67% of the aggregate principal amount of Term Loan Facility Claims held by all Consenting First Lien Creditors with respect to any modifications, amendments, waivers, or supplements regarding the treatment and allowance of Term Loan Facility Claims under the Secured Creditor Settlement, (2) Consenting First Lien Creditors holding at least 66.67% of the aggregate principal amount of 8.00% First Lien Notes Claims held by all Consenting First Lien Noteholders with respect to any modifications, amendments, waivers or supplements regarding the treatment and allowance of 8.00% First Lien Notes Claims under the Secured Creditor Settlement, (3) Consenting First Lien Noteholders holding at least 66.67% of the aggregate principal amount of 9.50% First Lien Notes Claims held by all Consenting First Lien Creditors with respect to any modifications, amendments, waivers or supplements regarding the treatment and allowance of 9.50% First Lien Notes Claims under the Secured Creditor Settlement, and (4) the Company Parties.</td></tr>
<tr><td>**Releases**</td><td>The Consenting First Lien Creditors shall be included in the definition of "Released Parties" and "Releasing Parties" (or any similar definition relating to beneficiaries and providers of a debtor release, third party release, and exculpation, as applicable) under the Plan.</td></tr>
<tr><td>**Payment of Professional Fees/Expenses**</td><td>On the Effective Date, all unpaid Restructuring Expenses and any other fees and expenses of counsel and other professionals representing the Intelsat Jackson Ad Hoc Group and the Jackson First Lien Notes Group shall be indefeasibly paid in full in cash by the Debtors.</td></tr>
<tr><td>**Appellate Rights**</td><td>For the avoidance of doubt, nothing in this Term Sheet, the Secured Creditor Settlement, the Secured Creditor Settlement Order, the Plan, or the Confirmation Order shall in any way impair or prejudice the appellate rights available under applicable law to the holders of First Lien Claims or the Jackson Crossover Ad Hoc Group with regard to any Secured Creditor Settlement Order or any Secured Creditor Claims Litigation.</td></tr>
</table>

5

## EXHIBIT A

## DEFINITIONS

| | |
|---|---|
| **8.00% First Lien Notes** | Those certain 8.00% senior secured first Lien notes due 2024, originally issued in an aggregate principal amount of $1,250,000,000 with a subsequent issuance in an aggregate principal amount of $99,700,000 pursuant to the 8.00% First Lien Notes Indenture. |
| **8.00% First Lien Notes Claims** | Any Claims arising under the 8.00% First Lien Notes, that certain 8.00% First Lien Notes Indenture or any related credit documentation. |
| **8.00% First Lien Notes Indenture** | That certain indenture, dated as of March 29, 2016, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, for the 8.00% First Lien Notes, by and among Intelsat Jackson Holdings S.A., as issuer, Intelsat Connect Finance S.A. and the other guarantors from time to time party thereto, as guarantors, and Wilmington Trust, National Association, as trustee. |
| **9.50% First Lien Notes** | Those certain 9.50% senior secured first Lien notes due 2022, originally issued in an aggregate principal amount of $490,000,000 pursuant to the 9.50% First Lien Notes Indenture. |
| **9.50% First Lien Notes Claims** | Any Claim arising under the 9.50% First Lien Notes, that certain 9.50% First Lien Notes Indenture or any related credit documentation. |
| **9.50% First Lien Notes Indenture** | That certain indenture, dated as of June 30, 2016, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, for the 9.50% First Lien Notes, by and among Intelsat Jackson Holdings S.A., as issuer, Intelsat Connect Finance S.A. and the other guarantors from time to time party thereto, as guarantors, and Wilmington Trust, National Association, as trustee. |
| **Allowed** | As to a Claim or an interest, a Claim or an interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. |
| **Bankruptcy Code** | Title 11 of the United States Code. |
| **Bankruptcy Rules** | The Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended. |
| **Claim** | Any claim, as defined in section 101(5) of the Bankruptcy Code, against one or more of the Jackson Debtors. |
| **Committee** | The official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code, as may be reconstituted from time to time. |
| **Company Parties** | Intelsat S.A., a company incorporated under the Laws of the Grand Duchy of Luxembourg, and each of its direct and indirect subsidiaries listed on Exhibit A to the Plan Support Agreement that have executed and delivered counterpart signature pages to the Plan Support Agreement to counsel to the Consenting Creditors. |

6

| | |
|---|---|
| **Effective Date** | The occurrence of the effective date of the Plan according to its terms. |
| **Final DIP Order** | *Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Claims, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, and (F) Granting Related Relief* entered by the Bankruptcy Court in the Chapter 11 Cases on June 9, 2020 at docket number 285. |
| **Final Order** | An order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument, or rehearing shall then be pending or (ii) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied, or resulted in no modification of such order, and such time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules may be filed relating to such order, shall not cause an order not to be a Final Order. |
| **First Lien Agent** | Bank of America, N.A., acting through such of its affiliates or branches as it may designate, in its capacity as administrative agent under the First Lien Credit Agreement, or any successor administrative agent or collateral agent as permitted by the terms set forth in the First Lien Credit Agreement. |
| **First Lien Claims** | Collectively, the First Lien Notes Claims and the Term Loan Facility Claims. |
| **First Lien Credit Agreement** | That certain credit agreement, dated as of January 12, 2011, as amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time, by and among the Intelsat Jackson Holdings S.A. as borrower, Intelsat Connect Finance S.A. (as successor to Intelsat (Luxembourg) S.A.), as guarantor, the First Lien Lenders, and the First Lien Agent. |
| **First Lien Notes** | Collectively, the 8.00% First Lien Notes and the 9.50% First Lien Notes. |
| **First Lien Notes Claims** | Collectively, the 8.00% First Lien Notes Claims and the 9.50% First Lien Notes Claims. |

7

| | |
|---|---|
| **First Lien Notes Claims Settlement** | The compromise and settlement by and among the Debtors and holders of First Lien Notes Claims regarding the allowance and treatment of Claims held by certain holders of First Lien Notes Claims, as set forth in this Term Sheet. |
| **Impaired** | With respect to any class of Claims or interests, a class of Claims or interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Intelsat Jackson Ad Hoc Group** | The ad hoc group of certain creditors represented by Akin Gump Strauss Hauer & Feld LLP and advised by Centerview Partners LLC. |
| **Jackson Crossover Ad Hoc Group** | The ad hoc group of certain creditors represented by Jones Day and advised by Houlihan Lokey Capital, Inc. |
| **Jackson First Lien Notes Group** | The ad hoc group of certain creditors represented by Wilmer Cutler Pickering Hale and Dorr LLP (and local Virginia counsel). |
| **Petition Date** | May 13, 2020. |
| **Plan** | The joint plan of reorganization to be filed by or on behalf of the Debtors under chapter 11 of the Bankruptcy Code that is consistent in all respects with this Term Sheet. |
| **Plan Support Agreement** | The Chapter 11 Plan Support Agreement to which this Term Sheet is attached. |
| **Required Consenting First Lien Creditors** | As of the relevant date, Consenting First Lien Creditors holding at least 50.01% of the aggregate principal amount of First Lien Claims held by all Consenting First Lien Creditors; *provided*, that with respect to any terms or conditions that relate to the implementation or approval of the Secured Creditor Settlement or the treatment and allowance of the First Lien Claims under the Plan, such term shall mean, as of the relevant date, both (i) Consenting First Lien Creditors holding at least 50.01% of the aggregate principal amount of Term Loan Claims held by all Consenting First Lien Creditors and (ii) Consenting First Lien Creditors holding at least 50.01% of the aggregate principal amount of First Lien Notes Claims held by all Consenting First Lien Creditors. |
| **Restructuring Expenses** | Collectively, the fees and expenses of the Intelsat Jackson Ad Hoc Group and the Jackson First Lien Notes Group. |

8

| | |
|---|---|
| **Secured Creditor Claims Litigation** | Any litigation or proceeding (including, without limitation, any contested matter or adversary proceeding), brought by the Jackson Crossover Ad Hoc Group, the Committee, or any other party in interest (other than the Debtors) challenging the Allowance or treatment of, or asserting challenge to the First Lien Notes Claims Settlement, the 8.00% First Lien Notes Claims, and/or the 9.50% First Lien Notes Claims, or any portion thereof relating to any premium or makewhole amount or interest thereon, (it being understood and agreed that the full amount of principal and all accrued but unpaid interest at the applicable contract rates on the First Lien Notes are, in all circumstances, Allowed and not subject to any dispute and shall be paid in full in cash on the Effective Date), including the *Objection of the Official Committee of Unsecured Creditors to Jackson Secured Creditors' Claims to Make-Whole Premiums and Postpetition Interest at Default Rate* [Docket No. 1476]. |
| **Secured Creditor Settlement** | The compromise and settlement by and among the Debtors and certain prepetition secured parties consisting of the First Lien Notes Claims Settlement and the Term Loan Facility Claims Settlement regarding the allowance and treatment of Claims held by such prepetition secured parties to be implemented pursuant to the Secured Creditor Settlement Order and the Plan, as applicable, as set forth in this Term Sheet. |
| **Term Loan Facility** | That certain prepetition first lien term loan facility provided for under the First Lien Credit Agreement. |
| **Term Loan Facility Claims** | Any Claim arising under the Term Loan Facility, that certain First Lien Credit Agreement, or any related credit document. |
| **Term Loan Facility Claims Settlement** | The compromise and settlement regarding the allowance and treatment of the Term Loan Facility Claims set forth in this Term Sheet. |
| **Unimpaired** | With respect to a class of Claims or interests, a class of Claims or interests that is not Impaired. |

9

## Exhibit J

**Replacement/Incremental DIP Facility Term Sheet**

**Confidential, Privileged and Prepared at the Request of Counsel**
**Subject to FRE 408**

# Key DIP Facility Terms

**Facility**

- $1.5bn DIP Financing
  - Refinances existing $1.0bn DIP Facility
  - $500mm Upsize

**Interest Rate**

- L + 475bps
  - 1.00 % LIBOR floor

**Fees[1]**

- <u>Commitment Fee</u>: 1.50% on $685mm ($1.5bn less Jackson Secured Ad Hoc Group and Jackson Crossover Ad Hoc Group Existing DIP Facility holdings)
- <u>OID</u>: 0.75% on full $1.5bn DIP Financing

**Allocation**

- 48.0% of the full $1.5bn DIP Financing allocated to Jackson Secured Ad Hoc Group
- 52.0% of the full $1.5bn DIP Financing allocated to Jackson Crossover Ad Hoc Group

Akin Gump CENTER|VIEW PARTNERS        1
STRAUSS HAUER & FELD LLP

(1)    Fees allocated 48.0% to Jackson Secured Ad Hoc Group and 52.0% to Jackson Crossover Ad Hoc Group.

## EXHIBIT  B

**Second Amended Disclosure Statement Comparison**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| INTELSAT S.A., *et al.*,[1] | ) | Case No. 20-32299 (KLP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**SECOND AMENDED DISCLOSURE STATEMENT
FOR
THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF INTELSAT S.A. AND ITS DEBTOR AFFILIATES**

| | |
|---|---|
| Edward O. Sassower, P.C. (admitted *pro hac vice*) | Michael A. Condyles (VA 27807) |
| Steven N. Serajeddini, P.C. (admitted *pro hac vice*) | Peter J. Barrett (VA 46179) |
| Aparna Yenamandra (admitted *pro hac vice*) | Jeremy S. Williams (VA 77469) |
| **KIRKLAND & ELLIS LLP** | Brian H. Richardson (VA 92477) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KUTAK ROCK LLP** |
| 601 Lexington Avenue | 901 East Byrd Street, Suite 1000 |
| New York, New York 10022 | Richmond, Virginia 23219-4071 |
| Telephone:      (212) 446-4800 | Telephone:  (804) 644-1700 |
| Facsimile:      (212) 446-4900 | Facsimile:    (804) 783-6192 |

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  August 2431, 2021

---

[1]   Due to the large number of Debtors in these Chapter 11 Cases, for which joint administration has been granted, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/intelsat.

The location of the Debtors' service address is:  7900 Tysons One Place, McLean, VA 22102.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF INTELSAT S.A. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE AMENDED PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE DEBTORS URGE HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE AMENDED PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE AMENDED PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE AMENDED PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE AMENDED PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS OR ANTICIPATED EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE AMENDED PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE AMENDED PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE AMENDED PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE AMENDED PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE AMENDED PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE AMENDED PLAN, WHO VOTE TO REJECT THE AMENDED PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE AMENDED PLAN) WILL BE BOUND BY THE TERMS OF THE AMENDED PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE AMENDED PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE AMENDED PLAN. THERE IS NO ASSURANCE THAT THE AMENDED PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE AMENDED PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE AMENDED PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII ENTITLED "RISK FACTORS" BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE AMENDED PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE AMENDED PLAN.

SUMMARIES OF THE AMENDED PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE AMENDED PLAN.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.   THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE AMENDED PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE AMENDED PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.   ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONSUMMATION OF THE AMENDED PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77A4, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT") OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.   TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF SECURITIES ISSUED UNDER THE AMENDED PLAN CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES IN COMPLIANCE WITH THE FEDERAL SECURITIES LAWS AND ANY

APPLICABLE "BLUE SKY" LAWS.  THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF SUCH SECURITIES.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT:

- THE DEBTORS' BUSINESS STRATEGY;

- THE DEBTORS' TECHNOLOGY;

- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- THE DEBTORS' LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- THE DEBTORS' FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- THE OVERALL HEALTH OF THE SATELLITE TELECOMMUNICATIONS INDUSTRY;

- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;

- THE AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- COSTS OF CONDUCTING THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- GOVERNMENTAL REGULATION AND TAXATION OF THE SATELLITE TELECOMMUNICATIONS INDUSTRY;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- RISKS IN CONNECTION WITH ACQUISITIONS;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE AMENDED PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE AMENDED PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES;  THE IMPACT OF THE COVID-19 PANDEMIC ON THE DEBTORS' BUSINESS; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ........................................................................................................................1

II.     PRELIMINARY STATEMENT ..............................................................................................1

        A.      FCC Order...................................................................................................................2
        B.      DIP Negotiations and Chapter 11 Filing ..................................................................3
        C.      Plan Negotiations .......................................................................................................4
        D.      Judicial Mediation .....................................................................................................5
        E.      Special Committee Review and Settlement of Certain Intercompany Matters ..............6
        F.      Amended Plan Support Agreement and Amended Plan.............................................7

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN................................................................................................................................~~8~~9

        A.      What is chapter 11?...................................................................................................~~8~~9
        B.      Why are the Debtors sending me this Disclosure Statement? .................................9
        C.      Am I entitled to vote on the Amended Plan? ...........................................................9
        D.      What will I receive from the Debtors if the Amended Plan is consummated?................10
        E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim,
                DIP Facility Claim, or a Priority Tax Claim? ..........................................................~~19~~20
        F.      How do I know if I have a Convenience Claim and what does that mean for my General
                Unsecured Claim if I do? .......................................................................................21
        ~~F.~~G.   Are any regulatory approvals required to consummate the Amended Plan?.................21
        ~~G.~~H.   What happens to my recovery if the Amended Plan is not confirmed or does not go
                effective?................................................................................................................~~22~~23
        ~~H.~~I.   If the Amended Plan provides that I get a distribution, do I get it upon Confirmation or
                when the Amended Plan goes effective, and what is meant by "Confirmation," "Effective
                Date," and "Consummation?" .................................................................................~~22~~23
        ~~I.~~J.   Why is the Bankruptcy Court holding a Confirmation Hearing?.................................~~22~~23
        ~~J.~~K.   What is the purpose of the Confirmation Hearing?....................................................23
        ~~K.~~L.   What are the sources of Cash and other consideration required to fund the Amended
                Plan?........................................................................................................................23
        ~~L.~~M.   Are there risks to owning the New Common Stock upon emergence from chapter 11?.................23
        ~~M.~~N.   Is there potential litigation related to the Amended Plan? .........................................~~23~~24
        ~~N.~~O.   What is the Management Incentive Plan and how will it affect the distribution I receive
                under the Amended Plan? ......................................................................................25
        ~~O.~~P.   How will the preservation of the Causes of Action impact my recovery under the
                Amended Plan?.......................................................................................................~~26~~27
        ~~P.~~Q.   Will there be releases and exculpation granted to parties in interest as part of the
                Amended Plan?.......................................................................................................27
        ~~Q.~~R.   What impact does the Claims Bar Date have on my Claim? ......................................~~31~~32
        ~~R.~~S.   What is the deadline to vote on the Amended Plan?...................................................32
        ~~S.~~T.   How do I vote for or against the Amended Plan? ......................................................32
        ~~T.~~U.   How do I opt out of the granting of releases? ...........................................................32
        ~~U.~~V.   What is the effect of the Amended Plan on the Debtors' ongoing businesses? .................~~32~~33
        ~~V.~~W.   Will any party have significant influence over the corporate governance and operations of
                the Reorganized Debtors? ......................................................................................~~32~~33
        ~~W.~~X.   Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Amended Plan?............................................................................................33
        ~~X.~~Y.   Do the Debtors recommend voting in favor of the Amended Plan? .........................~~33~~34

IV.     THE DEBTORS' PLAN ...................................................................................................~~33~~34

        A.      The Amended Plan...................................................................................................~~33~~34

B.     Summary of Value Allocation ......................................................................................47 49

V.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.......54 56

    A.     Intelsat's Corporate History ........................................................................................54 56
    B.     Intelsat's Business Operations ....................................................................................55 57
    C.     The C-Band Clearing Process .....................................................................................57 60
    D.     The Debtors' Prepetition Capital Structure ................................................................60 62

VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS..............................................................63 65

    A.     Additional Capital Required to Comply with the FCC's February 28, 2020 C-Band Order.......64 66
    B.     The COVID-19 Pandemic ...........................................................................................64 66
    C.     Contingency Planning ..................................................................................................65 67
    D.     Establishment of the Special Committees and Appointment of the Disinterested Directors ......65 67
    E.     Entry into the Grace Period, the Guarantee Releases, and Related Asserted Claims.................65 67
    F.     DIP Financing .............................................................................................................69 71

VII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11
      CASES ..................................................................................................................................70 72

    A.     First and Second Day Relief and Other Case Matters ................................................70 72
    B.     Appointment of Official Committee of Unsecured Creditors ....................................70 72
    C.     Schedules and Statements, Claims Bar Date and Exclusivity Extension ...................71 73
    D.     Operational Achievements ...........................................................................................71 73
    E.     Gogo Commercial Aviation Purchase .........................................................................72 74
    F.     SES Claims ..................................................................................................................74 76
    G.     Engagement and Negotiations with Stakeholders ......................................................74 76
    H.     Original Plan Support Agreement ...............................................................................75 77
    I.     Judicial Mediation .......................................................................................................76 78
    J.     Convert Ad Hoc Group Standing Motion and SES' Intervention Motion ................77 79
    K.     Settlement of Certain Debtor Intercompany Claims ...................................................78 80
    L.     The Guarantee Claims Standstill.................................................................................97 99
    M.    The Amended Plan Support Agreement.......................................................................100 102
    N.     Non-TopCo Plan .........................................................................................................100 102

VIII.  RISK FACTORS .....................................................................................................................100 102

    A.     Bankruptcy Law Considerations .................................................................................100 102
    B.     Risks Related to Recoveries Under the Amended Plan...............................................106 108
    C.     Risks Related to the Debtors' and the Reorganized Debtors' Businesses...........................112 115
    D.     Risks Related to Regulation ........................................................................................115 118

IX.    CERTAIN SECURITIES LAW MATTERS ..........................................................................117 120

    A.     1145 Securities............................................................................................................118 120
    B.     4(a)(2) Securities.........................................................................................................119 122
    C.     New Common Stock & Management Incentive Plan...................................................122 125

X.     SOLICITATION AND VOTING PROCEDURES .................................................................122 125

    A.     Holders of Claims Entitled to Vote on the Amended Plan.........................................122 125
    B.     Voting Record Date .....................................................................................................123 125
    C.     Voting on the Amended Plan .......................................................................................123 126
    D.     Ballots Not Counted....................................................................................................123 126

XI.    CONFIRMATION OF THE AMENDED PLAN ....................................................................124 126

    A.     Requirements for Confirmation of the Amended Plan................................................124 126

B.   Best Interests of Creditors/Liquidation Analysis ................................................................124127
C.   Feasibility................................................................................................................................125127
D.   Acceptance by Impaired Classes.............................................................................................125128
E.   Confirmation Without Acceptance by All Impaired Classes ..................................................126128
F.   Valuation of the Debtors .........................................................................................................127129

XII.   **CERTAIN UNITED STATES FEDERAL INCOME TAX AND LUXEMBOURG TAX CONSEQUENCES OF THE AMENDED PLAN...............................................................................127130**

A.   Introduction..............................................................................................................................127130
B.   Certain U.S. Federal Income Tax Consequences of the Amended Plan to the Debtors and the Reorganized Debtors .........................................................................................................129132
C.   Certain Luxembourg Tax Consequences of the Amended Plan to the Debtors and the Reorganized Debtors ...............................................................................................................133136
D.   Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Entitled to Vote .......................................................................................................................134136
E.   Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims..................151153
F.   Certain Luxembourg Tax Consequences to Holders of New Common Stock, Reorganized S.A. Common Stock, New Warrants or CVRs.........................................................................151153
G.   U.S. Information Reporting and Withholding..........................................................................155157
H.   FATCA .....................................................................................................................................156158

XIII.   **RECOMMENDATION OF THE DEBTORS ............................................................................157159**

**EXHIBITS**[2]

EXHIBIT A      Amended Plan of Reorganization

EXHIBIT B      Corporate Structure of the Debtors

EXHIBIT C      Liquidation Analysis

EXHIBIT D      Financial Projections

EXHIBIT E      Valuation Analysis

EXHIBIT F      Plan Allocation of Distributable Value by Debtor

EXHIBIT G      Amended Plan Support Agreement

---

[2]    Each Exhibit is incorporated herein by reference.

## I.   INTRODUCTION

Intelsat S.A. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors," and, together with Intelsat S.A.'s non-Debtor affiliates, the "Company"), submit this disclosure statement (including all exhibits hereto and as may be amended or modified from time to time and including all exhibits and supplements thereto, in accordance with its terms, the "Disclosure Statement") pursuant to sections 1125 and 1126 of the Bankruptcy Code in connection with the solicitation of acceptances with respect to the *Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* (as may be amended or modified from time to time and including all exhibits and supplements thereto, in accordance with its terms, the "Amended Plan").  A copy of the Amended Plan is attached hereto as **Exhibit A** and incorporated herein by reference.[1]  Each Debtor is a proponent of the Amended Plan within the meaning of section 1129 of the Bankruptcy Code.  While the Amended Plan constitutes a single plan of reorganization for all Debtors, the Amended Plan does not contemplate substantive consolidation of any of the Debtors.  Reference is made to this Disclosure Statement for a discussion of the Debtors' history, business, properties, operations, projections, risk factors, a summary and description of the Amended Plan, and certain related matters.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE AMENDED PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE AMENDED PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE AMENDED PLAN.**

## II.   PRELIMINARY STATEMENT

The Company operates the world's largest satellite fleet and connectivity infrastructure and provides diversified communications services to many of the world's leading media companies, telecommunications operators, and Internet service providers, as well as the U.S. government and military. Since its inception in the early 1960s, the Company has played a critical part in many of history's most epic moments, including broadcasting the first moonwalk to the world, providing the hotline between the Pentagon and the Kremlin during the Cold War, and broadcasting World Cups, the Olympic Games, and Super Bowls to billions of people worldwide.  Every day, the Company's fleet of over fifty satellites, which covers 99 percent of the earth's populated regions, enables people in remote villages and locations to stay connected to the Internet and to each other.

The Company uses its satellites as relay stations in space for the transmission of voice, video, and data communications.  The Company's satellites primarily send and receive signals in one of three high-frequency radio "bands" (*i.e.*, ranges within the radio/electromagnetic spectrum): Ku-band, Ka-band, and C-band.

The "C-band" refers to certain portions of the electromagnetic spectrum that were historically allocated to fixed satellite services ("FSS").  For over 40 years, the Company has invested in and built a C-band business in reliance on C-band licenses held by Intelsat License LLC ("License"), which have

---

[1]   Capitalized terms used but not immediately defined in this Disclosure Statement have the meanings ascribed to such terms in the Amended Plan or subsequently in this Disclosure Statement.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Amended Plan.  **Any summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Amended Plan, is qualified in its entirety by reference to the Amended Plan, the exhibits, and other materials referenced in the Amended Plan, the Plan Supplement, and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Amended Plan, the Amended Plan shall govern.**

routinely been renewed.  The Company operates a significant portion of its business based on License's rights to the C-band and the expectation that the FCC would continue to license C-band spectrum for use by License in perpetuity.  Based on these rights and expectations, the Company and other satellite operators have invested over $50 billion to design, manufacture, and launch satellites, and make long-term contractual commitments to their customers.

As of the Petition Date, the Debtors had approximately $15 billion in total funded debt obligations, consisting of approximately $3.1 billion in aggregate principal amount outstanding under a secured term loan credit facility (the "Term Loan Facility"); approximately $1.8 billion in aggregate principal amount outstanding of secured notes (the "First Lien Notes"); approximately $6.8 billion in aggregate principal amount outstanding of the Jackson Senior Notes (as defined below); approximately $1.4 billion of unsecured notes for which Intelsat (Luxembourg) S.A. is the primary obligor (the "LuxCo Senior Notes"); approximately $1.2 billion of unsecured notes for which Intelsat Connect Finance S.A. is the primary obligor (the "Connect Senior Notes"); and approximately $402.5 million of convertible senior notes for which Intelsat S.A. is the primary obligor (the "Convertible Senior Notes").

In early 2020, the Debtors retained Kirkland & Ellis LLP ("K&E") and PJT Partners ("PJT") to assist them in navigating the complex interaction between the requirements under the anticipated FCC Order (defined below) and their liquidity situation, and began to seek alternative capital sources, including financing from third parties.  The Debtors and their advisors explored all potential avenues to effectuate a liability management transaction, including by identifying and approaching potentially interested strategic investors with whom the Debtors could negotiate a potential value-maximizing out-of-court transaction.

### A.    FCC Order

On March 3, 2020, the Federal Communications Commission (the "FCC") issued its final order (the "FCC Order") regarding the reallocation of the C-band for use by new fifth-generation ("5G") terrestrial wireless networks.  As a result of the FCC Order, the Company will be required to "clear" the lower 300 MHz of this spectrum over the continental United States (*i.e.*, cease its communications via those radio frequencies and move incumbent users into the upper 200 MHz of the C-band) no later than December 5, 2025.  Furthermore, to be eligible for approximately $4.87 billion in "Accelerated Relocation Payments" authorized by the FCC to existing licensees, the Company will be required to clear the lowest 120 MHz (3700–3820 MHz) of the spectrum by December 5, 2021, and to clear the remaining 180 MHz (3820–4000 MHz) range no later than December 5, 2023.  Meeting the deadlines imposed by the FCC Order to obtain the Accelerated Relocation Payments is a complex and technically challenging effort across all 48 contiguous United States that will take three years to complete.  The cost of launching the new satellites and other expenses associated with clearing the C-band spectrum is more than $1 billion through 2021. Although under the FCC Order the Company's clearing costs will be reimbursed in arrears, the Company does not expect to begin to receive reimbursements until late-2021 for work that has already begun.

The C-band clearing process has required and will continue to require the Debtors to incur significant costs related to clearing activities well in advance of receiving reimbursement for such costs. Given the Debtors' existing financial leverage, the requirements of the FCC Order, and the Debtors' current and future business prospects, particularly as adjusted for the impact of COVID-19, the Debtors began to explore the possibility of seeking chapter 11 relief and debtor-in-possession ("DIP") financing.  In March 2020, the Debtors retained Alvarez & Marsal North America LLC ("A&M") to assist in these analyses.

In an effort to conserve liquidity as the Debtors assessed their strategic alternatives, the Company elected to withhold a $125 million interest payment that was due on April 15, 2020 on account of the Jackson 8.5% Senior Notes Indenture due 2024 and entered into a 30-day grace period.  The grace period

enabled the Debtors to preserve liquidity as the Company continued to engage with key stakeholders and progressed discussions regarding financing and restructuring options.

### B.    DIP Negotiations and Chapter 11 Filing

In May 2020, despite their efforts to conserve liquidity, the Debtors and their advisors realized that chapter 11 proceedings may be required to address the Debtors' liquidity requirements and leveraged capital structure while meeting the requirements of the FCC Order on a timeline sufficient to earn the Accelerated Relocation Payments.  Accordingly, the Debtors began a robust and competitive marketing process for postpetition financing.  The Debtors received five preliminary proposals for DIP financing from third-party financial institutions in addition to multiple proposals from certain of the Debtors' prepetition creditors.  Among these proposals was a $1 billion superpriority senior secured priming multi-draw term loan credit facility proposed by an ad hoc group of certain prepetition secured parties represented by Akin Gump Strauss Hauer & Feld LLP and Centerview Partners LLC (the "Jackson Ad Hoc Group").  The Debtors ultimately reached agreement with both the Jackson Ad Hoc Group and a crossover ad hoc group of term loan lenders and noteholders represented by Jones Day and Houlihan Lokey Capital, Inc. (the "Jackson Crossover Ad Hoc Group") on the terms of the joint DIP facility provided by each group's constituents (the "DIP Facility") to Intelsat Jackson Holdings S.A. ("Jackson"), as borrower, with Jackson's obligations guaranteed by various of its subsidiaries.

With the DIP Facility negotiated, the Debtors were determined to meet the requirements imposed by the FCC Order and earn the Accelerated Relocation Payments of approximately $5 billion.  On May 13, 2020 (the "Petition Date"), the Debtors commenced their Chapter 11 Cases in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").  The Debtors smoothly transitioned into chapter 11 and obtained authority from the Bankruptcy Court to operate their business in a manner that is substantially consistent with their prepetition practices through a variety of "first day motions" and related court orders.[2]  Critically, on June 9, 2020, the Bankruptcy Court authorized the Debtors to enter into the DIP Credit Agreement [Docket No. 285].  The DIP Credit Agreement contained a sizable investment basket, which, as subsequently amended, allowed the Debtors to consummate the Gogo Transaction, as defined and described more fully herein.

On May 26, 2020, License filed the "Accelerated Relocation Election of Intelsat License LLC" pursuant to 47 C.F.R. § 27.1412(c), the FCC Order and the Wireless Telecommunication Bureau's May 11, 2020, public notice.  On August 14, 2020, License filed the "Intelsat C-Band Clearing Transition Plan" (the "Transition Plan") reflecting revisions made in response to comments received from the FCC and interested parties.  Following the Transition Plan, the Company finalized all of its required contracts with satellite manufacturers and launch vehicle providers to meet the accelerated C-band spectrum clearing timelines.  On October 28, 2020, License filed a second updated Transition Plan.  To date, the Debtors have made substantial progress toward clearing the C-band, and while meeting the requirements in the FCC Order to remain eligible for the nearly $5 billion in Accelerated Relocation Payments is challenging, License's C-band clearing plan remains on schedule.

As the Debtors stabilized operations in chapter 11 and began engaging with creditors regarding a restructuring transaction, the Company remained focused on long-term growth.  On August 31, 2020, Jackson and Gogo Inc. (the "Seller") entered into a purchase agreement (the "Purchase Agreement") with

---

[2]    The Debtors have continued to successfully operate their business throughout these cases, both on an ordinary-course basis and through other transactions, including: (a) obtaining approval from the Bankruptcy Court to release certain liens in order to enhance the value of the Debtors' investment in Spaceflight Industries; (b) entering into a long-term commercial agreement with Speedcast Communications Inc.; (c) entering into a new joint venture with JSAT International Inc.; and (d) undertaking a comprehensive review of and implementing a strategy for value maximization with respect to Executory Contracts and Unexpired Leases.

3

respect to the Seller's commercial aviation business ("Gogo CA") for $400 million in cash, subject to customary adjustments (the "Gogo Transaction"). Jackson funded the purchase price of the Gogo Transaction with proceeds from the DIP Facility and cash on hand. In connection with the Gogo Transaction, Jackson entered into an amendment to the credit agreement governing the DIP Facility to permit the transactions contemplated by the Purchase Agreement, which was approved by the Court in the *Order (I) Authorizing the Debtors to (A) Consummate a Proposed Transaction and (B) Enter into an Amendment to the DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 720] on August 31, 2020. On December 1, 2020, the Gogo Transaction closed, allowing the Debtors, as the world's largest satellite operator, to combine with the leading provider of commercial inflight broadband and entertainment services to deliver unprecedented innovation and long-term value to commercial airlines.

### C.      Plan Negotiations

While devoting significant time and effort to C-band clearing efforts and the Gogo Transaction, to facilitate the meaningful participation of the Debtors' key constituents in the formulation of a plan of reorganization, the Debtors devoted significant time and resources to provide substantial amounts of diligence to the Debtors' key stakeholders, including the official committee of Unsecured Creditors (the "Creditors' Committee"), the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, the ad hoc group of noteholders and equity holders represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP and Ducera Partners LLC (the "HoldCo Creditor Ad Hoc Group"), and holders of primarily Convertible Senior Notes and equity represented by Stroock & Stroock & Lavan LLP (the "Convert Ad Hoc Group"). Among other things, the Debtors have provided voluminous information regarding historical intercompany transactions and various foreign and domestic tax issues and considerations—topics that were critical to the negotiation of the *Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 1467] (the "Original Plan") and the Amended Plan and were therefore critical for the various interested parties to understand.

Beginning in mid-October 2020, the Debtors entered into nondisclosure agreements with several of their key creditor constituencies in order to share the Debtors' go-forward business plan (the "Business Plan"). Members of the Creditors' Committee, the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Convert Ad Hoc Group all received confidential information and attended presentations with the Debtors' management related to the Business Plan and have been kept apprised of any adjustments made in light of material changes since mid-October.

Engagement on the Debtors' Business Plan soon turned to engagement regarding the terms of a restructuring transaction. Beginning in November 2020, the Debtors and their primary creditor constituencies agreed to expand the scope and duration of the applicable confidentiality agreements to allow the parties to engage in direct plan negotiations. These negotiations continued in earnest from November 2020 until mid-February 2021, with each of the restricted parties, including certain members of the ad hoc group of first lien noteholders, represented by Wilmer Cutler Pickering Hale and Dorr LLP (the "Jackson First Lien Noteholder Group"), who became restricted in early February 2021, agreeing to extend their confidentiality agreements multiple times. In particular, the parties spent significant time discussing complex issues related to, among other things, intercompany transactions, foreign and domestic tax issues, and the value of the Debtors' business, including rights related to the FCC Order.

Following this lengthy process of extensions and negotiations, the efforts of the Debtors, the Jackson Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group culminated in the formulation and execution of a plan support agreement that outlined the terms of the Debtors' proposed restructuring (the "Original Plan Support Agreement"). The Original Plan Support Agreement embodied a resolution of certain complex issues in these Chapter 11 Cases and was incorporated into the Original Plan.

4

After the Debtors filed the Original Plan and the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 1468] (the "Original Disclosure Statement") on February 12, 2021, they continued to engage with their stakeholders in these Chapter 11 Cases to build greater consensus for the Company's restructuring. In particular, on March 19, 2021, certain members of the Jackson Crossover Ad Hoc Group agreed to sign non-disclosure agreements and become restricted from trading in order to facilitate open and productive plan discussions. The Jackson Crossover Ad Hoc Group and the Convert Ad Hoc Group were not parties to the Original Plan Support Agreement and did not support the Original Plan. Negotiations continued for weeks and included negotiations between the Debtors' advisors and the advisors to the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group. Then, the Company's management and advisors engaged directly with certain principals of the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group, which ultimately led to a revised bid from the Jackson Crossover Ad Hoc Group (the "Crossover Proposal"). The Debtors' advisors then took that bid to the advisors for the HoldCo Creditors Ad Hoc Group in an effort to build as much consensus as possible. Certain principals of the HoldCo Creditor Ad Hoc Group then agreed to execute nondisclosure agreements and become restricted to facilitate the ongoing negotiation.

Though the Crossover Proposal narrowed the issues between the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group, the parties in interest had not yet reached agreement on a set of terms for a restructuring that each could support. After consultation with their key economic stakeholders, the Debtors determined that pursuing a judicial mediation, focused primarily on the open issues between the Crossover Proposal and the Original Plan, filed with the support of the parties to the Original Plan Support Agreement, was the path most likely to reach a more consensual plan of reorganization.

On April 6, 2021, the Debtors filed a motion requesting the court to compel mediation, which the court granted on April 21, 2021 in the *Order Compelling Mediation of Plan and Confirmation-Related Disputes and Appointing Judicial Mediator* [Docket No. 2049] (the "Mediation Order"). The Mediation Order appointed the Honorable Frank J. Santoro, Chief Judge for the United States Bankruptcy Court of the Eastern District of Virginia as the judicial mediator (the "Mediator") with full authority to settle these matters and to enter any order necessary in furtherance of the settlement efforts, which were to focus on certain Plan and confirmation related issues (the mediation process described herein, the "Mediation"). The Mediation was expanded to include every party in interest who requested to partake in the Mediation, including, among others: (a) the Debtors; (b) the Jackson Crossover Ad Hoc Group; (c) the HoldCo Creditor Ad Hoc Group; (d) the Jackson Ad Hoc Group; (e) the Convert Ad Hoc Group; (f) U.S. Bank National Association, in its capacity as Indenture Trustee for the Jackson Senior Notes ("U.S. Bank"); (g) the Committee; (h) the ad hoc group of equity holders of Intelsat S.A. (the "Ad Hoc Equity Group"); and (i) SES Americom Inc. ("SES").

### D.    Judicial Mediation

The Mediation began with the Mediator rapidly getting up to speed on the various complex issues in these Chapter 11 Cases and the positions of the Mediation parties with respect thereto, through conversations with and presentations from the Mediation parties. Numerous in-person Mediation sessions were held between mid-April and the date of the filing of this Disclosure Statement, including on June 30 and July 1, 2021, when certain principals of the Mediation parties and their advisors met in-person—for the first time in these Chapter 11 Cases—in Richmond, Virginia for Mediation sessions with the Mediator and each other, and again on July 15, 2021 in Richmond, Virginia.

After the in-person Mediation sessions, the Debtors and their major stakeholders continued to negotiate the terms of a restructuring, including by sharing multiple proposals outlining the key economic terms for a potential chapter 11 plan. The Debtors and these key stakeholders were in active discussions with each other, both directly and through the Mediator in the weeks that followed. Ultimately, these

5

continued good-faith negotiations culminated in agreement among the Debtors, the HoldCo Creditors Ad Hoc Group, the Jackson Ad Hoc Group, the Jackson First Lien Noteholder Group, and the Jackson Crossover Ad Hoc Group regarding the terms of a restructuring that each was willing to support. After hard-fought, good-faith negotiations, each party entered into a plan support agreement (the "Amended Plan Support Agreement"), which outlined the terms of the Debtors' proposed restructuring.  In parallel, the Debtors worked with these parties to formulate the Amended Plan, as contemplated by the Amended Plan Support Agreement and with the support of each party thereto.

### E.    Special Committee Review and Settlement of Certain Intercompany Matters

The boards of directors of Debtors Intelsat S.A.,[3] Intelsat (Luxembourg) S.A. ("LuxCo"), Intelsat Envision Holdings LLC ("Envision"), Intelsat Connect Finance S.A. ("ICF"), and Jackson each established special committees (the "Special Committees") and appointed disinterested directors (the "Disinterested Directors") to serve as independent fiduciaries on each of the Special Committees.  The Special Committees also retained independent advisors to advise them with respect to their duties.  The Special Committees were authorized to determine whether a conflict exists between the applicable Debtor and its stakeholders with regard to any matter (matters with such conflicts, the "Conflicts Matters").  In the event that the Special Committees determine that a matter constitutes a Conflicts Matter, the Special Committees are authorized to take any and all actions with respect to any review, discussion, consideration, deliberation, examination, investigation, analysis, assessment, evaluation, exploration, response, and negotiation on behalf of the applicable Debtor of the terms and conditions of any restructuring transaction, including to (a) review and evaluate any restructuring transaction and consider whether or not it is fair to and in the best interests of the applicable Debtor, its subsidiaries, and their respective stakeholders; (b) consult with management and the applicable Debtor's advisors with respect to discussions and negotiations regarding the terms and conditions of a restructuring transaction; and (c) consider such other matters as may be requested by the applicable Debtor or its board of directors.

The Special Committees, as independent fiduciaries for their respective estates, expended significant time and effort gathering voluminous data and information regarding a multitude of complex issues in the Chapter 11 Cases, including:  potential claims that may exist in connection with certain historical and ongoing intercompany transactions and relationships, among other transactions; the allocation of payment of certain of the administrative expenses in these Chapter 11 Cases; various foreign and domestic tax issues, including the value of and entitlement to tax attributes such as net operating losses held by that certain Luxembourg fiscal unity formed by certain of the Debtors (the "Tax Unity"), as well as other tax attributes held outside of the Tax Unity; the Accelerated Relocation Payments and which Debtor or Debtors should be entitled to receive them; and the Debtors' Business Plan and enterprise valuation.  The advisors to the Special Committees were given access to substantially the same data and information, including data and information that had been made available to advisors for the Creditors' Committee, the Jackson Ad Hoc Group, the Ad Hoc Group of Secured Noteholders, the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Convert Ad Hoc Group.

The Special Committees evaluated the Original Plan, including the consideration to be provided thereunder and its resolution of numerous Claims that may have constituted Conflicts Matters.  After substantial review, analysis, and consultation with their independent advisors, each Special Committee authorized its respective Debtor to enter into the Original Plan Support Agreement, pursuant to its terms and conditions and subject to each Special Committee's ongoing investigations and analyses.

After the filing of the Original Plan, the Special Committees continued to assess and evaluate the merits of these potential claims in light of developing facts and circumstances, including:  (a) briefing filed

---

[3]    References in this Disclosure Statement to "Intelsat" refer to Intelsat S.A., unless otherwise noted.

6

by parties in interest in these cases related to which Debtor entity may be entitled to the Accelerated Relation Payments; (b) updates to the tax modeling regarding the estimated present value of the net-operating losses (the "NOLs") held by the Tax Unity and considerations with respect to the non-Tax Unity NOLs at Intelsat Investment Holdings S.à.r.l. ("Holdings SARL") and Intelsat S.A. (collectively with Holdings SARL, Holdings, Investments, LuxCo, Envision, and ICF, the "HoldCos"); (c) pleadings[4] filed with respect to the release of certain guarantees by certain of the Debtors before the Petition Date; (d) facts related to approximately six months of further business performance progress; (e) progress made by the Debtors in satisfying the requirements for payment of the Accelerated Relocation Payments; and (f) other legal and factual developments in the chapter 11 cases, including the Mediation.

As a result, the Amended Plan is premised on a global settlement of certain claims and causes of action between the Debtors, which will avoid the need for lengthy, value-destructive litigation through releases of claims and causes of action such as potential fraudulent transfer, avoidance, preference, recharacterization and derivative actions on account of historical acts, covenants to support the necessary transactions to implement a restructuring for all of the Debtors, and other agreements to support a restructuring that will inure to the benefit of the Debtors' estates. As described in greater detail below, the Settlement will resolve issues regarding: (a) the post-emergence organizational structure; (b) numerous highly complex considerations regarding the Luxembourg tax profile of the Debtors, including, among other things, (i) preservation of the Tax Unity and potential alternative restructuring outcomes that would not have preserved the Tax Unity and (ii) the use of Tax Unity tax attributes; (c) the recipient and allocation of any Accelerated Relocation Payments; (d) intercompany transactions that arose in the course of the Debtors' business prior to the Petition Date—including certain transactions and/or balances that could potentially be the subject of fact intensive and time consuming fraudulent transfer or preference litigation; (e) intercompany balances that have accumulated after the Petition Date; and (f) allocation of certain administrative expenses.

### F.  Amended Plan Support Agreement and Amended Plan

The Amended Plan provides for the reorganization of the Debtors as a going concern with a deleveraged capital structure and sufficient liquidity to fund the Debtors' post-emergence Business Plan and continue clearing activities to enable the Debtors to be eligible for the Accelerated Relocation Payments.

Specifically, the Amended Plan provides the Debtors with a New Capital Structure consisting of $7.125 billion in New Debt, which may include New Term Loans and New Notes that may be fully backstopped by the Backstop Parties.

Pursuant to and in accordance with the Amended Plan Support Agreement and Amended Plan, upon consummation of the Restructuring Transactions, the Debtors will fully repay the DIP Facility with proceeds from the New Debt. The Equity Issuer will issue 96.0 percent of the authorized but unissued New Common Stock to Holders of Allowed Jackson Unsecured Claims and 4.0 percent to Holders of ICF Unsecured Claims, each subject to dilution in accordance with Dilution Principles. The Equity Issuer will also issue 100.0 percent of the Series A Warrants and approximately 46.4 percent of the Series B Warrants to Holders of ICF Unsecured Claims, approximately 6.3 percent of the Series B Warrants to Holders of S.A. Unsecured Claims, and approximately 47.3 percent of the Series B Warrants to Holders of Envision Unsecured Claims. Any New Common Stock issued upon the exercise of the New Warrants shall be subject

---

[4]  No fewer than five parties in interest have collectively filed (a) numerous proofs of claim; (b) two objections to the Jackson Parent Guarantee Claims and one objection to the Lux Parent Guarantee Claims; (c) five responses to the objections, (d) two motions for partial summary judgment; and (e) two objections to the motions for partial summary judgment and cross-motion for partial summary judgment.

to dilution pursuant to the Dilution Principles.  The CVR Issuer will issue 100 percent of the Series A CVRs and 67.5 percent of the Series B CVRs to Holders of Jackson Unsecured Claims, and 32.5 percent of the Series B CVRs to the Holders of ICF Unsecured Claims.

The Amended Plan Support Agreement attached hereto as **Exhibit G** also includes agreement on a standstill on the prosecution of such Guarantee Claims by and among each of the Parent Guarantors (as defined herein), the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group.

Additionally, the Amended Plan contains customary release, exculpation, and injunction provisions, which will facilitate the Debtors' successful reorganization by providing certainty in connection with the Amended Plan to the Reorganized Debtors and each of the Debtors' stakeholders.

In the event that the Plan is not confirmed as to Holdings SARL and/or Intelsat S.A. (a "Plan Toggle Event"), the Debtors shall immediately seek, and the Parties to the Amended Plan Support Agreement shall support, the Confirmation of the "Non-TopCo Plan" without the need to resolicit votes on the Non-TopCo Plan.  Upon conversion to the Non-TopCo Plan, all references in the Amended Plan to the "Plan" and any references herein to the "Amended Plan" shall be deemed to refer to the Non-TopCo Plan. Any references to the Debtors shall be deemed to refer to all of the Debtors other than whichever (or both) of Intelsat S.A. and Holdings SARL that a Plan Toggle Event occurs with respect to.  The Non-TopCo Plan shall be consistent in all respects with the terms of the Amended Plan (including, for the avoidance of doubt, the treatment of Claims provided under the Plan for all classes of creditors other than creditors of Holdings SARL and/or Intelsat S.A.).  The Non-TopCo Plan may differ from the Amended Plan as required to remove Holdings SARL and/or Intelsat S.A. from the Amended Plan and which shall (unless waived in accordance with the Amended Plan Support Agreement) still require that the Settlement Agreement Order be entered as a condition precedent to confirmation of the Non-TopCo Plan, and otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Unsecured Creditors.

The Debtors believe that the Amended Plan (including the Non-TopCo Plan, if applicable) is in the best interests of the Debtors' estates and represents the best path forward at this time.  Given the Debtors' core strengths, including their experienced management team and robust satellite fleet, the Debtors are confident that they can implement the restructuring embodied in the Amended Plan to ensure the Debtors' long-term viability.  For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote or reject the Amended Plan vote to accept the Amended Plan.

Notwithstanding any other provision in this Disclosure Statement or an order approving this Disclosure Statement (the "Disclosure Statement Order"), the Bankruptcy Court makes no finding or ruling in the Disclosure Statement Order, other than with respect to the adequacy of the Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code, with respect to (a) the negotiations, reasonableness, business purpose, or good faith of the Settlement Agreement or the Amended Plan, or as to the terms of the Settlement Agreement or the Amended Plan (or the treatment of any class of Claims thereunder and whether those Claims are or are not impaired) for any purpose, (b) whether the Amended Plan satisfies any of the requirements for confirmation under section 1129 of the Bankruptcy Code, or (c) the standard of review or any factor required for approval of the Settlement Agreement or Confirmation of the Amended Plan. Any objections or requests served in connection with the Settlement Agreement and/or the Amended Plan are hereby reserved and not waived by entry of the Disclosure Statement Order; provided, however, that nothing in the Disclosure Statement or the Disclosure Statement Order shall preclude the Debtors or any other party in interest that is the subject of such objection or discovery requests from seeking to overrule such objections or limit or otherwise overrule such discovery requests.

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim entitled to vote to accept or reject the Amended Plan.  **Prior to voting on the Amended Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure**

**Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Article IX of this Disclosure Statement, entitled "Risk Factors."**

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

A.    **What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any Person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other Entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtors' liabilities in accordance with the terms of the confirmed plan.

B.    **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Amended Plan. Before soliciting acceptances of the Amended Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Amended Plan and to share such disclosure statement with all Holders of Claims or Interests whose votes on the Amended Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

C.    **Am I entitled to vote on the Amended Plan?**

Your ability to vote on, and your distribution under, the Amended Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Amended Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| *Unclassified Non-Voting Claims* | | | |
| N/A | DIP Claims | N/A | N/A |
| N/A | Administrative Claims | N/A | N/A |
| N/A | Priority Tax Claims | N/A | N/A |
| *Other Claims and Interests* | | | |
| A1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

9

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| A2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| A3 | Debtor Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| A4 | Non-Debtor Intercompany Claims | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| A5 | Intercompany Interests | Impaired / Unimpaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| A6 | Term Loan Facility Claims | Impaired | Entitled to Vote |
| A7 | 8.00% First Lien Notes Claims | Impaired | Entitled to Vote |
| A8 | 9.50% First Lien Notes Claims | Impaired | Entitled to Vote |
| A9 | Convenience Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| *Jackson* | | | |
| B1 | Unsecured Claims | Impaired | Entitled to Vote |
| *Jackson Subsidiaries* | | | |
| C1 | Unsecured Claims | Impaired | Entitled to Vote |
| *ICF* | | | |
| D1 | Unsecured Claims | Impaired | Entitled to Vote |
| *Envision* | | | |
| E1 | Unsecured Claims | Impaired | Entitled to Vote |
| *LuxCo* | | | |
| F1 | Unsecured Claims | Impaired | Entitled to Vote |
| *Intelsat Investments S.A.* | | | |
| G1 | Unsecured Claims | Impaired | Entitled to Vote |
| *Intelsat Holdings S.A.* | | | |
| H1 | Unsecured Claims | Impaired | Entitled to Vote |
| *Intelsat Investment Holdings S.à.r.l.* | | | |
| I1 | Unsecured Claims | Impaired | Entitled to Vote |
| I2 | TopCo Guarantee Claims | Impaired | Entitled to Vote |
| *Intelsat S.A.* | | | |
| J1 | Unsecured Claims | Impaired | Entitled to Vote |
| J2 | TopCo Guarantee Claims | Impaired | Entitled to Vote |
| J3 | Intelsat Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Amended Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Amended Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Amended Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Amended Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE**

**DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE AMENDED PLAN.[5]**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Amended Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of an Allowed Claim or Allowed Interest, as applicable.

| | | | | | | |
|---|---|---|---|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** | | | | | | |
| **Class** | **Claim / Interest** | **Treatment of Claim / Interest** | **Projected Amount of Claims** | **Estimated Recovery Under Plan[6]** | **Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7]** | **Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7]** |
| *Unclassified Non-Voting Claims* | | | | | | |
| N/A | DIP Claims | Each Holder of an Allowed DIP Claim shall receive payment in full in Cash. | N/A | N/A | N/A | N/A |
| N/A | Administrative Claims | Each Holder of an Allowed Administrative Claim shall receive payment in full in Cash. | N/A | N/A | N/A | N/A |
| N/A | Priority Tax Claims | Each Holder of an Allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | N/A | N/A | N/A | N/A |
| *Other Claims and Interests* | | | | | | |
| A1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s) (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either: (a) payment in full | $22,486,945 | 100% | $22,486,945 | 100% |

---

[5]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.

[6]   Values determined based on the midpoint of the estimated range of the Debtors' Enterprise Value (as defined and estimated by PJT in the Valuation Analysis, attached to this Disclosure Statement as **Exhibit E**).

[7]   As described in greater detail below, SES has filed a proof of claim against each of the Debtors in the amount of $1.8 billion. SES asserts, among other things, that the Debtors owe or will owe SES approximately $420 million from the Accelerated Relocation Payments that the Debtors are eligible to receive. SES has further argued that it is entitled to punitive damages of three times the $420 million of compensatory damages allegedly owed. The Debtors believe these arguments are without merit but reflect the impact 0on recoveries if such arguments were successful for illustrative purposes only.

11

| | | | | | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
|---|---|---|---|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** | | | | | | |
| **Class** | **Claim / Interest** | **Treatment of Claim / Interest** | **Projected Amount of Claims** | **Estimated Recovery Under Plan[6]** | | |
| | | in Cash; (b) delivery of collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | | | |
| A2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s) (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either: (a) payment in full in Cash; or (b) such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $1,098 | 100% | $1,098 | 100% |
| A3 | Debtor Intercompany Claims | Each Allowed Debtor Intercompany Claim shall, at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either on or after the Effective Date, be: (a) Reinstated; or (b) distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), without any distribution on account of such Claims. | $18,536,061,882 | N/A | $18,536,061,882 | N/A |

12

| | | | | | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
|---|---|---|---|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** | | | | | | |
| **Class** | **Claim / Interest** | **Treatment of Claim / Interest** | **Projected Amount of Claims** | **Estimated Recovery Under Plan[6]** | | |
| A4 | Non-Debtor Intercompany Claims | Subject to the terms of the Settlement Agreement and the Settlement Order, except to the extent otherwise provided in the Restructuring Steps Memorandum or the Plan, each Allowed Non-Debtor Intercompany Claim shall, at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), either on or after the Effective Date, be: (a) Reinstated; or (b) distributed, contributed, set off, settled, canceled and released, or otherwise addressed at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Required Consenting HoldCo Creditors), without any distribution on account of such Claims. | $52,723,938 | N/A | $52,723,938 | N/A |
| A5 | Intercompany Interests | Except to the extent otherwise provided in the Restructuring Steps Memorandum, on the Effective Date, Intercompany Interests shall, at the option of the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely if such Claim is against a HoldCo, the Consenting HoldCo Creditors), either be: (a) Reinstated; or (b) discharged, canceled, released, and extinguished and of no further force or effect without any distribution on account of such Interests. | N/A | N/A | N/A | N/A |
| A6 | Term Loan Facility Claims | Except to the extent that a Holder of an Allowed Term Loan Facility Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Term Loan Facility Claim, each Holder of an Allowed Term Loan Facility Claim shall receive payment in full in Cash as compromised in accordance with the Term Loan Facility Claims Settlement; *provided, however*, for the avoidance of doubt, no distributions to Holders of Allowed Term Loan Facility Claims shall be made out of the deposit accounts of the HoldCos. | $3,095,000,000 | 99.67% | $3,095,000,000 | 99.67% |

13

| | | SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
| A7 | 8.00% First Lien Notes Claims | Except to the extent that a Holder of an Allowed 8.00% First Lien Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 8.00% First Lien Notes Claim, each Holder of an Allowed 8.00% First Lien Notes Claim shall receive payment in full in Cash of its Pro Rata share of (x) the full amount of all 8.00% First Lien Notes Claims as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; *provided, however*, that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the Holders of Allowed 8.00% First Lien Notes Claims as Unimpaired and the Holders of Allowed 8.00% First Lien Notes Claims shall receive payment in full, in Cash of: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including any premium or makewhole amounts and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render the 8.00% First Lien Notes Claims Unimpaired (and, for the avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the 8.00% First Lien Notes Claims Unimpaired | $1,380,371,550 | 99.49% | $1,380,371,550 | 99.49% |

14

| | | | | | | |
|---|---|---|---|---|---|---|
| | | **SUMMARY OF EXPECTED RECOVERIES** | | | | |
| **Class** | **Claim / Interest** | **Treatment of Claim / Interest** | **Projected Amount of Claims** | **Estimated Recovery Under Plan[6]** | **Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7]** | **Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7]** |
| | | shall be expressly reserved and preserved), with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; *provided, further, however*, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; *provided, further, however*, for the avoidance of doubt, no distributions to Holders of Allowed 8.00% First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos. | | | | |
| A8 | 9.50% First Lien Notes Claims | Except to the extent that a Holder of an Allowed 9.50% First Lien Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed 9.50% First Lien Notes Claim, each Holder of an Allowed 9.50% First Lien Notes Claim shall receive payment in full in Cash of its Pro Rata share of (x) the full amount of all 9.50% First Lien Notes Claims as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; *provided, however*, that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the Holders of Allowed 9.50% First Lien Notes Claims as Unimpaired and the Holders of Allowed 9.50% First Lien Notes Claims shall receive payment in full, in | $608,879,106 | 95.51% | $608,879,106 | 95.51% |

| | | SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|---|---|
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
| | | Cash of: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including any premium or makewhole amounts and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render the 9.50% First Lien Notes Claims Unimpaired (and, for the avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the 9.50% First Lien Notes Claims Unimpaired shall be expressly reserved and preserved), with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; *provided, further, however*, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; *provided, further, however*, for the avoidance of doubt, no distributions to Holders of Allowed 9.50% First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos. | | | | |
| A9 | Convenience Claims[8] | Each Holder of an Allowed Convenience Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash. | $4,551,249 | 100% | $4,551,249 | 100% |
| | | *Jackson* | | | | |
| B1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Jackson agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Jackson, each Holder of an Allowed Unsecured Claim against Jackson shall receive its Pro Rata share of the Jackson Unsecured Recovery. | $7,057,077,327 | 11.20% | $8,868,716,560 | 6.18% |

---

[8]   Recoveries on account of the Allowed Convenience Claims may modestly dilute the recoveries to Holders of Allowed Claims depending on the ultimate reconciliation of the Allowed Convenience Claims.

16

| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
|---|---|---|---|---|---|---|
| | | | | | | |
| *Jackson Subsidiaries* | | | | | | |
| C1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Jackson Subsidiaries agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Jackson Subsidiaries, each Holder of an Allowed Unsecured Claim against Jackson Subsidiaries shall receive its Pro Rata share of the Jackson Unsecured Recovery. | $7,151,305,565 | 44.77% | $8,962,944,798 | 35.83% |
| *ICF* | | | | | | |
| D1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against ICF agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against ICF, each Holder of an Allowed Unsecured Claim against ICF shall receive its Pro Rata share of the ICF Unsecured Recovery. | $1,298,821,049 | 22.54% | $3,110,460,282 | 14.90% |
| *Envision* | | | | | | |
| E1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Envision agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Envision, each Holder of an Allowed Unsecured Claim against Envision shall receive its Pro Rata share of the Envision Unsecured Recovery. | $1,708,765,694 | 4.29% | $3,520,404,927 | 3.15% |
| *LuxCo* | | | | | | |
| F1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against LuxCo agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against | $2,655,689,106[8] | 0.04%[9] | $4,467,328,339[8] | 0.03%[8] |

---

[9]   The estimated Allowed Unsecured Claims Against LuxCo include Claims held by Holders of Connect Senior Notes. Recoveries to Holders of Unsecured Claims Against LuxCo exclude any recoveries on account of the Connect Senior Notes and there shall be no distribution of any portion of the LuxCo Unsecured Recovery on account of Connect Senior Notes Claims Against LuxCo.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | **Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7]** | **Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7]** |
| **Class** | **Claim / Interest** | **Treatment of Claim / Interest** | **Projected Amount of Claims** | **Estimated Recovery Under Plan[6]** | | |

**SUMMARY OF EXPECTED RECOVERIES**

| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful | Estimated Recovery Under Plan If SES Is Successful |
|---|---|---|---|---|---|---|
| | | LuxCo, each Holder of an Allowed Unsecured Claim against LuxCo shall receive its Pro Rata share of the LuxCo Unsecured Recovery; *provided*, for the avoidance of doubt, that there shall be no distribution of any portion of the LuxCo Unsecured Recovery on account of (i) the Intercompany Senior Notes Claims and (ii) the Connect Senior Notes Claims, in each instance as a result of the settlements and compromises set forth in the Plan and Plan Support Agreement. | | | | |
| | | *Intelsat Investments S.A.* | | | | |
| G1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Investments agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Investments, each Holder of an Allowed Unsecured Claim against Investments shall receive its Pro Rata share of the Investments Unsecured Recovery. | $0 | N/A | $1,811,639,233 | 0.02% |
| | | *Intelsat Holdings S.A.* | | | | |
| H1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Holdings agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Holdings, each Holder of an Allowed Unsecured Claim against Holdings shall receive its Pro Rata share of the Holdings Unsecured Recovery. | $0 | N/A | $1,811,639,233 | 0.00% |
| | | *Intelsat Investment Holdings S.à.r.l.* | | | | |
| I1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Holdings SARL agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Holdings SARL, each Holder of an Allowed Unsecured Claim against Holdings SARL shall receive its Pro Rata share of the Holdings SARL Unsecured Recovery. | $0 | N/A | $1,811,639,233 | 0.00% |
| I2 | TopCo Guarantee | Except to the extent that a Holder of an | N/A | N/A | N/A | N/A |

18

| | | | | | | |
|---|---|---|---|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** | | | | | | |
| **Class** | **Claim / Interest** | **Treatment of Claim / Interest** | **Projected Amount of Claims** | **Estimated Recovery Under Plan[6]** | **Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7]** | **Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7]** |
| | Claims | Allowed TopCo Guarantee Claim against Holdings SARL agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each TopCo Guarantee Claim against Holdings SARL, each Holder of an Allowed TopCo Guarantee Claim against Holdings SARL shall receive its Pro Rata share of the Holdings SARL Unsecured Recovery. | | | | |
| *Intelsat S.A.* | | | | | | |
| J1 | Unsecured Claims | Except to the extent that a Holder of an Allowed Unsecured Claim against Intelsat agrees to less favorable treatment of its Allowed Claim (including, for the avoidance of doubt, the HoldCo Creditor Ad Hoc Group Waiver), in full and final satisfaction, settlement, release, and discharge of and in exchange for each Unsecured Claim against Intelsat, each Holder of an Allowed Unsecured Claim against Intelsat shall receive its Pro Rata share of the S.A. Unsecured Recovery. | $410,061,305 | 6.88% | $2,221,700,538 | 2.29% |
| J2 | TopCo Guarantee Claims | Except to the extent that a Holder of an Allowed TopCo Guarantee Claim against Intelsat agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each TopCo Guarantee Claim against Intelsat, each Holder of an Allowed TopCo Guarantee Claim against Intelsat shall receive its Pro Rata share of the S.A. Unsecured Recovery; *provided* that 30 percent (30%) of any distributions made on account of TopCo Guarantee Claims against Intelsat to the Jackson Senior Notes Trustees shall be gifted Pro Rata to Holders of Connect Senior Notes Claims in consideration for the covenants, compromises, releases, and other benefits provided by the members of the HoldCo Creditor Ad Hoc Group pursuant to the Plan Support Agreement; *provided* that the aggregate value of such gift shall not exceed $6 million. | N/A | N/A | N/A | N/A |
| J3 | Interests | No distributions shall be made under the Plan in respect of Interests in Intelsat. On the Effective Date, Holders of Interests in Intelsat | N/A | N/A | N/A | N/A |

19

| | | | | | | Estimated Recovery Under Plan If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] |
| Class | Claim / Interest | Treatment of Claim / Interest | Projected Amount of Claims | Estimated Recovery Under Plan[6] | Projected Amount of Claims If SES Is Successful in Prosecuting Each of Its $1.8 Billion Claims[7] | |
|---|---|---|---|---|---|---|
| | | shall have their Interests in Intelsat diluted and extinguished by the equity distributions made pursuant to the Plan and shall receive no distribution on account of their Interests. ~~Holders of Interests may receive a *de minimis* Cash payment in lieu of any fractional interest retained in order to extinguish such interests in accordance with Luxembourg law.~~ | | | | |

### E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Facility Claim, or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Amended Plan.

### 1.   *DIP Claims*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment; (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Credit Agreement and the DIP Order, and (iv) all other DIP Obligations as provided for in the DIP Credit Agreement other than Contingent DIP Obligations, which shall otherwise survive the Effective Date and shall be paid in full in Cash as soon as reasonably practicable after they become due and payable under the DIP Documents. Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall receive on the Effective Date payment in full in Cash of such Holder's Allowed DIP Claim. All reasonable and documented unpaid fees and expenses of the DIP Agent, including reasonable and documented fees, expenses, and costs of its advisors, shall be paid in Cash on the Effective Date. Contemporaneously with the foregoing receipt of payment in full in Cash of the Allowed DIP Claims, except with respect to Contingent DIP Obligations under the DIP Credit Agreement (which contingent obligations shall survive the Effective Date and shall continue to be governed by the DIP Credit Agreement), the DIP Facility, the DIP Credit Agreement, and all related loan documents shall be deemed canceled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders. The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably

20

requested by the Debtors or the Reorganized Debtors, as applicable.  For the avoidance of doubt, no DIP Claims shall be paid out of the deposit accounts of the HoldCos.

## 2. *Administrative Claims*

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, or as otherwise set forth in an order of the Bankruptcy Court (including pursuant to the procedures specified therein), as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following:  (1) if an Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than ninety days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

## 3. *Priority Tax Claims*

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each Holder of an Allowed Priority Tax Claim will, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) receive Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) otherwise be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## 4. *Statutory Fees*

The Debtors shall pay any outstanding fees owed pursuant to 28 U.S.C. § 1930(a), including U.S. Trustee fees, in full on or before the Effective Date.  The Debtors, the Reorganized Debtors, and/or the Distribution Agent[10] shall continue to pay such fees until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

The Debtors shall continue complying with monthly reporting requirements through the Effective Date as required under the Local Bankruptcy Rules.  After the Effective Date, the Reorganized Debtors and/or the Distribution Agent shall file quarterly reports consistent with Local Bankruptcy Rule 2015-(a)-1.  The Reorganized Debtors and/or the Distribution Agent shall no longer have the obligation to file quarterly reports with respect to a Debtor once such Debtor's case is converted, dismissed or a final decree has been entered by the Court.

---

[10]  The Distribution Agent may be the Reorganized Debtors, one of the Debtors' already retained professionals, or another third party, including, if applicable each of the Indenture Trustees.  In the event that the Debtors engage a third party which has not yet been retained in these Chapter 11 Cases, the Debtors will disclose the terms of that engagement. which disclosure shall be included in the Plan Supplement in the event that the Debtors engage a third party to serve as the Distribution Agent prior to the filing of the Plan Supplement.

21

**F.      How do I know if I have a Convenience Claim and what does that mean for my General Unsecured Claim if I do?**

Any Holder of a General Unsecured Claim in an Allowed amount that is greater than $0 but less than or equal to the Convenience Claim Threshold, or in excess of the Convenience Claim Threshold for which the Holder of such Claim timely elects on a Convenience Claim Opt-In Form to have such Claim irrevocably reduced to the Convenience Claim Threshold and treated as a Convenience Claim in full and final satisfaction of such Claim, will be entitled to the treatment provided for Holders of Allowed Claims in Class A9.  In other words, Holders of Allowed Convenience Claims, including those who timely elect on a Convenience Claim Threshold to have such Claim reduced to the Convenience Claim Threshold, will be entitled to receive payment in full in Cash, in full and final satisfaction of such Claim.

**G.      Are any regulatory approvals required to consummate the Amended Plan?**

Yes, regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Amended Plan, and they must be obtained prior to the Effective Date.

The Amended Plan and associated Restructuring Transactions may constitute a transfer of control, requiring prior FCC approval.  If such approval is required, the Debtors may be required to submit applications that provide information concerning their current and proposed ownership, information regarding how the transaction will occur, and an explanation of how the transfer of control benefits the public interest.  These applications may take 45 days or longer for the FCC to approve, request additional information, or deny.

Ownership by foreign persons of the Reorganized Debtors could also result in review by the Committee on Foreign Investment in the United States ("CFIUS"), if such ownership is accompanied by control or other rights, which review would focus on the national security implications of any such foreign ownership upon emergence.  CFIUS is authorized to review any investment, acquisition, merger, takeover, or other transaction that (A) would result in foreign control (as such term is defined for CFIUS purposes) of a U.S. business or (B) involves a foreign person making a noncontrolling investment in a U.S. business that affords it specific rights that make its investment non-passive. CFIUS may impose mitigation measures (*i.e.*, conditions to clearance) on any pending transaction or in rare cases recommend that the President block a pending transaction or order divestiture for a completed transaction.  Depending on the ultimate foreign ownership of the New Common Stock or governance rights afforded to the holders of the New Common Stock, submitting a declaration or notice to CFIUS may be advisable, if not required.  If a CFIUS filing is required or advisable, it could take three or four months (or longer) for the filing to be prepared and submitted and for CFIUS to complete its review.  The CFIUS assessment is separate from, but complementary to, the national security review conducted by Team Telecom that is described in further detail in section VIII.D.3.

Ownership or control by foreign persons of certain of the Reorganized Debtors could require changes to a Proxy Agreement dated June 7, 2017 to which certain of the Reorganized Debtors, Intelsat General Corporation ("IGC"), and the U.S. Department of Defense are parties.  The Proxy Agreement is administered by the Defense Counterintelligence and Security Agency ("DCSA") and mitigates foreign ownership, control, or influence ("FOCI") under the National Industrial Security Program Operating Manual to allow IGC to maintain the requisite security clearances to perform certain government contracts.

The U.S. Department of State administers the International Traffic in Arms Regulations, (the "ITAR"), which set forth export control requirements regarding defense articles and defense services.  One of the Debtors, Intelsat US LLC, is currently registered under the ITAR. As an ITAR registrant, Intelsat US LLC would need to notify the U.S. State Department's Directorate of Defense Trade Controls ("DDTC") at least 60 days prior to emergence with respect to the consummation of the Amended

22

Plan, as required by the ITAR, if emergence will result in the transfer to a foreign person of ownership or control (as such terms are defined under the ITAR). Regardless of whether this notice is required, no approval would be required from DDTC (though the U.S. State Department is a CFIUS member agency). Moreover, and in any event, Intelsat US LLC will need to submit a material change notice under the ITAR to DDTC within five days following closing.

Additionally, filings under certain non-United States foreign direct investment ("FDI") regimes may be advisable or required. Analysis regarding jurisdictions in which such filings may be required or advisable is ongoing.

Finally, antitrust-related notifications and observations of the statutory waiting period under the Hart-Scott-Rodino Antitrust Improvement Acts of 1976, as amended (the "HSR Act") under certain non-United States antitrust/merger control regulatory regimes may be required for consummation of the Restructuring Transactions. Analysis regarding jurisdictions in which such notifications may be required or advisable is ongoing.

**H.    What happens to my recovery if the Amended Plan is not confirmed or does not go effective?**

In the event that the Amended Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Amended Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article XII.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit C**.

**I.    If the Amended Plan provides that I get a distribution, do I get it upon Confirmation or when the Amended Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Amended Plan refers to approval of the Amended Plan by the Bankruptcy Court. Confirmation of the Amended Plan does not guarantee that you will receive the distribution indicated under the Amended Plan. After Confirmation of the Amended Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Amended Plan can go effective. Initial distributions to Holders of Allowed Claims will only be made on the date the Amended Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Amended Plan. *See* Article XII of this Disclosure Statement, entitled "Confirmation of the Amended Plan," for a discussion of the conditions precedent to Consummation of the Amended Plan.

**J.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Amended Plan and recognizes that any party in interest may object to Confirmation of the Amended Plan. The Confirmation Hearing will be scheduled by the Bankruptcy Court, and all parties in interest will be served notice of the time, date, and location of the Confirmation Hearing once scheduled. The Confirmation Hearing may be adjourned from time to time without further notice.

**K.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any Person acquiring property under a plan of reorganization, any creditor or interest holder of a debtor, and any other Person or entity as may be ordered by the bankruptcy

23

court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**L.     What are the sources of Cash and other consideration required to fund the Amended Plan?**

The Reorganized Debtors shall fund distributions under the Amended Plan with (a) the issuance and distribution of New Common Stock; (b) distribution of the New Warrants; (c) CVRs; (d) proceeds of the New Debt; (e) Reorganized S.A. Common Stock and (f) Cash on hand.

**M.     Are there risks to owning the New Common Stock upon emergence from chapter 11?**

Yes.  *See* Article IX of this Disclosure Statement, entitled "Risk Factors."

**N.     Is there potential litigation related to the Amended Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Amended Plan as well.   Objections potentially could give rise to litigation. *See* Article IX.C.6 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Amended Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Amended Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Amended Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Amended Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article IX.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Amended Plan."

On March 31, 2021, SES filed *SES Americom, Inc.'s Objection to Debtors' Motion for Approval of the Disclosure Statement* [Docket No. 1752] (the "SES Disclosure Statement Objection").  The SES Disclosure Statement Objection asserts, among other things, that the Original Plan was unconfirmable because, among other things it: (a) was not proposed in good faith; (b) fails to satisfy the best interests of the creditors test; (c) improperly classifies SES's claim with other general unsecured claims; and (d) violates the absolute priority rule.  Additionally, SES has alleged that the Original Plan was unconfirmable because, SES alleges, (a) that management of the Company has conflicts of interest with respect to US LLC, (b) because of such alleged conflicts of interest, US LLC should have appointed a special committee to investigate and take actions with respect to Conflicts Matters, and (c) the board of directors of US LLC breached its fiduciary duties to its stakeholders.  Additionally, SES has asserted that it believes its asserted claim should be allowed in full against each Debtor, and placed into its own class because it is not substantially similar to other unsecured claims against the Debtors.  If SES's claim were allowed and placed into its own class, SES argues that it may render the Amended Plan unconfirmable in the event that SES votes to reject the Amended Plan.

On April 7, 2021, the Convert Ad Hoc Group filed its *Omnibus Objection of Ad Hoc Group of Convertible Noteholders to Debtors' Motions (I) for Disclosure Statement Approval and Related Relief and (II) to Extend Exclusivity* [Docket No. 1808] (the "Convert Ad Hoc Group's Disclosure Statement Objection").  The Convert Ad Hoc Group's Disclosure Statement Objection asserts, among other things, that the Original Plan was unconfirmable because, as it alleges, (a) conflicts of interests exist and (b) the settlements contemplated in the Amended Plan are improper.  Additionally, the Convert Ad Hoc Group has

24

asserted that it believes that a plan cannot be confirmed at Intelsat S.A. without its constituents voting to accept it.

The Debtors believe that the arguments regarding the confirmability of the Amended Plan asserted by SES and the Convert Ad Hoc Group lack merit, and the Debtors intend to prove that the Amended Plan satisfies the requirements of applicable law and is confirmable at the Confirmation Hearing. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. If the Bankruptcy Court disagrees with the Debtors' position, the Amended Plan may not be confirmed.

On February 5, 2021, the Convert Ad Hoc Group filed the *Motion of Ad Hoc Group of Convertible Noteholders for Entry of an Order: (I) Granting Standing to Prosecute Intercompany Claims on Behalf of Debtor Intelsat S.A.; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [Docket No. 1439] (the "Standing Motion"). The Standing Motion asserts, among other things, that (a) the Convert Ad Hoc Group should be granted standing to prosecute a proposed adversary complaint on behalf of the estate of Intelsat S.A., alleging that Jackson is not entitled to the Accelerated Relocation Payments and Intelsat S.A. is entitled to such Accelerated Relocation Payments; (b) the Convert Ad Hoc Group should be granted limited authority to settle intercompany claims; and (c) the automatic stay should be modified to allow the Convert Ad Hoc Group to prosecute the claims in their proposed adversary proceeding.

On March 3, 2021, SES filed its *Motion (I) To Intervene in the Accelerated Relocation Payments Litigation and/or (II) For Derivative Standing to Prosecute Intercompany Claims on Behalf of Debtor Intelsat US LLC* [Docket No. 1552] (the "Intervention Motion"). By the Intervention Motion, SES seeks either to (a) intervene in the "accelerated relocation payments litigation," initiated by the Convert Ad Hoc Group in the Standing Motion or (b) obtain standing to prosecute claims on behalf of Intelsat US LLC ("US LLC"). Specifically, SES seeks standing to prosecute claims that US LLC is entitled to receipt of the Accelerated Relocation Payments—not Intelsat S.A., as asserted by the Convert Ad Hoc Group, or as was determined by the Debtors.

Because the Standing Motion and the Intervention Motion challenge which Debtor entities are entitled to the Accelerated Relocation Payments that was embodied in the Original Plan, the Debtors believed that it would be most appropriate to consider such matters in the appropriate context—at confirmation. Accordingly, the Debtors filed a motion (the "Scheduling Motion") [Docket No. 1568] seeking to adjourn those matters until June 14, 2021, in conjunction with confirmation of the Original Plan. On March 15, 2021, the Bankruptcy Court granted the Scheduling Motion and entered an order [Docket No. 1630] adjourning the Standing Motion and Intervention Motion to June 14, 2021 and establishing a related schedule for discovery and other pre-trial matters related to the Standing Motion and Intervention Motion. Consistent with the prior scheduling order, the Convert Ad Hoc Group and SES agreed to modify the discovery and trial schedule to remain consistent with the schedule for confirmation of the Amended Plan. To do so, on June 3, 2021, the Debtors, with the consent of the Convert Ad Hoc Group and SES, filed the *Notice of Modified Dates Relating to the Standing Motion and the Intervention Motion* [Docket No. 2291], which adjourned, without dates, the pre-trial schedule and trial schedule for the Standing Motion and the Intervention Motion until a mutually agreeable pre-trial schedule and future trial date is proposed, at or before the hearing on the adequacy of this Disclosure Statement.

In addition, as described in further detail in sections VII.E and VIII.L herein, numerous pleadings have been filed on account of certain Guarantee Claims, which could have a material impact on voting and recovery under any chapter 11 plan. Certain of the parties to litigation regarding the Guarantee Claims have reached an agreement regarding a standstill of certain litigation regarding the Guarantee Claims, but certain of the Guarantee Claims remain subject to an ultimate resolution. If certain of the Guarantee Claims are fully allowed recoveries of Holders of Claims against some or all of the Parent Guarantors could be diluted.

25

**O.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Amended Plan?**

The Management Incentive Plan (the "MIP") shall provide for terms consistent with the Management Incentive Plan Term Sheet (the "MIP Term Sheet").

As described more fully in the MIP Term Sheet, the MIP will be subject to the following key terms:

- The MIP equity pool (the "MIP Pool") will consist of shares of New Common Stock representing 3.26 percent of New Common Stock as of the Effective Date, determined on a fully diluted and fully distributed basis (*i.e.*, assuming conversion of all outstanding convertible securities and full distribution of the MIP Pool and hereinafter referred to as "Fully Diluted Basis"), and the long-term cash incentive pool will provide for $18 million in long-term cash incentive awards (the "Cash LTIP Pool").

- On the Effective Date, the Equity Issuer will grant (i) a number of restricted stock units ("RSUs") and performance stock units ("PSUs") collectively representing 2.32% of New Common Stock at target as of the Effective Date and determined on a Fully Diluted Basis (with such RSUs and PSUs having the potential to collectively represent up to 2.99% of New Common Stock as of the Effective Date and determined on a Fully Diluted Basis, if such PSUs vest at their maximum), and (ii) a portion of the Cash LTIP Pool in the form of long term cash incentive awards.

- The eight most senior executives of the Company (the "Management Committee") will receive emergence grants representing approximately 1.32 percent of New Common Stock at target as of the Effective Date and determined on a Fully Diluted Basis (with such RSUs and PSUs having the potential to collectively represent up to 1.99% of New Common Stock as of the Effective Date and determined on a Fully Diluted Basis, if such PSUs vest at their maximum), with the emergence grants (i) 50% in the form of RSUs and (ii) 50% in the form of PSUs. Other key employees will receive (i) emergence grants representing approximately 1.00 percent of New Common Stock as of the Effective Date on a Fully Diluted Basis consisting of 100 percent RSUs, and (ii) long-term cash incentive awards. The portion of the MIP Pool that has not previously been granted and all shares of New Common Stock subject to the emergence grants or subsequent awards that have been forfeited before vesting may be granted following the Effective Date, in the form of RSUs or PSUs (or their full value equivalent), at the discretion of and on terms and conditions determined by the board of the Equity Issuer or the compensation committee thereof.

- RSUs and long-term incentive cash awards will vest in equal 33⅓ percent installments on each of the first three anniversaries of the Effective Date, and the PSUs will vest upon an Exit Event (as described in definitive documentation governing the MIP) based on the equity value of the Equity Issuer achieved as of the Exit Event, as follows:  (a) if the equity value of the Equity Issuer is $4,350,000,000, 50 percent of the target number of PSUs will vest; (b) if the equity value of the Equity Issuer is $7,250,000,000 or more, 200 percent of the target number of PSUs will vest; and (c) if the equity value of the Equity Issuer is in between $4,350,000,000 and $7,250,000,000, the percentage of the target number of PSUs that vests will be determined using straight-line interpolation. Notwithstanding anything to the contrary in the foregoing, if no Exit Event occurs prior to the fourth anniversary of the Effective Date, the equity value of the Equity Issuer will be measured on each of the fourth and fifth anniversaries of the Effective Date (each, a "Valuation Event"), and the PSUs will vest in accordance with the framework set forth above based on the equity value of the Equity Issuer as of such Valuation Events.

26

- Upon a qualifying termination (*i.e.*, a termination of employment (x) by the Company without "cause," (y) due to the participant's death or "disability" or (z) by the participant for "good reason," solely to the extent the participant is party to an employment agreement with a "good reason" concept), emergence grants will vest in accordance with the terms specified in the MIP Term Sheet.  For qualifying terminations of members of the Management Committee prior to the third anniversary of the Effective Date, the next installment of RSUs will vest as of such participant's qualifying termination date.  If a Management Committee member's qualifying termination occurs within the first 18 months of the Effective Date, none of their PSUs will vest.  If a Management Committee member's qualifying termination occurs on or after the eighteen (18)-month anniversary of the Effective Date, such participant's PSUs will remain outstanding and eligible to vest upon the occurrence of an Exit Event or the Valuation Events, in each case, based on actual performance achieved in connection therewith, and the number of PSUs that will vest based on such performance achievement will be pro-rated, as described in the MIP Term Sheet.  In addition, the portion of the Management Committee members' qualifying termination emergence grants that remains unvested following the treatment set forth above will remain outstanding for six (6) months following their qualifying termination date (the "Tail Period") and eligible to vest upon the occurrence of an Exit Event during the Tail Period.  If an Exit Event occurs during the Tail Period, 100% of the their unvested emergence grants will vest upon such Exit Event, provided, that the percentage of PSUs that vests will be determined based on achievement of the performance criteria set forth above.  For qualifying terminations of other key employees of the Company that occur prior to the third anniversary of the Effective Date, the RSUs and long-term cash incentive awards will vest pro-rata as described in the MIP Term Sheet.  Upon any participant's qualifying termination that occurs following a "change in control," 100 percent of the participant's unvested emergence grants will accelerate and vest.

If you are a Holder of an Allowed Claim who receives New Common Stock or the New Warrants under the Amended Plan, the value of your New Common Stock or New Common Stock purchased pursuant to the New Warrants will be diluted by any New Common Stock distributed pursuant to the MIP.

**P.     How will the preservation of the Causes of Action impact my recovery under the Amended Plan?**

The Amended Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Amended Plan Supplement; and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than (1) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Amended Plan, including in Article VIII of the Amended Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date and (2) the Causes of Action released by the Debtors pursuant to the Settlement Agreement, following entry of the Settlement Order and upon the effective date of such Settlement Agreement.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Amended Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all**

available Causes of Action against it.  **The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Amended Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

**Q.    Will there be releases and exculpation granted to parties in interest as part of the Amended Plan?**

Yes, Article VIII of the Amended Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtor Releases, Third-Party Releases, and Exculpation provisions included in the Amended Plan are an integral part of the Debtors' overall restructuring efforts and are an essential element of the negotiations among the Debtors and various parties in interest in obtaining their support for the Amended Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Amended Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Further, the Amended Plan embodies a settlement of claims and causes of action between the Debtors and the parties to the Amended Plan Support Agreement and incorporates the settlement and releases in the Settlement.  To effectuate the settlement contemplated in the Settlement, the Settlement Agreement, and the Amended Plan Support Agreement and embodied in the Amended Plan, the Amended Plan includes Debtor and ~~third-party releases~~Third-Party Releases, an exculpation provision, and an injunction provision. These consensual release and exculpation provisions comply with the Bankruptcy Code and prevailing law because, among other reasons, they are the product of extensive good-faith, arm's-length negotiations, were material inducements for the Consenting Creditors to enter into the Amended Plan Support Agreement, the Settlement, and the settlement embodied in the Amended Plan, and are supported by the Debtors and the parties to the Amended Plan Support Agreement.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE AMENDED PLAN OR FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE AMENDED PLAN BY THE AMENDED PLAN OBJECTION DEADLINE (WHICH OBJECTION SHALL AUTOMATICALLY CONSTITUTE AN OPT OUT FROM THE RELEASES) WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION SET FORTH IN ARTICLE VIII OF THE AMENDED PLAN AGAINST THE DEBTORS AND THE RELEASED PARTIES.**

**IF YOU DO NOT TAKE ONE OF THE FOREGOING ACTIONS, YOU WILL BE DEEMED TO HAVE GIVEN THE THIRD PARTY RELEASE DESCRIBED IMMEDIATELY BELOW AND IN ARTICLE VIII.E OF THE AMENDED PLAN.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE AMENDED PLAN.**

The Debtors believe that the releases and exculpations in the Amended Plan are necessary and appropriate and meet the requisite legal standard.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Amended Plan are copied in pertinent part below.

28

1.  *Releases by the Debtors*

In addition to any release provided in the Settlement Order, effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, any intercompany transactions, the DIP Facility, the DIP Order, the Term Loan Facility, the First Lien Notes, the Senior Notes, the Indentures, the Chapter 11 Cases, the matters settled pursuant to the Settlement, including the Historical Intercompany Transaction Claims, Claims related to the Debtors' tax attributes, including the 2018 Reorganization Claims, the Accelerated Relocation Payment Claims, any preference, fraudulent transfer, or other avoidance, recovery, or preservation claim pursuant to sections 544, 547, 548, 550, or 551 of the Bankruptcy Code and applicable state and foreign laws, the Plan Support Agreement, the Secured Creditor Settlement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Disclosure Statement, the New Debt Documents, the Backstop Commitment Agreement, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the New Debt Documents, the Backstop Commitment Agreement, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan or (2) any retained Causes of Action. Notwithstanding anything in this Article VIII.D to the contrary, if the Plan Toggle Event occurs: (a) nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of (i) any TopCo Guarantee Claims or (ii) any Causes of Action against the TopCos that are not released pursuant to the Settlement; and (b) nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims. Nothing in this Article VIII.D shall operate to release, discharge, or enjoin any Entity's rights with respect to the Secured Creditor Claims

29

**Litigation (subject to the Debtors' obligations with respect to the Secured Creditor Settlement and the Secured Creditor Settlement Motion).**

### 2. *Third-Party Releases*

**Effective as of the Effective Date, in each case except for Claims arising under, or preserved by, the Plan, each Releasing Party (other than the Debtors or the Reorganized Debtors), in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the DIP Facility, the DIP Order, the Term Loan Facility, the First Lien Notes, the Senior Notes, the Indentures, the Chapter 11 Cases, the matters settled pursuant to the Settlement, including the Historical Intercompany Transaction Claims, Claims related to the Debtors' tax attributes, including the 2018 Reorganization Claims, the Accelerated Relocation Payment Claims, any preference, fraudulent transfer, or other avoidance, recovery, or preservation claim pursuant to sections 544, 547, 548, 550, or 551 of the Bankruptcy Code and applicable state and foreign laws, the Plan Support Agreement, the Secured Creditor Settlement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Disclosure Statement, the New Debt Documents, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the New Debt Documents, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations arising on or after the Effective Date of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan. Notwithstanding anything in this Article VIII.E to the contrary, if the Plan Toggle Event occurs: (a) nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of (i) any TopCo Guarantee Claims or (ii) any Causes of Action against the TopCos that are not released pursuant to the Settlement; and (b) nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims. Nothing in this Article VIII.E shall operate to release, discharge, or enjoin any Entity's rights with respect to the Secured**

**Creditor Claims Litigation (subject to the Debtors' obligations with respect to the Secured Creditor Settlement and the Secured Creditor Settlement Motion).**

### 3. *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Chapter 11 Cases, the Disclosure Statement, the New Debt Documents, the Backstop Commitment Agreement, the New Corporate Governance Documents, the New Warrants Agreements, the CVR Agreements, the Settlement, the Settlement Agreement, the Plan Support Agreement, the Secured Creditor Settlement, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 4. *Injunction*

In addition to any injunction provided in the Settlement Order, effective as of the Effective Date, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has filed a motion requesting the right to

31

**perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan. Notwithstanding the foregoing, all Entities are permanently enjoined and prohibited from taking any action (i) to adversely impact, reduce or diminish the Debtors' or Reorganized Debtors' net operating losses or other tax assets or attributes, or (ii) otherwise taking any action (including in the United States or any foreign jurisdiction) that is intended or is reasonably likely to directly or indirectly prevent, impede, hinder, adversely affect, and/or delay any of the Restructuring Transactions or any actions or efforts of the Debtors and Reorganized Debtors and/or their ability to consummate the Plan. Notwithstanding anything in this Article VIII.G to the contrary, if the Plan Toggle Event occurs: (a) nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of (i) any TopCo Guarantee Claims or (ii) any Causes of Action against the TopCos that are not released pursuant to the Settlement; and (b) nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims. Nothing in this Article VIII.G shall operate to release, discharge, or enjoin any Entity's rights with respect to the Secured Creditor Claims Litigation (subject to the Debtors' obligations with respect to the Secured Creditor Settlement and the Secured Creditor Settlement Motion).**

For more detail, *see* Article VIII of the Amended Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**R.      What impact does the Claims Bar Date have on my Claim?**

The Bankruptcy Court established September 9, 2020, at 5:00 p.m., prevailing Eastern Time, as the general Claims bar date (the "Bar Date") in the Chapter 11 Cases. Entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, must have filed proofs of claim on or before the Bar Date as, and to the extent, required by the Bar Date Order.

In accordance with Bankruptcy Rule 3003(c)(2), if any Person or Entity that is required, but failed, to File a Proof of Claim on or before the Bar Date: (1) such Person or Entity is forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a Proof of Claim with respect thereto); (2) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such Person or Entity will not receive any distribution in the Chapter 11 Cases on account of that Claim; and (4) such Person or Entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which proofs of claim are Filed on or before the Bar Date.

**S.      What is the deadline to vote on the Amended Plan?**

The Voting Deadline is October 18, 2021, at 5:00 p.m. (prevailing Eastern Time).

**T.      How do I vote for or against the Amended Plan?**

Detailed instructions regarding how to vote on the Amended Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote on the Amended Plan. For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your

32

ballot or a master ballot including your vote is **actually received** by the Debtors' Solicitation Agent, Stretto, **on or before the Voting Deadline, *i.e.*, October 18, 2021, at 5:00 p.m. prevailing Eastern Time**. *See* Article XI of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**U.  How do I opt out of the granting of releases?**

The ballots distributed to Holders of Claims or Interests that are entitled to vote on the Amended Plan contain an option to opt out of granting the releases.  You must check the box indicating your desire to opt out of granting the releases and return the ballot so that it is **actually received** by the Solicitation Agent **on or before the Voting Deadline, *i.e.*, October 18, 2021, at 5:00 p.m. prevailing Eastern Time**. Holders of Claims or Interests may also opt out of granting the releases by objecting to the Amended Plan releases before the Confirmation Objection Deadline of October 18, 2021, at 5:00 p.m. prevailing Eastern Time.

Holders of Claims or Interests that are not entitled to vote on the Amended Plan will receive an Opt Out Form, which must be signed and returned in the accompanying pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery so that it is **actually received** by the Solicitation Agent **on or before the Opt-Out Deadline, *i.e.*, October 18, 2021, at 5:00 p.m. prevailing Eastern Time**.

**V.  What is the effect of the Amended Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be liquidated or forced to go out of business. Following Confirmation, the Amended Plan will be consummated on the Effective Date.  Except as otherwise provided in the Amended Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Amended Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Amended Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On or after the Effective Date, and unless otherwise provided in the Amended Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Amended Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**W.  Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

The New Board shall be appointed pursuant to the terms of the Corporate Governance Term Sheet. Corporate governance for the Reorganized Debtors, including the New Corporate Governance Documents, shall be consistent with the Corporate Governance Term Sheet and section 1123(a)(6) of the Bankruptcy Code.

As set forth in the Amended Plan, to the extent known, the Debtors will disclose at or prior to the Confirmation Hearing the identity and affiliations of any person proposed to serve on the Equity Issuer Board.  The Equity Issuer Board shall include the CEO and shall be comprised of seven (7) members. *See* Am. Plan Art. IV.O.

As set forth in the Corporate Governance Term Sheet, which is attached as Exhibit E to the Amended Plan Support Agreement, which is attached as Exhibit G to the Amended Disclosure Statement, three (3) directors shall be designated by Pacific Investment Management Company LLC, one (1) director shall be designated by Appaloosa LP and related funds, one (1) director shall be designated by Davidson

Kempner Capital Management KLP, one (1) director shall be designated by CarVal Investors and related funds, and the then-serving Chief Executive Officer of the Reorganized Debtors shall serve as a director.

**X.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Amended Plan?**

If you have any questions regarding this Disclosure Statement or the Amended Plan, please contact the Debtors' Solicitation Agent, Stretto, via one of the following methods:

> *By mail or hand delivery at*:
> Stretto
> Attn: Intelsat S.A., et al., Ballot Processing
> c/o Stretto
> 410 Exchange, Suite 410
> Irvine, CA 92602
>
> *By electronic mail at*:
> Intelsatinquiries@stretto.com
>
> *By telephone (toll free) at*:
> (855) 489-1434
>
> *By telephone (international) at*:
> (949) 561-0347

Copies of the Amended Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Solicitation Agent at https://cases.stretto.com/intelsat (free of charge) or the Bankruptcy Court's website at http://www.vaeb.uscourts.gov (for a fee).

**Y.    Do the Debtors recommend voting in favor of the Amended Plan?**

Yes.  The Debtors believe that the Amended Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative.  The Debtors believe that the Amended Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Amended Plan.

**IV.    THE DEBTORS' PLAN**

**A.    The Amended Plan**

The Amended Plan contemplates, among other things, the payment in Cash in full of the DIP Claims, Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Secured Claims and Other Priority Claims from proceeds of the New Debt and Cash on hand.  In addition, the Amended Plan includes the following key terms:

1. *Issuance of New Common Stock*

The Equity Issuer will issue 96.0 percent of the authorized but unissued New Common Stock to Holders of Allowed Unsecured Claims Against Jackson and the Jackson Subsidiaries and 4.0 percent to Holders of Allowed Unsecured Claims Against ICF, each subject to dilution in accordance with the Dilution Principles set forth in the Amended Plan.

All of the shares or units of New Common Stock issued pursuant to the Amended Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Common Stock under the Amended Plan shall be governed by the terms and conditions set forth in the Amended Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the New Common Stock shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the New Common Stock on a recognized U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents.

2. *New Capital Structure*

Prior to the Effective Date, certain members of the Jackson Crossover Ad Hoc Group and HoldCo Creditor Ad Hoc Group, among others determined by the Jackson Crossover Ad Hoc Group with the reasonable consent of the Debtors (which consent is not to be unreasonably withheld, conditioned, or delayed), may backstop the New Term Loans and New Notes on terms set forth in a backstop commitment agreement, to be provided in advance of the Confirmation Hearing.  The New Capital Structure will provide for (i) $7.125 billion of the New Term Loans and New Notes and a revolving credit facility for up to $500 million of availability, which availability may be increased up to $750 million with the consent of the Required Consenting Jackson Crossover Group Members.

Prior to the Effective Date, the Debtors may use commercially reasonable efforts (including, for the avoidance of doubt, conducting a solicitation process for financing proposals that will provide superior economic terms to the terms to be set forth in the Backstop Commitment (as defined in the Amended Plan)) to secure commitments to fund the New Capital Structure.  The New Capital Structure may include a combination of the New Term Loan and/or New Notes, and may be secured by a lien on substantially all of the assets of the Reorganized Debtors and their subsidiaries.

The New Term Loans and New Notes shall be 100 percent backstopped by the Backstop Parties, and the Backstop Parties shall be obligated to fund the New Term Loans and New Notes in accordance with the terms and conditions of the Backstop Commitment Agreement.  Subject to, and in accordance with the Backstop Commitment Agreement, as consideration for the Backstop Commitments, the Backstop Parties shall receive a Backstop Premium, which will be payable on, and as a condition to, the Effective Date in Cash in amount equal to 2.5 percent of the aggregate amount of the New Term Loans and New Notes, and shall be fully earned on the Effective Date.

On the Effective Date, the net Cash proceeds of the New Term Loans and New Notes, as applicable, will be used to pay in full in Cash Allowed DIP Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, executory contract and unexpired lease Cure Claims, and other Claims, as and to the extent that any such Claims are required to be paid in Cash under this Plan, and distributed to Holders of Allowed Claims entitled to a Cash distribution in accordance with Article III of this Plan.

Confirmation of the Plan shall be deemed (a) approval of the New Revolver, New Term Loans, and New Notes, as applicable, and (b) authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents and agreements necessary or appropriate to pursue or obtain the New Revolver, New Term Loans, and issue the New Notes, as applicable, and incur and pay any fees and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to obtain the New Revolver and the New Term Loans and issue the New Notes, as applicable.

On the Effective Date, all Liens and security interests granted pursuant to, or in connection with the New Revolver, New Term Loans and/or New Notes, as applicable: (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable Liens on, and security interests in, the collateral securing the New Revolver, New Term Loans, and/or New Notes, as applicable, with the priorities established in respect thereof under applicable non-bankruptcy law, the Plan, and the Confirmation Order; and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the New Revolver, New Term Loans, and/or New Notes, as applicable, are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

The Debtors and Reorganized Debtors shall take all actions necessary to permit the New Notes to be eligible for resale under rule 144(a) of the Securities Act, and the Plan and Confirmation Order shall authorize all such action by the Debtors and Reorganized Debtors.

### 3. *General Settlement of Claims and Interests*

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

36

The Amended Plan Support Agreement incorporates the terms of Term Loan Claims Settlement, to be approved by the Bankruptcy Court pursuant to the Confirmation Order, and the Amended Plan incorporates the terms of the Settlement, each of which to be approved by the Bankruptcy Court pursuant to the Confirmation Order or a separate order approving the Settlement Agreement.

### 4. *CVRs*

On the Effective Date, the CVR Issuer will issue the CVRs only to the extent required to provide for distributions to the applicable Holders of Claims in exchange for their Claims pursuant to Article III.B of the Amended Plan. All of the CVRs issued pursuant to the Amended Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.

The CVRs shall have a term that shall automatically terminate on the earlier of (i) the date on which the holders of CVRs have received the maximum amount of distributions on the CVR permitted under the CVR Agreements and (ii) the later of (a) the Outside Date and (b) the date on which there is no obligation remaining pursuant to an Additional Acceleration Contract to pay Further Acceleration Payments to any Debtor or Reorganized Debtor or any of their respective Affiliate (as defined in the CVR Term Sheet). The CVRs shall entitle the holder of such CVRs to such holder's pro rata share of cash equal to 100 percent of the Initial Further Acceleration Payments or the Subsequent Further Acceleration Payments (each as defined in the CVR Term Sheet), as applicable. In the event that Jackson receives a Minimum Payment of $4,865,366,000 and the Debtors actually receive Further Acceleration Payments before the Effective Date, then the initial allocation of cash issued on the Effective Date shall be adjusted to provide certain holders of Allowed Claims the amount of cash they would have received had the CVRs been issued at the time that such Further Acceleration Payments were received. The CVRs shall survive any change of control transaction (including a sale of all or substantially all of the assets of the CVR Issuer).

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the CVRs shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the CVRs on a recognized U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents.

### 5. *New Warrants*

On the Effective Date, the Equity Issuer will issue 100.0 percent of the Series A Warrants and approximately 46.4 percent of the Series B Warrants to Holders of ICF Unsecured Claims, approximately 6.3 percent of the Series B Warrants to Holders of S.A. Unsecured Claims, and approximately 47.3 percent of the Series B Warrants to Holders of Envision Unsecured Claims. All of the New Warrants issued pursuant to the Amended Plan shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable. Any New Common Stock issued upon the exercise of the New Warrants shall be subject to dilution pursuant to the Dilution Principles and shall, when so issued and upon payment of the exercise price in accordance with the terms of the New Warrants, be duly authorized, validly issued, fully paid, and non-assessable.

The Reorganized Debtors (i) shall emerge from these Chapter 11 Cases as a private company on the Effective Date and the New Warrants (including any New Common Stock issued upon the exercise of the New Warrants) shall not be listed on a public stock exchange, (ii) shall not be voluntarily subjected to any reporting requirements promulgated by the SEC, and (iii) shall not be required to list the New Warrants (including any New Common Stock issued upon the exercise of the New Warrants) on a recognized

37

U.S. stock exchange, except, in each case, as otherwise may be required pursuant to the New Corporate Governance Documents.

### 6.  *Reorganized S.A. Common Stock*

The Confirmation Order shall authorize the issuance of the Reorganized S.A. Common Stock, as necessary, in one or more issuances without the need for any further corporate action, and the Debtors or Reorganized Debtors, as applicable, are authorized to take any action necessary or appropriate in furtherance thereof.  By the Effective Date for Debtor Intelsat, applicable Holders of Claims shall receive approximately 100 percent (subject to the extinguishment of Intelsat Interests) of shares or units of the Reorganized S.A. Common Stock in exchange for their Claims pursuant to Article III.B and consistent with the Restructuring Steps Memorandum.

All of the shares or units of Reorganized S.A. Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the Reorganized S.A. Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.  For the avoidance of doubt, the Reorganized S.A. Common Stock may constitute Interests in Intelsat, which may retain its Interests in Holdings SARL or take other actions under applicable nonbankruptcy law to retain any assets of Holdings SARL, except for Interests in Holdings, which may be owned by or become the Equity Issuer.

### 7.  *Releases*

Article VIII of the Amended Plan contains certain releases (as described more fully in Article IV.P of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Amended Plan?").

### 8.  *Secured Creditor Settlement*

**Settlement/Allowance**.  Pursuant to Bankruptcy Rule 9019, in settlement and compromise of any disputes between the certain of the Debtors and the Holders of the First Lien Claims regarding the allowance, classification and treatment of the First Lien Claims, the Debtors shall seek entry of an Order, which provides that the First Lien Claims are Allowed and settled as follows  (the settlement described herein, "Secured Creditor Settlement" and an order approving the Secured Creditor Settlement, the "Secured Creditor Settlement Order"):

(a)    8.00% First Lien Notes Claims Allowance:  Allowed against all of the obligors and guarantors under the 8.00% First Lien Notes Indenture in the amount equal to: (i) full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate (it being understood and agreed that until the Effective Date the Debtors shall continue to pay interest on the principal amount in accordance with the Final DIP Order); and (iii) $23,634,033.54 on account of prepayment premium and/or makewhole amounts payable under the 8.00% First Lien Notes Indenture (which amount represents 77% of the aggregate amount of any prepayment premium and/or makewhole amounts payable under the 8.00% First Lien Notes Indenture, along with interest thereon at the contractual rate, through the Effective Date)[11]

---

[11]    This amount assumes an Effective Date of 12/31/21, and the interest component thereof is subject to change based on actual Effective Date.

(the "Settled/Allowed 8.00% First Lien Notes Claims").  In the event the Secured Creditor Settlement Order is not entered or does not remain in effect, 8.00% First Lien Notes Claims shall be allowed in an amount equal to:  (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through and including the Effective Date at the contractual rate; and (iii) such additional amounts as many be determined in a Final Order sufficient to render the 8.00% First Lien Notes Claims Unimpaired.  For the avoidance of doubt, in the event that the Secured Creditor Settlement Order is not entered or does not remain in effect, the 8.00% First Lien Notes Claims shall be treated as Unimpaired and holders of 8.00% First Lien Notes Claims shall not be bound by the Secured Creditor Settlement and shall be entitled to seek allowance in full of their 8.00% First Lien Notes Claims in an amount sufficient to render the 8.00% First Lien Notes Claims Unimpaired, including to seek interest (at the contractual rate) on, or as part of, such Claims until such Claims are paid in full, and all parties' rights are reserved in connection with any such litigation.

(b)     8.00% First Lien Notes Claims Treatment:  Except to the extent that a Holder of a Settled/Allowed 8.00% First Lien Notes Claim agrees to less favorable treatment of its Settled/Allowed 8.00% First Lien Notes Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Settled/Allowed 8.00% First Lien Notes Claim, each Holder of a Settled/Allowed 8.00% First Lien Notes Claim shall receive payment in full in Cash of its Pro Rata share of (x) the full amount of all First Lien Notes Claims as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; provided, however, that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the Holders of Allowed 8.00% First Lien Notes Claims as Unimpaired and the Holders of Allowed 8.00% First Lien Notes Claims shall receive payment in full, in Cash of: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including all premium or makewhole amounts, and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render such 8.00% First Lien Notes Claims Unimpaired (and, for the avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the First Lien Notes Claims Unimpaired shall be expressly reversed and preserved),, with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; provided, further, however, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; provided, further, however, for the avoidance of doubt, no distributions to Holders of Settled/Allowed 8.00% First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos.

(c)     9.50% First Lien Notes Claims Allowance: Allowed against all of the obligors and guarantors under the 9.50% First Lien Notes Indenture in the amount equal to: (i) full

39

outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate (it being understood and agreed that until the Effective Date the Debtors shall continue to pay interest on the principal amount in accordance with the Final DIP Order); and (iii) $91,536,911.35 on account of prepayment premium and/or makewhole amounts payable under the 9.50% First Lien Notes Indenture (which amount represents 77% of the aggregate amount of any prepayment premium and/or makewhole amounts payable under the 9.50% First Lien Notes Indenture, along with interest thereon at the contractual rate, through the Effective Date)12 (the "Settled/Allowed 9.50% First Lien Notes Claims" and, together with the Settled/Allowed 9.50% First Lien Notes Claims, the "Settled/Allowed First Lien Notes Claims").  In the event the Secured Creditor Settlement Order is not entered or does not remain in effect, 9.50% First Lien Notes Claims shall be allowed in an amount equal to: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through and including the Effective Date at the contractual rate; and (iii) such additional amounts as many be determined in a Final Order sufficient to render such 9.50% First Lien Notes Claims Unimpaired.  For the avoidance of doubt, in the event that the Secured Creditor Settlement Order is not entered or does not remain in effect, the 9.50% First Lien Notes Claims shall be treated as Unimpaired and holders of 9.50% First Lien Notes Claims shall not be bound by the Secured Creditor Settlement and shall be entitled to seek allowance in full of their 9.50% First Lien Notes Claims in an amount sufficient to render the 9.50% First Lien Notes Claims Unimpaired, including to seek interest (at the contractual rate) on, or as part of, such Claims until such Claims are paid in full, and all parties' rights are reserved in connection with any such litigation.

(d)     9.50% First Lien Notes Claims Treatment:  Except to the extent that a Holder of a Settled/Allowed 9.50% First Lien Notes Claim agrees to less favorable treatment of its Settled/Allowed 9.50% First Lien Notes Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Settled/Allowed 9.50% First Lien Notes Claim, each holder of a Settled/Allowed 9.50% First Lien Notes Claim shall receive payment in full in Cash of its Pro Rata share of (x) the full amount of all First Lien Notes Claims as compromised in accordance with the Secured Creditor Settlement, if the Secured Creditor Settlement Order has been entered and remains in effect as of the Effective Date, subject to recoupment and reduction, or supplementation and increase, in the payment of the amounts specified in clause (iii) below in the event and to the extent of entry of a subsequent Final Order inconsistent with the Secured Creditor Settlement Order, or (y) as otherwise set forth in a Final Order, if the Secured Creditor Settlement Order has not been entered or does not remain in effect as of the Effective Date; provided, however, that for the avoidance of doubt, to the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), the Plan shall be deemed to be amended so as to treat the Holders of Allowed First Lien Notes Claims as Unimpaired and the Holders of Allowed First Lien Notes Claims shall receive payment in full, in Cash of: (i) the full outstanding principal amount; (ii) any accrued and unpaid interest on the principal amount through the Effective Date at the contractual rate; and (iii) such additional amounts (including all premium or makewhole amounts and any contractual or other interest thereon), if any, as may be determined in a Final Order sufficient to render such 9.50% First Lien Notes Claims Unimpaired (and, for the

---

12    This amount assumes an Effective Date of 12/31/21, and the interest component thereof is subject to change based on actual Effective Date.

avoidance of doubt, all parties' (other than the Debtors and the Reorganized Debtors) rights in respect of the additional amounts necessary to render the 8.00% First Lien Notes Claims Unimpaired shall be expressly reserved and preserved), with the payment of the amounts specified in clauses (i) and (ii) to occur on the Effective Date and the payment of the amounts specified in clause (iii) to occur as soon as practicable after entry of the Final Order; *provided, further, however*, that in no event shall the amounts specified in clauses (i) and (ii) be subject to recoupment and reduction, or supplementation and increase; *provided, further, however*, for the avoidance of doubt, no distributions to Holders of Settled/Allowed 9.50% First Lien Notes Claims shall be made out of the deposit accounts of the HoldCos.

(e)     First Lien Notes Claims Classification:  Each of the 8.00% First Lien Notes Claims and 9.50% First Lien Notes Claims shall be separately classified under the Plan from other First Lien Claims.  The 8.00% First Lien Notes Claims and 9.50% First Lien Notes Claims shall be Impaired and entitled to vote to accept or reject the Plan.

**Settlement/Allowance of Term Loan Facility Claims:**  Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 1123(b)(3), in settlement and compromise of any disputes regarding the allowance, classification, and treatment of the Term Loan Facility Claims, the Plan shall provide that Term Loan Facility Claims are Allowed and settled as follows:

(a)     Term Loan Facility Claims Allowance:  Allowed against all of the obligors and guarantors under the Term Loan Facility in the amount equal to: (i) full outstanding principal amount; (ii) any accrued interest through the Effective Date at the contractual rate applicable to ABR Loans (in the case of Tranche B-3 Term Loans and Tranche B-4 Term Loans) and applicable to Fixed Rate Loans (in the case of Tranche B-5 Term Loans); and (iii) 90% of the accrued default interest through the Effective Date on the ABR Loans and Fixed Rate Loans (the "Settled/Allowed Term Loan Facility Claims").  Any payments of interest made during the Chapter 11 Cases are characterized as payments of allowed interest.

(b)     Term Loan Facility Claims Treatment: Except to the extent that a Holder of a Settled/Allowed Term Loan Facility Claim agrees to less favorable treatment of its Settled/Allowed Term Loan Facility Claim, on the Effective Date, in settlement and compromise of any disputes regarding the allowance, classification and treatment of Term Loan Facility Claims, each holder of a Settled/Allowed Term Loan Facility Claim shall receive payment in full in Cash solely to the extent of its Settled/Allowed Term Loan Facility Claim; provided, however, for the avoidance of doubt, no distributions to holders of Settled/Allowed Term Loan Facility Claims shall be made out of the deposit accounts of the HoldCos.

(c)     Term Loan Facility Claims Classification:  The Term Loan Facility Claims shall be separately classified under the Plan from other First Lien Claims.  Term Loan Facility Claims shall be Impaired and entitled to vote to accept or reject the Plan.

Pursuant to the Amended Plan Support Agreement, the Jackson Crossover Ad Hoc Group shall be permitted to prosecute the Secured Creditor Claims Litigation (as defined in the Amended Plan Support Agreement), and challenge or contest the First Lien Notes Claims Settlement or the treatment of the First Lien Notes Claims on any basis (it being understood and agreed that the full amount of principal and all accrued but unpaid interest at the applicable contract rates on the First Lien Notes are, in all circumstances, Allowed and not subject to any dispute and shall be paid in full in Cash on the Effective Date).  Additionally, pursuant to the Amended Plan Support Agreement, the Debtors shall be required to support the Secured

41

Creditor Settlement, including by (i) filing the Secured Creditor Settlement Motion within fourteen (14) days of the effective date of the Amended Plan Support Agreement, seeking approval of the Secured Creditor Settlement Motion at the Confirmation Hearing, (ii) objecting to any request not to have the Secured Creditor Settlement Motion approved at the Confirmation Hearing (iii), objecting to or defending against any Secured Creditor Claims Litigation, and (iv) seeking approval of the Term Loan Facility Claims Settlement in connection with Confirmation of the Plan.  The Jackson Ad Hoc Group and the First Lien Noteholders Group shall be permitted to support and/or prosecute the Secured Creditor Settlement. Additionally, the rights of all parties (including the Jackson Ad Hoc Group, the First Lien Noteholders Group, the Jackson Crossover Ad Hoc Group, and the Creditors' Committee) to appeal any order entered in respect of the Secured Creditor Claims Litigation (including in respect of the allowed amount or treatment of the First Lien Claims or related to the Secured Creditor Settlement) shall be expressly reserved and preserved; *provided, however*, that the Debtors and Reorganized Debtors, as applicable, shall (a) defend any appeal of the Secured Creditor Settlement Order or (b) appeal and support the reversal on appeal of an order denying approval of the Secured Creditor Settlement; *provided, further, however*, that such appeal of the Secured Creditor Claims Order shall not seek to stay the Confirmation Order or otherwise stay consummation of the Plan.

### 9. *Implementation of Settlement of Certain Debtor Intercompany Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Amended Plan incorporates the Settlement set forth in the Settlement Agreement and as shall be approved by the Settlement Order (which may be the Confirmation Order).  In consideration for the distributions and other benefits provided pursuant to the Settlement Agreement and the Amended Plan, the provisions of the Settlement Agreement and the Amended Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a party to the Settlement Agreement may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

### 10. *Guarantee Claims Standstill*

Pursuant to the Amended Plan Support Agreement, the Jackson Crossover Group will not seek entry of an order allowing a HoldCo Guarantee Claim (whether on a temporary or final basis), or seek a distribution from any of the HoldCo Guarantors on account of any HoldCo Guarantee Claims, and neither the HoldCo Creditor Ad Hoc Group nor any Company Party shall prosecute any objection or participate in any challenge to the Guarantee Claims, in each case at any time when (1) the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group (in each case in a percentage amount required for the effectiveness of the Amended Plan Support Agreement pursuant to Section 2 of the Amended Plan Support Agreement) are parties to the Amended Plan Support Agreement or a plan support agreement that provides (a) treatment for Jackson Senior Notes Claims against all Debtors that is no less favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement and (b) treatment for the HoldCo Senior Notes Claims that is no more favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement, and (2) no plan of reorganization has been filed by any person or entity having a right to file a plan that (a) provides treatment to Jackson Senior Notes Claims against any Debtor that is less favorable than the treatment of such claims specified in the Amended Plan Support Agreement or (b) provides treatment to any HoldCo Senior Notes Claim that is more favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement; *provided*, that this clause (2) shall not apply to any plan filed by the Jackson Crossover Ad Hoc Group.

Pursuant to the Plan Support Agreement, to the extent that the conditions in the preceding paragraph (the "Standstill Conditions") cease to exist at any time before the Bankruptcy Court enters the Confirmation Order, the HoldCo Creditor Ad Hoc Group and the Debtors agree that they will consent to and support the

adjournment of the Confirmation Hearing by twenty-one (21) days to permit the Jackson Crossover Ad Hoc Group to seek the temporary allowance for voting purposes of the Guarantee Claims (and with such period to be extended solely to the extent necessary for any requisite solicitation to occur following the Bankruptcy Court's ruling with respect to such temporary allowance, including with respect to the HoldCo Guarantee Claims) before the Confirmation Hearing commences or resumes, as applicable; *provided*, that nothing in this paragraph shall prevent or limit the Jackson Crossover Ad Hoc Group from immediately seeking any relief with respect to the Guarantee Claims at any time after the Standstill Conditions cease to exist.

Nothing in the Amended Plan Support Agreement shall prevent the Jackson Crossover Ad Hoc Group from (1) seeking entry of an order allowing a Guarantee Claim (whether on a temporary or final basis) against, or seeking a distribution from, the TopCo Guarantors or (2) defending any Guarantee Claim asserted against the HoldCo Guarantors or TopCo Guarantors against objections or challenges from any party; *provided* that (i) any hearing regarding the merits of any Guarantee Claim against any TopCo Guarantor shall occur contemporaneously with the Confirmation Hearing, and in no event shall any such hearing occur prior to the Confirmation Hearing, (ii) no hearing regarding the merits of any Guarantee Claim against any HoldCo Guarantor may occur until after the Confirmation Hearing (except as provided in Section 7.05(h)), and (iii) the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Company Parties (as defined in the Amended Plan Support Agreement) will each support the Bankruptcy Court's entry of the Guarantee Litigation Scheduling Order.

Pursuant to the Amended Plan Support Agreement, in the event (x) any hearing, other than the September 1, 2021 hearing scheduled pursuant to the Initial Guarantee Litigation Scheduling Stipulated Order, concerning the merits or temporary allowance of any Guarantee Claim is scheduled by the Bankruptcy Court for a date prior to the Confirmation Hearing or (y) the Bankruptcy Court does not enter the Guarantee Litigation Scheduling Order prior to the commencement of the Disclosure Statement Hearing, then (1) the standstill provided in the Amended Plan Support Agreement shall automatically terminate, (2) the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group shall each be permitted to take any and all actions with respect to the Guarantee Claims as each may deem appropriate (including, for the avoidance of doubt, participating in any hearing or briefing with respect to such hearing) concerning the merits or temporary allowance of any Guarantee Claim that is set to occur on or prior to the Confirmation Hearing, (3) the Required Consenting Jackson Crossover Group Members and Required Consenting HoldCo Creditors may each terminate the Amended Plan Support Agreement, *provided*, that the Required Consenting Jackson Crossover Group Members and Required Consenting HoldCo Creditors may only terminate the Amended Plan Support Agreement within 7 days (except as may be extended by the Required Consenting Unsecured Creditors) of: (i) the time at which a hearing concerning the merits or temporary allowance of any Guarantee Claim is scheduled by the Bankruptcy Court for a date prior to the Confirmation Hearing; (ii) the time that the Bankruptcy Court determines that it will not enter the Guarantee Litigation Scheduling Order; or (iii) the occurrence of the Disclosure Statement Hearing without the Bankruptcy Court having previously entered the Guarantee Litigation Scheduling Order; and (4) upon such termination of the Amended Plan Support Agreement by either the Required Consenting Jackson Crossover Group Members or the Required Consenting HoldCo Creditors pursuant to clause (3) of this sentence, the Debtors shall (A) immediately amend the Plan (and the Non-TopCo Plan) to provide that the Guarantee Claims shall not be (i) released or waived against any Guarantor unless consented to in writing by the Required Consenting Jackson Crossover Group Members or (ii) Allowed in any amount against any HoldCo unless consented to in writing by the Required HoldCo Creditors or otherwise ordered by the Bankruptcy Court or other court of competent jurisdiction, and (B) make any other amendments to the Plan (and the Non-TopCo Plan) necessary to effectuate the amendments in the foregoing clauses (i) and (ii) and to ensure that the Plan does not prejudice either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group's rights and defenses with respect to the Guarantee Claims (including the right to seek a disputed claims reserve with respect to the Guarantee Claims). For the avoidance of doubt, the

amendments to the plan contemplated by clause (4) of the preceding sentence, under the circumstances contemplated therein, are hereby consented to by the Parties to the Amended Plan Support Agreement.

Pursuant to the Amended Plan Support Agreement, notwithstanding anything to the contrary therein, it shall not be a violation of the Standstill Conditions, and each Party shall otherwise be entitled under the Amended Plan Support Agreement, to take any actions and make any filings with the Bankruptcy Court necessary to comply with the Initial Guarantee Claims Litigation Stipulation unless or until the Guarantee Claims Litigation Order is entered by the Bankruptcy Court.

No ruling, order, or judgment issued by any court with respect to an objection or challenge by another party to the TopCo Guarantee Claims, or with respect to a motion for temporary allowance of the TopCo Guarantee Claims, in which the HoldCo Creditor Ad Hoc Group is prevented by Section 7.05 of the Amended Plan Support Agreement from participating, shall have res judicata, collateral estoppel, or any other precedential effect against either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group in any proceeding seeking to enforce or challenge the HoldCo Guarantee Claims.

Pursuant to the Amended Plan Support Agreement, all Guarantee Claims against the HoldCo Guarantors will be withdrawn with prejudice and are not entitled to any distribution under the Plan (or the Non-TopCo Plan, as applicable) and will be released on the Effective Date; provided, that, this condition shall not be required to be satisfied, and the Plan shall be automatically amended to remove this condition, if, at the time of entry of the Confirmation Order or prior thereto, either of the following events have occurred: (a) Consenting Creditors that hold at least two-thirds (2/3) of the ICF Connect Senior Notes (excluding any Connect Senior Notes held by the Debtors) cease to be party to this Agreement or (b) the Required Consenting HoldCo Creditors have terminated this Agreement.  For the avoidance of doubt, the TopCo Guarantee Claims shall not be withdrawn, enjoined, or released on the Effective Date.

During the effective period of the Amended Plan Support Agreement, all Consenting Creditors shall use reasonable best efforts to direct the Trustees to support the Guarantee Litigation Scheduling Order and the matters set forth in Section 7.05 of the Amended Plan Support Agreement, provided that this shall not require any Consenting Creditor to provide any indemnification to, or incur any other out-of-pocket cost to, any Trustee.

The Debtors shall not settle, seek to settle, or support any settlement of, any Guarantee Claim without the prior written consent of the Required Consenting Unsecured Creditors; *provided, however*, that the Required Consenting HoldCo Creditors shall be deemed to consent to any such settlement at any time after the HoldCo Guarantee Claims have been withdrawn with prejudice.

Pursuant to the Amended Plan, upon the occurrence of the Effective Date, (i) each Holder of an Allowed TopCo Guarantee Claim against Holdings SARL shall receive its Pro Rata share of the Holdings SARL Unsecured Recovery and each Holder of an Allowed TopCo Guarantee Claim against Intelsat S.A. shall receive its Pro Rata share of the S.A. Unsecured Recovery as applicable; and (ii) 30 percent of any distributions made on account of TopCo Guarantee Claims against Intelsat to the Jackson Senior Notes Trustees shall be distributed Pro Rata to Holders of Connect Senior Notes Claims in consideration for the covenants, compromises, releases, and other benefits provided by the members of the HoldCo Creditor Ad Hoc Group pursuant to the Amended Plan Support Agreement; *provided* that the aggregate value of such distribution shall not exceed $6 million.

### 11. *Management Incentive Plan*

On the Effective Date, the Equity Issuer shall institute the MIP, enact and enter into related policies and agreements, and distribute the New Common Stock to participants consistent with the terms and allocations set forth in the MIP Term Sheet; *provided* that the form and substance of the Management

44

Incentive Plan shall be consistent with the PSA Definitive Document Requirements.  The Required Consenting Jackson Crossover Group Members and the Debtors shall negotiate the terms of the definitive MIP documentation in good faith prior to the Effective Date.

### 12. *Restructuring Expenses*

Pursuant to Amended Plan, Restructuring Expenses means, collectively, the reasonable and documented fees and expenses, whether incurred before, on, or after the Effective Date, of (a) the Jackson Ad Hoc Group (including all fees and expenses of Akin Gump Strauss Hauer & Feld LLP (including, for an avoidance of doubt, whether incurred before, on, or after the Effective Date, all fees and expenses related to any Secured Creditor Claims Litigation and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation) and Centerview Partners), the First Lien Noteholders Group (including all fees and expenses of Wilmer Cutler Pickering Hale and Dorr, LLP (including, for an avoidance of doubt, whether incurred before, on, or after the Effective Date, all fees and expenses related to any Secured Creditor Claims Litigation and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation)), (b) the Jackson Crossover Ad Hoc Group (including all fees and expenses of the Jackson Crossover Ad Hoc Group Advisors (including, for the avoidance of doubt, whether incurred before, on, or after the Effective Date, (x) all fees and expenses related to any Secured Creditor Claims Litigation, and any subsequent litigation related to the Claims that are the subject of the Secured Creditor Claims Litigation, or the Guarantee Claims, and (y) fees and expenses set forth in the Houlihan Engagement Letter)), (c) the HoldCo Creditor Ad Hoc Group (including all fees and expenses of the HoldCo Creditor Ad Hoc Group Advisors), and (d) the professionals to be paid by the Company Parties pursuant to the Plan Support Agreement or as adequate protection pursuant to the DIP Order.

In particular, the fees and expenses of the Jackson Ad Hoc Group, the First Lien Noteholders Group, the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group, including professionals retained for these Chapter 11 Cases are being paid as a component of the cumulative consideration agreed to by the parties in the Amended Plan Support Agreement.  Payment of Restructuring Expenses is an integral component of the overall deal struck among the Debtors and the Consenting Creditors and is consistent with numerous other chapter 11 cases where comparable professional fees and expenses were paid by the estates of chapter 11 debtors as consideration for supporting a restructuring support agreement and a plan.  Further, the Debtors have already been authorized and directed to pay a significant portion of the Restructuring Expenses, including certain reasonable and documented fees of the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group, by the Bankruptcy Court pursuant to the Final DIP Order.

### 13. *Indenture Trustee Fees*

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall pay in Cash all reasonable and documented unpaid Indenture Trustee Fees that are required to be paid under the Indentures. From and after the Effective Date, the Reorganized Debtors shall pay in Cash all reasonable and documented Indenture Trustee Fees, including, all Indenture Trustee Fees incurred in connection with distributions made pursuant to the Amended Plan or the cancellation and discharge of the Notes or the Indentures.

If the Debtors dispute any requested Indenture Trustee Fees, the Debtors or Reorganized Debtors, as applicable, shall (1) pay the undisputed portion of Indenture Trustee Fees and (2) notify the applicable Indenture Trustee of such dispute within ten (10) Business Days after presentment of the invoices by the applicable Indenture Trustee.  Upon such notification, the applicable Indenture Trustee may submit such dispute for resolution by the Bankruptcy Court; *provided*, *however*, that the Bankruptcy Court's review shall be limited to a determination under the reasonableness standard in accordance with the applicable Indenture.  Nothing herein shall in any way affect or diminish the right of the Indenture Trustees to exercise

their respective Indenture Trustee Charging Liens against distributions on account of the Notes Claims with respect to any unpaid Indenture Trustee Fees, as applicable.

### 14. *Treatment of Employee and Retiree Benefits*

As of the Petition Date, the Debtors maintain the Retiree Medical Plans for the benefit of certain retired former employees (the "Retirees") to provide continued access to health and welfare benefits coverage.  As of July 2001, the Retiree Medical Plans were closed to new entrants.  Certain benefits under the Retiree Medical Plans are provided under plan documents adopted by the Debtors, and the remaining Retirees receive benefits pursuant to a 2007 consent decree entered as a result of a settlement reached by the Debtors and certain retired former employees in *Morales et al. v. Intelsat Global Service Corp.*, 04-cv-1044 (D. D.C.) (the "Consent Decree").  The Consent Decree incorporates by reference a benefits plan document (the "Consent Plan").

The Consent Plan permits Intelsat to periodically propose changes to the retirees' medical benefits, subject to the retirees' right to object.  If a sufficient number of retirees object to any proposed change, the validity of the change is referred to a neutral expert to determine whether the proposed change reduces the value of the medical benefits, taken as a whole.  If it does not, the change may be implemented by Intelsat.  The neutral expert's decision is final and binding on the parties.

In September 2018, Intelsat notified retirees of a proposed change.  Rather than self-insure, as Intelsat previously had done, Intelsat now funds a Health Reimbursement Arrangement ("HRA") for each eligible retiree (the "Current Plan").  The HRAs, together with the retirees' required monetary contribution, are sufficient to permit retirees to purchase medigap plans in the marketplace.  These medigap plans are secondary to the retirees' Medicare coverage, as was the prior Intelsat self-insured plan.

In October 2018, a minority (but sufficient number) of eligible retirees objected to the proposed change (the "Objectors") and sought to preliminarily enjoin its implementation.  Judge Chutkan of the District Court for the District of Columbia denied the Objectors' preliminary injunction motion and referred assessment of the proposed change to the neutral expert, as required by the Consent Plan.  In denying the preliminary injunction motion, the court held that Objectors failed to demonstrate irreparable harm and any entitlement to relief would be to monetary damages, not injunctive relief.  The Objectors did not appeal the denial of their preliminary injunction motion.

In December 2018, the neutral expert reviewed the proposed change and found that it did not reduce the value of the medical benefits, taken as a whole.  The Objectors sought the district court's review of the expert's decision, and the court, viewing the application as a renewed preliminary injunction motion, again denied Objectors' request (the "December Order").

In January 2019, Objectors filed a renewed motion to enforce the Consent Decree, along with a motion for a permanent injunction, and for reconsideration of the December Order.  The district court denied the reconsideration motion by order dated January 3, 2019 (the "January Order").  The Objectors sought review of both the December and January Orders in the District of Columbia Circuit Court of Appeals, which appeal was denied and the case remanded.  Shortly before the Debtors commenced the Chapter 11 Cases, the Objectors filed a renewed motion to enforce the Consent Decree and for a permanent injunction.

The Debtors believe that the Current Plan satisfies all of the Debtors' obligations to their retirees under applicable law, including the Consent Decree.  The Debtors intend to assume their obligations under the Retiree Medical Plans; in particular, the Debtors will continue providing medical benefits to those Retirees covered by the Consent Decree pursuant to the Current Plan after the Effective Date. Confirmation of the Amended Plan and entry of the proposed Confirmation Order will constitute a finding that the

Amended Plan satisfies the Debtors' obligations to retirees under the Consent Decree and, accordingly, that the Debtors have satisfied the requirements of 11 U.S.C. § 1129(a)(13).

### 15. *Treatment of Executory Contracts and Unexpired Leases*

#### (a)        Assumption of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Amended Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Amended Plan, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed by the Debtors or Reorganized Debtors, as applicable, including the Amended Plan Support Agreement, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease (1) was assumed, assumed and assigned, or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease Schedule.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Amended Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Amended Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Amended Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

#### (b)        Claims Based on Rejection of Executory Contracts or Unexpired Leases

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Amended Plan and the Rejected Executory Contract and Unexpired Leases List, as applicable.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Amended Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than 30 days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Amended Plan, notwithstanding anything in a Proof of Claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as an Unsecured Claim pursuant to Article III.B of the Amended Plan and may be objected to in accordance with the provisions of Article VII of the Amended Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Notwithstanding anything to the contrary in the Amended Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including 30 days after the Effective Date.

### (c)      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Amended Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Amended Plan.

### (d)      Reservation of Rights

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

For more detail, *see* Article V of the Amended Plan, entitled "Treatment of Executory Contracts and Unexpired Leases," which is incorporated herein by reference.

### 16. *Non-TopCo Plan*

In the event that a Plan Toggle Event occurs, for any reason, then the Debtors shall immediately seek, and the Consenting Creditors shall support, Confirmation of the Non-TopCo Plan without the need to resolicit votes on the Non-TopCo Plan. Upon conversion to the Non-TopCo Plan, all references in the Amended Plan to the "Plan" and any references herein to the "Amended Plan" shall be deemed to refer to the Non-TopCo Plan. Any references to the Debtors shall be deemed to refer to all of the Debtors other than whichever (or both) of Intelsat S.A. and Holdings SARL that a Plan Toggle Event occurs with respect to. The Non-TopCo Plan shall be consistent in all respects with the terms of the Amended Plan (including, for the avoidance of doubt, the treatment of Claims provided under the Plan for all classes of creditors other than creditors of Holdings SARL and/or Intelsat S.A.). The Non-TopCo Plan may differ from the Amended Plan only to the extent required to remove Holdings SARL and/or Intelsat S.A. from the Amended Plan and which shall (unless waived in accordance with the Amended Plan Support Agreement) still require that the Settlement Agreement Order be entered as a condition precedent to confirmation of the Non-TopCo Plan, and otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Unsecured Creditors.

### 17. *Disputed and Contingent Claims Reserve*

On or after the Effective Date, the Debtors, the or Reorganized Debtors, as applicable, will establish one or more reserves for Claims, including the Secured Creditor Claims Disputed Distribution Reserve, that are contingent or have not yet been Allowed, and including any Guarantee Claims that have not been withdrawn with prejudice or disallowed by a Final Order, in an amount or amounts as reasonably determined by the applicable Debtors (with the consent of the Required Consenting Jackson Crossover

48

Group Members and, solely with respect to any Claims against any HoldCo, the Required Consenting HoldCo Creditors) or Reorganized Debtors, as applicable, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim. To the extent that a Disputed Claim may be entitled to receive New Common Stock pursuant to the Plan, such New Common Stock will remain authorized but unissued pending resolution of such Disputed Claim. Notwithstanding anything to the contrary in the Plan (including this Section VII.F), the reserve established for Guarantee Claims that have not been released or disallowed by a Final Order shall be established in such amount assuming that such Guarantee Claims are Allowed in full, or as otherwise agreed between the Debtors or Reorganized Debtors, as applicable, and the Required Consenting Jackson Crossover Group Members.

To the extent the Secured Creditor Settlement Order has not been entered as of the Effective Date or does not remain in effect as of the Effective Date (or is vacated or reversed after the Effective Date pursuant to a Final Order), then until such time as the Disputed portions of the 8.00% First Lien Notes Claims and 9.50% First Lien Notes Claims are Allowed (or otherwise required to be paid for the First Lien Notes Claims to be Unimpaired), and all such amounts are paid in full in Cash, or disallowed, pursuant to a Final Order, the Debtors and Reorganized Debtors, as applicable, shall maintain the Secured Creditor Claims Disputed Distribution Reserve in the amount of the portion of such Claims that constitute Disputed Claims (including interest thereon at the applicable contractual rates). Any modifications to the Secured Creditor Claims Distribution Reserve following the Effective Date shall be (a) mutually agreed upon by the Debtors or Reorganized Debtors, as applicable, the Required First Lien Consenting First Lien Noteholders, and the Required Consenting Jackson Crossover Group Members or (b) pursuant to separate Bankruptcy Court order.

SES contends that the Debtors or Reorganized Debtors, as applicable should establish a Cash reserve in the amount of SES's asserted constructive trust claim, to the extent that such Claim remains a Disputed Claim as of the Effective Date. SES further contends that the Debtors or Reorganized Debtors, as applicable, should reserve sufficient authorized but unissued New Common Stock (and other consideration) to which SES may be entitled on account of any of its unsecured claims against the Debtors, to the extent that such Claims remained Disputed Claims as of the Effective Date. The Debtors and Reorganized Debtors currently contemplate establishing Disputed and Contingent Claims reserves as set forth in the prior paragraphs of this section IV.A.17. SES and all other parties' rights to argue and seek alternative and incremental forms of reserves at confirmation (or that no reserves should be established) are reserved.

### B.    Summary of Value Allocation

For purposes of the Amended Plan, A&M created a "natural recovery model" (the "Base Recovery Model") to allocate the Debtors' distributable value (as opposed to liquidation value—the threshold required by section 1129 of the Bankruptcy Code), including the value of any interest that the Debtors may hold in non-Debtor affiliates, across each Debtor entity. The Base Recovery Model then calculates creditor recoveries on a waterfall basis according to creditors' respective claims under section 1129(b)'s "absolute priority rule." This allocation of value will be described in detail in an expert report (the "A&M Allocation Expert Report") to be prepared in advance of the Confirmation Hearing pursuant to a schedule that the Debtors will propose for entry by the Bankruptcy Court, but is summarized for illustrative purposes below.

#### 1.    *Allocation of Distributable Value*

For purposes of the Base Recovery Model, the Debtors estimated the total distributable value at $11.278 billion. This estimate was comprised of three parts: (1) the midpoint of the estimated enterprise value of the Debtors; (2) plus the projected balance sheet cash at December 31, 2021 (the estimated

emergence date); (3) less the minimum cash required to operate the Debtors on a post-emergence basis, as outlined in the table below:

| Component | Distributable Value ($ millions) |
|---|---|
| Debtors' Enterprise Value | $11,000[13] |
| Plus Balance Sheet Cash @ 12/31/2021 (Estimated Emergence) | $494[14] |
| Less Minimum Cash | $216[15] |
| **TOTAL DISTRIBUTABLE VALUE** | **$11,278** |

First, A&M allocated certain discrete assets to the Debtor entity that owns and/or will receive those assets, including: (i) the Accelerated Relocation Payments; (ii) receivables for capital and expense reimbursements related to the C-band relocation initiative; (iii) the Company's investments in the acquired Gogo Commercial Aviation business; (iv) other investments; and (v) certain other assets, including certain tax attributes (collectively, "Discrete Assets"). After allocating the Discrete Assets, which total approximately $6.331 billion, A&M allocated the remaining approximately $4.947 billion of value (the "Net Satellite Operations Value") to specific legal entities *pro rata* based on each legal entity's relative contribution of 2021 adjusted earnings before interest and taxes[16] ("Adjusted EBIT") pursuant to the Debtors' latest forecast, subject to further adjustments below.

This allocation methodology implements certain existing and in-force intercompany agreements between Jackson and certain subsidiaries, which agreements will be assumed. These intercompany agreements include: (i) that certain Master Intercompany Services Agreement, effective as of July 2, 2018 (the "MISA") and (ii) that certain Bilateral Agreement (including all amendments thereto, the "Bilateral Agreement") among US LLC, Intelsat Alliance LP ("Alliance"), and Intelsat Ventures S.à r.l. ("Ventures"). The Bilateral Agreement treats both Ventures and its direct and indirect subsidiaries ("Ventures Group") and US LLC and its direct and indirect subsidiaries ("US LLC Group") as two distinct operating units, and consequently aggregates materially all of the Company's Adjusted EBIT between them.[17] In order to accommodate an equitable value allocation within the Ventures Group and US LLC Group, the Base Recovery Model further distributes value within each group based on the net book value[18] ("NBV") of certain assets of certain legal entities as of the Debtors' June 30, 2021 trial balances and the estimated external revenue[19] of certain legal entities for 2021 pursuant to the Debtors' latest forecast. This

---

13   *See* Valuation Analysis, **Exhibit E**.

14   *See* Financial Projections, **Exhibit D**.

15   *See* Financial Projections, **Exhibit D**.

16   Excluding ASC 606 deferred revenue.

17   Further detail on the Bilateral Agreement is included in section VII.K(2)(c) herein.

18   Excludes goodwill, intercompany assets, funded debt, liabilities subject to compromise, ASC 606 deferred revenue, and certain line items on the balance sheet related to the Discrete Assets described herein.

19   Excludes ASC 606 deferred revenue.

is further described in section V.B.4, entitled "Net Satellite Operations Value," and will be described in more detail in the A&M Allocation Expert Report.

### 2. *Allocation of Accelerated Relocation Payments*

The Base Recovery Model recognizes that the Debtors will receive the Accelerated Relocation Payments if they meet the deadlines set forth in the FCC Order. The Base Recovery Model also takes into account the relevant intercompany agreements that relate to the Accelerated Relocation Payments and profit sharing.

Among other things, without the FCC licenses owned by License, there would be no ability to participate in the accelerated clearing process and accordingly no Accelerated Relocation Payments. License elected to participate in the accelerated clearing process and submitted an accelerated relocation election form pursuant to the FCC Order and the Wireless Telecommunications Bureau's May 11, 2020 Public Notice detailing the form of accelerated relocation election to be filed on FCC Docket No. 18-122. Moreover, with the approval of the FCC, License will receive the Accelerated Relocation Payments pursuant to a contract executed with the clearinghouse appointed by the FCC. For these and other reasons, the Debtors believe that License is the appropriate recipient of any Accelerated Relocation Payments that the Debtors earn through their efforts to clear the C-band in the continental United States.

While the Debtors contend that the appropriate recipient of the Accelerated Relocation Payments from the FCC is License, certain intercompany agreements dictate that the proceeds must then be divided among License, Jackson, and US LLC. Certain of the Debtors are members of Alliance, a limited partnership formed as part of the Company's 2018 restructuring. Specifically, Intelsat Genesis GP, LLC ("Genesis GP") is the general partner of Alliance, and Jackson and Intelsat Genesis Inc. ("GenesisCo") are limited partners in Alliance. Prior to the formation of Alliance, Jackson, through various direct and indirect subsidiaries, owned substantially all of the Company's assets, including the Company's rights to operate in the C-band. Pursuant to the partnership agreement of Alliance (including all amendments thereto, the "Partnership Agreement"), Jackson directly or indirectly contributed substantially all of its assets, except its rights to the first 100 MHz of C-band spectrum used by License in the continental United States (the "C-Band Monetization Property") to Alliance. At all relevant times before and after the Company's 2018 restructuring, including as of the Petition Date, License held substantially all of the Company's FCC issued licenses to operate within the C-band.

In connection with the formation of Alliance, Alliance and the partners therein also entered into that certain nominee agreement (the "Nominee Agreement") to clarify the enforcement mechanism for the C-Band Monetization Property. Specifically, the Nominee Agreement provided that, to the extent that Alliance or a subsidiary thereof received C-Band Monetization Property, it would hold such C-Band Monetization Property as an agent for the benefit of Jackson and the C-Band Monetization Property would be treated as if it had always been beneficially owned by Jackson.

The FCC Order provides for the distribution of Accelerated Relocation Payments following the clearing of specific segments of the C-band as outlined below:

*($ in millions)*

| Phase | Spectrum Band | Milestone Date | ARPs [1] |
|---|---|---|---|
| Phase I | 0 - 120 MHz [2] | December 5, 2021 | $   1,198 |
| Phase II | 120 - 300 MHz [3] | December 5, 2023 | 3,668 |
| **Total Gross Value** | | | **$   4,865** |

*Note:*

*1) ARPs assume no delay in clearing spectrum by milestone date*

*2) Includes 46 of top 50 partial economic areas for 0-120 MHz band*

*3) Includes all other partial economic areas for 0-120 MHz band*

The Company believes that it is reasonable to allocate the Accelerated Relocation Payments based on (1) the results of the FCC's C-band spectrum auction, which concluded in February 2021 and (2) by allocating value pro rata to the Alliance partnership for its contribution of guard band (281-300 MHz), which was required to be cleared but was not included in the auction (collectively, the "Auction Proceeds Methodology"). Under the Auction Proceeds Methodology, the Accelerated Relocation Payments are allocated as follows:[20]

*($ in millions)*

| Spectrum Band | Adj. ARPs [1] | % Share |
|---|---|---|
| 0 - 100 MHz | $   1,703 | *35%* |
| 101 - 300 MHz | 3,162 | *65%* |
| **Total Gross Value** | **$   4,865** | *100%* |

*Note:*

*1) Adjusted based on Auction Proceeds Methodology*

Because Jackson has retained the right to monetize the first 100 MHz of the C-band, the Debtors believe that, if the Auction Proceeds Methodology is utilized, Jackson is entitled to anticipated Accelerated Relocation Payments in the gross amount of approximately $1.703 billion, and License is entitled to the remaining approximately $3.162 billion gross amount attributable to anticipated Accelerated Relocation Payments.

Pursuant to the Bilateral Agreement, 7.8 percent, or approximately $247 million of the approximate $3.162 billion gross share of the Accelerated Relocation Payments allocated to License—a subsidiary of Ventures and party to the Bilateral Agreement—should be paid by Ventures to US LLC. Ventures' ability to satisfy this obligation is premised on License distributing such an amount to Ventures, which leaves License with approximately $2.916 billion in gross Accelerated Relocation Payments, and results in the following allocation of gross value across the three legal entities entitled to Accelerated Relocation Payments:

---

[20]   Prior Company filings with the FCC, as well as certain other Company filings, have allocated 45 percent of the amount to Phase I and 55 percent of the amount to Phase II. Nevertheless, based on the latest market data, the Debtors believe that allocating the Accelerated Relocation Payments in accordance with the Auction Proceeds Methodology is reasonable, which will be described in further detail in the A&M Allocation Expert Report.

*($ in millions)*

|  | Jackson | License | US LLC | Total |
|---|---|---|---|---|
| **Adj. ARPs** | $        1,703 | $        2,916 | $        247 | $        4,865 |
| **Spectrum Band** | 0 - 100 MHz | 101 - 300 | 101 - 300 |  |
| **% Allocation** | *100.0%* | *92.2%* | *7.8%* |  |

These gross amounts of Accelerated Relocation Payments must be converted from a gross basis to a net basis to reflect the actual value received by the Company. The first step to convert Accelerated Relocation Payments from a gross basis to a net basis is to value them on an after-tax basis (assuming that projected specified tax attributes in existence at the end of 2021 are not available to offset such payments) at the present value of the Phase I Amount and the Phase II Amount.[21] Because the Debtors anticipate receiving the Phase I Amount earlier than the Phase II Amount, the payments were discounted to their present value using different discount factors. Additionally, the tax payable related to each Phase I and Phase II Amounts depends on the fiscal year's projected losses pursuant to the Business Plan. The after-tax, present-value adjustments reduced the total value of Accelerated Relocation Payments as follows:

*($ in millions)*

|  | Jackson | License | US LLC | Total |
|---|---|---|---|---|
| **Adj. ARPs** | $        1,703 | $        2,916 | $        247 | $        4,865 |
| **Net ARPs Pre-Exp.** | $        1,491 | $        1,898 | $        161 | $        3,550 |

The final step to convert Accelerated Relocation Payments from a gross basis to a net basis is to make certain adjustments for non-reimbursable C-band spend. First, pursuant to the definition of C-Band Monetization Property in the Partnership Agreement, the Accelerated Relocation Payments' value is further reduced by $160 million for the amount of spend required to complete the C-band relocation that is not anticipated to be reimbursed. This reduction is applied pro rata across Jackson, License and US LLC based on the after-tax, present-value of Accelerated Relocation Payments noted above, reducing Jackson's value of Accelerated Relocation Payments from $1.491 billion to $1.424 billion, License from $1.898 billion to $1.813 billion and US LLC from $161 million to $153 million.

Next, $111 million of this reduction is added back to US LLC related to the non-reimbursable spend projected to be incurred through the expected emergence date of December 31, 2021 ("Pre-Emergence Non-Reimbursables"). The remaining $49 million of the reduction is related to non-reimbursable spend projected to be incurred after the emergence date ("Post-Emergence Non-Reimbursables"), and remains an offset to the Accelerated Relocation Payments' value. The impact of non-reimbursable C-band spend results in the following net after-tax, present value for Accelerated Relocation Payments, which comprises the final legal entity allocation of distributable value for plan value allocation purposes:

---

[21]    As noted above, such attributes were valued and allocated separately, and a significant component of the value attributed to them is their use in offsetting taxable income attributable to the Accelerated Relocation Payments.

*($ in millions)*

|  | Jackson | License | US LLC | Total |
|---|---|---|---|---|
| Net ARPs Pre-Exp. | $ 1,491 | $ 1,898 | $ 161 | $ 3,550 |
| Less: Total Non-Reimb. | (67) | (85) | (7) | (160) |
| Subtotal | $ 1,424 | $ 1,813 | $ 153 | $ 3,390 |
| Plus: Pre-Emrg. Non-Reimb. | - | - | 111 | 111 |
| Net ARPs Dist. Value | $ 1,424 | $ 1,813 | $ 264 | $ 3,501 |
| *Net ARPs Dist. Value (%)* | *40.7%* | *51.8%* | *7.6%* | *100.0%* |

The Convert Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and SES have asserted that the Debtors' methodology for allocating value has improperly diverted value away from the HoldCos and US LLC, respectively.  These assertions are premised primarily on assertions that a majority, if not all, of the Accelerated Relocation Payments should be allocated to the Debtor of their preference.  Specifically, the Convert Ad Hoc Group has asserted that all or a material portion of the value of the Accelerated Relocation Payments should be allocated to Intelsat S.A.  The HoldCo Creditor Ad Hoc Group has asserted that all or a material portion of the value of the Accelerated Relocation Payments should be allocated to ICF, Envision, LuxCo, and Intelsat S.A., though such assertions are settled pursuant to the Amended Plan.  SES has asserted that all or significantly more of the Accelerated Relocation Payments should be allocated to US LLC.

The Debtors disagree with the assertions made by each of the Convert Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and SES, respectfully, and believe the allocation of distributable value under the Amended Plan to be reasonable.  At the Confirmation Hearing, the Bankruptcy Court may agree with the Debtors, may agree with the Convert Ad Hoc Group, may agree with SES, or may adopt a different Base Recovery Model or make changes to the Debtors' Base Recovery Model.  If the Bankruptcy Court adopts changes to the Base Recovery Model under the Amended Plan for any reason, then such changes will have an impact on the recovery to Holders of Claims, and the allocation of value among the Debtors will be adjusted consistent with the Bankruptcy Court's determinations. The Amended Plan may still be confirmed with a revised Base Recovery Model without resolicitation.  Therefore, Holders of Claims entitled to vote on the Amended Plan should take into account the possibility of changes to the Base Recovery Model at confirmation when determining whether to vote in favor of the Amended Plan.

### 3.  *FCC Order Reimbursement Payments*

The Debtors anticipate receiving approximately $1.106 billion in reimbursement payments on account of their costs incurred to clear the spectrum through the expected emergence date of December 31, 2021.  Of these reimbursement payments, approximately $828 million are expected to be attributable to capital expenditures and expenses incurred by Satellite and approximately $278 million are expected to be attributable to capital expenditures and expenses incurred by US LLC.  Accordingly, the anticipated value of the reimbursement expenses has been allocated to Satellite and US LLC in an amount equal to the receivable amount each entity is estimated to have on its balance sheet on the expected emergence date.

### 4.  *Net Satellite Operations Value*

The $4.947 billion of Net Satellite Operations Value is allocated primarily based on the 2021 Adjusted EBIT of each legal entity.  To accommodate an equitable value allocation to the subsidiaries of certain legal entities, NBV and external revenue are also considered.

Allocable value to each legal entity is determined by (1) allocating 2021 Adjusted EBIT pursuant to the Debtors' latest forecast by legal entity *pro rata* based on the Debtors' December 31, 2020 full-year

trial balances; (2) introducing intercompany revenues and expenses to accommodate the MISA and the profit split between US LLC and Ventures as set forth in the Bilateral Agreement; (3) allocating Net Satellite Operations Value by legal entity *pro rata* based on Adjusted EBIT for legal entities with positive Adjusted EBIT values;[22] (4) each legal entity within the US LLC Group is allocated value equal to that of its NBV; (5) remaining value allocated to the US LLC Group from step 3 less the allocated value in step 4 is allocated *pro rata* to US LLC and IGC based on 2021 external revenue pursuant to the Debtors' latest forecast; (6) within the ventures group, IGSM is allocated value based on the relative external revenue to that of US LLC; and (7) remaining value allocated to the Ventures Group from step 3 less the allocated value in step 6 is allocated *pro rata* to legal entities within the Ventures Group, excluding IGSM, based on relative NBV.

Construction-in-process assets unrelated to the C-band relocation initiative are allocated based on net book values and legal entity ownership forecasted as of the expected emergence date of December 31, 2021 pursuant to the Debtors' latest forecast. Construction-in-process assets total $407 million, of which $360 million is allocated to Satellite LLC as the owner of certain space assets and $46 million is related to certain ground assets and infrastructure, of which $42 million is allocated to US LLC as the owner of those assets.

### 5. *Waterfall*

To determine the recovery to unsecured creditors at each legal entity, the plan value allocation waterfall, which distributes value to creditors according to Section 1129 of the Bankruptcy Code's absolute priority rule, incorporates the following key assumptions and adjustments to the Base Recovery Model.

- Allocation of $306 million of value that would otherwise be reflected at Jackson to the HoldCos to account for the settlement of claims reflected in the Amended Plan and the Settlement Agreement;

- Inclusion and satisfaction of all of post-petition intercompany administrative amounts funded directly or indirectly pursuant to the Cash Management Order.[23] This includes approximately $430 million in administrative amounts indirectly funded by Jackson to US LLC to repay funds transferred to US LLC for the purpose of acquiring Gogo Commercial Aviation and for general operating expenses thereafter;

- Secured claims include DIP Claims of $1.5 billion, which includes a $500 million upsize to the existing facility that is expected to close before the Debtors' projected emergence from chapter 11, as well as the Debtors' prepetition credit facilities, which include the First Lien Credit Agreement and the First Lien Notes. The Base Recovery Model assumes the DIP ~~Loan~~ Facility receives recoveries based on Total Collateral Value available for distribution pro rata by Debtor. Prepetition secured claims then receive recoveries based on remaining collateral value pro rata by Debtor. Secured claims are fully satisfied and result in no deficiency claims.

- For purposes of calculating creditor recoveries under the Base Recovery Model, the Debtors estimated that the value of the collateral of the DIP Claims, Term Loan Facility Claims, 8.00% First Lien Notes Claims, and 9.50% First Lien Notes Claims at $10.333 billion in the aggregate

---

[22] Certain legal entities outside of the Ventures Group, US LLC Group, and Jackson and its parent entities were allocated value equal to that of its respective NBV.

[23] "Cash Management Order" means the *Final Order (A) Authorizing the Debtors to (I) Continue to Operate Their Cash Management System, (II) Maintain Existing Business Forms and Books and Records, and (III) Perform Intercompany Transactions and Granting Administrative Status to Intercompany Transactions and (B) Granting Related Relief* [Docket No. 260].

(the "Collateral Value"). The remaining distributable value is assumed to be unencumbered (the "Unencumbered Value"), consisting primarily of cash at the holding company level, unencumbered real estate held at a specific legal entity, value of certain joint ventures, and the value redistributed from Jackson to the HoldCos to account for the Settlement noted above.

| Value | Amount ($ millions) |
|---|---|
| Total Collateral Value | $10,333[24] |
| Total Unencumbered Asset Value | $946 |
| **Total Distributable Value** | **$11,278** |

For each Debtor, recoveries to general unsecured creditors were determined by dividing the amount of distributable value remaining to satisfy unsecured claims by the amount of unsecured claims held against such Debtor.

A table setting forth the estimated amount of allowed unsecured claims and associated anticipated recoveries, organized by Debtor, is attached hereto as **Exhibit F**.

### 6.  *SES Claims*

As discussed in greater detail herein, SES has filed proofs of a claim against each of the Debtors in the amount of $1.8 billion.  SES asserts that it is entitled to $450 million of the Accelerated Relocation Payments that the Debtors may receive pursuant to the FCC Order.  It also asserts that it is entitled to an additional $1.35 billion against each Debtor as punitive damages (calculated as three-times its alleged compensatory damages of $450 million).

The Debtors have objected to each of SES's proofs of claim.  The Debtors' Amended Plan assumes that the proof of claims filed by SES relating to the Accelerated Relocation Payments are disallowed.  The Debtors have also assumed that no amount of the Accelerated Relocation Payments will be held in constructive trust for SES.  In the event that SES's claim is allowed against one or more Debtors, it may have the effect of diluting recoveries to other creditors of those Debtors.  Additionally, if any portion of the Accelerated Relocation Payments are deemed to be held in constructive trust for SES, the value distributable to the Debtors entitled to receive such payments could be diminished and/or certain distributions to creditors could be delayed.

---

[24]  SES argues that the Accelerated Relocation Payments are not collateral encumbered by perfected liens held by the Prepetition Secured Parties.  SES contends that the Accelerated Relocation Payments are postpetition revenue, as to which the Debtors did not have an entitlement on the Petition Date, and that they are, therefore, not Cash Collateral because they are not "proceeds, products, offspring or profits" of prepetition collateral.  SES argues that they arise exclusively from the postpetition clearing work performed by US LLC and, therefore, are unencumbered unless and until, pursuant to the terms of the DIP Order, the Prepetition Secured Parties can demonstrate that there was a diminution in value in their Prepetition Collateral caused by the Debtors' use thereof.  SES further contends that no diminution in value has occurred.  If SES succeeds and the Base Recovery Model must be revised to treat the Accelerated Relocation Payments as assets unencumbered by prepetition liens, these changes may impact recoveries to Holders of Claims.  All parties rights are reserved in connection with any such arguments.

If the Bankruptcy Court determines that the Accelerated Relocation Payments are not collateral encumbered by perfected liens held by the Prepetition Secured Parties, the Plan Support Agreement and the Settlement Agreement might not remain in force without modification, and the Plan might not be confirmable without resolicitation of votes.

SES has also asserted that the Debtors have diverted value away from US LLC so as to limit SES's recovery on its claims. The Debtors disagree and have allocated value among the Debtors, including US LLC, in accordance with the methodology described herein. If SES succeeds on its claims on the merits and succeeds on its claims that the Accelerated Relocation Payments should be allocated more heavily or exclusively to US LLC, creditors' recoveries would be diluted as set forth herein and as set forth in **Exhibit F**, attached hereto.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Intelsat's Corporate History

In 1964, inspired by President John F. Kennedy's address to the United Nations General Assembly, in which he proposed "a global system of communications satellite linking the whole world in telegraph and telephone and radio and television," a group of nations signed an interim agreement establishing an intergovernmental organization to create a global satellite communication system. The member states party to the agreement designated certain entities as signatories to market and use the intergovernmental organization's communications system within their territories and to hold an investment share in the organization. An interim agreement was finalized in 1971, when 85 nations entered into an establishing and operating agreement creating the International Telecommunications Satellite Organization, INTELSAT, which was charged with operating and providing access to international telecommunications satellites on a commercial basis. Over the ensuing decades, INTELSAT grew to include more than 200 member states and territories, of which, by the year 2000, 70 relied on the system for all international communications, and 40 utilized the system for national telecommunications.

Nonetheless, as a public intergovernmental organization, INTELSAT's business was subject to various restrictions, which began to inhibit INTELSAT's ability to compete effectively in the expanding marketplace for satellite telecommunications.

Responding to these trends, in March 2000, Congress passed, and President Clinton signed, the Open Market Reorganization for the Betterment of International Telecommunications Act—the "ORBIT" Act—which provided for INTELSAT's privatization by July 31, 2001. On July 18, 2001, the INTELSAT agreement was amended by its member nations to privatize INTELSAT—by transferring substantially all assets, liabilities, and operations to a private company known as Intelsat, Ltd., and its satellites and corresponding operating licenses to a Delaware-incorporated subsidiary and U.S. licensee, Intelsat LLC.

The privatized company continued to expand its global communications infrastructure through investments and acquisitions of other satellite service providers. In March 2004, the Company purchased five satellites and related assets from Loral Space & Communications Corporation, which enabled Intelsat to provide full satellite coverage for North America, and expanded its customer base in the broadcasting, cable television, and corporate networking sectors. Then, in January 2005, a consortium of private equity investors acquired Intelsat for total Cash consideration of approximately $3.2 billion and approximately $1.9 billion of pre-acquisition debt remaining outstanding after the transaction. In 2006, the reorganized company acquired the equity of PanAmSat Holding Corporation ("PanAmSat") for $3.2 billion and assumed or refinanced PanAmSat's $3.2 billion in debt. The acquisition added PanAmSat's video market expertise, advanced satellite fleet, and blue-chip media customer base to Intelsat's portfolio and nearly doubled the company's fleet of satellites, establishing the company as the largest provider of satellite services worldwide.

On February 4, 2008, another consortium of private equity investors led by BC Partners and Silver Lake Partners acquired Intelsat. On April 23, 2013, Intelsat S.A. completed an initial public offering on the New York Stock Exchange (the "NYSE"), issuing approximately 22.2 million shares of common

57

stock at $18.00 per share.  Intelsat S.A.'s shares were traded on the NYSE until May 19, 2020, shortly after the commencement of these Chapter 11 Cases.

### B.        Intelsat's Business Operations

As discussed above, the Company operates the world's largest satellite fleet and connectivity infrastructure, and provides diversified communications services to many of the world's leading media companies, telecommunications operators, Internet service providers, and the U.S. government and military.  The Company has approximately 1,200 employees and maintains its corporate administrative headquarters in McLean, Virginia, with local sales and marketing support offices in sixteen countries across the globe.  The Company operates over fifty satellites and eight owned satellite ground stations connecting its satellite network to terrestrial networks, covering 99 percent of the world's populated regions and providing a critical layer in the global communications infrastructure.  The Company also operates over a significant terrestrial network, which completes the system's connectivity worldwide.

In simplified terms, the Company uses its satellites as relay stations in space for the transmission of voice, video, and data communications.  The satellites allow communications to bypass existing ground-based infrastructure, which is often limited and unreliable in many parts of the world.  This satellite-based communications system typically involves four steps.  First, an "uplink" station or other ground-based equipment transmits the desired communications signal to one of the Company's satellites.  Second, the satellite amplifies the incoming signal, and changes the radio frequency of the signal.  Third, the satellite transmits the signal back to earth, where in the final step it is received by one or more specialized "downlink" station(s) or other ground-based equipment.  For two-way applications, the ground-based equipment can reverse the transmission path.

The Company's satellites primarily send and receive signals in one of three high-frequency radio "bands" (*i.e.*, ranges within radio/electromagnetic spectrum):  C-band, Ku-band, and Ka-band. Higher-frequency radio waves—that is, radio waves with a smaller wavelength—are ideal for use by radar, communication satellites, and cable and satellite television broadcasting because the smaller wavelength of the radio waves in these bands allow the waves to be directed in narrow beams to and from satellites to specific ground locations with a high degree of precision.

The Company uses its extensive satellite and telecommunications network to provide diversified communications services to the world's leading media companies; fixed and wireless telecommunications operators; data networking service providers for enterprise and mobile applications; multinational corporations; and Internet service providers.  Approximately 200 countries and territories receive Intelsat's services and, based upon the position of the Company's satellites and beams, most of the Company's on-network revenue aligns to emerging regions.  Additionally, the Company is developing coverage that is more comprehensive over developed regions, such as the continental United States and Europe, as well as ocean routes.

The Company operates primarily across four customer sectors:  media, enterprise and wireless, mobility, and government.

- *Media*.  Approximately 43 percent of the Company's revenue originates from its media sector. Through its media sector, the Company provides direct-to-home television, distributes television programming, and broadcasts events worldwide on behalf of its customers, which include the BBC, 21st Century Fox, TimeWarner, the Walt Disney Company, and Discovery Incorporated.  In total, the Company distributes approximately 5,500 video channels and 1,600 HD video channels, including CBS, ABC, Fox, ESPN, BBC World News, HBO, and the Discovery Channel.  In addition, the Company frequently distributes broadcast events to worldwide audiences.  On February 2, 2020, the approximately 160 million people who

watched Patrick Mahomes lead the Kansas City Chiefs to a Super Bowl victory over the San Francisco 49ers were receiving the broadcast through the Company's satellite network, which has also been used to broadcast video from the *Tour de France*, the World Cup, the 2018 North Korea-United States Singapore Summit, and coverage from Prince Harry's and Meghan Markle's Royal Wedding.

- *Enterprise and Wireless*.  The Company's enterprise and wireless sector, which represented approximately $500 million (24 percent) of the Company's 2019 revenues, provides services to fixed and wireless telecommunications companies, such as Verizon, Vodafone, Orange, and America Movil.  The Company provides the satellite and telecommunications services necessary to create the wireless networks (such as the 2G, 3G, and 4G networks) that millions of people around the world use to make cell phone calls and access the Internet.  The Company also provides services for private corporate networks, and broadband for remote communities lacking traditional, terrestrial communications networks.  For example, through a recent partnership with Africa Mobile Networks, the Company has enabled mobile connectivity for over 3.5 million people living in remote African villages.

- *Mobility*.  The Company's mobility sector, which represented approximately $270 million (13 percent) of the Company's 2019 revenue, provides industry leading broadband services for aviation, maritime, and land mobility applications.  For example, the Company is a leader in the market for in-flight Internet connectivity, allowing millions of passengers around the world to access the Internet while in the air via customers such as Global Eagle Entertainment and Panasonic Avionics Corporation.  The Company is also a leader in providing Internet access for commercial ships, including most of the world's largest cruise vessels.  The Debtors anticipate substantial growth in this sector of their business, in part due to the synergistic acquisition of Gogo CA, which the Debtors believe will provide strategic enhancements to the Debtors' existing mobility business, complement the Debtors' existing strategic plans to develop new customer relationships and consumer-facing capabilities, and potentially become the Debtors' core mobility solutions business unit.

- *Government*.  The Company is also the leading provider of commercial satellite communications services to the United States government and other select military and civilian organizations and their contractors, for intelligence, surveillance and reconnaissance missions, as well as in-flight communications for government officials, troops, and cargo aircraft. Representative customers in this business sector include the U.S. Department of Defense, U.S. Department of State, and Australian Defence Force.  Moreover, as part of this business, which constituted approximately $380 million (18 percent) of the Company's 2019 revenue, the Company distributes the global satellite feed for the American Forces Network, which provides entertainment options, such as access to broadcasts of March Madness and the Super Bowl, to the more than one million U.S. service members who are stationed around the world at U.S. military bases and on U.S. naval ships.  The Company's government-contracting subsidiary, Intelsat General Communications LLC, is not a Debtor in these bankruptcy cases.

The Company is also positioned to stabilize its revenue and thereafter return to growth by continuing its commitment to innovation and investments in new technologies that will keep its network competitive and cost-efficient.  It will invest in a next generation software-defined network: a high-performance space and ground network that leverages software-defined satellites, ground infrastructure, various types of operational flexibility (coverage, frequency, radio-frequency performance) and software technologies to generate superior network performance and cost efficiencies, while enabling a future-proofed network and backwards compatibility with globally deployed, existing ground infrastructure.  The Company also has recently begun investing in a new Intelsat 40e satellite, which

59

features North American coast-to-coast high-throughput coverage and is particularly well designed for mobility applications.

Nonetheless, the Company's business is capital intensive, and over the past five years has required capital expenditures of between $225 million and $725 million annually. These capital expenditures largely fund the construction and launch of multiple new satellites, upgrades to ground networks, and new technologies. The Company expects to launch at least four new satellites over the next several years (not including the additional satellites launched as part of the C-band spectrum clearing program). Upgrading and launching new and next generation satellites, including the Debtors' upcoming NextGen Satellite Program, (*i.e.*, to ultimately build and launch at least two next-generation satellites that would contain the latest and most advanced software-defined satellite technology) is essential to maintaining the quality of the Company's network, enabling new services, and maintaining the Company's competitive position against existing and new competitors who are likewise constantly reinvesting in and improving their own networks and service capabilities.

### C.    The C-Band Clearing Process

In its business, the Company uses its satellites as relay stations in space for the transmission of voice, video, and data communications. The Company's satellites primarily send and receive signals in one of three high-frequency radio "bands" (*i.e.*, ranges within radio/electromagnetic spectrum), including the C-band. The "C-band" refers to certain portions of the radio/electromagnetic spectrum that were historically allocated by the International Telecommunications Union ("ITU") table of allocations exclusively for FSS and certain point-to-point terrestrial services (other "Fixed Services"). The ITU rules permit certain regions to allow for other terrestrial use pursuant to each administration's rule. The FCC, pursuant to its regulatory jurisdiction under the Communications Act of 1934, administers the telecommunications licenses for services in the United States and has historically limited the use of the C-band for FSS and Fixed Services only. Ever since Intelsat began operations, the FCC has allocated the 3700–4200 MHz band for use by commercial satellite services for downlinks (communications from space-based satellites to ground stations) and the 5925–6425 MHz band for uplinks (communications from ground stations to satellites). Most of the Company's FSS operations within the C-band spectrum involve broadcasting downlink signals to FCC-licensed earth stations, which then deliver the received television and radio programming to cable TV head-ends or other terrestrial retransmission sites. The world's largest media programmers currently use the C-band to deliver leading content to cable television distributors, television broadcast affiliates, radio stations, and private video and data networks for customers across the United States.

For over 40 years, Intelsat has been utilizing C-band radio frequencies to build its comprehensive network of communications satellites and ground infrastructure. During this time, the Company has invested in and built a C-band business in the United States in reliance on the licenses that have been issued by the FCC and perennially renewed. The Company operates a significant portion of its business based on License's rights to the C-band to provide services in the United States. The Company (along with other satellite operators) expected the FCC, pursuant to its consistent practice, to continue to license the spectrum for use by satellite operators in perpetuity. Based on these rights and expectations, the Company and other satellite operators have invested over $50 billion to design, manufacture, and launch satellites, and make long-term contractual commitments to their customers.

In 2017, the FCC issued a Notice of Inquiry ("NOI") exploring reallocating portions of the C-band spectrum currently licensed to satellite operators in order to accommodate the deployment of critical 5G

60

wireless services in the continental United States.[25]  Beginning in 2017, in response to the FCC's NOI, the Company worked collaboratively with other satellite operators and with customer groups, associations, and other stakeholders to propose a market-based solution to the reallocation suggested by the FCC.  The proposal put forth by the Company and other satellite operators supported the FCC's stated goals of clearing a large portion of spectrum, quickly, while also protecting incumbent services, through a private auction facilitated by a committee of satellite operators to assist in the transition.  In the summer of 2018, the FCC issued a Notice of Proposed Rulemaking ("NPRM") that specifically addressed the market-based proposal put forth by Intelsat as a method of reallocating the spectrum and sought comment on the market-based approach and other potential approaches.  After the FCC issued the NPRM, US LLC formed a consortium with other satellite operators (the "C-Band Alliance" or "CBA") for the purpose of designing and implementing a private auction and independent clearing procedure to reallocate existing satellite operations from a portion of the C-band spectrum for new 5G wireless applications.

Members of the CBA worked collaboratively with the FCC over the course of 2018 and 2019 to address the issues raised by various parties to make the private auction path the approach taken in the final FCC Order.  On November 18, 2019, however, the FCC's chairman suggested that the FCC would pursue a public auction of the C-band spectrum, a dramatic change from the private market approach supported by the CBA.  On February 7, 2020, the FCC issued its draft order reflecting this shift to a public auction construct in the C-band proceeding.  On March 3, 2020, the FCC made this order final.

The FCC Order does not tie compensation to any satellite operator to the estimated value of the spectrum.  Instead, the FCC Order provides for at-cost reimbursement for relocating customer services to the upper part of the C-band (capital expenditures for new satellites and ground equipment), and certain Accelerated Relocation Payments if licensees clear their portions of the spectrum quickly: one incentive for partial clearing by December 5, 2021 and a second incentive for full clearing by December 5, 2023.  For the Company, these Accelerated Relocation Payments are capped at approximately $4.87 billion.

The FCC's change of direction significantly affected the Company's market capitalization.  On November 1, 2019, Intelsat had an equity market capitalization of approximately $3.8 billion.  From the beginning of November through November 18, 2019, the share price of Intelsat dropped rapidly and by over 75 percent, wiping out approximately $2.9 billion in equity market capitalization.

The Accelerated Relocation Payments present an important opportunity for the Company to earn billions of dollars of proceeds that would increase the Company's value, help meet capital investment needs, and continue to enable the Company to improve technologies for delivering enhanced, new and more cost-efficient communications services.  To be eligible to receive the Accelerated Relocation Payments, per the FCC Order, License elected in May 2020 to clear its portion of the C-band spectrum on the FCC's accelerated time frame.  If successful, License would expect to receive a payment of approximately $1.20 billion in 2022 after clearing the 3700–3820 MHz portion of the spectrum by December 5, 2021.  If the Company successfully clears the remaining portion of the spectrum (3820–4000 MHz) by December 5, 2023, License would expect to receive a payment of approximately $3.67 billion in 2024.

To meet these deadlines, the Company needed to promptly commence work to clear the spectrum.  The Company's existing satellites were created to access the entire C-band spectrum (3700–4200 MHz)— that is, the Company's existing satellites were constructed with a portion of their transponders configured exclusively to use the now-reallocated portion of the C-band.  The Company must transition customers, who historically have uploaded content to one of the twenty-four C-band transponders on the Company's satellites, which then download content to affiliated cable facilities for distribution within a franchise area.

---

[25]    The C-band is uniquely suited to help facilitate the transition to 5G, as it offers a balance of higher speeds with reliable signal propagation that will help network operators provide expansive 5G coverage.

Following C-band clearance, only nine transponders per satellite will be available for upload and download, thereby significantly reducing the Company's ability to provide services to its customers. While these existing satellites will still be able to operate in the 4000–4200 MHz portion of the spectrum, their overall effectively available capacity will be significantly reduced.

To address the reduced capacity of its existing satellites resulting from compliance with the FCC Order, the Company has finalized agreements for the manufacture and launch of seven additional satellites to maintain the Company's current satellite communications operations. In addition to the costs for the manufacturing of new satellites, launch contracts, and associated insurance and project management costs, the Company is advancing three other major initiatives (a) installing approximately 20,000 radio frequency filters on an estimated 22,500 antennas in about 10,500 different earth station locations for over 70 content distribution customers; (b) relocating and consolidating several existing urban ground station sites by constructing and bringing into use only two new rural locations; and (c) funding and coordinating upgrades to compression technology to provide service continuity while significantly reducing bandwidth consumed, to ten or more of the Company's largest C-band customers.

The Debtors have made substantial progress toward clearing the C-band, and the Company is on track to meet all requirements set forth in the FCC Order to remain eligible for the nearly $5 billion in Accelerated Relocation Payments. On August 14, 2020, License filed its Transition Plan reflecting revisions made in response to comments received from the FCC and interested parties. On September 17, 2020, the Company announced that it had finalized all required contracts with satellite manufacturers and launch-vehicle providers to move forward and meet the accelerated C-band spectrum clearing timelines established by the FCC. As of July 31, 2021, the Debtors had incurred C-band clearing related costs and expenses of $1.038 billion, of which $971 million is expected to be reimbursable under the FCC Order. On October 28, 2020, License filed a revised version of its final C-band spectrum transition plan with the FCC.

On December 8, 2020, the FCC began the C-band auction as contemplated by the FCC Order. The clock phase of the auction recently closed with gross proceeds of approximately $80.9 billion. The assignment phase of the auction commenced February 8, 2021, and concluded on February 24, 2021, yielding over $81 billion in gross proceeds.

### D.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $14.8 billion of third-party funded debt obligations, with an annual interest expense of approximately $1.13 billion. The following simplified organizational chart and table depicts the Debtors' prepetition capital structure as of the Petition Date:

| Obligation | Maturity | Approximate Annual Interest Expense | Approximate Principal Amount Outstanding |
|---|---|---|---|
| Intelsat S.A. 4.5% Convertible Senior Notes | June 2025 | $18.1 million | $402.5 million |
| 2021 Lux Senior Notes | June 2021 | $32.6 million | $421.2 million |
| 2023 Lux Senior Notes | June 2023 | $72.2 million | $888.3 million |
| 2024 Lux Senior Notes | Nov. 2024 | $13.1 thousand | $0.1 million |
| 2023 Connect Senior Notes | Feb. 2023 | $118.8 million | $1.25 billion |
| 2023 Jackson Senior Notes | Aug. 2023 | $109.2 million | $1.985 billion |
| 2024 Jackson Senior Notes | Oct. 2024 | $250.8 million | $2.95 billion |
| 2025 Jackson Senior Notes | July 2025 | $183.8 million | $1.885 billion |
| 8.00% First Lien Notes | Feb. 2024 | $108.0 million | $1.3497 billion |
| 9.50% First Lien Notes | Sept. 2022 | $46.6 million | $490 million |
| Intelsat Jackson LIBOR + 3.75% Senior Secured First Lien Term Loan – Tranche B-3 | Nov. 2023 | $113.6 million[26] | $2.0 billion |
| Intelsat Jackson LIBOR + 4.5% Senior Secured First Lien Term Loan – Tranche B-4 | Jan. 2024 | $25.4 million[27] | $395 million |
| Intelsat Jackson 6.625% Senior Secured Term Loan – Tranche B-5 | Jan. 2024 | $46.4 million | $700 million |
| **Total:** | | **$1.13 billion** | **$14.8 billion** |

---

[26]    Based on LIBOR of 1.932%, pursuant to the Company's hedging contracts prior to the Petition Date.

[27]    Based on LIBOR of 1.932%, pursuant to the Company's hedging contracts prior to the Petition Date.

**Simplified Structure Chart**

| Outstanding Third Party Debt | | | |
|---|---|---|---|
| **Convertible Senior Notes** | | | |
| 4.5% | Senior Convertible Notes due | 2025 | $402.5mm |
| **LuxCo Senior Notes** | | | |
| 7.75% | Senior Notes due | 2021 | $421.2mm |
| 8.125% | Senior Notes due | 2023 | $888.3mm |
| **LuxCo Senior Notes** | | | |
| 12.5% | Senior Notes due | 2024 | $.01mm |
| **Connect Senior Notes** | | | |
| 9.5% | Senior Notes due | 2023 | $1,250.0mm |
| **Jackson Senior Secured Notes** | | | |
| 9.5% | Senior Secured Notes due | 2022 | $490.0mm |
| 8% | Senior Secured Notes due | 2024 | $1,349.7mm |
| **Jackson Senior Notes** | | | |
| 5.5% | Senior Notes due | 2023 | $1,985.0mm |
| 8.5% | Senior Notes due | 2024 | $2,950.0mm |
| 9.75% | Senior Notes due | 2025 | $1,885.0mm |
| **Jackson Secured Credit Agreement** | | | |
| B-3 | Tranche Term Loan due | 2023 | $2,000.0mm |
| B-4 | Tranche Term Loan due | 2024 | $395.0mm |
| B-5 | Tranche Term Loan due | 2024 | $700.0mm |

**Total Enterprise Debt = $14,716.8mm**

★      **Primary Obligor**



1. *Prepetition First Lien Credit Facility*

As of the Petition Date, the Prepetition Obligors were jointly and severally indebted and liable to the Term Loan Facility Lenders in an aggregate amount of approximately $3,114,786,736, which consisted of (x) approximately $3,095,000,000 in principal amount of term loans advanced under the Prepetition Credit Agreement, plus (y) approximately $19,786,736 on account of accrued and unpaid interest thereon as of the Petition Date.

2. *Prepetition First Lien Notes*

As of the Petition Date, the Prepetition Obligors were jointly and severally indebted and liable to (a) the holders of 9.50% First Lien Notes in the aggregate amount of approximately $495,560,139, which consisted of (x) approximately $490,000,000 in principal amount, plus (y) approximately $5,560,139 on account of accrued and unpaid interest thereon as of the Petition Date and (b) holders of 8.00% First Lien Notes in the aggregate amount of approximately $1,376,071,703, which consisted of (x) approximately $1,349,678,000 in principal amount of 8.00% First Lien Notes, plus (y) no less than approximately $26,393,703 on account of accrued and unpaid interest thereon as of the Petition Date.

3. *Jackson Senior Notes*

On June 5, 2013, Intelsat Jackson issued $2.0 billion in aggregate principal amount of senior notes under the 2023 Jackson Senior Notes Indenture. As of the Petition Date, there was approximately $1.985 billion in principal outstanding under the 2023 Jackson Senior Notes. As of the Petition Date, approximately $30,980,000 in interest has accrued.

On September 19, 2018, Intelsat Jackson issued $2.25 billion in aggregate principal amount of senior notes under the 2024 Jackson Senior Notes Indenture. As of the Petition Date, there was approximately $2.95 billion in principal outstanding under the 2024 Jackson Senior Notes. As of the Petition Date, approximately $144,870,000 in interest has accrued.

On July 5, 2017, Intelsat Jackson issued $1.5 billion in aggregate principal amount of senior notes under the 2025 Jackson Senior Notes Indenture. In October 2018, Intelsat Jackson completed an add-on offering of $400 million in aggregate principal amount of the 2025 Jackson Senior Notes. As of the Petition Date, there was approximately $1.885 billion in principal outstanding under the 2025 Jackson Senior Notes. As of the Petition Date, approximately $60,240,000 in interest has accrued.

4. *Connect Senior Notes*

On August 16, 2018, ICF issued $1.25 billion in aggregate principal amount of senior notes under the Connect Senior Notes Indenture. Pursuant to the Connect Senior Notes Indenture, the Connect Senior Notes bear interest at a rate of 9.5 percent per year, payable semi-annually on June 15 and December 15 of each year, and will mature on February 15, 2023. As of the Petition Date, there was approximately $1.25 billion in principal outstanding under the Connect Senior Notes. As of the Petition Date, approximately $48,820,000 in interest has accrued.

5. *LuxCo Senior Notes*

On April 5, 2013, LuxCo issued three separate senior notes under the Intelsat Lux Multi Senior Notes Indenture. Under the Intelsat LuxCo Multi Senior Notes Indenture, LuxCo issued: (a) $500 million in aggregate principal amount of notes bearing interest at a rate of 6.75 percent per year, payable semi-annually on June 1 and December 1 of each year that would have matured on June 1, 2018; (b) $2 billion in aggregate principal amount of notes bearing interest at a rate of 7.75 percent per year,

payable semi-annually on June 1 and December 1 of each year that will mature on June 1, 2021; and (c) $1 billion in aggregate principal amount of notes bearing interest at a rate of 8.125 percent per year, payable semi-annually on June 1 and December 1 of each year that will mature on June 1, 2023. In May 2018, LuxCo redeemed certain of the notes under the Intelsat LuxCo Multi Senior Notes Indenture. As of the Petition Date, there was approximately $421.2 million in principal outstanding under the 2021 LuxCo Senior Notes and $900 million in principal outstanding on the 2023 LuxCo Senior Notes. As of the Petition Date, approximately $14,690,000 in interest has accrued under the 2021 LuxCo Senior Notes and approximately $32,480,000 in interest has accrued under the 2023 LuxCo Senior Notes.

On January 6, 2017, LuxCo issued approximately $403.3 million in aggregate principal amount of senior notes under the 2024 LuxCo Senior Notes Indenture. As of the Petition Date, approximately $6,950,000 in interest has accrued. Pursuant to the 2024 LuxCo Senior Notes Indenture, the 2024 Intelsat LuxCo Senior Notes bear interest at a rate of 12.5 percent per year, payable semi-annually on November 15 and May 15 of each year, and will mature on November 15, 2024. The majority of the 2024 LuxCo Senior Notes are held intercompany by certain of the Debtors.

On August 16, 2018, Intelsat Luxembourg S.A. issued approximately $1.579 billion in aggregate principal amount of senior notes to ICF and Envision. As of the Petition Date, there was approximately $1.579 billion in principal outstanding under the 2026 LuxCo Senior Notes. As of the Petition Date, approximately $371,000,000 in interest has accrued on the 2026 LuxCo Senior Notes. The 2026 LuxCo Senior Notes are held intercompany by ICF and Envision.

### 6.  *Convertible Senior Notes*

On June 18, 2018, Intelsat S.A. issued $402.5 million in aggregate principal amount of convertible senior notes under an indenture dated as of June 18, 2018, by and among Holdings, as issuer, Envision, as guarantor, and U.S. Bank, as trustee. Pursuant to the Convertible Senior Notes Indenture, the Convertible Senior Notes bear interest at a rate of 4.5 percent per year, payable semi-annually on June 15 and December 15 of each year, and will mature on June 15, 2025. Subject to certain adjustments, holders may convert their Convertible Senior Notes into common shares at a ratio of 55.0085 common shares per $1,000 principal amount of Convertible Senior Notes. As of the Petition Date, there was approximately $402.5 million in principal outstanding under the 2025 Convertible Senior Notes.

### 7.  *Intelsat S.A. Prepetition Common Stock*

Intelsat S.A.'s certificate of incorporation authorizes the board of directors to issue any class of shares. As of the Petition Date, the Debtors had approximately 142,085,774 shares of common stock outstanding. The number of common stock outstanding includes the Series A Preferred Shares issued in the Company's IPO, which were converted to common equity in May 2016. The Debtors have never declared or paid any Cash dividends to holders of Intelsat S.A. common stock.

## VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS

The Debtors commenced these Chapter 11 Cases to efficiently access capital and engage with stakeholders through a chapter 11 process. The Debtors required access to capital to meet two unexpected, external challenges: (a) the requirement to clear the C-band in order to obtain up to $4.87 billion in Accelerated Relocation Payments and (b) address the significant reduction in revenue and Cash flow associated with the global COVID-19 pandemic. The Debtors' ability to meet these challenges was limited by the Debtors' prepetition capital structure, which, as discussed, includes approximately $14.8 billion in total outstanding funded debt obligations, with annual debt service payments totaling approximately $1.13 billion.

**A.    Additional Capital Required to Comply with the FCC's February 28, 2020 C-Band Order**

The C-Band Alliance was formed to enable a private auction of C-band spectrum.  Various economic analyses estimated the value of the portion of the spectrum that the FCC proposed to be reallocated to be between $43 billion and $77 billion.  Based on these estimates, the C-Band Alliance proposed to the FCC that existing operators should receive at least half the value of the total auction proceeds for vacating it for 5G use—in the Company's case, at least $20 billion.

Unfortunately, the FCC Order—which provided for a fundamentally different public sale process in which the C-Band Alliance would play no role, with limited compensation available to current C-band licensees—dramatically reduced the amount the Debtors expected to receive and imposed significant delay on the Debtors' ability to obtain reimbursement for the costs associated with their C-band clearing efforts.

The Debtors estimate the total cost of their endeavors to meet the FCC's Accelerated Relocation Payment deadlines and clear the C-band spectrum will ultimately total $1.6 billion, of which approximately $1.2 billion will be spent through December 2021.  The cost of building and launching the required new satellites alone totals over $1 billion.

Significantly, while the FCC Order provides that the Debtors' clearing costs will eventually be reimbursed, those reimbursements are not expected to begin until late-2021.  Until that time, the Debtors have and will continue to incur hundreds of millions of dollars in unreimbursed cumulative clearing costs.  The Debtors would have been unable to fund their respective portions of these necessary clearing expenses while servicing their current debt obligations, maintaining their financial covenants, and meeting their operating requirements.

**B.    The COVID-19 Pandemic**

In addition to the working capital challenges posed by the FCC Order, the Debtors (like many businesses) face additional operating and financial pressure from the impacts of the COVID-19 pandemic.  The COVID-19 pandemic has had a devastating impact on the worldwide economy, and particularly on many of the Debtors' important customers in the airline, maritime, energy, and media industries.  As a result of both the spread of COVID-19 and the various governmental responses, consumer travel declined precipitously in 2020.  The Debtors, among other things, are one of the largest providers of broadband services to airlines and cruise ship customers for passenger Internet connectivity, and revenues from those businesses, and businesses in the energy industry, have declined accordingly.  Similarly, the Debtors' media business has been a leader in broadcasting occasional use events such as live sports and concerts.  Government restrictions on such events have reduced the Debtors' associated broadcast revenue dramatically.  Notably, the pandemic, and the attendant economic contraction, was a material factor in the chapter 11 filings of at least three of the Debtors' customers, distributors, or other stakeholders.

Despite these conditions, the Debtors have continued to deliver critical satellite communications to the end users of its customers' services, whether first responders and emergency service providers or people who unavoidably must travel by air or sea as a result of the COVID-19 pandemic.  However, the Debtors revenue and cash flows have been materially impacted in 2020 and 2021 as a result of the COVID-19 pandemic.  The global pandemic will put even greater pressure on the cash flows and working capital the Debtors need to fund their ordinary operations, meet their debt service obligations, and clear the C-band spectrum in accordance with the FCC Order.

C.     **Contingency Planning**

In February and March 2020, the Debtors retained K&E, PJT, and A&M to assist them in navigating the complex interaction of the requirements under the FCC Order and their liquidity situation, and began to seek alternative capital sources, including financing from third parties.

The Debtors and their advisors exhaustively surveyed and explored all potential avenues to effectuate a liability management transaction, including by identifying and approaching numerous potentially interested strategic investors in the telecommunications, aerospace and defense, satellite services, and emerging space sectors with whom the Debtors could negotiate a potential value-maximizing out-of-court transaction.  Given the Debtors' existing financial leverage, the nature of the FCC Order, and the Debtors' current and future business prospects, particularly as adjusted for the impact of COVID-19, the Debtors also began exploring the possibility of accessing chapter 11 relief and DIP financing to address their liquidity needs.

Realizing that chapter 11 proceedings may be required to enable the Debtors to restructure their operations and to obtain access to the capital required to clear the C-band spectrum on the FCC's expedited timeline, the Debtors began to evaluate the required size of a postpetition financing facility for the proceedings, identified potential sources of postpetition funding, and began a robust and competitive marketing process for postpetition financing, with the aim of achieving the best terms possible.

D.     **Establishment of the Special Committees and Appointment of the Disinterested Directors**

The boards of directors of Intelsat S.A., LuxCo, Envision, ICF, and Jackson each established a Special Committee and appointed Disinterested Directors to serve on each respective Special Committee.

Each applicable board of directors delegated to its Special Committee the authority to investigate and determine, in the Special Committee's business judgment, whether any matter involves a Conflict Matter, including any conflict of interest between the applicable Debtor and any Related Party, including, affiliates, equity holders, subsidiaries, directors, and managers.

Each applicable board of directors delegated to its Special Committee the authority to take any action with respect to the Conflict Matters, as determined in the sole judgment of the Disinterested Directors, including, any release or settlement of potential Claims or Causes of Action of the applicable Debtor or its subsidiaries, if any, and any other transaction implicating the Company or its subsidiaries.

The Special Committees are authorized and empowered, at the expense of the applicable Debtors, to retain and employ legal, financial, and other advisors to advise and assist it in connection with fulfilling its duties.  Each of the Special Committees retained separate advisors from those representing the Debtors.

E.     **Entry into the Grace Period, the Guarantee Releases, and Related Asserted Claims**

In an effort to conserve liquidity as the Debtors assessed their strategic alternatives, on April 15, 2020, Intelsat and certain of its affiliates elected to withhold a $125 million interest payment due April 15, 2020, on the Jackson 8.5% Senior Notes Indenture Due 2024 and entered into a 30-day grace period, provided for in the applicable indenture, to preserve liquidity as the Company continued to engage with key stakeholders and further progress discussions regarding financing and restructuring options.

Prior to filing voluntary bankruptcy petitions, Intelsat S.A., Holdings SARL, Holdings, Investments, LuxCo, and ICF (collectively, the "Parent Guarantors") elected to release their guarantees (the "Parent Guarantees") of five prepetition funded debt instruments (the releases, collectively, the "Guarantee Releases") pursuant to section 10.01(k) of each applicable indenture.  Section 10.01(k) of

68

each indenture is substantially identical and provides in relevant part: "Any Guarantee given by any Parent of the Issuer may be released at any time upon written notice to the Trustee from such Parent of the Issuer." Specifically:

- Intelsat S.A. released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; (iii) Jackson 9.75% Senior Notes due 2025; (iv) LuxCo 7.75% Senior Notes due 2021; and (v) LuxCo 8.125% Senior Notes due 2023;

- Holdings SARL released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; (iii) Jackson 9.75% Senior Notes due 2025; (iv) LuxCo 7.75% Senior Notes due 2021; and (v) LuxCo 8.125% Senior Notes due 2023;

- Holdings released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; (iii) Jackson 9.75% Senior Notes due 2025; (iv) LuxCo 7.75% Senior Notes due 2021; and (v) LuxCo 8.125% Senior Notes due 2023;

- Investments released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; (iii) Jackson 9.75% Senior Notes due 2025; (iv) LuxCo 7.75% Senior Notes due 2021; and (v) LuxCo 8.125% Senior Notes due 2023;

- LuxCo released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; and (iii) Jackson 9.75% Senior Notes due 2025;

- ICF released its guarantees of the (i) Jackson 5.5% Senior Notes due 2023; (ii) Jackson 8.5% Senior Notes due 2024; and (iii) Jackson 9.75% Senior Notes due 2025.

Notwithstanding the Guarantee Releases, U.S. Bank, in its capacity as indenture trustee under the Jackson 5.5% Senior Notes due 2023, the Jackson Senior Notes due 2024, and the Jackson 9.75% Senior Notes due 2025 (collectively, the "Jackson Senior Notes"), filed proofs of claim against S.A., Holdings SARL, Holdings, Investments, LuxCo, and ICF for the full outstanding amount under the Jackson Senior Notes (the "Jackson Parent Guarantee Claims"). Additionally, Delaware Trust Company ("Delaware Trust"), in its capacity as indenture trustee under the LuxCo Senior Notes filed proofs of claim against S.A., Holdings SARL, Holdings, and Investments for the full outstanding amount under the LuxCo Senior Notes (the "LuxCo Parent Guarantee Claims," and together with the Jackson Parent Guarantee Claims, the "Guarantee Claims").

On February 10, 2021, the Convert Ad Hoc Group filed the *Objection of Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by U.S. Bank National Association, as Indenture Trustee* [Docket No. 1455] (the "Converts' Jackson Notes Objection") and the *Objection of Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by the Delaware Trust Company, as Successor Trustee* [Docket No. 1463] (the "Converts' LuxCo Notes Objection" and together with the Jackson Parent Guarantee Claim Objection, the "Converts' Objections"). In the Converts' Objections, the Convert Ad Hoc Group asserted that the Guarantee Releases were valid under the terms of each of the governing indentures and applicable law and not subject to avoidance and, therefore, the Guarantee Claims do not assert valid claims, in so far as they assert claims against certain of the Parent Guarantors[28] on the basis of any alleged obligation to guarantee the Jackson Senior Notes or the LuxCo Senior Notes.

---

[28]   The Convert Ad Hoc Group objected to the Guarantee Claims filed against S.A., Investments, Holdings, and Holdings SARL, but did not object to the Guarantee Claims filed against LuxCo or ICF.

69

The Converts' Objections were initially scheduled for a hearing on March 17, 2021. Then, on March 9, 2021, the Convert Ad Hoc Group agreed to adjourn the Converts' Objections until June 14, 2021, which was the anticipated date of the Debtors' Confirmation Hearing at the time, and reserved the right to seek another hearing on the Converts' Objections, should the need arise.

On March 12, 2021, U.S. Bank filed the *Response of U.S. Bank National Association, as Indenture Trustee for the Jackson Unsecured Notes, to the Objection of the Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by U.S. Bank National Association, as Indenture Trustee* [Docket No. 1622] and the Jackson Crossover Ad Hoc Group filed the *Opposition of the Jackson Crossover Group to the Objection of the Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by U.S. Bank National Association, as Trustee* [Docket No. 1623] (together, the "Responses to the Converts' Jackson Notes Objection"). The Responses to the Converts' Jackson Notes Objection each dispute the validity of the Guarantee Releases, asserting that they may have been prohibited by the terms of the governing indentures or applicable law and that they may be subject to avoidance. The Responses to the Converts' Jackson Notes Objections also indicate that U.S. Bank and the Jackson Crossover Ad Hoc Group intend to seek discovery in connection with, among other things, the purpose of the Parent Guarantees and the circumstances of the Guarantee Releases.

Then, on March 17, 2021 U.S. Bank and the Jackson Crossover Ad Hoc Group filed the *Joint Motion of U.S. Bank National Association, as Indenture Trustee for the 2024 Notes, and the Jackson Crossover Group for Partial Summary Judgment of the Objection of the Ad Hoc Group of Convertible Noteholders to Proof of Claim Filed by U.S. Bank National Association, as Indenture Trustee* [Docket No. 1680] (the "Motion for Partial Summary Judgment on the Converts' Jackson Notes Objection"). In the Motion for Partial Summary Judgment on the Converts' Jackson Notes Objection, U.S. Bank and the Jackson Crossover Ad Hoc Group sought judgement as a matter of law that the Debtors were in material breach of the indentures for the Jackson Senior Notes because (a) the Debtors had entered into a 30-day grace period after failing to make payment on April 15, 2020 under the 8.5% Jackson Senior Notes due 2024 (the "Jackson 2024 Notes") and (b) the board decision authorizing the commencement of these Chapter 11 Cases, prior to missing the April 15, 2020 interest payment, constitutes a material anticipatory breach of the indenture for the 2024 Notes. Ultimately, the Motion for Partial Summary Judgment on the Converts' Jackson Note Objection seeks denial of the Converts Ad Hoc Group's request to disallow the Guarantee Claims filed against the Parent Guarantors in connection with their guarantees of the Jackson 2024 Notes. U.S. Bank and the Jackson Crossover Ad Hoc Group originally scheduled the Motion for Partial Summary Judgment on the Converts' Jackson Notes Objection for hearing on April 14, 2021.

Then, on March 19, 2021, the HoldCo Creditor Ad Hoc Group filed the *Objection of the Ad Hoc Committee of Parent Company Creditors to Proofs of Claim Filed by U.S. Bank National Association, as Jackson Unsecured Notes Trustee for the Jackson Unsecured Notes* [Docket No. 1700] (the "HoldCo Creditors' Objection," and together with the Converts' Objections, the "Guarantee Claims Objections"). In the HoldCo Creditors' Objection, the HoldCo Creditor Ad Hoc Group joined the Converts' Jackson Note Objection with respect to Intelsat S.A., Investments, Holdings, and Holdings SARL and objected to the Guarantee Claims asserted against ICF and LuxCo in connection with the Jackson Senior Notes on substantially the same bases as were asserted in the Converts' Objections. The HoldCo Creditor Ad Hoc Group originally scheduled the HoldCo Creditors' Objection for a hearing on May 13, 2021.

In response to the HoldCo Creditors' Objection, on March 24, 2021, the Jackson Crossover Group filed the *Opposition of the Jackson Crossover Ad Hoc Group to the Objection of the Ad Hoc Committee of Parent Company Creditors to Proofs of Claim Filed by U.S. Bank National Association as Jackson Unsecured Notes Trustee for the Jackson Unsecured Notes* [Docket No. 1727] and U.S. Bank filed the *Response of U.S. Bank National Association as Indenture Trustee for the Jackson Unsecured Notes, to the Objection of the Ad Hoc Committee of Parent Company Creditors to Proofs of Claim Filed by U.S. Bank*

70

*National Association, as Jackson Unsecured Notes Trustee for the Jackson Unsecured Notes* [Docket No. 1726] (together, the "Responses to the HoldCo Creditors' Objection," and together with the Responses to the Converts' Jackson Notes Objection, the "Objection Responses"). Shortly thereafter, on March 24, 2021, the Jackson Crossover Ad Hoc Group and U.S. Bank filed the *Joint Motion of U.S. Bank National Association, as Indenture Trustee for the 2024 Notes, and the Jackson Crossover Group for Partial Summary Judgment on the Objection of the Ad Hoc Committee of Parent Company Creditors to Proofs of Claim Filed by U.S. Bank National Association, as Jackson Unsecured Notes Trustee for the Jackson Unsecured Notes* (the "Motion for Partial Summary Judgment on the HoldCo Creditors' Objection," and together with the Motion for Partial Summary Judgment on the Converts' Jackson Notes Objection, the "Motions for Partial Summary Judgment"). The Responses to the HoldCo Creditors' Objections and the Motion for Partial Summary Judgment on the HoldCo Creditors' Objection each made arguments that are substantially similar to arguments asserted in the responses and motion for partial summary judgement filed by U.S. Bank and the Jackson Crossover Ad Hoc Group regarding the Converts' Jackson Note Objection. U.S. Bank and the Jackson Crossover Group originally scheduled the Motion for Partial Summary Judgement on the HoldCo Creditors' Objection for a hearing on April 14, 2021.

In response to the March 24, 2021 joint motions filed by the Jackson Crossover Ad Hoc Group and U.S. Bank, on March 31, 2021, the Convert Ad Hoc Group filed the *Ad Hoc Group of Convertible Noteholders' (I) Objection to Joint Motion of U.S. Bank National Association, as Indenture Trustee for the 2024 Notes, and the Jackson Crossover Group for Partial Summary Judgment and (II) Cross-Motion for Partial Summary Judgment on the Objection to Proofs of Claim Filed by U.S. Bank National Association, as Indenture Trustee* [Docket No. 1769] (the "Convert Cross Motion").

On April 7, 2021, the HoldCo Creditor Ad Hoc Group filed *The Ad Hoc Committee of Parent Company Creditors' (A) Objection to the Joint Motions of the Jackson Unsecured Notes Trustee and the Jackson Crossover Group for Partial Summary Judgment on the Guarantee Claims Objections and (B) Cross-Motion for Entry of An Order Granting (I) Partial Summary Judgment and (II) Related Relief* [Docket No. 1805] (the "HoldCo Cross Motion" and, together with the Convert Cross Motion, the "Cross Motions") in response to the March 24, 2021 joint motions filed by the Jackson Crossover Ad Hoc Group and U.S. Bank as well as a joinder to the Convert Ad Hoc Group's March 31, 2021 objection and cross-motion for partial summary judgment [Docket No. 1807].

On April 13, 2021, the court entered the *Stipulated Order Adjourning Guarantee-Related Motions and Cross-Motions for Summary Judgement and Regarding Anticipated Motion of the Jackson Crossover Group for Temporary Allowance* [Docket No. 1852] (the "Stipulated Order"), which adjourned the various guarantee-related pleadings without a date. Additionally, the Stipulated Order provided that the Jackson Crossover Ad Hoc Group would file a motion for temporary allowance of certain of the claims filed by U.S. Bank no later than 14 days before the hearing on the adequacy of the Disclosure Statement, to be heard at such hearing.

On April 21, 2021, Delaware Trust filed the *Response of Delaware Trust Company to Objection of Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by Delaware Trust Company as Successor Trustee* [Docket No. 2045]. This Response disputes the validity of the Guarantee Releases, asserting that they may have been prohibited by the terms of the governing indentures or applicable law and that they may be subject to avoidance. It also incorporates by reference the arguments raised by U.S. Bank with respect to the Jackson Notes by incorporating by reference the Responses to the Converts' Jackson Notes Objection.

On August 16, 2021, the Convert Ad Hoc Group filed a joinder to the HoldCo Creditor Ad Hoc Group's April 7 objection and cross-motion for partial summary judgment [Docket No. 1805].

71

Finally, on August 17, 2021, the Debtors filed *the Debtors' Objection to the Joint Motion of U.S. Bank National Association, Indenture Trustee for the 2024 Notes, and the Jackson Crossover Group for Partial Summary Judgment on the Objection of the Ad Hoc Group of Convertible Noteholders to Proofs of Claim Filed by U.S. Bank National Association, as Indenture Trustee* [Docket No. 2622]. In their objection, the Debtors requested that the court deny the Motions for Partial Summary Judgment and instead grant the Cross Motions.

In the face of substantial and good-faith disagreement set forth in the numerous pleadings described above and the material impact that the Guarantee Claims have on voting and recovery under any chapter 11 plan, the relevant parties engaged in negotiation on a consensual resolution to the Guarantee Claims in the context of the broader Mediation and Amended Plan negotiations. Such a resolution could obviate the need for time-consuming and value destructive litigation, while also serving as a potential cornerstone for a broader consensual plan of reorganization.

Ultimately, the Debtors, the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group reached a resolution that would, among other things, provide for the adjournment of any litigation concerning the ~~HoldCo~~ Guarantee Claims and, upon consummation of the Amended Plan, the withdrawal with prejudice of ~~such claims~~the HoldCo Guarantee Claims. To the extent that the standstill set forth in the Amended Plan Support Agreement remains in effect, the Jackson Crossover Ad Hoc Group agreed to cease prosecuting, and direct U.S. Bank to cease prosecuting, the Guarantee Claims against Holdings, Investments, LuxCo and ICF and such claims will be ultimately withdrawn. The parties agreed that 30 percent of any distributions made on account of TopCo Guarantee Claims against Intelsat to the Jackson Senior Notes Trustees shall be distributed Pro Rata to Holders of Connect Senior Notes Claims in consideration for the covenants, compromises, releases, and other benefits provided by the members of the HoldCo Creditor Ad Hoc Group pursuant to the Plan Support Agreement; *provided* that the aggregate value of such distribution shall not exceed $6 million.

Nothing in the Amended Plan Support Agreement shall prevent the Jackson Crossover Ad Hoc Group from (1) seeking entry of an order allowing a Guarantee Claim (whether on a temporary or final basis) against, or seeking a distribution from, the TopCo Guarantors or (2) defending any Guarantee Claim asserted against the HoldCo Guarantors or TopCo Guarantors against objections or challenges from any party; *provided*, that (i) any hearing regarding the merits of any Guarantee Claim against any TopCo Guarantor shall occur contemporaneously with the Confirmation Hearing, and in no event shall any such hearing occur prior to the Confirmation Hearing, (ii) no hearing regarding the merits of any Guarantee Claim against any HoldCo Guarantor may occur until after the Confirmation Hearing (except as provided in Section 7.05(h)), and (iii) the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Company Parties will each support the Bankruptcy Court's entry of the Guarantee Litigation Scheduling Order.

### F.    DIP Financing

As the COVID-19 pandemic deepened, and realizing that chapter 11 proceedings may be required to address the Debtors' liquidity needs and capital structure, the Debtors, with the assistance of their advisors, began to evaluate the required size of a postpetition financing facility for the Chapter 11 Cases, identified potential sources of postpetition funding, and began a robust and competitive marketing process for postpetition financing.

Prior to the Petition Date, the Debtors and their advisors solicited interest from ten (10) financial institutions to determine the extent to which third parties may be willing to provide DIP financing to the Debtors. Of these financial institutions eight (8) executed confidentiality agreements and received private information about the Debtors' business, operations, and liquidity position. The Debtors received multiple proposals for DIP financing, including for the DIP Facility, a $1 billion superpriority senior secured priming

multi-draw term loan credit facility proposed by the Jackson Ad Hoc Group.  After weeks of negotiation and analysis, the Debtors and their advisors determined that the DIP Facility was the best option available to the Debtors.  During the time between the Petition Date and entry of the Final DIP Order on June 9, the Debtors were able to build complete consensus around the DIP Facility.  As of the Petition Date, the DIP Facility was to be provided by the Jackson Ad Hoc Group, but following robust negotiations and certain modifications to the terms of the DIP Facility, the Debtors ultimately reached agreement with both the Jackson Ad Hoc Group and the Jackson Crossover Ad Hoc Group on the terms of the DIP Facility, which was ultimately provided by the constituents of each group.  The Debtors also engaged with, and gained the support for the DIP Facility of, the HoldCo Creditor Ad Hoc Group, the U.S. Trustee, and the Creditors' Committee.

The DIP Facility has provided the capital necessary for Jackson and its subsidiaries to pay for the clearing costs, maintain the adequate Cash balance given the capital-intensive nature of the Company's businesses, and—because of the sizable investment basket contained in the DIP Credit Agreement, as amended—enabled it to pursue strategic opportunities during these Chapter 11 Cases, such as the Gogo Transaction.

## VII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First and Second Day Relief and Other Case Matters

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of David Tolley, Executive Vice President, Chief Financial Officer, and Co-Chief Restructuring Officer of Intelsat S.A. in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 6].  At a hearing on May 15, 2020, the Bankruptcy Court granted all of the relief initially requested in the First Day Motions.[29]

On June 9, 2020, the Debtors held their second day hearing, at which the Bankruptcy Court granted certain of the first day relief on a final basis, including authority  to continue to pay employee wages and benefits, pay certain Taxes, continue the cash management system, and pay certain vendor claims in the ordinary course.

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of these Chapter 11 Cases and ease administrative burdens, including certain retention applications seeking to retain certain professionals postpetition pursuant to sections 327 and 328 of the Bankruptcy Code, including K&E as legal counsel to the Debtors, Kutak Rock LLP as co-counsel to the Debtors, PJT as investment banker to the Debtors, A&M as restructuring advisor to the Debtors, and legal and financial advisors to the Special Committees, among others.

### B.    Appointment of Official Committee of Unsecured Creditors

On May 27, 2020, the U.S. Trustee Filed a notice [Docket No. 193] appointing the Creditors' Committee.  The Committee is currently composed of the following members: The Boeing Company; the PBGC; Delaware Trust Company; Tysons Corner Office I, LLC; U.S. Bank, National Association, BOKF,

---

[29]   The First Day Motions, the First Day Declaration, and all orders for relief granted in these cases can be viewed free of charge at https://cases.stretto.com/Intelsat.

N.A.; and JSAT International, Inc.  The Committee has retained Milbank LLP as its legal counsel, Hunton Andrews Kurth LLP as Virginia counsel, FTI Consulting as its financial advisor, and Moelis & Company as investment banker.

### C.      Schedules and Statements, Claims Bar Date and Exclusivity Extension

On July 11, 2020, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs.

On June 9, 2020, the Bankruptcy Court entered an order (the "Bar Date Order") establishing August 17, 2020 as the general claims bar date and November 16, 2020 as the governmental claims bar date [Docket No. 518].  On or before July 15, 2020, the Debtors served notice of the bar dates in accordance with the Bar Date Order.  On or before July 15, 2020, the Debtors published notice of the bar dates in accordance with the Bar Date Order.

Any party required to file a Proof of Claim under the Bar Date Order that failed to do so before the applicable bar date is forever barred, estopped, and enjoined from asserting such claim against the Debtors and the Debtors will be forever discharged from any indebtedness or liability relating to such claim.  Such party will not be permitted to vote to accept or reject the Amended Plan or receive any recovery under the Amended Plan.

On September 2, 2021, the Bankruptcy Court entered an order extending the Debtors exclusive periods (a) to file a chapter 11 plan for each Debtor through and including February 15, 2021 and (b) to solicit acceptances thereof through and including April 12, 2021 [Docket No. 735].

On April 21, 2021, the Bankruptcy Court entered an order extending the Debtors exclusive periods (a) to file a chapter 11 plan for each Debtor through and including August 13, 2021 and (b) to solicit acceptances thereof through and including October 13, 2021 [Docket No. 2047].

On August 13, 2021, the Debtors file a motion seeking entry of an order further extending the Debtors exclusive periods (a) to file a chapter 11 plan for each Debtor through and including November 13, 2021 and (b) to solicit acceptances thereof through and including January 13, 2021 [Docket No. 2606].

### D.      Operational Achievements

During the course of these Chapter 11 Cases, the Debtors have continued to successfully manage their business, both on an ordinary-course basis and through other transactions, including:

- *Lien Release Motion* [Docket No. 190].  Obtaining authorization from the Bankruptcy Court to release certain liens and amend the Spaceflight Loan Agreement, which was a prerequisite to execute the sale of Spaceflight, Inc. to Mitsui & Co. (U.S.A.), Inc.—a transaction that enhanced the value of the Debtors' investment in Spaceflight Industries, Inc. and certain of its subsidiaries;

- *Speedcast 9019 Motion* [Docket No. 461].  Entering into a mutually beneficial long-term commercial agreement with long-time customer Speedcast Communications Inc., which provided for, among other things, the release of the Company's general unsecured claim in Speedcast's chapter 11 cases, and coordinating its approval in these and Speedcast's chapter 11 cases;

74

- *Horizons-4 Joint Venture* [Docket No. 833]. Entering into a new joint venture and agreement with long-time business partner, JSAT International, Inc. for replacing the Horizons-1/Galaxy 13 satellite, which must be addressed as part of the C-band clearing process with a Ku-band payload on the Galaxy 37 satellite;

- *Executory Contracts and Unexpired Leases* [Docket Nos. 1003, 1123, 1077, 1133, 1134, 1141, 1349, and 2160].[30] To date, the Debtors have finalized or are in process of finalizing decisions with respect to their ongoing agreements that constitute "Executory Contracts" or "Unexpired Leases" within the meaning of the section 365 of the Bankruptcy Code. The Debtors have filed notices rejecting certain executory agreements [Docket Nos. 1123, 1134] and filed notices assuming certain executory agreements [Docket Nos. 1003, 1077, 1133, 1141, 1349, and 2160]; and

- *SD Satellite Contract* [Docket No. 1268]. Entering into the "SD Satellite Contract" to manufacture two software-defined satellites which are expected to satisfy future customer demand primarily in the mobility sector across the Continental United States, North Atlantic, and other western hemisphere regions.

### E.  Gogo Commercial Aviation Purchase

#### 1.  *The Transaction*

As the Company stabilized its operations in chapter 11 and began engaging with creditors regarding a restructuring a transaction, it remained focused on returning the business to long-term growth. On August 31, 2020, Jackson and the Seller entered into the Purchase Agreement with respect to the Gogo Commercial Aviation business for $400 million in cash, subject to customary adjustments. Jackson funded the purchase price of the Gogo Transaction with proceeds from the DIP Facility and cash on hand. In connection with the Gogo Transaction, Jackson entered into an amendment to the credit agreement governing the DIP Facility to permit the transactions contemplated by the Purchase Agreement, which was approved by the Court in the *Order (I) Authorizing the Debtors to (A) Consummate a Proposed Transaction and (B) Enter Into an Amendment to the DIP Credit Agreement and (II) Granting Related Relief* [Docket No. 720] on August 31, 2020.

Pursuant to the Purchase Agreement, Jackson agreed to acquire 100 percent of the equity of Gogo LLC and Gogo International Holdings, which, together with their respective subsidiaries, comprised

---

[30] On May 10, 2021, the Debtors filed the *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 2160] (the "Rejection Notice") to reject certain contracts between Intelsat US LLC and Space-Communication Ltd. ("Spacecom"). The contracts listed in the notice of rejection include (i) that certain Coordination Agreement dated June 6, 2013 (the "Coordination Agreement"), and (ii) that certain Satellite Network Agreement dated June 6, 2013 (the "Satellite Network Agreement" and with the Coordination Agreement, collectively, the "Spacecom Agreements").

On May 24, 2021, Spacecom filed its *Objection and Reservation of Rights of Space-Communication Ltd. with Respect to Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases* [Docket No. 2247] (the "Spacecom Objection"). Spacecom argues that the Satellite Network Agreement is not an executory contract because, Spacecom alleges the only remaining obligation is Intelsat US LLC's obligation to pay the annual coordination fee of $650,000.00. Additionally, Spacecom alleges that the harm inflicted on third parties by the rejection of the Spacecom Agreements warrants the application of the public interest standard rather than the usual business judgement standard for contract rejection. Regardless, Spacecom argues that the rejection of the Spacecom Agreements does not meet either standard.

No hearing has been set on the Rejection Notice or the Spacecom Objection. Though a final resolution is outstanding, for purposes of the Amended Plan and this Disclosure Statement, the Debtors have assumed that Spacecom is entitled to a rejection damages claim in the amount of $5.2 million, attributable to the annual coordination fee ($650,000) multiplied by the number of years remaining on the Spacecom Agreements (8).

Gogo CA.  On September 11, 2020, Jackson assigned its rights and obligations arising under the Purchase Agreement to Aviation AcquisitionCo, an indirect subsidiary of Jackson.  After satisfaction of the closing conditions set forth in the Purchase Agreement, including the receipt of regulatory approvals from CFIUS and the FCC, the Gogo Transaction was consummated on December 1, 2020, and ownership of Gogo CA— the leading provider of commercial inflight broadband and entertainment services—was transferred to the Company.

### 2. *The Marketing Process and Creditor Engagement*

The Seller engaged in a private sale process for Gogo CA in which it pursued bids from multiple financial and strategic bidders (the "Sale Process").  The Debtors understand that the Seller was advised by a number of external advisors, including an investment bank and legal counsel, to facilitate and manage the Sale Process.

On June 24, 2020, the Seller formally invited the Debtors to submit a preliminary, non-binding indication of interest for Gogo CA by June 26, 2020.  The Debtors ultimately submitted a non-binding indication of interest on July 2, 2020, and were selected to participate in the next phase of the Sale Process. The Debtors understand that multiple other bidders also submitted non-binding indications of interest and were selected to participate in the next phase of the Sale Process.  During that phase, the Debtors received access to more detailed information from the Seller, including various accounting, finance, human resources, legal, and technical information regarding Gogo CA, as well as additional time with Gogo CA's management.

On July 8, 2020, the Seller delivered a process letter to the Debtors setting forth guidelines for the submission of a final proposal for the acquisition of Gogo CA.  The process letter contemplated that the final proposal would be due July 27, 2020.

On July 27, 2020, the Debtors submitted a revised non-binding indication of interest for Gogo CA to the Seller, subject to ongoing diligence, which included a proposal for a period of exclusivity for the Debtors, and the Seller to work on an expedited basis to complete the diligence process and negotiate the terms of the definitive documentation for the Gogo Transaction.  The Debtors understand that at this stage the Seller also received indications of interest from multiple other bidders.  Notably, in connection with its second quarter 2020 earnings release, the Seller publicly disclosed on August 10, 2020, that it had retained investment bankers and was in a process to sell Gogo CA, which provided an opportunity for any potential interested purchasers to come forward with higher and better proposals.

On August 16, 2020, the Seller granted the Debtors an exclusivity period through August 31, 2020, during which the Debtors completed their due diligence, continued to work through the key economic terms of the Gogo Transaction with the Seller, and the parties finalized definitive documentation of the Gogo Transaction with the Seller.

On August 31, 2020, following receipt of approval from the Bankruptcy Court, Jackson and the Seller executed the Purchase Agreement.

During the entirety of the Sale Process, the Debtors coordinated with the key stakeholders in these Chapter 11 Cases, including: (i) the Creditors' Committee; (ii) the Jackson Ad Hoc Group; (iii) the Jackson Crossover Ad Hoc Group; and (iv) the HoldCo Creditor Ad Hoc Group, as well as the U.S. Trustee.  The Debtors initially engaged with advisors to these stakeholders regarding the potential for the Gogo Transaction in mid-July 2020.  Their advisors were provided access to certain information on Gogo CA and the Sale Process to enable them to conduct their own diligence.  Additionally, the Debtors and their advisors had multiple telephone conferences with and gave several presentations to the advisors to these stakeholders on a variety of topics related to the Transaction.  On or about August 19, 2020, certain creditors, within

76

each of the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group, became restricted to receive confidential information regarding the Gogo Transaction. After their review, each of the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, and the HoldCo Creditor Ad Hoc Group ultimately supported the Gogo Transaction.

### F.     SES Claims

On July 14, 2020, SES filed a proof of claim in the amount of $1.8 billion against each of the Debtors. SES asserts that the Debtors owe money (or will owe money) to SES as a result of a consortium agreement between Debtor US LLC, SES, and other satellite operators (the "Consortium Agreement"). SES alleges it is entitled to 50 percent of the combined accelerated relocation payments that may eventually be payable to the Debtors and SES pursuant to the FCC Order, which provides for Accelerated Relocation Payments subject to the satisfaction of certain deadlines and other conditions set forth therein. SES' proof of claim alleges that the Debtors breached the Consortium Agreement, breached fiduciary duties to SES, and also alleges unjust enrichment. SES seeks compensatory and punitive damages. The Debtors dispute the allegations in the proofs of claim and believe that no claim by SES should be allowed. On October 19, 2020, the Debtors filed an objection to the SES proofs of claim.

To the extent that any portion of SES's claim is allowed, the Debtors believe that it would appropriately be classified as an unsecured claim against US LLC, as SES has no security interest or other basis for priority. To the extent that any portion of SES's claim is allowed, the Debtors have requested that the Court equitably subordinate such claim based on SES's misconduct. Contrary to the Debtors' view, SES has asserted in the SES Disclosure Statement Objection that it believes its claim should be allowed in full, against each Debtor and should be placed into its own class, and SES has asserted that its claim is not substantially similar to other unsecured claims against Jackson Subsidiaries. *See* SES Disclosure Statement Obj. ¶¶ 16, 94. If SES's claim were allowed and placed into its own class, it may render the Amended Plan unconfirmable over an objection from SES. Further, SES asserts that the Amended Plan may be unable to satisfy the absolute priority rule, in the event that its claim is classified separately from unsecured claims. The Debtors disagree with SES's assertions.

The Debtors believe that these arguments by SES are without merit and that SES will ultimately receive no claim. However, if the Debtors are incorrect and SES is entitled to a claim against any Debtor or multiple Debtors in any amount near the $1.8 billion figure that SES asserts, recoveries to creditors may be substantially diluted by SES's claim. Additionally, in the event that any of the Accelerated Relocation Payments are deemed to be held in constructive trust on behalf of SES, such payments may not become assets of the Debtors and ultimately may not become distributable to the Debtors' other stakeholders, ultimately reducing the recoveries of stakeholders other than SES. In either case, such an outcome may render the Amended Plan, as drafted, unconfirmable.

### G.     Engagement and Negotiations with Stakeholders

Even while devoting significant time and effort to the Gogo Transaction and the C-band clearing process, in the early days of the Chapter 11 Cases, to facilitate the meaningful participation of the Debtors' key constituents in the formulation of a chapter 11 plan, the Debtors actively engaged and informed their constituents on the complex issues in the Chapter 11 Cases. To that end, the Debtors devoted significant time and resources to providing substantial diligence and document production to the Debtors' key stakeholders, including the Creditors' Committee, the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Convert Ad Hoc Group related to the Company's historic and go-forward operations to facilitate negotiation of the Amended Plan. In particular, the Debtors have provided voluminous information regarding historical intercompany transactions and various tax issues and considerations.

77

In total, the Debtors have given virtual data room access to approximately 200 professionals across over 30 professional advisor firms or other institutions, other than the Debtors' retained professionals. The Debtors have provided a massive amount of primary material to interested parties, but have also taken steps to ensure that interested parties are able to take advantage of the analyses already performed by the Debtors and their advisors, so as to avoid the unnecessary duplication of efforts at the estates' expense. By maintaining a strong flow of information to parties in interest, the Debtors received varying perspectives and insights that assisted the Debtors' successful Plan negotiations. The Debtors believe their cooperation with diligence requests and their proactive approach to information sharing was instrumental to negotiating a mutually beneficial and consensual Plan.

In addition to diligence related to tax and intercompany issues, beginning in mid-November 2020, the Debtors entered into nondisclosure agreements with several of their key creditor constituencies, who became restricted from trading, so the Debtors could share their Business Plan, including the benefits of the Gogo Transaction, and allow creditors to analyze related diligence. In particular, members of the Creditors' Committee, the Jackson Ad Hoc Group, Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Convert Ad Hoc Group all received confidential information and attended presentations with the Debtors' management related to the Business Plan.

Following the Debtors' distribution of their go-forward Business Plan, the Debtors and many of their key economic constituents, including the HoldCo Creditor Ad Hoc Group, the Jackson Ad Hoc Group, the Jackson Crossover Ad Hoc Group, and the Creditors Committee as well as the Convert Ad Hoc Group, were in constant dialogue regarding many of the key issues in these Chapter 11 Cases and in the Amended Plan, including intercompany transactions, foreign and domestic tax issues, and the value of the Debtors' business, including rights related to the FCC Order. Engagement between these creditor groups and the Debtors regarding the Business Plan soon progressed to engagement regarding the terms of a restructuring transaction.

Later, in November 2020, the Debtors and their primary creditor constituencies agreed to expand the scope and duration of the applicable confidentiality agreements to allow the parties to engage in direct negotiations regarding a plan of reorganization. The parties have stayed restricted through the filing of this Disclosure Statement in a good faith effort to negotiate the terms of the Amended Plan. The Debtors and these stakeholders have exchanged multiple rounds of term sheet proposals, culminating in the Amended Plan filed by the Debtors. Additionally, the parties spent significant time discussing complex issues related to, among other things, intercompany transactions, foreign and domestic tax issues, and the value of the Debtors' business, including rights related to the FCC Order.

### H. Original Plan Support Agreement

Following this lengthy process of extensions of confidentiality agreements and negotiations, the efforts of the Debtors and the Consenting Creditors culminated in the formulation and execution of the Original Plan Support Agreement, which outlined the terms of and committed the Consenting Creditors to support the restructuring transactions contemplated by the Original Plan. Holders of approximately 73.0 percent of the Connect Senior Notes Claims, approximately 37.3 percent of the LuxCo Senior Notes Claims, approximately 36.1 percent of the of First Lien Notes claims, approximately 34.9 percent of the Term Loan Facility Claims, approximately 32.1 percent of the Convertible Notes Claims, and approximately 7.6 percent of the Jackson Senior Notes Claims were all party to the Original Plan Support Agreement as of February 12, 2021. In achieving the agreements reflected in the Original Plan Support Agreement, the Debtors and the Consenting Creditors had to resolve several contentious deal terms, each of which required considerable compromises.

78

The Original Plan Support Agreement and its corresponding plan term sheet (the "Original Plan Term Sheet") attached to the Original Plan as Exhibit B resolved three key issues between the Debtors, the Jackson Ad Hoc Group, and the Jackson First Lien Noteholder Group: (a) the amount of the "makewhole" under the Prepetition 9.50% First Lien Notes Indenture; (b) the prepayment premium on the Prepetition 8.00% First Lien Notes Indentures; and (c) the rate at which postpetition interest on the three term loan tranches under the Term Loan Facility should accrue.

In addition, after extensive arm's length negotiations, on February 11, 2021, the Debtors and the HoldCo Creditor Ad Hoc Group agreed to the terms of a settlement regarding the treatment of claims against the HoldCos. Specifically, the Original Plan Support Agreement and the Original Plan Term Sheet resolved key issues between the Debtors and the HoldCo Creditor Ad Hoc Group, including, among others, (i) disputes over the Debtors' Business Plan and the valuation of the Debtors; (ii) the ownership of the Debtors' Lux NOLs, including intercompany and tax-related claims related to the Debtors' 2018 reorganization;[31] (iii) intercompany Claims by and among the HoldCos related to other historical intercompany transactions; and (iv) the claims related to the Accelerated Relocation Payments.

On February 12, 2021, the Debtors filed the Original Plan, which was consistent with the Original Plan Support Agreement. As of the date that the Original Disclosure Statement was filed, each of the Debtors, including the Special Committees, as applicable, supported the Plan.[32]

## I.    Judicial Mediation

After the Original Plan was filed, the Debtors continued to work with all major stakeholders, including the parties to the Original Plan Support Agreement to build greater consensus for a restructuring transaction. Though these efforts narrowed the issues between the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group, the parties in interest had not yet reached agreement on the terms for a restructuring that each could support. After consultation with their key economic stakeholders, the Debtors determined that pursuing a judicial mediation, focused primarily on the open issues between the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group was the path most likely to reach a more consensual plan of reorganization.

On April 6, 2021, the Debtors filed a motion requesting the court to compel mediation, which the court granted on April 21, 2021. The Mediation Order appointed the Honorable Frank J. Santoro, Chief Judge for the United States Bankruptcy Court of the Eastern District of Virginia, as the judicial mediator with full authority to settle matters within the scope of the Mediation Order and to enter any order necessary in furtherance of the settlement efforts, which were to focus on certain Plan and confirmation related issues.

The Mediation was expanded to include every party in interest who requested to partake in the Mediation, including, among others: (a) the Debtors; (b) the Jackson Crossover Ad Hoc Group; (c) the HoldCo Creditor Ad Hoc Group; (d) the Jackson Ad Hoc Group; (e) the Convert Ad Hoc Group; (f) U.S. Bank; (g) the Committee; (h) the Ad Hoc Equity Group; and (i) SES. The Mediation began with the Mediator rapidly getting up to speed on the various complex issues in these Chapter 11 Cases and the positions of the Mediation parties with respect thereto, through conversations with and presentations from the Mediation parties. Numerous in-person Mediation sessions were held between mid-April and the date of this Disclosure Statement, including on June 30 and July 1, 2021, when certain principals of the Mediation parties and their advisors met in-person—for the first time in these Chapter 11 Cases—in

---

[31]    *See Statement of Financial Affairs for Intelsat Ventures S.A. R.L.*, July 11, 2020, Case No. 20-32312 (KLP) [Docket No. 6] p. 48.

[32]    SES has asserted that the Original Plan was not filed in good faith. The Debtors disagree.

Richmond, Virginia for Mediation sessions with the Mediator and each other, and again on July 15, 2021 in Richmond, Virginia.

After the in-person mediation sessions concluded, the Debtors and their major stakeholders continued to vigorously negotiate the terms of a restructuring, including by sharing multiple proposals outlining proposed key economic terms for a potential chapter 11 plan.  The Debtors and these key stakeholders were in active discussions with each other, both directly and through the Mediator in the weeks that followed.  Ultimately, these continued good-faith negotiations, culminated in agreement among the Debtors and their major future equity holders.  In particular, the Debtors, the HoldCo Creditor Ad Hoc Group, and the Jackson Crossover Ad Hoc Group reached an agreement regarding a restructuring that each was willing to support.  After hard-fought, good faith negotiations to document the Amended Plan Support Agreement, each such party entered into the Amended Plan Support Agreement, which outlines the terms of the Debtors' proposed restructuring.  In parallel, the Debtors worked with the other parties to the Amended Plan Support Agreement to formulate the Amended Plan, as contemplated by the Amended Plan Support Agreement, with the support of each party thereto.

### J.      Convert Ad Hoc Group Standing Motion and SES' Intervention Motion

On February 5, 2021, the Convert Ad Hoc Group filed the Standing Motion.  The Standing Motion asserts, among other things, that (a) the Convert Ad Hoc Group should be granted standing to prosecute a proposed adversary complaint on behalf of the estate of Intelsat S.A., alleging that Jackson is not entitled to the Accelerated Relocation Payments and Intelsat S.A. is entitled to such Accelerated Relocation Payments; (b) the Convert Ad Hoc Group should be granted limited authority to settle intercompany claims; and (c) the automatic stay should be modified to allow the Convert Ad Hoc Group to prosecute the claims in their proposed adversary proceeding.

Then, on March 3, 2021, SES, the Debtors' largest competitor and a former member of the C-Band Alliance, filed the Intervention Motion.  By the Intervention Motion, SES seeks to either (a) intervene in the "accelerated relocation payments litigation," initiated by the Convert Ad Hoc Group in the Standing Motion or (b) to obtain standing to prosecute claims on behalf of US LLC.  Specifically, SES seeks standing to prosecute claims that US LLC is entitled to receipt of the Accelerated Relocation Payments—not Intelsat S.A. as asserted by the Convert Ad Hoc Group or License and Jackson, as was determined by the Debtors.

As noted in section IV.M herein, the Debtors believed that it would be most appropriate to consider such matters in the appropriate context—at the Confirmation Hearing.  Accordingly, the Debtors filed the Scheduling Motion, seeking to adjourn those matters until June 14, 2021, in conjunction with confirmation of the Original Plan.  On March 15, 2021, the Bankruptcy Court entered an order granting the Scheduling Motion, which adjourned the Standing Motion and Intervention Motion to June 14, 2021 and established a related schedule for discovery and other pre-trial matters related to the Standing Motion and Intervention Motion.

On April 14, 2021, the Debtors filed their objection to the Intervention Motion [Docket No. 1931] and, with the Special Committee of Intelsat S.A., jointly filed an objection to the Standing Motion [Docket No. 1929].  The Intervention Motion was also objected to by the HoldCo Creditor Ad Hoc Group [Docket No. 1911], the Jackson Ad Hoc Group [Docket No. 1913], the Jackson Crossover Ad Hoc Group [Docket No. 1916], the Ad Hoc Group of Secured Noteholders [Docket No. 1923], U.S. Bank [Docket No. 1925], and the Convert Ad Hoc Group [Docket No. 1932].  The Standing Motion was also Objected to by the HoldCo Creditor Ad Hoc Group [Docket No. 1911], the Jackson Ad Hoc Group [Docket No. 1913], the Jackson Crossover Ad Hoc Group [Docket No. 1915], and U.S. Bank [Docket No. 1925].

On April 29, 2021, consistent with the Scheduling Order, the Debtors, with the consent of the Convert Ad Hoc Group and SES, filed the *Notice of Modified Dates Relating to the Standing Motion and*

*the Intervention Motion* [Docket No. 2126], which set forth a modified discovery and trial schedule for the Standing Motion and the Intervention Motion to remain consistent with the schedule for confirmation of the Amended Plan, and providing for the issues raised by those motions to be set to be heard by the Bankruptcy Court at the Confirmation Hearing.

The Debtors' position is that Intelsat License LLC, as holder of the FCC Licenses that are subject to the FCC Order, is the most appropriate recipient of the Accelerated Relocation Payments. Among other things, neither Intelsat S.A. nor US LLC has a viable claim to the Accelerated Relocation Payments, because (a) they have no right to broadcast in the C-band—the Debtors' rights to do so belong to Intelsat License LLC and (b) they do not own substantial satellites broadcasting in the C-band—those belong primarily to Intelsat Satellite LLC and its subsidiaries. Without the licenses, there would be no Accelerated Relocation Payments. In addition, License is the entity that elected to participate in the accelerated clearing process, and License is the entity that will receive the payments from the FCC-designated clearinghouse pursuant to an agreement with the Clearinghouse. Accordingly, the Debtors believe that neither Intelsat S.A. nor US LLC would likely succeed in the arguments advanced by SES and the Convert Ad Hoc Group that they are entitled to the Accelerated Relocation Payments, which the FCC Order expressly provides will go to "incumbent space station operators," which are the "operators authorized to provide service to any part of the contiguous U.S. pursuant to an FCC-issued license as of June 21, 2018"—that entity is License.[33]

Further, the Special Committees believe that the theory advanced by certain members of the Convert Ad Hoc Group that Intelsat S.A. is entitled to the Accelerated Relocation Payments, because they are in consideration for early relinquishment of an FCC forbearance from imposing sanctions on the Company's operations in the C-band until December 5, 2025, is not credible. First, the FCC Order does not suggest that incumbent C-band operators' rights to operate have already been terminated. Additionally, the FCC could fine various Debtors—not just Intelsat S.A.—were the Company operating in the C-band without authorization. However, the Special Committees, including the Special Committee at Intelsat S.A., zealously advanced these arguments and were able to leverage them for additional consideration in the settlement embodied in the Amended Plan.

### K.    Settlement of Certain Debtor Intercompany Claims

#### 1.    *Special Committee Appointment and Investigation*

As discussed above, the boards of certain of the Debtors delegated to their Special Committees the authority to investigate and determine, in such Special Committees' own business judgment, whether any matter involves a Conflict Matter, including any conflict of interest between the applicable Debtor and any related party. Each applicable board also delegated to its Special Committee the authority to take any action with respect to the Conflict Matters, as determined in the sole judgment of the Disinterested Directors, including: (a) any release or settlement of potential Claims or Causes of Action of the applicable Debtor against any related party, (b) any decision regarding all or part of a restructuring transaction to the extent it constitutes a Conflict Matter; and (c) any other transaction implicating the applicable Debtor in which a related party has an interest.

After spending the early months of these Chapter 11 Cases diligently gathering and analyzing information related to the complex issues posed by the Debtors' complex and unique capital structure, including tax, corporate, and other intercompany issues, and, where applicable, building on analysis already performed by the Debtors and their advisors, the Special Committees, with the support of their individually retained professional advisors, as applicable, negotiated an arm's-length, good-faith settlement of certain

---

[33]    FCC Order ¶ 115.

intercompany issues, which was incorporated into the Original Plan, which formed the basis for the Original Plan.

Pursuant to the Mediation Order, the Debtors, certain stakeholders, including the Ad Hoc Groups, undertook vigorous negotiations under the Mediator's supervision.  Concurrently with the Mediation, the Debtors, as fiduciaries of their estates, and the Special Committees, continued analyzing and investigating claims and causes of action, including in light of certain changed facts and circumstances surrounding these Chapter 11 Cases.

After substantial review, analysis, and consultation with their independent advisors, the Disinterested Directors of each Special Committee authorized its respective Debtor to enter into the Amended Plan Support Agreement, inclusive of the Settlement, pursuant to its terms and conditions.  Such authorization is subject to each Special Committee's ability to continue and complete its investigation into Conflicts Matters and the resolution of such investigation, and is without any prejudice to the Fiduciary Out of each Debtor set forth in the Amended Plan Support Agreement.

## 2. *Debtor Intercompany Claims Resolved by the Settlement.*

The resolution embodied in the Settlement resolves a multitude of complex, legally uncertain, and fact-intensive issues, including many intercompany issues, many of which involve the application of foreign law or prospective events.  Litigation of the issues resolved pursuant to the Settlement would involve lengthy, value-destructive litigation, which is avoided by the Settlement through releases of discrete claims and causes of action such as potential fraudulent transfer, avoidance, preference, recharacterization, or other derivative actions on account of historical acts, covenants to support the necessary transactions to implement a restructuring for all of the Debtors, and other agreements to support a restructuring that will inure to the benefit of the Debtors' estates.

Specifically, the Settlement resolves (a) the post-emergence organizational structure; (b) numerous highly complex considerations regarding the Luxembourg tax profile of the Debtors, including, among other things, (i) preservation of the Tax Unity and associated value allocation theories regarding potential alternative restructuring outcomes that would not have preserved the Tax Unity, (ii) the use of Tax Unity tax attributes by its members, (iii) numerous highly complex considerations regarding the Luxembourg tax profile of the Debtors; (c) intercompany transactions that arose in the course of the Debtors' business prior to the Petition Date—including certain transactions and/or balances that could potentially be the subject of fact intensive and time consuming fraudulent transfer or preference litigation; (d) intercompany balances that have accumulated after the Petition Date; and (e) allocation of certain administrative expenses.  A more fulsome description of the issues resolved is set forth below:

### (a) Emergence Considerations.

The Debtors explored numerous post-emergence organizational structures—both public and private—and have analyzed the various tax, corporate, and restructuring considerations associated therewith.  Many of these structures presented unique challenges given the interplay of U.S. and Luxembourg law, and the Debtors worked closely with their Luxembourg advisors to understand a complex array of international issues and carefully assess the viability of effectuating each structure in an effort to design a value-maximizing post-emergence structure for the Debtors.

### (i) Luxembourg Law Issues.

Because under Luxembourg law, Luxembourg courts have exclusive jurisdiction in insolvency matters with respect to companies that have their principal offices in Luxembourg, there is a significant risk that Luxembourg courts will not recognize a U.S. court order.  Accordingly, even if Jackson alone were to

emerge pursuant to a plan of reorganization confirmed by the Court, creditors and other stakeholders could attempt to seek relief in Luxembourg courts if such plan was not consummated in accordance with Luxembourg law.  Challenges in Luxembourg could include attempts to unwind a confirmed plan in order to effectuate alternative restructuring transactions under Luxembourg bankruptcy laws.    Further, Luxembourg corporate tax law formalities vary from those in the United States.

### (ii)    Jackson-Only Emergence.

In the course of negotiations with creditors, several proposals arose regarding a "Jackson-only" emergence structure in which Jackson and its subsidiaries would confirm a chapter 11 plan without the other Debtors  (or, potentially, together with Holdings but without the other HoldCos in an effort to preserve the Tax Unity without global consensus) in the emergence structure.  Based on rigorous analysis, the Debtors believe that any such emergence could be costly and risky from an implementation standpoint; accordingly, the Debtors believe that it is preferable to seek confirmation of a plan of reorganization that provides for the emergence of all Debtors, or, in the event of a Plan Toggle Event, a chapter 11 plan that provides for the emergence of all Debtors except Holdings SARL and/or Intelsat S.A.

### (b)    Tax Matters.

Issues related to the Debtors' tax profile—and, in particular, the ability to utilize and ascribe value to the Debtors' Luxembourg net operating losses (the "Lux NOLs")—have consistently been a source of contention and disagreement among all constituencies over the course of the case.  These issues include, among other things, the perceived value associated with preserving the Tax Unity (which is influenced by many considerations, including the Debtors' historical and go-forward tax treatment of various transactions, including the 2018 Reorganization (as defined herein) and tax positions and the possibility of tax reform (both in the U.S. and abroad)); the perceived value to the HoldCos of *not* preserving the Tax Unity and instead going their own way; and potential claims related to the consumption of NOLS of the Tax Unity (the "Tax Unity NOLs") and movement of other tax assets in the 2018 Reorganization.

It is important to put the following arguments into broader context.  Most (though not all) of the arguments below fundamentally go to one basic question:  How much value should be delivered to the HoldCos based on the value associated with preserving the Reorganized Debtors' access to the Tax Unity NOLs that, under Luxembourg tax rules, essentially resides at Holdings?  To preserve those benefits for Jackson going forward, Jackson must remain a member of the Tax Unity, which fundamentally means that, directly or indirectly, Jackson must continue to be 95 percent owned by Holdings.

In evaluating this fundamental value distribution question, over the course of these Chapter 11 Cases, the Debtors' advisors have conducted extensive tax modeling with respect to the Tax Unity NOLs, and this modeling has, in turn, contributed to further analyses performed by other advisors.  This modeling has been performed on a "with and without" basis: It has compared the expected Luxembourg taxes that would be paid by Jackson if the Tax Unity is preserved ("with") to the expected Luxembourg taxes that would be paid by Jackson if the Tax Unity is not preserved ("without"), and the difference between those two figures has been reduced to an expected value (after being subject to discounting, because the value is expected to be received over a long period of time).

As with any modeling exercise, the Luxembourg tax modeling that underlies this value determination is only as good as the inputs that feed into it.  Those inputs include, among other things, (a) anticipated go-forward tax positions and company performance, overlaid with essentially unknowable "change in law" risk that is particularly pronounced right now, at a time when "tax reform is in the air"; (b) the appropriate discount rate for tax savings that reach past 2040; and (c) questions with respect to whether "with and without" is even the right basis to value the Lux NOLs.

83

Various parties in the case have made assertions regarding the Luxembourg tax modeling performed by the Debtors' advisors.  Unsurprisingly, some of those arguments would have, if accurate, increased the value of preserving the Tax Unity, while other arguments (generally asserted by the Jackson stakeholders) would have, if accurate, reduced the value of preserving the Tax Unity.  Also unsurprisingly, each side asserts that the other's arguments are incorrect.

In evaluating the Settlement, the Special Committees considered all of the widely diverging views on these issues, along with certain related issues, in addressing the fundamental question of how much the HoldCo stakeholders should receive for the value being brought to the table by preserving the Tax Unity. The following litany of tax issues are among the issues that were considered.  The prospect of *actually litigating these widely ranging tax issues and their impact on value*, and the costs associated with doing that, are as crystal clear an example as any that the Settlement is within the range of reasonableness required by rule 9019 of the Bankruptcy Rules.

**(i)      Tax Unity Preservation.**

In 2010, certain Debtors domiciled in Luxembourg formed the Tax Unity for the purposes of consolidating taxable income and/or losses attributable to each member in the Tax Unity.  The current Tax Unity members are Holdings, which is the head of the Tax Unity, Investments, LuxCo., ICF, Jackson, Intelsat Align S.à.r.l, and Ventures (which joined in 2019 following its formation in 2018) (each, a "Debtor Member" and collectively, the "Debtor Members").  In addition, Envision, Alliance, and several entities below Ventures in the Company's corporate structure are transparent from a Luxembourg tax perspective. As a result, their income is attributed to the Debtor Members of the Tax Unity.  Under Luxembourg law, net operating losses that one member generates while part of a tax fiscal unity can be used to offset the taxable income of other fiscal unity members in the same tax year such Lux NOLs are generated, or in future tax years if the Lux NOLs are carried forward.

Generally, a company with a taxable presence in Luxembourg generates Lux NOLs if its operating expenses exceed its revenues during a single tax year (similar to how losses are treated under U.S. tax law). A company may apply, or "carry forward," Lux NOLs to reduce future Luxembourg tax payments (subject to certain conditions, including, in some cases, a time period in which the Lux NOLs must be used before they expire).  In the case of a Luxembourg tax fiscal unity, Lux NOLs that one member generates can generally be used to offset the taxable income of other members of the fiscal unity in either the tax year the Lux NOLs are generated or in future tax years if carried forward.

Once an entity is a member of a Luxembourg tax fiscal unity for five complete tax years, Lux NOLs generated by that entity are permanently vested in the tax unity at the end of each tax year.  If an entity that generates Lux NOLs that are "swept" into the tax unity in this way subsequently leaves the tax unity, it does not take any portion of the Lux NOLs with it (though it does keep any Lux NOLs for the year it departs, because departure from the tax unity is retroactive to the beginning of the year of departure).  For example, Jackson has been a member of the Tax Unity for more than five years, so the Lux NOLs that it generated on a standalone basis in 2020 have, by operation of law, vested with the Tax Unity, and if it were to depart the Tax Unity, it would no longer have access to the Tax Unity's Lux NOLs (including the Lux NOLs it generated in 2020), but it would keep any Lux NOLs generated in 2021 (assuming it departs the Tax Unity in 2021).

Different rules apply to entities that have not been members of a Luxembourg tax fiscal unity for five years.  If an entity leaves a Luxembourg tax fiscal unity within five years of joining it, the entity is, in essence, treated as if it had never joined, and the unused Lux NOLs generated by such entity individually revest with that entity (or, if the entity, standing alone, would have had a tax liability, the entity will owe that amount).  Because of this, if Ventures were to depart the Tax Unity, it would take with it Lux NOLs

attributable to it (along with the tax basis in assets transferred to it in connection with the 2018 restructuring).

These issues have grounds for fulsome argument and negotiation. For example, the Jackson stakeholders advocated for a lower overall valuation of the Lux NOLs, asserting that potential changes in U.S. tax rules (whether through tax reform legislation or regulatory action), shifts in the enforcement of existing U.S. tax rules, and changes in international tax norms as a result of ongoing Organisation for Economic Co-operation and Development ("OECD") negotiations could result in the reduction of the value of the Tax Unity NOLs, or potentially, increase U.S. taxation to such an extent that the Debtors would restructure in a manner that would reduce or eliminate their future Luxembourg taxable income (and thus, the value of the Tax Unity NOLs that could be used to offset such income). The Intelsat S.A. stakeholders argued that Intelsat S.A. was entitled to the Lux NOLs because it had indirect ownership and control of Holdings, where the Lux NOLs reside as a matter of Luxembourg tax law. The LuxCo and ICF stakeholders advocated for value allocation on account of LuxCo's role in creating the applicable tax attributes and generating Lux NOLs in the past that would be used to offset income before Lux NOLs that were generated subsequently. Certain of these issues are discussed in greater detail below.

### (ii)  Tax Claims Related to 2018 Reorganization.

In July 2018, the Debtors implemented a series of internal transactions and related steps that reorganized the ownership of certain of their assets among entities in order to enhance their ability to efficiently transact business (such transactions, collectively, the "2018 Reorganization"). Certain key steps of the 2018 Reorganization were as follows:

- Jackson formed two new subsidiaries: GenesisCo, a Delaware corporation, and Ventures, a Luxembourg corporation. Genesis also formed a new subsidiary, Genesis GP, a Delaware limited liability company.

- Jackson transferred all of its equity interests in Intelsat Corporation ("Corporation") to Genesis, and all of its equity interests in Intelsat Global Sales and Marketing Limited ("IGSM"), as well as certain other assets, to Ventures.

- Corporation transferred all of its equity interests in PanAmSat Satellite Europe Limited ("PSEL"), as well as its liabilities arising under a number of pre-existing intercompany debts, to Genesis. Corporation kept its employees and the majority of its assets and operations, and was then converted into a Delaware limited liability company that is now known as Intelsat US LLC.

- Certain other pre-existing intercompany debts were rationalized, either by being set off against each other to reduce the net amounts owing, or canceled entirely by way of the creditor contributing its receivable to the debtor.

- US LLC and Ventures entered into the Bilateral Agreement, pursuant to which they agreed that the profits of the global Intelsat business would be split based on the relative contributions made by US LLC and its subsidiaries (on the one hand) and Ventures and its subsidiaries (on the other hand) to the global business.

- Alliance, a Delaware limited partnership, was formed between Jackson and Genesis (as limited partners) and Genesis GP (as the general partner). Both Jackson and Genesis contributed certain assets to Alliance in exchange for their partnership interests in Alliance. Jackson's contribution comprised its equity interests in Ventures and certain other assets, and Genesis'

85

contribution was its equity interests in US LLC.  When Alliance was formed, the partnership interests of Jackson and Genesis were documented as 92.2 percent and 7.8 percent respectively, although these were retrospectively amended to 92.5 percent and 7.5 percent, respectively, on December 7, 2018.

- Alliance contributed to Ventures certain assets that it received from Jackson as part of Jackson's partnership contribution in exchange for an interest free loan (the "IFL") issued by Ventures to Alliance.  The amount of the IFL was $13,286,195,000.  This loan was initially documented in a single Interest Free Loan Agreement, and was subsequently split into two separate Interest Free Loan Agreements in the amounts of $11,256,195,000 and $2,030,000,000,[34] with the receivable in respect of the smaller loan being transferred from Alliance to US LLC, with US LLC subsequently transferring it to Intelsat US Finance LLC ("US Finance").

- US LLC, Ventures, and certain subsidiaries of US LLC and Ventures entered into the MISA, pursuant to which certain services are provided among the subsidiaries.[35]  The MISA also established the role of Intelsat Clearinghouse LLC ("Clearinghouse"), which acts as a payment intermediary among entities receiving and providing services under the MISA.

The Debtors, through their Special Committees, evaluated a number of claims with respect to the 2018 Reorganization and their impact on the value of preserving of the Tax Unity, including use of Tax Unity NOLs and the transfer of other tax attributes in connection with the 2018 Reorganization.

(1)     2018 Use of Tax Attributes.

As described above, the net effect of the 2018 Reorganization essentially transformed $5 billion of Tax Unity NOLs (together with approximately $1 billion of NOLs generated by Jackson in 2018 that otherwise would have been "swept" to the Tax Unity) into tax attributes of Ventures.  If not for the 2018 Reorganization, even if Jackson had subsequently left the Tax Unity in 2021, the attributes used in the 2018 Reorganization would have remained property of the remaining Tax Unity members (*i.e.*, the HoldCos) because these NOLs had been generated by Debtors who had been members of the Tax Unity for at least five years.  The 2018 Reorganization provided for the use of those NOLs in connection with generating future tax deductions at Ventures, which has been a member of the Tax Unity for fewer than five years and can, accordingly, depart the Tax Unity while "taking with it" those tax attributes (which would no longer be utilizable by the HoldCos).  No tax sharing or other agreement existed at the time of the 2018 Reorganization.

The Special Committees evaluated whether the transfer transaction could be subject to clawback under potential fraudulent conveyance, unjust enrichment, and violation of fiduciary duty claims under both Luxembourg and U.S. law—claims that are particularly significant as Jackson's position as to the value of preserving the Tax Unity has depended, in part, on Ventures' ownership of those tax attributes.  The HoldCo stakeholders have maintainedCreditor Ad Hoc Group has asserted (a) that (a) the transfer of the attributes constituted an actual fraudulent transfer, characterizing the transaction as an "insider transaction" that bore many traditional "badges of fraud"; (b) that the 2018 Reorganization could have been accomplished in a non-taxable manner, meaning that it was not necessary to utilize Tax Unity NOLs to offset the gain; and(c)

---

[34]  The balances of these Intercompany Loan Agreements have subsequently been reduced by partial repayments.

[35]  The 2018 MISA replaced a certain *Amended and Restated Master Intercompany Services Agreement*, dated as of January 12, 2011, as amended from time to time, in order to reflect changes in intercompany services relationships resulting from the 2018 Reorganization.

86

that (c) the Debtors' directors are liable for a violation of their duties under Luxembourg law because the transaction did not provide benefits to the HoldCos or their creditors.; and (d) various other additional additional arguments regarding the 2018 Reorganization.[36]  In response, Jackson stakeholders have asserted that (a) the HoldCos stakeholders' arguments were generally based on "tax sharing" litigation theories that are not applicable in light of (i) the absence of a tax sharing agreement, (ii) lack of ability for the HoldCos to independently monetize the Tax Unity NOLs (a point that stakeholders of the HoldCos dispute), (iii) the fact that the HoldCos were likely solvent at the time of transfer, (iv) the fact that Jackson used fewer NOLs in the 2018 Reorganization than it had contributed to the Tax Unity at that time, and (v) the Tax Unity NOLs are a joint asset of the entire Tax Unity for so long as the Tax Unity remains; (b) that there was no way to carry out the 2018 Reorganization in a completely tax-free manner while achieving the corporate economic objectives of the 2018 Reorganization; and that (c) there is no reasonable basis on which to assert that the directors would be personally liable for a transaction that was (i) thoroughly vetted and evaluated by advisors, (ii) cleared by advisors at a time when there were no plans to split the Tax Unity, and (iii) designed to accomplish multiple important goals that were entirely unrelated to obtaining a "step-up" in the assets transferred to Ventures.; and (d) that the various other additional arguments that have been raised with respect to the 2018 Reorganization have no merit.

Stakeholders of the HoldCos also asserted that they did not receive reasonably equivalent value in exchange for the transfer of the tax attributes.  In response, Jackson stakeholders asserted that the Debtors' entire enterprise, including the HoldCos, benefited from the 2018 Reorganization, including the step-up in value resulting from the 2018 Reorganization being at least partially taxable, which essentially converted Tax Unity NOLs, some of which may have expired before they could be used with future tax attributes whose expiration timeline had not yet started, by, among other things, (i) aligning the Debtors' international operations into a "profit split" structure, which is viewed more favorably than historic "cost-plus" arrangements and (ii) simplifying operational complications of the old structure; while benefits were most directly received at the Jackson level, the changes increasing value in Jackson increased the value of the HoldCos as well.

Finally, various additional arguments have been asserted with respect to the consequences of the 2018 Reorganization, all of which are addressed by the Settlement.

**(iii)     Potential Tax Reform.**

On May 28, 2021, the U.S. Treasury Department released the "Greenbook," a 114-page explanation of certain potential tax changes provided in the Biden Administration's FY 2022 budget.  The "Greenbook" contains various potential tax reform proposals that could, hypothetically, negatively impact the Debtors' go-forward ability to utilize the Tax Unity NOLs—likely on an indirect basis (by, *e.g.*, increasing U.S. tax exposure that reduces the net tax savings associated with the Tax Unity NOLs).  An ongoing process at the OECD looks to fundamentally overhaul the taxation of multinational corporations.

Separately from the "Greenbook" proposals, there is proposed legislation and potential regulatory action that could similarly affect the value attributable to the Tax Unity NOL going forward, either directly or by having such a substantial influence on the Debtors' tax profile that a fundamental restructuring that would reduce the value of the Tax Unity NOLs could be necessitated.

---

[36]   Public disclosure of certain other arguments raised by the HoldCo Creditor Ad Hoc Group is precluded by the *Confidentiality Agreement and Stipulated Protective Order* [Docket No. 737] (the "Protective Order").  Parties wishing to receive information related to these arguments may contact Debtors' counsel, complete a copy of the declaration attached to the Protective Order as Exhibit A (which Debtors' counsel will provide upon request), indicating consent to be bound by the terms of the Protective Order, and return to Debtors' counsel.

87

In evaluating the Settlement, the Special Committees carefully considered these possibilities in evaluating whether the value ascribed to the Tax Unity NOLs should be materially reduced.

### (c)    Accelerated Relocation Payments.

*Factual Background:* On February 28, 2020, the FCC adopted the FCC Order reallocating a significant portion of the mid-band radio frequency spectrum, the 3700 to 4200 MHz range of the C-band, for new 5G terrestrial wireless networks. In previous decades, the Debtors had used the C-band spectrum for satellite communication networks, which had enabled the delivery of broadcast television and radio network content to over 100 million U.S. households, supported government and public safety operations, provided critical links to remote and underserved areas, and ensured communications systems' availability during disasters when terrestrial services fail.

Pursuant to 47 C.F.R. § 27.1412(d), and as a result of the FCC Order, License and other eligible space station operators are required to clear their transponders from the 3.7-4.0 GHz band of the C-band spectrum by December 2025 and to migrate the existing services of incumbent earth stations in the contiguous United States to the 4.0-4.2 GHz band. Additionally, to incentivize early clearance of the 3.7-4.0 GHz band of the C-band spectrum, the FCC arranged for License and other eligible space station operators to be eligible for compensation in the form of Accelerated Relocation Payments if they clear on an accelerated timeframe, including clearing the 3.7-3.82 GHz range of the C-band by December 2021[37] and the 3.82-4.0 GHz range of the C-band by December 2023.

The clearing will require, among other things, multiple new satellites to be procured and launched into service, and the purchase of new video compression technology and radio frequency filters. The changes needed to facilitate the clearing come at a substantial initial expense to the Debtors. That said, the Debtors anticipate clearing C-band spectrum in accordance with the earliest phase I and phase II deadlines and becoming eligible to receive Accelerated Relocation Payments. Accordingly, the question remains how the Accelerated Relocation Payment funds will be distributed among certain of the Debtors if the Debtors achieve the FCC Order's accelerated timeframe.

License is an indirect subsidiary of Jackson and the holder of orbital slot licenses from the FCC that allow it to operate certain Company satellites at certain orbital locations with coverage of North America and to send and receive signals to and from those satellites using certain portions of C-band spectrum, specifically at radio frequencies of 3.7-4.2 GHz. All of these licenses were listed as property of License LLC on its schedule of assets and liabilities filed on July 11, 2020 [Docket No. 7]. No other debtor entity possesses similar licenses with North America coverage or listed any similar assets on its schedule of assets and liabilities.[38] License is also the entity that submitted an Accelerated Relocation Election pursuant to 47 C.F.R. § 27.1412(c), the FCC Order, and the Wireless Bureau's May 11, 2020 Public Notice, and, with the approval of the FCC, License will receive the Accelerated Relocation Payments pursuant to a contract with the Relocation Payment Clearinghouse (as defined in the FCC Order) appointed by the FCC.

Additionally, allocation of the Accelerated Relocation Payments is subject to certain existing and in-force intercompany agreements, which will be assumed, including the MISA and the Bilateral Agreement. As noted in further detail in section V.B herein, certain of the Debtors are members of Alliance (as defined above), which limited partnership was formed as part of the 2018 Reorganization. Genesis GP is the general partner of Alliance, and Jackson and Genesis are limited partners in Alliance. As

---

[37]    The final 20 MHz of the Phase I clearing is a temporary "guard band" while the Phase II clearing is performed. Once Phase II is complete, the unused "guard band" shifts to the final 20 MHz in the cleared range.

[38]    Debtor legal entity PanAmSat Europe Corporation has a $4 million carrying value for orbital slot licenses on its balance sheet as of March 31, 2021. These orbital slot licenses do not provide coverage of North America.

discussed above, pursuant to the Partnership Agreement and the relevant contribution agreements effecting the transfer of assets in connection with this restructuring (the "Contribution Agreements"), Jackson directly or indirectly contributed substantially all of its assets, except the C-Band Monetization Property (*i.e.*, the rights to the first 100 MHz of C-band spectrum used by License in the United States) to Alliance. Then, Alliance, Genesis, Jackson, and Genesis GP entered into the Nominee Agreement to clarify the enforcement mechanism for the carveout of the C-Band Monetization Property. Specifically, the Nominee Agreement provided that, to the extent that Alliance or a subsidiary thereof received Jackson C-Band Monetization Property, it would hold such C-Band Monetization Property as an agent for the benefit of Jackson and the C-Band Monetization Property would be treated as if it had always been beneficially owned by Jackson.

Separately, US LLC, among other Debtors including Alliance and Ventures, is party to the Bilateral Agreement which provides for a split of the US LLC Group and Ventures Group profits and losses, and therefore is applicable to License's share of the Accelerated Relocation Payments. Prior to the 2018 Reorganization, US LLC provided services to Jackson (and the other Intelsat entities) on a "cost-plus" model. However, in connection with the 2018 Reorganization, as discussed above, (a) US LLC was contributed to Alliance by the then-newly-formed GenesisCo, and GenesisCo received approximately 7.5 percent of the equity of Alliance in exchange for US LLC; (b) Jackson received the remaining 92.5 percent of Alliance for the transfer of its assets (except for the C-Band Monetization Property);[39] and (c) US LLC was shifted from being a "cost-plus" service provider to being a joint entrepreneur in the Alliance enterprise, losing the right to receive a cost-plus payment for its services to most entities (including Ventures, License, and Intelsat Satellite LLC), but obtaining rights to 7.8 percent of the enterprise's profits pursuant to the Bilateral Agreement.[40]

The Debtors analyzed the legal issues associated with the Debtors' allocation of Accelerated Relocation Payments including: (a) which Debtors hold the Company's licenses to operate in the C-band and related, historical intercompany transactions, (b) which Debtors own the Company's C-band operating satellites and other related assets, (c) which Debtors provide the services and employees that support the Company's C-band operations and agreements that govern such services, (d) the FCC's draft and final Order, and (e) the effect of the intercompany agreements described herein on the allocation of the Accelerated Relocation Payments. The Accelerated Relocation Payments are most appropriately divided between License, US LLC, and Jackson, for the following reasons, among others:

*FCC Order.* Pursuant to the FCC Order, the FCC created a clearinghouse to process payments relating to the repurposing of the C-band. The clearinghouse will enter into an agreement with License related to those payments and the payments will be made to License under the terms of the FCC Order and that agreement.

Relatedly, the FCC Order establishes "two Accelerated Relocation Deadlines . . . for incumbent space station operators that voluntarily relocate on an accelerated schedule (with additional obligations and

---

[39]   The split was determined based on a go-forward calculation of the value of the services being provided by US LLC, along with certain other intangibles and assets that it provided to the Company business. This valuation analysis was premised, in meaningful part, on the view that the C-Band Monetization Property (which, at the time, was thought to be the only portion of the C-band that would be subject to any kind of clearing for 5G) was held outside of Alliance. Without the holdback, Jackson's ownership of Alliance would have been higher.

[40]   More specifically, the Bilateral Agreement contemplates a profit split that applies generally to the "Business Operating Income" of the "Business," through which the profits and losses of Alliance and its subsidiaries are pooled, and then 7.8 percent of the profits, net the losses, are distributed to US LLC. The 7.8 percent profit share is subject to periodic re-evaluation, which is likely to occur as a result of the acquisition of Gogo by US LLC, but the Debtors do not believe there is a basis to re-evaluate the profit split with respect to rights regarding an asset, the C-Band, that existed at the time the 2018 Reorganization was implemented.

incentives for such operators)."   The FCC Order characterizes the Accelerated Relocation Payments as providing an incentive to encourage incumbent licensees to voluntarily clear the lower C-band as quickly as possible.  The payments are designed to encourage entities with the *right* to broadcast in the C-band to relinquish that *right* by specific early deadlines *prior to* the otherwise-applicable deadline.

Thus, the FCC Order explicitly provides that the Accelerated Relocation Payments will go to the "incumbent space station operators," which are the "operators authorized to provide service to any part of the contiguous U.S. *pursuant to an FCC-issued license* as of June 21, 2018."  FCC Order ¶ 115 (emphasis added).  Other portions of the Final Order also use similar language to refer to the entities that are eligible to receive accelerated relocation payments, describing them as "incumbent C-band users," *id.* ¶ 46; "existing C-band FSS [fixed satellite services] users," *id.* ¶ 113; "eligible space station operators," *id.* ¶ 169; "satellite incumbents," *id.* ¶ 187; and "incumbent licensees," *id.* ¶ 196.  All of these terms most naturally refer to the entities that actually hold the FCC license, not entities higher up the corporate chain. License is the only Debtor entity authorized to provide service pursuant to an FCC-issued license.

Additionally, as discussed, License is the entity that elected to comply with the FCC's accelerated relocation deadlines by submitting an accelerated relocation election form pursuant to the FCC Order and the Wireless Telecommunications Bureau's May 11, 2020 Public Notice.  License is thus the entity responsible for ensuring that the accelerated relocation deadlines are met.  Accordingly, the Debtors believe that License is the rightful recipient of all Accelerated Relocation Payments that the Debtors earn through their efforts to clear the C-band, except for those attributable to the clearing of the first 100 MHz, of which Jackson is the beneficial owner by operation of the Contribution Agreement, the Partnership Agreement, and the Nominee Agreement, and except as such proceeds are otherwise distributed pursuant to the intercompany agreements.

*Phase Allocation.*   In determining the relative value between phase I and phase II, the FCC forecasted the relative value of (a) the lower 100 MHz of spectrum band in the top 46 Partial Economic Areas ("PEAs") plus a temporary 20 MHz guard band until phase II milestones are complete, and (b) the upper 180 MHz of spectrum band in the top 46 PEAs plus the total 280 MHz in all other PEAs.  While satisfaction of phase I is tied to a milestone of the Debtors clearing 120 MHz, the underlying value of the contingent payment for this milestone is the lower 100 MHz of spectrum band.  There are varying ways to consider how much of the value attributable to clearing the first 120 MHz band in Phase I should be allocated to the first 100 MHz (as defined for purposes of what constitutes the C-Band Monetization Property that was retained by Jackson).  In one view, because the full 120 MHz must be cleared to satisfy Phase I obligations and the last 20 MHz of this represents a "guard band" that is required to facilitate the use of the first 100 MHz, the full value of Phase I should be viewed as attributable to the first 100 MHz. Alternatively, because the "guard band" will ultimately shift to the final 20 MHz of the cleared portion of the spectrum, 5/6 of Phase I could be allocated to the first 100 MHz (and therefore considered part of Jackson's C-Band Monetization Property).  The Debtors take the latter view.

While the FCC Order divides the Accelerated Relocation Payments between December 2021 and December 2023 (approximately 25 percent of the total in the first payment and 75 percent in the second payment), actual market values for each phase may be imputed from the results of the C-band auction, which were announced via a public notice dated February 24, 2021.  Based on market data, 37 percent ($1.819 billion) of the total net value is properly allocated to clearing the first 120 MHz, and 63 percent ($3.047 billion) of the total gross value is properly allocated to clearing the incremental 101-280 MHz spectrum band.[41]

---

[41]   The Debtors themselves previously proposed in a letter to the FCC that approximately 45 percent of the Accelerated Relocation Payment should be allocated to Phase I and approximately 55 percent of the Accelerated Relocation Payment should be allocated to Phase II, resulting in 37.5 percent of the total Accelerated Relocation Payment being treated as C-Band

Based on Jackson's right to monetize the first 100 MHz of the C-band (*i.e.*, Jackson's beneficial ownership, by operation of the Partnership Agreement and the Nominee Agreement), and utilizing the split derived by the above-stated market values for each phase set forth above, for purposes of determining entity-by-entity entitlement to recoveries with respect to the Accelerated Relocation Payments, Jackson is properly allocated 37 percent of the gross Accelerated Relocation Payments.  License is entitled to the remaining 63 percent of the gross Accelerated Relocation Payments, subject to Ventures' obligations under the 7.8 percent profit split with US LLC incorporated into the Bilateral Agreement.  Accordingly, US LLC is entitled to 7.8 percent of the 63 percent allocated to License LLC (by virtue of the obligation of Ventures under the Bilateral Agreement), or approximately 4.9 percent of the gross Accelerated Relocation Payments received.  Importantly, the Bilateral Agreement operates on a GAAP profit-based methodology and it is possible that, for example, if there are unreimbursed expenses associated with obtaining the Accelerated Relocation Payments, the amount to be distributed to US LLC would decline as a result.

These amounts must be adjusted from a gross basis to a net basis to reflect the actual value received by the Company.  The first step to convert Accelerated Relocation Payments from a gross basis to a net basis is to value them on an after-tax basis (assuming that projected specified tax attributes in existence at the end of 2021 are not available to offset such payments).[42]  Because the Debtors anticipate receiving the Phase I Amount earlier than the Phase II Amount, the payments were discounted to their present value using different discount factors.  Additionally, the tax payable related to each Phase I and Phase II Amounts receipt depends on the fiscal year's projected losses pursuant to the Business Plan.  The after-tax, present-value adjustments (prior to any adjustment for non-reimbursable C-band spend) reduces the total value of Accelerated Relocation Payments as follows:  Jackson is entitled to $1.566 billion, License to $1.829 billion, and US LLC is entitled to $155 million in present-value Accelerated Relocation Payments.  The next step to convert Accelerated Relocation Payments from a gross basis to a net basis is to make certain adjustments for non-reimbursable C-band spend pursuant to the definition of C-Band Monetization Property in the Partnership Agreement.  The Accelerated Relocation Payments' value is properly further reduced by $157 million for the amount of spend required to complete the C-band relocation that is not anticipated to be reimbursed, which reduction is applied pro rata across Jackson, License and US LLC based on the after-tax, present-value of Accelerated Relocation Payments noted above, reducing Jackson's value of Accelerated Relocation Payments from $1.566 billion to $1.496 billion, License from $1.829 billion to $1.747 billion and US LLC from $155 million to $148 million.  Next, $111 million of this reduction is properly added back to US LLC related to the Pre-Emergence Non-Reimbursables.  The remaining $49 million of the reduction is related to Post-Emergence Non-Reimbursables, and remains an offset to the Accelerated Relocation Payments' value.

The result of the above analysis is that Jackson is properly allocated a value of approximately $1.496 billion (approximately 42.7 percent of the net present distributable value of the Accelerated Relocation Payments), License receives a value of approximately $1.747 billion (approximately 49.9 percent of the net present distributable value of the Accelerated Relocation Payments), and US LLC receives a net present distributable value of approximately $259 million (approximately 7.4 percent of the present value of the Accelerated Relocation Payments).

---

Monetization Property allocable to Jackson (subject to reduction for certain unreimbursed fees) and 62.5 percent should be allocated to Alliance.  That allocation has been utilized for certain filings and other purposes.  Based on the market data set forth above, the Debtors believe it is reasonable to allocate value based on the Auction Proceeds Methodology described herein as between phase I and phase II.

[42]  As noted above, such attributes were valued and allocated separately, and a significant component of the value attributed to them is their use in offsetting taxable income attributable to the Accelerated Relocation Payments.

Certain stakeholders have asserted that they disagree with the Debtors' allocation methodology. They have suggested that US LLC alone[43] or S.A. alone[44] or the HoldCos alone or with certain other entities should rightfully receive of the Accelerated Relocation Payments; these positions have been contested in various Debtor pleadings, which are incorporated herein by reference.[45]   The Bankruptcy Court will determine these allocation issues at the Confirmation Hearing.

### (d)     Administrative Expenses.

Over the course of these Chapter 11 Cases, the Debtors have accrued significant expenses, including for estate professionals retained by the Debtors, which likely constitute administrative expenses. Because certain of these professionals provide services on behalf of all the Debtors, the proportional responsibility of each Settling Debtor for payment of such expenses and the methodology for determination of the allocation, could be subject to subject to dispute.

The Debtors' proposed plan of reorganization allocated fees for professionals retained by the Debtors based on the distributable cash before fees at each of the entities, resulting in 23 percent of Debtor professionals' fees being allocated as HoldCo expenses (subject to allocation among the HoldCos based on distributable cash before fees), and 77 percent of the fees being allocated as Jackson expenses.

### (e)     Intercompany Transactions.

Well over one hundred historical intercompany transactions were reviewed by the Special Committees, including, among many others, transactions that fell into the following categories: (a) dividends originating from Jackson and ending with LuxCo; (b) the creation of ICF; (c) the creation of Envision; (d) a cash contribution from ICF to Jackson; (e) a notes contribution from ICF to Jackson; and (f) other smaller transactions including loans, a one-off cash dividend, non-cash dividends, guarantee releases, and others.[46]

### (i)     Dividends.

*Factual Background*:  Since May 2014, Jackson has paid a total of approximately $2.16 billion in dividends to LuxCo.  LuxCo used the vast majority of these dividends to fund its regularly-scheduled interest obligations on LuxCo debt.  Because of this, Jackson typically paid the dividends to LuxCo a few days before LuxCo's regularly-scheduled interest obligations were owed.

---

[43]   *See Motion of SES Americom to Intervene in the Accelerated Relocation Payments Litigation and/or for Derivative Standing to Prosecute Intercompany Claims on Behalf of Debtor Intelsat US LLC* [Docket No. 1552].

[44]   *See Motion of Ad Hoc Group of Convertible Noteholders for Entry of an Order: (I) Granting Standing to Prosecute Intercompany Claims on Behalf of Intelsat S.A.; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [Docket No. 1439].

[45]   *See Objection of the Debtors to the Motion of SES Americom, Inc. to Intervene in Accelerated Relocation Payments Litigation and/or for Derivative Standing to Prosecute Intercompany Claims On Behalf of Debtor Intelsat US LLC* [Docket No. 1930] (the "Objection to SES Standing Motion"); *Objection of the Debtors and the Special Committee of the Board of Intelsat S.A. to the Ad Hoc Group of Convertible Noteholders' Motion for an Order (I) Granting Standing to Prosecute Intercompany Claims on Behalf of Debtor Intelsat, S.A.; (II) Modifying the Automatic Stay; and (III) Granting Related Relief* [Docket No. 1929] (the "Objection to Converts' Standing Motion").  The arguments set forth in the Objection to SES Standing Motion and the Objection to Converts' Standing Motion are incorporated herein by reference.

[46]   *The Special Committees' review was broad-ranging, covering well over 100 transactions and net balances.  The list of categories of transactions included herein is illustrative and not exhaustive and focuses on transactions that the Special Committees determined posed the greatest litigation risk.*

92

Prior to the formation of ICF and Envision, Jackson sent the cash dividends directly to LuxCo. After the formation of ICF, Jackson paid the dividends to ICF, and ICF in turn paid the entire amount of the dividend to LuxCo. After the formation of Envision, Jackson paid the dividends to ICF, ICF paid the entire amount of the dividend to Envision, and Envision in turn paid the entire amount of the dividend to LuxCo. When the dividends moved through ICF and Envision before arriving at LuxCo, the entire amount of the dividends moved through the chain, and neither ICF nor Envision kept any portion of the dividend payments.[47]

The Jackson board of directors (and the ICF and Envision boards once these entities were in the chain) approved each dividend payment. Generally, the boards reviewed a memorandum and presentation prepared by the Vice President of Finance, which (i) described the purpose of the dividend, (ii) confirmed that the applicable entity's relevant covenant obligations did not prohibit the entity from paying the dividend, and (iii) provided a balance sheet test (for Jackson and ICF) and a solvency analysis (for Envision) confirming the entities would remain solvent after the issuance of the dividends. In addition, the Jackson and ICF boards also generally received a report from PricewaterhouseCoopers Luxembourg ("PwC Lux"), which confirmed that (i) Jackson's and ICF's interim accounts were free of material misstatements, (ii) Jackson and ICF would have distributable profits after the distribution and nothing caused PwC Lux to believe otherwise, and (iii) other conditions of Luxembourg law were satisfied to distribute to dividends.

*Potential Claims Evaluated by Special Committees*: The Special Committees evaluated whether the dividends could be subject to potential constructive fraudulent transfer claims under §548 and §544(b). With respect to potential §544(b), the threshold issue will be which jurisdiction's claims apply. "The place of the wrong for choice of law purposes is the place where the last event necessary to make an actor liable for an alleged tort takes place." *McCarthy v. Giron*, 2014 WL 2696660, at *10 (E.D. Va. 2014). With respect to the dividend payments, there are potential arguments that New York, Virginia, or Luxembourg law could apply. Given the difference in the lookback periods between these jurisdictions, the choice of law will impact the size of the potential claim.

Specifically, there is an argument that New York law applies because the "last act" for wiring money is the location of the receiving bank. *Terry v. June*, 420 F. Supp. 2d 493, 505-06 (W.D. Va. 2006). Here, the cash dividends were transferred through bank accounts located in New York. New York has a six-year lookback period. Thus, assuming New York law applies, the total value of the claim is $2.16 billion.

There is also an argument that Virginia law applies. Intelsat's headquarters are in McLean, Virginia, and the relevant actions by Jackson, ICF, Envision, and LuxCo in accounting for the intercompany transfers occurred in Virginia. Where "the Debtor is a Virginia entity headquartered in Virginia . . . , it is reasonable to infer that the last events necessary to create liability, the transfers of the Debtor's assets, occurred in Virginia." *In re Rescue Rangers, LLC*, 576 B.R. 521, 529–30 (Bankr. E.D. Va. 2017). Virginia's look-back period is five years. Thus, assuming Virginia law applies, the total value of the claim is approximately $1.87 billion.

Finally, there could be an argument that Luxembourg law applies since the "last necessary act" arguably occurred in Luxembourg where the board approvals were made, *see Cole v. Champion Enterps., Inc.*, 305 F. App'x 122, 128 n.8 (4th Cir. 2008) ("last act essential" in contract case was board meeting in Michigan for choice of law purposes), or where a Luxembourg accountant recorded book entries of transfers. Furthermore, the majority of the dividend payments were made from one Luxembourg entity to another Luxembourg entity, with the relevant U.S. contacts being the banks used. *Cf. In re FAH Liquidating*, 572 B.R., 117, 124–25 (Bankr. D. Del. 2017) (applying German law for transaction to German

---

[47] Approximately $970 million went through ICF, and around $537 million also went through Envision.

93

company for project in Germany, despite transfers originating in U.S.); *In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 613 (Bankr. S.D.N.Y. 2017). If the "last act" is found to be in Luxembourg, there will be no avoidance under § 544(b) and only the § 548 two-year look-back will apply. Thus, the total value of the claim would be around $683.1 million.

Regardless of which law applies, dividends are generally deemed *not* an exchange of reasonably equivalent value. Thus, the constructive fraud analysis will hinge on solvency, which remains a contested issue. While at the time the dividends were made, the boards reviewed balance sheet analyses and PwC Lux reports that generally evidenced sufficient liquidity to issue the dividend payments, other market-based evidence, including the trading price of Jackson's debt, the overall debt at Jackson, the overall debt of the enterprise as a whole, and the market cap of the enterprise as a whole could be used to argue that Jackson was not solvent during portions of the time period since May 2014. Litigating whether Jackson was solvent during multiple portions of a six-year period will be time consuming and expensive (especially given the necessity of utilizing expert testimony).

In addition, while the ICF and Envision Special Committees have raised the "mere conduit" defense to shield the entity from liability against Jackson, such a defense may not be applicable. *See In re Railworks Corp.*, 700 F.3d 398, 403 (4th Circ. 2014). When ICF and Envision were in the chain, Jackson dividends passed through these entities' banks before reaching LuxCo. However, the dividends did not remain in the ICF and Envision bank accounts for long and neither entity ever redirected those funds for any other purpose. On that basis, ICF and Envision could argue that, even if the Jackson dividends were fraudulent conveyances, ICF and Envision should not be liable because they were "mere conduits" rather than initial transferees.

Courts analyzing this defense have analyzed whether the recipient (i) had "legal dominion and control" over the funds, and (ii) exercised such legal dominion and control. *Id.*; *see also In re Presidential Airways Inc.*, 228 B.R. 594, 600 (Bankr. E.D.Va. 1999). The recipient generally has legal dominion and control if it can put the money to its own use. *See In re Excello Press, Inc.*, 104 B.R. 924 (Bankr. N.D.Ill. 1989), *aff'd in part, rev'd in part on other grounds*, 120 B.R. 938 (N.D. Ill. Oct. 18, 1990). Courts adopting this test have held that, where the ultimate recipient of the funds had direct business relationships with the debtor, entities acting as "mere fiduciaries" or agents of the ultimate recipient had no legal dominion and control of the funds. Here, ICF and Envision were not fiduciaries or agents of LuxCo, but were independent entities. If the "mere conduits" defense does not apply, Jackson could potentially recover from not only LuxCo, but from ICF and/or Envision as well.

### (ii)    Creation of ICF.

*Factual Background:* At the end of 2016, Intelsat evaluated several options to address the upcoming maturity date of the LuxCo 2018 Notes. While LuxCo had a certain amount of cash to assist with the LuxCo 2018 maturity, there was going to be a significant shortfall. And while the existing indentures of Jackson permitted dividends for LuxCo's ordinary course interest payments (as discussed above), there was a question regarding whether the dividends could legally be used to pay the principal of the LuxCo Notes at maturity. Intelsat was also looking at options to redeem the notes at a discount from the third party noteholders. After evaluating several options, Intelsat created ICF to carry out the goal of redeeming the LuxCo Notes.

Upon its creation, LuxCo contributed $50,000 cash to ICF in exchange for 50,000 ICF shares and became its sole shareholder. Subsequently, LuxCo and ICF were party to two agreements that had the overall effect of transferring cash and ownership of Jackson from LuxCo to ICF in order to effectuate the removal of LuxCo 2018 Notes and replace them with ICF 2022 Notes and LuxCo 2024 Notes.

94

On December 2, 2016, S.A., LuxCo, ICF, and certain third-party noteholders of the LuxCo 2018 Notes, LuxCo 2021 Notes, and LuxCo 2023 Notes entered into a Support and Exchange Agreement. Under the terms of the Support and Exchange Agreement, for every $1000 of LuxCo 2018 Notes purchased, ICF paid the third-party LuxCo 2018 noteholders $450 in newly issued 12.5% ICF 2022 Notes and $600 in cash, plus the cash value of all accrued and unpaid interest on the LuxCo notes.[48]  The Support and Exchange Agreement further detailed how ICF was to be capitalized by LuxCo in order to effectuate these transfers, which included a transfer from LuxCo to ICF of (i) cash, (ii) the remaining LuxCo 2018 notes held by LuxCo, and (iii) equity in Jackson.  ICF would then use the interest payments received as the holder of the LuxCo 2018 Notes to fund its new obligations under the ICF 2022 Notes.

On December 22, 2016, LuxCo and ICF entered into the Contribution to Reserves Agreement, which formalized the terms of the Support and Exchange Agreement that discussed the capitalization of ICF.  Pursuant to the Amended Plan Support Agreement, LuxCo contributed to ICF:

i.     100 percent of LuxCo's equity interests in Jackson (with a book value of approximately $2.3 billion at the time of the transfer in December 2016);

ii.    All LuxCo 2018 Notes still owned by LuxCo (with a fair market value of approximately $20.5 million as of December 13, 2016); and

iii.   Cash totaling approximately $307 million.

LuxCo and ICF approved this transaction in their respective December 5, 2016 board meetings.  As part of these meetings, information was provided to the board from Guggenheim Securities LLC, the Vice President of Corporate & Securities, the Vice President of Treasury & Tax, and the Vice President and Controller.

Following ICF's initial buy-up of LuxCo 2018 Notes from third party noteholders, ICF and LuxCo executed an exchange of the LuxCo 2018 Notes for 12.5% LuxCo 2024 Notes on a one-for-one basis.  In total, as part of this exchange, ICF exchanged $402.6 million of LuxCo 2018 Notes for $402.6 million of LuxCo 2024 Notes.  This second exchange was not only detailed in the Support and Exchange Agreements, but also approved by both ICF and LuxCo in their respective board meetings on December 20, 2016.

***Potential Claims Evaluated by Special Committees***:  The Special Committees analyzed several legal issues associated with the creation of ICF including (i) whether LuxCo received reasonably equivalent value for its contribution of cash, notes, and Jackson shares to ICF; (ii) whether LuxCo received reasonably equivalent value for its exchange with ICF of LuxCo 2018 Notes for LuxCo 2024 Notes; and (iii) whether LuxCo was solvent at the time of these transfers.

Whether reasonably equivalent value was exchanged will be a contested issue.  Specifically, LuxCo may argue that it did not receive any benefit from ICF's repurchase of the LuxCo 2018 Notes because not only were the LuxCo notes subordinated by the newly created ICF notes, but the repurchased LuxCo 2018 Notes were also not retired.  Instead, following the repurchase, the LuxCo 2018 Notes were held by ICF to whom LuxCo was then obligated to pay interest.  As a result, any discount captured from ICF's repurchase of the LuxCo Notes was not a benefit that LuxCo received.  Finally, LuxCo may argue that they did not receive any benefit from the exchange of LuxCo 2018 Notes for LuxCo 2024 Notes because the interest rate was nearly double (6.75 percent vs. 12.5 percent).  On the other hand, ICF may argue that LuxCo did receive a significant benefit from the transaction because there was no other way for LuxCo to address the

---

[48]  The Support and Exchange Agreements entered with the 2021 and 2023 LuxCo Noteholders had similar breakdowns of purchasing their respective notes for a mixture of cash and ICF 2022 Notes.

upcoming maturity of its LuxCo 2018 Notes.  Further, although the exchanged LuxCo 2024 Notes did have a higher interest rate than the LuxCo 2018 Notes, it allowed LuxCo to fully address the upcoming maturity date and extend it with a maturity date six years later.

Whether LuxCo was solvent at the time of the transfer will also be a contested issue.  As with the dividends, there are a number of market factors that could be used to argue LuxCo was insolvent.  However, litigating solvency would be an expensive and time consuming exercise.

### (iii)      Creation of Envision.

*Factual Background*:   In response to Intelsat S.A.'s stock price increase in May 2018, Intelsat S.A. management—with the assistance of Intelsat S.A.'s advisors—were looking into a number of potential transactions to raise equity and debt financing for Intelsat S.A. to strengthen its balance sheet and address upcoming maturities.  After reviewing several options, it was decided that Intelsat S.A. would issue common shares and convertible notes and use the proceeds of both issuances to repurchase LuxCo 2021 Notes.  In order to facilitate the issuance of convertible notes, Intelsat S.A. needed both an entity to support the issuance as a guarantor and a mechanism to fund the coupon payments.  Thus, Envision was created on June 6, 2018, to carry out both purposes.

Upon creation, LuxCo contributed its 50,000 shares in ICF to Envision at a book value of $1 per share.  Simultaneously, the Transaction Committee of the Intelsat S.A. board of directors approved the issuance common shares and of the 4.5% S.A. Convertible Notes with Envision as Guarantor of the notes. The Pricing Term Sheet of the notes confirmed that S.A. expected to "loan and/or contribute all or a portion of the net proceeds from the sale of the notes to the guarantor [Envision]," and that the proceeds would be used to purchase LuxCo 2021 Notes.  As detailed in The Pricing Term Sheet, the proceeds of both the common share issuance and the 4.5% S.A. Notes were contributed down from Intelsat S.A. to Envision— in the form of a $460 million cash contribution and a $150 million intercompany note—for Envision to repurchase LuxCo debt.

The $460 million cash contribution was to be contributed down through the chain of entities between S.A. and Envision.  On or about June 13, 2018, the board of directors of each entity in the chain (including LuxCo, Holdings SARL, Holdings, Investments, and LuxCo) adopted resolutions, which acknowledged (i) Intelsat S.A.'s offer and sale of convertible senior unsecured bonds and issuance of common shares for the purpose of raising capital to be loaned and/or contributed, directly or indirectly, through the entities down to Envision, and (ii) that it was in the best interests of each entity to contribute the proceeds down the chain of entities to Envision.  These entities subsequently entered into a Payment Instruction Agreement on June 18, 2018, where Intelsat S.A. was instructed to pay the $460 million directly to Envision to "satisfy and fully pay" the contribution payables agreed to at each entity in the chain.  Thus, the $460 million cash contribution went directly from Intelsat S.A. bank accounts to Envision bank accounts.

The $150 million loan from Intelsat S.A. to Envision came in the form of a note, with an interest rate of 12.5 percent and a maturity date of 2026.  The interest Intelsat S.A. earned from this note was used to fund Intelsat S.A.'s interest obligations on its 4.5% Convertible Notes.  A written resolution of the LuxCo board of directors reviewed and approved, as the sole shareholder of Envision, the loan from S.A. to Envision.  The board found that the terms of the $150 million loan were not materially less favorable to Envision than those that could have been obtained in a comparable transaction by Envision with an unrelated person or entity and that it was advisable and in the best interests of Envision to enter into the $150 million loan with Intelsat S.A.  Since the issuance of the loan, Envision has paid Intelsat S.A. $27,708,333 in interest.

Overall, Envision used the proceeds from the cash contribution and loan to repurchase approximately $600 million aggregate principal amount of the LuxCo 2021 Notes from third party noteholders.  S.A. was a Guarantor of the LuxCo 2021 Notes.  Following Envision's purchase of the LuxCo 2021 Notes, Envision and LuxCo entered into an exchange whereby Envision exchanged its $600 million of LuxCo 2021 Notes for $600 million of 13.5% LuxCo 2026 Notes.  Intelsat S.A. was not a Guarantor of the LuxCo 2026 Notes.  As a result, through this transaction Intelsat S.A. removed its guarantor obligations from LuxCo's notes.

*Potential Claims Evaluated by Special Committees*:  The Special Committees analyzed several legal issues associated with the Creation of Envision including (i) whether S.A. received reasonably equivalent value for the contribution of cash; (ii) whether the intercompany loan was made with commercially reasonable terms and/or could be subject to a recharacterization claim; (iii) whether Intelsat S.A. was solvent at the time of the transfers; (iv) whether the entities between Intelsat S.A. and Envision have potential claims associated with the $460 million cash contribution; and (v) whether LuxCo received reasonably equivalent value for its exchange with Envision of LuxCo 2021 Notes for LuxCo 2026 Notes.

Overall, the creation of Envision ultimately benefited Intelsat S.A. and LuxCo.  Intelsat S.A.'s loan and contributions to Envision allowed Envision to repurchase LuxCo 2021 Notes from third-party noteholders.  The subsequent exchange of LuxCo 2021 Notes (which S.A. was a Guarantor) for LuxCo 2026 Notes (which Intelsat S.A. was *not* a Guarantor) effectively removed Intelsat S.A.'s guarantor obligations.  LuxCo further benefited from addressing the maturity of its LuxCo 2021 Notes through the exchange for notes with a longer maturity date.

### (iv)    ICF Cash Contribution to Jackson.

*Factual Background*:    In August 2018, ICF issued 9.5% Senior Notes due 2023 ("ICF 2023 Notes"), which raised $1.25 billion and was guaranteed by Envision and LuxCo.  ICF used the net proceeds of the notes offering for two primary purposes:  (i) to repurchase or redeem all $731.9 million aggregate principal amount outstanding of the ICF 2022 Notes, and (ii) to contribute $482 million to Jackson so that Jackson could repurchase and cancel approximately $448.0 million aggregate principal amount of the Jackson 2020 Notes and approximately $30 million aggregate principal amount for the Jackson 2023 Notes and the Jackson 2025 Notes.  At the time of ICF's contribution to Jackson, it was a Guarantor of the Jackson 2020 Notes, the Jackson 2023 Notes, and the Jackson 2025 notes.

ICF's contribution was approved by the ICF board of directors via a Written Resolution on August 1, 2018.  Similarly, Jackson's board of directors approved the receipt of the contribution and the use of the funds to repurchase Jackson debt via a Written Resolution on August 15, 2018.

*Potential Claims Evaluated by Special Committees*:  The Special Committees analyzed several legal issues associated with ICF's cash contribution to Jackson including (i) whether ICF received reasonably equivalent value for the cash contribution; and (ii) whether ICF was solvent at the time of the contribution.  There is an argument that reasonably equivalent value was given because the notes that Jackson repurchased with the ICF cash contribution were notes under which ICF was a Guarantor.  Thus, ICF arguably received value because the transaction resulted in the removal of its guarantee obligations.  Further, while market-based evidence, including the trading price of ICF's debt, the overall debt at ICF, the overall debt of the enterprise as a whole, and the market cap of the enterprise as a whole indicate that ICF was likely solvent at the time of the cash contributions.  However, uncertainty still exists with respect to any likely results of litigation.

97

### (v)      ICF Notes Contribution to Jackson.

*Factual Background*:  As of December 2018, ICF held approximately $112 million aggregate principal amount of the LuxCo 2023 Notes, approximately $403 million aggregate principal amount of the LuxCo 2024 Notes, and approximately $979 million aggregate principal amount of the LuxCo 2026 Notes. The interest earned on these notes enabled ICF to service its debt, as well as address the maturity of the LuxCo 2021 Notes.  However, recent debt refinancing transactions gave ICF alternative paths to address the LuxCo 2021 Notes at maturity.  In addition, holding LuxCo Notes in excess of $1.25 billion created a wealth tax expense (that was valued at approximately $1.3 million annually at the time) that could be avoided if ICF contributed a portion of its LuxCo notes to Jackson.

After consideration and discussion, the ICF board of directors approved the contribution of LuxCo notes to Jackson.  The parties thereafter entered into a Contribution Agreement, which provided for the contribution of $111,663,000 of the LuxCo 2023 Notes and $220,610,000 of the LuxCo 2024 Notes.  Since this contribution, Jackson has received approximately $36.6 million in interest from LuxCo.

*Potential Claims Evaluated by Special Committees*:  The Special Committees analyzed several legal issues associated with ICF's notes contribution to Jackson including: (i) whether ICF received reasonably equivalent value for the notes contribution and (ii) whether ICF was solvent at the time of the contribution.  ICF arguably received reasonably equivalent value from the notes contribution due to the tax savings received because of the contribution.  However, there is a potential argument that reasonably equivalent value was not provided because the alleged tax savings was less than the amount ICF would have received in interest from LuxCo if ICF kept the notes.  Further, if the initial transaction is successfully challenged, it is possible the $36.6 million in interest Jackson has received post-contribution would also be challenged as well.

With respect to solvency, as discussed above, the market-based evidence indicates ICF was likely solvent at the time of the contribution, but the process of litigating the issue could provide for legally uncertain outcomes.

### (vi)      Other Transactions.

The Special Committees further reviewed a series of other intercompany transactions, which included the following:

TopCo Services Agreement:  On October 1, 2016, S.A. and several of its subsidiary entities (including Holdings, Holdings SARL, Investments, and Jackson) entered into a Services Agreement (the "TopCo Services Agreement"), through which the "Service Providers" (the non-Jackson entities) agreed to provide a collection of services to the "Service Recipient" (Jackson).  Jackson was, in turn, responsible for paying the parent entities back at cost.  The services included professional services, insurance, legal services, equity-based compensation, and board fees.  The boards of directors of each of the parties to the TopCo Services Agreement reviewed the terms and purpose of the agreement, and ultimately approved it.  Given Jackson likely was the sole beneficiary of many of the services under the Amended Plan Support Agreement (given certain of the other TopCo entities had no employees) and that the services were billed at cost, there likely is sufficient reasonably equivalent value exchange for the payments related to the Amended Plan Support Agreement, but the result of any related litigation is legally uncertain.  The total amount paid under the TopCo Services Agreement was $42.6 million.

ICF to LuxCo One-Time Dividend Payment:  On May 30, 2018, a dividend of $49,952,375 was paid directly from ICF to LuxCo.  This dividend did not originate from Jackson, but instead was cash ICF had on hand from interest payments received on the LuxCo notes that ICF held.  The purpose of the dividend was to assist LuxCo with redeeming the outstanding portion of its LuxCo 2018 Notes.  The dividend was

approved via a board resolution, where the board reviewed (i) a presentation describing the purpose of the dividend and a balance sheet testing showing the total capital reserves of ICF before and after the proposed dividends, indicating that ICF will remain solvent after the dividend payment; (ii) the relevant covenant obligations, which did not prohibit the dividend; and (iii) a report from PwC Lux that confirmed ICF's interim account was free of material misstatement, that ICF would have distributable profits after the distribution, and that the other conditions of Luxembourg law had been satisfied.  Given dividends are generally presumed to be *not* for reasonably equivalent value, this transaction will likely hinge on solvency.

Grant of Management LLC Shares:  Investments held all outstanding LLC interests in Intelsat Management LLC ("Management LLC"), a Delaware limited liability company, which served the primary corporate function of holding four employment contracts of certain key management executives of Intelsat S.A. and paying all amounts due to the executives pursuant to the terms and obligations set forth in their contracts.  Prior to November 2016, these payments were made through the dividends Investments received from LuxCo.  However, LuxCo was no longer able to declare dividends up the chain due to insufficient distributable reserves at LuxCo resulting from the incurrence of a Luxembourg GAAP accounting impairment charge.  Thus, Investments proposed to contribute the shares of Management LLC to Jackson (via LuxCo) to enable Management LLC to continue to meet its payment obligations.  The value of the shares was deemed to be $1.00 (US).  The parties entered into an agreement memorializing the contribution.  Jackson held Management LLC from November 2016 until July 2018.  In July 2018, Jackson contributed it down to one of its subsidiaries, Intelsat Alliance LP, which later merged with Intelsat US LLC in December 2018.

Non-Cash Dividends:  On several occasions from 2014–2016, non-cash dividends moved between the entities, including Jackson, LuxCo, Investments, Holdings, and Holdings SARL.  One subset of non-cash dividends originated at Jackson, Holdings, or Holdings SARL, and were generally in the form of intercompany receivables from S.A.  The non-cash dividends ranged from $8–10 million, and were generally contributed up the chain to S.A.  The non-cash dividends went through the same review and approval process as the cash dividends.

Historical Jackson-Holdings Loan:  In October 2013, Holdings made a loan of $28.3 million to Jackson with a 3.5 percent interest rate.  The purpose of the loan was to avoid wealth tax obligations at Holdings due to the excess of assets that were held at Holdings at that time.  The board unanimously approved a resolution to loan Holdings' net recorded equity to Jackson.  Jackson paid $19.8 million in interest and principal on the loan from October 2013 through May 2016.

LIBOR Note:  In 2005, Intelsat Subsidiary Holdings Company (succeeded by Jackson) and Intelsat Ltd. (succeeded by Investments) entered into an agreement to settle their outstanding intercompany debts through the issuance of a note, with an interest rate of LIBOR-plus-two-percent.  The two defining characteristics of this note are that (1) there is no set maturity date, but they are payable on demand; and (2) through successive board resolutions since at least 2015, Jackson agreed to "advance" the interest that Investments owed to Jackson by adding the "accrued" interest to the principal versus being paid.  The note is now worth approximately $572 million, with annually accruing interest rate at approximately $25 million.  As of April 1, 2020, Jackson had paid nearly $100 million in interest on the LIBOR note.

### 3. *Settlement Terms*

The intercompany issues described above, including (a) claims relating to historic intercompany transactions between and among the Debtors, the series of internal transactions and related steps that the Debtors implemented in July 2018 that reorganized the ownership of certain of their assets among Entities, and the Accelerated Relocation Payments; (b) claims and Causes of Action against any of the Debtors' directors, managers, officers, and other related Entities; and (c) the covenants and actions required of each party hereto to support the foregoing and to effectuate a tax value maximizing transaction, are settled

pursuant to the Settlement, through releases, covenants to support, and value for the creditors at the HoldCos under the Amended Plan.  The terms of the Settlement shall be set forth in greater detail in the Settlement Agreement and shall be subject to Bankruptcy Court approval through the Confirmation Order or by separate order.

### L.    The Guarantee Claims Standstill

#### 1.    *The Guarantee Claims*

As discussed in further detail in section VII.E hereto, in an effort to conserve liquidity as the Debtors assessed their strategic alternatives, on April 15, 2020, Intelsat and certain of its affiliates elected to withhold a $125 million interest payment due April 15, 2020, on the Jackson 8.5% Senior Notes Indenture Due 2024 and entered into a 30-day grace period, provided for in the applicable indenture, to preserve liquidity as the Company continued to engage with key stakeholders and further progress discussions regarding financing and restructuring options.

Prior to filing voluntary bankruptcy petitions, each of the Parent Guarantors elected to initiate Guarantee Releases pursuant to section 10.01(k) of each applicable indenture, resulting in Parent Guarantors releasing its guarantees of the Jackson 5.5% Senior Notes due 2023, the Jackson 8.5% Senior Notes due 2024, the Jackson 9.75% Senior Notes due 2025, the LuxCo 7.75% Senior Notes due 2021, and/or the LuxCo 8.125% Senior Notes due 2023, as further detailed in VII.E hereto.

Certain stakeholders have argued that these Guarantee Releases were ineffective or improper and therefore that the Guarantee Claims should be allowed, as discussed in further detail in section VII.E herein, generating substantial litigation.  As of the date hereof, five well-funded, independently advised parties in interest have pursued:  (a) numerous proofs of claim; (b) two objections to the Jackson Parent Guarantee Claims and one objection to the Lux Parent Guarantee Claims; (c) five responses to the objections; (d) two motions for partial summary judgment; and (e) two objections to the motions for partial summary judgment and cross-motion for partial summary judgment.  While the Debtors believe that the Guarantee Claims lack merit, litigating the fact-intensive claims and causes of action asserted by various stakeholders would be extremely costly and time-consuming.

Based on the substantial and good faith disagreement set forth in the numerous pleadings described above, many of the parties thereto engaged in months of good faith and hard-fought negotiations regarding a consensual resolution to the Guarantee Claims and related claims and causes of action.  These conversations resulted in an agreement regarding the Guarantee Claims by and among each of the Parent Guarantors, the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, U.S. Bank, and Delaware Trust, which is included in the Amended Plan Support Agreement.  The Amended Plan Support Agreement includes an agreement on a standstill on the prosecution of the Guarantee Claims, the pleadings related thereto, and other related potential causes of action, as described in greater detail herein and in the Amended Plan Support Agreement attached hereto as **Exhibit G**.

#### 2.    *The Standstill*

Pursuant to the Amended Plan Support Agreement, the Jackson Crossover Group will not seek entry of an order allowing a HoldCo Guarantee Claim (whether on a temporary or final basis), or seek a distribution from any of the HoldCo Guarantors on account of any HoldCo Guarantee Claims, and neither the HoldCo Creditor Ad Hoc Group nor any Company Party shall prosecute any objection or participate in any challenge to the Guarantee Claims, in each case at any time when (1) the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group (in each case in a percentage amount required for the effectiveness of the Amended Plan Support Agreement pursuant to Section 2 of the Amended Plan Support Agreement) are parties to the Amended Plan Support Agreement or a plan support agreement that provides

100

(a) treatment for Jackson Senior Notes Claims against all Debtors that is no less favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement and (b) treatment for the HoldCo Senior Notes Claims that is no more favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement, and (2) no plan of reorganization has been filed by any person or entity having a right to file a plan that (a) provides treatment to Jackson Senior Notes Claims against any Debtor that is less favorable than the treatment of such claims specified in the Amended Plan Support Agreement or (b) provides treatment to any HoldCo Senior Notes Claim that is more favorable in any respect than the treatment of such claims specified in the Amended Plan Support Agreement; *provided*, that this clause (2) shall not apply to any plan filed by the Jackson Crossover Ad Hoc Group.

Pursuant to the Plan Support Agreement, to the extent that the Standstill Conditions cease to exist at any time before the Bankruptcy Court enters the Confirmation Order, the HoldCo Creditor Ad Hoc Group and the Debtors agree that they will consent to and support the adjournment of the Confirmation Hearing by twenty-one (21) days to permit the Jackson Crossover Ad Hoc Group to seek the temporary allowance for voting purposes of the Guarantee Claims (and with such period to be extended solely to the extent necessary for any requisite solicitation to occur following the Bankruptcy Court's ruling with respect to such temporary allowance, including with respect to the HoldCo Guarantee Claims) before the Confirmation Hearing commences or resumes, as applicable; *provided*, that nothing in this paragraph shall prevent or limit the Jackson Crossover Ad Hoc Group from seeking any relief with respect to the Guarantee Claims at any time after the Standstill Conditions cease to exist.

Nothing in the Amended Plan Support Agreement shall prevent the Jackson Crossover Ad Hoc Group from (1) seeking entry of an order allowing a Guarantee Claim (whether on a temporary or final basis) against, or seeking a distribution from, the TopCo Guarantors or (2) defending any Guarantee Claim asserted against the HoldCo Guarantors or TopCo Guarantors against objections or challenges from any party; *provided*, that (i) any hearing regarding the merits of any Guarantee Claim against any TopCo Guarantor shall occur contemporaneously with the Confirmation Hearing, and in no event shall any such hearing occur prior to the Confirmation Hearing, (ii) no hearing regarding the merits of any Guarantee Claim against any HoldCo Guarantor may occur until after the Confirmation Hearing (except as provided in Section 7.05(h)), and (iii) the Jackson Crossover Ad Hoc Group, the HoldCo Creditor Ad Hoc Group, and the Company Parties will each support the Bankruptcy Court's entry of the Guarantee Litigation Scheduling Order.

Pursuant to the Amended Plan Support agreement, in the event (x) any hearing other than the September 1, 2021 hearing scheduled pursuant to the Initial Guarantee Litigation Scheduling Stipulated Order concerning the merits or temporary allowance of any Guarantee Claim is scheduled by the Bankruptcy Court for a date prior to the Confirmation Hearing or (y) the Bankruptcy Court does not enter the Guarantee Litigation Scheduling Order prior to the commencement of the Disclosure Statement Hearing, then (1) the standstill provided in the Amended Plan Support Agreement shall automatically terminate, (2) the Jackson Crossover Ad Hoc Group and the HoldCo Creditor Ad Hoc Group shall each be permitted to take any and all actions with respect to the Guarantee Claims as each may deem appropriate (including, for the avoidance of doubt, participating in any hearing or briefing with respect to such hearing) concerning the merits or temporary allowance of any Guarantee Claim that is set to occur on or prior to the Confirmation Hearing, (3) the Required Consenting Jackson Crossover Group Members and Required Consenting HoldCo Creditors may each terminate the Amended Plan Support Agreement, *provided*, that the Required Consenting Jackson Crossover Group Members and Required Consenting HoldCo Creditors may only terminate the Amended Plan Support Agreement within seven (7) days (except as may be extended by the Required Consenting Unsecured Creditors) of: (i) the time at which a hearing concerning the merits or temporary allowance of any Guarantee Claim is scheduled by the Bankruptcy Court for a date prior to the Confirmation Hearing; (ii) the time that the Bankruptcy Court determines that it will not enter the Guarantee Litigation Scheduling Order; or (iii) commencement of the Disclosure Statement Hearing as

101

set forth in clause (y) of this paragraph and (4) upon such termination of the Amended Plan Support Agreement by either the Required Consenting Jackson Crossover Group Members or the Required Consenting HoldCo Creditors pursuant to clause (3) of this sentence, the Debtors shall (A) immediately amend the Plan (and the Non-TopCo Plan) to provide that the Guarantee Claims shall not be (i) released or waived against any Guarantor unless consented to in writing by the Required Consenting Jackson Crossover Group Members or (ii) Allowed in any amount against any HoldCo unless consented to in writing by the Required HoldCo Creditors or otherwise ordered by the Bankruptcy Court or other court of competent jurisdiction, and (B) make any other amendments to the Plan (and the Non-TopCo Plan) necessary to effectuate the amendments in the foregoing clauses (i) and (ii) and to ensure that the Plan does not prejudice either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group's rights and defenses with respect to the Guarantee Claims (including the right to seek a disputed claims reserve with respect to the Guarantee Claims). For the avoidance of doubt, the amendments to the plan contemplated by clause (4) of the preceding sentence, under the circumstances contemplated therein, are hereby consented to by the Parties to the Amended Plan Support Agreement.

Pursuant to the Amended Plan Support Agreement, notwithstanding anything to the contrary therein, it shall not be a violation of the Standstill Conditions, and each Party shall otherwise be entitled under the Amended Plan Support Agreement, to take any actions and make any filings with the Bankruptcy Court necessary to comply with the Initial Guarantee Litigation Stipulation unless or until the Guarantee Claims Litigation Order is entered by the Bankruptcy Court.

No ruling, order, or judgment issued by any court with respect to an objection or challenge by another party to the TopCo Guarantee Claims, or with respect to a motion for temporary allowance of the TopCo Guarantee Claims, in which the HoldCo Creditor Ad Hoc Group is prevented by Section 7.05 of the Amended Plan Support Agreement from participating, shall have res judicata, collateral estoppel, or any other precedential effect against either the Jackson Crossover Ad Hoc Group or the HoldCo Creditor Ad Hoc Group in any proceeding seeking to enforce or challenge the HoldCo Guarantee Claims.

Pursuant to the Amended Plan Support Agreement, all Guarantee Claims against the HoldCo Guarantors will be withdrawn with prejudice and are not entitled to any distribution under the Plan (or the Non-TopCo Plan, as applicable) and will be released on the Effective Date; provided, that, for the avoidance of doubt, the TopCo Guarantee Claims shall not be withdrawn, enjoined, or released on the Effective Date.

During the effective period of the Amended Plan Support Agreement, all Consenting Creditors shall use reasonable best efforts to direct the Trustees to support the Guarantee Litigation Scheduling Order and the matters set forth in Section 7.05 of the Amended Plan Support Agreement, provided that this shall not require any Consenting Creditor to provide any indemnification to, or incur any other out-of-pocket cost to, any Trustee.

It shall not be a violation of the Standstill Conditions, and each Party shall otherwise be entitled under this Agreement, to take any actions and make any filings with the Bankruptcy Court necessary to comply with the Initial Guarantee Claims Litigation Stipulation unless or until the Guarantee Claims Litigation Order is entered by the Bankruptcy Court.

For the avoidance of doubt, before the Confirmation Hearing, the Debtors shall not settle, seek to settle, or support any settlement of, any Guarantee Claim without the prior written consent of the Required Consenting Unsecured Creditors; *provided, however*, that the Required Consenting HoldCo Creditors shall be deemed to consent to any such settlement at any time after the HoldCo Guarantee Claims have been withdrawn with prejudice.

Pursuant to the Amended Plan, upon the occurrence of the Effective Date, (i) each Holder of an Allowed TopCo Guarantee Claim against Holdings SARL shall receive its Pro Rata share of the Holdings

SARL Unsecured Recovery; and (ii) 30 percent of any distributions made on account of TopCo Guarantee Claims against Intelsat to the Jackson Senior Notes Trustees shall be gifted Pro Rata to Holders of Connect Senior Notes Claims in consideration for the covenants, compromises, releases, and other benefits provided by the members of the HoldCo Creditor Ad Hoc Group pursuant to the Amended Plan Support Agreement; provided that the aggregate value of such gift shall not exceed $6 million.

### M.     The Amended Plan Support Agreement

As discussed in further detail in section II.F, following months of continued, active, good-faith negotiation, the Debtors and their major stakeholders, the Debtors, the HoldCo Creditors Ad Hoc Group, the Jackson Ad Hoc Group, the Jackson First Lien Noteholder Group, and the Jackson Crossover Ad Hoc Group reached agreement on the terms of a restructuring that each was willing to support and entered into the Amended Plan Support Agreement, which outlines the terms of the Debtors' proposed restructuring. In parallel, the Debtors worked with the other parties to the Amended Plan Support Agreement to formulate the Amended Plan, which is consistent with the Amended Plan Support Agreement and enjoys the support of each party thereto. As noted in further detail herein, the Amended Plan Support Agreement provides for signatories' commitment to support the Settlement under Bankruptcy Rule 9019 amongst certain parties to the Amended Plan Support Agreement to be reflected the Settlement Agreement to be approved by the Court through the Confirmation Order or by separate order. This Settlement resolves certain key issues in the case, paving the way for the consensual restructuring reflected in the Amended Plan.

### N.     Non-TopCo Plan

In the event that a Plan Toggle Event occurs, for any reason, the Debtors shall immediately seek, and the Parties to the Amended Plan Support Agreement shall support, the Confirmation of the Non-TopCo Plan without the need to resolicit votes on the Non-TopCo Plan. Upon conversion to the Non-TopCo Plan, all references in the Amended Plan to the "Plan" and any references herein to the "Amended Plan" shall be deemed to refer to the New-TopCo Plan. Any references to the Debtors shall be deemed to refer to all of the Debtors other than whichever (or both) of Intelsat S.A. and Holdings SARL that a Plan Toggle Event occurs with respect to. The Non-TopCo Plan shall be consistent in all respects with the terms of the Amended Plan (including, for the avoidance of doubt, the treatment of Claims provided under the Plan for all classes of creditors other than creditors of Holdings SARL and/or Intelsat S.A.). The Non-TopCo Plan may differ from the Amended Plan only to the extent required to remove Holdings SARL and/or Intelsat S.A. from the Amended Plan and which shall still (unless waived in accordance with the Amended Plan Support Agreement) require that the Settlement Agreement Order be entered as a condition precedent to confirmation of the Non-TopCo Plan, and otherwise be in form and substance reasonably acceptable to the Debtors and the Required Consenting Unsecured Creditors.

## VIII.   RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Amended Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Amended Plan and its implementation.

### A.     Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Amended Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Amended Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

1.  ***Parties in Interest May Object to the Amended Plan's Classification of Claims and Interests***

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Amended Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.  ***The Conditions Precedent to the Effective Date of the Amended Plan May Not Occur***

As more fully set forth in Article IX of the Amended Plan, the Effective Date of the Amended Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

3.  ***The Debtors May Fail to Satisfy Voting Requirements***

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Amended Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Amended Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Amended Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Amended Plan.

4.  ***The Debtors May Not Be Able to Satisfy Voting Requirements if SES's Claim Is Placed into Its Own Class and SES Votes to Reject the Amended Plan.***

SES has asserted that it believes its claim should be allowed in full, against each Debtor, and placed into its own class, and SES has asserted that its claim is not substantially similar to other unsecured claims against Jackson Subsidiaries. *See* SES Disclosure Statement Obj. ¶¶ 16, 94. The Debtors disagree with all of SES's assertions, including its assertions that (a) its claim should be allowed in full; (b) it should be allowed against any Debtor; and (c) to the extent SES is determined to have a valid claim, it should be placed into its own class. If SES's claim were allowed and placed into its own class, the Debtors may be unable to obtain confirmation of the Amended Plan without SES voting to accept it or, if confirmed, recoveries under the Amended Plan could be materially impacted. The Debtors may also seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Amended Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Amended Plan.

5.  ***The Debtors May Not Be Able to Satisfy Voting Requirements if the Convert Ad Hoc Group Votes to Reject the Plan at Intelsat S.A.***

The Convert Ad Hoc Group has argued that the Amended Plan is not confirmable at Intelsat S.A. without the Convert Ad Hoc Group's voting to accept the Amended Plan. *See* the Convert Ad Hoc Group's Disclosure Statement Obj. ¶ 51. As mentioned above, if votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Amended Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Amended Plan. In the event that sufficient votes are not

received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Amended Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Amended Plan.

### 6. *Absolute Priority Rule*

SES has asserted that it believes its alleged Claim should be allowed and placed into its own class. *See* SES Disclosure Statement Obj. ¶¶ 16, 94.  If SES is successful in prosecuting its alleged Claim, and it is placed into its own class, a vote to reject the Amended Plan from SES may render the Amended Plan unconfirmable under the absolute priority rule of section 1129(b).  Section 1129(b) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than the requirement that the plan has been accepted by all impaired classes, a plan may be confirmed so long as it does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.  The Debtors believe that the Amended Plan satisfies section 1129(b) and intend to prove so at Confirmation.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 7. *The Debtors May Not Be Able to Secure Confirmation of the Amended Plan*

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims or equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Amended Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Amended Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Amended Plan, reserve the right to modify the terms and conditions of the Amended Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Amended Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Amended Plan or no distribution whatsoever under the Amended Plan.

### 8. *The Plan May Not Be Confirmed With Respect to the TopCo Debtors*

The Amended Plan is a single plan of reorganization for all of the Debtors; however, pursuant to section 7.06 of the Amended Plan Support Agreement, under certain facts and circumstances, the Debtors

may bifurcate the Amended Plan, seeking confirmation of the Non-TopCo Plan[49] separately from a plan of reorganization for Holdings SARL and Intelsat S.A. If this toggle occurs and the Non-TopCo Plan is separately confirmed, then a plan of reorganization may not be confirmed at Holdings SARL or Intelsat S.A. and there could be an impact on the recovery to Holders of Claims at the Debtors. The Non-TopCo Plan may still be confirmed based on tabulation of votes for the Amended Plan without resolicitation. Therefore, Holders of Claims entitled to vote on the Amended Plan should take into account the possibility of confirmation of the Non-TopCo Plan alone when determining whether to vote in favor of the Amended Plan.

### 9. *Nonconsensual Confirmation*

In the event that any impaired class of Claims or Interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Amended Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Amended Plan may result in, among other things, increased expenses relating to professional compensation.

### 10. *Proposed in Good Faith*

Section 1129(a)(3) of the Bankruptcy Code provides that a court shall confirm a plan only if the plan has been proposed in good faith and not by any means forbidden by law. The Convert Ad Hoc Group and SES allege that the Original Plan was not proposed in good faith. The Debtors believe that the Amended Plan was proposed in good faith and otherwise complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 11. *Best Interests of Creditors Test*

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or an equity Interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the Debtors liquidated under chapter 7.

SES has asserted that the creditors of US LLC may receive more in a liquidation than is provided to such creditors under the Original Plan, because the Original Plan allocated only some of the value of the Accelerated Relocation Payments to US LLC, while SES alleges all of such value should be allocated exclusively to US LLC. *See* SES Disclosure Statement Obj. ¶¶ 16, 77. The Debtors believe that the allocation of distributable value provided for in the Amended Plan reflects the correct allocation of the Debtors' assets, including any Accelerated Relocation Payments that they may receive, among the Debtors, which would apply during a liquidation as well. Accordingly, the Debtors disagree that any creditor would

---

[49] "Non-TopCo Plan" means a single plan of reorganization for all of the Debtors other than Holdings SARL and Intelsat S.A., as discussed above.

receive a greater amount in a liquidation.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Convert Ad Hoc Group has also argued that the Amended Plan does not satisfy the best interests test because the Amended Plan does not attribute any value to Intelsat S.A. on account of the Accelerated Relocation Payments.  The Debtors disagree with the assertions made by the Convert Ad Hoc Group and believe the allocation of the value of the Accelerated Relocation Payments under the Amended Plan to be reasonable.  As further described in section IV.B.2 of this Disclosure Statement, entitled "Allocation of Accelerated Relocation Payments," the Debtors have allocated the value of the anticipated Accelerated Relocation Payments, taking into account, among other things, that License holds the relevant FCC Licenses and the effect of certain intercompany agreements on certain Debtors' rights to receive value on account of any Accelerated Relocation Payments received.  In sum, the Debtors believe, and the Amended Plan assumes, that Jackson is entitled to 42.7 percent of the value associated with the anticipated receipt of Accelerated Relocation Payments, License is entitled to 49.9 percent, and US LLC is entitled to 7.4 percent.

The Convert Ad Hoc Group has argued that the Amended Plan does not satisfy the best interests test because the Amended Plan fails to consider certain intercompany claims held by Intelsat S.A. against Envision and held by Envision against LuxCo.  As provided in the Amended Plan, claims among the Debtors, including those raised by the Convert Ad Hoc Group, are being settled pursuant to the Amended Plan, which Settlement is the product of arm's-length good faith negotiations, and provides reasonable value to all Debtors under the circumstances.

### 12. *Continued Risk upon Confirmation*

Even if the Amended Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for satellite services, changes in satellite technology, and increasing expenses.  *See* Article VIII.M of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses."  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Amended Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Amended Plan and prohibits creditors and others from proposing a plan. The Debtors currently have the exclusive right to propose the Amended Plan.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Amended Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Amended Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 13. *The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7

of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate such debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing the business in a controlled manner; (b) additional administrative expenses involved in the appointment of a chapter 7 trustee; and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 14. *One or More of the Chapter 11 Cases May Be Dismissed*

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial consummation of a confirmed plan, or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases.  In such event, the Debtors would be unable to confirm the Amended Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Amended Plan.

### 15. *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Amended Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Amended Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 16. *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will, in fact, occur.

### 17. *Risk that Foreign Courts Will Not Enforce the Confirmation Order*

After the Effective Date, the Reorganized Debtors will maintain business operations in certain foreign jurisdictions, including the Grand Duchy of Luxembourg—where many of the Debtors are incorporated—and the United Kingdom.  Additionally, implementation of the Amended Plan and the Restructuring Transactions contemplated thereunder may require certain actions to be taken by and/or with respect to certain of the Debtors or Reorganized Debtors incorporated in certain foreign jurisdictions, including the Grand Duchy of Luxembourg.  There is a risk that the courts in these jurisdictions will not enforce the Confirmation Order, which may affect the Reorganized Debtors' ability to effectuate certain relief granted pursuant to the Confirmation Order.

### 18. *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

Article VIII of the Amended Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The Convert Ad Hoc Group and SES have alleged that these provisions may be improper because they are too broad, fails to give an opportunity for a party voting in favor of the Amended Plan to opt out of the releases, and was negotiated among "insiders."  The releases, injunctions, and exculpations provided in the Amended Plan are subject to objection by all parties in interest and may not be approved.  The Debtors believe that the releases, injunctions, and exculpations

provided in the Amended Plan are consensual or otherwise proper, and intend to prove so at Confirmation. If the releases are not approved, certain Released Parties may withdraw their support for the Amended Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Amended Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Further, the Amended Plan embodies a settlement of claims and causes of action between the Debtors and their stakeholders. To effectuate the settlement embodied in the Amended Plan, the Amended Plan includes Debtor and third-party releases, an exculpation provision, and an injunction provision. These provisions comply with the Bankruptcy Code and prevailing law because, among other reasons, they are the product of extensive good-faith, arm's-length negotiations, were material inducements for the Consenting Creditors to enter into the Amended Plan Support Agreement and the Settlement embodied in the Amended Plan, and are supported by the Debtors and the signatories to the Amended Plan Support Agreement.

### 19. *The Secured Creditor Settlement is Subject to Potential Dispute*

The Debtors are pursuing the Secured Creditor Settlement, which, as described in greater detail in Section IV of this Disclosure Statement and in the Secured Creditor Settlement Term Sheet, provides for a settlement of the First Lien Claims. Approval of the Secured Creditor Settlement will be sought pursuant to a motion separate from the Amended Plan. The Jackson Crossover Ad Hoc Group does not support the Secured Creditor Settlement and has reserved their right to challenge it and it may be subject to challenge from other parties in interest in these Chapter 11 Cases as well. If the Secured Creditor Settlement is challenged, the ultimate amount of the consideration provided to the Holders of First Lien Claims could be higher or lower based on the outcome of any litigation brought to challenge the Secured Creditor Settlement. That litigation could continue after Confirmation of the Amended Plan, in which case the Debtors may establish a reserve account to reserve the Secured Creditor Claims Disputed Distribution Reserve (as defined in the Plan). The Debtors believe that the secured creditor settlement is a fair and reasonable resolution of potential disputes around the First Lien Claims and is the best interests of their estates. Nonetheless, the outcome of this litigation may impact the timing and amounts of recoveries for the Holders of First Lien Claims and Holders entitled to vote should consider this when determining whether to vote to approve or reject the Amended Plan.

### 20. *The Convert Ad Hoc Group's Standing Motion or SES's Intervention Motion May Be Granted*

In the event that the Standing Motion or the Intervention Motion is granted, depending on the nature of the ruling, the Debtors' Chapter 11 Cases may be prolonged due to litigation stemming from the Standing Motion or Intervention Motion and related adversary proceedings which would otherwise be resolved by the Amended Plan.

### B. Risks Related to Recoveries Under the Amended Plan

### 1. *The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results*

The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry sectors in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure

109

Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. *The Reorganized Debtors Do Not Intend to Offer to Register or to Exchange the New Common Stock, New Warrants, or CVRs*

Upon emergence, the New Common Stock, New Warrants or CVRs will not be registered under the Securities Act or any state securities laws.  As a result, until the Reorganized Debtors (i) register the New Common Stock, New Warrants, or CVRs under the Securities Act or (ii) offer to exchange the New Common Stock, New Warrants, or CVRs in an exchange offer registered under the Securities Act, the New Common Stock, New Warrants, and CVRs generally may be transferred or re-sold only in transactions exempt from the securities registration requirements of federal and applicable state laws, including pursuant to the exemption set forth in section 1145 of the Bankruptcy Code. *See* Article X to this Disclosure Statement entitled "Certain Securities Law Matters," which begins on page 113.  In addition, the Reorganized Debtors will not be subject to the reporting requirements of the Securities Act, and holders of the New Common Stock, New Warrants or CVRs will not be entitled to any information except as may be expressly required in the applicable New Corporate Governance Documents.

### 3. *There is No Established Market for the Shares of New Common Stock, New Warrants, or CVRs and One May Not Develop*

The New Common Stock, New Warrants (including any shares of New Common Stock issuable upon the exercise of the New Warrants), and CVRs will be a new issuance of Securities, and there is no established trading market for those Securities.  The Reorganized Debtors do not intend to apply to list the New Common Stock, New Warrants, or CVRs on a national securities exchange.  You may not be able to sell your New Common Stock, New Warrants, or CVRs at a particular time or at favorable prices.  As a result, the Debtors cannot assure you as to the liquidity of any trading market for the New Common Stock, New Warrants, or CVRs.  Accordingly, you may be required to bear the financial risk of your ownership of the New Common Stock, New Warrants, or CVRs indefinitely.  The liquidity of any market for shares of New Common Stock, New Warrants, or the CVRs will depend upon, among other things, the number of Holders of shares of New Common Stock, New Warrants, and CVRs, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New Common Stock, New Warrants, or CVRs will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New Common Stock, New Warrants, or CVRs may be substantially limited and the price of the New Common Stock, New Warrants, or CVRs may decline.

### 4. *The Trading Price for the Shares of New Common Stock, New Warrants, CVRs, or the New Debt May Be Depressed Following the Effective Date*

Assuming that the Effective Date occurs, shares of New Common Stock, New Warrants, and/or CVRs will be issued to Holders of certain Classes of Claims.  Following the Effective Date of the Amended Plan, shares of New Common Stock or New Warrants may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, Holders of Claims that receive shares of New Common Stock, New Warrants, and/or CVRs may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New Common Stock available for trading could cause the

trading price for the shares of New Common Stock, New Warrants, and/or CVRs to be depressed, particularly in the absence of an established trading market for the New Common Stock, the New Warrants, and/or CVRs.  In addition, the New Debt, which is consideration for various Classes of Claims under the Amended Plan, may trade at prices below par.

**5. *If the New Warrants Are Exercised, the Underlying Shares of New Common Stock Could Be Eligible for Future Resale, Which Could Lead to "Market Overhang," Resulting in Dilution and Potentially Depressing the Trading Price of the New Common Stock***

If the New Warrants are exercised or, a substantial number of additional shares of New Common Stock could be eligible for resale, which could depress the trading price of the New Common Stock.  The Reorganized Debtors also may grant options and equity awards pursuant to the MIP and may grant additional options, warrants, or other convertible securities in the future.  The exercise or conversion of the New Warrants or other options or convertible or derivative securities will dilute the percentage ownership of other Holders of the New Common Stock.  If Holders of the New Common Stock sell substantial amounts of New Common Stock, shares issued upon the exercise of the New Warrants or other outstanding options or convertible or derivative securities, it could create a circumstance commonly referred to as an "overhang," in anticipation of which the trading price of the New Common Stock could fall.  An overhang may adversely affect the Reorganized Debtors' ability to obtain financing on reasonable and acceptable terms whether or not sales have occurred or are occurring.

**6. *Certain Holders of New Common Stock, New Warrants, or CVRs May Be Restricted in Their Ability to Transfer or Sell Their Securities***

To the extent that shares of the New Common Stock, New Warrants, or CVRs issued under the Amended Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; *provided*, *however*, shares of such securities will not be freely tradable if, at the time of transfer, the Holder is an "affiliate" of the Equity Issuer or the issuer of the CVRs, as applicable, as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer.  Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.  Resales by Holders of Claims who receive New Common Stock or New Warrants pursuant to the Amended Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The Reorganized Debtors do not intend to register or apply to list the New Common Stock, New Warrants, or CVRs on a national securities exchange.  However, such New Common Stock, New Warrants or, CVRs may be listed in the future, though there can be no assurance that such securities will be listed promptly or at all.

The Debtors make no representation regarding the right of any holder of New Common Stock, New Warrants, or CVRs to freely resell such securities (including, as applicable, shares issuable thereunder). *See* Article X to this Disclosure Statement entitled "Certain Securities Law Matters," which begins on page 113.

7. ***Restricted Securities Issued under the Amended Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies***

To the extent that securities issued pursuant to the Amended Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale, and notice requirements of Rule 144. Further, Holders of New Common Stock, New Warrants, or CVRs who are deemed to be "underwriters" under section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 113.

8. ***Certain Significant Holders of Shares of New Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date***

Assuming that the Effective Date occurs, Holders of Claims and Interests who receive distributions representing a substantial percentage of the outstanding shares of the New Common Stock, including, as applicable, shares issued under the New Warrants ("Large Holders") may be in a position to influence matters requiring approval from the Holders of shares of New Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. These Large Holders may have interests that differ from those of the other Holders of shares of New Common Stock and may vote in a manner adverse to the interests of other Holders of shares of New Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of New Common Stock or New Warrants. In addition, subject to the provisions of the New Corporate Governance Documents, a holder of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of New Common Stock or New Warrants. A holder of a significant number of shares of New Common Stock may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by Holders of a significant number of shares of New Common Stock may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

**9.** ***The Rights and Responsibilities of Holders of New Common Shares Are Governed by Luxembourg Law***

The rights and responsibilities of Holders of New Common Stock (including, as applicable, shares of New Common Stock issuable under the New Warrants) are governed by Luxembourg law and differ in some respects from the rights and responsibilities of shareholders under other jurisdictions, including the United States.  Equity Issuer's corporate affairs will be governed by its articles of association, as amended from time to time, the New Corporate Governance Documents, and by the laws governing companies incorporated in Luxembourg.  The rights of Equity Issuer's shareholders and the responsibilities of its board of directors under Luxembourg law may not be as clearly established as they are under the laws of other jurisdictions.  Equity Issuer may hold all of its shareholder meetings in Luxembourg.  The Holders of the New Common Shares may have more difficulty in protecting their interests in the face of actions by Equity Issuer's board of directors than if Equity Issuer were incorporated in the United States.  However, the Shareholders Agreement will be governed by Delaware law.

**10.** ***Because Equity Issuer Will Be Incorporated Under the Laws of Luxembourg, Holders of New Common Shares May Face Difficulty Protecting Their Interests, and Their Ability to Protect Their Rights Through Other International Courts, Including Courts in the United States, May Be Limited***

Equity Issuer will be a public limited liability company incorporated under the laws of Luxembourg, and as a result, it may be difficult for investors to effect service of process within the United States upon Equity Issuer or to enforce both in the United States and outside the United States judgments against it obtained in United States courts in any action, including actions predicated upon the civil liability provisions of the federal securities laws of the United States.  In addition, a majority of Equity Issuer's directors may be residents of jurisdictions other than the United States, and all or a substantial portion of the assets of those Persons may be located outside the United States.  As a result, it may be difficult for investors to effect service of process within the United States on certain of these directors or to enforce against them judgments obtained in United States courts, including judgments predicated upon the civil liability provisions of the federal securities laws of the United States.  There is uncertainty as to whether the courts of Luxembourg would (a) enforce judgments of United States courts obtained against the Equity Issuer or the issuer of the CVRs predicated upon the civil liability provisions of the federal securities laws of the United States or (b) entertain original actions brought in Luxembourg courts against the Equity Issuer or the issuer of the CVRs predicated upon the federal securities laws of the United States.

**11.** ***The Value of the CVRs Is Speculative and May Be Zero***

Assuming that the Effective Date occurs, CVRs will be issued to Holders of certain Classes of Claims, which will entitle the recipients of such CVRs to such recipients' pro rata share of cash equal to 100 percent of the Initial Further Acceleration Payments or the Subsequent Further Acceleration Payments (each as defined in the CVR Term Sheet), as applicable.  The CVRs shall have a term that expires on the Outside Date; *provided* that any payments agreed (if any) to prior to the relocation deadline shall constitute additional C-band proceeds regardless of whether such payments are received after the relocation deadline.  The Debtors and Reorganized Debtors may be unable to obtain any additional C-band proceeds, which would have an adverse effect on the value of the CVRs.  The tax treatment of the CVRs is discussed in Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax and Luxembourg Tax Consequences of the Amended Plan."

113

**12.** *Issuance of New Common Stock Pursuant to the Management Incentive Plan or Exercise of the New Warrants may Dilute Holdings of New Common Stock*

The Amended Plan provides for potential issuance of New Common Stock pursuant to the MIP, and for the issuance of New Warrants, which, if exercised, will permit Holders thereof to purchase shares of New Common Stock.  Consistent with the Dilution Principles set forth in the Amended Plan, issuance of New Common Stock pursuant to the MIP or the exercise of the New Warrants would have a dilutive effect on the New Common Stock issued pursuant to the Amended Plan.

**13.** *Certain Tax Implications of the Amended Plan*

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "Certain United States Federal Income Tax and Luxembourg Tax Consequences of the Amended Plan," to determine how the tax implications of the Amended Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of certain Claims.

**14.** *The Debtors May Not Be Able to Accurately Report Their Financial Results*

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations to the extent applicable and the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

**15.** *Contingencies Could Affect Allowed Claims Classes*

The distributions available to Holders of Allowed Claims under the Amended Plan can be affected by a variety of contingencies, including, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Amended Plan.

**16.** *Potential Dilution of Claims*

On July 14, 2020, SES filed a proof of Claim in the amount of $1.8 billion against each of the Debtors.  SES asserts that the Debtors owe money (or will owe money) to SES pursuant to certain alleged contractual and fiduciary obligations arising from the Consortium Agreement between Debtor US LLC, SES, and other satellite operators.

114

The Debtors dispute the allegations in the proof of Claim and on October 19, 2020, filed an objection to the Claim.  To the extent that any portion of SES's Claim is allowed, the Debtors have requested that the Court equitably subordinate such Claim based on SES's conduct in matters related to the Consortium Agreement.  While the ultimate resolution of the Claim is not currently predictable, if there is an adverse ruling, the ruling could have the effect of significantly diluting the recoveries of Holders of Claims against the Debtors.  Further, SES asserts that the Accelerated Relocation Payments that it claims entitlement to should be held in a constructive trust on its behalf.  If any portion of the Accelerated Relocation Payments are deemed to be held in constructive trust for SES, the value distributable to the Debtors entitled to receive such payments would be diminished, which in turn would diminish recoveries to Holders of Clams against such Debtors.

Similarly, the Guarantee Claims were filed by U.S. Bank and Delaware Trust in the aggregate amounts of approximately $8.1 billion against Intelsat S.A., Holdings SARL, Holdings S.A., and Investments S.A. and approximately $6.8 billion against LuxCo and ICF.  U.S. Bank asserts that each of the foregoing Debtors is obligated to guarantee the obligations of Jackson under the Jackson Senior Notes.  Similarly, Delaware Trust asserts that Intelsat S.A., Holdings SARL, Holdings S.A., and Investments S.A. are obligated to guarantee the obligations of LuxCo under the LuxCo Senior Notes.  The Amended Plan Support Agreement includes a resolution of certain Guarantee Claims, the pleadings related thereto, and other related potential causes of action, including, as described in greater detail herein and in the Amended Plan Support Agreement attached hereto as **Exhibit G**, an agreement on a standstill on the prosecution of such Guarantee Claims.  To the extent that the Bankruptcy Court does not approve the resolution of the Guarantee Claims as set forth in the Amended Plan Support Agreement, the ruling could have the effect of: (a) if certain of the Guarantee Claims are fully allowed, significantly diluting either the recoveries of Holders of Claims against the Parent Guarantors or (b) if certain of the Guarantee Claims are disallowed, significantly reducing the recoveries of Holders of Guarantee Claims, as applicable.

Additionally, the Debtors continue to evaluate their options respect to their ongoing agreements that constitute "Executory Contracts" or "Unexpired Leases" within the meaning of the section 365 of the Bankruptcy Code.  The Debtors may seek to reject certain agreements, including the Spacecom Agreements (as defined herein).  In the event that the Debtors reject agreements, and Unsecured Claims that may be asserted in connection therewith may dilute the recoveries to be expected by other Holders of Unsecured Claims against the applicable Debtors.  The size of any rejection damages Claim could be subject to dispute and litigation with the applicable Executory Contract or Unexpired Lease counterparty.  In the event of such litigation, it is possible that the resulting rejection damages Claim could be allowed in amount exceeding any amount estimated by the Debtors.

Therefore, Holders of Claims entitled to vote on the Amended Plan should take into account the possibility of dilution of their expected recoveries when determining whether to vote in favor of the Amended Plan.

### 17. *Risks Related to Plan Value Allocation.*

The Convert Ad Hoc Group and SES have asserted that the Debtors' methodology for allocating value has improperly diverted value away from Intelsat S.A. and US LLC, respectively.  These assertions are premised primarily on assertions that a majority, if not all, of the Accelerated Relocation Payments should be allocated to the Debtor of their preference.  The Debtors disagree with these assertions made by each of the Convert Ad Hoc Group and SES, respectfully, and believe the allocation of distributable value under the Amended Plan to be correct.  The Bankruptcy Court at the Confirmation Hearing may agree with the Debtors, may agree with the Convert Ad Hoc Group, may agree with SES, or may adopt a different Base Recovery Model or make changes to the Debtors' Base Recovery Model.  If the Bankruptcy Court adopts changes to the Base Recovery Model under the Amended Plan for any reason, then such changes will have an impact on the recovery to Holders of Claims, and the allocation of value among the Debtors

115

will be adjusted consistent with the Bankruptcy Court's determinations.  The Amended Plan may still be confirmed with a revised Base Recovery Model without resolicitation.  Therefore, Holders of Claims entitled to vote on the Amended Plan should take into account the possibility of changes to the Base Recovery Model at confirmation when determining whether to vote in favor of the Amended Plan.

        SES disputes the Debtors' characterization of SES's position regarding the proper Debtor that is entitled to the Accelerated Relocation Payments.  SES asserts that it is not a mere preference of SES.  Rather, SES's position that US LLC is the sole Debtor entitled to ownership of the Accelerated Relocation Payment is based on, among other things, (1) language in the FCC Order stating that "[i]ncumbent space station operators are not 'selling' their spectrum usage rights," but rather the FCC has "set an accelerated relocation payment that fairly incentivizes incumbent space station operators to expedite the transition," *id.* ¶ 214; and (2) the fact that Intelsat US is the entity primarily responsible for performing the work required to meet the Debtors' obligations under the FCC Order to clear the C-Band on an accelerated basis.  The Debtors disagree.  SES maintains that if it succeeds in obtaining an order from the Bankruptcy Court that the Accelerated Relocation Payments must be reallocated to US LLC in the Base Recovery Model, the Plan Support Agreement and the Settlement Agreement might not remain in force without modification and the Plan might not be confirmable without resolicitation of votes.  All parties rights are preserved with respect to such arguments.

## C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 1.    *The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness*

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of Cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness upon emergence.

### 2.    *The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases*

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Amended Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn

116

could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3.  *Financial Results May Be Volatile and May Not Reflect Historical Trends*

The Financial Projections attached hereto as **Exhibit D** are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Amended Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Term Loan, New Notes, and New Common Stock, and the ability of the Debtors to make payments with respect to their indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors financial results may be volatile as restructuring activities and expenses, contract terminations and rejections, and Claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the Business Plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' Business Plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their Business Plan.  Any deviations from the Debtors' existing Business Plan would necessarily cause a deviation.

### 4.  *The Debtors' Substantial Liquidity Needs May Impact Revenue*

The Debtors operate in a capital-intensive industry.  If the Debtors' Cash flow from operations remains depressed or decreases, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the Cash necessary to fund ongoing operations, the Debtors have incurred significant Professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant Professional fees and costs throughout the remainder of the Chapter 11 Cases.  The Debtors cannot guarantee that Cash on hand, Cash flow from operations, and Cash provided by the DIP Facility will

be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and condition of the DIP Order; (b) their ability to maintain adequate Cash on hand; (c) their ability to develop, confirm, and consummate the Amended Plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that Cash on hand, Cash flow from operations, and Cash provided under the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 5.  *The Debtors' Business Is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business*

The Debtors' operations are subject to foreign and United States federal laws and regulations, including those governing the satellite and telecommunications industries and the health and safety of employees.  Sanctions for noncompliance may include revocation of licenses or permits, corrective action orders, administrative or civil penalties, and criminal prosecution.  These liabilities and costs could have an adverse effect on the business, financial condition, results of operations, and Cash flows of the Reorganized Debtors.

### 6.  *The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases*

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Amended Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 7.  *The Loss of Key Personnel Could Adversely Affect the Debtors' Operations*

The Debtors' Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

**8.** ***Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations***

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the Amended Plan (a) would be subject to compromise and/or treatment under the Amended Plan and/or (b) would be discharged in accordance with the terms of the Amended Plan.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

**D.      Risks Related to Regulation**

The Debtors can provide no assurance that the required regulatory and government consents will be obtained in connection with the Restructuring Transactions.  In addition, even if all required regulatory and other governmental consents are obtained and the closing conditions are satisfied, no assurance can be given as to the terms, conditions, and timing of the approvals or clearances.

**1.** ***The Debtors' Business Depends upon Licenses Issued by the FCC, and If Licenses Are Not Renewed or the Reorganized Debtors Are Out of Compliance with FCC Regulations and Policies, the Reorganized Debtors' Business Could Be Impaired***

The Debtors are subject to regulation by the FCC under the Communications Act of 1934, as amended.  The majority of the Debtors' satellites are licensed and regulated by the FCC.  The Debtors' business depends upon maintaining their FCC licenses, which include authorization for the use of spectrum and are renewable upon timely application to the FCC.  Interested parties may challenge a renewal application.  The FCC has authority to revoke licenses or not grant renewal applications.  The Debtors cannot be certain that the Reorganized Debtors' future renewal applications will be approved, or that the renewals will not include conditions or qualifications that could adversely affect the Reorganized Debtors' operations, could result in impairment, and could adversely affect the Reorganized Debtors' liquidity and financial condition.

FCC rules governing the Debtors' regulated service offerings impose costs on their operations, and changes in those rules could have an adverse effect on the Reorganized Debtors' business.  Moreover, governmental regulations and policies may change over time, and the changes may have an adverse impact upon the Reorganized Debtors' businesses, financial condition, and results of operations.

**2.** ***There Will Be FCC Approval Requirements in Connection with Emergence from Chapter 11***

FCC prior approval is required for any proposed transaction, including a chapter 11 reorganization, that involves the assignment or transfer of control of FCC licenses, and the FCC has discretion to impose conditions that serve the public interest on grant of any application to assign or transfer control of FCC licenses.

The Debtors' emergence from bankruptcy pursuant to the Amended Plan will require prior consent of the FCC to effectuate an assignment or transfer of control of the FCC licenses from the debtor-in-possession licensees to the Reorganized Debtors.  The FCC will determine whether the proposed transaction serves the public interest, convenience, and necessity; this entails a public proceeding whereby the FCC

119

will seek comment on the applications related to the Amended Plan.  It is not possible to guarantee the FCC's grant of the application by any particular date.

The Debtors are in the process of determining the direct and indirect voting and equity interests in Debtor entities that are anticipated to be held by foreign individuals or entities.[50]  The FCC may refer the FCC applications to "Team Telecom" (a group of Executive Branch agencies, including the Departments of Justice and Homeland Security and the Federal Bureau of Investigation) for coordination and recommendations on national security and foreign policy issues raised by the transaction because Intelsat is currently subject to a Team Telecom mitigation agreement and the FCC may want Team Telecom to confirm whether the existing agreement should be continued, amended, or terminated.  In the event Team Telecom review is required, the timeline to receive the FCC Approvals for the Company's emergence may be lengthened.

**3.   *There May Be CFIUS, DSS, DDTC/ITAR, or FDI Approval Requirements in Connection with Emergence from Chapter 11***

Depending on ultimate foreign ownership of the Reorganized Debtors and specific governance rights afforded to foreign holders of New Common Stock after emergence, it is possible that obtaining regulatory review from CFIUS would be advisable, if not required.  CFIUS looks at various indicia of control or certain minority rights when assessing the potential national security threats posed by an investment in or acquisition of a U.S. business by a foreign individual or entity.  If a CFIUS filing is required or advisable, it could take three or four months (or longer) for the filing to be prepared and submitted and for CFIUS to complete its review.  The CFIUS assessment process is separate from, but complementary to, the national security review conducted by Team Telecom that is described above.

Certain of the contracts from which the Debtors obtain revenue are classified contracts held by IGC.  IGC holds a facility security clearance and certain of its employees hold personal security clearances pursuant to a Proxy Agreement administered by DCSA to mitigate FOCI.  Depending on the ultimate foreign ownership or control by foreign persons of certain of the Reorganized Debtors after emergence, DCSA may require changes to the Proxy Agreement or the overall FOCI mitigation strategy.  Failure to reach and/or maintain an appropriate agreement with the DCSA regarding the appropriate FOCI mitigation arrangement could result in invalidation or termination of the security clearances, which in turn would mean that IGC could not perform classified contracts and the Reorganized Debtors would not obtain the benefits of those contracts or future classified contracts.  In addition, changes to the ultimate foreign ownership or control by foreign persons of certain of the Reorganized Debtors after emergence may impinge on the Debtors' ability to negotiate with DCSA future modifications to the overall FOCI mitigation strategy, which could hamper the Debtors' ability to improve business operations and reduce certain redundancies with respect to the performance of classified contracts.

The U.S. Department of State administers the ITAR, which set forth export control requirements regarding defense articles and defense services.  One of the Debtors, Intelsat US LLC, is currently registered under the ITAR.  As an ITAR registrant, Intelsat US LLC would need to notify DDTC at least 60 days prior to emergence with respect to the consummation of the Amended Plan, as required by the ITAR, if emergence will result in the transfer to a foreign person of ownership or control (as such terms are defined under the ITAR).  Regardless of whether this notice is required, no approval would be required from DDTC (though the U.S. State Department is a CFIUS member agency).  Moreover, and in any event, Intelsat US LLC will need to submit a material change notice under the ITAR to the DDTC within five days following closing.

---

[50]   Foreign individuals mean non-U.S. Persons.

Additionally, filings under the certain FDI regimes outside of the United States may be advisable or required.  Analysis regarding jurisdictions in which such filings may be required or advisable is ongoing.

4. ***There May Be Regulatory Requirements under U.S. and Foreign Antitrust and Merger Control Regimes with Emergence from Chapter 11.***

Consummation of the Restructuring Actions may require antitrust-related notifications under the HSR Act and certain non-United States antitrust/merger control regulatory regimes.  Failure by any governmental authority to grant a necessary approval or to permit a statutory waiting period to expire could delay or prevent consummation of the Restructuring Transactions.  Analysis regarding jurisdictions in which such notifications may be required or advisable is ongoing.

5. ***The Debtors May Fail to Meet One or More of the C-Band Clearing Requirements of the FCC Order and Therefore Be Unable to Realize the Full Value of the Anticipated Accelerated Relocation Payments***

The Debtors will only be entitled to receive the full value of the Accelerated Relocation Payments if they successfully clear the C-band and satisfy certain other requirements of the FCC Order, including those related to customer migration, while adhering to the schedule set forth by the FCC.  In the event that the Debtors are unable to meet one or more of the requirements of the FCC Order, they would likely be unable to realize the full value of the Accelerated Relocated Payments.

## IX.    CERTAIN SECURITIES LAW MATTERS

The offering, issuance, and distribution of any Securities pursuant to the Plan, including the New Common Stock, New Warrants (and any New Common Stock issuable upon exercise of the New Warrants), and CVRs issuable pursuant to the Amended Plan and any New Debt (to the extent issued in the form of bonds), will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon either (i) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code) or (ii) pursuant to section 4(a)(2) under the Securities Act and/or Regulation D thereunder.  The New Common Stock underlying the MIP will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

The following discussion of the issuance and transferability of the New Common Stock, New Warrants, and CVRs, relates solely to matters arising under federal and state securities laws.  The rights of Holders of New Common Stock, New Warrants, and CVRs, including the right to transfer such interests, will also be governed by the New Organizational Documents, which will be filed with the Plan Supplement.

### A.    1145 Securities

As discussed herein, the Amended Plan provides for the offer, issuance, sale, and distribution of the 1145 Securities.

Section 1145 of the Bankruptcy Code provides that section 5 of the Securities Act and any state law requirements for the issuance of a Security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a Claim against, an interest in, or Claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a Claim against or interest in a debtor or are issued principally in such exchange or partly for Cash and property.  The Debtors believe that the issuance of the 1145 Securities in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code (except with respect to an underwriter as described below).

121

Accordingly, no registration statement is expected to be filed under the Securities Act or any state securities laws.  Recipients of the New Common Stock, New Warrants, and CVRs are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

### 1.  *Subsequent Transfers*

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Amended Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (a) purchases a Claim against, interest in, or Claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any Security received or to be received in exchange for such a Claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities (*i.e.*, affiliates).  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, Holders of 1145 Securities who are deemed to be "underwriters" may be entitled to resell their 1145 Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements, and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the 1145 Securities, would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an

122

"underwriter" with respect to the 1145 Securities and, in turn, whether any Person may freely resell 1145 Securities.

You should confer with your own legal advisors to determine whether or not you are an "underwriter," an "issuer" or an "affiliate."

## B.     4(a)(2) Securities

### 1.   *Issuance*

Section 4(a)(2) of the Securities Act provides that the issuance of securities, including the New Debt (to the extent issued in the form of bonds) (together with any New Common Stock, New Warrants, and CVRs to the extent under section 1145(a) of the Bankruptcy Code is unavailable, including shares issuable thereunder, collectively, the "4(a)(2) Securities"), by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.

The Debtors believe that the 4(a)(2) Securities will be issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act, Regulation D and/or Regulation S. Section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of a Security in connection with transactions not involving any public offering.  Rule 506 of Regulation D provides nonexclusive safe harbor conditions with respect to the exemption provided by section 4(a)(2).  Regulation S provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of securities made outside of the United States to any non-U.S. Person (within the meaning of Regulation S).  Any securities issued in reliance on section 4(a)(2), including in compliance with Rule 506 of Regulation D and/or Regulation S will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned, or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act, including the "safe harbor" exemptions provided by Rule 144 or Rule 144A under the Securities Act to the extent available, and other applicable law.

The New Debt issued in the form of bonds will not be registered under the Trust Indenture Act. Pursuant to the Trust Indenture Act, securities owned by the obligor or affiliates of the obligor are disregarded for the purpose of directing the conduct of remedies by the trustee, or the exercise of trust powers by the trustee, and consenting to waivers of default.  Therefore, affiliates of the Debtors who purchase New Debt issued in the form of bonds will be able to exercise rights and remedies as Holders of such debt.

### 2.   *Subsequent Transfers*

Unlike the 1145 Securities, the 4(a)(2) Securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, including the exemptions provided by Rule 144 or Rule 144A under the Securities Act, to the extent available.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer.  An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period

123

whether or not there is current public information regarding the issuer. Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, during the twelve months preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available.

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of one percent of the outstanding securities of the same class being sold and, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

You should confer with your own legal advisors to determine whether or not you are an "underwriter," an "issuer" or an "affiliate."

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Effective Date. Accordingly, holders of 4(a)(2) Securities will be required to hold the 4(a)(2) Securities for at least six months and, thereafter, to sell the 4(a)(2) Securities only in accordance with the applicable requirements of Rule 144, unless such 4(a)(2) Securities are registered under the Securities Act or are otherwise exempt.

In addition, the 4(a)(2) Securities may also be subject to restrictions in the New Organizational Documents and to certain regulatory restrictions, such as those set forth in the rules of the FCC.

The Debtors and Reorganized Debtors shall take all actions necessary to permit the issuance of the New Notes to settle through the facilities of DTC and for the New Notes to be eligible for resale under Rule 144A of the Securities Act, and the Plan and Confirmation Order shall authorize all such action by the Debtors and Reorganized Debtors.

\*\*\*\*

*Legend*. To the extent certificated or issued by way of direct registration on the records of the Issuer's transfer agent, certificates evidence the 4(a)(2) Securities, as applicable, upon exercise of their rights will bear a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOTE BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR ANY OTHER APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR

AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonable require certification, legal opinions, or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell, or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

****

**PERSONS WHO RECEIVE SECURITIES UNDER THE AMENDED PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH RECIPIENT OF SECURITIES AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR RECIPIENT OF SECURITIES MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE AMENDED PLAN.**

**SHOULD THE REORGANIZED DEBTORS ELECT ON OR AFTER THE EFFECTIVE DATE TO REFLECT ANY OWNERSHIP OF THE SECURITIES TO BE ISSUED UNDER THE PLAN THROUGH THE FACILITIES OF DTC, THE REORGANIZED DEBTORS NEED NOT PROVIDE ANY FURTHER EVIDENCE OTHER THAN THE PLAN OR THE CONFIRMATION ORDER WITH RESPECT TO THE TREATMENT OF THE SECURITIES TO BE ISSUED UNDER THE PLAN UNDER APPLICABLE SECURITIES LAWS. DTC SHALL BE REQUIRED TO ACCEPT AND CONCLUSIVELY RELY UPON THE PLAN AND CONFIRMATION ORDER IN LIEU OF A LEGAL OPINION REGARDING WHETHER THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE EXEMPT FROM REGISTRATION AND/OR ELIGIBLE FOR DTC BOOK-ENTRY DELIVERY, SETTLEMENT, AND DEPOSITORY SERVICES. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO ENTITY (INCLUDING, FOR THE AVOIDANCE OF DOUBT, DTC) MAY REQUIRE A LEGAL OPINION REGARDING THE VALIDITY OF ANY TRANSACTION CONTEMPLATED BY THE PLAN,**

**INCLUDING, FOR THE AVOIDANCE OF DOUBT, WHETHER THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE EXEMPT FROM REGISTRATION AND/OR ELIGIBLE FOR DTC BOOK-ENTRY DELIVERY, SETTLEMENT, AND DEPOSITORY SERVICES.**

### C.   New Common Stock & Management Incentive Plan.

The Confirmation Order shall authorize the board of Equity Issuer to adopt and enter into the MIP, which shall reserve exclusively for management employees 3.26 percent of the New Common Stock on a fully diluted, fully distributed basis which will be reserved and issued as set forth in the Amended Plan. Grants of such New Common Stock from the MIP Pool will dilute all of the New Common Stock outstanding at the time of such issuance. The New Common Stock is also subject to dilution in connection with the conversion of any other options, warrants, convertible securities or other securities that may be issued post-emergence. The New Common Stock from the MIP Pool will be issued pursuant to a registration statement or an available exemption from registration under the Securities Act and other applicable law.

## X.   SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Amended Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Amended Plan.

<div style="border:1px solid black; text-align:center;">

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

</div>

### A.   Holders of Claims Entitled to Vote on the Amended Plan

Under the provisions of the Bankruptcy Code, not all Holders of Claims against or Interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article IV.C of this Disclosure Statement, entitled "Am I entitled to vote on the Amended Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the Holder's Claim or Interest) under the Amended Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Amended Plan only from Holders of Claims or Interests in Classes B1, B2, B3, B4, C1, C2, C3, C4, D1, E1, F1, G1, H1, I1, I2, J1, and J2 (the "Voting Classes"). The Holders of Claims or Interests in the Voting Classes are Impaired under the Amended Plan and may, in certain circumstances, receive a distribution under the Amended Plan. Accordingly, Holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Amended Plan. The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes A1, A2, A3, A4, A5, A9, or J3.

### B.   Voting Record Date

**The Voting Record Date is August 25, 2021**. The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Amended Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Amended Plan as the holder of a Claim or Interest.

126

C.      **Voting on the Amended Plan**

**The Voting Deadline is October 18, 2021, at 5:00 p.m. (prevailing Eastern Time)**.  In order to be counted as votes to accept or reject the Amended Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Solicitation Agent on or before the Voting Deadline.

**To vote, complete, sign, and date your ballot and return it (with an original signature)** *promptly* **via electronic mail to Intelsatinquiries@stretto.com with "Intelsat Vote" in the subject line.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL FREE AT (888) 909-0100 OR VIA ELECTRONIC MAIL TO Intelsatinquiries@stretto.com.**

D.      **Ballots Not Counted**

**A ballot will not be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of such Claim or Interest; (2) it is cast by any Entity that does not hold a Claim or Interest in a Voting Class; (3) it is cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim or Interest shall be entitled to vote in the amount of $1.00); (4) it is unsigned or lacking an original signature (for the avoidance of doubt, a ballot submitted via Stretto online balloting portal shall be deemed an original signature); (5) it is not marked to accept or reject the Amended Plan or marked both to accept and reject the Amended Plan; (6) it is submitted by any Entity not entitled to vote pursuant to the procedures described herein; and (7) it is submitted by improper means.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Amended Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT TOLL-FREE AT +1 (855) 489 1434. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED. [51]**

---

XI.     **CONFIRMATION OF THE AMENDED PLAN**

A.      **Requirements for Confirmation of the Amended Plan**

Among the requirements for Confirmation of the Amended Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Amended Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Amended Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Amended Plan is feasible; and (3) the Amended Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Amended Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Amended Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan

---

[51]   For any ballot cast via electronic mail, a format of the attachment must be found in the common workplace and industry standard format (*i.e.*, industry-standard PDF file) and a received date and time in the Solicitation Agent's inbox will be used as a timestamp for a receipt.

confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan Confirmation; and (3) the Amended Plan has been proposed in good faith.

**B.      Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the Debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Amended Plan. Consequently, the Debtors and their management believe that Confirmation of the Amended Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Amended Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Amended Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Amended Plan.

SES has asserted that, based on its view that US LLC is entitled to certain assets, including the Accelerated Relocation Payments, the creditors of US LLC may receive more in a liquidation.  *See* SES Disclosure Statement Obj. ¶¶ 16, 77.  Similarly, the Convert Ad Hoc Group has asserted that, based on its view that Intelsat S.A. is entitled to certain assets, including the Accelerated Relocation Payments, the creditors of Intelsat S.A. may receive more in a liquidation.  The Debtors believe that the allocation of distributable value provided for in the Amended Plan reflects a reasonable allocation of the Debtors assets among the Debtors, which would apply during a liquidation as well.  For these and many other reasons, the Debtors disagree with SES's and the Convert Ad Hoc Group's assertions.

**C.      Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

**To determine whether the Amended Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under**

**the Amended Plan.  As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (the "Financial Projections").  Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "Risk Factors." for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.**

The Financial Projections are attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Amended Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to Confirmation, except as described in the following section, that each class of Claims or equity Interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[52]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired Claims as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in a number of Allowed Claims in that class, counting only those Claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Amended Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Amended Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity Interests as acceptance by Holders of at least two-thirds in amount of Allowed Interests in that class, counting only those Interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Amended Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Amended Plan actually cast their ballots in favor of acceptance.

If a Class contains Holders of Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Amended Plan, the Amended Plan shall be presumed accepted by the Holders of such Claims or Interests in such class.

### E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of Claims or equity interests that is impaired under, and has not accepted, the plan.

---

[52]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

If any Impaired Class rejects the Amended Plan, the Debtors reserve the right to seek to confirm the Amended Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Amended Plan or is deemed to have rejected the Amended Plan, the Debtors may request Confirmation of the Amended Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Amended Plan or any Plan Supplement document, including the right to amend or modify the Amended Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1. *No Unfair Discrimination*

The "unfair discrimination" test applies to classes of Claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of Claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. *Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of Claims receive more than 100 percent of the amount of the Allowed Claims in the class. As to the dissenting class, the test sets different standards depending upon the type of Claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Amended Plan pursuant to section 1129(b) of the Bankruptcy Code, the Amended Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Amended Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Amended Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Amended Plan and the treatment of all Classes of Claims or Interests under the Amended Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Amended Plan.

### F.    Valuation of the Debtors

In conjunction with formulating the Amended Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of PJT, produced the Valuation Analysis that is set forth in **Exhibit E** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations. Accordingly, the Valuation Analysis further supports the Debtors conclusion that the treatment of Classes under the Amended Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for Confirmation.

130

### XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX AND LUXEMBOURG TAX CONSEQUENCES OF THE AMENDED PLAN

#### A.    Introduction

The following discussion is a summary of certain United States ("U.S.") federal income and Luxembourg tax consequences of the consummation of the Amended Plan to the Debtors, Reorganized Debtors, and to certain holders of Allowed Claims.  The following summary does not address the U.S. federal income or Luxembourg tax consequences to holders of Claims or Interests not entitled to vote to accept or reject the Amended Plan.

The summary of the U.S. federal income tax consequences of the consummation of the Amended Plan is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  The summary of the Luxembourg tax consequences of the consummation of the Amended Plan is based on the laws of the Grand-Duchy of Luxembourg, including the Income Tax Law of December 4, 1967, ("ITL"), the Municipal Business Tax Law of December 1, 1936, and the Net Wealth Tax Law of October 16, 1934, including the regulations promulgated thereunder, and published judicial decisions rendered by Luxembourg administrative jurisdictions that may be relevant to the Amended Plan and administrative pronouncements, each as amended and in effect on the date hereof and is subject to any change in law or regulations or changes in interpretation or application thereof (and which may possibly have a retroactive effect).  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained.  The Debtors have not requested and do not intend to request a ruling from the IRS, the Luxembourg tax authorities ("LTA"), or any other taxing authority regarding any of the other tax consequences of the Amended Plan discussed below.  The discussion below is not binding upon the IRS, the LTA, the courts, or any other tax authority.  No assurance can be given that the IRS, the LTA, or any other tax authority would not assert, or that a court would not sustain, a different position than any position discussed herein.

Unless specifically provided for in this summary, this discussion does not purport to address all aspects of U.S. federal income or Luxembourg taxation that may be relevant to the Debtors, Reorganized Debtors, or to certain holders of Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to such holders of Claims subject to special treatment under the U.S. federal income or Luxembourg tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, holders of Claims that hold more than 10.0 percent or more of the equity of the Debtors or that will hold 10.0 percent or more of the equity of the Reorganized Debtors after receiving the distributions contemplated by the Amended Plan, holders of Claims who are themselves in bankruptcy, and regulated investment companies or funds and those holding, or who will hold, Claims, or the New Common Stock, New Series A Warrants, New Series B Warrants, CVRs, or any other consideration to be received under the Amended Plan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. (other than Luxembourg) taxation is addressed.  Furthermore, this summary assumes that holders of Claims hold only Claims in a single Class and hold Claims as "capital assets" (within the meaning of section 1221 of the IRC).  This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any

131

ramifications such arrangements may have on the treatment of a Holder under the Amended Plan). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income and Luxembourg tax purposes in accordance with their form.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

As used herein, a "Luxembourg individual holder" means an individual resident in Luxembourg who is subject to personal income tax (impôt sur le revenu) on his or her worldwide income from Luxembourg or foreign sources.

In addition, a "Luxembourg corporate holder" means a corporation or other entity taxable as a corporation (that is organized under the laws of Luxembourg under Article 159 of the Luxembourg Income Tax Act ITL) resident in Luxembourg subject to corporate income tax (impôt sur le revenu des collectivités) and municipal business tax (impôt commercial communal) on its worldwide income from Luxembourg or foreign sources. A Luxembourg corporate holder is also subject to net wealth tax (impôt sur la fortune) on its worldwide wealth.

For purposes of this summary, Luxembourg individual holders and Luxembourg corporate holders are collectively referred to as "Luxembourg Holders." A "Non-Luxembourg Holder" means any investor in New Common Stock, New Warrants, or CVRs other than a Luxembourg Holder.

If a partnership (or other entity treated as a pass-through entity for U.S. federal income or Luxembourg tax purposes) is a holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) of such entity generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims or Interest should consult their respective tax advisors regarding the U.S. federal income and Luxembourg tax consequences of the Amended Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME AND LUXEMBOURG TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U. S. FEDERAL, STATE, LOCAL, LUXEMBOURG AND NON-U.S. TAX CONSEQUENCES OF THE AMENDED PLAN.**

B.      **Certain U.S. Federal Income Tax Consequences of the Amended Plan to the Debtors and the Reorganized Debtors**

1.  *In General*

As a general matter, Jackson and its direct subsidiary, GenesisCo, are both currently subject to U.S. federal income tax.  The Debtors expect that both entities will continue to be subject to U.S. federal income tax following the Restructuring Transactions.  The Debtors that are the direct and indirect owners of Jackson are not currently subject to U.S. federal income tax, and the Debtors expect that such Debtors will not be subject to U.S. federal income tax immediately following the Restructuring Transactions.

The discussion below indicates that the consummation of the Amended Plan may be subject to section 351 of the IRC if, as expected, Holders of Allowed Claims hold more than 80 percent of the New Common Stock.  In the event that the Restructuring Transactions set forth in the Restructuring Steps Memorandum contemplate that the Equity Issuer will issue New Common Stock at more than one point of time, and Holders of Claims collectively hold less than 80 percent of the New Common Stock after an earlier issuance but held more than 80 percent of the New Common Stock after the Amended Plan is fully consummated, there is meaningful uncertainty with respect to whether section 351 of the IRC would apply to each issuance of New Common Stock (on the basis that the implementation of the Restructuring Transactions should be viewed as a single transaction for purposes of section 351) or if, instead, each separate issuance should be independently evaluated, in which case earlier issuances (immediately after which Holders held less than 80 percent of the stock) would not be eligible for tax-deferred treatment under section 351 and would, instead, be taxable under section 1001 of the IRC (or potentially subject to recapitalization treatment under section 354 of the IRC if the Equity Issuer is the Lux Issuer (as defined below) of the applicable Claim).  Holders of Claims should consult their own tax advisors regarding the potential implication of these rules.

2.  *Effects of the Restructuring Transactions on Tax Attributes of Debtors*

(a)     **Preservation of Tax Attributes and Cancellation of Indebtedness Income ("COD Income")**

As a result of the Restructuring Transactions, the U.S. tax attributes of Jackson may, depending on certain factors, be reduced by the amount of its excluded COD Income.  Because Jackson and GenesisCo are the only Debtors subject to U.S. federal income tax that are regarded for U.S. federal income tax purposes, and GenesisCo is not the issuer of any third-party debt (and any Intercompany Claims against GenesisCo are expected to be Reinstated) the Debtors expect any reduction of their U.S. tax attributes to only be relevant with respect to Jackson, and only to the extent any excluded COD Income is attributable to its "trade or business within the United States" as described in section 864(b) of the IRC (Jackson's "U.S. Trade or Business").

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (X) the amount of Cash paid, (Y) the issue price of any new indebtedness of the debtor issued, and (Z) the fair market value of any new consideration, in each case, given in satisfaction of such indebtedness at the time of the satisfaction.  Unless an exception or exclusion applies, COD Income constitutes taxable income like any other item of taxable income.

Pursuant to section 108 of the IRC, a debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of indebtedness occurs pursuant to that proceeding.  Instead, as

133

a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, the tax attributes of a debtor will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers (d) capital loss carryovers; (e) tax basis in assets (subject to the Asset Tax Basis Floor, as described below); (f) passive activity loss and credit carryovers; and (g) foreign tax credits. A debtor with COD Income may elect to first reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC (which can include a reduction in the basis of a partnership interest, but only if the "inside" basis of assets in the partnership are also reduced), though it has not been determined whether the Debtors will make this election. The reduction in tax attributes occurs only after the taxable income (or loss) for the taxable year of the debt discharge has been determined and any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

The aggregate tax basis of Jackson in its assets is not required to be reduced below the amount of indebtedness (determined on an entity-by-entity basis) that Jackson will be subject to immediately after the cancellation of debt giving rise to COD Income (the "Asset Tax Basis Floor"). Generally, all of an entity's obligations that are treated as debt under general U.S. federal income tax principles (including intercompany debt treated as debt for U.S. federal income tax purposes) are taken into account in determining an entity's Asset Tax Basis Floor.

The exact amount of the COD Income (if any) that will be realized by the Debtors will not be determinable until after the consummation of the Amended Plan. In addition, there is significant uncertainty regarding the application of the above COD Income rules in the case of a non-U.S. entity, like Jackson, that is subject to the COD Income rules in connection with its U.S. Trade or Business. Accordingly, the Debtors are currently unable to determine the precise effect that the COD Income rules will have on the U.S. tax attributes of Jackson.

### (b)      Limitation of NOL Carryforwards and Other Tax Attributes under Sections 382 and 383 of the IRC

After giving effect to the reduction in tax attributes from excluded COD Income (if any), the ability of Jackson and GenesisCo to use any tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the IRC.

### (i)      General Sections 382 and 383 Annual Limitations

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and NOL carryforwards, disallowed business interest carryovers under section 163(j) of the IRC ("163(j) Carryovers"),[53] tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) and deductions recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net

---

[53]   In the case of the Debtors, 163(j) Carryovers refers both to "current law" limitations on the deductibility of interest on third-party debt, as well as limitations under prior law that applied only to certain intercompany arrangements among the Debtors.

unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of sections 382 and 383 of the IRC are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Amended Plan will result in one or more "ownership changes" of the Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of sections 382 and 383 of the IRC applies.

### (ii)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject (the "382 Limitation") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the "ownership change" occurs: 1.58 percent for August 2021). The 382 Limitation may be increased, up to the amount of any net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.[54] Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

Notwithstanding the rules described above, if subsequent to an ownership change, a debtor corporation and its subsidiaries do not continue the debtor corporation's historic business or use a significant portion of its historic business assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

There is significant uncertainty regarding the application of the 382 Limitation in the case of a non-U.S. entity, like Jackson or GenesisCo, that is subject to the 382 Limitation rules in connection with its U.S. Trade or Business. Accordingly, the Debtors are currently unable to determine the precise effect that the 382 Limitation will have on the U.S. tax attributes of Jackson or GenesisCo.

### (iii)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOLs, NOL carryforwards, and 163(j) Carryovers will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Debtors undergo another

---

[54]  Regulations have been proposed that would significantly change the application of the rules relating to built-in gains and losses for purposes of computing the 382 Limitation. However, proposed regulations have also been released that would "grandfather" companies that undergo an "ownership change" pursuant to an order entered in a bankruptcy case that was commenced prior to, or within 30 days of, the publication of the finalized new rules in this area. Accordingly, the Debtors do not expect the proposed regulations to apply to them or to the Reorganized Debtors with respect to the "ownership change" that will occur pursuant to the Amended Plan.

"ownership change" within two years after the Effective Date, then the Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.  If the Debtors were to undergo another "ownership change" after the expiration of this two year period, the resulting 382 limitation would be determined under the regular rules for ownership changes.  It is possible that certain transactions occurring less than two years prior to the Restructuring Transactions will result in an "ownership change" for purposes of section 382 of the IRC occurring immediately prior to the Restructuring Transactions.  If these transactions are considered to constitute a separate "ownership change" for purposes of section 382 and the 382(l)(5) Exception applies, the Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for the 382(l)(5) Exception or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the 382 Limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule for determining the 382 Limitation, which requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the ownership change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception because the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors do not currently know whether they are eligible for the 382(l)(5) Exception, and regardless of whether the 382(l)(5) Exception is available, the Reorganized Debtors may decide to affirmatively elect out of the 382(l)(5) Exception so that the 382(l)(6) Exception instead applies.  Whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, though, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the IRC were to occur after the Effective Date.

**3.** *Impact of the Restructuring Transactions on the Future Taxable Income of the Debtors*

**(c)     Tax Treaty Application**

Because the Reorganized Debtors will not be publicly traded in 2021 or at the Effective Date, the historic basis for the Debtors' ability to rely on certain applicable tax treaty provisions that currently impact the tax treatment of the Debtors' global income may no longer apply beginning in 2022.  If the Reorganized Debtors determine that they are unable to continue to rely on such tax treaty provisions, the taxation of the Debtors' future global income may differ meaningfully from the historic taxation of the Debtors' income which could, among other things, affect the projections and valuation reflected elsewhere in this Disclosure Statement.  The Debtors currently intend that the Reorganized Debtors will continue to be eligible in 2022 for the benefits of the relevant tax treaty provisions.

**(d)     Restructuring of the Debtors**

The Debtors are evaluating the possibility of engaging in certain substantial reorganization steps in connection with the Restructuring Transactions such that the structure of the Debtors and their affiliates may change meaningfully.  Such reorganization steps may include transactions that may be treated as taxable exchanges of assets in the applicable tax jurisdictions, potentially resulting in taxable gain being

136

attributed to the Debtors.  The tax consequences, if any, of such Restructuring Transactions are not currently known.

**C.      Certain Luxembourg Tax Consequences of the Amended Plan to the Debtors and the Reorganized Debtors**

The Multilateral Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting could result in significant changes to the tax laws and practices in multiple jurisdictions, including Luxembourg, after the date of this discussion and could therefore have an impact on this discussion.  In addition, considering the recent adoption of the Luxembourg law implementing Council Directive (EU) 2017/952 of 29 May 2017 amending Directive (EU) 2016/1164 as regards hybrid mismatches with third countries ("ATAD II"), there is little precedent on its application.  Luxembourg Holders and Non-Luxembourg Holders are urged to consult their tax advisors regarding the potential application of these rules.

Certain of the Debtors ("Lux Issuers") and their shareholders ("Lux HoldCos") that are parties to the Amended Plan, including Intelsat, the Debtors' ultimate parent company, are Luxembourg-incorporated entities.  The Luxembourg tax consequences of the Amended Plan to the Debtors and the Reorganized Debtors will depend, among other things, on the transaction steps used to complete the restructuring contemplated by the Amended Plan (the "Restructuring Steps"), which remain subject to ongoing analysis and review.  Although not free from doubt, the Debtors expect that the Restructuring Steps used to complete the restructuring contemplated by the Amended Plan will not give rise to materially adverse Luxembourg tax consequences to the Debtors or Reorganized Debtors.  The Debtors currently do not anticipate recognizing COD Income for purposes of Luxembourg Generally Accepted Accounting Principles ("Luxembourg GAAP") or Luxembourg tax that would substantially limit the Debtors' or Reorganized Debtors' Lux NOLs.  The Debtors' conclusion with respect to the recognition of COD Income for Luxembourg purposes remains subject to the finalization of the Restructuring Steps, which shall be provided in the Plan Supplement, and the Debtors cannot guarantee this anticipated result or that the LTA will not challenge any position taken by the Debtors or Reorganized Debtors under the Amended Plan.

**D.      Certain U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims Entitled to Vote**

1.  *General Considerations*

**(a)      Treatment of Debt as a Security**

In certain cases discussed below, the treatment of the consummation of the Amended Plan to U.S. Holders of Allowed Claims will depend on whether a Claim constitutes a "security" of the Debtor issuing consideration in exchange for such a Claim.  Neither the IRC nor the Treasury Regulations define the term "security."  Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.  The Debtors expect that the Convertible Senior Notes, the 2021 Lux Senior Notes, the 2023 Lux

137

Senior Notes, the 2024 Lux Senior Notes, the First Lien Notes, the 2023 Jackson Senior Notes, the 2024 Jackson Senior Notes, the 2025 Jackson Senior Notes, and the Term Loan Facility will each be treated as a "security" for U.S. federal income tax purposes, while each other Claim will not be treated as a "security" for U.S. federal income tax purposes.

### (b)      Bifurcation of Recoveries

Certain Holders of Allowed Claims against entities other than Intelsat may receive a combination of New Common Stock, New Series A Warrants and New Series B Warrants issued by the Equity Issuer, forms of consideration issued or distributed by an entity other than the Equity Issuer, including Cash and the CVRs, and certain other forms of consideration issued with respect to a guarantor of such Claims. Although not free from doubt, the Debtors intend to treat such Holders of Allowed Claims as exchanging Claims in multiple separate transactions, pursuant to which (a) in one transaction, Holders transfer a portion of their Claim to the Equity Issuer in exchange for, as applicable, the New Common Stock, New Warrants, and, if Jackson is the Equity Issuer, the CVRs, which amount will generally be all of such Claims other than the amounts specified with respect to clauses (b) and (c) of this paragraph; (b) in a separate transaction, Holders transfer a specified portion of their Claims directly to the relevant entity issuing consideration other than the consideration being issued by the Equity Issuer (including the CVRs from Jackson, in the event that Jackson is not the Equity Issuer), which amount will generally be equal to the value of the consideration being received from such subsidiary, and (c) in a separate transaction, Holders receive consideration attributable to their guarantee claims against Intelsat pursuant to a mechanism to be set forth in the Restructuring Transactions Memorandum.

Certain Holders of Claims against Intelsat will receive New Series B Warrants issued by entities other than Reorganized S.A., in addition to Cash at Intelsat and Reorganized S.A. Common Stock. Although not free from doubt, the Debtors intend to treat such Holders of Allowed Claims as exchanging Claims in multiple separate transactions, pursuant to which (a) in one transaction, Holders transfer a portion of their Claim to the Equity Issuer in exchange for New Series B Warrants, (b) in a separate transaction, Holders transfer a specified portion of their Claim to any entity whose Cash is funding relevant distributions under the Plan, and (c) in a separate transaction, Holders transfer other Claims to Reorganized S.A. in exchange for Reorganized S.A. Common Stock, which amount will generally be all of such Claims other than the amounts specified with respect to clauses (a) and (b) of this paragraph.

In the event the above "bifurcation" approach was not respected, the tax consequences of the consummation of the Amended Plan could be materially different than described below. In particular, a Holder of a Claim could be required to recognize gain, but be prohibited from recognizing losses, in certain circumstances, or other differences in tax treatment could apply. Holders of Claims should consult their own tax advisors regarding the treatment of consideration under the Amended Plan.

### (c)      Treatment of Reallocation of Consideration from Guarantee Claims against Intelsat to Holders of other Claims

The Plan provides that the ICF Unsecured Recovery will include a portion of consideration that would otherwise be distributed to the Jackson Senior Notes Trustees with respect to TopCo Guarantee Claims. Although not free from doubt, the Debtors intend to take the position that (a) to the extent such recovery consists of consideration issued by the Equity Issuer or any Debtor other than Intelsat, the Holder of such Claim shall be treated as receiving such consideration directly in respect of its underlying Claim (as set forth in the bifurcation discussion, above); and (b) to the extent such recovery consists of Cash at

138

Intelsat and Reorganized S.A. Common Stock, the receipt of such consideration will be treated as occurring in a separate transaction pursuant to steps set forth in the Restructuring Transactions Memorandum.

**2.   *U.S. Federal Income Tax Consequences to U.S. Holders of First Lien Claims*[55]**

Pursuant to the Amended Plan, in exchange for full and final satisfaction of the First Lien Claims the Holders of such Claims shall receive Cash.

The Debtors expect that the transactions in which the U.S. Holders of First Lien Claims exchange such Claims for Cash will be treated as a fully taxable exchange under section 1001 of the IRC. A U.S. Holder of a Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the amount of Cash received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the First Lien Claim exchanged therefor. A U.S. Holder's adjusted tax basis in its First Lien Claim would be equal to the amount paid therefor, increased by any accrued original issue discount ("OID") and any market discount and reduced by any amortizable bond premium previously taken into account. Assuming a U.S. Holder of a First Lien Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year. The treatment of accrued interest and market discount is discussed below.

**3.   *U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims against Jackson and Unsecured Claims against Jackson Subsidiaries***

Pursuant to the Amended Plan, in exchange for full and final satisfaction of the Unsecured Claims against Jackson and Unsecured Claims against Jackson Subsidiaries, the Holders of such Claims shall receive New Common Stock, CVRs, and Cash.

As a general matter, to the extent an Unsecured Claim against Jackson Subsidiaries constitute guarantee Claims with respect to the same debt instrument that constitutes an Unsecured Claim against Jackson, any recovery received in respect of such guarantee will, for U.S. federal income tax purposes, be combined with any recovery received in respect of the primary Claim against Jackson. The following discussion assumes this treatment is respected.

Additionally, certain Unsecured Claims against Jackson or Unsecured Claims against Jackson Subsidiaries (*e.g.*, trade claims of Jackson Subsidiaries) may not be treated as having been contributed to the Equity Issuer. In such case, although not free from doubt, the Debtors expect that the transactions in which the U.S. Holders of such Claims exchange such Claims for New Common Stock, CVRs, and Cash will be treated as a fully taxable exchange under section 1001 of the IRC. A U.S. Holder of a such a Claim should recognize gain or loss equal to the difference between (i) the amount of Cash plus the fair market value of the New Common Stock and CVRs received, in each case, that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the applicable Claim exchanged therefor. A U.S. Holder's adjusted tax basis in its Claim exchanged would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account. Assuming a U.S. Holder of a Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the

---

[55]   This discussion applies collectively to Claims (including primary Claims against Jackson, guarantee Claims against Jackson's subsidiaries, and guarantee Claims against ICF (collectively, and for purposes of this tax disclosure only, the "First Lien Claims")).

Claim at the time of the Restructuring Transactions exceeds one year.  The treatment of accrued interest and market discount is discussed below.

### (i)         Treatment if the Equity Issuer is Not Jackson

If the Equity Issuer is not Jackson, other than with respect to any Claims not treated as contributed to the Equity Issuer as set forth above, the Debtors expect that the transactions in which the U.S. Holders of Unsecured Claims against Jackson and Unsecured Claims against Jackson Subsidiaries contribute a portion of such Claims in exchange for New Common Stock will qualify as an exchange under section 351 of the IRC.

While section 351 of the IRC, when applicable, generally prevents recognition of both gains and losses, section 367 of the IRC overrides the gain (but not the loss) deferral provisions of section 351 of the IRC where the corporation issuing stock is a non-United States corporation.  Section 367(a)(1) of the IRC and the Treasury Regulations promulgated thereunder specifically provide for the recognition of gain (but not loss) in exchanges that would otherwise qualify for tax-deferred treatment pursuant to section 351 of the IRC, but for the transfer of property to a non-United States corporation.  Thus, if the contribution of a Claim in exchange for New Common Stock qualifies as an exchange under section 351 of the IRC, a U.S. Holder of such Claim should recognize gain, but not loss, for United States federal income tax purposes in connection with the Restructuring Transactions.  The amount of such gain recognized by a U.S. Holder of a Claim should equal the excess of (i) the fair market value of the New Common Stock received and (ii) such U.S. Holder's adjusted tax basis in the Claim contributed in exchange for such New Common Stock.

In certain circumstances, a U.S. Holder of a Claim may be able to avoid current recognition of gain under section 367 of the IRC pursuant to section 367(a)(2) of the IRC and the Treasury Regulations promulgated thereunder.  Specifically, if a U.S. Holder of a Claim contributes "stock or securities" to the Equity Issuer in exchange for New Common Stock, and if such U.S. Holder either owns less than 5 percent of the New Common Stock immediately after the transfer, or, if a U.S. Holder of a Claim owns 5 percent or more of the New Common Stock immediately after the transfer and such U.S. Holder enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under section 367 of the IRC, such U.S. Holder can avoid current recognition of gain under section 367 of the IRC as long as certain other conditions are met.  U.S. Holders are urged to consult their tax advisors regarding the availability of gain deferral under the exceptions outlined in this paragraph.

If section 351 of the IRC does not apply to the receipt of New Common Stock by a U.S. Holder in exchange for a Claim, such exchange may be fully taxable and such a U.S. Holder may recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the fair market value of the New Common Stock received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim contributed in the exchange therefor.  A U.S. Holder's adjusted tax basis in its Claim contributed in the exchange would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account.  Such a U.S. Holder's adjusted tax basis in the New Common Stock would equal the fair market value of such New Common Stock, and its holding period in the New Common Stock would begin on the day after the day of the Restructuring Transactions.  Assuming a U.S. Holder of a Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.

The U.S. federal income tax treatment of the rights to the proceeds from the CVRs is unclear, and U.S. Holders who receive such rights are urged to consult their own tax advisors regarding such treatment. Treatment of the CVRs will depend in part on whether the receipt of such rights is a "closed transaction" or an "open transaction" and whether the rights are treated as rights to payment under a contract or as a debt

140

instrument for U.S. federal income tax purposes.  However, as treatment as a debt instrument is unlikely, the discussion below does not address the tax consequences of such a characterization.  Open transaction treatment should apply only if the fair market value of the CVRs cannot be ascertained at the time of the exchange, and the IRS has taken the position that only in "rare and extraordinary circumstances" is the fair market value of property so uncertain that open transaction treatment is available.  The IRS is not bound by any position taken by the Debtors, and may characterize the CVRs as a debt instrument or otherwise.  If the IRS disagrees with any position taken by the Debtors, the tax treatment to U.S. Holders receiving the CVRs in exchange for Claims may be materially different from the treatment described below.

Assuming closed transaction treatment applies with respect to a U.S. Holder's receipt of the CVRs, to the extent that a U.S. Holder of a Claim exchanges a portion of its Claim with an entity other than the Equity Issuer for CVRs and Cash, the Debtors expect that such U.S. Holder will be treated as receiving such distributions under the Amended Plan in a fully taxable exchange under section 1001 of the IRC.  Such U.S. Holder should recognize gain or loss equal to the difference between (i) the amount of Cash and the fair market value of any CVRs received in exchange for its Claim and (ii) such U.S. Holder's adjusted tax basis, if any, in its Claim exchanged therefor.  Assuming a U.S. Holder holds its Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.

A U.S. Holder of a Claim should obtain a tax basis in the CVRs, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the fair market value thereof as of the date such property is distributed to such U.S. Holder.  The holding period for any such CVRs should begin on the day following the Effective Date.

The tax basis of any CVRs determined to be received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest.  The holding period for any such CVRs should begin on the day following the Effective Date.

However, if open transaction treatment applies to a U.S. Holder's receipt of the CVRs because the value cannot be "reasonably ascertained" as of the Effective Date, such U.S. Holder generally would not take the CVRs into account on the Effective Date for purposes of determining gain with respect to the exchange, generally would take no tax basis in the CVRs (and accordingly would generally realize gain only as they receive any payments pursuant to the CVRs in excess of their adjusted tax basis in the Claims contributed in exchange therefore) and generally would not recognize any loss until the receipt of final payments under, or other disposition of, the CVRs.

### (ii)     Treatment if the Equity Issuer is Jackson

If the Equity Issuer is Jackson, the consummation of the Amended Plan may be subject to treatment as a recapitalization under section 354 of the IRC, rather than the rules of section 351 described above.  The anticipated treatment of U.S. Holders of Unsecured Claims against Jackson and Unsecured Claims against Jackson Subsidiaries in such a circumstance is expected to be essentially the same as the treatment described above, with the exception that (a) section 367 of the IRC will generally not require a U.S. Holder of such a Claim to recognize gain and (b) gain, but not loss, would be recognized with respect to any Cash and CVRs received from the Equity Issuer.

### 4.   *U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims against ICF*

Pursuant to the Amended Plan, in exchange for full and final satisfaction of the Unsecured Claims against ICF, the holders of such Claims shall receive their *pro rata* share of Cash, New Common Stock,

New Warrants, and Series B CVRs.  In addition, holders of such Claims will receive a portion of the distributions that would otherwise be made to certain Holders of the Jackson Senior Notes Guarantee Claims against Intelsat.

**The U.S. federal income tax treatment of the receipt of consideration in respect amounts that otherwise would have been received by certain Holders of the Jackson Senior Notes Guarantee Claims against Intelsat is uncertain, will depend, in part, on the transactions set forth in the Restructuring Transaction Memorandum with respect to the receipt of such consideration, and is not discussed below.  Holders of Claims should consult their own tax advisors with respect to such treatment.**

### (a)     Treatment if Equity Issuer is Not ICF.

Although not free from doubt, if the Equity Issuer is not ICF, other than with respect to any Claims not treated as contributed to the Equity Issuer as set forth above, the Debtors expect that the transactions in which the U.S. Holders of such Claims contribute such Unsecured Claims against ICF in exchange for New Common Stock, New Warrants will qualify as an exchange under section 351 of the IRC.

If the contribution of Claims in exchange for New Common Stock, New Warrants qualifies as an exchange under section 351 of the IRC, a U.S. Holder of a Claim should recognize gain, but not loss, for United States federal income tax purposes with respect to such contribution pursuant to section 367(a) of the IRC.  The amount of such gain recognized by a U.S. Holder of a Claim should equal the excess of (i) the fair market value of the New Common Stock, New Warrants received over (ii) such U.S. Holder's adjusted tax basis in the Claims contributed in exchange for such New Common Stock, New Warrants. However, a U.S. Holder of a Claim may be able to avoid current recognition of gain under section 367 of the IRC if the Claims contributed in exchange for New Common Stock are considered "stock or securities" and if such U.S. Holder either owns less than 5 percent of the New Common Stock immediately after the transfer, or, if a U.S. Holder owns 5 percent or more of the New Common Stock immediately after the transfer, such U.S. Holder enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under section 367 of the IRC, as long as certain other conditions are met.

The Debtors do not expect the New Warrants to be considered "stock" for purposes of section 351 of the IRC, and expect the New Warrants received by a U.S. Holder of a Unsecured Claim against ICF in exchange for its Claim to be considered "boot" for purposes of section 351 of the IRC.  Accordingly, if a U.S. Holder of an Unsecured Claim against ICF meets the requirements to avoid gain recognition under section 367 of the IRC, such U.S. Holder should recognize gain, but not loss, to the extent of the lesser of (i) the fair market value of the of New Warrants received and (ii) the excess of (A) the fair market value of the New Common Stock, New Warrants received over (B) such U.S. Holder's adjusted tax basis in the Claims contributed in exchange for such New Common Stock, New Warrants. U.S. Holders of Claims are urged to consult their tax advisors regarding the availability of gain deferral under the exceptions outlined in the preceding two paragraphs.

If the contribution of the Claims in exchange for consideration does not qualify as an exchange under section 351 of the IRC, a U.S. Holder of such a Claim may recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the fair market value of the consideration received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim contributed in the exchange therefor.  The adjusted tax basis of a U.S. Holder's Claim contributed in the exchange would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account.  The Holder's adjusted tax basis in the consideration received would equal the fair market value of such consideration, and its holding period in the consideration would begin on the day after the day of

142

the Restructuring Transactions. Assuming a U.S. Holder holds its Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.

The U.S. federal income tax treatment of the rights to the proceeds from the Series B CVRs is unclear, and U.S. Holders who receive such rights are urged to consult their own tax advisors regarding such treatment. Treatment of the Series B CVRs will depend in part on whether the receipt of such rights is a "closed transaction" or an "open transaction" and whether the rights are treated as rights to payment under a contract or as a debt instrument for U.S. federal income tax purposes. However, as treatment as a debt instrument is unlikely, the discussion below does not address the tax consequences of such a characterization. Open transaction treatment should apply only if the fair market value of the Series B CVRs cannot be ascertained at the time of the exchange, and the IRS has taken the position that only in "rare and extraordinary circumstances" is the fair market value of property so uncertain that open transaction treatment is available. The IRS is not bound by any position taken by the Debtors, and may characterize the Series B CVRs as a debt instrument or otherwise. If the IRS disagrees with any position taken by the Debtors, the tax treatment to U.S. Holders receiving the Series B CVRs in exchange for Claims may be materially different from the treatment described below.

Assuming closed transaction treatment applies with respect to a U.S. Holder's receipt of the Series B CVRs, to the extent that a U.S. Holder of a Claim exchanges a portion of its Claim with an entity other than the Equity Issuer for Cash and Series B CVRs, the Debtors expect that such U.S. Holder will be treated as receiving such distributions under the Amended Plan in a fully taxable exchange under section 1001 of the IRC. Such U.S. Holder should recognize gain or loss equal to the difference between (i) the amount of Cash and the fair market value of any Series B CVRs received in exchange for its Claim and (ii) such U.S. Holder's adjusted tax basis, if any, in its Claim exchanged therefor. Assuming a U.S. Holder holds its Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.

A U.S. Holder of a Claim should obtain a tax basis in the Series B CVRs, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the fair market value thereof as of the date such property is distributed to such U.S. Holder. The holding period for any such Series B CVRs should begin on the day following the Effective Date.

The tax basis of any Series B CVRs determined to be received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest. The holding period for any such Series B CVRs should begin on the day following the Effective Date.

However, if open transaction treatment applies to a U.S. Holder's receipt of the Series B CVRs because the value cannot be "reasonably ascertained" as of the Effective Date, such U.S. Holder generally would not take the Series B CVRs into account on the Effective Date for purposes of determining gain with respect to the exchange, generally would take no tax basis in the Series B CVRs (and accordingly would generally realize gain only as they receive any payments pursuant to the Series B CVRs in excess of their adjusted tax basis in the Claims contributed in exchange therefore) and generally would not recognize any loss until the receipt of final payments under, or other disposition of, the Series B CVRs.

The treatment of accrued interest and market discount is discussed below.

143

**(b)**         **Treatment if the Equity Issuer is ICF.**

If the Equity Issuer is ICF, the contribution of the applicable Claim in exchange for New Common Stock, New Warrants may be subject to treatment as a recapitalization under section 354 of the IRC, rather than the rules of section 351 described above.  The anticipated treatment of U.S. Holders of Unsecured Claims against ICF in such a circumstance is expected to be essentially the same as the treatment described above, including with respect to the application of section 367 of the IRC, with the exception that (i) the New Warrants should not constitute "boot," (ii) gain, but not loss, would be required to be recognized with respect to any Cash and Series B CVRs received, and (iii) section 367 of the IRC will generally not require the U.S. Holders of Claims in such circumstances to recognize gain, in each case, to the extent section 354 of the IRC, rather than section 351, applies to such exchange.

**5.**   *U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims against Envision*

Pursuant to the Amended Plan, in exchange for full and final satisfaction of the Unsecured Claims, the holders of such Claims shall receive their *pro rata* share of Cash and New Series B Warrants.

Although not free from doubt, the Debtors expect that the transactions in which the U.S. Holders of Claims exchange such Claims for Cash and New Series B Warrants will be treated as a fully taxable exchange under section 1001 of the IRC.  A U.S. Holder of a Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the amount of Cash plus the fair market value of the New Series B Warrants received, in each case, that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim exchanged therefor.  A U.S. Holder's adjusted tax basis in its Unsecured Claim exchanged would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account.  Assuming a U.S. Holder of a Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.  The Treatment of accrued interest and market discount is discussed below.

**6.**   *U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims against LuxCo, Investments, Holdings, and Holdings SARL*

Pursuant to the Amended Plan, in exchange for full and final satisfaction of Unsecured Claims against LuxCo, Investments, Holdings, and Holdings SARL, the holders of such Claims shall receive their *pro rata* share of Cash.

With respect to Unsecured Claims against Holdings SARL that are attributable to Holdings SARL guarantees of debt issued by other entities, the tax treatment is uncertain and will be subject to the Restructuring Transactions, which are subject to ongoing analysis. **The below discussion does not apply to the receipt of consideration from Holdings SARL that is attributable to a guarantee claim related to a debt instrument issued by an entity other than Holdings SARL (*e.g.*, the below discussion does not apply to Jackson Senior Notes Guarantee Claims), and Holders of such Claims should consult their own tax advisors regarding such consequences.**

The Debtors expect that the transactions in which the U.S. Holders of Claims exchange such Claims for Cash will be treated as a fully taxable exchange under section 1001 of the IRC.  A U.S. Holder of a Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the amount of Cash received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim exchanged therefor.  A U.S. Holder's adjusted tax basis in its Claim

144

exchanged would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account.  Assuming a U.S. Holder of a Claim holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.  The Treatment of accrued interest and market discount is discussed below.

7. ***U.S. Federal Income Tax Consequences to U.S. Holders of Unsecured Claims against Intelsat***

Pursuant to the Amended Plan, in exchange for full and final satisfaction of the Unsecured Claims against Intelsat, the holders of such Claims shall receive their *pro rata* share of Cash, New Series B Warrants, and Reorganized S.A Common Stock.

With respect to Unsecured Claims against Intelsat that are attributable to Intelsat guarantees of debt issued by other entities, while not free from doubt, the receipt of any New Common Stock or Series B Warrants should be subject to, and treated as part of, the recoveries received in respect of such underlying debt instrument, rather than being treated as having been separately received from Intelsat as a payment on a guarantee.  However, with respect to any recoveries in respect of such guarantees received directly from Intelsat or Reorganized S.A., the tax treatment is uncertain and will be subject to the Restructuring Transactions, which are subject to ongoing analysis.  **The below discussion does not apply to the receipt of consideration from Intelsat that is attributable to a guarantee claim related to a debt instrument issued by an entity other than Intelsat (*e.g.*, the below discussion does not apply to Jackson Senior Notes Guarantee Claims), and Holders of such Claims should consult their own tax advisors regarding such consequences.**

(a) **Treatment of the Receipt of Reorganized S.A. Common Stock and Cash at Intelsat**

(i) **Treatment if Reorganized S.A. is not Intelsat**

Although not free from doubt, if Reorganized S.A. is not Intelsat, the Debtors expect that the transactions in which the U.S. Holders of Unsecured Claims against Intelsat contribute such Claims in exchange for Reorganized S.A. Common Stock, will qualify as an exchange under section 351 of the IRC.

If the contribution of Unsecured Claims against Intelsat in exchange for Reorganized S.A. Common Stock qualifies as an exchange under section 351 of the IRC, a U.S. Holder of such a Claim should recognize gain, but not loss, for United States federal income tax purposes with respect to such contribution pursuant to section 367(a) of the IRC.  The amount of such gain recognized by a U.S. Holder of a Claim who is subject to this treatment should equal the excess of (i) the fair market value of the Reorganized S.A. Common Stock received over (ii) such U.S. Holder's adjusted tax basis in the Claims contributed in exchange for such Reorganized S.A. Common Stock.  However, a U.S. Holder of a Claim may be able to avoid current recognition of gain under section 367 of the IRC if the Claims contributed in exchange for Reorganized S.A. Common Stock are considered "stock or securities" and if such U.S. Holder either owns less than 5 percent of the Reorganized S.A. Common Stock immediately after the transfer, or, if a U.S. Holder owns 5 percent or more of the Reorganized S.A. Common Stock immediately after the transfer, such U.S. Holder enters into a "gain recognition agreement" that meets the requirements set forth in the Treasury Regulations promulgated under section 367 of the IRC, as long as certain other conditions are met.

The Debtors expect the Cash received from Intelsat by a U.S. Holder of an Unsecured Claim against Intelsat in exchange for its Claim to be considered "boot" for purposes of section 351 of the IRC.

145

Accordingly, if a U.S. Holder of such a Claim meets the requirements to avoid gain recognition under section 367 of the IRC, such U.S. Holder should recognize gain, but not loss, to the extent of the lesser of (i) the amount of such Cash received and (ii) the excess of (A) the fair market value of the Reorganized S.A. Common Stock and such Cash received over (B) such U.S. Holder's adjusted tax basis in the Claims contributed in exchange for such Reorganized S.A. Common Stock and Cash received from Intelsat.  U.S. Holders of Unsecured Claims against Intelsat are urged to consult their tax advisors regarding the availability of gain deferral under the exceptions outlined in the preceding two paragraphs.

If the contribution of the Unsecured Claims in exchange for Reorganized S.A. Common Stock does not qualify as an exchange under section 351 of the IRC, then such exchange should be subject to section 1001 of the IRC, and a U.S. Holder of such a Claim should recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (i) the amount of Cash and fair market value of the Reorganized S.A. Common Stock received that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Claim contributed in the exchange therefor.  The adjusted tax basis of a U.S. Holder's Claim contributed in the exchange would be equal to the amount paid therefor, increased by any accrued OID and any market discount and reduced by any amortizable bond premium previously taken into account.  The Holder's adjusted tax basis in the Reorganized S.A. Common Stock would equal the fair market value of such Reorganized S.A. Common Stock, and its holding period in the Reorganized S.A. Common Stock would begin on the day after the day of the Restructuring Transactions.  Assuming a U.S. Holder holds its Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.

### (ii)      Treatment if Reorganized S.A. is Intelsat

If Reorganized S.A. is Intelsat, the contribution of an Unsecured Claim against Intelsat in exchange for Reorganized S.A. Common Stock may be subject to treatment as a recapitalization under section 354 of the IRC, rather than the rules of section 351 described above.  The anticipated treatment of U.S. Holders of such Claims in such a circumstance is expected to be essentially the same as the treatment described above, including with respect to the application of section 367 of the IRC, with the exception that section 367 of the IRC will generally not require the U.S. Holders of such Claims in such circumstances to recognize gain, in each case, to the extent section 354, rather than section 351, applies to such exchange.

### (b)      Treatment of the Receipt of Property Other than Reorganized S.A. Common Stock and Cash at Intelsat

Although not free from doubt, the Debtors expect that the transactions in which the U.S. Holders of Unsecured Claims against Intelsat exchange such Claims for Cash other than at Intelsat and New Series B Warrants will be treated as a fully taxable exchange under section 1001 of the IRC.  A U.S. Holder of a Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the amount of Cash other than at Intelsat plus the fair market value of the New Series B Warrants received, in each case, that is not allocable to accrued but unpaid interest and (ii) such U.S. Holder's adjusted tax basis in the Unsecured Claim exchanged therefor.  A U.S. Holder's adjusted tax basis in its Unsecured Claim against Intelsat exchanged would be equal to the amount paid therefor, increased by any accrued OID and any market discount, and reduced by any amortizable bond premium previously taken into account.  Assuming a U.S. Holder of an Unsecured Claim against Intelsat holds such Claim as a capital asset, any gain or loss realized would be capital gain or loss (except, as described below, to the extent of market discount) and would be long-term capital gain or loss if such U.S. Holder's holding period in the Claim at the time of the Restructuring Transactions exceeds one year.  The treatment of accrued interest and market discount is discussed below.

146

**8.** *Receipt of Interests in Distribution Reserves*

As will be described in the Plan and Plan Supplement, reserves may be established by either the Debtors or the Reorganized Debtors for the distribution of additional consideration after the Effective Date for Claims that are contingent or have not yet been Allowed.  As will be provided in the Plan Supplement, certain U.S. Holders of Claims may receive a share of such reserves.

Such a U.S. Holder would recognize gain or loss equal to the difference between (a) the fair market value of the interests in any reserve for Claims that are contingent or have not yet been Allowed ("Distribution Reserve Interests") received (subject to accrued interest described below) and (b) the U.S. Holder's adjusted tax basis in its Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.

**(a)      Liquidating Trust Treatment.**

Although not free from doubt and subject to further analysis by the Debtors, any reserve for Claims that are contingent or have not yet been Allowed may be classified as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and qualify as a "grantor trust" within the meaning of sections 671 through 679 of the IRC to the Holders of relevant Claims.  In such case, any beneficiaries of such a reserve would be treated as grantors and deemed owners thereof and, for all U.S. federal income tax purposes, any beneficiaries would be treated as if they had received a distribution of an undivided interest in the assets of such reserve and then contributed such undivided interest to such reserve.  If this treatment applies, the administrator of the reserve shall, in an expeditious but orderly manner, make timely distributions to beneficiaries of any reserve pursuant to the Plan and Plan Supplement and not unduly prolong its duration.  Any reserve would not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Plan Supplement.

Other than with respect to any assets of any reserve for Claims that are contingent or have not yet been Allowed that are subject to potential disputed claims of ownership or uncertain distributions, the treatment of the deemed transfer of assets to applicable Holders of Claims prior to the contribution of such assets to such reserve should generally be consistent with the treatment described above with respect to the receipt of the applicable assets directly.

Other than with respect to any assets of any reserve that are subject to potential disputed claims of ownership or uncertain distributions, no entity-level tax should be imposed on any reserve with respect to earnings generated by the assets held by it.  Each beneficiary must report on its federal income tax return its allocable share of income, gain, loss, deduction and credit, if any, recognized or incurred by any reserve, even if no distributions are made.  Allocations of taxable income with respect to any reserve shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein) if, immediately before such deemed distribution, such reserve had distributed all of its other assets (valued for this purpose at their tax book value) to the beneficiaries, taking into account all prior and concurrent distributions from such reserve.  Similarly, taxable losses of any reserve will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets.  The tax book value of the assets for this purpose shall equal their respective fair market values on the Effective Date or, if later, the date such assets were acquired, adjusted in either case in accordance with the tax accounting principles

147

prescribed by the applicable provisions of the IRC, Treasury Regulations and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, gain, loss, deduction and credit to any Holder of a beneficial interest in any reserve for Claims that are contingent or have not yet been Allowed, and the ability of such Holder to benefit from any deductions or losses, may depend on the particular circumstances or status of the Holder. Taxable income or loss allocated to a beneficiary should be treated as income or loss with respect to the interest of such beneficiary in any reserve and not as income or loss with respect to such beneficiary's applicable Claim. In the event any tax is imposed on any reserve, the administrator of such reserve shall be responsible for payment, solely out of the assets of any reserve, of any such taxes imposed on any reserve.

The administrator of any such reserve shall be liable to prepare and provide to, or file with, the appropriate taxing authorities and other required parties such notices, tax returns and other filings, including all federal, state and local tax returns as may be required under the Bankruptcy Code, the Plan, the Plan Supplement or by other applicable law, including, if required under applicable law, notices required to report interest or dividend income. To the extent that a reserve for Claims that are contingent or have not yet been Allowed is properly treated as a "liquidating trust" as described above, the administrator of such reserve will file tax returns pursuant to section 1.671-4(a) of the Treasury Regulations on the basis that such reserve is a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations and related Treasury Regulations. As soon as reasonably practicable after the close of each calendar year, the administrator of such reserve will send each affected beneficiary a statement setting forth such beneficiary's respective share of income, gain, deduction, loss and credit for the year, and will instruct the Holder to report all such items on its tax return for such year and to pay any tax due with respect thereto.

### (b)      Disputed Ownership Fund Treatment.

With respect to any of the assets of any reserve for Claims that are contingent or have not yet been Allowed that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable, the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss with respect to such property on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

Additional discussion of the expected tax consequences related to the receipt of any Distribution Reserve Interests shall be provided in the Plan Supplement, as applicable.

### 9.  *Distributions Attributable to Accrued Interest (and OID)*

To the extent that any amount received by a U.S. Holder of a Claim exchanged under the Amended Plan is attributable to accrued but untaxed interest (or OID) on the debt instruments constituting the exchanged Claim, such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). Conversely, a U.S. Holder of an exchanged Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt

148

instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.  The tax basis of any non-Cash consideration treated as received in satisfaction of accrued but untaxed interest (or OID) should equal the amount of such accrued but untaxed interest (or OID).  The holding period for such non-Cash consideration should begin on the day following the receipt of such property.

The extent to which the consideration received by a U.S. Holder of an exchanged Claim will be attributable to accrued interest on the debt constituting the exchanged Claim is unclear.  Certain legislative history and case law indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.  The Amended Plan provides that amounts paid to U.S. Holders of Claims will be allocated first to unpaid principal and then to unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Amended Plan.  U.S. Holders of Claims are urged to consult their tax advisor regarding the allocation of consideration and the deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### 10. *Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the exchanged Claim.

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debt instruments were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include such market discount in its income as the market discount accrued).  To the extent that a U.S. Holder exchanged Claims that were acquired by the U.S. Holder with market discount in exchange for other property pursuant to a tax-free or other reorganization transaction (other than a transaction described in section 351 of the IRC) for other property, any market discount that accrued on such exchanged Claims and was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized by the U.S. Holder on the subsequent sale, exchange, redemption, or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.  To the extent that a U.S. Holder exchanged Claims that were acquired by the U.S. Holder with market discount in exchange for other property pursuant to an exchange described in section 351 of the IRC, such U.S. Holder may be required to recognize gain treated as ordinary income on such exchange to the extent of the accrued but unrecognized market discount with respect to the exchanged Claim.

### 11. *Net Investment Income Tax*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, interest, dividends, and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of debt of, and equity interests in, the Debtors and Reorganized Debtors.

### 12. *Limitations on Use of Capital Losses*

A U.S. Holder of a Claim or Interest who recognizes capital losses as a result of the exchanges under the Amended Plan will be subject to limits on the use of such capital losses.  For a non-corporate

U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 annually ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

**13.** *Ownership and Disposition of New Common Stock or Reorganized S.A. Common Stock*

**(a)**      **Dividends on New Common Stock or Reorganized S.A. Common Stock**

Any distributions made on account of the New Common Stock or Reorganized S.A. Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the applicable Reorganized Debtors as determined under U.S. federal income tax principles.  Certain qualified dividends received by a non-corporate taxpayer are taxed at preferential rates.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.  It is uncertain whether dividends from the Reorganized Debtors will constitute qualified dividends for the purposes of these rules.

Distributions that constitute dividends for U.S. federal income tax purposes which are paid to U.S. Holders that are corporations should not be eligible for the dividends-received deduction generally applicable to U.S. corporations with respect to dividends received from other U.S. corporations.

**(b)**      **Sale, Redemption, or Repurchase of New Common Stock or Reorganized S.A. Common Stock**

Unless a non-recognition provision of the IRC applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Stock or Reorganized S.A. Common Stock received pursuant to the Amended Plan.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the applicable New Common Stock or Reorganized S.A. Common Stock for more than one year.  Long-term capital gains of a non-corporate taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.  Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on such dispositions of the New Common Stock or Reorganized S.A. Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Claim or recognized an ordinary loss on the exchange of its Claim for New Common Stock or Reorganized S.A. Common Stock.

**(c)**      **PFIC Status**

The Equity Issuer or Reorganized S.A. would be classified as a passive foreign investment company ("PFIC") for any taxable year if, after the application of certain look-through rules, either: (1) 75 percent or more of its gross income for such year is "passive income" as defined in the relevant provisions of the IRC, or (2) 50 percent or more of the value of its assets, determined on the basis of a

150

quarterly average, during such year is attributable to assets that produce or are held for the production of passive income. In determining whether the Equity Issuer or Reorganized S.A. is a PFIC, it will be treated as owning its proportionate share of the assets, and earning its proportionate share of the income (which may be reduced in each case by certain intercompany transactions pursuant to reliance upon Proposed Treasury Regulations section 1.1297-2(c)), of any other corporation in which it owns, directly or indirectly, 25 percent or more (by value) of the stock. However, the Equity Issuer's or Reorganized S.A.'s status as a PFIC in any taxable year requires a factual determination that depends on, among other things, the composition of its income, assets, and activities in each year, and can only be made annually after the close of each taxable year. Therefore, there can be no assurance that the Equity Issuer (or any Reorganized Debtor that is a non-U.S. corporation, including Reorganized S.A.) will not be classified as a PFIC for the taxable year in which the Restructuring Transactions occur, or for any future taxable year after the Restructuring Transactions. Moreover, the determination of whether the Equity Issuer or any other Reorganized Debtor that is a non-U.S. corporation, including Reorganized S.A. will be classified as a PFIC for the taxable year in which the Restructuring Transactions occur or any other year in which the New Common Stock or Reorganized S.A. is not publicly traded for the entirety of such year may depend in substantial part on whether such Equity Issuer or Reorganized Debtor is classified as a "controlled foreign corporation" (a "CFC") for U.S. federal income tax purposes for those years. The Debtors do not currently know whether the Equity Issuer or the other Reorganized Debtors which are non-U.S. corporations, including Reorganized S.A., will be classified as CFCs for U.S. federal income tax purposes. However, based on certain estimates of the Reorganized Debtors' gross income, the value of their assets, and the adjusted tax basis of their assets (including goodwill), the Debtors do not expect any of the Reorganized Debtors to be considered PFICs for the taxable year in which the Restructuring Transactions occur.

If the Equity Issuer or Reorganized S.A. is treated as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock or Reorganized S.A. Common Stock, the U.S. Holder would be subject to additional U.S. information return filing requirements. Additionally, if the Equity Issuer or Reorganized S.A. is treated as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock or Reorganized S.A. Common Stock, such U.S. Holder may be subject to adverse tax consequences upon a sale, exchange, or other disposition of such New Common Stock or Reorganized S.A. Common Stock, or upon the receipt of distributions in respect of the New Common Stock or Reorganized S.A. Common Stock. Under the "default PFIC regime," in general, an "excess distribution" is any distribution to a U.S. Holder that is greater than 125 percent of the average annual distributions received by the U.S. Holder (including return of capital distributions) during the three preceding taxable years or, if shorter, a U.S. Holder's holding period. If the Equity Issuer or Reorganized S.A. is classified as a PFIC for any taxable year during which a U.S. Holder owns the New Common Stock or Reorganized S.A. Common Stock, gains from the sale or other disposition of, and "excess distributions" with respect to, the New Common Stock or Reorganized S.A. Common Stock should be allocated ratably over a U.S. Holder's entire holding period and taxed at the highest ordinary income tax rate in effect for each such taxable year (subject to certain exceptions). Moreover, interest should be charged retroactively at the rate applicable to underpayments of tax (with respect to each such tax year's ratable allocation) through the date of gains from the sale or other disposition of, and "excess distributions" with respect to, the New Common Stock or Reorganized S.A. Common Stock.

The Debtors cannot provide any assurances that they will assist investors in determining whether the Equity Issuer or any Reorganized Debtor, including Reorganized S.A. is a PFIC for any taxable year. Additionally, the tax consequences that would apply if the Equity Issuer or Reorganized S.A. is classified as a PFIC would also be different from those described above if a U.S. Holder that holds New Common Stock or Reorganized S.A. Common Stock, as applicable, were able to make a valid election to treat the Equity Issuer or Reorganized S.A., as applicable, as a "qualified electing fund" (such election, a "QEF Election"). At this time, the Debtors do not expect to provide U.S. Holders with the information necessary to make and maintain a valid QEF Election and therefore U.S. Holders should assume that a QEF

151

Election will not be available.  U.S. Holders should consult their tax advisors about the potential application of the PFIC rules to their ownership of New Common Stock or Reorganized S.A. Common Stock.  A U.S. Holder can also avoid certain of the adverse rules described above where a mark-to-market election is available with respect to its New Common Stock or Reorganized S.A. Common Stock, as applicable.  The mark-to-market election is only available where the New Common Stock or Reorganized S.A. Common Stock, as applicable, is "marketable."  Each of the New Common Stock and Reorganized S.A. Common Stock will be marketable if it is "regularly traded" on a "qualified exchange" or other market within the meaning of applicable Treasury Regulations.  The New Common Stock will not be "regularly traded" on a "qualified exchange" for this purpose and therefore, the mark-to-market election would not be available to a U.S. Holder of the New Common Stock if the Equity Issuer becomes a PFIC.  It is unclear whether the Reorganized S.A. Common Stock will be "regularly traded" on a "qualified exchange" for this purpose and therefore, it is unclear whether the mark-to-market election would be available to a U.S. Holder of the Reorganized S.A. Common Stock if Reorganized S.A. becomes a PFIC.

**14.** *Ownership, Exercise, and Disposition of the New Warrants*

**(a)    Certain Deemed Distributions with Respect to the New Warrants**

Under section 305 of the IRC, certain transactions that have the effect of increasing the proportionate interest of a shareholder or warrant holder (treating warrants as stock for this purpose) in the corporation's assets are treated as creating deemed distributions to such shareholder or warrant holder in respect of such "stock" interest.  Any deemed distribution will be taxed and reported to the IRS in the same manner as an actual distribution on stock and thus could potentially be taxable as a dividend (in whole or in part), despite the absence of any actual payment of cash (or property) to the U.S. Holder in connection with such distribution.

**(b)    Exercise of the New Warrants**

A U.S. Holder that elects to exercise the New Warrants will generally be treated as purchasing, in exchange for its New Series A Warrants or New Series B Warrants and the amount of cash funded by the U.S. Holder to exercise the New Warrants, the New Common Stock it is entitled to purchase pursuant to the New Warrants, as applicable.  In each case, such purchase will generally be treated as the exercise of an option under general tax principles and the U.S. Holder therefore should not recognize income, gain or loss for U.S. federal income tax purposes.  A U.S. Holder's aggregate tax basis in the New Common Stock received upon exercise of a New Warrant will generally equal the sum of (a) the amount of cash paid by the U.S. Holder to exercise its New Warrant, as applicable, plus (b) such U.S. Holder's tax basis in its New Warrant, as applicable, immediately before such New Warrant is exercised.  A U.S. Holder's holding period in the New Common Stock received on the exercise of the New Warrants will begin on the day after the exercise date of the New Warrants, as applicable.

**(c)    Lapse or Other Disposition of the New Warrants**

A U.S. Holder that elects not to exercise the New Warrants and instead allows the New Warrants to lapse may be entitled to claim a capital loss upon expiration of the New Warrants in an amount equal to the amount of tax basis allocated to the New Warrants, subject to any limitations on such U.S. Holder's ability to utilize capital losses.  Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of either electing to exercise or electing not to exercise the New Warrants.  Additionally, in the event that a U.S. Holder sells its New Warrants in a taxable transaction, the U.S. Holder will generally recognize gain or loss upon such sale in an amount equal to the difference between the amount realized upon such sale and the U.S. Holder's tax basis in the New Warrants, as applicable.  Such gain or loss will be treated as gain or loss from the sale or exchange of property which has the same character as the New

152

Common Stock to which the New Warrants relate, respectively, would have had in the hands of the U.S. Holder if such New Common Stock had been acquired by the U.S. Holder upon exercise.  If such sale gives rise to capital gain or loss to the U.S. Holder, such gain or loss will be long-term or short-term in character based upon the length of time such U.S. Holder has held its New Warrants, as discussed above.

### 15. *Ownership and Disposition of the CVRs*

#### (a)      **Payments with respect to the CVRs**

If closed transaction treatment applies to a U.S. Holder's receipt of the CVRs, future payments in respect of the CVRs would likely reduce the U.S. Holder's basis in its CVRs (but not below zero) and thereafter result in gain to the U.S. Holder.  If no payment is made in respect of the CVRs, or if the final payment in respect of the CVRs is less than the U.S. Holder's tax basis in its CVRs, the U.S. Holder generally should recognize a loss.  Assuming the receipt of the CVRs is treated as a closed transaction, the character of any gain or loss recognized by a U.S. Holder in a future taxable year with respect to the CVRs generally is unclear.

In addition, a deferred payment given as consideration in exchange for certain property generally must provide for adequate stated interest or a portion of the payment will be characterized as interest for U.S. federal income tax purposes.  Generally, section 483 of the IRC applies to contracts for the sale or exchange of property if the contract provides for one or more contingent payments.  Contingent payments are accounted for when payment is made.  Under section 483, a portion of a contingent payment equal to the amount of "unstated interest" is treated as interest, and the rest of the payment is treated as a receipt of consideration. "Unstated interest" represents the excess of (x) the total deferred payments (i.e., all payments due more than one year after the date of the sale or exchange) over (y) the aggregate present value of all deferred payments (using a discount rate equal to the applicable Federal rate under section 1274(d) of the IRC) plus any stated interest.  The U.S. Holder must include this interest in taxable income in the taxable year in which the payment is made.  Accordingly, if the exchange of Claims and CVRs is characterized as a closed transaction and the CVR is characterized as the receipt of a deferred payment obligation (rather than the receipt of property), a U.S. Holder may be required to treat a portion of any payments received with respect to the CVRs as imputed interest in the year of receipt.

If open transaction treatment applies to a U.S. Holder's receipt of the CVRs, future payments in respect of the CVRs would be subject to tax as such payments are made or deemed made in accordance with the U.S. Holder's regular method of accounting.  The U.S. Holder generally would treat a portion of such payments as interest income under section 483 of the IRC, then as recovery of tax basis in the U.S. Holder's Claims (reduced by the amount of the Cash received in respect of such Claims), and the balance as gain.  To the extent the U.S. Holder has unrecovered tax basis in its Claims after receipt of all payments pursuant to the CVRs, the U.S. Holder generally should recognize a loss.  Any recognized gain or loss generally should be capital or ordinary depending on the nature of the U.S. Holder's interest in its Claims.

#### (b)      **Sale, Redemption or Repurchase of CVRs**

Unless a non-recognition provision of the IRC applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of CVRs received pursuant to the Amended Plan.  Such capital gain will be long term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the applicable CVRs for more than one year.  Long term capital gains of a non-corporate taxpayer

generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described above.

### E.    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims

The Debtors do not anticipate that there will be material U.S. federal income tax consequences to Non-U.S. Holders of Claims, because neither the Equity Issuer nor Reorganized is domiciled in the United States.  Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences to such Non-U.S. Holder and the ownership and disposition of non-Cash consideration.

### F.    Certain Luxembourg Tax Consequences to Holders of New Common Stock, Reorganized S.A. Common Stock, New Warrants or CVRs

#### 1.    *Tax Regime Applicable to Luxembourg Holders upon the Exchange of Claims against New Common Stock, Reorganized S.A. Common Stock New Warrants or CVRs or upon the Exchange of New Warrants against New Common Stock*

According to Articles 22(5) and 102(1a) ITL and the related parliamentary comments, an exchange of assets shall be treated as the sale of an asset for valuable consideration followed by the acquisition of the asset received in exchange for valuable consideration and thus may lead to the realization of any profit or loss in the hands of the Holders.  However, the transfer price of the asset given in exchange is its *valeur estimée de réalisation* (fair market value) as defined by Article 27(2) ITL as the price that would be obtained in an arm's length transfer of the asset, taking into account all the circumstances and conditions affecting the price, except abnormal or personal circumstances or conditions.  The acquisition price of the asset received in exchange also corresponds, according to Article 25(1) ITL, to its fair market value.

If the fair market value of the exchanged assets are the same, the Luxembourg Holders should not realize for Luxembourg tax purposes any gain or loss upon the exchange of their Claims against New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs or upon the exchange of New Warrants against New Common Stock.

#### 2.    *Tax Regime Applicable to Realized Capital Gains*

##### (a)    Luxembourg Holders

###### (i)    Luxembourg Individual Holders

A Luxembourg individual holder will be subject to Luxembourg income taxes for capital gains in the following cases: if the New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs (x) represent the assets of a business or (y) were acquired for speculative purposes (i.e., disposed of within six months after acquisition), in which case any capital gain will be levied at ordinary income tax rates (including unemployment fund contributions), and subject to dependence insurance contribution.

If the New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs do not represent the assets of a business, and the Luxembourg individual has disposed of them more than six months after their acquisition, then any capital gains realized by such individual should in principle be tax exempt unless the New Common Stock or Reorganized S.A. Common Stock, belongs or New Warrants or CVRs are deemed to belong to a substantial participation within the meaning of Article 100 ITL (i.e., a direct or indirect participation representing more than 10.0 percent of the share capital, owned by the Luxembourg resident individual (alone or together with his or her spouse or partner and underage children) at any time during the five years preceding the disposal), in which case, any capital gains should be taxable

at half of the overall tax rate (including unemployment fund contributions) of the relevant individual.  In this case, the capital gains would also be subject to dependence insurance contribution.

### (ii)      Luxembourg Corporate Holders

Capital gains realized upon the disposal of New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs by a fully-taxable resident Luxembourg corporate holder (without benefiting from a special tax regime) will, in principle, be subject to corporate income tax and municipal business tax.

An exemption from such taxes may be available to a Luxembourg corporate holder pursuant to Article 166 of the ITL and the Grand-Ducal Decree of December 21, 2001 (as amended) provided that (x) the Luxembourg corporate holder of New Common Stock or Reorganized S.A. Common Stock, holds such New Common Stock or Reorganized S.A. Common Stock, at the time of the disposal representing at least 10 percent of the total share capital of the relevant Luxembourg Debtor or has a cost price of at least €6,000,000 and (y) such qualifying shareholding has been held for an uninterrupted period of at least twelve (12) months (the "participation exemption regime" or "LPER").  However, under the Luxembourg recapture rules, any capital gain realized on the disposal of a subsidiary that otherwise qualifies for the LPER is taxable up to the sum of any amount corresponding to expenses related to the shareholding and any write-down recorded on the qualifying shareholding that reduced the taxable basis of the company in the year of the disposal and/or in the previous financial years (subject however to the use of NOLs).  The amount of taxation cannot exceed the amount of the capital gain.

If the New Warrants qualify as a preferential subscription right within the meaning of the case law of the Luxembourg Administrative Court of Appeal number 28919C dated 16 February 2012 (the "2012 Case-Law"), the disposal of such preferential subscription right should be considered as a partial disposal of the underlying shares to which New Warrants are attached and thus any capital gain realized upon the disposal of such New Warrants should be tax exempt provided the conditions of the participation exemption regime (mentioned above) are met.  If the Holder of New Warrants does not hold underlying shares to which New Warrants are attached the participation exemption regime should not apply.

Capital gains remain taxable for the amount of expenses related to the participation and write-downs in the value of the New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs previously deducted or deducted in the year of disposal of the New Common Stock New Warrants.

### (iii)      Non-Luxembourg Holders

Subject to any applicable tax treaty, an individual who is a Non-Luxembourg Holder of New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs (and who does not have a permanent establishment, a permanent representative, or a fixed place of business in Luxembourg to which the New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs are attributable) will, except for certain former Luxembourg individual holders and Non-Luxembourg individual holders realizing within a period of 6 months after acquisition of a substantial participation within the meaning of Article 100 ITL, not be subject to Luxembourg taxation on capital gains arising upon disposal of such New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs.

Subject to any applicable tax treaty, a corporate Non-Luxembourg Holder of New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs (which does not have a permanent establishment, a permanent representative, or a fixed place of business in Luxembourg to which New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs are attributable) will, except for certain former Luxembourg corporate holders and Non-Luxembourg corporate holders realizing within a period of 6 months after acquisition a substantial participation within the meaning of Article 100 ITL, be

155

tax exempt on any capital gain realized upon the disposal of New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs.

### 3.   *Tax Regime Applicable to Distributions*

#### (a)   **Luxembourg Withholding Tax**

A Luxembourg withholding tax of 15.0 percent (17.65 percent if the dividend tax is not charged to the shareholder) is due on dividends and similar distributions to the Reorganized Debtor's shareholders (subject to the exceptions discussed below under "Exemption from Luxembourg Withholding Tax" and "Reduction of Luxembourg Withholding Tax"). Absent an exception, the Reorganized Debtors will be required to withhold at such rate from distributions to the shareholder and pay such withheld amounts to the LTA.

#### (b)   **Exemption from Luxembourg Withholding Tax**

Dividends and similar distributions paid to Reorganized Debtor's Luxembourg and Non-Luxembourg Holders may be exempt from Luxembourg dividend withholding tax if: (i) the shareholder is a qualifying corporate entity holding a stake representing at least 10.0 percent of the total share capital of the Reorganized Debtors or acquired the New Common Stock or Reorganized S.A. Common Stock for at least €1,200,000 (or its equivalent amount in a foreign currency); and (ii) the shareholder has either held this qualifying stake in the capital of the Reorganized Debtors for an uninterrupted period of at least twelve (12) months at the time of the payment of the dividend or undertakes to continue to own such qualifying shareholding until such time as it has held the New Common Stock or Reorganized S.A. Common Stock for an uninterrupted period of at least twelve (12) months. If a payment is made within the twelve (12) month-period, the withholding tax must be paid and then is refunded. Examples of qualifying corporate shareholders are taxable Luxembourg companies, certain taxable companies resident in other European Union member states, capital companies resident in Switzerland subject to income tax without benefiting from an exemption, and companies fully subject to a tax corresponding to Luxembourg corporate income tax that are resident in countries that have concluded a treaty for the avoidance of double taxation with Luxembourg.

The application of the Luxembourg dividend withholding tax exemption to taxable companies resident in other EU member states or to their EU permanent establishments is not granted if the income allocated is part of a tax avoidance scheme (special anti-abuse rule).

Under current Luxembourg tax law, payments to shareholders in relation to a reduction of share capital (and associated share premium as the case may be) are not subject to Luxembourg dividend withholding tax if certain conditions are met, including that the repayment of capital is motivated by sound business reasons, which would be deemed not to be the case if the Reorganized Debtors have distributable reserves or profits at the time of the capital reduction. In the absence of sound business reasons at the time of the payment to shareholders with respect to their New Common Stock or Reorganized S.A. Common Stock, a distribution of share capital (and associated share premium as the case may be) will be re-characterized for Luxembourg tax purposes as a distribution of such reserves or earnings subject to withholding tax.

#### (c)   **Reduction of Luxembourg Withholding Tax**

Residents of countries that have concluded a treaty for the avoidance of double taxation with Luxembourg may claim application of a reduced rate on or exemption from Luxembourg dividend withholding tax, depending on the terms of the relevant tax treaty, as amended by the Multilateral

Convention to Implement Tax Treaty Related Measures to Prevent Base Erosion and Profit Shifting, if applicable.

### (d)     50% Dividend Exemption—for Luxembourg Holders and Credit of Luxembourg Withholding Tax on Dividends and Other Distributions

#### (i)     Luxembourg Holders

Subject to the satisfaction of certain conditions and assuming, in the case of fully taxable corporate Luxembourg Holders, that the participation exemption does not apply, only half of the gross amount of a dividend distributed to a fully taxable corporate Luxembourg Holder or an individual Luxembourg Holder will be subject to Luxembourg corporate income tax or Luxembourg income tax, respectively.  All or part of the withholding tax levied can in principle be credited against the applicable tax by the (fully taxable) Luxembourg Holder.

#### (ii)     Non-Luxembourg Holders

Withholding tax levied may be credited by Non-Luxembourg resident Holders depending on the rule applicable in their own jurisdictions.

### 4.   *Net Wealth Tax*

#### (a)     Luxembourg Holders

Luxembourg net wealth tax will not be levied on a Luxembourg individual holder holding New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs.

Luxembourg net wealth tax will be levied on Luxembourg corporate holders not entitled to a specific net wealth tax exemption based on Luxembourg domestic law with respect to their New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs.

Net wealth tax is levied annually at a rate of 0.5 percent on the net wealth of enterprises resident in Luxembourg on an amount of unitary value as determined for net wealth tax purposes up to and excluding €500.0 million.  When the unitary value exceeds the aforementioned threshold, net wealth tax is levied at 0.5 percent on the first €500.0 million and at 0.05 percent on the portion of the unitary value exceeding €500.0 million.  The New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs (provided the New Warrants or CVRs qualify as preferential subscription rights within the meaning of the 2012 Case-Law) may be exempt from net wealth tax subject to the conditions set forth by Paragraph 60 of the Law of October 16, 1934 on the valuation of assets (Bewertungsgesetz), as amended.

#### (b)     Non-Luxembourg Holders

Luxembourg net wealth tax will not be levied on a Non-Luxembourg Holder with respect to the New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs held unless they are

attributable to an enterprise or part thereof which is carried on through a permanent establishment, a fixed place of business, or a permanent representative in Luxembourg of a Non-Luxembourg corporate holder.

**5.** *Registration, Estate and Gift Taxes*

No registration tax or stamp duty will be payable by a holder of New Common Stock, Reorganized S.A. Common Stock, New Warrants, or CVRs in Luxembourg upon the disposal thereof.

No estate or inheritance tax is levied on the transfer of New Common Stock, New Warrants or CVRs upon the death of a holder thereof in cases where the deceased was not a resident of Luxembourg for inheritance tax purposes and no gift tax is levied upon a gift of New Common Stock if the gift is not passed before a Luxembourg notary or recorded in a deed registered in Luxembourg. Where a holder of New Common Stock is a resident of Luxembourg for tax purposes at the time of his death, the New Common Stock is included in its taxable basis for inheritance tax or estate tax purposes.

**THE LUXEMBOURG TAX CONSIDERATIONS SUMMARIZED ABOVE ARE FOR GENERAL INFORMATION ONLY.   EACH HOLDER OF NEW COMMON STOCK, NEW WARRANTS OR CVRs IS URGED TO CONSULT ITS, HIS OR HER TAX ADVISOR AS TO THE PARTICULAR CONSEQUENCES THAT MAY APPLY TO SUCH HOLDER.**

**G.      U.S. Information Reporting and Withholding**

The Debtors, Reorganized Debtors, and applicable withholding agents will withhold all amounts required by law to be withheld from payments of interest and dividends, whether in connection with distributions under the Amended Plan or in connection with payments made on account of consideration received pursuant to the Amended Plan, and will comply with all applicable information reporting requirements.  The IRS may make the information returns reporting such interest and dividends and withholding available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments under the Amended Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Amended Plan unless that Holder:  (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders of Claims subject to the Amended Plan are urged to consult their tax advisors regarding these regulations and whether the transactions

158

contemplated by the Amended Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

### H.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or could be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Common Stock or Reorganized S.A. Common Stock), and, subject to the paragraph below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Stock or Reorganized S.A. Common Stock). FATCA withholding could apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules that were previously scheduled to take effect on January 1, 2019 would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Holder.

**THE FEDERAL INCOME AND LUXEMBOURG TAX CONSEQUENCES OF THE AMENDED PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION AND LUXEMBOURG TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE AMENDED PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

[*Remainder of page intentionally left blank.*]

## XIII.   RECOMMENDATION OF THE DEBTORS

In the opinion of the Debtors, the Amended Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Amended Plan vote to accept the Amended Plan and support Confirmation of the Amended Plan.

Dated:  August 2431, 2021

INTELSAT S.A.
on behalf of itself and all other Debtors


*/s/ David Tolley*

David Tolley

Chief Financial Officer and Co-Chief
Restructuring Officer
Intelsat S.A.

160

**<u>Exhibit A</u>**

**Plan of Reorganization**

[Filed Separately]

**Exhibit B**

**Corporate Structure**

**<u>Exhibit C</u>**

**Liquidation Analysis**

**Exhibit D**

**Financial Projections**

**<u>Exhibit E</u>**

**Valuation Analysis**

**Exhibit F**

**Plan Allocation of Distributable Value by Debtor**

**<u>Exhibit G</u>**

**Plan Support Agreement**