Edward O. Sassower, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| INTELSAT S.A., *et al.*,[1] | ) ) | Case No. 20-32299 (KLP) |
| Debtors. | ) ) ) | (Jointly Administered) |

**NOTICE OF FILING PLAN SUPPLEMENT FOR
THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF INTELSAT S.A. AND ITS DEBTOR AFFILIATES**

PLEASE TAKE NOTICE that, as contemplated by the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 3891] (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, and including all exhibits and supplements thereto, the "Plan"),[2] which was confirmed on December 17, 2021 by the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") pursuant to that certain *Order Confirming the Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 3894] (the "Confirmation Order"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file the Plan Supplement with the Court.

PLEASE TAKE FURTHER NOTICE that on October 19, 2021, as contemplated by the *Second Amended Joint Chapter 11 Plan of Reorganization of Intelsat, S.A. and Its Debtor Affiliates* [Docket No. 2773] (the "Second Amended Plan"), the Debtors filed the *Notice of Filing Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and*

---

[1]   Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been granted, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/intelsat.  The location of the Debtors' service address is: 7900 Tysons One Place, McLean, VA 22102.

[2]   Capitalized terms used but not defined in herein have the meanings given to them in the Plan.

*Its Debtor Affiliates* [Docket No. 3156] with the Court (as may be modified, amended, or supplemented from time to time, the "First Plan Supplement to the Second Amended Plan"). On October 21, 2021, the Debtors filed the *Notice of Filing Second Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 3188] (as may be modified, amended, or supplemented from time to time, the "Second Plan Supplement to the Second Amended Plan") with the Court. On November 19, 2021, the Debtors filed the *Notice of Filing of Revised Exhibit M to Second Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 3529] (as may be modified, amended, or supplemented from time to time, the "Third Plan Supplement to the Second Amended Plan") with the Court. On November 23, 2021, the Debtors filed the *Notice of Filing Fourth Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 3624] (as may be modified, amended, or supplemented from time to time, the "Fourth Plan Supplement to the Second Amended Plan") with the Court. On December 3, 2021, the Debtors filed the *Notice of Filing Fifth Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* [Docket No. 3718] (as may be modified, amended, or supplemented from time to time, the "Fifth Plan Supplement to the Second Amended Plan") with the Court.

**PLEASE TAKE FURTHER NOTICE** that, as part of the First Plan Supplement to the Second Amended Plan, the Debtors filed the *Shareholders Agreement*, the *Articles of Association*, the *Registration Rights Agreement*, the *New Series A Warrant Agreement*, the *New Series B Warrant Agreement*, the *Settlement Agreement*, the *Restructuring Steps Memorandum*, the *Series A CVR Agreement*, the *Series B CVR Agreement*, and the *Rejected Executory Contract and Unexpired Lease List*.

**PLEASE TAKE FURTHER NOTICE** that, as part of the Third Plan Supplement to the Second Amended Plan, the Debtors filed the *Members of the Equity Issuer Board*.

**PLEASE TAKE FURTHER NOTICE** that, as part of the Fifth Plan Supplement to the Second Amended Plan, the Debtors filed the *Second Amended Assumed Executory Contract and Unexpired Lease List*, the *Amended Schedule of Retained Causes of Action*, and the *Management Incentive Plan Documents*.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file this *Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates* (the "First Plan Supplement to the Fourth Amended Plan" and together with the First Plan Supplement to the Second Amended Plan, the Second Plan Supplement to the Second Amended Plan, the Third Plan Supplement to the Second Amended Plan, the Fourth Plan Supplement to the Second Amended Plan, and the Fifth Plan Supplement to the Second Amended Plan, the "Plan Supplement") in support of the Plan, which includes the form of the following documents.

| | |
|---|---|
| **Exhibit A-1** | Shareholders Agreement |
| **Exhibit A-2** | Redline comparison to Shareholders Agreement that was filed on October 19, 2021 |
| **Exhibit B-1** | Articles of Association |

2

| | |
|---|---|
| **Exhibit B-2** | Redline comparison to Articles of Association that were filed on October 19, 2021 |
| **Exhibit C-1** | Registration Rights Agreement |
| **Exhibit C-2** | Redline comparison to Registration Rights Agreement that was filed on October 19, 2021 |
| **Exhibit D-1** | New Series A Warrant Agreement |
| **Exhibit D-2** | Redline comparison to New Series A Warrant Agreement that was filed on October 19, 2021 |
| **Exhibit E-1** | New Series B Warrant Agreement |
| **Exhibit E-2** | Redline comparison to New Series B Warrant Agreement that was filed on October 19, 2021 |
| **Exhibit G-1** | Restructuring Steps Memorandum |
| **Exhibit G-2** | Redline comparison to Restructuring Steps Memorandum that was filed on October 19, 2021 |
| **Exhibit H-1** | Series A CVR Agreement |
| **Exhibit H-2** | Redline comparison to Series A CVR Agreement that was filed on October 19, 2021 |
| **Exhibit I-1** | Series B CVR Agreement |
| **Exhibit I-2** | Redline comparison to Series B CVR Agreement that was filed on October 19, 2021 |
| **Exhibit J-1** | Rejected Executory Contract and Unexpired Lease List |
| **Exhibit J-2** | Redline comparison to Rejected Executory Contract and Unexpired Lease List that was filed on October 19, 2021 |
| **Exhibit K-1** | Assumed Executory Contract and Unexpired Lease List |
| **Exhibit K-2** | Redline comparison to Second Amended Assumed Executory Contract and Unexpired Lease List filed on December 3, 2021 |
| **Exhibit L-1** | Schedule of Retained Causes of Action |
| **Exhibit L-2** | Redline comparison to Amended Schedule of Retained Causes of Action that was filed on December 3, 2021 |
| **Exhibit N-1** | Management Incentive Plan Documents |
| **Exhibit N-2** | Redline comparison to Management Incentive Plan Documents that were filed on December 3, 2021 |
| **Exhibit O** | Reorganized ISA S.A. Articles of Association |
| **Exhibit P** | Reorganized ISA S.A. Shareholders Agreement |

**PLEASE TAKE FURTHER NOTICE** that certain documents, or portions thereof, contained in the Plan Supplement may remain subject to ongoing review, material revision, and further negotiation among the Debtors and interested parties with respect thereto.  The Debtors reserve all rights, with the consent of any applicable counterparties to the extent required under the Plan or the Plan Support Agreement, to alter, amend, modify, or supplement the Plan Supplement and any of the documents contained therein in accordance with the terms of the Plan and the Plan Support Agreement.

**PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan, and thereby are approved by the Court pursuant to the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that the Plan, the Plan Supplement, and other documents and materials filed in these chapter 11 cases may be obtained at no charge from Stretto, the Debtors' notice, claims, and solicitation agent in these chapter 11 cases (the "Solicitation Agent"), by (a) accessing the Debtors' restructuring website at https:/cases.stretto.com/Intelsat; (b) emailing Intelsatinquiries@stretto.com and referencing "Intelsat S.A." in the subject line; (c) calling the Debtors' restructuring hotline at 855-489-1434 (domestic toll-free) or 949-561-0347 (international toll), and asking for the Solicitation Group; or (d) writing to the Solicitation Agent at the following address: Intelsat S.A., et al., Ballot Processing, c/o Stretto, 410 Exchange, Suite 100, Irvine, CA 92602.  Copies of any pleadings filed in these chapter 11 cases may be obtained for a fee via PACER at http://www.ecf.vaeb.uscourts.gov.

[*Remainder of page intentionally left blank*]

Richmond, Virginia
Dated: February 15, 2022

*/s/ Jeremy S. Williams*

| | |
|---|---|
| **KUTAK ROCK LLP** | **KIRKLAND & ELLIS LLP** |
| Michael A. Condyles (VA 27807) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Peter J. Barrett (VA 46179) | Edward O. Sassower, P.C. (admitted *pro hac vice*) |
| Jeremy S. Williams (VA 77469) | Steven N. Serajeddini, P.C. (admitted *pro hac vice*) |
| 901 East Byrd Street, Suite 1000 | Aparna Yenamandra (admitted *pro hac vice*) |
| Richmond, Virginia 23219-4071 | 601 Lexington Avenue |
| Telephone:      (804) 644-1700 | New York, New York 10022 |
| Facsimile:      (804) 783-6192 | Telephone:    (212) 446-4800 |
| Email:    Michael.Condyles@KutakRock.com | Facsimile:    (212) 446-4900 |
|         Peter.Barrett@KutakRock.com | Email:      edward.sassower@kirkland.com |
|         Jeremy.Williams@KutakRock.com |         steven.serajeddini@kirkland.com |
| |         aparna.yenamandra@kirkland.com |

*Co-Counsel to the Debtors*                     *Co-Counsel to the Debtors*
*and Debtors in Possession*                      *and Debtors in Possession*

## <u>Exhibit A-1</u>

### Shareholders Agreement

*Execution Version*

**INTELSAT EMERGENCE S.A.**
**SHAREHOLDERS AGREEMENT**

This Shareholders Agreement (this "Agreement") is made and entered into as of February [●], 2022 (the "Effective Date"), by and among Intelsat Emergence S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg, having its registered office in the City of Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés de Luxembourg*) under number B 264124 (the "Company"), and all of the shareholders of the Company who were issued shares of Company Common Stock under the Plan (each such party as identified on the signature pages hereto, together with any Person (as defined below) who hereafter becomes a party to this Agreement, (together with any Appaloosa Holder, CarVal Holder, DK Holder and Initial First Threshold Holder, the "Holders" and each, a "Holder"). The Company and the Holders are referred to collectively herein as the "Parties."

In consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Party, the Parties agree as follows:

**1.      Definitions.** As used in this Agreement, the following terms shall have the respective meanings set forth in this Section 1:

"Acquiring Shareholder" has the meaning set forth in Section 4(e).

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any investment fund the primary investment advisor to which is such Person or an Affiliate thereof); *provided* that for purposes of this Agreement, no Holder shall be deemed an Affiliate of the Company or any of its Subsidiaries. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Appaloosa Holder" means Palomino Master Ltd., Azteca Partners LLC, and any of their respective related funds that hold shares of Company Common Stock.

"Approved Transferee" has the meaning set forth in Section 4(a).

"Articles" means the Articles of Association of the Company, as amended from time to time.

"Beneficial Interest" means, solely for the purposes of and as used in Section 4, with respect to any Beneficial Owner, the Securities Entitlement held by such Beneficial Owner in the shares of Company Common Stock it Beneficially Owns.

"Beneficial Owner" means, solely for the purposes of and as used in Section 4, any Person holding beneficial ownership of Company Common Stock, including through a Securities Entitlement. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.

"Board" means the board of directors of the Company.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York or Luxembourg, Grand Duchy of Luxembourg.

"CarVal Holder" means CVI AA Cayman Securities LP, CVI AV Cayman Securities LP, CVIC Cayman Securities Ltd., CarVal GCF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI CVF V Cayman Securities Ltd., CarVal CCF Cayman Securities Ltd., CVI CCOF Cayman Securities Ltd., CVI CVF III Cayman Securities Ltd., together with their Affiliates and related funds.

"Cede & Co." means Cede & Co., as nominee for DTC, or such other nominee as may be selected by DTC, as nominee for DTC, which as of the Effective Date is the sole registered holder of Company Common Stock under this Agreement on behalf of the Beneficial Owners of Securities Entitlements.

"Chosen Courts" has the meaning set forth in Section 8(f).

"Close of Business" means 5:00 p.m. Eastern Time.

"Communications Laws" means the United States Communications Act of 1934, the United States Telecommunications Act of 1996, any rule, regulation or policy of the Federal Communications Commission, and/or any statute, rule, regulation or policy of any other U.S., federal, state or local governmental or regulatory authority, agency, court commission, or other governmental body with respect to the operation of channels of radio communication and/or the provision of communications services.

"Company" has the meaning set forth in the preamble.

"Company Common Stock" means the common shares, nominal value $0.01 per share, in registered form, of the Company.

"Company Common Stock Equivalent" has the meaning set forth in Section 7(a).

"Competitor of the Company" means (a) any Person set forth on Annex A and (b) any Affiliate of any such Person set forth on Annex A who is directly or indirectly engaged in any business that is competitive with the Company and its Subsidiaries, as reasonably determined by the Board in good faith, *provided*, that no investment funds and similar entities that own (directly or through Affiliates) a business that is competitive with the Company and its Subsidiaries but which has implemented internal controls to prevent the sharing of any information under Section 3 within the organization or with the management of the competitive entity shall be deemed a Competitor of the Company. For the avoidance of doubt, no Holder (including any of the Nominating Shareholders) shall be deemed a Competitor of the Company solely on the basis that such Holder owns an interest in a Competitor of the Company unless such interest is greater than a 12.5% voting interest in such Competitor of the Company or the Holder or one of its Affiliates or any of their directors, officers, employees, managers, agents or representatives are on the board of directors or similar governing body of such Competitor of the Company.

"Confidential Information" has the meaning set forth in Section 3(b)(i).

2

"CVR Agreements" means, collectively, those certain agreements setting forth the full terms and conditions of the contingent value rights issued pursuant to the Plan on the Plan Effective Date.

"Designation Right Assignment" has the meaning set forth in Section 2(d).

"Depository Agreement" means the Blanket Issuer Letter of Representations from the Company to DTC dated as of on or about the Effective Date as the same may be amended or supplemented from time to time.

"Dilution Principles" has the meaning set forth in Section 8(a).

"Direct Owner" means any Holder of Company Common Stock who is registered on the Company's books and records for the Company Common Stock.

"Direct Owner Legend" means the legend on the account of each Direct Owner set forth on Exhibit C-1 hereto.

"Director" means any member of the Board.

"DK Holder" means Davidson Kempner Capital Management LP, together with its Affiliates and related funds.

"Drag-along Notice" has the meaning set forth in Section 6(a)(ii).

"Drag-along Sale" has the meaning set forth in Section 6(a)(i).

"Drag-along Shareholder" has the meaning set forth in Section 6(a)(i).

"Dragging Shareholder" has the meaning set forth in Section 6(a)(i).

"DTC" means The Depository Trust Company.

"DTC Participant" means any Person that is reflected on the books and records of DTC as having a direct interest in the Company Common Stock held of record by Cede & Co.

"Effective Date" has the meaning set forth in the preamble.

"Excess New Securities" has the meaning set forth in Section 7(b)(i).

"Exchange Act" means the Securities Exchange Act of 1934.

"Existing Holder Exception" has the meaning set forth in Section 4(d)(i).

"Fair Market Value" means the fair market value of the shares of Company Common Stock or other equity securities of the Company as determined in good faith by the Board; *provided, however,* that the Company may obtain an independent appraisal of the value of the shares of Company Common Stock or other equity securities of the Company on an annual basis for the Board to rely upon in determining the Fair Market Value, which appraisal shall be prepared by a nationally recognized independent valuation firm (a "Valuation Firm"); *provided, further,* that if the Holder for whom the determination of Fair Market Value is being made objects to such Fair Market Value determination, the Company shall obtain an independent appraisal (or another independent appraisal if an annual appraisal was already obtained) of the value of

3

the shares of Company Common Stock or other equity securities of the Company from a valuation firm mutually agreed upon between the Company and such Holder (which is different from the Valuation Firm if an annual appraisal was already obtained). The Holder shall deliver written notice of his or her objection to the Company within twenty Business Days after such Holder receives notice of the Board's determination. Any determination by such mutually agreed valuation firm pursuant to the foregoing provisions shall be a final and binding determination (save for manifest error) of Fair Market Value for purposes of Section 4(d). The Company shall pay the cost and expense of any independent appraisal, except that the objecting Holder shall reimburse the Company for such cost and expense in the event that such final and binding determination of Fair Market Value by the mutually agreed valuation firm is equal to or less than the Fair Market Value as initially determined by the Board.

"Financial Statements" has the meaning set forth in Section 3(a).

"First Threshold" means at least 20% of the outstanding Company Common Stock, which, for the avoidance of doubt, will be calculated in accordance with the Dilution Principles.

"Global Security" means the global certificate or certificates issued to DTC as provided in the Depository Agreement, each of which shall be in substantially the form attached hereto as Exhibit C-2.

"hold" means, in respect of the Company Common Stock, direct or indirect beneficial ownership of Company Common Stock.

"Holder" has the meaning set forth in the preamble. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Company Common Stock (including Beneficial Interests).

"Holder Website" has the meaning set forth in Section 3(b)(i)(C).

"Initial Term" has the meaning set forth in Section 2(a)(iii).

"Initial First Threshold Holder" means Pacific Investment Management Company LLC together with its Affiliates and related funds.

"Joinder" means (i) a Joinder to this Agreement in substantially the form attached hereto as Exhibit B or (ii) any agreement to be bound by the terms of this Agreement authorized by the Board pursuant to the Management Incentive Plan.

"Listing" means a listing of the Company's securities resulting in the Company being registered under Section 12(b) of the Exchange Act.

"Luxembourg Law" means the Luxembourg law on commercial companies dated August 10, 1915.

"Major Consent Amendment" has the meaning set forth in Section 8(d).

"Major Consent Approval" has the meaning set forth in Section 5(a).

"Major Consent Matter" has the meaning set forth in Section 5(a).

"Major Transferee" means a Transferee to which a Nominating Shareholder transfers any of its rights to designate a Director pursuant to Section 2(d).

"Management Incentive Plan" means the management incentive plan implemented by the Company on the Effective Date.

"Minimum Threshold" means the First Threshold, Second Threshold or Third Threshold, as applicable.

"Minority Directors" means the Directors elected upon proposal of the Minority Investors in accordance with the terms of this Agreement.

"Minority Investor" means each of the Appaloosa Holder, the CarVal Holder and the DK Holder, in each case so long as such Person holds the Third Threshold.

"New Indenture" means that certain indenture for 6.500% First Lien Secured Notes due 2030 dated January 27, 2022 between Intelsat Jackson Holdings, S.A., the guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time.

"New Issuance Notice" has the meaning set forth in Section 7(a).

"New Securities" has the meaning set forth in Section 7(a).

"New Warrant Agreements" means, collectively, those certain agreements setting forth the full terms and conditions of the Warrants.

"Nominating Shareholder" means each of the Initial First Threshold Holder, the Appaloosa Holder, the CarVal Holder and the DK Holder or a Major Transferee, in each case so long as such Person holds at least the Minimum Threshold.

"Non-Conforming Issuance" has the meaning set forth in Section 5(a)(vii).

"Non-Employee Director" means one individual nominated to the Board in accordance with Section 2(a)(ii)(A), *provided*, that such individual shall (x) not be an employee or member of the board of managers or other governing body of the applicable Nominating Shareholder or any of its Affiliates and (y) have experience in one of the following industries: (1) space, (2) satellite, (3) technology, (4) communication, (5) aerospace and defense, (6) military/government and (7) commercial aviation.

"Non-Recourse Parties" has the meaning set forth in Section 8(o).

"Observer" has the meaning set forth in Section 2(p).

"Parties" has the meaning set forth in the preamble.

"Person" means any individual, partnership, corporation, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

"Plan" means the Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates filed by the Debtors on December 17, 2021 at Docket No. 3891 in Case No. 20-32299 (KLP) in the Bankruptcy Court, and confirmed by the Bankruptcy Court at Docket No. 3894 in Case No. 20-32299 (KLP), as amended, modified or supplemented.

"Plan Effective Date" means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective.

"Preemptive Rightholder" has the meaning set forth in Section 7(a).

"Proportionate Percentage" has the meaning set forth in Section 7(b)(i).

"Proposed Price" has the meaning set forth in Section 7(a).

"Proposed Transferee" has the meaning set forth in Section 6(b)(i).

"Redemption Notice" has the meaning set forth in Section 4(d)(iv)(A).

"Redemption Price" has the meaning set forth in Section 4(d)(iv)(B).

"Registration Deadline" has the meaning set forth in Section 8(t)(ii).

"Registration Rights Agreement" means the Registration Rights Agreement among the Company and the holders party thereto, dated as of the Effective Date.

"Related Party Transaction" has the meaning set forth in Section 2(m).

"Representative Director" means a Person elected as a Director upon proposal of a Nominating Shareholder in accordance with the terms of this Agreement.

"Representatives" of a Holder means its partners (including limited partners except for any Competitors of the Company), shareholders, members, directors, officers, managers, employees, financing sources (including existing and bona fide prospective investors except for any Competitors of the Company), agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its Affiliates or wholly owned subsidiaries.

"Sale Notice" has the meaning set forth in Section 6(b)(ii).

"Second Threshold" means at least 15% of the outstanding Company Common Stock, which, for avoidance of doubt, will be calculated in accordance with Dilution Principles.

"Securities Act" means the U.S. Securities Act of 1933.

"Securities Entitlement" means a securities entitlement with respect to shares of Company Common Stock registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been ultimately credited to any other Person's securities account.

"Selling Shareholder" has the meaning set forth in Section 6(b)(i).

"Stock Register" has the meaning set forth in Section 4(b).

"Subject Purchaser" has the meaning set forth in Section 7(a).

"Subsidiary" means, when used with respect to any Person, any corporation or other entity, whether incorporated or unincorporated, (a) of which such Person or any other

6

Subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any Subsidiary of such Person do not have a majority of the voting interests in such partnership) or (b) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other entity is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries.

"Supermajority Board Approval" has the meaning set forth in Section 5(b)

"Supermajority Board Matters" has the meaning set forth in Section 5(b).

"Tag-along Notice" has the meaning set forth in Section 6(b)(iii).

"Tag-along Period" has the meaning set forth in Section 6(b)(iii).

"Tag-along Sale" has the meaning set forth in Section 6(b)(i).

"Tag-along Seller" has the meaning set forth in Section 6(b)(iii).

"Tag-along Shareholder" has the meaning set forth in Section 6(b)(i).

"Third Threshold" means at least 5% of the outstanding Company Common Stock, which, for avoidance of doubt, will be calculated in accordance with Dilution Principles.

"Transfer" means any sale, pledge, assignment, encumbrance or other transfer or disposition of any share of Company Common Stock or Beneficial Interest to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise, other than (i) in connection with any bona fide mortgage, encumbrance or pledge to a financial institution in connection with any bona fide loan or debt transaction or enforcement thereunder, including foreclosure thereof or (ii) any indirect transfer due to transfers of passive investments, such as a limited partnership interest or mutual fund interest, in a pooled investment vehicle or fund (including private fund or a fund registered under the Investment Company Act of 1940). "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings.

"Transfer Agent" means American Stock Transfer & Trust, LLC.

"Warrants" means, collectively, those certain warrants issued pursuant to the Plan on the Plan Effective Date.

Unless the context requires otherwise: (a) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (b) references to Sections, paragraphs and clauses refer to Sections, paragraphs and clauses of this Agreement; (c) the terms "include," "includes," "including" or words of like import shall be deemed to be followed by the words "without limitation"; (d) the terms "hereof," "herein" or "hereunder" refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) unless the context otherwise requires, the term "or" is not exclusive and shall have the inclusive meaning of "and/or"; (f) defined terms herein will apply equally to both the singular and plural forms and derivative forms of defined terms will have correlative meanings; (g) references to any law or statute shall be deemed to refer to such law or statute as amended or supplemented from time to time and shall include all rules and regulations and forms promulgated thereunder, and

7

references to any law, rule, form or statute shall be construed as including any legal and statutory provisions, rules or forms consolidating, amending, succeeding or replacing the applicable law, rule, form or statute; (h) references to any Person include such Person and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns; and (i) references to "days" are to calendar days unless otherwise indicated. Each of the Parties hereto acknowledges that each Party was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction shall be raised or used in which the provisions of this Agreement shall be construed in favor or against any Party hereto because one is deemed to be the author thereof.

### 2.   **Board of Directors.**

(a)   <u>Composition and Size</u>. From and after the Effective Date, each Holder shall vote (or cause to be voted) all of the Company Common Stock held by such Holder and any other voting securities of the Company over which such Holder has voting control and, as the Company or a Nominating Shareholder may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings), so that:

(i)   the number of directors constituting the Board is seven directors (or, if such number of directors is increased pursuant to <u>Section 5(a)(ix)</u>, such number of directors as so increased), other than any vacancy resulting from the death, removal or resignation of any Director in accordance with <u>Section 2(c)</u> or <u>Section 2(g)</u> until such vacancy is filled in accordance with <u>Section 2(a)(ii)</u> or <u>Section 2(h)</u>, as applicable;

(ii)   the following individuals are elected and continue to serve as directors of the Board:

(A)   three individuals proposed by the Initial First Threshold Holder (or any Major Transferee to which such right is assigned pursuant to <u>Section 2(d)</u>), so long as such Person (together with any Affiliates that hold Company Common Stock) holds the First Threshold, at least one of whom shall be a Non-Employee Director; *provided*, that the number of individuals designated by such Person shall be reduced to two in the event that such Person (together with any Affiliates that hold Company Common Stock) ceases to hold the First Threshold but holds the Second Threshold or if such Person has made a Designation Right Assignment of such Director right pursuant to <u>Section 2(d)</u>; *provided*, *further*, that the number of individuals designated by such Person shall be reduced to one in the event that such Person (together with any Affiliates that hold Company Common Stock) ceases to hold the Second Threshold but holds the Third Threshold or if such Person has made a Designation Right Assignment of such Director right pursuant to <u>Section 2(d)</u>;

(B)   one individual proposed by the Appaloosa Holder (or any Major Transferee to which such right is assigned pursuant to <u>Section 2(d)</u>), so long as such Person (together with any related funds that hold Company Common Stock) holds the Third Threshold;

(C)   one individual proposed by the DK Holder (or any Major Transferee to which such right is assigned pursuant to <u>Section 2(d)</u>), so long as such Person (together with any Affiliates that hold Company Common Stock) holds the Third

Threshold; *provided, that* such initial individual (I) shall not be an employee or member of any governing body of the DK Holder or the Major Transferee or any of its Affiliates, as applicable and (II) shall have relevant industry experience;

(D)    one individual proposed by the CarVal Holder (or any Major Transferee to which such right is assigned pursuant to Section 2(d)), so long as such Person (together with any Affiliates that hold Company Common Stock) holds the Third Threshold; *provided, that*, such initial individual (I) shall not be an employee or member of any governing body of the CarVal Holder or the Major Transferee or any of its Affiliates, as applicable and (II) shall have relevant industry experience; and

(E)    the then-serving Chief Executive Officer of the Company;

(iii)    the Directors as of the Effective Date shall, subject to each such Director's earlier death or resignation or removal upon request by the applicable Nominating Shareholder (in the case of a Representative Director), serve as Directors until the annual meeting of the shareholders of the Company in 2023 (such term, the "Initial Term"); and

(iv)    at each annual meeting of the shareholders of the Company (or in connection with the casting of votes in writing in lieu of such meeting) at which a Nominating Shareholder is entitled to propose a Representative Director under Section 2(a)(ii), the Person(s) so proposed shall be elected or reelected, as applicable, at such meeting (or by such votes in writing, if applicable).

(b)    Company Action. The Company shall take all actions necessary to cause the nomination of the persons contemplated by Section 2(a), including causing such Persons to be included in the slate of nominees recommended by the Board to the Holders for election as Directors. Each Holder hereby irrevocably and unconditionally undertakes to, and grants an irrevocable proxy to any Director in office when the Holder's vote is to be cast to, on its behalf, vote its shares in favor of the election to the Board of the designees of the Nominating Shareholders pursuant to Section 2(a)(ii) or the removal from the Board of a Director pursuant to Section 2(c) or Section 2(g).

(c)    Minimum Threshold. If a Nominating Shareholder ceases to hold at least the Minimum Threshold at any time following the Effective Date, (i) such Holder's designee (or, in the event the Initial First Threshold Holder or its Major Transferee entitled to propose two or more Directors (if any), as applicable, ceases to hold the First Threshold but continues to hold the Second Threshold or ceases to hold the Second Threshold but continues to hold the Third Threshold, the designee of the Initial First Threshold Holder's or its Major Transferee's, as applicable, choosing) shall resign immediately from the Board and the resulting vacancy shall be filled in accordance with Section 2(h) and (ii) thereafter such Nominating Shareholder shall no longer have the right to propose a Director for election under Section 2(a)(ii) or to transfer such right of proposal to any Major Transferee (or in the event the Initial First Threshold Holder or its Major Transferee entitled to propose two or more Directors (if any) ceases to hold the First Threshold but continues to hold the Second Threshold or ceases to hold the Second Threshold but continues to hold the Third Threshold, the Initial First Threshold Holder or such Major Transferee shall, respectively, no longer have the right to propose three Directors (but shall continue to have the right to propose, and transfer the right of proposal for, two Directors) or two Directors (but shall continue to have the right to propose, and transfer the right of proposal for, one Director). Notwithstanding any other provision herein, no Holder (including its Affiliates) shall at any time be entitled to propose more than three Directors for election to the Board at

any time under Section 2(a)(ii), notwithstanding the amount of shares of Company Common Stock held by such Holder and its Affiliates.

(d)     Assignment of Nominating Shareholder Rights. A Nominating Shareholder, in such Nominating Shareholder's sole discretion, shall have the right to assign its rights under this Section 2 to a Major Transferee. In order to exercise such right, a Nominating Shareholder must (i) transfer to such Major Transferee at least the applicable amount of Company Common Stock to exercise such right (i.e., in the aggregate, the Third Threshold for one director, the Second Threshold for two directors or the First Threshold for three directors) and (ii) if the transfer provided for in Section 2(d)(i) would not put such Nominating Shareholder below its then highest Minimum Threshold, irrevocably assign the right to propose the Director(s) being assigned to the relevant Major Transferee (a "Designation Right Assignment"). If a Nominating Shareholder shall exercise such right, the Nominating Shareholder must deliver written notice thereof to the Company at or prior to effecting such transfer and the Company shall, within two Business Days of receiving such notice, deliver written notice thereof to all of the other Nominating Shareholders. Upon the exercise of a Designation Right Assignment in accordance with this Section 2(d), the Minority Director appointed by the Major Transferee shall be entitled to exercise all of the rights under this Agreement afforded a Minority Director appointed by a Nominating Shareholder, including rights under Section 2(i) and Section 2(l).

(e)     Nomination of Directors. The Company shall provide notice to each Nominating Shareholder at least 45 days prior to each annual meeting of the shareholders of the Company (or at least 10 days prior to a solicitation by the casting of votes in writing in lieu of such annual meeting). Unless a Nominating Shareholder provides written notice to the Company no later than 30 days prior to such annual meeting (or at any time prior to a solicitation by the casting of votes in writing in lieu of such annual meeting) (i) that a then-current Representative Director will not be proposed for reelection to the Board at such annual meeting of the shareholders of the Company (or such casting of votes in writing in lieu of such annual meeting) and (ii) identifies the individual such Nominating Shareholder proposes for election in place of such then-current Representative Director, such then-current Representative Director shall be automatically nominated for reelection to the Board at such annual meeting (or such casting of votes in writing in lieu of such annual meeting) unless at the time of such meeting (or such casting of votes in writing in lieu of such annual meeting) such Nominating Shareholder no longer has the right to nominate such Representative Director.

(f)     Board Size. In no event shall the authorized size of the Board be fewer than seven Directors, other than any vacancy resulting from the death, removal or resignation of any Director in accordance with Section 2(c) or Section 2(g) until such vacancy is filled in accordance with Section 2(a)(ii) or Section 2(h), as applicable. Any change in the authorized number of Directors shall require Major Consent Approval.

(g)     Removal of Directors. A Representative Director may be removed with or without cause at any time upon request of his or her Nominating Shareholder. In such event, such Nominating Stockholder will request a resignation from its Representative Director. Each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company or a Nominating Shareholder may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings) to the extent necessary in order to give effect to such Nominating Stockholder's removal of its Representative Director.

10

(h)    <u>Vacancies on the Board</u>. Subject to the provisions of article 441-2 of the Luxembourg Law, any vacancy on the Board resulting from the death, resignation, removal or otherwise of a Director shall be filled by a majority vote of the then-existing Board; *provided* that the Board shall vote to fill any vacancy of a Representative Director, other than any vacancy resulting from the failure of a Nominating Shareholder to meet the applicable Minimum Threshold as described in <u>Section 2(c)</u>, with the replacement individual identified to the Board by the relevant Nominating Shareholder; *provided further* that the Board shall vote to fill any vacancy resulting from the failure of a Nominating Shareholder to meet the applicable Minimum Threshold as described in <u>Section 2(c)</u> with an individual who (i) is unaffiliated with any then-existing Holder holding more than 5% of the then-outstanding shares of Company Common Stock (which, for avoidance of doubt, will be calculated in accordance with Dilution Principles) and (ii) satisfies the independence requirements of the New York Stock Exchange rules.

(i)    <u>Quorum</u>. The quorum for the transaction of business of the Board at meetings of the Board shall require (i) a majority of the Directors, and (ii) for so long as (A) the Minority Investors have the right to appoint three Directors, two Minority Directors, and (B) the Minority Investors have the right to appoint two Directors, one Minority Director; *provided*, *that* the quorum requirements set forth in clause (ii) above will not apply as to a properly called meeting of the Board if such Minority Director(s) fail to appear at such meeting and a subsequent properly called meeting in adjournment thereof is held for substantially the same purposes between three and ten Business Days after the first meeting (in which case quorum will be assumed at such second properly called meeting, assuming the quorum requirement of a majority of the Directors is satisfied). Notwithstanding the foregoing, the quorum of any portion of a Board meeting where a Major Consent Matter or Supermajority Board Matter will be considered shall require, in addition to that set forth in the immediately preceding sentence, all of the Minority Directors then elected to the Board (including if there is only one or two Minority Directors then elected); *provided that* such special quorum requirements will not apply as to a properly called meeting of the Board if (x) a Minority Director fails to appear at a properly called meeting of the Board and the same Minority Director fails to appear at a subsequently properly called meeting in adjournment thereof held between three and ten Business Days after the first meeting (in which case quorum will be assumed at such second properly called meeting, assuming the quorum requirement of a majority of the Directors is satisfied) and (y) in the case where more than one Minority Director remains, any of the Minority Directors fails to appear at a properly called meeting and any of the other Minority Directors fails to appear at a subsequently properly called meeting of the Board in adjournment thereof held between three and ten Business Days after the second meeting (in which case quorum will be assumed at the following properly called meeting (that is, the third meeting), assuming the quorum requirement of a majority of the Directors is satisfied); *provided that*, in each case, the terms of the particular Major Consent Matter or Supermajority Board Matter remain substantially consistent for each meeting of the Board and meeting in adjournment thereof. For the avoidance of doubt, quorum will be achieved with a majority of the Directors regardless of whether any Minority Directors are present at a third properly called meeting of the Board where a Major Consent Matter or Supermajority Board Matter will be considered in accordance with the foregoing. In addition, the special quorum requirements set forth in the immediately preceding two sentences shall only apply to the portion of the Board meeting relating to the Major Consent Matter or Supermajority Board Matter at issue, and all regular business at the Board meeting may still be conducted even if the special quorum requirements are not satisfied at such Board meeting (but subject to the quorum requirements set forth in the first sentence of this <u>Section 2(i)</u>).

(j)    <u>Voting</u>. Each Director will have one vote with respect to each matter to be decided upon by the Board. Other than Major Consent Matters or Supermajority Board Matters, all matters will be decided by the affirmative vote or consent of a majority of the Directors

11

present or represented and voting at a properly called Board meeting that satisfies the quorum requirements set forth in Section 2(i) and the provisions of the Articles; *provided* that any action by written consent of the Board shall require the unanimous affirmative vote of all Directors then in office. In case of a tie, neither the Chairperson (as defined below) nor any other Director shall have a casting (tie breaking) vote.

(k)     Chairperson. The Chairperson of the Board (the "Chairperson") will initially be selected by the Representative Directors designated by the Initial First Threshold Holder; *provided*, *that*, such individual shall be acceptable to at least two Minority Directors; *provided*, *further*, that at the first meeting of the Board occurring after each anniversary of the Effective Date, the Chairperson will be selected by majority vote of the Board, such Chairperson to serve until the next such annual vote. The Chairperson shall preside at meetings of the Board and of the shareholders of the Company and exercise and perform such other powers and duties as may from time to time be assigned to him or her by the Board or as may be prescribed by this Agreement or the Articles. In the absence of the Chairperson, another Director designated by the Chairperson or, if none was designated by the Chairperson, by the Board (or as applicable, the shareholder meeting) shall act as chairperson of any meeting.

(l)     Meetings of the Board. A meeting of the Board may be called at any time by (i) the Chairperson, (ii) the then-serving Chief Executive Officer of the Company, or (iii) two of the Minority Directors.

(m)     Related Party Transactions. Without prejudice to any necessary actions, steps or formalities required under applicable Luxembourg Law in case of a conflict of interest (as defined under Luxembourg Law), the Board shall take reasonable steps to cause the Company to enact controls so that the Company does not, and does not permit any of its Subsidiaries to, enter into any agreement, transaction or series of related transactions (or amendment or modification thereto) with any Director or Affiliate of the Company or any portfolio company of the Initial First Threshold Holder or the Minority Investors, except in connection with a Holder's (other than a Director or officer's) status as an employee of the Company or such Subsidiary in the ordinary course of business (a "Related Party Transaction"), without the affirmative vote of a majority of the disinterested members of the Board (i.e., excluding any Director who is (i) a Representative of, or (ii) a Representative Director of, any Person with whom the Company or any of its Subsidiaries is proposing to enter into the Related Party Transaction (or amendment or modification thereto) or any Affiliate thereof) subject to all other requirements in this Agreement and the Articles necessary to effectuate an act of the Board. In any case, all Related Party Transactions must be on arm's-length terms; *provided*, *however*, that (i) any issuance of equity securities issued to a Preemptive Rightholder pursuant to the pre-emptive rights described in Section 7, to an employee pursuant to the Management Incentive Plan or in connection with the exercise of the Warrants and (ii) the determination of any Further Accelerated Relocation Payments (as defined in the CVR Agreements) in accordance with the terms of the CVR Agreements shall, in each case, not be deemed a Related Party Transaction; *provided further*, that approval by the Board of a Related Party Transaction in accordance with the terms of this Section 2(m) shall be deemed to be conclusive evidence that such Related Party Transaction is on arm's length terms.

(n)     Governing Documents. In the event of any conflict between the terms and provisions of this Agreement and those contained in the Articles or other similar governing documents of the Company, the terms and provisions of this Agreement shall govern and control to the maximum extent permitted by Luxembourg law and all Parties to this Agreement shall take all necessary steps to cause the Articles to be amended to the greatest extent permitted by Luxembourg law to resolve such conflict in favor of this Agreement, including but

not limited to, (i) the Company convening an extraordinary general meeting of the Holders with an agenda item to consider such amendment, and (ii) the Holders exercising their voting rights to pass the required resolutions to amend the Articles accordingly.

(o)      Initial Directors. The initial Directors shall be (i) Lisa Hammit, Easwaran Sundaram and Jinhy Yoon, deemed proposed in accordance with Section 2(a)(ii)(A), (ii) James E. Bolin, deemed proposed in accordance with Section 2(a)(ii)(B), (iii) Roy H. Chestnutt, deemed proposed in accordance with Section 2(a)(ii)(C), (iv) Marc R. Montagner, deemed proposed in accordance with Section 2(a)(ii)(D), and (v) Stephen Spengler, in accordance with Section 2(a)(ii)(E). The Company has confirmed that each initial Director has provided the Company with evidence confirming that such initial Director is a citizen of the United States as of the Effective Date.

(p)      Board Observer. Each Nominating Shareholder shall have the right to designate one non-voting observer (each, an "Observer") to the Board for so long as such Holder remains a Nominating Shareholder. Each Nominating Shareholder may change the identity of its observer from time to time upon written notice to the Company. Each Observer will be entitled to attend and receive notice of all meetings of the Board and receive copies of all materials provided or made available to the Board in connection therewith; provided, that: (i) each Observer shall enter into a non-disclosure agreement, substantially in the form set forth on Exhibit A; and (ii) the Company reserves the right to withhold any information and to exclude an Observer from any meeting or portion thereof if access to such information or attendance at such meeting would reasonably be expected to, based on advice of outside counsel, cause a waiver of the attorney-client privilege between the Company or any of its Subsidiaries and their respective counsel after taking all commercially reasonable steps to enter into arrangements to mitigate such loss of privilege (provided that all Observers in similar circumstances shall be treated equally in such determination). The right to designate an Observer is assignable or transferable only together with an assignment of such Nominating Shareholder's rights under Section 2(d). Any attempt to assign or transfer such right not in compliance with Section 2(d) and this Section 2(p) shall be null and void ab initio. The Company shall take all action reasonably necessary, at its sole cost and expense, to ensure that each Observer is entitled to (i) insurance coverage on the same terms provided to the Company's officers and Directors either under the Company's policy or policies applicable to such officers and Directors, or under a supplemental policy, as provided under the Articles, (ii) indemnification and reimbursement of expenses, on the same terms provided to the Company's officers and Directors under the Articles, and (iii) any other supplemental indemnification and reimbursement of expense arrangements offered by the Company to its officers or Directors.

(q)      Required Adjustments. In connection with a Listing of the Company Common Stock, the Holders shall work in good faith to adjust the Board composition and the Director designation rights described in this Section 2 if, upon the advice of outside counsel, it is determined that adjustments are necessary to satisfy applicable codified securities laws and mandatory stock exchange listing requirements.

3.      **Information Rights.**

(a)      Financial Statements; Earnings Calls. The Company will furnish to each Holder the following: (i) within 65 days (or 150 days in the case of the first fiscal quarter containing the Effective Date and 90 days in the case of the first full fiscal quarter after the Effective Date occurs) after the end of each of the first three fiscal quarters of each fiscal year (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal quarter ending after the Effective Date, quarterly unaudited consolidated financial statements of

13

the Company and its Subsidiaries; and (ii) within 120 days (or 135 days in the case of the first fiscal year ending after the Effective Date) following the conclusion of each of the Company's fiscal years ending after the Effective Date (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal year ending after the Effective Date, annual audited consolidated financial statements of the Company and its Subsidiaries (clauses (i) and (ii) collectively, the "Financial Statements"); and (iii) the information if, as and when provided to the noteholders or trustee, as applicable, pursuant to Section 3.10(a) of the New Indenture (or any substantially similar provision in connection with any amendment to the New Indenture or any refinancing indebtedness thereof), including, for the avoidance of doubt, the Financial Statements; *provided, however,* that if the Company files the Financial Statements described in this Section 3(a) with the Securities and Exchange Commission, the requirement to deliver the Financial Statements pursuant to clauses (i) and (ii) shall be deemed satisfied. For the avoidance of doubt, if required pursuant to clauses (i) and (ii), Intelsat Jackson Holdings S.A. or one of its direct or indirect parent entities may provide the Financial Statements, as applicable, in the case of the fiscal year ending December 31, 2021. Reasonably promptly following the release of each of the quarterly unaudited financial statements, the Company will provide a video and/or a telephonic presentation (which may be a single presentation held together with other securityholders or holders of indebtedness of the Company and its Affiliates) to the Representatives of Holders to discuss the Company's financial condition and results of operations, following which presentation the Company will allow the Representatives of Holders to ask reasonable questions. Any participant in quarterly calls (including bona fide potential transferees permitted in accordance with the terms hereof) (A) shall not be a Competitor of the Company and each Holder hereby represents and warrants to the same as to itself, its Representatives and its bona fide potential transferees that participate in such calls, and (B) shall be subject to Section 3(b); *provided,* that each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of Section 3(b) if such Representative or recipient were party to this Agreement. With respect to any recipient who is a bona fide potential transferee of Company Common Stock, the applicable Holder must first comply with Section 3(b)(i)(C) prior to sharing any such information. The Company shall use commercially reasonable efforts to promptly post all such information required by this Section 3(a) on a website (which may be nonpublic, require a confidentiality acknowledgement, with such acknowledgement being deemed to satisfy the requirement for a nondisclosure agreement as set forth in Section 3(b)(i)(C) and shall be maintained using commercially reasonable efforts by the Company or a third party) (the "Holder Website") to which access will be given to the Holders and bona fide prospective investors or bona fide potential transferees (with the exception of Competitors of the Company) in the Company Common Stock.

(b)     Confidentiality.

(i)     Each Holder acknowledges that any notices or information furnished, including verbally, pursuant to this Agreement, including the Financial Statements and any information actually provided pursuant to Section 3(a)(iii), (the "Confidential Information") is confidential and competitively sensitive. Each Holder shall use, and shall cause any Person to whom Confidential Information is disclosed by such Holder pursuant to clause (A) below to use, the Confidential Information only in connection with its investment in the shares of Company Common Stock and not for any other purpose (including to disadvantage competitively the Company or any other Holder). Each Holder shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(A)     to the Holder's Representatives in the normal course of the performance of their duties for such Holder (it being understood that such Representatives shall be informed by the Holder of the confidential nature of such

14

information and shall be directed to treat such information in accordance with this Section 3(b));

(B)     to the extent required by applicable law, rule or regulation or requested by any regulatory or self-regulatory authority in connection with the conduct of its ordinary oversight activities; *provided* that the Holder shall take reasonable steps to minimize the extent of any such required disclosure and give the Company prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Company may, at its sole expense, seek an appropriate protective order or similar relief (and the Holder shall cooperate with such efforts by the Company, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall use reasonable best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information);

(C)     to any Person to whom the Holder is contemplating a transfer of its shares of Company Common Stock permitted in accordance with the terms hereof; *provided* that such Person is not prohibited from receiving such information pursuant to this Section 3 and, prior to such disclosure such potential transferee is advised of the confidential nature of such information and executes a non-disclosure agreement in a standard form previously approved by the Board for all such potential transferees and which agreement is independently enforceable by the Company and includes a certification that such Person is not a Competitor of the Company (which, for the avoidance of doubt, shall be deemed satisfied if such Person has accepted the confidentiality acknowledgement required prior to being granted access to the Holder Website).

(D)     to any regulatory authority or rating agency to which the Holder or any of its Affiliates is subject or with which it has regular dealings, solely (I) as long as such authority or agency is advised of the confidential nature of such information and (II) such information is provided as the result of a routine request not targeted to the Company or any of its Subsidiaries;

(E)     in connection with the Holder's or the Holder's Affiliates' normal fund raising, marketing, informational or reporting activities or to any bona fide prospective purchaser of the equity or assets of the Holder or the Holder's Affiliates, or prospective merger partner of the Holder or the Holder's Affiliates; *provided* that prior to such disclosure, if any Confidential Information is shared with such Persons, the Persons to whom such information is disclosed are advised of the confidential nature of such information and are subject to customary confidentially obligations with respect to such information; or

(F)     if the prior written consent of the Company shall have been obtained.

(ii)     Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Company or the Holder. The restrictions contained in this Section 3(b) shall terminate 18 months following the date on which the Holder ceases to hold any shares of Company Common Stock.

(iii)     Confidential Information does not include: (A) information that is or becomes generally available to the public (including as a result of any information filed or

15

submitted by the Company with the Securities and Exchange Commission) other than as a result of a disclosure by the Holder or its Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement, (B) information that is or was in the possession of the Holder or its Representatives on a non-confidential basis prior to its disclosure to the Holder or its Representatives by the Company; or (C) information that was or becomes available to the Holder or its Representatives on a non-confidential basis from a source other than the Company, which source is or was (at the time of receipt of the relevant information) not, to the best of the Holder's or its Representatives' knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Company or another Person.

(c)     The Company shall provide to each Director and, subject to the limitations set forth in Section 2(p), each Observer, copies of any materials distributed or made available to any other Directors or Observers. A Representative Director or Observer shall be entitled to share and discuss with the Representatives of the Nominating Shareholder that appointed such Representative Director or Observer any materials or other information obtained by such Person in such capacity, provided that such information is shared in the normal course of the performance of their duties for such Nominating Shareholder (it being understood that such Representatives shall be informed by such Director, Observer or Nominating Shareholder of the confidential nature of such information and shall be directed to treat such information in accordance with Section 3(b).

**4.     Transfers.**

(a)     Requirements for Transfer. The Company Common Stock or any Beneficial Interest shall be freely transferable except as provided in this Section 4(a). Notwithstanding any other provision of this Agreement, each Holder agrees that it shall not Transfer any of its Company Common Stock or Beneficial Interest except where (x) the Transferee executes and delivers to the Company a Joinder, to the extent such Transferee is not already a party to this Agreement, and (y) each of the following clauses (i) through (v) is correct:

(i)     such Transfer is permitted under the Securities Act and other applicable federal law or state securities or blue sky laws and then, with respect to a Transfer of shares of Company Common Stock or Beneficial Interest, if requested by the Company or the Transfer Agent, as applicable, only upon delivery to the Company of a written opinion of counsel in form and substance reasonably satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act; provided, that notwithstanding the foregoing, such a legal opinion shall not be required for any Transfer of shares of Company Common Stock or Beneficial Interest that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the Company has a good faith reason to believe that such shares of Company Common Stock or Beneficial Interest are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the Company or an "underwriter" (as such term is defined in the Securities Act) with respect to such Company Common Stock or Beneficial Interest;

(ii)     such Transfer would not reasonably be expected to require the Company to initiate a registration or qualification of the Company Common Stock pursuant to the Exchange Act or any applicable federal or state securities or blue sky laws;

(iii)     such Transfer, upon consummation, would not result in the Company having, in the aggregate, either (A) 1,900 or more holders of record (as such concept is

understood for purposes of Section 12(g) of the Exchange Act) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act (determined, in each case, in the Company's reasonable discretion) of any class of equity securities of the Company;

(iv)    such Transfer would not cause the Company or any Subsidiary or Affiliate of the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended; and

(v)    such Transfer would not cause the Company or any Subsidiary or Affiliate of the Company to be subject to regulation under the Investment Advisers Act of 1940, as amended.

(the Transferee of such Transfer in compliance with both clauses (x) and (y) being an "Approved Transferee"). Any attempted or purported Transfer of all or a portion of the Company Common Stock or Beneficial Interest held by a Holder in violation of this Section 4(a) shall be null and void and of no force or effect whatsoever, such purported Transferee shall not be treated as a Holder of the Company Common Stock or Beneficial Interest for purposes of this Agreement or otherwise, and the Company shall not register such Transfer on the Stock Register.

(b)    <u>Schedule; DTC; Global Security</u>.

(i)    The Company or its Transfer Agent shall keep (A) a register (the "<u>Stock Register</u>") for the purpose of registering the Company Common Stock and permitted Transfers thereof.  The Stock Register shall initially show one position for Cede & Co. representing all of the shares of Company Common Stock held by DTC on behalf of the Beneficial Owners of Securities Entitlements holding through their respective DTC Participants. The Transfer Agent shall have no responsibility whatsoever directly to the Beneficial Owners of Securities Entitlements holding through their respective DTC Participants with respect to transfers of the Company Common Stock.  Any Beneficial Owners of Securities Entitlements holding through their respective DTC Participants may move their holdings of Company Common Stock directly to the Stock Register only through the procedures established by the DTC.

(ii)    No Transferee shall be entitled to the benefits and rights as a Holder, Direct Owner, Beneficial Owner or otherwise under this Agreement unless such Transferee shall have delivered to the Company an executed and acknowledged Joinder, unless such Transferee is already a party hereto. The direct Transferee (i.e., a Transferee that holds the Company Common Stock registered on the Stock Register and not simply a Beneficial Interest in the Company Common Stock registered in the name of Cede & Co.) of the Company Common Stock Transferred shall be bound by this Agreement as a Direct Owner. Any indirect transferee (i.e., a Transferee that holds a Beneficial Interest in the Company Common Stock registered in the name of Cede & Co.) of Company Common Stock in accordance with this Section 4 shall be bound by this Agreement as a Beneficial Owner. Following such a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa), the Transfer Agent shall amend the Stock Register to reflect the change in Direct Owners, and the Company shall take any other appropriate action in connection therewith.  Any Transferee will have no rights under this Agreement until it has delivered an executed Joinder to the Company or the Transfer Agent.  A Transferor that is party to this Agreement shall not be relieved of any liability for a breach of the Transfer provisions hereunder.

17

(iii)     The Company will enter into the Depository Agreement pursuant to which DTC will act as a securities depository for the Company Common Stock. The Company Common Stock deposited with DTC will be represented by a Global Security (which may be a book-entry security or consist of one or more certificates as required by DTC), which will be registered in the name of Cede & Co., as nominee for DTC or as DTC shall otherwise direct, and deposited with, or on behalf of, DTC. No other certificates evidencing such Company Common Stock will be issued. The Global Security shall be in the form attached hereto as Exhibit C-2 or described therein and shall represent such Company Common Stock as shall be specified therein, and may provide that it shall represent the aggregate amount of outstanding Company Common Stock from time to time endorsed thereon and that the aggregate amount of outstanding Company Common Stock represented thereby may from time to time be increased or decreased. As of the Effective Date, without the need for any action or consent of any Person, including the Company Common Stock, an initial Global Security shall be issued reflecting the number of shares of Company Common Stock to be issued to Cede & Co. as of the Effective Date. Any Global Security shall be executed by an officer on behalf of the Company. Any endorsement of a Global Security to reflect the amount, or any increase or decrease in the amount, of outstanding Company Common Stock represented thereby shall be made in such manner and upon instructions given by the Company as specified in the Depository Agreement.

(iv)     The Company will use commercially reasonable efforts to notate its register and records reflecting Transfer of the Company Common Stock made in compliance with this Section 4 on the Stock Register within seven Business Days from receipt of the applicable Joinder or notice of trade, as applicable, and the relevant Holder transferring Company Common Stock in accordance with Section 4(a) hereby grants an irrevocable power of attorney to the Company to record such transfer of Company Common Stock on its behalf.

(c)     New Issuances. No shares of equity securities (including any shares of Company Common Stock) shall be issued to any Person who is not a party to this Agreement (including upon the exercise of any options, warrants (including the Warrants) or other shares of equity securities issued to any Director, officer or employee of the Company under any employee benefit plan) unless and until such Person shall have executed and delivered to the Company a Joinder.

(d)     Ownership Restriction Regarding Communications Laws. Notwithstanding anything to the contrary in Section 4(a),

(i)     the Company may restrict the Beneficial Ownership, or proposed Beneficial Ownership, of Company Common Stock or other equity securities of the Company by any Person (other than any Holders holding 5% or more of the Company Common Stock as of the Effective Date with respect to their holdings on the Effective Date and the information disclosed by the Company to the FCC about such Holders prior to the Effective Date (the "Existing Holder Exception")) or the Transfer of shares of Company Common Stock or Beneficial Interests (or other equity securities) to any Person if the Beneficial Ownership or proposed Beneficial Ownership of Company Common Stock (or other equity securities) of (or the transfer of shares of Company Common Stock or other equity securities to) such Person is or would be, as determined by the Board in good faith upon the reasonable advice of outside counsel, in violation of any provision of the Communications Laws.

(ii)     if the Company believes in good faith, based upon the reasonable advice of outside counsel, that the Beneficial Ownership or proposed Beneficial Ownership of shares of Company Common Stock or other equity securities of the Company by any Person (other than

18

with respect to the Existing Holder Exception) may result in a violation of the Communications Laws, the Company may at any time request information from Holders, other equity securities holders, Transferees or proposed Transferees, including without limitation information on citizenship, affiliations, and ownership or other interests in other companies or enterprises, and such Person shall furnish promptly to the Company such information; *provided* that the Company shall execute, upon the written request of such Person, a nondisclosure agreement in a form reasonably acceptable to such Person and the Company with respect to any such information so requested and provided.

(iii)      if (x) the Company does not receive the relevant information requested pursuant to Section 4(d)(ii) or (y) the Company determines, in good faith upon the reasonable advice of outside counsel, that the Beneficial Ownership or proposed Beneficial Ownership of shares of Company Common Stock or other equity securities by a Person (other than with respect to the Existing Holder Exception) or that the exercise of any rights of Company Common Stock or other equity securities by a Person (other than with respect to the Existing Holder Exception), results or would result, as determined by the Company, in a Communications Law violation, the Company has the absolute right to (A) refuse to issue shares of Company Common Stock or other equity securities to such Person, (B) refuse to permit or recognize a Transfer (or attempted Transfer) of shares of Company Common Stock, Beneficial Interests or other equity securities to such Person and any such Transfer or attempted Transfer shall not be notated in the books and records of the Company (including the Stock Register), (C) suspend any rights attached to such shares of Company Common Stock, Beneficial Interests or equity securities (including without limitation the right to attend and vote at shareholder meetings and the right, if any, to receive dividends or other distributions) and which causes or would cause such Communications Law violation, or (D) compulsorily redeem the shares of Company Common Stock or other equity securities of the Company Beneficially Owned by such Person. The Company shall in addition have the right to exercise any and all appropriate remedies, at law or in equity in any court of competent jurisdiction, against any such Person, with a view towards obtaining such information or preventing or curing any situation which causes or would cause a Communications Law violation. Any measure taken by the Company pursuant to (A), (B) or (C), respectively, shall remain in effect until the requested information has been received and/or the Company has determined that the Beneficial Ownership, proposed Beneficial Ownership or Transfer of shares of Company Common Stock or Beneficial Interests or other equity securities by (or to) the relevant Person or that the exercise of any rights of shares of Company Common Stock, Beneficial Interests or other equity securities by such Person as the case may be, will not result in a Communications Law violation.

(iv)      in case of a compulsory redemption,

(A)      the Company shall serve a notice (a "Redemption Notice") upon the relevant Holder(s), specifying (1) the shares of Company Common Stock or other equity securities of the Company to be redeemed, and (2) the Redemption Price for such shares of Company Common Stock or other equity securities of the Company. Immediately after the close of business on the date specified in the Redemption Notice, (i) each such Holder shall cease to be the holder of the shares of Company Common Stock or other equity securities of the Company specified in such notice, (ii) the compulsory redemption of Company Common Stock in accordance with Section 4(d) shall be recorded in the Stock Register by the Company, as transferee, and the relevant Holder(s), as transferor(s) and the relevant Holder(s) hereby grant(s) for such purpose an irrevocable power of attorney to the Company to record the compulsory redemption

19

of Company Common Stock on its behalf and (iii) as the case may be, such Holder's name shall be removed from the schedule of Holders on the Stock Register;

(B)    the price at which the shares of Company Common Stock or other equity securities of the Company specified in any Redemption Notice shall be redeemed (the "Redemption Price") shall be an amount equal to 98% of the Fair Market Value minus any and all costs and expenses incurred by the Company in connection with the redemption as determined by the Board.  Any Redemption under this Section 4(d) is strictly limited to, and each Holder waives to the fullest extent possible any right to request any such Redemption if not falling under, at the discretion of the Board, the scope of this Section 4(d);

(C)    payment of the Redemption Price shall be made directly to the Holder. Upon payment of the Redemption Price, no Person interested in the shares of Company Common Stock or other equity securities of the Company specified in such Redemption Notice shall have any further interest in such shares of Company Common Stock or other equity securities of the Company or any of them, or any claim against the Company or its assets in respect thereof;

(D)    the exercise by the Company of the powers conferred by this Section 4(d) shall not be questioned or invalidated in any case, on the ground that there was insufficient evidence of ownership of shares of Company Common Stock or other equity securities of the Company by any Person or that the true ownership of any shares of Company Common Stock or other equity securities of the Company was otherwise than appeared to the Company at the date of any Redemption Notice; and

(E)    each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings) to the extent necessary to effect a compulsory redemption of Company Common Stock purported to be made by the Company in accordance with Section 4(d), the Articles and applicable law.

(e)    Anti-Takeover Restrictions. Notwithstanding anything to the contrary in Section 4(a), no Holder (including Affiliates or other Persons acting in coordination together) (an "Acquiring Shareholder") may acquire (whether through acquisition, issuance, merger or otherwise) shares of Company Common Stock or Beneficial Interests that would result in such Acquiring Shareholder holding more than 45% of the outstanding shares of Company Common Stock unless either:

(i)    such acquisition is the result of a Drag-along Sale conducted pursuant to Section 6(a) and approved by the affirmative vote of no less than two-thirds (66-$^2$/$_3$%) of the disinterested members of the Board (i.e., excluding any Director who is (A) a Representative of, or (B) a Representative Director of, the Acquiring Shareholder); or

(ii)    each of the following conditions is satisfied:

20

(A)     the Acquiring Shareholder offers to purchase all other outstanding shares of Company Common Stock on the same terms;

(B)     the Acquiring Shareholder's offer to the holders of all other outstanding shares of Company Common Stock is approved by the affirmative vote of a majority of the disinterested members of the Board (i.e., excluding any Director who is (A) a Representative of, or (B) a Representative Director of, the Acquiring Shareholder); and

(C)     the Acquiring Shareholder's offer to the holders of all other outstanding shares of Company Common Stock is approved by Persons holding a majority of all outstanding shares of Company Common Stock (excluding all shares held by the Acquiring Shareholder).

5.      **Major Consent Matters and Supermajority Board Matters**.

(a)     **Major Consent Matters**. The Company agrees not to engage in, and to cause its applicable Subsidiaries not to engage in, any of the following matters (the "Major Consent Matters") without the approval of at least (i)(A) 66-$^2$/$_3$% (e.g., five of seven) of the Directors and (B) Holders holding 55% of the then-outstanding shares of Company Common Stock or (ii) 85% (e.g., six of seven) of the Directors ("Major Consent Approval"):

(i)     initiating, by application of the Company, or any decision or action of the shareholder(s), any voluntary dissolution, winding up or liquidation in relation to the Company or Intelsat Jackson Holdings S.A.;

(ii)     any sale of the Company (including any change in control of the majority of voting interests in the Company, other than any transfer by the Holders in compliance with Section 6(b) to the extent that neither the Company nor any of its Subsidiaries is involved in such transaction in a capacity other than implementing the transfer of equity securities in connection therewith and other actions ancillary thereto) or all or substantially all of its assets;

(iii)     conversion of the Company to another form of entity (other than in connection with a Listing);

(iv)     any redemption or repurchase of equity securities other than (x) pursuant to a pro rata offer to all holders of such class of equity securities, (y) of equity securities owned by employees of the Company in connection with termination of employment or (z) a compulsory redemption for Communications Laws reasons under Section 4(d) of this Agreement;

(v)     any election of the Company or any of its Subsidiaries to be taxed in a different manner or classified differently for tax purposes (including any change to the jurisdiction of organization or means of qualification for tax treaty benefits of the Company or any of its Subsidiaries);

(vi)     any amendment to the Articles, including, without limitation, any amendment to the Articles that would create additional authorized share capital, *provided, however*, that 20% of the Company Common Stock (in addition to Company Common Stock reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants) shall be authorized but unissued on the Effective Date and issuable pursuant to a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent

21

true-up offering as set forth in Section 7(c)); provided, further, that Major Consent Approval will not be required for amendments to the Articles in connection with (x) issuances of Company Common Stock permitted by the foregoing proviso, (y) issuances of Company Common Stock reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants, and (z) a change of address in Luxembourg;

(vii)    any suppression of statutory pre-emption rights (whether under Luxembourg Law or other applicable law), *provided, however*, that the Company may issue up to 20% of the Company Common Stock (in addition to Company Common Stock reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants) without honoring Holders' preemptive rights if the Board determines (in compliance with Section 5(b)(ii)) that such shares must be issued before the Company could comply with such preemptive rights (such issuance, the "Non-Conforming Issuance"), *provided, further,* that upon any Non-Conforming Issuance, the Company shall make a subsequent true-up offering as set forth in Section 7(c);

(viii)    the issuance of equity securities, options or other rights to acquire such equity securities, or convertible/exchangeable indebtedness, of the Company or any of its Subsidiaries, other than a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent true-up offering as set forth in Section 7(c)) or the issuance of Company Common Stock reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants;

(ix)    any change in the size, voting or composition of the Board; *provided* that such change shall not (a) reduce the size of the Board to less than seven Directors, (b) modify the consent or quorum rights of any Directors provided for in this Agreement, or (c) modify the voting thresholds set forth in this Agreement; and

(x)    any Major Consent Amendment.

(b)    **Supermajority Board Matters**. The Company agrees not to engage in, and to cause its applicable Subsidiaries not to engage in, any of the following matters (the "Supermajority Board Matters") without the affirmative vote of at least 66-$\frac{2}{3}$% (e.g., five of seven) of the Directors ("Supermajority Board Approval"):

(i)    initiating, by application of the Company, or any decision or action of the shareholder(s), any voluntary bankruptcy proceedings, receivership or any other insolvency or restructuring proceedings in Luxembourg or any other jurisdiction in relation to Company or Intelsat Jackson Holdings S.A.;

(ii)    any Non-Conforming Issuance;

(iii)    any type of dividend or distribution on or repurchase or redemption of equity securities of the Company or any of its Subsidiaries, other than (A) dividends and distributions from a wholly-owned Subsidiary of the Company to the Company or another wholly-owned Subsidiary thereof (B) redemptions of equity securities of the Company owned by employees of the Company in connection with the termination of employment; *provided that* in any event no non-pro rata dividends shall be permitted (other than in connection with redemptions for any aggregator vehicle related to the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company) and (C) compulsory redemptions for Communications Laws reasons under Section 4(d) of this Agreement;

22

(iv)	any amendment to this Agreement, the Registration Rights Agreement, CVR Agreements, the Management Incentive Plan and the New Warrant Agreements, to the extent not a Major Consent Amendment;

(v)	any consummation of a listing of securities of the Company on any national securities exchange, including a Listing;

(vi)	any incurrence of material debt, including any guarantees, incurrence or prepayment thereof by the Company or any of its Subsidiaries (other than drawdown of revolving debt previously approved and trade debt incurred in the ordinary course of business);

(vii)	any hiring or firing of executive officers of the Company or any of its Subsidiaries;

(viii)	any commencement or settlement of any litigation or dispute with an expected value of more than $50 million;

(ix)	any change in auditor or change in significant tax or accounting policy other than as required by United States generally accepted accounting principles, as in effect at the applicable time, consistently applied;

(x)	any acquisition or disposition of assets or liabilities, or merger, consolidation, share exchange, business combination, joint venture or similar transaction involving the Company or any of its Subsidiaries outside the ordinary course of business, in a transaction that involves consideration (including assumed debt) or investments in excess of 10% of the consolidated total assets of the Company and its Subsidiaries, to the extent not a Major Consent Matter;

(xi)	any material transaction of the Company or any of its Subsidiaries involving spectrum rights (including transferring the use of spectrum rights or receiving proceeds from spectrum clearances) outside the ordinary course of business;

(xii)	any adoption, approval or revision of any equity incentive plan;

(xiii)	any entry into a new line of business or termination of any material existing line of business, or any other material change in the nature or scope of the business of the Company and its Subsidiaries;

(xiv)	any approval of an annual budget of the Company and its Subsidiaries, *provided*, *that* to the extent that a budget has not been approved by year-end, until a new budget is approved, the Company will be permitted to operate on the prior year's budget with a variance of up to 10% on a consolidated basis (which shall include a variance of no more than 10% on line items for capital expenditures and operating expenses); and

(xv)	any capital expenditure by the Company or any of its Subsidiaries in excess of $500 million in the aggregate during any 12-month period.

(c)	**Required Shareholder Approvals Under Luxembourg Law**. To the extent Luxembourg Law requires any shareholder approvals in addition to the Major Consent Approval or Supermajority Board Approval in order to take any Major Consent Matter or Supermajority Board Matter, as applicable, each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such

23

Holder has voting control and, as the Company may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting) to approve such Major Consent Matter or Supermajority Board Matter following such Supermajority Board Approval or Major Consent Approval, as applicable. The Company shall take all necessary or desirable actions within its control (including calling special shareholder meetings) to facilitate the foregoing. Each Holder hereby irrevocably and unconditionally undertakes to, and grants an irrevocable proxy to any Director in office when the Holder's vote is to be cast to, on its behalf, vote its shares in favor of any such Major Consent Matter or Supermajority Board Matter, as applicable, pursuant to this Section 5(c). For the avoidance of doubt, unless expressly set forth herein as a Major Consent Approval Matter or Supermajority Board Matter, nothing herein shall limit the rights of the shareholders of the Company to approve extraordinary shareholder resolutions under Luxembourg Law.

6.      **Tag-along and Drag-along Rights.**

(a)      Drag-along Rights.

(i)      Subject to Section 4(e), if at any time a Holder or group of Holders who hold in the aggregate more than 50% of the then-outstanding shares of Company Common Stock (a "Dragging Shareholder"), proposes to transfer at least 75% of the then outstanding shares of Company Common Stock (other than to an Affiliate of such Dragging Shareholder or in connection with an initial public offering of the Company), or to otherwise effect a sale of the Company, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets, or otherwise, in each case to an unaffiliated bona fide third party purchaser (a "Drag-along Sale"), the Dragging Shareholder shall have the right to require that each other Holder (each, a "Drag-along Shareholder") participate in such transaction in the manner set forth in this Section 6(a) on a pro rata basis (except that, at the election of the Dragging Shareholder, a Drag-along Shareholder may be required to (A) include all of its equity in such Drag-along Sale if such Drag-along Shareholder, together with its Affiliates, holds less than 1% of the Company's then-outstanding Company Common Stock or (B) if such Drag-along Shareholder is an employee of the Company or any of its Subsidiaries, rollover its Company Common Stock or other equity securities in customary amounts) if, and only if, (x) the Major Consent Approval has been obtained and (y) at least 75% of the consideration for the Drag-Along Sale is paid in cash and/or publicly traded securities in the manner set forth in this Section 6(a). Notwithstanding anything to the contrary in this Agreement, each Drag-along Shareholder shall (A) consent to, vote in favor of, raise no objection to and waive and refrain from exercising any appraisal or dissenter's rights claim or any claim of fiduciary breach (but not any claim that such Drag-along Sale is not being effected in accordance with the terms set forth in this Agreement) and (B) obtain any required consents and take any and all reasonably necessary action in furtherance of the Drag-along Sale as requested by and at the Company's expense.

(ii)      The Dragging Shareholder shall exercise its rights pursuant to this Section 6(a) by delivering a written notice (the "Drag-along Notice") to the Company (A) no later than 20 days prior to the closing date of such Drag-along Sale. The Company will promptly deliver a copy of the Drag-along Notice to each Drag-along Shareholder. The Drag-along Notice shall make reference to the Dragging Shareholder's rights and obligations hereunder and shall describe in reasonable detail: (A) the number of shares of Company Common Stock to be sold by the Dragging Shareholder, if the Drag-along Sale is structured as a transfer of Company Common Stock; (B) the identity of the third party purchaser; (C) the proposed date, time and location of the closing of the Drag-along Sale; (D) the per share purchase price and the other

24

material terms and conditions of the transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

(iii)     The consideration to be received by a Drag-along Shareholder shall be the same form and amount of consideration per share of Company Common Stock to be received by the Dragging Shareholder (or, if the Dragging Shareholder is given an option as to the form and amount of consideration to be received, the same option shall be given) and the terms and conditions of such transfer shall, except as otherwise provided in the immediately succeeding sentence, be the same as those upon which the Dragging Shareholder transfers its Company Common Stock. Any (A) representations and warranties to be made or provided by a Drag-along Shareholder in connection with such Drag-along Sale shall be limited to representations and warranties related to such Drag-along Shareholder's authority, ownership and the ability to convey title to its Company Common Stock, and with respect thereto, shall be the same representations and warranties that the Dragging Shareholder makes or provides with respect to its Company Common Stock, (B) Drag-along Shareholder will not be required to agree to any non-competition or similar restrictions in connection with such Drag-along Sale, and (C) covenants, indemnities and agreements made by the Drag-along Shareholders shall be the same covenants, indemnities and agreements as the Dragging Shareholder makes or provides in connection with the Drag-along Sale, except that with respect to covenants, indemnities and agreements pertaining specifically to the Dragging Shareholder, the Drag-along Shareholder shall make the comparable covenants, indemnities and agreements pertaining specifically to itself; *provided that* any indemnification obligation relating to the Company shall be (i) several and not joint and (ii) pro rata based on the consideration received by the Dragging Shareholder and each Drag-along Shareholder*; provided, further*, that in no event shall any indemnification obligation of a Drag-along Shareholder exceed the aggregate proceeds received by such Drag-along Shareholder in connection with the Drag-along Sale.

(iv)     The fees and expenses of the Dragging Shareholder incurred in connection with a Drag-along Sale and for the benefit of all Holders as determined in good faith by the Board, excluding any Director appointed or nominated by any Dragging Shareholder or its Affiliates (it being understood that costs incurred by or on behalf of a Dragging Shareholder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Company or the third party purchaser, shall be shared by all the Holders on a pro rata basis, based on the aggregate consideration received by each Holder; *provided that* no Holder shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Drag-along Sale.

(v)     Each Holder and the Company shall take all actions as may be reasonably necessary to consummate the Drag-along Sale, including entering into agreements, signing or making available the register of Company Common Stock and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Dragging Shareholder, subject to the terms and provisions of this Section 6(a); *provided that*, such Holder shall not be entitled to any consideration from the Drag-along Sale until such Holder has taken all such actions reasonably requested by the Company or the Dragging Shareholder in writing. Notwithstanding anything to the contrary contained in this Section 6(a), management of the Company shall not be required to agree to any non-compete, non-solicit or similar restrictive covenants in connection with a Drag-along Sale that are more restrictive in any manner than those (in scope, duration or otherwise) to which management is then subject.

(vi)      The Dragging Shareholder shall have 120 days following the date of the Drag-along Notice in which to consummate the Drag-along Sale, on the terms set forth in the Drag-along Notice (which such 120 day period may be extended for a reasonable time not to exceed 180 days to the extent reasonably necessary to obtain any government approvals). If at the end of such period, the Dragging Shareholder has not completed the Drag-along Sale, the Dragging Shareholder may not then effect a transaction subject to this Section 6(a) without again fully complying with the provisions of this Section 6(a).

(b)      Tag-along Rights.

(i)      If at any time a Holder or group of Holders (the "Selling Shareholder") proposes to transfer (other than to an Affiliate, as a Drag-along Shareholder pursuant to a Drag-Along Sale, or pursuant to its registration rights as set forth in the Registration Rights Agreement) at least 25% of the then-outstanding shares of Company Common Stock in any single transaction or series of related transactions to a purchaser (the "Proposed Transferee") and the Selling Shareholder cannot or has not elected to exercise its drag-along rights set forth in Section 6(a), each other Holder (each, a "Tag-along Shareholder") shall be permitted to participate in such transfer (a "Tag-along Sale") on the terms and conditions set forth in this Section 6(b).

(ii)      Prior to the consummation of any such transfer of Company Common Stock described in Section 6(b)(i), the Selling Shareholder shall deliver to the Company and each other Holder a written notice (a "Sale Notice") of the proposed Tag-along Sale subject to this Section 6(b) no later than 20 days prior to the closing date of the Tag-along Sale. The Sale Notice shall make reference to the Tag-along Shareholders' rights hereunder and shall describe in reasonable detail: (A) the aggregate number of shares of Company Common Stock the Proposed Transferee has offered to purchase; (B) the identity of the Proposed Transferee; (C) the proposed date, time and location of the closing of the Tag-along Sale; (D) the per share purchase price and the other material terms and conditions of the transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

(iii)      Each Tag-along Shareholder may exercise its right to participate in a transfer of Company Common Stock by the Selling Shareholder subject to this Section 6(b) by delivering to the Selling Shareholder a written notice (a "Tag-along Notice") stating its election to do so and specifying the number of shares of Company Common Stock to be transferred by it no later than ten days after receipt of the Sale Notice (the "Tag-along Period"). Each Tag-along Shareholder that timely delivers a Tag-along Notice (a "Tag-along Seller") shall have the right to transfer in a transfer subject to this Section 6(b) up to the number of shares of Company Common Stock equal to the product of (x) the aggregate number of shares of Company Common Stock owned by the Tag-along Seller and (y) a fraction (A) the numerator of which is equal to the number of shares of Company Common Stock proposed to be sold by the Selling Shareholder in the Tag-along Sale, and (B) the denominator of which is equal to the number of shares of Company Common Stock owned by the Selling Shareholder. The Selling Shareholder shall attempt to have the Proposed Transferee in such Tag-along Sale agree to purchase all of the shares of Company Common Stock proposed to be sold in the Tag-along Sale; *provided that*, if such Proposed Transferee does not agree to purchase all of the shares of Company Common Stock proposed to be sold in the Tag-along Sale, the number of shares of Company Common Stock to be sold in such Tag-along Sale shall be reduced pro rata.

(iv)      Each Tag-along Shareholder who does not deliver a Tag-along Notice in compliance with Section 6(b)(iii) above shall be deemed to have waived all of such Tag-along

26

Shareholder's rights to participate in such transfer, and the Selling Shareholder shall (subject to the rights of any Tag-along Seller) thereafter be free to transfer to the Proposed Transferee its shares of Company Common Stock at a per share price that is no greater than the per share price set forth in the Sale Notice and on other same terms and conditions which are not materially more favorable to the Selling Shareholder than those set forth in the Sale Notice without any further obligation to the non-accepting Tag-along Shareholders.

(v)      Each Tag-along Seller shall receive the same consideration per share as the Selling Shareholder after deduction of such Tag-along Seller's proportionate share of the related expenses in accordance with Section 6(b)(vii) below.

(vi)      Each Tag-along Seller shall make or provide the same representations, warranties, covenants, indemnities and agreements as the Selling Shareholder makes or provides in connection with the Tag-along Sale (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Selling Shareholder, the Tag-along Seller shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to itself); *provided that* all representations, warranties, and covenants shall be made by the Selling Shareholder and each Tag-along Seller severally and not jointly and any indemnification obligation of the Selling Shareholder and each Tag-along Seller shall be (i) several and not joint, and (ii) pro rata based on the consideration received by the Selling Shareholder and all of the Tag-along Sellers; provided, further, that in no event shall any indemnification obligation of the Selling Shareholder or a Tag-along Seller exceed the aggregate proceeds received by such Selling Shareholder or Tag-along Seller in connection with the Tag-along Sale.

(vii)      The fees and expenses of the Selling Shareholder incurred in connection with a Tag-along Sale and for the benefit of all Holders as determined in good faith by the Board, excluding any Director appointed or nominated by any Selling Shareholder or its Affiliates (it being understood that costs incurred by or on behalf of the Selling Shareholder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Company or the Proposed Transferee, shall be shared by all Tag-along Sellers participating in the Tag-along Sale on a pro rata basis, based on the aggregate consideration received by each such Tag-along Seller; *provided, that* no Tag-along Seller shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Tag-along Sale.

(viii)      Each Tag-along Seller shall take all actions as may be reasonably necessary to consummate the Tag-along Sale, including entering into agreements, executing the register of Company Common Stock and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Selling Shareholder.

(ix)      The Selling Shareholder shall have 120 days following the expiration of the Tag-along Period in which to transfer the shares of Common Stock described in the Sale Notice and the shares to be sold by the Tag-along Sellers, on the terms set forth in the Sale Notice (which such 120 day period may be extended for a reasonable time not to exceed 180 days to the extent reasonably necessary to obtain any government approvals). If at the end of such 120 day period, the Selling Shareholder has not completed such transfer, the Selling Shareholder may not then effect a transfer of Company Common Stock subject to this Section 6(b) without again fully complying with the provisions of this Section 6(b).

27

(x)     If the Selling Shareholder transfers to the Proposed Transferee any of its shares of Company Common Stock in breach of this Section 6(b), then each Tag-along Shareholder shall have the right to transfer to the Selling Shareholder, and the Selling Shareholder undertakes to purchase from each Tag-along Shareholder, the number of shares of Company Common Stock that such Tag-along Shareholder would have had the right to transfer to the Proposed Transferee pursuant to this Section 6(b), for a per share amount and form of consideration and upon the terms and conditions on which the Proposed Transferee bought such Company Common Stock from the Selling Shareholder (subject to the restrictions in such terms and conditions set forth in this Section 6(b)), but without indemnity being granted by any Tag-along Shareholder to the Selling Shareholder; *provided, that*, nothing contained in this Section 6(b) shall preclude any Holder from seeking alternative remedies against such Selling Shareholder as a result of its breach of this Section 6(b).

## 7.     **Future Issuance of Shares; Preemptive Rights.**

(a)     Offering Notice. In addition to any statutory pre-emptive rights under Luxembourg Law, except for (i) options to subscribe for or purchase Company Common Stock or restricted stock which may be issued pursuant to the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company, (ii) a stock split, stock dividend, reorganization or recapitalization applicable to all shares of Company Common Stock, (iii) equity securities of the Company issued upon exercise, conversion or exchange of any security or obligation, including the Warrants, which is by its terms convertible into or exchangeable or exercisable for shares of Company Common Stock (such security or obligation, a "Company Common Stock Equivalent"), either (x) previously issued or (y) issued in accordance with the terms of this Agreement and the Articles, and in each case so long as such exercise, conversion or exchange occurs in accordance with the terms of such security, (iv) equity securities of the Company issued in consideration of an acquisition, business combination, debt financing (whether pursuant to a stock purchase, asset purchase, merger or otherwise), strategic partnership or joint venture by the Company of another Person, approved by the Board (subject to Section 5), and, if applicable, the Holders, in accordance with the terms of this Agreement and the Articles, (v) equity securities issued in an initial public offering and (vi) equity securities issued by any Subsidiary of the Company to the Company or to any other wholly owned Subsidiary of the Company, if any, if the Company or any of its Subsidiaries wishes to issue to any Person any equity securities or to any Holder or its Affiliates any debt securities of the Company or such Subsidiary (such securities, collectively, "New Securities", and such recipients, collectively, the "Subject Purchaser"), then the Company shall (or shall cause its applicable Subsidiary to) offer such New Securities to each of the Holders (other than Holders who receive Company Common Stock or Company Common Stock Equivalents under the Management Incentive Plan, or any other equity plan, incentive plan or similar arrangement of the Company, and Holders of the Warrants to the extent they are unexercised) (each, a "Preemptive Rightholder", and collectively, the "Preemptive Rightholders") by sending written notice (the "New Issuance Notice") to the Preemptive Rightholders at least 15 Business Days prior to such issuance of New Securities, which New Issuance Notice shall state, in reasonable detail, the material terms and conditions of such issuance, including (x) the number of New Securities proposed to be issued and (y) the proposed issue price per security of the New Securities (the "Proposed Price"). Upon delivery of the New Issuance Notice, such offer shall be irrevocable unless and until the rights provided for in Section 7(b) shall have been waived or shall have expired. For the avoidance of doubt, preemptive rights set forth in this Section 7 shall not be construed as a limitation on any statutory pre-emptive rights, including pursuant to Luxembourg Law.

(b)     Exercise.

(i)      For a period of ten Business Days after the giving of the New Issuance Notice pursuant to Section 7(a), each of the Preemptive Rightholders shall have the right, but not the obligation, to subscribe for its Proportionate Percentage of the New Securities, at an issue price equal to the Proposed Price and upon the same terms and conditions set forth in the New Issuance Notice. Each such Preemptive Rightholder shall have the right to subscribe for that percentage of the New Securities determined by dividing (x) the total number of shares of Company Common Stock then held by such Preemptive Rightholder exercising its rights under this Section 7(b) by (y) the total number of shares of Company Common Stock held by all of the Preemptive Rightholders (the "Proportionate Percentage"). If any Preemptive Rightholder does not fully subscribe for the number or amount of New Securities that it is entitled to subscribe for pursuant to the preceding sentence, then each Preemptive Rightholder which elected to purchase New Securities shall have the right to subscribe for that percentage of the remaining New Securities not so subscribed for (for the purposes of this Section 7(b)(i), the "Excess New Securities") determined by dividing (x) the total number of shares of Company Common Stock then held by such fully participating Preemptive Rightholder by (y) the total number of shares of Company Common Stock then held by all fully participating Preemptive Rightholders who elected to purchase Excess New Securities.

(ii)      The right of each Preemptive Rightholder to subscribe for the New Securities under subsection (a) above shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the ten Business Day period referred to in Section 7(b)(i) to the Company or its applicable Subsidiary, which notice shall state the amount of New Securities that such Preemptive Rightholder elects to purchase pursuant to Section 7(b)(i). The failure of a Preemptive Rightholder to respond within such ten Business Day period shall be deemed to be a waiver of such Preemptive Rightholder's rights under Section 7(b)(i), *provided* that each Preemptive Rightholder may waive its rights under Section 7(b)(i) prior to the expiration of such ten Business Day period by giving written notice to the Company.

(c)      Non-Conforming Issuance. Notwithstanding the requirements of Section 7(a), the Company may proceed with a Non-Conforming Issuance; *provided*, that the Company shall:

(i)      within 30 days following such Non-Conforming Issuance, offer, in writing, to issue to each Preemptive Rightholder its Proportionate Percentage of the New Securities, at the same price and on the same terms and conditions with respect to such New Securities as the proposed transferees received in such Non-Conforming Issuance; and

(ii)      keep such offer open for a period of no less than ten Business Days, during which period, each Preemptive Rightholder may accept such offer by sending a written notice of exercise to the Company committing to subscribe for in accordance with the procedures set forth in Section 7(b), an amount of such New Securities (not to exceed the amount specified in the offer made pursuant to Section 7(c)(i));

*provided, further*, that (A) for all purposes under this Agreement but subject to applicable law, any issuance of New Securities to a Preemptive Rightholder pursuant to this Section 7(c) shall be deemed to have occurred on the date of the consummation of such Non-Conforming Issuance and (B) during the period commencing on the consummation of such Non-Conforming Issuance and ending on the earlier of (x) the consummation of the issuance of New Securities to a Preemptive Rightholder pursuant to this Section 7(c) and (y) the expiration of the ten Business Day period specified in clause (ii) above, the New Securities issued pursuant to this Section 7(c) shall not be taken into account in calculating the Proportionate Percentage of any Holder for any purposes under this Agreement.

(d)    Closing. The closing of the subscription for New Securities subscribed for by the Preemptive Rightholders under (i) Section 7(b) shall be held before a Luxembourg notary (solely to the extent required by Luxembourg Law) (A) on or between 15 and 30 Business Days after the giving of the New Issuance Notice pursuant to Section 7(a), if the Preemptive Rightholders elect to subscribe for all of the New Securities under Section 7(b), or (B) the date of the closing of the sale to the Subject Purchaser made pursuant to Section 7(a) if the Preemptive Rightholders elect to subscribe for some, but not all, of the New Securities under Section 7(b), (ii) Section 7(c) shall be held before a Luxembourg notary (solely to the extent required by Luxembourg Law) between 15 and 30 Business Days after the date of the offer specified under Section 7(c)(i), or (iii) in relation to both (i) and (ii), at such other time as the parties to the transaction may reasonably agree. At such closing, the Company shall (or shall cause its applicable Subsidiary to) record the subscription of New Securities by the relevant Preemptive Rightholders in its register of Company Common Stock and each relevant Preemptive Rightholder hereby grants irrevocable proxy to the Company to sign such register of Company Common Stock on its behalf, deliver certificates (to the extent that the Company or its applicable Subsidiary has certificated shares) representing the New Securities to the participating Preemptive Rightholders, and such New Securities shall be issued free and clear of all liens (other than those arising hereunder or pursuant to applicable law and those attributable to actions by the purchasers thereof) and the Company shall (or shall cause its applicable Subsidiary to) so represent and warrant, and further represent and warrant that such New Securities shall be, upon issuance thereof to the Preemptive Rightholders and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. Each Preemptive Rightholder subscribing for the New Securities shall deliver immediately prior to closing payment against delivery in full in immediately available funds for the New Securities subscribed for by him, her or it. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary to effectuate the closing. Notwithstanding the foregoing, if the closing of a sale or issuance of New Securities is not consummated within a six-month period (plus such number of additional days (if any) necessary to allow the expiration or termination of all waiting periods under antitrust laws applicable to such sale) after the date upon which the New Issuance Notice is delivered or if the principal terms of such sale or issuance change such that the terms are, in the aggregate, less favorable in any material respect to the Preemptive Rightholders than those in the New Issuance Notice, then the restrictions provided for herein shall again become effective, and no issuance or sale of New Securities may be made thereafter by the Company or its applicable Subsidiary without again offering the same to the Preemptive Rightholders or issuers in accordance with this Section 7. Notwithstanding any other provision of this Section 7, there shall be no liability on the part of the Company, any of its Subsidiaries or any Holder to any Preemptive Rightholder arising from the failure of the Company or its applicable Subsidiary to consummate the sale of New Securities to the Subject Purchaser for any reason (provided, that the foregoing shall not prohibit any Preemptive Rightholder from raising or pursuing any claim that a purported issuance of New Securities does not comply with this Section 7 or this Agreement).

(e)    Holders' Undertakings.

(i)    To the extent that the Holders or, as applicable, the holders of equity securities in a Subsidiary of the Company, would benefit from preemptive rights as a matter of applicable law with respect to the operations listed in items (i) to (vi) in Section 7(a), each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), the

30

Company shall take all necessary and desirable actions within its control (including calling special board or stockholder meetings or vote its equity securities in the relevant Subsidiary) in order to effect any such operations in such terms determined by the Board in accordance with this Agreement.

(ii)    Each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings) in order to effect to any issuance proposed to be made by the Board to the relevant Preemptive Rightholders in accordance with Sections 7(c)(i) and 7(c)(ii).

### 8.    **Miscellaneous.**

(a)    Calculations. For purposes of determining satisfaction of any Holder thresholds in this Agreement, the Company Common Stock held by any Holder shall be (a) calculated without giving effect to any management incentive dilution, including from the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company (whether as a result of actually issued and outstanding shares of Company Common Stock or contingent instruments (e.g., options)) or dilution from other future-issued securities, including under the Warrants, and (b) aggregated with shares of Company Common Stock held by its and its Affiliates' related funds, investment vehicles and managed accounts; *provided, however*, that if the Company makes a Non-Conforming Issuance, any determination made on or before the earlier of (x) the consummation of the issuance of New Securities to all subscribing Preemptive Rightholders pursuant to Section 7(c) and (y) the expiration of the applicable offer period specified in Section 7(c)(ii) shall exclude any shares issued in connection with such Non-Conforming Issuance (the "Dilution Principles").

(b)    Termination. The rights under Section 3(a), Section 4(a)(ii), Section 4(a)(iii), Section 4(a)(iv), Section 4(a)(v), Section 4(b)(ii), Section 4(b)(iv), Section 4(c), Section 4(e), Section 6, and Section 7 shall terminate automatically upon the effectiveness of a Listing of Company Common Stock.

(c)    Remedies. In the event of a breach by the Company or a Holder of any of its obligations under this Agreement, the Company or the Holder, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Parties agree that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate and shall waive any requirement for the posting of a bond. Each Party hereby irrevocably waives their rights to claim the benefit of the provisions of article 1142 of the Luxembourg Civil Code in case of breach of any of its obligations under this Agreement and acknowledges and agrees that the other Parties shall be entitled to the remedy of specific performance (*exécution forcée en nature*) of the defaulting Party's obligations thereunder in addition to any other recourse allowed by law. No failure or delay by any Person in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further

31

exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

(d)      Amendment; Modification; Waivers. This Agreement may not be amended, altered, changed, waived or repealed in any respect (including, for the avoidance of doubt, by amendment, merger, consolidation or otherwise) without Supermajority Board Approval, *provided* that no amendment may adversely affect a Holder relative to other Holders without such Holder's prior written consent. Notwithstanding the foregoing, any amendment, modification or supplement to, or waiver of, Section 2(f), Section 3(a), Section 4, Section 5(a), Section 6, Section 7, Section 8(t) or the Registration Rights Agreement shall require Major Consent Approval in each case to the extent such amendment, modification or supplement is material and adverse to the Holders (other than the Initial First Threshold Holder) (a "Major Consent Amendment"); *provided* that no amendment may adversely affect a Holder relative to other Holders without such Holder's prior written consent; *provided* further that any Holder may waive any of its rights under this Agreement, solely as to itself, without Supermajority Board Approval or Major Consent Approval. Any amendment or waiver must specifically reference this Agreement, specify the provision(s) hereof that it is intended to amend or waive and further specify that it is intended to amend or waive such provision(s).

(e)      Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (i) upon delivery, if served by personal delivery upon the Person for whom it is intended, (ii) on the third Business Day after the date mailed if delivered by registered or certified mail, return receipt requested, postage prepaid, (iii) on the following Business Day if delivered by a nationally-recognized, overnight, air courier or (iv) when delivered or, if sent after the Close of Business, on the following Business Day if sent by facsimile transmission or email with electronic confirmation, in each case, to the address set forth on such Person's signature page hereto or to such other address as may be designated in writing, in the same manner, by such Person.

(f)      Governing Law; Forum. This Agreement and all disputes or controversies arising out of or relating to this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principles of conflicts of laws. Each of the Company and each Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware) (together with the appellate courts thereof, the "Chosen Courts"). In connection with any claim arising out of or related to this Agreement, each of the Company and each Holder hereby irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection that such Person may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the Company or the Holder, (iv) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with Section 8(e), although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (v) agrees not to seek a transfer of venue on the basis that another forum is more convenient. Notwithstanding anything herein to the contrary, (i) nothing in this Section 8(f) shall prohibit any party from seeking or obtaining orders for conservatory or interim relief from any court of competent jurisdiction and (ii) each of the Company and each Holder agrees that any judgment issued by a Chosen Court may be recognized, recorded, registered or enforced in any jurisdiction in the world and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction.

(g)     <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, successors, legal representatives, permitted assigns and Transferees. The Company shall cause any successor or assign (whether by merger, consolidation, sale of assets or otherwise) to assume the obligations of the Company under this Agreement or enter into a new agreement with the Holders on terms substantially the same as this Agreement as a condition of any such transaction.

(h)     <u>Waiver of Trial by Jury</u>. EACH OF THE COMPANY AND EACH HOLDER ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PERSON HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH OF THE COMPANY AND EACH HOLDER CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) SUCH PERSON UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PERSON MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PERSON HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(i)     <u>No Side Agreements</u>. Each Holder represents that, as of the Effective Date, all agreements with respect to the governance of the Company are as set forth in this Agreement, the Articles, the Registration Rights Agreement, the Management Incentive Plan, the CVR Agreements and the New Warrant Agreements and no other agreements or understandings (whether oral or written) with respect to any such matters or the relationship (as it relates to the Company) between or among such Holder, on the one hand, and any of the Company, its Directors or any other Holder, on the other hand, have been entered into or made.

(j)     <u>Severability</u>. The provisions of this Agreement shall be deemed severable. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction; *provided*, *however*, that if any one or more of the provisions contained in this Agreement shall be determined to be excessively broad as to activity, subject, duration or geographic scope, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable under applicable law.

(k)     <u>Business Days</u>. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a day other than a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

(l)      <u>Entire Agreement</u>. This Agreement, together with the Articles, the Registration Rights Agreement, the Management Incentive Plan, the CVR Agreements and the New Warrant Agreements, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and supersedes any and all prior or contemporaneous discussions, agreements and understandings, whether oral or written, that may have been made or entered into by or among any of the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

(m)      <u>Execution of Agreement; Counterparts</u>. This Agreement may be executed and delivered (by facsimile, by electronic mail in portable document format (.pdf) or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

(n)      <u>Determination of Ownership</u>. In determining the Direct Owners of Company Common Stock hereunder for any purpose, the Company may rely solely on the records of the Transfer Agent for the Company Common Stock from time to time, or, if no such Transfer Agent exists, the Company's Stock Register.

(o)      <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Holders may be partnerships or limited liability companies, each Holder covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any of the Company's or any Holder's former, current or future direct or indirect equity holders, controlling Persons, shareholders, directors, officers, employees, agents, Affiliates, members, financing sources, managers, general or limited partners or assignees (and collectively, the "<u>Non-Recourse Parties</u>"), in each case other than the Company, the Holders or any of their permitted assigns under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Non-Recourse Parties, as such, for any obligation or liability of the Company or the Holders under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this <u>Section 8(o)</u> shall relieve or otherwise limit the liability of the Company or any Holder, as such, for any breach or violation of its obligations under this Agreement or such agreements, documents or instruments.

(p)      <u>Third-Party Beneficiaries</u>. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Company and the Holders and their respective successors and permitted assigns any rights, benefits or remedies of any nature whatsoever.

(q)      <u>Recapitalizations, Exchanges, etc.</u> The provisions of this Agreement shall apply to the full extent set forth herein with respect to (i) the Company Common Stock, (ii) any and all securities into which shares of Company Common Stock are converted, exchanged or substituted in any recapitalization or other capital reorganization by the Company and (iii) any and all equity securities of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in conversion of, in exchange for or in substitution of, the Company Common Stock and shall be appropriately adjusted for any stock dividends, splits, reverse splits, combinations, recapitalizations and the like occurring after the Effective Date.

34

(r)      Holder Votes. For the avoidance of doubt, nothing in this Agreement shall require any Holder to cast any votes as directed by the Company.

(s)      Headings; Section References. All heading references contained in this Agreement are for convenience purposes only and shall not be deemed to limit or affect any of the provisions of this Agreement.

(t)      Registration Rights.

(i)      The Company shall use reasonable efforts to pursue a Listing of the Company Common Stock after a Holder demand made, at any time after the fourth anniversary of the Effective Date, by either (A) the Initial First Threshold Holder or (B) the Holders of a majority of the outstanding shares of Company Common Stock (excluding shares held by the Initial First Threshold Holder).

(ii)      The Company shall be required to (A) publicly list the Company Common Stock on a U.S. national securities exchange no later than the fifth anniversary the Effective Date and (B) file with the Securities and Exchange Commission, or, if permitted by the rules of the Securities and Exchange Commission at the time of submission, confidentially submit, a preliminary registration statement with the Securities and Exchange Commission relating thereto at least 180 days before the fifth anniversary of the Effective Date and take commercially reasonable efforts to cause such registration statement to be declared effective by the Securities and Exchange Commission no later than the fifth anniversary of the Effective Date (the "Registration Deadline"); provided, that if the Board, in its good faith judgment and upon advice of external counsel to the Company, reasonably determines that (1) the Company is unable to satisfy the listing requirements for a Listing of the Company Common Stock or (2) it would be materially adverse to the Company to consummate such Listing of the Company Common Stock or furnish such preliminary registration statement because such action would (a) materially interfere with a significant acquisition, corporate reorganization, financing, securities offering or other significant transaction development involving the Company or (b) based on the advice of the Company's outside counsel, require disclosure of material non-public information that the Company has a bona fide business purpose for preserving as confidential, then the Company shall have the right to defer such action; provided, that (x) in the case of clause (1), if the Company is unable to satisfy the listing requirements of one U.S. national securities exchange, it shall pursue a Listing of the Company Common Stock on another U.S. national securities exchange and (y) in the case of clause (2), the deferral of any action permitted by clause (2) shall only be permitted two times and any such deferral, shall be limited to 60 days in the aggregate and in no event shall such deferral delay the effectiveness of such registration statement past the Registration Deadline. Each Holder acknowledges and agrees that the sole remedy for any breach of the provisions in this Section 8(t)(ii) shall be specific performance, including injunctive relief in support of specific performance.

(u)      Further Assurances. Each Holder and the Company shall (and the Company shall cause its Subsidiaries to) do, execute and perform all such further acts, deeds, documents and things as may be reasonably required from time to time in order to implement all the provisions of this Agreement.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK,
SIGNATURE PAGES OF HOLDERS TO FOLLOW]*

35

IN WITNESS WHEREOF, the Parties have executed this Shareholders Agreement as of the date first written above.

INTELSAT EMERGENCE S.A.

By: _____

Name: José Toscano

Title:   Delegate of the Board of Directors

Address:

with a copy (which shall not constitute notice) to: _____

_____

_____

_____

_____

EXHIBIT A

***Form of Non-Disclosure Agreement***

**BOARD OBSERVER CONFIDENTIALITY AGREEMENT**

This Board Observer Confidentiality Agreement (the "**Agreement**") is made as of [•], 2022 (the "**Effective Date**"), by and between:

    (1)    Intelsat Emergence S.A. (to be renamed Intelsat S.A.) ("**Intelsat**" and together with its direct and indirect Subsidiaries and Affiliates, collectively, the "**Company**"); and

    (2)    [NAME OF BOARD OBSERVER] (the "**Board Observer**").   In and for purposes of this Agreement, the Company and the Board Observer are collectively referred to as the "**Parties**."

Capitalized terms used but not defined herein shall have the meaning set forth in that certain Shareholders Agreement, entered into as of [●] by and among the Company and all of the shareholders of the Company who were issued shares of Company Common Stock under the *Fourth Amended Joint Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated December 17, 2021 (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Plan**") (the "**Shareholders Agreement**").

WHEREAS, it is anticipated that the Board Observer will be designated as a non-voting observer on Intelsat's Board of Directors (the "**Board**"), upon and subject to the occurrence of the consummation of the Plan (such occurrence, "**Emergence**"), subject to the terms and conditions set forth in the Plan;

WHEREAS, the Board Observer acknowledges that the Board Observer may be provided with or otherwise have access to Confidential Information (defined below) about the Company; and

WHEREAS, in consideration for and as a condition to the Company permitting the Board Observer to serve as an observer and furnishing access to such Confidential Information (and acknowledging the confidentiality provisions set forth in this Agreement and any duties of confidentiality arising as a matter of Luxembourg Law as a consequence of the appointment of the Board Observer as an observer), the Board Observer and the Company hereby agrees to the terms and conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the covenants and conditions set forth in this Agreement and the Board Observer's receipt of Confidential Information, it is agreed as follows:

1.    Definitions.  For purposes of this Agreement:

    (a)    "**Company Representative**" means any Representative of the Company or its Affiliates.

1

(b)  "**Board Observer Representative**" means any Representative of the Board Observer.

(c)  "**Representative**" means, with respect to a person, any Affiliate of such person and any officer, director, shareholder, member, partner, managing director, principal, associate, analyst, employee, subcontractor, attorney, banker, accountant, consultant, auditor, advisor or other professional, co-investors, potential financing sources, or agent of (i) such person, (ii) its Affiliates or (iii) in the case of the Board Observer, its Nominating Shareholder.

2.  <u>Confidentiality</u>.  As a condition to the Board Observer receiving any Confidential Information, the Board Observer agrees:

(a)  to treat as confidential in accordance with the terms of this Agreement any Confidential Information that is furnished on or after the date of this Agreement, by or on behalf of the Company to the Board Observer;

(b)  not to disclose or cause to be disclosed, in any manner whatsoever, directly or indirectly, in whole or in part, such Confidential Information, except as is expressly permitted by this Agreement; and

(c)  that Confidential Information will be used only for the purposes of (i) the Board Observer preparing to serve as a non-voting observer of the Board and otherwise for the evaluation of the business, operations and affairs of the Company in his or her capacity as a non-voting observer of the Board post-Emergence and (ii) monitoring, administering or managing its Nominating Shareholder's investment in the Company.

3.  <u>Confidential Information</u>.

(a)  The term "**Confidential Information**" means any and all documents, information (whether oral, written, or electronic), and other material about or concerning the Company, its Affiliates, the Board, or a transaction, in each case, furnished hereunder by or on behalf of the Company or a Company Representative to the Board Observer on or after the Effective Date, including information related to accounting, financial matters, tax, legal, and operational information, and includes proprietary oral, written, or electronic communications, confidential memoranda, presentations, notes, reports, analyses, compilations, forecasts, data, studies, or other documents or materials (including all Board discussions, notices, minutes, consents, and Board materials) prepared by the Company or any of its Affiliates or its Affiliates' managers, directors, officers, members, partners, associates, or employees, Company Representative, or the Board Observer which contain, are based upon, or otherwise reflect such material.  The Company has no obligation to disclose publicly any Confidential Information to the extent the Board Observer shares such Confidential Information in any manner not permitted under <u>Section 4</u> of this Agreement.

3

(b)    The term "Confidential Information" does not include information which:

(i)    at the time of disclosure or thereafter is or becomes available to the public other than as a result of a disclosure by the Board Observer in violation of this Agreement;

(ii)    is, was, or becomes available to the Board Observer from (i) a source other than the Company or its Representatives if such source is not known by the Board Observer at the time of the disclosure to be bound by a confidentiality agreement with, or other known contractual or fiduciary obligation of confidentiality to, the Company with respect to such information or (ii) its Nominating Shareholder in its capacity as a Holder, which, for the avoidance of doubt, shall be governed by the Shareholders Agreement and not this Agreement;

(iii)    has been independently developed by the Board Observer without using the Confidential Information;

(iv)    is determined by a court of competent jurisdiction not to be Confidential Information pursuant to a final order not subject to appeal; or

(v)    is or was disclosed in accordance with Section 4 of this Agreement.

4.    Permitted Disclosures.

(a)    Notwithstanding anything to the contrary herein, the Board Observer may disclose any Confidential Information:

(i)    with the prior written consent of the Company or its Representatives;

(ii)    to any Board Observer Representative, subject to Section 2 of this Agreement; or

(iii)    in the event the Board Observer is requested or required (as determined by the Board Observer upon the advice of counsel) by any applicable Law, rule, professional standard, regulation, policy statement, court order, legal, arbitral, judicial, governmental or administrative process or other similar process (whether by oral questions, interrogatories, requests for information or documents in legal or regulatory proceedings, subpoena, civil investigative demand, or other similar process, or by the Securities and Exchange Commission (the "**SEC**") or the New York Stock Exchange, the Nasdaq Stock Market, or any other regulatory or self-regulatory authority, if applicable) (collectively, "**Law**") to disclose all or any portion of the Confidential Information; *provided* that the Board Observer agrees with respect to such a request made under applicable Law

4

or by such a body, to the extent permitted by Law, to promptly notify the Company of such request so that the Company may intervene at the Company's sole cost and expense to take legally-available steps to resist or narrow such request, including the Company's efforts to seek a protective order or other appropriate remedy; *provided, further*, that if, absent the entry of such a protective order or other remedy, the Board Observer is required to disclose Confidential Information, the Board Observer may disclose only that portion of the Confidential Information that the Board Observer is required to disclose and will exercise commercially reasonable efforts to seek assurance that confidential treatment will be accorded to that portion of the Confidential Information that is being disclosed (at the Company's sole cost and expense).  In addition, to the extent permitted by Law, the Board Observer agrees that the Board Observer will not oppose, and, to the extent requested by the Company and at the Company's sole cost and expense, will use commercially reasonable efforts to cooperate with the Company, at the Company's sole cost and expense, with regard to, any action by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded to the Confidential Information, or to resist or narrow the request or requirement for information.

(b)     Without limiting the generality of the foregoing, the Board Observer shall direct each of its Board Observer Representatives who is either provided with Confidential Information by, or otherwise has access to Confidential Information through, the Board Observer to comply with the terms of this Agreement.  The Board Observer agrees to be liable for any breach of the terms of this Agreement by any such Board Observer Representative (except in the case of such Board Observer Representative who is a Representative of the applicable Nominating Shareholder, in which case, the Nominating Shareholder shall be liable for such breach), except to the extent that any such Board Observer Representative has executed a confidentiality agreement with the Company with respect to the Confidential Information.  For the avoidance of doubt, any information received by the Board Observer or a Board Observer Representative from the applicable Nominating Shareholder or as a Representative of the applicable Nominating Shareholder in its capacity as a Holder shall be governed by the Shareholders Agreement and not this Agreement, and any information received by a Board Observer Representative in his or her capacity as a Representative Director of the applicable Nominating Shareholder shall be governed by Luxembourg Law and the Shareholders Agreement and not this Agreement.

5.     <u>Return or Destruction of Confidential Information</u>.  Except as otherwise required by Law, or the Board Observer's internal document retention policies and procedures, if the Board Observer ceases to serve as a non-voting observer on the Board, then, within five (5)

5

business days of being so requested in writing (email being sufficient) by the Company, the Board Observer shall either (at the Board Observer's election) return to the Company or destroy all Confidential Information, without retaining any copies, summaries, or extracts thereof, excluding copies, documents, memoranda, notes, and other writings prepared by the Board Observer based on the Confidential Information.  Upon the Company's request, the Board Observer shall promptly provide written verification that it has complied with the terms of this Section 5.  Notwithstanding the foregoing, the Board Observer may retain copies of the Confidential Information to the extent the Board Observer reasonably believes it is required to satisfy internal bona-fide document retention or compliance policies and procedures, as well as any portions of the Confidential Information that have been disclosed to the public other than through a breach of this Agreement by the Board Observer.  For the avoidance of doubt, the Board Observer shall not be required to return, destroy, or expunge any Confidential Information located on backup servers and similar devices except in the ordinary course of business; *provided* that the Board Observer shall not access or use such Confidential Information unless required by Law to do so or in order to enforce or defend itself in proceedings arising out of or related to this Agreement; *provided, further*, that any such materials so retained shall be held subject to the terms of this Agreement notwithstanding the termination of this Agreement or the termination of the Board Observer's services as a non-voting observer on the Board for so long as they are retained.  Notwithstanding the return, retention, or destruction of the Confidential Information, the Board Observer will be bound by these obligations of confidentiality and other obligations herein in accordance with the terms of this Agreement.

6.      Acknowledgements.  The Board Observer acknowledges that neither the Company nor the Company Representatives make any express or implied representation or warranty herein as to the accuracy or completeness of the Confidential Information, and the Board Observer agrees that neither the Company nor the Company Representatives, will have any liability under this Agreement relating to the Confidential Information or for any errors therein or omissions therefrom on account of this Agreement.  The Board Observer further agrees that neither it nor the Board Observer Representatives are entitled, under this Agreement, to rely on the accuracy or completeness of the Confidential Information.  The Board Observer understands that the provisions of this Agreement apply to Confidential Information that may be provided to the Board Observer as set forth herein, but acknowledges that nothing in this Agreement requires that the Company or the Company Representatives provide the Board Observer with any such Confidential Information.  The Company and the Company Representatives shall have no ongoing duty, under this Agreement, to verify, update, investigate, or review for accuracy any Confidential Information provided to the Board Observer, whether at the time such Confidential Information is provided or at any time thereafter.  The Board Observer agrees that neither the Company nor the Company Representatives shall be liable under this Agreement to the Board Observer or any other person, whether in contract, tort, or otherwise, resulting from the use of or reliance upon the Confidential Information by the Board Observer.  The Board Observer further acknowledges that the Confidential

6

Information may include material, nonpublic information relating to the Company and its securities, and United States and foreign securities laws and regulations regulate the trading of securities and derivatives while a party is in possession of and in reliance upon such information.

7.     Remedies.  The Parties acknowledge that money damages may not be a sufficient remedy for any breach or threatened breach of this Agreement and that the Company shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages and in addition to all other remedies) as a remedy for any such breach or threatened breach of this Agreement to the extent permitted by law.  In the event that such equitable relief is granted, such remedy or remedies shall not be deemed to be the exclusive remedy or remedies for breach or threatened breach of this Agreement, but shall be in addition to all other remedies available at law or equity.  The Board Observer agrees not to resist such application for relief on the basis that the Company has an adequate remedy at law, and further agrees to waive any requirement for securing or posting any bond in connection with such remedy to the extent a breach has occurred.

8.     Termination.  This Agreement shall terminate on the date that is eighteen (18) months after the date when the Board Observer ceases to serve as a non-voting observer on the Board; provided, however, that Sections 5 through 9 of this Agreement shall survive the termination hereof.

9.     Choice of Law.

       (a)     This Agreement shall be governed by the laws of the State of Delaware without regard to its conflict of laws principles that would dictate the application of another jurisdiction's laws.

       (b)     Any suit, action, or proceeding brought in connection with this Agreement shall be brought in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware).  The Parties hereby irrevocably consent to the exclusive jurisdiction of such courts, agree not to commence any suit, action, or proceeding relating thereto except in such courts, and waive, to the fullest extent permitted by law, the right to move to dismiss or transfer any suit, action or proceedings brought in such court on the basis of any objections as to venue or inconvenient forum or on the basis of any objection to personal jurisdiction.

10.    Interpretation; Headings.  The term "person" as used in this Agreement shall be broadly interpreted to include any individual, corporation, company, partnership or other entity. The headings set forth herein are included solely for the purpose of identification and

7

shall not be used for the purpose of construing the meaning of the provisions of this Agreement.

11. _Severability_. If any portion of this Agreement shall be declared invalid or unenforceable, the remainder of this Agreement shall be unaffected thereby and shall remain in full force and effect.

12. _Counterparts_. This Agreement may be signed in one or more counterparts (including by means of Docusign (or similar service) or PDF signature pages), each of which need not contain the signature of all parties hereto, and all of such counterparts taken together shall constitute a single agreement.

13. _Amendment; Waiver_. This Agreement shall not be amended, modified, or waived except by a separate written agreement signed by each of the Parties. No course of dealing between the Parties shall be deemed to modify or amend any provision of this Agreement, and no failure or delay by the Parties in the exercise (or partial exercise) of each of their rights, powers, privileges or remedies shall operate as a waiver thereof or preclude any other future rights, powers, privileges or remedies. Where a written consent is required pursuant to or contemplated by this Agreement, such written consent shall be deemed to have occurred if it is conveyed in writing (including email) between the Company or a Company Representative and the Board Observer, or vice versa.

14. _Assignment; No Third Party Beneficiaries_. Absent the prior written consent of the Company, the Board Observer may not assign its rights or obligations under this Agreement and any such attempted assignment without such prior written consent shall be null and void. This Agreement is for the benefit of the Board Observer and the Company and no other person shall be a third party beneficiary hereof.

15. _Binding Effect_. This Agreement shall be binding upon each of the Parties and their respective successors and permitted assigns.

16. _Waiver of Right to Trial by Jury_. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT.

17. _Notice_. Notices authorized or required by this Agreement may be delivered by hand or reputable third-party overnight courier service and must also be delivered by email. Notices to Intelsat shall be delivered to: Intelsat Emergence S.A. (to be renamed Intelsat S.A.), 4, rue Albert Borschette L-1246 Luxembourg, Grand Duchy of Luxembourg, Attn: Legal Department; with a copy (which shall not constitute notice) to: Kirkland and Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Edward O. Sassower, P.C., Steven Serajeddini, P.C. and Aparna Yenamandra. Notices to the Board Observer shall

8

be delivered to: [•], with a copy (which shall not constitute notice) to: [•].  Any such notice will be deemed to have been given on the day of actual delivery thereof.

IN WITNESS WHEREOF, the Company and the Board Observer have executed this Agreement as of the date and year first written above.


**Intelsat Emergence S.A.**


By:_____

Name: Jose Toscano

Title: Authorized Signatory

[Company Signature Page to Board Observer Confidentiality Agreement]

**BOARD OBSERVER**

By:

_____

Name:

<u>EXHIBIT B</u>

### *Form of Joinder Agreement*

      The undersigned hereby agrees, effective as of the date set forth below, to become a party to that certain Shareholders Agreement (as amended, restated and modified from time to time, the "<u>Agreement</u>"), dated as of [•], by and among [•], a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg (the "<u>Company</u>"), and the shareholders [*and Beneficial Owners*] of the Company. The undersigned hereby agrees to be bound by all of the terms of the Agreement and shall hereafter be deemed to be, for all purposes of the Agreement, a party to the Agreement and a "Holder" (as defined in the Agreement). The undersigned hereby grants an irrevocable power of attorney to the Company to record the transfer of Company Common Stock on its behalf. This Joinder Agreement and all disputes or controversies arising out of or relating to this Joinder Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principles of conflicts of laws. The address, facsimile number and email address to which notices may be sent to the undersigned are as follows:

Address:      _____

                   _____

                   _____

Facsimile No.:  _____

Email:

Date:        _____

**[If entity]**

**[ENTITY NAME]**

By:_____
      Name:
      Title:

**[If individual]**

_____
Individual Name:

<u>Exhibit C-1</u>

DIRECT OWNER LEGEND

THESE SHARES OF COMPANY COMMON STOCK HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145; PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

THESE SHARES OF COMPANY COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH SHARES OF COMPANY COMMON STOCK IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE SHARES OF COMPANY COMMON STOCK ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF [COMPANY] (THE "COMPANY"), DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SHAREHOLDERS AGREEMENT"). NO REGISTRATION OR TRANSFER OF THE SHARES OF COMPANY COMMON STOCK ISSUABLE UPON EXERCISE OF SUCH SHARES MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH.

THE COMPANY OR THE TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE COMPANY COMMON STOCK REPRESENTED HEREBY A COPY OF THE SHAREHOLDERS AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE COMPANY COMMON STOCK UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS. THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE COMPANY.

EXHIBIT C-2

FORM OF GLOBAL SECURITY
-EVIDENCING-
SHARES OF COMMON STOCK
-IN-

INTELSAT EMERGENCE S.A.

[●]

CUSIP: L5217E120

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO INTELSAT EMERGENCE S.A. (THE "COMPANY") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUIRED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THE SECURITIES REPRESENTED HEREBY WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "BANKRUPTCY CODE"). THE SECURITIES REPRESENTED HEREBY MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE COMPANY. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE COMPANY, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE COMPANY IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE SHARES OF COMPANY COMMON STOCK REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF THE COMPANY, DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SHAREHOLDERS AGREEMENT"). NO REGISTRATION OR TRANSFER OF THE COMPANY COMMON STOCK MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. COPIES OF SUCH AGREEMENT ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER OF SHARES OF COMPANY COMMON STOCK WILL BE MADE ON THE BOOKS OF THE COMPANY UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE APPLICABLE TERMS OF THE SHAREHOLDERS AGREEMENT.

ONLY PARTIES TO THE SHAREHOLDERS AGREEMENT ARE ENTITLED TO EXERCISE THE RIGHTS OF HOLDERS UNDER THE SHAREHOLDERS AGREEMENT.  NO PERSON MAY BECOME A HOLDER OF COMPANY COMMON STOCK PURSUANT TO ANY TRANSFER OF COMPANY COMMON STOCK OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT.

This is to certify that CEDE & CO. is the owner and registered holder of this Certificate evidencing the ownership of the shares of common stock set forth on the Schedule of Increases and Decreases attached hereto as Schedule A, each of which represents an undivided share of common stock in the Company.

At the request of the registered holder this Certificate may be exchanged for one or more Certificates issued to the registered holder in such denominations as the registered holder may request.

The registered holder of this Certificate is entitled at any time upon tender of this Certificate to the Company, endorsed in blank or accompanied by all necessary instruments of assignment and transfer in proper form, at its principal office in Luxembourg and, upon payment of any tax or other governmental charges, to receive such holder's Units evidenced by this Certificate.

The Company may deem and treat the person in whose name this Certificate is registered upon the books of the Company as the owner hereof for all purposes and the Company shall not be affected by any notice to the contrary.

**IN WITNESS WHEREOF**, the Company has caused this Certificate to be executed in its name by the manual or facsimile signature of one of its authorized signatories.

**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**

By: _____

José Toscano
Delegate of the Board of Directors

<u>SCHEDULE A</u>

SCHEDULE OF INCREASES AND DECREASES IN
SHARES OF COMPANY COMMON STOCK

    The following increases and decreases in the number of shares of Company Common Stock evidenced by this Global Security have been made:

| Date | Amount of increases or decreases in number of shares evidenced by this Global Security | Number of shares evidenced by this Global Security following such increase or decrease | Signature of authorized signatory |
| --- | --- | --- | --- |

## Exhibit A-2

**Redline to Shareholders Agreement filed on October 19, 2021**

*FilingExecution* **Version** + PW 10.19

[•]
## INTELSAT EMERGENCE S.A.
## SHAREHOLDERS AGREEMENT

This Shareholders Agreement (this "Agreement") is made and entered into as of February [•●], 2022 (the "Effective Date"), by and among [•]Intelsat Emergence S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg, having its registered office in the City of Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés de Luxembourg*) under number B [•]264124 (the "Company"), and all of the shareholders of the Company who were issued shares of Company Common Stock under the Plan (each such party as identified on the signature pages hereto, together with any Person (as defined below) who hereafter becomes a party to this Agreement and a Beneficial Owner (as defined below) of Company Common Stock, (together with any Appaloosa Holder, CarVal Holder, DK Holder and Initial First Threshold Holder, the "Holders" and each, a "Holder"). The Company and the Holders are referred to collectively herein as the "Parties."

In consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Party, the Parties agree as follows:

**1.** **Definitions.** As used in this Agreement, the following terms shall have the respective meanings set forth in this Section 1:

"Acquiring Shareholder" has the meaning set forth in Section 4(e).

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any investment fund the primary investment advisor to which is such Person or an Affiliate thereof); *provided* that for purposes of this Agreement, no Holder shall be deemed an Affiliate of the Company or any of its Subsidiaries. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Appaloosa Holder" means Appaloosa LP, together with Palomino Master Ltd. and, Azteca Partners LLC, and any of their respective related funds to whomthat hold shares of Company Common Stock are transferred pursuant to this Agreement.

"Approved Transferee" has the meaning set forth in Section 4(a).

"Articles" means the Articles of Association of the Company, as amended from time to time.

"Beneficial Interest" means, solely for the purposes of and as used in Section 4, with respect to any Beneficial Owner, the securities entitlementSecurities Entitlement held by such Beneficial Owner in the shares of Company Common Stock it Beneficially Owns.

"Beneficial Owner" means, solely for the purposes of and as used in Section 4, any Person owning a securities entitlement with respect to sharesholding beneficial ownership of Company Common Stock registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been credited to any other Person's securities account, including through a Securities Entitlement. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.

"Board" means the board of directors of the Company.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York or Luxembourg, Grand Duchy of Luxembourg.

"CarVal Holder" means CVI AA Cayman Securities LP, CVI AV Cayman Securities LP, CVIC Cayman Securities Ltd., CarVal GCF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI CVF V Cayman Securities Ltd., CarVal CCF Cayman Securities Ltd., CVI CCOF Cayman Securities Ltd., CVI CVF III Cayman Securities Ltd., together with their Affiliates and related funds.

"Cede & Co." means Cede & Co., as nominee for DTC, or such other nominee as may be selected by DTC, as nominee for DTC, which as of the Effective Date is the sole registered holder of Company Common Stock under this Agreement on behalf of the Beneficial Owners of Securities Entitlements.

"Chosen Courts" has the meaning set forth in Section 8(f).

"Close of Business" means 5:00 p.m. Eastern Time.

"Communications Laws" means the United States Communications Act of 1934, the United States Telecommunications Act of 1996, any rule, regulation or policy of the Federal Communications Commission, and/or any statute, rule, regulation or policy of any other U.S., federal, state or local governmental or regulatory authority, agency, court commission, or other governmental body with respect to the operation of channels of radio communication and/or the provision of communications services.

"Company" has the meaning set forth in the preamble.

"Company Common Stock" means the common shares, nominal value $0.01 per share, in registered form, of the Company.

"Company Common Stock Equivalent" has the meaning set forth in Section 7(a).

"Competitor of the Company" means (a) any Person set forth on Schedule BAnnex A and (b) [any Affiliate of any such Person set forth on Schedule BAnnex A who is directly or indirectly engaged in any business that is competitive with the Company and its Subsidiaries, as reasonably determined by the Board in good faith, *provided*, that no investment funds and similar entities that own (directly or through Affiliates) a business that is competitive with the Company and its Subsidiaries but which has implemented internal controls to prevent the sharing of any information under Section 3 within the organization or with the management of the competitive entity shall be deemed a Competitor of the Company. For the avoidance of

-2-

doubt, no Holder (including any of the Nominating Shareholders) shall be deemed a Competitor of the Company solely on the basis that such Holder owns an interest in a Competitor of the Company unless such interest is greater than a [~~20~~12.5% ~~of~~ voting] interest in such Competitor of the Company or the Holder or one of its Affiliates or any of their directors, officers, employees, managers, agents or representatives are on the board of directors or similar governing body of such Competitor of the Company.]

"Confidential Information" has the meaning set forth in Section 3(b)(i).

"CVR Agreements" means, collectively, those certain agreements setting forth the full terms and conditions of the contingent value rights issued pursuant to the Plan on the Plan Effective Date.

"Designation Right Assignment" has the meaning set forth in Section 2(d).

"Depository Agreement" means the Blanket Issuer Letter of Representations from the Company to DTC~~,~~ dated as of ~~[●], 20[●],~~on or about the Effective Date as the same may be amended or supplemented from time to time.

"Dilution Principles" has the meaning set forth in Section 8(a).

"Direct Owner" means any ~~holder~~Holder of Company Common Stock who is registered on the Company's books and records for the Company Common Stock.

"Direct Owner Legend" means the legend on the account of each ~~Holder of shares of Company Common Stock held in book-entry on the books and records for the Company Common Stock~~Direct Owner set forth on Exhibit ~~D~~C-1 hereto.

"Director" means any member of the Board.

"DK Holder" means Davidson Kempner Capital Management LP, together with its Affiliates and related funds.

"Drag-along Notice" has the meaning set forth in Section 6(a)(ii).

"Drag-along Sale" has the meaning set forth in Section 6(a)(i).

"Drag-along Shareholder" has the meaning set forth in Section 6(a)(i).

"Dragging Shareholder" has the meaning set forth in Section 6(a)(i).

"DTC" means The Depository Trust Company.

"DTC Participant" means any Person that is reflected on the books and records of DTC as having a direct interest in the Company Common Stock held of record by ~~DTC~~Cede & Co.

"Effective Date" has the meaning set forth in the preamble.

"Excess New Securities" has the meaning set forth in Section 7(b)(i).

"Exchange Act" means the Securities Exchange Act of 1934.

"Existing Holder Exception" has the meaning set forth in Section 4(d)(i).

-3-

"Fair Market Value" means the fair market value of the shares of Company Common Stock or other equity securities of the Company as determined in good faith by the Board; *provided, however,* that the Company may obtain an independent appraisal of the value of the shares of Company Common Stock or other equity securities of the Company on an annual basis for the Board to rely upon in determining the Fair Market Value, which appraisal shall be prepared by a nationally recognized independent valuation firm mutually agreed upon between the Company and such Holder (a "Valuation Firm"); *provided, further,* that if the Company has not obtained an annual appraisal and the Holder for whom the determination of Fair Market Value is being made objects to such Fair Market Value determination, the Company shall obtain an independent appraisal (or another independent appraisal if an annual appraisal was already obtained) of the value of the shares of Company Common Stock or other equity securities of the Company from a valuation firm mutually agreed upon between the Company and such Holder (which is different from the Valuation Firm if an annual appraisal was already obtained). The Holder shall deliver written notice of his or her objection to the Company within twenty Business Days after such Holder receives notice of the Board's determination. Any determination of an independent appraiserby such mutually agreed valuation firm pursuant to the foregoing provisions shall be a final and binding determination (save for manifest error) of Fair Market Value for purposes of Section 4(d). The Company shall pay the cost and expense of suchany independent appraisal, except that the objecting Holder shall reimburse the Company for such cost and expense in the event that such final and binding determination of Fair Market Value by the mutually agreed valuation firm is equal to or less than the Fair Market Value as initially determined by the Board.

"Financial Statements" has the meaning set forth in Section 3(a).

"First Threshold" means at least 20% of the outstanding Company Common Stock, which, for the avoidance of doubt, will be calculated in accordance with the Dilution Principles.

"Global Security" means the global certificate or certificates issued to DTC as provided in the Depository Agreement, each of which shall be in substantially the form attached hereto as Exhibit D-C-2.

"hold" means, in respect of the Company Common Stock, direct or indirect beneficial ownership as a registered holder of Company Common Stock and/or Beneficial Ownership of a Beneficial Interest in Company Common Stock.

"Holder" has the meaning set forth in the preamble. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Company Common Stock or(including Beneficial Interests).

"Holder Website" has the meaning set forth in Section 3(b)(i)(C).

"Initial Term" has the meaning set forth in Section 2(a)(iii).

"Initial First Threshold Holder" means Pacific Investment Management Company LLC together with its Affiliates and related funds.

"Joinder" means (i) a Joinder to this Agreement in substantially the form attached hereto as Exhibit B or (ii) any agreement to be bound by the terms of this Agreement authorized by the Board pursuant to the Management Incentive Plan.

"Listing" means a listing of the Company's securities resulting in the Company being registered under Section 12(b) of the Exchange Act.

"Luxembourg Law" means the Luxembourg law on commercial companies dated August 10, 1915.

"Major Consent Amendment" has the meaning set forth in Section 8(d).

"Major Consent Approval" has the meaning set forth in Section 5(a).

"Major Consent Matter" has the meaning set forth in Section 5(a).

"Major Transferee" means ~~an Approved~~a Transferee to which a Nominating Shareholder transfers any of its rights to designate a Director pursuant to Section 2(d).

"Management Incentive Plan" means the management incentive plan implemented by the Company on the Effective Date.

"Minimum Threshold" means the First Threshold, Second Threshold or Third Threshold, as applicable.

"Minority Directors" means the Directors elected upon proposal of the Minority Investors in accordance with the terms of this Agreement.

"Minority Investor" means each of the Appaloosa Holder, the CarVal Holder and the DK Holder, in each case so long as such Person holds the Third Threshold.

"New Indenture" means that certain indenture for 6.500% First Lien Secured Notes due 2030 dated January 27, 2022 between Intelsat Jackson Holdings, S.A., the guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time.

"New Issuance Notice" has the meaning set forth in Section 7(a).

"New Securities" has the meaning set forth in Section 7(a).

"New Warrant Agreements" means, collectively, those certain agreements setting forth the full terms and conditions of the Warrants.

"Nominating Shareholder" means each of the Initial First Threshold Holder, the Appaloosa Holder, the CarVal Holder and the DK Holder or a Major Transferee, in each case so long as such Person holds at least the Minimum Threshold.

"Non-Conforming Issuance" has the meaning set forth in Section 5(a)(vii).

"Non-Employee Director" means one individual nominated to the Board in accordance with Section 2(a)(ii)(A), *provided*, that such individual shall (x) not be an employee or member of the board of managers or other governing body of the applicable Nominating Shareholder or any of its Affiliates and (y) have experience in one of the following industries: (1) space, (2) satellite, (3) technology, (4) communication, (5) aerospace and defense, (6) military/government and (7) commercial aviation.

"Non-Recourse Parties" has the meaning set forth in Section 8(o).

"Observer" has the meaning set forth in Section 2(p).

"Parties" has the meaning set forth in the preamble.

"Person" means any individual, partnership, corporation, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

"Plan" means the [SecondFourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates filed by the Debtors on August 31December 17, 2021 [at Docket No. 2773]] as confirmed by the [Confirmation Order] entered by3891 in Case No. 20-32299 (KLP) in the Bankruptcy Court on [•], 2021 [Docket Number [•]], and confirmed by the Bankruptcy Court at Docket No. 3894 in Case No. 20-32299 (KLP), as amended, modified or supplemented.

"Plan Effective Date" means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective.

"Preemptive Rightholder" has the meaning set forth in Section 7(a).

"Proportionate Percentage" has the meaning set forth in Section 7(b)(i).

"Proposed Price" has the meaning set forth in Section 7(a).

"Proposed Transferee" has the meaning set forth in Section 6(b)(i).

"Public Side Financial Reporting" has the meaning set forth in Section 3(a).

"Redemption Notice" has the meaning set forth in Section 4(d)(iv)(A).

"Redemption Price" has the meaning set forth in Section 4(d)(iv)(B).

"Registration Deadline" has the meaning set forth in Section 8(st)(ii).

"Registration Rights Agreement" has the meaning set forth in Section 8(s)means the Registration Rights Agreement among the Company and the holders party thereto, dated as of the Effective Date.

"Related Party Transaction" has the meaning set forth in Section 2(m).

"Representative Director" means a Person elected as a Director upon proposal of a Nominating Shareholder in accordance with the terms of this Agreement.

"Representatives" of a Holder means its partners (including limited partners except for any Competitors of the Company), shareholders, members, directors, officers, employeesmanagers, employees, financing sources (including existing and bona fide prospective investors except for any Competitors of the Company), agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its Affiliates or wholly owned subsidiaries.

"Sale Notice" has the meaning set forth in Section 6(b)(ii).

"Second Threshold" means at least 15% of the outstanding Company Common Stock, which, for avoidance of doubt, will be calculated in accordance with Dilution Principles.

"Securities Act" means the U.S. Securities Act of 1933.

"Securities Entitlement" means a securities entitlement with respect to shares of Company Common Stock registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been ultimately credited to any other Person's securities account.

"Selling Shareholder" has the meaning set forth in Section 6(b)(i).

"Stock Register" has the meaning set forth in Section 4(b).

"Subject Purchaser" has the meaning set forth in Section 7(a).

"Subsidiary" means, when used with respect to any Person, any corporation or other entity, whether incorporated or unincorporated, (a) of which such Person or any other Subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any Subsidiary of such Person do not have a majority of the voting interests in such partnership) or (b) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other entity is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries.

"Supermajority Board Approval" has the meaning set forth in Section 5(b)

"Supermajority Board Matters" has the meaning set forth in Section 5(b).

"Tag-along Notice" has the meaning set forth in Section 6(b)(iii).

"Tag-along Period" has the meaning set forth in Section 6(b)(iii).

"Tag-along Sale" has the meaning set forth in Section 6(b)(i).

"Tag-along Seller" has the meaning set forth in Section 6(b)(iii).

"Tag-along Shareholder" has the meaning set forth in Section 6(b)(i).

"Third Threshold" means at least 5% of the outstanding Company Common Stock, which, for avoidance of doubt, will be calculated in accordance with Dilution Principles.

"Transfer" means any sale, pledge, assignment, encumbrance or other transfer or disposition of any share of Company Common Stock or Beneficial Interest to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise, other than (i) in connection with any bona fide mortgage, encumbrance or pledge to a financial institution in connection with any bona fide loan or debt transaction or enforcement thereunder, including foreclosure thereof or (ii) any indirect transfer due to transfers of passive investments, such as a limited partnership interest or mutual fund interest, in a pooled investment vehicle or fund (including private fund or a fund registered under the

Investment Company Act of 1940). "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings.

"Transfer Agent" means American Stock Transfer & Trust, LLC.

"Warrants" means, collectively, those certain warrants issued pursuant to the Plan on the Plan Effective Date.

Unless the context requires otherwise: (a) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (b) references to Sections, paragraphs and clauses refer to Sections, paragraphs and clauses of this Agreement; (c) the terms "include," "includes," "including" or words of like import shall be deemed to be followed by the words "without limitation"; (d) the terms "hereof," "herein" or "hereunder" refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) unless the context otherwise requires, the term "or" is not exclusive and shall have the inclusive meaning of "and/or"; (f) defined terms herein will apply equally to both the singular and plural forms and derivative forms of defined terms will have correlative meanings; (g) references to any law or statute shall be deemed to refer to such law or statute as amended or supplemented from time to time and shall include all rules and regulations and forms promulgated thereunder, and references to any law, rule, form or statute shall be construed as including any legal and statutory provisions, rules or forms consolidating, amending, succeeding or replacing the applicable law, rule, form or statute; (h) references to any Person include such Person and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns; and (i) references to "days" are to calendar days unless otherwise indicated. Each of the Parties hereto acknowledges that each Party was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction shall be raised or used in which the provisions of this Agreement shall be construed in favor or against any Party hereto because one is deemed to be the author thereof.

## 2.   **Board of Directors.**

(a)     Composition and Size. From and after the Effective Date, each Holder shall vote (or cause to be voted) all of the Company Common Stock held by such Holder and any other voting securities of the Company over which such Holder has voting control and, as the Company or a Nominating Shareholder may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings), so that:

(i)     the number of directors constituting the Board is seven directors (or, if such number of directors is increased pursuant to Section 5(a)(ix), such number of directors as so increased), other than any vacancy resulting from the death, removal or resignation of any Director in accordance with Section 2(c) or Section 2(g) until such vacancy is filled in accordance with Section 2(a)(ii) or Section 2(h), as applicable;

(ii)     the following individuals are elected and continue to serve as directors of the Board:

(A)     three individuals proposed by the Initial First Threshold Holder (or any Major Transferee to which such right is assigned pursuant to Section 2(d)), so long as such Person (together with any Affiliates that hold Company Common Stock) holds

the First Threshold, at least one of whom shall be a Non-Employee Director; *provided*, that the number of individuals designated by such Person shall be reduced to two in the event that such Person (together with any Affiliates that ~~holdCompany~~hold Company Common Stock) ceases to hold the First Threshold but holds the Second Threshold or if such Person has made a Designation Right Assignment of such Director right pursuant to Section 2(d); *provided*, *further*, that the number of individuals designated by such Person shall be reduced to one in the event that such Person (together with any Affiliates that hold Company Common Stock) ceases to hold the Second Threshold but holds the Third Threshold or if such Person has made a Designation Right Assignment of such Director right pursuant to Section 2(d);

(B)     one individual proposed by the Appaloosa Holder (or any Major Transferee to which such right is assigned pursuant to Section 2(d)), so long as such Person (together with any related funds that hold Company Common Stock) holds the Third Threshold;

(C)     one individual proposed by the DK Holder (or any Major Transferee to which such right is assigned pursuant to Section 2(d)), so long as such Person (together with any Affiliates that hold Company Common Stock) holds the Third Threshold; *provided, that* such [initial] individual (I) shall not be an employee or member of any governing body of the DK Holder or the Major Transferee or any of its Affiliates, as applicable and (II) shall have relevant industry experience;

(D)     one individual proposed by the CarVal Holder (or any Major Transferee to which such right is assigned pursuant to Section 2(d)), so long as such Person (together with any Affiliates that hold Company Common Stock) holds the Third Threshold; *provided, that*, such [initial] individual (I) shall not be an employee or member of any governing body of the CarVal Holder or the Major Transferee or any of its Affiliates, as applicable and (II) shall have relevant industry experience; and

(E)     the then-serving Chief Executive Officer of the Company;

(iii)     the Directors as of the Effective Date shall, subject to each such Director's earlier death or resignation or removal upon request by the applicable Nominating Shareholder (in the case of a Representative Director), serve as Directors until the annual meeting of the shareholders of the Company in [2023] (such term, the "Initial Term"); and

(iv)     at each annual meeting of the shareholders of the Company (or in connection with the casting of votes in writing in lieu of such meeting) at which a Nominating Shareholder is entitled to propose a Representative Director under Section 2(a)(ii), the Person(s) so proposed shall be elected or reelected, as applicable, at such meeting (or by such votes in writing, if applicable).

(b)     Company Action. The Company shall take all actions necessary to cause the nomination of the persons contemplated by Section 2(a), including causing such Persons to be included in the slate of nominees recommended by the Board to the Holders for election as Directors. Each Holder hereby irrevocably and unconditionally undertakes to, and grants an irrevocable proxy to any Director in office when the Holder's vote is to be cast to, on its behalf, vote its shares in favor of the election to the Board of the designees of the Nominating Shareholders pursuant to Section 2(a)(ii) or the removal from the Board of a Director pursuant to Section 2(c) or Section 2(g).

(c)      <u>Minimum Threshold</u>. If a Nominating Shareholder ceases to hold at least the Minimum Threshold at any time following the Effective Date, (i) such Holder's designee (or, in the event the Initial First Threshold Holder or its Major Transferee entitled to propose two or more Directors (if any), as applicable, ceases to hold the First Threshold but continues to hold the Second Threshold or ceases to hold the Second Threshold but continues to hold the Third Threshold, the designee of the Initial First Threshold Holder's or its Major Transferee's, as applicable, choosing) shall resign immediately from the Board and the resulting vacancy shall be filled in accordance with <u>Section 2(h)</u> and (ii) thereafter such Nominating Shareholder shall no longer have the right to propose a Director for election under <u>Section 2(a)(ii)</u> or to transfer such right of proposal to any Major Transferee (or in the event the Initial First Threshold Holder or its Major Transferee entitled to propose two or more Directors (if any) ceases to hold the First Threshold but continues to hold the Second Threshold or ceases to hold the Second Threshold but continues to hold the Third Threshold, the Initial First Threshold Holder or such Major Transferee shall, respectively, no longer have the right to propose three Directors (but shall continue to have the right to propose, and transfer the right of proposal for, two Directors) or two Directors (but shall continue to have the right to propose, and transfer the right of proposal for, one Director). Notwithstanding any other provision herein, no Holder (including its Affiliates) shall at any time be entitled to propose more than three Directors for election to the Board at any time under <u>Section 2(a)(ii)</u>, notwithstanding the amount of shares of Company Common Stock held by such Holder and its Affiliates.

(d)      <u>Assignment of Nominating Shareholder Rights</u>. A Nominating Shareholder, in such Nominating Shareholder's sole discretion, shall have the right to assign its rights under this <u>Section 2</u> to a Major Transferee. In order to exercise such right, a Nominating Shareholder must (i) transfer to such Major Transferee at least the applicable amount of Company Common Stock to exercise such right (i.e., in the aggregate, the Third Threshold for one director, the Second Threshold for two directors or the First Threshold for three directors) and (ii) if the transfer provided for in <u>Section 2(d)(i)</u> would not put such Nominating Shareholder below its then highest Minimum Threshold, irrevocably assign the right to propose the Director(s) being assigned to the relevant Major Transferee (a "Designation Right Assignment"). If a Nominating Shareholder shall exercise such right, the Nominating Shareholder must deliver written notice thereof to the Company at or prior to effecting such transfer and the Company shall, within two Business Days of receiving such notice, deliver written notice thereof to all of the other Nominating Shareholders. Upon the exercise of a Designation Right Assignment in accordance with this <u>Section 2(d)</u>, the Minority Director appointed by the Major Transferee shall be entitled to exercise all of the rights under this Agreement afforded a Minority Director appointed by a Nominating Shareholder, including rights under <u>Section 2(i)</u> and <u>Section 2(l)</u>.

(e)      <u>Nomination of Directors</u>. The Company shall provide notice to each Nominating Shareholder at least [45] days prior to each annual meeting of the shareholders of the Company (or at least 10 days prior to a solicitation by the casting of votes in writing in lieu of such annual meeting). Unless a Nominating Shareholder provides written notice to the Company no later than [30] days prior to such annual meeting (or at any time prior to a solicitation by the casting of votes in writing in lieu of such annual meeting) (i) that a then-current Representative Director will not be proposed for reelection to the Board at such annual meeting of the shareholders of the Company (or such casting of votes in writing in lieu of such annual meeting) and (ii) identifies the individual such Nominating Shareholder proposes for election in place of such then-current Representative Director, such then-current Representative Director shall be automatically nominated for reelection to the Board at such annual meeting (or such casting of votes in writing in lieu of such annual meeting) unless at the time of such meeting (or such casting of votes in writing in lieu of such annual meeting) such Nominating Shareholder no longer has the right to nominate such Representative Director.

(f)    Board Size. In no event shall the authorized size of the Board be fewer than seven Directors, other than any vacancy resulting from the death, removal or resignation of any Director in accordance with Section 2(c) or Section 2(g) until such vacancy is filled in accordance with Section 2(a)(ii) or Section 2(h), as applicable. Any change in the authorized number of Directors shall require Major Consent Approval.

(g)    Removal of Directors. A Representative Director may be removed with or without cause at any time upon request of his or her Nominating Shareholder. In such event, such Nominating Stockholder will request a resignation from its Representative Director. Each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company or a Nominating Shareholder may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings) to the extent necessary in order to give effect to such Nominating Stockholder's removal of its Representative Director.

(h)    Vacancies on the Board. Subject to the provisions of article 441-2 of the Luxembourg Law, any vacancy on the Board resulting from the death, resignation, removal or otherwise of a Director shall be filled by a majority vote of the then-existing Board; *provided* that the Board shall vote to fill any vacancy of a Representative Director, other than any vacancy resulting from the failure of a Nominating Shareholder to meet the applicable Minimum Threshold as described in Section 2(c), with the replacement individual identified to the Board by the relevant Nominating Shareholder; *provided further* that the Board shall vote to fill any vacancy resulting from the failure of a Nominating Shareholder to meet the applicable Minimum Threshold as described in Section 2(c) with an individual who (i) is unaffiliated with any then-existing Holder holding more than 5% of the then-outstanding shares of Company Common Stock (which, for avoidance of doubt, will be calculated in accordance with Dilution Principles) and (ii) satisfies the independence requirements of the New York Stock Exchange rules.

(i)    Quorum. The quorum for the transaction of business of the Board at meetings of the Board shall require (i) a majority of the Directors, and (ii) for so long as (A) the Minority Investors have the right to appoint three Directors, two Minority Directors, and (B) the Minority Investors have the right to appoint two Directors, one Minority Director; *provided*, *that* the quorum requirements set forth in clause (ii) above will not apply as to a properly called meeting of the Board if such Minority Director(s) fail to appear at such meeting and a subsequent properly called meeting in adjournment thereof is held for substantially the same purposes between three and ten Business Days after the first meeting (in which case quorum will be assumed at such second properly called meeting, assuming the quorum requirement of a majority of the Directors is satisfied). Notwithstanding the foregoing, the quorum of any portion of a Board meeting where a Major Consent Matter or Supermajority Board Matter will be considered shall require, in addition to that set forth in the immediately preceding sentence, all of the Minority Directors then elected to the Board (including if there is only one or two Minority Directors then elected); *provided that* such special quorum requirements will not apply as to a properly called meeting of the Board if (x) a Minority Director fails to appear at a properly called meeting of the Board and the same Minority Director fails to appear at a subsequently properly called meeting in adjournment thereof held between three and ten Business Days after the first meeting (in which case quorum will be assumed at such second properly called meeting, assuming the quorum requirement of a majority of the Directors is satisfied) and (y) in the case where more than one Minority Director remains, any of the Minority Directors fails to appear at a properly called meeting and any of the other Minority Directors fails to appear at a subsequently

properly called meeting of the Board in adjournment thereof held between three and ten Business Days after the second meeting (in which case quorum will be assumed at the following properly called meeting (that is, the third meeting), assuming the quorum requirement of a majority of the Directors is satisfied); *provided that*, in each case, the terms of the particular Major Consent Matter or Supermajority Board Matter remain substantially consistent for each meeting of the Board and meeting in adjournment thereof. For the avoidance of doubt, quorum will be achieved with a majority of the Directors regardless of whether any Minority Directors are present at a third properly called meeting of the Board where a Major Consent Matter or Supermajority Board Matter will be considered in accordance with the foregoing. In addition, the special quorum requirements set forth in the immediately preceding two sentences shall only apply to the portion of the Board meeting relating to the Major Consent Matter or Supermajority Board Matter at issue, and all regular business at the Board meeting may still be conducted even if the special quorum requirements are not satisfied at such Board meeting (but subject to the quorum requirements set forth in the first sentence of this Section 2(i)).

(j)        Voting. Each Director will have one vote with respect to each matter to be decided upon by the Board. Other than Major Consent Matters or Supermajority Board Matters, all matters will be decided by the affirmative vote or consent of a majority of the Directors present or represented and voting at a properly called Board meeting that satisfies the quorum requirements set forth in Section 2(i) and the provisions of the Articles; *provided* that any action by written consent of the Board shall require the unanimous affirmative vote of all Directors then in office. In case of a tie, neither the Chairperson (as defined below) nor any other Director shall have a casting (tie breaking) vote.

(k)        Chairperson. The Chairperson of the Board (the "Chairperson") will initially be selected by the Representative Directors designated by the Initial First Threshold Holder; *provided*, *that*, such individual shall be acceptable to at least two Minority Directors; *provided*, *further*, that at the first meeting of the Board occurring after each anniversary of the Effective Date, the Chairperson will be selected by majority vote of the Board, such Chairperson to serve until the next such annual vote. The Chairperson shall preside at meetings of the Board and of the shareholders of the Company and exercise and perform such other powers and duties as may from time to time be assigned to him or her by the Board or as may be prescribed by this Agreement or the Articles. In the absence of the Chairperson, another Director designated by the Chairperson or, if none was designated by the Chairperson, by the Board (or as applicable, the shareholder meeting) shall act as chairperson of any meeting.

(l)        Meetings of the Board. A meeting of the Board may be called at any time by (i) the Chairperson, (ii) the then-serving Chief Executive Officer of the Company, or (iii) two of the Minority Directors. [The Board will hold at least [four] meetings a year.]

(m)        Related Party Transactions. Without prejudice to any necessary actions, steps or formalities required under applicable Luxembourg Law in case of a conflict of interest (as defined under Luxembourg Law), the Board shall take reasonable steps to cause the Company to enact controls so that the Company does not, and does not permit any of its Subsidiaries to, enter into any agreement, transaction or series of related transactions (or amendment or modification thereto) with any Director or Affiliate of the Company or any portfolio company of the Initial First Threshold Holder or the Minority Investors, except in connection with a Holder's (other than a Director or officer's) status as an employee of the Company or such Subsidiary in the ordinary course of business (a "Related Party Transaction"), without the affirmative vote of a majority of the disinterested members of the Board (i.e., excluding any Director who is (i) a Representative of, or (ii) a Representative Director of, any Person with whom the Company or any of its Subsidiaries is proposing to enter into the Related Party Transaction (or amendment

or modification thereto) or any Affiliate thereof) subject to all other requirements in this Agreement and the Articles necessary to effectuate an act of the Board. In any case, all Related Party Transactions must be on arm's-length terms; *provided*, *however*, that (i) any issuance of equity securities issued to a Preemptive Rightholder pursuant to the pre-emptive rights described in <u>Section 7</u>, to an employee pursuant to the Management Incentive Plan or in connection with the exercise of the Warrants ~~shall~~<u>and (ii) the determination of any Further Accelerated Relocation Payments (as defined in the CVR Agreements) in accordance with the terms of the CVR Agreements shall, in each case,</u> not be deemed a Related Party Transaction; *provided further*, that approval by the Board of a Related Party Transaction in accordance with the terms of this <u>Section 2(m)</u> shall be deemed to be conclusive evidence that such Related Party Transaction is on arm's length terms.

(n)     <u>Governing Documents</u>. In the event of any conflict between the terms and provisions of this Agreement and those contained in the Articles or other similar governing documents of the Company, the terms and provisions of this Agreement shall govern and control to the maximum extent permitted by ~~[Luxembourg] Law.~~ <u>law and all Parties to this Agreement shall take all necessary steps to cause the Articles to be amended to the greatest extent permitted by Luxembourg law to resolve such conflict in favor of this Agreement, including but not limited to, (i) the Company convening an extraordinary general meeting of the Holders with an agenda item to consider such amendment, and (ii) the Holders exercising their voting rights to pass the required resolutions to amend the Articles accordingly.</u>

(o)     <u>Initial Directors</u>. The initial Directors shall be (i) ~~[•], [•] and [•]~~<u>Lisa Hammit, Easwaran Sundaram and Jinhy Yoon</u>, deemed proposed in accordance with <u>Section 2(a)(ii)(A)</u>, (ii) ~~[•]~~<u>James E. Bolin</u>, deemed proposed in accordance with <u>Section 2(a)(ii)(B)</u>, (iii) ~~[•]~~<u>Roy H. Chestnutt</u>, deemed proposed in accordance with <u>Section 2(a)(ii)(C)</u>, (iv) ~~[•]~~<u>Marc R. Montagner</u>, deemed proposed in accordance with <u>Section 2(a)(ii)(D)</u>, and (v) ~~[•]~~<u>Stephen Spengler</u>, in accordance with <u>Section 2(a)(ii)(E)</u>. The Company has confirmed that each initial Director has provided the Company with evidence confirming that such initial Director is a citizen of the United States as of the Effective Date.

(p)     <u>Board Observer</u>. Each Nominating Shareholder shall have the right to designate one non-voting observer (each, an "<u>Observer</u>") to the Board for so long as such Holder remains a Nominating Shareholder. Each Nominating Shareholder may change the identity of its observer from time to time upon written notice to the Company. Each Observer will be entitled to attend and receive notice of all meetings of the Board and receive copies of all materials provided or made available to the Board in connection therewith; *provided*, *that*: (i) each Observer shall enter into a non-disclosure agreement, substantially in the form set forth on <u>Exhibit A</u>; and (ii) the Company reserves the right to withhold any information and to exclude an Observer from any meeting or portion thereof if access to such information or attendance at such meeting would reasonably be expected to, based on advice of outside counsel, cause a waiver of the attorney-client privilege between the Company or any of its Subsidiaries and their respective counsel after taking all commercially reasonable steps to enter into arrangements to mitigate such loss of privilege (provided that all Observers in similar circumstances shall be treated equally in such determination). The right to designate an Observer is assignable or transferable only together with an assignment of such Nominating Shareholder's rights under <u>Section 2(d)</u>. Any attempt to assign or transfer such right not in compliance with <u>Section 2(d)</u> and this <u>Section 2(p)</u> shall be null and void *ab initio*. The Company shall take all action reasonably necessary, at its sole cost and expense, to ensure that each Observer is entitled to (i) insurance coverage on the same terms provided to the Company's officers and Directors either under the Company's policy or policies applicable to such officers and Directors, or under a supplemental policy, as provided under the Articles, (ii) indemnification and reimbursement of

-13-

expenses, on the same terms provided to the Company's officers and Directors under the Articles, and (iii) any other supplemental indemnification and reimbursement of expense arrangements offered by the Company to its officers or Directors.

(q)     Required Adjustments. In connection with ~~the Company's initial public listing or initial public offering~~a Listing of the Company Common Stock, the Holders shall work in good faith to adjust the Board composition and the Director designation rights described in this Section 2 if, upon the advice of outside counsel, it is determined that adjustments are necessary to satisfy applicable codified securities laws and mandatory stock exchange listing requirements.

**3.     Information Rights.**

(a)     Financial Statements; Earnings Calls. The Company will furnish to each Holder the following: [(i) within [●]65 days ([●]or 150 days in the case of the first ~~three~~ fiscal ~~quarters ending~~quarter containing the Effective Date and 90 days in the case of the first full fiscal quarter after the Effective Date occurs) ~~following~~after the ~~conclusion~~end of each of the ~~Company's~~first three fiscal quarters of each fiscal year (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal quarter ending after the Effective Date, quarterly unaudited consolidated financial statements of the Company and its Subsidiaries; and (ii) within [●]120 days ([●]or 135 days in the case of the first ~~three~~ fiscal ~~quarters~~year ending after the Effective Date) ~~days after the end of each~~following the conclusion of each of the Company's fiscal years ending after the Effective Date (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal year ending after the Effective Date, annual audited consolidated financial statements of the Company and its Subsidiaries (clauses (i) and (ii) collectively, the "~~Public Side~~ Financial Statements"); and (iii) the information if, as and when provided to the noteholders or trustee, as applicable, pursuant to Section 3.10(a) of the New Indenture (or any substantially similar provision in connection with any amendment to the New Indenture or any refinancing indebtedness thereof), including, for the avoidance of doubt, the Financial Statements; *provided, however,* that if the Company ~~becomes subject to the reporting requirements of the Exchange Act and the Public Side~~files the Financial Statements described in this Section 3(a) with the Securities and Exchange Commission, the requirement to deliver the Financial Statements pursuant to clauses (i) and (ii) shall be deemed satisfied]. ~~Promptly after the initial report to Holders that is furnished after the Effective Date pursuant to the immediately preceding sentence, the Company will use commercially reasonable efforts to furnish the business and financial reporting so that Common Shares may be quoted pursuant to the requirements of Rule 15c2-11 of the Exchange Act (the "Public Side Financial Reporting") and will thereafter use commercially reasonable efforts to maintain compliance with such requirements~~For the avoidance of doubt, if required pursuant to clauses (i) and (ii), Intelsat Jackson Holdings S.A. or one of its direct or indirect parent entities may provide the Financial Statements, as applicable, in the case of the fiscal year ending December 31, 2021. Reasonably promptly following the release of each of the quarterly unaudited financial statements, the Company will provide a video and/or a telephonic presentation (which may be a single presentation held together with other securityholders or holders of indebtedness of the Company and its Affiliates) to the Representatives of Holders to discuss the Company's financial condition and results of operations, following which presentation the Company will allow the Representatives of Holders to ask reasonable questions. Any participant in quarterly calls (including bona fide potential transferees permitted in accordance with the terms hereof) (A) shall not be a Competitor of the Company and each Holder hereby represents and warrants to the same as to itself, its Representatives and its bona fide potential transferees that participate in such calls, and (B) shall be subject to Section 3(b); *provided,* that each Holder shall be liable for any action of its

Representatives or recipients that would constitute a violation of Section 3(b) if such Representative or recipient were party to this Agreement. With respect to any recipient who is a bona fide potential transferee of Company Common Stock, the applicable Holder must first comply with Section 3(b)(i)(C) prior to sharing any such information. The Company shall use commercially reasonable efforts to promptly post all such information required by this Section 3(a) on a website (which may be nonpublic, require a confidentiality acknowledgement, with such acknowledgement being deemed to satisfy the requirement for a nondisclosure agreement as set forth in Section 3(b)(i)(C) and shall be maintained using commercially reasonable efforts by the Company or a third party) (the "Holder Website") to which access will be given to the Holders and bona fide prospective investors or bona fide potential transferees (with the exception of Competitors of the Company) in the Company Common Stock.

(b)     Confidentiality.

(i)     Each Holder acknowledges that any notices or information furnished, including verbally, pursuant to this Agreement, including the Financial Statements and any information actually provided pursuant to Section 3(a)(iii), (the "Confidential Information") is confidential and competitively sensitive. Each Holder shall use, and shall cause any Person to whom Confidential Information is disclosed by such Holder pursuant to clause (A) below to use, the Confidential Information only in connection with its investment in the shares of Company Common Stock and not for any other purpose (including to disadvantage competitively the Company or any other Holder). Each Holder shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(A)     to the Holder's Representatives in the normal course of the performance of their duties for such Holder (it being understood that such Representatives shall be informed by the Holder of the confidential nature of such information and shall be directed to treat such information in accordance with this Section 3(b));

(B)     to the extent required by applicable law, rule or regulation or requested by any regulatory or self-regulatory authority in connection with the conduct of its ordinary oversight activities; *provided* that the Holder shall take reasonable steps to minimize the extent of any such required disclosure and give the Company prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Company may, at its sole expense, seek an appropriate protective order or similar relief (and the Holder shall cooperate with such efforts by the Company, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall use reasonable best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information);

(C)     to any Person to whom the Holder is contemplating a transfer of its shares of Company Common Stock permitted in accordance with the terms hereof; *provided* that such Person is not prohibited from receiving such information pursuant to this Section 3 and, prior to such disclosure such potential transferee is advised of the confidential nature of such information and executes a non-disclosure agreement in a standard form previously approved by the Board for all such potential transferees and which agreement is independently enforceable by the Company and includes a certification that such Person is not a Competitor of the Company; (which, for the avoidance of doubt, shall be deemed satisfied if such Person has accepted the confidentiality acknowledgement required prior to being granted access to the Holder Website).

-15-

(D)      to any regulatory authority or rating agency to which the Holder or any of its Affiliates is subject or with which it has regular dealings, solely (I) as long as such authority or agency is advised of the confidential nature of such information and (II) such information is provided as the result of a routine request not targeted to the Company or any of its Subsidiaries;

(E)      in connection with the Holder's or the Holder's Affiliates' normal fund raising, marketing, informational or reporting activities or to any bona fide prospective purchaser of the equity or assets of the Holder or the Holder's Affiliates, or prospective merger partner of the Holder or the Holder's Affiliates; *provided* that prior to such disclosure, if any Confidential Information is shared with such Persons, the Persons to whom such information is disclosed are advised of the confidential nature of such information and are subject to  customary confidentially obligations with respect to such information; or

(F)      if the prior written consent of the Company shall have been obtained.

(ii)      Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Company or the Holder. The restrictions contained in this Section 3(b) shall terminate 18 months following the date on which the Holder ceases to hold any shares of Company Common Stock.

(iii)      Confidential Information does not include ~~information that~~: (A) information that is or becomes generally available to the public (including as a result of any information filed or submitted by the Company with the Securities and Exchange Commission) other than as a result of a disclosure by the Holder or its Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement, (B) information that is or was in the possession of the Holder or its Representatives on a non-confidential basis prior to its disclosure to the Holder or its Representatives by the Company~~,~~; or (C) information that was or becomes available to the Holder or its Representatives on a non-confidential basis from a source other than the Company, which source is or was (at the time of receipt of the relevant information) not, to the best of the Holder's or its Representatives' knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Company or another Person ~~or (D) the Public Side Financial Reporting~~.

(c)      The Company shall provide to each Director and, subject to the limitations set forth in Section 2(p), each Observer, copies of any materials distributed or made available to any other Directors or Observers. A Representative Director or Observer shall be entitled to share and discuss with the Representatives of the Nominating Shareholder that appointed such Representative Director or Observer any materials or other information obtained by such Person in such capacity, provided that such information is shared in the normal course of the performance of their duties for such Nominating Shareholder (it being understood that such Representatives shall be informed by such Director, Observer or Nominating Shareholder of the confidential nature of such information and shall be directed to treat such information in accordance with Section 3(b).

**4.      ~~Transfer Restrictions~~Transfers.**

(a)      Requirements for Transfer. The Company Common Stock or any Beneficial Interest shall be freely transferable except as provided in this Section 4(a). Notwithstanding any

other provision of this Agreement, each Holder agrees that it shall not~~, directly or indirectly,~~ Transfer any of its Company Common Stock or Beneficial Interest <u>except where (x) the Transferee executes and delivers to the Company a Joinder, to the extent such Transferee is not already a party to this Agreement, and (y) each of the following clauses (i) through (v) is correct</u>:

      (i)    ~~except as~~<u>such Transfer is</u> permitted under the Securities Act and other applicable federal law or state securities or blue sky laws~~,~~ and then, with respect to a Transfer of shares of Company Common Stock or ~~any~~ Beneficial Interest, if requested by the Company or the Transfer Agent, as applicable, only upon delivery to the Company of a written opinion of counsel in form and substance reasonably satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act~~. Notwithstanding~~<u>; provided, that notwithstanding</u> the foregoing, such a legal opinion shall not be required for any Transfer of shares of Company Common Stock <u>or Beneficial Interest</u> that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the Company has a good faith reason to believe that such shares of Company Common Stock <u>or Beneficial Interest</u> are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the Company or an "underwriter" (as such term is defined in the Securities Act) with respect to such Company Common Stock <u>or Beneficial Interest</u>;

      (ii)    ~~if~~ such Transfer would <u>not</u> reasonably be expected to require the Company to initiate a registration or qualification of ~~such~~<u>the</u> Company Common Stock pursuant to the Exchange Act or any applicable federal or state securities or blue sky laws~~, or require the Company to begin to file reports pursuant to the Exchange Act (as a result of the number of holders of such Company Common Stock or otherwise) or any applicable federal or state securities or blue sky laws~~;

      (iii)    ~~if~~ such Transfer, upon consummation, would <u>not</u> result in the Company having, in the aggregate, <u>either</u> (A) ~~1,000~~<u>1,900</u> or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act (determined, in each case, in the Company's ~~sole~~<u>reasonable</u> discretion)<u> of any class of equity securities of the Company</u>;

      (iv)    ~~if~~ such Transfer would <u>not</u> cause the Company or any Subsidiary or Affiliate of the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended; and

      (v)    ~~if~~ such Transfer would <u>not</u> cause the Company or any Subsidiary or Affiliate of the Company to be subject to regulation under the Investment Advisers Act of 1940, as amended.

(the Transferee of ~~any~~ such Transfer <u>in compliance with both clauses (x) and (y)</u> being an "Approved Transferee"). ~~The Company Common Stock has not been registered under the Securities Act, the Exchange Act, or state securities laws and will not be listed for trading on any securities exchange.~~ Any attempted or purported Transfer of all or a portion of the Company Common Stock <u>or Beneficial Interest</u> held by a Holder in violation of this Section 4(a) shall be null and void and of no force or effect whatsoever, such purported Transferee shall not be treated as ~~an Owner~~<u>a Holder</u> of the Company Common Stock <u>or Beneficial Interest</u> for

purposes of this Agreement or otherwise, and the Company shall not register such Transfer on the Stock Register.

(b)      Schedule; DTC; Global Security.

(i)      The Company or its Transfer Agent shall keep (A) a register (the "Stock Register") for the purpose of registering the Company Common Stock and permitted Transfers thereof.  The Stock Register shall initially show one position for Cede & Co. representing all of the shares of Company Common Stock held by DTC on behalf of the Beneficial Owners of Securities Entitlements holding through their respective DTC Participants. The Transfer Agent shall have no responsibility whatsoever directly to the Beneficial Owners of Securities Entitlements holding through their respective DTC Participants with respect to transfers of the Company Common Stock.  Any Beneficial Owners of Securities Entitlements holding through their respective DTC Participants may move their holdings of Company Common Stock directly to the Stock Register only through the procedures established by the DTC.

(ii)      No ~~Transfer of any Company Common Stock shall be binding on the non-Transferring Owners or the Company unless (i) the~~ Transferee shall be entitled to the benefits and rights as a Holder, Direct Owner, Beneficial Owner or otherwise under this Agreement unless such Transferee shall have delivered to the Company an executed and acknowledged Joinder, unless such Transferee is already a party hereto. The direct Transferee (i.e., a Transferee that holds the Company Common Stock registered on the Stock Register and not simply a Beneficial Interest in the Company Common Stock registered in the name of Cede & Co.) of the Company Common Stock Transferred shall be bound by this Agreement as a Direct Owner. Any indirect transferee (i.e., a Transferee that holds a Beneficial Interest in the Company Common Stock registered in the name of Cede & Co.) of Company Common Stock in accordance with this Section 4 shall be bound by this Agreement as a Beneficial Owner. Following such a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa), the Transfer Agent shall amend the Stock Register ~~or Beneficial Owner Register, as applicable,~~ to reflect the change in Direct Owners ~~or to reflect new Beneficial Owners (or, if applicable, any valid Transfer of Ownership Interests between Beneficial Owners)~~, and the Company shall take any other appropriate action in connection therewith ~~To the fullest extent permitted by applicable law, any Transfer in which the Transferee is required to but does not so deliver a Joinder shall be *void ab initio*~~.  Any Transferee will have no rights under this Agreement until it has delivered an executed Joinder to the Company or the Transfer Agent.  A Transferor that is party to this Agreement shall not be relieved of any liability for a breach of the Transfer provisions hereunder.

(iii)      The Company will enter into the Depository Agreement pursuant to which DTC will act as a securities depository for the Company Common Stock. The Company Common Stock deposited with DTC will be represented by a Global Security (which may be a book-entry security or consist of one or more certificates as required by DTC), which will be registered in the name of Cede & Co., as nominee for DTC or as DTC shall otherwise direct, and deposited with, or on behalf of, DTC. No other certificates evidencing such Company Common Stock will be issued. The Global Security shall be in the form attached hereto as Exhibit C-2 or described therein and shall represent such Company Common Stock as shall be specified therein, and may provide that it shall represent the aggregate amount of outstanding Company Common Stock from time to time endorsed thereon and that the aggregate amount of outstanding Company Common Stock represented thereby may from time to time be increased or decreased. As of the Effective Date, without the need for any action or consent of any Person, including the Company Common Stock, an initial Global Security shall be issued reflecting the number of shares of Company Common Stock to be issued to Cede & Co. as of

the Effective Date. Any Global Security shall be executed by an officer on behalf of the Company. Any endorsement of a Global Security to reflect the amount, or any increase or decrease in the amount, of outstanding Company Common Stock represented thereby shall be made in such manner and upon instructions given by the Company as specified in the Depository Agreement.

(iv)     The Company will use commercially reasonable efforts to notate its register and records reflecting transferTransfer of the Company Common Stock made in compliance with this Section 4 on the Stock Register within seven Business Days from receipt of the applicable Joinder or notice of trade, as applicable, and the relevant Holder transferring Company Common Stock in accordance with Section 4(a) hereby grants an irrevocable power of attorney to the Company to record such transfer of Company Common Stock on its behalf.

(c)     New Issuances. No shares of equity securities (including any shares of Company Common Stock) shall be issued to any Person who is not a party to this Agreement (including upon the exercise of any options, warrants (including the Warrants) or other shares of equity securities issued to any Director, officer or employee of the Company under any employee benefit plan) unless and until such Person shall have executed and delivered to the Company a Joinder.

(d)     Ownership Restriction Regarding Communications Laws. [Notwithstanding anything to the contrary in Section 4(a),

(i)     the Company may restrict the Beneficial Ownership, or proposed Beneficial Ownership, of Company Common Stock or other equity securities of the Company by any Person (other than any Holders ofholding 5% or more of the Company Common Stock as of the Effective Date with respect to their holdings on the Effective Date and the information disclosed by the Company to the FCC about such Holders prior to the Effective Date (the "Existing Holder Exception")) or the Transfer of shares of Company Common Stock or Beneficial Interests (or other equity securities) to any Person if the Beneficial Ownership or proposed Beneficial Ownership of Company Common Stock (or other equity securities) of (or the transfer of shares of Company Common Stock or other equity securities to) of such Person is or would be, as determined by the Board in good faith upon the reasonable advice of outside counsel, in violation of any provision of the Communications Laws.

(ii)     if the Company believes in good faith, based upon the reasonable advice of outside counsel, that the Beneficial Ownership or proposed Beneficial Ownership of shares of Company Common Stock or other equity securities of the Company by any Person (other than with respect to the Existing Holder Exception) may result in a violation of the Communications Laws, the Company may at any time request information from Holders, other equity securities holders, transfereesTransferees or proposed transfereesTransferees, including without limitation information on citizenship, affiliations, and ownership or other interests in other companies or enterprises, and such Person shall furnish promptly to the Company such information; provided that the Company shall execute, upon the written request of such Person, a nondisclosure agreement in a form reasonably acceptable to such Person and the Company with respect to any such information so requested and provided.

(iii)     if (x) the Company does not receive the relevant information requested pursuant to Section 4(d)(ii) or (y) the Company determines, in good faith upon the reasonable advice of outside counsel, that the Beneficial Ownership or proposed Beneficial Ownership of shares of Company Common Stock or other equity securities by a Person (other than with respect to the Existing Holder Exception) or that the exercise of any rights of Company

-19-

Common Stock or other equity securities by a Person (other than with respect to the Existing Holder Exception), results or would result, as determined by the Company, in a Communications Law violation, the Company has the absolute right to (A) refuse to issue shares of Company Common Stock or other equity securities to such Person, (B) refuse to permit or recognize a Transfer (or attempted Transfer) of shares of Company Common Stock, Beneficial Interests or other equity securities to such Person and any such Transfer or attempted Transfer shall not be notated in the books and records of the Company (including the register of Company Common Stock Register), (C) suspend any rights attached to such shares of Company Common Stock, Beneficial Interests or equity securities (including without limitation the right to attend and vote at shareholder meetings and the right, if any, to receive dividends or other distributions) and which causes or would cause such Communications Law violation, or (D) compulsorily redeem the shares of Company Common Stock or other equity securities of the Company heldBeneficially Owned by such Person. The Company shall in addition have the right to exercise any and all appropriate remedies, at law or in equity in any court of competent jurisdiction, against any such Person, with a view towards obtaining such information or preventing or curing any situation which causes or would cause a Communications Law violation. Any measure taken by the Company pursuant to (A), (B) or (C), respectively, shall remain in effect until the requested information has been received and/or the Company has determined that the Beneficial Ownership, proposed Beneficial Ownership or Transfer of shares of Company Common Stock or Beneficial Interests or other equity securities by (or to) the relevant Person or that the exercise of any rights of shares of Company Common Stock, Beneficial Interests or other equity securities by such Person as the case may be, will not result in a Communications Law violation.

(iv)     [in case of a compulsory redemption],

(A)     the Company shall serve a notice (a "Redemption Notice") upon the relevant Holder(s), specifying (1) the shares of Company Common Stock or other equity securities of the Company to be redeemed, and (2) the Redemption Price for such shares of Company Common Stock or other equity securities of the Company. Immediately after the close of business on the date specified in the Redemption Notice, (i) each such Holder shall cease to be the holder of the shares of Company Common Stock or other equity securities of the Company specified in such notice, (ii) the compulsory redemption of Company Common Stock in accordance with Section 4(d) shall be recorded in the register of Company Common Stock Register by the Company, as transferee, and the relevant Holder(s), as transferor(s) and the relevant Holder(s) hereby grant(s) for such purpose an irrevocable power of attorney to the Company to record the compulsory redemption of Company Common Stock on its(their) behalf and (iii) as the case may be, such Holder's name shall be removed from the schedule of Holders. on the Stock Register;

(B)     the price at which the shares of Company Common Stock or other equity securities of the Company specified in any Redemption Notice shall be redeemed (the "Redemption Price") shall be an amount equal to 98% of the Fair Market Value. minus any and all costs and expenses incurred by the Company in connection with the redemption as determined by the Board.  Any Redemption under this Section 4(d) is strictly limited to, and each Holder waives to the fullest extent possible any right to request any such Redemption if not falling under, at the discretion of the Board, the scope of this Section 4(d);

(C)     payment of the Redemption Price shall be made directly to the Holder. Upon payment of the Redemption Price, no Person interested in the shares of

-20-

Company Common Stock or other equity securities of the Company specified in such Redemption Notice shall have any further interest in such shares of Company Common Stock or other equity securities of the Company or any of them, or any claim against the Company or its assets in respect thereof, ~~except in the case of a deposit of the Redemption Price as aforesaid, the right to receive the Redemption Price so deposited (without interest).~~.

(D)     the exercise by the Company of the powers conferred by this Section 4(d) shall not be questioned or invalidated in any case, on the ground that there was insufficient evidence of ownership of shares of Company Common Stock or other equity securities of the Company by any Person or that the true ownership of any ~~the~~ shares of Company Common Stock or other equity securities of the Company was otherwise than appeared to the Company at the date of any Redemption Notice~~.~~; and

(E)     ~~Each~~each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings) to the extent necessary to effect a compulsory redemption of Company Common Stock purported to be made by the Company in accordance with Section 4(d), the Articles and applicable law.]

(e)     Anti-Takeover Restrictions. Notwithstanding anything to the contrary in Section 4(a), no Holder (including Affiliates or other Persons acting in coordination together) (an "Acquiring Shareholder") may acquire (whether through acquisition, issuance, merger or otherwise) shares of Company Common Stock or Beneficial Interests that would result in such Acquiring Shareholder holding more than 45% of the outstanding shares of Company Common Stock unless either:

(i)     [such acquisition is the result of a Drag-along Sale conducted pursuant to Section 6(a) and approved by the affirmative vote of no less than two-thirds (66-$^2/_3$%) of the disinterested members of the Board (i.e., excluding any Director who is (A) a Representative of, or (B) a Representative Director of, the Acquiring Shareholder)]; or

(ii)     each of the following conditions is satisfied:

(A)     the Acquiring Shareholder offers to purchase all other outstanding shares of Company Common Stock on the same terms;

(B)     the Acquiring Shareholder's offer to the holders of all other outstanding shares of Company Common Stock is approved by the affirmative vote of a majority of the disinterested members of the Board (i.e., excluding any Director who is (A) a Representative of, or (B) a Representative Director of, the Acquiring Shareholder); and

(C)     the Acquiring Shareholder's offer to the holders of all other outstanding shares of Company Common Stock is approved by Persons holding a majority of all outstanding shares of Company Common Stock (excluding all shares held by the Acquiring Shareholder).

**5.**      **Major Consent Matters and Supermajority Board Matters**.

(a)      **Major Consent Matters**. The Company agrees not to engage in, and to cause its applicable Subsidiaries not to engage in, any of the following matters (the "Major Consent Matters") without the approval of at least (i)(A) 66-$^2$/$_3$% (e.g., five of seven) of the Directors and (B) Holders holding 55% of the then-outstanding shares of Company Common Stock or (ii) 85% (e.g., six of seven) of the Directors ("Major Consent Approval"):

(i)      initiating, by application of the Company, or any decision or action of the shareholder(s), any voluntary dissolution, winding up or liquidation in relation to the Company or Intelsat Jackson Holdings S.A.;

(ii)      any sale of the Company (including any change in control of the majority of voting interests in the Company, other than any transfer by the Holders in compliance with Section 6(b) to the extent that neither the Company nor any of its Subsidiaries is involved in such transaction in a capacity other than implementing the transfer of equity securities in connection therewith and other actions ancillary thereto) or all or substantially all of its assets;

(iii)      conversion of the Company to another form of entity (other than in connection with ~~an initial public offering~~a Listing);

(iv)      any redemption or repurchase of equity securities other than (x) pursuant to a pro rata offer to all holders of such class of equity securities, (y) of equity securities owned by employees of the Company in connection with termination of employment or (z) a compulsory redemption for Communications Laws reasons under Section 4(d) of this Agreement;

(v)      any election of the Company or any of its Subsidiaries to be taxed in a different manner or classified differently for tax purposes (including any change to the jurisdiction of organization or means of qualification for tax treaty benefits of the Company or any of its Subsidiaries);

(vi)      any amendment to the Articles, including, without limitation, any amendment to the Articles that would create additional authorized share capital, *provided, however*, that 20% of the Company Common Stock (in addition to Company Common Stock reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants) shall be authorized but unissued on the Effective Date and issuable pursuant to a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent true-up offering as set forth in Section 7(c)); provided, further, that Major Consent Approval will not be required for amendments to the Articles in connection with (x) issuances of Company Common Stock permitted by the foregoing proviso, (y) issuances of Company Common Stock reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants, and (z) a change of address in Luxembourg;

(vii)      any suppression of statutory pre-emption rights (whether under Luxembourg Law or other applicable law), *provided, however*, that the Company may issue up to 20% of the Company Common Stock (in addition to Company Common Stock reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants) without honoring Holders' preemptive rights if the Board determines (in compliance with Section 5(b)(ii)) that such shares must be issued before the Company could comply with such preemptive rights (such issuance, the "Non-Conforming Issuance"), *provided, further,* that upon any Non-

Conforming Issuance, the Company shall make a subsequent true-up offering as set forth in Section 7(c);

(viii)   the issuance of equity securities, options or other rights to acquire such equity securities, or convertible/exchangeable indebtedness, of the Company or any of its Subsidiaries, other than a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent true-up offering as set forth in Section 7(c)) or the issuance of Company Common Stock reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants;

(ix)   any change in the size, voting or composition of the Board; *provided* that such change shall not (a) reduce the size of the Board to less than seven Directors, (b) modify the consent or quorum rights of any Directors provided for in this Agreement, or (c) modify the voting thresholds set forth in this Agreement; and

(x)   any Major Consent Amendment.

(b)   **Supermajority Board Matters**. The Company agrees not to engage in, and to cause its applicable Subsidiaries not to engage in, any of the following matters (the "Supermajority Board Matters") without the affirmative vote of at least 66-$^2$/$_3$% (e.g., five of seven) of the Directors ("Supermajority Board Approval"):

(i)   initiating, by application of the Company, or any decision or action of the shareholder(s), any voluntary bankruptcy proceedings, receivership or any other insolvency or restructuring proceedings in Luxembourg or any other jurisdiction in relation to Company or Intelsat Jackson Holdings S.A.;

(ii)   any Non-Conforming Issuance;

(iii)   any type of dividend or distribution on or repurchase or redemption of equity securities of the Company or any of its Subsidiaries, other than (A) dividends and distributions from a wholly-owned Subsidiary of the Company to the Company or another wholly-owned Subsidiary thereof (B) redemptions of equity securities of the Company owned by employees of the Company in connection with the termination of employment; *provided that* in any event no non-pro rata dividends shall be permitted (other than in connection with redemptions for any aggregator vehicle related to the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company) and (C) compulsory redemptions for Communications Laws reasons under Section 4(d) of this Agreement;

(iv)   any amendment to this Agreement, the Registration Rights Agreement, CVR Agreements, the Management Incentive Plan and the New Warrant Agreements, to the extent not a Major Consent Amendment;

(v)   any consummation of ~~an initial public offering~~a listing of securities of the Company on any national securities exchange, including a Listing;

(vi)   any incurrence of material debt, including any guarantees, incurrence or prepayment thereof by the Company or any of its Subsidiaries (other than drawdown of revolving debt previously approved and trade debt incurred in the ordinary course of business);

(vii)   any hiring or firing of executive officers of the Company or any of its Subsidiaries;

(viii)   any commencement or settlement of any litigation or dispute with an expected value of more than $50 million;

(ix)   any change in auditor or change in significant tax or accounting policy other than as required by United States generally accepted accounting principles, as in effect at the applicable time, consistently applied;

(x)   any acquisition or disposition of assets or liabilities, or merger, consolidation, share exchange, business combination, joint venture or similar transaction involving the Company or any of its Subsidiaries outside the ordinary course of business, in a transaction that involves consideration (including assumed debt) or investments in excess of 10% of the consolidated total assets of the Company and its Subsidiaries, to the extent not a Major Consent Matter;

(xi)   any material transaction of the Company or any of its Subsidiaries involving spectrum rights (including transferring the use of spectrum rights or receiving proceeds from spectrum clearances) outside the ordinary course of business;

(xii)   any adoption, approval or revision of any equity incentive plan;

(xiii)   any entry into a new line of business or termination of any material existing line of business, or any other material change in the nature or scope of the business of the Company and its Subsidiaries;

(xiv)   any approval of an annual budget of the Company and its Subsidiaries, *provided*, *that* to the extent that a budget has not been approved by year-end, until a new budget is approved, the Company will be permitted to operate on the prior year's budget with a variance of up to 10% on a consolidated basis (which shall include a variance of no more than 10% on line items for capital expenditures and operating expenses); and

(xv)   any capital expenditure by the Company or any of its Subsidiaries in excess of $500 million in the aggregate during any 12-month period.

(c)   **Required Shareholder Approvals Under Luxembourg Law**. To the extent Luxembourg Law requires any shareholder approvals in addition to the Major Consent Approval or Supermajority Board Approval in order to take any Major Consent Matter or Supermajority Board Matter, as applicable, each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting) to approve such Major Consent Matter or Supermajority Board Matter following such Supermajority Board Approval or Major Consent Approval, as applicable. The Company shall take all necessary or desirable actions within its control (including calling special shareholder meetings) to facilitate the foregoing. Each Holder hereby irrevocably and unconditionally undertakes to, and grants an irrevocable proxy to any Director in office when the Holder's vote is to be cast to, on its behalf, vote its shares in favor of any such Major Consent Matter or Supermajority Board Matter, as applicable, pursuant to this Section 5(c). For the avoidance of doubt, unless expressly set forth herein as a Major Consent Approval Matter or Supermajority Board Matter, nothing herein shall limit the rights of the shareholders of the Company to approve extraordinary shareholder resolutions under Luxembourg Law.

-24-

**6.** **Tag-along and Drag-along Rights.**

(a) Drag-along Rights.

(i) Subject to Section 4(e), if at any time a Holder or group of Holders who hold in the aggregate more than 50% of the then-outstanding shares of Company Common Stock (a "Dragging Shareholder"), proposes to transfer at least 75% of the then outstanding shares of Company Common Stock (other than to an Affiliate of such Dragging Shareholder or in connection with an initial public offering of the Company), or to otherwise effect a sale of the Company, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets, or otherwise, in each case to an unaffiliated bona fide third party purchaser (a "Drag-along Sale"), the Dragging Shareholder shall have the right to require that each other Holder (each, a "Drag-along Shareholder") participate in such transaction in the manner set forth in this Section 6(a) on a pro rata basis (except that, at the election of the Dragging Shareholder, a Drag-along Shareholder may be required to (A) include all of its equity in such Drag-along Sale if such Drag-along Shareholder, together with its Affiliates, holds less than 1% of the Company's then-outstanding Company Common Stock or (B) if such Drag-along Shareholder is an employee of the Company or any of its Subsidiaries, rollover its Company Common Stock or other equity securities in customary amounts) if, and only if, (x) the Major Consent Approval has been obtained and (y) at least 75% of the consideration for the Drag-Along Sale is paid in cash and/or publicly traded securities in the manner set forth in this Section 6(a). Notwithstanding anything to the contrary in this Agreement, each Drag-along Shareholder shall (A) consent to, vote in favor of, raise no objection to and waive and refrain from exercising any appraisal or dissenter's rights claim or any claim of fiduciary breach (but not any claim that such Drag-along Sale is not being effected in accordance with the terms set forth in this Agreement) and (B) obtain any required consents and take any and all reasonably necessary action in furtherance of the Drag-along Sale as requested by and at the Company's expense.

(ii) The Dragging Shareholder shall exercise its rights pursuant to this Section 6(a) by delivering a written notice (the "Drag-along Notice") to the Company (A) no later than 20 days prior to the closing date of such Drag-along Sale. The Company will promptly deliver a copy of the Drag-along Notice to each Drag-along Shareholder. The Drag-along Notice shall make reference to the Dragging Shareholder's rights and obligations hereunder and shall describe in reasonable detail: (A) the number of shares of Company Common Stock to be sold by the Dragging Shareholder, if the Drag-along Sale is structured as a transfer of Company Common Stock; (B) the identity of the third party purchaser; (C) the proposed date, time and location of the closing of the Drag-along Sale; (D) the per share purchase price and the other material terms and conditions of the transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

(iii) The consideration to be received by a Drag-along Shareholder shall be the same form and amount of consideration per share of Company Common Stock to be received by the Dragging Shareholder (or, if the Dragging Shareholder is given an option as to the form and amount of consideration to be received, the same option shall be given) and the terms and conditions of such transfer shall, except as otherwise provided in the immediately succeeding sentence, be the same as those upon which the Dragging Shareholder transfers its Company Common Stock. Any (A) representations and warranties to be made or provided by a Drag-along Shareholder in connection with such Drag-along Sale shall be limited to representations and warranties related to such Drag-along Shareholder's authority, ownership and the ability to convey title to its Company Common Stock, and with respect thereto, shall be

-25-

the same representations and warranties that the Dragging Shareholder makes or provides with respect to its Company Common Stock, (B) Drag-along Shareholder will not be required to agree to any non-competition or similar restrictions in connection with such Drag-along Sale, and (C) covenants, indemnities and agreements made by the Drag-along Shareholders shall be the same covenants, indemnities and agreements as the Dragging Shareholder makes or provides in connection with the Drag-along Sale, except that with respect to covenants, indemnities and agreements pertaining specifically to the Dragging Shareholder, the Drag-along Shareholder shall make the comparable covenants, indemnities and agreements pertaining specifically to itself; *provided that* any indemnification obligation relating to the Company shall be (i) several and not joint and (ii) pro rata based on the consideration received by the Dragging Shareholder and each Drag-along Shareholder*; provided, further*, that in no event shall any indemnification obligation of a Drag-along Shareholder exceed the aggregate proceeds received by such Drag-along Shareholder in connection with the Drag-along Sale.

(iv)     The fees and expenses of the Dragging Shareholder incurred in connection with a Drag-along Sale and for the benefit of all Holders as determined in good faith by the Board, excluding any Director appointed or nominated by any Dragging Shareholder or its Affiliates (it being understood that costs incurred by or on behalf of a Dragging Shareholder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Company or the third party purchaser, shall be shared by all the Holders on a pro rata basis, based on the aggregate consideration received by each Holder; *provided that* no Holder shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Drag-along Sale.

(v)     Each Holder and the Company shall take all actions as may be reasonably necessary to consummate the Drag-along Sale, including entering into agreements, signing or making available the register of Company Common Stock and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Dragging Shareholder, subject to the terms and provisions of this Section 6(a)[; *provided that*, such Holder shall not be entitled to any consideration from the Drag-along Sale until such Holder has taken all such actions] reasonably requested by the Company or the Dragging Shareholder in writing. Notwithstanding anything to the contrary contained in this Section 6(a), management of the Company shall not be required to agree to any non-compete, non-solicit or similar restrictive covenants in connection with a Drag-along Sale that are more restrictive in any manner than those (in scope, duration or otherwise) to which management is then subject.

(vi)     The Dragging Shareholder shall have 120 days following the date of the Drag-along Notice in which to consummate the Drag-along Sale, on the terms set forth in the Drag-along Notice (which such 120 day period may be extended for a reasonable time not to exceed 180 days to the extent reasonably necessary to obtain any government approvals). If at the end of such period, the Dragging Shareholder has not completed the Drag-along Sale, the Dragging Shareholder may not then effect a transaction subject to this Section 6(a) without again fully complying with the provisions of this Section 6(a).

(b)     Tag-along Rights.

(i)     If at any time a Holder or group of Holders (the "Selling Shareholder") proposes to transfer (other than to an Affiliate, as a Drag-along Shareholder pursuant to a Drag-Along Sale, or pursuant to its registration rights as set forth in the Registration Rights Agreement) at least 25% of the then-outstanding shares of Company Common Stock in any single transaction or series of related transactions to a purchaser (the "Proposed Transferee")

and the Selling Shareholder cannot or has not elected to exercise its drag-along rights set forth in Section 6(a), each other Holder (each, a "Tag-along Shareholder") shall be permitted to participate in such transfer (a "Tag-along Sale") on the terms and conditions set forth in this Section 6(b).

(ii)     Prior to the consummation of any such transfer of Company Common Stock described in Section 6(b)(i), the Selling Shareholder shall deliver to the Company and each other Holder a written notice (a "Sale Notice") of the proposed Tag-along Sale subject to this Section 6(b) no later than 20 days prior to the closing date of the Tag-along Sale. The Sale Notice shall make reference to the Tag-along Shareholders' rights hereunder and shall describe in reasonable detail: (A) the aggregate number of shares of Company Common Stock the Proposed Transferee has offered to purchase; (B) the identity of the Proposed Transferee; (C) the proposed date, time and location of the closing of the Tag-along Sale; (D) the per share purchase price and the other material terms and conditions of the transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

(iii)     Each Tag-along Shareholder may exercise its right to participate in a transfer of Company Common Stock by the Selling Shareholder subject to this Section 6(b) by delivering to the Selling Shareholder a written notice (a "Tag-along Notice") stating its election to do so and specifying the number of shares of Company Common Stock to be transferred by it no later than ten days after receipt of the Sale Notice (the "Tag-along Period"). Each Tag-along Shareholder that timely delivers a Tag-along Notice (a "Tag-along Seller") shall have the right to transfer in a transfer subject to this Section 6(b) up to the number of shares of Company Common Stock equal to the product of (x) the aggregate number of shares of Company Common Stock owned by the Tag-along Seller and (y) a fraction (A) the numerator of which is equal to the number of shares of Company Common Stock proposed to be sold by the Selling Shareholder in the Tag-along Sale, and (B) the denominator of which is equal to the number of shares of Company Common Stock owned by the Selling Shareholder. The Selling Shareholder shall attempt to have the Proposed Transferee in such Tag-along Sale agree to purchase all of the shares of Company Common Stock proposed to be sold in the Tag-along Sale; provided that, if such Proposed Transferee does not agree to purchase all of the shares of Company Common Stock proposed to be sold in the Tag-along Sale, the number of shares of Company Common Stock to be sold in such Tag-along Sale shall be reduced pro rata.

(iv)     Each Tag-along Shareholder who does not deliver a Tag-along Notice in compliance with Section 6(b)(iii) above shall be deemed to have waived all of such Tag-along Shareholder's rights to participate in such transfer, and the Selling Shareholder shall (subject to the rights of any Tag-along Seller) thereafter be free to transfer to the Proposed Transferee its shares of Company Common Stock at a per share price that is no greater than the per share price set forth in the Sale Notice and on other same terms and conditions which are not materially more favorable to the Selling Shareholder than those set forth in the Sale Notice without any further obligation to the non-accepting Tag-along Shareholders.

(v)     Each Tag-along Seller shall receive the same consideration per share as the Selling Shareholder after deduction of such Tag-along Seller's proportionate share of the related expenses in accordance with Section 6(b)(vii) below.

(vi)     Each Tag-along Seller shall make or provide the same representations, warranties, covenants, indemnities and agreements as the Selling Shareholder makes or provides in connection with the Tag-along Sale (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Selling

-27-

Shareholder, the Tag-along Seller shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to itself); *provided that* all representations, warranties, and covenants shall be made by the Selling Shareholder and each Tag-along Seller severally and not jointly and any indemnification obligation of the Selling Shareholder and each Tag-along Seller shall be (i) several and not joint, and (ii) pro rata based on the consideration received by the Selling Shareholder and all of the Tag-along Sellers; provided, further, that in no event shall any indemnification obligation of the Selling Shareholder or a Tag-along Seller exceed the aggregate proceeds received by such Selling Shareholder or Tag-along Seller in connection with the Tag-along Sale.

(vii)    The fees and expenses of the Selling Shareholder incurred in connection with a Tag-along Sale and for the benefit of all Holders as determined in good faith by the Board, excluding any Director appointed or nominated by any Selling Shareholder or its Affiliates (it being understood that costs incurred by or on behalf of the Selling Shareholder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Company or the Proposed Transferee, shall be shared by all Tag-along Sellers participating in the Tag-along Sale on a pro rata basis, based on the aggregate consideration received by each such Tag-along Seller; *provided, that* no Tag-along Seller shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Tag-along Sale.

(viii)    Each Tag-along Seller shall take all actions as may be reasonably necessary to consummate the Tag-along Sale, including entering into agreements, executing the register of Company Common Stock and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Selling Shareholder.

(ix)    The Selling Shareholder shall have 120 days following the expiration of the Tag-along Period in which to transfer the shares of Common Stock described in the Sale Notice and the shares to be sold by the Tag-along Sellers, on the terms set forth in the Sale Notice (which such 120 day period may be extended for a reasonable time not to exceed 180 days to the extent reasonably necessary to obtain any government approvals). If at the end of such 120 day period, the Selling Shareholder has not completed such transfer, the Selling Shareholder may not then effect a transfer of Company Common Stock subject to this Section 6(b) without again fully complying with the provisions of this Section 6(b).

(x)    If the Selling Shareholder transfers to the Proposed Transferee any of its shares of Company Common Stock in breach of this Section 6(b), then each Tag-along Shareholder shall have the right to transfer to the Selling Shareholder, and the Selling Shareholder undertakes to purchase from each Tag-along Shareholder, the number of shares of Company Common Stock that such Tag-along Shareholder would have had the right to transfer to the Proposed Transferee pursuant to this Section 6(b), for a per share amount and form of consideration and upon the terms and conditions on which the Proposed Transferee bought such Company Common Stock from the Selling Shareholder (subject to the restrictions in such terms and conditions set forth in this Section 6(b)), but without indemnity being granted by any Tag-along Shareholder to the Selling Shareholder; *provided, that*, nothing contained in this Section 6(b) shall preclude any Holder from seeking alternative remedies against such Selling Shareholder as a result of its breach of this Section 6(b).

-28-

**7.      Future Issuance of Shares; Preemptive Rights.**

(a)      Offering Notice. In addition to any statutory pre-emptive rights under Luxembourg Law, except for (i) options to subscribe for or purchase Company Common Stock or restricted stock which may be issued pursuant to the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company, (ii) a stock split, stock dividend, reorganization or recapitalization applicable to all shares of Company Common Stock, (iii) equity securities of the Company issued upon exercise, conversion or exchange of any security or obligation, including the Warrants, which is by its terms convertible into or exchangeable or exercisable for shares of Company Common Stock (such security or obligation, a "Company Common Stock Equivalent"), either (x) previously issued or (y) issued in accordance with the terms of this Agreement and the Articles, and in each case so long as such exercise, conversion or exchange occurs in accordance with the terms of such security, (iv) equity securities of the Company issued in consideration of an acquisition, business combination, debt financing (whether pursuant to a stock purchase, asset purchase, merger or otherwise), strategic partnership or joint venture by the Company of another Person, approved by the Board (subject to Section 5), and, if applicable, the Holders, in accordance with the terms of this Agreement and the Articles, (v) equity securities issued in an initial public offering and (vi) equity securities issued by any Subsidiary of the Company to the Company or to any other wholly owned Subsidiary of the Company, if any, if the Company or any of its Subsidiaries wishes to issue to any Person any equity securities or to any Holder or its Affiliates any debt securities of the Company or such Subsidiary (such securities, collectively, "New Securities", and such recipients, collectively, the "Subject Purchaser"), then the Company shall (or shall cause its applicable Subsidiary to) offer such New Securities to each of the Holders (other than Holders who receive Company Common Stock or Company Common Stock Equivalents under the Management Incentive Plan, or any other equity plan, incentive plan or similar arrangement of the Company, and Holders of the Warrants to the extent they are unexercised) (each, a "Preemptive Rightholder", and collectively, the "Preemptive Rightholders") by sending written notice (the "New Issuance Notice") to the Preemptive Rightholders at least 15 Business Days prior to such issuance of New Securities, which New Issuance Notice shall state, in reasonable detail, the material terms and conditions of such issuance, including (x) the number of New Securities proposed to be issued and (y) the proposed issue price per security of the New Securities (the "Proposed Price"). Upon delivery of the New Issuance Notice, such offer shall be irrevocable unless and until the rights provided for in Section 7(b) shall have been waived or shall have expired. [For the avoidance of doubt, preemptive rights set forth in this Section 7 shall not be construed as a limitation on any statutory pre-emptive rights, including pursuant to Luxembourg Law.]

(b)      Exercise.

(i)      For a period of ten Business Days after the giving of the New Issuance Notice pursuant to Section 7(a), each of the Preemptive Rightholders shall have the right, but not the obligation, to subscribe for its Proportionate Percentage of the New Securities, at an issue price equal to the Proposed Price and upon the same terms and conditions set forth in the New Issuance Notice. Each such Preemptive Rightholder shall have the right to subscribe for that percentage of the New Securities determined by dividing (x) the total number of shares of Company Common Stock then held by such Preemptive Rightholder exercising its rights under this Section 7(b) by (y) the total number of shares of Company Common Stock held by all of the Preemptive Rightholders exercising their rights under this Section 7(b) (the "Proportionate Percentage"). If any Preemptive Rightholder does not fully subscribe for the number or amount of New Securities that it is entitled to subscribe for pursuant to the preceding sentence, then each Preemptive Rightholder which elected to purchase New Securities shall have the right to

subscribe for that percentage of the remaining New Securities not so subscribed for (for the purposes of this Section 7(b)(i), the "Excess New Securities") determined by dividing (x) the total number of shares of Company Common Stock then held by such fully participating Preemptive Rightholder by (y) the total number of shares of Company Common Stock then held by all fully participating Preemptive Rightholders who elected to purchase Excess New Securities.

(ii)     The right of each Preemptive Rightholder to subscribe for the New Securities under subsection (a) above shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the ten Business Day period referred to in Section 7(b)(i) to the Company or its applicable Subsidiary, which notice shall state the amount of New Securities that such Preemptive Rightholder elects to purchase pursuant to Section 7(b)(i). The failure of a Preemptive Rightholder to respond within such ten Business Day period shall be deemed to be a waiver of such Preemptive Rightholder's rights under Section 7(b)(i), *provided* that each Preemptive Rightholder may waive its rights under Section 7(b)(i) prior to the expiration of such ten Business Day period by giving written notice to the Company.

(c)     Non-Conforming Issuance. Notwithstanding the requirements of Section 7(a), the Company may proceed with a Non-Conforming Issuance; *provided*, that the Company shall:

(i)     within 30 days following such Non-Conforming Issuance, offer, in writing, to issue to each Preemptive Rightholder its Proportionate Percentage of the New Securities, at the same price and on the same terms and conditions with respect to such New Securities as the proposed transferees received in such Non-Conforming Issuance; and

(ii)     keep such offer open for a period of no less than ten Business Days, during which period, each Preemptive Rightholder may accept such offer by sending a written notice of exercise to the Company committing to subscribe for in accordance with the procedures set forth in Section 7(b), an amount of such New Securities (not to exceed the amount specified in the offer made pursuant to Section 7(c)(i));

*provided, further*, that (A) for all purposes under this Agreement but subject to applicable law, any issuance of New Securities to a Preemptive Rightholder pursuant to this Section 7(c) shall be deemed to have occurred on the date of the consummation of such Non-Conforming Issuance and (B) during the period commencing on the consummation of such Non-Conforming Issuance and ending on the earlier of (x) the consummation of the issuance of New Securities to a Preemptive Rightholder pursuant to this Section 7(c) and (y) the expiration of the ten Business Day period specified in clause (ii) above, the New Securities issued pursuant to this Section 7(c) shall not be taken into account in calculating the Proportionate Percentage of any Holder for any purposes under this Agreement.

(d)     Closing. The closing of the subscription for New Securities subscribed for by the Preemptive Rightholders under (i) Section 7(b) shall be held before a ~~Luxemborg~~Luxembourg notary [(solely to the extent required by Luxembourg Law]) (A) on or between 15 and 30 Business Days after the giving of the New Issuance Notice pursuant to Section 7(a), if the Preemptive Rightholders elect to subscribe for all of the New Securities under Section 7(b), or (B) the date of the closing of the sale to the Subject Purchaser made pursuant to Section 7(a) if the Preemptive Rightholders elect to subscribe for some, but not all, of the New Securities under Section 7(b), (ii) Section 7(c) shall be held before a Luxembourg notary (solely to the extent required by Luxembourg Law) between 15 and 30 Business Days after the date of the offer specified under Section 7(c)(i), or (iii) in relation to both (i) and (ii), at such other time as the parties to the transaction may reasonably agree. At such closing, the Company shall (or

-30-

shall cause its applicable Subsidiary to) record the subscription of New Securities by the relevant Preemptive Rightholders in its register of Company Common Stock and each relevant Preemptive Rightholder hereby grants irrevocable proxy to the Company to sign such register of Company Common Stock on its behalf, deliver certificates (to the extent that the Company or its applicable Subsidiary has certificated shares) representing the New Securities to the participating Preemptive Rightholders, and such New Securities shall be issued free and clear of all liens (other than those arising hereunder or pursuant to applicable law and those attributable to actions by the purchasers thereof) and the Company shall (or shall cause its applicable Subsidiary to) so represent and warrant, and further represent and warrant that such New Securities shall be, upon issuance thereof to the Preemptive Rightholders and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. Each Preemptive Rightholder subscribing for the New Securities shall deliver immediately prior to closing payment against delivery in full in immediately available funds for the New Securities subscribed for by him, her or it. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary to effectuate the closing. Notwithstanding the foregoing, if the closing of a sale or issuance of New Securities is not consummated within a six-month period (plus such number of additional days (if any) necessary to allow the expiration or termination of all waiting periods under antitrust laws applicable to such sale) after the date upon which the New Issuance Notice is delivered or if the principal terms of such sale or issuance change such that the terms are, in the aggregate, less favorable in any material respect to the Preemptive Rightholders than those in the New Issuance Notice, then the restrictions provided for herein shall again become effective, and no issuance or sale of New Securities may be made thereafter by the Company or its applicable Subsidiary without again offering the same to the Preemptive Rightholders or issuers in accordance with this Section 7. Notwithstanding any other provision of this Section 7, there shall be no liability on the part of the Company, any of its Subsidiaries or any Holder to any Preemptive Rightholder arising from the failure of the Company or its applicable Subsidiary to consummate the sale of New Securities to the Subject Purchaser for any reason (provided, that the foregoing shall not prohibit any Preemptive Rightholder from raising or pursuing any claim that a purported issuance of New Securities does not comply with this Section 7 or this Agreement).

(e)     Holders' Undertakings.

(i)     [To the extent that the Holders or, as applicable, the holders of equity securities in a Subsidiary of the Company, would benefit from preemptive rights as a matter of applicable law with respect to the operations listed in items (i) to (vi) in Section 7(a), each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), the Company shall take all necessary and desirable actions within its control (including calling special board or stockholder meetings or vote its equity securities in the relevant Subsidiary) in order to effect any such operations in such terms determined by the Board in accordance with this Agreement.]

(ii)     Each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), and the Company shall take all necessary or desirable actions

-31-

within its control (including calling special board and shareholder meetings) in order to effect to any issuance proposed to be made by the Board to the relevant Preemptive Rightholders in accordance with Sections 7(c)(i) and 7(c)(ii).

8.   **Miscellaneous.**

(a)   Calculations. For purposes of determining satisfaction of any Holder thresholds in this Agreement, the Company Common Stock held by any Holder shall be (a) calculated without giving effect to any management incentive dilution, including from the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company (whether as a result of actually issued and outstanding shares of Company Common Stock or contingent instruments (e.g., options)) or dilution from other future-issued securities, including under the Warrants, and (b) aggregated with shares of Company Common Stock held by its and its Affiliates' related funds, investment vehicles and managed accounts; *provided, however*, that if the Company makes a Non-Conforming Issuance, any determination made on or before the earlier of (x) the consummation of the issuance of New Securities to all subscribing Preemptive Rightholders pursuant to Section 7(c) and (y) the expiration of the applicable offer period specified in Section 7(c)(ii) shall exclude any shares issued in connection with such Non-Conforming Issuance (the "Dilution Principles").

(b)   Termination. The rights under Section 3(a), Section 4(a)(ii), Section 4(a)(iii), Section 4(a)(iv), Section 4(a)(v), Section 4(b)(ii), Section 4(b)(iv), Section 4(c), Section 4(e)), Section 6, and Section 7 shall terminate automatically upon the effectiveness of ~~an initial public offering~~a Listing of Company Common Stock.

(c)   Remedies. In the event of a breach by the Company or a Holder of any of its obligations under this Agreement, the Company or the Holder, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Parties agree that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate and shall waive any requirement for the posting of a bond. Each Party hereby irrevocably waives their rights to claim the benefit of the provisions of article 1142 of the Luxembourg Civil Code in case of breach of any of its obligations under this Agreement and acknowledges and agrees that the other Parties shall be entitled to the remedy of specific performance (*exécution forcée en nature*) of the defaulting Party's obligations thereunder in addition to any other recourse allowed by law. No failure or delay by any Person in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

(d)   Amendment; Modification; Waivers. This Agreement may not be amended, altered, changed, waived or repealed in any respect (including, for the avoidance of doubt, by amendment, merger, consolidation or otherwise) without Supermajority Board Approval, *provided* that no amendment may adversely affect a Holder relative to other Holders without such Holder's prior written consent. Notwithstanding the foregoing, any amendment, modification or supplement to, or waiver of, Section 2(f), Section 3(a), Section 4, Section 5(a), Section 6, Section 7, Section 8(~~s~~t) or the Registration Rights Agreement shall require Major Consent Approval in each case to the extent such amendment, modification or supplement is material and adverse to the Holders (other than the Initial First Threshold Holder) (a "Major

Consent Amendment"); *provided* that no amendment may adversely affect a Holder relative to other Holders without such Holder's prior written consent; *provided* further that any Holder may waive any of its rights under this Agreement, solely as to itself, without Supermajority Board Approval or Major Consent Approval. Any amendment or waiver must specifically reference this Agreement, specify the provision(s) hereof that it is intended to amend or waive and further specify that it is intended to amend or waive such provision(s).

(e)     Notices. All notices and other communications hereunder shall be in writing and shall be deemed duly given (i) upon delivery, if served by personal delivery upon the Person for whom it is intended, (ii) on the third Business Day after the date mailed if delivered by registered or certified mail, return receipt requested, postage prepaid, (iii) on the following Business Day if delivered by a nationally-recognized, overnight, air courier or (iv) when delivered or, if sent after the Close of Business, on the following Business Day if sent by facsimile transmission or email with electronic confirmation, in each case, to the address set forth on such Person's signature page hereto or to such other address as may be designated in writing, in the same manner, by such Person.

(f)     Governing Law; Forum. This Agreement and all disputes or controversies arising out of or relating to this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principles of conflicts of laws. Each of the Company and each Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware) (together with the appellate courts thereof, the "Chosen Courts"). In connection with any claim arising out of or related to this Agreement, each of the Company and each Holder hereby irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection that such Person may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the Company or the Holder, (iv) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with Section 8(e), although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (v) agrees not to seek a transfer of venue on the basis that another forum is more convenient. Notwithstanding anything herein to the contrary, (i) nothing in this Section 8(f) shall prohibit any party from seeking or obtaining orders for conservatory or interim relief from any court of competent jurisdiction and (ii) each of the Company and each Holder agrees that any judgment issued by a Chosen Court may be recognized, recorded, registered or enforced in any jurisdiction in the world and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction.

(g)     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, successors, legal representatives, permitted assigns and ~~Approved~~ Transferees. The Company shall cause any successor or assign (whether by merger, consolidation, sale of assets or otherwise) to assume the obligations of the Company under this Agreement or enter into a new agreement with the Holders on terms substantially the same as this Agreement as a condition of any such transaction.

(h)     Waiver of Trial by Jury. EACH OF THE COMPANY AND EACH HOLDER ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND

THEREFORE EACH SUCH PERSON HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH OF THE COMPANY AND EACH HOLDER CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) SUCH PERSON UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PERSON MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PERSON HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(i)     No Side Agreements. Each Holder represents that, as of the Effective Date, all agreements with respect to the governance of the Company are as set forth in this Agreement, the Articles, the Registration Rights Agreement, the Management Incentive Plan, the CVR Agreements and the New Warrant Agreements and no other agreements or understandings (whether oral or written) with respect to any such matters or the relationship (as it relates to the Company) between or among such Holder, on the one hand, and any of the Company, its Directors or any other Holder, on the other hand, have been entered into or made.

(j)     Severability. The provisions of this Agreement shall be deemed severable. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction; *provided*, *however*, that if any one or more of the provisions contained in this Agreement shall be determined to be excessively broad as to activity, subject, duration or geographic scope, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable under applicable law.

(k)     Business Days. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a day other than a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

(l)     Entire Agreement. This Agreement, together with the Articles, the Registration Rights Agreement, the Management Incentive Plan, the CVR Agreements and the New Warrant Agreements, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and supersedes any and all prior or contemporaneous discussions, agreements and understandings, whether oral or written, that may have been made or entered into by or among any of the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

(m)     Execution of Agreement; Counterparts. This Agreement may be executed and delivered (by facsimile, by electronic mail in portable document format (.pdf) or otherwise) in any

number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

(n)     Determination of Ownership. In determining the Direct Owners of Company Common Stock hereunder for any purpose, the Company may rely solely on the records of the Transfer Agent for the Company Common Stock from time to time, or, if no such Transfer Agent exists, the Company's Stock Register.

(o)     No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Holders may be partnerships or limited liability companies, each Holder covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any of the Company's or any Holder's former, current or future direct or indirect equity holders, controlling Persons, shareholders, directors, officers, employees, agents, Affiliates, members, financing sources, managers, general or limited partners or assignees (and collectively, the "Non-Recourse Parties"), in each case other than the Company, the Holders or any of their permitted assigns under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Non-Recourse Parties, as such, for any obligation or liability of the Company or the Holders under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this Section 8(o) shall relieve or otherwise limit the liability of the Company or any Holder, as such, for any breach or violation of its obligations under this Agreement or such agreements, documents or instruments.

(p)     Third-Party Beneficiaries. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Company and the Holders and their respective successors and permitted assigns any rights, benefits or remedies of any nature whatsoever.

(q)     Recapitalizations, Exchanges, etc. The provisions of this Agreement shall apply to the full extent set forth herein with respect to (i) the Company Common Stock, (ii) any and all securities into which shares of Company Common Stock are converted, exchanged or substituted in any recapitalization or other capital reorganization by the Company and (iii) any and all equity securities of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in conversion of, in exchange for or in substitution of, the Company Common Stock and shall be appropriately adjusted for any stock dividends, splits, reverse splits, combinations, recapitalizations and the like occurring after the Effective Date.

(r)     [Holder Votes. For the avoidance of doubt, nothing in this agreementAgreement shall require any Holder to cast any votes as directed by the Company.]

(s)     Headings; Section References. All heading references contained in this Agreement are for convenience purposes only and shall not be deemed to limit or affect any of the provisions of this Agreement.

(t)     Registration Rights.

-35-

(i)      The Company shall use reasonable efforts to pursue ~~public listing~~a Listing of the Company Common Stock ~~on a U.S. national securities exchange~~ after a Holder demand made, at any time after the fourth anniversary of the Effective Date, by either (A) the Initial First Threshold Holder or (B) the Holders of a majority of the outstanding shares of Company Common Stock (excluding shares held by the Initial First Threshold Holder).

(ii)      The Company shall be required to (A) publicly list the Company Common Stock on a U.S. national securities exchange no later than the fifth anniversary the Effective Date and (B) file with the Securities and Exchange Commission, or, if permitted by the rules of the Securities and Exchange Commission at the time of submission, confidentially submit, a preliminary registration statement with the Securities and Exchange Commission relating thereto at least 180 days before the fifth anniversary of the Effective Date and take commercially reasonable efforts to cause such registration statement to be declared effective by the Securities and Exchange Commission no later than the fifth anniversary of the Effective Date (the "Registration Deadline"); *provided*, that if the Board, in its good faith judgment and upon advice of external counsel to the Company, reasonably determines that (1) the Company is unable to satisfy the listing requirements for ~~listing~~a Listing of the Company Common Stock ~~on a U.S. national securities exchange~~ or (2) it would be materially adverse to the Company to consummate such ~~public listing~~Listing of the Company Common Stock or furnish such preliminary registration statement because such action would (a) materially interfere with a significant acquisition, corporate reorganization, financing, securities offering or other significant transaction development involving the Company or (b) based on the advice of the Company's outside counsel, require disclosure of material non-public information that the Company has a bona fide business purpose for preserving as confidential, then the Company shall have the right to defer such action; *provided*, that (x) in the case of clause (1), if the Company is unable to satisfy the listing requirements of one U.S. national securities exchange, it shall pursue a ~~listing~~Listing of the Company Common Stock on another U.S. national securities exchange and (y) in the case of clause (2), the deferral of any action permitted by clause (2) shall only be permitted two times and any such deferral, shall be limited to [30]60 days in the aggregate and in no event shall such deferral delay the effectiveness of such registration statement past the Registration Deadline. Each Holder acknowledges and agrees that the sole remedy for any breach of the provisions in this Section 8(~~s~~t)(ii) shall be specific performance, including injunctive relief in support of specific performance.

(u)      <u>Further Assurances</u>. Each Holder and the Company shall (and the Company shall cause its Subsidiaries to) do, execute and perform all such further acts, deeds, documents and things as may be reasonably required from time to time in order to implement all the provisions of this Agreement.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK,*
*SIGNATURE PAGES OF HOLDERS TO FOLLOW]*

IN WITNESS WHEREOF, the Parties have executed this Shareholders Agreement as of the date first written above.

[•]

INTELSAT EMERGENCE S.A.

By: _____
Name: José Toscano
Title:   Delegate of the Board of Directors

Address:

with a copy (which shall not constitute notice)
to: _____
_____
_____
_____
_____

*[Different first page link-to-previous setting changed from on in original to off in modified.]*

## EXHIBIT A

### *Form of Non-Disclosure Agreement*

### **BOARD OBSERVER CONFIDENTIALITY AGREEMENT**

[To come.]

A-2̶1

44807.00001

NAI-1522216134v7

*[Different first page link-to-previous setting changed from on in original to off in modified.]*
*[Link-to-previous setting changed from on in original to off in modified.]*

This Board Observer Confidentiality Agreement (the "**Agreement**") is made as of [•], 2022 (the "**Effective Date**"), by and between:

(1)     Intelsat Emergence S.A. (to be renamed Intelsat S.A.) ("**Intelsat**" and together with its direct and indirect Subsidiaries and Affiliates, collectively, the "**Company**"); and

(2)     [NAME OF BOARD OBSERVER] (the "**Board Observer**").   In and for purposes of this Agreement, the Company and the Board Observer are collectively referred to as the "**Parties**."

Capitalized terms used but not defined herein shall have the meaning set forth in that certain Shareholders Agreement, entered into as of [●] by and among the Company and all of the shareholders of the Company who were issued shares of Company Common Stock under the *Fourth Amended Joint Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated December 17, 2021 (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Plan**") (the "**Shareholders Agreement**").

WHEREAS, it is anticipated that the Board Observer will be designated as a non-voting observer on Intelsat's Board of Directors (the "**Board**"), upon and subject to the occurrence of the consummation of the Plan (such occurrence, "**Emergence**"), subject to the terms and conditions set forth in the Plan;

WHEREAS, the Board Observer acknowledges that the Board Observer may be provided with or otherwise have access to Confidential Information (defined below) about the Company; and

WHEREAS, in consideration for and as a condition to the Company permitting the Board Observer to serve as an observer and furnishing access to such Confidential Information (and acknowledging the confidentiality provisions set forth in this Agreement and any duties of confidentiality arising as a matter of Luxembourg Law as a consequence of the appointment of the Board Observer as an observer), the Board Observer and the Company hereby agrees to the terms and conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the covenants and conditions set forth in this Agreement and the Board Observer's receipt of Confidential Information, it is agreed as follows:

1.     Definitions.  For purposes of this Agreement:

(a)     "**Company Representative**" means any Representative of the Company or its Affiliates.

*[Link-to-previous setting changed from on in original to off in modified.]*

*[Different first page link-to-previous setting changed from on in original to off in modified.]*
*[Link-to-previous setting changed from on in original to off in modified.]*

(b)    "**Board Observer Representative**" means any Representative of the Board Observer.

(c)    "**Representative**" means, with respect to a person, any Affiliate of such person and any officer, director, shareholder, member, partner, managing director, principal, associate, analyst, employee, subcontractor, attorney, banker, accountant, consultant, auditor, advisor or other professional, co-investors, potential financing sources, or agent of (i) such person, (ii) its Affiliates or (iii) in the case of the Board Observer, its Nominating Shareholder.

2.    Confidentiality.  As a condition to the Board Observer receiving any Confidential Information, the Board Observer agrees:

(a)    to treat as confidential in accordance with the terms of this Agreement any Confidential Information that is furnished on or after the date of this Agreement, by or on behalf of the Company to the Board Observer;

(b)    not to disclose or cause to be disclosed, in any manner whatsoever, directly or indirectly, in whole or in part, such Confidential Information, except as is expressly permitted by this Agreement; and

(c)    that Confidential Information will be used only for the purposes of (i) the Board Observer preparing to serve as a non-voting observer of the Board and otherwise for the evaluation of the business, operations and affairs of the Company in his or her capacity as a non-voting observer of the Board post-Emergence and (ii) monitoring, administering or managing its Nominating Shareholder's investment in the Company.

3.    Confidential Information.

(a)    The term "**Confidential Information**" means any and all documents, information (whether oral, written, or electronic), and other material about or concerning the Company, its Affiliates, the Board, or a transaction, in each case, furnished hereunder by or on behalf of the Company or a Company Representative to the Board Observer on or after the Effective Date, including information related to accounting, financial matters, tax, legal, and operational information, and includes proprietary oral, written, or electronic communications, confidential memoranda, presentations, notes, reports, analyses, compilations, forecasts, data, studies, or other documents or materials (including all Board discussions, notices, minutes, consents, and Board materials) prepared by the Company or any of its Affiliates or its Affiliates' managers, directors, officers, members, partners, associates, or employees, Company Representative, or the Board Observer which contain, are based upon, or otherwise reflect such material.  The Company has no obligation to disclose publicly any Confidential Information to the

*[Link-to-previous setting changed from on in original to off in modified.]*

*[Different first page link-to-previous setting changed from on in original to off in modified.]*
*[Link-to-previous setting changed from on in original to off in modified.]*

extent the Board Observer shares such Confidential Information in any manner not permitted under Section 4 of this Agreement.

(b)     The term "Confidential Information" does not include information which:

(i)      at the time of disclosure or thereafter is or becomes available to the public other than as a result of a disclosure by the Board Observer in violation of this Agreement;

(ii)     is, was, or becomes available to the Board Observer from (i) a source other than the Company or its Representatives if such source is not known by the Board Observer at the time of the disclosure to be bound by a confidentiality agreement with, or other known contractual or fiduciary obligation of confidentiality to, the Company with respect to such information or (ii) its Nominating Shareholder in its capacity as a Holder, which, for the avoidance of doubt, shall be governed by the Shareholders Agreement and not this Agreement;

(iii)    has been independently developed by the Board Observer without using the Confidential Information;

(iv)     is determined by a court of competent jurisdiction not to be Confidential Information pursuant to a final order not subject to appeal; or

(v)      is or was disclosed in accordance with Section 4 of this Agreement.

4.     Permitted Disclosures.

(a)     Notwithstanding anything to the contrary herein, the Board Observer may disclose any Confidential Information:

(i)      with the prior written consent of the Company or its Representatives;

(ii)     to any Board Observer Representative, subject to Section 2 of this Agreement; or

(iii)    in the event the Board Observer is requested or required (as determined by the Board Observer upon the advice of counsel) by any applicable Law, rule, professional standard, regulation, policy statement, court order, legal, arbitral, judicial, governmental or administrative process or other similar process (whether by oral questions, interrogatories, requests for information or documents in legal or regulatory proceedings, subpoena, civil investigative demand, or other similar process, or by the Securities and Exchange Commission (the "**SEC**") or the New York Stock

*[Link-to-previous setting changed from on in original to off in modified.]*

*[Different first page link-to-previous setting changed from on in original to off in modified.]*
*[Link-to-previous setting changed from on in original to off in modified.]*

Exchange, the Nasdaq Stock Market, or any other regulatory or self-regulatory authority, if applicable) (collectively, "**Law**") to disclose all or any portion of the Confidential Information; *provided* that the Board Observer agrees with respect to such a request made under applicable Law or by such a body, to the extent permitted by Law, to promptly notify the Company of such request so that the Company may intervene at the Company's sole cost and expense to take legally-available steps to resist or narrow such request, including the Company's efforts to seek a protective order or other appropriate remedy; *provided, further*, that if, absent the entry of such a protective order or other remedy, the Board Observer is required to disclose Confidential Information, the Board Observer may disclose only that portion of the Confidential Information that the Board Observer is required to disclose and will exercise commercially reasonable efforts to seek assurance that confidential treatment will be accorded to that portion of the Confidential Information that is being disclosed (at the Company's sole cost and expense).  In addition, to the extent permitted by Law, the Board Observer agrees that the Board Observer will not oppose, and, to the extent requested by the Company and at the Company's sole cost and expense, will use commercially reasonable efforts to cooperate with the Company, at the Company's sole cost and expense, with regard to, any action by the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded to the Confidential Information, or to resist or narrow the request or requirement for information.

(b)    Without limiting the generality of the foregoing, the Board Observer shall direct each of its Board Observer Representatives who is either provided with Confidential Information by, or otherwise has access to Confidential Information through, the Board Observer to comply with the terms of this Agreement.  The Board Observer agrees to be liable for any breach of the terms of this Agreement by any such Board Observer Representative (except in the case of such Board Observer Representative who is a Representative of the applicable Nominating Shareholder, in which case, the Nominating Shareholder shall be liable for such breach), except to the extent that any such Board Observer Representative has executed a confidentiality agreement with the Company with respect to the Confidential Information.  For the avoidance of doubt, any information received by the Board Observer or a Board Observer Representative from the applicable Nominating Shareholder or as a Representative of the applicable Nominating Shareholder in its capacity as a Holder shall be governed by the Shareholders Agreement and not this Agreement, and any information received by a Board Observer Representative in his or her capacity as a Representative Director of the

*[Link-to-previous setting changed from on in original to off in modified.]*

-6-

*[Different first page link-to-previous setting changed from on in original to off in modified.]*
*[Link-to-previous setting changed from on in original to off in modified.]*

applicable Nominating Shareholder shall be governed by Luxembourg Law and the Shareholders Agreement and not this Agreement.

5.      Return or Destruction of Confidential Information.  Except as otherwise required by Law, or the Board Observer's internal document retention policies and procedures, if the Board Observer ceases to serve as a non-voting observer on the Board, then, within five (5) business days of being so requested in writing (email being sufficient) by the Company, the Board Observer shall either (at the Board Observer's election) return to the Company or destroy all Confidential Information, without retaining any copies, summaries, or extracts thereof, excluding copies, documents, memoranda, notes, and other writings prepared by the Board Observer based on the Confidential Information.  Upon the Company's request, the Board Observer shall promptly provide written verification that it has complied with the terms of this Section 5.  Notwithstanding the foregoing, the Board Observer may retain copies of the Confidential Information to the extent the Board Observer reasonably believes it is required to satisfy internal bona-fide document retention or compliance policies and procedures, as well as any portions of the Confidential Information that have been disclosed to the public other than through a breach of this Agreement by the Board Observer.  For the avoidance of doubt, the Board Observer shall not be required to return, destroy, or expunge any Confidential Information located on backup servers and similar devices except in the ordinary course of business; *provided* that the Board Observer shall not access or use such Confidential Information unless required by Law to do so or in order to enforce or defend itself in proceedings arising out of or related to this Agreement; *provided, further,* that any such materials so retained shall be held subject to the terms of this Agreement notwithstanding the termination of this Agreement or the termination of the Board Observer's services as a non-voting observer on the Board for so long as they are retained.  Notwithstanding the return, retention, or destruction of the Confidential Information, the Board Observer will be bound by these obligations of confidentiality and other obligations herein in accordance with the terms of this Agreement.

6.      Acknowledgements.  The Board Observer acknowledges that neither the Company nor the Company Representatives make any express or implied representation or warranty herein as to the accuracy or completeness of the Confidential Information, and the Board Observer agrees that neither the Company nor the Company Representatives, will have any liability under this Agreement relating to the Confidential Information or for any errors therein or omissions therefrom on account of this Agreement.  The Board Observer further agrees that neither it nor the Board Observer Representatives are entitled, under this Agreement, to rely on the accuracy or completeness of the Confidential Information.  The Board Observer understands that the provisions of this Agreement apply to Confidential Information that may be provided to the Board Observer as set forth herein, but acknowledges that nothing in this Agreement requires that the Company or the Company Representatives provide the Board Observer with any such Confidential Information.  The Company and the Company Representatives shall have no ongoing

*[Link-to-previous setting changed from on in original to off in modified.]*

-7-

*[Different first page link-to-previous setting changed from on in original to off in modified.]*
*[Link-to-previous setting changed from on in original to off in modified.]*

duty, under this Agreement, to verify, update, investigate, or review for accuracy any Confidential Information provided to the Board Observer, whether at the time such Confidential Information is provided or at any time thereafter. The Board Observer agrees that neither the Company nor the Company Representatives shall be liable under this Agreement to the Board Observer or any other person, whether in contract, tort, or otherwise, resulting from the use of or reliance upon the Confidential Information by the Board Observer. The Board Observer further acknowledges that the Confidential Information may include material, nonpublic information relating to the Company and its securities, and United States and foreign securities laws and regulations regulate the trading of securities and derivatives while a party is in possession of and in reliance upon such information.

7.    Remedies. The Parties acknowledge that money damages may not be a sufficient remedy for any breach or threatened breach of this Agreement and that the Company shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages and in addition to all other remedies) as a remedy for any such breach or threatened breach of this Agreement to the extent permitted by law. In the event that such equitable relief is granted, such remedy or remedies shall not be deemed to be the exclusive remedy or remedies for breach or threatened breach of this Agreement, but shall be in addition to all other remedies available at law or equity. The Board Observer agrees not to resist such application for relief on the basis that the Company has an adequate remedy at law, and further agrees to waive any requirement for securing or posting any bond in connection with such remedy to the extent a breach has occurred.

8.    Termination. This Agreement shall terminate on the date that is eighteen (18) months after the date when the Board Observer ceases to serve as a non-voting observer on the Board; provided, however, that Sections 5 through 9 of this Agreement shall survive the termination hereof.

9.    Choice of Law.

      (a)    This Agreement shall be governed by the laws of the State of Delaware without regard to its conflict of laws principles that would dictate the application of another jurisdiction's laws.

      (b)    Any suit, action, or proceeding brought in connection with this Agreement shall be brought in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware). The Parties hereby irrevocably consent to the exclusive jurisdiction of such courts, agree not to commence any suit, action, or proceeding relating thereto except in such courts, and waive, to the fullest extent permitted by law, the right to move to dismiss or transfer any suit,

*[Link-to-previous setting changed from on in original to off in modified.]*

-8-

*[Different first page link-to-previous setting changed from on in original to off in modified.]*
*[Link-to-previous setting changed from on in original to off in modified.]*

action or proceedings brought in such court on the basis of any objections as to venue or inconvenient forum or on the basis of any objection to personal jurisdiction.

10. Interpretation; Headings.  The term "person" as used in this Agreement shall be broadly interpreted to include any individual, corporation, company, partnership or other entity. The headings set forth herein are included solely for the purpose of identification and shall not be used for the purpose of construing the meaning of the provisions of this Agreement.

11. Severability.  If any portion of this Agreement shall be declared invalid or unenforceable, the remainder of this Agreement shall be unaffected thereby and shall remain in full force and effect.

12. Counterparts.  This Agreement may be signed in one or more counterparts (including by means of Docusign (or similar service) or PDF signature pages), each of which need not contain the signature of all parties hereto, and all of such counterparts taken together shall constitute a single agreement.

13. Amendment; Waiver.  This Agreement shall not be amended, modified, or waived except by a separate written agreement signed by each of the Parties.  No course of dealing between the Parties shall be deemed to modify or amend any provision of this Agreement, and no failure or delay by the Parties in the exercise (or partial exercise) of each of their rights, powers, privileges or remedies shall operate as a waiver thereof or preclude any other future rights, powers, privileges or remedies.  Where a written consent is required pursuant to or contemplated by this Agreement, such written consent shall be deemed to have occurred if it is conveyed in writing (including email) between the Company or a Company Representative and the Board Observer, or vice versa.

14. Assignment; No Third Party Beneficiaries.  Absent the prior written consent of the Company, the Board Observer may not assign its rights or obligations under this Agreement and any such attempted assignment without such prior written consent shall be null and void.  This Agreement is for the benefit of the Board Observer and the Company and no other person shall be a third party beneficiary hereof.

15. Binding Effect.  This Agreement shall be binding upon each of the Parties and their respective successors and permitted assigns.

16. Waiver of Right to Trial by Jury.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT.

*[Link-to-previous setting changed from on in original to off in modified.]*

*[Different first page link-to-previous setting changed from on in original to off in modified.]*
*[Link-to-previous setting changed from on in original to off in modified.]*

17.    Notice.  Notices authorized or required by this Agreement may be delivered by hand or reputable third-party overnight courier service and must also be delivered by email.  Notices to Intelsat shall be delivered to: Intelsat Emergence S.A. (to be renamed Intelsat S.A.), 4, rue Albert Borschette L-1246 Luxembourg, Grand Duchy of Luxembourg, Attn: Legal Department; with a copy (which shall not constitute notice) to: Kirkland and Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn: Edward O. Sassower, P.C., Steven Serajeddini, P.C. and Aparna Yenamandra.  Notices to the Board Observer shall be delivered to: [•], with a copy (which shall not constitute notice) to: [•].  Any such notice will be deemed to have been given on the day of actual delivery thereof.

*[Link-to-previous setting changed from on in original to off in modified.]*

IN WITNESS WHEREOF, the Company and the Board Observer have executed this Agreement as of the date and year first written above.

**Intelsat Emergence S.A.**

By:_____

Name: Jose Toscano

Title: Authorized Signatory

[Company Signature Page to Board Observer Confidentiality Agreement]

**BOARD OBSERVER**

By:

_____

Name:

[Board Observer Signature Page to Board Observer Confidentiality Agreement]

<u>EXHIBIT B</u>

***Form of Joinder Agreement***

The undersigned hereby agrees, effective as of the date set forth below, to become a party to that certain Shareholders Agreement (as amended, restated and modified from time to time, the "<u>Agreement</u>"), dated as of [•], by and among [•], a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg (the "<u>Company</u>"), and the shareholders [*and Beneficial Owners*] of the Company. The undersigned hereby agrees to be bound by all of the terms of the Agreement and shall hereafter be deemed to be, for all purposes of the Agreement, a party to the Agreement and a "Holder" (as defined in the Agreement). The undersigned hereby grants an irrevocable power of attorney to the Company to record the transfer of Company Common Stock on its behalf. This Joinder Agreement and all disputes or controversies arising out of or relating to this Joinder Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principles of conflicts of laws. The address, facsimile number and email address to which notices may be sent to the undersigned are as follows:

Address:         _____

                 _____

                 _____

Facsimile No.:   _____

Email:

Date:            _____

**[If entity]**

**[**ENTITY NAME**]**

By:_____

      Name:

      Title:

**[If individual]**

_____

Individual Name:

-2-

Exhibit C-1

DIRECT OWNER LEGEND

THESE SHARES OF COMPANY COMMON STOCK HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145; PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

THESE SHARES OF COMPANY COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH SHARES OF COMPANY COMMON STOCK IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE SHARES OF COMPANY COMMON STOCK ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF [COMPANY] (THE "COMPANY"), DATED AS OF FEBRUARY [●], 20[●]2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SHAREHOLDERS AGREEMENT"). NO REGISTRATION OR TRANSFER OF THE SHARES OF COMPANY COMMON STOCK ISSUABLE UPON EXERCISE OF SUCH SHARES MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING COMPLIANCE WITH THE SHAREHOLDERS AGREEMENT.

THE COMPANY OR THE TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE COMPANY COMMON STOCK REPRESENTED HEREBY A COPY OF THE SHAREHOLDERS AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE COMPANY COMMON STOCK UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS. THESE

LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE COMPANY.

EXHIBIT C-2

FORM OF GLOBAL SECURITY
-EVIDENCING-
SHARES OF COMMON STOCK
-IN-

INTELSAT EMERGENCE S.A.

[COMPANY●]

[_____]

CUSIP: L5217E120

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO [COMPANY]INTELSAT EMERGENCE S.A. (THE "COMPANY") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUIRED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THE SECURITIES REPRESENTED HEREBY WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "BANKRUPTCY CODE"). THE SECURITIES REPRESENTED HEREBY MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE COMPANY. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE COMPANY, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE COMPANY IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE SHARES OF COMPANY COMMON STOCK REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF THE COMPANY, DATED AS OF FEBRUARY [●], 20[●]2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SHAREHOLDERS AGREEMENT"). NO REGISTRATION OR TRANSFER OF THE COMPANY COMMON STOCK MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING COMPLIANCE WITH THE SHAREHOLDERS AGREEMENT. COPIES OF SUCH AGREEMENT ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF

-5-

THE COMPANY. NO TRANSFER OF SHARES OF COMPANY COMMON STOCK WILL BE MADE ON THE BOOKS OF THE COMPANY UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE APPLICABLE TERMS OF THE SHAREHOLDERS AGREEMENT.

ONLY PARTIES TO THE SHAREHOLDERS AGREEMENT ARE ENTITLED TO EXERCISE THE RIGHTS OF HOLDERS UNDER THE SHAREHOLDERS AGREEMENT.  NO PERSON MAY BECOME A HOLDER OF COMPANY COMMON SHARESSTOCK PURSUANT TO ANY TRANSFER OF COMPANY COMMON SHARESSTOCK OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT, WHICH INCLUDES, AMONG THE ABOVE-REFERENCED RESTRICTIONS, RESTRICTIONS ON TRANSFERS TO "COMPETITORS" OF THE COMPANY.  A THEN-CURRENT LIST OF SUCH COMPETITORS MAY BE OBTAINED BY CONTACTING THE COMPANY.

This is to certify that CEDE & CO. is the owner and registered holder of this Certificate evidencing the ownership of the shares of common stock set forth on the Schedule of Increases and Decreases attached hereto as Schedule A, each of which represents an undivided share of common stock in the Company.

At the request of the registered holder this Certificate may be exchanged for one or more Certificates issued to the registered holder in such denominations as the registered holder may request.

The registered holder of this Certificate is entitled at any time upon tender of this Certificate to the [        ]Company, endorsed in blank or accompanied by all necessary instruments of assignment and transfer in proper form, at its principal office in [            ]Luxembourg and, upon payment of any tax or other governmental charges, to receive such holder's Units evidenced by this Certificate.

The Company may deem and treat the person in whose name this Certificate is registered upon the books of the Company as the owner hereof for all purposes and the Company shall not be affected by any notice to the contrary.

**IN WITNESS WHEREOF**, the Company has caused this Certificate to be executed in its name by the manual or facsimile signature of one of its authorized signatories.



**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**

By: _____

[        ]

José Toscano
Delegate of the Board of Directors

By:

-6-

-7-

## SCHEDULE A

### SCHEDULE OF INCREASES AND DECREASES IN
### SHARES OF COMPANY COMMON STOCK

The following increases and decreases in the number of shares of Company Common Stock evidenced by this Global Security have been made:

| Date | Amount of increases or ~~decrease~~**decreases** in number of shares evidenced by this Global Security | Number of shares evidenced by this Global Security following such increase or decrease | Signature of authorized signatory |
|---|---|---|---|

-7-

## **Exhibit B-1**

### **Articles of Association**

**INTELSAT EMERGENCE S.A.**

*Société Anonyme*

**Article 1.  Form, Name**

There exists among the shareholder(s) and all those who may become owners of the Shares hereafter a company in the form of a *société anonyme*, under the name of "**Intelsat Emergence S.A.**" (the "**Company**").

**Article 2.  Duration**

The Company is established for an undetermined duration. Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the Company may be dissolved at any time by a resolution of the Shareholders adopted in the manner required for the amendment of these Articles.

**Article 3.  Registered office**

**3.1**      The Company has its registered office in the City of Luxembourg, Grand Duchy of Luxembourg.

**3.2**      Within the same municipality, the registered office may be transferred by means of a decision of the Board. It may be transferred to any other municipality in the Grand Duchy of Luxembourg by means of a decision of the Board (in which case the Board shall have the power to amend these Articles accordingly) or a resolution of the General Meeting adopted in the manner required for an amendment of these Articles.

**3.3**      The Company may have offices and branches, both in Luxembourg and abroad.

**3.4**      In the event that the Board determines that extraordinary political, economic or social developments have occurred or are imminent that would interfere with the normal activities of the Company at its registered office, or with the ease of communications between such office and Persons abroad, the registered office may be temporarily transferred abroad until the complete cessation of these abnormal circumstances; such temporary measures shall have no effect on the nationality of the Company which, notwithstanding the temporary transfer of its registered office, will remain a Luxembourg company.

**Article 4.  Purpose, Object**

**4.1**      The object of the Company is the holding of participations, in any form whatsoever, in Luxembourg and foreign companies, or other entities or enterprises, the acquisition by purchase, subscription, or in any other manner as well as the transfer by sale, exchange or otherwise of stock, bonds, debentures, notes and other securities or rights of any kind including interests in partnerships, and the holding, acquisition, disposal, investment in any manner (in), development, licensing or sub licensing of, any patents or other intellectual property rights of any nature or origin as well as the ownership, administration, development and management of its portfolio. The Company may carry out its business through branches in Luxembourg or abroad.

**4.2**      The Company may further conduct or be involved in any way in, directly or indirectly, any satellite telecommunications or other telecommunications or communications related business in the broadest sense, including without limitation the owning and/or operation of satellites, teleports, any ground assets, and any related or connected activity.

**4.3**      The Company may borrow in any form and proceed to a private or public issue of shares, bonds,

1

convertible bonds and debentures or any other securities or instruments it deems fit.

**4.4** In a general fashion the Company may grant assistance (by way of loans, advances, guarantees or granting of securities or otherwise) to companies or other enterprises or Persons in which the Company has an interest or which form part of the group of companies to which the Company belongs or any entity or Person as the Company may deem fit (including up-stream or cross-stream), take any controlling, management, administrative and/or supervisory measures and carry out any operation which it may deem useful in the accomplishment and development of its purposes.

**4.5** The Company may use any techniques, legal means and instruments to manage its investments efficiently and protect itself against credit risks, currency exchange exposure, interest rate risks and other risks.

**4.6** Finally, the Company may perform all commercial, technical and financial or other operations, connected directly or indirectly in all areas in order to facilitate the accomplishment of its purpose.

### Article 5.  Share capital

**5.1** <u>Issued Share Capital</u>

The Company has an issued share capital of six hundred seventy-eight thousand three hundred fifty-five dollars and sixty-four cents US Dollars (USD 678,355.64) represented by a total of sixty-seven million, eight hundred thirty-five thousand, five hundred and sixty-four (67,835,564) fully paid Shares with such rights and obligations as set forth in the present Articles.

**5.2** <u>Authorised Share Capital</u>

**5.2.1** The authorised share capital of the Company (including the issued share capital) is set at nine hundred twenty-five thousand, nine hundred ninety-five dollars and forty-five cents US Dollars (USD 925,995.45) to be represented by ninety-two million, five hundred ninety-nine thousand, five hundred forty-five (92,599,545) Shares.

**5.2.2** The authorised unissued share capital (and any authorisation granted to the Board in relation thereto) shall be valid for a period ending on the date which falls five (5) years after the extraordinary general meeting of shareholders of the Company held on February 10, 2022. The shares to be issued under the authorised share capital may be issued beyond the initial authorized capital period of five (5) years if those Share Rights (as defined below) were issued within the relevant initial authorised capital period of five (5) years.

**5.2.3** The Board, or any delegate(s) duly appointed by the Board, may from time to time, during the period referred to in Article 5.2.2, discretionally issue, in one or several tranches, Shares (or any rights, securities or other entitlement to Shares, including the Warrants, pursuant to the Management Incentive Plan or in connection with a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent true-up offering as set forth in Section 7(c) of the Shareholders Agreement), together referred to as the "**Share Rights**") as it determines within the limits of the authorized unissued share capital solely (i) upon the exercise of a Warrant, (ii) pursuant to the Management Incentive Plan, or (iii) in connection with a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent true-up offering as set forth in Section 7(c) of the Shareholders Agreement). Any such issuance of Shares will be final and valid and the date of issue of such Shares (or any successive issue) and the terms, date, place and condition of the subscription for such issued Shares, including the issue price, and to which

Person(s) such Shares are issued shall be determined by the Board or its delegate(s) in its or their sole discretion resolve. The Board and/or its delegate shall record each such share capital increase by way of a notarial deed and amend the register of Shares to reflect the amendment accordingly. The Board is authorized during the period referred to in Article 5.2.2 to waive, suppress or limit any preferential or pre-emptive subscription rights of existing Shareholders (including in case of issue of shares by way of incorporation of reserves) to the extent the Board deems such waiver, suppression or limitation advisable for any issue or issues of Shares or Share Rights (within the authorized unissued share capital).

5.3     The issued and/or authorised unissued share capital of the Company may be increased, reduced, amended or extended one or several times by a resolution of the General Meeting of Shareholders adopted in compliance with the quorum and majority rules applicable to the amendment of these Articles and subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement.

5.4     The Company may not issue fractional Shares and no fractions of Shares shall exist at any time. The Board shall be authorised at its discretion to provide for the payment of cash or the issuance of scrip in lieu of any fraction of a Share.

5.5     Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the Company or its Subsidiaries may discretionally proceed to the purchase or repurchase of its own Shares and may hold Shares in treasury, each time subject to the conditions and within the limits laid down by law and it may proceed to the cancellation of all or part of the Shares held in treasury and the Board is authorised to record such cancellation and if it deems fit the corresponding reduction of share capital in the Articles.

5.6     Any share premium paid on the issue of Shares and/or contribution made to an account 115 (*apport en capitaux propres non rémunérés par des titres* of the Luxembourg chart of accounts) shall be freely distributable.

5.7     Each Holder that is a party to the Shareholders Agreement shall have the pre-emptive rights set out in the Shareholders Agreement in case of any issuance of Shares and/or other equity and debt securities.

**Article 6.  Shares**

6.1     <u>Shares</u>

6.1.1     Shares of the Company are in registered form.

6.1.2     As regards Shares in registered form:

(i)     A register of Shares will be kept at the registered office of the Company. Without prejudice to the conditions for transfer by book entry in the case provided for in Article 6.1.2 (v) or as the case may be applicable law, and subject to the Shareholders Agreement, a transfer of registered Shares shall be carried out by means of a declaration of transfer entered in the relevant register, dated and signed by (i) the transferor and the transferee or by their duly authorised representatives or by (ii) the Company upon notification of the transfer or acceptance of the transfer by the Company. The Company may accept and enter in the relevant register a transfer on the basis of correspondence or other documents recording the agreement between the transferor and the transferee.

(ii)     The Company may appoint registrars in different jurisdictions who will each maintain a separate register for the registered Shares entered therein and the holders of Shares may elect to be entered in one of the

3

registers and to be transferred from time to time from one register to another register. The Board may however impose transfer restrictions for Shares in compliance with applicable trading restrictions. The transfer to the register kept at the Company's registered office may always be requested. The principal register of Shares and any separate register as per this Article 6.1.2(ii) shall together be treated as the register of Shares for the purposes of these Articles.

(iii)        Subject to the provisions of Article 6.1.2(v), the Company may consider the Person in whose name the registered Shares are registered in the register of Shareholders as the full owner of such registered Shares. The Company shall be completely free from any responsibility in dealing with such registered Shares towards third parties and shall be justified in considering any right, interest or claims of such third parties in or upon such registered shares to be non-existent, subject, however, to any right which such third party might have to demand the registration or change in registration of registered Shares. In the event that a holder of registered Shares does not provide an address to which all notices or announcements from the Company may be sent, the Company may permit a notice to this effect to be entered into the register(s) of Shareholders and such holder's address will be deemed to be at the registered office of the Company or such other address as may be so entered by the Company from time to time, until a different address shall be provided to the Company by such holder. The holder may, at any time, change his address as entered in the register(s) of Shareholders by means of written notification to the Company or the relevant registrar.

(iv)        All communications and notices to be given to a registered Shareholder shall be deemed validly made to the latest postal address or, if applicable, e-mail address communicated by the Shareholder to the Company.

(v)        Where Shares are recorded in the register(s) of Shareholders on behalf of one or more Persons in the name of a securities settlement system or the operator of such a system or in the name of a professional securities depositary or any other depositary (such systems, professionals or other depositaries being referred to hereinafter as "**Depositaries**") or of a sub-depositary designated by one or more Depositaries, the Company subject to having received a certificate, proxy or confirmation in proper form obtained from the bank, broker or other nominee established as the holder of record with the Depositary, will permit those Persons to exercise the rights attached to those Shares, including admission to and voting at General Meetings (to the extent the relevant Shares carry voting rights) in accordance with Article 6.1.3. The Board may determine the formal requirements with which such certificates or proxies must comply and the exercise of the rights in respect of such Shares may in addition be subject to the internal rules and procedures of the securities settlement system. Notwithstanding the foregoing, the Company may make dividend payments and any other payments in cash, Shares or other securities only to the Depositary or sub-depositary recorded in the register(s) or in accordance with its instructions, and such payment will effect full discharge of the Company's obligations. Where Shares are recorded in the register(s) of Shareholders on behalf of one or more Persons in the name of a Depositary, the Company shall make payments, by way of dividends or otherwise, in cash, Shares or other assets only into the hands of the Depositary or sub-depositary recorded in the register or in accordance with their instructions, and such payment shall release the Company from any and all obligations for such payment.

**6.1.3**        To attend a General Meeting in person, a holder of Shares held through a Depositary must provide the Company with a certificate obtained from the bank, broker or other nominee established as the holder of record with the Depositary. Such certificate or proxy must certify the number of Shares recorded in the relevant

4

account on the Record Date. Such certificate or proxy must be provided to the Company no later than three (3) business days prior to the date of such General Meeting.

**6.1.4**      The Shares are indivisible vis-à-vis the Company which will recognize only one holder per Share. In case a Share is held by more than one Person, the Persons claiming ownership of the Share will be required to name a single proxy to represent the Share vis-à-vis the Company. The Company has the right to suspend the exercise of all rights attached to such Share until one Person has been so appointed. The same rule shall apply in the case of a conflict between an usufructuary and a bare owner or between a pledgor and a pledgee.

**Article 7.  Transfer of Shares**

Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement (with, for the avoidance of doubt, such undertakings terminating automatically upon the effectiveness of a Listing, a Transfer of registered Shares shall be carried out by means of a declaration of transfer entered in the relevant register, dated and signed by the transferor and the transferee or by their duly authorized representatives or in accordance with the procedures of the Depositary. The Company may accept and enter in the relevant register a Transfer on the basis of correspondence or other documents recording the agreement between the transferor and the transferee satisfactory to the Company.

**Article 8.  Voting of Shares**

Each Share shall carry one vote unless otherwise provided for by these Articles or by the Company Law. The issuance of non-voting shares is prohibited solely to the extent required by section 1123(a)(6) of chapter 11 of title 11 of the United States Code.

**Article 9.  Limitation of Ownership - Communication Laws**

**9.1**      The Company may restrict the Beneficial Ownership, or proposed Beneficial Ownership, of Shares or other equity securities of the Company by any Person (other than any Holders of 5% or more of the Shares with respect to their holdings on the date of the Shareholders Agreement and the information disclosed by the Company to the FCC about such Holders prior to the date of the Shareholders Agreement (the "**Existing Holder Exception**")) or the Transfer of Shares or Beneficial Interests (or other equity securities) to any Person if the Beneficial Ownership or proposed Beneficial Ownership of Shares (or other equity securities) of (or the transfer of shares of Shares or other equity securities to) such Person is or would be, as determined by the Board in good faith upon the reasonable advice of outside counsel, in violation of any provision of the Communications Laws.

**9.2**      If the Company believes in good faith, based upon the reasonable advice of outside counsel, that the Beneficial Ownership or proposed Beneficial Ownership of Shares or other equity securities of the Company by any Person (other than with respect to the Existing Holder Exception) may result in a violation of the Communications Laws, the Company may at any time request information from Holders, other equity securities holders, transferees or proposed transferees, including without limitation information on citizenship, affiliations, and ownership or other interests in other companies or enterprises, and such Person shall furnish promptly to the Company such information; *provided* that the Company shall execute, upon the written request of such Person, a nondisclosure agreement in a form reasonably acceptable to such Person and the Company with respect to any such information so requested and provided.

**9.3**      If (x) the Company does not receive the relevant information requested pursuant to Article 9.2 or (y) the Company determines, in good faith upon the reasonable advice of outside counsel, that the Beneficial Ownership or proposed Beneficial Ownership of Shares or other equity securities by a Person (other than with respect to the Existing Holder Exception) or that the exercise of any rights of Shares or other equity securities by a Person (other than with respect to the Existing Holder Exception), results or would result, as determined by the Company, in a Communications Law violation, the Company has the absolute right to (A) refuse to issue Shares or other equity securities to such Person, (B) refuse to permit or recognize a Transfer (or attempted Transfer) of Shares, Beneficial Interests or other equity securities to such Person and any such Transfer or attempted Transfer shall not be notated in the books and records of the Company (including the register of Shares), (C) suspend any rights attached to such Shares, Beneficial Interests or equity securities (including without limitation the right to attend and vote at General Meetings and the right, if any, to receive dividends or other distributions) and which causes or would cause such Communications Law violation, or (D) compulsorily redeem the Shares or other equity securities of the Company Beneficially Owned by such Person. The Company shall in addition have the right to exercise any and all appropriate remedies, at law or in equity in any court of competent jurisdiction, against any such Person, with a view towards obtaining such information or preventing or curing any situation which causes or would cause a Communications Law violation. Any measure taken by the Company pursuant to (A), (B) or (C), respectively, shall remain in effect until the requested information has been received and/or the Company has determined that the Beneficial Ownership, proposed Beneficial Ownership or Transfer of Shares or Beneficial Interests or other equity securities by (or to) the relevant Person or that the exercise of any rights of Shares, Beneficial Interests or other equity securities by such Person as the case may be, will not result in a Communications Law violation.

**9.4**      In case of a compulsory redemption made pursuant to this Article 9,

**9.4.1**      The Company shall serve a notice (a "**Redemption Notice**") upon the relevant Holder(s), specifying (1) the Shares or other equity securities of the Company to be redeemed, and (2) the Redemption Price for such Shares or other equity securities of the Company. Immediately after the close of business on the date specified in the Redemption Notice, (i) each such Holder shall cease to be the holder of the Shares or other equity securities of the Company specified in such notice (ii) the compulsory redemption of Shares in accordance with this Article 9 shall be recorded in the register of Shares by the Company, as transferee, and the relevant Holder(s), as transferor(s) and the relevant Holder(s) hereby grant(s) for such purpose an irrevocable power of attorney to the Company to record the compulsory redemption of Shares on its(their) behalf and (iii) as the case may be, such Holder's name shall be removed from the schedule of Holders.

**9.4.2**      The price at which the Shares or other equity securities of the Company specified in any Redemption Notice shall be redeemed (the "**Redemption Price**") shall be an amount equal to ninety eight percent (98%) of the Fair Market Value minus any and all costs and expenses incurred by the Company in connection with the redemption as determined by the Board. Any Redemption under this Article 9 is strictly limited to, and each Holder waives to the fullest extent possible any  right to request any such Redemption if not falling under, at the discretion of the Board, the scope of this Article 9.

**9.4.3**      Payment of the Redemption Price shall be made directly to the Holder. Upon payment of the Redemption Price, no Person interested in the Shares or other equity securities of the Company specified in such

6

Redemption Notice shall have any further interest in such Shares or other equity securities of the Company or any of them, or any claim against the Company or its assets in respect thereof.

**9.4.4** The exercise by the Company of the powers conferred by this Article 9 shall not be questioned or invalidated in any case, on the ground that there was insufficient evidence of ownership of Shares or other equity securities of the Company by any Person or that the true ownership of the Shares or other equity securities of the Company was otherwise than appeared to the Company at the date of any Redemption Notice.

### Article 10.  Anti-Takeover Restrictions

No Holder (including Affiliates or other Persons acting in coordination together) (an "**Acquiring Shareholder**") may acquire (whether through acquisition, issuance, merger or otherwise) Shares or Beneficial Interests that would result in such Acquiring Shareholder Beneficially Owning more than 45% of the outstanding Shares unless either:

**10.1.1** such acquisition is the result of a Drag-along Sale conducted pursuant to Article 11 and approved by the affirmative vote of no less than two-thirds (66-2/3%) of the disinterested members of the Board (i.e., excluding any Director who is (A) a Representative of, or (B) a Representative Director of, the Acquiring Shareholder); or

**10.1.2** each of the following conditions is satisfied:

(A) the Acquiring Shareholder offers to purchase all other outstanding Shares on the same terms;

(B) the Acquiring Shareholder's offer to the holders of all other outstanding Shares is approved by the affirmative vote of a majority of the disinterested members of the Board (i.e., excluding any Director who is (A) a Representative of, or (B) a Representative Director of, the Acquiring Shareholder); and

(C) the Acquiring Shareholder's offer to the holders of all other outstanding Shares is approved by Persons holding a majority of all outstanding Shares (excluding all Shares held by the Acquiring Shareholder).

**10.1.3** The rights under this Section 10 shall terminate automatically upon a Listing of the Company's Common Stock.

### Article 11.  Drag-along Rights

**11.1.1** Subject to Article 10, if at any time a Holder or group of Holders who hold in the aggregate more than fifty percent (50%) of the then-outstanding Shares (a "**Dragging Shareholder**"), proposes to transfer at least seventy-five percent (75%) of the then-outstanding Shares (other than to an Affiliate of such Dragging Shareholder or in connection with an initial public offering of the Company), or to otherwise effect a sale of the Company, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets, or otherwise, in each case to an unaffiliated bona fide third party purchaser (a "**Drag-along Sale**"), the Dragging Shareholder shall have the right to require that each other Holder (each, a "**Drag-along Shareholder**") participate in such transaction in the manner set forth in this Article 11 on a pro rata basis (except that, at the election of the Dragging Shareholder, a Drag-along Shareholder may be required to (A) include all of its Shares in such Drag-along Sale if such Drag-along Shareholder, together with its Affiliates, holds less than 1% of the Company's then-outstanding Shares or (B) if such Drag-along Shareholder is an employee of the Company or any of its Subsidiaries, rollover its Shares in customary amounts) if, and only if, (x) the Major Consent Approval has been obtained and (y) at least seventy-five percent (75%) of the consideration for the Drag-Along Sale is paid in cash and/or publicly traded securities in the manner set

7

forth in this Article 11. Notwithstanding anything to the contrary in this Agreement, each Drag-along Shareholder shall (A) consent to, vote in favour of, raise no objection to and waive and refrain from exercising any appraisal or dissenter's rights claim or any claim of fiduciary breach (but not any claim that such Drag-along Sale is not being effected in accordance with the terms set forth in these Articles) and (B) obtain any required consents and take any and all reasonably necessary action in furtherance of the Drag-along Sale as requested by and at the Company's expense.

11.1.2    The Dragging Shareholder shall exercise its rights pursuant to this Article 11 by delivering a written notice (the "**Drag-along Notice**") to the Company (A) no later than 20 days prior to the closing date of such Drag-along Sale. The Company will promptly deliver a copy of the Drag-along Notice to each Drag-along Shareholder. The Drag-along Notice shall make reference to the Dragging Shareholder's rights and obligations hereunder and shall describe in reasonable detail: (A) the number of Shares to be sold by the Dragging Shareholder, if the Drag-along Sale is structured as a transfer of Shares; (B) the identity of the third party purchaser; (C) the proposed date, time and location of the closing of the Drag-along Sale; (D) the per share purchase price and the other material terms and conditions of the transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

11.1.3    The consideration to be received by a Drag-along Shareholder shall be the same form and amount of consideration per Share to be received by the Dragging Shareholder (or, if the Dragging Shareholder is given an option as to the form and amount of consideration to be received, the same option shall be given) and the terms and conditions of such transfer shall, except as otherwise provided in the immediately succeeding sentence, be the same as those upon which the Dragging Shareholder transfers its Shares. Any (A) representations and warranties to be made or provided by a Drag-along Shareholder in connection with such Drag-along Sale shall be limited to representations and warranties related to such Drag-along Shareholder's authority, ownership and the ability to convey title to its Shares, and with respect thereto, shall be the same representations and warranties that the Dragging Shareholder makes or provides with respect to its Shares, (B) Drag-along Shareholder will not be required to agree to any non-competition or similar restrictions in connection with such Drag-along Sale, and (C) covenants, indemnities and agreements made by the Drag-along Shareholders shall be the same covenants, indemnities and agreements as the Dragging Shareholder makes or provides in connection with the Drag-along Sale, except that with respect to covenants, indemnities and agreements pertaining specifically to the Dragging Shareholder, the Drag-along Shareholder shall make the comparable covenants, indemnities and agreements pertaining specifically to itself; provided that any indemnification obligation relating to the Company shall be (i) several and not joint and (ii) pro rata based on the consideration received by the Dragging Shareholder and each Drag-along Shareholder; provided, further, that in no event shall any indemnification obligation of a Drag-along Shareholder exceed the aggregate proceeds received by such Drag-along Shareholder in connection with the Drag-along Sale.

11.1.4    The fees and expenses of the Dragging Shareholder incurred in connection with a Drag-along Sale and for the benefit of all Holders as determined in good faith by the Board, excluding any Director appointed or nominated by any Dragging Shareholder or its Affiliates (it being understood that costs incurred by or on behalf of a Dragging Shareholder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Company or the third party purchaser, shall be shared by all the Holders on a pro rata

basis, based on the aggregate consideration received by each Holder; provided that no Holder shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Drag-along Sale.

**11.1.5** Each Holder and the Company shall take all actions as may be reasonably necessary to consummate the Drag-along Sale, including entering into agreements, signing or making available the register of Shares and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Dragging Shareholder, subject to the terms and provisions of this Article 11; provided that, such Holder shall not be entitled to any consideration from the Drag-along Sale until such Holder has taken all such actions reasonably requested by the Company or the Dragging Shareholder in writing. Notwithstanding anything to the contrary contained in this Article 11, management of the Company shall not be required to agree to any non-compete, non-solicit or similar restrictive covenants in connection with a Drag-along Sale that are more restrictive in any manner than those (in scope, duration or otherwise) to which management is then subject.

**11.1.6** The Dragging Shareholder shall have 120 days following the date of the Drag-along Notice in which to consummate the Drag-along Sale, on the terms set forth in the Drag-along Notice (which such 120-day period may be extended for a reasonable time not to exceed 180 days to the extent reasonably necessary to obtain any government approvals). If at the end of such period, the Dragging Shareholder has not completed the Drag-along Sale, the Dragging Shareholder may not then effect a transaction subject to this Article 11 without again fully complying with the provisions of this Article 11.

**11.1.7** In relation to any Drag-along Sale, each of the Holders and the Company hereby expressly (i) waives any right it may have to claim the benefit of the provisions of Article 1142 of the Luxembourg Civil Code in case of breach of any of its obligations under this Article 11 with respect to a Drag-along Sale and (ii) acknowledges and agrees that the other Holders and/or the Company shall be entitled to the remedy of specific performance (*exécution forcée en nature*) of the defaulting Holder's obligations thereunder in addition to any other recourse permitted by law.

**11.1.8** The rights under this Section 11 shall terminate automatically upon a Listing of the Company Common Stock.

### Article 12.  Management of the Company – Board

**12.1** The Company shall be managed by a Board which is vested with the broadest powers to manage the business of the Company and to authorise and/or perform all acts of disposal, management and administration falling within the purposes of the Company.

**12.2** Save as otherwise provided in these Articles, all powers not expressly reserved by the law or by the Articles to the General Meeting shall be within the competence of the Board.

**12.3** Except as otherwise provided herein, by law or in the Shareholders Agreement, the Board of the Company is authorised to take such action (by resolution or otherwise) and to adopt such provisions as shall be necessary, appropriate, convenient or deemed fit to implement the purpose of the Company.

**12.4** Any duties that are owed by a board of directors of a public limited liability company to a public limited liability company under Luxembourg law shall be owed by the Board to the Company; provided that this shall

not grant any rights to the Company or any other Person that would not be afforded under Luxembourg law (including, without limitation, with respect to rights that are afforded under Luxembourg law only to holders of 10% or more of the Shares).

**Article 13.    Composition of the Board**

**13.1**    The Company shall be managed by a Board composed of a minimum of seven (7) (other than any vacancy resulting from the death, retirement, resignation, dismissal, removal or otherwise of any Director in accordance with Article 13.2.2 or Article 13.4 until such vacancy is filled in accordance with Article 13.2.1 or Article 13.5, as applicable). Directors, may be, but do not need to be, Shareholders of the Company.

**13.2**    Appointment of Directors

**13.2.1**    The Directors are appointed by the General Meeting of Shareholders only from nominations in accordance with the following provisions so that the following individuals are elected and continue to serve as Directors of the Board:

(i)    three (3) individuals proposed by the Initial First Threshold Holder (or any Major Transferee to which such right is assigned), so long as such Person (together with any Affiliate that holds Shares) holds the First Threshold, at least one of whom shall be a Non-Employee Director; provided, that the number of individuals designated by such Person shall be reduced to two in the event that such Person (together with any Affiliate that holds Shares) ceases to hold the First Threshold but holds the Second Threshold or if such Person has made a Designation Right Assignment of such Director right; provided, further, that the number of individuals designated by such Person shall be reduced to one in the event that such Person (together with any Affiliate that holds Shares) ceases to hold the Second Threshold but holds the Third Threshold or if such Person has made a Designation Right Assignment of such Director right;

(ii)    one (1) individual proposed by the Appaloosa Holder (or any Major Transferee to which such right is assigned), so long as such Person (together with any related funds that hold Shares) holds the Third Threshold;

(iii)    one (1) individual proposed by the DK Holder (or any Major Transferee to which such right is assigned), so long as such Person (together with any Affiliate that holds Shares) holds the Third Threshold; provided, that such initial individual (I) shall not be an employee or member of any governing body of the DK Holder or the Major Transferee or any of its Affiliates, as applicable, and (II) shall have relevant industry experience;

(iv)    one (1) individual proposed by the CarVal Holder (or any Major Transferee to which such right is assigned), so long as such Person (together with any Affiliate that holds Shares) holds the Third Threshold; provided, that, such initial individual (I) shall not be an employee or member of any governing body of the CarVal Holder or the Major Transferee or any of its Affiliates, as applicable, and (II) shall have relevant industry experience; and

(v)    the then-serving Chief Executive Officer of the Company.

10

**13.2.2**       If a Nominating Shareholder ceases to hold at least the Minimum Threshold at any time, (i) such Nominating Shareholder's designee (or, in the event the Initial First Threshold Holder or its Major Transferee entitled to propose two or more Directors (if any), as applicable, ceases to hold the First Threshold but continues to hold the Second Threshold or ceases to hold the Second Threshold but continues to hold the Third Threshold, the designee of the Initial First Threshold Holder's or its Major Transferee's, as applicable, choosing) shall resign immediately from the Board and the resulting vacancy shall be filled in accordance with the Articles and, where applicable, the Shareholders Agreement and (ii) thereafter such Nominating Shareholder shall no longer have the right to propose a Director for election under Article 13.2.1 or to transfer such right of proposal to any Major Transferee (or in the event the Initial First Threshold Holder or its Major Transferee entitled to propose two or more Directors (if any) ceases to hold the First Threshold but continues to hold the Second Threshold or ceases to hold the Second Threshold but continues to hold the Third Threshold, the Initial First Threshold Holder or such Major Transferee shall, respectively, no longer have the right to propose three Directors (but shall continue to have the right to propose, and transfer the right of proposal for, two Directors) or two Directors (but shall continue to have the right to propose, and transfer the right of proposal for, one Director). Notwithstanding any other provision of the Articles, no Holder (including its Affiliates) shall at any time be entitled to propose more than three Directors for election to the Board at any time under Article 13.2.1, notwithstanding the amount of Shares held by such Holder and its Affiliates.

**13.2.3**       A Nominating Shareholder, in such Nominating Shareholder's sole discretion, shall have the right to assign its nomination rights under Article 13.2.1 to a Major Transferee. In order to exercise such right, a Nominating Shareholder must (i) transfer to such Major Transferee at least the applicable amount of Shares to exercise such right (i.e., in the aggregate, the Third Threshold for one director, the Second Threshold for two directors or the First Threshold for three directors) and (ii) if the transfer provided for in Article 13.2.3(i) would not put such Nominating Shareholder below its then highest Minimum Threshold, irrevocably assign the right to propose the Director(s) being assigned to the relevant Major Transferee (a "**Designation Right Assignment**"). If a Nominating Shareholder shall exercise such right, the Nominating Shareholder must deliver written notice thereof to the Company at or prior to effecting such transfer, and the Company shall, within two Business Days of receiving such notice, deliver written notice thereof to all of the other Nominating Shareholders. Upon the exercise of a Designation Right Assignment in accordance with the Articles and the Shareholders Agreement, the Minority Director appointed by the Major Transferee shall be entitled to exercise all of the rights afforded a Minority Director appointed by a Nominating Shareholder, including rights under Article 15.4 and Article 15.1 as regards to quorum and convening of board meetings.

**13.2.4**       The Company shall provide notice to each Nominating Shareholder at least forty-five (45) days prior to each annual General Meeting (or at least ten (10) days prior to a solicitation by the casting of votes in writing in lieu of such annual General Meeting). Unless a Nominating Shareholder provides written notice to the Company no later than thirty (30) days prior to such annual General Meeting (or at any time prior to a solicitation by the casting of votes in writing in lieu of such annual General Meeting) (i) that a then-current Representative Director will not be proposed for reelection to the Board at such annual General Meeting (or such casting of votes in writing in lieu of such annual General Meeting) and (ii) identifies the individual such Nominating Shareholder proposes for election in place of such then-current Representative Director, such then-current Representative Director shall be automatically nominated for reelection to the Board at such annual General Meeting (or such casting of votes in writing in lieu of such annual General Meeting) unless at the time of such meeting (or such casting of votes in writing in lieu of such

11

annual General Meeting) such Nominating Shareholder no longer has the right to nominate such Representative Director.

**13.2.5** For purposes of determining satisfaction of any Holder thresholds in the Articles, the Shares held by any Holder shall be (a) calculated without giving effect to any management incentive dilution, including from the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company (whether as a result of actually issued and outstanding Shares or contingent instruments (e.g., options)) or dilution from other future-issued securities, including under the Warrants, and (b) aggregated with Shares held by its and its Affiliates' related funds, investment vehicles and managed accounts; *provided, however*, that if the Company makes a Non-Conforming Issuance, any determination made on or before the earlier of (x) the consummation of the issuance of New Securities to all subscribing Preemptive Rightholders pursuant to the Shareholders Agreement and (y) the expiration of the applicable offer period specified in the Shareholders Agreement shall exclude any Shares issued in connection with such Non-Conforming Issuance (the "**Dilution Principles**").

**13.3** The Directors are appointed for a period not exceeding six (6) years and until their successors are elected. The Directors shall be eligible for re-election indefinitely.

**13.4** A Representative Director may be removed with or without cause at any time upon request of his or her Nominating Shareholder. In such event, such Nominating Shareholder will request a resignation from its Representative Director.

**13.5** In the event of a vacancy in the office of a Director because of death, retirement, resignation, dismissal, removal or otherwise, the remaining Directors appointed by a General Meeting may fill such vacancy by simple majority vote and appoint a successor, chosen in accordance with the provisions of the Shareholders Agreement, to act until the next General Meeting.

**13.6** Each Nominating Shareholder shall have the right to designate one non-voting observer for as long as such Holder remains a Nominating Shareholder. The rights and obligations of the observer(s) so appointed shall be determined by the Board in accordance with and pursuant to the provisions of the Shareholders Agreement.

**13.7** Each Holder shall take and do (and where applicable vote or cause to be voted all of the Shares held by such Holder and any other voting securities of the Company over which such Holder has voting control) all necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting) to give effect to this Article 13, and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings) to give effect to the same.

**13.8** Subject to applicable law, each Director shall be entitled to reimbursement of reasonable, out of pocket expenses incurred in connection with its service as a Director.

### Article 14.   Chairperson

**14.1** The Board shall, to the extent required by law and otherwise may, appoint a chairperson of the Board in accordance with the provisions of the Shareholders Agreement. The chairperson shall preside over all meetings of the Board and of Shareholders. In the absence of the chairperson, another Director designated by the chairperson or, if none was designated by the chairperson, by the Board (or as applicable, the General Meeting) shall

chair the relevant meeting.

**14.2**      In case of a tie, neither the chairperson nor any other Board member shall have a casting (tie breaking) vote.

**Article 15.      Board Proceedings**

**15.1**      The Board shall meet upon call by (or on behalf of) (i) the chairperson, (ii) the then-serving Chief Executive Officer of the Company or (iii) any two (2) of the Minority Directors. The Board shall meet as often as required by the interests of the Company.

**15.2**      Notice of any meeting of the Board must be given by letter, telephone, facsimile transmission or e-mail to each Director at least (i) in the case of a physical meeting to be held in Luxembourg, at least ten (10) Business Days before the meeting, and (ii) in the case of any other meeting of the Board, at least three (3) Business Days before the meeting, except in the case of this clause (ii) in the case of an emergency, in which event twenty-four (24) hours' notice shall be sufficient. No convening notice shall be required for meetings held pursuant to a schedule previously approved by the Board and communicated to all Board members. A meeting of the Board may also be validly held without convening notice to the extent the Directors present or represented do not object and those Directors not present or represented (other than conflicted Directors) have waived the convening notice in writing, by fax, email or otherwise.

**15.3**      Any Director may act at any meeting of the Board by appointing in writing by letter or by cable, telegram, facsimile transmission or e-mail another Director as his proxy. A Director may represent more than one of the other Directors.

**15.4**      Subject to any quorum requirement as may be set out in the Shareholders Agreement, the duly convened meeting of the Board shall be duly constituted and may validly deliberate if a majority of all Directors in office (and entitled to vote) is present or represented. If quorum is not met at a meeting of the Board, the meeting shall be reconvened. Subject to any quorum requirement as may be set out in the Shareholders Agreement, any duly reconvened meeting of the Board shall be duly constituted and may validly deliberate if any two Directors in office (and entitled to vote) are present.

**15.5**      <u>Majorities</u>

**15.5.1**      Subject to the majorities required for the Major Consent Matters and the Supermajority Board Matters, resolutions put to the vote in a quorate meeting of the Board shall be passed only if approved by a simple majority of affirmative votes of the Directors present or represented (and entitled to vote).

**15.5.2**      Major Consent Matters put to the vote in a quorate meeting of the Board shall be passed only if approved by at least (i)(A) 66-$^2$/$_3$% (i.e., five of seven) of the Directors ("**Supermajority Board Approval**") and (B) 55% of the then-issued and outstanding Shares or (ii) 85% (i.e., six of seven) of the Directors ("**Major Consent Approval**").

**15.5.3**      Supermajority Board Matters put to the vote in a quorate meeting of the Board shall be passed only if approved by the affirmative vote of at least 66-2/3% (i.e., five of seven) of the Directors.

13

**15.5.4**    To the extent any Shareholder approvals is required in addition to the Major Consent Approval or Supermajority Board Approval in order to take any Major Consent Matter or Supermajority Board Matter, as applicable, each Holder shall take and do (and where applicable to vote or cause to be voted all of the Shares held by such Holder and any other voting securities of the Company over which such Holder has voting control, it being understood that nothing in this Articles shall require any Holder to cast any vote as directed by the Company) all necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting) to give effect to this Article 15.5. The Company shall take all necessary or desirable actions within its control (including calling General Meetings) to facilitate the foregoing.

**15.6**    Meetings of the Board may be held physically or, in all circumstances, by way of telephone conference call, video conference or similar means of communication which permit the participants to communicate with each other. A Director attending in such manner shall be deemed present at the meeting for as long as he is connected.

**15.7**    The Board may also in all circumstances with unanimous consent of those Directors entitled to vote pass resolutions by circular means and written resolutions signed by all members of the Board entitled to vote will be as valid and effective as if passed at a meeting duly convened and held. Such signatures may appear on a single document or multiple copies of an identical resolution and may be evidenced by letters, cables, facsimile transmission or e-mail.

**15.8**    The minutes of any meeting of the Board (or copies or extracts of such minutes which may be produced in judicial proceedings or otherwise) shall be signed by the chairperson of the Board, the chairperson (*ad hoc*) of the relevant meeting or by any two (2) Directors or as resolved at the relevant Board meeting or any subsequent Board meeting. Minutes or resolutions of the Board (or copies or extracts thereof) may further be certified by the secretary of the Board.

### Article 16.    Delegation of power, committees, secretary

**16.1**    The Board may delegate the daily management of the business of the Company, as well as the power to represent the Company in its day-to-day business, to individual Directors or other officers or agents of the Company (with power to sub-delegate). In addition, the Board may delegate the daily management of the business of the Company, as well as the power to represent the Company in its day-to-day business to an executive or other committee as it deems fit. The Board shall determine the conditions of appointment and dismissal as well as the remuneration and powers of any such Person or Persons so appointed.

**16.2**    The Board may (but shall not be obliged to unless required by law) establish one or more committees (including an audit committee and a compensation committee) and for which it shall, if one or more of such committees are set up, appoint the members (who must be members of the Board), determine the purpose, powers and authorities as well as the procedures and such other rules as may be applicable thereto. The Board shall be in charge of the supervision of the activities of the committee(s).

**16.3**    The Board may appoint a secretary of the Company who may be but does not need to be a member of the Board and determine his/her responsibilities, powers and authorities.

14

**Article 17.     Binding Signature**

The Company will be bound by the joint signatures of any two (2) Directors or by the sole or joint signatures of any Person or Persons to whom such signatory power shall have been delegated by the Board. For the avoidance of doubt, for acts regarding the daily management of the Company, the Company will be bound by the sole signature of its Chief Executive Officer or any Person or Persons to whom such signatory power is delegated by the Board (with or without power of substitution).

**Article 18.     Liability of the Directors**

**18.1**     The Directors are not held personally liable for the indebtedness or other obligations validly made in the name of the Company. As agents of the Company, they are responsible for the performance of their duties.

**18.2**     Subject to the exceptions and limitations listed below, every Person who is, or has been, a director or officer  of the Company or a direct or indirect Subsidiary of the Company shall be indemnified by the Company to the fullest extent permitted by law against liability and against all expenses reasonably incurred or paid by him in connection with any claim, action, suit or proceeding which he or she becomes involved as a party or otherwise by virtue of his or her being or having been such Director or officer and against amounts paid or incurred by him or her in the settlement thereof. The words "claim", "action", "suit" or "proceeding" shall apply to all claims, actions, suits or proceedings (civil, criminal or otherwise including appeals) actual or threatened and the words "liability" and "expenses" shall include without limitation attorneys' fees, costs, judgments, amounts paid in settlement and other liabilities.

**18.3**     No indemnification shall be provided to any director or officer of the Company or a direct or indirect Subsidiary of the Company:

**18.3.1**     Against any liability to the Company or its Shareholders by reason of wilful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his or her office;

**18.3.2**     With respect to any matter as to which he/she shall have been finally adjudicated to have acted in bad faith and not in the interest of the Company (or as the case may be the relevant subsidiary); or

**18.3.3**     In the event of a settlement, unless the settlement has been approved by a court of competent jurisdiction or by the Board.

**18.4**     The Company shall, to the fullest extent permitted by law, purchase and maintain insurance on customary terms for the industry and size of the Company to protect any director, officer of Board observer of the Company or a direct or indirect Subsidiary of the Company to the maximum extent of the coverage available under such policy or policies against any expense, liability or loss, whether the Company would have the power to indemnify such person against such expense, liability or loss under these Articles or otherwise. The Company may also make other arrangements, including, but not limited to, providing a trust fund, letter of credit, or surety bond on behalf of a director or officer of the Company or a direct or indirect Subsidiary of the Company against any liability asserted against him/her or incurred by or on behalf of him/her in his/her capacity as a director or officer of the Company or a direct or indirect Subsidiary of the Company.

**18.5**     The right of indemnification herein provided shall be severable, shall not affect any other rights to

15

which any director or officer of the Company or a direct or indirect Subsidiary of the Company may now or hereafter be entitled, shall continue as to a Person who has ceased to be such director or officer and shall inure to the benefit of the heirs, executors and administrators of such a Person. The right to indemnification provided herein is not exclusive and nothing contained herein shall affect any rights to indemnification to which corporate personnel, including directors and officers, may be entitled by contract or otherwise under law.

**18.6**    Expenses in connection with the preparation and representation of a defence of any claim, action, suit or proceeding of the character described in this Article shall be advanced by the Company prior to final disposition thereof upon receipt of an undertaking by or on behalf of the officer or director, to repay such amount if it is ultimately determined that he/she is not entitled to indemnification under this Article.

### Article 19.    Conflicts of Interest

**19.1**    No contract or other transaction between the Company and any other company or firm shall be affected or invalidated solely by the fact that any one or more of the Directors or officers of the Company is financially interested in, or is a director, associate, officer, agent, adviser or employee of such other company or firm. Subject to Article 19.2 and the Shareholders Agreement, any Director or officer who serves as a director, officer or employee or otherwise of any company or firm with which the Company shall contract or otherwise engage in business shall not, by reason of such affiliation with such other company or firm only, be prevented from considering and voting or acting upon any matters with respect to such contract or other business.

**19.2**    In the case of a conflict of interest of a Director, such Director shall indicate such conflict of interest to the Board and shall not deliberate or vote on the relevant matter. Any conflict of interest arising at Board level shall be reported to the next General Meeting of Shareholders before any resolution is put to vote.

**19.3**    The day-to-day Director(s) or person(s) in charge of the day-to-day business of the Company, if any, are *mutatis mutandis* subject to this Article 19 of these Articles, provided that if only one (1) day-to-day director has been appointed and is in a situation of conflicting interests, the relevant decision shall be adopted by the Board.

### Article 20.    Meetings of the Shareholders of the Company

**20.1**    In the case of a plurality of Shareholders, any regularly constituted General Meeting shall represent the entire body of Shareholders. It shall have the broadest powers to order, carry out or ratify acts relating to all the operations of the Company.

**20.2**    In the case of a sole shareholder, the Sole Shareholder assumes all powers conferred to the General Meeting. In these Articles, as long as the Company has only one shareholder, any reference to decisions taken, or powers exercised, by the General Meeting shall be deemed to be a reference to decisions taken, or powers exercised, by the Sole Shareholder. The decisions taken by the Sole Shareholder are documented by way of minutes.

**20.3**    The annual General Meeting shall be held, in accordance with Luxembourg law, in Luxembourg at the address of the registered office of the Company or at such other place in Luxembourg as may be specified in the convening notice of the meeting within six (6) months of the end of the previous financial year.

**20.4**    The annual General Meeting may be held abroad if, in the absolute and final judgment of the Board,

16

exceptional circumstances so require.

20.5     Other General Meetings may be held at such place and time as may be specified in the respective convening notices of the meeting. Shareholders taking part in a meeting by conference call, through video conference or by any other means of communication allowing for their identification, allowing all Persons taking part in the meeting to hear one another on a continuous basis and allowing for an effective participation of all such Persons in the meeting, are deemed to be present for the computation of the quorums and votes, subject to such means of communication being made available at the place of the meeting.

20.6     General Meetings shall be convened in accordance with the provisions of law. If all of the Shareholders are present or represented at a general meeting of Shareholders, the General Meeting may be held without prior notice or publication.

20.7     Proposals from Shareholders for any General Meeting as to in particular without limitation regarding agenda items, resolutions or any other business, may only be made in compliance with the Company Law and these Articles and will only be accepted by the Company if required by the Company Law and these Articles.

20.8     Any Shareholder may be represented at a General Meeting by appointing as his or her proxy another Person, who need not be a Shareholder. Any Shareholder is entitled to be admitted to any General Meeting; provided, however, that the Board may determine a date and time preceding the General Meeting as the record date for admission to such meeting, which may not be less than twenty (20) calendar days before the date of such meeting (the "**Record Date**").

20.9     The Board may suspend the voting rights of Shareholders who are in material default of their obligations under the Articles or the Shareholders Agreement, provided that prior to suspending such voting rights, the Board shall provide written notice to such Shareholders, setting forth in reasonable detail the alleged default(s), at least fourteen (14) calendar days prior to any the General Meeting or other meeting of Shareholders for which the Board desires to suspend such Shareholder's voting rights.

20.10     Shareholders of notes or bonds or other securities issued by the Company (if any) shall not, unless compulsorily otherwise provided for by law, be entitled to assist or attend General Meetings or receive notice thereof.

**Article 21.    Quorum and majority, and amendment of the Articles**

21.1     Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, at any General Meeting of Shareholders other than a General Meeting convened for the purpose of amending the Company's Articles or voting on resolutions whose adoption is subject to the quorum and majority requirements for amendments of the Articles, no presence quorum is required and resolutions shall be adopted, irrespective of the number of Shares represented, by a simple majority of votes validly cast.

21.2     At any extraordinary General Meeting of Shareholders for the purpose of amending the Company's Articles or voting on resolutions whose adoption is subject to the quorum and majority requirements for amendments of the Articles, the quorum shall be at least one half of the issued and outstanding Shares of the Company (other than Shares held by or on behalf of the Company or a direct Subsidiary). If such quorum is not present, a second General Meeting may be convened at which there shall be no quorum requirement. Resolutions amending the Company's Articles or whose adoption is subject to the quorum and majority requirements for amendments of the Articles shall

17

only be validly passed by a two thirds (2/3) majority of the votes validly cast at any such General Meeting, save as otherwise provided by law, the Articles and the Shareholders Agreement.

**Article 22.    Accounting Year**

The accounting year of the Company shall begin on first of January and shall terminate on the thirty-first of December of each year.

**Article 23.    Independent Auditor(s)**

**23.1**     The operations of the Company shall be supervised by a supervisory auditor (*commissaire aux comptes*) who may but need not be a shareholder. Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the supervisory auditor shall be elected by the General Meeting for a period ending at the next annual General Meeting or until a successor is elected. Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the supervisory auditor in office may be removed at any time by the General Meeting with or without cause.

**23.2**     In the event the thresholds set by law as to the appointment of an approved statutory auditor (*réviseur d'entreprises agréé*) are met or otherwise required or permitted by law, the accounts of the Company shall (and in case only permitted but not required by law, may) be supervised by an approved statutory auditor (*réviseur d'entreprises agréé*).

**Article 24.    Distributions**

Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement,

**24.1**     From the annual net profits of the Company, five percent (5%) shall be allocated to a non-distributable reserve as required by law. This allocation shall cease to be required as soon as, and as long as, such reserve amounts to ten percent (10 %) of the issued share capital of the Company.

**24.2**     The General Meeting of Shareholders, upon recommendation of the Board, shall determine how the annual results of the Company will be disposed of in accordance with the provisions of the present Articles. The General Meeting of Shareholders may resolve to distribute any distributable net profits, reserves and/or share premium.

**24.3**     Interim distributions (including for the avoidance of doubt, interim dividends) may be declared and paid (including by way of staggered payments) by the Board (including out of any share premium or other capital or other reserves) subject to observing the terms and conditions provided by law either by way of a cash distribution or by way of an in-kind distribution (including Shares).

**24.4**     The distributions declared may be paid in US Dollars (USD) or any other currency selected by the Board and may be paid at such places and times as may be determined by the Board (subject to the resolutions of the General Meeting of Shareholders). The Board may make a final determination of the rate of exchange applicable to translate distributions of funds into the currency of their payment. Distributions may be made in specie (including by way of Shares).

**24.5**     A distribution declared but not paid (and not claimed) on a Share after five years cannot thereafter be claimed by the holder of such Share and shall be forfeited by the holder of such Share, and revert to the

18

Company. No interest will be paid on distributions declared and unclaimed which are held by the Company on behalf of holders of Shares.

### Article 25.    Liquidation

In the event of the dissolution of the Company for whatever reason or at whatever time (subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement), the liquidation will be performed by liquidators or by the Board then in office who will be endowed with the powers provided by articles 1100-4 et seq. of the Company Law. Once all debts, charges and liquidation expenses have been met, any balance resulting shall be paid to the holders of Shares in the Company in accordance with the provisions of these Articles.

### Article 26.    Definitions

| | |
|---|---|
| Acquiring Shareholder | Has the meaning ascribed to it in Article 10; |
| Affiliate | Means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any investment fund the primary investment advisor to which is such Person or an Affiliate thereof); provided that for purposes of these Articles, no Shareholder or Holder shall be deemed an Affiliate of the Company or any of its Subsidiaries. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise; |
| Appaloosa Holder | Means Palomino Master Ltd., Azteca Partners LLC and any of their respective related funds that hold Shares; |
| Articles | Means the present articles of association of the Company as amended from time to time; |
| Beneficial Interests | Means with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Shares it Beneficially Owns; |
| Beneficial Owner | Means any Person owning a securities entitlement with respect to Shares registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry |

| | |
|---|---|
| | system maintained by DTC and DTC Participants and which securities entitlement has not been credited to any other Person's securities account. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings; |
| Board | Means the Board of Directors (*conseil d'administration)* of the Company; |
| Business Day | Means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York or Luxembourg, Grand Duchy of Luxembourg; |
| CarVal Holder | Means CVI AA Cayman Securities LP, CVI AV Cayman Securities LP, CVIC Cayman Securities Ltd., CarVal GCF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI CVF V Cayman Securities Ltd., CarVal CCF Cayman Securities Ltd., CVI CCOF Cayman Securities Ltd., CVI CVF III Cayman Securities Ltd., together with their Affiliates and related funds; |
| Communication Laws | Means the United States Communications Act of 1934, as amended, the United States Telecommunications Act of 1996, any rule, regulation or policy of the Federal Communications Commission, and/or any statute, rule, regulation or policy of any other U.S., federal, state or local governmental or regulatory authority, agency, court commission, or other governmental body with respect to the operation of channels of radio communication and/or the provision of communications services, each as amended from time to time; |
| Company Law | Means the Luxembourg law of 10th August 1915 on commercial companies as amended (and any replacement law thereof), as amended from time to time; |
| CVR Agreements | Means, collectively, those certain agreements setting forth the full terms and conditions of the contingent value rights issued pursuant to the Plan on the Plan Effective Date; |
| Designation Right Assignment | Has the meaning ascribed to it in Article 13.2.3; |
| Dilution Principles | Has the meaning ascribed to it in Article 13.2.5; |
| Director | Means a member of the Board; |

20

| DK Holder | Means Davidson Kempner Capital Management LP, together with its Affiliates and related funds; |
|---|---|
| Drag-along Notice | Has the meaning ascribed to it in Article 11.1.2; |
| Drag-along Sale | Has the meaning ascribed to it in Article 11.1.1; |
| Drag-along Shareholder | Has the meaning ascribed to it in Article 11.1.1; |
| Dragging Shareholder | Has the meaning ascribed to it in Article 11.1.1; |
| DTC | Means The Depository Trust Company; |
| DTC Participant | Means any Person that is reflected on the books and records of DTC as having a direct interest in the Shares held of record by DTC; |
| Existing Holder Exception | Has the meaning ascribed to it in Article 9.1; |
| Fair Market Value | Means the fair market value of the Shares or other equity securities of the Company as determined in good faith by the Board; provided, however, that the Company may obtain an independent appraisal of the value of the Shares or other equity securities of the Company on an annual basis for the Board to rely upon in determining the Fair Market Value, which appraisal shall be prepared by a nationally recognized independent valuation firm (a "**Valuation Firm**"); *provided, further*, that if the Holder for whom the determination of Fair Market Value is being made objects to such Fair Market Value determination, the Company shall obtain an independent appraisal (or another independent appraisal if an annual appraisal was already obtained) of the value of the Shares or other equity securities of the Company from a valuation firm mutually agreed upon between the Company and such Holder (which is different from the Valuation Firm if an annual appraisal was already obtained). The Holder shall deliver written notice of his or her objection to the Company within twenty (20) Business Days after such Holder receives notice of the Board's determination. Any determination by such mutually agreed valuation firm pursuant to the foregoing provisions shall be a final and binding determination (save for manifest error) of Fair Market Value for purposes of Article 9.4. The Company shall pay the cost and expense of any independent appraisal, except that the objecting Holder shall reimburse the Company for such cost and expense in the event that such final and binding determination of Fair Market Value by |

21

| | the mutually agreed valuation firm is equal to or less than the Fair Market Value as initially determined by the Board; |
|---|---|
| First Threshold | Means at least twenty percent (20%) of the outstanding Shares, which, for the avoidance of doubt, will be calculated in accordance with the Dilution Principles; |
| General Meeting | Means the general meeting of Shareholders; |
| Hold | Means, in respect of the Shares, direct ownership as a Shareholder and/or Beneficial Ownership of a Beneficial Interest in Shares. Derivative terms, including, without limitation, "Holder", should be interpreted accordingly and shall include, for the avoidance of doubt, the Appaloosa Holder, CarVal Holder, DK Holder and the Initial First Threshold Holder; |
| Initial First Threshold Holder | Means Pacific Investment Management Company LLC together with its Affiliates and related funds; |
| Listing | Means a listing of securities resulting in the Company being registered under Section 12(b) of the Exchange Act; |
| Major Consent Approval | Has the meaning ascribed to it in Article 15.5.2; |
| Major Consent Matters | Means any of the following matters:<br><br>(i) initiating, by application of the Company, or any decision or action of the Shareholder(s), any voluntary dissolution, winding up or liquidation in relation to the Company or Intelsat Jackson Holdings S.A.;<br><br>(ii) any sale of the Company (including any change in control of the majority of voting interests in the Company, other than any transfer by the Holders in compliance with the tag-along rights provided for in the Shareholders Agreement to the extent that neither the Company nor any of its Subsidiaries is involved in such transaction in a capacity other than implementing the transfer of equity securities in connection therewith and other actions ancillary thereto) or all or substantially all of its assets;<br><br>(iii) conversion of the Company to another form of entity (other than in connection with a Listing);<br><br>(iv) any redemption or repurchase of equity securities other than (x) pursuant to a pro rata offer to all holders |

of such class of equity securities, (y) of equity securities owned by employees of the Company in connection with termination of employment or (z) a compulsory redemption for Communications Laws reasons under Article 9;

(v)                any election of the Company or any of its Subsidiaries to be taxed in a different manner or classified differently for tax purposes (including any change to the jurisdiction of organization or means of qualification for tax treaty benefits of the Company or any of its Subsidiaries);

(vi)               any amendment to the Articles, including, without limitation, any amendment to the Articles that would create additional authorized share capital, provided, however, that twenty percent (20%) of the Shares (in addition to Shares reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants) shall be authorized but unissued on the date of the extraordinary general meeting of shareholders of the Company held on February 10, 2022 and issuable pursuant to a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent true-up offering as set forth in Section 7(c) of the Shareholders Agreement); provided, further, that Major Consent Approval will not be required for amendments to the Articles in connection with (x) issuances of Shares permitted by the foregoing proviso, (y) issuances of Shares reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants, and (z) a change of address in Luxembourg;

(vii)              any suppression of statutory pre-emption rights (whether under Luxembourg Law or other applicable law); *provided however*, that the Company may make a Non-Conforming Issuance, provided, further, that upon any Non-Conforming Issuance, the Company shall make a subsequent true-up offering as set forth in Section 7(c) of the Shareholders Agreement;

(viii)             the issuance of equity securities, options or other rights to acquire such equity securities, or convertible/exchangeable indebtedness, of the Company or any of its Subsidiaries, other than a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a

23

|  | subsequent true-up offering as set forth in Section 7(c) of the Shareholders Agreement) or the issuance of Shares reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants;<br><br>(ix)    any change in the size, voting or composition of the Board; provided that such change shall not (a) reduce the size of the Board to less than seven Directors, (b) modify the consent or quorum rights of any Directors provided for in the Shareholders Agreement, or (c) modify the voting thresholds set forth in the Shareholders Agreement; and<br><br>(x)    any Major Consent Amendment; |
|---|---|
| Major Transferee | Means an Approved Transferee to which a Nominating Shareholder transfers any of its rights to designate a Director pursuant to the Shareholders Agreement; |
| Management Incentive Plan | Means the management incentive plan implemented by the Company on the date of the Shareholders Agreement; |
| Minimum Threshold | Means the First Threshold, Second Threshold or Third Threshold, as applicable; |
| Minority Director | Means the Directors elected upon proposal of the Minority Investors in accordance with the terms of the Shareholders Agreement; |
| Minority Investor | Means each of the Appaloosa Holder, the CarVal Holder and the DK Holder, in each case so long as such Person holds the Third Threshold; |
| New Securities | Has the meaning ascribed to it in the Shareholders Agreement; |
| New Warrant Agreements | Means, collectively, those certain agreements setting forth the full terms and conditions of the Warrants; |
| Nominating Shareholder | Means each of the Initial First Threshold Holder, the Appaloosa Holder, the CarVal Holder and the DK Holder or a Major Transferee, in each case so long as such Person holds at least the Minimum Threshold; |
| Non-Conforming Issuance | Means an issuance by the Company of up to 20% of the Shares (in addition to Shares reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants) without honoring Holders' preemptive rights if the Board |

| | determines (in compliance with clause (ii) of the Supermajority Board Matters) that such Shares must be issued before the Company could comply with such preemptive rights; |
|---|---|
| Non-Employee Director | Means one individual nominated to the Board in accordance with the Shareholders Agreement, provided, that such individual shall (x) not be an employee or member of the board of managers or other governing body of the applicable Nominating Shareholder or any of its Affiliates, and (y) have experience in one of the following industries: (1) space, (2) satellite, (3) technology, (4) communication, (5) aerospace and defense, (6) military/government and (7) commercial aviation; |
| Person | Means any individual, partnership, corporation, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof; |
| Plan | Means the Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates filed by the Debtors on December 17, 2021 at Docket No. 3891 in Case No. 20-32299 (KLP) in the Bankruptcy Court, and confirmed by the Bankruptcy Court at Docket No. 3894 in Case No. 20-32299 (KLP), as amended, modified or supplemented; |
| Plan Effective Date | Means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective; |
| Preemptive Rightholder | Has the meaning ascribed to it in the Shareholders Agreement; |
| Registration Rights Agreement | Means the Registration Rights Agreement among the Company and the holders party thereto dated on or about the Plan Effective Date; |
| Representative Director | Means a Person elected as a Director upon proposal of a Nominating Shareholder in accordance with the terms of the Shareholders Agreement; |
| Record Date | Has the meaning ascribed to it in Article 20.8; |
| Representatives | Means with regard to a Shareholder or Holder, its partners, shareholders, members, directors, officers, employees, agents, counsel, accountants, consultants, investment advisers or other |

25

| | professionals or representatives, or its Affiliates or wholly owned Subsidiaries; |
|---|---|
| RCS Law | Means the law dated 19 December 2002 concerning the register of commerce and of companies as well as the accounting and the annual accounts of undertakings, as amended (and any replacement law thereof); |
| RESA | Means the Luxembourg electronic legal gazette (*Recueil électronique des Sociétés et Associations*); |
| Second Threshold | Means at least fifteen percent (15%) of the outstanding Shares, which, for avoidance of doubt, will be calculated in accordance with Dilution Principles; |
| Shareholder | Means a duly registered holder of Shares of the Company; |
| Shareholders Agreement | Means the Shareholders Agreement of the Company dated on or about the Plan Effective Date (as it may be amended, modified or supplemented from time to time in accordance with the terms thereof); |
| Share Rights | Has the meaning ascribed to it in Article 5.2.3; |
| Shares | Means the common shares (*actions*) with a nominal value of one cent of US Dollar (USD 0.01) per share, in registered form, of the Company; |
| Subsidiary | Means when used with respect to any Person, any corporation or other entity, whether incorporated or unincorporated, (a) of which such Person or any other Subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any Subsidiary of such Person do not have a majority of the voting interests in such partnership) or (b) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other entity is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries; |
| Supermajority Board Approval | Has the meaning ascribed to it in Article 15.5.2; |
| Supermajority Board Matters | Means any of the following matters: |

26

(i)        initiating, by application of the Company, or any decision or action of the Shareholder(s), any voluntary bankruptcy proceedings, receivership or any other insolvency or restructuring proceedings in Luxembourg or any other jurisdiction in relation to Company or Intelsat Jackson Holdings S.A.;

(ii)        any Non-Conforming Issuance;

(iii)        any type of dividend or distribution on or repurchase or redemption of equity securities of the Company or any of its Subsidiaries, other than (A) dividends and distributions from a wholly-owned Subsidiary of the Company to the Company or another wholly-owned Subsidiary thereof (B) redemptions of equity securities of the Company owned by employees of the Company in connection with the termination of employment; provided that in any event no non-pro rata dividends shall be permitted (other than in connection with redemptions for any aggregator vehicle related to the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company) and (C) compulsory redemptions for Communications Laws reasons under Article 9;

(iv)        any amendment to these Articles (if applicable), the Registration Rights Agreement, CVR Agreements, the Management Incentive Plan and the New Warrant Agreements, to the extent not a Major Consent Amendment;

(v)        any consummation of a listing of securities of the Company on any national securities exchange, including a Listing;

(vi)        any incurrence of material debt, including any guarantees, incurrence or prepayment thereof by the Company or any of its Subsidiaries (other than drawdown of revolving debt previously approved and trade debt incurred in the ordinary course of business);

(vii)        any hiring or firing of senior officers of the Company or any of its Subsidiaries;

(viii)        any commencement or settlement of any litigation or dispute with an expected value of more than $50 million;

27

| | |
|---|---|
| | (ix)      any change in auditor or change in significant tax or accounting policy other than as required by United States generally accepted accounting principles, as in effect at the applicable time, consistently applied; |
| | (x)      any acquisition or disposition of assets or liabilities, or merger, consolidation, share exchange, business combination, joint venture or similar transaction involving the Company or any of its Subsidiaries outside the ordinary course of business, in a transaction that involves consideration (including assumed debt) or investments in excess of 10% of the consolidated total assets of the Company and its Subsidiaries, to the extent not a Major Consent Matter; |
| | (xi)      any material transaction of the Company or any of its Subsidiaries involving spectrum rights (including transferring the use of spectrum rights or receiving proceeds from spectrum clearances) outside the ordinary course of business; |
| | (xii)      any adoption, approval or revision of any equity incentive plan; |
| | (xiii)      any entry into a new line of business or termination of any material existing line of business, or any other material change in the nature or scope of the business of the Company and its Subsidiaries; |
| | (xiv)      any approval of an annual budget of the Company and its Subsidiaries, provided, that to the extent that a budget has not been approved by year-end, until a new budget is approved, the Company will be permitted to operate on the prior year's budget with a variance of up to 10% on a consolidated basis (which shall include a variance of no more than 10% on line items for capital expenditures and operating expenses); and |
| | (xv)      any capital expenditure by the Company or any of its Subsidiaries in excess of $500 million in the aggregate during any 12-month period; |
| Third Threshold | Means at least five percent (5%) of the outstanding Shares, which, for avoidance of doubt, will be calculated in accordance with Dilution Principles; |

28

| Transfer | Means any sale, pledge, assignment, encumbrance or other transfer or disposition of any Share or Beneficial Interest to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise, other than (i) in connection with any bona fide mortgage, encumbrance or pledge to a financial institution in connection with any bona fide loan or debt transaction or enforcement thereunder, including foreclosure thereof or (ii) any indirect transfer due to transfers of passive investments, such as a limited partnership interest or mutual fund interest, in a pooled investment vehicle or fund (including private fund or a fund registered under the Investment Company Act of 1940). "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings; and |
|---|---|
| Warrants | Means, collectively, those certain warrants issued pursuant to the Plan on the Plan Effective Date. |

**Article 27.    Applicable law and general provision**

27.1    Nothing in these Articles shall require any Shareholder to cast any vote as directed by the Company.

27.2    Notices and communications may be made or waived and circular resolutions may be evidenced in writing, by fax, email or any other means of electronic communication.

27.3    Signatures may be in handwritten or electronic form, provided they fulfil all legal requirements for being deemed equivalent to handwritten signatures. Signatures of circular resolutions or resolutions adopted by telephone or video conference may appear on one original or several counterparts of the same document, all of which taken together shall constitute one and the same document.

27.4    All matters not expressly governed by these Articles shall be determined in accordance with the applicable law and, subject to any non-waivable provisions of the law, with the Shareholders Agreement. The competent Luxembourg courts shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a duty owed by any director or officer of the Company to the Company or the Company's Shareholders, (iii) any action asserting a claim against the Company arising pursuant to any provision of the Company Law and the RCS Law or the Company's Articles, and (iv) any action asserting a claim against the Company with respect to its internal affairs, relationship with its Shareholders or other holders of interest, its directors, officers, or any action as to its Articles or other constitutional or governing documents. Notwithstanding the foregoing or anything to the contrary set forth in these Articles, the governing law and forum selection clauses in the Shareholders Agreement, Registration Rights Agreement, New Warrant Agreements and CVR Agreements shall be as set forth in such documents.

**Exhibit B-2**

**Redline to Articles of Association filed on October 19, 2021**

**[NEW TOPCOINTELSAT EMERGENCE S.A.]**

*Société Anonyme*

**Article 1.  Form, Name**

There exists among the shareholder(s) and all those who may become owners of the Shares hereafter a company in the form of a *société anonyme*, under the name of "**[New TopCoIntelsat Emergence S.A.]**" (the "**Company**").

**Article 2.  Duration**

The Company is established for an undetermined duration. Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the Company may be dissolved at any time by a resolution of the Shareholders adopted in the manner required for the amendment of these Articles.

**Article 3.  Registered office**

**3.1**        The Company has its registered office in the City of Luxembourg, Grand Duchy of Luxembourg.

**3.2**        Within the same municipality, the registered office may be transferred by means of a decision of the Board. It may be transferred to any other municipality in the Grand Duchy of Luxembourg by means of a decision of the Board (in which case the Board shall have the power to amend these Articles accordingly) or a resolution of the General Meeting adopted in the manner required for an amendment of these Articles.

**3.3**        The Company may have offices and branches, both in Luxembourg and abroad.

**3.4**        In the event that the Board determines that extraordinary political, economic or social developments have occurred or are imminent that would interfere with the normal activities of the Company at its registered office, or with the ease of communications between such office and Persons abroad, the registered office may be temporarily transferred abroad until the complete cessation of these abnormal circumstances; such temporary measures shall have no effect on the nationality of the Company which, notwithstanding the temporary transfer of its registered office, will remain a Luxembourg company.

**Article 4.  Purpose, Object**

**4.1**        The object of the Company is the holding of participations, in any form whatsoever, in Luxembourg and foreign companies, or other entities or enterprises, the acquisition by purchase, subscription, or in any other manner as well as the transfer by sale, exchange or otherwise of stock, bonds, debentures, notes and other securities or rights of any kind including interests in partnerships, and the holding, acquisition, disposal, investment in any manner (in), development, licensing or sub licensing of, any patents or other intellectual property rights of any nature or origin as well as the ownership, administration, development and management of its portfolio. The Company may carry out its business through branches in Luxembourg or abroad.

**4.2**        [The Company may further conduct or be involved in any way in, directly or indirectly, any satellite telecommunications or other telecommunications or communications related business in the broadest sense, including without limitation the owning and/or operation of satellites, teleports, any ground assets, and any related or

1

12392265_12

connected activity.]

**4.3**    The Company may borrow in any form and proceed to a private or public issue of shares, bonds, convertible bonds and debentures or any other securities or instruments it deems fit.

**4.4**    In a general fashion the Company may grant assistance (by way of loans, advances, guarantees or granting of securities or otherwise) to companies or other enterprises or Persons in which the Company has an interest or which form part of the group of companies to which the Company belongs or any entity or Person as the Company may deem fit (including up-stream or cross-stream), take any controlling, management, administrative and/or supervisory measures and carry out any operation which it may deem useful in the accomplishment and development of its purposes.

**4.5**    The Company may use any techniques, legal means and instruments to manage its investments efficiently and protect itself against credit risks, currency exchange exposure, interest rate risks and other risks.

**4.6**    Finally, the Company may perform all commercial, technical and financial or other operations, connected directly or indirectly in all areas in order to facilitate the accomplishment of its purpose.

**Article 5.  Share capital**

**5.1**    Issued Share Capital

The Company has an issued share capital of [ ] [six hundred seventy-eight thousand three hundred fifty-five dollars and sixty-four cents US Dollars] ([USD [ ] 678,355.64) represented by a total of [ ] ([ ]sixty-seven million, eight hundred thirty-five thousand, five hundred and sixty-four (67,835,564) fully paid common shares [each with a nominal value of [ ] ([USD] [ ])/without nominal value] (the "Common Shares") with such rights and obligations as set forth in the present Articles.

**5.2**    Authorised Share Capital

**5.2.1**    The authorised share capital of the Company (including the issued share capital) is set at [ ] [nine hundred twenty-five thousand, nine hundred ninety-five dollars and forty-five cents US Dollars] ([USD [ ] 925,995.45) to be represented by [ ] ([ ]ninety-two million, five hundred ninety-nine thousand, five hundred forty-five (92,599,545) Shares, [each with a nominal value of [ ] ([USD] [ ])/without nominal value].

**5.2.2**    The authorised unissued share capital (and any authorisation granted to the Board in relation thereto) shall be valid for a period ending on the date which falls [five (5)] years after the publication in the RESA of the extraordinary general meeting of shareholders of the Company held on [ ].February 10, 2022. The shares to be issued under the authorised share capital may be issued beyond the initial authorized capital period of five (5) years if those Share Rights (as defined below) were issued within the relevant initial authorised capital period of five (5) years.

**5.2.3** ~~[Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement,] the~~The Board, or any delegate(s) duly appointed by the Board, may from time to time, during the period referred to in Article ~~[5.2.2],~~5.2.2, discretionally issue, in one or several ~~times~~tranches, Shares (or any rights, securities or other entitlement to Shares ~~(including but not limited to convertible bonds or notes, warrants (,~~ including the Warrants~~) and options)~~, pursuant to the Management Incentive Plan or in connection with a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent true-up offering as set forth in Section 7(c) of the Shareholders Agreement), together referred to as the "**Share Rights**") as it determines within the limits of the ~~authorised~~authorized unissued share capital solely (i) upon the exercise of a Warrant, (ii) pursuant to the Management Incentive Plan, or (iii) in connection with a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent true-up offering as set forth in Section 7(c) of the Shareholders Agreement). Any such issuance of Shares will be final and valid and the date of issue of such Shares (or any successive issue) and the terms, date, place and condition of the subscription for ~~the issued shares (including against contributions in cash, contributions in kind or by way of incorporation of available reserves and as dividends or other distributions whether in lieu of cash dividend or other distribution payments or otherwise), at such times and on such terms and conditions~~such issued Shares, including the issue price, and to ~~such~~which Person(s) ~~(including employees or officers) as~~such Shares are issued shall be determined by the Board or its delegate(s) ~~may~~ in its or their sole discretion resolve~~, without reserving any preferential or pre-emptive subscription rights to existing Shareholders (including in case of issue of shares by way of incorporation of reserves).~~ The Board and/or its delegate shall record each such share capital increase by way of a notarial deed and amend the register of Shares to reflect the amendment accordingly. The Board is ~~authorised~~authorized during the period referred to in Article ~~[5.2.2]~~5.2.2 to waive, suppress or limit any preferential or pre-emptive subscription rights of existing Shareholders (including in case of issue of shares by way of incorporation of reserves) to the extent the Board deems such waiver, suppression or limitation advisable for any issue or issues of Shares ~~(or any rights, securities or other entitlement to Shares)~~Share Rights (within the ~~authorised~~authorized unissued share capital ~~[and subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement]~~).

~~[In addition, the Board may allocate within the limits of the authorised unissued share capital, existing Shares or new Shares, including free of charge, to directors, officers and staff members of the Company or of companies or other entities in which the Company holds directly or indirectly at least 10 per cent of the capital or voting rights. The authorisation granted in this clause shall by operation of law, operate as a waiver by existing Shareholders of their preferential subscription right for the benefit of the recipients of such Shares allotted free of charge. The Board may determine the terms~~

3

12392265_12

and conditions of such allocation, which may comprise a period after which the allocation is final and a minimum holding period during which the recipients must retain the Shares.]

5.2.4 Upon an issue of Shares within the authorised unissued share capital pursuant to this Article 5.2 [and the applicable Shareholders' Agreement], the Board or any delegate(s) duly appointed by the Board shall cause Article [5.1] to be amended accordingly.

**5.3**     The issued and/or authorised unissued share capital of the Company may be increased, reduced, amended or extended one or several times by a resolution of the General Meeting of Shareholders adopted in compliance with the quorum and majority rules applicable to the amendment of these Articles and subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement.

**5.4**     The Company may not issue fractional Shares and no fractions of Shares shall exist at any time. The Board shall be authorised at its discretion to provide for the payment of cash or the issuance of scrip in lieu of any fraction of a Share.

**5.5**     Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the Company or its Subsidiaries may discretionally proceed to the purchase or repurchase of its own Shares and may hold Shares in treasury, each time subject to the conditions and within the limits laid down by law and it may proceed to the cancellation of all or part of the Shares held in treasury and the Board is authorised to record such cancellation and if it deems fit the corresponding reduction of share capital in the Articles.

**5.6**     Any share premium paid on the issue of Shares and/or contribution made to an account 115 (*apport en capitaux propres non rémunérés par des titres* of the Luxembourg chart of accounts) shall be freely distributable in accordance with the provisions of these Articles.

**5.7**     Each ~~Shareholder~~Holder that is a party to the Shareholders Agreement shall have the ~~preemptive~~pre-emptive rights set out in the Shareholders Agreement in case of any issuance of Shares and/or other equity and debt securities.

**Article 6.  Shares**

**6.1**     Shares

**6.1.1**     Shares of the Company are in registered [or dematerialized] form.

**6.1.2**     As regards Shares in registered form:

(i)     A register of Shares will be kept at the registered office of the Company. Ownership of registered Shares will be established by inscription in the said register [or in the event separate registrars have been appointed pursuant to Article [6.1.3], such separate register]. Without prejudice to the conditions for transfer by book entry in the case provided for in Article [6.1.6]6.1.2 (v) or as the case may be applicable law, and subject to the provisions of [Article 9] and the applicable Shareholders' Agreement, a

4

12392265_12

transfer of registered Shares shall be carried out by means of a declaration of transfer entered in the relevant register, dated and signed by (i) the transferor and the transferee or by their duly authorised representatives or by (ii) the Company upon notification of the transfer or acceptance of the transfer by the Company. The Company may accept and enter in the relevant register a transfer on the basis of correspondence or other documents recording the agreement between the transferor and the transferee.

(ii)        [The Company may appoint registrars in different jurisdictions who will each maintain a separate register for the registered Shares entered therein and the holders of Shares may elect to be entered in one of the registers and to be transferred from time to time from one register to another register. The Board of Directors may however impose transfer restrictions for Shares that are registered, listed, quoted, dealt in, or have been placed in certain jurisdictions in compliance with the requirements applicable thereintrading restrictions. The transfer to the register kept at the Company's registered office may always be requested. ]The principal register of Shares and any separate register as per this Article 6.1.2(ii) shall together be treated as the register of Shares for the purposes of these Articles.

(iii)        Subject to the provisions of Article [6.1.6] and [Article 9]6.1.2(v), the Company may consider the Person in whose name the registered Shares are registered in the register of Shareholders as the full owner of such registered Shares. The Company shall be completely free from any responsibility in dealing with such registered Shares towards third parties and shall be justified in considering any right, interest or claims of such third parties in or upon such registered shares to be non-existent, subject, however, to any right which such third party might have to demand the registration or change in registration of registered Shares. In the event that a holder of registered Shares does not provide an address to which all notices or announcements from the Company may be sent, the Company may permit a notice to this effect to be entered into the register(s) of Shareholders and such holder's address will be deemed to be at the registered office of the Company or such other address as may be so entered by the Company from time to time, until a different address shall be provided to the Company by such holder. The holder may, at any time, change his address as entered in the register(s) of Shareholders by means of written notification to the Company or the relevant registrar.

(iv)        All communications and notices to be given to a registered Shareholder shall be deemed validly made to the latest postal address or, if applicable, e-mail address communicated by the Shareholder to the Company.

(v)        Where Shares are recorded in the register(s) of Shareholders on behalf of one or more Persons in the name of a securities settlement system or the operator of such a system or in the name of a professional securities depositary or any other depositary (such systems, professionals or other depositaries being referred to hereinafter as "**Depositaries**") or of a sub-depositary designated by one or more Depositaries, the Company – subject to having received from the Depositary with whom those Shares are kept in account a certificate, proxy or confirmation in proper form –obtained from the bank, broker or other nominee established as the holder of record with the Depositary, will permit those Persons to exercise the rights attached to those Shares, including admission to and voting at General Meetings (to the extent the relevant Shares carry voting rights) in accordance with Article 6.1.3. The Board may determine the formal requirements with which such certificates or proxies must comply and the exercise

5

of the rights in respect of such Shares may in addition be subject to the internal rules and procedures of the securities settlement system. Notwithstanding the foregoing, the Company may make dividend payments and any other payments in cash, Shares or other securities only to the Depositary or sub-depositary recorded in the register(s) or in accordance with its instructions, and such payment will effect full discharge of the Company's obligations. Where Shares are recorded in the register(s) of Shareholders on behalf of one or more Persons in the name of a Depositary, the Company shall make payments, by way of dividends or otherwise, in cash, Shares or other assets only into the hands of the Depositary or sub-depositary recorded in the register or in accordance with their instructions, and such payment shall release the Company from any and all obligations for such payment.

**6.1.3**    To attend a General Meeting in person, a holder of Shares held through a Depositary must provide the Company with a certificate obtained from the bank, broker or other nominee established as the holder of record with the Depositary. Such certificate or proxy must certify the number of Shares recorded in the relevant account on the Record Date. Such certificate or proxy must be provided to the Company no later than three (3) business days prior to the date of such General Meeting.

6.1.3 [As regards Shares in dematerialized form:

(i) Shares issued in dematerialized form shall be issued by means of their registration in an issuance account held at a settlement institution or a central account keeper as referred to by the Luxembourg law of 6 April 2013 on dematerialized securities, as amended or replaced (the "**2013 Law**") or, subject to and in accordance with Regulation (EU) No 909/2014 of the European Parliament and of the Council of 23 July 2014 on improving securities settlement in the European Union and on central securities depositaries, as amended or replaced, at or on behalf of a central securities depositary (such settlement institution, central account keeper and central securities depositary, a "**CSD**").]

**6.1.4**    The Shares are indivisible vis-à-vis the Company which will recogniserecognize only one holder per Share. In case a Share is held by more than one Person, the Persons claiming ownership of the Share will be required to name a single proxy to represent the Share vis-à-vis the Company. The Company has the right to suspend the exercise of all rights attached to such Share until one Person has been so appointed. The same rule shall apply in the case of a conflict between an usufructuary and a bare owner or between a pledgor and a pledgee.

**6.2** [Other Securities

Securities (other than Shares which are covered by Article [6.1]) of the Company are in registered form only.

6.2.1 The provisions of Article [6.1] shall apply mutatis mutandis.]

**Article 7.  Transfer of Shares**

Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement (with, for the avoidance of doubt, such undertakings terminating automatically upon the effectiveness of a Listing), a Transfer of registered Shares shall be carried out by means of a declaration of transfer entered in the

6

12392265_12

relevant register, dated and signed by the transferor and the transferee or by their duly ~~authorised~~authorized representatives or in accordance with the procedures of the Depositary. The Company may accept and enter in the relevant register a Transfer on the basis of correspondence or other documents recording the agreement between the transferor and the transferee satisfactory to the Company.

### Article 8.  Voting of Shares

Each Share shall carry one vote unless otherwise provided for by these Articles or by ~~law~~the Company Law. The issuance of ~~nonvoting~~non-voting shares is prohibited solely to the extent required by section 1123(a)(6) of chapter 11 of title 11 of the United States Code.

### Article 9.  Limitation of Ownership - Communication Laws[1]

**9.1**       The Company may restrict the Beneficial Ownership, or proposed Beneficial Ownership, of ~~Common~~ Shares or other equity securities of the Company by any Person (other than any ~~Shareholders~~Holders of 5% or more of the ~~Common~~ Shares ~~as of the Effective Date~~ with respect to their holdings on the date of the Shareholders Agreement and the information disclosed by the Company to the FCC about such ~~Shareholders~~Holders prior to the date of the Shareholders Agreement (the "**Existing ~~Shareholder~~Holder Exception**")) or the Transfer of ~~Common~~ Shares ~~[~~or Beneficial Interests~~]~~ (or other equity securities) to any Person if the Beneficial Ownership or proposed Beneficial Ownership of ~~Common~~ Shares (or other equity securities) of (or the transfer of shares of ~~Common~~ Shares or other equity securities to) ~~of~~ such Person is or would be, as determined by the Board in good faith upon the reasonable advice of outside counsel, in violation of any provision of the Communications Laws.

**9.2**       If the Company believes in good faith, based upon the reasonable advice of outside counsel, that the Beneficial Ownership or proposed Beneficial Ownership of ~~Common~~ Shares or other equity securities of the Company by any Person (other than with respect to the Existing ~~Shareholder~~Holder Exception) may result in a violation of the Communications Laws, the Company may at any time request information from ~~Shareholders~~Holders, other equity securities holders, transferees or proposed transferees, including without limitation information on citizenship, affiliations, and ownership or other interests in other companies or enterprises, and such Person shall furnish promptly to the Company such information; *provided* that the Company shall execute, upon the written request of such Person, a nondisclosure agreement in a form reasonably acceptable to such Person and the Company with respect to any such information so requested and provided.

**9.3**       If (x) the Company does not receive the relevant information requested pursuant to Article ~~[~~9.2~~]~~ or (y) the Company determines, in good faith upon the reasonable advice of outside counsel, that the Beneficial Ownership or proposed Beneficial Ownership of ~~Common~~ Shares or other equity securities by a Person (other than

---

[1] **Note to Draft**: Article 9 is subject to further review.

7

with respect to the Existing ~~Shareholder~~Holder Exception) or that the exercise of any rights of ~~Common~~ Shares or other equity securities by a Person (other than with respect to the Existing ~~Shareholder~~Holder Exception), results or would result, as determined by the Company, in a Communications Law violation, the Company has the absolute right to (A) refuse to issue ~~shares of Common~~ Shares or other equity securities to such Person, (B) refuse to permit or recognize a Transfer (or attempted Transfer) of ~~shares of Common~~ Shares ~~or [and~~, Beneficial Interests] or other equity securities to such Person and any such Transfer or attempted Transfer shall not be notated in the books and records of the Company (including the register of ~~Common~~ Shares), (C) suspend any rights attached to such ~~shares of Common~~ Shares, Beneficial Interests or equity securities (including without limitation the right to attend and vote at General Meetings and the right, if any, to receive dividends or other distributions) and which causes or would cause such Communications Law violation, or (D) compulsorily redeem the ~~Common~~ Shares or other equity securities of the Company ~~held~~Beneficially Owned by such Person. The Company shall in addition have the right to exercise any and all appropriate remedies, at law or in equity in any court of competent jurisdiction, against any such Person, with a view towards obtaining such information or preventing or curing any situation which causes or would cause a Communications Law violation. Any measure taken by the Company pursuant to (A), (B) or (C), respectively, shall remain in effect until the requested information has been received and/or the Company has determined that the Beneficial Ownership, proposed Beneficial Ownership or Transfer of ~~Common~~ Shares [or Beneficial Interests] or other equity securities by (or to) the relevant Person or that the exercise of any rights of ~~Common~~ Shares, Beneficial Interests or other equity securities by such Person as the case may be, will not result in a Communications Law violation.

**9.4**       In case of a compulsory redemption made pursuant to this Article [9],

**9.4.1**       The Company shall serve a notice (a "**Redemption Notice**") upon the relevant ~~Shareholder(~~Holder(s), specifying (1) the ~~Common~~ Shares or other equity securities of the Company to be redeemed, and (2) the Redemption Price for such ~~Common~~ Shares or other equity securities of the Company. Immediately after the close of business on the date specified in the Redemption Notice, (i) each such ~~Shareholder~~Holder shall cease to be the holder of the ~~Common~~ Shares or other equity securities of the Company specified in such notice (ii) the compulsory redemption of ~~Common~~ Shares in accordance with this Article [9] shall be recorded in the register of ~~Common~~ Shares by the Company, as transferee, and the relevant ~~Shareholder(~~Holder(s), as transferor(s) and the relevant ~~Shareholder(~~Holder(s) hereby grant(s) for such purpose an irrevocable power of attorney to the Company to record the compulsory redemption of Shares on its(their) behalf and (iii) as the case may be, such ~~Shareholder's~~Holder's name shall be removed from the schedule of ~~Shareholders~~Holders.

**9.4.2**       The price at which the Shares or other equity securities of the Company specified in any Redemption Notice shall be redeemed (the "**Redemption Price**") shall be an amount equal to ninety eight percent

8

(98%) of the Fair Market Value. minus any and all costs and expenses incurred by the Company in connection with the redemption as determined by the Board. Any Redemption under this Article 9 is strictly limited to, and each Holder waives to the fullest extent possible any right to request any such Redemption if not falling under, at the discretion of the Board, the scope of this Article 9.

**9.4.3**    Payment of the Redemption Price shall be made directly to the ShareholderHolder. Upon payment of the Redemption Price, no Person interested in the Common Shares or other equity securities of the Company specified in such Redemption Notice shall have any further interest in such Common Shares or other equity securities of the Company or any of them, or any claim against the Company or its assets in respect thereof, except in the case of a deposit of the Redemption Price as aforesaid, the right to receive the Redemption Price so deposited (without interest).

**9.4.4**    The exercise by the Company of the powers conferred by this Article [9] shall not be questioned or invalidated in any case, on the ground that there was insufficient evidence of ownership of Common Shares or other equity securities of the Company by any Person or that the true ownership of the Common Shares or other equity securities of the Company was otherwise than appeared to the Company at the date of any Redemption Notice.

**Article 10.   Anti-Takeover Restrictions**

No Holder (including Affiliates or other Persons acting in coordination together) (an "**Acquiring Shareholder**") may acquire (whether through acquisition, issuance, merger or otherwise) Shares or Beneficial Interests that would result in such Acquiring Shareholder Beneficially Owning more than 45% of the outstanding Shares unless either:

**10.1.1**    such acquisition is the result of a Drag-along Sale conducted pursuant to Article 11 and approved by the affirmative vote of no less than two-thirds (66-2/3%) of the disinterested members of the Board (i.e., excluding any Director who is (A) a Representative of, or (B) a Representative Director of, the Acquiring Shareholder); or

**10.1.2**    each of the following conditions is satisfied:

(A)    the Acquiring Shareholder offers to purchase all other outstanding Shares on the same terms;

(B)    the Acquiring Shareholder's offer to the holders of all other outstanding Shares is approved by the affirmative vote of a majority of the disinterested members of the Board (i.e., excluding any Director who is (A) a Representative of, or (B) a Representative Director of, the Acquiring Shareholder); and

(C)    the Acquiring Shareholder's offer to the holders of all other outstanding Shares is approved by Persons holding a majority of all outstanding Shares (excluding all Shares held by the Acquiring Shareholder).

**10.1.3**    The rights under this Section 10 shall terminate automatically upon a Listing of the Company's Common Stock.

**Article 11.   Drag-along Rights**

9

12392265_12

**11.1.1** Subject to Article 10, if at any time a Holder or group of Holders who hold in the aggregate more than fifty percent (50%) of the then-outstanding Shares (a "**Dragging Shareholder**"), proposes to transfer at least seventy-five percent (75%) of the then-outstanding Shares (other than to an Affiliate of such Dragging Shareholder or in connection with an initial public offering of the Company), or to otherwise effect a sale of the Company, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets, or otherwise, in each case to an unaffiliated bona fide third party purchaser (a "**Drag-along Sale**"), the Dragging Shareholder shall have the right to require that each other Holder (each, a "**Drag-along Shareholder**") participate in such transaction in the manner set forth in this Article 11 on a pro rata basis (except that, at the election of the Dragging Shareholder, a Drag-along Shareholder may be required to (A) include all of its Shares in such Drag-along Sale if such Drag-along Shareholder, together with its Affiliates, holds less than 1% of the Company's then-outstanding Shares or (B) if such Drag-along Shareholder is an employee of the Company or any of its Subsidiaries, rollover its Shares in customary amounts) if, and only if, (x) the Major Consent Approval has been obtained and (y) at least seventy-five percent (75%) of the consideration for the Drag-Along Sale is paid in cash and/or publicly traded securities in the manner set forth in this Article 11. Notwithstanding anything to the contrary in this Agreement, each Drag-along Shareholder shall (A) consent to, vote in favour of, raise no objection to and waive and refrain from exercising any appraisal or dissenter's rights claim or any claim of fiduciary breach (but not any claim that such Drag-along Sale is not being effected in accordance with the terms set forth in these Articles) and (B) obtain any required consents and take any and all reasonably necessary action in furtherance of the Drag-along Sale as requested by and at the Company's expense.

**11.1.2** The Dragging Shareholder shall exercise its rights pursuant to this Article 11 by delivering a written notice (the "**Drag-along Notice**") to the Company (A) no later than 20 days prior to the closing date of such Drag-along Sale. The Company will promptly deliver a copy of the Drag-along Notice to each Drag-along Shareholder. The Drag-along Notice shall make reference to the Dragging Shareholder's rights and obligations hereunder and shall describe in reasonable detail: (A) the number of Shares to be sold by the Dragging Shareholder, if the Drag-along Sale is structured as a transfer of Shares; (B) the identity of the third party purchaser; (C) the proposed date, time and location of the closing of the Drag-along Sale; (D) the per share purchase price and the other material terms and conditions of the transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

**11.1.3** The consideration to be received by a Drag-along Shareholder shall be the same form and amount of consideration per Share to be received by the Dragging Shareholder (or, if the Dragging Shareholder is given an option as to the form and amount of consideration to be received, the same option shall be given) and the terms and conditions of such transfer shall, except as otherwise provided in the immediately succeeding sentence, be the same as those upon which the Dragging Shareholder transfers its Shares. Any (A) representations and warranties to be made or provided by a Drag-along Shareholder in connection with such Drag-along Sale shall be limited to representations and warranties related to such Drag-along Shareholder's authority, ownership and the ability to convey title to its Shares, and with respect thereto, shall be the same representations and warranties that the Dragging Shareholder makes or provides with respect to its Shares, (B) Drag-along Shareholder will not be required to agree to any non-competition or similar restrictions in connection with such Drag-along Sale, and (C) covenants, indemnities and agreements made by the Drag-along Shareholders shall be the same covenants, indemnities and

10

agreements as the Dragging Shareholder makes or provides in connection with the Drag-along Sale, except that with respect to covenants, indemnities and agreements pertaining specifically to the Dragging Shareholder, the Drag-along Shareholder shall make the comparable covenants, indemnities and agreements pertaining specifically to itself; provided that any indemnification obligation relating to the Company shall be (i) several and not joint and (ii) pro rata based on the consideration received by the Dragging Shareholder and each Drag-along Shareholder; provided, further, that in no event shall any indemnification obligation of a Drag-along Shareholder exceed the aggregate proceeds received by such Drag-along Shareholder in connection with the Drag-along Sale.

**11.1.4**    The fees and expenses of the Dragging Shareholder incurred in connection with a Drag-along Sale and for the benefit of all Holders as determined in good faith by the Board, excluding any Director appointed or nominated by any Dragging Shareholder or its Affiliates (it being understood that costs incurred by or on behalf of a Dragging Shareholder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Company or the third party purchaser, shall be shared by all the Holders on a pro rata basis, based on the aggregate consideration received by each Holder; provided that no Holder shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Drag-along Sale.

**11.1.5**    Each Holder and the Company shall take all actions as may be reasonably necessary to consummate the Drag-along Sale, including entering into agreements, signing or making available the register of Shares and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Dragging Shareholder, subject to the terms and provisions of this Article 11; provided that, such Holder shall not be entitled to any consideration from the Drag-along Sale until such Holder has taken all such actions reasonably requested by the Company or the Dragging Shareholder in writing. Notwithstanding anything to the contrary contained in this Article 11, management of the Company shall not be required to agree to any non-compete, non-solicit or similar restrictive covenants in connection with a Drag-along Sale that are more restrictive in any manner than those (in scope, duration or otherwise) to which management is then subject.

**11.1.6**    The Dragging Shareholder shall have 120 days following the date of the Drag-along Notice in which to consummate the Drag-along Sale, on the terms set forth in the Drag-along Notice (which such 120-day period may be extended for a reasonable time not to exceed 180 days to the extent reasonably necessary to obtain any government approvals). If at the end of such period, the Dragging Shareholder has not completed the Drag-along Sale, the Dragging Shareholder may not then effect a transaction subject to this Article 11 without again fully complying with the provisions of this Article 11.

**11.1.7**    In relation to any Drag-along Sale, each of the Holders and the Company hereby expressly (i) waives any right it may have to claim the benefit of the provisions of Article 1142 of the Luxembourg Civil Code in case of breach of any of its obligations under this Article 11 with respect to a Drag-along Sale and (ii) acknowledges and agrees that the other Holders and/or the Company shall be entitled to the remedy of specific performance (*exécution forcée en nature*) of the defaulting Holder's obligations thereunder in addition to any other recourse permitted by law.

**11.1.8**    The rights under this Section 11 shall terminate automatically upon a Listing of the Company Common Stock.

12392265_12

**Article 12.** ~~Article 10.~~ **Management of the Company – Board**

**12.1** ~~10.1~~ The Company shall be managed by a Board which is vested with the broadest powers to manage the business of the Company and to authorise and/or perform all acts of disposal, management and administration falling within the purposes of the Company. ~~In the event the Company has only one Shareholder, the Company may, at the option of the sole Shareholder, be managed by one Director as provided for by law and all provisions in the present Articles referring to the Board shall be deemed to refer to the sole Director who shall have all such powers as provided for by law and as set forth in the present Articles with respect to the Board.~~

**12.2** ~~10.2 Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement~~Save as otherwise provided in these Articles, all powers not expressly reserved by the law or by the Articles to the General Meeting shall be within the competence of the Board.

**12.3** ~~10.3~~ Except as otherwise provided herein, by law or in the ~~applicable~~ Shareholders~~'~~ Agreement, the Board of the Company is authorised to take such action (by resolution or otherwise) and to adopt such provisions as shall be necessary, appropriate, convenient or deemed fit to implement the purpose of the Company.

**12.4** ~~10.4~~ Any duties that are owed by a board of directors of ~~an S.A. to an S.A.~~a public limited liability company to a public limited liability company under Luxembourg law shall be owed by the Board to the Company; provided that this shall not grant any rights to the Company or any other Person that would not be afforded under Luxembourg law (including, without limitation, with respect to rights that are afforded under Luxembourg law only to holders of 10% or more of the Shares).

**Article 13.** ~~Article 11.~~ **Composition of the Board**

**13.1** ~~11.1 Except in case of a sole shareholder where the Company may be managed by a sole Director as set forth in Article [10.1], the~~The Company shall be managed by a Board composed of a minimum of ~~[~~seven (7)~~]~~ (other than any vacancy resulting from the death, retirement, resignation, dismissal, removal or otherwise of any Director in accordance with ~~Section 2(c) or Section 2(g) of the Shareholder Agreement~~Article 13.2.2 or Article 13.4 until such vacancy is filled in accordance with ~~Section 2(a)(ii) or Section 2(h) of the Shareholders Agreement~~Article 13.2.1 or Article 13.5, as applicable). Directors ~~who~~, may be, but do not need to be, Shareholders of the Company.

**13.2** ~~11.2~~ Appointment of Directors

**13.2.1** ~~11.2.1~~ The Directors are appointed by the General Meeting of Shareholders only from nominations in accordance with the following provisions ~~of the Articles and the Shareholders Agreement~~ so that the following individuals are elected and continue to serve as Directors of the Board:

12

(i)    three (3) individuals proposed by the Initial First Threshold Holder (or any Major Transferee to which such right is assigned pursuant to the Shareholders Agreement), so long as such Person (together with any Affiliate that holds Common Shares) holds the First Threshold, at least one of whom shall be a Non-Employee Director; provided, that the number of individuals designated by such Person shall be reduced to two in the event that such Person (together with any Affiliate that holds Common Shares) ceases to hold the First Threshold but holds the Second Threshold or if such Person has made a Designation Right Assignment of such Director right pursuant to the Shareholders Agreement; provided, further, that the number of individuals designated by such Person shall be reduced to one in the event that such Person (together with any Affiliate that holds Common Shares) ceases to hold the Second Threshold but holds the Third Threshold or if such Person has made a Designation Right Assignment of such Director right pursuant to the Shareholders Agreement;

(ii)    one (1) individual proposed by the Appaloosa Holder (or any Major Transferee to which such right is assigned pursuant to the Shareholders Agreement), so long as such Person (together with any Affiliate related funds that holds Common hold Shares) holds the Third Threshold;

(iii)    one (1) individual proposed by the DK Holder (or any Major Transferee to which such right is assigned pursuant to the Shareholders Agreement), so long as such Person (together with any Affiliate that holds Common Shares) holds the Third Threshold; provided, that such [initial] individual (I) shall not be an employee or member of any governing body of the DK Holder or the Major Transferee or any of its Affiliates, as applicable, and (II) shall have relevant industry experience;

(iv)    one (1) individual proposed by the CarVal Holder (or any Major Transferee to which such right is assigned pursuant to the Shareholders Agreement), so long as such Person (together with any Affiliate that holds Common Shares) holds the Third Threshold; provided, that, such [initial] individual (I) shall not be an employee or member of any governing body of the CarVal Holder or the Major Transferee or any of its Affiliates, as applicable, and (II) shall have relevant industry experience; and

(v)    the then-serving Chief Executive Officer of the Company.

**13.2.2**    11.2.2 If a Nominating Shareholder ceases to hold at least the Minimum Threshold at any time following the date of the Shareholders Agreement, (i) such Nominating Shareholder's designee (or, in the event the Initial First Threshold Holder or its Major Transferee entitled to propose two or more Directors (if any), as applicable, ceases to hold the First Threshold but continues to hold the Second Threshold or ceases to hold the Second Threshold but continues to hold the Third Threshold, the designee of the Initial First Threshold Holder's or its Major Transferee's, as applicable, choosing) shall resign immediately from the Board and the resulting vacancy shall

13

be filled in accordance with the Articles and, where applicable, the Shareholders Agreement and (ii) thereafter such Nominating Shareholder shall no longer have the right to propose a Director for election under Article [11.2.1] or the Shareholders Agreement13.2.1 or to transfer such right of proposal to any Major Transferee (or in the event the Initial First Threshold Holder or its Major Transferee entitled to propose two or more Directors (if any) ceases to hold the First Threshold but continues to hold the Second Threshold or ceases to hold the Second Threshold but continues to hold the Third Threshold, the Initial First Threshold Holder or such Major Transferee shall, respectively, no longer have the right to propose three Directors (but shall continue to have the right to propose, and transfer the right of proposal for, two Directors) or two Directors (but shall continue to have the right to propose, and transfer the right of proposal for, one Director). Notwithstanding any other provision of the Articles or the Shareholders Agreement, no ShareholderHolder (including its Affiliates) shall at any time be entitled to propose more than three Directors for election to the Board at any time under Article [11.2.1]13.2.1, notwithstanding the amount of Shares held by such ShareholderHolder and its Affiliates.

13.2.3    11.2.3 A Nominating Shareholder, in such Nominating Shareholder's sole discretion, shall have the right to assign its nomination rights under Article [11.2.1]13.2.1 to a Major Transferee in accordance with the Shareholders Agreement. In order to exercise such right, a Nominating Shareholder must (i) transfer to such Major Transferee at least the applicable amount of Shares to exercise such right (i.e., in the aggregate, the Third Threshold for one director, the Second Threshold for two directors or the First Threshold for three directors) and (ii) if the transfer provided for in Article [11.2.313.2.3(i)] would not put such Nominating Shareholder below its then highest Minimum Threshold, irrevocably assign the right to propose the Director(s) being assigned to the relevant Major Transferee (a "**Designation Right Assignment**"). If a Nominating Shareholder shall exercise such right, the Nominating Shareholder must deliver written notice thereof to the Company at or prior to effecting such transfer, and the Company shall, within two Business Days of receiving such notice, deliver written notice thereof to all of the other Nominating Shareholders. Upon the exercise of a Designation Right Assignment in accordance with the Articles and the Shareholders Agreement, the Minority Director appointed by the Major Transferee shall be entitled to exercise all of the rights under the Shareholders Agreement afforded a Minority Director appointed by a Nominating Shareholder, including rights under Section 2(i) and 2(l) of the Shareholders AgreementArticle 15.4 and Article 15.1 as regards to quorum and convening of board meetings.

13.2.4    11.2.4 The Company shall provide notice to each Nominating Shareholder at least [forty-five (45)] days prior to each annual General Meeting (or at least [ten (10)] days prior to a solicitation by the casting of votes in writing in lieu of such annual General Meeting). Unless a Nominating Shareholder provides written notice to the Company no later than [thirty (30)] days prior to such annual General Meeting (or at any time prior to a solicitation by the casting of votes in writing in lieu of such annual General Meeting) (i) that a then-current Representative Director will not be proposed for reelection to the Board at such annual General Meeting (or such casting of votes in writing in lieu of such annual General Meeting) and (ii) identifies the individual such Nominating Shareholder proposes for election in place of such then-current Representative Director, such then-current Representative Director shall be

14

12392265_12

automatically nominated for reelection to the Board at such annual General Meeting (or such casting of votes in writing in lieu of such annual General Meeting) unless at the time of such meeting (or such casting of votes in writing in lieu of such annual General Meeting) such Nominating Shareholder no longer has the right to nominate such Representative Director.

**13.2.5**    ~~11.2.5~~ For purposes of determining satisfaction of any ~~Shareholder~~Holder thresholds in the Articles, the Shares held by any ~~Shareholder~~Holder shall be (a) calculated without giving effect to any management incentive dilution, including from the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company (whether as a result of actually issued and outstanding Shares or contingent instruments (e.g., options)) or dilution from other future-issued securities, including under the Warrants, and (b) aggregated with Shares held by its and its Affiliates' related funds, investment vehicles and managed accounts; *provided, however*, that if the Company makes a Non-Conforming Issuance, any determination made on or before the earlier of (x) the consummation of the issuance of New Securities to all subscribing Preemptive Rightholders pursuant to the Shareholders' Agreement and (y) the expiration of the applicable offer period specified in the Shareholders' Agreement shall exclude any Shares issued in connection with such Non-Conforming Issuance (the "**Dilution Principles**").

**13.3**    ~~11.3~~ The Directors are appointed for a period not exceeding [six (6)] years and until their successors are elected. The Directors shall be eligible for re-election indefinitely.

**13.4**    ~~11.4~~ A Representative Director may be removed with or without cause at any time upon request of his or her Nominating Shareholder. In such event, such Nominating ~~Stockholder~~Shareholder will request a resignation from its Representative Director. ~~Each Holder shall~~

**13.5**    In the event of a vacancy in the office of a Director because of death, retirement, resignation, dismissal, removal or otherwise, the remaining Directors appointed by a General Meeting may fill such vacancy by simple majority vote and appoint a successor, chosen in accordance with the provisions of the Shareholders Agreement, to act until the next General Meeting.

**13.6**    Each Nominating Shareholder shall have the right to designate one non-voting observer for as long as such Holder remains a Nominating Shareholder. The rights and obligations of the observer(s) so appointed shall be determined by the Board in accordance with and pursuant to the provisions of the Shareholders Agreement.

**13.7**    Each Holder shall take and do (and where applicable vote (or cause to be voted) all of ~~such Holder's~~the Shares held by such Holder and any other voting securities of the Company over which such Holder has voting control ~~and, as the Company or a Nominating Shareholder may reasonably request in writing, shall take all other) all~~ necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such ~~annual~~ meeting) to give effect to this Article 13, and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings) to ~~the extent necessary in order to~~ give effect to ~~such~~

15

Nominating Stockholder's removal of its Representative Directorthe same.

11.5 In the event of a vacancy in the office of a Director because of death, retirement, resignation, dismissal, removal or otherwise, the remaining Directors appointed by a General Meeting may fill such vacancy by simple majority vote and appoint a successor, chosen in accordance with the provisions of the Shareholders Agreement, to act until the next General Meeting.

11.6 One or more observers may be appointed in accordance with and pursuant to the provisions of the Shareholders Agreement. The rights and obligations of the observer(s) so appointed shall be set out in the Shareholders Agreement.

13.8      11.7 Subject to applicable law, each Director shall be entitled to reimbursement of reasonable, out of pocket expenses incurred in connection with its service as a Director.

### Article 14.   Article 12. Chairperson

14.1      12.1 The Board shall, to the extent required by law and otherwise may, appoint a chairperson of the Board in accordance with the provisions of the Shareholders Agreement. The chairperson shall preside over all meetings of the Board and of Shareholders. In the absence of the chairperson, another Director designated by the chairperson or, if none was designated by the chairperson, by the Board (or as applicable, the General Meeting) shall chair the relevant meeting.

14.2      12.2 In case of a tie, neither the chairperson nor any other Board member shall have a casting (tie breaking) vote.

### Article 15.   Article 13. Board Proceedings

15.1      13.1 The Board shall meet upon call by (or on behalf of) (i) the chairperson, (ii) the then-serving Chief Executive Officer of the Company or (iii) any two (2) of the Minority Directors. The Board shall meet as often as required by the interests of the Company.

15.2      13.2 Notice of any meeting of the Board must be given by letter, telephone, facsimile transmission or e-mail to each Director at least (i) in the case of a physical meeting to be held in Luxembourg, at least [ten (10)] Business Days before the meeting, and (ii) in the case of any other meeting of the Board, at least [three (3)] Business Days before the meeting, except in the case of this clause (ii) in the case of an emergency, in which event twenty-four (24) hours' notice shall be sufficient[2]. No convening notice shall be required for meetings held pursuant to a schedule previously approved by the Board and communicated to all Board members. A meeting of the Board may also be validly held without convening notice to the extent the Directors present or represented do not object and those Directors not present or represented (other than conflicted Directors) have waived the convening notice in writing, by

---

[2] **Note to Draft**: Subject to further review.

16

fax, email or otherwise.

**15.3**      ~~13.3~~ Any Director may act at any meeting of the Board by appointing in writing by letter or by cable, telegram, facsimile transmission or e-mail another Director as his proxy. A Director may represent more than one of the other Directors.

**15.4**      ~~13.4~~ Subject to any quorum requirement as may be set out in the Shareholders Agreement, the duly convened meeting of the Board shall be duly constituted and may validly deliberate if a majority of all Directors in office (and entitled to vote) is present or represented. If quorum is not met at a meeting of the Board, the meeting shall be reconvened. Subject to any quorum requirement as may be set out in the Shareholders Agreement, any duly reconvened meeting of the Board shall be duly constituted and may validly deliberate if any two Directors in office (and entitled to vote) are present.

**15.5**      ~~13.5~~ Majorities

**15.5.1**      ~~13.5.1~~ Subject to the majorities required for the Major Consent Matters and the Supermajority Board Matters, resolutions put to the vote in a quorate meeting of the Board shall be passed only if approved by a simple majority of affirmative votes of the Directors present [or represented] (and entitled to vote).

**15.5.2**      ~~13.5.2~~ Major Consent Matters put to the vote in a quorate meeting of the Board shall be passed only if approved by at least (i)(A) 66-$^2$/$_3$% (i.e., five of seven) of the Directors (**"Supermajority Board Approval"**) and (B) 55% of the then-issued and outstanding Shares or (ii) 85% (i.e., six of seven) of the Directors (**"Major Consent Approval"**).

**15.5.3**      ~~13.5.3~~ Supermajority Board Matters put to the vote in a quorate meeting of the Board shall be passed only if approved by the affirmative vote of at least 66-2/3% (i.e., five of seven) of the Directors.

**15.5.4**      To the extent any Shareholder approvals is required in addition to the Major Consent Approval or Supermajority Board Approval in order to take any Major Consent Matter or Supermajority Board Matter, as applicable, each Holder shall take and do (and where applicable to vote or cause to be voted all of the Shares held by such Holder and any other voting securities of the Company over which such Holder has voting control, it being understood that nothing in this Articles shall require any Holder to cast any vote as directed by the Company) all necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting) to give effect to this Article 15.5. The Company shall take all necessary or desirable actions within its control (including calling General Meetings) to facilitate the foregoing.

**15.6**      ~~13.6~~ Meetings of the Board may be held physically or, in all circumstances, by way of telephone conference call, video conference or similar means of communication which permit the participants to communicate with each other. A Director attending in such manner shall be deemed present at the meeting for as long as he is connected.

**15.7**      ~~13.7~~ The Board may also in all circumstances with unanimous consent of those Directors entitled

17

to vote pass resolutions by circular means and written resolutions signed by all members of the Board entitled to vote will be as valid and effective as if passed at a meeting duly convened and held. Such signatures may appear on a single document or multiple copies of an identical resolution and may be evidenced by letters, cables, facsimile transmission or e-mail.

**15.8**      **13.8** The minutes of any meeting of the Board (or copies or extracts of such minutes which may be produced in judicial proceedings or otherwise) shall be signed by the chairperson of the Board, the chairperson (*ad hoc*) of the relevant meeting or by any two (2) Directors or as resolved at the relevant Board meeting or any subsequent Board meeting. Minutes or resolutions of the Board (or copies or extracts thereof) may further be certified by the secretary of the Board.

### Article 16.      Article 14. Delegation of power, committees, secretary

**16.1**      **14.1** The Board may delegate the daily management of the business of the Company, as well as the power to represent the Company in its day-to-day business, to individual Directors or other officers or agents of the Company (with power to sub-delegate). In addition, the Board may delegate the daily management of the business of the Company, as well as the power to represent the Company in its day-to-day business to an executive or other committee as it deems fit. The Board shall determine the conditions of appointment and dismissal as well as the remuneration and powers of any such Person or Persons so appointed.

**16.2**      **14.2** The Board may (but shall not be obliged to unless required by law) establish one or more committees (including an audit committee and a compensation committee) and for which it shall, if one or more of such committees are set up, appoint the members (who must be members of the Board), determine the purpose, powers and authorities as well as the procedures and such other rules as may be applicable thereto. The Board shall be in charge of the supervision of the activities of the committee(s).

**16.3**      **14.3** The Board may appoint a secretary of the Company who may be but does not need to be a member of the Board and determine his/her responsibilities, powers and authorities.

### Article 17.      Article 15. Binding Signature

The Company will be bound [by the joint signatures of any two (2) Directors or] by the sole or joint signatures of any Person or Persons to whom such signatory power shall have been delegated by the Board. For the avoidance of doubt, for acts regarding the daily management of the Company, the Company will be bound by the sole signature of its Chief Executive Officer or any Person or Persons to whom such signatory power is delegated by the Board (with or without power of substitution).

### Article 18.      Article 16. [Liability of the Directors

**18.1**      **16.1** The Directors are not held personally liable for the indebtedness or other obligations validly made in the name of the Company. As agents of the Company, they are responsible for the performance of their duties.

18

12392265_12

**18.2**      16.2 Subject to the exceptions and limitations listed below, every Person who is, or has been, a director or officer  of the Company or a direct or indirect Subsidiary of the Company shall be indemnified by the Company to the fullest extent permitted by law against liability and against all expenses reasonably incurred or paid by him in connection with any claim, action, suit or proceeding which he or she becomes involved as a party or otherwise by virtue of his or her being or having been such Director or officer and against amounts paid or incurred by him or her in the settlement thereof. The words "claim", "action", "suit" or "proceeding" shall apply to all claims, actions, suits or proceedings (civil, criminal or otherwise including appeals) actual or threatened and the words "liability" and "expenses" shall include without limitation attorneys' fees, costs, judgments, amounts paid in settlement and other liabilities.

**18.3**      16.3 No indemnification shall be provided to any director or officer of the Company or a direct or indirect Subsidiary of the Company:

**18.3.1**      16.3.1 Against any liability to the Company or its Shareholders by reason of wilful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his or her office;

**18.3.2**      16.3.2 With respect to any matter as to which he/she shall have been finally adjudicated to have acted in bad faith and not in the interest of the Company (or as the case may be the relevant subsidiary); or

**18.3.3**      16.3.3 In the event of a settlement, unless the settlement has been approved by a court of competent jurisdiction or by the Board.

**18.4**      16.4 The Company shall, to the fullest extent permitted by law, purchase and maintain insurance on customary terms for the industry and size of the Company to protect any director, officer of Board observer of the Company or a direct or indirect Subsidiary of the Company to the maximum extent of the coverage available under such policy or policies against any expense, liability or loss, whether the Company would have the power to indemnify such person against such expense, liability or loss under these Articles or otherwise. The Company may also make other arrangements, including, but not limited to, providing a trust fund, letter of credit, or surety bond on behalf of a director or officer of the Company or a direct or indirect Subsidiary of the Company against any liability asserted against him/her or incurred by or on behalf of him/her in his/her capacity as a director or officer of the Company [or a direct or indirect Subsidiary of the Company].

**18.5**      16.5 The right of indemnification herein provided shall be severable, shall not affect any other rights to which any director or officer of the Company or a direct or indirect Subsidiary of the Company may now or hereafter be entitled, shall continue as to a Person who has ceased to be such director or officer and shall inure to the benefit of the heirs, executors and administrators of such a Person. The right to indemnification provided herein is not exclusive and nothing contained herein shall affect any rights to indemnification to which corporate personnel, including directors and officers, may be entitled by contract or otherwise under law.

**18.6**      16.6 Expenses in connection with the preparation and representation of a defence of any claim, action, suit or proceeding of the character described in this Article shall be advanced by the Company prior to final

19

disposition thereof upon receipt of an undertaking by or on behalf of the officer or director, to repay such amount if it is ultimately determined that he/she is not entitled to indemnification under this Article.][3]

### Article 19. ~~Article 17.~~ Conflicts of Interest

**19.1** ~~17.1~~ No contract or other transaction between the Company and any other company or firm shall be affected or invalidated solely by the fact that any one or more of the Directors or officers of the Company is financially interested in, or is a director, associate, officer, agent, adviser or employee of such other company or firm. Subject to Article ~~17.2~~19.2 and the ~~applicable~~ Shareholders' Agreement, any Director or officer who serves as a director, officer or employee or otherwise of any company or firm with which the Company shall contract or otherwise engage in business shall not, by reason of such affiliation with such other company or firm only, be prevented from considering and voting or acting upon any matters with respect to such contract or other business.

**19.2** ~~17.2~~ In the case of a conflict of interest of a Director, such Director shall indicate such conflict of interest to the Board and shall not deliberate or vote on the relevant matter. Any conflict of interest arising at Board level shall be reported to the next General Meeting of Shareholders before any resolution is put to vote.

**19.3** ~~17.3~~ The day-to-day Director(s) or person(s) in charge of the day-to-day business of the Company, if any, are *mutatis mutandis* subject to this ~~article Article 17~~Article 19 of these Articles, provided that if only one (1) day-to-day director has been appointed and is in a situation of conflicting interests, the relevant decision shall be adopted by the Board.

### Article 20. ~~Article 18.~~ Meetings of the Shareholders of the Company

**20.1** ~~18.1~~ In the case of a plurality of Shareholders, any regularly constituted General Meeting shall represent the entire body of Shareholders. It shall have the broadest powers to order, carry out or ratify acts relating to all the operations of the Company.

**20.2** ~~18.2~~ In the case of a sole shareholder, the Sole Shareholder assumes all powers conferred to the General Meeting. In these Articles, as long as the Company has only one shareholder, any reference to decisions taken, or powers exercised, by the General Meeting shall be deemed to be a reference to decisions taken, or powers exercised, by the Sole Shareholder. The decisions taken by the Sole Shareholder are documented by way of minutes.

**20.3** ~~18.3~~ The annual General Meeting shall be held, in accordance with Luxembourg law, in Luxembourg at the address of the registered office of the Company or at such other place in Luxembourg as may be specified in the convening notice of the meeting within six (6) months of the end of the previous financial year.

**20.4** ~~18.4~~ The annual General Meeting may be held abroad if, in the absolute and final judgment of the Board, exceptional circumstances so require.

---

[3] **Note to Draft**: Article 16 remains subject to further review and revision.

12392265_12

**20.5**    **18.5** Other General Meetings may be held at such place and time as may be specified in the respective convening notices of the meeting. Shareholders taking part in a meeting by conference call, through video conference or by any other means of communication allowing for their identification, allowing all Persons taking part in the meeting to hear one another on a continuous basis and allowing for an effective participation of all such Persons in the meeting, are deemed to be present for the computation of the quorums and votes, subject to such means of communication being made available at the place of the meeting.

**20.6**    **18.6** General Meetings shall be convened in accordance with the provisions of law. If all of the Shareholders are present or represented at a general meeting of Shareholders, the General Meeting may be held without prior notice or publication.

**20.7**    **18.7** Proposals from Shareholders for any General Meeting as to in particular without limitation regarding agenda items, resolutions or any other business, may only be made in compliance with the Company Law and these Articles and will only be accepted by the Company if required by the Company Law and these Articles.

**20.8**    **18.8** Any Shareholder may be represented at a General Meeting by appointing as his or her proxy another Person, who need not be a Shareholder. Any Shareholder is entitled to be admitted to any General Meeting; provided, however, that the Board may determine a date and time preceding the General Meeting as the record date for admission to such meeting, which may not be less than twenty (20) calendar days before the date of such meeting (the "**Record Date**").

**20.9**    **18.9** The Board may suspend the voting rights of Shareholders who are in material default of their obligations under the Articles or the applicable Shareholders' Agreement., provided that prior to suspending such voting rights, the Board shall provide written notice to such Shareholders, setting forth in reasonable detail the alleged default(s), at least fourteen (14) calendar days prior to any the General Meeting or other meeting of Shareholders for which the Board desires to suspend such Shareholder's voting rights.

**20.10**    **18.10** Shareholders of notes or bonds or other securities issued by the Company (if any) shall not, unless compulsorily otherwise provided for by law, be entitled to assist or attend General Meetings or receive notice thereof.

**Article 21.    Article 19. Quorum and majority, and amendment of the Articles**

**21.1**    **19.1** Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, at any General Meeting of Shareholders other than a General Meeting convened for the purpose of amending the Company's Articles or voting on resolutions whose adoption is subject to the quorum and majority requirements for amendments of the Articles, no presence quorum is required and resolutions shall be adopted, irrespective of the number of Shares represented, by a simple majority of votes validly cast.

**21.2**    **19.2** At any extraordinary General Meeting of Shareholders for the purpose of amending the Company's Articles or voting on resolutions whose adoption is subject to the quorum and majority requirements for amendments of the Articles, the quorum shall be at least one half of the issued and outstanding Shares of the

21

Company (other than Shares held by or on behalf of the Company or a direct Subsidiary). If such quorum is not present, a second General Meeting may be convened at which there shall be no quorum requirement. Resolutions amending the Company's Articles or whose adoption is subject to the quorum and majority requirements for amendments of the Articles shall only be validly passed by a two thirds (2/3) majority of the votes validly cast at any such General Meeting, save as otherwise provided by law, the Articles and the Shareholders Agreement.

### Article 22.   ~~Article 20.~~ Accounting Year

The accounting year of the Company shall begin on first of January and shall terminate on the thirty-first of December of each year.

### Article 23.   ~~Article 21.~~ Independent Auditor(s)

**23.1**   ~~21.1~~ The operations of the Company shall be supervised by a supervisory auditor (*commissaire aux comptes*) who may but need not be a shareholder. Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the supervisory auditor shall be elected by the General Meeting for a period ending at the next annual General Meeting or until a successor is elected. Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the supervisory auditor in office may be removed at any time by the General Meeting with or without cause.

**23.2**   ~~21.2~~ In the event the thresholds set by law as to the appointment of an approved statutory auditor (*réviseur d'entreprises agréé*) are met or otherwise required or permitted by law, the accounts of the Company shall (and in case only permitted but not required by law, may) be supervised by an approved statutory auditor (*réviseur d'entreprises agréé*).

### Article 24.   ~~Article 22.~~ Distributions

Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement,

**24.1**   ~~22.1~~ From the annual net profits of the Company, five percent (5%) shall be allocated to a non-distributable reserve as required by law. This allocation shall cease to be required as soon as, and as long as, such reserve amounts to ten percent (10 %) of the issued share capital of the Company.

**24.2**   ~~22.2~~ The General Meeting of Shareholders, upon recommendation of the Board, shall determine how the annual results of the Company will be disposed of in accordance with the provisions of the present Articles. The General Meeting of Shareholders may resolve to distribute any distributable net profits, reserves and/or share premium.

**24.3**   ~~22.3~~ Interim distributions (including for the avoidance of doubt, interim dividends) may be declared and paid (including by way of staggered payments) by the Board (including out of any share premium or other capital or other reserves) subject to observing the terms and conditions provided by law either by way of a cash distribution or by way of an in-kind distribution (including Shares).

**24.4**   ~~22.4~~ The distributions declared may be paid in ~~[~~US Dollars~~]~~ (~~[~~USD~~]~~) or any other currency selected

22

~~12392265_12~~

by the Board and may be paid at such places and times as may be determined by the Board (subject to the resolutions of the General Meeting of Shareholders). The Board may make a final determination of the rate of exchange applicable to translate distributions of funds into the currency of their payment. Distributions may be made in specie (including by way of Shares).

24.5      22.5 A distribution declared but not paid (and not claimed) on a Share after five years cannot thereafter be claimed by the holder of such Share and shall be forfeited by the holder of such Share, and revert to the Company. No interest will be paid on distributions declared and unclaimed which are held by the Company on behalf of holders of Shares.

## Article 25.      Article 23. Liquidation

In the event of the dissolution of the Company for whatever reason or at whatever time (subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement), the liquidation will be performed by liquidators or by the Board then in office who will be endowed with the powers provided by articles 1100-4 et seq. of the Company Law. Once all debts, charges and liquidation expenses have been met, any balance resulting shall be paid to the holders of Shares in the Company in accordance with the provisions of these Articles.

## Article 26.      Article 24. Definitions

| | |
|---|---|
| Acquiring Shareholder | Has the meaning ascribed to it in Article 10; |
| Affiliate | Means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any investment fund the primary investment advisor to which is such Person or an Affiliate thereof); provided that for purposes of these Articles, no Shareholder or Holder shall be deemed an Affiliate of the Company or any of its Subsidiaries. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise; |
| Appaloosa Holder | Means Appaloosa LP, together with Palomino Master Ltd. and, Azteca Partners LLC and any of their respective related funds to whom Shares are transferred pursuant to the |

| | |
|---|---|
| | Shareholders Agreementthat hold Shares; |
| Approved Transferee | Has the meaning ascribed to it in the Shareholders Agreement; |
| Articles | Means the present articles of association of the Company as amended from time to time; |
| [Beneficial Interests] | Has the meaning ascribed to it in the Shareholders AgreementMeans with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Shares it Beneficially Owns; |
| [Benefical Ownership]Beneficial Owner | Has the meaning ascribed to it in the Shareholders AgreementMeans any Person owning a securities entitlement with respect to Shares registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been credited to any other Person's securities account. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings; |
| Board | Means the Board of Directors (conseil d'administration) of the Company; |
| Business Day | Means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York or Luxembourg, Grand Duchy of Luxembourg; |
| CarVal Holder | Means CVI AA Cayman Securities LP, CVI AV Cayman Securities LP, CVIC Cayman Securities Ltd., CarVal GCF Cayman Securities Ltd., CVI CVF IV Cayman Securities Ltd., CVI CVF V Cayman Securities Ltd., CarVal CCF Cayman Securities Ltd., CVI CCOF Cayman Securities Ltd., CVI CVF III Cayman Securities Ltd., together with their Affiliates and related funds; |
| Communication Laws | Means the United States Communications Act of 1934, as amended, the United States Telecommunications Act of 1996, any rule, regulation or policy of the Federal Communications |

12392265_12

| | |
|---|---|
| | Commission, and/or any statute, rule, regulation or policy of any other U.S., federal, state or local governmental or regulatory authority, agency, court commission, or other governmental body with respect to the operation of channels of radio communication and/or the provision of communications services, each as amended from time to time; |
| Company Law | Means the Luxembourg law of 10th August 1915 on commercial companies as amended (and any replacement law thereof), as amended from time to time; |
| CVR Agreements | Has the meaning ascribed to it in the Shareholders AgreementMeans, collectively, those certain agreements setting forth the full terms and conditions of the contingent value rights issued pursuant to the Plan on the Plan Effective Date; |
| Designation Right Assignment | Has the meaning ascribed to it in the Shareholders AgreementArticle 13.2.3; |
| Dilution Principles | Has the meaning ascribed to it in Article [11.2.5]13.2.5; |
| Director | Means a member of the Board; |
| DK Holder | Means Davidson Kempner Capital Management LP, together with its Affiliates and related funds; |
| Drag-along Notice | Has the meaning ascribed to it in Article 11.1.2; |
| Drag-along Sale | Has the meaning ascribed to it in Article 11.1.1; |
| Drag-along Shareholder | Has the meaning ascribed to it in Article 11.1.1; |
| Dragging Shareholder | Has the meaning ascribed to it in Article 11.1.1; |
| DTC | Means The Depository Trust Company; |
| DTC Participant | Means any Person that is reflected on the books and records of DTC as having a direct interest in the Shares held of record by DTC; |
| Existing Holder Exception | Has the meaning ascribed to it in Article 9.1; |
| Fair Market Value | meansMeans the fair market value of the shares of Company Common StockShares or other equity securities of the Company as determined in good faith by the Board; provided, however, that the Company may obtain an independent |

25

12392265_12

|  | appraisal of the value of the ~~shares of Company Common Stock~~Shares or other equity securities of the Company on an annual basis for the Board to rely upon in determining the Fair Market Value, which appraisal shall be prepared by a nationally recognized independent valuation firm ~~mutually agreed upon between the Company and such Holder~~ (a "**Valuation Firm**"); *provided, further*, that if the ~~Company has not obtained an annual appraisal and the~~ Holder for whom the determination of Fair Market Value is being made objects to such Fair Market Value determination, the Company shall obtain an independent appraisal (or another independent appraisal if an annual appraisal was already obtained) of the value of the ~~shares of Company Common Stock~~Shares or other equity securities of the Company from a valuation firm mutually agreed upon between the Company and such Holder (which is different from the Valuation Firm if an annual appraisal was already obtained). The Holder shall deliver written notice of his or her objection to the Company within twenty (20) Business Days after such Holder receives notice of the Board's determination. Any determination ~~of an independent appraiser~~by such mutually agreed valuation firm pursuant to the foregoing provisions shall be a final and binding determination (save for manifest error) of Fair Market Value for purposes of ~~Section [9.4.2]~~Article 9.4. The Company shall pay the cost and expense of ~~such~~any independent appraisal, except that the objecting Holder shall reimburse the Company for such cost and expense in the event that such final and binding determination of Fair Market Value by the mutually agreed valuation firm is equal to or less than the Fair Market Value as initially determined by the Board; |
| --- | --- |
| First Threshold | Means at least twenty percent (20%) of the outstanding ~~Common~~ Shares, which, for the avoidance of doubt, will be calculated in accordance with the Dilution Principles; |
| General Meeting | Means the general meeting of Shareholders; |
| Hold | Means, in respect of the Shares, direct ownership as a Shareholder and/or Beneficial Ownership of a Beneficial Interest |

26

| | |
|---|---|
| | in Shares. Derivative terms, including, without limitation, "Holder", should be interpreted accordingly and shall include, for the avoidance of doubt, the Appaloosa Holder, CarVal Holder, DK Holder and the Initial First Threshold Holder; |
| Initial First Threshold Holder | Means Pacific Investment Management Company LLC together with its Affiliates and related funds; |
| Listing | Means a listing of securities resulting in the Company being registered under Section 12(b) of the Exchange Act; |
| Major Consent Approval | Has the meaning ascribed to it in Article 15.5.2; |
| Major Consent Matters | Has the meaning ascribed to it in the Shareholders Agreement;Means any of the following matters:<br><br>(i)        initiating, by application of the Company, or any decision or action of the Shareholder(s), any voluntary dissolution, winding up or liquidation in relation to the Company or Intelsat Jackson Holdings S.A.;<br><br>(ii)        any sale of the Company (including any change in control of the majority of voting interests in the Company, other than any transfer by the Holders in compliance with the tag-along rights provided for in the Shareholders Agreement to the extent that neither the Company nor any of its Subsidiaries is involved in such transaction in a capacity other than implementing the transfer of equity securities in connection therewith and other actions ancillary thereto) or all or substantially all of its assets;<br><br>(iii)        conversion of the Company to another form of entity (other than in connection with a Listing);<br><br>(iv)        any redemption or repurchase of equity securities other than (x) pursuant to a pro rata offer to all holders of such class of equity securities, (y) of equity securities owned by employees of the Company in connection with termination of employment or (z) a compulsory redemption for Communications Laws reasons under Article 9;<br><br>(v)        any election of the Company or any of its Subsidiaries to be taxed in a different manner or classified differently for tax purposes (including any change to the |

jurisdiction of organization or means of qualification for tax treaty benefits of the Company or any of its Subsidiaries);

(vi)            any amendment to the Articles, including, without limitation, any amendment to the Articles that would create additional authorized share capital, provided, however, that twenty percent (20%) of the Shares (in addition to Shares reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants) shall be authorized but unissued on the date of the extraordinary general meeting of shareholders of the Company held on February 10, 2022 and issuable pursuant to a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent true-up offering as set forth in Section 7(c) of the Shareholders Agreement); provided, further, that Major Consent Approval will not be required for amendments to the Articles in connection with (x) issuances of Shares permitted by the foregoing proviso, (y) issuances of Shares reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants, and (z) a change of address in Luxembourg;

(vii)            any suppression of statutory pre-emption rights (whether under Luxembourg Law or other applicable law); *provided however*, that the Company may make a Non-Conforming Issuance, provided, further, that upon any Non-Conforming Issuance, the Company shall make a subsequent true-up offering as set forth in Section 7(c) of the Shareholders Agreement;

(viii)            the issuance of equity securities, options or other rights to acquire such equity securities, or convertible/exchangeable indebtedness, of the Company or any of its Subsidiaries, other than a Non-Conforming Issuance (which, for the avoidance of doubt, shall be subject to a subsequent true-up offering as set forth in Section 7(c) of the Shareholders Agreement) or the issuance of Shares reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants;

(ix)            any change in the size, voting or composition of the Board; provided that such change shall not (a) reduce the size of the Board to less than seven Directors, (b) modify the

28

| | |
|---|---|
| | consent or quorum rights of any Directors provided for in the Shareholders Agreement, or (c) modify the voting thresholds set forth in the Shareholders Agreement; and<br><br>(x)             any Major Consent Amendment; |
| Major Transferee | Means an Approved Transferee to which a Nominating Shareholder transfers any of its rights to designate a Director pursuant to the Shareholders Agreement; |
| Management Incentive Plan | HasMeans the meaning ascribed to it inmanagement incentive plan implemented by the Company on the date of the Shareholders Agreement; |
| Minimum Threshold | Means the First Threshold, Second Threshold or Third Threshold, as applicable; |
| Minority Director | Means the Directors elected upon proposal of the Minority Investors in accordance with the terms of the Shareholders Agreement; |
| Minority Investor | meansMeans each of the Appaloosa Holder, the CarVal Holder and the DK Holder, in each case so long as such Person holds the Third Threshold; |
| New Securities | Has the meaning ascribed to it in the Shareholders Agreement; |
| New Warrant Agreements | Has the meaning ascribed to it in the Shareholders AgreementMeans, collectively, those certain agreements setting forth the full terms and conditions of the Warrants; |
| Nominating Shareholder | Means each of the Initial First Threshold Holder, the Appaloosa Holder, the CarVal Holder and the DK Holder or a Major Transferee, in each case so long as such Person holds at least the Minimum Threshold; |
| Non-Conforming Issuance | Has the meaning ascribed to it in the Shareholders AgreementMeans an issuance by the Company of up to 20% of the Shares (in addition to Shares reserved for issuance pursuant to the Management Incentive Plan and the exercise of the Warrants) without honoring Holders' preemptive rights if the Board determines (in compliance with clause (ii) of the Supermajority Board Matters) that such Shares must be issued |

29

12392265_12

| | |
|---|---|
| | before the Company could comply with such preemptive rights; |
| Non-Employee Director | Means one individual nominated to the Board in accordance with the Shareholders Agreement, provided, that such individual shall (x) not be an employee or member of the board of managers or other governing body of the applicable Nominating Shareholder or any of its Affiliates, and (y) have experience in one of the following industries: (1) space, (2) satellite, (3) technology, (4) communication, (5) aerospace and defense, (6) military/government and (7) commercial aviation; |
| Person | Means any individual, partnership, corporation, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof; |
| Preemptive RightholderPlan | Has the meaning ascribed to it in the Shareholders AgreementMeans the Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates filed by the Debtors on December 17, 2021 at Docket No. 3891 in Case No. 20-32299 (KLP) in the Bankruptcy Court, and confirmed by the Bankruptcy Court at Docket No. 3894 in Case No. 20-32299 (KLP), as amended, modified or supplemented; |
| Plan Effective Date | Means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective; |
| Registration Rights AgreementPreemptive Rightholder | Has the meaning ascribed to it in the Shareholders Agreement; |
| Registration Rights Agreement | Means the Registration Rights Agreement among the Company and the holders party thereto dated on or about the Plan Effective Date; |
| Representative Director | Means a Person elected as a Director upon proposal of a Nominating Shareholder in accordance with the terms of the Shareholders Agreement; |
| Record Date | Has the meaning ascribed to it in Article 20.8; |

| | |
|---|---|
| Representatives | Means with regard to a Shareholder or Holder, its partners, shareholders, members, directors, officers, employees, agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its Affiliates or wholly owned Subsidiaries; |
| RCS Law | Means the law dated 19 December 2002 concerning the register of commerce and of companies as well as the accounting and the annual accounts of undertakings, as amended (and any replacement law thereof); |
| RESA | Means the Luxembourg electronic legal gazette (*Recueil électronique des Sociétés et Associations*); |
| Second Threshold | Means at least fifteen percent (15%) of the outstanding ~~Common~~ Shares, which, for avoidance of doubt, will be calculated in accordance with Dilution Principles; |
| Shareholder | Means a duly registered holder of Shares of the Company; |
| Shareholders Agreement | Means the Shareholders Agreement of the Company~~,~~ dated ~~as of [•]~~on or about the Plan Effective Date (as it may be amended, modified or supplemented from time to time in accordance with the terms thereof); |
| Share Rights | Has the meaning ascribed to it in Article 5.2.3; |
| Shares | Means the ~~Common Shares and any other~~common shares (*actions*) with a nominal value of one cent of US Dollar (USD 0.01) per share, in registered form, of the Company; |
| Subsidiary | Means when used with respect to any Person, any corporation or other entity, whether incorporated or unincorporated, (a) of which such Person or any other Subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any Subsidiary of such Person do not have a majority of the voting interests in such partnership) or (b) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other entity is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one |

31

12392265_12

| | |
|---|---|
| | or more of its Subsidiaries; |
| Supermajority Board Approval | Has the meaning ascribed to it in Article 15.5.2; |
| Supermajority Board Matters | Has the meaning ascribed to it in the Shareholders Agreement;Means any of the following matters:<br><br>(i)        initiating, by application of the Company, or any decision or action of the Shareholder(s), any voluntary bankruptcy proceedings, receivership or any other insolvency or restructuring proceedings in Luxembourg or any other jurisdiction in relation to Company or Intelsat Jackson Holdings S.A.;<br><br>(ii)        any Non-Conforming Issuance;<br><br>(iii)        any type of dividend or distribution on or repurchase or redemption of equity securities of the Company or any of its Subsidiaries, other than (A) dividends and distributions from a wholly-owned Subsidiary of the Company to the Company or another wholly-owned Subsidiary thereof (B) redemptions of equity securities of the Company owned by employees of the Company in connection with the termination of employment; provided that in any event no non-pro rata dividends shall be permitted (other than in connection with redemptions for any aggregator vehicle related to the Management Incentive Plan or any other equity plan, incentive plan or similar arrangement of the Company) and (C) compulsory redemptions for Communications Laws reasons under Article 9;<br><br>(iv)        any amendment to these Articles (if applicable), the Registration Rights Agreement, CVR Agreements, the Management Incentive Plan and the New Warrant Agreements, to the extent not a Major Consent Amendment;<br><br>(v)        any consummation of a listing of securities of the Company on any national securities exchange, including a Listing;<br><br>(vi)        any incurrence of material debt, including any guarantees, incurrence or prepayment thereof by the Company or any of its Subsidiaries (other than drawdown of revolving debt previously approved and trade debt incurred in the ordinary |

32

12392265_12

course of business);

(vii)         any hiring or firing of senior officers of the Company or any of its Subsidiaries;

(viii)        any commencement or settlement of any litigation or dispute with an expected value of more than $50 million;

(ix)          any change in auditor or change in significant tax or accounting policy other than as required by United States generally accepted accounting principles, as in effect at the applicable time, consistently applied;

(x)           any acquisition or disposition of assets or liabilities, or merger, consolidation, share exchange, business combination, joint venture or similar transaction involving the Company or any of its Subsidiaries outside the ordinary course of business, in a transaction that involves consideration (including assumed debt) or investments in excess of 10% of the consolidated total assets of the Company and its Subsidiaries, to the extent not a Major Consent Matter;

(xi)          any material transaction of the Company or any of its Subsidiaries involving spectrum rights (including transferring the use of spectrum rights or receiving proceeds from spectrum clearances) outside the ordinary course of business;

(xii)         any adoption, approval or revision of any equity incentive plan;

(xiii)        any entry into a new line of business or termination of any material existing line of business, or any other material change in the nature or scope of the business of the Company and its Subsidiaries;

(xiv)         any approval of an annual budget of the Company and its Subsidiaries, provided, that to the extent that a budget has not been approved by year-end, until a new budget is approved, the Company will be permitted to operate on the prior year's budget with a variance of up to 10% on a consolidated basis (which shall include a variance of no more than 10% on line items for capital expenditures and operating expenses); and

12392265_12

| | |
|---|---|
| | (xv)                     any capital expenditure by the Company or any of its Subsidiaries in excess of $500 million in the aggregate during any 12-month period; |
| Third Threshold | Means at least five percent (5%) of the outstanding ~~Common~~ Shares, which, for avoidance of doubt, will be calculated in accordance with Dilution Principles; |
| Transfer | ~~Has the meaning ascribed to it in the Shareholders Agreement;~~Means any sale, pledge, assignment, encumbrance or other transfer or disposition of any Share or Beneficial Interest to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise, other than (i) in connection with any bona fide mortgage, encumbrance or pledge to a financial institution in connection with any bona fide loan or debt transaction or enforcement thereunder, including foreclosure thereof or (ii) any indirect transfer due to transfers of passive investments, such as a limited partnership interest or mutual fund interest, in a pooled investment vehicle or fund (including private fund or a fund registered under the Investment Company Act of 1940). "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings; and |
| Warrants | ~~Has the meaning ascribed to it in the Shareholders Agreement~~Means, collectively, those certain warrants issued pursuant to the Plan on the Plan Effective Date. |

## Article 27.   ~~Article 25.~~ Applicable law and general provision

27.1     Nothing in these Articles shall require any Shareholder to cast any vote as directed by the Company.

27.2     Notices and communications may be made or waived and circular resolutions may be evidenced in writing, by fax, email or any other means of electronic communication.

27.3     Signatures may be in handwritten or electronic form, provided they fulfil all legal requirements for being deemed equivalent to handwritten signatures. Signatures of circular resolutions or resolutions adopted by telephone or video conference may appear on one original or several counterparts of the same document, all of which taken together shall constitute one and the same document.

34

12392265_12

27.4      25.1 [All matters not expressly governed by these Articles shall be determined in accordance with the applicable law and, subject to any non-waivable provisions of the law, with the Shareholders Agreement. In the event of any conflict between the terms and provisions of the Articles and those contained in the Shareholders Agreement, the terms and provisions of the Shareholders Agreement shall govern and control,] to the extent permitted by law.

25.2 [The competent Luxembourg courts shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a duty owed by any director or officer of the Company to the Company or the Company's Shareholders, (iii) any action asserting a claim against the Company arising pursuant to any provision of the Company Law and the RCS Law or the Company's Articles, and (iv) any action asserting a claim against the Company with respect to its internal affairs, relationship with its Shareholders or other holders of interest, its directors, officers, or any action as to its Articles or other constitutional or governing documents. Notwithstanding the foregoing or anything to the contrary set forth in these Articles, the governing law and forum selection clauses in the applicable Shareholders' Agreement, Registration Rights Agreement, New Warrant Agreements and CVR Agreements shall be as set forth in such documents.]

12392265_12

**<u>Exhibit C-1</u>**

**Registration Rights Agreement**

**REGISTRATION RIGHTS AGREEMENT**

**among**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**

**AND**

**THE HOLDERS PARTY HERETO**

**DATED FEBRUARY [●], 2022**

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS ........................................................................................................... 1
    Section 1.1    Definitions.............................................................................................. 1

ARTICLE II DEMAND AND SHELF REGISTRATION ........................................................ 6
    Section 2.1    Right to Demand; Demand Notices ....................................................... 6
    Section 2.2    Shelf Registration................................................................................. 7
    Section 2.3    Deferral or Suspension of Registration ............................................... 10
    Section 2.4    Effective Registration Statement ......................................................... 11
    Section 2.5    Selection of Underwriters; Cutback...................................................... 12
    Section 2.6    Lock-up ................................................................................................. 13
    Section 2.7    Participation in Underwritten Offering; Information by Holder............ 14
    Section 2.8    Registration Expenses .......................................................................... 14

ARTICLE III PIGGYBACK REGISTRATION ......................................................................... 15
    Section 3.1    Notices .................................................................................................. 15
    Section 3.2    Underwriter's Cutback.......................................................................... 16
    Section 3.3    Company Control.................................................................................. 17
    Section 3.4    Selection of Underwriters .................................................................... 17
    Section 3.5    Withdrawal of Registration................................................................... 17
    Section 3.6    New Securities ...................................................................................... 17

ARTICLE IV REGISTRATION PROCEDURES ...................................................................... 18
    Section 4.1    Registration Procedures ....................................................................... 18

ARTICLE V INDEMNIFICATION ........................................................................................... 22
    Section 5.1    Indemnification by the Company.......................................................... 22
    Section 5.2    Indemnification by Holders .................................................................. 23
    Section 5.3    Conduct of Indemnification Proceedings.............................................. 23
    Section 5.4    Settlement Offers .................................................................................. 24
    Section 5.5    Other Indemnification .......................................................................... 24
    Section 5.6    Contribution ......................................................................................... 24

ARTICLE VI EXCHANGE ACT COMPLIANCE; QUOTATION ........................................... 25
    Section 6.1    Exchange Act Compliance.................................................................... 25
    Section 6.2    Quotation on OTC Market .................................................................... 25

ARTICLE VII MISCELLANEOUS............................................................................................ 26
    Section 7.1    Severability ........................................................................................... 26
    Section 7.2    Governing Law; Jurisdiction; Waiver of Jury Trial.............................. 26
    Section 7.3    Other Registration Rights ..................................................................... 26
    Section 7.4    Successors and Assigns......................................................................... 26
    Section 7.5    Notices .................................................................................................. 27
    Section 7.6    Headings ............................................................................................... 27
    Section 7.7    Additional Parties................................................................................. 27

i

Section 7.8      Adjustments ................................................................................. 28
Section 7.9      Entire Agreement ........................................................................ 28
Section 7.10    Counterparts; .pdf Signature ...................................................... 28
Section 7.11    Amendment.................................................................................. 28
Section 7.12    Extensions; Waivers.................................................................... 29
Section 7.13    Business Days .............................................................................. 29
Section 7.14    Further Assurances...................................................................... 29
Section 7.15    No Third-Party Beneficiaries...................................................... 29
Section 7.16    Interpretation; Construction........................................................ 29
Section 7.17    Term............................................................................................. 30

ii

**THIS REGISTRATION RIGHTS AGREEMENT,** dated as of February [●], 2022 (this "Agreement"), is entered into by and among Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a société anonyme organized under the Laws of the Grand Duchy of Luxembourg (RC Luxembourg B 264124) (together with any successor entity thereto, the "Company"), and each of the Holders (as defined below) that are parties hereto from time to time.

## RECITALS

A. The Company and certain affiliated debtors (collectively, the "Debtors") filed the Plan of Reorganization (as defined below) pursuant to Chapter 11 of the U.S. Bankruptcy Code, which, as amended, was confirmed by the U.S. Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") on December 17, 2021.

B. The Company proposes to issue the New Common Stock (as defined below) pursuant to, and upon the terms set forth in, the Plan of Reorganization.

C. The Company and the Holders have agreed to enter into this Agreement pursuant to which the Company shall grant the Holders registration rights under the Securities Act (as defined below) with respect to the Registrable Securities (as defined below) in furtherance of the foregoing.

D. Pursuant to the order of the Bankruptcy Court confirming the Plan of Reorganization, this Agreement is binding upon the Company and all Holders as if such parties had actually signed this Agreement regardless of which such parties execute this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Holders hereby agree as follows:

## AGREEMENT

## ARTICLE I

## DEFINITIONS

Section 1.1    Definitions.  As used herein, the following terms shall have the following respective meanings:

"Adoption Agreement" means an Adoption Agreement in the form attached hereto as Exhibit A.

"Affiliate" means, with respect to any Person, any Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person (including, the case of any Person that is an investment fund or managed account, the investment advisor thereof and any investment fund or managed account having the same investment advisor). As used in this definition, the term "control," including the correlative terms "controlling," "controlled by" and "under common control with," means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through

ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person. Notwithstanding the foregoing, (a) the Company, its Subsidiaries and their respective joint ventures (if any) shall not be considered Affiliates of any Holder for purposes of this Agreement (and vice versa), and (b) no Holder shall be considered an Affiliate of (i) any portfolio company in which investment funds affiliated with such Holder have made a debt or equity investment (and vice versa), (ii) any limited partners, non-managing members of, or other similar direct or indirect investors in such Holder or its investment fund affiliates (and vice versa) or (iii) any portfolio company in which any limited partner, non-managing member of, or other similar direct or indirect investor in such Holder or any of its investment fund affiliates have made a debt or equity investment (and vice versa), and none of the Persons described in clauses (i) through (iii) of this definition shall be considered an Affiliate of each other.

"Agreement" has the meaning set forth in the Preamble.

"Assignee" has the meaning set forth in Section 7.4.

"Automatic Shelf Registration Statement" means an "automatic shelf registration statement" as defined in Rule 405 (or any successor rule then in effect) promulgated under the Securities Act.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"beneficially owned," "beneficial ownership" and similar phrases have the same meanings as such terms have under Rule 13d-3 (or any successor rule then in effect) under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable upon the occurrence of a subsequent event.

"Board" means the Board of Directors of the Company.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York or Luxembourg City are authorized or obligated by law or executive order to close.

"Commission" means the Securities and Exchange Commission or any other U.S. Federal agency at the time administering the Securities Act.

"Company" has the meaning set forth in the Preamble.

"Company Notice" has the meaning ascribed to it in the Section 2.2(c)(ii).

"Company Shareholders Agreement" means the Shareholders Agreement, dated February [●], 2022, by and among the Company and the holders of New Common Stock party thereto.

"Control," and its correlative meanings, "Controlling," and "Controlled," mean the possession, direct or indirect (including through one or more intermediaries), of the power to direct or cause the direction of the management of a Person, whether through the ownership of voting securities, by contract or otherwise.

2

"Debtors" has the meaning set forth in the Recitals.

"Demand Holder" means (i) (A) each Holder who, together with its Affiliates who are Holders, at the Effective Date, beneficially owned Registrable Securities equal to 10.0% or more of the outstanding shares of New Common Stock at the Effective Date until such Holder, together with its Affiliates who are Holders, at any date, ceases to beneficially own 5.0% or more of the then-outstanding shares of New Common Stock or (B) a Person, together with its Affiliates, to whom a Demand Holder has transferred rights in accordance with Section 7.4 resulting in such Person, together with its Affiliates, becoming Holders of Registrable Securities equal to 10.0% or more of the then-outstanding shares of New Common Stock until such Person, together with its Affiliates who are Holders, on any date, ceases to beneficially own 10% or more of the then-outstanding shares of New Common Stock or (ii) any group of Holders, together with their respective Affiliates who are Holders, that, at the time of determination, collectively beneficially own Registrable Securities equal to 10.0% or more of the then-outstanding shares of New Common Stock where each Holder, together with its Affiliates that are Holders, at the Effective Date, beneficially owned Registrable Securities equal to 5.0% or more of the outstanding shares of New Common Stock at the Effective Date; provided, however, that any decrease in the beneficial ownership percentage of any such Holder resulting from the issuance or issuances by the Company of New Common Stock or other securities convertible into or exercisable for New Common Stock after the Effective Date shall not cause any such Holder or group of Holders to cease to be a Demand Holder for purposes of this Agreement.

"Demand Notice" has the meaning ascribed to it in Section 2.1(b).

"Demand Registration" means a registration of New Common Stock pursuant to Section 2.1.

"Demand Right" has the meaning ascribed to it in Section 2.1(a).

"Effective Date" means the effective date of the Plan of Reorganization.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"FINRA" means the Financial Industry Regulatory Authority or any successor regulatory authority.

"Form S-1 Shelf" has the meaning ascribed to it in Section 2.2(a).

"Form S-3 Shelf" has the meaning ascribed to it in Section 2.2(a).

"Holders" means any holder of Registrable Securities that is set forth on Schedule I hereto and Transferees of such Holders that acquire Registrable Securities in accordance with Section 7.4 and execute an Adoption Agreement in accordance with Section 7.4 (in each case, so long as such Persons holds any Registrable Securities).

"Information" has the meaning ascribed to it in Section 4.1(i).

3

"Initial Notice" has the meaning ascribed to it in Section 3.1(a).

"Initial Public Offering" means the earlier of (i) a transaction or action pursuant to which the New Common Stock is listed on a national securities exchange in the United States and (ii) a SPAC Business Combination.

"Inspectors" has the meaning ascribed to it in Section 4.1(i).

"Lock-up Period" has the meaning ascribed to it in Section 2.6(a).

"Long-Form Registration Statement" has the meaning ascribed to it in Section 2.1(a).

"Marketed Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.2(c)(i).

"New Common Stock" means the common shares, nominal value $0.01 per share, of the Company.

"New Registration Rights Agreement" has the meaning ascribed to it in Section 3.6.

"Non-Marketed Shelf Take-Down" has the meaning ascribed to it in Section 2.2(d).

"Person" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, joint venture, unincorporated organization or any governmental entity or any department, agency or political subdivision thereof.

"Piggyback-Eligible Holder" has the meaning ascribed to it in Section 3.1(a).

"Piggyback Notice" has the meaning ascribed to it in Section 3.1(a).

"Piggyback Registration" means any registration pursuant to Section 3.1(a).

"Plan of Reorganization" means the Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates filed by the Debtors on December 17, 2021 at Docket No. 3891 in Case No. 20-32299 (KLP) in the U.S. Bankruptcy Court for the Eastern District of Virginia (including all exhibits, schedules and supplements thereto and as it may be amended, modified or supplemented from time to time), which has been confirmed on December 17, 2021.

"Preemptive Rights Holders" has the meaning ascribed to it in Section 3.6.

"Prospectus" means the prospectus included in any Registration Statement, as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the securities covered by such Registration Statement and, in each case, by all other amendments and supplements to such prospectus, including post-effective amendments and, in each case, all material incorporated by reference in such prospectus.

"Records" has the meaning ascribed to it in Section 4.1(i).

"Registrable Securities" means, with respect to any Holder, at any time, the New Common Stock held or beneficially owned by such Holder at such time; provided, however, that as to any Registrable Securities, such securities shall cease to be Registrable Securities (i) upon the sale thereof pursuant to an effective registration statement, (ii) upon the sale thereof pursuant to Rule 144 under the Securities Act, (iii) when such securities cease to be outstanding, or (iv) when both (A) on advice of counsel to the Company, which counsel shall be reasonably acceptable to the relevant Holder, such securities may be sold without volume, manner of sale and public information limitations under Rule 144 (or any similar provisions then in force) and (B) the relevant Holder, together with its Affiliates, at any date, ceases to beneficially own 2.0% or more of the outstanding shares of New Common Stock at the Effective Date.

"Registration Statement" means any Registration Statement of the Company which covers the Registrable Securities, including any preliminary Prospectus and the Prospectus, amendments and supplements to such Registration Statement, including post-effective amendments, all exhibits thereto and all material incorporated by reference in such Registration Statement.

"Requesting Holder" means a Holder exercising a Demand Right.

"Rule 144" means Rule 144 under the Securities Act (or successor rule).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Selling Holder" means the Holders selling Registrable Securities pursuant to a Registration Statement under this Agreement.

"Selling Holders' Counsel" has the meaning ascribed to it in Section 4.1(b).

"Shelf Holder" has the meaning ascribed to it in Section 2.2(b).

"Shelf Registration" has the meaning ascribed to it in Section 2.2(a).

"Shelf Registration Statement" has the meaning ascribed to it in Section 2.2(a).

"Shelf Take-Down" has the meaning ascribed to it in Section 2.2(b).

"Shelf Take-Down Notice" has the meaning ascribed to it in Section 2.2(c)(iii).

"Short-Form Registration Statement" has the meaning ascribed to it in Section 2.1(a).

"SPAC Business Combination" means a business combination, merger or similar transaction of the Company or an entity created in connection with a transaction with a special purpose acquisition corporation whose securities are listed on the New York Stock Exchange or quoted on The Nasdaq Stock Market or are traded or quoted on any other national stock exchange or automated quotation system. For the avoidance of doubt, the publicly traded company created upon completion of a SPAC Business Combination shall be the Company for the purposes of this Agreement following completion of a SPAC Business Combination.

5

"Subsidiary" means each Person in which another Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% in voting power of the outstanding capital stock or other equity interests.

"Transfer" means any direct or indirect sale, assignment, transfer, conveyance, gift, bequest by will or under intestacy laws, pledge, hypothecation or other encumbrance, or any other disposition, of the stated security (or any interest therein or right thereto, including the issuance of any total return swap or other derivative whose economic value is primarily based upon the value of the stated security) or of all or part of the voting power (other than the granting of a revocable proxy) associated with the stated security (or any interest therein) whatsoever, or any other transfer of beneficial ownership of the stated security, with or without consideration and whether voluntarily or involuntarily (including by operation of law).

"Transferee" means a Person acquiring New Common Stock pursuant to a Transfer.

"Underwritten Offering" means a sale, on the Company's or any Holder's behalf, of New Common Stock by the Company or a Holder to an underwriter for reoffering to the public.

"Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.2(b)(ii).

"Underwritten Shelf Take-Down Notice" has the meaning ascribed to it in Section 2.2(c)(i).

## ARTICLE II

## DEMAND AND SHELF REGISTRATION

Section 2.1     Right to Demand; Demand Notices.

(a)     Holders' Demand for Registration.  Subject to the provisions of this Article II, at any time and from time to time after the Company's Initial Public Offering, each Demand Holder shall have the right to request in writing that the Company register the sale on a Registration Statement on Form S-1 (or any successor form thereto) (a "Long-Form Registration Statement"), or, if available, a Registration Statement on Form S-3 (or any successor form thereto) (a "Short-Form Registration Statement"), under the Securities Act of all or part of the Registrable Securities beneficially owned by such Demand Holder or its Affiliates (a "Demand Right"). Notwithstanding the foregoing, (i) the Company shall only be required to effect two (2) Demand Registrations and/or Underwritten Shelf Take-Downs in any twelve (12) month period (provided, however, that an Underwritten Shelf Take-Down that is a block trade or that is not a Marketed Underwritten Shelf Take-Down shall not count as an Underwritten Shelf Take-Down for purposes of this limitation) and (ii) a Demand Right may be exercised only if the aggregate offering price of the New Common Stock to be sold by the Demand Holder in the applicable offering, together with any New Common Stock to be sold by any Piggyback-Eligible Holder electing to be included in a Piggyback Registration pursuant to Section 3.1 in respect of such offering, before deduction of underwriter discounts and commissions, is reasonably expected to exceed, in the aggregate, $50.0 million.

6

(b)     <u>Demand Notices</u>.  All requests made pursuant to this <u>Section 2.1</u> shall be made by providing written notice to the Company (each such written notice, a "<u>Demand Notice</u>"), which notice shall (i) specify the aggregate number and class or classes of Registrable Securities proposed to be registered by the Demand Holder (and its Affiliates) providing such Demand Notice and (ii) state the intended methods of disposition in the offering (including whether or not such offering shall be an Underwritten Offering).

(c)     <u>Demand Filing</u>.  Subject to <u>Section 2.3</u>, promptly (but in any event within five (5) Business Days) after receipt of any Demand Notice, the Company shall give written notice of the Demand Notice to all Piggyback-Eligible Holders of Registrable Securities and otherwise comply with <u>Section 3.1</u>.  Subject to <u>Section 2.3</u>, the Company shall use reasonable best efforts to file (or confidentially submit) the Registration Statement in respect of a Demand Notice as soon as practicable and, in any event, within 60 days in the case of a Long-Form Registration Statement and 30 days in the case of a Short-Form Registration Statement, in each case after receiving a Demand Notice and shall use reasonable best efforts to cause the same to be declared effective by the Commission as promptly as practicable after such filing (or confidential submission).

(d)     <u>Demand Withdrawal</u>.  A Requesting Holder may withdraw all or any portion of its Registrable Securities from a Demand Registration by providing written notice to the Company at least five (5) Business Days prior to the later of the (i) effectiveness of the applicable Registration Statement and (ii) commencement of a "roadshow" relating to such Demand Registration.

Section 2.2     <u>Shelf Registration</u>.

(a)     <u>Filing</u>.  Following the Company's Initial Public Offering and from and after such time as the Company shall have qualified for the use of a registration statement for an offering to be made on a delayed or continuous basis pursuant to Rule 415 under the Securities Act or any successor rule thereto on Form S-1 (the "<u>Form S-1 Shelf</u>") or, if available, on Form S-3 (a "<u>Form S-3 Shelf</u>" and, together with the Form S-1 Shelf and any Automatic Shelf Registration Statement, if available, a "<u>Shelf Registration Statement</u>"), the Company will, pursuant to the requirements of this <u>Section 2.2(a)</u>, file (or confidentially submit) a Shelf Registration Statement upon the written request by any Demand Holder that the Company register under the Securities Act all or a portion of the Registrable Securities owned by such Holder at such time in accordance with Rule 415 under the Securities Act or any successor rule thereto (a "<u>Shelf Registration</u>"). Subject to <u>Section 2.3</u>, the Company shall give written notice of such request to all Piggyback-Eligible Holders promptly (but in any event within five (5) Business Days after receipt of any such written request from a Demand Holder) and otherwise comply with <u>Section 3.1</u>. With respect to each Shelf Registration, (i) the Company shall add Registrable Securities of any Piggyback-Eligible Holder who requests in writing that the Company include the Registrable Securities owned by such Piggyback-Eligible Holder in the Shelf Registration Statement; <u>provided</u>, <u>that</u>, such written request is delivered to the Company at least five (5) Business Days prior to the filing (or confidential submission) of the Shelf Registration Statement, and (ii) the Company shall use its reasonable best efforts to file (or confidentially submit) with the Commission as promptly as practicable, and in any event within 60 days in the case of a Form S-1 Shelf and 30 days in the case of a Form S-3 Shelf, in each case  after it receives a request under this <u>Section 2.2(a)</u> to register

7

all or a portion of the Registrable Securities. The Company shall use its reasonable best efforts to cause to be declared effective the Shelf Registration Statement as promptly as practicable after the filing (or confidential submission) thereof. In no event shall the Company be required to file, and maintain effectiveness of, more than one Shelf Registration Statement at any one time pursuant to this Section 2.2(a); provided, however, that the Company shall be required to amend or supplement any existing Shelf Registration Statement, if required, to accommodate the inclusion of additional Registrable Securities beneficially owned by any Demand Holder or Piggyback-Eligible Holder or amend the plan of distribution to accommodate subsequent registration requests by any Demand Holder pursuant to this Section 2.2.

(b)     Shelf Take-Downs.  Any Holder whose Registrable Securities are included in an effective Shelf Registration Statement (a "Shelf Holder") may initiate an offering or sale of all or part of such Registrable Securities (a "Shelf Take-Down"), in which case the provisions of this Section 2.2 shall apply.  Notwithstanding the foregoing:

(i)     any such Shelf Holder may initiate an unlimited number of Non-Marketed Shelf Take-Downs pursuant to Section 2.2(d) below; and

(ii)     any such Shelf Holder may initiate (together with other co-initiating Shelf Holders) an Underwritten Offering (including any block trade) (an "Underwritten Shelf Take-Down") pursuant to Section 2.2(c) below; provided that in each case, (A) the Company shall only be required to effect two (2) Demand Registrations and/or Underwritten Shelf Take-Downs in any twelve (12) month period (provided, however, that an Underwritten Shelf Take-Down that is a block trade or that is not a Marketed Underwritten Shelf Take-Down shall not count as an Underwritten Shelf Take-Down for purposes of this limitation) and (B) the Registrable Securities proposed to be sold by the initiating Shelf Holder (and if applicable, other co-initiating Shelf Holders) in such Underwritten Shelf Take-Down shall be required to (x) have a reasonably anticipated aggregate offering price of at least $50.0 million before deduction of underwriting discounts and commissions or (y) constitute all remaining Registrable Securities held by such Shelf Holder (and, if applicable, other co-initiating Shelf Holders).

(c)     Underwritten Shelf Take-Downs.

(i)     Subject to Section 2.2(b), if a Shelf Holder so elects in a written request delivered to the Company (an "Underwritten Shelf Take-Down Notice") to effect a Shelf Take-Down in the form of an Underwritten Shelf-Take Down, the Company shall use its reasonable best efforts to file and effect an amendment or supplement to its Shelf Registration Statement (including the filing of a Prospectus supplement with respect to such Underwritten Shelf Take-Down) for such purpose as soon as practicable. Such initiating Shelf Holder shall indicate in such Underwritten Shelf Take-Down Notice the number of Registrable Securities of such Shelf Holder to be included in such Underwritten Shelf Take-Down and whether it intends for such Underwritten Shelf Take-Down to involve a customary "roadshow" (including an "electronic roadshow") or other marketing effort by the Company and the underwriters (a "Marketed Underwritten Shelf Take-Down").

8

(ii)     Within three (3) Business Days of receipt of an Underwritten Shelf Take-Down Notice with respect to a Marketed Underwritten Shelf Take-Down, the Company shall promptly deliver a written notice of such Marketed Underwritten Shelf Take-Down to all Shelf Holders (which notice shall state that the material terms of such proposed Marketed Underwritten Shelf Take-Down, to the extent known, as well as the identity of the Shelf Holder requesting such Underwritten Shelf Take-Down, are available upon request) (a "Company Notice") and, in each case, subject to Section 2.5(b) and Section 2.7, the Company shall include in such Marketed Underwritten Shelf Take-Down all such Registrable Securities of such Shelf Holders for which the Company has received written requests within three (3) Business Days after giving the Company Notice, which requests must specify the aggregate amount of such Registrable Securities of such Holder to be offered and sold pursuant to such Marketed Underwritten Shelf Take-Down.

(iii)     Subject to Section 2.2(b), if a Shelf Holder desires to effect an Underwritten Shelf Take-Down that is not a Marketed Underwritten Shelf Take-Down, the Shelf Holder initiating such Shelf Take-Down shall provide written notice (a "Shelf Take-Down Notice") of such Shelf Take-Down to the Company, which, to the extent such Shelf Take-Down Notice includes the information specified in clause (E) below, the Company shall promptly provide to the other Shelf Holders.  Any such Shelf Take-Down Notice shall be delivered to the Company as far in advance of the completion of such Shelf Take-Down as shall be reasonably practicable in light of the circumstances applicable to such Shelf Take-Down but no less than five (5) Business Days prior to such Shelf Take-Down.  Any Shelf Take-Down Notice shall set forth (A) identity of the initiating Shelf Holder (and, if applicable, co-initiating Shelf Holders), (B) the total number of Registrable Securities expected to be offered and sold in such Shelf Take-Down, (C) the expected date of such Shelf Take-Down, (D) the expected plan of distribution of such Shelf Take-Down, and (E) in the sole discretion of the initiating Shelf Holder, (i) an invitation to the other Shelf Holders to elect to include in the Shelf Take-Down the Registrable Securities held by such other Shelf Holders (but subject to Section 2.5(b) and Section 2.7) and (ii) the action or actions required (including the timing thereof) in connection with such Shelf Take-Down with respect to the other Shelf Holders if any such Shelf Holder elects to exercise such right.  Upon receipt of a Shelf Take-Down Notice, if applicable, the other Shelf Holders may elect to sell Registrable Securities in such Shelf Take-Down, at the same price per Registrable Security and pursuant to the same terms and conditions with respect to payment for the Registrable Securities as agreed to by the initiating Shelf Holder (and, if applicable, co-initiating Shelf Holders), by sending, at least three (3) Business Days prior to the expected date of such Shelf Take-Down set forth in such Shelf Take-Down Notice, an irrevocable written notice to the initiating Shelf Holder, indicating its election to participate in the Shelf Take-Down and the total number of its Registrable Securities to include in the Shelf Take-Down (but, in all cases, subject to Section 2.5(b) and Section 2.7).

(iv)     Notwithstanding the delivery of any Underwritten Shelf Take-Down Notice, all determinations as to whether to complete any Underwritten Shelf Take-Down and as to the timing, manner, price and other terms of any Underwritten Shelf Take-Down shall be at the discretion of the Shelf Holder (or, if there are co-initiating Shelf

<div align="center">9</div>

Holders, the Holders of a majority of the Registrable Securities under such Underwritten Shelf Take-down Notice) initiating the Underwritten Shelf Take-Down.

(d)    Non-Marketed Shelf Take-Downs. If a Shelf Holder desires to effect a Shelf Take-Down that does not constitute an Underwritten Shelf Take-Down (a "Non-Marketed Shelf Take-Down") and if such Non-Marketed Shelf Take-Down requires actions to be taken by the Company, such Shelf Holder shall so indicate in a written request delivered to the Company no later than three (3) Business Days prior to the expected date of such Non-Marketed Shelf Take-Down (or such shorter period as the Company may agree), which request shall include (i) the aggregate number and class or classes of Registrable Securities expected to be offered and sold in such Non-Marketed Shelf Take-Down, (ii) the expected plan of distribution of such Non-Marketed Shelf Take-Down and (iii) the action or actions required (including the timing thereof) in connection with such Non-Marketed Shelf Take-Down, and, if necessary, the Company shall use its reasonable best efforts to file and effect an amendment or supplement to its Shelf Registration Statement (including the filing of a Prospectus supplement with respect to such Non-Marketed Shelf Take-Down) for such purpose as soon as practicable.

(e)    Continued Effectiveness. The Company shall use its reasonable best efforts to keep the Shelf Registration Statement filed pursuant to Section 2.2(a) hereof continuously effective under the Securities Act, including by filing a new Shelf Registration Statement if necessary, in order to permit the Prospectus (or any Prospectus supplement) forming a part thereof to be usable by a Shelf Holder until the earlier of (i) the date as of which all Registrable Securities registered by such Shelf Registration Statement have been sold and (ii) such shorter period as Shelf Holders holding a majority of the Registrable Securities may reasonably determine.

Section 2.3    Deferral or Suspension of Registration. If (a) the Company receives a Demand Notice, a request to file (or confidentially submit) a Shelf Registration Statement, or a written request from a Shelf Holder for a Shelf Take-Down and the Board, in its good faith judgment and upon advice of external counsel to the Company, determines that it would be materially adverse to the Company for such Registration Statement to be filed (or confidentially submitted) or declared effective on or before the date such filing or effectiveness would otherwise be required hereunder, or for such Registration Statement or Prospectus included therein to be used to sell Registrable Securities or for such Shelf Take-Down to be effected, because such action would: (i) materially interfere with a significant acquisition, corporate reorganization, financing, securities offering or other significant transaction or development involving the Company; (ii) based on the advice of the Company's outside counsel, require disclosure of material non-public information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act or the Exchange Act, or (b) the Company is subject to a Commission stop order suspending the effectiveness of any Registration Statement or the initiation of proceedings with respect to such Registration Statement under Section 8(d) or 8(e) of the Securities Act, then the Company shall have the right to defer such filing (but not the preparation), initial effectiveness or continued use of a Registration Statement and the Prospectus included therein for a period of not more than 60 days (or such longer period as the Requesting Holder or Shelf Holder, as applicable, may determine). If the Company shall so postpone the filing or initial effectiveness of a Registration Statement with respect to a Demand Notice and if the Requesting Holder within 30 days after

10

receipt of the notice of postponement advises the Company in writing that it has determined to withdraw such Demand Notice, then such Demand Registration shall be deemed to be withdrawn. Unless consented to in writing by the Holders, the Company shall not use the deferral or suspension rights provided under this Section 2.3 more than twice, and for no more than 90 days in the aggregate, in any 12-month period.  In the event of any deferral or suspension pursuant to this Section 2.3, the Company shall (i) use its reasonable best efforts to keep the Requesting Holder or Shelf Holders, as applicable, apprised of the estimated length of the anticipated delay; and (ii) notify the Requesting Holder or Shelf Holders, as applicable, promptly upon termination of the deferral or suspension.  After the expiration of the deferral or suspension period and without any further request from the Requesting Holder or Shelf Holders, as applicable, to the extent such Requesting Holder has not withdrawn the Demand Notice, if applicable, the Company shall as promptly as reasonably practicable complete the preparation of and file (or confidentially submit) a Registration Statement or Prospectus or post-effective amendment or supplement to the applicable Registration Statement, Prospectus or document, or file any other required document, as applicable, so that, as thereafter delivered to purchasers of the Registrable Securities included therein, the Prospectus will not include a material misstatement or omission and will be effective and useable for the sale of Registrable Securities.

Section 2.4    Effective Registration Statement.  A registration requested pursuant to this Article II shall not be deemed to have been effected, nor shall such registration be counted towards the limitations set forth in Section 2.1(a) or Section 2.2(b)(ii):

(a)    unless a Registration Statement with respect thereto has been declared effective by the Commission and remains effective in compliance with the provisions of the Securities Act and the laws of any U.S. state or other jurisdiction applicable to the disposition of Registrable Securities covered by such Registration Statement for not less than (i) in the case of a Registration Statement filed pursuant to Section 2.2, the period described in Section 2.2(e), or (ii) in the case of any other Registration Statement, 180 days (or such shorter period as will terminate when all of such Registrable Securities shall have been disposed of in accordance with such Registration Statement) or, in each case, if such Registration Statement relates to an Underwritten Offering, such longer period as, in the opinion of external counsel for the Company, a Prospectus is required by law to be delivered in connection with sales of Registrable Securities by an underwriter or dealer;

(b)    if, after it becomes effective, such registration is interfered with by any stop order, injunction or other order or requirement of the Commission or other governmental authority or court for any reason other than a violation of applicable law solely by any Selling Holder and has not thereafter become effective;

(c)    unless the requested Registration Statement, in the case of a Demand Registration or a Shelf Registration, has been declared effective by the Commission for more than 75% of the full amount of Registrable Securities for which registration has been requested, or the offering, in the case of an Underwritten Shelf Take-Down, has resulted in the disposition by the Holders of at least 75% of the amount of Registrable Securities requested to be included and, in each case, any Registrable Securities not included or disposed of, as applicable, were reduced from such registration or Underwritten Shelf Take-Down pursuant to the terms of Section 3.2;

11

(d)     with respect to any request for a Registration Statement or an offering, to the extent the applicable Holders shall have reimbursed the Company for all reasonable and documented expenses of the Company related to such Registration Statement or offering; or

(e)     if, in the case of an Underwritten Offering, the conditions to closing specified in an underwriting agreement applicable to the Company are not satisfied or waived other than by reason of any breach or failure by any Selling Holder.

Section 2.5     Selection of Underwriters; Cutback.

(a)     Selection of Underwriters.  If a Requesting Holder intends to offer and sell the Registrable Securities covered by its request under this Article II by means of an Underwritten Offering, such Requesting Holder shall, in reasonable consultation with other participating Holders under such Underwritten Offering, select the managing underwriter or underwriters to administer such offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company, such acceptance not to be unreasonably withheld, conditioned or delayed. If a Shelf Holder intends to offer and sell the Registrable Securities covered by its request under this Article II by means of an Underwritten Shelf Take-Down, the requesting Shelf Holder shall select, in reasonable consultation with other participating Holders, the managing underwriter or underwriters to administer such offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company, such acceptance not to be unreasonably withheld, conditioned or delayed.

(b)     Underwriter's Cutback.  Notwithstanding any other provision of this Article II or Section 3.1, if the managing underwriter or underwriters of an Underwritten Offering in connection with a Demand Registration or a Shelf Registration advise the Company in their good faith opinion that the inclusion of all such Registrable Securities proposed to be included in the Registration Statement or such Underwritten Offering would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities to be offered thereby or in such Underwritten Offering, then the number of Registrable Securities proposed to be included in such Registration Statement or Underwritten Offering shall be allocated among the Company, the Selling Holder and all other Persons selling Registrable Securities in such Underwritten Offering in the following order:

(i)     *first*, the Registrable Securities of the class or classes proposed to be registered held by the Holder that initiated (or co-initiated) such Underwritten Offering and the Registrable Securities of the same class or classes (or convertible at the Holder's option into such class or classes) held by other Holders requested to be included in such Underwritten Offering (allocated, if necessary, *pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Underwritten Offering);

(ii)     *second,* all other securities of the same class or classes (or convertible at the holder's option into such class or classes) requested to be included in such Underwritten Offering other than securities to be sold by the Company; and

12

(iii)    *third*, the securities of the same class or classes to be sold by the Company.

No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration or offering. If the underwriter has not limited the number of Registrable Securities to be underwritten, the Company may include securities for its own account (or for the account of any other Persons) in such registration if the underwriter so agrees and if the number of Registrable Securities would not thereby be limited.

Section 2.6    Lock-up.

(a)    If requested by the managing underwriters in connection with any Underwritten Offering, each Holder (i) who beneficially owns 5.0% or more of the outstanding New Common Stock or (ii) who is a natural person and serving as a director or executive officer of the Company shall agree to be bound by customary lock-up agreements providing that such Holder shall not, directly or indirectly, effect any Transfer (including sales pursuant to Rule 144) of any such shares of New Common Stocks without prior written consent from the underwriters managing such Underwritten Offering during a period beginning on the date of launch of such Underwritten Offering and ending up to 180 days in the case of an Initial Public Offering (or 90 days for any Underwritten Offering after the Initial Public Offering) from and including the date of pricing or such shorter period as reasonably requested by the underwriters managing such Underwritten Offering (the "Lock-Up Period"); provided that (A) the foregoing shall not apply to any shares of New Common Stock that are offered for sale as part of such Underwritten Offering, (B) such Lock-Up Period shall be no longer than and on substantially the same terms as the lock-up period applicable to the Company, its directors and executive officers or any other holders of more than 5.0% of the Company's equity securities that has a registration rights agreement with the Company or any of its Subsidiaries and (C) such Lock-Up Period shall not commence unless the Company notifies the Holders in writing prior to the commencement of the Lock-Up Period. Each such Holder agrees to execute a customary lock-up agreement in favor of the underwriters to such effect.

(b)    Nothing in Section 2.6(a) shall prevent: (i) any Holder that is a partnership, limited liability company or corporation from (A) making a distribution of New Common Stock to the partners, members or stockholders thereof or (B) Transferring New Common Stock to an Affiliate of such Holder; (ii) any Holder who is an individual from Transferring New Common Stock to (A) an individual by will or the laws of descent or distribution or by gift without consideration of any kind or (B) a trust or estate planning-related entity for the sole benefit of such Holder or a lineal descendant or antecedent or spouse; (iii) any Holder from (A) pledging, hypothecating or otherwise granting a security interest in New Common Stock or securities convertible into or exchangeable for New Common Stock to one or more lending institutions as collateral or security for any loan, advance or extension of credit and any transfer upon foreclosure upon such New Common Stock or such securities or (B) Transferring New Common Stock pursuant to a final non-appealable order of a court or regulatory agency or (iv) any Holder from Transferring New Common Stock in a manner that was permitted under, but subject to the conditions described in, the lock-ups entered into in connection with the Company's Initial Public Offering or other Underwritten Offering after the Initial Public Offering; provided that, in the case of clauses (i), (ii), (iii) and (iv), such Transfer is otherwise in compliance with applicable

13

securities laws; provided, further, that, in the case of clause (i), clause (ii) and, if applicable, clause (iv), each such Transferee agrees in writing to become bound by the applicable underwriter lock-up.

Section 2.7    Participation in Underwritten Offering; Information by Holder.  No Holder may participate in an Underwritten Offering hereunder unless such Holder (a) agrees to sell such Holder's New Common Stock on the basis provided in any underwriting arrangements, and in accordance with the terms and provisions of this Agreement, including any lock-up arrangements, and (b) completes and executes all questionnaires, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements.  In addition, the Holders shall furnish to the Company such information regarding such Holder or Holders and the distribution proposed by such Holders, as applicable, as the Company may reasonably request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this Article II.  Nothing in this Section 2.7 shall be construed to create any additional rights regarding the registration of New Common Stock in any Person otherwise than as set forth herein.

Section 2.8    Registration Expenses.    All expenses incident to the Company's performance of or compliance with this Agreement, including without limitation (i) all registration and filing fees, and any other fees and expenses associated with filings required to be made with any stock exchange, the Commission and FINRA (including, if applicable, the reasonable fees and expenses of any "qualified independent underwriter" and its counsel as may be required by the rules and regulations of FINRA), (ii) all fees and expenses of compliance with state securities or blue sky laws, (iii) all printing and related messenger and delivery expenses (including expenses of printing certificates for the New Common Stock in a form eligible for deposit with The Depository Trust Company and of printing prospectuses), (iv) all fees and disbursements of counsel for the Company and of all independent certified public accountants of the Company and its Subsidiaries (including the expenses of any special audit and "cold comfort" letters required by or incident to such performance)), (v) all fees and expenses incurred in connection with the listing of the New Common Stock on any securities exchange, (vi) all reasonable fees and documented out-of-pocket disbursements of a single Selling Holders' Counsel and (vii) all reasonable fees and documented out-of-pocket disbursements of underwriters customarily paid by the issuer or sellers of securities, including expenses of any special experts retained, if required, in connection with the requested registration (excluding underwriting discounts and commissions and transfer taxes, if any, and fees and disbursements of counsel to underwriters), will be borne by the Company, regardless of whether the Registration Statement becomes effective (or such offering is completed) and whether or not all or any portion of the Registrable Securities originally requested to be included in such registration are ultimately included in such registration; provided, however, that (x) any underwriting discounts, commissions or fees in connection with the sale of the Registrable Securities will be borne by the Holders pro rata on the basis of the number of shares of New Common Stock so registered and sold, (y) transfer taxes with respect to the sale of Registrable Securities will be borne by the Holder of such Registrable Securities and (z) the fees and expenses of any other counsel, accountants or other persons retained or employed by any Holder will be borne by such Holder.

14

# ARTICLE III

## PIGGYBACK REGISTRATION

Section 3.1    <u>Notices</u>.

(a)    If the Company at any time proposes for any reason to register the sale of securities for cash under the Securities Act (other than a registration on Form S-4 or Form S-8, or any successor of either such form, or a registration relating solely to the offer and sale to the Company's managers or employees pursuant to any employee equity plan or other employee benefit plan or arrangement or a registration relating to its Initial Public Offering) whether or not securities are to be sold by the Company or otherwise, and whether or not in connection with any Demand Registration pursuant to <u>Section 2.1</u>, any Shelf Registration pursuant to <u>Section 2.2</u> or any other agreement (such registration, a "<u>Piggyback Registration</u>"), the Company shall give written notice of its intention to so register the securities, at least ten (10) Business Days prior to the expected date of filing of such Registration Statement or amendment thereto in which the Company first intends to identify the selling stockholders and the number of and type of securities to be sold (each such notice, an "<u>Initial Notice</u>"), to (i) each Holder who, together with its Affiliates who are Holders, at the Effective Date, beneficially owned Registrable Securities equal to 5.0% or more of the outstanding shares of New Common Stock at the Effective Date, (ii) any Person, together with its Affiliates, to whom any of the foregoing Holders has transferred rights in accordance with <u>Section 7.4</u> resulting in such Person, together with its Affiliates, receiving a number of Registrable Securities equal to 5.0% or more of the then-outstanding shares of New Common Stock if such Person, together with its Affiliates has continuously beneficially owned 5.0% or more of the then-outstanding shares of New Common Stock from the date of such transfer through the date of such Initial Notice, and (iii) each Holder that has notified the Company that it is unable to sell its Registrable Securities under Rule 144 without complying with the volume, manner of sale and public information restrictions of Rule 144 (each, a "<u>Piggyback-Eligible Holder</u>"). The Company shall, subject to the provisions of <u>Section 3.2</u> and <u>Section 3.3</u> below, use its reasonable best efforts to include in such Piggyback Registration on the same terms and conditions as the securities otherwise being sold, all Registrable Securities of the same class or classes as the securities proposed to be registered (or convertible at the Piggyback-Eligible Holder's option into such class or classes) with respect to which the Company has received written requests from Piggyback-Eligible Holders for inclusion therein within the time period specified by the Company in the applicable Initial Notice, which time period shall be not less than five (5) Business Days after sending the applicable Initial Notice (each such written request, a "<u>Piggyback Notice</u>"), which Piggyback Notice shall specify the number of, and the class or classes, of Registrable Securities proposed to be included in the Piggyback Registration.

(b)    If a Piggyback-Eligible Holder does not deliver a Piggyback Notice within the period specified in <u>Section 3.1(a)</u>, such Holder shall be deemed to have irrevocably waived any and all rights under this <u>Article III</u> with respect to such registration (but not with respect to future registrations in accordance with this <u>Article III</u>).

(c)    No registration effected under this <u>Section 3.1</u> shall relieve the Company of its obligation to effect any registration upon request under <u>Section 2.1</u> or <u>Section 2.2</u> hereof, and no registration effected pursuant to this <u>Section 3.1</u> shall be deemed to have been

15

effected pursuant to Section 2.1 or Section 2.2 hereof.  The Initial Notice, the Piggyback Notice and the contents thereof shall be kept confidential until the public filing of the Registration Statement.

Section 3.2    Underwriter's Cutback.  If the managing underwriter of an Underwritten Offering that includes a Piggyback Registration advises the Company that it is the managing underwriter's good faith opinion that the inclusion of all such Registrable Securities proposed to be included in the Registration Statement for such Underwritten Offering would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities to be offered thereby, then the number of securities proposed to be included in such Underwritten Offering shall be allocated among the Company, the Selling Holders and all other Persons selling securities in such Underwritten Offering in the following order:

(a)    If the Piggyback Registration referred to in Section 3.1 is initiated as an underwritten primary registration on behalf of the Company, then, with respect to each class proposed to be registered:

(i)    *first*, the securities held by the Company of the class or classes proposed to be registered that the Company proposes to sell, as applicable;

(ii)    *second*, all Registrable Securities of the same class or classes (or convertible at the Piggyback-Eligible Holder's option into such class or classes) held by Piggyback-Eligible Holders requested to be included in such Piggyback Registration (allocated, if necessary, *pro rata* among the respective Piggyback-Eligible Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Piggyback-Eligible Holder at the time of such Piggyback Registration); and

(iii)    *third*, all other securities of the same class or classes (or convertible at the holder's option into such class or classes) requested to be included in such Piggyback Registration.

(b)    if the Piggyback Registration referred to in Section 3.1 is an underwritten secondary registration on behalf of any Holder, then the provisions of Section 2.5 shall apply.

(c)    if the Piggyback Registration referred to in Section 3.1 is an underwritten secondary registration on behalf of any holder of securities other than a Holder, then, with respect to each class proposed to be registered:

(i)    *first*, the securities of the class or classes proposed to be registered held by such holder;

(ii)    *second*, the Registrable Securities of the same class or classes (or convertible at the Piggyback-Eligible Holder's option into such class or classes) held by Piggyback-Eligible Holders requested to be included in such Piggyback Registration (*pro rata* among the respective Holders of such Registrable Securities in

16

proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Piggyback Registration);

(iii)    *third,* all other securities of the same class or classes (or convertible at the holder's option into such class or classes) requested to be included in such Piggyback Registration other than New Common Stock to be sold by the Company; and

(iv)    *fourth,* the New Common Stock to be sold by the Company.

Section 3.3    Company Control.    Except for a Registration Statement being filed in connection with the exercise of a Demand Right or a Shelf Registration, the Company may decline to file a Registration Statement after an Initial Notice has been given or after receipt by the Company of a Piggyback Notice, and the Company may withdraw a Registration Statement after filing and after such Initial Notice or Piggyback Notice, but prior to the effectiveness of the Registration Statement, provided that (i) the Company shall promptly notify the Selling Holders in writing of any such action and (ii) nothing in this Section 3.3 shall prejudice the right of any Demand Holder to immediately request that such registration be effected as a registration under Section 2.1 or Section 2.2 to the extent permitted thereunder.

Section 3.4    Selection of Underwriters.    If the Company intends to offer and sell New Common Stock by means of an Underwritten Offering (other than an offering pursuant to Section 2.1 or Section 2.2), the Company shall select the managing underwriter or underwriters to administer such Underwritten Offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing.

Section 3.5    Withdrawal of Registration.    Any Holder shall have the right to withdraw all or a part of its Piggyback Notice by giving written notice to the Company of such withdrawal at least three (3) Business Days prior to the earliest of (i) effectiveness of the applicable Registration Statement, (ii) the filing of any Registration Statement relating to such Piggyback Registration that includes a price range or (iii) commencement of a "roadshow" relating to the Registration Statement for such Piggyback Registration.

Section 3.6    New Securities.    In the event the Company issues any New Securities (as defined in the Company Shareholders Agreement) that are subject to (a) the preemptive rights of any Holder as set forth in Section 7 of the Company Shareholders Agreement (such Holders, the "Preemptive Rights Holders") and (b) a registration rights agreement between the Company and the holders of such New Securities (a "New Registration Rights Agreement"), such New Registration Rights Agreement shall provide all Preemptive Rights Holders (to the extent such Holders are Piggyback Eligible Holders) with registration rights that are substantially similar to the rights set forth in this Article III, with such rights applicable to any Registerable Securities then held by such Preemptive Rights Holders.

17

## ARTICLE IV

## REGISTRATION PROCEDURES

Section 4.1    Registration Procedures.   If and whenever the Company is under an obligation pursuant to the provisions of this Agreement to use its reasonable best efforts to effect the registration of any Registrable Securities, the Company shall, as expeditiously as practicable:

(a)    in the case of Registrable Securities, use its reasonable best efforts to cause a Registration Statement that registers such Registrable Securities to become and remain effective for a period of 180 days or, if earlier, until all of such Registrable Securities covered thereby have been disposed of; provided, that, in the case of any registration of Registrable Securities on a Shelf Registration Statement which are intended to be offered on a continuous or delayed basis, such 180-day period shall be extended, if necessary, to keep the Registration Statement continuously effective, supplemented and amended, including by filing a new Registration Statement, to the extent necessary to ensure that it is available for sales of such Registrable Securities, and to ensure that it conforms with the requirements of this Agreement, the Securities Act and the policies, rules and regulations of the Commission as announced from time to time, until the earlier of when (i) the Selling Holders have sold all of such Registrable Securities and (ii) there are no Registrable Securities covered by the Registration Statement;

(b)    furnish to each Selling Holder, at least ten (10) Business Days before filing a Registration Statement, or such shorter period as reasonably practical, copies of such Registration Statement or any amendments or supplements thereto, which documents shall be subject to the review, comment and approval by one lead counsel (and any reasonably necessary local counsel) selected by the Selling Holders who beneficially own a majority of such Registrable Securities, which counsel (who may also be counsel to the Company), in each case, shall be subject to the reasonable approval of each Demand Holder whose Registrable Securities are included in such registration, and who shall represent all Selling Holders as a group (the "Selling Holders' Counsel") (it being understood that such ten (10) Business Day period need not apply to successive drafts of the same document proposed to be filed so long as such successive drafts are supplied to the Selling Holders' Counsel in advance of the proposed filing by a period of time that is customary and reasonable under the circumstances);

(c)    furnish to each Selling Holder and each underwriter, if any, such number of copies of final conformed versions of the applicable Registration Statement and of each amendment and supplement thereto (in each case including all exhibits and any documents incorporated by reference) reasonably requested by such Selling Holder or underwriter in writing;

(d)    in the case of Registrable Securities, prepare and file with the Commission such amendments, including post-effective amendments, and supplements to such Registration Statement and the applicable Prospectus or Prospectus supplement, including any free writing prospectus as defined in Rule 405 under the Securities Act, used in connection therewith as may be (i) reasonably requested by any Holder (to the extent such request relates to information relating to such Selling Holder), or (ii) necessary to keep such Registration Statement effective for at least the period specified in Section 4.1(a) and to comply with the provisions of this Agreement and the Securities Act with respect to the sale or other disposition of such Registrable Securities,

18

and furnish to each Selling Holder and to the managing underwriter(s), if any, within a reasonable period of time prior to the filing thereof a copy of any amendment or supplement to such Registration Statement or Prospectus; provided, however, that, with respect to each free writing prospectus or other materials to be delivered to purchasers at the time of sale of the Registrable Securities, the Company shall (i) ensure that no Registrable Securities are sold "by means of" (as defined in Rule 159A(b) under the Securities Act) such free writing prospectus or other materials without the prior written consent of the sellers of the Registrable Securities, which free writing prospectus or other materials shall be subject to the review of counsel to such sellers and (ii) make all required filings of all free writing prospectuses or other materials with the Commission as are required;

(e)    notify in writing each Selling Holder promptly (i) of the receipt by the Company of any notification with respect to any comments by the Commission with respect to such Registration Statement or any amendment or supplement thereto or any request by the Commission for the amending or supplementing thereof or for additional information with respect thereto, (ii) of the receipt by the Company of any notification with respect to the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement or any amendment or supplement thereto or the initiation or threatening of any proceeding for that purpose and (iii) of the receipt by the Company of any notification with respect to the suspension of the qualification of such Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purposes and, in any such case as promptly as reasonably practicable thereafter, prepare and file an amendment or supplement to such Registration Statement or Prospectus which will correct such statement or omission or effect such compliance;

(f)    use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as the Selling Holders reasonably request and do any and all other acts and things which may be reasonably necessary or advisable to enable such Selling Holders to consummate their disposition in such jurisdictions; provided, however, that the Company will not be required to qualify generally to do business, subject itself to general taxation or consent to general service of process in any jurisdiction where it would not otherwise be required to do so but for this Section 4.1(f);

(g)    furnish to each Selling Holder such number of copies of a summary Prospectus or other prospectus, including a preliminary prospectus and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents as such Selling Holders or any underwriter may reasonably request in writing;

(h)    notify on a timely basis each Selling Holder of such Registrable Securities at any time when a prospectus relating to such Registrable Securities is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing and, at the request of such Selling Holder, as soon as practicable prepare, file with the Commission and furnish to such Selling Holder a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the offeree of such securities,

19

such Prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing;

(i)      make available for inspection by the Selling Holders, the Selling Holders' Counsel or any underwriter participating in any disposition pursuant to such Registration Statement and any attorney, accountant or other agent retained by any such Selling Holder or underwriter (collectively, the "Inspectors"), all pertinent financial and other records, pertinent corporate documents and properties of the Company (collectively, the "Records"), as shall be necessary to enable them to exercise their due diligence responsibility, and cause the Company's officers, managers and employees to supply all information (together with the Records, the "Information") requested by any such Inspector in connection with such Registration Statement and request that the independent public accountants who have certified the Company's financial statements make themselves available, at reasonable times and for reasonable periods, to discuss the business of the Company.  Any of the Information which the Company determines in good faith and upon consultation with external counsel to be confidential, and of which determination the Inspectors are so notified, shall not be disclosed by the Inspectors unless (i) the disclosure of such Information is necessary to avoid or correct a misstatement or omission in the Registration Statement, (ii) the release of such Information is requested or required pursuant to a subpoena, order from a court of competent jurisdiction or other interrogatory by a governmental entity or similar process; (iii) such Information has been made generally available to the public; or (iv) such Information is or becomes available to such Inspector on a non-confidential basis other than through the breach of an obligation of confidentiality (contractual or otherwise).  The Holder(s) of Registrable Securities agree that they will, upon learning that disclosure of such Information is sought in a court of competent jurisdiction or by another governmental entity, give notice to the Company and allow the Company, at the Company's expense, to undertake appropriate action to prevent disclosure of the Information deemed confidential;

(j)      deliver to the underwriters of any Underwritten Offering, and any Holder that is named as an underwriter in such offering, a "comfort" letter addressed thereto in customary form and at customary times and covering matters of the type customarily covered by such comfort letters from its independent certified public accountants;

(k)      deliver to the underwriters of any Underwritten Offering, and any Holder that is named as an underwriter in such offering, a written and signed legal opinion or opinions addressed thereto in customary form from its outside or in-house legal counsel dated the closing date of the Underwritten Offering;

(l)      provide a transfer agent and registrar (which may be the same entity and which may be the Company) for such Registrable Securities and deliver to such transfer agent and registrar such customary forms, legal opinions from its outside or in-house legal counsel, agreements and other documentation as such transfer agent and/or registrar so request;

(m)      issue to any underwriter to which any Selling Holders may sell Registrable Securities in such offering certificates, or if the Registrable Securities are uncertificated other evidence of issuance, evidencing such Registrable Securities;

(n) upon the request of any Selling Holder of the Registrable Securities included in such registration, use reasonable best efforts to cause such Registrable Securities to be listed on any national securities exchange on which the New Common Stock is listed or, if the New Common Stock is not listed on a national securities exchange, use its reasonable best efforts to qualify such Registrable Securities for inclusion on such national securities exchange as the Company shall designate;

(o) otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the Commission and make available to its security holders, as soon as reasonably practicable, earnings statements (which need not be audited) covering a period of 12 months beginning within three months after the effective date of the Registration Statement, which earnings statements shall satisfy the provisions of Section 11(a) of the Securities Act;

(p) notify the Selling Holders and the lead underwriter or underwriters, if any, and (if requested) confirm such advice in writing, as promptly as reasonably practicable after notice thereof is received by the Company when the applicable Registration Statement or any amendment thereto has been filed or becomes effective and when the applicable Prospectus or any amendment or supplement thereto has been filed;

(q) use its reasonable best efforts to prevent the entry of, and use its reasonable best efforts to obtain as promptly as reasonably practicable the withdrawal of, any stop order with respect to the applicable Registration Statement or other order suspending the use of any preliminary or final Prospectus;

(r) promptly incorporate in a prospectus supplement or post-effective amendment to the applicable Registration Statement such information as the lead underwriter or underwriters, if any, and each Selling Holder agree should be included therein relating to the plan of distribution with respect to such class of Registrable Securities, which may include disposition of Registrable Securities by all lawful means, including firm-commitment underwritten public offerings, block trades, agented transactions, sales directly into the market, purchases or sales by brokers, derivative transactions, short sales, stock loan or stock pledge transactions and sales not involving a public offering; and make all required filings of such prospectus supplement or post-effective amendment as promptly as reasonably practicable after being notified of the matters to be incorporated in such prospectus supplement or post-effective amendment;

(s) cooperate with each Selling Holder and each underwriter or agent, if any, participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA;

(t) provide a CUSIP number or numbers for all such units, in each case not later than the effective date of the applicable Registration Statement;

(u) to the extent reasonably requested by the lead or managing underwriters in connection with an Underwritten Offering (including an Underwritten Offering pursuant to Section 2.1 or Section 2.2) make appropriate officers of the Company available to attend any "roadshows" scheduled in connection with any such Underwritten Offering, with all

21

reasonable out of pocket costs and expenses incurred by the Company or such officers in connection with such attendance to be paid by the Company;

(v)      enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the Selling Holder or Selling Holders, as the case may be, owning at least a majority of the Registrable Securities covered by any applicable Registration Statement shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, including customary indemnification and contribution to the effect and to the extent provided in Article V hereof, provided, however, that if a Selling Holder becomes a party to any underwriting agreement or related documents, the Selling Holder shall not be required in any such underwriting agreement or related documents to make any representations or warranties to or agreements with the Company or the underwriters other than customary representations, warranties or agreements regarding such Selling Holder's title to Registrable Securities and any written information provided by the Holder to the Company expressly for inclusion in the related Registration Statement, and the liability of any Selling Holder under the underwriting agreement shall be several and not joint and in no event shall the liability of any Selling Holder under the underwriting agreement be greater in amount than the dollar amount of the proceeds received by such Selling Holder under the sale of the Registrable Securities pursuant to such underwriting agreement (net of underwriting discounts and commissions);

(w)      upon request, promptly remove all legends on such Selling Holder's Registrable Securities relating to the restrictions on resale in connection with the sale of such Registrable Securities pursuant to an effective Registration Statement; and

(x)      subject to all the other provisions of this Agreement, use its reasonable best efforts to take all other steps necessary to effect the registration, marketing and sale of such Registrable Securities contemplated hereby.

## ARTICLE V

## INDEMNIFICATION

Section 5.1      Indemnification by the Company.  The Company agrees to indemnify and hold harmless, to the full extent permitted by law, each Holder, its Affiliates and their respective officers, directors, managers, partners, members and representatives, and each of their respective successors and assigns, and each Person who controls any of the foregoing (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), against any losses, claims, damages, liabilities and expenses caused by any violation by the Company of the Securities Act or the Exchange Act applicable to the Company and relating to action or inaction required of the Company in connection with the registration contemplated by a Registration Statement or any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto, or any other disclosure document (including reports and other documents filed under the Exchange Act and any document incorporated by reference therein) or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or any amendment thereof or supplement thereto, in the light of the circumstances under which they were made) not misleading; provided, however, that the Company

shall not be liable in any such case to the extent that any such loss, claim, damage, liability or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto in reliance upon and in conformity with information furnished to the Company in writing by the Person asserting such loss, claim, damage, liability or expense specifically for use therein. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any such Person and shall survive the transfer of such securities. The Company will also indemnify underwriters, selling brokers, dealer managers and similar securities industry professionals participating in the distribution, their officers and directors and each Person who Controls such Persons to the same extent as provided above with respect to the indemnification of the Holder, if requested.

Section 5.2    Indemnification by Holders.  Each Holder agrees to indemnify and hold harmless, to the full extent permitted by law, the Company, the Company's Controlled Affiliates and their respective directors, managers, partners, members and representatives, and each of their respective successors and assigns, and each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) against any losses, claims, damages or liabilities and expenses caused by any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or any amendment thereof or supplement thereto, in the light of the circumstances under which they were made) not misleading, to the extent, but only to the extent, that such untrue statement or omission was made in reliance on and in conformity with any information furnished in writing by such Holder to the Company expressly for inclusion in such Registration Statement and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting such loss, claim, damage, liability or expense; provided that the obligation to indemnify shall be several, not joint and several, for each Holder and in no event shall the liability of any Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

Section 5.3    Conduct of Indemnification Proceedings.  Any Person entitled to indemnification hereunder will (i) give prompt (but in any event within 30 days after such Person has actual knowledge of the facts constituting the basis for indemnification) written notice to the indemnifying party of any claim with respect to which it seeks indemnification and (ii) permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; provided, however, that any delay or failure to so notify the indemnifying party shall relieve the indemnifying party of its obligations hereunder only to the extent, if at all, that it is materially and adversely prejudiced by reason of such delay or failure.  Any Person entitled to indemnification hereunder shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Person unless (a) the indemnifying party has agreed in writing to pay such fees or expenses, (b) the indemnifying party shall have failed to assume the defense of such claim within a reasonable time after receipt of notice of such claim from the Person entitled to indemnification hereunder and employ counsel reasonably satisfactory to such Person, (c) the indemnified party has reasonably concluded, based on the advice of counsel, that there may be

23

legal defenses available to it or other indemnified parties that are different from or in addition to those available to the indemnifying party or (d) in the reasonable judgment of any such Person, based upon advice of counsel, a conflict of interest may exist between such Person and the indemnifying party with respect to such claims (in which case, if such Person notifies the indemnifying party in writing that such Person elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such claim on behalf of such Person).  If such defense is not assumed by the indemnifying party, the indemnifying party will not be subject to any liability for any settlement made without its consent (but such consent will not be unreasonably withheld, conditioned or delayed).  No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened action or claim in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement (i) includes an unconditional release of such indemnified party from all liability on any claims that are the subject matter of such action, (ii) does not include a statement as to or an admission of fault, culpability or failure to act by or on behalf of any indemnified party and (iii) does not commit any indemnified party to take, or hold back from taking, any action.  No indemnified party shall, without the written consent of the indemnifying party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder, and no indemnifying party shall be liable for any settlement or compromise of any such action or claim effected without its consent, in each case which consent shall not be unreasonably withheld.

Section 5.4    Settlement Offers.  Whenever the indemnified party or the indemnifying party receives a firm offer to settle a claim for which indemnification is sought hereunder, it shall promptly notify the other of such offer.  If the indemnifying party refuses to accept such offer within 20 Business Days after receipt of such offer (or of notice thereof), such claim shall continue to be contested and, if such claim is within the scope of the indemnifying party's indemnity contained herein, the indemnified party shall be indemnified pursuant to the terms hereof.  An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim will not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim in any one jurisdiction, unless in the written opinion of counsel to the indemnified party, reasonably satisfactory to the indemnifying party, use of one counsel would be expected to give rise to a conflict of interest between such indemnified party and any other of such indemnified parties with respect to such claim, in which event the indemnifying party shall be obligated to pay the fees and expenses of one additional counsel.

Section 5.5    Other Indemnification.  Indemnification similar to that specified in this Article V (with appropriate modifications) shall be given by the Company and each Selling Holder with respect to any required registration or other qualification of Registrable Securities under Federal or state law or regulation of governmental authority other than the Securities Act.

Section 5.6    Contribution.  If for any reason the indemnification provided for in Section 5.1 or Section 5.2 is unavailable to an indemnified party or insufficient to hold it harmless as contemplated by Section 5.1 and Section 5.2, then (i) the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnified party

24

and the indemnifying party or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company, on the one hand, and such prospective sellers, on the other hand, from their sale of the Registrable Securities, provided that, no Selling Holder shall be required to contribute in an amount greater than the dollar amount of the net proceeds received by such Selling Holder with respect to the sale of the Registrable Securities giving rise to such indemnification obligation.  The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or expenses (or actions in respect thereof) referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or, except as provided in Section 5.3, defending any such action or claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The Holders' obligations in this Section 5.6 to contribute shall be several in proportion to the amount of Registrable Securities registered by them and not joint.

## ARTICLE VI

## EXCHANGE ACT COMPLIANCE; QUOTATION

Section 6.1    Exchange Act Compliance.  So long as the Company (a) has registered a class of securities under Section 12 or Section 15 of the Exchange Act and (b) files reports under Section 13 of the Exchange Act, then the Company shall take all actions reasonably necessary to enable Holders to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 under the Securities Act, as such rule may be amended from time to time or any similar rules or regulations adopted by the Commission, including, without limiting the generality of the foregoing, (i) making and keeping current public information available, as those terms are understood and defined in Rule 144 promulgated under the Securities Act, (ii) filing with the Commission in a timely manner all reports and other documents required of the Company under the Exchange Act to the extent so required and (iii) at the request of any Holder if such Holder proposes to sell securities in compliance with Rule 144, forthwith furnish to such Holder, as applicable, a written statement of compliance with the reporting requirements of the Commission as set forth in Rule 144 and make available to such Holder such information as will enable the Holder to make sales pursuant to Rule 144.

Section 6.2    Quotation on OTC Market.  So long as the Company (a) has registered a class of securities under Section 12 or Section 15 of the Exchange Act and (b) files reports under Section 13 of the Exchange Act, then, until and unless (i) the New Common Stock is listed on a "national securities exchange" as defined in Rule 600(b)(45) of Regulation National Market System promulgated by the Commission, as amended or (ii) the New Common Stock may be sold by any and all Holders without restriction by the Commission pursuant to a Registration Statement in an at-the-market offering, the Company shall use its commercially reasonable efforts to cause the New Common Stock to be quoted on any of the OTCQX or OTCQB markets as promptly as practicable and shall thereafter use its commercially reasonable efforts to maintain such quotation.

## ARTICLE VII

## MISCELLANEOUS

Section 7.1     Severability.  If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 7.2     Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Agreement shall be brought and determined exclusively in a state or federal court located within the State of Delaware.  EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 7.3     Other Registration Rights.  If the Company shall at any time hereafter provide to any holder of any securities of the Company rights with respect to the registration of such securities under the Securities Act, such rights shall not be inconsistent with, in conflict with or adversely affect any of the rights provided to the Holders of Registrable Securities in, or conflict (in a manner that adversely affects Holders of Registrable Securities) with any other provisions included in, this Agreement.  The Company shall not grant any registration rights to third parties which are more favorable than the rights granted hereunder unless any such more favorable rights are concurrently added to the rights granted hereunder.

Section 7.4     Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto, each of which, in the case of the Holders not already a party to this Agreement, shall agree to become subject to the terms of this Agreement by executing an Adoption Agreement and be bound to the same extent as the parties hereto.  The Company may not assign any of its rights or delegate any of its duties hereunder without the prior written consent of the Holders of at least two-thirds of the Registrable Securities.  Subject to Section 2.1(a) and Section 2.2(a), any Holder may, at its election and at any time or from time to time, assign its rights and delegate its duties hereunder, in whole or in part, to any Transferee of such Holder (each, an "Assignee"); provided, that no such assignment shall be binding upon or obligate the Company to any such Assignee that is not already a party to this Agreement unless and until such Assignee delivers the Company an Adoption Agreement.  If a Holder assigns its rights under this Agreement in connection with the Transfer of less than all of its Registrable Securities, the Holder shall retain its rights under this Agreement with respect to its remaining Registrable Securities.  If a Holder assigns its rights under this Agreement in connection with the Transfer of all of its Registrable Securities, the Holder shall have no further rights or

26

obligations under this Agreement, except under <u>Article V</u> hereof in respect of offerings in which such Holder participated or registrations in which Registrable Securities held by such Holder were included. Any purported assignment in violation of this provision shall be null and *void ab initio*.

Section 7.5   <u>Notices</u>.   All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail, or sent by nationally-recognized overnight courier postage prepaid (with a copy of such communication sent by electronic mail), addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties.   All such notices, requests, consents and other communications shall be delivered as follows:

(a)   if to the Company, to:

Intelsat Emergence S.A. (to be renamed Intelsat S.A.)
*société anonyme*
4, rue Albert Borschette
L-1246 Luxembourg
RCS Luxembourg B. 264124
Attention:      Legal Department

with a copy (which shall not constitute notice to the Company) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:      Edward O. Sassower, P.C.
                      Steven N. Serajeddini, P.C.
                      Aparna Yenamandra
Edward.Sassower@Kirkland.com
Steven Serajeddini@Kirkland.com
Aparna.Yenamandra@Kirkland.com

(b)   if to a Holder, to the address set forth under such Holder's name in <u>Schedule I</u> attached hereto.

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by electronic mail, on the date of such delivery and (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch.

Section 7.6   <u>Headings</u>.   The headings contained in this Agreement are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

Section 7.7   <u>Additional Parties</u>.   Additional parties to this Agreement shall only include each Holder who has executed an Adoption Agreement, in the form attached hereto as <u>Exhibit A</u>.

Section 7.8    Adjustments.  If, and as often as, there are any changes in the New Common Stock or securities convertible into or exchangeable into or exercisable for New Common Stock as a result of any reclassification, recapitalization, stock split (including a reverse stock split) or subdivision or combination, exchange or readjustment of shares or units, or any stock dividend or stock distribution, merger or other similar transaction affecting such New Common Stock or such securities, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to such New Common Stock or such securities as so changed.

Section 7.9    Entire Agreement.  This Agreement and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such subject matter.

Section 7.10    Counterparts; .pdf Signature.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document.  This Agreement may be executed by .pdf signature (or similar means), and a .pdf signature (or similar means) shall constitute an original for all purposes. No party hereto or to any such agreement or instrument will raise the use of electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 7.11    Amendment.  Other than with respect to amendments to Schedule I attached hereto, which may be amended by the Company from time to time to reflect the Holders at such time, and subject to Section 5(b) and Section 8(d) of the Company Shareholders Agreement, this Agreement may not be amended, modified or supplemented without the written consent of the Holders of at least two-thirds of the Registrable Securities; provided, however, that any party may give a waiver as to itself; provided further, however that no amendment, modification, supplement, or waiver that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder; provided further, however, that the waiver of any provision with respect to any Registration Statement or offering may be given by Holders holding at least at least two-thirds of the then-outstanding Registrable Securities entitled to participate in such offering or, if such offering shall have been commenced, having elected to participate in such offering. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders of at least two-thirds of the Registrable Securities to which such waiver or consent relates; provided, however, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence. Notwithstanding the foregoing, any amendment, modification or supplement to, or waiver of (i) the definitions of "Demand Holder," "Holder,", Piggyback-Eligible Holder," or "Registrable Securities," (ii) the reference to "$50.0 million" in Section 2.1(a) and Section 2.2(b)(ii)(x) and (iii) the references to (A) "five (5) Business Days" in Section 2.1(c) and in the second sentence of Section 2.2(a), (B) "three (3) Business Days" in Section 2.2(c)(ii), and (C) "ten (10) Business Days" and "five (5) Business Days" in Section 3.1(a), which, in each case,

28

materially adversely affects, alters, or changes the interests of any Holder shall not be effective against such Holder without the prior written consent of such Holder.

Section 7.12    Extensions; Waivers.  Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.  Any extension or waiver pursuant to this Section 7.12 will be valid only if set forth in a writing signed by the party to be bound thereby. No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.  Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

Section 7.13    Business Days.  If any time period for giving notice or taking action hereunder expires on a day that is not a Business Day, the time period will automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

Section 7.14    Further Assurances.  Each of the parties hereto shall execute all such further instruments and documents and take all such further action as the Company may reasonably require in order to effectuate the terms and purposes of this Agreement.

Section 7.15    No Third-Party Beneficiaries.  Except pursuant to Article V, this Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

Section 7.16    Interpretation; Construction.  This Agreement has been freely and fairly negotiated among the parties.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.  Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise.  The words "include," "includes," and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, including the schedules, exhibits and annexes, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited.  References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections, schedules, annexes and exhibits mean the sections of this Agreement and the schedules, annexes and exhibits attached to this Agreement, except where otherwise stated. The parties intend that each representation, warranty, and covenant contained herein will have

29

independent significance.  If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

Section 7.17   Term.  This Agreement shall terminate (i) with respect to any Holder, at such time as such Holder has no Registrable Securities and (ii) in full and be of no further effect at such time as there are no Registrable Securities held by any Holders. Notwithstanding the foregoing, Article V, Section 7.2, Section 7.5, and Section 7.16 shall survive any termination.

* * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

**THE COMPANY**:

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.), a société anonyme organized under the laws of the Grand Duchy of Luxembourg**

By: _____
    Name:
    Title:

[*Signature Page to Registration Rights Agreement*]

**EXHIBIT A**

**ADOPTION AGREEMENT**

This Adoption Agreement ("Adoption") is executed pursuant to the terms of the Registration Rights Agreement, dated as of February [●], 2022, a copy of which is attached hereto (as amended, the "Registration Rights Agreement"), by the undersigned (the "Undersigned") executing this Adoption.  Capitalized terms used herein without definition are defined in the Registration Rights Agreement and are used herein with the same meanings set forth therein.  By the execution of this Adoption, the Undersigned agrees as follows:

1.      Acknowledgment.   The Undersigned acknowledges that the Undersigned is acquiring shares of New Common Stock, subject to the terms and conditions of the Registration Rights Agreement.

2.      Agreement.  The Undersigned (i) agrees that the New Common Stock acquired by the Undersigned, and other shares of New Common Stock that may be acquired by the Undersigned in the future, shall be bound by and subject to the terms of the Registration Rights Agreement, pursuant to the terms thereof, and (ii) hereby adopts the Registration Rights Agreement with the same force and effect as if the undersigned were originally a party thereto.

3.      Notice.  Any notice required as permitted by the Registration Rights Agreement shall be given to the Undersigned at the address listed beside the Undersigned's signature below.

[NAME OF HOLDER]                    Address for Notices:

By: _____           [_____]
Name:                           [_____]
Title:                          Telephone:  [_____]
Date:                           Email:      [_____]

## SCHEDULE I

## List of Holders

| Name | Address for Notice | Shares of New Common Stock |
|------|-------------------|----------------------------|
|      |                   |                            |
|      |                   |                            |
|      |                   |                            |
|      |                   |                            |
|      |                   |                            |

**Exhibit C-2**

**Redline to Registration Rights Agreement filed on October 19, 2021**

*Filing Version* 10.20.21

# REGISTRATION RIGHTS AGREEMENT

**among**

**[EQUITY ISSUER]**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**

**AND**

**THE HOLDERS PARTY HERETO**

**DATED FEBRUARY [●], 202[●]2022**

NAI-1521435260v710

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS ...................................................................................................1
  Section 1.1     Definitions ......................................................................................1

ARTICLE II DEMAND AND SHELF REGISTRATION ..................................................6
  Section 2.1     Right to Demand; Demand Notices.................................................6
  Section 2.2     Shelf Registration. ..........................................................................7
  Section 2.3     Deferral or Suspension of Registration.........................................10
  Section 2.4     Effective Registration Statement ...................................................11
  Section 2.5     Selection of Underwriters; Cutback................................................12
  Section 2.6     Lock-up...........................................................................................13
  Section 2.7     Participation in Underwritten Offering; Information by Holder .....13
  Section 2.8     Registration Expenses.....................................................................14

ARTICLE III PIGGYBACK REGISTRATION ...................................................................14
  Section 3.1     Notices ............................................................................................14
  Section 3.2     Underwriter's Cutback....................................................................15
  Section 3.3     Company Control ............................................................................17
  Section 3.4     Selection of Underwriters ..............................................................17
  Section 3.5     Withdrawal of Registration.............................................................17
  Section 3.6     New Securities ................................................................................17

ARTICLE IV REGISTRATION PROCEDURES ................................................................17
  Section 4.1     Registration Procedures ..................................................................17

ARTICLE V INDEMNIFICATION .....................................................................................22
  Section 5.1     Indemnification by the Company ...................................................22
  Section 5.2     Indemnification by Holders ............................................................23
  Section 5.3     Conduct of Indemnification Proceedings .......................................23
  Section 5.4     Settlement Offers ...........................................................................24
  Section 5.5     Other Indemnification.....................................................................24
  Section 5.6     Contribution....................................................................................24

ARTICLE VI EXCHANGE ACT COMPLIANCE; QUOTATION ........................................25
  Section 6.1     Exchange Act Compliance .............................................................25
  Section 6.2     Quotation on OTC Market..............................................................25

ARTICLE VII MISCELLANEOUS .....................................................................................25
  Section 7.1     Severability.....................................................................................25
  Section 7.2     Governing Law; Jurisdiction; Waiver of Jury Trial .......................25
  Section 7.3     Other Registration Rights ...............................................................26
  Section 7.4     Successors and Assigns ..................................................................26
  Section 7.5     Notices............................................................................................26
  Section 7.6     Headings .........................................................................................27
  Section 7.7     Additional Parties ..........................................................................27

i

Section 7.8    Adjustments ................................................................................27
Section 7.9    Entire Agreement.........................................................................27
Section 7.10   Counterparts; .pdf Signature .......................................................28
Section 7.11   Amendment .................................................................................28
Section 7.12   Extensions; Waivers ....................................................................28
Section 7.13   Business Days ..............................................................................29
Section 7.14   Further Assurances ......................................................................29
Section 7.15   No Third-Party Beneficiaries.......................................................29
Section 7.16   Interpretation; Construction.........................................................29
Section 7.17   Term............................................................................................29

ii

**THIS REGISTRATION RIGHTS AGREEMENT,** dated as of February [●], 202[●]2022 (this "Agreement"), is entered into by and among [EQUITY ISSUER]Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a société anonyme organized under the Laws of the Grand Duchy of Luxembourg (RC Luxembourg B[●] 264124) (together with any successor entity thereto, the "Company"), and each of the Holders (as defined below) that are parties hereto from time to time.

<div align="center">

**RECITALS**

</div>

A.       The Company and certain affiliated debtors (collectively, the "Debtors") filed the Plan of Reorganization (as defined below) pursuant to Chapter 11 of the U.S. Bankruptcy Code, which, as amended, was confirmed by the U.S. Bankruptcy Court for the Eastern District of Virginia on [●], 202[●](the "Bankruptcy Court") on December 17, 2021.

B.       The Company proposes to issue the New Common Stock (as defined below) pursuant to, and upon the terms set forth in, the Plan of Reorganization.

C.       The Company and the Holders have agreed to enter into this Agreement pursuant to which the Company shall grant the Holders registration rights under the Securities Act (as defined below) with respect to the Registrable Securities (as defined below) in furtherance of the foregoing.

D.       Pursuant to the order of the Bankruptcy Court confirming the Plan of Reorganization, this Agreement is binding upon the Company and all Holders as if such parties had actually signed this Agreement regardless of which such parties execute this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Holders hereby agree as follows:

<div align="center">

**AGREEMENT**

**ARTICLE I**

**DEFINITIONS**

</div>

Section 1.1      Definitions.  As used herein, the following terms shall have the following respective meanings:

"Adoption Agreement" means an Adoption Agreement in the form attached hereto as Exhibit A.

"Affiliate" means, with respect to any Person, any Person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person (including, the case of any Person that is an investment fund or managed account, the investment advisor thereof and any investment fund or managed account having the same investment advisor). As used in this definition, the term "control," including the correlative terms "controlling," "controlled by" and "under common control with," means possession,

NAI-1521435260v710

directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or any partnership or other ownership interest, by contract or otherwise) of a Person. Notwithstanding the foregoing, (a) the Company, its Subsidiaries and their respective joint ventures (if any) shall not be considered Affiliates of any Holder for purposes of this Agreement (and vice versa), and (b) no Holder shall be considered an Affiliate of (i) any portfolio company in which investment funds affiliated with such Holder have made a debt or equity investment (and vice versa), (ii) any limited partners, non-managing members of, or other similar direct or indirect investors in such Holder or its investment fund affiliates (and vice versa) or (iii) any portfolio company in which any limited partner, non-managing member of, or other similar direct or indirect investor in such Holder or any of its investment fund affiliates have made a debt or equity investment (and vice versa), and none of the Persons described in clauses (i) through (iii) of this definition shall be considered an Affiliate of each other.

"Agreement" has the meaning set forth in the Preamble.

"Assignee" has the meaning set forth in Section 7.4.

"Automatic Shelf Registration Statement" means an "automatic shelf registration statement" as defined in Rule 405 (or any successor rule then in effect) promulgated under the Securities Act.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"beneficially owned," "beneficial ownership" and similar phrases have the same meanings as such terms have under Rule 13d-3 (or any successor rule then in effect) under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable upon the occurrence of a subsequent event.

"Board" means the Board of Directors of the Company.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York or Luxembourg City are authorized or obligated by law or executive order to close.

"Commission" means the Securities and Exchange Commission or any other U.S. Federal agency at the time administering the Securities Act.

"Company" has the meaning set forth in the Preamble.

"Company Notice" has the meaning ascribed to it in the Section 2.2(c)(ii).

"Company Shareholders Agreement" means the Shareholders Agreement, dated February [•], 202[•]2022, by and among the Company and the holders of New Common Stock party thereto.

<div align="center">2</div>

NAI-1521435260v7

"Control," and its correlative meanings, "Controlling," and "Controlled," mean the possession, direct or indirect (including through one or more intermediaries), of the power to direct or cause the direction of the management of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Debtors" has the meaning set forth in the Recitals.

"Demand Holder" means (i) (A) each Holder who, together with its Affiliates who are Holders, at the Effective Date, beneficially owned Registrable Securities equal to 10.0% or more of the outstanding shares of New Common Stock at the Effective Date until such Holder, together with its Affiliates who are Holders, at any date, ceases to beneficially own 5.0% or more of the then-outstanding shares of New Common Stock or (B) a Person, together with its Affiliates, to whom a Demand Holder has transferred rights in accordance with Section 7.4 resulting in such Person, together with its Affiliates, becoming Holders of Registrable Securities equal to 10.0% or more of the then-outstanding shares of New Common Stock until such Person, together with its Affiliates who are Holders, on any date, ceases to beneficially own 10% or more of the then-outstanding shares of New Common Stock or (ii) any group of Holders, together with their respective Affiliates who are Holders, that, at the time of determination, collectively beneficially own Registrable Securities equal to 10.0% or more of the then-outstanding shares of New Common Stock where each Holder, together with its Affiliates that are Holders, at the Effective Date, beneficially owned Registrable Securities equal to 5.0% or more of the outstanding shares of New Common Stock at the Effective Date; provided, however, that any decrease in the beneficial ownership percentage of any such Holder resulting from the issuance or issuances by the Company of New Common Stock or other securities convertible into or exercisable for New Common Stock after the Effective Date shall not cause any such Holder or group of Holders to cease to be a Demand Holder for purposes of this Agreement.

"Demand Notice" has the meaning ascribed to it in Section 2.1(b).

"Demand Registration" means a registration of New Common Stock pursuant to Section 2.1.

"Demand Right" has the meaning ascribed to it in Section 2.1(a).

"Effective Date" means the effective date of the Plan of Reorganization.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"FINRA" means the Financial Industry Regulatory Authority or any successor regulatory authority.

"Form S-1 Shelf" has the meaning ascribed to it in Section 2.2(a).

"Form S-3 Shelf" has the meaning ascribed to it in Section 2.2(a).

"Holders" means any holder of Registrable Securities that is set forth on Schedule I hereto and Transferees of such Holders that acquire Registrable Securities in accordance with

<div align="center">3</div>

NAI-1521435260v7

Section 7.4 and execute an Adoption Agreement in accordance with Section 7.4 (in each case, so long as such Persons holds any Registrable Securities).

"Information" has the meaning ascribed to it in Section 4.1(i).

"Initial Notice" has the meaning ascribed to it in Section 3.1(a).

"Initial Public Offering" means the earlier of (i) a transaction or action pursuant to which the New Common Stock is listed on a national securities exchange in the United States and (ii) a SPAC Business Combination.

"Inspectors" has the meaning ascribed to it in Section 4.1(i).

"Lock-up Period" has the meaning ascribed to it in Section 2.6(a).

"Long-Form Registration Statement" has the meaning ascribed to it in Section 2.1(a).

"Marketed Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.2(c)(i).

"New Common Stock" means the common shares, nominal value $0.01 per share, of the Company.

"New Registration Rights Agreement" has the meaning ascribed to it in Section 3.6.

"Non-Marketed Shelf Take-Down" has the meaning ascribed to it in Section 2.2(d).

"Person" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, joint venture, unincorporated organization or any governmental entity or any department, agency or political subdivision thereof.

"Piggyback-Eligible Holder" has the meaning ascribed to it in Section 3.1(a).

"Piggyback Notice" has the meaning ascribed to it in Section 3.1(a).

"Piggyback Registration" means any registration pursuant to Section 3.1(a).

"Plan of Reorganization" means the [Second]Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates, dated August 31, 2021, filed inby the Debtors' Chapter 11 cases on December 17, 2021 at Docket No. 3891 in Case No. 20-32299 (KLP) in the U.S. Bankruptcy Court for the Eastern District of Virginia, Case No. 20-32299 (KLP) (including all exhibits, schedules and supplements thereto and as it may be amended, modified or supplemented from time to time), which has been confirmed on [•], 202[•]December 17, 2021.

"Preemptive Rights Holders" has the meaning ascribed to it in Section 3.6.

"Prospectus" means the prospectus included in any Registration Statement, as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any

4

portion of the securities covered by such Registration Statement and, in each case, by all other amendments and supplements to such prospectus, including post-effective amendments and, in each case, all material incorporated by reference in such prospectus.

"Records" has the meaning ascribed to it in Section 4.1(i).

"Registrable Securities" means, with respect to any Holder, at any time, the New Common Stock held or beneficially owned by such Holder at such time; provided, however, that as to any Registrable Securities, such securities shall cease to be Registrable Securities (i) upon the sale thereof pursuant to an effective registration statement, (ii) upon the sale thereof pursuant to Rule 144 under the Securities Act, (iii) when such securities cease to be outstanding, or (iv) when both (A) in the opinionon advice of counsel to the Company, which counsel shall be reasonably acceptable to the relevant Holder, such securities may be sold without volume, manner of sale and public information limitations under Rule 144 (or any similar provisions then in force) and (B) the relevant Holder, together with its Affiliates, at any date, ceases to beneficially own 2.0% or more of the outstanding shares of New Common Stock at the Effective Date.

"Registration Statement" means any Registration Statement of the Company which covers the Registrable Securities, including any preliminary Prospectus and the Prospectus, amendments and supplements to such Registration Statement, including post-effective amendments, all exhibits thereto and all material incorporated by reference in such Registration Statement.

"Requesting Holder" means a Holder exercising a Demand Right.

"Rule 144" means Rule 144 under the Securities Act (or successor rule).

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Selling Holder" means the Holders selling Registrable Securities pursuant to a Registration Statement under this Agreement.

"Selling Holders' Counsel" has the meaning ascribed to it in Section 4.1(b).

"Shelf Holder" has the meaning ascribed to it in Section 2.2(b).

"Shelf Registration" has the meaning ascribed to it in Section 2.2(a).

"Shelf Registration Statement" has the meaning ascribed to it in Section 2.2(a).

"Shelf Take-Down" has the meaning ascribed to it in Section 2.2(b).

"Shelf Take-Down Notice" has the meaning ascribed to it in Section 2.2(c)(iii).

"Short-Form Registration Statement" has the meaning ascribed to it in Section 2.1(a).

5

NAI-1521435260v7

"SPAC Business Combination" means a business combination, merger or similar transaction of the Company or an entity created in connection with a transaction with a special purpose acquisition corporation whose securities are listed on the New York Stock Exchange or quoted on The Nasdaq Stock Market or are traded or quoted on any other national stock exchange or automated quotation system. For the avoidance of doubt, the publicly traded company created upon completion of a SPAC Business Combination shall be the Company for the purposes of this Agreement following completion of a SPAC Business Combination.

"Subsidiary" means each Person in which another Person owns or controls, directly or indirectly, capital stock or other equity interests representing more than 50% in voting power of the outstanding capital stock or other equity interests.

"Transfer" means any direct or indirect sale, assignment, transfer, conveyance, gift, bequest by will or under intestacy laws, pledge, hypothecation or other encumbrance, or any other disposition, of the stated security (or any interest therein or right thereto, including the issuance of any total return swap or other derivative whose economic value is primarily based upon the value of the stated security) or of all or part of the voting power (other than the granting of a revocable proxy) associated with the stated security (or any interest therein) whatsoever, or any other transfer of beneficial ownership of the stated security, with or without consideration and whether voluntarily or involuntarily (including by operation of law).

"Transferee" means a Person acquiring New Common Stock pursuant to a Transfer.

"Underwritten Offering" means a sale, on the Company's or any Holder's behalf, of New Common Stock by the Company or a Holder to an underwriter for reoffering to the public.

"Underwritten Shelf Take-Down" has the meaning ascribed to it in Section 2.2(b)(ii).

"Underwritten Shelf Take-Down Notice" has the meaning ascribed to it in Section 2.2(c)(i).

## ARTICLE II

## DEMAND AND SHELF REGISTRATION

Section 2.1    Right to Demand; Demand Notices.

(a)    Holders' Demand for Registration. Subject to the provisions of this Article II, at any time and from time to time after the Company's Initial Public Offering, each Demand Holder shall have the right to request in writing that the Company register the sale on a Registration Statement on Form S-1 (or any successor form thereto) (a "Long-Form Registration Statement"), or, if available, a Registration Statement on Form S-3 (or any successor form thereto) (a "Short-Form Registration Statement"), under the Securities Act of all or part of the Registrable Securities beneficially owned by such Demand Holder or its Affiliates (a "Demand Right"). Notwithstanding the foregoing, (i) the Company shall only be required to effect two (2) Demand Registrations and/or Underwritten Shelf Take-Downs in any twelve (12) month period (provided, however, that an Underwritten Shelf Take-Down that is a block trade or that is not a Marketed Underwritten Shelf Take-Down shall not count as an Underwritten Shelf

6

Take-Down for purposes of this limitation) and (ii) a Demand Right may be exercised only if the aggregate offering price of the New Common Stock to be sold by the Demand Holder in the applicable offering, together with any New Common Stock to be sold by any Piggyback-Eligible Holder electing to be included in a Piggyback Registration pursuant to Section 3.1 in respect of such offering, before deduction of underwriter discounts and commissions, is reasonably expected to exceed, in the aggregate, $50.0 million.

(b)      Demand Notices.  All requests made pursuant to this Section 2.1 shall be made by providing written notice to the Company (each such written notice, a "Demand Notice"), which notice shall (i) specify the aggregate number and class or classes of Registrable Securities proposed to be registered by the Demand Holder (and its Affiliates) providing such Demand Notice and (ii) state the intended methods of disposition in the offering (including whether or not such offering shall be an Underwritten Offering).

(c)      Demand Filing.  Subject to Section 2.3, promptly (but in any event within five (5) Business Days) after receipt of any Demand Notice, the Company shall give written notice of the Demand Notice to all Piggyback-Eligible Holders of Registrable Securities and otherwise comply with Section 3.1.  Subject to Section 2.3, the Company shall use reasonable best efforts to file (or confidentially submit) the Registration Statement in respect of a Demand Notice as soon as practicable and, in any event, within 60 days in the case of a Long-Form Registration Statement and 30 days in the case of a Short-Form Registration Statement, in each case after receiving a Demand Notice and shall use reasonable best efforts to cause the same to be declared effective by the Commission as promptly as practicable after such filing (or confidential submission).

(d)      Demand Withdrawal.  A Requesting Holder may withdraw all or any portion of its Registrable Securities from a Demand Registration by providing written notice to the Company at least five (5) Business Days prior to the later of the (i) effectiveness of the applicable Registration Statement and (ii) commencement of a "roadshow" relating to such Demand Registration.

Section 2.2     Shelf Registration.

(a)      Filing.  Following the Company's Initial Public Offering and from and after such time as the Company shall have qualified for the use of a registration statement for an offering to be made on a delayed or continuous basis pursuant to Rule 415 under the Securities Act or any successor rule thereto on Form S-1 (the "Form S-1 Shelf") or, if available, on Form S-3 (a "Form S-3 Shelf" and, together with the Form S-1 Shelf and any Automatic Shelf Registration Statement, if available, a "Shelf Registration Statement"), the Company will, pursuant to the requirements of this Section 2.2(a), file (or confidentially submit) a Shelf Registration Statement upon the written request by any Demand Holder that the Company register under the Securities Act all or a portion of the Registrable Securities owned by such Holder at such time in accordance with Rule 415 under the Securities Act or any successor rule thereto (a "Shelf Registration"). Subject to Section 2.3, the Company shall give written notice of such request to all Piggyback-Eligible Holders promptly (but in any event within five (5) Business Days after receipt of any such written request from a Demand Holder) and otherwise comply with Section 3.1. With respect to each Shelf Registration, (i) the Company shall add

7

NAI-1521435260v7

Registrable Securities of any Piggyback-Eligible Holder who requests in writing that the Company include the Registrable Securities owned by such Piggyback-Eligible Holder in the Shelf Registration Statement; provided, that, such written request is delivered to the Company at least five (5) Business Days prior to the filing (or confidential submission) of the Shelf Registration Statement, and (ii) the Company shall use its reasonable best efforts to file (or confidentially submit) with the Commission as promptly as practicable, and in any event within 60 days in the case of a Form S-1 Shelf and 30 days in the case of a Form S-3 Shelf, in each case after it receives a request under this Section 2.2(a) to register all or a portion of the Registrable Securities. The Company shall use its reasonable best efforts to cause to be declared effective the Shelf Registration Statement as promptly as practicable after the filing (or confidential submission) thereof. In no event shall the Company be required to file, and maintain effectiveness of, more than one Shelf Registration Statement at any one time pursuant to this Section 2.2(a); provided, however, that the Company shall be required to amend or supplement any existing Shelf Registration Statement, if required, to accommodate the inclusion of additional Registrable Securities beneficially owned by any Demand Holder or Piggyback-Eligible Holder or amend the plan of distribution to accommodate subsequent registration requests by any Demand Holder pursuant to this Section 2.2.

(b)     Shelf Take-Downs.  Any Holder whose Registrable Securities are included in an effective Shelf Registration Statement (a "Shelf Holder") may initiate an offering or sale of all or part of such Registrable Securities (a "Shelf Take-Down"), in which case the provisions of this Section 2.2 shall apply.  Notwithstanding the foregoing:

(i)     any such Shelf Holder may initiate an unlimited number of Non-Marketed Shelf Take-Downs pursuant to Section 2.2(d) below; and

(ii)     any such Shelf Holder may initiate (together with other co-initiating Shelf Holders) an Underwritten Offering (including any block trade) (an "Underwritten Shelf Take-Down") pursuant to Section 2.2(c) below; provided that in each case, (A) the Company shall only be required to effect two (2) Demand Registrations and/or Underwritten Shelf Take-Downs in any twelve (12) month period (provided, however, that an Underwritten Shelf Take-Down that is a block trade or that is not a Marketed Underwritten Shelf Take-Down shall not count as an Underwritten Shelf Take-Down for purposes of this limitation) and (B) the Registrable Securities proposed to be sold by the initiating Shelf Holder (and if applicable, other co-initiating Shelf Holders) in such Underwritten Shelf Take-Down shall be required to (x) have a reasonably anticipated aggregate offering price of at least $50.0 million before deduction of underwriting discounts and commissions or (y) constitute all remaining Registrable Securities held by such Shelf Holder (and, if applicable, other co-initiating Shelf Holders).

(c)     Underwritten Shelf Take-Downs.

(i)     Subject to Section 2.2(b), if a Shelf Holder so elects in a written request delivered to the Company (an "Underwritten Shelf Take-Down Notice") to effect a Shelf Take-Down in the form of an Underwritten Shelf-Take Down, the Company shall use its reasonable best efforts to file and effect an amendment or

8

NAI-1521435260v7

supplement to its Shelf Registration Statement (including the filing of a Prospectus supplement with respect to such Underwritten Shelf Take-Down) for such purpose as soon as practicable. Such initiating Shelf Holder shall indicate in such Underwritten Shelf Take-Down Notice the number of Registrable Securities of such Shelf Holder to be included in such Underwritten Shelf Take-Down and whether it intends for such Underwritten Shelf Take-Down to involve a customary "roadshow" (including an "electronic roadshow") or other marketing effort by the Company and the underwriters (a "Marketed Underwritten Shelf Take-Down").

(ii)     Within three (3) Business Days of receipt of an Underwritten Shelf Take-Down Notice with respect to a Marketed Underwritten Shelf Take-Down, the Company shall promptly deliver a written notice of such Marketed Underwritten Shelf Take-Down to all Shelf Holders (which notice shall state that the material terms of such proposed Marketed Underwritten Shelf Take-Down, to the extent known, as well as the identity of the Shelf Holder requesting such Underwritten Shelf Take-Down, are available upon request) (a "Company Notice") and, in each case, subject to Section 2.5(b) and Section 2.7, the Company shall include in such Marketed Underwritten Shelf Take-Down all such Registrable Securities of such Shelf Holders for which the Company has received written requests within three (3) Business Days after giving the Company Notice, which requests must specify the aggregate amount of such Registrable Securities of such Holder to be offered and sold pursuant to such Marketed Underwritten Shelf Take-Down.

(iii)     Subject to Section 2.2(b), if a Shelf Holder desires to effect an Underwritten Shelf Take-Down that is not a Marketed Underwritten Shelf Take-Down, the Shelf Holder initiating such Shelf Take-Down shall provide written notice (a "Shelf Take-Down Notice") of such Shelf Take-Down to the Company, which, to the extent such Shelf Take-Down Notice includes the information specified in clause (E) below, the Company shall promptly provide to the other Shelf Holders.  Any such Shelf Take-Down Notice shall be delivered to the Company as far in advance of the completion of such Shelf Take-Down as shall be reasonably practicable in light of the circumstances applicable to such Shelf Take-Down but no less than five (5) Business Days prior to such Shelf Take-Down.  Any Shelf Take-Down Notice shall set forth (A) identity of the initiating Shelf Holder (and, if applicable, co-initiating Shelf Holders), (B) the total number of Registrable Securities expected to be offered and sold in such Shelf Take-Down, (C) the expected date of such Shelf Take-Down, (D) the expected plan of distribution of such Shelf Take-Down,  and (E) in the sole discretion of the initiating Shelf Holder, (i) an invitation to the other Shelf Holders to elect to include in the Shelf Take-Down the Registrable Securities held by such other Shelf Holders (but subject to Section 2.5(b) and Section 2.7) and (ii) the action or actions required (including the timing thereof) in connection with such Shelf Take-Down with respect to the other Shelf Holders if any such Shelf Holder elects to exercise such right.  Upon receipt of a Shelf Take-Down Notice, if applicable, the other Shelf Holders may elect to sell Registrable Securities in such Shelf Take-Down, at the same price per Registrable Security and pursuant to the same terms and conditions with respect to payment for the Registrable Securities as agreed to by the initiating Shelf Holder (and, if applicable, co-initiating Shelf Holders), by sending, at least three (3) Business Days prior to the expected date of

9

such Shelf Take-Down set forth in such Shelf Take-Down Notice, an irrevocable written notice to the initiating Shelf Holder, indicating its election to participate in the Shelf Take-Down and the total number of its Registrable Securities to include in the Shelf Take-Down (but, in all cases, subject to Section 2.5(b) and Section 2.7).

(iv)    Notwithstanding the delivery of any Underwritten Shelf Take-Down Notice, all determinations as to whether to complete any Underwritten Shelf Take-Down and as to the timing, manner, price and other terms of any Underwritten Shelf Take-Down shall be at the discretion of the Shelf Holder  (or, if there are co-initiating Shelf Holders, the Holders of a majority of the Registrable Securities under such Underwritten Shelf Take-down Notice) initiating the Underwritten Shelf Take-Down.

(d)    Non-Marketed Shelf Take-Downs. If a Shelf Holder desires to effect a Shelf Take-Down that does not constitute an Underwritten Shelf Take-Down (a "Non-Marketed Shelf Take-Down") and if such Non-Marketed Shelf Take-Down requires actions to be taken by the Company, such Shelf Holder shall so indicate in a written request delivered to the Company no later than three (3) Business Days prior to the expected date of such Non-Marketed Shelf Take-Down (or such shorter period as the Company may agree), which request shall include (i) the aggregate number and class or classes of Registrable Securities expected to be offered and sold in such Non-Marketed Shelf Take-Down, (ii) the expected plan of distribution of such Non-Marketed Shelf Take-Down and (iii) the action or actions required (including the timing thereof) in connection with such Non-Marketed Shelf Take-Down, and, if necessary, the Company shall use its reasonable best efforts to file and effect an amendment or supplement to its Shelf Registration Statement (including the filing of a Prospectus supplement with respect to such Non-Marketed Shelf Take-Down) for such purpose as soon as practicable.

(e)    Continued Effectiveness.  The Company shall use its reasonable best efforts to keep the Shelf Registration Statement filed pursuant to Section 2.2(a) hereof continuously effective under the Securities Act, including by filing a new Shelf Registration Statement if necessary, in order to permit the Prospectus (or any Prospectus supplement) forming a part thereof to be usable by a Shelf Holder until the earlier of (i) the date as of which all Registrable Securities registered by such Shelf Registration Statement have been sold and (ii) such shorter period as Shelf Holders holding a majority of the Registrable Securities may reasonably determine.

Section 2.3    Deferral or Suspension of Registration.  If (a) the Company receives a Demand Notice, a request to file (or confidentially submit) a Shelf Registration Statement, or a written request from a Shelf Holder for a Shelf Take-Down and the Board, in its good faith judgment and upon advice of external counsel to the Company, determines that it would be materially adverse to the Company for such Registration Statement to be filed (or confidentially submitted) or declared effective on or before the date such filing or effectiveness would otherwise be required hereunder, or for such Registration Statement or Prospectus included therein to be used to sell Registrable Securities or for such Shelf Take-Down to be effected, because such action would: (i) materially interfere with a significant acquisition, corporate reorganization, financing, securities offering or other significant transaction or development involving the Company; (ii) based on the advice of the Company's outside counsel, require

10

NAI-1521435260v7

disclosure of material non-public information that the Company has a bona fide business purpose for preserving as confidential; or (iii) render the Company unable to comply with requirements under the Securities Act or the Exchange Act, or (b) the Company is subject to a Commission stop order suspending the effectiveness of any Registration Statement or the initiation of proceedings with respect to such Registration Statement under Section 8(d) or 8(e) of the Securities Act, then the Company shall have the right to defer such filing (but not the preparation), initial effectiveness or continued use of a Registration Statement and the Prospectus included therein for a period of not more than 60 days (or such longer period as the Requesting Holder or Shelf Holder, as applicable, may determine).  If the Company shall so postpone the filing or initial effectiveness of a Registration Statement with respect to a Demand Notice and if the Requesting Holder within 30 days after receipt of the notice of postponement advises the Company in writing that it has determined to withdraw such Demand Notice, then such Demand Registration shall be deemed to be withdrawn.  Unless consented to in writing by the Holders, the Company shall not use the deferral or suspension rights provided under this Section 2.3 more than twice, and for no more than 90 days in the aggregate, in any 12-month period.  In the event of any deferral or suspension pursuant to this Section 2.3, the Company shall (i) use its reasonable best efforts to keep the Requesting Holder or Shelf Holders, as applicable, apprised of the estimated length of the anticipated delay; and (ii) notify the Requesting Holder or Shelf Holders, as applicable, promptly upon termination of the deferral or suspension.  After the expiration of the deferral or suspension period and without any further request from the Requesting Holder or Shelf Holders, as applicable, to the extent such Requesting Holder has not withdrawn the Demand Notice, if applicable, the Company shall as promptly as reasonably practicable complete the preparation of and file (or confidentially submit) a Registration Statement or Prospectus or post-effective amendment or supplement to the applicable Registration Statement, Prospectus or document, or file any other required document, as applicable, so that, as thereafter delivered to purchasers of the Registrable Securities included therein, the Prospectus will not include a material misstatement or omission and will be effective and useable for the sale of Registrable Securities.

Section 2.4    Effective Registration Statement.  A registration requested pursuant to this Article II shall not be deemed to have been effected, nor shall such registration be counted towards the limitations set forth in Section 2.1(a) or Section 2.2(b)(ii):

(a)    unless a Registration Statement with respect thereto has been declared effective by the Commission and remains effective in compliance with the provisions of the Securities Act and the laws of any U.S. state or other jurisdiction applicable to the disposition of Registrable Securities covered by such Registration Statement for not less than (i) in the case of a Registration Statement filed pursuant to Section 2.2, the period described in Section 2.2(e), or (ii) in the case of any other Registration Statement, 180 days (or such shorter period as will terminate when all of such Registrable Securities shall have been disposed of in accordance with such Registration Statement) or, in each case, if such Registration Statement relates to an Underwritten Offering, such longer period as, in the opinion of external counsel for the Company, a Prospectus is required by law to be delivered in connection with sales of Registrable Securities by an underwriter or dealer;

(b)    if, after it becomes effective, such registration is interfered with by any stop order, injunction or other order or requirement of the Commission or other

11

NAI-1521435260v7

governmental authority or court for any reason other than a violation of applicable law solely by any Selling Holder and has not thereafter become effective;

(c)      unless the requested Registration Statement, in the case of a Demand Registration or a Shelf Registration, has been declared effective by the Commission for more than 75% of the full amount of Registrable Securities for which registration has been requested, or the offering, in the case of an Underwritten Shelf Take-Down, has resulted in the disposition by the Holders of at least 75% of the amount of Registrable Securities requested to be included and, in each case, any Registrable Securities not included or disposed of, as applicable, were reduced from such registration or Underwritten Shelf Take-Down pursuant to the terms of Section 3.2;

(d)      with respect to any request for a Registration Statement or an offering, to the extent the applicable Holders shall have reimbursed the Company for all reasonable and documented expenses of the Company related to such Registration Statement or offering; or

(e)      if, in the case of an Underwritten Offering, the conditions to closing specified in an underwriting agreement applicable to the Company are not satisfied or waived other than by reason of any breach or failure by any Selling Holder.

Section 2.5      Selection of Underwriters; Cutback.

(a)      Selection of Underwriters.  If a Requesting Holder intends to offer and sell the Registrable Securities covered by its request under this Article II by means of an Underwritten Offering, such Requesting Holder shall, in reasonable consultation with other participating Holders under such Underwritten Offering, select the managing underwriter or underwriters to administer such offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company, such acceptance not to be unreasonably withheld, conditioned or delayed. If a Shelf Holder intends to offer and sell the Registrable Securities covered by its request under this Article II by means of an Underwritten Shelf Take-Down, the requesting Shelf Holder shall select, in reasonable consultation with other participating Holders, the managing underwriter or underwriters to administer such offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing and shall be reasonably acceptable to the Company, such acceptance not to be unreasonably withheld, conditioned or delayed.

(b)      Underwriter's Cutback.  Notwithstanding any other provision of this Article II or Section 3.1, if the managing underwriter or underwriters of an Underwritten Offering in connection with a Demand Registration or a Shelf Registration advise the Company in their good faith opinion that the inclusion of all such Registrable Securities proposed to be included in the Registration Statement or such Underwritten Offering would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities to be offered thereby or in such Underwritten Offering, then the number of Registrable Securities proposed to be included in such Registration Statement or Underwritten Offering shall be allocated among the Company, the Selling Holder and all other Persons selling Registrable Securities in such Underwritten Offering in the following order:

12

NAI-1521435260v7

(i)      *first*, the Registrable Securities of the class or classes proposed to be registered held by the Holder that initiated (or co-initiated) such Underwritten Offering and the Registrable Securities of the same class or classes (or convertible at the Holder's option into such class or classes) held by other Holders requested to be included in such Underwritten Offering (allocated, if necessary, *pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Underwritten Offering);

(ii)      *second,* all other securities of the same class or classes (or convertible at the holder's option into such class or classes) requested to be included in such Underwritten Offering other than securities to be sold by the Company; and

(iii)      *third*, the securities of the same class or classes to be sold by the Company.

No Registrable Securities excluded from the underwriting by reason of the underwriter's marketing limitation shall be included in such registration or offering. If the underwriter has not limited the number of Registrable Securities to be underwritten, the Company may include securities for its own account (or for the account of any other Persons) in such registration if the underwriter so agrees and if the number of Registrable Securities would not thereby be limited.

Section 2.6    Lock-up.

(a)      If requested by the managing underwriters in connection with any Underwritten Offering, each Holder (i) who beneficially owns 5.0% or more of the outstanding New Common Stock or (ii) who is a natural person and serving as a director or executive officer of the Company shall agree to be bound by customary lock-up agreements providing that such Holder shall not, directly or indirectly, effect any Transfer (including sales pursuant to Rule 144) of any such shares of New Common Stocks without prior written consent from the underwriters managing such Underwritten Offering during a period beginning on the date of launch of such Underwritten Offering and ending up to 180 days in the case of an Initial Public Offering (or 90 days for any Underwritten Offering after the Initial Public Offering) from and including the date of pricing or such shorter period as reasonably requested by the underwriters managing such Underwritten Offering (the "Lock-Up Period"); provided that (A) the foregoing shall not apply to any shares of New Common Stock that are offered for sale as part of such Underwritten Offering, (B) such Lock-Up Period shall be no longer than and on substantially the same terms as the lock-up period applicable to the Company, its directors and executive officers or any other holders of more than 5.0% of the Company's equity securities that has a registration rights agreement with the Company or any of its Subsidiaries and (C) such Lock-Up Period shall not commence unless the Company notifies the Holders in writing prior to the commencement of the Lock-Up Period.  Each such Holder agrees to execute a customary lock-up agreement in favor of the underwriters to such effect.

(b)      Nothing in Section 2.6(a) shall prevent: (i) any Holder that is a partnership, limited liability company or corporation from (A) making a distribution of New Common Stock to the partners, members or stockholders thereof or (B) Transferring New

13

NAI-1521435260v7

Common Stock to an Affiliate of such Holder; (ii) any Holder who is an individual from Transferring New Common Stock to (A) an individual by will or the laws of descent or distribution or by gift without consideration of any kind or (B) a trust or estate planning-related entity for the sole benefit of such Holder or a lineal descendant or antecedent or spouse; (iii) any Holder from (A) pledging, hypothecating or otherwise granting a security interest in New Common Stock or securities convertible into or exchangeable for New Common Stock to one or more lending institutions as collateral or security for any loan, advance or extension of credit and any transfer upon foreclosure upon such New Common Stock or such securities or (B) Transferring New Common Stock pursuant to a final non-appealable order of a court or regulatory agency or (iv) any Holder from Transferring New Common Stock in a manner that was permitted under, but subject to the conditions described in, the lock-ups entered into in connection with the Company's Initial Public Offering or other Underwritten Offering after the Initial Public Offering; <u>provided</u> that, in the case of clauses (i), (ii), (iii) and (iv), such Transfer is otherwise in compliance with applicable securities laws; <u>provided</u>, <u>further</u>, that, in the case of clause (i), clause (ii) and, if applicable, clause (iv), each such Transferee agrees in writing to become bound by the applicable underwriter lock-up.

Section 2.7   <u>Participation in Underwritten Offering; Information by Holder</u>.  No Holder may participate in an Underwritten Offering hereunder unless such Holder (a) agrees to sell such Holder's New Common Stock on the basis provided in any underwriting arrangements, and in accordance with the terms and provisions of this Agreement, including any lock-up arrangements, and (b) completes and executes all questionnaires, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements.  In addition, the Holders shall furnish to the Company such information regarding such Holder or Holders and the distribution proposed by such Holders, as applicable, as the Company may reasonably request in writing and as shall be required in connection with any registration, qualification or compliance referred to in this <u>Article II</u>.  Nothing in this <u>Section 2.7</u> shall be construed to create any additional rights regarding the registration of New Common Stock in any Person otherwise than as set forth herein.

Section 2.8   <u>Registration Expenses</u>.  All expenses incident to the Company's performance of or compliance with this Agreement, including without limitation (i) all registration and filing fees, and any other fees and expenses associated with filings required to be made with any stock exchange, the Commission and FINRA (including, if applicable, the reasonable fees and expenses of any "qualified independent underwriter" and its counsel as may be required by the rules and regulations of FINRA), (ii) all fees and expenses of compliance with state securities or blue sky laws, (iii) all printing and related messenger and delivery expenses (including expenses of printing certificates for the New Common Stock in a form eligible for deposit with The Depository Trust Company and of printing prospectuses), (iv) all fees and disbursements of counsel for the Company and of all independent certified public accountants of the Company and its Subsidiaries (including the expenses of any special audit and "cold comfort" letters required by or incident to such performance)), (v) all fees and expenses incurred in connection with the listing of the New Common Stock on any securities exchange, (vi) all reasonable fees and documented out-of-pocket disbursements of a single Selling Holders' Counsel ~~with such fees not to exceed $[●]~~ and (vii) all reasonable fees and documented out-of-pocket disbursements of underwriters customarily paid by the issuer or sellers of securities, including expenses of any special experts retained, if required, in connection with the requested

<div align="center">14</div>

registration (excluding underwriting discounts and commissions and transfer taxes, if any, and fees and disbursements of counsel to underwriters), will be borne by the Company, regardless of whether the Registration Statement becomes effective (or such offering is completed) and whether or not all or any portion of the Registrable Securities originally requested to be included in such registration are ultimately included in such registration; provided, however, that (x) any underwriting discounts, commissions or fees in connection with the sale of the Registrable Securities will be borne by the Holders pro rata on the basis of the number of shares of New Common Stock so registered and sold, (y) transfer taxes with respect to the sale of Registrable Securities will be borne by the Holder of such Registrable Securities and (z) the fees and expenses of any other counsel, accountants or other persons retained or employed by any Holder will be borne by such Holder.

## ARTICLE III

## PIGGYBACK REGISTRATION

Section 3.1    Notices.

(a)    If the Company at any time proposes for any reason to register the sale of securities for cash under the Securities Act (other than a registration on Form S-4 or Form S-8, or any successor of either such form, or a registration relating solely to the offer and sale to the Company's managers or employees pursuant to any employee equity plan or other employee benefit plan or arrangement or a registration relating to its Initial Public Offering) whether or not securities are to be sold by the Company or otherwise, and whether or not in connection with any Demand Registration pursuant to Section 2.1, any Shelf Registration pursuant to Section 2.2 or any other agreement (such registration, a "Piggyback Registration"), the Company shall give written notice of its intention to so register the securities, at least ten (10) Business Days prior to the expected date of filing of such Registration Statement or amendment thereto in which the Company first intends to identify the selling stockholders and the number of and type of securities to be sold (each such notice, an "Initial Notice"), to (i) each Holder who, together with its Affiliates who are Holders, at the Effective Date, beneficially owned Registrable Securities equal to 5.0% or more of the outstanding shares of New Common Stock at the Effective Date, (ii) any Person, together with its Affiliates, to whom any of the foregoing Holders has transferred rights in accordance with Section 7.4 resulting in such Person, together with its Affiliates, receiving a number of Registrable Securities equal to 5.0% or more of the then-outstanding shares of New Common Stock if such Person, together with its Affiliates has continuously beneficially owned 5.0% or more of the then-outstanding shares of New Common Stock from the date of such transfer through the date of such Initial Notice, and (iii) each Holder that has notified the Company that it is unable to sell its Registrable Securities under Rule 144 without complying with the volume, manner of sale and public information restrictions of Rule 144 (each, a "Piggyback-Eligible Holder"). The Company shall, subject to the provisions of Section 3.2 and Section 3.3 below, use its reasonable best efforts to include in such Piggyback Registration on the same terms and conditions as the securities otherwise being sold, all Registrable Securities of the same class or classes as the securities proposed to be registered (or convertible at the Piggyback-Eligible Holder's option into such class or classes) with respect to which the Company has received written requests from Piggyback-Eligible Holders for inclusion therein within the time period specified by the Company in the applicable Initial Notice, which

15

NAI-1521435260v7

time period shall be not less than five (5) Business Days after sending the applicable Initial Notice (each such written request, a "Piggyback Notice"), which Piggyback Notice shall specify the number of, and the class or classes, of Registrable Securities proposed to be included in the Piggyback Registration.

(b)       If a Piggyback-Eligible Holder does not deliver a Piggyback Notice within the period specified in Section 3.1(a), such Holder shall be deemed to have irrevocably waived any and all rights under this Article III with respect to such registration (but not with respect to future registrations in accordance with this Article III).

(c)       No registration effected under this Section 3.1 shall relieve the Company of its obligation to effect any registration upon request under Section 2.1 or Section 2.2 hereof, and no registration effected pursuant to this Section 3.1 shall be deemed to have been effected pursuant to Section 2.1 or Section 2.2 hereof.  The Initial Notice, the Piggyback Notice and the contents thereof shall be kept confidential until the public filing of the Registration Statement.

Section 3.2     Underwriter's Cutback.  If the managing underwriter of an Underwritten Offering that includes a Piggyback Registration advises the Company that it is the managing underwriter's good faith opinion that the inclusion of all such Registrable Securities proposed to be included in the Registration Statement for such Underwritten Offering would be reasonably likely to interfere with the successful marketing, including, but not limited to, the pricing, timing or distribution, of the Registrable Securities to be offered thereby, then the number of securities proposed to be included in such Underwritten Offering shall be allocated among the Company, the Selling Holders and all other Persons selling securities in such Underwritten Offering in the following order:

(a)       If the Piggyback Registration referred to in Section 3.1 is initiated as an underwritten primary registration on behalf of the Company, then, with respect to each class proposed to be registered:

(i)       *first*, the securities held by the Company of the class or classes proposed to be registered that the Company proposes to sell, as applicable;

(ii)       *second*, all Registrable Securities of the same class or classes (or convertible at the Piggyback-Eligible Holder's option into such class or classes) held by Piggyback-Eligible Holders requested to be included in such Piggyback Registration (allocated, if necessary, *pro rata* among the respective Piggyback-Eligible Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Piggyback-Eligible Holder at the time of such Piggyback Registration); and

(iii)       *third*, all other securities of the same class or classes (or convertible at the holder's option into such class or classes) requested to be included in such Piggyback Registration.

16

NAI-1521435260v7

(b)    if the Piggyback Registration referred to in <u>Section 3.1</u> is an underwritten secondary registration on behalf of any Holder, then the provisions of <u>Section 2.5</u> shall apply.

(c)    if the Piggyback Registration referred to in <u>Section 3.1</u> is an underwritten secondary registration on behalf of any holder of securities other than a Holder, then, with respect to each class proposed to be registered:

(i)    *first*, the securities of the class or classes proposed to be registered held by such holder;

(ii)    *second*, the Registrable Securities of the same class or classes (or convertible at the Piggyback-Eligible Holder's option into such class or classes) held by Piggyback-Eligible Holders requested to be included in such Piggyback Registration (*pro rata* among the respective Holders of such Registrable Securities in proportion, as nearly as practicable, to the amounts of Registrable Securities requested to be included in such registration by each such Holder at the time of such Piggyback Registration);

(iii)    *third,* all other securities of the same class or classes (or convertible at the holder's option into such class or classes) requested to be included in such Piggyback Registration other than New Common Stock to be sold by the Company; and

(iv)    *fourth*, the New Common Stock to be sold by the Company.

Section 3.3    <u>Company Control</u>.  Except for a Registration Statement being filed in connection with the exercise of a Demand Right or a Shelf Registration, the Company may decline to file a Registration Statement after an Initial Notice has been given or after receipt by the Company of a Piggyback Notice, and the Company may withdraw a Registration Statement after filing and after such Initial Notice or Piggyback Notice, but prior to the effectiveness of the Registration Statement, <u>provided</u> that (i) the Company shall promptly notify the Selling Holders in writing of any such action and (ii) nothing in this <u>Section 3.3</u> shall prejudice the right of any Demand Holder to immediately request that such registration be effected as a registration under <u>Section 2.1</u> or <u>Section 2.2</u> to the extent permitted thereunder.

Section 3.4    <u>Selection of Underwriters</u>.  If the Company intends to offer and sell New Common Stock by means of an Underwritten Offering (other than an offering pursuant to <u>Section 2.1</u> or <u>Section 2.2)</u>, the Company shall select the managing underwriter or underwriters to administer such Underwritten Offering, which managing underwriter or underwriters shall be investment banking firms of nationally recognized standing.

Section 3.5    <u>Withdrawal of Registration</u>.  Any Holder shall have the right to withdraw all or a part of its Piggyback Notice by giving written notice to the Company of such withdrawal at least three (3) Business Days prior to the earliest of (i) effectiveness of the applicable Registration Statement, (ii) the filing of any Registration Statement relating to such Piggyback

17

Registration that includes a price range or (iii) commencement of a "roadshow" relating to the Registration Statement for such Piggyback Registration.

Section 3.6    New Securities.  In the event the Company issues any New Securities (as defined in the Company Shareholders Agreement) that are subject to (a) the preemptive rights of any Holder as set forth in Section 7 of the Company Shareholders Agreement (such Holders, the "Preemptive Rights Holders") and (b) a registration rights agreement between the Company and the holders of such New Securities (a "New Registration Rights Agreement"), such New Registration Rights Agreement shall provide all Preemptive Rights Holders (to the extent such Holders are Piggyback Eligible Holders) with registration rights that are substantially similar to the rights set forth in this Article III, with such rights applicable to any Registerable Securities then held by such Preemptive Rights Holders.

## ARTICLE IV

## REGISTRATION PROCEDURES

Section 4.1    Registration Procedures.  If and whenever the Company is under an obligation pursuant to the provisions of this Agreement to use its reasonable best efforts to effect the registration of any Registrable Securities, the Company shall, as expeditiously as practicable:

(a)     in the case of Registrable Securities, use its reasonable best efforts to cause a Registration Statement that registers such Registrable Securities to become and remain effective for a period of 180 days or, if earlier, until all of such Registrable Securities covered thereby have been disposed of; provided, that, in the case of any registration of Registrable Securities on a Shelf Registration Statement which are intended to be offered on a continuous or delayed basis, such 180-day period shall be extended, if necessary, to keep the Registration Statement continuously effective, supplemented and amended, including by filing a new Registration Statement, to the extent necessary to ensure that it is available for sales of such Registrable Securities, and to ensure that it conforms with the requirements of this Agreement, the Securities Act and the policies, rules and regulations of the Commission as announced from time to time, until the earlier of when (i) the Selling Holders have sold all of such Registrable Securities and (ii) there are no Registrable Securities covered by the Registration Statement;

(b)     furnish to each Selling Holder, at least ten (10) Business Days before filing a Registration Statement, or such shorter period as reasonably practical, copies of such Registration Statement or any amendments or supplements thereto, which documents shall be subject to the review, comment and approval by one lead counsel (and any reasonably necessary local counsel) selected by the Selling Holders who beneficially own a majority of such Registrable Securities, which counsel (who may also be counsel to the Company), in each case, shall be subject to the reasonable approval of each Demand Holder whose Registrable Securities are included in such registration, and who shall represent all Selling Holders as a group (the "Selling Holders' Counsel") (it being understood that such ten (10) Business Day period need not apply to successive drafts of the same document proposed to be filed so long as such successive drafts are supplied to the Selling Holders' Counsel in advance of the proposed filing by a period of time that is customary and reasonable under the circumstances);

18

(c)      furnish to each Selling Holder and each underwriter, if any, such number of copies of final conformed versions of the applicable Registration Statement and of each amendment and supplement thereto (in each case including all exhibits and any documents incorporated by reference) reasonably requested by such Selling Holder or underwriter in writing;

(d)      in the case of Registrable Securities, prepare and file with the Commission such amendments, including post-effective amendments, and supplements to such Registration Statement and the applicable Prospectus or Prospectus supplement, including any free writing prospectus as defined in Rule 405 under the Securities Act, used in connection therewith as may be (i) reasonably requested by any Holder (to the extent such request relates to information relating to such Selling Holder), or (ii) necessary to keep such Registration Statement effective for at least the period specified in Section 4.1(a) and to comply with the provisions of this Agreement and the Securities Act with respect to the sale or other disposition of such Registrable Securities, and furnish to each Selling Holder and to the managing underwriter(s), if any, within a reasonable period of time prior to the filing thereof a copy of any amendment or supplement to such Registration Statement or Prospectus; provided, however, that, with respect to each free writing prospectus or other materials to be delivered to purchasers at the time of sale of the Registrable Securities, the Company shall (i) ensure that no Registrable Securities are sold "by means of" (as defined in Rule 159A(b) under the Securities Act) such free writing prospectus or other materials without the prior written consent of the sellers of the Registrable Securities, which free writing prospectus or other materials shall be subject to the review of counsel to such sellers and (ii) make all required filings of all free writing prospectuses or other materials with the Commission as are required;

(e)      notify in writing each Selling Holder promptly (i) of the receipt by the Company of any notification with respect to any comments by the Commission with respect to such Registration Statement or any amendment or supplement thereto or any request by the Commission for the amending or supplementing thereof or for additional information with respect thereto, (ii) of the receipt by the Company of any notification with respect to the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement or any amendment or supplement thereto or the initiation or threatening of any proceeding for that purpose and (iii) of the receipt by the Company of any notification with respect to the suspension of the qualification of such Registrable Securities for sale in any jurisdiction or the initiation or threatening of any proceeding for such purposes and, in any such case as promptly as reasonably practicable thereafter, prepare and file an amendment or supplement to such Registration Statement or Prospectus which will correct such statement or omission or effect such compliance;

(f)      use its reasonable best efforts to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as the Selling Holders reasonably request and do any and all other acts and things which may be reasonably necessary or advisable to enable such Selling Holders to consummate their disposition in such jurisdictions; provided, however, that the Company will not be required to qualify generally to do business, subject itself to general taxation or consent to general service of process in any jurisdiction where it would not otherwise be required to do so but for this Section 4.1(f);

19

NAI-1521435260v7

(g)      furnish to each Selling Holder such number of copies of a summary Prospectus or other prospectus, including a preliminary prospectus and any other prospectus filed under Rule 424 under the Securities Act, in conformity with the requirements of the Securities Act, and such other documents as such Selling Holders or any underwriter may reasonably request in writing;

(h)      notify on a timely basis each Selling Holder of such Registrable Securities at any time when a prospectus relating to such Registrable Securities is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing and, at the request of such Selling Holder, as soon as practicable prepare, file with the Commission and furnish to such Selling Holder a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the offeree of such securities, such Prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing;

(i)      make available for inspection by the Selling Holders, the Selling Holders' Counsel or any underwriter participating in any disposition pursuant to such Registration Statement and any attorney, accountant or other agent retained by any such Selling Holder or underwriter (collectively, the "Inspectors"), all pertinent financial and other records, pertinent corporate documents and properties of the Company (collectively, the "Records"), as shall be necessary to enable them to exercise their due diligence responsibility, and cause the Company's officers, managers and employees to supply all information (together with the Records, the "Information") requested by any such Inspector in connection with such Registration Statement and request that the independent public accountants who have certified the Company's financial statements make themselves available, at reasonable times and for reasonable periods, to discuss the business of the Company.  Any of the Information which the Company determines in good faith and upon consultation with external counsel to be confidential, and of which determination the Inspectors are so notified, shall not be disclosed by the Inspectors unless (i) the disclosure of such Information is necessary to avoid or correct a misstatement or omission in the Registration Statement, (ii) the release of such Information is requested or required pursuant to a subpoena, order from a court of competent jurisdiction or other interrogatory by a governmental entity or similar process; (iii) such Information has been made generally available to the public; or (iv) such Information is or becomes available to such Inspector on a non-confidential basis other than through the breach of an obligation of confidentiality (contractual or otherwise).  The Holder(s) of Registrable Securities agree that they will, upon learning that disclosure of such Information is sought in a court of competent jurisdiction or by another governmental entity, give notice to the Company and allow the Company, at the Company's expense, to undertake appropriate action to prevent disclosure of the Information deemed confidential;

(j)      deliver to the underwriters of any Underwritten Offering, and any Holder that is named as an underwriter in such offering, a "comfort" letter addressed thereto in

20

NAI-1521435260v7

customary form and at customary times and covering matters of the type customarily covered by such comfort letters from its independent certified public accountants;

(k)    deliver to the underwriters of any Underwritten Offering, and any Holder that is named as an underwriter in such offering, a written and signed legal opinion or opinions addressed thereto in customary form from its outside or in-house legal counsel dated the closing date of the Underwritten Offering;

(l)    provide a transfer agent and registrar (which may be the same entity and which may be the Company) for such Registrable Securities and deliver to such transfer agent and registrar such customary forms, legal opinions from its outside or in-house legal counsel, agreements and other documentation as such transfer agent and/or registrar so request;

(m)    issue to any underwriter to which any Selling Holders may sell Registrable Securities in such offering certificates, or if the Registrable Securities are uncertificated other evidence of issuance, evidencing such Registrable Securities;

(n)    upon the request of any Selling Holder of the Registrable Securities included in such registration, use reasonable best efforts to cause such Registrable Securities to be listed on any national securities exchange on which the New Common Stock is listed or, if the New Common Stock is not listed on a national securities exchange, use its reasonable best efforts to qualify such Registrable Securities for inclusion on such national securities exchange as the Company shall designate;

(o)    otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the Commission and make available to its security holders, as soon as reasonably practicable, earnings statements (which need not be audited) covering a period of 12 months beginning within three months after the effective date of the Registration Statement, which earnings statements shall satisfy the provisions of Section 11(a) of the Securities Act;

(p)    notify the Selling Holders and the lead underwriter or underwriters, if any, and (if requested) confirm such advice in writing, as promptly as reasonably practicable after notice thereof is received by the Company when the applicable Registration Statement or any amendment thereto has been filed or becomes effective and when the applicable Prospectus or any amendment or supplement thereto has been filed;

(q)    use its reasonable best efforts to prevent the entry of, and use its reasonable best efforts to obtain as promptly as reasonably practicable the withdrawal of, any stop order with respect to the applicable Registration Statement or other order suspending the use of any preliminary or final Prospectus;

(r)    promptly incorporate in a prospectus supplement or post-effective amendment to the applicable Registration Statement such information as the lead underwriter or underwriters, if any, and each Selling Holder agree should be included therein relating to the plan of distribution with respect to such class of Registrable Securities, which may include disposition of Registrable Securities by all lawful means, including firm-commitment

21

NAI-1521435260v7

underwritten public offerings, block trades, agented transactions, sales directly into the market, purchases or sales by brokers, derivative transactions, short sales, stock loan or stock pledge transactions and sales not involving a public offering; and make all required filings of such prospectus supplement or post-effective amendment as promptly as reasonably practicable after being notified of the matters to be incorporated in such prospectus supplement or post-effective amendment;

(s)   cooperate with each Selling Holder and each underwriter or agent, if any, participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with FINRA;

(t)   provide a CUSIP number or numbers for all such units, in each case not later than the effective date of the applicable Registration Statement;

(u)   to the extent reasonably requested by the lead or managing underwriters in connection with an Underwritten Offering (including an Underwritten Offering pursuant to Section 2.1 or Section 2.2) make appropriate officers of the Company available to attend any "roadshows" scheduled in connection with any such Underwritten Offering, with all reasonable out of pocket costs and expenses incurred by the Company or such officers in connection with such attendance to be paid by the Company;

(v)   enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the Selling Holder or Selling Holders, as the case may be, owning at least a majority of the Registrable Securities covered by any applicable Registration Statement shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, including customary indemnification and contribution to the effect and to the extent provided in Article V hereof, provided, however, that if a Selling Holder becomes a party to any underwriting agreement or related documents, the Selling Holder shall not be required in any such underwriting agreement or related documents to make any representations or warranties to or agreements with the Company or the underwriters other than customary representations, warranties or agreements regarding such Selling Holder's title to Registrable Securities and any written information provided by the Holder to the Company expressly for inclusion in the related Registration Statement, and the liability of any Selling Holder under the underwriting agreement shall be several and not joint and in no event shall the liability of any Selling Holder under the underwriting agreement be greater in amount than the dollar amount of the proceeds received by such Selling Holder under the sale of the Registrable Securities pursuant to such underwriting agreement (net of underwriting discounts and commissions);

(w)   upon request, promptly remove all legends on such Selling Holder's Registrable Securities relating to the restrictions on resale in connection with the sale of such Registrable Securities pursuant to an effective Registration Statement; and

(x)   subject to all the other provisions of this Agreement, use its reasonable best efforts to take all other steps necessary to effect the registration, marketing and sale of such Registrable Securities contemplated hereby.

<div align="center">22</div>

NAI-1521435260v7

## ARTICLE V

## INDEMNIFICATION

Section 5.1    Indemnification by the Company.  The Company agrees to indemnify and hold harmless, to the full extent permitted by law, each Holder, its Affiliates and their respective officers, directors, managers, partners, members and representatives, and each of their respective successors and assigns, and each Person who controls any of the foregoing (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), against any losses, claims, damages, liabilities and expenses caused by any violation by the Company of the Securities Act or the Exchange Act applicable to the Company and relating to action or inaction required of the Company in connection with the registration contemplated by a Registration Statement or any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto, or any other disclosure document (including reports and other documents filed under the Exchange Act and any document incorporated by reference therein) or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or any amendment thereof or supplement thereto, in the light of the circumstances under which they were made) not misleading; provided, however, that the Company shall not be liable in any such case to the extent that any such loss, claim, damage, liability or expense arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto in reliance upon and in conformity with information furnished to the Company in writing by the Person asserting such loss, claim, damage, liability or expense specifically for use therein. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of any such Person and shall survive the transfer of such securities. The Company will also indemnify underwriters, selling brokers, dealer managers and similar securities industry professionals participating in the distribution, their officers and directors and each Person who Controls such Persons to the same extent as provided above with respect to the indemnification of the Holder, if requested.

Section 5.2    Indemnification by Holders.  Each Holder agrees to indemnify and hold harmless, to the full extent permitted by law, the Company, the Company's Controlled Affiliates and their respective directors, managers, partners, members and representatives, and each of their respective successors and assigns, and each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) against any losses, claims, damages or liabilities and expenses caused by any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or any amendment thereof or supplement thereto, in the light of the circumstances under which they were made) not misleading, to the extent, but only to the extent, that such untrue statement or omission was made in reliance on and in conformity with any information furnished in writing by such Holder to the Company expressly for inclusion in such Registration Statement and has not been corrected in a subsequent writing prior to or concurrently with the sale of the Registrable Securities to the Person asserting such loss, claim,

23

NAI-1521435260v7

damage, liability or expense; <u>provided</u> that the obligation to indemnify shall be several, not joint and several, for each Holder and in no event shall the liability of any Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.

Section 5.3    <u>Conduct of Indemnification Proceedings</u>.    Any Person entitled to indemnification hereunder will (i) give prompt (but in any event within 30 days after such Person has actual knowledge of the facts constituting the basis for indemnification) written notice to the indemnifying party of any claim with respect to which it seeks indemnification and (ii) permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party; <u>provided</u>, <u>however</u>, that any delay or failure to so notify the indemnifying party shall relieve the indemnifying party of its obligations hereunder only to the extent, if at all, that it is materially and adversely prejudiced by reason of such delay or failure. Any Person entitled to indemnification hereunder shall have the right to select and employ separate counsel and to participate in the defense of such claim, but the fees and expenses of such counsel shall be at the expense of such Person unless (a) the indemnifying party has agreed in writing to pay such fees or expenses, (b) the indemnifying party shall have failed to assume the defense of such claim within a reasonable time after receipt of notice of such claim from the Person entitled to indemnification hereunder and employ counsel reasonably satisfactory to such Person, (c) the indemnified party has reasonably concluded, based on the advice of counsel, that there may be legal defenses available to it or other indemnified parties that are different from or in addition to those available to the indemnifying party or (d) in the reasonable judgment of any such Person, based upon advice of counsel, a conflict of interest may exist between such Person and the indemnifying party with respect to such claims (in which case, if such Person notifies the indemnifying party in writing that such Person elects to employ separate counsel at the expense of the indemnifying party, the indemnifying party shall not have the right to assume the defense of such claim on behalf of such Person).  If such defense is not assumed by the indemnifying party, the indemnifying party will not be subject to any liability for any settlement made without its consent (but such consent will not be unreasonably withheld, conditioned or delayed).  No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened action or claim in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement (i) includes an unconditional release of such indemnified party from all liability on any claims that are the subject matter of such action, (ii) does not include a statement as to or an admission of fault, culpability or failure to act by or on behalf of any indemnified party and (iii) does not commit any indemnified party to take, or hold back from taking, any action.  No indemnified party shall, without the written consent of the indemnifying party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder, and no indemnifying party shall be liable for any settlement or compromise of any such action or claim effected without its consent, in each case which consent shall not be unreasonably withheld.

Section 5.4    <u>Settlement Offers</u>.  Whenever the indemnified party or the indemnifying party receives a firm offer to settle a claim for which indemnification is sought hereunder, it shall promptly notify the other of such offer.  If the indemnifying party refuses to accept such offer within 20 Business Days after receipt of such offer (or of notice thereof), such claim shall

24

NAI-1521435260v7

continue to be contested and, if such claim is within the scope of the indemnifying party's indemnity contained herein, the indemnified party shall be indemnified pursuant to the terms hereof.  An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim will not be obligated to pay the fees and expenses of more than one counsel for all parties indemnified by such indemnifying party with respect to such claim in any one jurisdiction, unless in the written opinion of counsel to the indemnified party, reasonably satisfactory to the indemnifying party, use of one counsel would be expected to give rise to a conflict of interest between such indemnified party and any other of such indemnified parties with respect to such claim, in which event the indemnifying party shall be obligated to pay the fees and expenses of one additional counsel.

Section 5.5   Other Indemnification.  Indemnification similar to that specified in this Article V (with appropriate modifications) shall be given by the Company and each Selling Holder with respect to any required registration or other qualification of Registrable Securities under Federal or state law or regulation of governmental authority other than the Securities Act.

Section 5.6   Contribution.   If for any reason the indemnification provided for in Section 5.1 or Section 5.2 is unavailable to an indemnified party or insufficient to hold it harmless as contemplated by Section 5.1 and Section 5.2, then (i) the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnified party and the indemnifying party or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as shall be appropriate to reflect the relative benefits received by the Company, on the one hand, and such prospective sellers, on the other hand, from their sale of the Registrable Securities, provided that, no Selling Holder shall be required to contribute in an amount greater than the dollar amount of the net proceeds received by such Selling Holder with respect to the sale of the Registrable Securities giving rise to such indemnification obligation.  The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or expenses (or actions in respect thereof) referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such indemnified party in connection with investigating or, except as provided in Section 5.3, defending any such action or claim. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. The Holders' obligations in this Section 5.6 to contribute shall be several in proportion to the amount of Registrable Securities registered by them and not joint.

## ARTICLE VI

## EXCHANGE ACT COMPLIANCE; QUOTATION

Section 6.1   Exchange Act Compliance.  So long as the Company (a) has registered a class of securities under Section 12 or Section 15 of the Exchange Act and (b) files reports under Section 13 of the Exchange Act, then the Company shall take all actions reasonably necessary to enable Holders to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 under the Securities Act, as such rule may be amended from time to time or any similar rules or regulations adopted by the Commission,

25

NAI-1521435260v7

including, without limiting the generality of the foregoing, (i) making and keeping current public information available, as those terms are understood and defined in Rule 144 promulgated under the Securities Act, (ii) filing with the Commission in a timely manner all reports and other documents required of the Company under the Exchange Act to the extent so required and (iii) at the request of any Holder if such Holder proposes to sell securities in compliance with Rule 144, forthwith furnish to such Holder, as applicable, a written statement of compliance with the reporting requirements of the Commission as set forth in Rule 144 and make available to such Holder such information as will enable the Holder to make sales pursuant to Rule 144.

Section 6.2     Quotation on OTC Market.  So long as the Company (a) has registered a class of securities under Section 12 or Section 15 of the Exchange Act and (b) files reports under Section 13 of the Exchange Act, then, until and unless (i) the New Common Stock is listed on a "national securities exchange" as defined in Rule 600(b)(45) of Regulation National Market System promulgated by the Commission, as amended or (ii) the New Common Stock may be sold by any and all Holders without restriction by the Commission pursuant to a Registration Statement in an at-the-market offering, the Company shall use its commercially reasonable efforts to cause the New Common Stock to be quoted on any of the OTCQX or OTCQB markets as promptly as practicable and shall thereafter use its commercially reasonable efforts to maintain such quotation.

## ARTICLE VII

## MISCELLANEOUS

Section 7.1     Severability.  If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 7.2     Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Delaware irrespective of the choice of laws principles thereof. The parties agree that any legal action or proceeding regarding this Agreement shall be brought and determined exclusively in a state or federal court located within the State of Delaware.  EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 7.3     Other Registration Rights.  If the Company shall at any time hereafter provide to any holder of any securities of the Company rights with respect to the registration of such securities under the Securities Act, such rights shall not be inconsistent with, in conflict with or adversely affect any of the rights provided to the Holders of Registrable Securities in, or

26

NAI-1521435260v7

conflict (in a manner that adversely affects Holders of Registrable Securities) with any other provisions included in, this Agreement.  The Company shall not grant any registration rights to third parties which are more favorable than the rights granted hereunder unless any such more favorable rights are concurrently added to the rights granted hereunder.

Section 7.4     Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties hereto, each of which, in the case of the Holders, not already a party to this Agreement, shall agree to become subject to the terms of this Agreement by executing an Adoption Agreement and be bound to the same extent as the parties hereto.  The Company may not assign any of its rights or delegate any of its duties hereunder without the prior written consent of the Holders of at least two-thirds of the Registrable Securities.  Subject to Section 2.1(a) and Section 2.2(a), any Holder may, at its election and at any time or from time to time, assign its rights and delegate its duties hereunder, in whole or in part, to any Transferee of such Holder (each, an "Assignee"); provided, that no such assignment shall be binding upon or obligate the Company to any such Assignee that is not already a party to this Agreement unless and until such Assignee delivers the Company an Adoption Agreement.  If a Holder assigns its rights under this Agreement in connection with the Transfer of less than all of its Registrable Securities, the Holder shall retain its rights under this Agreement with respect to its remaining Registrable Securities.  If a Holder assigns its rights under this Agreement in connection with the Transfer of all of its Registrable Securities, the Holder shall have no further rights or obligations under this Agreement, except under Article V hereof in respect of offerings in which such Holder participated or registrations in which Registrable Securities held by such Holder were included. Any purported assignment in violation of this provision shall be null and *void ab initio*.

Section 7.5     Notices.   All notices, requests, consents and other communications hereunder to any party shall be deemed to be sufficient if delivered in writing in person, by electronic mail, or sent by nationally-recognized overnight courier postage prepaid (with a copy of such communication sent by electronic mail), addressed to such party at the address set forth below or at such other address as may hereafter be designated in writing by such party to the other parties.  All such notices, requests, consents and other communications shall be delivered as follows:

(a)     if to the Company, to:

[●]
Intelsat Emergence S.A. (to be renamed Intelsat S.A.)
*société anonyme*
4, rue Albert Borschette
L-1246 Luxembourg
RCS Luxembourg B. [●]264124
Attention:     Legal Department

with a copy (which shall not constitute notice to the Company) to:

27

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:     Edward O. Sassower, P.C.
               Steven N. Serajeddini, P.C.
               Aparna Yenamandra
Edward.Sassower@Kirkland.com
Steven Serajeddini@Kirkland.com
Aparna.Yenamandra@Kirkland.com

(b)     if to a Holder, to the address set forth under such Holder's name in Schedule I attached hereto.

All such notices, requests, consents and other communications shall be deemed to have been received (i) in the case of personal delivery or delivery by electronic mail, on the date of such delivery and (ii) in the case of dispatch by nationally recognized overnight courier, on the next Business Day following such dispatch.

Section 7.6     Headings.  The headings contained in this Agreement are for the sole purpose of convenience of reference, and shall not in any way limit or affect the meaning or interpretation of any of the terms or provisions of this Agreement.

Section 7.7     Additional Parties.  Additional parties to this Agreement shall only include each Holder who has executed an Adoption Agreement, in the form attached hereto as Exhibit A.

Section 7.8     Adjustments.  If, and as often as, there are any changes in the New Common Stock or securities convertible into or exchangeable into or exercisable for New Common Stock as a result of any reclassification, recapitalization, stock split (including a reverse stock split) or subdivision or combination, exchange or readjustment of shares or units, or any stock dividend or stock distribution, merger or other similar transaction affecting such New Common Stock or such securities, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to such New Common Stock or such securities as so changed.

Section 7.9     Entire Agreement.  This Agreement and the other writings referred to herein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such subject matter.

Section 7.10     Counterparts; .pdf Signature.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original instrument, but all of which together shall constitute one and the same document.  This Agreement may be executed by .pdf signature (or similar means), and a .pdf signature (or similar means) shall constitute an original for all purposes. No party hereto or to any such agreement or instrument will raise the use of electronic mail to deliver a signature or the fact that any signature or agreement or instrument

28

was transmitted or communicated through the use of electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 7.11    Amendment.    Other than with respect to amendments to Schedule I attached hereto, which may be amended by the Company from time to time to reflect the Holders at such time, and subject to Section 5(b) and Section 8(d) of the Company Shareholders Agreement, this Agreement may not be amended, modified or supplemented without the written consent of the Holders of at least two-thirds of the Registrable Securities; provided, however, that any party may give a waiver as to itself; provided further, however that no amendment, modification, supplement, or waiver that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder; provided further, however, that the waiver of any provision with respect to any Registration Statement or offering may be given by Holders holding at least at least two-thirds of the then-outstanding Registrable Securities entitled to participate in such offering or, if such offering shall have been commenced, having elected to participate in such offering. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders of at least two-thirds of the Registrable Securities to which such waiver or consent relates; provided, however, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence. Notwithstanding the foregoing, any amendment, modification or supplement to, or waiver of (i) the definitions of "Demand Holder," "Holder,", Piggyback-Eligible Holder," or "Registrable Securities," and (ii) the reference to "$50.0 million" in Section 2.1(a) and Section 2.2(b)(ii)(x) and (iii) the references to (A) "five (5) Business Days" in Section 2.1(c) and in the second sentence of Section 2.2(a), (B) "three (3) Business Days" in Section 2.2(c)(ii), and (C) "ten (10) Business Days" and "five (5) Business Days" in Section 3.1(a), which, in each case, materially adversely affects, alters, or changes the interests of any Holder shall not be effective against such Holder without the prior written consent of such Holder.

Section 7.12    Extensions; Waivers.    Any party may, for itself only, (a) extend the time for the performance of any of the obligations of any other party under this Agreement, (b) waive any inaccuracies in the representations and warranties of any other party contained herein or in any document delivered pursuant hereto and (c) waive compliance with any of the agreements or conditions for the benefit of such party contained herein.  Any extension or waiver pursuant to this Section 7.12 will be valid only if set forth in a writing signed by the party to be bound thereby.  No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence.  Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

Section 7.13    Business Days.    If any time period for giving notice or taking action hereunder expires on a day that is not a Business Day, the time period will automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

29

NAI-1521435260v7

Section 7.14   Further Assurances.   Each of the parties hereto shall execute all such further instruments and documents and take all such further action as the Company may reasonably require in order to effectuate the terms and purposes of this Agreement.

Section 7.15   No Third-Party Beneficiaries.   Except pursuant to Article V, this Agreement shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns and other Persons expressly named herein.

Section 7.16   Interpretation; Construction.   This Agreement has been freely and fairly negotiated among the parties.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.  Any reference to any law will be deemed to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise.  The words "include," "includes," and "including" will be deemed to be followed by "without limitation."  Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole, including the schedules, exhibits and annexes, as the same may from time to time be amended, modified or supplemented, and not to any particular subdivision unless expressly so limited.  References to "will" or "shall" mean that the party must perform the matter so described and a reference to "may" means that the party has the option, but not the obligation, to perform the matter so described. All references to sections, schedules, annexes and exhibits mean the sections of this Agreement and the schedules, annexes and exhibits attached to this Agreement, except where otherwise stated.  The parties intend that each representation, warranty, and covenant contained herein will have independent significance.  If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) that the party has not breached will not detract from or mitigate the party's breach of the first covenant.

Section 7.17   Term.  This Agreement shall terminate (i) with respect to any Holder, at such time as such Holder has no Registrable Securities and (ii) in full and be of no further effect at such time as there are no Registrable Securities held by any Holders. Notwithstanding the foregoing, Article V, Section 7.2, Section 7.5, and Section 7.16 shall survive any termination.

* * * *

NAI-1521435260v7

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above written.

**THE COMPANY:**

[—————]

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.), a société anonyme organized under the laws of the Grand Duchy of Luxembourg**

By: _____
    Name:
    Title:

*[Signature Page to Registration Rights Agreement]*

NAI-1521435260v7

**EXHIBIT A**

**ADOPTION AGREEMENT**

This Adoption Agreement ("Adoption") is executed pursuant to the terms of the Registration Rights Agreement, dated as of February [•], 202[•]2022, a copy of which is attached hereto (as amended, the "Registration Rights Agreement"), by the undersigned (the "Undersigned") executing this Adoption.  Capitalized terms used herein without definition are defined in the Registration Rights Agreement and are used herein with the same meanings set forth therein.  By the execution of this Adoption, the Undersigned agrees as follows:

1.    Acknowledgment.   The Undersigned acknowledges that the Undersigned is acquiring shares of New Common Stock, subject to the terms and conditions of the Registration Rights Agreement.

2.    Agreement.  The Undersigned (i) agrees that the New Common Stock acquired by the Undersigned, and other shares of New Common Stock and other securities of the Company that may be acquired by the Undersigned in the future, shall be bound by and subject to the terms of the Registration Rights Agreement, pursuant to the terms thereof, and (ii) hereby adopts the Registration Rights Agreement with the same force and effect as if the undersigned were originally a party thereto.

3.    Notice.  Any notice required as permitted by the Registration Rights Agreement shall be given to the Undersigned at the address listed beside the Undersigned's signature below.

[NAME OF HOLDER]                    Address for Notices:

By: _____          [_____]
Name:                              [_____]
Title:                             Telephone:  [_____]
Date:                              Email:         [_____]

NAI-1521435260v7

## SCHEDULE I

## List of Holders

| Name | Address for Notice | Shares of New Common Stock |
|------|-------------------|---------------------------|
|      |                   |                           |
|      |                   |                           |
|      |                   |                           |
|      |                   |                           |
|      |                   |                           |

NAI-1521435260v7

**<u>Exhibit D-1</u>**

**New Series A Warrant Agreement**

*Form of Execution Version*

**SERIES A WARRANT AGREEMENT**

**between**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**

**and**

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,**
**as Warrant Agent**

**Dated as of February [●], 2022**

**Series A Warrants to Subscribe to and Purchase Common Shares**

**TABLE OF CONTENTS**

**Page**

**1.**   Definitions................................................................................................................1

**2.**   Book-Entry Warrants. ............................................................................................10
    2.1   Original Issuance of Warrants.................................................................10
    2.2   Form of Warrants ....................................................................................10
    2.3   Delivery of Book-Entry Warrants ...........................................................11
    2.4   Global Warrant Certificates ...................................................................11
    2.5   Transfer and Exchange of Book-Entry Warrants .....................................13
    2.6   Restrictions on Exchange or Transfer of a Book-Entry Warrant for a
           Beneficial Interest in a Global Warrant Certificate..................................13
    2.7   Withholding and Reporting Requirements ...............................................13

**3.**   Exercise and Expiration of Warrants .....................................................................14
    3.1   Right to Acquire Common Shares Upon Exercise....................................14
    3.2   Exercise and Expiration of Warrants ......................................................14
    3.3   Application of Funds upon Exercise of Warrants .....................................16
    3.4   Payment of Taxes....................................................................................16
    3.5   [reserved]. ..............................................................................................16
    3.6   Shares Issuable.......................................................................................16
    3.7   Cashless Exercise ...................................................................................16
    3.8   Cost Basis Information ............................................................................19

**4.**   ERISA Eligibility. .................................................................................................19

**5.**   Transferability; No Restrictions.............................................................................19
    5.1   General Restriction .................................................................................19
    5.2   Exchange Listing ....................................................................................20

**6.**   Dissolution, Liquidation or Winding up .................................................................20

**7.**   Adjustments ...........................................................................................................21
    7.1   Adjustments ............................................................................................21
    7.2   Fractional Interest ..................................................................................28
    7.3   No Other Adjustments.............................................................................28

**8.**   [reserved.] .............................................................................................................29

**9.**   Reservation and Authorization of Common Shares..................................................29

**10.**  Warrant Transfer Books ........................................................................................29

**11.**  Warrant Holders ....................................................................................................30
    11.1  No Voting or Dividend Rights .................................................................30
    11.2  Rights of Action .....................................................................................31

**12.**  Information and Confidentiality.............................................................................31
    12.1  Reporting and Disclosure........................................................................31
    12.2  Confidentiality .......................................................................................32

**13.**  Concerning the Warrant Agent...............................................................................34

| 13.1 | Rights and Duties of the Warrant Agent. | 34 |
| 13.2 | Limitation of Liability. | 36 |
| 13.3 | Indemnification. | 37 |
| 13.4 | Right to Consult Counsel | 37 |
| 13.5 | Compensation and Reimbursement | 38 |
| 13.6 | Warrant Agent May Hold Equity Issuer Securities | 38 |
| 13.7 | Resignation and Removal; Appointment of Successor | 38 |
| **14.** | Notices. | 39 |
| 14.1 | Notices Generally | 39 |
| 14.2 | Required Notices to Holders | 40 |
| **15.** | Inspection | 41 |
| **16.** | Amendments | 41 |
| **17.** | Waivers | 42 |
| **18.** | Successor to Equity Issuer | 42 |
| **19.** | Headings | 42 |
| **20.** | Counterparts | 42 |
| **21.** | Severability | 43 |
| **22.** | No Redemption | 43 |
| **23.** | Persons Benefiting | 43 |
| **24.** | Applicable Law | 43 |
| **25.** | Entire Agreement | 43 |
| **26.** | Force Majeure. | 43 |
| **27.** | Further Assurances. | 44 |
| **28.** | Confidentiality. | 44 |

**EXHIBITS**

Exhibit A        Form of Book-Entry Warrant Statement

Exhibit B        Form of Global Warrant Certificate

Exhibit C        Cashless Exercise Examples

## SERIES A WARRANT AGREEMENT

This Series A Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, this "*Agreement*"), dated as of February [●], 2022 between Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 264124 (and any Successor Equity Issuer (as defined below) that becomes successor to the Equity Issuer in accordance with Section 18) (the "*Equity Issuer*") and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*," which term includes any successor thereto permitted under this Agreement).  Capitalized terms that are used in this Agreement shall have the meanings set forth in Section 1 hereof.

### WITNESSETH THAT:

**WHEREAS**, pursuant to the terms and conditions of the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates*, Docket No. 3891 of Case No. 20-32299 (KLP) (the "*Plan*") relating to a reorganization under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), the Equity Issuer proposes to issue and deliver Warrants (as defined below) to subscribe to and purchase up to, in the aggregate, a number of Common Shares (as defined below) representing 9.0% of the number of Common Shares of the Equity Issuer issued and outstanding as of the Effective Date (as defined below) (assuming the exercise of all Warrants, but not the Series B Warrants (as defined below), subject to adjustment as provided herein, and the Warrant Statements and the Global Warrant Certificates (as defined below) evidencing such Warrants;

**WHEREAS**, each Warrant shall entitle the registered owner thereof to subscribe to and purchase one (1) Common Share, subject to adjustment as provided herein;

**WHEREAS**, the Warrants and the Common Shares issuable upon exercise of the Warrants are being issued in an offering in reliance on the exemption from the registration requirements of the Securities Act (as defined below) afforded by section 1145 of the Bankruptcy Code, and of any applicable state securities or "blue sky" laws; and

**WHEREAS**, the Equity Issuer desires that the Warrant Agent act on behalf of the Equity Issuer, and the Warrant Agent is willing to so act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants.

**NOW THEREFORE,** in consideration of the mutual agreements herein contained, the Equity Issuer and the Warrant Agent agree as follows:

1.    **Definitions**.

"*Action*" has the meaning set forth in Section 14.2(c).

"*Adjustment Events*" has the meaning set forth in Section 7.1.

"**_Affiliate_**" of any specified Person, means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**_Agent Members_**" has the meaning set forth in Section 2.4(b).

"**_Aggregate Exercise Price_**" has the meaning set forth in Section 3.2(c).

"**_Agreement_**" has the meaning set forth in the preamble hereto.

"**_Allowed_**" has the meaning set forth in the Plan.

"**_Applicable Procedures_**" means, with respect to any transfer or exchange of, or exercise of any Warrants evidenced by, any Global Warrant Certificate, the rules and procedures of the Depositary that apply to such transfer, exchange or exercise.

"**_Appropriate Officer_**" means any person designated as such by the Board of Directors from time to time.

"**_Bankruptcy Code_**" has the meaning set forth in the recitals hereto.

"**_Beneficial Interest_**" means, solely for purposes of and as used in Sections 2.4, 2.6, 5.1 and 10, with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Warrants it Beneficially Owns.

"**_Beneficial Owner_**" means, solely for purposes of and as used in Sections 2.4, 2.6, 5.1 and 10, any Person owning a securities entitlement with respect to Warrants registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been ultimately credited to any other Person's securities account. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.

"**_Black-Scholes Eligible Transaction_**" means any Sale Cash Only Transaction, Eligible Sale Cash and Securities Transaction, De Minimis Sale Cash and Securities Transaction or Private Sale Transaction.

"**_Black-Scholes Value_**" means, with respect to any Black-Scholes Eligible Transaction, the value of a Warrant on the date of consummation of such Black-Scholes Eligible Transaction, as determined by a Valuation Firm using the Black Scholes Option Pricing Model for a "call" option, subject to the following assumptions: (a) an underlying security price for Common Shares equal to the value of the consideration received in such Black-Scholes Eligible Transaction for an outstanding Common Share, (b) a strike price equal to the Exercise Price in effect as of the date of consummation of the applicable Black-Scholes Eligible Transaction, (c) a maturity equal to the remaining term of the Warrant, (d) a volatility to be determined by such Valuation Firm as of the

<center>2</center>

date of determination and pursuant to customary practices for calculating such volatility (but in any event no more than 45% and no less than 20%; *provided, however*, that such range will not be disclosed to such Valuation Firm); and (e) a risk-free interest rate equal to the interpolated rate on the United States Treasury securities with a maturity closest to the remaining term of the Warrant as of the date of consummation of the applicable Black-Scholes Eligible Transaction.

"*Board of Directors*" means either the board of directors of the Equity Issuer or any duly authorized committee of that board.

"*Book-Entry Warrants*" means Warrants issued by book-entry registration in the books and records of the Warrant Agent and reflected on the Warrant Register.

"*Book-Entry Warrant Legend*" has the meaning set forth in Section 2.3(a).

"*Business Day*" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a legal holiday in the State of New York or Luxembourg City or a day on which banking institutions and trust companies in the state in which the Corporate Agency Office is located are authorized or obligated by law, regulation or executive order to close.

"*Cash Consideration*" means, with respect to any Sale Cash Only Transaction or Sale Cash and Securities Transaction, the consideration constituting cash and property other than securities.

"*Cash Dividend*" has the meaning set forth in Section 7.1(c).

"*Cashless Market Exercise Price*" has the meaning set forth in Section 3.7.

"*Cash-Out Warrant Percentage*" means, with respect to any Eligible Sale Cash and Securities Transaction, the percentage of the total consideration per Common Share receivable in such Transaction by a Qualifying Person represented by Cash Consideration (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).

"*Cash-Out Warrants*" has the meaning set forth in Section 7.1(h)(z)(i)(B).

"*Cash Value Claim*" has the meaning set forth in Section 3.7.

"*Cash Value per Cash Value Warrant*" has the meaning set forth in Section 3.7.

"*Cash Value Warrants*" has the meaning set forth in Section 3.7.

"*Commission*" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act, whichever is the relevant statute for the particular purpose.

"*Common Shares*" means, subject to the provisions of Section 7.1(h), the common shares of the Equity Issuer issued upon the Effective Date in accordance with the Plan each with a nominal value of USD $0.01.

"*Competitor*" means a "Competitor of the Company" as defined in the Shareholders Agreement.

"*Confidential Information*" has the meaning set forth in Section 12.2.

"*Constituent Person*" has the meaning set forth in the definition of "Qualifying Person."

"*Corporate Agency Office*" has the meaning set forth in Section 10.

"*Current Market Price*" means on any date:

(i)    if the reference is to the per share price of Common Shares (or other applicable security) on any date herein specified and if on such date the Common Shares (or other applicable security) are listed or admitted to trading on any U.S. national securities exchange or traded and quoted in the over-the-counter market in the United States:

(A)    for the purpose of any computation under this Agreement (except under Section 7.2), the VWAP for the 30 consecutive Trading Days ending on such date or, if such date is not a Trading Day, on the next preceding Trading Day; or

(B)    for the purposes of any computation under Section 7.2, the Quoted Price for such date or, if such date is not a Trading Day, for the next preceding Trading Day; or

(ii)    if the reference is to the per share price of Common Shares (or other applicable security) on any date herein specified and if on such date the Common Shares are not listed or admitted to trading on any U.S. national securities exchange or traded and quoted in the over-the-counter market in the United States, the Fair Market Value for one (1) Common Share (or other applicable security).

"*De Minimis Sale Cash and Securities Transaction*" means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes more than 75% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).

"*Depositary*" means DTC and its successors as depositary hereunder.

"*Direct Owner*" means any holder of Book-Entry Warrants.

"*Drag-along Sale*" has the meaning set forth in the Shareholders Agreement as in effect on the date hereof.

4

"***DTC***" means The Depository Trust Company or any successor thereto.

"***DTC Participant***" means any Person that is reflected on the books and records of DTC as having a direct interest in the Warrants held of record by DTC as of immediately prior to the Effective Date.

"***Effective Date***" means February [●], 2022.

"***Eligible Sale Cash and Securities Transaction***" means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes no less than 50% and no more than 75% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).

"***Equity Issuer***" has the meaning set forth in the preamble hereto.

"***Equity Issuer Order***" means a written request or order signed in the name of the Equity Issuer by an Appropriate Officer and delivered to the Warrant Agent.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***Excess***" has the meaning set forth in Section 3.7.

"***Exchange Act***" means the Securities Exchange Act of 1934 and any statute successor thereto, in each case, as amended from time to time.

"***Ex-Dividend Date***" means the first date on which the Common Shares trade on the applicable exchange or in the applicable market, regular way, without the right to receive the issuance, dividend or distribution in question.

"***Exercise Date***" has the meaning set forth in Section 3.2(f).

"***Exercise Form***" has the meaning set forth in Section 3.2(c).

"***Exercise Period***" means the period from and including the Original Issue Date to and including the Expiration Date.

"***Exercise Price***" means the exercise price per Common Share, initially set at $60.15, subject to adjustment as provided in Section 7.1, provided that the exercise price per Common Share may not be lower than the nominal or par value per share unless expressly decided otherwise by the Equity Issuer and to the extent permitted by law.

"***Expiration Date***" means the date that is the fifth (5th) anniversary of the Effective Date.

"***Fair Market Value***" means, on any date, as to any security or other non-cash assets: the amount which a willing buyer would pay a willing seller in an arm's length transaction on such

5

date (neither being under any compulsion to buy or sell) for such security or other non-cash property, as reasonably determined as of such date by a Valuation Firm, whose determination shall be filed with the Warrant Agent with written notice of such determination given by the Equity Issuer to the Holders in accordance with Section 14.2, provided that, after the Board's receipt of a report of a Valuation Firm during any twelve-month period, the Fair Market Value will be determined in good faith by the Board of Directors.  For the avoidance of doubt, the Board of Directors will consider the report of such Valuation Firm in good faith in making any determination of the Fair Market Value during the twelve-month period following receipt of such report of the Valuation Firm.

"*Financial Statements*" has the meaning set forth in Section 12.1.

"*Funds*" has the meaning set forth in Section 3.3.

"*Global Warrant Certificate*" means a certificate for Warrants in global form, deposited with or on behalf of and registered in the name of the Depositary or its nominee, that bears the Global Warrant Legend and that has the "Schedule of Decreases in Warrants" attached thereto, substantially in the form attached as Exhibit B.

"*Global Warrant Legend*" has the meaning set forth in Section 2.4(a).

"*Holder*" means any Person in whose name at the time any Warrant is registered upon the Warrant Register and, when used with respect to any Warrant Statement, the Person in whose name such evidenced by the applicable Warrant Statement is registered in the Warrant Register.

"*Holder Website*" has the meaning set forth in Section 12.2(c).

"*Ineligible Sale Cash and Securities Transaction*" means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes less than 50% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

"*Listing*" means a public listing of the Equity Issuer's securities on a U.S. national securities exchange resulting in the Equity Issuer being registered under Section 12(b) of the Exchange Act.

"*New Indenture*" means that certain indenture for 6.500% First Lien Secured Notes due 2030 dated January 27, 2022 between Intelsat Jackson Holdings S.A., the guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time.

"*Non-Cash Dividend*" has the meaning set forth in Section 7.1(b).

"*Non-Surviving Transaction*" has the meaning set forth in Section 7.1(h).

6

"*Original Issue Date*" means the Effective Date, the date on which Warrants are originally issued under this Agreement.

"*Outstanding*" when used with respect to any Warrants, means, as of the time of determination, all Warrants theretofore originally issued under this Agreement, as adjusted pursuant to Section 7.1, except (i) Warrants that have been exercised pursuant to Section 3.2(a), (ii) Warrants that have expired, terminated or become void pursuant to Section 3.2(b) or Section 6 and (iii) Warrants that have otherwise been acquired by the Equity Issuer or any of its Subsidiaries; provided, however, that in determining whether the Holders of the requisite amount of the Outstanding Warrants have given any request, demand, authorization, direction, notice, consent or waiver under the provisions of this Agreement, Warrants held directly or beneficially by the Equity Issuer or any Subsidiary of the Equity Issuer or any of their respective employees shall be disregarded and deemed not to be outstanding.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, trust, association, joint-stock company, business trust or any other entity, unincorporated organization or government or any agency or political subdivision thereof.

"*Plan*" has the meaning set forth in the recitals hereto.

"*Plan Effective Time*" has the meaning set forth in Section 2.1(a).

"*Private Sale Transaction*" means, as related to the Equity Issuer, a Transaction that results in Substituted Securities that either (a) are not of an issuer that is subject to the reporting requirements of the Exchange Act or (b) do not have an average aggregate trading volume of common equity of at least $20 million per Trading Day over the sixty (60) Trading Days preceding such Private Sale Transaction.

"*Qualifying Person*" means, with respect to any Transaction, a holder of Common Shares that is not (i) an employee of the Equity Issuer or of any Subsidiary thereof, (ii) a Person with which the Equity Issuer has consolidated or into which the Equity Issuer has merged or which has merged into the Equity Issuer or to which a sale or transfer of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole) was made, as the case may be (any Person described in this clause (ii), a "*Constituent Person*") or (iii) an Affiliate of a Constituent Person.

"*Quoted Price*" means, on any Trading Day, with respect to the Common Shares (or other applicable security), the VWAP of the Common Shares (or other applicable security) on such Trading Day on the principal U.S. national securities exchange on which the Common Shares (or other applicable security) are listed or admitted to trading or, if the Common Shares (or other applicable security) are not listed or admitted to trading on any U.S. national securities exchange, the average of the closing bid and asked prices in the over-the-counter market in the United States as furnished by any New York Stock Exchange member firm that shall be selected from time to time by the Equity Issuer for that purpose (or, if such volume-weighted average price or the average of the closing bid and asked price is unavailable, the Fair Market Value on such Trading Day).

"*Recipient*" has the meaning set forth in Section 3.2(e).

"***Redomestication Transaction***" means a Non-Surviving Transaction in which all of the property received upon such Non-Surviving Transaction by each holder of Common Shares consists solely of securities, cash in lieu of fractional shares and other de minimis consideration, and the holders of the Common Shares immediately prior to such Non-Surviving Transaction are the only holders of the equity securities of the Successor Equity Issuer immediately after the consummation of such Non-Surviving Transaction.

"***Representatives***" means a Person's partners (including limited partners except for any Competitors), shareholders, members, directors, officers, managers, employees, financing sources (including existing and bona fide prospective investors except for any Competitors), agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its Affiliates or wholly owned subsidiaries.

"***Required Warrant Holders***" means Holders of Warrants evidencing at least a majority of the then-Outstanding Warrants.

"***Roll-Over Warrant Percentage***" means, with respect to any Eligible Sale Cash and Securities Transaction, the percentage of the total consideration per Common Share receivable in such Transaction by a Qualifying Person represented by Substituted Securities (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).

"***Roll-Over Warrants***" has the meaning set forth in Section 7.1(h)(z)(i)(B).

"***Sale Cash and Securities Transaction***" means a Sale Transaction that is neither (i) a Sale Cash Only Transaction nor (ii) a Sale Securities Only Transaction.

"***Sale Cash Only Transaction***" means a Sale Transaction in which all of the consideration receivable upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole)) of such Sale Transaction consists of cash and/or property other than securities.

"***Sale Securities Only Transaction***" means a Sale Transaction in which all of the property received upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole)) of such Sale Transaction consists solely of securities.

"***Sale Transaction***" means any Transaction that does not constitute a Redomestication Transaction (*i.e.*, either (i) a Sale Cash and Securities Transaction, (ii) a Sale Cash Only Transaction or (iii) a Sale Securities Only Transaction).

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Series B Warrants***" means the warrants issued pursuant to the Plan and the Series B Warrant Agreement.

"**Series B Warrant Agreement**" means that certain agreement providing for, among other things, the issuance of the Series B Warrants.

"*Shareholders Agreement*" means the Equity Issuer's shareholders agreement.

"**Subsidiary**" means a Person more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Equity Issuer or by one or more other Subsidiaries, or by the Equity Issuer and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock, shares or other equity interests (including partnership interests) which ordinarily have voting power for the election of directors, managers, general partners or trustees, whether at all times or only so long as no senior class of stock, shares or other equity interests (including partnership interests) have such voting power by reason of any contingency.

"**Substituted Property**" has the meaning set forth in Section 7.1(h)(y).

"**Substituted Securities**" has the meaning set forth in Section 7.1(h)(z)(i)(A).

"**Successor Equity Issuer**" has the meaning set forth in Section 18.

"**Surviving Transaction**" has the meaning set forth in Section 7.1(h).

"**Trading Day**" means a day on which trading in the Common Shares (or other applicable security) generally occurs on the principal exchange or market on which the Common Shares (or other applicable security) is then listed or traded; provided that if the Common Shares (or other applicable security) is not so listed or traded, "Trading Day" means a Business Day.

"**Transaction**" has the meaning set forth in Section 7.1(h).

"**Transfer**" means any sale, pledge, assignment or other transfer or disposition of any Warrant to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise.  "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings.

"**Valuation Firm**" means an independent and nationally recognized investment banking or valuation firm that is mutually acceptable to (i) if such Valuation Firm is selected in connection with the determination a Cashless Market Exercise Price pursuant to Section 3.7, the Equity Issuer and the applicable Holder seeking a cashless exercise pursuant to such section, and (ii) in all other instances, the Equity Issuer and the Required Warrant Holders.

"*VWAP*" means the volume-weighted average price for trading hours of the regular trading session (including any extensions thereof), determined without regard to pre-open or after-hours trading or any other trading outside of the trading hours of the regular trading session (including any extensions thereof).

"**Warrant Agent**" has the meaning set forth in the preamble hereto.

"**Warrant Register**" has the meaning set forth in Section 2.3(b).

9

"*Warrant Statement*" means any statement issued by the Warrant Agent from time to time to a registered Holder of Book-Entry Warrants reflecting such book-entry position, in substantially the form set forth in Exhibit A hereto.

"*Warrants*" means those certain warrants to subscribe to and purchase one Common Share, subject to adjustment pursuant to Section 7, issued hereunder.

"*Winding Up*" has the meaning set forth in Section 6.

**2.     Book-Entry Warrants.**

2.1     Original Issuance of Warrants.

(a)     On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Plan, on the Original Issue Date the Equity Issuer will issue to holders of Allowed Unsecured Claims against ICF (as defined in the Plan) the Warrants in global form registered in the name of Cede & Co., as nominee for DTC (or such other nominee as may be selected by DTC), by causing DTC (subject to Section 2.1(b)) to credit the account or accounts in which such holders held their respective Allowed Unsecured Claims against ICF substantially concurrently with the effective time of the Plan (the "*Plan Effective Time*") the aggregate number of Warrants to be issued hereunder, *pro rata* based on the amount of Allowed Unsecured Claims against ICF held by each such holder immediately prior to the Plan Effective Time.  For the avoidance of doubt, on the Original Issue Date, the only Holder shall be Cede & Co. (or such other nominee as may be selected by DTC) as nominee for DTC.

(b)     Prior to the Original Issue Date or as soon as reasonably practicable thereafter (but in any event no later than 10 Business Days after the Original Issue Date), the Equity Issuer shall (a) cause the Warrants to be declared eligible for clearance and settlement through DTC, (b) pay or cause to be paid all expenses and application fees incurred in connection with the approval of the Warrants for book-entry transfer by DTC and (c) cause DTC to credit the Warrants to the account or accounts of the initial Holders of the Warrants in accordance with the Plan.

(c)     Each Book-Entry Warrant shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to subscribe for and purchase one (1) Common Share, subject to adjustment as provided in Section 7.

2.2     Form of Warrants.

The Warrants shall not be certificated other than a Global Warrant Certificate registered in the name of the Depositary or its nominee. The Warrants that are not represented by a Global Warrant Certificate shall be issued as Book-Entry Warrants on the Warrant Register, registered in the names of the Holders of such Warrants and evidenced by Warrant Statements.  The Warrant Statements shall have such insertions as are appropriate or required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements typed, stamped, printed, lithographed or engraved thereon (which does not impact

10

the Warrant Agent's rights, duties or immunities) as the officers of the Equity Issuer may approve and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed, or to conform to usage.  Each Warrant Statement shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase and subscribe for one (1) Common Share, subject to adjustment as provided in Section 7.

2.3    Delivery of Book-Entry Warrants.

(a)    Upon written order of the Equity Issuer, the Warrant Agent shall register in the Warrant Register the Book-Entry Warrants.  The account of each Holder of Book-Entry Warrants shall be marked with a legend in the following or a substantially comparable form (the "***Book-Entry Warrant Legend***") set forth on Exhibit A hereto.

(b)    The Equity Issuer shall cause to be kept at the office or offices of the Warrant Agent designated for such purpose a warrant register (the "***Warrant Register***"), in which, subject to such reasonable regulations as it may prescribe, it shall register the Direct Owners holding Book-Entry Warrants and exchanges and Transfers of outstanding Warrants in accordance with the procedures set forth in Section 2.6, Section 2.7 and Section 5 of this Agreement in a form reasonably acceptable to the Equity Issuer or Warrant Agent. No service charge shall be made for any exchange or registration of Transfer of the Warrants, but the Equity Issuer may require payment by the exercising Holder of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed on the registered Holder in connection with any such exchange or registration of Transfer. The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until any payments required by the immediately preceding sentence have been made.

2.4    Global Warrant Certificates.

(a)    Any Global Warrant Certificate shall bear the legend substantially in the form set forth in Exhibit B hereto (the "***Global Warrant Legend***").

(b)    So long as a Global Warrant Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("***Agent Members***") shall have no rights under this Agreement with respect to the Warrants evidenced by such Global Warrant Certificate held on their behalf by the Depositary or its custodian, and the Depositary may be treated by the Equity Issuer, the Warrant Agent and any agent of the Equity Issuer or the Warrant Agent as the absolute owner of such Warrants, and as the sole Holder of such Warrants, for all purposes.  Accordingly, any such Agent Member's Beneficial Interest in such Warrants will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Equity Issuer nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Equity Issuer, the Warrant Agent or any agent of the Equity Issuer

11

or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(c)    Any holder of a Beneficial Interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such Beneficial Interest, agree that transfers of Beneficial Interests in the Warrants evidenced by such Global Warrant Certificate may be effected only through a book-entry system maintained by the Depositary as the Holder of such Global Warrant Certificate (or its agent), and that ownership of a Beneficial Interest in Warrants evidenced thereby shall be reflected solely in such book-entry form.

(d)    Transfers of a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees except as set forth in Section 2.4(e). Interests of Beneficial Owners in a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be transferred in accordance with the Applicable Procedures.

(e)    The holder of a Global Warrant Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder of a Warrant is entitled to take under this Agreement or such Global Warrant Certificate.

(f)    Each Global Warrant Certificate will evidence such of the Outstanding Warrants as will be specified therein and each shall provide that it evidences the aggregate number of Outstanding Warrants from time to time endorsed thereon and that the aggregate number of Outstanding Warrants evidenced thereby may from time to time be reduced, to reflect exercises or expirations. Any endorsement of a Global Warrant Certificate to reflect the amount of any decrease in the aggregate number of Outstanding Warrants evidenced thereby will be made by the Warrant Agent (i) in the case of an exercise, in accordance with the Applicable Procedures as required by Section 3.2(c) or (ii) in the case of an expiration, in accordance with Section 3.2(b).

(g)    The Equity Issuer initially appoints DTC to act as Depositary with respect to the Global Warrant Certificates.

(h)    The Warrant Agent is hereby authorized to countersign and deliver one or more Global Warrant Certificates as required by this Section 2.4.

(i)    Any holder of a Beneficial Interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee may move their holdings of Warrants directly to the Warrant Register as Book-Entry Warrants only through the Applicable Procedures.

12

2.5     Transfer and Exchange of Book-Entry Warrants.  When a Holder of Book-Entry Warrants presents to the Warrant Agent a written request (i) to register the transfer of the Warrants; or (ii) to exchange such Warrants for an equal number of Warrants represented by Book-Entry Warrants of other authorized denominations, then the Warrant Agent shall register the transfer or make the exchange as requested if its customary requirements for such transactions are met; provided, however, that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, properly completed and duly executed by the registered Holder thereof or by his attorney, duly authorized in writing and accompanied by a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.

2.6     Restrictions on Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Global Warrant Certificate. A Book-Entry Warrant may not be exchanged for a Beneficial Interest in a Global Warrant Certificate unless the Warrants are eligible to be cleared or settled in DTC. Upon receipt by the Warrant Agent of appropriate instruments of transfer with respect to a Book-Entry Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Book-Entry Warrant, then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register, increase accordingly the number of Warrants on the Warrant Register registered in the name of the registered owner of the Global Warrant Certificate and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be increased accordingly. If no Global Warrant Certificate is then outstanding (for the avoidance of doubt, while the Warrants are eligible to be cleared or settled in DTC), the Equity Issuer shall issue and the Warrant Agent shall countersign a new Global Warrant Certificate representing the appropriate number of Warrants.

2.7     Withholding and Reporting Requirements.  The Equity Issuer shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions or other situations requiring withholding under applicable law, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements.  The Equity Issuer will be authorized to (a) take any actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements, (b) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, or (c) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes; provided, that the Equity Issuer will also (i) notify the relevant payee of any required withholding reasonably in advance of the date of the relevant payment, (ii) reasonably cooperate with such payee and its Affiliates in obtaining any available exemption or reduction of, or otherwise minimizing, such withholding, and (iii) provide such payee with receipts from the relevant governmental authority evidencing the receipt of any withheld amount.

13

**3.**      **Exercise and Expiration of Warrants**.

3.1      Right to Acquire Common Shares Upon Exercise.  Each Warrant duly issued by the Equity Issuer shall entitle the Holder thereof, subject to the provisions thereof and of this Agreement, to subscribe to and acquire from the Equity Issuer, for each Warrant evidenced thereby, one (1) Common Share at the Exercise Price, subject to adjustment as provided in this Agreement.  The Exercise Price, and the number of Common Shares obtainable upon exercise of each Warrant, shall be adjusted from time to time as required by Section 7.1.

3.2      Exercise and Expiration of Warrants.

(a)      Exercise of Warrants.  Subject to and upon compliance with the terms and conditions set forth herein, a Holder may exercise all or any whole number of the Warrants evidenced thereby, on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date, for the Common Shares obtainable thereunder.

(b)      Expiration of Warrants.  The Warrants, to the extent not exercised prior thereto, shall automatically expire, terminate and become void as of 5:00 p.m., New York time, on the Expiration Date. All rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time. No further action of any Person (including by, or on behalf of, any Holder, the Equity Issuer, or the Warrant Agent) shall be required to effectuate the expiration of Warrants pursuant to this Section 3.2(b).

(c)      Method of Exercise.  In order for a Holder to exercise all or any of its Warrants, the Holder must (i) (x) in the case of a Global Warrant Certificate, deliver to the Warrant Agent an exercise form for the election to exercise such Warrants substantially in the form set forth in Exhibit B hereto (an "***Exercise Form***"), setting forth the number of Warrants being exercised and, and, if applicable, whether cashless exercise is being elected with respect thereto as provided for in Section 3.7, otherwise properly completed and duly executed by the Holder thereof and deliver such Warrants by book-entry transfer through the facilities of the Depositary to the Warrant Agent in accordance with the Applicable Procedures and otherwise comply with the Applicable Procedures in respect of the exercise of such Warrants or (y) in the case of a Book-Entry Warrant, at the Corporate Agency Office (as defined below), (I) deliver to the Warrant Agent an Exercise Form, setting forth the number of Warrants being exercised and, if applicable, whether cashless exercise is being elected with respect thereto as provided for in Section 3.7, otherwise properly completed and duly executed by the Holder thereof as well as any such other information the Warrant Agent may reasonably require and (II) except in the case of a cashless exercise, deliver to the Warrant Agent, by wire transfer in immediately available funds, the amount of the aggregate Exercise Price of all the exercised Warrants (the "***Aggregate Exercise Price***") to the account (No. 530354616; ABA No. 021000021; Reference: American Stock Transfer & Trust Company, LLC as agent for Intelsat Emergence S.A. (to be renamed Intelsat S.A.)) of the Equity Issuer at the Warrant Agent or such other account as the Warrant Agent shall have given notice to the Equity Issuer and such Holder in accordance with Section 14.1(d); and (ii) pay to the Warrant Agent, by wire transfer in immediately available funds, an amount equal to all taxes required to be paid by the Holder, if any, pursuant to Section 3.4 prior to, or concurrently with, exercise of such Warrants to the account (No. 530354616; ABA No. 021000021; Reference: American Stock Transfer &

14

Trust Company, LLC as agent for Intelsat Emergence S.A. (to be renamed Intelsat S.A.)) of the Equity Issuer at the Warrant Agent or such other account as the Warrant Agent shall have given notice to the Equity Issuer and such Holder in accordance with Section 14.1(d), and (iii), if not already a holder of the Common Shares that is party to the Shareholders Agreement, deliver a joinder to the Shareholders Agreement. For the avoidance of doubt, any exercise of any Warrant may be "net share settled" pursuant to a cashless exercise as described in Section 3.7.

(d)  Partial Exercise.  If a Holder exercises fewer than all of its Warrants, (i) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Warrant Agent shall cause the custodian of the Depositary to endorse the "Schedule of Decreases in Warrants" attached to such Global Warrant Certificate to reflect the Warrants being exercised and (ii) in the case of exercise of Warrants evidenced by a Book-Entry Warrant, the Warrant Agent shall reduce the Warrant Register and such Holder's position by the whole number of Warrants duly exercised.

(e)  Issuance of Common Shares.  Upon due exercise of Warrants evidenced by any Warrant Statement in conformity with the foregoing provisions of Section 3.2(c), the Warrant Agent shall, when actions specified in Section 3.2(c)(i) have been effected and any payment specified in Section 3.2(c)(ii) is received, deliver to the Equity Issuer the Exercise Form received pursuant to Section 3.2(c)(i), deliver or deposit any funds, in accordance with Section 3.3, received as instructed in writing by the Equity Issuer and advise the Equity Issuer by telephone at the end of such day of the amount of funds so deposited to its account.  The Equity Issuer shall thereupon, as promptly as practicable, and in any event within five (5) Business Days after the Exercise Date referred to below, (i) determine the number of Common Shares issuable pursuant to exercise of such Warrants pursuant to Section 3.7 and (ii) (x) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, deliver or cause to be delivered to the Recipient in accordance with the Applicable Procedures Common Shares in book-entry form to be so held through the facilities of the Depositary, or, if the Common Shares may not then be held in book-entry form through the facilities of the Depositary, make a book entry into the stock ledger of the Equity Issuer representing such Common Shares, or (y) in the case of exercise of Warrants evidenced by Warrant Statements, make or cause to be made a book entry into the stock ledger of the Equity Issuer representing, in each case of (x) and (y) in an amount equal to the aggregate number of Common Shares issuable upon such exercise (based upon the aggregate number of Warrants so exercised and subjection to Section  3.7), as so determined, together with an amount in cash in lieu of any fractional share(s), if the Equity Issuer so elects pursuant to Section 7.2.  The Common Shares in book-entry form representing Common Shares so delivered shall be, to the extent possible, delivered by crediting the balance account of the Holder or such other Person as shall be designated by the Holder, in such Exercise Form (the Holder or such other designated Person being referred to herein as the "***Recipient***"), on the Equity Issuer's register of Common Shares. Once such Common Shares are delivered pursuant to this Section 3.2(e), for all purposes of this Agreement, the Recipient shall, as between such Person and the Equity Issuer, be entitled to all rights of the holder of record of such Common Shares.

(f)  Time of Exercise.  Each exercise of a Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which each of the

15

requirements for exercise of such Warrant specified in <u>Section 3.2(c)</u> has been duly satisfied (the "***Exercise Date***").

3.3     <u>Application of Funds upon Exercise of Warrants</u>.  All funds received by the Warrant Agent under this Agreement that are to be distributed or applied by the Warrant Agent in the performance of services, including funds received upon the exercise of Warrants (the "***Funds***"), shall be held by the Warrant Agent in its name as agent for the Equity Issuer.  Until paid pursuant to the terms of this Agreement, the Warrant Agent will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.).  The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party.  The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits.  The Warrant Agent shall not be obligated to pay such interest, dividends or earnings to the Equity Issuer, any holder or any other party.  The Warrant Agent shall promptly deposit all funds received by it in payment for the exercise of Warrants into an account of the Equity Issuer maintained with the Warrant Agent (or such other account as may be designated by the Equity Issuer) and shall advise the Equity Issuer by telephone, facsimile transmission, email or other form of electronic communication available to both parties, at the end of each day on which a payment for the exercise of Warrants is received of the amount so deposited to its account. The Warrant Agent shall promptly confirm such advice to the Equity Issuer in writing.

3.4     <u>Payment of Taxes</u>.  The Equity Issuer shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of Common Shares on exercise of Warrants pursuant hereto.  The Equity Issuer or the Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of Common Shares in book-entry form or any registered forms for Common Shares or payment of cash or other property to any Recipient other than, in each case, the Holder of the exercised Warrants, and in case of such transfer or payment, the Warrant Agent and the Equity Issuer shall not be required to issue or deliver any Common Shares in book-entry form or any registered form or pay any cash until it has been established to the Equity Issuer's or Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid.

3.5     [reserved].

3.6     <u>Shares Issuable</u>.  The number of Common Shares "obtainable upon exercise" of Warrants at any time shall be the number of Common Shares into which such Warrants are then exercisable.  The Equity Issuer will confirm the number of shares obtainable upon exercise if so requested by the Warrant Agent.  The number of Common Shares "into which each Warrant is exercisable" shall be one (1) share, subject to adjustment as provided in <u>Section 7.1</u>.

3.7     <u>Cashless Exercise</u>.  For the purpose of such a cashless exercise of the Warrants as described in <u>Section 3.2</u>, subject to the terms hereof and solely for the purpose of the payment of the Aggregate Exercise Price of all the exercised Warrants by way of set off, the certain number

16

of Warrants exercised (determined by the Equity Issuer pursuant to the formula set forth below) (the "*Cash Value Warrants*") shall entitle the Holder to the cash value per Cash Value Warrant (as determined by the Equity Issuer pursuant to the formula set forth below, the "*Cash Value per Cash Value Warrant*," and, in the aggregate, the "*Cash Value Claim*") instead of an issue of shares of Common Shares.

Notwithstanding anything to the contrary herein, the Holder shall at no time be entitled to receive a payment of the Cash Value Claim in cash or otherwise other than through the set off of the Cash Value Claim with the Aggregate Exercise Price of the Warrants exercised (except in respect to the Excess). The Aggregate Exercise Price shall be deemed fully paid by way of set off with the Cash Value Claim when set against such Aggregate Exercise Price.

Notwithstanding any provisions herein to the contrary, upon any cashless exercise of any Warrants, if, on the Exercise Date of a cashless exercise, (i) the Cashless Exercise Market Price of one share of the Common Shares is greater than the applicable Exercise Price on the Exercise Date and (ii) the applicable Exercise Price on Exercise Date is not lower than the nominal or par value per share of Common Shares, then the Equity Issuer shall issue to the Holder a number of shares of Common Shares with respect to the Warrants being exercised computed using the following formula:

$$X=((TW-CW)*Y)$$

| | |
|---|---|
| Where X = | the <u>rounded</u> number of Common Shares to be issued to the Holder in respect of the Warrants being exercised; if the result of the formula is not a full number of shares but a fractional amount, the number of shares issued shall be rounded down to the next full number; |
| CV = | the Cash Value per Cash Value Warrant calculated as follows: CV= (Y*A); |
| TW = | the number of exercised Warrants; |
| CW = | the Cash Value Warrants and is calculated as follows: CW= (AEP/CV); |
| A = | the Cashless Exercise Market Price of one (1) Common Share (on the Exercise Date); |
| Y = | the number of Common Shares into which a Warrant being exercised by the Holder is exercisable (on the Exercise Date) and which is one (1) Common Share subject to adjustment as provided in <u>Section 7.1</u>; and |
| AEP = | the Aggregate Exercise Price of the Warrants exercised by the Holder. |

An illustrative example is attached as <u>Exhibit C</u> to this Agreement.

17

If the foregoing calculation results in a negative number, then no Common Shares shall be issued upon exercise pursuant to this Section 3.

If the number of Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the formula set forth above (prior to the rounding down to the next full share) is not a full number of shares (such fractional number of shares being "FS"), the Holder shall be entitled to a cash payment of such additional amount (the "*Excess*") calculated as follows:

$$E=(FS-X)*A$$

Where E =        Excess in USD;

X =        The rounded number of Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the first formula set forth above; and

FS =        the number of Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the first formula set forth above prior to the rounding down to the next full share.

The Equity Issuer shall calculate and transmit such calculation of the number of Common Shares to be issued on such exercise to the Warrant Agent (and, if different from the Warrant Agent, the Equity Issuer's transfer agent for the Common Shares), and the Warrant Agent shall have no obligation under this Agreement to calculate, confirm or verify such amount.

For purposes of determining the per share value of Common Shares to be surrendered in connection with such cashless exercise (the "*Cashless Market Exercise Price*"), (i) at any time at which the Common Shares are listed on a U.S. national securities exchange, such value shall be VWAP for the last twenty (20) Trading Days of such Common Shares or (ii) at any time at which the Common Shares are not listed on a U.S. national securities exchange, such value shall be determined by the Board of Directors (and will take into account any valuation determined by a Valuation Firm in the last twelve month period pursuant to this paragraph) within five (5) Business Days following a notice of exercise; provided, that if the Holder does not agree with such value and the Board of Directors has not engaged a Valuation Firm in the last twelve month period pursuant to this paragraph, such value shall be determined by a Valuation Firm jointly selected by the Board of Directors and the applicable Holder.  The Valuation Firm selected pursuant to this Section 3.7 shall have ten (10) Business Days to make a determination regarding value and such determination shall be binding on the Equity Issuer and such Holder absent fraud or manifest error. In no event will the Equity Issuer be required to engage a Valuation Firm in connection with the Warrants or the Series B Warrants more than once per twelve-month period. After the Board of Directors' receipt of a report of a Valuation Firm during any twelve-month period, the Cashless Market Exercise Price will be determined by the Board of Directors; provided that, the Board of Directors will consider the report of such Valuation Firm in good faith in making any determination of the Cashless Exercise Market Price during the twelve-month period following the receipt of such report of the Valuation Firm.  The fees and expenses of such Valuation Firm shall be paid by the Equity Issuer.

Notwithstanding anything to the contrary in this Section 3.7, a Holder shall only be entitled to elect a cashless exercise of any Warrant, if, on the Exercise Date of such cashless exercise, (i) the Cashless Exercise Market Price of one Common Share is greater than the applicable Exercise Price on the Exercise Date and (ii) the applicable Exercise Price on Exercise Date is not lower than the nominal or par value per share of Common Shares.

3.8    Cost Basis Information. The Equity Issuer hereby instructs the Warrant Agent to record cost basis for newly issued shares at the time of exercise in accordance with instructions by the Equity Issuer.  If the Equity Issuer does not provide such cost basis information to the Warrant Agent, as outlined above, then the Warrant Agent will treat those shares issued hereunder as uncovered securities or the equivalent, and each holder of such shares will need to obtain such cost basis information from the Equity Issuer.

**4.    ERISA Eligibility.**

By accepting a Warrant, each Holder shall be deemed to represent that either (i) it does not hold "plan assets" subject to ERISA or Section 4975 of the Internal Revenue Code or (ii) its acquisition, holding and exercise of Warrants will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Internal Revenue Code.

**5.    Transferability; No Restrictions.**

5.1    General Restriction.

(a)    The Warrants or any Beneficial Interest shall be freely transferable except as provided in this Section 5.1.  Notwithstanding any other provision of this Agreement, each Holder agrees that it shall not Transfer any of its Warrants or Beneficial Interests except:

(i)    as permitted under the Securities Act and other applicable federal law or state securities or blue sky laws and then, with respect to a Transfer of Warrants or Beneficial Interests, if requested by the Equity Issuer or the Warrant Agent, as applicable, only upon delivery to the Equity Issuer of a written opinion of counsel in form and substance reasonably satisfactory to the Equity Issuer to the effect that such Transfer may be effected without registration under the Securities Act; provided, that notwithstanding the foregoing, such a legal opinion shall not be required for any Transfer of Warrants or Beneficial Interests that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the Equity Issuer has a good faith reason to believe that such Warrants or Beneficial Interests are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the Equity Issuer or an "underwriter" (as such term is defined in the Securities Act) with respect to such Warrants or Beneficial Interests;

(ii)    if such Transfer would not reasonably be expected to require the Equity Issuer to initiate a registration or qualification of the Warrants pursuant to the Exchange Act or any applicable federal or state securities or blue sky laws;

19

(iii)    if such Transfer, upon consummation, would not result in the Equity Issuer having, in the aggregate, either (A) 1,900 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act (determined, in each case, in the Equity Issuer's reasonable discretion) of any class of equity securities of the Equity Issuer;

(iv)    if such Transfer would not cause the Equity Issuer or any Subsidiary or Affiliate of the Equity Issuer to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(v)    if such Transfer would not cause the Equity Issuer or any Subsidiary or Affiliate of the Equity Issuer to be subject to regulation under the Investment Advisers Act of 1940, as amended.

(b)    The direct Transferee (*i.e.*, a Transferee that holds the Warrants represented by Warrant Statements and not simply a Beneficial Interest in the Warrants registered in the name of Cede & Co. (or such other nominee as may be selected by DTC)) of the Warrants Transferred shall be bound by this Agreement as a Direct Owner.  Any indirect Transferee (*i.e.*, a Transferee that holds a Beneficial Interest in the Warrants registered in the name of Cede & Co. (or such other nominee as may be selected by DTC)) of the Warrants Transferred shall be bound by this Agreement as a Beneficial Owner.  Following such a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa) the Warrant Agent shall amend the Warrant Register to reflect the change in Direct Owners, and the Board of Directors, the Warrant Agent or their respective authorized designee shall take any other appropriate action in connection therewith.

(c)    Any attempted or purported Transfer of all or a portion of the Warrants or Beneficial Interests held by a Holder in violation of this Section 5.1 shall be null and void and of no force or effect whatsoever, such purported Transferee shall not be treated as a Holder of the Warrants or Beneficial Interests for purposes of this Agreement or otherwise, and the Equity Issuer shall not register such Transfer.

5.2    Exchange Listing.  From and after such time a Listing of the Common Shares occurs, the Equity Issuer shall use commercially reasonable efforts to list the Warrants on such U.S. national securities exchange; provided, that such obligation shall terminate one year prior to the Expiration Date.  The restrictions under Section 5.1(a)(ii), 5.1(a)(iii), 5.1(a)(iv), and 5.1(a)(v) shall terminate automatically upon the effectiveness of a Listing of the Warrants.

**6.    Dissolution, Liquidation or Winding up**.

Unless Section 7.1(h) applies, if, on or prior to the Expiration Date, the Equity Issuer (or any other Person controlling the Equity Issuer) shall propose a voluntary or involuntary dissolution, liquidation or winding up (a "***Winding Up***") of the affairs of the Equity Issuer, the Equity Issuer shall give written notice thereof to the Warrant Agent and all Holders in the manner

20

provided in Section 14.1(d) at least ten (10) Business Days prior to the date on which such Winding Up is expected to become effective or, if earlier, the record date for such Winding Up. Such notice shall also specify the date, if known, as of which the holders of record of Common Shares shall be entitled to exchange their shares for securities, money or other property deliverable upon such Winding Up, on which date (i) each Holder of Warrants shall receive the securities, money or other property which such Holder would have been entitled to receive had such Holder been the holder of record of Common Shares into which the Warrants were exercisable immediately prior to such Winding Up (net of the then applicable Exercise Price) and (ii) the rights to exercise the Warrants shall terminate.

Unless Section 7.1(h) applies, in case of any such Winding Up of the Equity Issuer, the Equity Issuer shall deposit with the Warrant Agent any funds or other property which the Holders are entitled to receive pursuant to the above paragraph, together with an Equity Issuer Order as to the distribution thereof. After receipt of such deposit from the Equity Issuer and any such other necessary information as the Warrant Agent may reasonably require, the Warrant Agent shall make payment in the appropriate amount to such Holders as are reflected on the Warrant Register. The Warrant Agent shall not be required to pay interest on any money deposited pursuant to the provisions of this Section 6 except such as it shall agree with the Equity Issuer to pay thereon. Any moneys, securities or other property which at any time shall be deposited by the Equity Issuer or on its behalf with the Warrant Agent pursuant to this Section 6 shall be, and are hereby, assigned, transferred and set over to the Warrant Agent in accordance with Section 3.3 hereof; provided, that, moneys, securities or other property need not be segregated from other funds, securities or other property held by the Warrant Agent except to the extent required by law.

**7.     Adjustments**.

7.1     Adjustments. In order to prevent dilution of the rights granted under the Warrants and to grant the Holders certain additional rights, the Exercise Price shall be subject to adjustment from time to time only as specifically provided in this Section 7.1 (the "*Adjustment Events*") and the number of Common Shares obtainable upon exercise of Warrants shall be subject to adjustment from time to time only as specifically provided in this Section 7.1.

(a)     Subdivisions and Combinations. In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, effect a subdivision (by any stock split or otherwise) of the outstanding Common Shares into a greater number of Common Shares (other than (x) a subdivision upon a Transaction to which Section 7.1(h) applies or (y) a stock split effected by means of a stock dividend or distribution to which Section 7.1(b) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such subdivision becomes effective shall be proportionately decreased. Conversely, if the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, effect a combination (by any reverse stock split, combination, subdivision or otherwise) of the outstanding Common Shares into a smaller number of Common Shares (other than a combination upon a Transaction to which Section 7.1(h) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such combination becomes effective shall be

21

proportionately increased. Any adjustment under this Section 7 shall become effective immediately after the opening of business on the day after the date upon which the subdivision or combination becomes effective.

(b) Common Share Non-Cash Dividends. In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, fix a record date for the issuance or making of a dividend or distribution to all holders of the Common Shares of evidences of its indebtedness, any other securities or any cash, property or other assets (excluding any dividends payable solely in cash) or of subscription rights, options or warrants to subscribe to and purchase or acquire any capital stock of the Equity Issuer (excluding stock dividends or distribution referred to in Section 7.1(a)) (any such event being herein called a "**Non-Cash Dividend**"), the Exercise Price shall be decreased immediately after the record date for such Non-Cash Dividend to a price determined by multiplying the Exercise Price then in effect by a fraction, (i) the numerator of which shall be the then Current Market Price of the Common Shares on the Ex-Dividend Date for such Non-Cash Dividend less the Fair Market Value of the evidences of indebtedness, securities, cash, property or other assets issued or distributed in such Non-Cash Dividend applicable to one Common Share or of such subscription rights or warrants applicable to one Common Share, and (ii) the denominator of which shall be such then Current Market Price per Common Share on the Ex-Dividend Date for such Non-Cash Dividend; such adjustment shall be made successively whenever such a record date is fixed.

(c) Common Share Cash Dividends. In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, fix a record date for the issuance or making of a distribution to all holders of the Common Shares of any dividend payable solely in cash (any such dividend being referred to as a "**Cash Dividend**"), the Exercise Price shall be decreased immediately after the record date for such Cash Dividend to a price determined by multiplying the Exercise Price then in effect by a fraction, (i) the numerator of which shall be the then Current Market Price of the Common Shares on the Ex-Dividend Date for such Cash Dividend less the per share Cash Dividend amount, and (ii) the denominator of which shall be such then Current Market Price per Common Share on the Ex-Dividend Date for such Cash Dividend.

(d) Adjustments Due to Dividends. For purposes of Sections 7.1(b) and 7.1(c), any adjustment required by Sections 7.1(b) and 7.1(c) shall be made successively whenever such a record date is fixed and in the event that such distribution is not so made, the Exercise Price shall again be adjusted to be the Exercise Price that was in effect immediately prior to such record date, and "Current Market Price" per Common Share at any date shall mean, (i) if the Common Shares are then listed on a national securities exchange, the average of the daily Quoted Prices for ten (10) consecutive Trading Days immediately prior to such date, or (ii) if the Common Shares are not then so listed, the Fair Market Value immediately prior to such date.

(e) Reclassifications. A reclassification of the Common Shares (other than any such reclassification in connection with a Transaction to which Section 7.1(h) applies) into

22

Common Shares and shares of any other class of stock shall be deemed, if the outstanding Common Shares shall be changed into a larger or smaller number of Common Shares as a part of such reclassification, a subdivision or combination, as the case may be, of the outstanding Common Shares for the purposes and within the meaning of Section 7.1(a) (and the effective date of such reclassification shall be deemed to be "the date upon which such subdivision becomes effective" or "the date upon which such combination becomes effective," as applicable, for the purposes and within the meaning of Section 7.1(a)).

(f)      Other Provisions Applicable to Adjustments.   The following provisions shall be applicable to the making of adjustments to the Exercise Price and the number of Common Shares into which each Warrant is exercisable under this Section 7.1:

(i)      Treasury Stock.  The dividend or distribution of any issued Common Shares owned or held by or for the account of the Equity Issuer shall be deemed a dividend or distribution of Common Shares for purposes of Section 7.1(b).  The Equity Issuer shall not make or issue any dividend or distribution on Common Shares held in the treasury of the Equity Issuer.  For the purposes of Section 7.1(b), the number of Common Shares at any time outstanding shall not include shares held in the treasury of the Equity Issuer.

(ii)      When Adjustments Are to be Made.  The adjustments required by Article VII shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exercise Price (excluding Cash Dividends) that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made increases or decreases the Exercise Price immediately prior to the making of such adjustment by at least one percent (1%).  Any adjustment representing a change of less than such minimum amount (except as aforesaid) shall be carried forward and made as soon as such adjustment, together with other adjustments required by Section 7.1(a), Section 7.1(b), Section 7.1(c) and Section 7.1(e) and not previously made, would result in such minimum adjustment.

(iii)      Fractional Interests.  In computing adjustments under Section 7.1, fractional interests in Common Shares shall be taken into account to the nearest one-thousandth (1/1000) of a share.

(g)      Adjustment to Shares Obtainable Upon Exercise.  Whenever the Exercise Price is adjusted as provided in this Section 7.1, the number of Common Shares into which a Warrant is exercisable shall simultaneously be adjusted by multiplying such number of Common Shares into which a Warrant is exercisable immediately prior to such adjustment by a fraction, the numerator of which shall be the Exercise Price immediately prior to such adjustment, and the denominator of which shall be the Exercise Price immediately thereafter.

(h)      Changes in Common Shares.  In case at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, the Equity Issuer shall be a party to or shall otherwise engage in any transaction or

23

series of related transactions constituting:  (1) a merger of the Equity Issuer into, a Drag-along Sale involving (or other direct or indirect sale of all of the Equity Issuer's equity to), or a consolidation of the Equity Issuer with, any other Person in which the previously outstanding Common Shares shall be (either directly or upon subsequent liquidation) cancelled, reclassified or converted or changed into or exchanged for securities or other property (including cash) or any combination of the foregoing, or a sale or transfer of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole) (a "*Non-Surviving Transaction*"), or (2) any merger of another Person into the Equity Issuer in which the previously outstanding Common Shares shall be cancelled, reclassified or converted or changed into or exchanged for securities of the Equity Issuer or other property (including cash) or any combination of the foregoing (a "*Surviving Transaction*"; any Non-Surviving Transaction or Surviving Transaction being herein called a "*Transaction*") then:

(x)       if such Transaction constitutes a Sale Cash Only Transaction, then, at the effective time of the consummation of such Sale Cash Only Transaction, any Warrants not exercised prior to the closing of such Sale Cash Only Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the greater of (1) the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such closing and (II) the positive difference, if any, of the Cash Consideration per Common Share in the Transaction and the Exercise Price per Common Share immediately prior to such closing and (2)  the Black-Scholes Value of each such Warrant as of the date of the consummation of the Sale Cash Only Transaction;

(y)       if such Transaction is a Redomestication Transaction, as a condition to the consummation of such Transaction, the Equity Issuer shall (or, in the case of any Non-Surviving Transaction, the Equity Issuer shall cause such other Person to) execute and deliver to the Warrant Agent a written instrument providing that any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the securities or other property ("*Substituted Property*") that would have been receivable upon such Transaction by a Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an Aggregate Exercise Price for such Warrant equal to the product of (i) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (ii) the Exercise Price per Common Share immediately prior to such Transaction; or

(z)       if such Transaction is a Sale Securities Only Transaction or a Sale Cash and Securities Transaction:

24

(i)      if such Transaction is not a Private Sale Transaction, as a condition to the consummation of such Transaction, the Equity Issuer shall (or, in the case of any Non-Surviving Transaction, the Equity Issuer shall cause such other Person to) execute and deliver to the Warrant Agent a written instrument providing that:

(A)      if such Transaction constitutes a Sale Securities Only Transaction, any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the securities ("*Substituted Securities*") that would have been receivable upon the consummation of such Transaction by a Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an Aggregate Exercise Price for such Warrant equal to the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per Common Share immediately prior to such Transaction;

(B)      if such Transaction constitutes a Sale Cash and Securities Transaction that is an Eligible Sale Cash and Securities Transaction, as a condition to the consummation of such Transaction, at the effective time of the consummation of such Transaction, (I) a portion of the Warrants not exercised prior to the closing of such Transaction equal to the Cash-Out Warrant Percentage (the "*Cash-Out Warrants*") shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of such Cash-Out Warrants, cash in an amount, for each such Cash-Out Warrant so evidenced, equal to the greater of (1) the product of (I) the number of Common Shares into which such Cash Out Warrant was exercisable immediately prior to such closing and (II) the positive difference, if any, of the Cash Consideration per Common Share in such Transaction and the Exercise Price per Common Share immediately prior to such closing and (2) the Black-Scholes Value of each such Cash-Out Warrant as of the date of the consummation of such Transaction and (II) a portion of the Warrants not exercised prior to the closing of such Transaction equal to the Roll-Over Warrant Percentage (the "*Roll-Over Warrants*"), upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement)

25

into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the Substituted Securities that would have been receivable upon the consummation of such Transaction by a Qualifying Person holding the number of Common Shares into which such Roll-Over Warrant was exercisable immediately prior to such Transaction and for an Aggregate Exercise Price for such Roll-Over Warrant equal to the product of (a) the number of Common Shares into which such Roll-Over Warrant was exercisable immediately prior to such Transaction and (b) the Exercise Price per Common Share immediately prior to such Transaction;

(C)     if such Transaction constitutes a Sale Cash and Securities Transaction that is an Ineligible Sale Cash and Securities Transaction any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the Substituted Securities that would have been receivable upon such Transaction by a Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an Aggregate Exercise Price for such Warrant equal to the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per Common Share immediately prior to such time as decreased (to an amount not less than the lesser of the par value of the Common Shares as of the date hereof and such par value as of such date of determination) by an amount equal to the Cash Consideration per Common Share receivable in such Sale Cash and Securities Transaction by a Qualifying Person; provided, however, that if, as the result of rights of election, the kind or amount of securities, cash and other property receivable upon such Sale Cash and Securities Transaction is not the same for each Common Share held by a Qualifying Person, then, for the purposes of this Section 7.1(h)(z)(i)(C), the kind and amount of securities, cash and other property receivable upon such Transaction for each Common Share held by a Qualifying Person shall be deemed to be the pro rata kind and amount per Common Share (determined on the basis of all outstanding Common Shares held by Qualifying Persons) actually received by all Qualifying Persons; and

(D)     if such Transaction constitutes a Sale Cash and Securities Transaction that is a De Minimis Sale Cash and Securities Transaction, then, at the effective time of the consummation of such

26

Transaction, any Warrants not exercised prior to the closing of such Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the Black-Scholes Value of each such Warrant as of the date of the consummation of the Transaction; and

(ii)    if such Transaction is a Private Sale Transaction, then, at the effective time of the consummation of such Private Sale Transaction, any Warrants not exercised prior to the closing of such Private Sale Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the Black-Scholes Value of each such Warrant in cash as of the date of the consummation of the Private Sale Transaction;

(iii)    for purposes of Section 7.1(h)(z)(i), if, as the result of rights of election, the kind or amount of securities, cash and other property receivable upon a Sale Cash and Securities Transaction is not the same for each Common Share held by a Qualifying Person, then the kind and amount of securities, cash and other property receivable upon such Transaction for each Common Share held by a Qualifying Person shall be deemed to be the pro rata kind and amount per Common Share (determined on the basis of all outstanding Common Shares held by Qualifying Persons) actually received by all Qualifying Persons;

(iv)    except as otherwise specified in Section 7.1(h)(z)(i), the rights and obligations of the Equity Issuer (or, in the event of a Non-Surviving Transaction such other Person) and the Holders in respect of Substituted Property or Substituted Securities shall be substantially unchanged to be as nearly equivalent as may be practicable to the rights and obligations of the Equity Issuer and Holders in respect of Common Shares hereunder as set forth in Section 3.1 hereof;

(v)    with respect to any Transaction, such written instrument under clause (i) above shall provide for adjustments which, for events subsequent to the effective date of such written instrument shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 7. The above provisions of this Section 7.1(h) shall similarly apply to successive Transactions.

(i)    <u>Warrants Deemed Exercisable</u>.  For purposes solely of this Section 7, the number of Common Shares which the holder of any Warrant would have been entitled to receive had such Warrant been exercised in full at any time or into which any Warrant was exercisable at any time.

(j)    <u>Notice of Adjustment</u>.  Upon the occurrence of each adjustment of the Exercise Price or the number of Common Shares into which a Warrant is exercisable pursuant to this Section 7.1, the Equity Issuer at its expense shall promptly:

27

(i)       compute such adjustment in accordance with the terms hereof;

(ii)      after such adjustment becomes effective, deliver to all Holders, in accordance with Section 14.1(d) and Section 14.2, a notice setting forth such adjustment and showing in reasonable detail the facts upon which such adjustment is based; and

(iii)     deliver to the Warrant Agent a certificate of the Secretary, Treasurer, Chief Accounting Officer, or Chief Financial Officer of the Equity Issuer setting forth the Exercise Price and the number of Common Shares into which each Warrant is exercisable after such adjustment and setting forth a brief statement of the facts requiring such adjustment and the computation by which such adjustment was made (including a description of the basis on which the Current Market Price of the Common Shares was determined).  As provided in Section 13, the Warrant Agent shall be entitled to rely on such certificate and shall be under no duty or responsibility with respect to any such certificate, except to exhibit the same from time to time at the Corporate Agency Office to any Holder desiring an inspection thereof during reasonable business hours.  The Equity Issuer hereby agrees that it will provide the Holders and the Warrant Agent with reasonable notice of any Adjustment Event set forth in this Section 7.1. The Equity Issuer further agrees that it will provide to the Holders and Warrant Agent with any new or amended exercise terms.  The Warrant Agent shall have no obligation under any section of this Agreement to determine whether an Adjustment Event has occurred or to calculate any of the adjustments set forth herein.

7.2    Fractional Interest.  The Equity Issuer shall not be required upon the exercise of any Warrant to issue any fractional Common Shares, but may, in lieu of issuing any fractional Common Shares make an adjustment therefore in cash on the basis of the Current Market Price per Common Share on the date of such exercise.  If Warrants evidenced by more than one Book-Entry Warrants evidencing shall be exercised at the same time by the same Holder, the number of full Common Shares which shall be issuable upon such exercise thereof shall be computed on the basis of the aggregate number of Warrants so to be exercised.  The Holders, by their acceptance of Warrants, expressly waive their right to receive any fraction of a Common Share if such amount of cash is paid in lieu thereof.  The Equity Issuer shall provide an initial funding of one thousand dollars ($1,000.00) for the purpose of issuing cash in lieu of fractional shares.  From time to time thereafter, Warrant Agent may request additional funding to cover fractional payments.  The Warrant Agent shall have no obligation to make fractional payments unless the Equity Issuer shall have provided the necessary funds to pay in full all amounts due and payable with respect thereto.

7.3    No Other Adjustments.  Except in accordance with Section 7.1, the applicable Exercise Price and the number of Common Shares obtainable upon exercise of any Warrant will not be adjusted for the issuance of Common Shares or any securities convertible into or exchangeable for Common Shares or carrying the right to subscribe to and purchase any of the foregoing, including, without limitation:

(i)     upon the issuance of any other securities by the Equity Issuer on or after the Original Issue Date, whether or not contemplated by the Plan, or upon the issuance of Common Shares upon the exercise of any such securities;

(ii)     upon the issuance of any Common Shares or other securities or any payments pursuant to any management or other equity incentive plan of the Equity Issuer;

(iii)     upon the issuance of any Common Shares pursuant to the exercise of the Warrants or of the Series B Warrants; or

(iv)     upon the issuance of any Common Shares or other securities of the Equity Issuer in connection with a business acquisition, strategic alliance, joint venture, or similar transaction.

**8.     [reserved.]**

**9.     Reservation and Authorization of Common Shares**.

The Equity Issuer covenants that, for the duration of the Exercise Period, the Equity Issuer will at all times reserve and keep available, from its authorized and unissued Common Shares solely for issuance and delivery upon the exercise of the Warrants and free of preemptive rights, such number of Common Shares and other securities, cash or property as from time to time shall be issuable upon the exercise in full of all Outstanding Warrants for cash.  The Equity Issuer further covenants that it shall, from time to time, take all steps reasonably necessary to increase the authorized number of Common Shares to such number of shares as shall be sufficient to deliver all Common Shares upon exercise in full of all Outstanding Warrants, if at any time the authorized number of Common Shares remaining unissued would otherwise be insufficient to allow delivery of all the Common Shares then deliverable upon the exercise in full of all Outstanding Warrants. The Equity Issuer covenants that all Common Shares issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer and will be free from all taxes, liens and charges in respect of the issue thereof.  The Equity Issuer shall take all such actions as may be reasonably necessary to ensure that all such Common Shares may be so issued without violation of any applicable law or governmental regulation or any requirements of any U.S. national securities exchange upon which the Common Shares may be listed (except for official notice of issuance which shall be immediately delivered by the Equity Issuer upon each such issuance).

The Equity Issuer hereby represents and warrants to the Holders that the issuance of the Warrants and the issuance of Common Shares upon exercise thereof in accordance with the terms hereof will not constitute a breach of, or a default under, any other material agreements to which the Equity Issuer is a party on the date hereof.

**10.     Warrant Transfer Books**.

The Warrant Agent will maintain an office or offices (the "***Corporate Agency Office***") in the United States of America, where Warrants may be surrendered for registration of transfer or exchange and where Warrants may be surrendered for exercise of Warrants evidenced thereby, which office is 620 115th Ave., Brooklyn NY 11219 (Attn: Corporate Actions/Warrant Exercise)

29

on the Original Issue Date.  The Warrant Agent will give prompt written notice to all Holders of any change in the location of such office.

The Equity Issuer shall cause to be kept at the Corporate Agency Office the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Equity Issuer shall provide for the registration of Warrants and of transfers or exchanges of Warrants as herein provided.  Subject to Section 5.1(c), the transfer and exchange of Beneficial Interests in Global Warrant Certificates shall be effected through the Depositary, in accordance with this Agreement and the procedures of the Depositary therefor.

All Book-Entry Warrants issued upon any registration of transfer or exchange of Book-Entry Warrants shall be the valid obligations of the Equity Issuer, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Book-Entry Warrants surrendered for such registration of transfer or exchange.

No service charge shall be made for any registration of transfer or exchange of Warrants; provided, however, the Equity Issuer may require payment of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed in connection with any registration of transfer or exchange.  The Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes and/or charges unless and until it is satisfied that all such payments have been made.

The Warrant Agent shall, upon request and at the expense of the Equity Issuer from time to time, deliver to the Equity Issuer such reports of registered ownership of the Warrants and such records of transactions with respect to the Warrants and the Common Shares as the Equity Issuer may request.  The Warrant Agent shall, upon reasonable advance notice, also make available to the Equity Issuer for inspection by the Equity Issuer's agents or employees, from time to time as the Equity Issuer may request, such books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Corporate Agency Office during normal business hours.

The Warrant Agent shall keep copies of this Agreement and any notices given to Holders hereunder available for inspection, upon reasonable advance notice, by the Holders during normal business hours at the Corporate Agency Office.  The Equity Issuer shall supply the Warrant Agent from time to time with such numbers of copies of this Agreement as the Warrant Agent may request.

**11.    Warrant Holders**.

11.1    No Voting or Dividend Rights.

(a)    No Holder of any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Shares of the Equity Issuer, including, without limitation, the right to vote, to receive dividends and other distributions as a holder of Common Shares or to receive notice of, or attend, meetings or any other proceedings of the holders of Common Shares.

(b)     No consent of any Holder of Warrants shall be required with respect to any action or proceeding of the Equity Issuer.

(c)     Except as provided in Section 6, no Holder of Warrants, by reason of the ownership or possession of a Warrant, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Shares prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant.

(d)     No Holder of Warrants shall have any right not expressly conferred hereunder or under, or by applicable law with respect to, the Warrants held by such Holder.

11.2    Rights of Action.  All rights of action against the Equity Issuer in respect of this Agreement, except rights of action vested in the Warrant Agent, are vested in the Holders of the Warrants, and any Holder of any Warrant, without the consent of the Warrant Agent or the Holder of any other Warrant, may, in such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Equity Issuer suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Agreement.

**12.    Information and Confidentiality.**

12.1    Reporting and Disclosure.

(a)     Subject to Section 12.2, Holders (other than Holders that are Competitors) shall be entitled to receive from the Equity Issuer the following information:  (i) within 65 days (or 150 days in the case of the first fiscal quarter containing the Effective Date and 90 days in the case of the first full fiscal quarter after the Effective Date occurs) after the end of each of the first three fiscal quarters of each fiscal year (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal quarter ending after the Effective Date, quarterly unaudited consolidated financial statements of the Equity Issuer and its Subsidiaries; and (ii) within 120 days (or 135 days in the case of the first fiscal year ending after the Effective Date) following the conclusion of each of the Equity Issuer's fiscal years ending after the Effective Date (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal year ending after the Effective Date, annual audited consolidated financial statements of the Equity Issuer and its Subsidiaries (clauses (i) and (ii) collectively, the "***Financial Statements***"); and (iii) the information if, as and when  provided to the noteholders or trustee, as applicable, pursuant to Section 3.10(a) of the New Indenture (or any substantially similar provision in connection with any amendment to the New Indenture or any refinancing indebtedness thereof), including, for the avoidance of doubt, the Financial Statements; *provided*, *however*, that if the Equity Issuer files the Financial Statements described in this Section 12.1(a) with the Securities and Exchange Commission, the requirement to deliver the Financial Statements pursuant to clauses (i) and (ii) shall be deemed satisfied. For the avoidance of doubt, if required pursuant to clauses (i) and (ii), Intelsat Jackson Holdings S.A. or one of its direct or indirect parent entities may provide the Financial Statements in the case of the fiscal year ending December 31, 2021. Reasonably promptly following the release of each of the quarterly unaudited financial statements, the Equity Issuer will provide a video and/or a telephonic presentation (which may be a single presentation

31

held together with other securityholders or holders of indebtedness of the Equity Issuer and its Affiliates) to the Representatives of Holders to discuss the Equity Issuer's financial condition and results of operations, following which presentation the Equity Issuer will allow the Representatives of Holders to ask reasonable questions. Any participant in quarterly calls (including bona fide potential transferees permitted in accordance with the terms hereof) (A) shall not be a Competitor of the Equity Issuer and each Holder hereby represents and warrants to the same as to itself, its Representatives and its bona fide potential transferees that participate in such calls, and (B) shall be subject to Section 12.2; *provided,* that each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of Section 12.2 if such Representative or recipient were party to this Agreement. With respect to any recipient who is a bona fide potential transferee of Warrants, the applicable Holder must first comply with Section 12.2 prior to sharing any such information.

(b)    The Equity Issuer shall use commercially reasonable efforts to promptly post all such information required by this Section 12.1 on a website (which may be nonpublic, require a confidentiality acknowledgement, with such acknowledgment being deemed to satisfy the requirement for a non-disclosure agreement as set forth in Section 12.2(c) and shall be maintained using commercially reasonable efforts by the Equity Issuer or a third party) (the "*Holder Website*") to which access will be given to the Holders and bona fide prospective investors or bona fide potential transferees (with the exception of Competitors) in the Warrants.

12.2    Confidentiality. The Warrant Agent and each Holder acknowledges that any notices or information furnished, including verbally, pursuant to this Agreement, including the Financial Statements and any information actually provided pursuant to Section 12.1(a)(iii), (the "*Confidential Information*") is confidential and competitively sensitive. The Warrant Agent and each Holder shall use, and shall cause any Person to whom Confidential Information is disclosed by the Warrant Agent or such Holder pursuant to clause (A) below, to use the Confidential Information only in connection with its ownership of the Warrants and not for any other purpose (including to disadvantage competitively the Equity Issuer, the Warrant Agent, or any other Holder). The Warrant Agent and each Holder shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(a)    to the Warrant Agent or the Holder's Representatives in the normal course of the performance of their duties for the Warrant Agent or such Holder (it being understood that such Representatives shall be informed by the Holder of the confidential nature of such information and shall be directed to treat such information in accordance with this Section 12.2;

(b)    to the extent required by applicable law, rule or regulation or requested by any regulatory or self-regulatory authority in connection with the conduct of its ordinary oversight activities; provided that the Warrant Agent and the Holder shall take reasonable steps to minimize the extent of any such required disclosure and give the Equity Issuer prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Equity Issuer may, at its sole expense, seek an appropriate protective order or similar relief (and the Warrant Agent and Holder, as applicable, shall cooperate with such efforts by the Equity Issuer, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall use reasonable best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information);

32

(c)      to any Person to whom the Warrant Agent or Holder is contemplating a transfer of its Warrants permitted in accordance with the terms hereof; provided that such person is not prohibited from receiving such information pursuant to this Section 12.2 and prior to such disclosure such potential transferee is advised of the confidential nature of such information and executes a non-disclosure agreement in a form consistent with the provisions of this Section 12.2 and which agreement is independently enforceable by the Equity Issuer and includes a certification that such Person is not a Competitor of the Equity Issuer (which, for the avoidance of doubt, shall be deemed satisfied if such Person has accepted the confidentiality acknowledgement required prior to being granted access to the Holder Website);

(d)      to any regulatory authority or rating agency to which the Warrant Agent or the Holder or any of its respective Affiliates is subject or with which it has regular dealings, solely (I) as long as such authority or agency is advised of the confidential nature of such information and (II) such information is provided as the result of a routine request not targeted to the Equity Issuer or any of its Subsidiaries;

(e)      in connection with the Warrant Agent or the Holder's or their respective Affiliates' normal fund raising, marketing, informational or reporting activities or to any bona fide prospective purchaser of the equity or assets of the Warrant Agent or Holder or their respective Affiliates, or prospective merger partner of the Warrant Agent or of the Holder or their respective Affiliates; provided that prior to such disclosure, if any Confidential Information is shared with such Persons, the Persons to whom such information is disclosed are advised of the confidential nature of such information and are subject to customary confidentially obligations with respect to such information; or

(f)      if the prior written consent of the Equity Issuer shall have been obtained.

Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Equity Issuer, the Warrant Agent, or the Holder. The restrictions contained in this Section 12.2 shall terminate eighteen (18) months following the date on which the Holder ceases to own any Warrants.

Confidential Information does not include information that: (A) is or becomes generally available to the public (including as a result of any information filed or submitted by the Equity Issuer with the Commission) other than as a result of a disclosure by the Warrant Agent or the Holder or their respective Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement, (B) is or was in the possession of the Warrant Agent or Holder or their respective Representatives on a non-confidential basis prior to its disclosure to the Warrant Agent or the Holder or their Representatives by the Equity Issuer, or (C) was or becomes available to the Warrant Agent or Holder or their respective Representatives on a non-confidential basis from a source other than the Equity Issuer, which source is or was (at the time of receipt of the relevant information) not, to the best of the Warrant Agent's or Holder's or their respective Representatives' knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Equity Issuer or another Person.

33

**13.      Concerning the Warrant Agent.**

Sections 13.1, 13.2, 13.3, 13.4, 13.5, and 13.6 shall survive the expiration of the Warrants and the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.

13.1    Rights and Duties of the Warrant Agent.

(a)      The Equity Issuer hereby appoints the Warrant Agent to act as agent of the Equity Issuer as set forth in this Agreement.  The Warrant Agent hereby accepts the appointment as agent of the Equity Issuer and agrees to perform that agency upon the express terms and conditions set forth in this Agreement and in the Warrant Statements or as the Equity Issuer and the Warrant Agent may hereafter agree in writing, by all of which the Equity Issuer and the Holders of Warrants, by their acceptance thereof, shall be bound.

(b)      The Warrant Agent shall not, by any act hereunder, be deemed to make any representations as to validity or authorization of (i) the Warrants, (ii) any securities or other property delivered upon exercise of any Warrant, (iii) the accuracy of the computation of the number or kind or amount of stock or other securities or other property deliverable upon exercise of any Warrant, (iv) the correctness of any of the representations of the Equity Issuer made in such certificates that the Warrant Agent receives; or (v) any of the statements of act or recitals contained in this Agreement.  The Warrant Agent shall not at any time have any duty to calculate or determine whether any facts exist that may require any adjustments pursuant to Section 7 hereof with respect to the kind and amount of shares or other securities or any property issuable to Holders upon the exercise of Warrants required from time to time.  The Warrant Agent shall have no duty or responsibility to determine the accuracy or correctness of such calculation or with respect to the methods employed in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any Common Shares or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to Section 7 hereof, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Equity Issuer to make any cash payment or to issue, transfer or deliver any Common Shares or other securities or property upon any exercise or upon any adjustment pursuant to Section 7 hereof or to comply with any of the covenants of the Equity Issuer contained in Section 7 hereof.

(c)      The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement or in the Warrant Statements or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Equity Issuer only.

(d)      The Warrant Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any holder of Warrants with respect to any action or default by the Equity Issuer, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Equity Issuer.

34

(e)     The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorney or agents, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorney or agents or for any loss to the Equity Issuer resulting from any such act, default, neglect or misconduct, absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof.

(f)     The Warrant Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document, or any security delivered to it, and believed by it to be genuine and to have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Equity Issuer with respect to any matter relating to its acting as Warrant Agent hereunder.

(g)     The Warrant Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(h)     The Warrant Agent shall not be liable or responsible for any failure of the Equity Issuer to comply with any of its obligations relating to any registration statement filed with the Commission or this Agreement, including without limitation obligations under applicable regulation or law.

(i)     The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Equity Issuer of any Warrants authenticated by the Warrant Agent and delivered by it to the Equity Issuer pursuant to this Agreement or for the application by the Equity Issuer of the proceeds of the issue and sale, or exercise, of the Warrants.

(j)     The Warrant Agent shall act hereunder solely as agent for the Equity Issuer, and its duties shall be determined solely by the express provisions hereof (and no duties or obligations shall be inferred or implied).  The Warrant Agent shall not assume any obligations or relationship of agency or trust with any of the owners or holders of the Warrants.

(k)     The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon any guaranty of signature by an "eligible guarantor institution" that is a member or participant in the Securities Transfer Agents Medallion Program or other comparable "signature guarantee program" or insurance program in addition to, or in substitution for, the foregoing.

(l)     In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Equity Issuer, the Holder of any Warrant or any other person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Equity Issuer which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(m)     Reliance on Equity Issuer Statement.  Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Equity Issuer prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer and delivered to the Warrant Agent.  The Warrant Agent may rely upon such statement, and will be indemnified and held harmless for such reliance, and shall not be held liable in connection with any delay in receiving such statement.

(n)     The Warrant Agent shall have no responsibility to the Equity Issuer, any Holders of Warrants or any holders of Common Shares for interest or earnings on any moneys held by the Warrant Agent pursuant to this Agreement.

(o)     The Warrant Agent shall not be required to take notice or be deemed to have notice of any event or condition hereunder, including any event or condition that may require action by the Warrant Agent, unless the Warrant Agent shall be specifically notified in writing of such event or condition by the Equity Issuer, and all notices or other instruments required by this Agreement to be delivered to the Warrant Agent must, in order to be effective, be received by the Warrant Agent as specified in Section 14.1 hereof, and in the absence of such notice so delivered, the Warrant Agent may conclusively assume no such event or condition exists.

13.2   Limitation of Liability.

(a)     The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction).  Notwithstanding anything contained herein to the contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Equity Issuer to Warrant Agent as fees and charges, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from Warrant Agent is being sought.  Neither party to this Agreement shall be liable to the other party for any consequential, indirect, special or incidental damages under any provisions of this Agreement or for any consequential, indirect, punitive, special or incidental

36

damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

(b)    Exclusions.  The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant. The Warrant Agent shall not be responsible for any breach by the Equity Issuer of any covenant or condition contained in this Agreement or in any Warrant.  The Warrant Agent shall not be responsible to make any adjustments required under the provisions of Section 7 hereof or responsible for the manner, method, or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Shares to be issued pursuant to this Agreement or any Warrant or as to whether any Common Shares shall, when issued, be valid and fully paid and non-assessable.

13.3    Indemnification.

(a)    The Equity Issuer covenants and agrees to indemnify and to hold the Warrant Agent harmless against any costs, expenses (including reasonable and documented fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant hereto; provided, however, that such covenant and agreement does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of, or arising out of, its gross negligence, bad faith, or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction).  The costs and expenses incurred in enforcing this right of indemnification shall be paid by the Equity Issuer.

(b)    Instructions.  From time to time, the Equity Issuer may provide the Warrant Agent with instructions, by Equity Issuer Order or otherwise, concerning the services performed by the Warrant Agent hereunder.  In addition, at any time the Warrant Agent may apply to any officer of the Equity Issuer for instruction, and may consult with legal counsel for the Warrant Agent or the Equity Issuer with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement. Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Equity Issuer for any action taken, suffered or omitted to be taken by Warrant Agent in reliance upon any Equity Issuer instructions or upon the advice or opinion of such counsel.  Warrant Agent shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from the Equity Issuer.

13.4    Right to Consult Counsel.  The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Equity Issuer), and the Warrant Agent shall incur no liability or responsibility to the Equity Issuer or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such counsel.

13.5     Compensation and Reimbursement.  The Equity Issuer agrees to pay the Warrant Agent from time to time compensation for all reasonable fees and expenses relating to its services hereunder as the Equity Issuer and the Warrant Agent may agree in writing from time to time and to reimburse the Warrant Agent for all of its reasonable expenses and disbursements, including reasonable counsel fees and other disbursements incurred in connection with the preparation, delivery, negotiation, amendment, administration and execution of this Agreement and the exercise and performance of its duties hereunder.

13.6     Warrant Agent May Hold Equity Issuer Securities.  The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Equity Issuer or become pecuniarily interested in any transaction in which the Equity Issuer may be interested, or contract with or lend money to the Equity Issuer or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Equity Issuer or for any other legal entity.  Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Equity Issuer or for any other legal entity.

13.7     Resignation and Removal; Appointment of Successor.

(a)     The Warrant Agent may resign its duties and be discharged from all further duties and liability hereunder (except liability arising as a result of the Warrant Agent's own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction)) after giving thirty (30) days' prior written notice to the Equity Issuer.  The Equity Issuer may remove the Warrant Agent upon thirty (30) days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as aforesaid.  The Warrant Agent shall, at the expense of the Equity Issuer, cause notice to be given in accordance with Section 14.1(d) to the Equity Issuer of said notice of resignation or notice of removal, as the case may be.  Upon such resignation or removal, the Equity Issuer shall appoint in writing a new Warrant Agent.  If the Equity Issuer shall fail to make such appointment within a period of thirty (30) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent.  Any new Warrant Agent, whether appointed by the Equity Issuer or by such a court, shall be a Person (other than a natural person) doing business under the laws of the United States or any state thereof in good standing, authorized under such laws to act as Warrant Agent, and having a combined capital and surplus (together with its Affiliates) of not less than $25,000,000. The combined capital and surplus of such new Warrant Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such Warrant Agent prior to its appointment; provided, however, such reports are published at least annually pursuant to law or to the requirements of a federal or state supervising or examining authority.  After acceptance in writing of such appointment by the new Warrant Agent, it shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be reasonably necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the reasonable

38

expense of the Equity Issuer and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent.  Not later than the effective date of any such appointment, the Equity Issuer shall file notice thereof with the resigning or removed Warrant Agent.  Failure to give any notice provided for in this <u>Section 13.7(a)</u>, however, or any defect therein, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a new Warrant Agent as the case may be.

(b)      Any Person into which the Warrant Agent or any new Warrant Agent may be merged, or any Person resulting from any consolidation to which the Warrant Agent or any new Warrant Agent shall be a party, shall be a successor Warrant Agent under this Agreement without any further act; <u>provided</u>, <u>however</u>, that such Person would be eligible for appointment as successor to the Warrant Agent under the provisions of <u>Section 13.7(a)</u>. Any such successor Warrant Agent shall promptly cause notice of its succession as Warrant Agent to be given in accordance with <u>Section 14.1(d)</u> to each Holder of a Warrant at such Holder's last address as shown on the Warrant Register.

**14.      Notices.**

14.1   <u>Notices Generally</u>.

(a)      Any request, notice, direction, authorization, consent, waiver, demand or other communication permitted or authorized by this Agreement to be made upon, given or furnished to or filed with the Equity Issuer or the Warrant Agent by the other party hereto or by any Holder shall be sufficient for every purpose hereunder if in writing, sent via trackable or first-class mail or delivered by hand (including by courier service) as follows:

if to the Equity Issuer, to:

Intelsat Emergence S.A. (to be renamed Intelsat S.A.)
*société anonyme*
4, rue Albert Borschette
L-1246 Luxembourg
RCS Luxembourg B. 264124
Attention:      Legal Department

and with a copy (which shall not constitute notice to the Equity Issuer) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:     Edward O. Sassower, P.C.
                    Steven N. Serajeddini, P.C.
                    Aparna Yenamandra
                    Edward.Sassower@Kirkland.com
                    Steven.Serajeddini@Kirkland.com
                    Aparna.Yenamandra@Kirkland.com

if to the Warrant Agent, to:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attention:      Corporate Actions

or, in either case, such other address as shall have been set forth in a notice delivered in accordance with this Section 14.1(a).

(b)      All such communications shall be effective when sent.

(c)      Any Person that telecopies any communication hereunder to any Person shall, on the same date as such telecopy is transmitted, also send, by trackable or first class mail, postage prepaid and addressed to such Person as specified above, an original copy of the communication so transmitted.

(d)      Except as set forth in the last paragraph of this Section 14.1(d), where this Agreement provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and (x) sent by electronic mail or (y) mailed, by trackable or first-class mail, to each Holder affected by such event, at the address of such Holder as it appears in the Warrant Register.  In any case where notice to Holders is given by mail or electronic mail, neither the failure to mail or transmit such notice, nor any defect in any notice so mailed or transmitted, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.  Where this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification as shall be made by a method approved by the Warrant Agent as one which would be most reliable under the circumstances for successfully delivering the notice to the addressees shall constitute a sufficient notification for every purpose hereunder.

Where this Agreement provides for notice of any event to a Holder of a Global Warrant Certificate, such notice shall be sufficiently given if given to the Depositary (or its designee), pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.

14.2    Required Notices to Holders.  In the event the Equity Issuer shall:

(a)      take any action that would result in an adjustment to the Exercise Price and/or the number of Common Shares issuable upon exercise of a Warrant pursuant to Section 7.1;

(b)      consummate any Winding Up; or

40

(c)      consummate any Transaction (each of (a), (b) or (c), an "**_Action_**");

then, in each such case, the Equity Issuer shall deliver to the Warrant Agent and, unless the Equity Issuer has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such Action, the Equity Issuer shall deliver (or cause to be delivered ) to each Holder of a Warrant, in accordance with Section 14.1(d) hereof, a written notice of such Action, including, in the case of an action pursuant to Section 14.2(a), the information required under Section 7.1(j)(ii).  Such notice shall be given promptly after taking such Action.

If at any time the Equity Issuer shall cancel any of the Actions for which notice has been given under this Section 14.2 prior to the consummation thereof, the Equity Issuer shall give each Holder prompt notice of such cancellation in accordance with Section 14.1(d), unless the Equity Issuer has made a filing with the Commission, including pursuant to a current report on Form 8-K, which filing discloses the cancellation of such Actions.  For the avoidance of doubt, if at any time the Equity Issuer shall cancel any of the Actions for which notice has been given under this Section 14.2 prior to the consummation thereof, the Equity Issuer shall give Warrant Agent prompt notice of such cancellation in accordance with Section 14.1(d).

## 15.    **Inspection**.

The Warrant Agent shall cause a copy of this Agreement to be available at all reasonable times at the office of the Warrant Agent for inspection by any Holder of any Warrant.  The Warrant Agent may require any such Holder to submit its Warrant Statement for inspection by the Warrant Agent.

## 16.    **Amendments**.

(a)      Except as provided in paragraphs (b) and (c) of this Section 16, this Agreement may be amended by the Equity Issuer and the Warrant Agent with the consent of the Required Warrant Holders.

(b)      Notwithstanding the foregoing, the Equity Issuer and the Warrant Agent may, without the consent or concurrence of the Holders of the Warrants, by supplemental agreement or otherwise, amend this Agreement for the purpose of making any changes or corrections in this Agreement that (i) are required to cure any ambiguity or to correct or supplement any defective or inconsistent provision or clerical omission or mistake or manifest error herein contained or (ii) add to the covenants and agreements of the Equity Issuer in this Agreement further covenants and agreements of the Equity Issuer thereafter to be observed, or surrender any rights or powers reserved to or conferred upon the Equity Issuer in this Agreement; provided, however, that in either case such amendment shall not adversely affect the rights or interests of the Holders of the Warrants hereunder in any material respect.

(c)      The consent of each Holder of any Warrant affected thereby shall be required for any supplement or amendment to this Agreement or the Warrants that would: (i) increase the Exercise Price or decrease the number of Common Shares receivable upon exercise of Warrants, in each case other than as provided in Section 7.1; (ii) cause the Expiration Date to be changed to an earlier date; or (iii) modify the provisions contained in Section 7.1 in a manner adverse to the Holders of Warrants.

41

(d)     The Warrant Agent shall join with the Equity Issuer in the execution and delivery of any such amendment unless such amendment affects the Warrant Agent's own rights, duties or immunities hereunder, in which case the Warrant Agent may, but shall not be required to, join in such execution and delivery; provided that, as a condition precedent to the Warrant Agent's execution of any amendment to this Agreement, the Equity Issuer shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment is in compliance with the terms of this Section 16.  Upon execution and delivery of any amendment pursuant to this Section 16, such amendment shall be considered a part of this Agreement for all purposes and every Holder of a Warrant theretofore or thereafter delivered hereunder shall be bound thereby.

(e)     Promptly after the execution by the Equity Issuer and the Warrant Agent of any such amendment, unless the Equity Issuer has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such adjustment, the Equity Issuer shall give notice to the Holders of Warrants, setting forth in general terms the substance of such amendment, in accordance with the provisions of Section 14.1(d).  Any failure of the Equity Issuer to mail such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

## 17.    Waivers.

The Equity Issuer may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Equity Issuer has obtained the written consent of the Required Warrant Holders, as required pursuant to Section 16.

## 18.    Successor to Equity Issuer.

So long as Warrants remain Outstanding, the Equity Issuer will not enter into any Transaction unless the acquirer (a "*Successor Equity Issuer*") shall expressly assume by a supplemental agreement, executed and delivered to the Warrant Agent, in form reasonably satisfactory to the Warrant Agent, the due and punctual performance of every covenant of this Agreement on the part of the Equity Issuer to be performed and observed.  Upon the consummation of such Transaction, the acquirer shall succeed to, and be substituted for, and may exercise every right and power of, the Equity Issuer under this Agreement with the same effect as if such acquirer had been named as the Equity Issuer herein.

## 19.    Headings.

The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

## 20.    Counterparts.

This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which together constitute one and the same instrument.  A signature to this Agreement transmitted electronically shall have the same authority, effect and enforceability as an original signature.

42

**21.     Severability**.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of the other provisions hereof; provided, that, if any provision of this Agreement, as applied to any party or to any circumstance, is adjudged by a court or governmental body not to be enforceable in accordance with its terms, the parties agree that the court or governmental body making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced; further, provided, that, if such excluded provision shall affect the rights, immunities, liabilities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately upon written notice to the Equity Issuer.

**22.     No Redemption**.

The Warrants shall not be subject to redemption by the Equity Issuer or any other Person; provided, that, the Warrants may be acquired by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of this Agreement.

**23.     Persons Benefiting**.

This Agreement shall be binding upon and inure to the benefit of the Equity Issuer, the Warrant Agent and the Holders from time to time.  Nothing in this Agreement, express or implied, is intended to confer upon any person other than the Equity Issuer, the Warrant Agent and the Holders any rights or remedies under or by reason of this Agreement or any part hereof, and all covenants, conditions, stipulations, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and of the Holders.  Each Holder, by acceptance of acceptance of a Warrant or of such interest in a Warrant, agrees to all of the terms and provisions of this Agreement applicable thereto.

**24.     Applicable Law**.

THIS AGREEMENT, EACH WARRANT ISSUED HEREUNDER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO AND THERETO, INCLUDING THE INTERPRETATION, CONSTRUCTION, VALIDITY AND ENFORCEABILITY THEREOF, SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.

**25.     Entire Agreement**.

This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

**26.     Force Majeure**.

43

Notwithstanding anything to the contrary contained herein, the Warrant Agent will not be liable for any delays or failures in performance resulting from acts beyond its reasonable control including, without limitation, acts of God, terrorist acts, shortage of supply, disruptions in public utilities, interruptions or malfunction of computer facilities, or loss of data due to power failures or mechanical difficulties with information storage or retrieval systems, labor difficulties, war, pandemics, epidemics or civil unrest.

**27.    Further Assurances.**

The Equity Issuer shall perform, acknowledge and deliver or cause to be performed, acknowledged and delivered all such further and other acts, documents, instruments and assurances as may be reasonably required by the Warrant Agent for the carrying out or performing by the Warrant Agent of the provisions of this Agreement.

**28.    Confidentiality.**

The Warrant Agent and the Equity Issuer agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services set forth in the attached schedule shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions) or to such party's advisors (including its attorneys).  However, each party may disclose relevant aspects of the other party's confidential information to its officers, affiliates, agents, subcontractors and employees to the extent reasonably necessary to perform its duties and obligations under this Agreement and such disclosure is not prohibited by applicable law.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.), a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg

By: _____

      Name:    José Toscano
      Title:     Delegate of the Board of Directors

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, as Warrant Agent

By: _____

      Name:
      Title:

[*Signature Page to Series A Warrant Agreement*]

EXHIBIT A



EXHIBIT B-1

## BOOK-ENTRY STATEMENT WARRANT LEGEND

THESE WARRANTS AND ANY COMMON SHARES ISSUABLE UPON EXERCISE OF THE WARRANTS HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145; PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN "UNDERWRITER" AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

THESE WARRANTS AND ANY COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE WARRANTS REPRESENTED HEREBY IN THE WARRANT AGREEMENT, ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**WARRANT AGREEMENT**"). IN ADDITION, THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) (THE "**EQUITY ISSUER**"), DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**SHAREHOLDERS AGREEMENT**"). NO REGISTRATION OR TRANSFER OF THE WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING, AS APPLICABLE, COMPLIANCE WITH THE WARRANT AGREEMENT OR THE SHAREHOLDERS AGREEMENT, AS APPLICABLE.

1

THE EQUITY ISSUER OR THE WARRANT AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS STATEMENT A COPY OF THE SHAREHOLDERS AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE COMMON SHARES ISSUABLE UPON EXERCISE OF THE WARRANTS, UPON WRITTEN REQUEST TO THE EQUITY ISSUER AT ITS PRINCIPAL PLACE OF BUSINESS. THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE EQUITY ISSUER.

EXHIBIT B-2

**FACE OF SERIES A GLOBAL WARRANT CERTIFICATE**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) GLOBAL
WARRANT CERTIFICATE**

**EVIDENCING**

**SERIES A WARRANTS TO SUBSCRIBE TO AND PURCHASE COMMON SHARES**

No. 1                                                                    CUSIP No.  L5217E104

UNLESS THIS GLOBAL SERIES A WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) (THE "**EQUITY ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL SERIES A WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE EQUITY ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THIS WARRANT HAS BEEN, AND THE SECURITIES REPRESENTED HEREBY WILL BE, ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "**BANKRUPTCY CODE**"). THIS WARRANT AND THE SECURITIES REPRESENTED BY THIS WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE EQUITY ISSUER IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE EQUITY ISSUER AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY

REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE WARRANTS REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER IN THE WARRANT AGREEMENT OF THE EQUITY ISSUER, DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**WARRANT AGREEMENT**"). IN ADDITION, THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF THE EQUITY ISSUER, DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**SHAREHOLDERS AGREEMENT**"). NO REGISTRATION OR TRANSFER OF THE WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING, AS APPLICABLE, COMPLIANCE WITH THE WARRANT OR SHAREHOLDERS AGREEMENT, AS APPLICABLE. COPIES OF SUCH AGREEMENTS ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE EQUITY ISSUER. NO TRANSFER OF THIS WARRANT OR THE SECURITIES REPRESENTED BY THIS WARRANT WILL BE MADE ON THE BOOKS OF THE EQUITY ISSUER UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE SHAREHOLDERS AGREEMENT.

ONLY PARTIES TO THE SHAREHOLDERS AGREEMENT ARE ENTITLED TO EXERCISE THE RIGHTS OF HOLDERS UNDER THE SHAREHOLDERS AGREEMENT.  NO PERSON MAY BECOME A HOLDER OF COMMON SHARES PURSUANT TO ANY TRANSFER OF COMMON SHARES OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT, WHICH INCLUDES, AMONG THE ABOVE-REFERENCED RESTRICTIONS, RESTRICTIONS ON TRANSFERS TO "COMPETITORS" OF THE EQUITY ISSUER.  A THEN-CURRENT LIST OF SUCH COMPETITORS MAY BE OBTAINED BY CONTACTING THE EQUITY ISSUER.

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**

No. 1

6,709,012 Warrants
CUSIP No. L5217E104

THIS CERTIFIES THAT, for value received, CEDE & CO., or registered assigns, is the registered owner of the number of Warrants to subscribe to and purchase Common Shares of Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 264124 (the "*Equity Issuer*", which term includes any successor thereto under the Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, the "*Warrant Agreement*"), dated as of February [●], 2022, between the Equity Issuer and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement)) specified above or such lesser number as may from time to time be endorsed on the "Schedule of Decreases in Warrants" attached hereto, and is entitled, subject to and upon compliance with the provisions hereof and of the Warrant Agreement, at such Holder's option, at any time when the Warrants evidenced hereby are exercisable, to subscribe to and purchase from the Equity Issuer one (1) Common Share of the Equity Issuer for each Warrant evidenced hereby, at the purchase price of $60.15 (as adjusted from time to time, the "*Exercise Price*"), payable in full at the time of subscription and purchase, the number of Common Shares into which and the Exercise Price at which each Warrant shall be exercisable each being subject to adjustment as provided in Section 7 of the Warrant Agreement.

All Common Shares issuable by the Equity Issuer upon the exercise of Warrants and payment of the Exercise Price shall, upon such issuance, be duly and validly issued and fully paid and nonassessable.  The Equity Issuer shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of Common Shares on exercise of Warrants. The Equity Issuer or Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of Common Shares in book-entry form or any registered forms for Common Shares or payment of cash or other property to any Recipient other than, in each case, the Holder of the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Equity Issuer shall not be required to issue or deliver any Common Shares in book-entry form or any registered form or pay any cash until such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or to the Equity Issuer.

Each Warrant evidenced hereby may be exercised by the Holder hereof at the Exercise Price then in effect on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date in the Warrant Agreement.

Subject to the provisions hereof and of the Warrant Agreement, the Holder of this Global Warrant Certificate may exercise all or any whole number of the Warrants evidenced hereby by delivery to the Warrant Agent of the Exercise Form on the reverse hereof, setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder

thereof to the Warrant Agent, and delivering such Warrants by book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise complying with the Applicable Procedures in respect of the exercise of such Warrants together with payment in full of the Exercise Price as then in effect for each Common Share receivable upon exercise of each Warrant being submitted for exercise unless cashless exercise is being elected with respect thereto.  Any such payment of the Exercise Price is to be by wire transfer in immediately available funds to such account of the Equity Issuer at such banking institution as the Equity Issuer shall have designated from time to time.

Reference is hereby made to the further provisions of this Global Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Global Warrant Certificate has been countersigned by the Warrant Agent by manual or electronic signature of an authorized officer on behalf of the Warrant Agent, this Global Warrant Certificate shall not be valid for any purpose and no Warrant evidenced hereby shall be exercisable.

IN WITNESS WHEREOF, the Equity Issuer has caused this certificate to be duly executed.

Dated:  February [●], 2022

**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**

[SEAL]

By: _____
      José Toscano
      Delegate of the Board of Directors

ATTEST:

Countersigned:

American Stock Transfer & Trust
Company, LLC, as Warrant Agent

By: _____
            Authorized Agent

_____

**Reverse of Series A Global Warrant Certificate**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) SERIES A WARRANT CERTIFICATE**

**EVIDENCING**

**SERIES A GLOBAL WARRANTS TO PURCHASE COMMON SHARES**

The warrants evidenced hereby are one of a duly authorized issue of warrants of the Equity Issuer designated as its Series A Warrants to subscribe to and purchase Common Shares (the "*Warrants*"), limited in aggregate number to 6,709,012  Common Shares issued under and in accordance with the Warrant Agreement, dated as of February [●], 2022 (the "*Warrant Agreement*"), between the Equity Issuer and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement), to which the Warrant Agreement and all amendments thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Equity Issuer, the Warrant Agent, the Holders of Global Warrant Certificates and Warrant Statements, as applicable, and the owners of the Warrants evidenced thereby and of the terms upon which the Warrants are, and are to be, countersigned and evidenced.  A copy of the Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent for inspection by the Holder hereof.

The Warrant Agreement provides for certain adjustments to the number of Common Shares into which a Warrant is exercisable and the Exercise Price to be made in certain circumstances as more fully specified in the Warrant Agreement, including in Section 7 thereof.

Except as provided in the Warrant Agreement, all Outstanding Warrants shall expire and all rights of the Holders of the Global Warrant Certificate and the Warrant Statements evidencing such Warrants shall automatically terminate and cease to exist, as of 5:00 p.m., New York time, on the Expiration Date.  The "Expiration Date" means the date that is the fifth anniversary of the Effective Date.

In the event of the exercise of less than all of the Warrants evidenced hereby, a new Global Warrant Certificate of the same tenor and for the number of Warrants which are not exercised shall be issued by the Equity Issuer in the name or upon the written order of the Holder of this Global Warrant Certificate upon the cancellation hereof.

Global Warrant Certificates are issuable only in denominations of whole numbers of Warrants.  Upon surrender at the office of the Warrant Agent and payment of the charges specified herein and in the Warrant Agreement, this Global Warrant Certificate may be exchanged for Book-Entry Warrants in other authorized denominations or the transfer hereof may be registered in whole or in part in authorized denominations to one or more designated transferees; provided, however, that such other Book-Entry Warrants issued upon exchange or registration of transfer shall evidence the same aggregate number of Warrants as this Global Warrant Certificate.  The Equity Issuer shall cause to be kept at the office or offices of the Warrant Agent the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Equity Issuer shall provide for the registration

of the Global Warrant Certificates and Book-Entry Warrants, as applicable, and of transfers or exchanges of Global Warrant Certificates and Book-Entry Warrants, as applicable.  No service charge shall be made for any registration of transfer or exchange of Warrants; provided, however, the Equity Issuer may require payment of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrants.

Prior to due presentment of this Global Warrant Certificate for registration of transfer, the Equity Issuer, the Warrant Agent and any agent of the Equity Issuer or the Warrant Agent may treat the Person in whose name this Global Warrant Certificate is registered as the owner hereof for all purposes, and neither the Equity Issuer, the Warrant Agent nor any such agent shall be affected by notice to the contrary.

The Warrant Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Equity Issuer and the rights of the Holders of Global Warrant Certificates under the Warrant Agreement at any time by the Equity Issuer and the Warrant Agent with the consent of the Required Warrant Holders.

Until the exercise of any Warrant, subject to the provisions of the Warrant Agreement and except as may be specifically provided for in the Warrant Agreement, (i) no Holder of a Global Warrant Certificate or Warrant Statement evidencing any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Shares of the Equity Issuer, including, without limitation, the right to vote, to receive dividends and other distributions or to receive notice of, or attend meetings of, stockholders or any other proceedings of the Equity Issuer; (ii) the consent of any such Holder shall not be required with respect to any action or proceeding of the Equity Issuer; (iii) except as provided with respect to a Winding Up of the Equity Issuer, no such Holder, by reason of the ownership or possession of a Warrant or the Global Warrant Certificate or Warrant Statement, as applicable, representing the same, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions (except as specifically provided in the Warrant Agreement), paid, allotted or distributed or distributable to the stockholders of the Equity Issuer prior to or for which the relevant record date preceded the date of the exercise of such Warrant; and (iv) no such Holder shall have any right not expressly conferred by the Warrant, Global Warrant Certificate, or Warrant Statement held by such Holder.

This Global Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

All terms used in this Global Warrant Certificate which are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement.  In the event of any conflict between this Global Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

Exercise Form for Series A Warrants

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attn: Corporate Actions

Re: Intelsat Emergence S.A. (to be renamed Intelsat S.A.) Series A Warrant Agreement, dated as of February [●], 2022

In accordance with and subject to the terms and conditions hereof and of the Warrant Agreement dated as of February [●], 2022 (the "**_Warrant Agreement_**"), the undersigned Holder of this Warrant hereby irrevocably elects to exercise _____ Warrants and represents that for each of the Warrants evidenced hereby being exercised such Holder either has (please check one box only):

☐ tendered the Exercise Price in the aggregate amount of $_____ by wire transfer in immediately available funds to such account of the Equity Issuer at such bank account as the Equity Issuer has designated from time to time for such purpose;

or

☐ cashless exercise.

The undersigned, if not already a shareholder of the Equity Issuer, is concurrently delivering a joinder to the Shareholders Agreement.

The undersigned requests that the Common Shares issuable upon exercise be in fully registered form in such numbers of Common Shares and registered in such names and delivered in such manner as is specified in the instructions set forth below.

If the number of Warrants exercised is less than all of the Warrants evidenced hereby, (i) if the Warrants exercised are represented by a Global Warrant Certificate, the Warrant Agent shall endorse the "Schedule of Decreases in Warrants" attached hereto to reflect the Warrants being exercised or (ii) if the Warrants exercised are represented by Book-Entry Warrants, the undersigned requests that a new Book-Entry Warrant representing the remaining Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

Dated:   _____        Name:   _____
                                                  (Please Print)
_____
   (Insert Social Security or Other        Address:   _____
   Identifying Number of Holder)
                                         _____

                                         _____
                                                  Signature
                                         (Signature must conform in all respects to name
                                         of Holder as specified on the face of this Global
                                         Warrant Certificate and Warrant Statement and
                                         must bear a signature guarantee by a bank, trust
                                         company or member firm of a U.S. national
                                         securities exchange.)

Signature Guaranteed:

        Instructions (i) as to numbers of Common Shares issuable upon exercise and as to delivery
of such securities and any other property issuable upon exercise and (ii) if applicable, as to Book-
Entry Warrants evidencing unexercised Warrants:

<u>Assignment</u>

(Form of Assignment To Be Executed If Holder Desires To Transfer Warrants)

        FOR VALUE RECEIVED _____ hereby sells, assigns
and transfers unto

Please insert social security or
other identifying number

(Please print name and address including zip code)

the Warrants represented by the within Global Warrant Certificate or Warrant Statement, as
applicable, and does hereby irrevocably constitute and appoint _____ Attorney, to
transfer said Global Warrant Certificate or Warrant, as applicable, on the books of the within-
named Equity Issuer with full power of substitution in the premises.

Dated:   _____        Signature   _____

                                         (Signature must conform in all respects to name
                                         of Holder as specified on the face of this Global
                                         Warrant Certificate and Warrant Statement and
                                         must bear a signature guarantee by a bank, trust
                                         company or member firm of a U.S. national
                                         securities exchange.)

## SCHEDULE A

## SCHEDULE OF DECREASES IN WARRANTS

The following decreases in the number of Warrants evidenced by this Global Warrant Certificate have been made:

| Date | Amount of decrease in number of Warrants evidenced by this Global Warrant Certificate | Number of Warrants evidenced by this Global Warrant Certificate following such decrease | Signature of authorized signatory |
|------|------|------|------|

EXHIBIT C

**Cashless Exercise Examples**

---

**Legend[1]**

A = Common Share price (*e.g.* $11 USD);

AEP = Aggregate exercise price;

B = Exercise Price (*e.g.* $1 USD);

CV = Cash Value per Cash Value Warrant;

CW = The "Cash Value Warrants;"

E = Excess (in USD);

FS = Number of shares to be issued (unrounded);

TW = Total number of warrants exercised (*e.g.* 100);

X = Number of shares to be issued (rounded); and

Y = The number of Common Shares exercisable (one (1) Common Share).[2]

---

**1. U.S. Cashless Exercise.**

$$X = \frac{TW(A - B)}{A}$$

$$X = \frac{100 * (11 - 1)}{11}$$

$$X = 90^{3} \; (FS = 90.91)$$

---

[1]    For illustrative purposes only.  Operational definitions appear in <u>Section 3.7</u> to the Agreement.

[2]    Subject to adjustment as provided in <u>Section 7.1</u>.

[3]    *See* <u>Section 3.7</u> ("[I]f the result of the formula is not a full number of shares but a fractional amount, the number of shares issued shall be rounded down to the next full number.")

**2. Luxembourg Cashless Exercise.**

$$X = (TW - CW) * Y$$

$$CW = \frac{AEP}{CV}$$

$$AEP = TW * B$$

$$AEP = (100 * \$1) = \$100$$

$$CV\,(Cash\,Value) = Y * A$$

$$CW = \frac{\$100}{\$11} = 9.09$$

$$X = (100 - 9.09) * 1$$

$$X = 90\ (FS = 90.91)$$

**3. Cash Value Claim.**

$$CVC = CW * CV$$
$$CVC = (100/11) * (11)$$
$$CVC = 100\ (AEP)$$

**4. Excess Formula.**

$$E = (FS - X) * A$$
$$E = (90.91 - 90) * A$$
$$E = 10.01$$

**Exhibit D-2**

**Redline to New Series A Warrant Agreement filed on October 19, 2021**

*FilingForm of Execution* Version

<br><br>

**SERIES A WARRANT AGREEMENT**

**between**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**

[●]

**and**

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,**
**as Warrant Agent**

**Dated as of February [●], 202[●]2022**

**Series A Warrants to Subscribe to and Purchase Common Shares**

**TABLE OF CONTENTS**

|  |  |  | **Page** |
|---|---|---|---|
|  | Definitions | .................................................................................................................... | 1 |
| 2. | Book-Entry Warrants. | ................................................................................................. | ~~9~~**10** |
|  | Original Issuance of Warrants | ................................................................................ | ~~9~~**10** |
|  | Form of Warrants | ...................................................................................................... | ~~9~~**10** |
|  | Delivery of Book-Entry Warrants | .......................................................................... | ~~10~~**11** |
|  | Global Warrant Certificates | .................................................................................... | ~~10~~**11** |
|  | Transfer and Exchange of Book-Entry Warrants | ................................................ | 12 |
|  | Restrictions on Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Global Warrant Certificate | ...................................... | ~~12~~**13** |
|  | Withholding and Reporting Requirements | ............................................................ | ~~12~~**13** |
|  | Exercise and Expiration of Warrants | ................................................................... | ~~12~~**13** |
|  | Right to Acquire Common Shares Upon Exercise | .............................................. | ~~12~~**13** |
|  | Exercise and Expiration of Warrants | ................................................................... | ~~13~~**14** |
|  | Application of Funds upon Exercise of Warrants | .............................................. | 15 |
|  | [Payment of Taxes | ..................................................................................................... | ~~15~~**16** |
|  | [reserved]. | .................................................................................................................. | ~~15~~**16** |
|  | Shares Issuable | ......................................................................................................... | ~~15~~**16** |
|  | [Cashless Exercise | .................................................................................................. | 16 |
|  | Cost Basis Information | ............................................................................................ | 18 |
| 4. | ERISA Eligibility. | ..................................................................................................... | ~~18~~**19** |
| 5. | Transferability; No Restrictions. | .......................................................................... | ~~18~~**19** |
|  | General Restriction | ................................................................................................... | ~~18~~**19** |
|  | Exchange Listing | ...................................................................................................... | ~~19~~**20** |
|  | Dissolution, Liquidation or Winding up | .............................................................. | ~~19~~**20** |
|  | Adjustments | ............................................................................................................... | ~~20~~**21** |
|  | Adjustments | ............................................................................................................... | ~~20~~**21** |
|  | Fractional Interest | .................................................................................................... | ~~26~~**28** |
|  | No Other Adjustments | ............................................................................................. | ~~26~~**28** |
| 8. | [reserved.] | ................................................................................................................. | ~~26~~**28** |
|  | Reservation and Authorization of Common Shares | ........................................... | ~~26~~**28** |
|  | Warrant Transfer Books | .......................................................................................... | ~~27~~**29** |
|  | Warrant Holders | ....................................................................................................... | ~~28~~**30** |
|  | No Voting or Dividend Rights | ............................................................................... | ~~28~~**30** |
|  | Rights of Action | ....................................................................................................... | ~~28~~**30** |
| 12. | Information and Confidentiality. | ......................................................................... | ~~28~~**31** |
|  | Reporting and Disclosure | ....................................................................................... | ~~28~~**31** |
|  | Confidentiality | .......................................................................................................... | ~~29~~**32** |
| 13. | Concerning the Warrant Agent. | .......................................................................... | ~~31~~**34** |

~~i~~**ii**

13.1    Rights and Duties of the Warrant Agent. ..................................................... ~~31~~34

13.2    Limitation of Liability. ............................................................................. ~~33~~36

13.3    Indemnification. ...................................................................................... ~~34~~37

        Right to Consult Counsel ......................................................................... ~~35~~37

        Compensation and Reimbursement .......................................................... ~~35~~38

        Warrant Agent May Hold Equity Issuer Securities .................................... ~~35~~38

        Resignation and Removal; Appointment of Successor ................................ ~~35~~38

14.    Notices. .................................................................................................... ~~36~~39

        Notices Generally .................................................................................... ~~36~~39

        Required Notices to Holders ..................................................................... ~~38~~40

Inspection .......................................................................................................... ~~38~~41

Amendments ...................................................................................................... ~~38~~41

Waivers .............................................................................................................. ~~39~~42

Successor to Equity Issuer ................................................................................. ~~39~~42

Headings ............................................................................................................ ~~40~~42

Counterparts ...................................................................................................... ~~40~~42

Severability ........................................................................................................ ~~40~~43

No Redemption .................................................................................................. ~~40~~43

Persons Benefiting ............................................................................................. ~~40~~43

Applicable Law .................................................................................................. ~~41~~43

Entire Agreement .............................................................................................. ~~41~~43

26.    Force Majeure. .......................................................................................... ~~41~~43

27.    Further Assurances. .................................................................................... ~~41~~44

28.    Confidentiality ........................................................................................... ~~41~~44

**EXHIBITS**

Exhibit A          Form of Book-Entry Warrant Statement

Exhibit B          Form of Global Warrant Certificate

Exhibit C          Cashless Exercise Examples

### SERIES A WARRANT AGREEMENT

This Series A Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, this "*Agreement*"), dated as of **February** [●], ~~2021~~**2022** between ~~[●]~~**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**, a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B~~[•]~~ **264124** (and any Successor ~~Company~~**Equity Issuer** (as defined below) that becomes successor to the Equity Issuer in accordance with Section 18) (the "*Equity Issuer*") and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*," which term includes any successor thereto permitted under this Agreement).  Capitalized terms that are used in this Agreement shall have the meanings set forth in Section 1 hereof.

### WITNESSETH THAT:

**WHEREAS**, pursuant to the terms and conditions of the ~~[*Second*]~~**Fourth** *Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates*, Docket No. ~~[2773]~~**3891** of Case No. 20-32299 (KLP) (the "*Plan*") relating to a reorganization under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), the Equity Issuer proposes to issue and deliver Warrants (as defined below) to subscribe to and purchase up to, in the aggregate, a number of Common Shares (as defined below) representing 9.0% of the number of Common Shares of the Equity Issuer issued and outstanding as of the Effective Date (as defined below) (assuming the exercise of all Warrants, but not the Series B Warrants (as defined below~~)~~), subject to adjustment as provided herein, and the Warrant Statements and the Global Warrant Certificates (as defined below) evidencing such Warrants;

**WHEREAS**, each Warrant shall entitle the registered owner thereof to subscribe to and purchase one (1) Common Share, subject to adjustment as provided herein;

**WHEREAS**, the Warrants and the Common Shares issuable upon exercise of the Warrants are being issued in an offering in reliance on the exemption from the registration requirements of the Securities Act (as defined below) afforded by section 1145 of the Bankruptcy Code, and of any applicable state securities or "blue sky" laws; and

**WHEREAS**, the Equity Issuer desires that the Warrant Agent act on behalf of the Equity Issuer, and the Warrant Agent is willing to so act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants.

**NOW THEREFORE,** in consideration of the mutual agreements herein contained, the Equity Issuer and the Warrant Agent agree as follows:

1.      **Definitions**.

"*Action*" has the meaning set forth in Section 14.2(c).

"*Adjustment Events*" has the meaning set forth in Section 7.1.

"*Affiliate*" of any specified Person, means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Agent Members*" has the meaning set forth in Section 2.4(b).¶

~~"*Agreement*" has the meaning set forth in the preamble hereto.~~

¶

"*Aggregate Exercise Price*" has the meaning set forth in Section 3.2(c).¶

¶

*"Agreement" has the meaning set forth in the preamble hereto.*¶

"*Allowed*" has the meaning set forth in the Plan.

"*Applicable Procedures*" means, with respect to any transfer or exchange of, or exercise of any Warrants evidenced by, any Global Warrant Certificate, the rules and procedures of the Depositary that apply to such transfer, exchange or exercise.

"*Appropriate Officer*" means any person designated as such by the Board of Directors from time to time.

"*Bankruptcy Code*" has the meaning set forth in the recitals hereto.

"*Beneficial Interest*" means, **solely for purposes of and as used in Sections 2.4, 2.6, 5.1 and 10,** with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Warrants it Beneficially Owns.

"*Beneficial Owner*" means**, solely for purposes of and as used in Sections 2.4, 2.6, 5.1 and 10,** any Person owning a securities entitlement with respect to Warrants registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been **ultimately** credited to any other Person's securities account. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.¶

[¶

*"Black-Scholes Eligible Transaction"* **means any Sale Cash Only Transaction, Eligible Sale Cash and Securities Transaction, De Minimis Sale Cash and Securities Transaction or Private Sale Transaction.**¶

"*Black-Scholes Value*" means, with respect to any ~~Sale Cash Only~~**Black-Scholes Eligible** Transaction, the value of a Warrant on the date of consummation of such ~~Sale Cash~~

2

~~Only~~**Black-Scholes Eligible** Transaction, as determined by a Valuation Firm ~~selected by the Board of Directors and a majority of Holders~~ using the Black Scholes Option Pricing Model for a "call" option, subject to the following assumptions: (a) an underlying security price for Common Shares equal to the value of the consideration received in such ~~Sale Cash Only~~**Black-Scholes Eligible** Transaction for an outstanding Common Share, (b) a strike price equal to the Exercise Price in effect as of the date of consummation of the applicable ~~Sale Cash Only~~**Black-Scholes Eligible** Transaction, (c) a maturity equal to the remaining term of the Warrant, (d) a volatility to be determined by such Valuation Firm as of the date of determination and pursuant to customary practices for calculating such volatility (but in any event no more than 45% and no less than 20%; *provided, however*, that such range will not be disclosed to such Valuation Firm); and (e) a risk-free interest rate equal to the interpolated rate on the United State~~ds~~ Treasury securities with a maturity closest to the remaining term of the Warrant as of the date of consummation of the applicable ~~Sale Cash Only~~**Black-Scholes Eligible** Transaction.~~]~~

"***Board of Directors***" means either the board of directors of the Equity Issuer or any duly authorized committee of that board.

"***Book-Entry Warrants***" means ~~Warrants issued by book-entry registration~~ Warrants issued by book-entry registration in the books and records of the Warrant Agent and reflected on the Warrant Register.

"***Book-Entry Warrant Legend***" has the meaning set forth in Section 2.3(a).

"***Business Day***" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a legal holiday in the State of New York or Luxembourg City or a day on which banking institutions and trust companies in the state in which the Corporate Agency Office is located are authorized or obligated by law, regulation or executive order to close.

"***Cash Consideration***" means, with respect to any Sale Cash Only Transaction or Sale Cash and Securities Transaction, the consideration constituting cash and property other than securities.

"***Cash Dividend***" has the meaning set forth in Section 7.1(c).

"***Cashless Market Exercise Price***" has the meaning set forth in Section 3.7.¶

"***Cash-Out Warrant Percentage***" **means, with respect to any Eligible Sale Cash and Securities Transaction, the percentage of the total consideration per Common Share receivable in such Transaction by a Qualifying Person represented by Cash Consideration (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).¶**

"***Cash-Out Warrants***" **has the meaning set forth in Section 7.1(h)(z)(i)(B).**

"***Cash Value Claim***" **has the meaning set forth in Section 3.7.¶**

"***Cash Value per Cash Value Warrant***" has the meaning set forth in Section 3.7.

3

"*Cash Value Warrants*" has the meaning set forth in <u>Section 3.7</u>.

"*Commission*" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act, whichever is the relevant statute for the particular purpose.

"*Common Shares*" means, subject to the provisions of <u>Section 7.1(h)</u>, the common shares of the Equity Issuer issued upon the Effective Date in accordance with the Plan each [with a nominal value of USD $[●][without nominal value]**0.01**.

"*Competitor*" means a "Competitor of the Company" as defined in the Shareholders Agreement.

"*Confidential Information*" has the meaning set forth in <u>Section 12.2</u>.

"*Constituent Person*" has the meaning set forth in the definition of "Qualifying Person."

"*Corporate Agency Office*" has the meaning set forth in <u>Section 10</u>.¶

"~~*Countersigning Agent*~~" ~~means any Person authorized by the Warrant Agent to act on behalf of the Warrant Agent to countersign Warrant Certificates.~~

"*Current Market Price*" means on any date:

(i)    [if the reference is to the per share price of Common Shares **(or other applicable security)** on any date herein specified and if on such date the Common Shares **(or other applicable security)** are listed or admitted to trading on any U.S. national securities exchange [or traded and quoted in the over-the-counter market in the United States]:

(A)    for the purpose of any computation under this Agreement (except under <u>Section 7.2</u>), the ~~average of the Quoted Prices~~**VWAP** for the 30 consecutive Trading Days ending on such date or, if such date is not a Trading Day, on the next preceding Trading Day; or

(B)    for the purposes of any computation under <u>Section 7.2</u>, the Quoted Price for such date or, if such date is not a Trading Day, for the next preceding Trading Day; or

(ii)    if the reference is to the per share price of Common Shares **(or other applicable security)** on any date herein specified and if on such date the Common Shares are not listed or admitted to trading on any U.S. national securities exchange [or traded and quoted in the over-the-counter market in the United States], the Fair Market Value for one (1) Common Share **(or other applicable security)**.¶

~~For the avoidance of doubt, no appraisal of any Person or third-party (other than a member of the Board of Directors) shall be permitted or required to determine the Current Market Price¶~~

4

"***De Minimis Sale Cash and Securities Transaction***" **means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes more than 75% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction)**.

"***Depositary***" means DTC and its successors as depositary hereunder.

"***Direct Owner***" means any holder of Book-Entry Warrants.¶

"***Drag-along Sale***" **has the meaning set forth in** *the Shareholders Agreement* **as in effect on the date hereof.**

"***DTC***" means The Depository Trust Company **or any successor thereto**.

"***DTC Participant***" means any Person that is reflected on the books and records of DTC as having a direct interest in the Warrants held of record by DTC as of immediately prior to the Effective Date.

"***Effective Date***" means **February** [●], 202[●]**2022.**¶

"***Eligible Sale Cash and Securities Transaction***" **means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes no less than 50% and no more than 75% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction)**.

"***Equity Issuer***" has the meaning set forth in the preamble hereto.

"***Equity Issuer Order***" means a written request or order signed in the name of the Equity Issuer by an Appropriate Officer and delivered to the Warrant Agent.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***Excess***" has the meaning set forth in Section 3.7.

"***Exchange Act***" means the Securities Exchange Act of 1934 and any statute successor thereto, in each case, as amended from time to time.

"***Ex-Dividend Date***" means the first date on which the Common Shares trade on the applicable exchange or in the applicable market, regular way, without the right to receive the issuance, dividend or distribution in question.

"***Exercise Date***" has the meaning set forth in Section 3.2(f).

5

"*Exercise Form*" has the meaning set forth in Section 3.2(c).

"*Exercise Period*" means the period from and including the Original Issue Date to and including the Expiration Date.

"*Exercise Price*" means the exercise price per Common Share, initially set at $[●]**60.15**, subject to adjustment as provided in Section 7.1, provided that the exercise price per Common Share may not be lower than the nominal or par value per share **unless expressly decided otherwise by the Equity Issuer and to the extent permitted by law**.

"*Expiration Date*" means the date that is the fifth (5th) anniversary of the Effective Date.

"*Fair Market Value*" means, on any date, as to any security or other non-cash assets: the amount which a willing buyer would pay a willing seller in an arm's length transaction on such date (neither being under any compulsion to buy or sell) for such security or other non-cash property, as reasonably determined as of such date by ~~the Board of Directors in good faith~~**a Valuation Firm**, whose determination shall be ~~evidenced by a resolution of the Board of Directors~~ filed with the Warrant Agent with written notice of such determination given by the Equity Issuer to the Holders in accordance with Section 14.2**, provided that, after the Board's receipt of a report of a Valuation Firm during any twelve-month period, the Fair Market Value will be determined in good faith by the Board of Directors.  For the avoidance of doubt, the Board of Directors will consider the report of such Valuation Firm in good faith in making any determination of the Fair Market Value during the twelve-month period following receipt of such report of the Valuation Firm.¶**

**"*Financial Statements*" has the meaning set forth in Section 12.1**.

"*Funds*" has the meaning set forth in Section 3.3.

"*Global Warrant Certificate*" means a certificate for Warrants in global form, deposited with or on behalf of and registered in the name of the Depositary or its nominee, that bears the Global Warrant Legend and that has the "Schedule of Decreases in Warrants" attached thereto, substantially in the form attached as Exhibit B.

"*Global Warrant Legend*" has the meaning set forth in Section 2.4(a).

"*Holder*" means any Person in whose name at the time any Warrant is registered upon the Warrant Register and, when used with respect to any Warrant Statement, the Person in whose name such evidenced by the applicable Warrant Statement is registered in the Warrant Register.¶

**"*Holder Website*" has the meaning set forth in Section 12.2(c).¶**

**"*Ineligible Sale Cash and Securities Transaction*" means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes less than 50% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the**

**Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).**

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.¶

**"*Listing*" means a public listing of the Equity Issuer's securities on a U.S. national securities exchange resulting in the Equity Issuer being registered under Section 12(b) of the Exchange Act.¶**

**"*New Indenture*" means that certain indenture for 6.500% First Lien Secured Notes due 2030 dated January 27, 2022 between Intelsat Jackson Holdings S.A., the guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time.**

"*Non-Cash Dividend*" has the meaning set forth in Section 7.1(b).

"*Non-Surviving Transaction*" has the meaning set forth in Section 7.1(h).

"*Original Issue Date*" means the Effective Date, the date on which Warrants are originally issued under this Agreement.

"*Outstanding*" when used with respect to any Warrants, means, as of the time of determination, all Warrants theretofore originally issued under this Agreement, as adjusted pursuant to Section 7.1, except (i) Warrants that have been exercised pursuant to Section 3.2(a), (ii) Warrants that have expired, terminated or become void pursuant to Section 3.2(b) or Section 6 and (iii) Warrants that have otherwise been acquired by the Equity Issuer or any of its Subsidiaries; provided, however, that in determining whether the Holders of the requisite amount of the ~~o~~Outstanding Warrants have given any request, demand, authorization, direction, notice, consent or waiver under the provisions of this Agreement, Warrants held directly or beneficially by the Equity Issuer or any Subsidiary of the Equity Issuer or any of their respective employees shall be disregarded and deemed not to be outstanding.¶

~~"*Owners*" means, collectively, any Beneficial Owners and Direct Owners.~~

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, trust, association, joint-stock company, business trust or any other entity, unincorporated organization or government or any agency or political subdivision thereof.

"*Plan*" has the meaning set forth in the recitals hereto.

"*Plan Effective Time*" has the meaning set forth in Section 2.1(a).¶

**"*Private Sale Transaction*" means, as related to the Equity Issuer, a Transaction that results in Substituted Securities that either (a) are not of an issuer that is subject to the reporting requirements of the Exchange Act or (b) do not have an average aggregate trading volume of common equity of at least $20 million per Trading Day over the sixty (60) Trading Days preceding such Private Sale Transaction.**

7

"***Qualifying Person***" means, with respect to any Transaction, a holder of Common Shares that is not (i) an employee of the Equity Issuer or of any Subsidiary thereof, (ii) a Person with which the Equity Issuer has consolidated or into which the Equity Issuer has merged or which has merged into the Equity Issuer or to which a sale or transfer of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole) was made, as the case may be (any Person described in this clause (ii), a "***Constituent Person***") or (iii) an Affiliate of a Constituent Person.

"***Quoted Price***" means, on any Trading Day, with respect to the Common Shares **(or other applicable security)**, the VWAP of the Common Shares **(or other applicable security)** on such Trading Day on the principal U.S. national securities exchange on which the Common Shares **(or other applicable security)** are listed or admitted to trading or, if the Common Shares **(or other applicable security)** are not listed or admitted to trading on any U.S. national securities exchange, the average of the closing bid and asked prices in the over-the-counter market in the United States as furnished by any New York Stock Exchange member firm that shall be selected from time to time by the Equity Issuer for that purpose (or, if such volume-weighted average price or the average of the closing bid and asked price is unavailable, the Fair Market Value on such Trading Day).

"***Recipient***" has the meaning set forth in Section 3.2(e).

"***Redomestication Transaction***" means a Non-Surviving Transaction in which all of the property received upon such Non-Surviving Transaction by each holder of Common Shares consists solely of securities, cash in lieu of fractional shares and other de minimis consideration, and the holders of the Common Shares immediately prior to such Non-Surviving Transaction are the only holders of the equity securities of the Successor Equity Issuer immediately after the consummation of such Non-Surviving Transaction.

"***Representatives***" ~~has the meaning set forth in Section 12.1~~**means a Person's partners (including limited partners except for any Competitors), shareholders, members, directors, officers, managers, employees, financing sources (including existing and bona fide prospective investors except for any Competitors), agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its Affiliates or wholly owned subsidiaries**.

"***Required Warrant Holders***" means Holders of Warrants evidencing at least a majority of the then-Outstanding Warrants.¶

"***Roll-Over Warrant Percentage***" **means, with respect to any Eligible Sale Cash and Securities Transaction, the percentage of the total consideration per Common Share receivable in such Transaction by a Qualifying Person represented by Substituted Securities (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).¶**

"***Roll-Over Warrants***" **has the meaning set forth in Section 7.1(h)(z)(i)(B).**

"***Sale Cash and Securities Transaction***" means a Sale Transaction that is neither (i) a Sale Cash Only Transaction nor (ii) a Sale Securities Only Transaction.

8

"*Sale Cash Only Transaction*" means a Sale Transaction in which all of the consideration receivable upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole)) of such Sale Transaction consists of cash and/or property other than securities.

"*Sale Securities Only Transaction*" means a Sale Transaction in which all of the property received upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole)) of such Sale Transaction consists solely of securities.

"*Sale Transaction*" means any Transaction that does not constitute a Redomestication Transaction (*i.e.*, either (i) a Sale Cash and Securities Transaction, (ii) a Sale Cash Only Transaction or (iii) a Sale Securities Only Transaction).

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Series B Warrants*" means the warrants issued pursuant to the Plan and the Series B Warrant Agreement.

"*Series B Warrant Agreement*" means that certain agreement providing for, among other things, the issuance of the Series B Warrants.

"*Shareholders Agreement*" means the Equity Issuer's shareholders agreement.

"*Subsidiary*" means a Person more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Equity Issuer or by one or more other Subsidiaries, or by the Equity Issuer and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock, shares or other equity interests (including partnership interests) which ordinarily have voting power for the election of directors, managers, general partners or trustees, whether at all times or only so long as no senior class of stock, shares or other equity interests (including partnership interests) have such voting power by reason of any contingency.

"*Substituted Property*" has the meaning set forth in Section 7.1(h)(~~i)(A~~**y**).

"*Substituted Securities*" has the meaning set forth in Section 7.1(h**)(z**)(i)(~~B~~**A**).

"*Successor Equity Issuer*" has the meaning set forth in Section 18.

"*Surviving Transaction*" has the meaning set forth in Section 7.1(h).

"*Trading Day*" means a day on which trading in the Common Shares (or other applicable security) generally occurs on the principal exchange or market on which the Common Shares (or other applicable security) is then listed or traded; provided that if the Common Shares (or other applicable security) is not so listed or traded, "Trading Day" means a Business Day.

"*Transaction*" has the meaning set forth in Section 7.1(h).

9

"*Transfer*" means any sale, pledge, assignment or other transfer or disposition of any Warrant to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise.  "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings.

"*Valuation Firm*" means an independent and nationally recognized investment banking or valuation firm **that is mutually acceptable to (i) if such Valuation Firm is selected in connection with the determination a Cashless Market Exercise Price pursuant to Section 3.7, the Equity Issuer and the applicable Holder seeking a cashless exercise pursuant to such section, and (ii) in all other instances, the Equity Issuer and the Required Warrant Holders**.

"*VWAP*" means the volume-weighted average price for trading hours of the regular trading session (including any extensions thereof), determined without regard to pre-open or after-hours trading or any other trading outside of the trading hours of the regular trading session (including any extensions thereof).

"*Warrant Agent*" has the meaning set forth in the preamble hereto.

"*Warrant Register*" has the meaning set forth in Section 2.3(b).

"*Warrant Statement*" means any statement issued by the Warrant Agent from time to time to a registered Holder of Book-Entry Warrants reflecting such book-entry position, in substantially the form set forth in Exhibit A hereto.

"*Warrants*" means those certain warrants to subscribe to and purchase [●] **one** Common Shares, subject to adjustment pursuant to Section 7, issued hereunder.

"*Winding Up*" has the meaning set forth in Section 6.

2.     **Book-Entry Warrants.**

2.1     Original Issuance of Warrants.

(a)     On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Plan, on the Original Issue Date the Equity Issuer will issue to holders of Allowed Unsecured Claims against ICF (as defined in the Plan) the Warrants in global form registered in the name of Cede & Co., as nominee for DTC **(or such other nominee as may be selected by DTC)**, by causing DTC (subject to Section 2.1(b)) to credit the account or accounts in which such holders held their respective Allowed Unsecured Claims against ICF substantially concurrently with the effective time of the Plan (the "*Plan Effective Time*") the aggregate number of Warrants to be issued hereunder, *pro rata* based on the amount of Allowed Unsecured Claims against ICF held by each such holder immediately prior to the Plan Effective Time.  **For the avoidance of doubt, on the Original Issue Date, the only Holder shall be Cede & Co. (or such other nominee as may be selected by DTC) as nominee for DTC.**

(b)     Prior to the Original Issue Date or as soon as reasonably practicable thereafter (but in any event no later than 10 Business Days after the Original Issue Date),

the Equity Issuer shall (a) cause the Warrants to be declared eligible for clearance and settlement through DTC, (b) pay or cause to be paid all expenses and application fees incurred in connection with the approval of the Warrants for book-entry transfer by DTC and (c) cause DTC to credit the Warrants to the account or accounts ~~in which~~**of** the ~~holders of Allowed Unsecured Claims against Jackson and Allowed Unsecured Claims against Jackson Subsidiaries held their respective Jackson Senior Notes (each as defined in~~**initial Holders of** the ~~Plan)~~**Warrants** in accordance with ~~Section 2.1(a)~~**the Plan**.

(c)   Each Book-Entry Warrant shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to subscribe for and purchase one (1) Common Share, subject to adjustment as provided in Section 7.

2.2   Form of Warrants.

The Warrants shall not be certificated other than a Global Warrant Certificate registered in the name of the Depositary or its nominee. The Warrants that are not represented by a Global Warrant Certificate shall be issued as Book-Entry Warrants on ~~the books and records of~~ the Warrant ~~Agent~~**Register**, registered in the names of the Holders of such Warrants and evidenced by Warrant Statements. The Warrant Statements shall have such insertions as are appropriate or required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements typed, stamped, printed, lithographed or engraved thereon (which does not impact the Warrant Agent's rights, duties or immunities) as the officers of the Equity Issuer may approve and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed, or to conform to usage. Each Warrant Statement shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase and subscribe for one (1) Common Share, subject to adjustment as provided in Section 7.

2.3   Delivery of Book-Entry Warrants.

(a)   Upon written order of the Equity Issuer, the Warrant Agent shall register in the Warrant Register the Book-Entry Warrants. The account of each Holder of Book-Entry Warrants shall be marked with a legend in the following or a substantially comparable form (the "***Book-Entry Warrant Legend***") set forth on Exhibit A hereto.

(b)   The Equity Issuer shall cause to be kept at the office or offices of the Warrant Agent designated for such purpose a warrant register (the "***Warrant Register***"), in which, subject to such reasonable regulations as it may prescribe, it shall register the Direct Owners holding Book-Entry Warrants and exchanges and Transfers of outstanding Warrants in accordance with the procedures set forth in Section 2.6, Section 2.7 and Section 5 of this Agreement in a form reasonably acceptable to the Equity Issuer or Warrant Agent. No service charge shall be made for any exchange or registration of Transfer of the Warrants, but the Equity Issuer may require payment by the exercising Holder of a sum sufficient to cover any transfer tax or other similar governmental charge

11

that may be imposed on the registered Holder in connection with any such exchange or registration of Transfer. The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until any payments required by the immediately preceding sentence have been made.

2.4     Global Warrant Certificates.

(a)     Any Global Warrant Certificate shall bear the legend substantially in the form set forth in Exhibit B hereto (the "**Global Warrant Legend**").

(b)     So long as a Global Warrant Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Agreement with respect to the Warrants evidenced by such Global Warrant Certificate held on their behalf by the Depositary or its custodian, and the Depositary may be treated by the Equity Issuer, the Warrant Agent and any agent of the Equity Issuer or the Warrant Agent as the absolute owner of such Warrants,  and as the sole Holder of such Warrants, for all purposes.  Accordingly, any such Agent Member's ~~b~~**B**eneficial ~~i~~**I**nterest in such Warrants will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Equity Issuer nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Equity Issuer, the Warrant Agent or any agent of the Equity Issuer or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(c)     Any holder of a Beneficial Interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such Beneficial Interest, agree that transfers of Beneficial Interests in the Warrants evidenced by such Global Warrant Certificate may be effected only through a book-entry system maintained by the Depositary as the Holder of such Global Warrant Certificate (or its agent), and that ownership of a Beneficial Interest in Warrants evidenced thereby shall be reflected solely in such book-entry form.

(d)     Transfers of a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees except as set forth in Section 2.4(e).  Interests of Beneficial Owners in a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be transferred in accordance with the Applicable Procedures ~~of the Depositary~~.

(e)     The holder of a Global Warrant Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any

12

action which a Holder of a Warrant is entitled to take under this Agreement or such Global Warrant Certificate.

(f)    Each Global Warrant Certificate will evidence such of the Outstanding Warrants as will be specified therein and each shall provide that it evidences the aggregate number of Outstanding Warrants from time to time endorsed thereon and that the aggregate number of Outstanding Warrants evidenced thereby may from time to time be reduced, to reflect exercises or expirations.  Any endorsement of a Global Warrant Certificate to reflect the amount of any decrease in the aggregate number of Outstanding Warrants evidenced thereby will be made by the Warrant Agent (i) in the case of an exercise, in accordance with the Applicable Procedures as required by Section 3.2(c) or (ii) in the case of an expiration, in accordance with Section 3.2(b).

(g)    The Equity Issuer initially appoints DTC to act as Depositary with respect to the Global Warrant Certificates.

(h)    The Warrant Agent is hereby authorized to countersign and deliver one or more Global Warrant Certificates as required by this Section 2.4.¶

**(i)    Any holder of a Beneficial Interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee may move their holdings of Warrants directly to the Warrant Register as Book-Entry Warrants only through the Applicable Procedures.**

2.5    Transfer and Exchange of Book-Entry Warrants.  When a Holder of Book-Entry Warrants ~~are presented~~**presents** to the Warrant Agent ~~with~~ a written request (i) to register the transfer of the Warrants; or (ii) to exchange such Warrants for an equal number of Warrants represented by Book-Entry Warrants of other authorized denominations, then the Warrant Agent shall register the transfer or make the exchange as requested if its customary requirements for such transactions are met; provided, however, that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, properly completed and duly executed by the registered Holder thereof or by his attorney, duly authorized in writing and accompanied by a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.

2.6    Restrictions on Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Global Warrant Certificate. A Book-Entry Warrant may not be exchanged for a Beneficial Interest in a Global Warrant Certificate unless the Warrants are eligible to be cleared or settled in DTC. Upon receipt by the Warrant Agent of appropriate instruments of transfer with respect to a Book-Entry Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Book-Entry Warrant, then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register, increase accordingly the number of Warrants on the Warrant Register registered in the name of the registered owner of the Global Warrant Certificate and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between

the Depositary and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be increased accordingly. If no Global Warrant Certificate is then outstanding **(for the avoidance of doubt, while the Warrants are eligible to be cleared or settled in DTC)**, the Equity Issuer shall issue and the Warrant Agent shall countersign a new Global Warrant Certificate representing the appropriate number of Warrants.

2.7 <u>Withholding and Reporting Requirements</u>. The Equity Issuer shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions or other situations requiring withholding under applicable law, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements. The Equity Issuer will be authorized to (a) take any actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements, (b) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, or (c) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes; provided, that the Equity Issuer will also (i) notify the relevant payee of any required withholding reasonably in advance of the date of the relevant payment, (ii) reasonably cooperate with such payee and its Affiliates in obtaining any available exemption or reduction of, or otherwise minimizing, such withholding, and (iii) provide such payee with receipts from the relevant governmental authority evidencing the receipt of any withheld amount.

**3. Exercise and Expiration of Warrants**.

3.1 <u>Right to Acquire Common Shares Upon Exercise</u>. Each Warrant duly issued by the Equity Issuer shall entitle the Holder thereof, subject to the provisions thereof and of this Agreement, to subscribe to and acquire from the Equity Issuer, for each Warrant evidenced thereby, one (1) Common Share at the Exercise Price, subject to adjustment as provided in this Agreement. The Exercise Price, and the number of Common Shares obtainable upon exercise of each Warrant, shall be adjusted from time to time as required by <u>Section 7.1</u>.

3.2 <u>Exercise and Expiration of Warrants</u>.

(a) <u>Exercise of Warrants</u>. Subject to and upon compliance with the terms and conditions set forth herein, a Holder may exercise all or any whole number of the Warrants evidenced thereby, on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date, for the Common Shares obtainable thereunder.

(b) <u>Expiration of Warrants</u>. The Warrants, to the extent not exercised prior thereto, shall automatically expire, terminate and become void as of 5:00 p.m., New York time, on the Expiration Date. All rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time. No further action of any Person (including by, or on behalf of, any Holder, the Equity Issuer, or the Warrant Agent) shall be required to effectuate the expiration of Warrants pursuant to this <u>Section 3.2(b)</u>.

(c) <u>Method of Exercise</u>. In order for a Holder to exercise all or any of its Warrants, the Holder must (i) (x) in the case of a Global Warrant Certificate, deliver to the Warrant

14

Agent an exercise form for the election to exercise such Warrants substantially in the form set forth in Exhibit B hereto (an "*Exercise Form*"), setting forth the number of Warrants being exercised and, and, if applicable, whether cashless exercise is being elected with respect thereto as provided for in Section 3.7, otherwise properly completed and duly executed by the Holder thereof and deliver such Warrants by book-entry transfer through the facilities of the Depositary to the Warrant Agent in accordance with the Applicable Procedures and otherwise comply with the Applicable Procedures in respect of the exercise of such Warrants or (y) in the case of a Book-Entry Warrant, at the Corporate Agency Office (as defined below), (I) deliver to the Warrant Agent an Exercise Form, setting forth the number of Warrants being exercised and, if applicable, whether cashless exercise is being elected with respect thereto as provided for in Section 3.7, otherwise properly completed and duly executed by the Holder thereof as well as any such other information the Warrant Agent may reasonably require and (II) except in the case of a cashless exercise, deliver to the Warrant Agent, by wire transfer in immediately available funds, the amount of the aggregate Exercise Price of all the exercised Warrants (the "*Aggregate Exercise Price*") to the account ([●]**No. 530354616; ABA No. 021000021; Reference: American Stock Transfer & Trust Company, LLC as agent for Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**) of the Equity Issuer at the Warrant Agent or such other account as the Warrant Agent shall have given notice to the Equity Issuer and such Holder in accordance with Section 14.1(d); and (ii) pay to the Warrant Agent, by wire transfer in immediately available funds, an amount equal to all taxes required to be paid by the Holder, if any, pursuant to Section 3.4 prior to, or concurrently with, exercise of such Warrants to the account ([●]**No. 530354616; ABA No. 021000021; Reference: American Stock Transfer & Trust Company, LLC as agent for Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**) of the Equity Issuer at the Warrant Agent or such other account as the Warrant Agent shall have given notice to the Equity Issuer and such Holder in accordance with Section 14.1(d), and (iii), if not already a holder of the Common Shares that is party to the Shareholders Agreement, deliver a joinder to the Shareholders Agreement. For the avoidance of doubt, any exercise of any Warrant may be "net share settled" pursuant to a cashless exercise as described in Section 3.7.

       (d)    Partial Exercise.  If a Holder exercises fewer than all of its Warrants, (i) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Warrant Agent shall cause the custodian of the Depositary to endorse the "Schedule of Decreases in Warrants" attached to such Global Warrant Certificate to reflect the Warrants being exercised and (ii) in the case of exercise of Warrants evidenced by a Book-Entry Warrant, the Warrant Agent shall reduce the Warrant Register and such Holder's position by the whole number of Warrants duly exercised.

       (e)    Issuance of Common Shares.  Upon due exercise of Warrants evidenced by any Warrant Statement in conformity with the foregoing provisions of Section 3.2(c), the Warrant Agent shall, when actions specified in Section 3.2(c)(i) have been effected and any payment specified in Section 3.2(c)(ii) is received, deliver to the Equity Issuer the Exercise Form received pursuant to Section 3.2(c)(i), deliver or deposit any funds, in accordance with Section 3.3, received as instructed in writing by the Equity Issuer and advise the Equity Issuer by telephone at the end of such day of the amount of funds so deposited to its account.  The Equity Issuer shall thereupon, as promptly as practicable, and in any event within five (5) Business Days after the Exercise Date referred to below, (i) determine the number of Common Shares issuable pursuant to exercise of such Warrants

<div align="center">15</div>

pursuant to Section 3.7 and (ii) (x) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, deliver or cause to be delivered to the Recipient in accordance with the Applicable Procedures Common Shares in book-entry form to be so held through the facilities of ~~DTC~~**the Depositary**, or, if the Common Shares may not then be held in book-entry form through the facilities of ~~DTC~~**the Depositary**, make a book entry into the stock ledger of the Equity Issuer representing such Common Shares, or (y) in the case of exercise of Warrants evidenced by Warrant Statements, make or cause to be made a book entry into the stock ledger of the Equity Issuer representing, in each case of (x) and (y) in an amount equal to the aggregate number of Common Shares issuable upon such exercise (based upon the aggregate number of Warrants so exercised and subjection to Section 3.7), as so determined, together with an amount in cash in lieu of any fractional share(s), if the Equity Issuer so elects pursuant to Section 7.2.  The Common Shares in book-entry form representing Common Shares so delivered shall be, to the extent possible, delivered by crediting the balance account of the ~~Direct Owner, Beneficial Owner,~~**Holder** or such other Person as shall be designated by the ~~Direct Owner or Beneficial Owner, as applicable~~**Holder**, in such Exercise Form (the ~~Direct Owner, Beneficial Owner,~~**Holder** or such other designated Person being referred to herein as the "***Recipient***"), ~~with DTC or the Equity Issuer's register of Common Shares if such owner elects to hold directly~~ on the Equity Issuer's register of Common Shares.  Once such Common Shares are delivered pursuant to this Section 3.2(~~a~~**c**), for all purposes of this Agreement, the Recipient shall, as between such Person and the Equity Issuer, be entitled to all rights of the holder of record of such Common Shares.

(f)    Time of Exercise.  Each exercise of a Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which each of the requirements for exercise of such Warrant specified in Section 3.2(c) has been duly satisfied (the "***Exercise Date***").

3.3    Application of Funds upon Exercise of Warrants.  All funds received by the Warrant Agent under this Agreement that are to be distributed or applied by the Warrant Agent in the performance of services, including funds received upon the exercise of Warrants (the "***Funds***"), shall be held by the Warrant Agent in its name as agent for the Equity Issuer.  Until paid pursuant to the terms of this Agreement, the Warrant Agent will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.).  The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party.  The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits.  The Warrant Agent shall not be obligated to pay such interest, dividends or earnings to the Equity Issuer, any holder or any other party.  The Warrant Agent shall promptly deposit all funds received by it in payment for the exercise of Warrants into an account of the Equity Issuer maintained with the Warrant Agent (or such other account as may be designated by the Equity Issuer) and shall advise the Equity Issuer by telephone, facsimile transmission, email or other form of electronic communication available to both parties, at the end of each day on which a payment for the exercise of Warrants is received of

16

the amount so deposited to its account. The Warrant Agent shall promptly confirm such advice to the Equity Issuer in writing.

3.4    [Payment of Taxes.  The Equity Issuer shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of Common Shares on exercise of Warrants pursuant hereto.  The Equity Issuer or the Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of Common Shares in book-entry form or any registered forms for Common Shares or payment of cash or other property to any Recipient other than, in each case, the Holder of the exercised Warrants, and in case of such transfer or payment, the Warrant Agent and the Equity Issuer shall not be required to issue or deliver any Common Shares in book-entry form or any registered form or pay any cash until it has been established to the Equity Issuer's or Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid.][reserved].Shares Issuable.  The number of Common Shares "obtainable upon exercise" of Warrants at any time shall be the number of Common Shares into which such Warrants are then exercisable.  The Equity Issuer will confirm the number of shares obtainable upon exercise if so requested by the Warrant Agent.  The number of Common Shares "into which each Warrant is exercisable" shall be one (1) share, subject to adjustment as provided in Section 7.1.[Cashless Exercise.  For the purpose of such a cash less**cashless** exercise of the Warrants as described in Section 3.2, subject to the terms hereof and solely for the purpose of the payment of the a**A**ggregate Exercise Price of all the exercised Warrants (the "*Aggregate Exercise Price*") by way of set off, the certain number of Warrants exercised (determined by the Equity Issuer pursuant to the formula set forth below) (the "*Cash Value Warrants*") shall entitle the Holder to the C**c**ash V**v**alue per Cash Value Warrant (**as determined by the Equity Issuer pursuant to the formula set forth below, the "*Cash Value per Cash Value Warrant*," and,** in the aggregate**,** the "*Cash Value Claim*") instead of an issue of shares of Common Shares.

Notwithstanding anything to the contrary herein, the Holder shall at no time be entitled to receive a payment of the Cash Value Claim in cash or otherwise other than through the set off of the Cash Value Claim with the Aggregate Exercise Price of the Warrants exercised (except in respect to the Excess). The Aggregate Exercise Price shall be deemed fully paid by way of set off with the Cash Value Claim when set against such Aggregate Exercise Price.

Notwithstanding any provisions herein to the contrary, upon any cashless exercise of any Warrants, if, on the Exercise Date of a cashless exercise, (i) the Cashless Exercise Market Price of one share of the Common Shares is greater than the applicable Exercise Price on the Exercise Date and (ii) the applicable Exercise Price on Exercise Date is not be lower than the nominal or par value per share of Common Shares, then the Equity Issuer shall issue to the Holder a number of shares of Common Shares with respect to the Warrants being exercised computed using the following formula:

17

$$X=((TW-CW)*Y)$$

Where $X$ =  the <u>rounded</u> number ~~of shares~~ of Common Shares to be issued to the Holder in respect of the Warrants being exercised; if the result of the formula is not a full number of shares but a fractional amount, the number of shares issued shall be rounded down to the next full number;

$CV$ =  the Cash Value per **Cash Value** Warrant calculated as follows: $CV= (Y*A)$;

$TW$ =  the number of exercised Warrants;

$CW$ =  the Cash Value Warrants and is calculated as follows: $CW= (AEP/CV)$;

$A$ =  the Cashless Exercise Market Price of one (1) ~~share of~~ Common Share~~s~~ (on the Exercise Date);

$Y$ =  the number of Common Shares into which a Warrant being exercised by the Holder is exercisable (on the Exercise Date) and which is one (1) Common Share subject to adjustment as provided in <u>Section 7.1</u>; and

$AEP$ =  the Aggregate Exercise Price of the Warrants exercised by the Holder.

An illustrative example is attached as <u>Exhibit C</u> to this Agreement.

If the foregoing calculation results in a negative number, then no Common Shares shall be issued upon exercise pursuant to this <u>Section 3</u>.

If the number ~~of shares~~ of Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the formula set forth above (prior to the rounding down to the next full share) is not a full number of shares (such fractional number of shares being "FS"), the Holder shall be entitled to a cash payment of **such additional amount (**the **"*Excess*")** calculated as follows:

18

$$E=(FS-X)*A$$

Where E =     Excess in USD;

X =     The rounded number of ~~shares of~~ Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the **first** formula ~~under (i)~~**set forth above**; and

FS =     the number of ~~shares of~~ Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the **first** formula set forth above ~~under (i)~~ prior to the rounding down to the next full share.

The Equity Issuer shall calculate and transmit such calculation of the number of Common Shares to be issued on such exercise to the Warrant Agent (and, if different from the Warrant Agent, the Equity Issuer's transfer agent for the Common Shares), and the Warrant Agent shall have no obligation under this Agreement to calculate, confirm or verify such amount.

For purposes of determining the per share value of Common Shares to be surrendered in connection with such cashless exercise (the "*Cashless Market Exercise Price*"), **(i) at any time at which the Common Shares are listed on a U.S. national securities exchange, such value shall be VWAP for the last twenty (20) Trading Days of such Common Shares or (ii)** at any time at which the Common Shares are not listed on a U.S. national securities exchange, such value shall be determined by the Board of Directors **(and will take into account any valuation determined by a Valuation Firm in the last twelve month period pursuant to this paragraph)** within five (5) ~~b~~**B**usiness ~~d~~**D**ays following a notice of exercise; provided, that if the Holder does not agree with such value **and the Board of Directors has not engaged a Valuation Firm in the last twelve month period pursuant to this paragraph**, such value shall be determined by a Valuation Firm jointly selected by the Board of Directors and the applicable Holder.~~]~~ The Valuation Firm selected pursuant to this Section 3.7 shall have ~~[●] days~~**ten (10) Business Days** to make a ~~decision~~**determination** regarding value **and such determination shall be binding on the Equity Issuer and such Holder absent fraud or manifest error**.  In no event will the Equity Issuer be required to engage a Valuation Firm in connection with the Warrants or the Series B Warrants more than once per twelve-month period**. After the Board of Directors' receipt of a report of a Valuation Firm during any twelve-month period, the Cashless Market Exercise Price will be determined by the Board of Directors; provided that, the Board of Directors will consider the report of such Valuation Firm in good faith in making any determination of the Cashless Exercise Market Price during the twelve-month period following the receipt of such report of the Valuation Firm**.  The fees and expenses of such Valuation Firm shall be paid by the Equity Issuer.

Notwithstanding anything to the contrary in this Section 3.7, a Holder shall only be entitled to elect a cashless exercise of any Warrant, if, on the Exercise Date of such cashless exercise, (i) the Cashless Exercise Market Price of one ~~share of the~~ Common Share~~s~~ is greater than the applicable Exercise Price on the Exercise Date and (ii) the applicable Exercise Price on Exercise Date is not ~~be~~ lower than the nominal or par value per share of Common Shares.

19

3.8     Cost Basis Information. The Equity Issuer hereby instructs the Warrant Agent to record cost basis for newly issued shares at the time of exercise in accordance with instructions by the Equity Issuer.  If the Equity Issuer does not provide such cost basis information to the Warrant Agent, as outlined above, then the Warrant Agent will treat those shares issued hereunder as uncovered securities or the equivalent, and each holder of such shares will need to obtain such cost basis information from the Equity Issuer.

**4.      ERISA Eligibility.**

By accepting a Warrant, each Holder shall be deemed to represent that either (i) it does not hold "plan assets" subject to ERISA or Section 4975 of the Internal Revenue Code or (ii) its acquisition, holding and exercise of Warrants will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Internal Revenue Code.

**5.      Transferability; No Restrictions.**

5.1     General¶ Restriction¶.

(a)     The Warrants or any Beneficial Interest shall be freely transferable ~~without the prior consent of the Equity Issuer~~ except as provided in this Section 5.1. Notwithstanding any other provision of this ~~Warrant~~ Agreement, each Holder agrees that it shall not ~~, directly or indirectly,~~ Transfer any of its Warrants or Beneficial ~~Interest:¶(1)~~ **Interests** except **:¶**

**(i)**     as permitted under the Securities Act and other applicable federal **law** or state securities or blue sky laws and then, with respect to a Transfer of Warrants **or Beneficial Interests**, if requested by the Equity Issuer or the Warrant Agent, as applicable, only upon delivery to the Equity Issuer of a written opinion of counsel in form and substance **reasonably** satisfactory to the Equity Issuer to the effect that such Transfer may be effected without registration under the Securities Act; provided, that **notwithstanding the foregoing,** such a legal opinion shall not be required for any Transfer of Warrants **or Beneficial Interests** that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the ~~Company~~**Equity Issuer** has a good faith reason to believe that such ~~shares of the~~ Warrants **or Beneficial Interests** are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the ~~Company~~**Equity Issuer** or an "underwriter" (as such term is defined in the Securities Act) with respect to such Warrants **or Beneficial Interests**;

**(ii)**     ~~(2)~~ if such Transfer would **not** reasonably be expected to require the Equity Issuer to initiate a registration or qualification of ~~such~~**the** Warrants pursuant to the Exchange Act ~~or any applicable federal or state securities or blue sky laws, or require the Equity Issuer to file reports pursuant to the Exchange Act (as a result of the number of holders of such Warrants or equity securities or otherwise)~~ or any applicable federal or state securities or blue sky laws;

20

**(iii)** (3) if such Transfer, upon consummation, would **not** result in the Equity Issuer having, in the aggregate, **either** (A) ~~1,000~~**1,900** or more holders of record (as such concept is understood for purposes of ~~s~~**S**ection 12(g) of the Exchange Act) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of ~~s~~**S**ection 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act (determined, in each case, in the Equity Issuer's ~~sole~~**reasonable** discretion) **of any class of equity securities of the Equity Issuer**;

**(iv)** (4) if such Transfer would **not** cause the Equity Issuer or any Subsidiary **or Affiliate** of the Equity Issuer to be required to register as an investment company under the Investment ~~Equity Issuer~~**Company** Act of 1940, as amended; or

**(v)** (5) if such Transfer would **not** cause the Equity Issuer or any Subsidiary **or Affiliate** of the Equity Issuer to be subject to regulation under the Investment Advisers Act of 1940.~~¶~~

~~(b) In no event shall any such Transfer relieve the transferring Holder of any of its obligations under~~ *~~the Shareholders Agreement~~***, as amended**.

**(b)** ~~(c)~~ The direct Transferee (*i.e.*, a Transferee that holds the Warrants represented by Warrant Statements and not simply a Beneficial Interest in the Warrants registered in the name of Cede & Co. **(or such other nominee as may be selected by DTC)**) of the Warrants Transferred shall be bound by this Agreement as a Direct Owner. Any indirect Transferee (*i.e.*, a Transferee that holds a Beneficial Interest in the Warrants registered in the name of Cede & Co. **(or such other nominee as may be selected by DTC)**) of the Warrants Transferred shall be bound by this Agreement as a Beneficial Owner. Following such a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa) the Warrant Agent shall amend the Warrant Register to reflect the change in Direct Owners, and the Board of Directors**, the Warrant Agent** or ~~its~~**their respective** authorized designee shall take any other appropriate action in connection therewith.

**(c)** ~~(d)~~ Any attempted or purported Transfer of all or a portion of the Warrants **or Beneficial Interests** held by a Holder in violation of this Section 5.1 shall be null and void and of no force or effect whatsoever, such purported Transferee ~~will~~**shall** not be treated as ~~an Owner~~**a Holder** of the Warrants **or Beneficial Interests** for purposes of this ~~Warrant~~ Agreement or otherwise, and the Equity Issuer ~~will~~**shall** not register such Transfer.

5.2    Exchange Listing. From and after such time **a Listing of** the Common Shares ~~are listed on any U.S. national securities exchange~~**occurs**, the Equity Issuer shall use commercially reasonable efforts to list the Warrants on such U.S. national securities exchange; provided, that such obligation shall terminate one year prior to the Expiration Date. **The restrictions under**

21

**Section 5.1(a)(ii), 5.1(a)(iii), 5.1(a)(iv), and 5.1(a)(v) shall terminate automatically upon the effectiveness of a Listing of the Warrants.**

6. **Dissolution, Liquidation or Winding up**.

Unless Section 7.1(h) applies, if, on or prior to the Expiration Date, the Equity Issuer (or any other Person controlling the Equity Issuer) shall propose a voluntary or involuntary dissolution, liquidation or winding up (a "**Winding Up**") of the affairs of the Equity Issuer, the Equity Issuer shall give written notice thereof to the Warrant Agent and all Holders in the manner provided in Section 14.1(d) at least ten (10) Business Days prior to the date on which such Winding Up is expected to become effective or, if earlier, the record date for such Winding Up. Such notice shall also specify the date, if known, as of which the holders of record of Common Shares shall be entitled to exchange their shares for securities, money or other property deliverable upon such Winding Up, on which date (i) each Holder of Warrants shall receive the securities, money or other property which such Holder would have been entitled to receive had such Holder been the holder of record of Common Shares into which the Warrants were exercisable immediately prior to such Winding Up (net of the then applicable Exercise Price) and (ii) the rights to exercise the Warrants shall terminate.

Unless Section 7.1(h) applies, in case of any such Winding Up of the Equity Issuer, the Equity Issuer shall deposit with the Warrant Agent any funds or other property which the Holders are entitled to receive pursuant to the above paragraph, together with an Equity Issuer Order as to the distribution thereof. After receipt of such deposit from the Equity Issuer and any such other necessary information as the Warrant Agent may reasonably require, the Warrant Agent shall make payment in the appropriate amount to such Holders as are reflected on the Warrant Register. The Warrant Agent shall not be required to pay interest on any money deposited pursuant to the provisions of this Section 6 except such as it shall agree with the Equity Issuer to pay thereon. Any moneys, securities or other property which at any time shall be deposited by the Equity Issuer or on its behalf with the Warrant Agent pursuant to this Section 6 shall be, and are hereby, assigned, transferred and set over to the Warrant Agent in accordance with Section 3.3 hereof; provided, that, moneys, securities or other property need not be segregated from other funds, securities or other property held by the Warrant Agent except to the extent required by law.

7. **Adjustments**.

7.1    Adjustments. In order to prevent dilution of the rights granted under the Warrants and to grant the Holders certain additional rights, the Exercise Price shall be subject to adjustment from time to time only as specifically provided in this Section 7.1 (the "**Adjustment Events**") and the number of Common Shares obtainable upon exercise of Warrants shall be subject to adjustment from time to time only as specifically provided in this Section 7.1.

(a)    Subdivisions and Combinations. In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, effect a subdivision (by any stock split or otherwise) of the outstanding Common Shares into a greater number of Common Shares (other than (x) a subdivision upon a Transaction to which Section 7.1(h) applies or (y) a stock split effected by means of a stock dividend or distribution to which Section 7.1(b)

22

applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such subdivision becomes effective shall be proportionately decreased.  Conversely, if the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, effect a combination (by any reverse stock split, combination, subdivision or otherwise) of the outstanding Common Shares into a smaller number of Common Shares (other than a combination upon a Transaction to which Section 7.1(h) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such combination becomes effective shall be proportionately increased.  Any adjustment under this Section 7 shall become effective immediately after the opening of business on the day after the date upon which the subdivision or combination becomes effective.

(b)      Common Share Non-Cash Dividends.  In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, fix a record date for the issuance or making of a dividend or distribution to all holders of the Common Shares of evidences of its indebtedness, any other securities or any cash, property or other assets (excluding any dividends payable solely in cash) or of subscription rights, options or warrants to subscribe to and purchase or acquire any capital stock of the Equity Issuer (excluding stock dividends or distribution referred to in Section 7.1(a)) (any such event being herein called a "*Non-Cash Dividend*"), the Exercise Price shall be decreased immediately after the record date for such Non-Cash Dividend to a price determined by multiplying the Exercise Price then in effect by a fraction, (i) the numerator of which shall be the then Current Market Price of the Common Shares on the Ex-Dividend Date for such Non-Cash Dividend less the ~~fair market value (as determined in good faith by the Equity Issuer's Board of Directors)~~**Fair Market Value** of the evidences of indebtedness, securities, cash, property or other assets issued or distributed in such Non-Cash Dividend applicable to one Common Share or of such subscription rights or warrants applicable to one Common Share, and (ii) the denominator of which shall be such then Current Market Price per Common Share on the Ex-Dividend Date for such Non-Cash Dividend; such adjustment shall be made successively whenever such a record date is fixed.

(c)      Common Share Cash Dividends.  In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part,  fix a record date for the issuance or making of a distribution to all holders of the Common Shares of any dividend payable solely in cash (any such dividend being referred to as a "*Cash Dividend*"), the Exercise Price shall be decreased immediately after the record date for such Cash Dividend to a price determined by multiplying the Exercise Price then in effect by a fraction, (i) the numerator of which shall be the then Current Market Price of the Common Shares on the Ex-Dividend Date for such Cash Dividend less the per share Cash Dividend amount, and (ii) the denominator of which shall be such then Current Market Price per Common Share on the Ex-Dividend Date for such Cash Dividend.

(d)      Adjustments Due to Dividends.  For purposes of Sections 7.1(b) and 7.1(c), any adjustment required by Sections 7.1(b) and 7.1(c) shall be made successively

23

whenever such a record date is fixed and in the event that such distribution is not so made, the Exercise Price shall again be adjusted to be the Exercise Price that was in effect immediately prior to such record date, and "Current Market Price" per Common Share at any date shall mean, (i) if the Common Shares are then listed on a national securities exchange, the average of the daily Quoted Prices for ten (10) consecutive t**T**rading d**D**ays immediately prior to such date, or (ii) if the Common Shares are not then so listed, the Quoted Price**Fair Market Value** immediately prior to such date.

(e)     Reclassifications.  A reclassification of the Common Shares (other than any such reclassification in connection with a Transaction to which Section 7.1(h) applies) into Common Shares and shares of any other class of stock shall be deemed, if the outstanding Common Shares shall be changed into a larger or smaller number of Common Shares as a part of such reclassification, a subdivision or combination, as the case may be, of the outstanding Common Shares for the purposes and within the meaning of Section 7.1(a) (and the effective date of such reclassification shall be deemed to be "the date upon which such subdivision becomes effective" or "the date upon which such combination becomes effective," as applicable, for the purposes and within the meaning of Section 7.1(a)).

(f)     Other Provisions Applicable to Adjustments.  The following provisions shall be applicable to the making of adjustments to the Exercise Price and the number of Common Shares into which each Warrant is exercisable under this Section 7.1:

(i)     Treasury Stock.  The dividend or distribution of any issued Common Shares owned or held by or for the account of the Equity Issuer shall be deemed a dividend or distribution of Common Shares for purposes of Section 7.1(b).  The Equity Issuer shall not make or issue any dividend or distribution on Common Shares held in the treasury of the Equity Issuer.  For the purposes of Section 7.1(b), the number of Common Shares at any time outstanding shall not include shares held in the treasury of the Equity Issuer.

(ii)     When Adjustments Are to be Made.  The adjustments required by Article VII shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exercise Price (excluding Cash Dividends) that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made increases or decreases the Exercise Price immediately prior to the making of such adjustment by at least **one percent (**1%**)**.  Any adjustment representing a change of less than such minimum amount (except as aforesaid) shall be carried forward and made as soon as such adjustment, together with other adjustments required by Section 7.1(a), Section 7.1(b), Section 7.1(c) and Section 7.1(e) and not previously made, would result in such minimum adjustment.

(iii)     Fractional Interests.  In computing adjustments under Section 7.1, fractional interests in Common Shares shall be taken into account to the nearest one-thousandth (1/1000) of a share.

24

(g)     <u>Adjustment to Shares Obtainable Upon Exercise</u>.  Whenever the Exercise Price is adjusted as provided in this <u>Section 7.1</u>, the number of Common Shares into which a Warrant is exercisable shall simultaneously be adjusted by multiplying such number of Common Shares into which a Warrant is exercisable immediately prior to such adjustment by a fraction, the numerator of which shall be the Exercise Price immediately prior to such adjustment, and the denominator of which shall be the Exercise Price immediately thereafter.

(h)     <u>Changes in Common Shares</u>.  In case at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, the Equity Issuer shall be a party to or shall otherwise engage in any transaction or series of related transactions constituting:  (1) a merger of the Equity Issuer into, a **Drag-along Sale involving (or other** direct or indirect sale of all of the Equity Issuer's equity to**)**, or a consolidation of the Equity Issuer with, any other Person in which the previously outstanding Common Shares shall be (either directly or upon subsequent liquidation) cancelled, reclassified or converted or changed into or exchanged for securities or other property (including cash) or any combination of the foregoing, or a sale or transfer of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole) (a "*Non-Surviving Transaction*"), or (2) any merger of another Person into the Equity Issuer in which the previously outstanding Common Shares shall be cancelled, reclassified or converted or changed into or exchanged for securities of the Equity Issuer or other property (including cash) or any combination of the foregoing (a "*Surviving Transaction*"; any Non-Surviving Transaction or Surviving Transaction being herein called a "*Transaction*") then:

(x)     if such Transaction constitutes a Sale Cash Only Transaction, then, at the effective time of the consummation of such Sale Cash Only Transaction, any Warrants not exercised prior to the closing of such Sale Cash Only Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the greater of (1) the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such closing and (II) the positive difference, if any, of the ~~Fair Market Value of the~~ Cash Consideration per Common Share in the Transaction and the Exercise Price per Common Share immediately prior to such closing and (2)  the Black-Scholes Value of each such Warrant as of the date of the consummation of the Sale Cash Only Transaction; ~~or~~

(y)     if such Transaction is a Redomestication Transaction, ~~a Sale Cash and Securities Transaction or a Sale Securities Only Transaction:¶(i)~~ as a condition to the consummation of such Transaction, the Equity Issuer shall (or, in the case of any Non-Surviving Transaction, the Equity Issuer shall cause *~~such other Person to) execute and deliver to the Warrant Agent a written instrument providing that~~*:¶

(A)     ~~if~~ such ~~Transaction constitutes a Redomestication Transaction,~~**other Person** *to) execute and deliver to the Warrant Agent a written*

25

*instrument providing that* any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the securities or other property ("***Substituted Property***") that would have been receivable upon such Transaction by a Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an ~~a~~**A**ggregate Exercise Price for such Warrant equal to the product of (~~I~~**i**) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (~~II~~**ii**) the Exercise Price per Common Share immediately prior to such Transaction; **or ¶**

**(z)      if such Transaction is a Sale Securities Only Transaction or a Sale Cash and Securities Transaction:¶**

**(i)      if such Transaction is not a Private Sale Transaction, as a condition to the consummation of such** *Transaction, the Equity Issuer shall (or, in the case of any Non-Surviving Transaction, the Equity Issuer shall cause such other Person to) execute and deliver to the Warrant Agent a written instrument providing that:*

~~(B)~~ **(A)** if such Transaction constitutes a Sale Securities Only Transaction, any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the securities ("***Substituted Securities***") that would have been receivable upon the consummation of such Transaction by **a** Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an ~~a~~**A**ggregate Exercise Price for such Warrant equal to the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per Common Share immediately prior to such Transaction; ~~or~~ **¶**

**(B)      if such Transaction constitutes a Sale Cash and Securities Transaction that is an Eligible Sale Cash and Securities Transaction, as a condition to the consummation of such Transaction, at the effective time of the consummation of such Transaction, (I) a portion of the Warrants not exercised prior to the closing of such Transaction equal to the Cash-Out Warrant Percentage (the** *"Cash-Out Warrants"***) shall**

26

**automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of such Cash-Out Warrants, cash in an amount, for each such Cash-Out Warrant so evidenced, equal to the greater of (1) the product of (I) the number of Common Shares into which such Cash Out Warrant was exercisable immediately prior to such closing and (II) the positive difference, if any, of the Cash Consideration per Common Share in such Transaction and the Exercise Price per Common Share immediately prior to such closing and (2) the Black-Scholes Value of each such Cash-Out Warrant as of the date of the consummation of such Transaction and (II) a portion of the Warrants not exercised prior to the closing of such Transaction equal to the Roll-Over Warrant Percentage (the "*Roll-Over Warrants*"), upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall** *be as nearly equivalent as may be practicable to the* **provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the Substituted Securities that would have been receivable upon the consummation of** *such Transaction by a Qualifying Person holding the number of Common Shares* **into which such Roll-Over Warrant was exercisable immediately prior to such Transaction and for an Aggregate Exercise Price for such Roll-Over Warrant equal to the product of (a) the number of Common Shares into which such Roll-Over Warrant was exercisable immediately prior to such Transaction and (b) the Exercise Price per Common Share immediately prior to such Transaction;**

(C) **(C)** if such Transaction constitutes a Sale Cash and Securities Transaction, **that is an Ineligible Sale Cash and Securities Transaction** any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the Substituted Securities that would have been receivable upon such Transaction by a Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an aAggregate Exercise Price for such Warrant equal to the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per Common Share immediately prior to such

27

time as decreased (to an amount not less than the lesser of the par value of the Common Shares as of the date hereof and such par value as of such date of determination) by an amount equal to the Fair Market Value of the Cash Consideration per Common Share receivable in such Sale Cash and Securities Transaction by a Qualifying Person; provided, however, that if, as the result of rights of election, the kind or amount of securities, cash and other property receivable upon such Sale Cash and Securities Transaction is not the same for each Common Share held by a Qualifying Person, then, for the purposes of this Section 7.1(h)(z)(i)(C), the kind and amount of securities, cash and other property receivable upon such **Transaction for each Common Share held by a Qualifying Person shall be deemed to be the pro rata kind and amount per Common Share (determined on the basis of all outstanding Common Shares held by Qualifying Persons) actually received by all Qualifying Persons; and¶**

**(D)    if such Transaction constitutes a** Sale Cash and Securities **Transaction that is a De Minimis Sale Cash and Securities Transaction, then, at the effective time of the consummation of such Transaction, any Warrants not exercised prior to the closing of such Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the Black-Scholes Value of each such Warrant as of the date of the consummation of the Transaction; and¶**

**(ii)    if such Transaction is a Private Sale Transaction, then, at the effective time of the consummation of such Private Sale Transaction, any Warrants not exercised prior to the closing of such Private Sale Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the Black-Scholes Value of each such Warrant in cash as of the date of the consummation of the Private Sale Transaction; ¶**

**(iii)    for purposes of Section 7.1(h)(z)(i), if, as the result of rights of election, the kind or amount of securities, cash and other property receivable upon a Sale Cash and Securities Transaction is not the same for each Common Share held by a Qualifying Person, then the kind and amount of securities, cash and other property receivable upon such** Transaction for each Common Share held by a Qualifying Person shall be deemed to be the pro rata kind and amount per Common Share (determined on the basis of all outstanding Common Shares held by Qualifying Persons) actually received by all Qualifying Persons.:

28

**(iv)**   ~~(ii)~~ except as otherwise specified in Section 7.1(h)(~~y~~**z**)(i), the rights and obligations of the Equity Issuer (or, in the event of a Non-Surviving Transaction such other Person) and the Holders in respect of Substituted Property or Substituted Securities shall be substantially unchanged to be as nearly equivalent as may be practicable to the rights and obligations of the Equity Issuer and Holders in respect of Common Shares hereunder as set forth in Section 3.1 hereof;

**(v)**   ~~(iii)~~ with respect to any Transaction, such written instrument under clause (i) above shall provide for adjustments which, for events subsequent to the effective date of such written instrument shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 7. The above provisions of this Section 7.1(h) shall similarly apply to successive Transactions.

(i)   Warrants Deemed Exercisable.  For purposes solely of this Section 7, the number of Common Shares which the holder of any Warrant would have been entitled to receive had such Warrant been exercised in full at any time or into which any Warrant was exercisable at any time.

(j)   Notice of Adjustment.  Upon the occurrence of each adjustment of the Exercise Price or the number of Common Shares into which a Warrant is exercisable pursuant to this Section 7.1, the Equity Issuer at its expense shall promptly:

(i)   compute such adjustment in accordance with the terms hereof;

(ii)   after such adjustment becomes effective, deliver to all Holders, in accordance with Section 14.1(d) and Section 14.2, a notice setting forth such adjustment and showing in reasonable detail the facts upon which such adjustment is based; and

(iii)   deliver to the Warrant Agent a certificate of the Secretary, Treasurer, Chief Accounting Officer, or Chief Financial Officer of the Equity Issuer setting forth the Exercise Price and the number of Common Shares into which each Warrant is exercisable after such adjustment and setting forth a brief statement of the facts requiring such adjustment and the computation by which such adjustment was made (including a description of the basis on which the Current Market Price of the Common Shares was determined).  As provided in Section ~~0~~**13**, the Warrant Agent shall be entitled to rely on such certificate and shall be under no duty or responsibility with respect to any such certificate, except to exhibit the same from time to time at the Corporate Agency Office to any Holder desiring an inspection thereof during reasonable business hours.  The Equity Issuer hereby agrees that it will provide the Holders and the Warrant Agent with reasonable notice of any Adjustment Event set forth in this Section 7.1. The Equity Issuer further agrees that it will provide to the Holders and Warrant Agent with any new or amended exercise terms.  The Warrant Agent shall have no obligation under any ~~S~~**s**ection of this Agreement to determine whether an Adjustment Event has occurred or to calculate any of the adjustments set forth herein.

29

7.2     <u>Fractional Interest</u>.  The Equity Issuer shall not be required upon the exercise of any Warrant to issue any fractional Common Shares, but may, in lieu of issuing any fractional Common Shares make an adjustment therefore in cash on the basis of the Current Market Price per Common Share on the date of such exercise.  If Warrants evidenced by more than one Book-Entry Warrants evidencing shall be exercised at the same time by the same Holder, the number of full Common Shares which shall be issuable upon such exercise thereof shall be computed on the basis of the aggregate number of Warrants so to be exercised.  The Holders, by their acceptance of Warrants, expressly waive their right to receive any fraction of a Common Share if such amount of cash is paid in lieu thereof.  The Equity Issuer shall provide an initial funding of one thousand dollars ($~~1,000~~**1,000.00**) for the purpose of issuing cash in lieu of fractional shares.  From time to time thereafter, Warrant Agent may request additional funding to cover fractional payments.  The Warrant Agent shall have no obligation to make fractional payments unless the Equity Issuer shall have provided the necessary funds to pay in full all amounts due and payable with respect thereto.

7.3     <u>No Other Adjustments</u>.  Except in accordance with <u>Section 7.1</u>, the applicable Exercise Price and the number of Common Shares obtainable upon exercise of any Warrant will not be adjusted for the issuance of Common Shares or any securities convertible into or exchangeable for Common Shares or carrying the right to subscribe to and purchase any of the foregoing, including, without limitation:

(i)     upon the issuance of any other securities by the Equity Issuer on or after the Original Issue Date, whether or not contemplated by the Plan, or upon the issuance of Common Shares upon the exercise of any such securities;

(ii)     upon the issuance of any Common Shares or other securities or any payments pursuant to any management or other equity incentive plan of the Equity Issuer;

(iii)     upon the issuance of any Common Shares pursuant to the exercise of the Warrants or of the Series B Warrants; or

(iv)     upon the issuance of any Common Shares or other securities of the Equity Issuer in connection with a business acquisition, strategic alliance, joint venture, or similar transaction.

**8.     [reserved.]**

**9.     Reservation and Authorization of Common Shares**.

The Equity Issuer covenants that, for the duration of the Exercise Period, the Equity Issuer will at all times reserve and keep available, from its authorized and unissued Common Shares solely for issuance and delivery upon the exercise of the Warrants and free of preemptive rights, such number of Common Shares and other securities, cash or property as from time to time shall be issuable upon the exercise in full of all Outstanding Warrants for cash.  The Equity Issuer further covenants that it shall, from time to time, take all steps reasonably necessary to increase the authorized number of Common Shares to such number of shares as shall be sufficient to deliver all Common Shares upon exercise in full of all Outstanding Warrants, if at any time the authorized number of Common Shares remaining unissued would otherwise be insufficient to allow delivery of all the Common Shares then deliverable upon the exercise in full of all Outstanding Warrants.

30

The Equity Issuer covenants that all Common Shares issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer and will be free from all taxes, liens and charges in respect of the issue thereof.  The Equity Issuer shall take all such actions as may be reasonably necessary to ensure that all such Common Shares may be so issued without violation of any applicable law or governmental regulation or any requirements of any U.S. national securities exchange upon which the Common Shares may be listed (except for official notice of issuance which shall be immediately delivered by the Equity Issuer upon each such issuance).

The Equity Issuer hereby represents and warrants to the Holders that the issuance of the Warrants and the issuance of Common Shares upon exercise thereof in accordance with the terms hereof will not constitute a breach of, or a default under, any other material agreements to which the Equity Issuer is a party on the date hereof.

**10.    Warrant Transfer Books**.

The Warrant Agent will maintain an office or offices (the "***Corporate Agency Office***") in the United States of America, where Warrants may be surrendered for registration of transfer or exchange and where Warrants may be surrendered for exercise of Warrants evidenced thereby, which office is [620 115th Ave., Brooklyn NY 11219 (Attn: Corporate Actions/Warrant Exercise)] on the Original Issue Date.  The Warrant Agent will give prompt written notice to all Holders of any change in the location of such office.

The Equity Issuer shall cause to be kept at the Corporate Agency Office the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Equity Issuer shall provide for the registration of Warrants and of transfers or exchanges of Warrants as herein provided.  Subject to Section 5.1(c), the transfer and exchange of Beneficial Interests in Global Warrant Certificates shall be effected through the Depositary, in accordance with this Agreement and the procedures of the Depositary therefor.

All Book-Entry Warrants issued upon any registration of transfer or exchange of Book-Entry Warrants shall be the valid obligations of the Equity Issuer, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Book-Entry Warrants surrendered for such registration of transfer or exchange.

No service charge shall be made for any registration of transfer or exchange of Warrants; provided, however, the Equity Issuer may require payment of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed in connection with any registration of transfer or exchange.  The Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes and/or charges unless and until it is satisfied that all such payments have been made.

The Warrant Agent shall, upon request and at the expense of the Equity Issuer from time to time, deliver to the Equity Issuer such reports of registered ownership of the Warrants and such records of transactions with respect to the Warrants and the Common Shares as the Equity Issuer may request.  The Warrant Agent shall, upon reasonable advance notice, also make available to the

31

Equity Issuer for inspection by the Equity Issuer's agents or employees, from time to time as the Equity Issuer may request, such books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Corporate Agency Office during normal business hours.

The Warrant Agent shall keep copies of this Agreement and any notices given to Holders hereunder available for inspection, upon reasonable advance notice, by the Holders during normal business hours at the Corporate Agency Office.  The Equity Issuer shall supply the Warrant Agent from time to time with such numbers of copies of this Agreement as the Warrant Agent may request.

**11.     Warrant Holders**.

11.1     <u>No Voting or Dividend Rights</u>.

(a)      No Holder of any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Shares of the Equity Issuer, including, without limitation, the right to vote, to receive dividends and other distributions as a holder of Common Shares or to receive notice of, or attend, meetings or any other proceedings of the holders of Common Shares.

(b)      No consent of any Holder of Warrants shall be required with respect to any action or proceeding of the Equity Issuer.

(c)      Except as provided in <u>Section 6</u>, no Holder of Warrants, by reason of the ownership or possession of a Warrant, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Shares prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant.

(d)      No Holder of Warrants shall have any right not expressly conferred hereunder or under, or by applicable law with respect to, the Warrants held by such Holder.

11.2     <u>Rights of Action</u>.  All rights of action against the Equity Issuer in respect of this Agreement, except rights of action vested in the Warrant Agent, are vested in the Holders of the Warrants, and any Holder of any Warrant, without the consent of the Warrant Agent or the Holder of any other Warrant, may, in such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Equity Issuer suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Agreement.

**12.     Information and Confidentiality.**

12.1     <u>Reporting and Disclosure</u>.  ¶

**(a)**      Subject to <u>Section 12.2</u>, Holders (other than Holders that are Competitors) shall be entitled to receive from the Equity Issuer the following information: ~~Subject to Section 12.2, Holders (other than Holders that are Competitors) shall be entitled to receive from the Equity~~

32

~~Issuer the following information until the Equity Issuer becomes subject to the reporting requirements of the Exchange Act: "re[~~ (i) within ~~[●]~~**65** days (~~[●]~~**or 150** days in the case **of the first fiscal quarter containing the Effective Date and 90 days in the case of the first full fiscal quarter after the Effective Date occurs) after the end of each** of the first three fiscal quarters *ending after the Effective Date) following the conclusion of each of the Equity Issuer's fiscal* ~~quarters~~**of each fiscal year (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal quarter** ending after the Effective Date, quarterly unaudited consolidated financial statements of the Equity Issuer and its Subsidiaries; and (ii) within ~~[●]~~**120** days (~~[●]~~**or 135** days in the case of the first ~~three~~ fiscal ~~quarters~~**year** *ending after the Effective Date) following the conclusion of each of the Equity Issuer's fiscal* **years** ending after the Effective Date~~) days after~~ **(or if such day is not a Business Day, on the next succeeding Business Day) commencing with** the ~~end of each~~**first** fiscal year **ending** *after the Effective Date*, annual audited consolidated financial statements of the Equity Issuer and its Subsidiaries~~. Promptly after the initial report to Holders that is furnished~~ *after the Effective Date* ~~pursuant to the immediately preceding sentence, the Equity Issuer will~~ *use commercially reasonable efforts to* ~~furnish the business and financial reporting so that common shares of the Equity Issuer may be quoted pursuant to the requirements of Rule 15c2-11 of the Exchange Act (the "Public Side Financial Reporting") and will thereafter use~~ *commercially reasonable efforts* ~~to maintain compliance with such requirements.~~ **(clauses (i) and (ii) collectively, the "*Financial Statements*"); and (iii) the information if, as and when provided to the noteholders or trustee, as applicable, pursuant to Section 3.10(a) of the New Indenture (or any substantially similar provision in connection with any amendment to the New Indenture or any refinancing indebtedness thereof), including, for the avoidance of doubt, the Financial Statements; *provided, however,* that if the Equity Issuer files the Financial Statements described in this Section 12.1(a) with the Securities and Exchange Commission, the requirement to deliver the Financial Statements pursuant to clauses (i) and (ii) shall be deemed satisfied. For the avoidance of doubt, if required pursuant to clauses (i) and (ii), Intelsat Jackson Holdings S.A. or one of its direct or indirect parent entities may provide the Financial Statements in the case of the fiscal year ending December 31, 2021.** Reasonably promptly following the release of each of the quarterly unaudited financial statements, the Equity Issuer will provide a video and/or a telephonic presentation (which may be a single presentation held together with other securityholders or holders of indebtedness of the Equity Issuer and its Affiliates) to the ~~directors, officers, members, managers, employees, affiliates, and agents (collectively, "~~Representatives~~")~~ of Holders to discuss the Equity Issuer's financial condition and results of operations, following which presentation the Equity Issuer will allow the Representatives of Holders to ask reasonable questions. Any participant in quarterly calls (including bona fide potential transferees permitted in accordance with the terms hereof) (A) shall not be a Competitor of the Equity Issuer and each Holder hereby represents and warrants to the same as to itself, its Representatives and its bona fide potential transferees that participate in such calls, and (B) shall be subject to Section 12.2**;** *provided,* that each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of Section 12.2 if such Representative or recipient were party to this Agreement.  With respect to any recipient who is a bona fide potential transferee of ~~Equity Issuer's common stock~~**Warrants**, the applicable Holder must first comply with Section 12.2 prior to sharing any such information.**¶**

**(b)     The Equity Issuer shall** *use commercially reasonable efforts to* **promptly post all such information required by this Section 12.1  on a website (which may be**

**nonpublic, require a confidentiality acknowledgement, with such acknowledgment being deemed to satisfy the requirement for a non-disclosure agreement as set forth in Section 12.2(c) and shall be maintained using** *commercially reasonable efforts* **by the Equity Issuer or a third party) (the "*Holder Website*") to which access will be given to the Holders and bona fide prospective investors or bona fide potential transferees (with the exception of Competitors) in the Warrants.**

12.2    Confidentiality.  The Warrant Agent and each Holder acknowledges that any notices or information furnished, including verbally, pursuant to this Agreement**, including the Financial Statements and any information actually provided pursuant to Section 12.1(a)(iii),** (the "*Confidential Information*") is confidential and competitively sensitive. The Warrant Agent and each Holder shall use, and shall cause any Person to whom Confidential Information is disclosed by the Warrant Agent or such Holder pursuant to clause (A) below, to use the Confidential Information only in connection with its ownership of the Warrants and not for any other purpose (including to disadvantage competitively the Equity Issuer, the Warrant Agent, or any other Holder). The Warrant Agent and each Holder shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(a)    to the Warrant Agent or the Holder's Representatives in the normal course of the performance of their duties for the Warrant Agent or such Holder (it being understood that such Representatives shall be informed by the Holder of the confidential nature of such information and shall be directed to treat such information in accordance with this Section 12.2;

(b)    to the extent required by applicable law, rule or regulation or requested by any regulatory or self-regulatory authority in connection with the conduct of its ordinary oversight activities; provided that the Warrant Agent and the Holder shall take reasonable steps to minimize the extent of any such required disclosure and give the Equity Issuer prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Equity Issuer may, at its sole expense, seek an appropriate protective order or similar relief (and the Warrant Agent and Holder, as applicable, shall cooperate with such efforts by the Equity Issuer, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall use reasonable best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information);

(c)    to any Person to whom the Warrant Agent or Holder is contemplating a transfer of its Warrants permitted in accordance with the terms hereof; provided that such ~~P~~**p**erson is not prohibited from receiving such information pursuant to this Section 12.2 and~~,~~ prior to such disclosure such potential transferee is advised of the confidential nature of such information and executes a non-disclosure agreement in a form ~~approved by~~**consistent with** the ~~Board~~**provisions** of ~~Directors~~**this Section 12.2** and which agreement is independently enforceable by the Equity Issuer and includes a certification that such Person is not a Competitor of the Equity Issuer **(which, for the avoidance of doubt, shall be deemed satisfied if such Person has accepted the confidentiality acknowledgement required prior to being granted access to the Holder Website)**;

(d)    to any regulatory authority or rating agency to which the Warrant Agent or the Holder or any of its respective Affiliates is subject or with which it has regular dealings, solely

34

(I) as long as such authority or agency is advised of the confidential nature of such information and (II) such information is provided as the result of a routine request not targeted to the Equity Issuer or any of its Subsidiaries;

(e)   [in connection with the Warrant Agent or the Holder's or their respective Affiliates' normal fund raising, marketing, informational or reporting activities or to any bona fide prospective purchaser of the equity or assets of the Warrant Agent or Holder or the their respective Affiliates, or prospective merger partner of the Warrant Agent or of the Holder or their respective Affiliates; provided that prior to such disclosure, if any Confidential Information is shared with such Persons, the Persons to whom such information is disclosed are advised of the confidential nature of such information and are subject to customary confidentially obligations with respect to such information;] or

(f)   if the prior written consent of the Equity Issuer shall have been obtained.

Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Equity Issuer, the Warrant Agent, or the Holder. The restrictions contained in this Section 12.2 shall terminate **eighteen (**18**)** months following the date on which the Holder ceases to own any Warrants.

Confidential Information does not include information that: (A) is or becomes generally available to the public (including as a result of any information filed or submitted by the Equity Issuer with the Commission) other than as a result of a disclosure by the Warrant Agent or the Holder or their respective Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement, (B) is or was in the possession of the Warrant Agent or Holder or their respective Representatives on a non-confidential basis prior to its disclosure to the Warrant Agent or the Holder or their Representatives by the Equity Issuer, or (C) was or becomes available to the Warrant Agent or Holder or their respective Representatives on a non-confidential basis from a source other than the Equity Issuer, which source is or was (at the time of receipt of the relevant information) not, to the best of the Warrant Agent's or Holder's or their respective Representatives' knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Equity Issuer or another Person.

**13.   Concerning the Warrant Agent.**

Sections 13.1, 13.2, 13.3, 13.4, 13.5, **and** 13.6, and 13.7 shall survive the expiration of the Warrants and the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.

13.1   Rights and Duties of the Warrant Agent.

(a)   The Equity Issuer hereby appoints the Warrant Agent to act as agent of the Equity Issuer as set forth in this Agreement. The Warrant Agent hereby accepts the appointment as agent of the Equity Issuer and agrees to perform that agency upon the express terms and conditions set forth in this Agreement and in the Warrant Statements or as the Equity Issuer and the Warrant Agent may hereafter agree in writing, by all of which the Equity Issuer and the Holders of Warrants, by their acceptance thereof, shall be bound.

(b)      The Warrant Agent shall not, by any act hereunder, be deemed to make any representations as to validity or authorization of (i) the Warrants, (ii) any securities or other property delivered upon exercise of any Warrant, (iii) the accuracy of the computation of the number or kind or amount of stock or other securities or other property deliverable upon exercise of any Warrant, (iv) the correctness of any of the representations of the Equity Issuer made in such certificates that the Warrant Agent receives; or (v) any of the statements of act or recitals contained in this Agreement.  The Warrant Agent shall not at any time have any duty to calculate or determine whether any facts exist that may require any adjustments pursuant to Section 7 hereof with respect to the kind and amount of shares or other securities or any property issuable to Holders upon the exercise of Warrants required from time to time.  The Warrant Agent shall have no duty or responsibility to determine the accuracy or correctness of such calculation or with respect to the methods employed in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any Common Shares or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to Section 7 hereof, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Equity Issuer to make any cash payment or to issue, transfer or deliver any Common Shares or other securities or property upon any exercise or upon any adjustment pursuant to Section 7 hereof or to comply with any of the covenants of the Equity Issuer contained in Section 7 hereof.

(c)      The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement or in the Warrant Statements or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Equity Issuer only.

(d)      The Warrant Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any holder of Warrants with respect to any action or default by the Equity Issuer, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Equity Issuer.

(e)      The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorney or agents, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorney or agents or for any loss to the Equity Issuer resulting from any such act, default, neglect or misconduct, absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof.

(f)      The Warrant Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document, or any security delivered to it, and believed by it to be genuine and to

36

have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Equity Issuer with respect to any matter relating to its acting as Warrant Agent hereunder.

(g)      The Warrant Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(h)      The Warrant Agent shall not be liable or responsible for any failure of the Equity Issuer to comply with any of its obligations relating to any registration statement filed with the Commission or this Agreement, including without limitation obligations under applicable regulation or law.

(i)      The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Equity Issuer of any Warrants authenticated by the Warrant Agent and delivered by it to the Equity Issuer pursuant to this Agreement or for the application by the Equity Issuer of the proceeds of the issue and sale, or exercise, of the Warrants.

(j)      The Warrant Agent shall act hereunder solely as agent for the Equity Issuer, and its duties shall be determined solely by the express provisions hereof (and no duties or obligations shall be inferred or implied).  The Warrant Agent shall not assume any obligations or relationship of agency or trust with any of the owners or holders of the Warrants.

(k)      The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon any guaranty of signature by an "eligible guarantor institution" that is a member or participant in the Securities Transfer Agents Medallion Program or other comparable "signature guarantee program" or insurance program in addition to, or in substitution for, the foregoing.

(l)      In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Equity Issuer, the Holder of any Warrant or any other person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Equity Issuer which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(m)      Reliance on Equity Issuer Statement.  Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Equity Issuer prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer and delivered to the Warrant Agent.  The

37

Warrant Agent may rely upon such statement, and will be indemnified and held harmless for such reliance, and shall not be held liable in connection with any delay in receiving such statement.

(n)    The Warrant Agent shall have no responsibility to the Equity Issuer, any Holders of Warrants or any holders of Common Shares for interest or earnings on any moneys held by the Warrant Agent pursuant to this Agreement.

(o)    The Warrant Agent shall not be required to take notice or be deemed to have notice of any event or condition hereunder, including any event or condition that may require action by the Warrant Agent, unless the Warrant Agent shall be specifically notified in writing of such event or condition by the Equity Issuer, and all notices or other instruments required by this Agreement to be delivered to the Warrant Agent must, in order to be effective, be received by the Warrant Agent as specified in Section 14.1 hereof, and in the absence of such notice so delivered, the Warrant Agent may conclusively assume no such event or condition exists.

13.2    Limitation of Liability.

(a)    The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction).  Notwithstanding anything contained herein to the contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Equity Issuer to Warrant Agent as fees and charges, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from Warrant Agent is being sought.  Neither party to this Agreement shall be liable to the other party for any consequential, indirect, special or incidental damages under any provisions of this Agreement or for any consequential, indirect, punitive, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

(b)    Exclusions.  The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant. The Warrant Agent shall not be responsible for any breach by the Equity Issuer of any covenant or condition contained in this Agreement or in any Warrant.  The Warrant Agent shall not be responsible to make any adjustments required under the provisions of Section 7 hereof or responsible for the manner, method, or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Shares to be issued pursuant to this Agreement or any Warrant or as to whether any Common Shares shall, when issued, be valid and fully paid and non-assessable.

13.3    Indemnification.

38

(a)     The Equity Issuer covenants and agrees to indemnify and to hold the Warrant Agent harmless against any costs, expenses (including reasonable and documented fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant hereto; provided, however, that such covenant and agreement does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of, or arising out of, its gross negligence, bad faith, or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction).  The costs and expenses incurred in enforcing this right of indemnification shall be paid by the Equity Issuer.

(b)     Instructions.  From time to time, the Equity Issuer may provide the Warrant Agent with instructions, by Equity Issuer Order or otherwise, concerning the services performed by the Warrant Agent hereunder.  In addition, at any time the Warrant Agent may apply to any officer of the Equity Issuer for instruction, and may consult with legal counsel for the Warrant Agent or the Equity Issuer with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement.  Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Equity Issuer for any action taken, suffered or omitted to be taken by Warrant Agent in reliance upon any Equity Issuer instructions or upon the advice or opinion of such counsel.  Warrant Agent shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from the Equity Issuer.

13.4     Right to Consult Counsel.  The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Equity Issuer), and the Warrant Agent shall incur no liability or responsibility to the Equity Issuer or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such counsel.

13.5     Compensation and Reimbursement.  The Equity Issuer agrees to pay the Warrant Agent from time to time compensation for all reasonable fees and expenses relating to its services hereunder as the Equity Issuer and the Warrant Agent may agree in writing from time to time and to reimburse the Warrant Agent for all of its reasonable expenses and disbursements, including reasonable counsel fees and other disbursements incurred in connection with the preparation, delivery, negotiation, amendment, administration and execution of this Agreement and the exercise and performance of its duties hereunder.

13.6     Warrant Agent May Hold Equity Issuer Securities.  The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Equity Issuer or become pecuniarily interested in any transaction in which the Equity Issuer may be interested, or contract with or lend money to the Equity Issuer or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement.  Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Equity Issuer or for any other legal entity.  Nothing herein shall preclude the Warrant Agent or

39

~~any Countersigning~~ Agent from acting in any other capacity for the Equity Issuer or for any other legal entity.

13.7    Resignation and Removal; Appointment of Successor.

(a)      The Warrant Agent may resign its duties and be discharged from all further duties and liability hereunder (except liability arising as a result of the Warrant Agent's own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction)) after giving **thirty (**30**)** days' prior written notice to the Equity Issuer.  The Equity Issuer may remove the Warrant Agent upon **thirty (**30**)** days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as aforesaid.  The Warrant Agent shall, at the expense of the Equity Issuer, cause notice to be given in accordance with Section 14.1(d) to the Equity Issuer of said notice of resignation or notice of removal, as the case may be.  Upon such resignation or removal, the Equity Issuer shall appoint in writing a new Warrant Agent.  If the Equity Issuer shall fail to make such appointment within a period of **thirty (**30**)** calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent.  Any new Warrant Agent, whether appointed by the Equity Issuer or by such a court, shall be a Person (other than a natural person) doing business under the laws of the United States or any state thereof in good standing, authorized under such laws to act as Warrant Agent, and having a combined capital and surplus (together with its Affiliates) of not less than $25,000,000. The combined capital and surplus of such new Warrant Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such Warrant Agent prior to its appointment; provided, however, such reports are published at least annually pursuant to law or to the requirements of a federal or state supervising or examining authority.  After acceptance in writing of such appointment by the new Warrant Agent, it shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be reasonably necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the reasonable expense of the Equity Issuer and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent.  Not later than the effective date of any such appointment, the Equity Issuer shall file notice thereof with the resigning or removed Warrant Agent.  Failure to give any notice provided for in this Section 13.7(a), however, or any defect therein, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a new Warrant Agent as the case may be.

(b)      Any Person into which the Warrant Agent or any new Warrant Agent may be merged, or any Person resulting from any consolidation to which the Warrant Agent or any new Warrant Agent shall be a party, shall be a successor Warrant Agent under this Agreement without any further act; provided, however, that such Person would be eligible for appointment as successor to the Warrant Agent under the provisions of Section 13.7(a).  Any such successor Warrant Agent shall promptly cause notice of its succession as

40

Warrant Agent to be given in accordance with Section 14.1(d) to each Holder of a Warrant at such Holder's last address as shown on the Warrant Register.

**14.   Notices.**

14.1   <u>Notices Generally</u>.

(a)      Any request, notice, direction, authorization, consent, waiver, demand or other communication permitted or authorized by this Agreement to be made upon, given or furnished to or filed with the Equity Issuer or the Warrant Agent by the other party hereto or by any Holder shall be sufficient for every purpose hereunder if in writing, sent via trackable or first-class mail or delivered by hand (including by courier service) as follows:¶

if to the Equity Issuer, to:¶

[•]¶
**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**
*société anonyme*
4, rue Albert Borschette
L-1246 Luxembourg
RCS Luxembourg B. [•]**264124**
Attention:      Legal Department

and with a copy (which shall not constitute notice to the Equity Issuer) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:      Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C.
Aparna Yenamandra
Edward.Sassower@Kirkland.com
Steven.Serajeddini@Kirkland.com
Aparna.Yenamandra@Kirkland.com

if to the Warrant Agent, to:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attention:      Corporate Actions

or, in either case, such other address as shall have been set forth in a notice delivered in accordance with this Section 14.1(a).

(b)      All such communications shall be effective when sent.

(c)      Any Person that telecopies any communication hereunder to any Person shall, on the same date as such telecopy is transmitted, also send, by trackable or first class mail, postage prepaid and addressed to such Person as specified above, an original copy of the communication so transmitted.

(d)      Except as set forth in the last paragraph of this Section 14.1(d), where this Agreement provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and **(x) sent by electronic mail or (y)** mailed, by trackable or first-class mail, to each Holder affected by such event, at the address of such Holder as it appears in the Warrant Register.  In any case where notice to Holders is given by mail **or electronic mail**, neither the failure to mail **or transmit** such notice, nor any defect in any notice so mailed **or transmitted**, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.  Where this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification as shall be made by a method approved by the Warrant Agent as one which would be most reliable under the circumstances for successfully delivering the notice to the addressees shall constitute a sufficient notification for every purpose hereunder.

Where this Agreement provides for notice of any event to a Holder of a Global Warrant Certificate, such notice shall be sufficiently given if given to the Depositary (or its designee), pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.

14.2    Required Notices to Holders.  In the event the Equity Issuer shall:

(a)      take any action that would result in an adjustment to the Exercise Price and/or the number of Common Shares issuable upon exercise of a Warrant pursuant to Section 7.1;

(b)      consummate any Winding Up; or

(c)      consummate any Transaction (each of (a), (b) or (c), an "*Action*");

then, in each such case, the Equity Issuer shall deliver to the Warrant Agent and, unless the Equity Issuer has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such Action, the Equity Issuer shall deliver (or cause to be delivered ) to each Holder of a Warrant, in accordance with Section 14.1(d) hereof, a written notice of such Action, including, in the case of an action pursuant to Section 14.2(a), the information required under Section 7.1(j)(ii).  Such notice shall be given promptly after taking such Action.

If at any time the Equity Issuer shall cancel any of the Actions for which notice has been given under this Section 14.2 prior to the consummation thereof, the Equity Issuer shall give each Holder prompt notice of such cancellation in accordance with Section 14.1(d), unless the Equity

Issuer has made a filing with the Commission, including pursuant to a current report on Form 8-K, which filing discloses the cancellation of such Actions.  For the avoidance of doubt, if at any time the Equity Issuer shall cancel any of the Actions for which notice has been given under this Section 14.2 prior to the consummation thereof, the Equity Issuer shall give Warrant Agent prompt notice of such cancellation in accordance with Section 14.1(d).

**15.   Inspection**.

The Warrant Agent shall cause a copy of this Agreement to be available at all reasonable times at the office of the Warrant Agent for inspection by any Holder of any Warrant.  The Warrant Agent may require any such Holder to submit its Warrant Statement for inspection by the Warrant Agent.

**16.   Amendments**.

(a)   Except as provided in paragraphs (b) and (c) of this Section 16, this Agreement may be amended by the Equity Issuer and the Warrant Agent with the consent of the Required Warrant Holders.

(b)   Notwithstanding the foregoing, the Equity Issuer and the Warrant Agent may, without the consent or concurrence of the Holders of the Warrants, by supplemental agreement or otherwise, amend this Agreement for the purpose of making any changes or corrections in this Agreement that (i) are required to cure any ambiguity or to correct or supplement any defective or inconsistent provision or clerical omission or mistake or manifest error herein contained or (ii) add to the covenants and agreements of the Equity Issuer in this Agreement further covenants and agreements of the Equity Issuer thereafter to be observed, or surrender any rights or powers reserved to or conferred upon the Equity Issuer in this Agreement; provided, however, that in either case such amendment shall not adversely affect the rights or interests of the Holders of the Warrants hereunder in any material respect.

(c)   The consent of each Holder of any Warrant affected thereby shall be required for any supplement or amendment to this Agreement or the Warrants that would: (i) increase the Exercise Price or decrease the number of Common Shares receivable upon exercise of Warrants, in each case other than as provided in Section 7.1; (ii) cause the Expiration Date to be changed to an earlier date; or (iii) modify the provisions contained in Section 7.1 in a manner adverse to the Holders of Warrants.

(d)   The Warrant Agent shall join with the Equity Issuer in the execution and delivery of any such amendment unless such amendment affects the Warrant Agent's own rights, duties or immunities hereunder, in which case the Warrant Agent may, but shall not be required to, join in such execution and delivery; provided that, as a condition precedent to the Warrant Agent's execution of any amendment to this Agreement, the Equity Issuer shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment is in compliance with the terms of this Section 16.  Upon execution and delivery of any amendment pursuant to this Section 16, such amendment shall be considered a part of this Agreement for all purposes and every Holder of a Warrant theretofore or thereafter delivered hereunder shall be bound thereby.

43

(e)      Promptly after the execution by the Equity Issuer and the Warrant Agent of any such amendment, unless the Equity Issuer has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such adjustment, the Equity Issuer shall give notice to the Holders of Warrants, setting forth in general terms the substance of such amendment, in accordance with the provisions of Section 14.1(d).  Any failure of the Equity Issuer to mail such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

**17.      Waivers**.

The Equity Issuer may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Equity Issuer has obtained the written consent of the Required Warrant Holders, as required pursuant to Section 16.

**18.      Successor to Equity Issuer**.

So long as Warrants remain Outstanding, the Equity Issuer will not enter into any Transaction unless the acquirer (a "***Successor Equity Issuer***") shall expressly assume by a supplemental agreement, executed and delivered to the Warrant Agent, in form reasonably satisfactory to the Warrant Agent, the due and punctual performance of every covenant of this Agreement on the part of the Equity Issuer to be performed and observed ~~and shall have provided for exercise rights in accordance with Section 7.1(h)(i)~~.  Upon the consummation of such Transaction, the acquirer shall succeed to, and be substituted for, and may exercise every right and power of, the Equity Issuer under this Agreement with the same effect as if such acquirer had been named as the Equity Issuer herein.

**19.      Headings**.

The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

**20.      Counterparts**.

This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which together constitute one and the same instrument.  A signature to this Agreement transmitted electronically shall have the same authority, effect and enforceability as an original signature.

**21.      Severability**.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of the other provisions hereof; provided, that, if any provision of this Agreement, as applied to any party or to any circumstance, is adjudged by a court or governmental body not to be enforceable in accordance with its terms, the parties agree that the court or governmental body making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced; further, provided, that, if such

44

excluded provision shall affect the rights, immunities, liabilities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately upon written notice to the Equity Issuer.

22.     **No Redemption**.

The Warrants shall not be subject to redemption by the Equity Issuer or any other Person; provided, that, the Warrants may be acquired by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of this Agreement.

23.     **Persons Benefiting**.

This Agreement shall be binding upon and inure to the benefit of the Equity Issuer, the Warrant Agent and the Holders from time to time.  Nothing in this Agreement, express or implied, is intended to confer upon any person other than the Equity Issuer, the Warrant Agent and the Holders any rights or remedies under or by reason of this Agreement or any part hereof, and all covenants, conditions, stipulations, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and of the Holders.  Each Holder, by acceptance of acceptance of a Warrant or of such interest in a Warrant, agrees to all of the terms and provisions of this Agreement applicable thereto.

24.     **Applicable Law**.

THIS AGREEMENT, EACH WARRANT ISSUED HEREUNDER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO AND THERETO, INCLUDING THE INTERPRETATION, CONSTRUCTION, VALIDITY AND ENFORCEABILITY THEREOF, SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.

25.     **Entire Agreement**.

This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

26.     **Force Majeure.**

Notwithstanding anything to the contrary contained herein, the Warrant Agent will not be liable for any delays or failures in performance resulting from acts beyond its reasonable control including, without limitation, acts of God, terrorist acts, shortage of supply, disruptions in public utilities, interruptions or malfunction of computer facilities, or loss of data due to power failures or mechanical difficulties with information storage or retrieval systems, labor difficulties, war, pandemics, epidemics or civil unrest.

27.     **Further Assurances.**

45

The Equity Issuer shall perform, acknowledge and deliver or cause to be performed, acknowledged and delivered all such further and other acts, documents, instruments and assurances as may be reasonably required by the Warrant Agent for the carrying out or performing by the Warrant Agent of the provisions of this Agreement.

## 28.    Confidentiality.

The Warrant Agent and the Equity Issuer agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services set forth in the attached schedule shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions) or to such party's advisors (including its attorneys).  However, each party may disclose relevant aspects of the other party's confidential information to its officers, affiliates, agents, subcontractors and employees to the extent reasonably necessary to perform its duties and obligations under this Agreement and such disclosure is not prohibited by applicable law.

<p align="center">[<em>Remainder of Page Intentionally Left Blank</em>]</p>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

[●]**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**, a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg

By: _____

|  |  |
|---|---|
| Name: | [David Tolley]**José Toscano** |
| **Title:** | **Delegate of the Board of Directors** |
| Title: | Chief Financial Officer and Treasurer |

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, as Warrant Agent

By: _____

Name:
Title:

*[Signature Page to Series A Warrant Agreement]*

EXHIBIT A



A-1

¶

**BOOK-ENTRY STATEMENT WARRANT LEGEND**

THESE WARRANTS AND ANY COMMON SHARES ISSUABLE UPON EXERCISE OF THE WARRANTS HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145; PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN "UNDERWRITER" AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

THESE WARRANTS AND ANY COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE WARRANTS REPRESENTED HEREBY IN THE WARRANT AGREEMENT, ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, DATED AS OF **FEBRUARY** [●], ~~2021~~**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**WARRANT AGREEMENT**"). IN ADDITION, THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF ~~[EQUITY ISSUER]~~**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)** (THE "**EQUITY ISSUER**"), DATED AS OF **FEBRUARY** [●], ~~2021~~**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**SHAREHOLDERS AGREEMENT**"). NO REGISTRATION OR TRANSFER OF THE WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING, AS

¶

¶

APPLICABLE, COMPLIANCE WITH THE WARRANT AGREEMENT OR THE SHAREHOLDERS AGREEMENT, AS APPLICABLE.

THE EQUITY ISSUER OR THE WARRANT AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS STATEMENT A COPY OF THE SHAREHOLDERS AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE COMMON SHARES ISSUABLE UPON EXERCISE OF THE WARRANTS, UPON WRITTEN REQUEST TO THE EQUITY ISSUER AT ITS PRINCIPAL PLACE OF BUSINESS. THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE EQUITY ISSUER.

EXHIBIT B-2

**FACE OF SERIES A GLOBAL WARRANT CERTIFICATE¶**

[•]

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) GLOBAL
WARRANT CERTIFICATE**

**EVIDENCING**

**SERIES A WARRANTS TO SUBSCRIBE TO AND PURCHASE COMMON SHARES¶**

[FACE]

No. [——]1                                                CUSIP No.[•] L5217E104

UNLESS THIS GLOBAL SERIES A WARRANT CERTIFICATE IS PRESENTED BY AN
AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW
YORK CORPORATION ("**DTC**"), TO [THE EQUITY ISSUER]**INTELSAT EMERGENCE
S.A. (TO BE RENAMED INTELSAT S.A.)** (THE "**EQUITY ISSUER**"), THE CUSTODIAN
OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND
ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN
SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF
DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS
IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER,
PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY
PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE &
CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL SERIES A WARRANT CERTIFICATE SHALL BE LIMITED
TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE EQUITY ISSUER, DTC, THEIR
SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THIS WARRANT HAS BEEN, AND THE SECURITIES REPRESENTED HEREBY WILL BE,
ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145
OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE
"**BANKRUPTCY CODE**"). THIS WARRANT AND THE SECURITIES REPRESENTED BY
THIS WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED
WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED
(THE "**SECURITIES ACT**"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE
AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE
BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED
TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE
BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE SECURITIES
MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1)
THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT

1¶¶

AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE EQUITY ISSUER IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE EQUITY ISSUER AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE WARRANTS REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER IN THE WARRANT AGREEMENT OF THE EQUITY ISSUER, DATED AS OF **FEBRUARY** [●], ~~2021~~**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**WARRANT AGREEMENT**"). IN ADDITION, THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF THE EQUITY ISSUER, DATED AS OF **FEBRUARY** [●], ~~2021~~**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**SHAREHOLDERS AGREEMENT**"). NO REGISTRATION OR TRANSFER OF THE WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING, AS APPLICABLE, COMPLIANCE WITH THE WARRANT OR SHAREHOLDERS AGREEMENT, AS APPLICABLE. COPIES OF SUCH AGREEMENTS ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE EQUITY ISSUER. NO TRANSFER OF THIS WARRANT OR THE SECURITIES REPRESENTED BY THIS WARRANT WILL BE MADE ON THE BOOKS OF THE EQUITY ISSUER UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE SHAREHOLDERS AGREEMENT.

ONLY PARTIES TO THE SHAREHOLDERS AGREEMENT ARE ENTITLED TO EXERCISE THE RIGHTS OF HOLDERS UNDER THE SHAREHOLDERS AGREEMENT. NO PERSON MAY BECOME A HOLDER OF COMMON SHARES PURSUANT TO ANY TRANSFER OF COMMON SHARES OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT, WHICH INCLUDES, AMONG THE ABOVE-REFERENCED RESTRICTIONS, RESTRICTIONS ON TRANSFERS TO "COMPETITORS" OF THE EQUITY ISSUER. A THEN-CURRENT LIST OF SUCH COMPETITORS MAY BE OBTAINED BY CONTACTING THE EQUITY ISSUER.

¶



**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**

No. [__]                                                                                         [__,__,__]1 6,709,012 Warrants
CUSIP No. [●]L5217E104

THIS CERTIFIES THAT, for value received, CEDE & CO., or registered assigns, is the registered owner of the number of Warrants to subscribe to and purchase Common Shares of [●]**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**, a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B[●] **264124** (the "*Equity Issuer*", which term includes any successor thereto under the Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, the "*Warrant Agreement*"), dated as of **February** [●], 202[●]**2022**, between the Equity Issuer and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement)) specified above or such lesser number as may from time to time be endorsed on the "Schedule of Decreases in Warrants" attached hereto, and is entitled, subject to and upon compliance with the provisions hereof and of the Warrant Agreement, at such Holder's option, at any time when the Warrants evidenced hereby are exercisable, to subscribe to and purchase from the Equity Issuer one (1) Common Share of the Equity Issuer for each Warrant evidenced hereby, at the purchase price of [●]**$60.15** (as adjusted from time to time, the "*Exercise Price*"), payable in full at the time of subscription and purchase, the number of Common Shares into which and the Exercise Price at which each Warrant shall be exercisable each being subject to adjustment as provided in Section 7 of the Warrant Agreement.

All Common Shares issuable by the Equity Issuer upon the exercise of Warrants **and payment of the Exercise Price** shall, upon such issuance, be duly and validly issued and fully paid and nonassessable.  The Equity Issuer shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of Common Shares on exercise of Warrants. The Equity Issuer or Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of Common Shares in book-entry form or any registered forms for Common Shares or payment of cash or other property to any Recipient other than, in each case, the Holder of the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Equity Issuer shall not be required to issue or deliver any Common Shares in book-entry form or any registered form or pay any cash until such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or to the Equity Issuer.

Each Warrant evidenced hereby may be exercised by the Holder hereof at the Exercise Price then in effect on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date in the Warrant Agreement.

Subject to the provisions hereof and of the Warrant Agreement, the Holder of this Global Warrant Certificate may exercise all or any whole number of the Warrants evidenced hereby by delivery to the Warrant Agent of the Exercise Form on the reverse hereof, setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof to the Warrant Agent, and delivering such Warrants by book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise complying with the Applicable Procedures in respect of the exercise of such Warrants together with payment in full of the Exercise Price as then in effect for each Common Share receivable upon exercise of each Warrant being submitted for exercise unless cashless exercise is being elected with respect thereto.  Any such payment of the Exercise Price is to be by wire transfer in immediately available funds to such account of the Equity Issuer at such banking institution as the Equity Issuer shall have designated from time to time.

Reference is hereby made to the further provisions of this Global Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Global Warrant Certificate has been countersigned by the Warrant Agent by manual or electronic signature of an authorized officer on behalf of the Warrant Agent, this Global Warrant Certificate shall not be valid for any purpose and no Warrant evidenced hereby shall be exercisable.

IN WITNESS WHEREOF, the Equity Issuer has caused this certificate to be duly executed.

Dated:  [—————— **February [●]**], ~~20[    ]~~**2022**

**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**
[●]

[SEAL]                                                   By: _____

**José Toscano**
**Delegate of the Board of**
**Directors**
                                                              ~~[Title]~~

ATTEST:

Countersigned:

American Stock Transfer & Trust                          [——————————]
Company, LLC, as Warrant Agent
                                        ~~OR~~

By: _____    ~~By:~~ _____
         Authorized Agent                           ~~as Countersigning Agent~~

By:        _____

Authorized Officer

**Reverse of Series A Global Warrant Certificate¶**

[●]

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) SERIES A
WARRANT CERTIFICATE**

**EVIDENCING**

**SERIES A GLOBAL WARRANTS TO PURCHASE COMMON SHARES**

The warrants evidenced hereby are one of a duly authorized issue of warrants of the Equity Issuer designated as its Series A Warrants to subscribe to and purchase Common Shares (the "*Warrants*"), limited in aggregate number to [●] **6,709,012** Common Shares issued under and in accordance with the Warrant Agreement, dated as of **February** [●]**, 2022** (the "*Warrant Agreement*"), between the Equity Issuer and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement), to which the Warrant Agreement and all amendments thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Equity Issuer, the Warrant Agent, the Holders of Global Warrant Certificates and Warrant Statements, as applicable, and the owners of the Warrants evidenced thereby and of the terms upon which the Warrants are, and are to be, countersigned and evidenced.  A copy of the Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent for inspection by the Holder hereof.

The Warrant Agreement provides ~~that, in addition to~~**for** certain adjustments to the number of Common Shares into which a Warrant is exercisable and the Exercise Price ~~required~~ to be made in certain circumstances~~, (x) in the case of any Transaction that is a Redomestication Transaction, a Sale Cash and Securities Transaction or a Sale Securities Only *Transaction, the Equity Issuer shall (or, in the case of any Non-Surviving Transaction, the Equity Issuer shall cause* the other Person involved in such Transaction *to) execute and deliver to the Warrant Agent a written instrument providing that* (i) the Warrants evidenced hereby, if then Outstanding, will be exercisable thereafter, during the period the Warrants evidenced hereby shall be exercisable as specified herein, only into the Substituted Securities (in the case of any Sale Securities Only Transaction or Sale Cash and Securities Transaction) or Substituted Property (in the case of any Transaction (other than a Sale Transaction)), subject to certain limitations if the Warrants have no value, that would have been receivable upon *such Transaction by a Qualifying Person holding the number of Common Shares* that would have been issued upon exercise of such Warrant if such Warrant had been exercised in full immediately prior to such Transaction (upon certain assumptions specified in the Warrant Agreement); (ii) in the case of any Sale Cash and Securities Transaction, the aggregate Exercise Price for any Warrant will be reduced in respect of the Fair Market Value of the Cash Consideration receivable upon such Transaction by a Qualifying Person; and (iii) the rights and obligations of the Equity Issuer (or, in the case of any Non-Surviving Transaction, the other Person involved in such Transaction) and the holders in respect of Substituted Securities shall be substantially unchanged to *be as nearly equivalent as may be*~~

*practicable to the* rights and obligations of the Equity Issuer and Holders in respect of Common Shares, and (y) in the case of any Sale Cash Only Transaction, the Equity Issuer shall make certain specified payments of cash and the Warrants will expire or become immediately exercisable, in each case as more fully specified in the Warrant Agreement**, including in Section 7 thereof**.

Except as provided in the Warrant Agreement, all Outstanding Warrants shall expire and all rights of the Holders of the Global Warrant Certificate and the Warrant Statements evidencing such Warrants shall automatically terminate and cease to exist, as of 5:00 p.m., New York time, on the Expiration Date.  The "Expiration Date" means the date that is the fifth anniversary of the Effective Date.

In the event of the exercise of less than all of the Warrants evidenced hereby, a new Global Warrant Certificate of the same tenor and for the number of Warrants which are not exercised shall be issued by the Equity Issuer in the name or upon the written order of the Holder of this Global Warrant Certificate upon the cancellation hereof.

Global Warrant Certificates are issuable only in denominations of whole numbers of Warrants.  Upon surrender at the office of the Warrant Agent and payment of the charges specified herein and in the Warrant Agreement, this Global Warrant Certificate may be exchanged for Book-Entry Warrants in other authorized denominations or the transfer hereof may be registered in whole or in part in authorized denominations to one or more designated transferees; <u>provided</u>, <u>however</u>, that such other Book -Entry Warrants issued upon exchange or registration of transfer shall evidence the same aggregate number of Warrants as this Global Warrant Certificate.  The Equity Issuer shall cause to be kept at the office or offices of the Warrant Agent the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Equity Issuer shall provide for the registration of the Global Warrant Certificates and Book-Entry Warrants, as applicable, and of transfers or exchanges of Global Warrant Certificates and Book-Entry Warrants, as applicable.  No service charge shall be made for any registration of transfer or exchange of Warrants; <u>provided</u>, <u>however</u>, the Equity Issuer may require payment of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrants.

Prior to due presentment of this Global Warrant Certificate for registration of transfer, the Equity Issuer, the Warrant Agent and any agent of the Equity Issuer or the Warrant Agent may treat the Person in whose name this Global Warrant Certificate is registered as the owner hereof for all purposes, and neither the Equity Issuer, the Warrant Agent nor any such agent shall be affected by notice to the contrary.

The Warrant Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Equity Issuer and the rights of the Holders of **Global** Warrant Certificates under the Warrant Agreement at any time by the Equity Issuer and the Warrant Agent with the consent of the Required Warrant Holders.

Until the exercise of any Warrant, subject to the provisions of the Warrant Agreement and except as may be specifically provided for in the Warrant Agreement, (i) no Holder of a Global Warrant Certificate or Warrant Statement evidencing any Warrant shall have or exercise any rights

by virtue hereof as a holder of Common Shares of the Equity Issuer, including, without limitation, the right to vote, to receive dividends and other distributions or to receive notice of, or attend meetings of, stockholders or any other proceedings of the Equity Issuer; (ii) the consent of any such Holder shall not be required with respect to any action or proceeding of the Equity Issuer; (iii) except as provided with respect to a Winding Up of the Equity Issuer, no such Holder, by reason of the ownership or possession of a Warrant or the Global Warrant Certificate or Warrant Statement, as applicable, representing the same, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions (except as specifically provided in the Warrant Agreement), paid, allotted or distributed or distributable to the stockholders of the Equity Issuer prior to or for which the relevant record date preceded the date of the exercise of such Warrant; and (iv) no such Holder shall have any right not expressly conferred by the Warrant, Global Warrant Certificate, or Warrant Statement held by such Holder.

This Global Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

All terms used in this Global Warrant Certificate which are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement. In the event of any conflict between this Global Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

<u>Exercise Form for Series A Warrants</u>

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attn: Corporate Actions


Re: [●]**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)** Series A Warrant Agreement, dated as of **February** [●]**, 2022**

In accordance with and subject to the terms and conditions hereof and of the Warrant Agreement dated as of **February** [●], ~~2021~~**2022** (the "***Warrant Agreement***"), the undersigned Holder of this Warrant hereby irrevocably elects to exercise _____ Warrants and represents that for each of the Warrants evidenced hereby being exercised such Holder either has (please check one box only):

☐      tendered the Exercise Price in the aggregate amount of $_____ by wire transfer in immediately available funds to such account of the Equity Issuer at such bank account as the Equity Issuer has designated from time to time for such purpose;

or

☐      cashless exercise.

The undersigned, if not already a shareholder of the Equity Issuer, is concurrently delivering a joinder to the Shareholders Agreement.

The undersigned requests that the ~~shares of~~ Common Shares issuable upon exercise be in fully registered form in such ~~denominations~~**numbers of Common Shares** and registered in such names and delivered in such manner as is specified in the instructions set forth below.

If the number of Warrants exercised is less than all of the Warrants evidenced hereby, (i) if the Warrants exercised are represented by a Global Warrant Certificate, the Warrant Agent shall endorse the "Schedule of Decreases in Warrants" attached hereto to reflect the Warrants being exercised or (ii) if the Warrants exercised are represented by Book-Entry Warrants, the undersigned requests that a new Book-Entry Warrant representing the remaining Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

Dated: _____

_____
(Insert Social Security or Other
Identifying Number of Holder)

Name: _____
(Please Print)

Address: _____

_____

_____
Signature
(Signature must conform in all respects to name of Holder as specified on the face of this Global Warrant Certificate and Warrant Statement and must bear a signature guarantee by a bank, trust company or member firm of a U.S. national securities exchange.)

Signature Guaranteed:

Instructions (i) as to ~~denominations~~**numbers** of Common Shares issuable upon exercise and as to delivery of such securities and any other property issuable upon exercise and (ii) if applicable, as to Book-Entry Warrants evidencing unexercised Warrants:

Assignment

(Form of Assignment To Be Executed If Holder Desires To Transfer Warrants)

FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto

Please insert social security or
other identifying number

(Please print name and address including zip code)

the Warrants represented by the within Global Warrant Certificate or Warrant Statement, as applicable, and does hereby irrevocably constitute and appoint _____ Attorney, to transfer said Global Warrant Certificate or Warrant, as applicable, on the books of the within-named Equity Issuer with full power of substitution in the premises.

Dated: _____

Signature _____

(Signature must conform in all respects to name of Holder as specified on the face of this Global Warrant Certificate and Warrant Statement and must bear a signature guarantee by a bank, trust company or member firm of a U.S. national securities exchange.)

# SCHEDULE A

## SCHEDULE OF DECREASES IN WARRANTS

The following decreases in the number of Warrants evidenced by this Global Warrant Certificate have been made:

| Date | Amount of decrease in number of Warrants evidenced by this Global Warrant Certificate | Number of Warrants evidenced by this Global Warrant Certificate following such decrease | Signature of authorized signatory |
|---|---|---|---|

EXHIBIT C

**Cashless Exercise Examples**

---

**Legend[1]**

A = Common ~~stock~~**Share** price (*e.g.* $11 USD);

AEP = Aggregate exercise price;

B = Exercise ~~p~~**P**rice (*e.g.* $1 USD);

CV = Cash ~~v~~**V**alue per ~~warrant~~**Cash Value Warrant**;

CW = The "Cash Value Warrants;"

E = Excess (in USD);

FS = Number of shares to be issued (unrounded);

TW = Total number of warrants exercised (*e.g.* 100);

X = Number of shares to be issued (rounded); and

Y = The number of Common Shares exercisable (one (1) Common Share).[2]

---

**1. U.S. Cashless Exercise.**

$$X = \frac{TW(A - B)}{A}$$

$$X = \frac{100 * (11 - 1)}{11}$$

---

[1]     For illustrative purposes only.  Operational definitions appear in Section 3.7 to the Agreement.

[2]     Subject to adjustment as provided in Section 7.1.

$$X = 901$$

1    Se

ar

*(FS = 90.91)*

**2. Luxembourg Cashless Exercise.**

$$X = (TW - CW) * Y$$

$$CW = \frac{AEP}{CV}$$

$$AEP = TW * B$$

$$AEP = (100 * \$1) = \$100$$

$$CV\ (Cash\ Value) = Y * A$$

$$CW = \frac{\$100}{\$11} = 9.09$$

$$X = (100 - 9.09) * 1$$

$$X = 90\ (FS = 90.91)$$

**3. Cash Value Claim.**

$$CVC = CW * CV$$
$$CVC = (100/11) * (11)$$
$$CVC = 100\ (AEP)$$

**4. Excess Formula.**

$$E = (FS - X) * A$$
$$E = (90.91 - 90) * A$$
$$E = 10.01$$



**<u>Exhibit E-1</u>**

**New Series B Warrant Agreement**

*Form of Execution Version*

**SERIES B WARRANT AGREEMENT**

**between**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**

**and**

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,**
**as Warrant Agent**

**Dated as of February [●], 2022**

**Series B Warrants to Subscribe to and Purchase Common Shares**

**TABLE OF CONTENTS**

<u>**Page**</u>

1.     Definitions.................................................................................................................1

2.     Book-Entry Warrants. ...........................................................................................10
    2.1    Original Issuance of Warrants.................................................................10
    2.2    Form of Warrants ...................................................................................11
    2.3    Delivery of Book-Entry Warrants ..........................................................11
    2.4    Global Warrant Certificates ...................................................................11
    2.5    Transfer and Exchange of Book-Entry Warrants ....................................13
    2.6    Restrictions on Exchange or Transfer of a Book-Entry Warrant for a
         Beneficial Interest in a Global Warrant Certificate..................................13
    2.7    Withholding and Reporting Requirements ..............................................13

3.     Exercise and Expiration of Warrants .....................................................................14
    3.1    Right to Acquire Common Shares Upon Exercise....................................14
    3.2    Exercise and Expiration of Warrants .....................................................14
    3.3    Application of Funds upon Exercise of Warrants ....................................16
    3.4    Payment of Taxes ..................................................................................16
    3.5    [reserved]. .............................................................................................16
    3.6    Shares Issuable......................................................................................17
    3.7    Cashless Exercise...................................................................................17
    3.8    Cost Basis Information ...........................................................................19

4.     ERISA Eligibility. .................................................................................................19

5.     Transferability; No Restrictions.............................................................................19
    5.1    General Restriction ................................................................................19
    5.2    Exchange Listing ...................................................................................20

6.     Dissolution, Liquidation or Winding up .................................................................21

7.     Adjustments ..........................................................................................................21
    7.1    Adjustments ..........................................................................................21
    7.2    Fractional Interest .................................................................................28
    7.3    No Other Adjustments............................................................................29

8.     [reserved.] .............................................................................................................29

9.     Reservation and Authorization of Common Shares..................................................29

10.    Warrant Transfer Books ........................................................................................30

11.    Warrant Holders ...................................................................................................31
    11.1   No Voting or Dividend Rights ................................................................31
    11.2   Rights of Action ....................................................................................31

12.    Information and Confidentiality..............................................................................31
    12.1   Reporting and Disclosure.......................................................................31
    12.2   Confidentiality ......................................................................................32

13.    Concerning the Warrant Agent...............................................................................34

13.1    Rights and Duties of the Warrant Agent. ............................................................34
13.2    Limitation of Liability. ......................................................................................36
13.3    Indemnification. ................................................................................................37
13.4    Right to Consult Counsel ...................................................................................38
13.5    Compensation and Reimbursement ....................................................................38
13.6    Warrant Agent May Hold Equity Issuer Securities .............................................38
13.7    Resignation and Removal; Appointment of Successor .........................................38

14.    Notices. ...........................................................................................................39
14.1    Notices Generally ..............................................................................................39
14.2    Required Notices to Holders ..............................................................................41

15.    Inspection .........................................................................................................41

16.    Amendments .....................................................................................................41

17.    Waivers .............................................................................................................42

18.    Successor to Equity Issuer .................................................................................42

19.    Headings ...........................................................................................................43

20.    Counterparts .....................................................................................................43

21.    Severability .......................................................................................................43

22.    No Redemption ..................................................................................................43

23.    Persons Benefiting .............................................................................................43

24.    Applicable Law ..................................................................................................43

25.    Entire Agreement ..............................................................................................44

26.    Force Majeure. ..................................................................................................44

27.    Further Assurances. ...........................................................................................44

28.    Confidentiality ...................................................................................................44

**EXHIBITS**

Exhibit A        Form of Book-Entry Warrant Statement

Exhibit B        Form of Global Warrant Certificate

Exhibit C        Cashless Exercise Examples

## SERIES B WARRANT AGREEMENT

This Series B Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, this "*Agreement*"), dated as of February [●], 2022 between Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 264124 (and any Successor Equity Issuer (as defined below) that becomes successor to the Equity Issuer in accordance with Section 18) (the "*Equity Issuer*") and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*," which term includes any successor thereto permitted under this Agreement).  Capitalized terms that are used in this Agreement shall have the meanings set forth in Section 1 hereof.

## WITNESSETH THAT:

**WHEREAS**, pursuant to the terms and conditions of the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates*, Docket No. 3891 of Case No. 20-32299 (KLP) (the "*Plan*") relating to a reorganization under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), the Equity Issuer proposes to issue and deliver Warrants (as defined below) to subscribe to and purchase up to, in the aggregate, a number of Common Shares (as defined below) representing 2.5% of the number of Common Shares of the Equity Issuer issued and outstanding as of the Effective Date (as defined below) (assuming the exercise of all Warrants, including all Series A Warrants (as defined below), subject to adjustment as provided herein, and the Warrant Statements and the Global Warrant Certificates (as defined below) evidencing such Warrants;

**WHEREAS**, each Warrant shall entitle the registered owner thereof to subscribe to and purchase one (1) Common Share, subject to adjustment as provided herein;

**WHEREAS**, the Warrants and the Common Shares issuable upon exercise of the Warrants are being issued in an offering in reliance on the exemption from the registration requirements of the Securities Act (as defined below) afforded by section 1145 of the Bankruptcy Code, and of any applicable state securities or "blue sky" laws; and

**WHEREAS**, the Equity Issuer desires that the Warrant Agent act on behalf of the Equity Issuer, and the Warrant Agent is willing to so act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants.

**NOW THEREFORE,** in consideration of the mutual agreements herein contained, the Equity Issuer and the Warrant Agent agree as follows:

1.      **Definitions**.

"*Action*" has the meaning set forth in Section 14.2(c).

"*Adjustment Events*" has the meaning set forth in Section 7.1.

"*Affiliate*" of any specified Person, means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Agent Members*" has the meaning set forth in Section 2.4(b).

"*Aggregate Exercise Price*" has the meaning set forth in Section 3.2(c).

"*Agreement*" has the meaning set forth in the preamble hereto.

"*Allowed*" has the meaning set forth in the Plan.

"*Applicable Procedures*" means, with respect to any transfer or exchange of, or exercise of any Warrants evidenced by, any Global Warrant Certificate, the rules and procedures of the Depositary that apply to such transfer, exchange or exercise.

"*Appropriate Officer*" means any person designated as such by the Board of Directors from time to time.

"*Bankruptcy Code*" has the meaning set forth in the recitals hereto.

"*Beneficial Interest*" means, solely for purposes of and as used in Sections 2.4, 2.6, 5.1 and 10, with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Warrants it Beneficially Owns.

"*Beneficial Owner*" means, solely for purposes of and as used in Sections 2.4, 2.6, 5.1 and 10, any Person owning a securities entitlement with respect to Warrants registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been ultimately credited to any other Person's securities account. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.

"*Black-Scholes Eligible Transaction*" means any Sale Cash Only Transaction, Eligible Sale Cash and Securities Transaction, De Minimis Sale Cash and Securities Transaction or Private Sale Transaction.

"*Black-Scholes Value*" means, with respect to any Black-Scholes Eligible Transaction, the value of a Warrant on the date of consummation of such Black-Scholes Eligible Transaction, as determined by a Valuation Firm using the Black Scholes Option Pricing Model for a "call" option, subject to the following assumptions: (a) an underlying security price for Common Shares equal to the value of the consideration received in such Black-Scholes Eligible Transaction for an outstanding Common Share, (b) a strike price equal to the Exercise Price in effect as of the date of consummation of the applicable Black-Scholes Eligible Transaction, (c) a maturity equal to the remaining term of the Warrant, (d) a volatility to be determined by such Valuation Firm as of the

2

date of determination and pursuant to customary practices for calculating such volatility (but in any event no more than 45% and no less than 20%; *provided, however*, that such range will not be disclosed to such Valuation Firm); and (e) a risk-free interest rate equal to the interpolated rate on the United States Treasury securities with a maturity closest to the remaining term of the Warrant as of the date of consummation of the applicable Black-Scholes Eligible Transaction.

"*Board of Directors*" means either the board of directors of the Equity Issuer or any duly authorized committee of that board.

"*Book-Entry Warrants*" means Warrants issued by book-entry registration in the books and records of the Warrant Agent and reflected on the Warrant Register.

"*Book-Entry Warrant Legend*" has the meaning set forth in Section 2.3(a).

"*Business Day*" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a legal holiday in the State of New York or Luxembourg City or a day on which banking institutions and trust companies in the state in which the Corporate Agency Office is located are authorized or obligated by law, regulation or executive order to close.

"*Cash Consideration*" means, with respect to any Sale Cash Only Transaction or Sale Cash and Securities Transaction, the consideration constituting cash and property other than securities.

"*Cash Dividend*" has the meaning set forth in Section 7.1(c).

"*Cashless Market Exercise Price*" has the meaning set forth in Section 3.7.

"*Cash-Out Warrant Percentage*" means, with respect to any Eligible Sale Cash and Securities Transaction, the percentage of the total consideration per Common Share receivable in such Transaction by a Qualifying Person represented by Cash Consideration (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).

"*Cash-Out Warrants*" has the meaning set forth in Section 7.1(h)(z)(i)(B).

"*Cash Value Claim*" has the meaning set forth in Section 3.7.

"*Cash Value per Cash Value Warrant*" has the meaning set forth in Section 3.7.

"*Cash Value Warrants*" has the meaning set forth in Section 3.7.

"*Commission*" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act, whichever is the relevant statute for the particular purpose.

"***Common Shares***" means, subject to the provisions of Section 7.1(h), the common shares of the Equity Issuer issued upon the Effective Date in accordance with the Plan each with a nominal value of USD $0.01.

"***Competitor***" means a "Competitor of the Company" as defined in the Shareholders Agreement.

"***Confidential Information***" has the meaning set forth in Section 12.2.

"***Constituent Person***" has the meaning set forth in the definition of "Qualifying Person."

"***Corporate Agency Office***" has the meaning set forth in Section 10.

"***Current Market Price***" means on any date:

(i)     if the reference is to the per share price of Common Shares (or other applicable security) on any date herein specified and if on such date the Common Shares (or other applicable security) are listed or admitted to trading on any U.S. national securities exchange or traded and quoted in the over-the-counter market in the United States:

(A)     for the purpose of any computation under this Agreement (except under Section 7.2), the VWAP for the 30 consecutive Trading Days ending on such date or, if such date is not a Trading Day, on the next preceding Trading Day; or

(B)     for the purposes of any computation under Section 7.2, the Quoted Price for such date or, if such date is not a Trading Day, for the next preceding Trading Day; or

(ii)     if the reference is to the per share price of Common Shares (or other applicable security) on any date herein specified and if on such date the Common Shares are not listed or admitted to trading on any U.S. national securities exchange or traded and quoted in the over-the-counter market in the United States, the Fair Market Value for one (1) Common Share (or other applicable security).

"***De Minimis Sale Cash and Securities Transaction***" means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes more than 75% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).

"***Depositary***" means DTC and its successors as depositary hereunder.

"***Direct Owner***" means any holder of Book-Entry Warrants.

"***Drag-along Sale***" has the meaning set forth in the Shareholders Agreement as in effect on the date hereof.

4

"**_DTC_**" means The Depository Trust Company or any successor thereto.

"**_DTC Participant_**" means any Person that is reflected on the books and records of DTC as having a direct interest in the Warrants held of record by DTC as of immediately prior to the Effective Date.

"***Effective Date**_"_ means February [●], 2022.

"**_Eligible Sale Cash and Securities Transaction_**" means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes no less than 50% and no more than 75% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).

"**_Equity Issuer_**" has the meaning set forth in the preamble hereto.

"**_Equity Issuer Order_**" means a written request or order signed in the name of the Equity Issuer by an Appropriate Officer and delivered to the Warrant Agent.

"***ERISA**_"_ means the Employee Retirement Income Security Act of 1974, as amended.

"**_Excess_**" has the meaning set forth in Section 3.7.

"**_Exchange Act_**" means the Securities Exchange Act of 1934 and any statute successor thereto, in each case, as amended from time to time.

"**_Ex-Dividend Date_**" means the first date on which the Common Shares trade on the applicable exchange or in the applicable market, regular way, without the right to receive the issuance, dividend or distribution in question.

"**_Exercise Date_**" has the meaning set forth in Section 3.2(f).

"**_Exercise Form_**" has the meaning set forth in Section 3.2(c).

"**_Exercise Period_**" means the period from and including the Original Issue Date to and including the Expiration Date.

"**_Exercise Price_**" means the exercise price per Common Share, initially set at $77.22, subject to adjustment as provided in Section 7.1, provided that the exercise price per Common Share may not be lower than the nominal or par value per share unless expressly decided otherwise by the Equity Issuer and to the extent permitted by law.

"**_Expiration Date_**" means the date that is the fifth (5th) anniversary of the Effective Date.

5

"*Fair Market Value*" means, on any date, as to any security or other non-cash assets: the amount which a willing buyer would pay a willing seller in an arm's length transaction on such date (neither being under any compulsion to buy or sell) for such security or other non-cash property, as reasonably determined as of such date by a Valuation Firm, whose determination shall be filed with the Warrant Agent with written notice of such determination given by the Equity Issuer to the Holders in accordance with Section 14.2, provided that, after the Board's receipt of a report of a Valuation Firm during any twelve-month period, the Fair Market Value will be determined in good faith by the Board of Directors. For the avoidance of doubt, the Board of Directors will consider the report of such Valuation Firm in good faith in making any determination of the Fair Market Value during the twelve-month period following receipt of such report of the Valuation Firm.

"*Financial Statements*" has the meaning set forth in Section 12.1.

"*Funds*" has the meaning set forth in Section 3.3.

"*Global Warrant Certificate*" means a certificate for Warrants in global form, deposited with or on behalf of and registered in the name of the Depositary or its nominee, that bears the Global Warrant Legend and that has the "Schedule of Decreases in Warrants" attached thereto, substantially in the form attached as Exhibit B.

"*Global Warrant Legend*" has the meaning set forth in Section 2.4(a).

"*Holder*" means any Person in whose name at the time any Warrant is registered upon the Warrant Register and, when used with respect to any Warrant Statement, the Person in whose name such evidenced by the applicable Warrant Statement is registered in the Warrant Register.

"*Holder Website*" has the meaning set forth in Section 12.2(c).

"*Ineligible Sale Cash and Securities Transaction*" means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes less than 50% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

"*Listing*" means a public listing of the Equity Issuer's securities on a U.S. national securities exchange resulting in the Equity Issuer being registered under Section 12(b) of the Exchange Act.

"*New Indenture*" means that certain indenture for 6.500% First Lien Secured Notes due 2030 dated January 27, 2022 between Intelsat Jackson Holdings S.A., the guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time.

"*Non-Cash Dividend*" has the meaning set forth in Section 7.1(b).

6

"**_Non-Surviving Transaction_**" has the meaning set forth in Section 7.1(h).

"**_Original Issue Date_**" means the Effective Date, the date on which Warrants are originally issued under this Agreement.

"**_Outstanding_**" when used with respect to any Warrants, means, as of the time of determination, all Warrants theretofore originally issued under this Agreement, as adjusted pursuant to Section 7.1, except (i) Warrants that have been exercised pursuant to Section 3.2(a), (ii) Warrants that have expired, terminated or become void pursuant to Section 3.2(b) or Section 6 and (iii) Warrants that have otherwise been acquired by the Equity Issuer or any of its Subsidiaries; provided, however, that in determining whether the Holders of the requisite amount of the Outstanding Warrants have given any request, demand, authorization, direction, notice, consent or waiver under the provisions of this Agreement, Warrants held directly or beneficially by the Equity Issuer or any Subsidiary of the Equity Issuer or any of their respective employees shall be disregarded and deemed not to be outstanding.

"**_Person_**" means any individual, corporation, limited liability company, partnership, joint venture, trust, association, joint-stock company, business trust or any other entity, unincorporated organization or government or any agency or political subdivision thereof.

"**_Plan_**" has the meaning set forth in the recitals hereto.

"**_Plan Effective Time_**" has the meaning set forth in Section 2.1(a).

"**_Private Sale Transaction_**" means, as related to the Equity Issuer, a Transaction that results in Substituted Securities that either (a) are not of an issuer that is subject to the reporting requirements of the Exchange Act or (b) do not have an average aggregate trading volume of common equity of at least $20 million per Trading Day over the sixty (60) Trading Days preceding such Private Sale Transaction.

"**_Qualifying Person_**" means, with respect to any Transaction, a holder of Common Shares that is not (i) an employee of the Equity Issuer or of any Subsidiary thereof, (ii) a Person with which the Equity Issuer has consolidated or into which the Equity Issuer has merged or which has merged into the Equity Issuer or to which a sale or transfer of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole) was made, as the case may be (any Person described in this clause (ii), a "**_Constituent Person_**") or (iii) an Affiliate of a Constituent Person.

"**_Quoted Price_**" means, on any Trading Day, with respect to the Common Shares (or other applicable security), the VWAP of the Common Shares (or other applicable security) on such Trading Day on the principal U.S. national securities exchange on which the Common Shares (or other applicable security) are listed or admitted to trading or, if the Common Shares (or other applicable security) are not listed or admitted to trading on any U.S. national securities exchange, the average of the closing bid and asked prices in the over-the-counter market in the United States as furnished by any New York Stock Exchange member firm that shall be selected from time to time by the Equity Issuer for that purpose (or, if such volume-weighted average price or the average of the closing bid and asked price is unavailable, the Fair Market Value on such Trading Day).

7

"*Recipient*" has the meaning set forth in <u>Section 3.2(e)</u>.

"*Redomestication Transaction*" means a Non-Surviving Transaction in which all of the property received upon such Non-Surviving Transaction by each holder of Common Shares consists solely of securities, cash in lieu of fractional shares and other de minimis consideration, and the holders of the Common Shares immediately prior to such Non-Surviving Transaction are the only holders of the equity securities of the Successor Equity Issuer immediately after the consummation of such Non-Surviving Transaction.

"*Representatives*" means a Person's partners (including limited partners except for any Competitors), shareholders, members, directors, officers, managers, employees, financing sources (including existing and bona fide prospective investors except for any Competitors), agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its Affiliates or wholly owned subsidiaries.

"*Required Warrant Holders*" means Holders of Warrants evidencing at least a majority of the then-Outstanding Warrants.

"*Roll-Over Warrant Percentage*" means, with respect to any Eligible Sale Cash and Securities Transaction, the percentage of the total consideration per Common Share receivable in such Transaction by a Qualifying Person represented by Substituted Securities (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).

"*Roll-Over Warrants*" has the meaning set forth in <u>Section 7.1(h)(z)(i)(B)</u>.

"*Sale Cash and Securities Transaction*" means a Sale Transaction that is neither (i) a Sale Cash Only Transaction nor (ii) a Sale Securities Only Transaction.

"*Sale Cash Only Transaction*" means a Sale Transaction in which all of the consideration receivable upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole)) of such Sale Transaction consists of cash and/or property other than securities.

"*Sale Securities Only Transaction*" means a Sale Transaction in which all of the property received upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole)) of such Sale Transaction consists solely of securities.

"*Sale Transaction*" means any Transaction that does not constitute a Redomestication Transaction (*i.e.*, either (i) a Sale Cash and Securities Transaction, (ii) a Sale Cash Only Transaction or (iii) a Sale Securities Only Transaction).

"*Securities Act*" means the Securities Act of 1933, as amended.

8

"*Series A Warrants*" means the warrants issued pursuant to the Plan and the Series A Warrant Agreement.

"*Series A Warrant Agreement*" means that certain agreement providing for, among other things, the issuance of the Series A Warrants.

"*Shareholders Agreement*" means the Equity Issuer's shareholders agreement.

"*Subsidiary*" means a Person more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Equity Issuer or by one or more other Subsidiaries, or by the Equity Issuer and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock, shares or other equity interests (including partnership interests) which ordinarily have voting power for the election of directors, managers, general partners or trustees, whether at all times or only so long as no senior class of stock, shares or other equity interests (including partnership interests) have such voting power by reason of any contingency.

"*Substituted Property*" has the meaning set forth in Section 7.1(h)(y).

"*Substituted Securities*" has the meaning set forth in Section 7.1(h)(z)(i)(A).

"*Successor Equity Issuer*" has the meaning set forth in Section 18.

"*Surviving Transaction*" has the meaning set forth in Section 7.1(h).

"*Trading Day*" means a day on which trading in the Common Shares (or other applicable security) generally occurs on the principal exchange or market on which the Common Shares (or other applicable security) is then listed or traded; provided that if the Common Shares (or other applicable security) is not so listed or traded, "Trading Day" means a Business Day.

"*Transaction*" has the meaning set forth in Section 7.1(h).

"*Transfer*" means any sale, pledge, assignment or other transfer or disposition of any Warrant to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise.  "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings.

"*Valuation Firm*" means an independent and nationally recognized investment banking or valuation firm that is mutually acceptable to (i) if such Valuation Firm is selected in connection with the determination a Cashless Market Exercise Price pursuant to Section 3.7, the Equity Issuer and the applicable Holder seeking a cashless exercise pursuant to such section, and (ii) in all other instances, the Equity Issuer and the Required Warrant Holders.

"*VWAP*" means the volume-weighted average price for trading hours of the regular trading session (including any extensions thereof), determined without regard to pre-open or after-hours trading or any other trading outside of the trading hours of the regular trading session (including any extensions thereof).

"*Warrant Agent*" has the meaning set forth in the preamble hereto.

"**Warrant Register**" has the meaning set forth in Section 2.3(b).

"**Warrant Statement**" means any statement issued by the Warrant Agent from time to time to a registered Holder of Book-Entry Warrants reflecting such book-entry position, in substantially the form set forth in Exhibit A hereto.

"**Warrants**" means those certain warrants to subscribe to and purchase one Common Share, subject to adjustment pursuant to Section 7, issued hereunder.

"**Winding Up**" has the meaning set forth in Section 6.

**2.     Book-Entry Warrants.**

2.1     Original Issuance of Warrants.

(a)     On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Plan, on the Original Issue Date the Equity Issuer will issue to holders of Allowed Unsecured Claims against ICF (as defined in the Plan), Allowed Unsecured Claims against Envision (as defined in the Plan) and Allowed Unsecured Claims against Intelsat (as defined in the Plan) the Warrants in global form registered in the name of Cede & Co., as nominee for DTC (or such other nominee as may be selected by DTC), by causing DTC (subject to Section 2.1(b)) to credit the account or accounts in which such holders held their respective Allowed Unsecured Claims against ICF, Allowed Unsecured Claims against Envision, and Allowed Unsecured Claims against Intelsat substantially concurrently with the effective time of the Plan (the "**Plan Effective Time**") the aggregate number of Warrants to be issued hereunder, in the following amounts, based on the amount of Allowed Unsecured Claims against ICF, Allowed Unsecured Claims Against Envision, or Allowed Unsecured Claims against Intelsat, as applicable, held by each such holder immediately prior to the Plan Effective Time:  (i) 46.447% *pro rata* to the holders of Allowed Unsecured Claims against ICF; (ii) 47.301% *pro rata* to the holders of Allowed Unsecured Claims against Envision; and (iii) 6.252% *pro rata* to the holders of Allowed Unsecured Claims against Intelsat.  For the avoidance of doubt, on the Original Issue Date, the only Holder shall be Cede & Co. (or such other nominee as may be selected by DTC) as nominee for DTC.

(b)     Prior to the Original Issue Date or as soon as reasonably practicable thereafter (but in any event no later than 10 Business Days after the Original Issue Date), the Equity Issuer shall (a) cause the Warrants to be declared eligible for clearance and settlement through DTC, (b) pay or cause to be paid all expenses and application fees incurred in connection with the approval of the Warrants for book-entry transfer by DTC and (c) cause DTC to credit the Warrants to the account or accounts of the initial Holders of the Warrants in accordance with the Plan.

(c)     Each Book-Entry Warrant shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to subscribe for and purchase one (1) Common Share, subject to adjustment as provided in Section 7.

10

2.2     Form of Warrants.

The Warrants shall not be certificated other than a Global Warrant Certificate registered in the name of the Depositary or its nominee. The Warrants that are not represented by a Global Warrant Certificate shall be issued as Book-Entry Warrants on the Warrant Register, registered in the names of the Holders of such Warrants and evidenced by Warrant Statements.  The Warrant Statements shall have such insertions as are appropriate or required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements typed, stamped, printed, lithographed or engraved thereon (which does not impact the Warrant Agent's rights, duties or immunities) as the officers of the Equity Issuer may approve and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed, or to conform to usage.  Each Warrant Statement shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase and subscribe for one (1) Common Share, subject to adjustment as provided in Section 7.

2.3     Delivery of Book-Entry Warrants.

(a)     Upon written order of the Equity Issuer, the Warrant Agent shall register in the Warrant Register the Book-Entry Warrants.  The account of each Holder of Book-Entry Warrants shall be marked with a legend in the following or a substantially comparable form (the "**Book-Entry Warrant Legend**") set forth on Exhibit A hereto.

(b)     The Equity Issuer shall cause to be kept at the office or offices of the Warrant Agent designated for such purpose a warrant register (the "**Warrant Register**"), in which, subject to such reasonable regulations as it may prescribe, it shall register the Direct Owners holding Book-Entry Warrants and exchanges and Transfers of outstanding Warrants in accordance with the procedures set forth in Section 2.6, Section 2.7 and Section 5 of this Agreement in a form reasonably acceptable to the Equity Issuer or Warrant Agent. No service charge shall be made for any exchange or registration of Transfer of the Warrants, but the Equity Issuer may require payment by the exercising Holder of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed on the registered Holder in connection with any such exchange or registration of Transfer. The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until any payments required by the immediately preceding sentence have been made.

2.4     Global Warrant Certificates.

(a)     Any Global Warrant Certificate shall bear the legend substantially in the form set forth in Exhibit B hereto (the "**Global Warrant Legend**").

(b)     So long as a Global Warrant Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Agreement with respect to the Warrants evidenced by such Global Warrant Certificate held on their behalf by the Depositary or its

11

custodian, and the Depositary may be treated by the Equity Issuer, the Warrant Agent and any agent of the Equity Issuer or the Warrant Agent as the absolute owner of such Warrants, and as the sole Holder of such Warrants, for all purposes. Accordingly, any such Agent Member's Beneficial Interest in such Warrants will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Equity Issuer nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Equity Issuer, the Warrant Agent or any agent of the Equity Issuer or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(c)     Any holder of a Beneficial Interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such Beneficial Interest, agree that transfers of Beneficial Interests in the Warrants evidenced by such Global Warrant Certificate may be effected only through a book-entry system maintained by the Depositary as the Holder of such Global Warrant Certificate (or its agent), and that ownership of a Beneficial Interest in Warrants evidenced thereby shall be reflected solely in such book-entry form.

(d)     Transfers of a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees except as set forth in Section 2.4(e). Interests of Beneficial Owners in a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be transferred in accordance with the Applicable Procedures.

(e)     The holder of a Global Warrant Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder of a Warrant is entitled to take under this Agreement or such Global Warrant Certificate.

(f)     Each Global Warrant Certificate will evidence such of the Outstanding Warrants as will be specified therein and each shall provide that it evidences the aggregate number of Outstanding Warrants from time to time endorsed thereon and that the aggregate number of Outstanding Warrants evidenced thereby may from time to time be reduced, to reflect exercises or expirations. Any endorsement of a Global Warrant Certificate to reflect the amount of any decrease in the aggregate number of Outstanding Warrants evidenced thereby will be made by the Warrant Agent (i) in the case of an exercise, in accordance with the Applicable Procedures as required by Section 3.2(c) or (ii) in the case of an expiration, in accordance with Section 3.2(b).

(g)     The Equity Issuer initially appoints DTC to act as Depositary with respect to the Global Warrant Certificates.

12

(h)      The Warrant Agent is hereby authorized to countersign and deliver one or more Global Warrant Certificates as required by this Section 2.4.

(i)      Any holder of a Beneficial Interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee may move their holdings of Warrants directly to the Warrant Register as Book-Entry Warrants only through the Applicable Procedures.

2.5    Transfer and Exchange of Book-Entry Warrants. When a Holder of Book-Entry Warrants presents to the Warrant Agent a written request (i) to register the transfer of the Warrants; or (ii) to exchange such Warrants for an equal number of Warrants represented by Book-Entry Warrants of other authorized denominations, then the Warrant Agent shall register the transfer or make the exchange as requested if its customary requirements for such transactions are met; provided, however, that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, properly completed and duly executed by the registered Holder thereof or by his attorney, duly authorized in writing and accompanied by a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.

2.6    Restrictions on Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Global Warrant Certificate. A Book-Entry Warrant may not be exchanged for a Beneficial Interest in a Global Warrant Certificate unless the Warrants are eligible to be cleared or settled in DTC. Upon receipt by the Warrant Agent of appropriate instruments of transfer with respect to a Book-Entry Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Book-Entry Warrant, then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register, increase accordingly the number of Warrants on the Warrant Register registered in the name of the registered owner of the Global Warrant Certificate and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be increased accordingly. If no Global Warrant Certificate is then outstanding (for the avoidance of doubt, while the Warrants are eligible to be cleared or settled in DTC), the Equity Issuer shall issue and the Warrant Agent shall countersign a new Global Warrant Certificate representing the appropriate number of Warrants.

2.7    Withholding and Reporting Requirements.  The Equity Issuer shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions or other situations requiring withholding under applicable law, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements.  The Equity Issuer will be authorized to (a) take any actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements, (b) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, or (c) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes; provided, that the Equity Issuer will also (i) notify the relevant payee of any required withholding reasonably in advance of the date of the

13

relevant payment, (ii) reasonably cooperate with such payee and its Affiliates in obtaining any available exemption or reduction of, or otherwise minimizing, such withholding, and (iii) provide such payee with receipts from the relevant governmental authority evidencing the receipt of any withheld amount.

**3.      Exercise and Expiration of Warrants**.

3.1      <u>Right to Acquire Common Shares Upon Exercise</u>.  Each Warrant duly issued by the Equity Issuer shall entitle the Holder thereof, subject to the provisions thereof and of this Agreement, to subscribe to and acquire from the Equity Issuer, for each Warrant evidenced thereby, one (1) Common Share at the Exercise Price, subject to adjustment as provided in this Agreement.  The Exercise Price, and the number of Common Shares obtainable upon exercise of each Warrant, shall be adjusted from time to time as required by <u>Section 7.1</u>.

3.2      <u>Exercise and Expiration of Warrants</u>.

(a)      <u>Exercise of Warrants</u>.  Subject to and upon compliance with the terms and conditions set forth herein, a Holder may exercise all or any whole number of the Warrants evidenced thereby, on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date, for the Common Shares obtainable thereunder.

(b)      <u>Expiration of Warrants</u>.  The Warrants, to the extent not exercised prior thereto, shall automatically expire, terminate and become void as of 5:00 p.m., New York time, on the Expiration Date. All rights thereunder and all rights in respect thereof under this Agreement shall cease as of such time. No further action of any Person (including by, or on behalf of, any Holder, the Equity Issuer, or the Warrant Agent) shall be required to effectuate the expiration of Warrants pursuant to this <u>Section 3.2(b)</u>.

(c)      <u>Method of Exercise</u>.  In order for a Holder to exercise all or any of its Warrants, the Holder must (i) (x) in the case of a Global Warrant Certificate, deliver to the Warrant Agent an exercise form for the election to exercise such Warrants substantially in the form set forth in <u>Exhibit B</u> hereto (an "***Exercise Form***"), setting forth the number of Warrants being exercised and, and, if applicable, whether cashless exercise is being elected with respect thereto as provided for in <u>Section 3.7</u>, otherwise properly completed and duly executed by the Holder thereof and deliver such Warrants by book-entry transfer through the facilities of the Depositary to the Warrant Agent in accordance with the Applicable Procedures and otherwise comply with the Applicable Procedures in respect of the exercise of such Warrants or (y) in the case of a Book-Entry Warrant, at the Corporate Agency Office (as defined below), (I) deliver to the Warrant Agent an Exercise Form, setting forth the number of Warrants being exercised and, if applicable, whether cashless exercise is being elected with respect thereto as provided for in <u>Section 3.7</u>, otherwise properly completed and duly executed by the Holder thereof as well as any such other information the Warrant Agent may reasonably require and (II) except in the case of a cashless exercise, deliver to the Warrant Agent, by wire transfer in immediately available funds, the amount of the aggregate Exercise Price of all the exercised Warrants (the "***Aggregate Exercise Price***") to the account (No. 530354616; ABA No. 021000021; Reference: American Stock

14

Transfer & Trust Company, LLC as agent for Intelsat Emergence S.A. (to be renamed Intelsat S.A.)) of the Equity Issuer at the Warrant Agent or such other account as the Warrant Agent shall have given notice to the Equity Issuer and such Holder in accordance with Section 14.1(d); and (ii) pay to the Warrant Agent, by wire transfer in immediately available funds, an amount equal to all taxes required to be paid by the Holder, if any, pursuant to Section 3.4 prior to, or concurrently with, exercise of such Warrants to the account (No. 530354616; ABA No. 021000021; Reference: American Stock Transfer & Trust Company, LLC as agent for Intelsat Emergence S.A. (to be renamed Intelsat S.A.)) of the Equity Issuer at the Warrant Agent or such other account as the Warrant Agent shall have given notice to the Equity Issuer and such Holder in accordance with Section 14.1(d), and (iii), if not already a holder of the Common Shares that is party to the Shareholders Agreement, deliver a joinder to the Shareholders Agreement. For the avoidance of doubt, any exercise of any Warrant may be "net share settled" pursuant to a cashless exercise as described in Section 3.7.

(d)     Partial Exercise.  If a Holder exercises fewer than all of its Warrants, (i) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Warrant Agent shall cause the custodian of the Depositary to endorse the "Schedule of Decreases in Warrants" attached to such Global Warrant Certificate to reflect the Warrants being exercised and (ii) in the case of exercise of Warrants evidenced by a Book-Entry Warrant, the Warrant Agent shall reduce the Warrant Register and such Holder's position by the whole number of Warrants duly exercised.

(e)     Issuance of Common Shares.  Upon due exercise of Warrants evidenced by any Warrant Statement in conformity with the foregoing provisions of Section 3.2(c), the Warrant Agent shall, when actions specified in Section 3.2(c)(i) have been effected and any payment specified in Section 3.2(c)(ii) is received, deliver to the Equity Issuer the Exercise Form received pursuant to Section 3.2(c)(i), deliver or deposit any funds, in accordance with Section 3.3, received as instructed in writing by the Equity Issuer and advise the Equity Issuer by telephone at the end of such day of the amount of funds so deposited to its account.  The Equity Issuer shall thereupon, as promptly as practicable, and in any event within five (5) Business Days after the Exercise Date referred to below, (i) determine the number of Common Shares issuable pursuant to exercise of such Warrants pursuant to Section 3.7 and (ii) (x) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, deliver or cause to be delivered to the Recipient in accordance with the Applicable Procedures Common Shares in book-entry form to be so held through the facilities of the Depositary, or, if the Common Shares may not then be held in book-entry form through the facilities of the Depositary, make a book entry into the stock ledger of the Equity Issuer representing such Common Shares, or (y) in the case of exercise of Warrants evidenced by Warrant Statements, make or cause to be made a book entry into the stock ledger of the Equity Issuer representing, in each case of (x) and (y) in an amount equal to the aggregate number of Common Shares issuable upon such exercise (based upon the aggregate number of Warrants so exercised and subjection to Section  3.7), as so determined, together with an amount in cash in lieu of any fractional share(s), if the Equity Issuer so elects pursuant to Section 7.2.  The Common Shares in book-entry form representing Common Shares so delivered shall be, to the extent possible, delivered by crediting the balance account of the Holder or such other Person as shall be designated by

15

the Holder, in such Exercise Form (the Holder or such other designated Person being referred to herein as the "***Recipient***"), on the Equity Issuer's register of Common Shares. Once such Common Shares are delivered pursuant to this Section 3.2(e), for all purposes of this Agreement, the Recipient shall, as between such Person and the Equity Issuer, be entitled to all rights of the holder of record of such Common Shares.

(f)      Time of Exercise.  Each exercise of a Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which each of the requirements for exercise of such Warrant specified in Section 3.2(c) has been duly satisfied (the "***Exercise Date***").

3.3      Application of Funds upon Exercise of Warrants.   All funds received by the Warrant Agent under this Agreement that are to be distributed or applied by the Warrant Agent in the performance of services, including funds received upon the exercise of Warrants (the "***Funds***"), shall be held by the Warrant Agent in its name as agent for the Equity Issuer.  Until paid pursuant to the terms of this Agreement, the Warrant Agent will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.).  The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party.  The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits.  The Warrant Agent shall not be obligated to pay such interest, dividends or earnings to the Equity Issuer, any holder or any other party.  The Warrant Agent shall promptly deposit all funds received by it in payment for the exercise of Warrants into an account of the Equity Issuer maintained with the Warrant Agent (or such other account as may be designated by the Equity Issuer) and shall advise the Equity Issuer by telephone, facsimile transmission, email or other form of electronic communication available to both parties, at the end of each day on which a payment for the exercise of Warrants is received of the amount so deposited to its account. The Warrant Agent shall promptly confirm such advice to the Equity Issuer in writing.

3.4      Payment of Taxes.  The Equity Issuer shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of Common Shares on exercise of Warrants pursuant hereto.  The Equity Issuer or the Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of Common Shares in book-entry form or any registered forms for Common Shares or payment of cash or other property to any Recipient other than, in each case, the Holder of the exercised Warrants, and in case of such transfer or payment, the Warrant Agent and the Equity Issuer shall not be required to issue or deliver any Common Shares in book-entry form or any registered form or pay any cash until it has been established to the Equity Issuer's or Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid.

3.5      [reserved].

16

3.6    <u>Shares Issuable</u>.  The number of Common Shares "obtainable upon exercise" of Warrants at any time shall be the number of Common Shares into which such Warrants are then exercisable.  The Equity Issuer will confirm the number of shares obtainable upon exercise if so requested by the Warrant Agent.  The number of Common Shares "into which each Warrant is exercisable" shall be one (1) share, subject to adjustment as provided in <u>Section 7.1</u>.

3.7    <u>Cashless Exercise</u>.  For the purpose of such a cashless exercise of the Warrants as described in <u>Section 3.2</u>, subject to the terms hereof and solely for the purpose of the payment of the Aggregate Exercise Price of all the exercised Warrants by way of set off, the certain number of Warrants exercised (determined by the Equity Issuer pursuant to the formula set forth below) (the "***Cash Value Warrants***") shall entitle the Holder to the cash value per Cash Value Warrant (as determined by the Equity Issuer pursuant to the formula set forth below, the "***Cash Value per Cash Value Warrant***," and, in the aggregate, the "***Cash Value Claim***") instead of an issue of shares of Common Shares.

Notwithstanding anything to the contrary herein, the Holder shall at no time be entitled to receive a payment of the Cash Value Claim in cash or otherwise other than through the set off of the Cash Value Claim with the Aggregate Exercise Price of the Warrants exercised (except in respect to the Excess). The Aggregate Exercise Price shall be deemed fully paid by way of set off with the Cash Value Claim when set against such Aggregate Exercise Price.

Notwithstanding any provisions herein to the contrary, upon any cashless exercise of any Warrants, if, on the Exercise Date of a cashless exercise, (i) the Cashless Exercise Market Price of one share of the Common Shares is greater than the applicable Exercise Price on the Exercise Date and (ii) the applicable Exercise Price on Exercise Date is not lower than the nominal or par value per share of Common Shares, then the Equity Issuer shall issue to the Holder a number of shares of Common Shares with respect to the Warrants being exercised computed using the following formula:

$$X=((TW-CW)*Y)$$

| | |
|---|---|
| Where X = | the <u>rounded</u> number of Common Shares to be issued to the Holder in respect of the Warrants being exercised; if the result of the formula is not a full number of shares but a fractional amount, the number of shares issued shall be rounded down to the next full number; |
| CV = | the Cash Value per Cash Value Warrant calculated as follows: CV= (Y*A); |
| TW = | the number of exercised Warrants; |
| CW = | the Cash Value Warrants and is calculated as follows: CW= (AEP/CV); |
| A = | the Cashless Exercise Market Price of one (1) Common Share (on the Exercise Date); |

17

Y =   the number of Common Shares into which a Warrant being exercised by the Holder is exercisable (on the Exercise Date) and which is one (1) Common Share subject to adjustment as provided in Section 7.1; and

AEP =   the Aggregate Exercise Price of the Warrants exercised by the Holder.

An illustrative example is attached as Exhibit C to this Agreement.

If the foregoing calculation results in a negative number, then no Common Shares shall be issued upon exercise pursuant to this Section 3.

If the number of Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the formula set forth above (prior to the rounding down to the next full share) is not a full number of shares (such fractional number of shares being "FS"), the Holder shall be entitled to a cash payment of such additional amount (the "*Excess*") calculated as follows:

$$E=(FS-X)*A$$

Where E =   Excess in USD;

X =   The rounded number of Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the first formula set forth above; and

FS =   the number of Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the first formula set forth above prior to the rounding down to the next full share.

The Equity Issuer shall calculate and transmit such calculation of the number of Common Shares to be issued on such exercise to the Warrant Agent (and, if different from the Warrant Agent, the Equity Issuer's transfer agent for the Common Shares), and the Warrant Agent shall have no obligation under this Agreement to calculate, confirm or verify such amount.

For purposes of determining the per share value of Common Shares to be surrendered in connection with such cashless exercise (the "*Cashless Market Exercise Price*"), (i) at any time at which the Common Shares are listed on a U.S. national securities exchange, such value shall be VWAP for the last twenty (20) Trading Days of such Common Shares or (ii) at any time at which the Common Shares are not listed on a U.S. national securities exchange, such value shall be determined by the Board of Directors (and will take into account any valuation determined by a Valuation Firm in the last twelve month period pursuant to this paragraph) within five (5) Business Days following a notice of exercise; provided, that if the Holder does not agree with such value and the Board of Directors has not engaged a Valuation Firm in the last twelve month period pursuant to this paragraph, such value shall be determined by a Valuation Firm jointly selected by the Board of Directors and the applicable Holder.  The Valuation Firm selected pursuant to this Section 3.7 shall have ten (10) Business Days to make a determination regarding value and such determination shall be binding on the Equity Issuer and such Holder absent fraud or manifest error.

18

In no event will the Equity Issuer be required to engage a Valuation Firm in connection with the Warrants or the Series A Warrants more than once per twelve-month period.  After the Board of Directors' receipt of a report of a Valuation Firm during any twelve-month period, the Cashless Market Exercise Price will be determined by the Board of Directors; provided that, the Board of Directors will consider the report of such Valuation Firm in good faith in making any determination of the Cashless Exercise Market Price during the twelve-month period following the receipt of such report of the Valuation Firm.   The fees and expenses of such Valuation Firm shall be paid by the Equity Issuer.

Notwithstanding anything to the contrary in this Section 3.7, a Holder shall only be entitled to elect a cashless exercise of any Warrant, if, on the Exercise Date of such cashless exercise, (i) the Cashless Exercise Market Price of one Common Share is greater than the applicable Exercise Price on the Exercise Date and (ii) the applicable Exercise Price on Exercise Date is not lower than the nominal or par value per share of Common Shares.

3.8    Cost Basis Information. The Equity Issuer hereby instructs the Warrant Agent to record cost basis for newly issued shares at the time of exercise in accordance with instructions by the Equity Issuer.  If the Equity Issuer does not provide such cost basis information to the Warrant Agent, as outlined above, then the Warrant Agent will treat those shares issued hereunder as uncovered securities or the equivalent, and each holder of such shares will need to obtain such cost basis information from the Equity Issuer.

**4.    ERISA Eligibility.**

By accepting a Warrant, each Holder shall be deemed to represent that either (i) it does not hold "plan assets" subject to ERISA or Section 4975 of the Internal Revenue Code or (ii) its acquisition, holding and exercise of Warrants will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Internal Revenue Code.

**5.    Transferability; No Restrictions.**

5.1    General Restriction.

(a)    The Warrants or any Beneficial Interest shall be freely transferable except as provided in this Section 5.1.  Notwithstanding any other provision of this Agreement, each Holder agrees that it shall not Transfer any of its Warrants or Beneficial Interests except:

(i)    as permitted under the Securities Act and other applicable federal law or state securities or blue sky laws and then, with respect to a Transfer of Warrants or Beneficial Interests, if requested by the Equity Issuer or the Warrant Agent, as applicable, only upon delivery to the Equity Issuer of a written opinion of counsel in form and substance reasonably satisfactory to the Equity Issuer to the effect that such Transfer may be effected without registration under the Securities Act; provided, that notwithstanding the foregoing, such a legal opinion shall not be required for any Transfer of Warrants or Beneficial Interests that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the Equity Issuer has a good faith reason to believe that

19

such Warrants or Beneficial Interests are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the Equity Issuer or an "underwriter" (as such term is defined in the Securities Act) with respect to such Warrants or Beneficial Interests;

(ii)     if such Transfer would not reasonably be expected to require the Equity Issuer to initiate a registration or qualification of the Warrants pursuant to the Exchange Act or any applicable federal or state securities or blue sky laws;

(iii)     if such Transfer, upon consummation, would not result in the Equity Issuer having, in the aggregate, either (A) 1,900 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act (determined, in each case, in the Equity Issuer's reasonable discretion) of any class of equity securities of the Equity Issuer;

(iv)     if such Transfer would not cause the Equity Issuer or any Subsidiary or Affiliate of the Equity Issuer to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(v)     if such Transfer would not cause the Equity Issuer or any Subsidiary or Affiliate of the Equity Issuer to be subject to regulation under the Investment Advisers Act of 1940, as amended.

(b)     The direct Transferee (*i.e.*, a Transferee that holds the Warrants represented by Warrant Statements and not simply a Beneficial Interest in the Warrants registered in the name of Cede & Co. (or such other nominee as may be selected by DTC)) of the Warrants Transferred shall be bound by this Agreement as a Direct Owner.  Any indirect Transferee (*i.e.*, a Transferee that holds a Beneficial Interest in the Warrants registered in the name of Cede & Co. (or such other nominee as may be selected by DTC)) of the Warrants Transferred shall be bound by this Agreement as a Beneficial Owner.  Following such a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa) the Warrant Agent shall amend the Warrant Register to reflect the change in Direct Owners, and the Board of Directors, the Warrant Agent or their respective authorized designee shall take any other appropriate action in connection therewith.

(c)     Any attempted or purported Transfer of all or a portion of the Warrants or Beneficial Interests held by a Holder in violation of this Section 5.1 shall be null and void and of no force or effect whatsoever, such purported Transferee shall not be treated as a Holder of the Warrants or Beneficial Interests for purposes of this Agreement or otherwise, and the Equity Issuer shall not register such Transfer.

5.2     Exchange Listing.  From and after such time a Listing of the Common Shares occurs, the Equity Issuer shall use commercially reasonable efforts to list the Warrants on such U.S. national securities exchange; provided, that such obligation shall terminate one year prior to

20

the Expiration Date.  The restrictions under <u>Section 5.1(a)(ii)</u>, <u>5.1(a)(iii)</u>, <u>5.1(a)(iv)</u>, and <u>5.1(a)(v)</u> shall terminate automatically upon the effectiveness of a Listing of the Warrants.

**6.      Dissolution, Liquidation or Winding up**.

Unless <u>Section 7.1(h)</u> applies, if, on or prior to the Expiration Date, the Equity Issuer (or any other Person controlling the Equity Issuer) shall propose a voluntary or involuntary dissolution, liquidation or winding up (a "***Winding Up***") of the affairs of the Equity Issuer, the Equity Issuer shall give written notice thereof to the Warrant Agent and all Holders in the manner provided in <u>Section 14.1(d)</u> at least ten (10) Business Days prior to the date on which such Winding Up is expected to become effective or, if earlier, the record date for such Winding Up.  Such notice shall also specify the date, if known, as of which the holders of record of Common Shares shall be entitled to exchange their shares for securities, money or other property deliverable upon such Winding Up, on which date (i) each Holder of Warrants shall receive the securities, money or other property which such Holder would have been entitled to receive had such Holder been the holder of record of Common Shares into which the Warrants were exercisable immediately prior to such Winding Up (net of the then applicable Exercise Price) and (ii) the rights to exercise the Warrants shall terminate.

Unless <u>Section 7.1(h)</u> applies, in case of any such Winding Up of the Equity Issuer, the Equity Issuer shall deposit with the Warrant Agent any funds or other property which the Holders are entitled to receive pursuant to the above paragraph, together with an Equity Issuer Order as to the distribution thereof.  After receipt of such deposit from the Equity Issuer and any such other necessary information as the Warrant Agent may reasonably require, the Warrant Agent shall make payment in the appropriate amount to such Holders as are reflected on the Warrant Register.  The Warrant Agent shall not be required to pay interest on any money deposited pursuant to the provisions of this <u>Section 6</u> except such as it shall agree with the Equity Issuer to pay thereon. Any moneys, securities or other property which at any time shall be deposited by the Equity Issuer or on its behalf with the Warrant Agent pursuant to this <u>Section 6</u> shall be, and are hereby, assigned, transferred and set over to the Warrant Agent in accordance with <u>Section 3.3</u> hereof; <u>provided</u>, that, moneys, securities or other property need not be segregated from other funds, securities or other property held by the Warrant Agent except to the extent required by law.

**7.      Adjustments**.

7.1      <u>Adjustments</u>.  In order to prevent dilution of the rights granted under the Warrants and to grant the Holders certain additional rights, the Exercise Price shall be subject to adjustment from time to time only as specifically provided in this <u>Section 7.1</u> (the "***Adjustment Events***") and the number of Common Shares obtainable upon exercise of Warrants shall be subject to adjustment from time to time only as specifically provided in this <u>Section 7.1</u>.

(a)      <u>Subdivisions and Combinations</u>.  In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, effect a subdivision (by any stock split or otherwise) of the outstanding Common Shares into a greater number of Common Shares (other than (x) a subdivision upon a Transaction to which <u>Section 7.1(h)</u> applies or (y) a stock split effected by means of a stock dividend or distribution to which <u>Section 7.1(b)</u>

21

applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such subdivision becomes effective shall be proportionately decreased.  Conversely, if the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, effect a combination (by any reverse stock split, combination, subdivision or otherwise) of the outstanding Common Shares into a smaller number of Common Shares (other than a combination upon a Transaction to which Section 7.1(h) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such combination becomes effective shall be proportionately increased.  Any adjustment under this Section 7 shall become effective immediately after the opening of business on the day after the date upon which the subdivision or combination becomes effective.

(b)     Common Share Non-Cash Dividends.  In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, fix a record date for the issuance or making of a dividend or distribution to all holders of the Common Shares of evidences of its indebtedness, any other securities or any cash, property or other assets (excluding any dividends payable solely in cash) or of subscription rights, options or warrants to subscribe to and purchase or acquire any capital stock of the Equity Issuer (excluding stock dividends or distribution referred to in Section 7.1(a)) (any such event being herein called a "*Non-Cash Dividend*"), the Exercise Price shall be decreased immediately after the record date for such Non-Cash Dividend to a price determined by multiplying the Exercise Price then in effect by a fraction, (i) the numerator of which shall be the then Current Market Price of the Common Shares on the Ex-Dividend Date for such Non-Cash Dividend less the Fair Market Value of the evidences of indebtedness, securities, cash, property or other assets issued or distributed in such Non-Cash Dividend applicable to one Common Share or of such subscription rights or warrants applicable to one Common Share, and (ii) the denominator of which shall be such then Current Market Price per Common Share on the Ex-Dividend Date for such Non-Cash Dividend; such adjustment shall be made successively whenever such a record date is fixed.

(c)     Common Share Cash Dividends.  In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part,  fix a record date for the issuance or making of a distribution to all holders of the Common Shares of any dividend payable solely in cash (any such dividend being referred to as a "*Cash Dividend*"), the Exercise Price shall be decreased immediately after the record date for such Cash Dividend to a price determined by multiplying the Exercise Price then in effect by a fraction, (i) the numerator of which shall be the then Current Market Price of the Common Shares on the Ex-Dividend Date for such Cash Dividend less the per share Cash Dividend amount, and (ii) the denominator of which shall be such then Current Market Price per Common Share on the Ex-Dividend Date for such Cash Dividend.

(d)     Adjustments Due to Dividends.  For purposes of Sections 7.1(b) and 7.1(c), any adjustment required by Sections 7.1(b) and 7.1(c) shall be made successively whenever such a record date is fixed and in the event that such distribution is not so made, the

22

Exercise Price shall again be adjusted to be the Exercise Price that was in effect immediately prior to such record date, and "Current Market Price" per Common Share at any date shall mean, (i) if the Common Shares are then listed on a national securities exchange, the average of the daily Quoted Prices for ten (10) consecutive Trading Days immediately prior to such date, or (ii) if the Common Shares are not then so listed, the Fair Market Value immediately prior to such date.

(e)     Reclassifications.  A reclassification of the Common Shares (other than any such reclassification in connection with a Transaction to which Section 7.1(h) applies) into Common Shares and shares of any other class of stock shall be deemed, if the outstanding Common Shares shall be changed into a larger or smaller number of Common Shares as a part of such reclassification, a subdivision or combination, as the case may be, of the outstanding Common Shares for the purposes and within the meaning of Section 7.1(a) (and the effective date of such reclassification shall be deemed to be "the date upon which such subdivision becomes effective" or "the date upon which such combination becomes effective," as applicable, for the purposes and within the meaning of Section 7.1(a)).

(f)     Other Provisions Applicable to Adjustments.  The following provisions shall be applicable to the making of adjustments to the Exercise Price and the number of Common Shares into which each Warrant is exercisable under this Section 7.1:

(i)     Treasury Stock.  The dividend or distribution of any issued Common Shares owned or held by or for the account of the Equity Issuer shall be deemed a dividend or distribution of Common Shares for purposes of Section 7.1(b).  The Equity Issuer shall not make or issue any dividend or distribution on Common Shares held in the treasury of the Equity Issuer.  For the purposes of Section 7.1(b), the number of Common Shares at any time outstanding shall not include shares held in the treasury of the Equity Issuer.

(ii)    When Adjustments Are to be Made.  The adjustments required by Article VII shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exercise Price (excluding Cash Dividends) that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made increases or decreases the Exercise Price immediately prior to the making of such adjustment by at least one percent (1%).  Any adjustment representing a change of less than such minimum amount (except as aforesaid) shall be carried forward and made as soon as such adjustment, together with other adjustments required by Section 7.1(a), Section 7.1(b), Section 7.1(c) and Section 7.1(e) and not previously made, would result in such minimum adjustment.

(iii)   Fractional Interests.  In computing adjustments under Section 7.1, fractional interests in Common Shares shall be taken into account to the nearest one-thousandth (1/1000) of a share.

(g)     Adjustment to Shares Obtainable Upon Exercise.  Whenever the Exercise Price is adjusted as provided in this Section 7.1, the number of Common Shares into which

23

a Warrant is exercisable shall simultaneously be adjusted by multiplying such number of Common Shares into which a Warrant is exercisable immediately prior to such adjustment by a fraction, the numerator of which shall be the Exercise Price immediately prior to such adjustment, and the denominator of which shall be the Exercise Price immediately thereafter.

(h)      Changes in Common Shares.  In case at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, the Equity Issuer shall be a party to or shall otherwise engage in any transaction or series of related transactions constituting: (1) a merger of the Equity Issuer into, a Drag-along Sale involving (or other direct or indirect sale of all of the Equity Issuer's equity to), or a consolidation of the Equity Issuer with, any other Person in which the previously outstanding Common Shares shall be (either directly or upon subsequent liquidation) cancelled, reclassified or converted or changed into or exchanged for securities or other property (including cash) or any combination of the foregoing, or a sale or transfer of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole) (a "***Non-Surviving Transaction***"), or (2) any merger of another Person into the Equity Issuer in which the previously outstanding Common Shares shall be cancelled, reclassified or converted or changed into or exchanged for securities of the Equity Issuer or other property (including cash) or any combination of the foregoing (a "***Surviving Transaction***"; any Non-Surviving Transaction or Surviving Transaction being herein called a "***Transaction***") then:

(x)      if such Transaction constitutes a Sale Cash Only Transaction, then, at the effective time of the consummation of such Sale Cash Only Transaction, any Warrants not exercised prior to the closing of such Sale Cash Only Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the greater of (1) the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such closing and (II) the positive difference, if any, of the Cash Consideration per Common Share in the Transaction and the Exercise Price per Common Share immediately prior to such closing and (2) the Black-Scholes Value of each such Warrant as of the date of the consummation of the Sale Cash Only Transaction;

(y)      if such Transaction is a Redomestication Transaction, as a condition to the consummation of such Transaction, the Equity Issuer shall (or, in the case of any Non-Surviving Transaction, the Equity Issuer shall cause such other Person to) execute and deliver to the Warrant Agent a written instrument providing that any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the securities or other property ("Substituted Property") that would have been receivable upon such Transaction by a Qualifying Person holding the number of

24

Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an Aggregate Exercise Price for such Warrant equal to the product of (i) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (ii) the Exercise Price per Common Share immediately prior to such Transaction; or

(z)     if such Transaction is a Sale Securities Only Transaction or a Sale Cash and Securities Transaction:

(i)     if such Transaction is not a Private Sale Transaction, as a condition to the consummation of such Transaction, the Equity Issuer shall (or, in the case of any Non-Surviving Transaction, the Equity Issuer shall cause such other Person to) execute and deliver to the Warrant Agent a written instrument providing that:

(A)     if such Transaction constitutes a Sale Securities Only Transaction, any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the securities ("**Substituted Securities**") that would have been receivable upon the consummation of such Transaction by a Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an Aggregate Exercise Price for such Warrant equal to the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per Common Share immediately prior to such Transaction;

(B)     if such Transaction constitutes a Sale Cash and Securities Transaction that is an Eligible Sale Cash and Securities Transaction, as a condition to the consummation of such Transaction, at the effective time of the consummation of such Transaction, (I) a portion of the Warrants not exercised prior to the closing of such Transaction equal to the Cash-Out Warrant Percentage (the "**Cash-Out Warrants**") shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of such Cash-Out Warrants, cash in an amount, for each such Cash-Out Warrant so evidenced, equal to the greater of (1) the product of (I) the number of Common Shares into which such Cash Out Warrant was exercisable immediately prior to such closing and (II) the positive difference, if any, of the Cash Consideration per Common Share in such Transaction and the

25

Exercise Price per Common Share immediately prior to such closing and (2) the Black-Scholes Value of each such Cash-Out Warrant as of the date of the consummation of such Transaction and (II) a portion of the Warrants not exercised prior to the closing of such Transaction equal to the Roll-Over Warrant Percentage (the "**Roll-Over Warrants**"), upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the Substituted Securities that would have been receivable upon the consummation of such Transaction by a Qualifying Person holding the number of Common Shares into which such Roll-Over Warrant was exercisable immediately prior to such Transaction and for an Aggregate Exercise Price for such Roll-Over Warrant equal to the product of (a) the number of Common Shares into which such Roll-Over Warrant was exercisable immediately prior to such Transaction and (b) the Exercise Price per Common Share immediately prior to such Transaction;

(C)    if such Transaction constitutes a Sale Cash and Securities Transaction that is an Ineligible Sale Cash and Securities Transaction any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the Substituted Securities that would have been receivable upon such Transaction by a Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an Aggregate Exercise Price for such Warrant equal to the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per Common Share immediately prior to such time as decreased (to an amount not less than the lesser of the par value of the Common Shares as of the date hereof and such par value as of such date of determination) by an amount equal to the Cash Consideration per Common Share receivable in such Sale Cash and Securities Transaction by a Qualifying Person; provided, however, that if, as the result of rights of election, the kind or amount of securities, cash and other property receivable upon such Sale Cash and Securities Transaction is not the same for each Common Share held by a Qualifying Person, then, for the purposes of this Section 7.1(h)(z)(i)(C), the kind and amount of securities, cash and other

26

property receivable upon such Transaction for each Common Share held by a Qualifying Person shall be deemed to be the pro rata kind and amount per Common Share (determined on the basis of all outstanding Common Shares held by Qualifying Persons) actually received by all Qualifying Persons; and

(D)     if such Transaction constitutes a Sale Cash and Securities Transaction that is a De Minimis Sale Cash and Securities Transaction, then, at the effective time of the consummation of such Transaction, any Warrants not exercised prior to the closing of such Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the Black-Scholes Value of each such Warrant as of the date of the consummation of the Transaction; and

(ii)     if such Transaction is a Private Sale Transaction, then, at the effective time of the consummation of such Private Sale Transaction, any Warrants not exercised prior to the closing of such Private Sale Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the Black-Scholes Value of each such Warrant in cash as of the date of the consummation of the Private Sale Transaction;

(iii)     for purposes of Section 7.1(h)(z)(i), if, as the result of rights of election, the kind or amount of securities, cash and other property receivable upon a Sale Cash and Securities Transaction is not the same for each Common Share held by a Qualifying Person, then the kind and amount of securities, cash and other property receivable upon such Transaction for each Common Share held by a Qualifying Person shall be deemed to be the pro rata kind and amount per Common Share (determined on the basis of all outstanding Common Shares held by Qualifying Persons) actually received by all Qualifying Persons;

(iv)     except as otherwise specified in Section 7.1(h)(z)(i), the rights and obligations of the Equity Issuer (or, in the event of a Non-Surviving Transaction such other Person) and the Holders in respect of Substituted Property or Substituted Securities shall be substantially unchanged to be as nearly equivalent as may be practicable to the rights and obligations of the Equity Issuer and Holders in respect of Common Shares hereunder as set forth in Section 3.1 hereof;

(v)     with respect to any Transaction, such written instrument under clause (i) above shall provide for adjustments which, for events subsequent to the effective date of such written instrument shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 7. The above provisions of this Section 7.1(h) shall similarly apply to successive Transactions.

27

(i)      Warrants Deemed Exercisable.  For purposes solely of this Section 7, the number of Common Shares which the holder of any Warrant would have been entitled to receive had such Warrant been exercised in full at any time or into which any Warrant was exercisable at any time.

(j)      Notice of Adjustment.  Upon the occurrence of each adjustment of the Exercise Price or the number of Common Shares into which a Warrant is exercisable pursuant to this Section 7.1, the Equity Issuer at its expense shall promptly:

(i)      compute such adjustment in accordance with the terms hereof;

(ii)      after such adjustment becomes effective, deliver to all Holders, in accordance with Section 14.1(d) and Section 14.2, a notice setting forth such adjustment and showing in reasonable detail the facts upon which such adjustment is based; and

(iii)      deliver to the Warrant Agent a certificate of the Secretary, Treasurer, Chief Accounting Officer, or Chief Financial Officer of the Equity Issuer setting forth the Exercise Price and the number of Common Shares into which each Warrant is exercisable after such adjustment and setting forth a brief statement of the facts requiring such adjustment and the computation by which such adjustment was made (including a description of the basis on which the Current Market Price of the Common Shares was determined).  As provided in Section 13, the Warrant Agent shall be entitled to rely on such certificate and shall be under no duty or responsibility with respect to any such certificate, except to exhibit the same from time to time at the Corporate Agency Office to any Holder desiring an inspection thereof during reasonable business hours.  The Equity Issuer hereby agrees that it will provide the Holders and the Warrant Agent with reasonable notice of any Adjustment Event set forth in this Section 7.1. The Equity Issuer further agrees that it will provide to the Holders and Warrant Agent with any new or amended exercise terms.  The Warrant Agent shall have no obligation under any section of this Agreement to determine whether an Adjustment Event has occurred or to calculate any of the adjustments set forth herein.

7.2      Fractional Interest.  The Equity Issuer shall not be required upon the exercise of any Warrant to issue any fractional Common Shares, but may, in lieu of issuing any fractional Common Shares make an adjustment therefore in cash on the basis of the Current Market Price per Common Share on the date of such exercise.  If Warrants evidenced by more than one Book-Entry Warrants evidencing shall be exercised at the same time by the same Holder, the number of full Common Shares which shall be issuable upon such exercise thereof shall be computed on the basis of the aggregate number of Warrants so to be exercised.  The Holders, by their acceptance of Warrants, expressly waive their right to receive any fraction of a Common Share if such amount of cash is paid in lieu thereof.  The Equity Issuer shall provide an initial funding of one thousand dollars ($1,000.00) for the purpose of issuing cash in lieu of fractional shares.  From time to time thereafter, Warrant Agent may request additional funding to cover fractional payments.  The Warrant Agent shall have no obligation to make fractional payments unless the Equity Issuer shall have provided the necessary funds to pay in full all amounts due and payable with respect thereto.

28

7.3     <u>No Other Adjustments</u>.  Except in accordance with <u>Section 7.1</u>, the applicable Exercise Price and the number of Common Shares obtainable upon exercise of any Warrant will not be adjusted for the issuance of Common Shares or any securities convertible into or exchangeable for Common Shares or carrying the right to subscribe to and purchase any of the foregoing, including, without limitation:

(i)     upon the issuance of any other securities by the Equity Issuer on or after the Original Issue Date, whether or not contemplated by the Plan, or upon the issuance of Common Shares upon the exercise of any such securities;

(ii)    upon the issuance of any Common Shares or other securities or any payments pursuant to any management or other equity incentive plan of the Equity Issuer;

(iii)   upon the issuance of any Common Shares pursuant to the exercise of the Warrants or of the Series A Warrants; or

(iv)    upon the issuance of any Common Shares or other securities of the Equity Issuer in connection with a business acquisition, strategic alliance, joint venture, or similar transaction.

**8.     [reserved.]**

**9.     Reservation and Authorization of Common Shares.**

The Equity Issuer covenants that, for the duration of the Exercise Period, the Equity Issuer will at all times reserve and keep available, from its authorized and unissued Common Shares solely for issuance and delivery upon the exercise of the Warrants and free of preemptive rights, such number of Common Shares and other securities, cash or property as from time to time shall be issuable upon the exercise in full of all Outstanding Warrants for cash.  The Equity Issuer further covenants that it shall, from time to time, take all steps reasonably necessary to increase the authorized number of Common Shares to such number of shares as shall be sufficient to deliver all Common Shares upon exercise in full of all Outstanding Warrants, if at any time the authorized number of Common Shares remaining unissued would otherwise be insufficient to allow delivery of all the Common Shares then deliverable upon the exercise in full of all Outstanding Warrants. The Equity Issuer covenants that all Common Shares issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer and will be free from all taxes, liens and charges in respect of the issue thereof.  The Equity Issuer shall take all such actions as may be reasonably necessary to ensure that all such Common Shares may be so issued without violation of any applicable law or governmental regulation or any requirements of any U.S. national securities exchange upon which the Common Shares may be listed (except for official notice of issuance which shall be immediately delivered by the Equity Issuer upon each such issuance).

The Equity Issuer hereby represents and warrants to the Holders that the issuance of the Warrants and the issuance of Common Shares upon exercise thereof in accordance with the terms hereof will not constitute a breach of, or a default under, any other material agreements to which the Equity Issuer is a party on the date hereof.

29

10.       **Warrant Transfer Books**.

The Warrant Agent will maintain an office or offices (the "***Corporate Agency Office***") in the United States of America, where Warrants may be surrendered for registration of transfer or exchange and where Warrants may be surrendered for exercise of Warrants evidenced thereby, which office is 620 115th Ave., Brooklyn NY 11219 (Attn: Corporate Actions/Warrant Exercise) on the Original Issue Date.  The Warrant Agent will give prompt written notice to all Holders of any change in the location of such office.

The Equity Issuer shall cause to be kept at the Corporate Agency Office the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Equity Issuer shall provide for the registration of Warrants and of transfers or exchanges of Warrants as herein provided.  Subject to Section 5.1(c), the transfer and exchange of Beneficial Interests in Global Warrant Certificates shall be effected through the Depositary, in accordance with this Agreement and the procedures of the Depositary therefor.

All Book-Entry Warrants issued upon any registration of transfer or exchange of Book-Entry Warrants shall be the valid obligations of the Equity Issuer, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Book-Entry Warrants surrendered for such registration of transfer or exchange.

No service charge shall be made for any registration of transfer or exchange of Warrants; provided, however, the Equity Issuer may require payment of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed in connection with any registration of transfer or exchange.  The Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes and/or charges unless and until it is satisfied that all such payments have been made.

The Warrant Agent shall, upon request and at the expense of the Equity Issuer from time to time, deliver to the Equity Issuer such reports of registered ownership of the Warrants and such records of transactions with respect to the Warrants and the Common Shares as the Equity Issuer may request.  The Warrant Agent shall, upon reasonable advance notice, also make available to the Equity Issuer for inspection by the Equity Issuer's agents or employees, from time to time as the Equity Issuer may request, such books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Corporate Agency Office during normal business hours.

The Warrant Agent shall keep copies of this Agreement and any notices given to Holders hereunder available for inspection, upon reasonable advance notice, by the Holders during normal business hours at the Corporate Agency Office.  The Equity Issuer shall supply the Warrant Agent from time to time with such numbers of copies of this Agreement as the Warrant Agent may request.

30

**11.    Warrant Holders**.

11.1    No Voting or Dividend Rights.

(a)     No Holder of any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Shares of the Equity Issuer, including, without limitation, the right to vote, to receive dividends and other distributions as a holder of Common Shares or to receive notice of, or attend, meetings or any other proceedings of the holders of Common Shares.

(b)     No consent of any Holder of Warrants shall be required with respect to any action or proceeding of the Equity Issuer.

(c)     Except as provided in Section 6, no Holder of Warrants, by reason of the ownership or possession of a Warrant, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Shares prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant.

(d)     No Holder of Warrants shall have any right not expressly conferred hereunder or under, or by applicable law with respect to, the Warrants held by such Holder.

11.2    Rights of Action.  All rights of action against the Equity Issuer in respect of this Agreement, except rights of action vested in the Warrant Agent, are vested in the Holders of the Warrants, and any Holder of any Warrant, without the consent of the Warrant Agent or the Holder of any other Warrant, may, in such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Equity Issuer suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Agreement.

**12.    Information and Confidentiality.**

12.1    Reporting and Disclosure.

(a)     Subject to Section 12.2, Holders (other than Holders that are Competitors) shall be entitled to receive from the Equity Issuer the following information: (i) within 65 days (or 150 days in the case of the first fiscal quarter containing the Effective Date and 90 days in the case of the first full fiscal quarter after the Effective Date occurs) after the end of each of the first three fiscal quarters of each fiscal year (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal quarter ending after the Effective Date, quarterly unaudited consolidated financial statements of the Equity Issuer and its Subsidiaries; and (ii) within 120 days (or 135 days in the case of the first fiscal year ending after the Effective Date) following the conclusion of each of the Equity Issuer's fiscal years ending after the Effective Date (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal year ending after the Effective Date, annual audited consolidated financial statements of the Equity Issuer and its Subsidiaries (clauses (i) and (ii) collectively, the "*Financial Statements*"); and (iii) the information if, as and when provided to the noteholders or trustee, as applicable, pursuant to Section 3.10(a) of the New Indenture (or any substantially similar provision

31

in connection with any amendment to the New Indenture or any refinancing indebtedness thereof), including, for the avoidance of doubt, the Financial Statements; *provided*, *however*, that if the Equity Issuer files the Financial Statements described in this Section 12.1(a) with the Securities and Exchange Commission, the requirement to deliver the Financial Statements pursuant to clauses (i) and (ii) shall be deemed satisfied. For the avoidance of doubt, if required pursuant to clauses (i) and (ii), Intelsat Jackson Holdings S.A. or one of its direct or indirect parent entities may provide the Financial Statements in the case of the fiscal year ending December 31, 2021. Reasonably promptly following the release of each of the quarterly unaudited financial statements, the Equity Issuer will provide a video and/or a telephonic presentation (which may be a single presentation held together with other securityholders or holders of indebtedness of the Equity Issuer and its Affiliates) to the Representatives of Holders to discuss the Equity Issuer's financial condition and results of operations, following which presentation the Equity Issuer will allow the Representatives of Holders to ask reasonable questions. Any participant in quarterly calls (including bona fide potential transferees permitted in accordance with the terms hereof) (A) shall not be a Competitor of the Equity Issuer and each Holder hereby represents and warrants to the same as to itself, its Representatives and its bona fide potential transferees that participate in such calls, and (B) shall be subject to Section 12.2; *provided,* that each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of Section 12.2 if such Representative or recipient were party to this Agreement. With respect to any recipient who is a bona fide potential transferee of Warrants, the applicable Holder must first comply with Section 12.2 prior to sharing any such information.

(b)      The Equity Issuer shall use commercially reasonable efforts to promptly post all such information required by Section 12.1 on a website (which may be nonpublic, require a confidentiality acknowledgement, with such acknowledgment being deemed to satisfy the requirement for a non-disclosure agreement as set forth in Section 12.2(c) and shall be maintained using commercially reasonable efforts by the Equity Issuer or a third party) (the "***Holder Website***") to which access will be given to the Holders and bona fide prospective investors or bona fide potential transferees (with the exception of Competitors) in the Warrants.

12.2    Confidentiality.  The Warrant Agent and each Holder acknowledges that any notices or information furnished, including verbally, pursuant to this Agreement, including the Financial Statements and any information actually provided pursuant to Section 12.1(a)(iii), (the "***Confidential Information***") is confidential and competitively sensitive. The Warrant Agent and each Holder shall use, and shall cause any Person to whom Confidential Information is disclosed by the Warrant Agent or such Holder pursuant to clause (A) below, to use the Confidential Information only in connection with its ownership of the Warrants and not for any other purpose (including to disadvantage competitively the Equity Issuer, the Warrant Agent, or any other Holder). The Warrant Agent and each Holder shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(a)      to the Warrant Agent or the Holder's Representatives in the normal course of the performance of their duties for the Warrant Agent or such Holder (it being understood that such Representatives shall be informed by the Holder of the confidential nature of such information and shall be directed to treat such information in accordance with this Section 12.2;

32

(b)      to the extent required by applicable law, rule or regulation or requested by any regulatory or self-regulatory authority in connection with the conduct of its ordinary oversight activities; provided that the Warrant Agent and the Holder shall take reasonable steps to minimize the extent of any such required disclosure and give the Equity Issuer prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Equity Issuer may, at its sole expense, seek an appropriate protective order or similar relief (and the Warrant Agent and Holder, as applicable, shall cooperate with such efforts by the Equity Issuer, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall use reasonable best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information);

(c)      to any Person to whom the Warrant Agent or Holder is contemplating a transfer of its Warrants permitted in accordance with the terms hereof; provided that such person is not prohibited from receiving such information pursuant to this Section 12.2 and prior to such disclosure such potential transferee is advised of the confidential nature of such information and executes a non-disclosure agreement in a form consistent with the provisions of this Section 12.2 and which agreement is independently enforceable by the Equity Issuer and includes a certification that such Person is not a Competitor of the Equity Issuer (which, for the avoidance of doubt, shall be deemed satisfied if such Person has accepted the confidentiality acknowledgement required prior to being granted access to the Holder Website);

(d)      to any regulatory authority or rating agency to which the Warrant Agent or the Holder or any of its respective Affiliates is subject or with which it has regular dealings, solely (I) as long as such authority or agency is advised of the confidential nature of such information and (II) such information is provided as the result of a routine request not targeted to the Equity Issuer or any of its Subsidiaries;

(e)      in connection with the Warrant Agent or the Holder's or their respective Affiliates' normal fund raising, marketing, informational or reporting activities or to any bona fide prospective purchaser of the equity or assets of the Warrant Agent or Holder or their respective Affiliates, or prospective merger partner of the Warrant Agent or of the Holder or their respective Affiliates; provided that prior to such disclosure, if any Confidential Information is shared with such Persons, the Persons to whom such information is disclosed are advised of the confidential nature of such information and are subject to  customary confidentially obligations with respect to such information; or

(f)      if the prior written consent of the Equity Issuer shall have been obtained.

Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Equity Issuer, the Warrant Agent, or the Holder. The restrictions contained in this Section 12.2 shall terminate eighteen (18) months following the date on which the Holder ceases to own any Warrants.

Confidential Information does not include information that: (A) is or becomes generally available to the public (including as a result of any information filed or submitted by the Equity Issuer with the Commission) other than as a result of a disclosure by the Warrant Agent or the Holder or their

33

respective Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement, (B) is or was in the possession of the Warrant Agent or Holder or their respective Representatives on a non-confidential basis prior to its disclosure to the Warrant Agent or the Holder or their Representatives by the Equity Issuer, or (C) was or becomes available to the Warrant Agent or Holder or their respective Representatives on a non-confidential basis from a source other than the Equity Issuer, which source is or was (at the time of receipt of the relevant information) not, to the best of the Warrant Agent's or Holder's or their respective Representatives' knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Equity Issuer or another Person.

**13.    Concerning the Warrant Agent.**

Sections 13.1, 13.2, 13.3, 13.4, 13.5, and 13.6 shall survive the expiration of the Warrants and the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.

13.1    Rights and Duties of the Warrant Agent.

(a)    The Equity Issuer hereby appoints the Warrant Agent to act as agent of the Equity Issuer as set forth in this Agreement.  The Warrant Agent hereby accepts the appointment as agent of the Equity Issuer and agrees to perform that agency upon the express terms and conditions set forth in this Agreement and in the Warrant Statements or as the Equity Issuer and the Warrant Agent may hereafter agree in writing, by all of which the Equity Issuer and the Holders of Warrants, by their acceptance thereof, shall be bound.

(b)    The Warrant Agent shall not, by any act hereunder, be deemed to make any representations as to validity or authorization of (i) the Warrants, (ii) any securities or other property delivered upon exercise of any Warrant, (iii) the accuracy of the computation of the number or kind or amount of stock or other securities or other property deliverable upon exercise of any Warrant, (iv) the correctness of any of the representations of the Equity Issuer made in such certificates that the Warrant Agent receives; or (v) any of the statements of act or recitals contained in this Agreement.  The Warrant Agent shall not at any time have any duty to calculate or determine whether any facts exist that may require any adjustments pursuant to Section 7 hereof with respect to the kind and amount of shares or other securities or any property issuable to Holders upon the exercise of Warrants required from time to time.  The Warrant Agent shall have no duty or responsibility to determine the accuracy or correctness of such calculation or with respect to the methods employed in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any Common Shares or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to Section 7 hereof, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Equity Issuer to make any cash payment or to issue, transfer or deliver any Common Shares or other securities or property upon any exercise or upon any adjustment pursuant to Section 7 hereof or to comply with any of the covenants of the Equity Issuer contained in Section 7 hereof.

34

(c)     The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement or in the Warrant Statements or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Equity Issuer only.

(d)     The Warrant Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any holder of Warrants with respect to any action or default by the Equity Issuer, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Equity Issuer.

(e)     The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorney or agents, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorney or agents or for any loss to the Equity Issuer resulting from any such act, default, neglect or misconduct, absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof.

(f)     The Warrant Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document, or any security delivered to it, and believed by it to be genuine and to have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Equity Issuer with respect to any matter relating to its acting as Warrant Agent hereunder.

(g)     The Warrant Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(h)     The Warrant Agent shall not be liable or responsible for any failure of the Equity Issuer to comply with any of its obligations relating to any registration statement filed with the Commission or this Agreement, including without limitation obligations under applicable regulation or law.

(i)     The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Equity Issuer of any Warrants authenticated by the Warrant Agent and delivered by it to the Equity Issuer pursuant to this Agreement or for the application by the Equity Issuer of the proceeds of the issue and sale, or exercise, of the Warrants.

(j)     The Warrant Agent shall act hereunder solely as agent for the Equity Issuer, and its duties shall be determined solely by the express provisions hereof (and no duties or

35

obligations shall be inferred or implied).  The Warrant Agent shall not assume any obligations or relationship of agency or trust with any of the owners or holders of the Warrants.

(k)     The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon any guaranty of signature by an "eligible guarantor institution" that is a member or participant in the Securities Transfer Agents Medallion Program or other comparable "signature guarantee program" or insurance program in addition to, or in substitution for, the foregoing.

(l)     In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Equity Issuer, the Holder of any Warrant or any other person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Equity Issuer which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(m)     <u>Reliance on Equity Issuer Statement</u>.  Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Equity Issuer prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer and delivered to the Warrant Agent.  The Warrant Agent may rely upon such statement, and will be indemnified and held harmless for such reliance, and shall not be held liable in connection with any delay in receiving such statement.

(n)     The Warrant Agent shall have no responsibility to the Equity Issuer, any Holders of Warrants or any holders of Common Shares for interest or earnings on any moneys held by the Warrant Agent pursuant to this Agreement.

(o)     The Warrant Agent shall not be required to take notice or be deemed to have notice of any event or condition hereunder, including any event or condition that may require action by the Warrant Agent, unless the Warrant Agent shall be specifically notified in writing of such event or condition by the Equity Issuer, and all notices or other instruments required by this Agreement to be delivered to the Warrant Agent must, in order to be effective, be received by the Warrant Agent as specified in <u>Section 14.1</u> hereof, and in the absence of such notice so delivered, the Warrant Agent may conclusively assume no such event or condition exists.

13.2   <u>Limitation of Liability</u>.

(a)     The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction).  Notwithstanding anything contained herein to the

36

contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Equity Issuer to Warrant Agent as fees and charges, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from Warrant Agent is being sought.  Neither party to this Agreement shall be liable to the other party for any consequential, indirect, special or incidental damages under any provisions of this Agreement or for any consequential, indirect, punitive, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

(b)     Exclusions.  The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant. The Warrant Agent shall not be responsible for any breach by the Equity Issuer of any covenant or condition contained in this Agreement or in any Warrant.  The Warrant Agent shall not be responsible to make any adjustments required under the provisions of Section 7 hereof or responsible for the manner, method, or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Shares to be issued pursuant to this Agreement or any Warrant or as to whether any Common Shares shall, when issued, be valid and fully paid and non-assessable.

13.3    Indemnification.

(a)     The Equity Issuer covenants and agrees to indemnify and to hold the Warrant Agent harmless against any costs, expenses (including reasonable and documented fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant hereto; provided, however, that such covenant and agreement does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of, or arising out of, its gross negligence, bad faith, or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction).  The costs and expenses incurred in enforcing this right of indemnification shall be paid by the Equity Issuer.

(b)     Instructions.  From time to time, the Equity Issuer may provide the Warrant Agent with instructions, by Equity Issuer Order or otherwise, concerning the services performed by the Warrant Agent hereunder.  In addition, at any time the Warrant Agent may apply to any officer of the Equity Issuer for instruction, and may consult with legal counsel for the Warrant Agent or the Equity Issuer with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement. Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Equity Issuer for any action taken, suffered or omitted to be taken by Warrant Agent in reliance upon any Equity Issuer instructions or upon the advice or

37

opinion of such counsel.  Warrant Agent shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from the Equity Issuer.

13.4    Right to Consult Counsel.  The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Equity Issuer), and the Warrant Agent shall incur no liability or responsibility to the Equity Issuer or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such counsel.

13.5    Compensation and Reimbursement.  The Equity Issuer agrees to pay the Warrant Agent from time to time compensation for all reasonable fees and expenses relating to its services hereunder as the Equity Issuer and the Warrant Agent may agree in writing from time to time and to reimburse the Warrant Agent for all of its reasonable expenses and disbursements, including reasonable counsel fees and other disbursements incurred in connection with the preparation, delivery, negotiation, amendment, administration and execution of this Agreement and the exercise and performance of its duties hereunder.

13.6    Warrant Agent May Hold Equity Issuer Securities.  The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Equity Issuer or become pecuniarily interested in any transaction in which the Equity Issuer may be interested, or contract with or lend money to the Equity Issuer or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Equity Issuer or for any other legal entity.  Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Equity Issuer or for any other legal entity.

13.7    Resignation and Removal; Appointment of Successor.

(a)      The Warrant Agent may resign its duties and be discharged from all further duties and liability hereunder (except liability arising as a result of the Warrant Agent's own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction)) after giving thirty (30) days' prior written notice to the Equity Issuer.  The Equity Issuer may remove the Warrant Agent upon thirty (30) days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as aforesaid.  The Warrant Agent shall, at the expense of the Equity Issuer, cause notice to be given in accordance with Section 14.1(d) to the Equity Issuer of said notice of resignation or notice of removal, as the case may be.  Upon such resignation or removal, the Equity Issuer shall appoint in writing a new Warrant Agent.  If the Equity Issuer shall fail to make such appointment within a period of thirty (30) calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent.  Any new Warrant Agent, whether appointed by the Equity Issuer or by such a court, shall be a Person (other than a natural person) doing business under the laws of the United States or any state thereof in good standing, authorized under such laws to act as Warrant Agent, and having a combined capital and surplus (together with its

38

Affiliates) of not less than $25,000,000. The combined capital and surplus of such new Warrant Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such Warrant Agent prior to its appointment; provided, however, such reports are published at least annually pursuant to law or to the requirements of a federal or state supervising or examining authority.  After acceptance in writing of such appointment by the new Warrant Agent, it shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be reasonably necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the reasonable expense of the Equity Issuer and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent.  Not later than the effective date of any such appointment, the Equity Issuer shall file notice thereof with the resigning or removed Warrant Agent.  Failure to give any notice provided for in this Section 13.7(a), however, or any defect therein, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a new Warrant Agent as the case may be.

(b)     Any Person into which the Warrant Agent or any new Warrant Agent may be merged, or any Person resulting from any consolidation to which the Warrant Agent or any new Warrant Agent shall be a party, shall be a successor Warrant Agent under this Agreement without any further act; provided, however, that such Person would be eligible for appointment as successor to the Warrant Agent under the provisions of Section 13.7(a). Any such successor Warrant Agent shall promptly cause notice of its succession as Warrant Agent to be given in accordance with Section 14.1(d) to each Holder of a Warrant at such Holder's last address as shown on the Warrant Register.

**14.   Notices.**

14.1   Notices Generally.

(a)     Any request, notice, direction, authorization, consent, waiver, demand or other communication permitted or authorized by this Agreement to be made upon, given or furnished to or filed with the Equity Issuer or the Warrant Agent by the other party hereto or by any Holder shall be sufficient for every purpose hereunder if in writing, sent via trackable or first-class mail or delivered by hand (including by courier service) as follows:

if to the Equity Issuer, to:

Intelsat Emergence S.A. (to be renamed Intelsat S.A.)
*société anonyme*
4, rue Albert Borschette
L-1246 Luxembourg
RCS Luxembourg B 264124
Attention:     Legal Department

and with a copy (which shall not constitute notice to the Equity Issuer) to:

39

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:      Edward O. Sassower, P.C.
                Steven N. Serajeddini, P.C.
                Aparna Yenamandra
                Edward.Sassower@Kirkland.com
                Steven.Serajeddini@Kirkland.com
                Aparna.Yenamandra@Kirkland.com

if to the Warrant Agent, to:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attention:      Corporate Actions

or, in either case, such other address as shall have been set forth in a notice delivered in accordance with this Section 14.1(a).

(b)      All such communications shall be effective when sent.

(c)      Any Person that telecopies any communication hereunder to any Person shall, on the same date as such telecopy is transmitted, also send, by trackable or first class mail, postage prepaid and addressed to such Person as specified above, an original copy of the communication so transmitted.

(d)      Except as set forth in the last paragraph of this Section 14.1(d), where this Agreement provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and (x) sent by electronic mail or (y)mailed, by trackable or first-class mail, to each Holder affected by such event, at the address of such Holder as it appears in the Warrant Register.  In any case where notice to Holders is given by mail or electronic mail, neither the failure to mail or transmit such notice, nor any defect in any notice so mailed or transmitted, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.  Where this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification as shall be made by a method approved by the Warrant Agent as one which would be most reliable under the circumstances for successfully delivering the notice to the addressees shall constitute a sufficient notification for every purpose hereunder.

Where this Agreement provides for notice of any event to a Holder of a Global Warrant Certificate, such notice shall be sufficiently given if given to the Depositary (or its designee),

40

pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.

14.2    Required Notices to Holders.  In the event the Equity Issuer shall:

(a)    take any action that would result in an adjustment to the Exercise Price and/or the number of Common Shares issuable upon exercise of a Warrant pursuant to Section 7.1;

(b)    consummate any Winding Up; or

(c)    consummate any Transaction (each of (a), (b) or (c), an "*Action*");

then, in each such case, the Equity Issuer shall deliver to the Warrant Agent and, unless the Equity Issuer has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such Action, the Equity Issuer shall deliver (or cause to be delivered ) to each Holder of a Warrant, in accordance with Section 14.1(d) hereof, a written notice of such Action, including, in the case of an action pursuant to Section 14.2(a), the information required under Section 7.1(j)(ii).  Such notice shall be given promptly after taking such Action.

If at any time the Equity Issuer shall cancel any of the Actions for which notice has been given under this Section 14.2 prior to the consummation thereof, the Equity Issuer shall give each Holder prompt notice of such cancellation in accordance with Section 14.1(d), unless the Equity Issuer has made a filing with the Commission, including pursuant to a current report on Form 8-K, which filing discloses the cancellation of such Actions.  For the avoidance of doubt, if at any time the Equity Issuer shall cancel any of the Actions for which notice has been given under this Section 14.2 prior to the consummation thereof, the Equity Issuer shall give Warrant Agent prompt notice of such cancellation in accordance with Section 14.1(d).

**15.    Inspection**.

The Warrant Agent shall cause a copy of this Agreement to be available at all reasonable times at the office of the Warrant Agent for inspection by any Holder of any Warrant.  The Warrant Agent may require any such Holder to submit its Warrant Statement for inspection by the Warrant Agent.

**16.    Amendments**.

(a)    Except as provided in paragraphs (b) and (c) of this Section 16, this Agreement may be amended by the Equity Issuer and the Warrant Agent with the consent of the Required Warrant Holders.

(b)    Notwithstanding the foregoing, the Equity Issuer and the Warrant Agent may, without the consent or concurrence of the Holders of the Warrants, by supplemental agreement or otherwise, amend this Agreement for the purpose of making any changes or corrections in this Agreement that (i) are required to cure any ambiguity or to correct or supplement any defective or inconsistent provision or clerical omission or mistake or manifest error herein contained or (ii) add to the covenants and agreements of the Equity Issuer in this Agreement further covenants and

41

agreements of the Equity Issuer thereafter to be observed, or surrender any rights or powers reserved to or conferred upon the Equity Issuer in this Agreement; provided, however, that in either case such amendment shall not adversely affect the rights or interests of the Holders of the Warrants hereunder in any material respect.

(c)     The consent of each Holder of any Warrant affected thereby shall be required for any supplement or amendment to this Agreement or the Warrants that would: (i) increase the Exercise Price or decrease the number of Common Shares receivable upon exercise of Warrants, in each case other than as provided in Section 7.1; (ii) cause the Expiration Date to be changed to an earlier date; or (iii) modify the provisions contained in Section 7.1 in a manner adverse to the Holders of Warrants.

(d)     The Warrant Agent shall join with the Equity Issuer in the execution and delivery of any such amendment unless such amendment affects the Warrant Agent's own rights, duties or immunities hereunder, in which case the Warrant Agent may, but shall not be required to, join in such execution and delivery; provided that, as a condition precedent to the Warrant Agent's execution of any amendment to this Agreement, the Equity Issuer shall deliver to the Warrant Agent a certificate from an Appropriate Officer that states that the proposed amendment is in compliance with the terms of this Section 16.  Upon execution and delivery of any amendment pursuant to this Section 16, such amendment shall be considered a part of this Agreement for all purposes and every Holder of a Warrant theretofore or thereafter delivered hereunder shall be bound thereby.

(e)     Promptly after the execution by the Equity Issuer and the Warrant Agent of any such amendment, unless the Equity Issuer has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such adjustment, the Equity Issuer shall give notice to the Holders of Warrants, setting forth in general terms the substance of such amendment, in accordance with the provisions of Section 14.1(d).  Any failure of the Equity Issuer to mail such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

**17.     Waivers**.

The Equity Issuer may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Equity Issuer has obtained the written consent of the Required Warrant Holders, as required pursuant to Section 16.

**18.     Successor to Equity Issuer**.

So long as Warrants remain Outstanding, the Equity Issuer will not enter into any Transaction unless the acquirer (a "***Successor Equity Issuer***") shall expressly assume by a supplemental agreement, executed and delivered to the Warrant Agent, in form reasonably satisfactory to the Warrant Agent, the due and punctual performance of every covenant of this Agreement on the part of the Equity Issuer to be performed and observed.  Upon the consummation of such Transaction, the acquirer shall succeed to, and be substituted for, and may exercise every right and power of, the Equity Issuer under this Agreement with the same effect as if such acquirer had been named as the Equity Issuer herein.

**19.      Headings**.

The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

**20.      Counterparts**.

This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which together constitute one and the same instrument.  A signature to this Agreement transmitted electronically shall have the same authority, effect and enforceability as an original signature.

**21.      Severability**.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of the other provisions hereof; provided, that, if any provision of this Agreement, as applied to any party or to any circumstance, is adjudged by a court or governmental body not to be enforceable in accordance with its terms, the parties agree that the court or governmental body making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced; further, provided, that, if such excluded provision shall affect the rights, immunities, liabilities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately upon written notice to the Equity Issuer.

**22.      No Redemption**.

The Warrants shall not be subject to redemption by the Equity Issuer or any other Person; provided, that, the Warrants may be acquired by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of this Agreement.

**23.      Persons Benefiting**.

This Agreement shall be binding upon and inure to the benefit of the Equity Issuer, the Warrant Agent and the Holders from time to time.  Nothing in this Agreement, express or implied, is intended to confer upon any person other than the Equity Issuer, the Warrant Agent and the Holders any rights or remedies under or by reason of this Agreement or any part hereof, and all covenants, conditions, stipulations, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and of the Holders.  Each Holder, by acceptance of acceptance of a Warrant or of such interest in a Warrant, agrees to all of the terms and provisions of this Agreement applicable thereto.

**24.      Applicable Law**.

THIS AGREEMENT, EACH WARRANT ISSUED HEREUNDER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO AND THERETO, INCLUDING THE INTERPRETATION, CONSTRUCTION, VALIDITY AND ENFORCEABILITY THEREOF,

43

SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.

**25.      Entire Agreement**.

This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

**26.      Force Majeure.**

Notwithstanding anything to the contrary contained herein, the Warrant Agent will not be liable for any delays or failures in performance resulting from acts beyond its reasonable control including, without limitation, acts of God, terrorist acts, shortage of supply, disruptions in public utilities, interruptions or malfunction of computer facilities, or loss of data due to power failures or mechanical difficulties with information storage or retrieval systems, labor difficulties, war, pandemics, epidemics or civil unrest.

**27.      Further Assurances.**

The Equity Issuer shall perform, acknowledge and deliver or cause to be performed, acknowledged and delivered all such further and other acts, documents, instruments and assurances as may be reasonably required by the Warrant Agent for the carrying out or performing by the Warrant Agent of the provisions of this Agreement.

**28.      Confidentiality.**

The Warrant Agent and the Equity Issuer agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services set forth in the attached schedule shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions) or to such party's advisors (including its attorneys).  However, each party may disclose relevant aspects of the other party's confidential information to its officers, affiliates, agents, subcontractors and employees to the extent reasonably necessary to perform its duties and obligations under this Agreement and such disclosure is not prohibited by applicable law.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.), a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg

By: _____

      Name:    José Toscano
      Title:     Delegate of the Board of Directors

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, as Warrant Agent

By: _____

      Name:
      Title:

[*Signature Page to Series B Warrant Agreement*]

EXHIBIT A



EXHIBIT B-1

## BOOK-ENTRY STATEMENT WARRANT LEGEND

THESE WARRANTS AND ANY COMMON SHARES ISSUABLE UPON EXERCISE OF THE WARRANTS HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145; PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN "UNDERWRITER" AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

THESE WARRANTS AND ANY COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE WARRANTS REPRESENTED HEREBY IN THE WARRANT AGREEMENT, ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**WARRANT AGREEMENT**"). IN ADDITION, THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) (THE "**EQUITY ISSUER**"), DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**SHAREHOLDERS AGREEMENT**"). NO REGISTRATION OR TRANSFER OF THE WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING, AS APPLICABLE, COMPLIANCE WITH THE WARRANT AGREEMENT OR THE SHAREHOLDERS AGREEMENT, AS APPLICABLE.

THE EQUITY ISSUER OR THE WARRANT AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS STATEMENT A COPY OF THE SHAREHOLDERS AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE COMMON SHARES ISSUABLE UPON EXERCISE OF THE WARRANTS, UPON WRITTEN REQUEST TO THE EQUITY ISSUER AT ITS PRINCIPAL PLACE OF BUSINESS. THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE EQUITY ISSUER.

EXHIBIT B-2

**FACE OF SERIES B GLOBAL WARRANT CERTIFICATE**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) GLOBAL WARRANT CERTIFICATE**

**EVIDENCING**

**SERIES B WARRANTS TO SUBSCRIBE TO AND PURCHASE COMMON SHARES**

No. 1                                                                                     CUSIP No. L5217E112

UNLESS THIS GLOBAL SERIES B WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) (THE "**EQUITY ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL SERIES B WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE EQUITY ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THIS WARRANT HAS BEEN, AND THE SECURITIES REPRESENTED HEREBY WILL BE, ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "**BANKRUPTCY CODE**"). THIS WARRANT AND THE SECURITIES REPRESENTED BY THIS WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR

1

(2) THE EQUITY ISSUER IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE EQUITY ISSUER AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE WARRANTS REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER IN THE WARRANT AGREEMENT OF THE EQUITY ISSUER, DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**WARRANT AGREEMENT**"). IN ADDITION, THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF THE EQUITY ISSUER, DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**SHAREHOLDERS AGREEMENT**"). NO REGISTRATION OR TRANSFER OF THE WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING, AS APPLICABLE, COMPLIANCE WITH THE WARRANT OR SHAREHOLDERS AGREEMENT, AS APPLICABLE. COPIES OF SUCH AGREEMENTS ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE EQUITY ISSUER. NO TRANSFER OF THIS WARRANT OR THE SECURITIES REPRESENTED BY THIS WARRANT WILL BE MADE ON THE BOOKS OF THE EQUITY ISSUER UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE SHAREHOLDERS AGREEMENT.

ONLY PARTIES TO THE SHAREHOLDERS AGREEMENT ARE ENTITLED TO EXERCISE THE RIGHTS OF HOLDERS UNDER THE SHAREHOLDERS AGREEMENT. NO PERSON MAY BECOME A HOLDER OF COMMON SHARES PURSUANT TO ANY TRANSFER OF COMMON SHARES OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT, WHICH INCLUDES, AMONG THE ABOVE-REFERENCED RESTRICTIONS, RESTRICTIONS ON TRANSFERS TO "COMPETITORS" OF THE EQUITY ISSUER. A THEN-CURRENT LIST OF SUCH COMPETITORS MAY BE OBTAINED BY CONTACTING THE EQUITY ISSUER.

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**

No. 1                                                                1,911,399 Warrants
                                                                CUSIP No. L5217E112

THIS CERTIFIES THAT, for value received, CEDE & CO., or registered assigns, is the registered owner of the number of Warrants to subscribe to and purchase Common Shares of Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 264124 (the "***Equity Issuer***", which term includes any successor thereto under the Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, the "***Warrant Agreement***"), dated as of February [●], 2022, between the Equity Issuer and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "***Warrant Agent***", which term includes any successor thereto permitted under the Warrant Agreement)) specified above or such lesser number as may from time to time be endorsed on the "Schedule of Decreases in Warrants" attached hereto, and is entitled, subject to and upon compliance with the provisions hereof and of the Warrant Agreement, at such Holder's option, at any time when the Warrants evidenced hereby are exercisable, to subscribe to and purchase from the Equity Issuer one (1) Common Share of the Equity Issuer for each Warrant evidenced hereby, at the purchase price of $77.22 (as adjusted from time to time, the "***Exercise Price***"), payable in full at the time of subscription and purchase, the number of Common Shares into which and the Exercise Price at which each Warrant shall be exercisable each being subject to adjustment as provided in Section 7 of the Warrant Agreement.

All Common Shares issuable by the Equity Issuer upon the exercise of Warrants and payment of the Exercise Price shall, upon such issuance, be duly and validly issued and fully paid and nonassessable. The Equity Issuer shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of Common Shares on exercise of Warrants. The Equity Issuer or Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of Common Shares in book-entry form or any registered forms for Common Shares or payment of cash or other property to any Recipient other than, in each case, the Holder of the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Equity Issuer shall not be required to issue or deliver any Common Shares in book-entry form or any registered form or pay any cash until such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or to the Equity Issuer.

Each Warrant evidenced hereby may be exercised by the Holder hereof at the Exercise Price then in effect on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date in the Warrant Agreement.

Subject to the provisions hereof and of the Warrant Agreement, the Holder of this Global Warrant Certificate may exercise all or any whole number of the Warrants evidenced hereby by delivery to the Warrant Agent of the Exercise Form on the reverse hereof, setting forth the number

3

of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof to the Warrant Agent, and delivering such Warrants by book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise complying with the Applicable Procedures in respect of the exercise of such Warrants together with payment in full of the Exercise Price as then in effect for each Common Share receivable upon exercise of each Warrant being submitted for exercise unless cashless exercise is being elected with respect thereto.  Any such payment of the Exercise Price is to be by wire transfer in immediately available funds to such account of the Equity Issuer at such banking institution as the Equity Issuer shall have designated from time to time.

Reference is hereby made to the further provisions of this Global Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Global Warrant Certificate has been countersigned by the Warrant Agent by manual or electronic signature of an authorized officer on behalf of the Warrant Agent, this Global Warrant Certificate shall not be valid for any purpose and no Warrant evidenced hereby shall be exercisable.

IN WITNESS WHEREOF, the Equity Issuer has caused this certificate to be duly executed.

Dated:  February [●], 2022

**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**

[SEAL]

By:  _____
      José Toscano
      Delegate of the Board of Directors

ATTEST:

Countersigned:

American Stock Transfer & Trust
Company, LLC, as Warrant Agent

By:  _____
      Authorized Agent

_____

_____

4

**Reverse of Series B Global Warrant Certificate**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) SERIES B
WARRANT CERTIFICATE**

**EVIDENCING**

**SERIES B GLOBAL WARRANTS TO PURCHASE COMMON SHARES**

The warrants evidenced hereby are one of a duly authorized issue of warrants of the Equity Issuer designated as its Series B Warrants to subscribe to and purchase Common Shares (the "*Warrants*"), limited in aggregate number to 1,911,399 Common Shares issued under and in accordance with the Warrant Agreement, dated as of February [●], 2022 (the "*Warrant Agreement*"), between the Equity Issuer and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement), to which the Warrant Agreement and all amendments thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Equity Issuer, the Warrant Agent, the Holders of Global Warrant Certificates and Warrant Statements, as applicable, and the owners of the Warrants evidenced thereby and of the terms upon which the Warrants are, and are to be, countersigned and evidenced.  A copy of the Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent for inspection by the Holder hereof.

The Warrant Agreement provides for certain adjustments to the number of Common Shares into which a Warrant is exercisable and the Exercise Price to be made in certain circumstances as more fully specified in the Warrant Agreement, including in Section 7 thereof.

Except as provided in the Warrant Agreement, all Outstanding Warrants shall expire and all rights of the Holders of the Global Warrant Certificate and the Warrant Statements evidencing such Warrants shall automatically terminate and cease to exist, as of 5:00 p.m., New York time, on the Expiration Date.  The "Expiration Date" means the date that is the fifth anniversary of the Effective Date.

In the event of the exercise of less than all of the Warrants evidenced hereby, a new Global Warrant Certificate of the same tenor and for the number of Warrants which are not exercised shall be issued by the Equity Issuer in the name or upon the written order of the Holder of this Global Warrant Certificate upon the cancellation hereof.

Global Warrant Certificates are issuable only in denominations of whole numbers of Warrants.  Upon surrender at the office of the Warrant Agent and payment of the charges specified herein and in the Warrant Agreement, this Global Warrant Certificate may be exchanged for Book-Entry Warrants in other authorized denominations or the transfer hereof may be registered in whole or in part in authorized denominations to one or more designated transferees; provided, however, that such other Book-Entry Warrants issued upon exchange or registration of transfer shall evidence the same aggregate number of Warrants as this Global Warrant Certificate.  The

5

Equity Issuer shall cause to be kept at the office or offices of the Warrant Agent the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Equity Issuer shall provide for the registration of the Global Warrant Certificates and Book-Entry Warrants, as applicable, and of transfers or exchanges of Global Warrant Certificates and Book-Entry Warrants, as applicable.  No service charge shall be made for any registration of transfer or exchange of Warrants; provided, however, the Equity Issuer may require payment of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrants.

Prior to due presentment of this Global Warrant Certificate for registration of transfer, the Equity Issuer, the Warrant Agent and any agent of the Equity Issuer or the Warrant Agent may treat the Person in whose name this Global Warrant Certificate is registered as the owner hereof for all purposes, and neither the Equity Issuer, the Warrant Agent nor any such agent shall be affected by notice to the contrary.

The Warrant Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Equity Issuer and the rights of the Holders of Global Warrant Certificates under the Warrant Agreement at any time by the Equity Issuer and the Warrant Agent with the consent of the Required Warrant Holders.

Until the exercise of any Warrant, subject to the provisions of the Warrant Agreement and except as may be specifically provided for in the Warrant Agreement, (i) no Holder of a Global Warrant Certificate or Warrant Statement evidencing any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Shares of the Equity Issuer, including, without limitation, the right to vote, to receive dividends and other distributions or to receive notice of, or attend meetings of, stockholders or any other proceedings of the Equity Issuer; (ii) the consent of any such Holder shall not be required with respect to any action or proceeding of the Equity Issuer; (iii) except as provided with respect to a Winding Up of the Equity Issuer, no such Holder, by reason of the ownership or possession of a Warrant or the Global Warrant Certificate or Warrant Statement, as applicable, representing the same, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions (except as specifically provided in the Warrant Agreement), paid, allotted or distributed or distributable to the stockholders of the Equity Issuer prior to or for which the relevant record date preceded the date of the exercise of such Warrant; and (iv) no such Holder shall have any right not expressly conferred by the Warrant, Global Warrant Certificate, or Warrant Statement held by such Holder.

This Global Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

All terms used in this Global Warrant Certificate which are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement.  In the event of any conflict between this Global Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

6

<u>Exercise Form for Series B Warrants</u>

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attn: Corporate Actions

Re: Intelsat Emergence S.A. (to be renamed Intelsat S.A.) Series B Warrant Agreement, dated as of February [●], 2022

In accordance with and subject to the terms and conditions hereof and of the Warrant Agreement dated as of February [●], 2022 (the "***Warrant Agreement***"), the undersigned Holder of this Warrant hereby irrevocably elects to exercise _____ Warrants and represents that for each of the Warrants evidenced hereby being exercised such Holder either has (please check one box only):

☐      tendered the Exercise Price in the aggregate amount of $_____ by wire transfer in immediately available funds to such account of the Equity Issuer at such bank account as the Equity Issuer has designated from time to time for such purpose;

or

☐      cashless exercise.

The undersigned, if not already a shareholder of the Equity Issuer, is concurrently delivering a joinder to the Shareholders Agreement.

The undersigned requests that the Common Shares issuable upon exercise be in fully registered form in such numbers of Common Shares and registered in such names and delivered in such manner as is specified in the instructions set forth below.

If the number of Warrants exercised is less than all of the Warrants evidenced hereby, (i) if the Warrants exercised are represented by a Global Warrant Certificate, the Warrant Agent shall endorse the "Schedule of Decreases in Warrants" attached hereto to reflect the Warrants being exercised or (ii) if the Warrants exercised are represented by Book-Entry Warrants, the undersigned requests that a new Book-Entry Warrant representing the remaining Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

Dated: _____         Name: _____
                                                       (Please Print)
_____
(Insert Social Security or Other
Identifying Number of Holder)         Address: _____

                                      _____

                                      _____
                                                 Signature
                                      (Signature must conform in all respects to name
                                      of Holder as specified on the face of this Global
                                      Warrant Certificate and Warrant Statement and
                                      must bear a signature guarantee by a bank, trust
                                      company or member firm of a U.S. national
                                      securities exchange.)

Signature Guaranteed:

        Instructions (i) as to numbers of Common Shares issuable upon exercise and as to delivery
of such securities and any other property issuable upon exercise and (ii) if applicable, as to Book-
Entry Warrants evidencing unexercised Warrants:

Assignment

(Form of Assignment To Be Executed If Holder Desires To Transfer Warrants)

        FOR VALUE RECEIVED _____ hereby sells, assigns
and transfers unto

Please insert social security or
other identifying number

(Please print name and address including zip code)

the Warrants represented by the within Global Warrant Certificate or Warrant Statement, as
applicable, and does hereby irrevocably constitute and appoint _____ Attorney, to
transfer said Global Warrant Certificate or Warrant, as applicable, on the books of the within-
named Equity Issuer with full power of substitution in the premises.

Dated: _____         Signature _____

                                      (Signature must conform in all respects to name
                                      of Holder as specified on the face of this Global
                                      Warrant Certificate and Warrant Statement and
                                      must bear a signature guarantee by a bank, trust
                                      company or member firm of a U.S. national
                                      securities exchange.)

8

## SCHEDULE A

## SCHEDULE OF DECREASES IN WARRANTS

The following decreases in the number of Warrants evidenced by this Global Warrant Certificate have been made:

| Date | Amount of decrease in number of Warrants evidenced by this Global Warrant Certificate | Number of Warrants evidenced by this Global Warrant Certificate following such decrease | Signature of authorized signatory |
|------|------|------|------|

9

EXHIBIT C

**Cashless Exercise Examples**

---

**Legend[1]**

A = Common Share price (*e.g.* $11 USD);

AEP = Aggregate exercise price;

B = Exercise Price (*e.g.* $1 USD);

CV= Cash Value per Cash Value Warrant;

CW= The "Cash Value Warrants;"

E = Excess (in USD);

FS = Number of shares to be issued (unrounded);

TW = Total number of warrants exercised (*e.g.* 100);

X = Number of shares to be issued (rounded); and

Y = The number of Common Shares exercisable (one (1) Common Share).[2]

---

**1. U.S. Cashless Exercise.**

$$X = \frac{TW(A - B)}{A}$$

$$X = \frac{100 * (11 - 1)}{11}$$

$$X = 90^{3} \ (FS = 90.91)$$

---

[1]   For illustrative purposes only.  Operational definitions appear in <u>Section 3.7</u> to the Agreement.

[2]   Subject to adjustment as provided in <u>Section 7.1</u>.

[3]   *See* <u>Section 3.7</u> ("[I]f the result of the formula is not a full number of shares but a fractional amount, the number of shares issued shall be rounded down to the next full number.")

**2. Luxembourg Cashless Exercise.**

$$X = (TW - CW) * Y$$

$$CW = \frac{AEP}{CV}$$

$$AEP = TW * B$$

$$AEP = (100 * \$1) = \$100$$

$$CV \ (Cash \ Value) = Y * A$$

$$CW = \frac{\$100}{\$11} = 9.09$$

$$X = (100 - 9.09) * 1$$

$$X = 90 \ (FS = 90.91)$$

**3. Cash Value Claim.**

$$CVC = CW * CV$$
$$CVC = (100/11) * (11)$$
$$CVC = 100 \ (AEP)$$

**4. Excess Formula.**

$$E = (FS - X) * A$$
$$E = (90.91 - 90) * A$$
$$E = 10.01$$

**Exhibit E-2**

**Redline to New Series B Warrant Agreement filed on October 19, 2021**

SERIES B WARRANT AGREEMENT

between

<u>INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)</u>

[●]

and

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC,
as Warrant Agent

Dated as of <u>February</u> [●], ~~202[●]~~<u>2022</u>

Series B Warrants to Subscribe to and Purchase Common Shares

## TABLE OF CONTENTS

**Page**

Definitions.................................................................................................................1

2.   Book-Entry Warrants. ...............................................................................~~8~~9

   Original Issuance of Warrants.................................................................~~8~~9
   Form of Warrants .................................................................................~~9~~10
   Delivery of Book-Entry Warrants ..........................................................~~9~~11
   Global Warrant Certificates ................................................................~~10~~11
   Transfer and Exchange of Book-Entry Warrants ....................................~~11~~12
   Restrictions on Exchange or Transfer of a Book-Entry Warrant for a
   Beneficial Interest in a Global Warrant Certificate.................................~~11~~13
   Withholding and Reporting Requirements .............................................~~12~~13

   Exercise and Expiration of Warrants .....................................................~~12~~13
   Right to Acquire Common Shares Upon Exercise....................................~~12~~13
   Exercise and Expiration of Warrants ....................................................~~12~~14
   Application of Funds upon Exercise of Warrants ....................................~~14~~16
   Payment of Taxes...............................................................................~~15~~16
   [reserved]. .......................................................................................~~15~~16
   Shares Issuable.................................................................................~~15~~16
   Cashless Exercise.............................................................................~~15~~16
   Cost Basis Information .......................................................................~~17~~19

4.   ERISA Eligibility. ..................................................................................~~17~~19

5.   Transferability; No Restrictions.............................................................~~17~~19
   General Restriction ...........................................................................~~17~~19
   Exchange Listing ..............................................................................~~19~~20

   Dissolution, Liquidation or Winding up ..................................................~~19~~20

   Adjustments ......................................................................................~~19~~21
   Adjustments .....................................................................................~~19~~21
   Fractional Interest .............................................................................~~25~~28
   No Other Adjustments........................................................................~~25~~28

8.   [reserved.] ............................................................................................~~26~~29

   Reservation and Authorization of Common Shares...................................~~26~~29

   Warrant Transfer Books ........................................................................~~26~~29

   Warrant Holders ..................................................................................~~27~~30
   No Voting or Dividend Rights .............................................................~~27~~30
   Rights of Action ...............................................................................~~28~~30

12.  Information and Confidentiality.............................................................~~28~~31
   Reporting and Disclosure...................................................................~~28~~31
   Confidentiality .................................................................................~~29~~31

13.  Concerning the Warrant Agent...............................................................~~30~~33

~~i~~ii

13.1    Rights and Duties of the Warrant Agent. ........................................................3033
13.2    Limitation of Liability. ......................................................................................3336
13.3    Indemnification. ................................................................................................3336
            Right to Consult Counsel ..................................................................................3437
            Compensation and Reimbursement ...................................................................3437
            Warrant Agent May Hold Equity Issuer Securities ...........................................3437
            Resignation and Removal; Appointment of Successor .....................................3437

14.    Notices. ...............................................................................................................3638
            Notices Generally ...............................................................................................3638
            Required Notices to Holders ..............................................................................3740

        Inspection ...........................................................................................................3840

        Amendments .......................................................................................................3841

        Waivers ...............................................................................................................3942

        Successor to Equity Issuer .................................................................................3942

        Headings ............................................................................................................3942

        Counterparts .......................................................................................................3942

        Severability ........................................................................................................3942

        No Redemption ...................................................................................................4042

        Persons Benefiting .............................................................................................4043

        Applicable Law ..................................................................................................4043

        Entire Agreement ...............................................................................................4043

26.    Force Majeure. ...................................................................................................4043

27.    Further Assurances. ...........................................................................................4043

28.    Confidentiality ...................................................................................................4143

**EXHIBITS**

Exhibit A           Form of Book-Entry Warrant Statement

Exhibit B           Form of Global Warrant Certificate

Exhibit C           Cashless Exercise Examples

ii

## SERIES B WARRANT AGREEMENT

This Series B Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, this "*Agreement*"), dated as of **February** [●], ~~2021~~**2022** between ~~[●]~~**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**, a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B~~[●]~~ **264124** (and any Successor ~~Company~~**Equity Issuer** (as defined below) that becomes successor to the Equity Issuer in accordance with Section 18) (the "*Equity Issuer*") and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*," which term includes any successor thereto permitted under this Agreement).  Capitalized terms that are used in this Agreement shall have the meanings set forth in Section 1 hereof.

## WITNESSETH THAT:

**WHEREAS**, pursuant to the terms and conditions of the ~~[Second]~~**Fourth** *Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and Its Debtor Affiliates*, Docket No. ~~[2773]~~**3891** of Case No. 20-32299 (KLP) (the "*Plan*") relating to a reorganization under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), the Equity Issuer proposes to issue and deliver Warrants (as defined below) to subscribe to and purchase up to, in the aggregate, a number of Common Shares (as defined below) representing 2.5% of the number of Common Shares of the Equity Issuer issued and outstanding as of the Effective Date (as defined below) (assuming the exercise of all Warrants, including all Series A Warrants (as defined below), subject to adjustment as provided herein, and the Warrant Statements and the Global Warrant Certificates (as defined below) evidencing such Warrants;

**WHEREAS**, each Warrant shall entitle the registered owner thereof to subscribe to and purchase one (1) Common Share, subject to adjustment as provided herein;

**WHEREAS**, the Warrants and the Common Shares issuable upon exercise of the Warrants are being issued in an offering in reliance on the exemption from the registration requirements of the Securities Act (as defined below) afforded by section 1145 of the Bankruptcy Code, and of any applicable state securities or "blue sky" laws; and

**WHEREAS**, the Equity Issuer desires that the Warrant Agent act on behalf of the Equity Issuer, and the Warrant Agent is willing to so act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants.

**NOW THEREFORE,** in consideration of the mutual agreements herein contained, the Equity Issuer and the Warrant Agent agree as follows:

1.      **Definitions**.

"*Action*" has the meaning set forth in Section 14.2(c).

"*Adjustment Events*" has the meaning set forth in Section 7.1.

"*Affiliate*" of any specified Person, means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such specified Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Agent Members*" has the meaning set forth in Section 2.4(b).¶

"*Agreement*" has the meaning set forth in the preamble hereto.

"*Aggregate Exercise Price*" has the meaning set forth in Section 3.2(c).¶

¶

"*Agreement*" has the meaning set forth in the preamble hereto.¶

"*Allowed*" has the meaning set forth in the Plan.

"*Applicable Procedures*" means, with respect to any transfer or exchange of, or exercise of any Warrants evidenced by, any Global Warrant Certificate, the rules and procedures of the Depositary that apply to such transfer, exchange or exercise.

"*Appropriate Officer*" means any person designated as such by the Board of Directors from time to time.

"*Bankruptcy Code*" has the meaning set forth in the recitals hereto.

"*Beneficial Interest*" means, **solely for purposes of and as used in Sections 2.4, 2.6, 5.1 and 10,** with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Warrants it Beneficially Owns.

"*Beneficial Owner*" means**, solely for purposes of and as used in Sections 2.4, 2.6, 5.1 and 10,** any Person owning a securities entitlement with respect to Warrants registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been **ultimately** credited to any other Person's securities account. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.¶

[¶

"*Black-Scholes Eligible Transaction*" **means any Sale Cash Only Transaction, Eligible Sale Cash and Securities Transaction, De Minimis Sale Cash and Securities Transaction or Private Sale Transaction.**¶

"*Black-Scholes Value*" means, with respect to any ~~Sale Cash Only~~**Black-Scholes Eligible** Transaction, the value of a Warrant on the date of consummation of such ~~Sale Cash~~

2

~~Only~~**Black-Scholes Eligible** Transaction, as determined by a Valuation Firm ~~selected by the Board of Directors and a majority of Holders~~ using the Black Scholes Option Pricing Model for a "call" option, subject to the following assumptions: (a) an underlying security price for Common Shares equal to the value of the consideration received in such ~~Sale Cash Only~~**Black-Scholes Eligible** Transaction for an outstanding Common Share, (b) a strike price equal to the Exercise Price in effect as of the date of consummation of the applicable ~~Sale Cash Only~~**Black-Scholes Eligible** Transaction, (c) a maturity equal to the remaining term of the Warrant, (d) a volatility to be determined by such Valuation Firm as of the date of determination and pursuant to customary practices for calculating such volatility (but in any event no more than 45% and no less than 20%; *provided, however*, that such range will not be disclosed to such Valuation Firm); and (e) a risk-free interest rate equal to the interpolated rate on the United State~~ds~~ Treasury securities with a maturity closest to the remaining term of the Warrant as of the date of consummation of the applicable ~~Sale Cash Only~~**Black-Scholes Eligible** Transaction.~~]~~

"***Board of Directors***" means either the board of directors of the Equity Issuer or any duly authorized committee of that board.

"***Book-Entry Warrants***" means ~~Warrants issued by book-entry registration~~ Warrants issued by book-entry registration in the books and records of the Warrant Agent and reflected on the Warrant Register.

"***Book-Entry Warrant Legend***" has the meaning set forth in Section 2.3(a).

"***Business Day***" means each Monday, Tuesday, Wednesday, Thursday and Friday which is not a legal holiday in the State of New York or Luxembourg City or a day on which banking institutions and trust companies in the state in which the Corporate Agency Office is located are authorized or obligated by law, regulation or executive order to close.

"***Cash Consideration***" means, with respect to any Sale Cash Only Transaction or Sale Cash and Securities Transaction, the consideration constituting cash and property other than securities.

"***Cash Dividend***" has the meaning set forth in Section 7.1(c).

"***Cashless Market Exercise Price***" has the meaning set forth in Section 3.7.¶

"***Cash-Out Warrant Percentage***" **means, with respect to any Eligible Sale Cash and Securities Transaction, the percentage of the total consideration per Common Share receivable in such Transaction by a Qualifying Person represented by Cash Consideration (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).¶**

"***Cash-Out Warrants***" **has the meaning set forth in Section 7.1(h)(z)(i)(B).**

"***Cash Value Claim***" **has the meaning set forth in Section 3.7.¶**

"***Cash Value per Cash Value Warrant***" has the meaning set forth in Section 3.7.

3

"*Cash Value Warrants*" has the meaning set forth in Section 3.7.

"*Commission*" means the Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act, whichever is the relevant statute for the particular purpose.

"*Common Shares*" means, subject to the provisions of Section 7.1(h), the common shares of the Equity Issuer issued upon the Effective Date in accordance with the Plan each [with a nominal value of USD $[●][without nominal value]**0.01**.

"*Competitor*" means a "Competitor of the Company" as defined in the Shareholders Agreement.

"*Confidential Information*" has the meaning set forth in Section 12.2.

"*Constituent Person*" has the meaning set forth in the definition of "Qualifying Person."

"*Corporate Agency Office*" has the meaning set forth in Section 10.¶

"*Countersigning Agent*" means any Person authorized by the Warrant Agent to act on behalf of the Warrant Agent to countersign Warrant Certificates.

"*Current Market Price*" means on any date:

(i)     [if the reference is to the per share price of Common Shares **(or other applicable security)** on any date herein specified and if on such date the Common Shares **(or other applicable security)** are listed or admitted to trading on any U.S. national securities exchange [or traded and quoted in the over-the-counter market in the United States]:

(A)     for the purpose of any computation under this Agreement (except under Section 7.2), the average of the Quoted Prices**VWAP** for the 30 consecutive Trading Days ending on such date or, if such date is not a Trading Day, on the next preceding Trading Day; or

(B)     for the purposes of any computation under Section 7.2, the Quoted Price for such date or, if such date is not a Trading Day, for the next preceding Trading Day; or

(ii)     if the reference is to the per share price of Common Shares **(or other applicable security)** on any date herein specified and if on such date the Common Shares are not listed or admitted to trading on any U.S. national securities exchange [or traded and quoted in the over-the-counter market in the United States], the Fair Market Value for one (1) Common Share **(or other applicable security)**.¶

For the avoidance of doubt, no appraisal of any Person or third-party (other than a member of the Board of Directors) shall be permitted or required to determine the Current Market Price¶

4

**"*De Minimis Sale Cash and Securities Transaction*" means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes more than 75% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction)**.

"*Depositary*" means DTC and its successors as depositary hereunder.

"*Direct Owner*" means any holder of Book-Entry Warrants.¶

**"*Drag-along Sale*" has the meaning set forth in *the Shareholders Agreement* as in effect on the date hereof.¶**

"*DTC*" means The Depository Trust Company **or any successor thereto**.

"*DTC Participant*" means any Person that is reflected on the books and records of DTC as having a direct interest in the Warrants held of record by DTC as of immediately prior to the Effective Date.

"*Effective Date*" means **February** [●], ~~202[●]~~**2022.**¶

**"*Eligible Sale Cash and Securities Transaction*" means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes no less than 50% and no more than 75% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction)**.

"*Equity Issuer*" has the meaning set forth in the preamble hereto.

"*Equity Issuer Order*" means a written request or order signed in the name of the Equity Issuer by an Appropriate Officer and delivered to the Warrant Agent.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Excess*" has the meaning set forth in Section 3.7.

"*Exchange Act*" means the Securities Exchange Act of 1934 and any statute successor thereto, in each case, as amended from time to time.

"*Ex-Dividend Date*" means the first date on which the Common Shares trade on the applicable exchange or in the applicable market, regular way, without the right to receive the issuance, dividend or distribution in question.

5

"*Exercise Date*" has the meaning set forth in Section 3.2(f).

"*Exercise Form*" has the meaning set forth in Section 3.2(c).

"*Exercise Period*" means the period from and including the Original Issue Date to and including the Expiration Date.

"*Exercise Price*" means the exercise price per Common Share, initially set at $[●]**77.22**, subject to adjustment as provided in Section 7.1, provided that the exercise price per Common Share may not be lower than the nominal or par value per share **unless expressly decided otherwise by the Equity Issuer and to the extent permitted by law**.

"*Expiration Date*" means the date that is the fifth (5th) anniversary of the Effective Date.

"*Fair Market Value*" means, on any date, as to any security or other non-cash assets: the amount which a willing buyer would pay a willing seller in an arm's length transaction on such date (neither being under any compulsion to buy or sell) for such security or other non-cash property, as reasonably determined as of such date by ~~the Board of Directors in good faith~~**a Valuation Firm**, whose determination shall be ~~evidenced by a resolution of the Board of Directors~~ filed with the Warrant Agent with written notice of such determination given by the Equity Issuer to the Holders in accordance with Section 14.2**, provided that, after the Board's receipt of a report of a Valuation Firm during any twelve-month period, the Fair Market Value will be determined in good faith by the Board of Directors. For the avoidance of doubt, the Board of Directors will consider the report of such Valuation Firm in good faith in making any determination of the Fair Market Value during the twelve-month period following receipt of such report of the Valuation Firm.**¶

"***Financial Statements***" **has the meaning set forth in Section 12.1**.

"*Funds*" has the meaning set forth in Section 3.3.

"*Global Warrant Certificate*" means a certificate for Warrants in global form, deposited with or on behalf of and registered in the name of the Depositary or its nominee, that bears the Global Warrant Legend and that has the "Schedule of Decreases in Warrants" attached thereto, substantially in the form attached as Exhibit B.

"*Global Warrant Legend*" has the meaning set forth in Section 2.4(a).

"*Holder*" means any Person in whose name at the time any Warrant is registered upon the Warrant Register and, when used with respect to any Warrant Statement, the Person in whose name such evidenced by the applicable Warrant Statement is registered in the Warrant Register.¶

"***Holder Website***" **has the meaning set forth in Section 12.2(c).**¶

"***Ineligible Sale Cash and Securities Transaction***" **means, with respect to any Sale Cash and Securities Transaction, a Transaction in which the Cash Consideration per Common Share receivable in such Transaction constitutes less than 50% of the total consideration per Common Share receivable in such Transaction by a Qualifying Person**

**(with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).**

"*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.¶

**"*Listing*" means a public listing of the Equity Issuer's securities on a U.S. national securities exchange resulting in the Equity Issuer being registered under Section 12(b) of the Exchange Act. ¶**

**"*New Indenture*" means that certain indenture for 6.500% First Lien Secured Notes due 2030 dated January 27, 2022 between Intelsat Jackson Holdings S.A., the guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time.**

"*Non-Cash Dividend*" has the meaning set forth in Section 7.1(b).

"*Non-Surviving Transaction*" has the meaning set forth in Section 7.1(h).

"*Original Issue Date*" means the Effective Date, the date on which Warrants are originally issued under this Agreement.

"*Outstanding*" when used with respect to any Warrants, means, as of the time of determination, all Warrants theretofore originally issued under this Agreement, as adjusted pursuant to Section 7.1, except (i) Warrants that have been exercised pursuant to Section 3.2(a), (ii) Warrants that have expired, terminated or become void pursuant to Section 3.2(b) or Section 6 and (iii) Warrants that have otherwise been acquired by the Equity Issuer or any of its Subsidiaries; provided, however, that in determining whether the Holders of the requisite amount of the ~~o~~Outstanding Warrants have given any request, demand, authorization, direction, notice, consent or waiver under the provisions of this Agreement, Warrants held directly or beneficially by the Equity Issuer or any Subsidiary of the Equity Issuer or any of their respective employees shall be disregarded and deemed not to be outstanding.¶

"~~*Owners*~~" ~~means, collectively, any Beneficial Owners and Direct Owners.~~

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, trust, association, joint-stock company, business trust or any other entity, unincorporated organization or government or any agency or political subdivision thereof.

"*Plan*" has the meaning set forth in the recitals hereto.

"*Plan Effective Time*" has the meaning set forth in Section 2.1(a).¶

**"*Private Sale Transaction*" means, as related to the Equity Issuer, a Transaction that results in Substituted Securities that either (a) are not of an issuer that is subject to the reporting requirements of the Exchange Act or (b) do not have an average aggregate trading volume of common equity of at least $20 million per Trading Day over the sixty (60) Trading Days preceding such Private Sale Transaction.**

7

"*Qualifying Person*" means, with respect to any Transaction, a holder of Common Shares that is not (i) an employee of the Equity Issuer or of any Subsidiary thereof, (ii) a Person with which the Equity Issuer has consolidated or into which the Equity Issuer has merged or which has merged into the Equity Issuer or to which a sale or transfer of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole) was made, as the case may be (any Person described in this clause (ii), a "*Constituent Person*") or (iii) an Affiliate of a Constituent Person.

"*Quoted Price*" means, on any Trading Day, with respect to the Common Shares **(or other applicable security)**, the VWAP of the Common Shares **(or other applicable security)** on such Trading Day on the principal U.S. national securities exchange on which the Common Shares **(or other applicable security)** are listed or admitted to trading or, if the Common Shares **(or other applicable security)** are not listed or admitted to trading on any U.S. national securities exchange, the average of the closing bid and asked prices in the over-the-counter market in the United States as furnished by any New York Stock Exchange member firm that shall be selected from time to time by the Equity Issuer for that purpose (or, if such volume-weighted average price or the average of the closing bid and asked price is unavailable, the Fair Market Value on such Trading Day).

"*Recipient*" has the meaning set forth in Section 3.2(e).

"*Redomestication Transaction*" means a Non-Surviving Transaction in which all of the property received upon such Non-Surviving Transaction by each holder of Common Shares consists solely of securities, cash in lieu of fractional shares and other de minimis consideration, and the holders of the Common Shares immediately prior to such Non-Surviving Transaction are the only holders of the equity securities of the Successor Equity Issuer immediately after the consummation of such Non-Surviving Transaction.

"*Representatives*" ~~has the meaning set forth in Section 12.2~~**means a Person's partners (including limited partners except for any Competitors), shareholders, members, directors, officers, managers, employees, financing sources (including existing and bona fide prospective investors except for any Competitors), agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its Affiliates or wholly owned subsidiaries**.

"*Required Warrant Holders*" means Holders of Warrants evidencing at least a majority of the then-Outstanding Warrants.¶

"***Roll-Over Warrant Percentage*" means, with respect to any Eligible Sale Cash and Securities Transaction, the percentage of the total consideration per Common Share receivable in such Transaction by a Qualifying Person represented by Substituted Securities (with the value of the Substituted Securities receivable in such Transaction being the Current Market Price of such Substituted Securities as of the Trading Day immediately prior to the consummation of such Transaction).**¶

"***Roll-Over Warrants*" has the meaning set forth in Section 7.1(h)(z)(i)(B).**

"*Sale Cash and Securities Transaction*" means a Sale Transaction that is neither (i) a Sale Cash Only Transaction nor (ii) a Sale Securities Only Transaction.

8

"**Sale Cash Only Transaction**" means a Sale Transaction in which all of the consideration receivable upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole)) of such Sale Transaction consists of cash and/or property other than securities.

"**Sale Securities Only Transaction**" means a Sale Transaction in which all of the property received upon the consummation (which includes, for the avoidance of doubt, a dividend or distribution if such Sale Transaction consists of a sale of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole)) of such Sale Transaction consists solely of securities.

"**Sale Transaction**" means any Transaction that does not constitute a Redomestication Transaction (*i.e.*, either (i) a Sale Cash and Securities Transaction, (ii) a Sale Cash Only Transaction or (iii) a Sale Securities Only Transaction).

"**Securities Act**" means the Securities Act of 1933, as amended.

"*Series A Warrants*" means the warrants issued pursuant to the Plan and the Series A Warrant Agreement.

"**Series A Warrant Agreement**" means that certain agreement providing for, among other things, the issuance of the Series A Warrants.

"*Shareholders Agreement*" means the Equity Issuer's shareholders agreement.

"**Subsidiary**" means a Person more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the Equity Issuer or by one or more other Subsidiaries, or by the Equity Issuer and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock, shares or other equity interests (including partnership interests) which ordinarily have voting power for the election of directors, managers, general partners or trustees, whether at all times or only so long as no senior class of stock, shares or other equity interests (including partnership interests) have such voting power by reason of any contingency.

"**Substituted Property**" has the meaning set forth in Section 7.1(h)(i)(A)(y).

"**Substituted Securities**" has the meaning set forth in Section 7.1(h)(z)(i)(BA).

"**Successor Equity Issuer**" has the meaning set forth in Section 18.

"**Surviving Transaction**" has the meaning set forth in Section 7.1(h).

"**Trading Day**" means a day on which trading in the Common Shares (or other applicable security) generally occurs on the principal exchange or market on which the Common Shares (or other applicable security) is then listed or traded; provided that if the Common Shares (or other applicable security) is not so listed or traded, "Trading Day" means a Business Day.

"**Transaction**" has the meaning set forth in Section 7.1(h).

9

"*Transfer*" means any sale, pledge, assignment or other transfer or disposition of any Warrant to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise.  "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings.

"*Valuation Firm*" means an independent and nationally recognized investment banking or valuation firm **that is mutually acceptable to (i) if such Valuation Firm is selected in connection with the determination a Cashless Market Exercise Price pursuant to Section 3.7, the Equity Issuer and the applicable Holder seeking a cashless exercise pursuant to such section, and (ii) in all other instances, the Equity Issuer and the Required Warrant Holders**.

"*VWAP*" means the volume-weighted average price for trading hours of the regular trading session (including any extensions thereof), determined without regard to pre-open or after-hours trading or any other trading outside of the trading hours of the regular trading session (including any extensions thereof).

"*Warrant Agent*" has the meaning set forth in the preamble hereto.

"*Warrant Register*" has the meaning set forth in Section 2.3(b).

"*Warrant Statement*" means any statement issued by the Warrant Agent from time to time to a registered Holder of Book-Entry Warrants reflecting such book-entry position, in substantially the form set forth in Exhibit A hereto.

"*Warrants*" means those certain warrants to subscribe to and purchase [●]**one** Common Shares, subject to adjustment pursuant to Section 7, issued hereunder.

"*Winding Up*" has the meaning set forth in Section 6.

**2.      Book-Entry Warrants.**

2.1      Original Issuance of Warrants.

(a)      On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Plan, on the Original Issue Date the Equity Issuer will issue to holders of Allowed Unsecured Claims against ICF (as defined in the Plan), Allowed Unsecured Claims against Envision (as defined in the Plan) and Allowed Unsecured Claims against Intelsat (as defined in the Plan) the Warrants in global form registered in the name of Cede & Co., as nominee for DTC **(or such other nominee as may be selected by DTC)**, by causing DTC (subject to Section 2.1(a**b**)) to credit the account or accounts in which such holders held their respective Allowed Unsecured Claims against ICF, Allowed Unsecured Claims against Envision, and Allowed Unsecured Claims against Intelsat substantially concurrently with the effective time of the Plan (the "*Plan Effective Time*") the aggregate number of Warrants to be issued hereunder, in the following amounts, based on the amount of Allowed Unsecured Claims against ICF, Allowed Unsecured Claims Against Envision, or Allowed Unsecured Claims against Intelsat, respective**as applicable,** held by each such holder immediately prior to the Plan Effective Time: (i) 46.447% *pro rata* to the holders of Allowed Unsecured Claims against

ICF; (ii) 47.301% *pro rata* to the holders of Allowed Unsecured Claims against Envision; and (iii) 6.252% *pro rata* to the holders of Allowed Unsecured Claims against Intelsat. **For the avoidance of doubt, on the Original Issue Date, the only Holder shall be Cede & Co. (or such other nominee as may be selected by DTC) as nominee for DTC.**

(b)     Prior to the Original Issue Date or as soon as reasonably practicable thereafter (but in any event no later than 10 Business Days after the Original Issue Date), the Equity Issuer shall (a) cause the Warrants to be declared eligible for clearance and settlement through DTC, (b) pay or cause to be paid all expenses and application fees incurred in connection with the approval of the Warrants for book-entry transfer by DTC and (c) cause DTC to credit the Warrants to the account or accounts ~~in which~~**of** the ~~holders of Allowed Unsecured Claims against Jackson and Allowed Unsecured Claims against Jackson Subsidiaries held their respective Jackson Senior Notes (each as defined in~~**initial Holders of** the ~~Plan)~~**Warrants** in accordance with ~~Section 2.1(a)~~**the Plan**.

(c)     Each Book-Entry Warrant shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to subscribe for and purchase one (1) Common Share, subject to adjustment as provided in Section 7.

2.2     Form of Warrants.

The Warrants shall not be certificated other than a Global Warrant Certificate registered in the name of the Depositary or its nominee. The Warrants that are not represented by a Global Warrant Certificate shall be issued as Book-Entry Warrants on ~~the books and records of~~ the Warrant ~~Agent~~**Register**, registered in the names of the Holders of such Warrants and evidenced by Warrant Statements.  The Warrant Statements shall have such insertions as are appropriate or required or permitted by this Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements typed, stamped, printed, lithographed or engraved thereon (which does not impact the Warrant Agent's rights, duties or immunities) as the officers of the Equity Issuer may approve and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed, or to conform to usage.  Each Warrant Statement shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase and subscribe for one (1) Common Share, subject to adjustment as provided in Section 7.

2.3     Delivery of Book-Entry Warrants.

(a)     Upon written order of the Equity Issuer, the Warrant Agent shall register in the Warrant Register the Book-Entry Warrants.  The account of each Holder of Book-Entry Warrants shall be marked with a legend in the following or a substantially comparable form (the "***Book-Entry Warrant Legend***") set forth on Exhibit A hereto.

(b)     The Equity Issuer shall cause to be kept at the office or offices of the Warrant Agent designated for such purpose a warrant register (the "***Warrant Register***"), in

11

which, subject to such reasonable regulations as it may prescribe, it shall register the Direct Owners holding Book-Entry Warrants and exchanges and Transfers of outstanding Warrants in accordance with the procedures set forth in <u>Section 2.6</u>, <u>Section 2.7</u> and <u>Section 5</u> of this Agreement in a form reasonably acceptable to the Equity Issuer or Warrant Agent. No service charge shall be made for any exchange or registration of Transfer of the Warrants, but the Equity Issuer may require payment by the exercising Holder of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed on the registered Holder in connection with any such exchange or registration of Transfer. The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until any payments required by the immediately preceding sentence have been made.

2.4     <u>Global Warrant Certificates</u>.

(a)     Any Global Warrant Certificate shall bear the legend substantially in the form set forth in <u>Exhibit B</u> hereto (the "***Global Warrant Legend***").

(b)     So long as a Global Warrant Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("***Agent Members***") shall have no rights under this Agreement with respect to the Warrants evidenced by such Global Warrant Certificate held on their behalf by the Depositary or its custodian, and the Depositary may be treated by the Equity Issuer, the Warrant Agent and any agent of the Equity Issuer or the Warrant Agent as the absolute owner of such Warrants,  and as the sole Holder of such Warrants, for all purposes.  Accordingly, any such Agent Member's ~~b~~**B**eneficial ~~i~~**I**nterest in such Warrants will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Equity Issuer nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Equity Issuer, the Warrant Agent or any agent of the Equity Issuer or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(c)     Any holder of a Beneficial Interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such Beneficial Interest, agree that transfers of Beneficial Interests in the Warrants evidenced by such Global Warrant Certificate may be effected only through a book-entry system maintained by the Depositary as the Holder of such Global Warrant Certificate (or its agent), and that ownership of a Beneficial Interest in Warrants evidenced thereby shall be reflected solely in such book-entry form.

(d)     Transfers of a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees except as set forth in <u>Section 2.4(e)</u>.  Interests of Beneficial Owners in a Global Warrant Certificate registered in the

name of the Depositary or its nominee shall be transferred in accordance with the Applicable Procedures ~~of the Depositary~~.

(e)      The holder of a Global Warrant Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder of a Warrant is entitled to take under this Agreement or such Global Warrant Certificate.

(f)      Each Global Warrant Certificate will evidence such of the Outstanding Warrants as will be specified therein and each shall provide that it evidences the aggregate number of Outstanding Warrants from time to time endorsed thereon and that the aggregate number of Outstanding Warrants evidenced thereby may from time to time be reduced, to reflect exercises or expirations.  Any endorsement of a Global Warrant Certificate to reflect the amount of any decrease in the aggregate number of Outstanding Warrants evidenced thereby will be made by the Warrant Agent (i) in the case of an exercise, in accordance with the Applicable Procedures as required by Section 3.2(c) or (ii) in the case of an expiration, in accordance with Section 3.2(b).

(g)      The Equity Issuer initially appoints DTC to act as Depositary with respect to the Global Warrant Certificates.

(h)      The Warrant Agent is hereby authorized to countersign and deliver one or more Global Warrant Certificates as required by this Section 2.4.¶

**(i)      Any holder of a Beneficial Interest in Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee may move their holdings of Warrants directly to the Warrant Register as Book-Entry Warrants only through the Applicable Procedures.**

2.5      Transfer and Exchange of Book-Entry Warrants. When a Holder of Book-Entry Warrants ~~are presented~~**presents** to the Warrant Agent ~~with~~ a written request (i) to register the transfer of the Warrants; or (ii) to exchange such Warrants for an equal number of Warrants represented by Book-Entry Warrants of other authorized denominations, then the Warrant Agent shall register the transfer or make the exchange as requested if its customary requirements for such transactions are met; provided, however, that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, properly completed and duly executed by the registered Holder thereof or by his attorney, duly authorized in writing and accompanied by a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association.

2.6      Restrictions on Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Global Warrant Certificate. A Book-Entry Warrant may not be exchanged for a Beneficial Interest in a Global Warrant Certificate unless the Warrants are eligible to be cleared or settled in DTC. Upon receipt by the Warrant Agent of appropriate instruments of transfer with respect to a Book-Entry Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an

13

endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Book-Entry Warrant, then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register, increase accordingly the number of Warrants on the Warrant Register registered in the name of the registered owner of the Global Warrant Certificate and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be increased accordingly. If no Global Warrant Certificate is then outstanding **(for the avoidance of doubt, while the Warrants are eligible to be cleared or settled in DTC)**, the Equity Issuer shall issue and the Warrant Agent shall countersign a new Global Warrant Certificate representing the appropriate number of Warrants.

2.7    <u>Withholding and Reporting Requirements</u>.  The Equity Issuer shall comply with all applicable tax withholding and reporting requirements imposed by any governmental unit, and all distributions or other situations requiring withholding under applicable law, including deemed distributions, pursuant to the Warrants will be subject to applicable withholding and reporting requirements.  The Equity Issuer will be authorized to (a) take any actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements, (b) apply a portion of any cash distribution to be made under the Warrants to pay applicable withholding taxes, or (c) liquidate a portion of any non-cash distribution to be made under the Warrants to generate sufficient funds to pay applicable withholding taxes; provided, that the Equity Issuer will also (i) notify the relevant payee of any required withholding reasonably in advance of the date of the relevant payment, (ii) reasonably cooperate with such payee and its Affiliates in obtaining any available exemption or reduction of, or otherwise minimizing, such withholding, and (iii) provide such payee with receipts from the relevant governmental authority evidencing the receipt of any withheld amount.

**3.    Exercise and Expiration of Warrants**.

3.1    <u>Right to Acquire Common Shares Upon Exercise</u>.  Each Warrant duly issued by the Equity Issuer shall entitle the Holder thereof, subject to the provisions thereof and of this Agreement, to subscribe to and acquire from the Equity Issuer, for each Warrant evidenced thereby, one (1) Common Share at the Exercise Price, subject to adjustment as provided in this Agreement.  The Exercise Price, and the number of Common Shares obtainable upon exercise of each Warrant, shall be adjusted from time to time as required by <u>Section 7.1</u>.

3.2    <u>Exercise and Expiration of Warrants</u>.

(a)    <u>Exercise of Warrants</u>.  Subject to and upon compliance with the terms and conditions set forth herein, a Holder may exercise all or any whole number of the Warrants evidenced thereby, on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date, for the Common Shares obtainable thereunder.

(b)    <u>Expiration of Warrants</u>.  The Warrants, to the extent not exercised prior thereto, shall automatically expire, terminate and become void as of 5:00 p.m., New York time, on the Expiration Date. All rights thereunder and all rights in respect thereof under

this Agreement shall cease as of such time. No further action of any Person (including by, or on behalf of, any Holder, the Equity Issuer, or the Warrant Agent) shall be required to effectuate the expiration of Warrants pursuant to this Section 3.2(b).

(c)      Method of Exercise.  In order for a Holder to exercise all or any of its Warrants, the Holder must (i) (x) in the case of a Global Warrant Certificate, deliver to the Warrant Agent an exercise form for the election to exercise such Warrants substantially in the form set forth in Exhibit B hereto (an "*Exercise Form*"), setting forth the number of Warrants being exercised and, and, if applicable, whether cashless exercise is being elected with respect thereto as provided for in Section 3.7, otherwise properly completed and duly executed by the Holder thereof and deliver such Warrants by book-entry transfer through the facilities of the Depositary to the Warrant Agent in accordance with the Applicable Procedures and otherwise comply with the Applicable Procedures in respect of the exercise of such Warrants or (y) in the case of a Book-Entry Warrant, at the Corporate Agency Office (as defined below), (I) deliver to the Warrant Agent an Exercise Form, setting forth the number of Warrants being exercised and, if applicable, whether cashless exercise is being elected with respect thereto as provided for in Section 3.7, otherwise properly completed and duly executed by the Holder thereof as well as any such other information the Warrant Agent may reasonably require and (II) except in the case of a cashless exercise, deliver to the Warrant Agent, by wire transfer in immediately available funds, the amount of the aggregate Exercise Price of all the exercised Warrants (the "*Aggregate Exercise Price*") to the account ([•]**No. 530354616; ABA No. 021000021; Reference: American Stock Transfer & Trust Company, LLC as agent for Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**) of the Equity Issuer at the Warrant Agent or such other account as the Warrant Agent shall have given notice to the Equity Issuer and such Holder in accordance with Section 14.1(d); and (ii) pay to the Warrant Agent, by wire transfer in immediately available funds, an amount equal to all taxes required to be paid by the Holder, if any, pursuant to Section 3.4 prior to, or concurrently with, exercise of such Warrants to the account ([•]**No. 530354616; ABA No. 021000021; Reference: American Stock Transfer & Trust Company, LLC as agent for Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**) of the Equity Issuer at the Warrant Agent or such other account as the Warrant Agent shall have given notice to the Equity Issuer and such Holder in accordance with Section 14.1(d), and (iii), if not already a holder of the Common Shares that is party to the Shareholders Agreement, deliver a joinder to the Shareholders Agreement. For the avoidance of doubt, any exercise of any Warrant may be "net share settled" pursuant to a cashless exercise as described in Section 3.7.

(d)      Partial Exercise.  If a Holder exercises fewer than all of its Warrants, (i) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Warrant Agent shall cause the custodian of the Depositary to endorse the "Schedule of Decreases in Warrants" attached to such Global Warrant Certificate to reflect the Warrants being exercised and (ii) in the case of exercise of Warrants evidenced by a Book-Entry Warrant, the Warrant Agent shall reduce the Warrant Register and such Holder's position by the whole number of Warrants duly exercised.

(e)      Issuance of Common Shares.  Upon due exercise of Warrants evidenced by any Warrant Statement in conformity with the foregoing provisions of Section 3.2(c), the

Warrant Agent shall, when actions specified in Section 3.2(c)(i) have been effected and any payment specified in Section 3.2(c)(ii) is received, deliver to the Equity Issuer the Exercise Form received pursuant to Section 3.2(c)(i), deliver or deposit any funds, in accordance with Section 3.3, received as instructed in writing by the Equity Issuer and advise the Equity Issuer by telephone at the end of such day of the amount of funds so deposited to its account.  The Equity Issuer shall thereupon, as promptly as practicable, and in any event within five (5) Business Days after the Exercise Date referred to below, (i) determine the number of Common Shares issuable pursuant to exercise of such Warrants pursuant to Section 3.7 and (ii) (x) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, deliver or cause to be delivered to the Recipient in accordance with the Applicable Procedures Common Shares in book-entry form to be so held through the facilities of ~~DTC~~**the Depositary**, or, if the Common Shares may not then be held in book-entry form through the facilities of ~~DTC~~**the Depositary**, make a book entry into the stock ledger of the Equity Issuer representing such Common Shares, or (y) in the case of exercise of Warrants evidenced by Warrant Statements, make or cause to be made a book entry into the stock ledger of the Equity Issuer representing, in each case of (x) and (y) in an amount equal to the aggregate number of Common Shares issuable upon such exercise (based upon the aggregate number of Warrants so exercised and subjection to Section 3.7), as so determined, together with an amount in cash in lieu of any fractional share(s), if the Equity Issuer so elects pursuant to Section 7.2.  The Common Shares in book-entry form representing Common Shares so delivered shall be, to the extent possible, delivered by crediting the balance account of the ~~Direct Owner, Beneficial Owner,~~**Holder** or such other Person as shall be designated by the ~~Direct Owner or Beneficial Owner, as applicable~~**Holder**, in such Exercise Form (the ~~Direct Owner, Beneficial Owner,~~**Holder** or such other designated Person being referred to herein as the "*Recipient*"), ~~with DTC or the Equity Issuer's register of Common Shares if such owner elects to hold directly~~ on the Equity Issuer's register of Common Shares.  Once such Common Shares are delivered pursuant to this Section 3.2(~~a~~**e**), for all purposes of this Agreement, the Recipient shall, as between such Person and the Equity Issuer, be entitled to all rights of the holder of record of such Common Shares.

(f)      Time of Exercise.  Each exercise of a Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which each of the requirements for exercise of such Warrant specified in Section 3.2(c) has been duly satisfied (the "*Exercise Date*").

3.3      Application of Funds upon Exercise of Warrants.  All funds received by the Warrant Agent under this Agreement that are to be distributed or applied by the Warrant Agent in the performance of services, including funds received upon the exercise of Warrants (the "*Funds*"), shall be held by the Warrant Agent in its name as agent for the Equity Issuer.  Until paid pursuant to the terms of this Agreement, the Warrant Agent will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating) (each as reported by Bloomberg Finance L.P.).  The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank,

16

financial institution or other third party.  The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits.  The Warrant Agent shall not be obligated to pay such interest, dividends or earnings to the Equity Issuer, any holder or any other party.  The Warrant Agent shall promptly deposit all funds received by it in payment for the exercise of Warrants into an account of the Equity Issuer maintained with the Warrant Agent (or such other account as may be designated by the Equity Issuer) and shall advise the Equity Issuer by telephone, facsimile transmission, email or other form of electronic communication available to both parties, at the end of each day on which a payment for the exercise of Warrants is received of the amount so deposited to its account. The Warrant Agent shall promptly confirm such advice to the Equity Issuer in writing.

3.4    [Payment of Taxes.  The Equity Issuer shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of Common Shares on exercise of Warrants pursuant hereto.  The Equity Issuer or the Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of Common Shares in book-entry form or any registered forms for Common Shares or payment of cash or other property to any Recipient other than, in each case, the Holder of the exercised Warrants, and in case of such transfer or payment, the Warrant Agent and the Equity Issuer shall not be required to issue or deliver any Common Shares in book-entry form or any registered form or pay any cash until it has been established to the Equity Issuer's or Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid.][reserved].Shares Issuable.  The number of Common Shares "obtainable upon exercise" of Warrants at any time shall be the number of Common Shares into which such Warrants are then exercisable.  The Equity Issuer will confirm the number of shares obtainable upon exercise if so requested by the Warrant Agent.  The number of Common Shares "into which each Warrant is exercisable" shall be one (1) share, subject to adjustment as provided in Section 7.1.[Cashless Exercise.  For the purpose of such a ~~cash less~~**cashless** exercise of the Warrants as described in Section 3.2, subject to the terms hereof and solely for the purpose of the payment of the ~~a~~**A**ggregate Exercise Price of all the exercised Warrants ~~(the "*Aggregate Exercise Price*")~~ by way of set off, the certain number of Warrants exercised (determined by the Equity Issuer pursuant to the formula set forth below) (the "*Cash Value Warrants*") shall entitle the Holder to the ~~C~~**c**ash ~~V~~**v**alue per Cash Value Warrant (**as determined by the Equity Issuer pursuant to the formula set forth below, the "*Cash Value per Cash Value Warrant,*" and,** in the aggregate**,** the "*Cash Value Claim*") instead of an issue of shares of Common Shares.

Notwithstanding anything to the contrary herein, the Holder shall at no time be entitled to receive a payment of the Cash Value Claim in cash or otherwise other than through the set off of the Cash Value Claim with the Aggregate Exercise Price of the Warrants exercised (except in respect to the Excess). The Aggregate Exercise Price shall be deemed fully paid by way of set off with the Cash Value Claim when set against such Aggregate Exercise Price.

Notwithstanding any provisions herein to the contrary, upon any cashless exercise of any Warrants, if, on the Exercise Date of a cashless exercise, (i) the Cashless Exercise Market Price of one share of the Common Shares is greater than the applicable Exercise Price on the Exercise Date and (ii) the applicable Exercise Price on Exercise Date is not ~~be~~ lower than the nominal or par value per share of Common Shares, then the Equity Issuer shall issue to the Holder a number of

shares of Common Shares with respect to the Warrants being exercised computed using the following formula:

$$X=((TW-CW)*Y)$$

Where X =    the rounded number ~~of shares~~ of Common Shares to be issued to the Holder in respect of the Warrants being exercised; if the result of the formula is not a full number of shares but a fractional amount, the number of shares issued shall be rounded down to the next full number;

CV =    the Cash Value per **Cash Value** Warrant calculated as follows: CV= (Y*A);

TW =    the number of exercised Warrants;

CW =    the Cash Value Warrants and is calculated as follows: CW= (AEP/CV);

A =    the Cashless Exercise Market Price of one (1) ~~share of~~ Common Share~~s~~ (on the Exercise Date);

Y =    the number of Common Shares into which a Warrant being exercised by the Holder is exercisable (on the Exercise Date) and which is one (1) Common Share subject to adjustment as provided in Section 7.1; and

AEP =    the Aggregate Exercise Price of the Warrants exercised by the Holder.

An illustrative example is attached as Exhibit C to this Agreement.

If the foregoing calculation results in a negative number, then no Common Shares shall be issued upon exercise pursuant to this Section 3.

If the number ~~of shares~~ of Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the formula set forth above (prior to the rounding down to the next full share) is not a full number of shares (such fractional number of shares being "FS"), the Holder shall be entitled to a cash payment of **such additional amount (**the **"*Excess*")** calculated as follows:

18

$$E=(FS-X)*A$$

Where E =     Excess in USD;

X =     The rounded number of ~~shares of~~ Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the **first** formula ~~under (i)~~**set forth above**; and

FS =     the number of ~~shares of~~ Common Shares to be issued to the Holder in respect of the Warrants being exercised pursuant to the **first** formula set forth above ~~under (i)~~ prior to the rounding down to the next full share.

The Equity Issuer shall calculate and transmit such calculation of the number of Common Shares to be issued on such exercise to the Warrant Agent (and, if different from the Warrant Agent, the Equity Issuer's transfer agent for the Common Shares), and the Warrant Agent shall have no obligation under this Agreement to calculate, confirm or verify such amount.

For purposes of determining the per share value of Common Shares to be surrendered in connection with such cashless exercise (the "*Cashless Market Exercise Price*"), **(i) at any time at which the Common Shares are listed on a U.S. national securities exchange, such value shall be VWAP for the last twenty (20) Trading Days of such Common Shares or (ii)** at any time at which the Common Shares are not listed on a U.S. national securities exchange, such value shall be determined by the Board of Directors **(and will take into account any valuation determined by a Valuation Firm in the last twelve month period pursuant to this paragraph)** within five (5) ~~b~~**B**usiness  ~~d~~**D**ays following a notice of exercise; provided, that if the Holder does not agree with such value **and the Board of Directors has not engaged a Valuation Firm in the last twelve month period pursuant to this paragraph**, such value shall be determined by a Valuation Firm jointly selected by the Board of Directors and the applicable Holder.~~]~~  The Valuation Firm selected pursuant to this Section 3.7 shall have ~~[●] days~~**ten (10) Business Days** to make a ~~decision~~**determination** regarding value **and such determination shall be binding on the Equity Issuer and such Holder absent fraud or manifest error**.  In no event will the Equity Issuer be required to engage a Valuation Firm in connection with the Warrants or the Series A Warrants more than once per twelve-month period.  **After the Board of Directors' receipt of a report of a Valuation Firm during any twelve-month period, the Cashless Market Exercise Price will be determined by the Board of Directors; provided that, the Board of Directors will consider the report of such Valuation Firm in good faith in making any determination of the Cashless Exercise Market Price during the twelve-month period following the receipt of such report of the Valuation Firm.**  The fees and expenses of such Valuation Firm shall be paid by the Equity Issuer.

Notwithstanding anything to the contrary in this Section 3.7, a Holder shall only be entitled to elect a cashless exercise of any Warrant, if, on the Exercise Date of such cashless exercise, (i) the Cashless Exercise Market Price of one ~~share of the~~ Common Share~~s~~ is greater than the applicable Exercise Price on the Exercise Date and (ii) the applicable Exercise Price on Exercise Date is not ~~be~~ lower than the nominal or par value per share of Common Shares.

19

3.8     Cost Basis Information. The Equity Issuer hereby instructs the Warrant Agent to record cost basis for newly issued shares at the time of exercise in accordance with instructions by the Equity Issuer.  If the Equity Issuer does not provide such cost basis information to the Warrant Agent, as outlined above, then the Warrant Agent will treat those shares issued hereunder as uncovered securities or the equivalent, and each holder of such shares will need to obtain such cost basis information from the Equity Issuer.

4.     **ERISA Eligibility.**

By accepting a Warrant, each Holder shall be deemed to represent that either (i) it does not hold "plan assets" subject to ERISA or Section 4975 of the Internal Revenue Code or (ii) its acquisition, holding and exercise of Warrants will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the Internal Revenue Code.

5.     **Transferability; No Restrictions.**

5.1     General¶ Restriction¶.

(a)     The Warrants or any Beneficial Interest shall be freely transferable without the prior consent of the Equity Issuer except as provided in this Section 5.1. Notwithstanding any other provision of this Warrant Agreement, each Holder agrees that it shall not, directly or indirectly, Transfer any of its Warrants or Beneficial Interest:¶(1) **Interests** except**:**¶

**(i)**     as permitted under the Securities Act and other applicable federal **law** or state securities or blue sky laws and then, with respect to a Transfer of Warrants **or Beneficial Interests**, if requested by the Equity Issuer or the Warrant Agent, as applicable, only upon delivery to the Equity Issuer of a written opinion of counsel in form and substance **reasonably** satisfactory to the Equity Issuer to the effect that such Transfer may be effected without registration under the Securities Act; provided, that **notwithstanding the foregoing,** such a legal opinion shall not be required for any Transfer of Warrants **or Beneficial Interests** that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the Company**Equity Issuer** has a good faith reason to believe that such shares of the Warrants **or Beneficial Interests** are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the Company**Equity Issuer** or an "underwriter" (as such term is defined in the Securities Act) with respect to such Warrants **or Beneficial Interests**;

**(ii)**     (2) if such Transfer would **not** reasonably be expected to require the Equity Issuer to initiate a registration or qualification of such**the** Warrants pursuant to the Exchange Act or any applicable federal or state securities or blue sky laws, or require the Equity Issuer to file reports pursuant to the Exchange Act (as a result of the number of holders of such Warrants or equity securities or otherwise) or any applicable federal or state securities or blue sky laws;

20

**(iii)** (3) if such Transfer, upon consummation, would **not** result in the Equity Issuer having, in the aggregate, **either** (A) 1,000**1,900** or more holders of record (as such concept is understood for purposes of s**S**ection 12(g) of the Exchange Act) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of s**S**ection 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act (determined, in each case, in the Equity Issuer's sole**reasonable** discretion) **of any class of equity securities of the Equity Issuer**;

**(iv)** (4) if such Transfer would **not** cause the Equity Issuer or any Subsidiary **or Affiliate** of the Equity Issuer to be required to register as an investment company under the Investment Equity Issuer**Company** Act of 1940, as amended; or

**(v)** (5) if such Transfer would **not** cause the Equity Issuer or any Subsidiary **or Affiliate** of the Equity Issuer to be subject to regulation under the Investment Advisers Act of 1940.¶

(b)        In no event shall any such Transfer relieve the transferring Holder of any of its obligations under *the Shareholders Agreement***, as amended**.

**(b)** (c)  The direct Transferee (*i.e.*, a Transferee that holds the Warrants represented by Warrant Statements and not simply a Beneficial Interest in the Warrants registered in the name of Cede & Co. **(or such other nominee as may be selected by DTC)**) of the Warrants Transferred shall be bound by this Agreement as a Direct Owner. Any indirect Transferee (*i.e.*, a Transferee that holds a Beneficial Interest in the Warrants registered in the name of Cede & Co. **(or such other nominee as may be selected by DTC)**) of the Warrants Transferred shall be bound by this Agreement as a Beneficial Owner.  Following such a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa) the Warrant Agent shall amend the Warrant Register to reflect the change in Direct Owners, and the Board of Directors**, the Warrant Agent** or its**their respective** authorized designee shall take any other appropriate action in connection therewith.

**(c)** (d) Any attempted or purported Transfer of all or a portion of the Warrants **or Beneficial Interests** held by a Holder in violation of this Section 5.1 shall be null and void and of no force or effect whatsoever, such purported Transferee will**shall** not be treated as an Owner**a Holder** of the Warrants **or Beneficial Interests** for purposes of this Warrant Agreement or otherwise, and the Equity Issuer will**shall** not register such Transfer.

5.2    Exchange Listing.  From and after such time **a Listing of** the Common Shares are listed on any U.S. national securities exchange**occurs**, the Equity Issuer shall use commercially reasonable efforts to list the Warrants on such U.S. national securities exchange; provided, that such obligation shall terminate one year prior to the Expiration Date.  **The restrictions under**

**Section 5.1(a)(ii), 5.1(a)(iii), 5.1(a)(iv), and 5.1(a)(v) shall terminate automatically upon the effectiveness of a Listing of the Warrants.**

6.      **Dissolution, Liquidation or Winding up**.

Unless Section 7.1(h) applies, if, on or prior to the Expiration Date, the Equity Issuer (or any other Person controlling the Equity Issuer) shall propose a voluntary or involuntary dissolution, liquidation or winding up (a "***Winding Up***") of the affairs of the Equity Issuer, the Equity Issuer shall give written notice thereof to the Warrant Agent and all Holders in the manner provided in Section 14.1(d) at least ten (10) Business Days prior to the date on which such Winding Up is expected to become effective or, if earlier, the record date for such Winding Up. Such notice shall also specify the date, if known, as of which the holders of record of Common Shares shall be entitled to exchange their shares for securities, money or other property deliverable upon such Winding Up, on which date (i) each Holder of Warrants shall receive the securities, money or other property which such Holder would have been entitled to receive had such Holder been the holder of record of Common Shares into which the Warrants were exercisable immediately prior to such Winding Up (net of the then applicable Exercise Price) and (ii) the rights to exercise the Warrants shall terminate.

Unless Section 7.1(h) applies, in case of any such Winding Up of the Equity Issuer, the Equity Issuer shall deposit with the Warrant Agent any funds or other property which the Holders are entitled to receive pursuant to the above paragraph, together with an Equity Issuer Order as to the distribution thereof. After receipt of such deposit from the Equity Issuer and any such other necessary information as the Warrant Agent may reasonably require, the Warrant Agent shall make payment in the appropriate amount to such Holders as are reflected on the Warrant Register. The Warrant Agent shall not be required to pay interest on any money deposited pursuant to the provisions of this Section 6 except such as it shall agree with the Equity Issuer to pay thereon. Any moneys, securities or other property which at any time shall be deposited by the Equity Issuer or on its behalf with the Warrant Agent pursuant to this Section 6 shall be, and are hereby, assigned, transferred and set over to the Warrant Agent in accordance with Section 3.3 hereof; provided, that, moneys, securities or other property need not be segregated from other funds, securities or other property held by the Warrant Agent except to the extent required by law.

7.      **Adjustments**.

7.1      Adjustments. In order to prevent dilution of the rights granted under the Warrants and to grant the Holders certain additional rights, the Exercise Price shall be subject to adjustment from time to time only as specifically provided in this Section 7.1 (the "***Adjustment Events***") and the number of Common Shares obtainable upon exercise of Warrants shall be subject to adjustment from time to time only as specifically provided in this Section 7.1.

(a)      Subdivisions and Combinations. In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, effect a subdivision (by any stock split or otherwise) of the outstanding Common Shares into a greater number of Common Shares (other than (x) a subdivision upon a Transaction to which Section 7.1(h) applies or (y) a stock split effected by means of a stock dividend or distribution to which Section 7.1(b)

22

applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such subdivision becomes effective shall be proportionately decreased.  Conversely, if the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, effect a combination (by any reverse stock split, combination, subdivision or otherwise) of the outstanding Common Shares into a smaller number of Common Shares (other than a combination upon a Transaction to which Section 7.1(h) applies), then and in each such event the Exercise Price in effect at the opening of business on the day after the date upon which such combination becomes effective shall be proportionately increased.  Any adjustment under this Section 7 shall become effective immediately after the opening of business on the day after the date upon which the subdivision or combination becomes effective.

(b)     Common Share Non-Cash Dividends.  In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, fix a record date for the issuance or making of a dividend or distribution to all holders of the Common Shares of evidences of its indebtedness, any other securities or any cash, property or other assets (excluding any dividends payable solely in cash) or of subscription rights, options or warrants to subscribe to and purchase or acquire any capital stock of the Equity Issuer (excluding stock dividends or distribution referred to in Section 7.1(a)) (any such event being herein called a "*Non-Cash Dividend*"), the Exercise Price shall be decreased immediately after the record date for such Non-Cash Dividend to a price determined by multiplying the Exercise Price then in effect by a fraction, (i) the numerator of which shall be the then Current Market Price of the Common Shares on the Ex-Dividend Date for such Non-Cash Dividend less the ~~fair market value (as determined in good faith by the Equity Issuer's Board of Directors)~~**Fair Market Value** of the evidences of indebtedness, securities, cash, property or other assets issued or distributed in such Non-Cash Dividend applicable to one Common Share or of such subscription rights or warrants applicable to one Common Share, and (ii) the denominator of which shall be such then Current Market Price per Common Share on the Ex-Dividend Date for such Non-Cash Dividend; such adjustment shall be made successively whenever such a record date is fixed.

(c)     Common Share Cash Dividends.  In the event the Equity Issuer shall, at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part,  fix a record date for the issuance or making of a distribution to all holders of the Common Shares of any dividend payable solely in cash (any such dividend being referred to as a "*Cash Dividend*"), the Exercise Price shall be decreased immediately after the record date for such Cash Dividend to a price determined by multiplying the Exercise Price then in effect by a fraction, (i) the numerator of which shall be the then Current Market Price of the Common Shares on the Ex-Dividend Date for such Cash Dividend less the per share Cash Dividend amount, and (ii) the denominator of which shall be such then Current Market Price per Common Share on the Ex-Dividend Date for such Cash Dividend.

(d)     Adjustments Due to Dividends.  For purposes of Sections 7.1(b) and 7.1(c), any adjustment required by Sections 7.1(b) and 7.1(c) shall be made successively

23

whenever such a record date is fixed and in the event that such distribution is not so made, the Exercise Price shall again be adjusted to be the Exercise Price that was in effect immediately prior to such record date, and "Current Market Price" per Common Share at any date shall mean, (i) if the Common Shares are then listed on a national securities exchange, the average of the daily Quoted Prices for ten (10) consecutive t**T**rading d**D**ays immediately prior to such date, or (ii) if the Common Shares are not then so listed, the ~~Quoted Price~~**Fair Market Value** immediately prior to such date.

(e)     _Reclassifications_.  A reclassification of the Common Shares (other than any such reclassification in connection with a Transaction to which Section 7.1(h) applies) into Common Shares and shares of any other class of stock shall be deemed, if the outstanding Common Shares shall be changed into a larger or smaller number of Common Shares as a part of such reclassification, a subdivision or combination, as the case may be, of the outstanding Common Shares for the purposes and within the meaning of Section 7.1(a) (and the effective date of such reclassification shall be deemed to be "the date upon which such subdivision becomes effective" or "the date upon which such combination becomes effective," as applicable, for the purposes and within the meaning of Section 7.1(a)).

(f)     _Other Provisions Applicable to Adjustments_.  The following provisions shall be applicable to the making of adjustments to the Exercise Price and the number of Common Shares into which each Warrant is exercisable under this Section 7.1:

(i)     _Treasury Stock_.  The dividend or distribution of any issued Common Shares owned or held by or for the account of the Equity Issuer shall be deemed a dividend or distribution of Common Shares for purposes of Section 7.1(b).  The Equity Issuer shall not make or issue any dividend or distribution on Common Shares held in the treasury of the Equity Issuer.  For the purposes of Section 7.1(b), the number of Common Shares at any time outstanding shall not include shares held in the treasury of the Equity Issuer.

(ii)     _When Adjustments Are to be Made_.  The adjustments required by Article VII shall be made whenever and as often as any specified event requiring an adjustment shall occur, except that no adjustment of the Exercise Price (excluding Cash Dividends) that would otherwise be required shall be made unless and until such adjustment either by itself or with other adjustments not previously made increases or decreases the Exercise Price immediately prior to the making of such adjustment by at least **one percent (**1%**)**.  Any adjustment representing a change of less than such minimum amount (except as aforesaid) shall be carried forward and made as soon as such adjustment, together with other adjustments required by Section 7.1(a), Section 7.1(b), Section 7.1(c) and Section 7.1(e) and not previously made, would result in such minimum adjustment.

(iii)     _Fractional Interests_.  In computing adjustments under Section 7.1, fractional interests in Common Shares shall be taken into account to the nearest one-thousandth (1/1000) of a share.

24

(g)      Adjustment to Shares Obtainable Upon Exercise.  Whenever the Exercise Price is adjusted as provided in this Section 7.1, the number of Common Shares into which a Warrant is exercisable shall simultaneously be adjusted by multiplying such number of Common Shares into which a Warrant is exercisable immediately prior to such adjustment by a fraction, the numerator of which shall be the Exercise Price immediately prior to such adjustment, and the denominator of which shall be the Exercise Price immediately thereafter.

(h)      Changes in Common Shares.  In case at any time or from time to time after the Original Issue Date while any Warrants remain Outstanding and unexpired in whole or in part, the Equity Issuer shall be a party to or shall otherwise engage in any transaction or series of related transactions constituting: (1) a merger of the Equity Issuer into, a **Drag-along Sale involving (or other** direct or indirect sale of all of the Equity Issuer's equity to**)**, or a consolidation of the Equity Issuer with, any other Person in which the previously outstanding Common Shares shall be (either directly or upon subsequent liquidation) cancelled, reclassified or converted or changed into or exchanged for securities or other property (including cash) or any combination of the foregoing, or a sale or transfer of all or substantially all of the assets of the Equity Issuer and its Subsidiaries (taken as a whole) (a "*Non-Surviving Transaction*"), or (2) any merger of another Person into the Equity Issuer in which the previously outstanding Common Shares shall be cancelled, reclassified or converted or changed into or exchanged for securities of the Equity Issuer or other property (including cash) or any combination of the foregoing (a "*Surviving Transaction*"; any Non-Surviving Transaction or Surviving Transaction being herein called a "*Transaction*") then:

(x)      if such Transaction constitutes a Sale Cash Only Transaction, then, at the effective time of the consummation of such Sale Cash Only Transaction, any Warrants not exercised prior to the closing of such Sale Cash Only Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the greater of (1) the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such closing and (II) the positive difference, if any, ~~of the Fair Market Value~~ of the Cash Consideration per Common Share in the Transaction and the Exercise Price per Common Share immediately prior to such closing and (2) the Black-Scholes Value of each such Warrant as of the date of the consummation of the Sale Cash Only Transaction; ~~or~~

(y)      if such Transaction is a Redomestication Transaction, **as** a ~~Sale Cash and Securities Transaction or a Sale Securities Only Transaction:¶~~

~~(i)~~      *as a* condition to the consummation of such Transaction, the Equity Issuer shall (or, in the case of any Non-Surviving Transaction, the Equity Issuer shall cause such other Person to) execute and deliver to the Warrant Agent a written instrument providing that.¶

25

(A)      if such Transaction constitutes a Redomestication Transaction, any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the securities or other property ("Substituted Property") that would have been receivable upon such Transaction by a Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an aAggregate Exercise Price for such Warrant equal to the product of (Ii) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (IIii) the Exercise Price per Common Share immediately prior to such Transaction; or ¶

(z)      if such Transaction is a Sale Securities Only Transaction or a Sale Cash and Securities Transaction:¶

(i)      if such Transaction is not a Private Sale Transaction, as a condition to the consummation of such Transaction, the Equity Issuer shall (or, in the case of any Non-Surviving Transaction, the Equity Issuer shall cause such other Person to) execute and deliver to the Warrant Agent a written instrument providing that:

(B) (A) if such Transaction constitutes a Sale Securities Only Transaction, any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the securities ("**Substituted Securities**") that would have been receivable upon the consummation of such Transaction by **a** Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an aAggregate Exercise Price for such Warrant equal to the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and (II) the Exercise Price per Common Share immediately prior to such Transaction; or ¶

(B)      if such Transaction constitutes a Sale Cash and Securities Transaction that is an Eligible Sale Cash and Securities Transaction, as a condition to the consummation of such Transaction, at the effective time of the consummation of such Transaction, (I) a portion of the Warrants not exercised prior to the closing of such Transaction equal to the Cash-Out

**Warrant Percentage (the "*Cash-Out Warrants*") shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of such Cash-Out Warrants, cash in an amount, for each such Cash-Out Warrant so evidenced, equal to the greater of (1) the product of (I) the number of Common Shares into which such Cash Out Warrant was exercisable immediately prior to such closing and (II) the positive difference, if any, of the Cash Consideration per Common Share in such Transaction and the Exercise Price per Common Share immediately prior to such closing and (2) the Black-Scholes Value of each such Cash-Out Warrant as of the date of the consummation of such Transaction and (II) a portion of the Warrants not exercised prior to the closing of such Transaction equal to the Roll-Over Warrant Percentage (the "*Roll-Over Warrants*"), upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall** *be as nearly equivalent as may be practicable to the* **provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the Substituted Securities that would have been receivable upon the consummation of** *such Transaction by a Qualifying Person holding the number of Common Shares* **into which such Roll-Over Warrant was exercisable immediately prior to such Transaction and for an Aggregate Exercise Price for such Roll-Over Warrant equal to the product of (a) the number of Common Shares into which such Roll-Over Warrant was exercisable immediately prior to such Transaction and (b) the Exercise Price per Common Share immediately prior to such Transaction;**

(C) **(C)** if such Transaction constitutes a Sale Cash and Securities Transaction, **that is an Ineligible Sale Cash and Securities Transaction** any Warrant that remains Outstanding in whole or in part, upon the exercise thereof at any time on or after the consummation of such Transaction, shall be exercisable (on such terms and subject to such conditions as shall be as nearly equivalent as may be practicable to the provisions set forth in this Agreement) into, in lieu of the Common Shares issuable upon such exercise prior to such consummation, only the Substituted Securities that would have been receivable upon such Transaction by a Qualifying Person holding the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and for an aAggregate Exercise Price for such Warrant equal to the product of (I) the number of Common Shares into which such Warrant was exercisable immediately prior to such Transaction and

27

(II) the Exercise Price per Common Share immediately prior to such time as decreased (to an amount not less than the lesser of the par value of the Common Shares as of the date hereof and such par value as of such date of determination) by an amount equal to ~~the Fair Market Value of~~ the Cash Consideration per Common Share receivable in such Sale Cash and Securities Transaction by a Qualifying Person; <u>provided</u>, <u>however</u>, that if, as the result of rights of election, the kind or amount of securities, cash and other property receivable upon such Sale Cash and Securities Transaction is not the same for each Common Share held by a Qualifying Person, then, for the purposes of this <u>Section 7.1(h)**(z)**(i)(C)</u>, the kind and amount of securities, cash and other property receivable upon such **Transaction for each Common Share held by a Qualifying Person shall be deemed to be the pro rata kind and amount per Common Share (determined on the basis of all outstanding Common Shares held by Qualifying Persons) actually received by all Qualifying Persons; and¶**

**(D)     if such Transaction constitutes a** Sale Cash and Securities **Transaction that is a De Minimis Sale Cash and Securities Transaction, then, at the effective time of the consummation of such Transaction, any Warrants not exercised prior to the closing of such Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the Black-Scholes Value of each such Warrant as of the date of the consummation of the Transaction; and¶**

**(ii)     if such Transaction is a Private Sale Transaction, then, at the effective time of the consummation of such Private Sale Transaction, any Warrants not exercised prior to the closing of such Private Sale Transaction shall automatically expire, terminate and become void and the Equity Issuer shall deliver or cause to be delivered to the Holder of any unexercised Warrants, cash in an amount, for each Warrant so evidenced, equal to the Black-Scholes Value of each such Warrant in cash as of the date of the consummation of the Private Sale Transaction; ¶**

**(iii)     for purposes of Section 7.1(h)(z)(i), if, as the result of rights of election, the kind or amount of securities, cash and other property receivable upon a Sale Cash and Securities Transaction is not the same for each Common Share held by a Qualifying Person, then the kind and amount of securities, cash and other property receivable upon such** Transaction for each Common Share held by a Qualifying Person shall be deemed to be the pro rata kind and amount per Common Share (determined on the basis of all outstanding

28

Common Shares held by Qualifying Persons) actually received by all Qualifying Persons.**;**

**(iv)**      ~~(ii)~~ except as otherwise specified in Section 7.1(h)(~~y~~**z**)(i), the rights and obligations of the Equity Issuer (or, in the event of a Non-Surviving Transaction such other Person) and the Holders in respect of Substituted Property or Substituted Securities shall be substantially unchanged to be as nearly equivalent as may be practicable to the rights and obligations of the Equity Issuer and Holders in respect of Common Shares hereunder as set forth in Section 3.1 hereof;

**(v)**      ~~(iii)~~ with respect to any Transaction, such written instrument under clause (i) above shall provide for adjustments which, for events subsequent to the effective date of such written instrument shall be as nearly equivalent as may be practicable to the adjustments provided for in this Section 7. The above provisions of this Section 7.1(h) shall similarly apply to successive Transactions.

(i)      Warrants Deemed Exercisable.  For purposes solely of this Section 7, the number of Common Shares which the holder of any Warrant would have been entitled to receive had such Warrant been exercised in full at any time or into which any Warrant was exercisable at any time.

(j)      Notice of Adjustment.  Upon the occurrence of each adjustment of the Exercise Price or the number of Common Shares into which a Warrant is exercisable pursuant to this Section 7.1, the Equity Issuer at its expense shall promptly:

(i)      compute such adjustment in accordance with the terms hereof;

(ii)      after such adjustment becomes effective, deliver to all Holders, in accordance with Section 14.1(d) and Section 14.2, a notice setting forth such adjustment and showing in reasonable detail the facts upon which such adjustment is based; and

(iii)      deliver to the Warrant Agent a certificate of the Secretary, Treasurer, Chief Accounting Officer, or Chief Financial Officer of the Equity Issuer setting forth the Exercise Price and the number of Common Shares into which each Warrant is exercisable after such adjustment and setting forth a brief statement of the facts requiring such adjustment and the computation by which such adjustment was made (including a description of the basis on which the Current Market Price of the Common Shares was determined).  As provided in Section ~~0~~**13**, the Warrant Agent shall be entitled to rely on such certificate and shall be under no duty or responsibility with respect to any such certificate, except to exhibit the same from time to time at the Corporate Agency Office to any Holder desiring an inspection thereof during reasonable business hours.  The Equity Issuer hereby agrees that it will provide the Holders and the Warrant Agent with reasonable notice of any Adjustment Event set forth in this Section 7.1. The Equity Issuer further agrees that it will provide to the Holders and Warrant Agent with any new or amended exercise terms.  The Warrant Agent shall have no obligation under

29

any ~~S~~section of this Agreement to determine whether an Adjustment Event has occurred or to calculate any of the adjustments set forth herein.

7.2     Fractional Interest.  The Equity Issuer shall not be required upon the exercise of any Warrant to issue any fractional Common Shares, but may, in lieu of issuing any fractional Common Shares make an adjustment therefore in cash on the basis of the Current Market Price per Common Share on the date of such exercise.  If Warrants evidenced by more than one Book-Entry Warrants evidencing shall be exercised at the same time by the same Holder, the number of full Common Shares which shall be issuable upon such exercise thereof shall be computed on the basis of the aggregate number of Warrants so to be exercised.  The Holders, by their acceptance of Warrants, expressly waive their right to receive any fraction of a Common Share if such amount of cash is paid in lieu thereof.  The Equity Issuer shall provide an initial funding of one thousand dollars ($~~1,000~~**1,000.00**) for the purpose of issuing cash in lieu of fractional shares.  From time to time thereafter, Warrant Agent may request additional funding to cover fractional payments.  The Warrant Agent shall have no obligation to make fractional payments unless the Equity Issuer shall have provided the necessary funds to pay in full all amounts due and payable with respect thereto.

7.3     No Other Adjustments.  Except in accordance with Section 7.1, the applicable Exercise Price and the number of Common Shares obtainable upon exercise of any Warrant will not be adjusted for the issuance of Common Shares or any securities convertible into or exchangeable for Common Shares or carrying the right to subscribe to and purchase any of the foregoing, including, without limitation:

(i)     upon the issuance of any other securities by the Equity Issuer on or after the Original Issue Date, whether or not contemplated by the Plan, or upon the issuance of Common Shares upon the exercise of any such securities;

(ii)    upon the issuance of any Common Shares or other securities or any payments pursuant to any management or other equity incentive plan of the Equity Issuer; ¶

**(iii)    upon the issuance of any Common Shares pursuant to the exercise of the Warrants or of the Series A Warrants;** or

**(iv)**    ~~(iii)~~ upon the issuance of any Common Shares or other securities of the Equity Issuer in connection with a business acquisition, strategic alliance, joint venture, or similar transaction.

**8.     [reserved.]**

**9.     Reservation and Authorization of Common Shares**.

The Equity Issuer covenants that, for the duration of the Exercise Period, the Equity Issuer will at all times reserve and keep available, from its authorized and unissued Common Shares solely for issuance and delivery upon the exercise of the Warrants and free of preemptive rights, such number of Common Shares and other securities, cash or property as from time to time shall be issuable upon the exercise in full of all Outstanding Warrants for cash.  The Equity Issuer further covenants that it shall, from time to time, take all steps reasonably necessary to increase the

authorized number of Common Shares to such number of shares as shall be sufficient to deliver all Common Shares upon exercise in full of all Outstanding Warrants, if at any time the authorized number of Common Shares remaining unissued would otherwise be insufficient to allow delivery of all the Common Shares then deliverable upon the exercise in full of all Outstanding Warrants. The Equity Issuer covenants that all Common Shares issuable upon exercise of the Warrants will, upon issuance, be duly and validly issued, fully paid and nonassessable and will be free of restrictions on transfer and will be free from all taxes, liens and charges in respect of the issue thereof. The Equity Issuer shall take all such actions as may be reasonably necessary to ensure that all such Common Shares may be so issued without violation of any applicable law or governmental regulation or any requirements of any U.S. national securities exchange upon which the Common Shares may be listed (except for official notice of issuance which shall be immediately delivered by the Equity Issuer upon each such issuance).

The Equity Issuer hereby represents and warrants to the Holders that the issuance of the Warrants and the issuance of Common Shares upon exercise thereof in accordance with the terms hereof will not constitute a breach of, or a default under, any other material agreements to which the Equity Issuer is a party on the date hereof.

**10.     Warrant Transfer Books**.

The Warrant Agent will maintain an office or offices (the "***Corporate Agency Office***") in the United States of America, where Warrants may be surrendered for registration of transfer or exchange and where Warrants may be surrendered for exercise of Warrants evidenced thereby, which office is [620 115th Ave., Brooklyn NY 11219 (Attn: Corporate Actions/Warrant Exercise)] on the Original Issue Date. The Warrant Agent will give prompt written notice to all Holders of any change in the location of such office.

The Equity Issuer shall cause to be kept at the Corporate Agency Office the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Equity Issuer shall provide for the registration of Warrants and of transfers or exchanges of Warrants as herein provided. Subject to Section 5.1(c), the transfer and exchange of Beneficial Interests in Global Warrant Certificates shall be effected through the Depositary, in accordance with this Agreement and the procedures of the Depositary therefor.

All Book-Entry Warrants issued upon any registration of transfer or exchange of Book-Entry Warrants shall be the valid obligations of the Equity Issuer, evidencing the same obligations, and entitled to the same benefits under this Agreement, as the Book-Entry Warrants surrendered for such registration of transfer or exchange.

No service charge shall be made for any registration of transfer or exchange of Warrants; provided, however, the Equity Issuer may require payment of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed in connection with any registration of transfer or exchange. The Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes and/or charges unless and until it is satisfied that all such payments have been made.

31

The Warrant Agent shall, upon request and at the expense of the Equity Issuer from time to time, deliver to the Equity Issuer such reports of registered ownership of the Warrants and such records of transactions with respect to the Warrants and the Common Shares as the Equity Issuer may request.  The Warrant Agent shall, upon reasonable advance notice, also make available to the Equity Issuer for inspection by the Equity Issuer's agents or employees, from time to time as the Equity Issuer may request, such books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Corporate Agency Office during normal business hours.

The Warrant Agent shall keep copies of this Agreement and any notices given to Holders hereunder available for inspection, upon reasonable advance notice, by the Holders during normal business hours at the Corporate Agency Office.  The Equity Issuer shall supply the Warrant Agent from time to time with such numbers of copies of this Agreement as the Warrant Agent may request.

**11.**   **Warrant Holders**.

11.1   <u>No Voting or Dividend Rights</u>.

(a)   No Holder of any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Shares of the Equity Issuer, including, without limitation, the right to vote, to receive dividends and other distributions as a holder of Common Shares or to receive notice of, or attend, meetings or any other proceedings of the holders of Common Shares.

(b)   No consent of any Holder of Warrants shall be required with respect to any action or proceeding of the Equity Issuer.

(c)   Except as provided in <u>Section 6</u>, no Holder of Warrants, by reason of the ownership or possession of a Warrant, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Shares prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant.

(d)   No Holder of Warrants shall have any right not expressly conferred hereunder or under, or by applicable law with respect to, the Warrants held by such Holder.

11.2   <u>Rights of Action</u>.  All rights of action against the Equity Issuer in respect of this Agreement, except rights of action vested in the Warrant Agent, are vested in the Holders of the Warrants, and any Holder of any Warrant, without the consent of the Warrant Agent or the Holder of any other Warrant, may, in such Holder's own behalf and for such Holder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Equity Issuer suitable to enforce, or otherwise in respect of, such Holder's right to exercise such Holder's Warrants in the manner provided in this Agreement.

**12.**   **Information and Confidentiality.**

12.1   <u>Reporting and Disclosure</u>.  ¶

32

**(a)** Subject to Section 12.2, Holders (other than Holders that are Competitors) shall be entitled to receive from the Equity Issuer the following information: ~~Subject to Section 12.2, Holders (other than Holders that are Competitors) shall be entitled to receive from the Equity Issuer the following information: Subject to Section 12.2, Holders (other than Holders that are Competitors) shall be entitled to receive from the Equity Issuer the following information until the Equity Issuer becomes subject to the reporting requirements of the Exchange Act: "re[~~(i) within ~~[●]~~**65** days (~~[●]~~**or 150** days in the case **of the first fiscal quarter containing the Effective Date and 90 days in the case of the first full fiscal quarter after the Effective Date occurs) after the end of each** of the first three fiscal quarters ~~*ending after the Effective Date) following the conclusion of each of the Equity Issuer's fiscal* quarters~~**of each fiscal year (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal quarter** ending after the Effective Date, quarterly unaudited consolidated financial statements of the Equity Issuer and its Subsidiaries; and (ii) within ~~[●]~~**120** days (~~[●]~~**or 135** days in the case of the first ~~three~~ fiscal ~~quarters~~**year** *ending after the Effective Date) following the conclusion of each of the Equity Issuer's fiscal* **years** ending after the Effective Date~~) days after~~ **(or if such day is not a Business Day, on the next succeeding Business Day) commencing with** the ~~end of each~~**first** fiscal year **ending after the Effective Date**, annual audited consolidated financial statements of the Equity Issuer and its Subsidiaries~~]. Promptly after the initial report to Holders that is furnished after the Effective Date~~ **(clauses (i) and (ii) collectively, the "*Financial Statements*"); and (iii) the information if, as and when provided to the noteholders or trustee, as applicable,** pursuant to **Section 3.10(a) of** the ~~immediately preceding sentence, the Equity Issuer will~~ *~~use commercially reasonable efforts~~***New Indenture (or any substantially similar provision in connection with any amendment to the New Indenture or any refinancing indebtedness thereof), including, for the avoidance of doubt, the Financial Statements; *provided, however,* that if the Equity Issuer files the Financial Statements described in this Section 12.1(a) with the Securities and Exchange Commission, the requirement** to ~~furnish~~**deliver** the ~~business and financial reporting so that common shares of the Equity Issuer may be quoted pursuant to the requirements of Rule 15c2-11 of the Exchange Act (the "Public Side Financial Reporting") and will thereafter use *commercially reasonable efforts* to maintain compliance with such requirements~~**Financial Statements pursuant to clauses (i) and (ii) shall be deemed satisfied. For the avoidance of doubt, if required pursuant to clauses (i) and (ii), Intelsat Jackson Holdings S.A. or one of its direct or indirect parent entities may provide the Financial Statements in the case of the fiscal year ending December 31, 2021**. Reasonably promptly following the release of each of the quarterly unaudited financial statements, the Equity Issuer will provide a video and/or a telephonic presentation (which may be a single presentation held together with other securityholders or holders of indebtedness of the Equity Issuer and its Affiliates) to the ~~directors, officers, members, managers, employees, affiliates, and agents (collectively,~~ "Representatives"~~)~~ of Holders to discuss the Equity Issuer's financial condition and results of operations, following which presentation the Equity Issuer will allow the Representatives of Holders to ask reasonable questions. Any participant in quarterly calls (including bona fide potential transferees permitted in accordance with the terms hereof) (A) shall not be a Competitor of the Equity Issuer and each Holder hereby represents and warrants to the same as to itself, its Representatives and its bona fide potential transferees that participate in such calls, and (B) shall be subject to Section 12.2; *provided,* that each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of Section 12.2 if such Representative or recipient were party to this Agreement. With respect to any recipient who is a

33

bona fide potential transferee of ~~Equity Issuer's common stock~~**Warrants**, the applicable Holder must first comply with Section 12.2 prior to sharing any such information.**¶**

**(b)     The Equity Issuer shall** *use commercially reasonable efforts* **to promptly post all such information required by Section 12.1 on a website (which may be nonpublic, require a confidentiality acknowledgement, with such acknowledgment being deemed to satisfy the requirement for a non-disclosure agreement as set forth in Section 12.2(c) and shall be maintained using** *commercially reasonable efforts* **by the Equity Issuer or a third party) (the "***Holder Website***") to which access will be given to the Holders and bona fide prospective investors or bona fide potential transferees (with the exception of Competitors) in the Warrants.**

12.2    Confidentiality.    The Warrant Agent and each Holder acknowledges that any notices or information furnished, including verbally, pursuant to this Agreement**, including the Financial Statements and any information actually provided pursuant to Section 12.1(a)(iii),** (the "*Confidential Information*") is confidential and competitively sensitive. The Warrant Agent and each Holder shall use, and shall cause any Person to whom Confidential Information is disclosed by the Warrant Agent or such Holder pursuant to clause (A) below, to use the Confidential Information only in connection with its ownership of the Warrants and not for any other purpose (including to disadvantage competitively the Equity Issuer, the Warrant Agent, or any other Holder). The Warrant Agent and each Holder shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(a)     to the Warrant Agent or the Holder's Representatives in the normal course of the performance of their duties for the Warrant Agent or such Holder (it being understood that such Representatives shall be informed by the Holder of the confidential nature of such information and shall be directed to treat such information in accordance with this Section 12.2;

(b)     to the extent required by applicable law, rule or regulation or requested by any regulatory or self-regulatory authority in connection with the conduct of its ordinary oversight activities; provided that the Warrant Agent and the Holder shall take reasonable steps to minimize the extent of any such required disclosure and give the Equity Issuer prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Equity Issuer may, at its sole expense, seek an appropriate protective order or similar relief (and the Warrant Agent and Holder, as applicable, shall cooperate with such efforts by the Equity Issuer, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall use reasonable best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information);

(c)     to any Person to whom the Warrant Agent or Holder is contemplating a transfer of its Warrants permitted in accordance with the terms hereof; provided that such ~~P~~**p**erson is not prohibited from receiving such information pursuant to this Section 12.2 and~~,~~ prior to such disclosure such potential transferee is advised of the confidential nature of such information and executes a non-disclosure agreement in a form ~~approved by~~**consistent with** the ~~Board~~**provisions** of ~~Directors~~**this Section 12.2** and which agreement is independently enforceable by the Equity Issuer and includes a certification that such Person is not a Competitor of the Equity Issuer **(which, for the avoidance of doubt, shall be deemed satisfied if such Person has accepted the**

34

**confidentiality acknowledgement required prior to being granted access to the Holder Website)**;

     (d)    to any regulatory authority or rating agency to which the Warrant Agent or the Holder or any of its respective Affiliates is subject or with which it has regular dealings, solely (I) as long as such authority or agency is advised of the confidential nature of such information and (II) such information is provided as the result of a routine request not targeted to the Equity Issuer or any of its Subsidiaries;

     (e)    [in connection with the Warrant Agent or the Holder's or their respective Affiliates' normal fund raising, marketing, informational or reporting activities or to any bona fide prospective purchaser of the equity or assets of the Warrant Agent or Holder or the their respective Affiliates, or prospective merger partner of the Warrant Agent or of the Holder or their respective Affiliates; provided that prior to such disclosure, if any Confidential Information is shared with such Persons, the Persons to whom such information is disclosed are advised of the confidential nature of such information and are subject to customary confidentially obligations with respect to such information;] or

     (f)    if the prior written consent of the Equity Issuer shall have been obtained.

Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Equity Issuer, the Warrant Agent, or the Holder. The restrictions contained in this Section 12.2 shall terminate **eighteen (**18**)** months following the date on which the Holder ceases to own any Warrants.

Confidential Information does not include information that: (A) is or becomes generally available to the public (including as a result of any information filed or submitted by the Equity Issuer with the Commission) other than as a result of a disclosure by the Warrant Agent or the Holder or their respective Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement, (B) is or was in the possession of the Warrant Agent or Holder or their respective Representatives on a non-confidential basis prior to its disclosure to the Warrant Agent or the Holder or their Representatives by the Equity Issuer, or (C) was or becomes available to the Warrant Agent or Holder or their respective Representatives on a non-confidential basis from a source other than the Equity Issuer, which source is or was (at the time of receipt of the relevant information) not, to the best of the Warrant Agent's or Holder's or their respective Representatives' knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Equity Issuer or another Person.

**13.**    **Concerning the Warrant Agent.**

    Sections 13.1, 13.2, 13.3, 13.4, 13.5, **and** 13.6, and 13.7 shall survive the expiration of the Warrants and the termination of this Agreement and the resignation, replacement or removal of the Warrant Agent.

    13.1    Rights and Duties of the Warrant Agent.

(a)      The Equity Issuer hereby appoints the Warrant Agent to act as agent of the Equity Issuer as set forth in this Agreement.  The Warrant Agent hereby accepts the appointment as agent of the Equity Issuer and agrees to perform that agency upon the express terms and conditions set forth in this Agreement and in the Warrant Statements or as the Equity Issuer and the Warrant Agent may hereafter agree in writing, by all of which the Equity Issuer and the Holders of Warrants, by their acceptance thereof, shall be bound.

(b)      The Warrant Agent shall not, by any act hereunder, be deemed to make any representations as to validity or authorization of (i) the Warrants, (ii) any securities or other property delivered upon exercise of any Warrant, (iii) the accuracy of the computation of the number or kind or amount of stock or other securities or other property deliverable upon exercise of any Warrant, (iv) the correctness of any of the representations of the Equity Issuer made in such certificates that the Warrant Agent receives; or (v) any of the statements of act or recitals contained in this Agreement.  The Warrant Agent shall not at any time have any duty to calculate or determine whether any facts exist that may require any adjustments pursuant to Section 7 hereof with respect to the kind and amount of shares or other securities or any property issuable to Holders upon the exercise of Warrants required from time to time.  The Warrant Agent shall have no duty or responsibility to determine the accuracy or correctness of such calculation or with respect to the methods employed in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any Common Shares or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to Section 7 hereof, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Equity Issuer to make any cash payment or to issue, transfer or deliver any Common Shares or other securities or property upon any exercise or upon any adjustment pursuant to Section 7 hereof or to comply with any of the covenants of the Equity Issuer contained in Section 7 hereof.

(c)      The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement or in the Warrant Statements or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Equity Issuer only.

(d)      The Warrant Agent shall not have any duty or responsibility in the case of the receipt of any written demand from any holder of Warrants with respect to any action or default by the Equity Issuer, including, without limiting the generality of the foregoing, any duty or responsibility to initiate or attempt to initiate any proceedings at law or otherwise or to make any demand upon the Equity Issuer.

(e)      The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorney or agents, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorney or agents or for any loss to the Equity Issuer resulting from any such act, default, neglect or misconduct, absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in the selection and continued employment thereof.

36

(f)      The Warrant Agent may rely on and shall be held harmless and protected and shall incur no liability for or in respect of any action taken, suffered or omitted to be taken by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in reliance upon any certificate, statement, instrument, opinion, notice, letter, facsimile transmission, telegram or other document, or any security delivered to it, and believed by it to be genuine and to have been made or signed by the proper party or parties, or upon any written or oral instructions or statements from the Equity Issuer with respect to any matter relating to its acting as Warrant Agent hereunder.

(g)      The Warrant Agent shall not be obligated to expend or risk its own funds or to take any action that it believes would expose or subject it to expense or liability or to a risk of incurring expense or liability, unless it has been furnished with assurances of repayment or indemnity satisfactory to it.

(h)      The Warrant Agent shall not be liable or responsible for any failure of the Equity Issuer to comply with any of its obligations relating to any registration statement filed with the Commission or this Agreement, including without limitation obligations under applicable regulation or law.

(i)      The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Equity Issuer of any Warrants authenticated by the Warrant Agent and delivered by it to the Equity Issuer pursuant to this Agreement or for the application by the Equity Issuer of the proceeds of the issue and sale, or exercise, of the Warrants.

(j)      The Warrant Agent shall act hereunder solely as agent for the Equity Issuer, and its duties shall be determined solely by the express provisions hereof (and no duties or obligations shall be inferred or implied).  The Warrant Agent shall not assume any obligations or relationship of agency or trust with any of the owners or holders of the Warrants.

(k)      The Warrant Agent may rely on and be fully authorized and protected in acting or failing to act upon any guaranty of signature by an "eligible guarantor institution" that is a member or participant in the Securities Transfer Agents Medallion Program or other comparable "signature guarantee program" or insurance program in addition to, or in substitution for, the foregoing.

(l)      In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Equity Issuer, the Holder of any Warrant or any other person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Equity Issuer which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(m)    Reliance on Equity Issuer Statement.  Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Equity Issuer prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer and delivered to the Warrant Agent.  The Warrant Agent may rely upon such statement, and will be indemnified and held harmless for such reliance, and shall not be held liable in connection with any delay in receiving such statement.

(n)    The Warrant Agent shall have no responsibility to the Equity Issuer, any Holders of Warrants or any holders of Common Shares for interest or earnings on any moneys held by the Warrant Agent pursuant to this Agreement.

(o)    The Warrant Agent shall not be required to take notice or be deemed to have notice of any event or condition hereunder, including any event or condition that may require action by the Warrant Agent, unless the Warrant Agent shall be specifically notified in writing of such event or condition by the Equity Issuer, and all notices or other instruments required by this Agreement to be delivered to the Warrant Agent must, in order to be effective, be received by the Warrant Agent as specified in Section 14.1 hereof, and in the absence of such notice so delivered, the Warrant Agent may conclusively assume no such event or condition exists.

13.2    Limitation of Liability.

(a)    The Warrant Agent shall be liable hereunder only for its own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction).  Notwithstanding anything contained herein to the contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, the amounts paid hereunder by the Equity Issuer to Warrant Agent as fees and charges, but not including reimbursable expenses, during the twelve (12) months immediately preceding the event for which recovery from Warrant Agent is being sought.  Neither party to this Agreement shall be liable to the other party for any consequential, indirect, special or incidental damages under any provisions of this Agreement or for any consequential, indirect, punitive, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

(b)    Exclusions.  The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant.  The Warrant Agent shall not be responsible for any breach by the Equity Issuer of any covenant or condition contained in this Agreement or in any Warrant.  The Warrant Agent shall not be responsible to make any adjustments required under the provisions of Section 7 hereof or responsible for the manner, method, or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by

38

any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Shares to be issued pursuant to this Agreement or any Warrant or as to whether any Common Shares shall, when issued, be valid and fully paid and non-assessable.

13.3    Indemnification.

(a)    The Equity Issuer covenants and agrees to indemnify and to hold the Warrant Agent harmless against any costs, expenses (including reasonable and documented fees of its legal counsel), losses or damages, which may be paid, incurred or suffered by or to which it may become subject, arising from or out of, directly or indirectly, any claims or liability resulting from its actions as Warrant Agent pursuant hereto; provided, however, that such covenant and agreement does not extend to, and the Warrant Agent shall not be indemnified with respect to, such costs, expenses, losses and damages incurred or suffered by the Warrant Agent as a result of, or arising out of, its gross negligence, bad faith, or willful misconduct (each as determined by a final judgment of a court of competent jurisdiction).  The costs and expenses incurred in enforcing this right of indemnification shall be paid by the Equity Issuer.

(b)    Instructions.  From time to time, the Equity Issuer may provide the Warrant Agent with instructions, by Equity Issuer Order or otherwise, concerning the services performed by the Warrant Agent hereunder.  In addition, at any time the Warrant Agent may apply to any officer of the Equity Issuer for instruction, and may consult with legal counsel for the Warrant Agent or the Equity Issuer with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement. Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Equity Issuer for any action taken, suffered or omitted to be taken by Warrant Agent in reliance upon any Equity Issuer instructions or upon the advice or opinion of such counsel.  Warrant Agent shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from the Equity Issuer.

13.4    Right to Consult Counsel.  The Warrant Agent may at any time consult with legal counsel satisfactory to it (who may be legal counsel for the Equity Issuer), and the Warrant Agent shall incur no liability or responsibility to the Equity Issuer or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such counsel.

13.5    Compensation and Reimbursement.  The Equity Issuer agrees to pay the Warrant Agent from time to time compensation for all reasonable fees and expenses relating to its services hereunder as the Equity Issuer and the Warrant Agent may agree in writing from time to time and to reimburse the Warrant Agent for all of its reasonable expenses and disbursements, including reasonable counsel fees and other disbursements incurred in connection with the preparation, delivery, negotiation, amendment, administration and execution of this Agreement and the exercise and performance of its duties hereunder.

13.6     Warrant Agent May Hold Equity Issuer Securities.  The Warrant Agent and any stockholder, director, officer or employee of the Warrant Agent may buy, sell or deal in any of the Warrants or other securities of the Equity Issuer or become pecuniarily interested in any transaction in which the Equity Issuer may be interested, or contract with or lend money to the Equity Issuer or otherwise act as fully and freely as though it were not Warrant Agent under this Agreement.  Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Equity Issuer or for any other legal entity.  Nothing herein shall preclude the Warrant ~~Agent or any Countersigning~~ Agent from acting in any other capacity for the Equity Issuer or for any other legal entity.

13.7     Resignation and Removal; Appointment of Successor.

(a)     The Warrant Agent may resign its duties and be discharged from all further duties and liability hereunder (except liability arising as a result of the Warrant Agent's own gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction)) after giving **thirty (**30**)** days' prior written notice to the Equity Issuer.  The Equity Issuer may remove the Warrant Agent upon **thirty (**30**)** days' written notice, and the Warrant Agent shall thereupon in like manner be discharged from all further duties and liabilities hereunder, except as aforesaid.  The Warrant Agent shall, at the expense of the Equity Issuer, cause notice to be given in accordance with Section 14.1(d) to the Equity Issuer of said notice of resignation or notice of removal, as the case may be.  Upon such resignation or removal, the Equity Issuer shall appoint in writing a new Warrant Agent.  If the Equity Issuer shall fail to make such appointment within a period of **thirty (**30**)** calendar days after it has been notified in writing of such resignation by the resigning Warrant Agent or after such removal, then the Holder of any Warrant may apply to any court of competent jurisdiction for the appointment of a new Warrant Agent.  Any new Warrant Agent, whether appointed by the Equity Issuer or by such a court, shall be a Person (other than a natural person) doing business under the laws of the United States or any state thereof in good standing, authorized under such laws to act as Warrant Agent, and having a combined capital and surplus (together with its Affiliates) of not less than $25,000,000. The combined capital and surplus of such new Warrant Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such Warrant Agent prior to its appointment; provided, however, such reports are published at least annually pursuant to law or to the requirements of a federal or state supervising or examining authority.  After acceptance in writing of such appointment by the new Warrant Agent, it shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named herein as the Warrant Agent, without any further assurance, conveyance, act or deed; but if for any reason it shall be reasonably necessary or expedient to execute and deliver any further assurance, conveyance, act or deed, the same shall be done at the reasonable expense of the Equity Issuer and shall be legally and validly executed and delivered by the resigning or removed Warrant Agent.  Not later than the effective date of any such appointment, the Equity Issuer shall file notice thereof with the resigning or removed Warrant Agent.  Failure to give any notice provided for in this Section 13.7(a), however, or any defect therein, shall not affect the legality or validity of the resignation of the Warrant Agent or the appointment of a new Warrant Agent as the case may be.

40

(b)      Any Person into which the Warrant Agent or any new Warrant Agent may be merged, or any Person resulting from any consolidation to which the Warrant Agent or any new Warrant Agent shall be a party, shall be a successor Warrant Agent under this Agreement without any further act; provided, however, that such Person would be eligible for appointment as successor to the Warrant Agent under the provisions of Section 13.7(a). Any such successor Warrant Agent shall promptly cause notice of its succession as Warrant Agent to be given in accordance with Section 14.1(d) to each Holder of a Warrant at such Holder's last address as shown on the Warrant Register.

14.   **Notices.**

14.1   Notices Generally.

(a)      Any request, notice, direction, authorization, consent, waiver, demand or other communication permitted or authorized by this Agreement to be made upon, given or furnished to or filed with the Equity Issuer or the Warrant Agent by the other party hereto or by any Holder shall be sufficient for every purpose hereunder if in writing, sent via trackable or first-class mail or delivered by hand (including by courier service) as follows:¶

if to the Equity Issuer, to:¶

> [•]
> **Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**
> *société anonyme*
> 4, rue Albert Borschette
> L-1246 Luxembourg
> RCS Luxembourg B. [•] **264124**
> Attention:      Legal Department

and with a copy (which shall not constitute notice to the Equity Issuer) to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attention:      Edward O. Sassower, P.C.
>                 Steven N. Serajeddini, P.C.
>                 Aparna Yenamandra
>                 Edward.Sassower@Kirkland.com
>                 Steven .Serajeddini@Kirkland.com
>                 Aparna.Yenamandra@Kirkland.com

if to the Warrant Agent, to:

> American Stock Transfer & Trust Company, LLC
> 6201 15th Avenue
> Brooklyn, New York 11219
> Attention:      Corporate Actions

41

or, in either case, such other address as shall have been set forth in a notice delivered in accordance with this <u>Section 14.1(a)</u>.

(b)      All such communications shall be effective when sent.

(c)      Any Person that telecopies any communication hereunder to any Person shall, on the same date as such telecopy is transmitted, also send, by trackable or first class mail, postage prepaid and addressed to such Person as specified above, an original copy of the communication so transmitted.

(d)      Except as set forth in the last paragraph of this <u>Section 14.1(d)</u>, where this Agreement provides for notice to Holders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and **(x) sent by electronic mail or (y)**mailed, by trackable or first-class mail, to each Holder affected by such event, at the address of such Holder as it appears in the Warrant Register.  In any case where notice to Holders is given by mail **or electronic mail**, neither the failure to mail **or transmit** such notice, nor any defect in any notice so mailed **or transmitted**, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.  Where this Agreement provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail, then such notification as shall be made by a method approved by the Warrant Agent as one which would be most reliable under the circumstances for successfully delivering the notice to the addressees shall constitute a sufficient notification for every purpose hereunder.

Where this Agreement provides for notice of any event to a Holder of a Global Warrant Certificate, such notice shall be sufficiently given if given to the Depositary (or its designee), pursuant to its Applicable Procedures, not later than the latest date (if any), and not earlier than the earliest date (if any), prescribed for the giving of such notice.

14.2    <u>Required Notices to Holders</u>.  In the event the Equity Issuer shall:

(a)      take any action that would result in an adjustment to the Exercise Price and/or the number of Common Shares issuable upon exercise of a Warrant pursuant to <u>Section 7.1</u>;

(b)      consummate any Winding Up; or

(c)      consummate any Transaction (each of (a), (b) or (c), an "***Action***");

then, in each such case, the Equity Issuer shall deliver to the Warrant Agent and, unless the Equity Issuer has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such Action, the Equity Issuer shall deliver (or cause to be delivered ) to each Holder of a Warrant, in accordance with <u>Section 14.1(d)</u> hereof, a written notice of such

42

Action, including, in the case of an action pursuant to Section 14.2(a), the information required under Section 7.1(j)(ii). Such notice shall be given promptly after taking such Action.

If at any time the Equity Issuer shall cancel any of the Actions for which notice has been given under this Section 14.2 prior to the consummation thereof, the Equity Issuer shall give each Holder prompt notice of such cancellation in accordance with Section 14.1(d), unless the Equity Issuer has made a filing with the Commission, including pursuant to a current report on Form 8-K, which filing discloses the cancellation of such Actions. For the avoidance of doubt, if at any time the Equity Issuer shall cancel any of the Actions for which notice has been given under this Section 14.2 prior to the consummation thereof, the Equity Issuer shall give Warrant Agent prompt notice of such cancellation in accordance with Section 14.1(d).

**15.    Inspection**.

The Warrant Agent shall cause a copy of this Agreement to be available at all reasonable times at the office of the Warrant Agent for inspection by any Holder of any Warrant. The Warrant Agent may require any such Holder to submit its Warrant Statement for inspection by the Warrant Agent.

**16.    Amendments**.

(a)    Except as provided in paragraphs (b) and (c) of this Section 16, this Agreement may be amended by the Equity Issuer and the Warrant Agent with the consent of the Required Warrant Holders.

(b)    Notwithstanding the foregoing, the Equity Issuer and the Warrant Agent may, without the consent or concurrence of the Holders of the Warrants, by supplemental agreement or otherwise, amend this Agreement for the purpose of making any changes or corrections in this Agreement that (i) are required to cure any ambiguity or to correct or supplement any defective or inconsistent provision or clerical omission or mistake or manifest error herein contained or (ii) add to the covenants and agreements of the Equity Issuer in this Agreement further covenants and agreements of the Equity Issuer thereafter to be observed, or surrender any rights or powers reserved to or conferred upon the Equity Issuer in this Agreement; provided, however, that in either case such amendment shall not adversely affect the rights or interests of the Holders of the Warrants hereunder in any material respect.

(c)    The consent of each Holder of any Warrant affected thereby shall be required for any supplement or amendment to this Agreement or the Warrants that would: (i) increase the Exercise Price or decrease the number of Common Shares receivable upon exercise of Warrants, in each case other than as provided in Section 7.1; (ii) cause the Expiration Date to be changed to an earlier date; or (iii) modify the provisions contained in Section 7.1 in a manner adverse to the Holders of Warrants.

(d)    The Warrant Agent shall join with the Equity Issuer in the execution and delivery of any such amendment unless such amendment affects the Warrant Agent's own rights, duties or immunities hereunder, in which case the Warrant Agent may, but shall not be required to, join in such execution and delivery; provided that, as a condition precedent to the Warrant Agent's execution of any amendment to this Agreement, the Equity Issuer shall deliver to the Warrant

43

Agent a certificate from an Appropriate Officer that states that the proposed amendment is in compliance with the terms of this Section 16.  Upon execution and delivery of any amendment pursuant to this Section 16, such amendment shall be considered a part of this Agreement for all purposes and every Holder of a Warrant theretofore or thereafter delivered hereunder shall be bound thereby.

(e)      Promptly after the execution by the Equity Issuer and the Warrant Agent of any such amendment, unless the Equity Issuer has made a filing with the Commission, including pursuant to a Current Report on Form 8-K, which filing discloses such adjustment, the Equity Issuer shall give notice to the Holders of Warrants, setting forth in general terms the substance of such amendment, in accordance with the provisions of Section 14.1(d).  Any failure of the Equity Issuer to mail such notice or any defect therein, shall not, however, in any way impair or affect the validity of any such amendment.

**17.      Waivers**.

The Equity Issuer may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Equity Issuer has obtained the written consent of the Required Warrant Holders, as required pursuant to Section 16.

**18.      Successor to Equity Issuer**.

So long as Warrants remain Outstanding, the Equity Issuer will not enter into any Transaction unless the acquirer (a "***Successor Equity Issuer***") shall expressly assume by a supplemental agreement, executed and delivered to the Warrant Agent, in form reasonably satisfactory to the Warrant Agent, the due and punctual performance of every covenant of this Agreement on the part of the Equity Issuer to be performed and observed ~~and shall have provided for exercise rights in accordance with Section 7.1(h)(i)~~.  Upon the consummation of such Transaction, the acquirer shall succeed to, and be substituted for, and may exercise every right and power of, the Equity Issuer under this Agreement with the same effect as if such acquirer had been named as the Equity Issuer herein.

**19.      Headings**.

The section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

**20.      Counterparts**.

This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which together constitute one and the same instrument.  A signature to this Agreement transmitted electronically shall have the same authority, effect and enforceability as an original signature.

**21.      Severability**.

The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision hereof will not affect the validity or enforceability of the other

provisions hereof; <u>provided</u>, that, if any provision of this Agreement, as applied to any party or to any circumstance, is adjudged by a court or governmental body not to be enforceable in accordance with its terms, the parties agree that the court or governmental body making such determination will have the power to modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its reduced form, such provision will then be enforceable and will be enforced; <u>further</u>, <u>provided</u>, that, if such excluded provision shall affect the rights, immunities, liabilities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately upon written notice to the Equity Issuer.

22.    **No Redemption**.

The Warrants shall not be subject to redemption by the Equity Issuer or any other Person; <u>provided</u>, that, the Warrants may be acquired by means other than a redemption, whether by tender offer, open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms of this Agreement.

23.    **Persons Benefiting**.

This Agreement shall be binding upon and inure to the benefit of the Equity Issuer, the Warrant Agent and the Holders from time to time.  Nothing in this Agreement, express or implied, is intended to confer upon any person other than the Equity Issuer, the Warrant Agent and the Holders any rights or remedies under or by reason of this Agreement or any part hereof, and all covenants, conditions, stipulations, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and of the Holders.  Each Holder, by acceptance of acceptance of a Warrant or of such interest in a Warrant, agrees to all of the terms and provisions of this Agreement applicable thereto.

24.    **Applicable Law**.

THIS AGREEMENT, EACH WARRANT ISSUED HEREUNDER AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO AND THERETO, INCLUDING THE INTERPRETATION, CONSTRUCTION, VALIDITY AND ENFORCEABILITY THEREOF, SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.

25.    **Entire Agreement**.

This Agreement sets forth the entire agreement of the parties hereto as to the subject matter hereof and supersedes all previous agreements among all or some of the parties hereto with respect thereto, whether written, oral or otherwise.

26.    **Force Majeure.**

Notwithstanding anything to the contrary contained herein, the Warrant Agent will not be liable for any delays or failures in performance resulting from acts beyond its reasonable control including, without limitation, acts of God, terrorist acts, shortage of supply, disruptions in public utilities, interruptions or malfunction of computer facilities, or loss of data due to power failures or

45

mechanical difficulties with information storage or retrieval systems, labor difficulties, war, pandemics, epidemics or civil unrest.

**27.      Further Assurances.**

The Equity Issuer shall perform, acknowledge and deliver or cause to be performed, acknowledged and delivered all such further and other acts, documents, instruments and assurances as may be reasonably required by the Warrant Agent for the carrying out or performing by the Warrant Agent of the provisions of this Agreement.

**28.      Confidentiality.**

The Warrant Agent and the Equity Issuer agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services set forth in the attached schedule shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions) or to such party's advisors (including its attorneys).  However, each party may disclose relevant aspects of the other party's confidential information to its officers, affiliates, agents, subcontractors and employees to the extent reasonably necessary to perform its duties and obligations under this Agreement and such disclosure is not prohibited by applicable law.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

[●]**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**, a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg

By: _____

| | |
|---|---|
| Name: | [David Tolley]**José Toscano** |
| **Title:** | **Delegate of the Board of Directors** |
| Title: | Chief Financial Officer and Treasurer |

AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC, as Warrant Agent

By: _____

Name:
Title:

*[Signature Page to Series B Warrant Agreement]*

EXHIBIT A



**EXHIBIT B-1¶**

### BOOK-ENTRY STATEMENT WARRANT LEGEND

THESE WARRANTS AND ANY COMMON SHARES ISSUABLE UPON EXERCISE OF THE WARRANTS HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145; PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN "UNDERWRITER" AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

THESE WARRANTS AND ANY COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE WARRANTS REPRESENTED HEREBY IN THE WARRANT AGREEMENT, ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, DATED AS OF **FEBRUARY** [●], ~~2021~~**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**WARRANT AGREEMENT**"). IN ADDITION, THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF ~~[EQUITY ISSUER]~~**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)** (THE "**EQUITY ISSUER**"), DATED AS OF **FEBRUARY** [●], ~~2021~~**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**SHAREHOLDERS AGREEMENT**"). NO REGISTRATION OR TRANSFER OF THE WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING, AS

2

APPLICABLE, COMPLIANCE WITH THE WARRANT AGREEMENT OR THE SHAREHOLDERS AGREEMENT, AS APPLICABLE.

THE EQUITY ISSUER OR THE WARRANT AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE WARRANTS REPRESENTED OR OTHERWISE EVIDENCED BY THIS STATEMENT A COPY OF THE SHAREHOLDERS AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE COMMON SHARES ISSUABLE UPON EXERCISE OF THE WARRANTS, UPON WRITTEN REQUEST TO THE EQUITY ISSUER AT ITS PRINCIPAL PLACE OF BUSINESS. THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE EQUITY ISSUER.

EXHIBIT B-2

**FACE OF SERIES B GLOBAL WARRANT CERTIFICATE¶**

**[●]**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) GLOBAL WARRANT CERTIFICATE**

**EVIDENCING**

**SERIES B WARRANTS TO SUBSCRIBE TO AND PURCHASE COMMON SHARES¶**

**[FACE]¶**

No. [——]**1**                                                         CUSIP No.[●] **L5217E112**

UNLESS THIS GLOBAL SERIES B WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO [THE EQUITY ISSUER]**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)** (THE "**EQUITY ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL SERIES B WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE EQUITY ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THIS WARRANT HAS BEEN, AND THE SECURITIES REPRESENTED HEREBY WILL BE, ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "**BANKRUPTCY CODE**"). THIS WARRANT AND THE SECURITIES REPRESENTED BY THIS WARRANT MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE

1

BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE EQUITY ISSUER IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE EQUITY ISSUER AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE WARRANTS REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER IN THE WARRANT AGREEMENT OF THE EQUITY ISSUER, DATED AS OF **FEBRUARY** [●], ~~2021~~**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**WARRANT AGREEMENT**"). IN ADDITION, THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF THE EQUITY ISSUER, DATED AS OF **FEBRUARY** [●], ~~2021~~**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "**SHAREHOLDERS AGREEMENT**"). NO REGISTRATION OR TRANSFER OF THE WARRANTS OR THE COMMON SHARES ISSUABLE UPON EXERCISE OF SUCH WARRANTS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING, AS APPLICABLE, COMPLIANCE WITH THE WARRANT OR SHAREHOLDERS AGREEMENT, AS APPLICABLE. COPIES OF SUCH AGREEMENTS ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE EQUITY ISSUER. NO TRANSFER OF THIS WARRANT OR THE SECURITIES REPRESENTED BY THIS WARRANT WILL BE MADE ON THE BOOKS OF THE EQUITY ISSUER UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE SHAREHOLDERS AGREEMENT.

ONLY PARTIES TO THE SHAREHOLDERS AGREEMENT ARE ENTITLED TO EXERCISE THE RIGHTS OF HOLDERS UNDER THE SHAREHOLDERS AGREEMENT. NO PERSON MAY BECOME A HOLDER OF COMMON SHARES PURSUANT TO ANY TRANSFER OF COMMON SHARES OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT, WHICH INCLUDES, AMONG THE ABOVE-REFERENCED RESTRICTIONS, RESTRICTIONS ON TRANSFERS TO "COMPETITORS" OF THE EQUITY ISSUER. A THEN-CURRENT LIST OF SUCH COMPETITORS MAY BE OBTAINED BY CONTACTING THE EQUITY ISSUER.

2

¶

[●]¶

### INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)

No. [___]————————————————————————[__,__,___]1 1,911,399 Warrants
CUSIP No. [●]L5217E112

THIS CERTIFIES THAT, for value received, CEDE & CO., or registered assigns, is the registered owner of the number of Warrants to subscribe to and purchase Common Shares of [●]Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B[●] 264124 (the "*Equity Issuer*", which term includes any successor thereto under the Warrant Agreement (as may be supplemented, amended or amended and restated pursuant to the applicable provisions hereof, the "*Warrant Agreement*"), dated as of **February** [●], 202[●]2022, between the Equity Issuer and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "*Warrant Agent*", which term includes any successor thereto permitted under the Warrant Agreement)) specified above or such lesser number as may from time to time be endorsed on the "Schedule of Decreases in Warrants" attached hereto, and is entitled, subject to and upon compliance with the provisions hereof and of the Warrant Agreement, at such Holder's option, at any time when the Warrants evidenced hereby are exercisable, to subscribe to and purchase from the Equity Issuer one (1) Common Share of the Equity Issuer for each Warrant evidenced hereby, at the purchase price of [●]$77.22 (as adjusted from time to time, the "*Exercise Price*"), payable in full at the time of subscription and purchase, the number of Common Shares into which and the Exercise Price at which each Warrant shall be exercisable each being subject to adjustment as provided in Section 7 of the Warrant Agreement.

All Common Shares issuable by the Equity Issuer upon the exercise of Warrants **and payment of the Exercise Price** shall, upon such issuance, be duly and validly issued and fully paid and nonassessable.  The Equity Issuer shall pay any and all taxes (other than income taxes) that may be payable in respect of the issue or delivery of Common Shares on exercise of Warrants. The Equity Issuer or Warrant Agent shall not be required, however, to pay any tax or other charge imposed in respect of any transfer involved in the issue and delivery of Common Shares in book-entry form or any registered forms for Common Shares or payment of cash or other property to any Recipient other than, in each case, the Holder of the exercised Warrant, and in case of such transfer or payment, the Warrant Agent and the Equity Issuer shall not be required to issue or deliver any Common Shares in book-entry form or any registered form or pay any cash until such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or to the Equity Issuer.

Each Warrant evidenced hereby may be exercised by the Holder hereof at the Exercise Price then in effect on any Business Day from and after the Original Issue Date until 5:00 p.m., New York time, on the Expiration Date in the Warrant Agreement.

Subject to the provisions hereof and of the Warrant Agreement, the Holder of this Global Warrant Certificate may exercise all or any whole number of the Warrants evidenced hereby by delivery to the Warrant Agent of the Exercise Form on the reverse hereof, setting forth the number of Warrants being exercised and otherwise properly completed and duly executed by the Holder thereof to the Warrant Agent, and delivering such Warrants by book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise complying with the Applicable Procedures in respect of the exercise of such Warrants together with payment in full of the Exercise Price as then in effect for each Common Share receivable upon exercise of each Warrant being submitted for exercise unless cashless exercise is being elected with respect thereto.  Any such payment of the Exercise Price is to be by wire transfer in immediately available funds to such account of the Equity Issuer at such banking institution as the Equity Issuer shall have designated from time to time.

Reference is hereby made to the further provisions of this Global Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Global Warrant Certificate has been countersigned by the Warrant Agent by manual or electronic signature of an authorized officer on behalf of the Warrant Agent, this Global Warrant Certificate shall not be valid for any purpose and no Warrant evidenced hereby shall be exercisable.

IN WITNESS WHEREOF, the Equity Issuer has caused this certificate to be duly executed.

Dated:  [——————— **February [●]**], ~~20[——]~~**2022**

<div style="margin-left: 50%">

**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**
~~[●]~~

</div>

[SEAL]                                                        By: _____

<div style="margin-left: 50%">

**José Toscano**
**Delegate of the Board of Directors**
~~[Title]~~

</div>

ATTEST:

Countersigned:

American Stock Transfer & Trust                          ~~[——————————]~~
Company, LLC, as Warrant Agent

<div style="text-align:center">OR</div>

By: _____          ~~By:~~ _____
        Authorized Agent                                          ~~as Countersigning Agent~~

4

By: _____

Authorized Officer

**Reverse of Series B Global Warrant Certificate¶**

**[●]**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.) SERIES B WARRANT CERTIFICATE**

**EVIDENCING**

**SERIES B GLOBAL WARRANTS TO PURCHASE COMMON SHARES**

The warrants evidenced hereby are one of a duly authorized issue of warrants of the Equity Issuer designated as its Series B Warrants to subscribe to and purchase Common Shares (the "***Warrants***"), limited in aggregate number to [●]**1,911,399** Common Shares issued under and in accordance with the Warrant Agreement, dated as of **February** [●]**, 2022** (the "***Warrant Agreement***"), between the Equity Issuer and American Stock Transfer & Trust Company, LLC, a New York limited liability trust company (the "***Warrant Agent***", which term includes any successor thereto permitted under the Warrant Agreement), to which the Warrant Agreement and all amendments thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Equity Issuer, the Warrant Agent, the Holders of Global Warrant Certificates and Warrant Statements, as applicable, and the owners of the Warrants evidenced thereby and of the terms upon which the Warrants are, and are to be, countersigned and evidenced.  A copy of the Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent for inspection by the Holder hereof.

The Warrant Agreement provides that, in addition to**for** certain adjustments to the number of Common Shares into which a Warrant is exercisable and the Exercise Price required to be made in certain circumstances, (x) in the case of any Transaction that is a Redomestication Transaction, a Sale Cash and Securities Transaction or a Sale Securities Only Transaction, the Equity Issuer shall (or, in the case of any Non-Surviving Transaction, the Equity Issuer shall cause the other Person involved in such Transaction *to) execute and deliver to the Warrant Agent a written instrument providing that* (i) the Warrants evidenced hereby, if then Outstanding, will be exercisable thereafter, during the period the Warrants evidenced hereby shall be exercisable as specified herein, only into the Substituted Securities (in the case of any Sale Securities Only Transaction or Sale Cash and Securities Transaction) or Substituted Property (in the case of any Transaction (other than a Sale Transaction)), subject to certain limitations if the Warrants have no value, that would have been receivable upon *such Transaction by a Qualifying Person holding the number of Common Shares* that would have been issued upon exercise of such Warrant if such Warrant had been exercised in full immediately prior to such Transaction (upon certain assumptions specified in the Warrant Agreement); (ii) in the case of any Sale Cash and Securities Transaction, the aggregate Exercise Price for any Warrant will be reduced in respect of the Fair Market Value of the Cash Consideration receivable upon such Transaction by a Qualifying Person;

5

~~and (iii) the rights and obligations of the Equity Issuer (or, in the case of any Non-Surviving Transaction, the other Person involved in such Transaction) and the holders in respect of Substituted Securities shall be substantially unchanged to~~ *be as nearly equivalent as may be practicable to the* ~~rights and obligations of the Equity Issuer and Holders in respect of Common Shares, and (y) in the case of any Sale Cash Only Transaction, the Equity Issuer shall make certain specified payments of cash and the Warrants will expire or become immediately exercisable, in each case~~ as more fully specified in the Warrant Agreement**, including in Section 7 thereof**.

Except as provided in the Warrant Agreement, all Outstanding Warrants shall expire and all rights of the Holders of the Global Warrant Certificate and the Warrant Statements evidencing such Warrants shall automatically terminate and cease to exist, as of 5:00 p.m., New York time, on the Expiration Date.  The "Expiration Date" means the date that is the fifth anniversary of the Effective Date.

In the event of the exercise of less than all of the Warrants evidenced hereby, a new Global Warrant Certificate of the same tenor and for the number of Warrants which are not exercised shall be issued by the Equity Issuer in the name or upon the written order of the Holder of this Global Warrant Certificate upon the cancellation hereof.

Global Warrant Certificates are issuable only in denominations of whole numbers of Warrants.  Upon surrender at the office of the Warrant Agent and payment of the charges specified herein and in the Warrant Agreement, this Global Warrant Certificate may be exchanged for Book-Entry Warrants in other authorized denominations or the transfer hereof may be registered in whole or in part in authorized denominations to one or more designated transferees; <u>provided</u>, <u>however</u>, that such other Book -Entry Warrants issued upon exchange or registration of transfer shall evidence the same aggregate number of Warrants as this Global Warrant Certificate.  The Equity Issuer shall cause to be kept at the office or offices of the Warrant Agent the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by law, the Equity Issuer shall provide for the registration of the Global Warrant Certificates and Book-Entry Warrants, as applicable, and of transfers or exchanges of Global Warrant Certificates and Book-Entry Warrants, as applicable.  No service charge shall be made for any registration of transfer or exchange of Warrants; <u>provided</u>, <u>however</u>, the Equity Issuer may require payment of a sum sufficient to cover any transfer tax or other similar governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrants.

Prior to due presentment of this Global Warrant Certificate for registration of transfer, the Equity Issuer, the Warrant Agent and any agent of the Equity Issuer or the Warrant Agent may treat the Person in whose name this Global Warrant Certificate is registered as the owner hereof for all purposes, and neither the Equity Issuer, the Warrant Agent nor any such agent shall be affected by notice to the contrary.

The Warrant Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Equity Issuer and the rights of the Holders of **Global** Warrant Certificates under the Warrant Agreement at any time by the Equity Issuer and the Warrant Agent with the consent of the Required Warrant Holders.

6

Until the exercise of any Warrant, subject to the provisions of the Warrant Agreement and except as may be specifically provided for in the Warrant Agreement, (i) no Holder of a Global Warrant Certificate or Warrant Statement evidencing any Warrant shall have or exercise any rights by virtue hereof as a holder of Common Shares of the Equity Issuer, including, without limitation, the right to vote, to receive dividends and other distributions or to receive notice of, or attend meetings of, stockholders or any other proceedings of the Equity Issuer; (ii) the consent of any such Holder shall not be required with respect to any action or proceeding of the Equity Issuer; (iii) except as provided with respect to a Winding Up of the Equity Issuer, no such Holder, by reason of the ownership or possession of a Warrant or the Global Warrant Certificate or Warrant Statement, as applicable, representing the same, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions (except as specifically provided in the Warrant Agreement), paid, allotted or distributed or distributable to the stockholders of the Equity Issuer prior to or for which the relevant record date preceded the date of the exercise of such Warrant; and (iv) no such Holder shall have any right not expressly conferred by the Warrant, Global Warrant Certificate, or Warrant Statement held by such Holder.

This Global Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

All terms used in this Global Warrant Certificate which are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement.  In the event of any conflict between this Global Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

<u>Exercise Form for Series B Warrants</u>

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attn: Corporate Actions

Re: [●]**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)** Series B Warrant Agreement, dated as of **February** [●]**, 2022**

In accordance with and subject to the terms and conditions hereof and of the Warrant Agreement dated as of **February** [●], ~~2021~~**2022** (the "***Warrant Agreement***"), the undersigned Holder of this Warrant hereby irrevocably elects to exercise _____ Warrants and represents that for each of the Warrants evidenced hereby being exercised such Holder either has (please check one box only):

☐      tendered the Exercise Price in the aggregate amount of $_____ by wire transfer in immediately available funds to such account of the Equity Issuer at such bank account as the Equity Issuer has designated from time to time for such purpose;

or

☐      cashless exercise.

The undersigned, if not already a shareholder of the Equity Issuer, is concurrently delivering a joinder to the Shareholders Agreement.

The undersigned requests that the ~~shares of~~ Common Shares issuable upon exercise be in fully registered form in such ~~denominations~~**numbers of Common Shares** and registered in such names and delivered in such manner as is specified in the instructions set forth below.

If the number of Warrants exercised is less than all of the Warrants evidenced hereby, (i) if the Warrants exercised are represented by a Global Warrant Certificate, the Warrant Agent shall endorse the "Schedule of Decreases in Warrants" attached hereto to reflect the Warrants being exercised or (ii) if the Warrants exercised are represented by Book-Entry Warrants, the undersigned requests that a new Book-Entry Warrant representing the remaining Warrants evidenced hereby be issued and delivered to the undersigned unless otherwise specified in the instructions below.

8

Dated: _____     Name: _____

_____     (Please Print)

(Insert Social Security or Other
Identifying Number of Holder)     Address: _____

_____

Signature

(Signature must conform in all respects to name of Holder as specified on the face of this Global Warrant Certificate and Warrant Statement and must bear a signature guarantee by a bank, trust company or member firm of a U.S. national securities exchange.)

Signature Guaranteed:

Instructions (i) as to ~~denominations~~ **numbers** of Common Shares issuable upon exercise and as to delivery of such securities and any other property issuable upon exercise and (ii) if applicable, as to Book-Entry Warrants evidencing unexercised Warrants:

Assignment

(Form of Assignment To Be Executed If Holder Desires To Transfer Warrants)

FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto

Please insert social security or
other identifying number

(Please print name and address including zip code)

the Warrants represented by the within Global Warrant Certificate or Warrant Statement, as applicable, and does hereby irrevocably constitute and appoint _____ Attorney, to transfer said Global Warrant Certificate or Warrant, as applicable, on the books of the within-named Equity Issuer with full power of substitution in the premises.

Dated: _____     Signature _____

(Signature must conform in all respects to name of Holder as specified on the face of this Global Warrant Certificate and Warrant Statement and must bear a signature guarantee by a bank, trust company or member firm of a U.S. national

9

securities exchange.)

## SCHEDULE A

## SCHEDULE OF DECREASES IN WARRANTS

The following decreases in the number of Warrants evidenced by this Global Warrant Certificate have been made:

| Date | Amount of decrease in number of Warrants evidenced by this Global Warrant Certificate | Number of Warrants evidenced by this Global Warrant Certificate following such decrease | Signature of authorized signatory |
|---|---|---|---|

11

EXHIBIT C

**Cashless Exercise Examples**

---

**Legend[1]**

A = Common ~~stock~~**Share** price (*e.g.* $11 USD);

AEP = Aggregate exercise price;

B = Exercise ~~p~~**P**rice (*e.g.* $1 USD);

CV= Cash ~~v~~**V**alue per ~~warrant~~**Cash Value Warrant**;

CW= The "Cash Value Warrants;"

E = Excess (in USD);

FS = Number of shares to be issued (unrounded);

TW = Total number of warrants exercised (*e.g.* 100);

X = Number of shares to be issued (rounded); and

Y = The number of Common Shares exercisable (one (1) Common Share).[2]

---

**1. U.S. Cashless Exercise.**

$$X = \frac{TW(A - B)}{A}$$

$$X = \frac{100 * (11 - 1)}{11}$$

---

[1]     For illustrative purposes only.  Operational definitions appear in <u>Section 3.7</u> to the Agreement.

[2]     Subject to adjustment as provided in <u>Section 7.1</u>.

$$X = 901$$

1    Se
ar
*(FS = 90.91)*

$$X = 901$$

**2. Luxembourg Cashless Exercise.**

$$X = (TW - CW) * Y$$

$$CW = \frac{AEP}{CV}$$

$$AEP = TW * B$$

$$AEP = (100 * \$1) = \$100$$

$$CV\,(Cash\,Value) = Y * A$$

$$CW = \frac{\$100}{\$11} = 9.09$$

$$X = (100 - 9.09) * 1$$

$$X = 90 \;(FS = 90.91)$$

**3. Cash Value Claim.**

$$CVC = CW * CV$$
$$CVC = (100/11) * (11)$$
$$CVC = 100 \;(AEP)$$

**4. Excess Formula.**

$$E = (FS - X) * A$$
$$E = (90.91 - 90) * A$$
$$E = 10.01$$



**Exhibit G-1**

**Restructuring Steps Memorandum**

**Restructuring Steps Memorandum**

Capitalized terms used but not otherwise defined herein shall have the meanings as given to them in the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates* as it may be altered, amended, modified, or supplemented from time to time (the "Plan").

The Debtors reserve the right to modify this Restructuring Steps Memorandum at any time.

Pursuant to the Plan, the Reorganized Debtors intend to implement the following Restructuring Transactions prior to, on, or after the Effective Date (unless otherwise indicated below):

*Prior to the Effective Date*:

**Step 1** – Holdings, Investments, LuxCo, and ICF each convert from a *société anonyme* (S.A.) into a *société à responsabilité limitée* (S.à.r.l.).

**Step 2** – An agent of the Holders of Allowed Claims receiving New Common Stock and/or New Warrants under the Plan forms Intelsat Emergence S.A., a new Luxembourg S.A. ("New TopCo") with appropriate share capital denominated in USD.

*On the Effective Date*: [1]

**Step 3** – The Holders of Allowed Unsecured Claims against ICF exchange a portion of such Claims with Envision for cash, as acknowledged by the Connect Senior Notes Trustee consistent with and as required by the Confirmation Order. Such Claims have a face amount equal to the amount of cash received. All Claims after being exchanged with or contributed to New TopCo or any Debtor or Reorganized Debtor other than the Debtor to which such Claims relate, hereafter "New Intercompany Claims."

**Step 4A** – The Holders of Allowed Unsecured Claims against Intelsat S.A. ("S.A.") exchange a portion of such Claims with Envision for cash, as acknowledged by the Convertible Senior Notes Trustee consistent with and as required by the Confirmation Order. Such Claims have a face amount equal to the amount of cash received.

**Step 4B** – The Holders of Allowed Unsecured Claims against ICF exchange a portion of such Claims with (1) ICF for cash, as acknowledged by the Connect Senior Notes Trustee consistent

---

[1]  All distributions on account of Notes Claims shall be effectuated through DTC and all Claims shall be discharged in accordance with the Confirmation Order and Article VIII of the Plan. Irrespective of any amounts specified in the acknowledgments, the full amount of the applicable Allowed Notes Claims are being treated as set forth in the Plan and discharged in accordance with the Plan. The Indenture Trustees executing the acknowledgments shall have no duty to deliver the Notes and any such delivery specified in the acknowledgments shall be deemed to have occurred upon the competition of the distributions contemplated by the Plan and this Restructuring Steps Memorandum through DTC's mandatory conversion.

with and as required by the Confirmation Order and (2) Jackson for cash in the aggregate amount of $140,000 and Series B CVRs. Such Claims have a face amount equal to the amount of cash and the fair market value of Series B CVRs received, as acknowledged by the Connect Senior Notes Trustee consistent with and as required by the Confirmation Order.

**Step 4C** – The Holders of Allowed Unsecured Claims against S.A. exchange a portion of such Claims with (1) Jackson for cash, $50,000 of which is transferred to S.A. to fund the share capital of Reorganized S.A. and (2) S.A. for cash, as acknowledged by the Convertible Senior Notes Trustee consistent with and as required by the Confirmation Order in accordance with applicable Luxembourg law, as acknowledged by the Convertible Senior Notes Trustee consistent with and as required by the Confirmation Order. Such Claims have a face amount equal to the amount of cash received.

**Step 4D** – The Holders of Allowed Unsecured Claims against LuxCo exchange a portion of such Claims with (1) LuxCo for cash, as acknowledged by the Lux Senior Notes Trustees consistent with and as required by the Confirmation Order and (2) Jackson for cash, as acknowledged by the Lux Senior Notes Trustees consistent with and as required by the Confirmation Order.  Such Claims have a face amount equal to the amount of cash received.

**Step 4E** – The Holders of Allowed Unsecured Claims against (1) Jackson and (2) Jackson Subsidiaries exchange a portion of such Claims with Jackson for cash, the right to receive reserve cash, Series A CVRs, and Series B CVRs, and the right to receive reserve Series A CVRs and reserve Series B CVRs, as acknowledged by the Jackson Senior Notes Trustees consistent with and as required by the Confirmation Order; *provided* that Claims against Jackson Subsidiaries being satisfied in full in Cash pursuant to the Plan may be satisfied directly by the Jackson Subsidiaries, rather than Jackson, in the Debtors' discretion. Such Claims have a face amount equal to the amount of cash and the right to receive reserve cash, and value of Series A CVRs, Series B CVRs and the right to receive reserve Series A CVRs and reserve Series B CVRs received. Jackson transfers the reserve cash and the reserve Series A CVRs and the reserve Series B CVRs to the escrow agent.

**Step 5** – Jackson borrows new exit financing and repays its secured debt (including accrued interest) with cash.

**Step 6** – The Holders of Allowed Unsecured Claims against S.A., ICF, Jackson, and the Jackson Subsidiaries that are not Convenience Claims (being paid in full in Cash) pursuant to the Plan contribute the remaining portion of such Claims (excluding the portion of the Allowed Unsecured Claims and all the accrued interest with respect to all claims against S.A. described in Step 11) (including accrued interest with respect to all Claims against ICF, Jackson, and the Jackson Subsidiaries) to New TopCo in exchange for New Common Stock and/or New Warrants, as applicable, issued by New TopCo, as acknowledged by the Indenture Trustees for the applicable Note Claims consistent with and as required by the Confirmation Order. A portion of the New Common Stock issued to the Holders of Allowed Unsecured Claims against Jackson and the Jackson Subsidiaries is transferred to the escrow agent. The Holders of Allowed Unsecured Claims against LuxCo contribute the remaining portion of such Claims (including accrued interest with respect to all Claims against LuxCo) to New TopCo in exchange for forty-five hundredths of a

2

percent (0.45%) of the New Series B Warrants, as acknowledged by the Lux Senior Notes Trustees consistent with and as required by the Confirmation Order.[2]

**Step 7A** – Envision fully nets its New Intercompany Claims against S.A. resulting from the exchange of Claims for cash in Step 4A against S.A.'s existing intercompany claim against Envision.

**Step 7B** – Jackson assumes S.A.'s obligation under Intelsat Clearinghouse LLC's intercompany claim against S.A.

**Step 7C** – Jackson assumes S.A.'s obligation under Intelsat US LLC's intercompany claim against S.A.

**Step 8A** – Jackson assumes a portion of the balance of Envision's obligation under S.A.'s intercompany claim against Envision, Jackson partially nets such balance against the New Intercompany Claims against S.A. received by Jackson in Step 4C(1) as well as with the intercompany claims Jackson assumed in Step 7B and Step 7C.

**Step 8B** – S.A. holds existing intercompany claims against Envision (reduced following Step 8A), Jackson, and Intelsat Invoice Services LLC. S.A. contributes such intercompany claims to Holdings SARL, which contributes such claims to Holdings, which contributes such claims to Investments, which contributes such claims to LuxCo (each such contribution to share premium), which contributes such claims to Envision.

**Step 9** – Holdings SARL sells all of its shares in Holdings to New TopCo in exchange for New Intercompany Claims against S.A. received by New TopCo in Step 6.

**Step 10A** – New TopCo subscribes to newly issued shares/share premium of Holdings at a price equal to the fair market value of its New Intercompany Claims against each of LuxCo, ICF, and Jackson received in Step 6 (including accrued interest), paying the issue price of the shares via a contribution in kind of such New Intercompany Claims against LuxCo, ICF, and Jackson (including accrued interest) at fair market value.

**Step 10B** – Holdings subscribes to newly issued shares/share premium of Investments at a price equal to the fair market value of the New Intercompany Claims against each of LuxCo, ICF, and Jackson received in Step 10A (including accrued interest), paying the issue price of the shares via a contribution in kind of such New Intercompany Claims against LuxCo, ICF, and Jackson (including accrued interest) at fair market value.

**Step 10C** – Investments subscribes to newly issued shares/share premium of LuxCo at a price equal to the fair market value of the New Intercompany Claims against each of ICF and Jackson

---

[2]    The ICF Unsecured Recovery shall be increased by the net amount of $140,000 in cash from proceeds of the New Debt (which shall not be subject to further adjustment by the professional fee allocation set forth in Article II.C.2 of the Plan), and the cash distributed pursuant to the LuxCo Unsecured Recovery shall be decreased by a corresponding amount.

3

received in Step 10B (including accrued interest), paying the issue price of the shares via a contribution in kind of such New Intercompany Claims against ICF and Jackson (including accrued interest) at fair market value.

**Step 10D** – Investments subscribes to newly issued shares/share premium of LuxCo for an issue price equal to the face amount of the New Intercompany Claims against LuxCo received in Step 10B (including accrued interest). The issue price of the shares is paid via netting against such New Intercompany Claims against LuxCo (including accrued interest).

**Step 10E** – LuxCo subscribes to newly issued limited liability company interests of Envision at a price equal to the fair market value of the New Intercompany Claims against each of ICF and Jackson received in Step 10C (including accrued interest), paying the issue price of the limited liability company interests via a contribution in kind of such New Intercompany Claims against ICF and Jackson (including accrued interest) at fair market value.

**Step 10F** – Envision subscribes to newly issued shares/share premium of ICF for an issue price equal to the face amount of the New Intercompany Claims against ICF received in Step 3 and Step 10E (including accrued interest). The issue price of the shares is paid via netting against such New Intercompany Claims against ICF (including accrued interest).

**Step 10G** – Envision subscribes to newly issued shares/share premium of ICF at a price equal to the fair market value of the New Intercompany Claims against Jackson received in Step 10E (including accrued interest), paying the issue price of the shares via a contribution in kind of such New Intercompany Claims against Jackson (including accrued interest) at fair market value.

**Step 10H** – ICF subscribes to newly issued shares/share premium of Jackson for an issue price equal to the face amount of the New Intercompany Claims against Jackson received in Step 10G (including accrued interest). The issue price of the shares is paid via netting against such New Intercompany Claims against Jackson (including accrued interest).

**Step 11** – The Holders of Allowed Claims against S.A. not contributed to New TopCo in Step 6 subscribe to newly issued shares/share premium of S.A. for an issue price equal to the face amount of such Claims (including accrued interest with respect to all Claims against S.A.), as acknowledged by the Convertible Senior Notes Trustee consistent with and as required by the Confirmation Order. The issue price of the shares is paid via netting against such Claims against S.A. (including accrued interest).

*On or After the Effective Date*:

**Step 12** – The Holders of Interests in S.A. who elect to participate receive the ISA Warrants.

*General Authority With Respect to Intercompany Claims, Intercompany Interests, and Other Restructuring Steps*:

At any point following the entry of the Confirmation Order, subject to the PSA Definitive Document Requirements, the Debtors may, but will not necessarily, take additional steps to

(a) modify, set off, distribute, contribute, eliminate, or otherwise modify or address intercompany claims, including certain intercompany claims resulting from the transactions performed on the Effective Date; (b) modify, set off, distribute, contribute, eliminate, or otherwise modify or address intercompany equity interests; or (c) transfer assets, rights, obligations, personnel, and similar items among Debtor entities; in each case, in furtherance of the transactions contemplated by the Plan.

**Exhibit G-2**

**Redline to Restructuring Steps Memorandum filed on October 19, 2021**

<div align="center">

**Exhibit G**
**Restructuring Steps Memorandum**

</div>

Capitalized terms used but not otherwise defined herein shall have the meanings as given to them in the *SecondFourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates* as it may be altered, amended, modified, or supplemented from time to time (the "Plan").

The Debtors reserve the right to modify this Restructuring Steps Memorandum at any time.[†]

Pursuant to the Plan, the Reorganized Debtors intend to implement the following Restructuring Transactions prior to, on, or after the Effective Date (unless otherwise indicated below):

*Prior to the Effective Date*:

**Step 1** – Holdings, Investments, LuxCo, and ICF each convert from a *societe anonyme* (S.A.) into a *societe a responsabilite limitee* (S.a.r.l.).

**Step 2** – An agent of the Holders of Allowed Claims receiving New Common Stock and/or New Warrants under the Plan forms [Intelsat TopCo HoldingsEmergence S.A.], a new Luxembourg S.A. ("New TopCo") with appropriate share capital denominated in USD.

*On the Effective Date*: [1]

**Step 3** – The Holders of Allowed Unsecured Claims against ICF exchange a portion of such Claims (including accrued interest) with Envision for cash, as acknowledged by the Connect Senior Notes Trustee consistent with and as required by the Confirmation Order. Such Claims have a face amount equal to the amount of cash received. All Claims after being exchanged with or contributed to New TopCo or any Debtor or Reorganized Debtor other than the Debtor to which such Claims relate, hereafter "New Intercompany Claims."

---

[†] Without limitation, the steps set forth below are subject to modification to account for any reserve for disputed, contingent, and/or unliquidated Claims.

[1] All distributions on account of Notes Claims shall be effectuated through DTC and all Claims shall be discharged in accordance with the Confirmation Order and Article VIII of the Plan. Irrespective of any amounts specified in the acknowledgments, the full amount of the applicable Allowed Notes Claims are being treated as set forth in the Plan and discharged in accordance with the Plan. The Indenture Trustees executing the acknowledgments shall have no duty to deliver the Notes and any such delivery specified in the acknowledgments shall be deemed to have occurred upon the competition of the distributions contemplated by the Plan and this Restructuring Steps Memorandum through DTC's mandatory conversion.

**Step 4A** – The Holders of Allowed Unsecured Claims against Intelsat S.A. ("S.A.") exchange a portion of such Claims (including accrued interest) with Envision for cash, as acknowledged by the Convertible Senior Notes Trustee consistent with and as required by the Confirmation Order. Such Claims have a face amount equal to the amount of cash received.

**Step 4B** – The Holders of Allowed Unsecured Claims against ICF exchange a portion of such Claims (including accrued interest) with (1) ICF for cash, as acknowledged by the Connect Senior Notes Trustee consistent with and as required by the Confirmation Order and (2) Jackson for cash in the aggregate amount of $140,000 and Series B CVRs. Such Claims have a face amount equal to the amount of cash and the fair market value of Series B CVRs received, as acknowledged by the Connect Senior Notes Trustee consistent with and as required by the Confirmation Order.

**Step 4C** – The Holders of Allowed Unsecured Claims against S.A. exchange a portion of such Claims with (including accrued interest) (1) S.A. for cash and (2) Jackson for cash 1) Jackson for cash, $50,000 of which is transferred to S.A. to fund the share capital of Reorganized S.A. and (2) S.A. for cash, as acknowledged by the Convertible Senior Notes Trustee consistent with and as required by the Confirmation Order in accordance with applicable Luxembourg law, as acknowledged by the Convertible Senior Notes Trustee consistent with and as required by the Confirmation Order. Such Claims have a face amount equal to the amount of cash received.

**Step 4D** – The Holders of Allowed Unsecured Claims against LuxCo exchange a portion of such Claims (including accrued interest) with (1) LuxCo for cash, as acknowledged by the Lux Senior Notes Trustees consistent with and as required by the Confirmation Order and (2) Jackson for cash, as acknowledged by the Lux Senior Notes Trustees consistent with and as required by the Confirmation Order. Such Claims have a face amount equal to the amount of cash received.[2]

**Step 4E** – The Holders of Allowed Unsecured Claims against (1) Jackson and (2) Jackson Subsidiaries exchange a portion of such Claims (including accrued interest) with Jackson for cash, the right to receive reserve cash, Series A CVRs, and Series B CVRs, and the right to receive reserve Series A CVRs and reserve Series B CVRs, as acknowledged by the Jackson Senior Notes Trustees consistent with and as required by the Confirmation Order; *provided* that Claims against Jackson Subsidiaries being satisfied in full in Cash pursuant to the Plan may be satisfied directly by the Jackson Subsidiaries, rather than Jackson, in the Debtors' discretion. Such Claims have a face amount equal to the amount of cash and the right to receive reserve cash, and value of Series A CVRs and, Series B CVRs and the right to receive reserve Series A CVRs and reserve Series B CVRs received. Jackson transfers the reserve cash and the reserve Series A CVRs and the reserve Series B CVRs to the escrow agent.

**Step 4F** – The Holders of Allowed Unsecured Claims against Holdings SARL exchange such Claims with Holdings SARL for cash.
**Step 4G** – The Holders of Allowed Unsecured Claims against Holdings exchange such Claims with Holdings for cash.

---

[2] The transactions regarding Allowed Claims against LuxCo are subject to ongoing analysis and modification.

2

~~**Step 4H** – The Holders of Allowed Unsecured Claims against Investments exchange such Claims with Investments for cash.~~

**Step 5** – Jackson borrows new exit financing and repays its secured debt (including accrued interest) with cash.

**Step 6** – The Holders of Allowed Unsecured Claims against S.A., ICF, Jackson, and the Jackson Subsidiaries that are not Convenience Claims (being paid in full in Cash) pursuant to the Plan contribute the remaining portion of such Claims (excluding the portion of the Allowed Unsecured Claims <u>and all the accrued interest with respect to all claims</u> against S.A. described in Step 11) (including accrued interest <u>with respect to all Claims against ICF, Jackson, and the Jackson Subsidiaries</u>) to New TopCo in exchange for New Common Stock and<u>/or</u> New Warrants, as applicable, issued by New TopCo~~.~~<u>, as acknowledged by the Indenture Trustees for the applicable Note Claims consistent with and as required by the Confirmation Order. A portion of the New Common Stock issued to the</u> <u>Holders of Allowed Unsecured Claims against Jackson and the Jackson Subsidiaries is transferred to the escrow agent.</u> <u>The Holders of Allowed Unsecured Claims against LuxCo contribute the remaining portion of such Claims (including accrued interest with respect to all Claims against LuxCo) to New TopCo in exchange for forty-five hundredths of a percent (0.45%) of the New Series B Warrants, as acknowledged by the Lux Senior Notes Trustees consistent with and as required by the Confirmation Order.[2]</u>

**Step 7<u>A</u>** – Envision ~~partially or~~ fully nets its New Intercompany Claims against S.A. resulting from the exchange of Claims for cash in Step 4A against S.A.'s existing intercompany claim against Envision.

~~(a) If Envision's New Intercompany Claim against S.A. received in Step 4A equals or exceeds the amount of S.A.'s intercompany claim against Envision, Envision contributes any remaining balance of Envision's New Intercompany Claim against S.A. to ICF, which contributes such New Intercompany Claim to Jackson to the premium reserve.~~

~~(b) If Envision's New Intercompany Claim against S.A. received in Step 4A is less than the amount of S.A.'s intercompany claim against Envision, Jackson assumes the balance of Envision's obligation under S.A.'s intercompany claim against Envision.~~

<u>**Step 7B** – Jackson assumes S.A.'s obligation under Intelsat Clearinghouse LLC's intercompany claim against S.A.</u>

<u>**Step 7C** – Jackson assumes S.A.'s obligation under Intelsat US LLC's intercompany claim against S.A.</u>

**Step 8<u>A</u>** – ~~If~~ Jackson assumes <u>a portion of</u> the balance of Envision's obligation under S.A.'s intercompany claim against Envision ~~pursuant to Step 7(b)~~, Jackson partially nets such balance

---

[2] <u>The ICF Unsecured Recovery shall be increased by the net amount of $140,000 in cash from proceeds of the New Debt (which shall not be subject to further adjustment by the professional fee allocation set forth in Article II.C.2 of the Plan), and the cash distributed pursuant to the LuxCo Unsecured Recovery shall be decreased by a corresponding amount.</u>

3

against the New Intercompany Claims against S.A. received by Jackson in Step 4C(1) as well as with the intercompany claims Jackson assumed in Step 7B and Step 7C.

(a) If, following the partial netting, Jackson holds a New Intercompany Claim against S.A., Jackson waives such New Intercompany Claim.

(b) If, following the partial netting, **Step 8B** – S.A. holds an existing intercompany claims against Envision (reduced following Step 8A), Jackson, and Intelsat Invoice Services LLC. S.A. contributes such intercompany claims to Holdings SARL, which contributes such claims to Holdings, which contributes such claims to Investments, which contributes such claims to LuxCo (each such contribution to share premium), which contributes such claims to Envision, which contributes such claim to ICF, which nets such claim against newly issued shares/share premium of Jackson.

**Step 9** – Holdings SARL sells all of its shares in Holdings to New TopCo in exchange for New Intercompany Claims against S.A. (including accrued interest) transferred by Holders of Allowed Unsecured Claims to received by New TopCo in Step 6.

**Step 10A** – New TopCo subscribes to newly issued shares/share premium of Holdings at a price equal to the fair market value of its New Intercompany Claims against each of LuxCo, ICF, and Jackson received in Step 6 (including accrued interest), paying the issue price of the shares via a contribution in kind of such New Intercompany Claims against LuxCo, ICF, and Jackson (including accrued interest) at fair market value.

**Step 10B** – Holdings subscribes to newly issued shares/share premium of Investments at a price equal to the fair market value of the New Intercompany Claims against each of LuxCo, ICF, and Jackson received in Step 10A (including accrued interest), paying the issue price of the shares via a contribution in kind of such New Intercompany Claims against LuxCo, ICF, and Jackson (including accrued interest) at fair market value.

**Step 10C** – Investments subscribes to newly issued shares/share premium of LuxCo at a price equal to the fair market value of the New Intercompany Claims against each of ICF and Jackson received in Step 10B (including accrued interest), paying the issue price of the shares via a contribution in kind of such New Intercompany Claims against ICF and Jackson (including accrued interest) at fair market value.

**Step 10D** – Investments subscribes to newly issued shares/share premium of LuxCo for an issue price equal to the face amount of the New Intercompany Claims against LuxCo received in Step 10B (including accrued interest). The issue price of the shares is paid via netting against such New Intercompany Claims against LuxCo (including accrued interest).

**Step 10DE** – LuxCo subscribes to newly issued limited liability company interests of Envision at a price equal to the fair market value of the New Intercompany Claims against each of ICF and Jackson received in Step 10C (including accrued interest), paying the issue price of the limited liability company interests via a contribution in kind of such New Intercompany Claims against ICF and Jackson (including accrued interest) at fair market value.

4

**Step 10~~E~~F** – Envision subscribes to newly issued shares/share premium of ICF for an issue price equal to the face amount of the New Intercompany Claims against ICF received in Step 3 and Step 10~~D~~E (including accrued interest). The issue price of the shares is paid via netting against such New Intercompany Claims against ICF (including accrued interest).[3]

**Step 10~~F~~G** – Envision subscribes to newly issued shares/share premium of ICF at a price equal to the fair market value of the New Intercompany Claims against Jackson received in Step 10~~D~~E (including accrued interest), paying the issue price of the shares via a contribution in kind of such New Intercompany Claims against Jackson (including accrued interest) at fair market value.

**Step 10~~G~~H** – ICF subscribes to newly issued shares/share premium of Jackson for an issue price equal to the face amount of the New Intercompany Claims against Jackson received in Step 10~~F~~G (including accrued interest). The issue price of the shares is paid via netting against such New Intercompany Claims against Jackson (including accrued interest).

**Step 11** – The Holders of Allowed Claims against S.A. not contributed to New TopCo in Step 6 subscribe to newly issued shares/share premium of S.A. for an issue price equal to the face amount of such Claims (including accrued interest~~)~~ with respect to all Claims against S.A.), as acknowledged by the Convertible Senior Notes Trustee consistent with and as required by the Confirmation Order. The issue price of the shares is paid via netting against such Claims against S.A. (including accrued interest).

*On or After the Effective Date*:

**Step 12** – The Holders of Interests in S.A. who elect to participate receive the ISA Warrants.

*General Authority With Respect to Intercompany Claims, Intercompany Interests, and Other Restructuring Steps*:

At any point following the entry of the Confirmation Order, subject to the PSA Definitive Document Requirements, the Debtors may, but will not necessarily, take additional steps to (a) modify, set off, distribute, contribute, eliminate, or otherwise modify or address intercompany claims, including certain intercompany claims resulting from the transactions performed on the Effective Date; (b) modify, set off, distribute, contribute, eliminate, or otherwise modify or address intercompany equity interests; or (c) transfer assets, rights, obligations, personnel, and similar items among Debtor entities; in each case, in furtherance of the transactions contemplated by the Plan.

---

[3] ~~The subscription and netting mechanism will be implemented to ultimately extinguish a portion of the Claims in order to facilitate the execution of the relevant steps from a legal, accounting, administrative and cost-efficiency perspective.~~

5

**Exhibit H-1**

**Series A CVR Agreement**

*Form of Execution Version*

### SERIES A CONTINGENT VALUE RIGHTS AGREEMENT

THIS SERIES A CONTINGENT VALUE RIGHTS AGREEMENT (this "Agreement") is entered into as of February [●], 2022 (the "Effective Date"), by and among (i) American Stock Transfer & Trust Company, LLC, as Rights Agent (the "Rights Agent"), (ii) Intelsat Jackson Holdings S.A., a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 149959 (the "CVR Issuer"), and (iii) solely as expressly provided herein (and, for the avoidance of doubt, not with respect to any of the provisions of Article II hereof, except Section 2.5(c)),  Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette,  L-1246  Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 264124 (the "Equity Issuer").

### RECITALS

WHEREAS, on the Effective Date, the CVR Issuer and certain of its Affiliates emerged as the Reorganized Debtors in accordance with the Plan; and

WHEREAS, pursuant to the Plan, the Reorganized Debtors were required to issue the contingent value rights contemplated in this Agreement to certain holders of claims in exchange for their claims, on and subject to the terms contained in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the consummation of the transactions contemplated by the Plan, the CVR Issuer and Rights Agent agree, for the equal and proportionate benefit of the holders of Series A CVRs (collectively, the "Holders"), as follows:

### ARTICLE I
### DEFINITIONS; CERTAIN RULES OF CONSTRUCTION

Section 1.1     Definitions.   All capitalized terms used in this Agreement without definitions shall have the respective meanings ascribed to them in the Plan.  As used in this Agreement, the following terms shall have the following meanings:

"Accelerated Relocation Payments" means the accelerated relocation payments described in the C-Band Order that are allocated to the Debtors and/or Reorganized Debtors in an amount equal to $4,865,366,000.

"Additional Acceleration Contract" means a written contract between any of the Applicable Intelsat Recipients, on the one hand, and any Private Entity, on the other hand, that provides for the payment of Applicable Consideration, and that is entered into prior to the Outside Date.

"Affiliate" means, of any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity.  For purposes of this definition, "control," as used with respect to any Entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies

of such Entity, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition and Agreement, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.  Notwithstanding the foregoing, and for the avoidance of doubt, no Entity shall be an Affiliate of the Debtors, any Reorganized Debtors, the Equity Issuer, or the CVR Issuer solely because (a) it is a holder of New Common Stock of the Equity Issuer or (b) it is controlled by a holder of New Common Stock of the Equity Issuer.

"Agreement" has the meaning set forth in the Preamble.

"Allowed" has the meaning set forth in the Plan.

"Applicable Consideration" means any and all consideration, without duplication, that is actually received by any of the Applicable Intelsat Recipients, from time to time, from a Private Entity, solely to the extent such consideration is received in connection with, or directly related to, private negotiations authorized by the FCC in footnote 497 of the C-Band Order to accomplish clearing earlier than the deadlines established by the FCC in the C-Band Order of the Cleared Spectrum; *provided* that such consideration (A) shall only constitute Applicable Consideration to the extent that the Minimum Payment Condition has been satisfied (and, for the avoidance of doubt, any amounts actually received by the Applicable Intelsat Recipients and counted towards satisfaction of the Minimum Payment Condition shall not constitute Applicable Consideration), (B) shall be calculated net of, and be reduced by, any Tax Costs with respect thereto and (C) shall be reduced by all reasonable documented costs and expenses incurred by the Applicable Intelsat Recipients in seeking, obtaining or procuring such consideration (solely to the extent such costs and expenses are not reimbursed to the Applicable Intelsat Recipients through Expense Reimbursements); *provided, further,* that Applicable Consideration shall not include any portion of (w) any accelerated relocation payments provided under the C-Band Order to any other space station operator (each, an "Other FSS Operator"), including SES Americom, Inc., Eutelsat S.A., Telesat Canada, Star One S.A., or any of their respective Affiliates and subsidiaries, in the event of any consolidation, amalgamation, merger, combination or similar transaction involving the Applicable Intelsat Recipients and any of the Other FSS Operators, (x) any Expense Reimbursements, or (y) any Accelerated Relocation Payments.

"Applicable Intelsat Recipients" means (i) prior to the Effective Date, the Jackson Entities, and (ii) on and after the Effective Date, the Equity Issuer and its Affiliates.

"Assignee" has the meaning set forth in Section 8.3.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

"Beneficial Interest" means, solely for purposes of and as used in Sections 2.2, 2.3, 2.4 and 2.6 of Article II, with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Series A CVRs it Beneficially Owns.

"Beneficial Owner" means, solely for purposes of and as used in Sections 2.2, 2.3, 2.4 and 2.6 of Article II, any Person owning a securities entitlement with respect to Series A CVRs

2

registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been ultimately credited to any other Person's securities account. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.

"Board Designee" has the meaning give to such term in Section 2.5(a) hereof.

"Board of Directors" means the board of directors (or other applicable governing body) of the Equity Issuer.

"Board Resolution" means a copy of a resolution certified by a duly authorized officer of the Equity Issuer to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to Rights Agent.

"Business Day" means any day, other than a Saturday, Sunday, or other day on which commercial banks are authorized or required by law to be closed in New York, NY, USA or the Grand Duchy of Luxembourg.

"C-Band Order" means that certain Report and Order and Order of Proposed Modification issued by the FCC on March 3, 2020 in In the Matter of Expanding Flexible Use of the 3.7 to 4.2 GHz Band, GN Docket No. 18-122, as may be amended or modified with respect to the clearing of the Cleared Spectrum.

"Change of Control" means one or a series of related transactions, directly or indirectly following which: (a) a shareholder or a group of shareholders of the Equity Issuer or CVR Issuer (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), acting in concert, directly or indirectly have acquired the right to cast, at a general meeting of shareholders of the Equity Issuer or CVR Issuer, more than fifty (50) percent of the voting shares of the CVR Issuer; or (b) all or substantially all of the assets of the Equity Issuer and its Affiliates (taken as a whole and as measured by asset valuations or other fair market value determinations) are sold or otherwise disposed of (including by way of merger, purchase, amalgamation, consolidation, scheme of arrangement or other business combination transaction) in a single transaction or a series of transactions (whether or not related) to a Person other than an Affiliate of the CVR Issuer.

"Cleared Spectrum" means the 3.7-4.0 GHz band in the contiguous United States, licenses for which were auctioned by the FCC on December 8, 2020 through February 17, 2021 in Auction 107 and specifically excluding any other radio frequencies or locations outside the contiguous United States.

"Competitor" means a "Competitor of the Company" as defined in the Shareholders Agreement.

"CVR Issuer" has the meaning set forth in the Preamble.

"Debtors" means Intelsat S.A. and its affiliated debtors and debtors in possession in the chapter 11 cases jointly administered under Case No. 20-32299 (KLP).

3

"Depository Agreement" means the Blanket Issuer Letter of Representations from the CVR Issuer to DTC, as the same may be amended or supplemented from time to time.

"Direct Owner" means any holder of Series A CVRs who is registered on the Series A CVR Register.

"Direct Owner Legend" means the legend on the account of each Holder of Series A CVRs held in book-entry on the Series A CVR Register in the form set forth on Exhibit A-1 hereto.

"DTC" means The Depository Trust Company or any successor thereto.

"DTC Participant" means any Person that is reflected on the books and records of DTC as having a direct interest in the Series A CVRs held of record by DTC.

"Effective Date" has the meaning set forth in the Preamble.

"Entity" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any company limited by shares, limited liability company or joint stock company), firm, society or other enterprise, association, organization or entity.

"Equity Issuer" has the meaning set forth in the Preamble.

"Escrow Agent" means American Stock Transfer & Trust Company, LLC, in its capacity as escrow agent as provided under Section 2.13.

"Event of Default" has the meaning set forth in Section 6.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Expense Reimbursements" means any and all payments received by any of the Applicable Intelsat Recipients on account of compensable relocation costs as described in the C-Band Order.

"FCC" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor Governmental Authority performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

"Financial Statements" has the meaning set forth in Section 7.1.

"Further Accelerated Relocation Payments" means any and all Applicable Consideration actually received by any Applicable Intelsat Recipient pursuant to an Additional Acceleration Contract, whether or not such Applicable Consideration is received before or after the Outside Date, not to exceed $420,000,000.  For the avoidance of doubt, the first $65,000,000 of Further Accelerated Relocation Payments are referred to as Initial Further Accelerated Relocation Payments and the remaining $355,000,000 of Further Accelerated Relocation Payments are referred to as Subsequent Further Accelerated Relocation Payments.

"Global Security" means the global certificate or certificates issued to DTC as provided in the Depository Agreement, each of which shall be in substantially the form attached hereto as Exhibit A-2.

"Governmental Authority" means any U.S. or non-U.S. (including Luxembourg) federal, state, provincial, local or other government or quasi-governmental, department, authority, court, tribunal, commission, instrumentality, regulatory body or self-regulatory body (including any securities exchange), or any political or other subdivision, department, agency or branch of any of the foregoing.

"Holders" has the meaning set forth in the Recitals.  A Person shall cease to be a Holder hereunder at such time as it ceases to hold, directly or indirectly, beneficial ownership of any Series A CVRs.

"Holder Website" has the meaning set forth in Section 7.1(b).

"Initial Distribution Escrow Account" means an interest-bearing escrow account established by the CVR Issuer with the Escrow Agent for the benefit of Holders.

"Initial Distribution Escrow Deposits" has the meaning set forth in Section 2.13.

"Initial Distribution Escrow Funds" means, at any time, the portion of the Initial Distribution Escrow Deposits then remaining in the Initial Distribution Escrow Account, plus all interest (if any) or other amounts earned thereon (if any).

"Initial Further Accelerated Relocation Payment" means the first $65,000,000 of any Further Accelerated Relocation Payments.

"Jackson" means Intelsat Jackson Holdings S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg.

"Jackson Entities" means, collectively, Intelsat Jackson Holdings S.A., a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 149959, and all of its direct and indirect subsidiaries, prior to the Effective Date.

"Law" means any foreign, federal, state, local or municipal laws, rules, judgments, orders, regulations, statutes, ordinances, codes, decisions, injunctions, orders, decrees or requirements of any Governmental Authority.

"Listing" means a listing of the Equity Issuer's securities resulting in the Equity Issuer being registered under Section 12(b) of the Exchange Act.

"Majority of Holders" means, as of the time of determination, Holders of not less than a majority of the issued and Outstanding Series A CVRs.

"Minimum Payment Amount" means $4,865,366,000 (*i.e.*, the maximum amount of potential Accelerated Relocation Payments provided under the C-Band Order as of the Effective Date).

"Minimum Payment Condition" means that the Applicable Intelsat Recipients (on an aggregate basis) shall have actually received an aggregate amount of consideration (either (a) pursuant to the C-Band Order as Accelerated Relocation Payments, (b) from a third party as compensation for the efforts of the Applicable Intelsat Recipients to clear the Cleared Spectrum solely to the extent such consideration is in connection with or directly related to private negotiations authorized by the FCC in footnote 497 of the C-Band Order to accomplish earlier clearing than the deadlines established by the FCC in the C-Band Order of the Cleared Spectrum, or (c) a combination of consideration set forth in clauses (a) and (b) of this parenthetical) in an amount equal to the Minimum Payment Amount; provided, that (1) no amounts counted towards satisfaction of the Minimum Payment Condition shall constitute Applicable Consideration and (2) no Expense Reimbursements received by the Applicable Intelsat Recipients shall count towards satisfaction of the Minimum Payment Condition.

"New Common Stock" means ordinary shares of the Equity Issuer.

"New Indenture" means that certain indenture for 6.500% First Lien Secured Notes due 2030 dated January 27, 2022 between the CVR Issuer, the guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time.

"Non-Recourse Parties" has the meaning set forth in Section 8.13.

"Officer's Certificate" means a certificate signed by an authorized officer of the CVR Issuer, in his or her capacity as such an officer, and delivered to the Rights Agent.

"Outside Date" means the date that is the earlier of (i) the date on which the certification of accelerated relocation for Phase II of the Debtors or Reorganized Debtors, as applicable, is validated pursuant to the C-Band Order, and (ii) December 5, 2025 (or, in the case of this clause (ii), such later deadline for clearing the Cleared Spectrum as may be adopted pursuant to the C-Band Order).

"Outstanding" when used with respect to Series A CVRs means, as of the date of determination, all Series A CVRs theretofore authenticated and delivered under this Agreement, except Series A CVRs theretofore cancelled by the Rights Agent in accordance with this Agreement or delivered to the Rights Agent for cancellation in accordance with this Agreement; *provided*, that, for the avoidance of doubt, any Series A CVRs owned by the CVR Issuer or any Affiliate of the CVR Issuer (other than any Series A CVRs abandoned and cancelled pursuant to Section 2.10 hereof) shall be treated as Outstanding for all purposes under this Agreement, including, but not limited to, the calculation and distribution of a Series A CVR Payment Amount.

"Person" means any individual, Entity, including any Governmental Authority (or any department, agency or political subdivision thereof) and any syndicate or group that would be deemed to be a person under section 13(d)(3) of the Exchange Act.

6

"Plan" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates* filed by the Debtors on December 17, 2021 at Docket No. 3891 in Case No. 20-32299 (KLP) in the Bankruptcy Court, and confirmed by the Bankruptcy Court at Docket No. 3894 in Case No. 20-32299 (KLP), as amended, modified or supplemented.

"Private Entity" means an Entity that is not a Governmental Authority and that is not the clearinghouse appointed by the FCC contemplated by the C-Band Order or any other comparable administrative Entity selected by the FCC.  Notwithstanding the foregoing, and for the avoidance of doubt, to the extent the Applicable Intelsat Recipients enter into an Additional Acceleration Contract with a Private Entity, and the parties agree to utilize a Governmental Authority or administrative clearinghouse for processing payments earned under such Additional Acceleration Contract, such payments shall be deemed to have been made by a Private Entity.

"Rights Agent" has the meaning set forth in the Preamble or its successor and/or assigns.

"Reorganized Debtor" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

"Representatives" has the meaning set forth in Section 7.1.

"SEC" means the United States Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended.

"Series A CVRs" means, collectively, the rights of Holders to receive a contingent cash payment pursuant to the terms of this Agreement.

"Series A CVR Payment Amount" has the meaning set forth in Section 2.6.

"Series A CVR Payment Date" means any date a Series A CVR Payment Amount is paid by the Rights Agent to the Holders pursuant to Section 2.6.

"Series A CVR Register" has the meaning set forth in Section 2.4(a).

"Series B Contingent Value Rights Agreement" means that certain Series B Contingent Value Rights Agreement, entered into as of February [●], 2022 by and among (i) American Stock Transfer & Trust Company, LLC, as rights agent, (ii) the CVR Issuer, and (iii) solely as expressly provided therein (and, for the avoidance of doubt, not with respect to any of the provisions of Article II thereof, except Section 2.5(c)), the Equity Issuer.

"Series B CVRs" means, collectively, the rights of holders to receive a contingent cash payment pursuant to the terms of that certain Series B Contingent Value Rights Agreement.

"Shareholders Agreement" means the Equity Issuer's shareholders agreement.

7

"Subsequent Further Accelerated Relocation Payments" means any Further Accelerated Relocation Payments that are not Initial Further Accelerated Relocation Payments, in an amount not to exceed $355,000,000.

"Subsidiary" means a Person more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the CVR Issuer or by one or more other Subsidiaries, or by the CVR Issuer and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock, shares or other equity interests (including partnership interests) which ordinarily have voting power for the election of directors, managers, general partners or trustees, whether at all times or only so long as no senior class of stock, shares or other equity interests (including partnership interests) have such voting power by reason of any contingency.

"Tax" means all taxes, customs, tariffs, imposts, levies, duties, fees or other like assessments or charges of a similar nature, however denominated, imposed by a Governmental Authority, together with all interest, penalties and additions imposed with respect to such amounts.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Tax Costs" means (i) any liability for cash Taxes of any kind imposed on or with respect to any Debtor or Reorganized Debtor to the extent attributable to Further Accelerated Relocation Payments, (ii) the tax-effected value of any utilization or decrease of any existing Tax attribute of any Debtor or Reorganized Debtor, including, but not limited to, any net operating loss or Tax credit, to the extent attributable to Further Accelerated Relocation Payments, and (iii) the tax-effected value of any decrease in the amount of any deduction or Tax attribute realized or generated by any Debtor or Reorganized Debtor, including, but not limited to, any net operating loss or Tax credit, to the extent attributable to Further Accelerated Relocation Payments, in each case, determined on a "with and without" basis with respect to any amount received by any Debtor or Reorganized Debtor, treating any Further Accelerated Relocation Payments as the last item realized in the applicable taxable period and, in the case of clauses (ii) and (iii), calculating the tax-effected value by, in the case of any Tax attribute that reduces taxable income, (A) multiplying the amount of such Tax attribute by the applicable Tax rate in the year such Further Accelerated Relocation Payment is received and (B) solely in the case of any such Tax attribute for Luxembourg Tax purposes, multiplying the product of the calculation described in clause (A) by fifty percent (50%), without regard to any projected availability of Tax attributes or credits in future years, and, in each of clauses (i)-(iii), further increased by any costs and expenses reasonably attributable to determining the amounts described in clauses (i) through (iii) and subject to appropriate adjustment provisions to account for any subsequent audit adjustment affecting such calculation subject to, and in accordance with, Section 2.5(f) hereof.  For the avoidance of doubt, for purposes of the foregoing clauses, any liability for cash Taxes of any kind, the tax-effected value of any utilization or decrease of any existing Tax attribute, and the tax-effected value of any decrease in the amount of any deduction or Tax attribute realized or generated attributable to income in respect of any escrow established in connection with this Agreement shall be treated as satisfying one or more of the foregoing clauses (i)-(iii) (in accordance with the methodology for calculation set forth herein). For further clarity, the foregoing calculation shall be performed consistently with the following illustrative calculation.  Assume that Further Accelerated Relocation Payments result in a net increase of $100 of overall taxable income, of which $85 is allocable to Luxembourg and $15 is allocable to the United States, that the relevant Luxembourg

8

income tax rate in the applicable tax period is 24.9%, and that the relevant United States income tax rate in the applicable period is 24% (on a combined federal/state basis). With respect to the $85 of additional Luxembourg taxable income, assuming that the full $85 of Luxembourg taxable income is offset by existing Luxembourg NOLs, the relevant Tax Cost shall be $10.58, calculated by multiplying $85 of income by the 24.9% tax rate ($21.165) and further multiplying that calculation by 50%. There shall be no further adjustment or modification to account for the fact that the Reorganized Debtors have incremental Luxembourg NOLs such that no additional cash tax cost is actually realized until later years. With respect to the $15 of additional U.S. taxable income, the Tax Cost shall be $3.6, calculated by multiplying $15 of income by the blended federal and state rate of 24%, and shall be the same regardless of whether the Reorganized Debtors have sufficient NOLs, credits or other tax attributes to offset their federal and state income. For the avoidance of doubt, the foregoing calculation is simplified and shall not preclude appropriate adjustments to take account of tax laws as they exist at the time.

"Termination Date" has the meaning set forth in Section 8.11.

"Transfer" means any sale, pledge, assignment, encumbrance or other transfer or disposition of any Series A CVR to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise. "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings. For the avoidance of doubt, the term "Transfer" includes a transfer of Beneficial Interests through DTC.

Section 1.2    Rules of Construction. The words "hereof," "herein," "hereto" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The headings and captions contained herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified and references to clauses without a cross-reference to a Section or subsection are references to clauses within the same Section or subsection. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meanings as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References (i) to "$" and "dollars" are to the currency of the United States and (ii) to "days" shall be to calendar days unless otherwise indicated. Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms. Except as required by Rule 14d-1(g)(3) promulgated by the SEC under the Exchange Act, when calculating the period of time before which, within which or following which any act is to be done or step taken, the date that is the reference date in beginning the calculation of such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

9

## ARTICLE II
## CONTINGENT VALUE RIGHTS

Section 2.1        Series A CVRs.

(a)        The Series A CVRs represent the rights of Holders to receive contingent payments pursuant to this Agreement.  Pursuant to the Plan, the Series A CVRs shall be issued *pro rata* to holders of Allowed Unsecured Claims (as defined in the Plan) against Jackson and Allowed Unsecured Claims against Jackson Subsidiaries (as defined in the Plan), and each holder thereof shall be deemed to have received as of the Effective Date, one Series A CVR for each $1,000.00 of Allowed Unsecured Claims against Jackson or Allowed Unsecured Claims against Jackson Subsidiaries held by such Holder as of the Effective Date, consistent with the Plan.

(b)        The Series A CVRs shall be distributed on the Effective Date in accordance with the terms of this Agreement and the Plan and without any further action of the CVR Issuer or any other Person.  The Series A CVRs shall entitle each Holder to such Holder's *pro rata* share (based on the number of Series A CVRs held by such Holder as compared to the number of Series A CVRs Outstanding on the applicable Series A CVR Payment Date (or any record date established by the CVR Issuer in accordance with this Agreement)) of cash equal to one hundred percent (100%) of the Initial Further Accelerated Relocation Payments.  The aggregate consideration distributed in respect of the Series A CVRs  shall not exceed the amount of the Initial Further Accelerated Relocation Payments.  For the avoidance of doubt, (i) no fractional Series A CVRs shall be issued, and any such fractions will be rounded down or rounded up to the nearest $1,000.00 of Allowed Unsecured Claims against Jackson or Allowed Unsecured Claims against Jackson Subsidiaries consistent with the Plan and (ii) no Series A CVR shall be issued to any Person prior to the Effective Date.

Section 2.2        Transferability.  The Series A CVRs or any Beneficial Interest shall be freely transferable without the prior consent of the CVR Issuer except as provided in this Section 2.2. Notwithstanding any other provision of this Agreement, each Holder agrees that it shall not Transfer any of its Series A CVRs or Beneficial Interests except:

(a)        to the extent that the Series A CVRs constitute "securities" (as such term is defined under the Section 2(a)(1) of the Securities Act), as permitted under the Securities Act and other applicable federal law or state securities or blue sky laws, and then, with respect to a Transfer of Series A CVRs or Beneficial Interests, if requested by the CVR Issuer or the Rights Agent, as applicable, only upon delivery to the CVR Issuer of a written opinion of counsel in form and substance reasonably satisfactory to the CVR Issuer to the effect that such Transfer may be effected without registration under the Securities Act; *provided*, that notwithstanding the foregoing, such a legal opinion shall not be  required for any Transfer of Series A CVRs or Beneficial Interests that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the CVR Issuer has a good faith reason to believe that such Series A CVRs or Beneficial Interests are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the CVR Issuer or an "underwriter"

10

(as such term is defined in the Securities Act) with respect to such Series A CVRs or Beneficial Interests;

(b)  if such Transfer would not reasonably be expected to require the CVR Issuer to initiate a registration or qualification of the Series A CVRs pursuant to the Exchange Act or any applicable federal or state securities or blue sky laws;

(c)  if such Transfer, upon consummation, would not result in the CVR Issuer having, in the aggregate, either (A) 1,900 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act (determined, in each case, in the CVR Issuer's reasonable discretion) of any class of equity securities of the CVR Issuer;

(d)  if such Transfer would not cause the CVR Issuer or any Subsidiary or Affiliate of the CVR Issuer to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(e)  if such Transfer would not cause the CVR Issuer or any Subsidiary or Affiliate of the CVR Issuer to be subject to regulation under the Investment Advisers Act of 1940, as amended.

The Series A CVRs have not been registered under the Securities Act, the Exchange Act, or state securities laws and will not be listed for trading on any securities exchange. Any attempted or purported Transfer of all or a portion of the Series A CVRs or Beneficial Interests held by a Holder in violation of this Section 2.2 shall be null and void and of no force or effect whatsoever, such purported Transferee shall not be treated as a Holder of the Series A CVRs or Beneficial Interests for purposes of this Agreement or otherwise, and the CVR Issuer shall not register such Transfer.  The restrictions under this Section 2.2(b), 2.2(c), 2.2(d), and 2.2(e) shall terminate automatically upon the effectiveness of a Listing.

Section 2.3     Exemption from Securities Registration at Issuance.  To the extent that the Series A CVRs constitute "securities" (as such term is defined under the Section 2(a)(1) of the Securities Act), the Series A CVRs shall be issued pursuant to Section 1145 of the Bankruptcy Code; provided that the Beneficial Owner is not deemed to be an "underwriter" as defined in Section 1145(b)(1) of the Bankruptcy Code.  To the extent the Series A CVRs constitute "securities" (as such term is defined under Section 2(a)(1) of the Securities Act) and are deemed not to have been issued pursuant to Section 1145 of the Bankruptcy Code, the Series A CVRs shall be issued in reliance upon an exemption from the registration requirement of Section 5 of the Securities Act provided by Section 4(a)(2) of the Securities Act.

Section 2.4     Series A CVR Register; DTC; Global Security

(a)  The Rights Agent shall keep a register (the "Series A CVR Register") for the purpose of registering Series A CVRs and permitted Transfers thereof.  The Series A CVR Register shall initially show one position for Cede & Co. representing all of the Series A CVRs held by DTC on behalf of the Beneficial Owners holding through their respective DTC

11

Participants. The Rights Agent shall have no responsibility whatsoever directly to the Beneficial Owners holding through their respective DTC Participants with respect to transfers of Series A CVRs. Any Beneficial Owners holding through their respective DTC Participants may move their holdings of Series A CVRs directly to the Series A CVR Register only through the procedures established by the DTC.

(b)    The direct Transferee (*i.e.*, a Transferee that holds the Series A CVRs directly and not simply a Beneficial Interest in Series A CVRs registered in the name of Cede & Co.) of the Series A CVRs Transferred shall be bound by this Agreement as a Direct Owner. Any indirect Transferee (*i.e.*, a Transferee that holds a Beneficial Interest in the Series A CVRs registered in the name of Cede & Co.) of Series A CVRs Transferred shall be bound by this Agreement as a Beneficial Owner. Following a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa), the Rights Agent shall amend the Series A CVR Register to reflect the change in Direct Owners, and the CVR Issuer shall take any other appropriate action in connection therewith.

(c)    The CVR Issuer will enter into the Depository Agreement pursuant to which DTC will act as a securities depository for the Series A CVRs. The Series A CVRs deposited with DTC will be represented by a Global Security (which may be a book entry security or consist of one or more certificates as required by DTC), which will be registered in the name of Cede & Co., as nominee for DTC or as DTC shall otherwise direct, and deposited with, or on behalf of, DTC. No other certificates evidencing such Series A CVRs will be issued. The Global Security shall be in the form attached hereto as Exhibit A-2 or described therein and shall represent such Series A CVRs as shall be specified therein, and may provide that it shall represent the aggregate amount of Outstanding Series A CVRs from time to time endorsed thereon and that the aggregate amount of Outstanding Series A CVRs represented thereby may from time to time be increased or decreased. As of the Effective Date, without the need for any action or consent of any Person, including the CVR Issuer, an initial Global Security shall be issued reflecting the number of Series A CVRs to be issued to Cede & Co. as of the Effective Date and shown on the Series A CVR Register. Any Global Security shall be executed by an officer on behalf of the CVR Issuer. Any endorsement of a Global Security to reflect the amount, or any increase or decrease in the amount, of Outstanding Series A CVRs represented thereby shall be made in such manner and upon instructions given by the CVR Issuer as specified in the Depository Agreement.

Section 2.5    Determination of Further Accelerated Relocation Payments.

(a)    As promptly as practicable, following the receipt by the Applicable Intelsat Recipients of any Further Accelerated Relocation Payments after satisfaction of the Minimum Payment Condition and prior to the Termination Date, the CVR Issuer shall deliver to the Rights Agent a certificate (a "Further Accelerated Relocation Payments Certificate") setting forth in reasonable detail (i) the Board of Directors' (or an Entity or Person designated by the Board of Directors (the "Board Designee's")) calculation of the amount of such Further Accelerated Relocation Payments, (ii) the amount of such Further Accelerated Relocation Payments that constitute Initial Further Accelerated Relocation Payments and Subsequent Further Accelerated Relocation Payments and (iii) any material assumptions or adjustments made by the Board of Directors (or the Board Designee) in the calculation of such Further Accelerated Relocation Payments (including, without limitation, any applicable inclusion of interest, or netting of costs

12

and expenses, associated with any Initial Distribution Escrow Funds, as set forth in <u>Section 2.13</u> hereof).  Within five (5) Business Days of delivery of a Further Accelerated Relocation Payments Certificate to the Rights Agent, the Rights Agent shall mail a notice, by e-mail to the e-mail address that appears on the Series A CVR Register or, if no e-mail address appears on the Series A CVR Register, by first class mail to the Holders at their addresses as they appear on the Series A CVR Register, that includes a copy of the Further Accelerated Relocation Payments Certificate (a "<u>Further Accelerated Relocation Payments Notice</u>").  All determinations and calculations with respect to the calculation of any Further Accelerated Relocation Payments in the Further Accelerated Relocation Payments Certificate shall be reasonably made by the Board of Directors (or the Board Designee, *provided* that such determinations and calculations are reviewed and approved by the Board of Directors) in good faith, and such determinations shall be final, binding and conclusive on the Holders, absent manifest error or a Further Accelerated Relocation Payments Dispute Statement on the terms set forth in this Section 2.5.

(b)     In the event that Holders holding Series A CVRs representing at least 20% of the Outstanding Series A CVRs disagree with any of the determinations or calculations set forth in a Further Accelerated Relocation Payments Certificate (such Holders, the "<u>Disputing Holders</u>"), the Disputing Holders may, within ten (10) Business Days after receipt by the Disputing Holders of the Further Accelerated Relocation Payments Notice, deliver written notice to the CVR Issuer and the Rights Agent (a "<u>Further Accelerated Relocation Payments Dispute Statement</u>") setting forth in reasonable detail the determinations or calculations (the "<u>Disputed Items</u>") that the Disputing Holders dispute; *provided*, that Holders shall not have any right to challenge any of the determinations or calculations set forth in a Further Accelerated Relocation Payments Certificate (or submit a Further Accelerated Relocation Payments Dispute Statement) if such Further Accelerated Relocation Payments Certificate provides for the distribution of the maximum amounts distributable to the Holders under this Agreement.  Any determinations or calculations not specifically identified in the Further Accelerated Relocation Payments Dispute Statement shall be deemed to be final, binding and conclusive.  In the event that the CVR Issuer and the Rights Agent do not receive a Further Accelerated Relocation Payments Dispute Statement within such ten (10) Business Day period, then the Further Accelerated Relocation Payments Certificate shall be deemed to be final, binding and conclusive.

(c)     A representative of the Disputing Holders (such representative to be identified in the Further Accelerated Relocation Payments Dispute Statement and selected by Disputing Holders who hold a majority of all Series A CVRs held by the Disputing Holders), on the one hand, and the CVR Issuer and the Equity Issuer, on the other hand, shall seek in good faith to resolve the Disputed Items for a period of ten (10) Business Days beginning on the date the CVR Issuer receives the Further Accelerated Relocation Payments Dispute Statement.  If the representative of the Disputing Holders, on one hand, and the CVR Issuer and the Equity Issuer, on the other hand, are unable to resolve all of the Disputed Items during such ten (10)-Business Day period, then the CVR Issuer shall promptly engage an independent third-party financial, accounting, valuation, appraisal or other advisor selected by a majority of the Disputing Holders that is reasonably acceptable to the Board of Directors or the Board Designee (as applicable)) (an "<u>Independent Advisor</u>") to conduct a non-binding determination or calculation of the remaining Disputed Items.  The Independent Advisor shall be required to make any such non-binding determinations or calculations within thirty (30) days of the engagement of the Independent Advisor.  The Board of Directors (or the Board Designee (as applicable)) shall

consider in good faith any comments to the Disputed Items in the Further Accelerated Relocation Payments Certificate based on the determinations and calculations of the Independent Advisor. The Board of Directors (or the Board Designee (as applicable)) shall not be required to make any adjustments to its own determinations as a result of the Independent Advisor's comments, calculations, or determinations; *provided*, that, if the Board of Directors (or the Board Designee (as applicable)) does make any such adjustments, it may not assign a value (i) higher than the greatest value for any Disputed Item calculated by the Board of Directors (or the Board Designee (as applicable)) or the Independent Advisor (whichever is greater) or (ii) lower than the smallest value for such item calculated by Board of Directors (or the Board Designee (as applicable)) or the Independent Advisor (whichever is smaller).  Notwithstanding anything to the contrary herein or in the Series B Contingent Value Rights Agreement, in no event shall the CVR Issuer be required to engage an Independent Advisor more than once with respect to the Further Accelerated Relocation Payments contemplated by a single Further Accelerated Relocation Payments Certificate.  The CVR Issuer shall bear fifty percent (50%) of the cost and expense of the Independent Advisor (the "Independent Advisor Costs") and the other fifty percent (50%) of the Independent Advisor Costs shall be borne *pro rata* by the Holders (with such portion of the costs and expenses to be offset against the amount payable to Holders hereunder).  For the avoidance of doubt, in no instance shall any Holder be required to pay for its respective allocation of the Independent Advisor Costs other than by offset against the amounts payable to such Holder hereunder.

(d)     The Further Accelerated Relocation Payments Certificate, as modified to incorporate any comments pursuant to the prior paragraph (if applicable), is hereinafter referred to as a "Final Further Accelerated Relocation Payments Certificate".  Within five (5) Business Days following the completion of any Final Further Accelerated Relocation Payments Certificate, the CVR Issuer shall distribute an amount of cash equal to the amount of the Further Accelerated Relocation Payments set forth in such certificate that constitute Initial Further Accelerated Relocation Payments (net of the Holders' portion of any costs and expenses of an Independent Advisor, if any) to the Rights Agent, for payment to the Holders in accordance with Section 2.6. For the avoidance of doubt, no Further Accelerated Relocation Payments that constitute Subsequent Further Accelerated Relocation Payments shall be distributed to Holders under this Agreement.

(e)     The CVR Issuer shall use commercially reasonable efforts to provide the Independent Advisor such information, cooperation and access as the Independent Advisor may reasonably request in connection with Section 2.5(c) (subject to customary confidentiality restrictions and access letters).

(f)     In the event any examination or audit with respect to Tax issues results in an increase to a Tax Cost following the payment of any Initial Further Accelerated Relocation Payment to the Holders, such increase in Tax Cost shall reduce any future payment to Holders with respect to the Series A CVRs, and such reduction in future payment shall be the sole remedy for the CVR Issuer resulting from any such increase to a Tax Cost.  In the event any examination or audit with respect to Tax issues results in a decrease to a Tax Cost following the payment of any Initial Further Accelerated Relocation Payment to the Holders, such decrease in Tax Cost shall result in an increase in any future payments to Holders with respect to the Series A CVRs, and

14

such increase shall be the sole remedy for any Holder resulting from any such decrease to a Tax Cost.

Section 2.6    Payments of Series A CVR Payment Amount.   Within five (5) Business Days following receipt of any cash from the CVR Issuer for payment to the Holders (each, a "Series A CVR Payment Amount"), including pursuant to Section 2.5(d), Section 2.5(f), and Section 2.13, the Rights Agent shall pay the applicable *pro rata* share of such Series A CVR Payment Amount to (a) each Holder holding its Series A CVRs directly on the Series A CVR Register (i) by check mailed to the address of such Holder as reflected on the Series A CVR Register as of the close of business on the last Business Day prior to such date or (ii) if such Holder is due a *pro rata* share of the Series A CVR Payment Amount in excess of ten thousand dollars ($10,000) and has provided the Rights Agent with wire transfer instructions in writing, by wire transfer of immediately available funds to the account specified in such instructions, and (b) Beneficial Owners of the Series A CVRs holding through their respective DTC Participants by sending a lump payment to DTC in respect of all such Series A CVRs.   The Rights Agent shall have no responsibilities whatsoever with regard to the distribution of payments by DTC to such Beneficial Owners.   The *pro rata* share of each Series A CVR Payment Amount due to each Holder shall be determined by multiplying the Series A CVR Payment Amount by a fraction (A) the numerator of which is the total number of Series A CVRs owned by such Holder on the Series A CVR Payment Date (or any record date established by the CVR Issuer in accordance with this Agreement) and (B) the denominator of which is the total number of Series A CVRs Outstanding on the Series A CVR Payment Date (or such record date, as applicable).

Section 2.7    Record Date.   The CVR Issuer may set a record date for purposes of determining the identity of Holders entitled to (i) receive the Series A CVR Payment Amount or (ii) vote or consent to any action by vote or consent authorized or permitted under this CVR Agreement. The record date with respect to any Series A CVR Payment shall be at least three (3) Business Days prior to the Series A CVR Payment Date and no more than ten (10) Business Days prior to the Series A CVR Payment Date.   If not set by the CVR Issuer prior to the first solicitation of a Holder of CVRs made by any Person in respect of any such action, or, in the case of any such vote, prior to such vote, the record date for such action shall be the later of ten (10) days prior to the first solicitation of such consent or the date of the most recent list of Holders furnished to the Rights Agent prior to such solicitation.   If a record date is fixed, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to receive the Series A CVR Payment Amount or take such action by vote or consent, whether or not such Persons continue to be Holders after such record date.   No such vote or consent shall be valid or effective if taken or made more than one hundred twenty (120) days after such record date.   The CVR Issuer shall provide Holders at least ten (10) Business Days' notice of any record date set pursuant to this Section 2.7.

Section 2.8    Payments on Series A CVRs.

(a)    The Rights Agent shall deduct and withhold, or cause to be deducted or withheld, from any amount payable pursuant to this Agreement, such amounts as are required to be deducted and withheld with respect to such payment under the Tax Code or any provision of state, local or foreign Tax Law; *provided*, that the Rights Agent shall (i) notify the relevant payee of any required withholding no later than five (5) Business Days in advance of the date of the relevant payment,

15

(ii) reasonably cooperate with such payee and its Affiliates in obtaining any available exemption or reduction, of, or otherwise minimizing, such withholding, and (iii) provide such payee with receipts from the relevant Governmental Authority evidencing the receipt of such deducted or withheld amount.  To the extent that amounts are so withheld and paid over to or deposited with the relevant Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Holder in respect of which such deduction and withholding was made.  The Rights Agent shall be entitled to solicit any appropriate forms or information, from Holders in order to determine the amount of such withholding, if any, and shall cooperate with the Holders to mitigate or eliminate any such withholding to the extent permitted by applicable law.

(b)     Neither the CVR Issuer nor the Rights Agent shall be liable to any Person in respect of the Series A CVR Payment Amount delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.  If, despite the CVR Issuer's and/or the Rights Agent's commercially reasonable efforts to deliver the Series A CVR Payment Amount to the applicable Holder, such Series A CVR Payment Amount has not been paid prior to two (2) years after the Series A CVR Payment Date (or immediately prior to such earlier date on which such Series A CVR Payment Amount would otherwise escheat to or become the property of any Governmental Authority), such Series A CVR Payment Amount shall, to the extent permitted by applicable Law, become the property of the CVR Issuer, free and clear of all claims or interest of any Person previously entitled thereto.

Section 2.9     <u>No Voting, Dividends or Interest; No Equity or Ownership Interest in the CVR Issuer.</u>

(a)     Neither the Holders (by virtue of their ownership of the Series A CVRs) nor the Series A CVRs shall have any rights common to stockholders of the CVR Issuer, including voting and dividend rights.  The Series A CVRs shall not represent an equity or ownership interest in the CVR Issuer or the Equity Issuer.

(b)     Except as set forth in <u>Section 2.13</u> with respect to the Initial Distribution Escrow Funds, interest shall not accrue on any amounts that may be payable to a Holder.

(c)     Except as expressly set forth in this Agreement, the Series A CVRs shall not (i) be subject to any mandatory or optional redemption rights by the Holders or the CVR Issuer or the Reorganized Debtors, (ii) mature or trigger any right to payment by the Holders or the Reorganized Debtors in any amount or on any specific date, or (iii) be convertible into or exchangeable for any security or other interest in the CVR Issuer or the Reorganized Debtors.

Section 2.10     <u>Ability to Abandon Series A CVR; CVR Issuer Acquisition of Series A CVRs</u>.  A Holder may at any time, at such Holder's option, abandon all of such Holder's remaining rights in a Series A CVR by transferring such Series A CVR to the CVR Issuer without consideration therefor and such Series A CVR shall be cancelled and shall not be considered Outstanding for any purposes under this Agreement.  Nothing in this Agreement shall prohibit the CVR Issuer or any of its Affiliates from offering to acquire or acquiring any Series A CVRs for consideration from the Holders, in private transactions or otherwise, in its sole discretion.

Section 2.11    Expiration of Series A CVRs.  Each Series A CVR shall expire on the Termination Date without any further action of the CVR Issuer or any Holder and all rights of Holders hereunder shall immediately terminate upon such expiration other than the right to receive any Series A CVR Payment Amount for which, prior to the occurrence of the Termination Date:  (x) the CVR Issuer has received Initial Further Accelerated Relocation Payments, but (y) such Initial Further Accelerated Relocation Payments have not been distributed to Holders.

Section 2.12    Maximum Series A Payment Amount; No Distribution Until Satisfaction of Minimum Payment Condition.  The aggregate amount distributed in respect of the Series A CVRs shall not exceed $65,000,000.  For the avoidance of doubt:  (a) no amounts shall be paid to the Holders under this Agreement until the Minimum Payment Condition has been satisfied; and (b) no amounts counted towards satisfaction of the Minimum Payment Condition shall be distributed under this Agreement.

Section 2.13    Escrow of Additional Acceleration Contract Consideration.  In the event that the Minimum Payment Condition has not been satisfied and the Applicable Intelsat Recipients actually receive cash consideration (that would, upon satisfaction of the Minimum Payment Condition, constitute Initial Further Accelerated Relocation Payments) pursuant to an Additional Acceleration Contract, then the CVR Issuer shall deposit, or cause to be deposited (the "Initial Distribution Escrow Deposits"), within sixty (60) days of receipt of such cash consideration, into the Initial Distribution Escrow Account, an amount of cash equal to the amount of cash that the CVR Issuer would have been required to pay to the Holders pursuant to this Agreement had the Minimum Payment Condition been satisfied at the time such Applicable Intelsat Recipients received such cash consideration (as determined in good faith by the Board of Directors).  In the event that the Minimum Payment Condition is satisfied prior to the Termination Date, the CVR Issuer shall promptly deliver written instructions to the Escrow Agent to release (a) any Initial Distribution Escrow Funds that constitute Initial Further Accelerated Relocation Payments (together with any interest accrued thereon, but reduced by the cost and expense of the Initial Distribution Escrow Account) to be distributed to the Rights Agent for further distribution to the Holders pursuant to Section 2.6 and, (b) after giving effect to the foregoing release, any remaining Initial Distribution Escrow Funds to the CVR Issuer.  In the event that the Minimum Payment Condition is not satisfied prior to the Termination Date, the CVR Issuer shall promptly cause all remaining Initial Distribution Escrow Funds to be released to the CVR Issuer.

## ARTICLE III
## THE RIGHTS AGENT

Section 3.1    Certain Duties and Responsibilities.  The Rights Agent shall not have any liability for any actions taken or not taken in connection with this Agreement, except to the extent of its fraud, willful misconduct, or gross negligence.

Section 3.2    Certain Rights of Rights Agent.  The Rights Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations may be read into this Agreement against the Rights Agent.  In addition:

(a)    the Rights Agent may rely and shall be protected and held harmless by the CVR Issuer in acting or refraining from acting upon any resolution, certificate, statement, instrument,

17

opinion, report, notice, request, direction, consent, order or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)      whenever the Rights Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Rights Agent may rely upon an Officer's Certificate, which certificate shall be full authorization and protection to the Rights Agent, and the Rights Agent shall, in the absence of fraud, gross negligence or willful misconduct of the Rights Agent or any of its Affiliates, incur no liability to anyone and shall be held harmless by the CVR Issuer for or in respect of any action taken, suffered or omitted to be taken by it under the provisions of this Agreement in reliance upon such certificate;

(c)      the Rights Agent may at any time consult with legal counsel satisfactory to it, and the Rights Agent shall incur no liability or responsibility to the CVR Issuer or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such counsel;

(d)      the permissive rights of the Rights Agent to do things enumerated in this Agreement may not be construed as a duty;

(e)      the Rights Agent shall not be required to give any note or surety in respect of the execution of such powers or otherwise in respect of the premises;

(f)      the Rights Agent shall not be liable for or by reason of, and shall be held harmless by the CVR Issuer with respect to, any of the statements of fact or recitals contained in this Agreement or be required to verify the same, but all such statements and recitals are and shall be deemed to have been made by the CVR Issuer only;

(g)      the Rights Agent shall have no liability and shall be held harmless by the CVR Issuer in respect of the validity of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Rights Agent and the enforceability of this Agreement against the Rights Agent assuming the due execution and delivery hereof by the CVR Issuer); nor shall it be responsible for any breach by the CVR Issuer of any covenant or condition contained in this Agreement;

(h)      the CVR Issuer agrees to indemnify the Rights Agent for, and hold the Rights Agent harmless against, any loss, liability, claim, demands, suits or expense arising out of or in connection with the Rights Agent's duties under this Agreement, including the reasonable costs and expenses of defending the Rights Agent against any claims, charges, demands, suits or loss, unless such loss has been determined by a court of competent jurisdiction to be a result of the Rights Agent's fraud, gross negligence, or willful misconduct;

(i)      the CVR Issuer agrees (i) to pay the fees and expenses of the Rights Agent in connection with this Agreement as agreed upon in writing by the Rights Agent and the CVR Issuer on or prior to the date hereof (email being sufficient) and (ii) to reimburse the Rights Agent for all Taxes and governmental charges, reasonable and documented out-of-pocket expenses incurred by the Rights Agent in the execution of this Agreement (other than Taxes imposed on or measured by the Rights Agent's net income and franchise or similar Taxes imposed on it).  The Rights Agent

18

shall also be entitled to reimbursement from the CVR Issuer for all reasonable and necessary out-of-pocket expenses paid or incurred by it, including reasonable legal fees of counsel, in connection with the administration and enforcement by the Rights Agent of its duties hereunder;

(j)    no provision of this Agreement shall require the Rights Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of its rights if there shall be reasonable grounds for believing that repayment of such funds or adequate indemnification against such risk or liability is not reasonably assured to it; and

(k)    no Holder shall be obligated to indemnify the Rights Agent for any services or actions under this Agreement and the Rights Agent shall not be entitled to deduct any sums from the Series A CVR Payment Amount in any circumstance except as provided in Section 2.8(a).

Section 3.3    Resignation and Removal; Appointment of Successor.

(a)    The Rights Agent may resign at any time by giving written notice thereof to the CVR Issuer specifying a date when such resignation shall take effect, which notice shall be sent at least sixty (60) days prior to the date so specified but in no event shall such resignation become effective until a successor Rights Agent has been appointed.  The CVR Issuer has the right to remove the Rights Agent at any time by a Board Resolution specifying a date when such removal shall take effect but no such removal shall become effective until a successor Rights Agent has been appointed.  Notice of such removal shall be given by the CVR Issuer to the Rights Agent, which notice shall be sent at least sixty (60) days prior to the date so specified.

(b)    If the Rights Agent provides notice of its intent to resign, is removed pursuant to Section 3.3(a) or becomes incapable of acting, the CVR Issuer shall, as soon as is reasonably practicable, appoint a qualified successor Rights Agent who, unless otherwise consented to in writing by the Majority of Holders, shall be a stock transfer agent of national reputation or the corporate trust department of a commercial bank of national reputation.  The successor Rights Agent so appointed shall, forthwith upon its acceptance of such appointment in accordance with Section 3.4, become the successor Rights Agent.

(c)    Promptly upon the delivery of any notice of resignation of a Rights Agent, removal of a Rights Agent or appointment of a successor Rights Agent, the CVR Issuer shall give notice of each such resignation and each such removal of a Rights Agent and each such appointment of a successor Rights Agent by mailing written notice of such event by first-class mail to the Holders as their names and addresses appear in the Series A CVR Register.  Each notice shall include the name and address of the successor Rights Agent.  If the CVR Issuer fails to send such notice within fifteen (15) days after acceptance of appointment by a successor Rights Agent in accordance with Section 3.4, the successor Rights Agent, within fifteen (15) days of such failure, shall cause the notice to be mailed at the expense of the CVR Issuer.

Section 3.4    Acceptance of Appointment by Successor.  Every successor Rights Agent appointed pursuant to Section 3.3(b) hereunder shall execute, acknowledge and deliver to the CVR Issuer and to the retiring Rights Agent an instrument accepting such appointment and a counterpart of this Agreement, and thereupon such successor Rights Agent, without any further act, deed or

19

conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Rights Agent.  On request of the CVR Issuer or the successor Rights Agent, the retiring Rights Agent shall execute and deliver an instrument transferring to the successor Rights Agent all the rights, powers and trusts of the retiring Rights Agent.

**ARTICLE IV**
**COVENANTS**

Section 4.1      List of Holders.  The CVR Issuer shall furnish or cause to be furnished to the Rights Agent the names and addresses of the Direct Owners no later than ten (10) Business Days after the CVR Issuer receives notice of such Direct Owners' names and addresses; *provided*, that, notwithstanding the foregoing, the CVR Issuer shall have no obligations pursuant to this sentence if the only Direct Owner is Cede & Co. at the Effective Date.  The Rights Agent shall reflect such names and addresses on the Series A CVR Register and confirm the write up of the Series A CVR Register and list of initial Direct Owners to the CVR Issuer promptly thereafter and, in any event, within five (5) Business Days of the receipt of such names and addresses from the CVR Issuer.

Section 4.2      Efforts to Obtain Further Accelerated Relocation Payments.  The CVR Issuer and the Equity Issuer shall use commercially reasonable efforts to:

(a)      obtain Further Accelerated Relocation Payments; *provided* that this Section 4.2 shall not affect the requirement that no Further Accelerated Relocation Payments shall exist unless the Minimum Payment Condition has been satisfied; and

(b)      in the event Further Accelerated Relocation Payments are actually received by an Entity other than the CVR Issuer, implement such intercompany transactions as may be necessary in order for the CVR Issuer to satisfy its obligations under this Agreement.

Section 4.3      Nonassignability.  The Equity Issuer and the CVR Issuer shall not, and shall cause all of their applicable Affiliates not to, assign the right to receive any consideration that would constitute Further Accelerated Relocation Payments to any Person unless such Person is an Affiliate and such assignment is made pursuant to Section 8.3.

**ARTICLE V**
**AMENDMENTS**

Section 5.1      Amendments without Consent of Holders.

(a)      Without the consent of any Holders or the Rights Agent, the CVR Issuer and the Equity Issuer (if such amendment would implicate a term of this Agreement applicable to the Equity Issuer) may enter into one or more amendments hereto, for any of the following purposes:

(i)      to evidence the succession of another Person to the CVR Issuer and the assumption by any such successor of the covenants of the CVR Issuer herein as provided in and subject to conformity with Section 8.3;

(ii)      to cure any ambiguity, to correct or supplement any provision herein that may be defective or inconsistent with any other provision herein, or to make any other

20

provisions with respect to matters or questions arising under this Agreement; *provided* that, in each case, such provisions do not adversely affect the interests of any Holder without such adversely affected Holder's prior written consent;

(iii)    to evidence the succession of another Person as a successor Rights Agent and the assumption by any such successor of the covenants and obligations of the Rights Agent herein in accordance with Section 3.3 and Section 3.4; or

(iv)    any other amendments hereto, unless such amendment is adverse to the interests of any Holder (in which case such amendment shall not be effective against such adversely affected Holder without such adversely affected Holder's prior written consent but shall be effective against all of the other Holders who are not adversely affected).

(b)    If and only if a Holder agrees to renounce such Holder's rights under this Agreement in accordance with Section 2.10, without the consent of any other Holders, the CVR Issuer, the Equity Issuer and the Rights Agent, in the Rights Agent's sole and absolute discretion, at any time and from time to time, may enter into one or more amendments hereto, to reduce the number of Series A CVRs by the number of Series A CVRs renounced by such Holder in accordance with Section 2.10.

(c)    Promptly after the execution by the CVR Issuer and the Rights Agent of any amendment pursuant to the provisions of this Section 5.1, the CVR Issuer shall mail (or cause the Rights Agent to mail) a notice thereof by first class mail to the Holders at their addresses as they appear on the Series A CVR Register, setting forth such amendment.

Section 5.2    Amendments with the Consent of the Equity Issuer Board and Holders.

(a)    With the prior written consent of the Majority of Holders (whether evidenced in writing or taken at a meeting of the Holders), the CVR Issuer (when authorized by a Board Resolution that has been adopted by at least three (3) of four (4) of the Chief Executive Officer and the Minority Directors (as defined in the Shareholders Agreement)), the Equity Issuer, and the Rights Agent may enter into one or more amendments hereto for the purpose of adding, eliminating or changing any provisions of this Agreement,  provided that no such amendment may (i) disproportionately (when compared with other Holders), materially, and adversely affect the rights of any Holder, or (ii) impair any Holder's right to receive payment when required or in the amount required pursuant to this Agreement, in each case, without the prior written consent of such affected Holder.

(b)    Promptly after the execution by the CVR Issuer, the Rights Agent, and, if applicable, the Equity Issuer of any amendment pursuant to the provisions of this Section 5.2, the CVR Issuer shall mail (or cause the Rights Agent to mail) a notice thereof by first class mail to the Holders at their addresses as they appear on the Series A CVR Register, setting forth such amendment.

Section 5.3    Effect of Amendments.  Upon the execution of any amendment under this Article V, this Agreement shall be modified in accordance therewith, such amendment shall form a part of this Agreement for all purposes and the CVR Issuer, the Equity Issuer, the Rights Agent, and every Holder shall be bound thereby.

21

## ARTICLE VI
## REMEDIES OF THE RIGHTS AGENT ON EVENT OF DEFAULT

Section 6.1      Event of Default.  "Event of Default" with respect to the Series A CVRs, means each one of the following events which shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of Law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)      default by the CVR Issuer in failing to distribute to the Rights Agent a payment when required pursuant to Section 2.5(d), Section 2.5(f), and Section 2.13, and continuance of such default for a period of thirty (30) days after there has been given, by registered or certified mail, to the CVR Issuer and the Equity Issuer by the Rights Agent or to the CVR Issuer and the Rights Agent by any Holder, a written notice specifying such default or breach and requiring it to be remedied; or

(b)      material default in the performance, or material breach in any material respect, of any covenant or warranty of the CVR Issuer or Equity Issuer in respect of the Series A CVRs, and continuance of such default or breach for a period of thirty (30) days after there has been given, by registered or certified mail, to the CVR Issuer and the Equity Issuer by the Rights Agent or to the CVR Issuer and the Rights Agent by the Majority of Holders, a written notice specifying such default or breach and requiring it to be remedied.

Section 6.2      Collection by the Rights Agent; Payment Obligations.

(a)      The Rights Agent may, and upon written request of the Majority of Holders, shall, proceed to protect and enforce its rights and the rights of the Holders by such appropriate judicial proceedings as the Rights Agent shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Agreement or in aid of the exercise of any power granted herein, or to enforce any other remedy.

(b)      In case the CVR Issuer shall fail forthwith to pay any amounts due following an Event of Default, any Holder and the Rights Agent may, and upon written request of the Majority of Holders the Rights Agent shall, institute any action or proceedings at Law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceedings to judgment or final decree, and may enforce any such judgment or final decree against the CVR Issuer or other obligor upon such Series A CVRs and collect in the manner provided by Law out of the property of the CVR Issuer or other obligor upon such Series A CVRs, wherever situated, the moneys adjudged or decreed to be payable; *provided however,* concurrently with any such written request, the Majority of Holders shall also provide indemnification to the Rights Agent in form and substance reasonably satisfactory to the Rights Agent.

(c)      Nothing herein contained shall be deemed to authorize the Rights Agent to authorize or consent to or vote for or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Series A CVRs, or the rights of any Holder thereof, or to authorize the Rights Agent to vote in respect of the claim of any Holder in any such proceeding.

22

(d)      All rights of action and of asserting claims under this Agreement, or under any of the Series A CVRs, may be enforced by the Rights Agent without the possession of any of the Series A CVRs or the production thereof and any trial or other proceedings instituted by the Rights Agent hereunder, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Rights Agent, each predecessor Rights Agent and their respective agents and attorneys, shall be for the ratable benefit of the Holders.

(e)      In any proceedings brought by the Rights Agent (and also any proceedings involving the interpretation of any provision of this Agreement to which the Rights Agent shall be a party) the Rights Agent shall be held to represent all the Holders, and it shall not be necessary to make any Holders parties to any such proceedings.

Section 6.3      Application of Proceeds.   Any monies collected by the Rights Agent pursuant to this Article VI in respect of the Series A CVRs shall be applied in the following order at the date or dates fixed by the Rights Agent in connection therewith:

> FIRST:  To the payment of costs and expenses (including fees and costs incurred by the Rights Agent and its reasonable attorney's fees) incurred by the Rights Agent in connection with the exercise of its rights under Section 6.2 in respect of which monies have been collected, except as a result of its willful misconduct, fraud or gross negligence; and

> SECOND:  To the payment of the whole amount then owing and unpaid upon all the Series A CVRs and in case such monies shall be insufficient to pay in full the whole amount so due and unpaid upon the Series A CVRs, then to the payment of such amounts without preference or priority of any Series A CVR over any other Series A CVR, ratably to the aggregate of such amounts due and payable.

Section 6.4      Delay or Omission Not Waiver of Default.  No delay or omission of the Rights Agent or of any Holder to exercise any right or power accruing upon any Event of Default occurring and continuing as aforesaid shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein; and every power and remedy given by this Agreement to the Rights Agent or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Rights Agent or by the Holders in accordance with the terms of this Agreement.

## ARTICLE VII
## INFORMATION AND CONFIDENTIALITY

Section 7.1      Reporting and Disclosure.

(a)      Subject to Section 7.2, Holders (other than Holders that are Competitors) shall be entitled to receive from the CVR Issuer the following information until the CVR Issuer becomes subject to the reporting requirements of the Exchange Act: (i) within 65 days (or 150 days in the case of the first fiscal quarter containing the Effective Date and 90 days in the case of the first full fiscal quarter after the Effective Date occurs) after the end of each of the first three fiscal quarters of each fiscal year (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal quarter ending after the Effective Date, quarterly unaudited

23

consolidated financial statements of the CVR Issuer and its Subsidiaries; and (ii) within 120 days (or 135 days in the case of the first fiscal year ending after the Effective Date) following the conclusion of each of the CVR Issuer's fiscal years ending after the Effective Date (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal year ending after the Effective Date, annual audited consolidated financial statements of the CVR Issuer and its Subsidiaries (clauses (i) and (ii) collectively, the "Financial Statements"); and (iii) the information if, as and when provided to the noteholders or trustee, as applicable, pursuant to Section 3.10(a) of the New Indenture (or any substantially similar provision in connection with any amendment to the New Indenture or any refinancing indebtedness thereof), including, for the avoidance of doubt, the Financial Statements; *provided*, *however*, that if the CVR Issuer files the Financial Statements described in this Section 7.1(a) with the Securities and Exchange Commission, the requirement to deliver the Financial Statements pursuant to clauses (i) and (ii) shall be deemed satisfied. For the avoidance of doubt, the CVR Issuer may satisfy its obligations pursuant to this Section 7.1 with respect to financial information relating to the CVR Issuer by furnishing financial information relating to one of its direct or indirect parent entities which wholly owns the CVR Issuer; *provided* that the same is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent entity and its Subsidiaries, on the one hand, and the information relating the CVR Issuer and its Subsidiaries on a standalone basis, on the other hand.  For the avoidance of doubt, reconciliation information that may be provided pursuant to Section 3.10(a) of the New Indenture (or any substantially similar provision in connection with any refinancing indebtedness thereof) will be deemed to satisfy the foregoing sentence and the consolidating information referred to in the proviso in the preceding sentence need not be audited. Promptly following the release of each of the quarterly unaudited financial statements, the CVR Issuer or one of its Affiliates will provide a video and/or a telephonic presentation (which may be a single presentation held together with other securityholders or holders of indebtedness of the CVR Issuer and its Affiliates) to the Holders and their respective partners (including limited partners except for any Competitors), shareholders, members, directors, officers, managers, employees, financing sources (including existing and bona fide prospective investors except for any Competitors), agents, counsel, accountants, consultants, investment advisors or other professionals or representatives, or its Affiliates or wholly owned subsidiaries  (collectively, "Representatives") to discuss the CVR Issuer's (or the Equity Issuer's or the Affiliate producing such reporting pursuant to Section 7.1 hereto) financial condition and results of operations, following which presentation the CVR Issuer will allow the Representatives of Holders to ask reasonable questions. Any participant in quarterly calls (including bona fide potential transferees permitted in accordance with the terms hereof) (A) shall not be a Competitor of the CVR Issuer and each Holder hereby represents and warrants to the same as to itself, its Representatives and its bona fide potential transferees that participate in such calls, and (B) shall be subject to Section 7.2; *provided,* that each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of Section 7.2 if such Representative or recipient were party to this Agreement. With respect to any recipient who is a bona fide potential transferee of Series A CVRs, the applicable Holder must first comply with Section 7.2 prior to sharing any such information.

(b)     The Company shall use commercially reasonable efforts to promptly post all information required by Section 7.1(a) on a website (which may be nonpublic, require a confidentiality acknowledgement, with such acknowledgement being deemed to satisfy the requirement for a non-disclosure agreement as set forth in Section 7.2 and shall be maintained,

24

using commercially reasonable efforts, by the CVR Issuer or a third party) (the "Holder Website") to which access will be given to the Holders and bona fide prospective investors or bona fide potential transferees (with the exception of Competitors) in the Series A CVRs.

Section 7.2    Confidentiality.    The Right Agents and Holders hereby agree that any confidential or non-public information they receive pursuant to this Agreement from or on behalf of the CVR Issuer or any Affiliate of the CVR Issuer, including the Financial Statements and any information actually provided pursuant to Section 7.1(a)(iii), (the "Confidential Information"), shall: (a) not be used for any purpose other than for purposes permitted under this Agreement; (b) not be used directly or indirectly in any way that is for competitive purposes; and (c) be kept confidential by, and not be disclosed by, such Rights Agent and the Holders and its Representatives; *provided*, *however*, that any such Confidential Information may be disclosed only to their Representatives who (i) need to know such Confidential Information and (ii) are bound in writing to a non-disclosure agreement no less restrictive than this Section 7.2 or are otherwise made aware of the confidentiality obligations set forth in this Section 7.2.  It is understood that such Representatives shall be informed by the Rights Agent or the applicable Holder of the confidential nature of such Confidential Information, and such Rights Agent or Holder, as applicable, shall be responsible for any disclosure or use made by its Representatives in breach of obligations under this Agreement to the same extent as if such disclosure or use had been made directly by the Rights Agent or such Holder, as applicable. "Confidential Information" shall not include any information that is (i) publicly available other than because of a breach of this Section 7.2 by the Rights Agent or the Holders or any of their respective Representatives or (ii) is lawfully disclosed to the Rights Agent or Holders by sources (other than the CVR Issuer or its Affiliates) rightfully in possession of the Confidential Information.  If the Rights Agent, Holders or their respective Representatives are legally required or requested to disclose any Confidential Information, they shall in advance of such disclosure, unless otherwise prohibited by Law, promptly notify the CVR Issuer of such request or requirement so that the CVR Issuer may seek to avoid or minimize the required disclosure and/or obtain an appropriate protective order or other appropriate relief to ensure that any Confidential Information so disclosed is maintained in confidence to the maximum extent possible by the Person receiving the disclosure, or, in the CVR Issuer's discretion, to waive compliance with the provisions of this Agreement.  In any such case, the Rights Agent and the Holders agree to cooperate and use commercially reasonable efforts to avoid or minimize the required disclosure and/or obtain such protective order or other relief.  If, in the absence of a protective order or the receipt of a waiver hereunder, the Rights Agent, Holders or their respective Representatives are legally obligated to disclose any Confidential Information, they shall disclose only so much thereof to the party compelling disclosure as they believe in good faith, on the basis of advice of counsel, is required by Law.  The Rights Agent or the Holder, as applicable, shall give the CVR Issuer prior written notice of the specific Confidential Information that they believe they are required to disclose under such circumstances.  All Confidential Information disclosed by or on behalf of the CVR Issuer or any of its Affiliates shall be, and shall remain, the property of the CVR Issuer or such Affiliate.  For the avoidance of doubt, a Person which ceases to be a Holder shall continue to be subject to this Section 7.2 with respect to any Confidential Information received by such Holder or its Representatives under this Agreement for 12 months after ceasing to be a Holder, at which point such Person will no longer be subject to this Section 7.2.

25

# ARTICLE VIII
## OTHER PROVISIONS OF GENERAL APPLICATION

Section 8.1    <u>Notices to Rights Agent, the CVR Issuer and the Equity Issuer</u>.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed given when delivered in person, by overnight courier, by electronic mail, or two (2) Business Days after being sent by registered or certified mail (postage prepaid, return receipt requested), as follows:

If to the Rights Agent, to it at:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attn: Corporate Actions /Intelsat CVR

Email: reorg_rm@astfinancial.com

*with a copy (which shall not constitute notice) to:*

American Stock Transfer & Trust Company, LLC
48 Wall Street, 22nd Floor
New York, NY 10005
Attention: Legal Department
Email: <u>legalteamAST@astfinancial.com</u>

If to the CVR Issuer or the Equity Issuer, to it at:

Intelsat Emergence S.A. (to be renamed Intelsat S.A.)
4, rue Albert Borschette
L-1246 Luxembourg, Grand Duchy of Luxembourg
Attention:    Legal Department
Email:        Michelle.Bryan@Intelsat.com

*with a copy (which shall not constitute notice) to:*

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:    Edward O. Sassower, P.C.
              Steven N. Serajeddini, P.C.
              Aparna Yenamandra
Email:        Edward.Sassower@Kirkland.com
              Steven.Serajeddini@Kirkland.com
              Aparna.Yenamandra@Kirkland.com

The Rights Agent, the CVR Issuer or the Equity Issuer may specify a different address or facsimile number by giving notice in accordance with this Section 8.1.

Section 8.2    Notice to Holders.  Where this Agreement provides for notice to Holders, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Holder affected by such event, at the Holder's address as it appears in the Series A CVR Register, not later than the latest date, and not earlier than the earliest date, if any, prescribed for the giving of such notice.  In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.

Section 8.3    Successors and Assigns; Merger, Change of Control.

(a)    The CVR Issuer may assign any or all of its rights, interests and obligations hereunder to (a) in its sole discretion and without the consent of any other party hereto, any of its Affiliates, but only (i) if the Board of Directors, including three of the four of the Chief Executive Officer and the Minority Directors (as defined in the Shareholders Agreement) approves of such assignment to such Affiliate and the CVR Issuer delivers to the Rights Agent an Officer's Certificate certifying that such Affiliate will be able to make any applicable payments pursuant to such agreement and (ii) for so long as it remains an Affiliate of the CVR Issuer, or (b) with the prior written consent of the Majority of Holders, any other Person (any permitted assignee under clause (a) or (b), an "Assignee"), in each case, provided that the Assignee agrees to assume and be bound by all of the terms of this Agreement.  Any Assignee may thereafter assign any or all of its rights, interests and obligations hereunder in the same manner as the CVR Issuer pursuant to the prior sentence.  In connection with any assignment to an Assignee described in clause (a) above in this Section 8.3, the CVR Issuer shall agree to remain liable for the performance by each Assignee of all obligations of the CVR Issuer hereunder.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by each of the successors of the CVR Issuer and each Assignee. Each of the successors of the CVR Issuer and Assignees shall expressly assume by an instrument supplemental hereto, executed and delivered to the Rights Agent, the due and punctual performance and observance of all of the covenants and obligations of this Agreement to be performed or observed by the CVR Issuer.  Any attempted assignment in violation of this Section 8.3 shall be void and of no effect.

(b)    The Equity Issuer and the CVR Issuer shall not consolidate, amalgamate, merge or combine with or into any other Entity in which the Equity Issuer or the CVR Issuer, as applicable, shall not be the surviving or continuing Entity in such consolidation, amalgamation, merger or combination, unless the surviving Entity in such consolidation, amalgamation, merger or combination shall assume all of the obligations of the Equity Issuer or the CVR Issuer, as applicable, under this Agreement.  This Agreement and the Series A CVRs shall survive any Change of Control.

Section 8.4    Benefits of Agreement.  Nothing in this Agreement, express or implied, shall give to any Person (other than the Rights Agent, the CVR Issuer and the Equity Issuer and their respective successors and Assignees, the Holders and their respective successors and permitted assigns) any benefit or any legal or equitable right, remedy or claim under this Agreement or under any covenant or provision herein contained, all such covenants and provisions being for the sole

27

benefit of the foregoing.  The rights of Holders and their successors and permitted assigns are limited to those expressly provided in this Agreement.  Notwithstanding anything to the contrary contained herein, any Holder or Holder's successor or permitted assign may agree to renounce, in whole or in part, its rights under this Agreement by written notice to the Rights Agent, the CVR Issuer and the Equity Issuer, which notice, if given, shall be irrevocable

Section 8.5      Governing Law.  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.

Section 8.7      Submission to Jurisdiction.  Each party to this Agreement and each Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware) (together with the appellate courts thereof, the "Chosen Courts").  In connection with any claim arising out of or related to this Agreement, each party to this Agreement and each Holder hereby irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection that such Person may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the CVR Issuer or the Holder, (iv) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with Section 8.1, although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (v) agrees not to seek a transfer of venue on the basis that another forum is more convenient.  Notwithstanding anything herein to the contrary, each of the parties to this Agreement and each Holder agrees that any judgment issued by a Chosen Court may be recognized, recorded, registered or enforced in any jurisdiction in the world and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction.

Section 8.8      Waiver of Trial by Jury.  EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

Section 8.9      Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable. The parties further agree to replace such invalid or unenforceable provision of this Agreement with a valid and enforceable provision that shall achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable provision.

28

Section 8.10    Counterparts and Signature.  This Agreement may be executed in two or more counterparts (including by facsimile or by an electronic scan delivered by electronic mail), each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties hereto and delivered to the other party, it being understood that the parties need not sign the same counterpart.

Section 8.11    Termination.  This Agreement and the Series A CVRs issued hereunder shall automatically terminate, without further action of any parties hereto, and be of no force or effect, and the parties hereto shall have no liabilities hereunder or with respect to any of the Series A CVRs, upon the earlier to occur of (a) the date on which Holders have received an aggregate amount equal to the maximum amount of payments on account of the Series A CVRs permitted hereunder, and (b) the later of (i) the Outside Date, and (ii) the date on which there is no obligation remaining pursuant to any Additional Acceleration Contract to pay Further Accelerated Relocation Payments to any Applicable Intelsat Recipient.  Such date that is the earlier to occur of the foregoing is referred to as the "Termination Date."

Section 8.12    Entire Agreement.  This Agreement contains the entire understanding of the parties hereto and thereto with reference to the transactions and matters contemplated hereby and thereby and supersedes all prior agreements, written or oral, among the parties with respect hereto and thereto.

Section 8.13    No Recourse.  This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties and then only in their capacities as such. Except to the extent named as a party, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present, or future direct or indirect stockholder, member, other direct or indirect equityholder, partner, manager, director, officer, employee, Affiliate or agent (collectively, the "Non-Recourse Parties") of any party to this Agreement or the Non-Recourse Parties of any Affiliate of any party to this Agreement, shall have any liability (whether in contract, tort, equity, or otherwise) for any of the covenants or agreements, or other obligations or liabilities of any of the parties under this Agreement or for any claim based upon, arising out of or related to this Agreement.  By accepting a Series A CVR, each Holder waives and releases all such liability against all Non-Recourse Parties.  The waiver and release are part of the consideration for the issue of the Series A CVRs.

Section 8.14    Conditions Precedent to Issuance of Series A CVRs.  The Series A CVRs shall not be issued prior to the satisfaction of all other conditions precedent to the effective date of the Plan (or waiver of such conditions in accordance with the terms of the Plan), including the condition precedent that the Settlement Order (as defined in the Plan) shall have been entered and not subject to any stay, and the Accelerated Relocation Payment Claims (as defined in the Plan) shall have been resolved pursuant to an order not subject to any stay, on the terms set forth in the Plan (or such other terms that are acceptable to the Required Consenting Jackson Crossover Group Members (as defined in the Plan)).

*[Remainder of page intentionally left blank]*

29

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its duly authorized officers as of the day and year first above written.

<u>CVR Issuer:</u>

**INTELSAT JACKSON HOLDINGS S.A.**


By:_____
Name: José Toscano
Title:   Chairman and CEO

<u>Equity Issuer:</u>

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**


By:_____
Name: José Toscano
Title:   Delegate of the Board of Directors

<u>Rights Agent:</u>

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC**


By:_____
Name:
Title:

30

EXHIBIT A-1


DIRECT OWNER LEGEND


TO THE EXTENT THESE SERIES A CVRS ARE SECURITIES, THESE SERIES A CVRS HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN "UNDERWRITER" AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

TO THE EXTENT THESE SERIES A CVRS ARE SECURITIES, THESE SERIES A CVRS HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH SERIES A CVRS IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE SERIES A CVRS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SERIES A CVR AGREEMENT OF INTELSAT JACKSON HOLDINGS S.A. (THE "CVR ISSUER"), DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SERIES A CVR AGREEMENT"). NO REGISTRATION OR TRANSFER OF THE CVR ISSUER MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING COMPLIANCE WITH THE SERIES A CVR AGREEMENT.

THE CVR ISSUER OR THE TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE SERIES A CVRS REPRESENTED HEREBY A COPY OF THE SERIES A CVR AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE SERIES A CVRS UPON WRITTEN REQUEST TO THE CVR ISSUER AT ITS PRINCIPAL PLACE OF BUSINESS. THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE CVR ISSUER.


1

EXHIBIT A-2

FORM OF GLOBAL CERTIFICATE
-EVIDENCING-
SERIES A CVRS
-OF-

INTELSAT JACKSON HOLDINGS S.A.

UNLESS THIS GLOBAL CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO INTELSAT JACKSON HOLDINGS S.A. (THE "CVR ISSUER") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUIRED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE CVR ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THE SECURITIES REPRESENTED HEREBY WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "BANKRUPTCY CODE").  THE SECURITIES REPRESENTED HEREBY MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE CVR ISSUER IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CVR ISSUER AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE SERIES A CVRS REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE SERIES A CVR AGREEMENT OF THE CVR ISSUER, DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SERIES A CVR AGREEMENT").  NO REGISTRATION OR TRANSFER OF SERIES A CVRS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING COMPLIANCE WITH THE SERIES A CVR AGREEMENT.  COPIES OF SUCH AGREEMENT ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE CVR ISSUER.  NO TRANSFER OF SERIES A CVRS WILL BE MADE ON THE BOOKS OF THE CVR ISSUER UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE APPLICABLE TERMS OF THE SERIES A CVR AGREEMENT.

NO PERSON MAY BECOME A HOLDER OF SERIES A CVRS PURSUANT TO ANY TRANSFER OF SERIES A CVRS OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SERIES A CVR AGREEMENT.

1

This is to certify that CEDE & CO. is the owner and registered holder of this Certificate evidencing the ownership of the Series A CVRs set forth on the Schedule of Increases and Decreases attached hereto as <u>Schedule A</u>, each of which represents a Series A CVR.

At the request of the registered holder this Certificate may be exchanged for one or more Certificates issued to the registered holder in such denominations as the registered holder may request.

The registered holder of this Certificate is entitled at any time upon tender of this Certificate to the CVR Issuer, endorsed in blank or accompanied by all necessary instruments of assignment and transfer in proper form, at its principal office in Luxembourg and, upon payment of any tax or other governmental charges, to receive such holder's securities evidenced by this Certificate.

The CVR Issuer may deem and treat the person in whose name this Certificate is registered upon the books of the CVR Issuer as the owner hereof for all purposes and the CVR Issuer shall not be affected by any notice to the contrary.

**IN WITNESS WHEREOF**, the CVR Issuer has caused this Certificate to be executed in its name by the manual or electronic signature of one of its authorized signatories.

<div align="right">

**INTELSAT JACKSON HOLDINGS S.A**.

By: _____

    José Toscano
    Chairman and CEO

</div>

<div align="center">2</div>

## SCHEDULE A
## SCHEDULE OF INCREASES AND DECREASES IN
## SERIES A CVRS

The following increases and decreases in the number of Series A CVRs evidenced by this Global Security have been made:

| Date | Amount of increases or decrease in number of Series A CVRs evidenced by this Global Security | Number of Series A CVRs evidenced by this Global Security following such increase or decrease | Signature of authorized signatory |
|---|---|---|---|
| | | | |

1

## Exhibit H-2

**Redline to Series A CVR Agreement filed on October 19, 2021**

*Filing*Form of Execution *Version*

## SERIES A CONTINGENT VALUE RIGHTS AGREEMENT

THIS SERIES A CONTINGENT VALUE RIGHTS AGREEMENT (this "Agreement") is entered into as of **February** [●], 20212022 (the "Effective Date"), by and among (i) American Stock Transfer & Trust Company, LLC, as Rights Agent (the "Rights Agent"), (ii) Intelsat Jackson Holdings S.A., a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 149959 (the "CVR Issuer"), and (iii) solely for purposes of Section 4.2, [●]**as expressly provided herein (and, for the avoidance of doubt, not with respect to any of the provisions of Article II hereof, except Section 2.5(c)), Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 264124** (the "Equity Issuer").

## RECITALS

WHEREAS, on the Effective Date, the CVR Issuer and certain of its Affiliates emerged as the Reorganized Debtors in accordance with the Plan; and

WHEREAS, pursuant to the Plan, the Reorganized Debtors were required to issue the contingent value rights contemplated in this Agreement to certain holders of claims in exchange for their claims, on and subject to the terms contained in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the consummation of the transactions contemplated by the Plan, the CVR Issuer and Rights Agent agree, for the equal and proportionate benefit of the holders of Series A CVRs (collectively, the "Holders"), as follows:

## ARTICLE I
## DEFINITIONS; CERTAIN RULES OF CONSTRUCTION

Section 1.1    Definitions.   All capitalized terms used in this Agreement without definitions shall have the respective meanings ascribed to them in the Plan.  As used in this Agreement, the following terms shall have the following meanings:

"Accelerated Relocation Payments" means the accelerated relocation payments described in the C-Band Order that are allocated to the Debtors and/or Reorganized Debtors in an amount equal to $4,865,366,000.

"Additional Acceleration Contract" means a written contract between any of the Applicable Intelsat Recipients, on the one hand, and any Private Entity, on the other hand, that provides for the payment of Applicable Consideration, and that is entered into prior to the Outside Date.

"Affiliate" means, of any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity. For purposes of this definition, "control," as used with respect to any Entity, means the possession,

directly or indirectly, of the power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition and Agreement, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.  Notwithstanding the foregoing, and for the avoidance of doubt, no Entity shall be an Affiliate of the Debtors, any Reorganized Debtors, ~~or~~**the** Equity Issuer**, or the CVR Issuer** solely because (a) it is a holder of New Common Stock of the Equity Issuer or (b) it is controlled by a holder of New Common Stock of the Equity Issuer.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Allowed</u>" has the meaning set forth in the Plan.

"<u>Applicable Consideration</u>" means any and all consideration, without duplication, that is actually received by any of the Applicable Intelsat Recipients, from time to time, from a Private Entity, solely to the extent such consideration is received in connection with, or directly related to, private negotiations authorized by the FCC in footnote 497 of the C-Band Order to accomplish clearing earlier than the deadlines established by the FCC in the C-Band Order of the Cleared Spectrum; *provided* that such consideration (A) shall only constitute Applicable Consideration to the extent that the Minimum Payment Condition has been satisfied (and, for the avoidance of doubt, any amounts actually received by the Applicable Intelsat Recipients and counted towards satisfaction of the Minimum Payment Condition shall not constitute Applicable Consideration), (B) shall be calculated net of, and be reduced by, any Tax Costs with respect thereto and (C) shall be reduced by all reasonable documented costs and expenses incurred by the ~~[~~Applicable Intelsat Recipients~~]~~ in seeking, obtaining or procuring such consideration (solely to the extent such costs and expenses are not reimbursed to the Applicable Intelsat Recipients through Expense Reimbursements); *provided, further,* that Applicable Consideration shall not include any portion of (w) any accelerated relocation payments provided under the C-Band Order to any other space station operator (each, an "<u>Other FSS Operator</u>"), including SES Americom, Inc., Eutelsat S.A., Telesat Canada, Star One S.A., or any of their respective Affiliates and subsidiaries, in the event of any consolidation, amalgamation, merger, combination or similar transaction involving the Applicable Intelsat Recipients and any of the Other FSS Operators, (x) any Expense Reimbursements, or (y) any Accelerated Relocation Payments.

"<u>Applicable Intelsat Recipients</u>" means (i) prior to the Effective Date, the Jackson Entities, and (ii) on and after the Effective Date, the Equity Issuer and its Affiliates.

"<u>Assignee</u>" has the meaning set forth in <u>Section 8.3</u>.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

"<u>Beneficial Interest</u>" means, **<u>solely for purposes of and as used in Sections 2.2, 2.3, 2.4 and 2.6 of Article II,</u>** with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Series A CVRs it Beneficially Owns.

"Beneficial Owner" means**, solely for purposes of and as used in Sections 2.2, 2.3, 2.4 and 2.6 of Article II,** any Person owning a securities entitlement with respect to Series A CVRs registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been **ultimately** credited to any other Person's securities account. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.¶

~~"Board Certificate" means a certificate authorized by the Board of Directors and signed by any two members of the Board of Directors authorized to sign on behalf of the Board of Directors, in each case in his or her capacity as such a member of the Board of Directors, and delivered to the Rights Agent~~¶

**"Board Designee" has the meaning give to such term in Section 2.5(a) hereof**.

"Board of Directors" means the board of directors (or other applicable governing body) of the Equity Issuer.

"Board Resolution" means a copy of a resolution certified by a duly authorized officer of the Equity Issuer to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to Rights Agent.

"Business Day" means any day, other than a Saturday, Sunday, or other day on which commercial banks are authorized or required by law to be closed in New York, NY, USA or the Grand Duchy of Luxembourg.

"C-Band Order" means that certain Report and Order and Order of Proposed Modification issued by the FCC on March 3, 2020 in In the Matter of Expanding Flexible Use of the 3.7 to 4.2 GHz Band, GN Docket No. 18-122, as may be amended or modified with respect to the clearing of the Cleared Spectrum.

"Change of Control" means one or a series of related transactions, directly or indirectly following which: (a) a shareholder or a group of shareholders of the Equity Issuer or CVR Issuer (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), acting in concert, directly or indirectly have acquired the right to cast, at a general meeting of shareholders of the Equity Issuer or CVR Issuer, more than fifty (50) percent of the voting shares of the CVR Issuer; or (b) all or substantially all of the assets of the Equity Issuer and its Affiliates (taken as a whole and as measured by asset valuations or other fair market value determinations) are sold or otherwise disposed of (including by way of merger, purchase, amalgamation, consolidation, scheme of arrangement or other business combination transaction) in a single transaction or a series of transactions (whether or not related) to a Person other than an Affiliate of the CVR Issuer.

"Cleared Spectrum" means the 3.7-4.0 GHz band in the contiguous United States, licenses for which were auctioned by the FCC on December 8, 2020 through February 17, 2021 in Auction 107 and specifically excluding any other radio frequencies or locations outside the contiguous United States.

¶

"Competitor" means a "Competitor of the Company" as defined in the Shareholders Agreement.

"CVR Issuer" has the meaning set forth in the Preamble.¶

**"Debtors" means Intelsat S.A. and its affiliated debtors and debtors in possession in the chapter 11 cases jointly administered under Case No. 20-32299 (KLP).**

"Depository Agreement" means the Blanket Issuer Letter of Representations from the CVR Issuer to DTC, dated as of [●], 20[●], as the same may be amended or supplemented from time to time.

"Direct Owner" means any holder of Series A CVRs who is registered on the books and records of the Rights Agent**Series A CVR Register**.

"Direct Owner Legend" means the legend on the account of each Holder of Series A CVRs held in book-entry on the books and records for the**Series A** CVR Issuer**Register in** the **form** set forth on Exhibit A-1 hereto.

 "DTC" means The Depository Trust Company or any successor thereto.

"DTC Participant" means any Person that is reflected on the books and records of DTC as having a direct interest in the Series A CVRs held of record by DTC.

"Effective Date" has the meaning set forth in the Preamble.

"Entity" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any company limited by shares, limited liability company or joint stock company), firm, society or other enterprise, association, organization or entity.

"Equity Issuer" has the meaning set forth in the Preamble.

"Escrow Agent" means American Stock Transfer & Trust Company, LLC, in its capacity as escrow agent as provided under Section 2.13.

"Event of Default" has the meaning set forth in Section 6.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Expense Reimbursements" means any and all payments received by any of the Applicable Intelsat Recipients on account of compensable relocation costs as described in the C-Band Order.

"FCC" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor Governmental Authority performing functions similar to those performed by the Federal Communications Commission on the Effective Date.¶

**"Financial Statements" has the meaning set forth in Section 7.1.**

¶

"Further Accelerated Relocation Payments" means any and all Applicable Consideration actually received by any Applicable Intelsat Recipient pursuant to an Additional Acceleration Contract, whether or not such Applicable Consideration is received before or after the Outside Date, not to exceed $420,000,000.  For the avoidance of doubt, the first $65,000,000 of Further Accelerated Relocation Payments are referred to as Initial Further Accelerated Relocation Payments and the remaining $355,000,000 of Further Accelerated Relocation Payments are referred to as Subsequent Further Accelerated Relocation Payments.

"Global Security" means the global certificate or certificates issued to DTC as provided in the Depository Agreement, each of which shall be in substantially the form attached hereto as Exhibit A-2.

"Governmental Authority" means any U.S. or non-U.S. (including Luxembourg) federal, state, provincial, local or other government or quasi-governmental, department, authority, court, tribunal, commission, instrumentality, regulatory body or self-regulatory body (including any securities exchange), or any political or other subdivision, department, agency or branch of any of the foregoing.

"Holders" has the meaning set forth in the Recitals.  A Person shall cease to be a Holder hereunder at such time as it ceases to hold, *directly or indirectly,* **beneficial ownership of** any Series A CVRs or Beneficial Interests.¶

**"Holder Website" has the meaning set forth in Section 7.1(b)**.

"Initial Distribution Escrow Account" means an interest-bearing escrow account established by the CVR Issuer with the Escrow Agent for the benefit of Holders.

"Initial Distribution Escrow Deposits" has the meaning set forth in Section 2.13.

"Initial Distribution Escrow Funds" means, at any time, the portion of the Initial Distribution Escrow Deposits then remaining in the Initial Distribution Escrow Account, plus all interest (if any) or other amounts earned thereon (if any).

"Initial Further Accelerated Relocation Payment" means the first $65,000,000 of any Further Accelerated Relocation Payments.

"Jackson" means Intelsat Jackson Holdings S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg.

"Jackson Entities" means, collectively, Intelsat Jackson Holdings S.A., a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 149959, and all of its direct and indirect subsidiaries, prior to the Effective Date.

"Law" means any foreign, federal, state, local or municipal laws, rules, judgments, orders, regulations, statutes, ordinances, codes, decisions, injunctions, orders, decrees or requirements of any Governmental Authority.¶

**"Listing" means a listing of the Equity Issuer's securities resulting in the Equity Issuer being registered under Section 12(b) of the Exchange Act.**

"Majority of Holders" means, as of the time of determination, Holders of not less than a majority of the issued and Outstanding Series A CVRs.

"Minimum Payment Amount" means $4,865,366,000 (*i.e.*, the maximum amount of potential Accelerated Relocation Payments provided under the C-Band Order as of the Effective Date).

"Minimum Payment Condition" means that the Applicable Intelsat Recipients (on an aggregate basis) shall have actually received an aggregate amount of consideration (either (a) pursuant to the C-Band Order as Accelerated Relocation Payments or, (b) from a third party as compensation for the efforts of the Applicable Intelsat Recipients to clear the Cleared Spectrum solely to the extent such consideration is in connection with or directly related to private negotiations authorized by the FCC in footnote 497 of the C-Band Order to accomplish earlier clearing than the deadlines established by the FCC in the C-Band Order of the Cleared Spectrum, **or (c) a combination of consideration set forth in clauses (a) and (b) of this parenthetical**) in an amount equal to the Minimum Payment Amount; provided, that (1) no amounts counted towards satisfaction of the Minimum Payment Condition shall constitute Applicable Consideration and (2) no Expense Reimbursements received by the Applicable Intelsat Recipients shall count towards satisfaction of the Minimum Payment Condition.

"New Common Stock" means ordinary shares of the Equity Issuer.¶

**"New Indenture" means that certain indenture for 6.500% First Lien Secured Notes due 2030 dated January 27, 2022 between the CVR Issuer, the guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time.**

"Non-Recourse Parties" has the meaning set forth in Section 8.13.

"Officer's Certificate" means a certificate signed by an authorized officer of the CVR Issuer, in his or her capacity as such an officer, and delivered to the Rights Agent.

"Outside Date" means the date that is the earlier of (i) the date on which the certification of accelerated relocation for Phase II of the Debtors or Reorganized Debtors, as applicable, is validated pursuant to the C-Band Order, and (ii) December 5, 2025 (or, in the case of this clause (ii), such later deadline for clearing the Cleared Spectrum as may be adopted pursuant to the C-Band Order).

"Outstanding" when used with respect to Series A CVRs means, as of the date of determination, all Series A CVRs theretofore authenticated and delivered under this Agreement, except Series A CVRs theretofore cancelled by the Rights Agent in accordance with this Agreement or delivered to the Rights Agent for cancellation in accordance with this Agreement; *provided*, that, for the avoidance of doubt, any Series A CVRs owned by the CVR Issuer or any Affiliate of the CVR Issuer (other than any Series A CVRs abandoned and cancelled pursuant to Section 2.10 hereof) shall be treated as Outstanding for all purposes under this Agreement,

including, but not limited to, the calculation and distribution of a Series A CVR Payment Amount.¶

~~"Owners" means, collectively, any Beneficial Owners and Direct Owners.~~

"Person" means any individual, Entity, including any Governmental Authority (or any department, agency or political subdivision thereof) and any syndicate or group that would be deemed to be a person under section 13(d)(3) of the Exchange Act.

"Plan" means the [~~●~~]*Fourth* *Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates* filed by the Debtors on [~~●~~]**December 17, 2021** at Docket No. [~~●~~]**3891** in Case No. 20-32299 (KLP) in the Bankruptcy Court, **and confirmed by the Bankruptcy Court at Docket No. 3894 in Case No. 20-32299 (KLP),** as amended, modified or supplemented.¶

[~~"Pre-Effective Date Further Accelerated Relocation Payments" has the meaning set forth in Section 2.14.~~]

"Private Entity" means an Entity that is not a Governmental Authority and that is not the clearinghouse appointed by the FCC contemplated by the C-Band Order or any other comparable administrative ~~e~~**E**ntity selected by the FCC.  Notwithstanding the foregoing, and for the avoidance of doubt, to the extent the Applicable Intelsat Recipients enter into an Additional Acceleration Contract with a Private Entity, and the parties agree to utilize a Governmental Authority or administrative clearinghouse for processing payments earned under such Additional Acceleration Contract, such payments shall be deemed to have been made by a Private Entity.

"Rights Agent" has the meaning set forth in the Preamble or its successor and/or assigns.

"Reorganized Debtor" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.¶

**"Representatives" has the meaning set forth in Section 7.1.**

"SEC" means the United States Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended.

"Series A CVRs" means, collectively, the rights of Holders to receive a contingent cash payment pursuant to the terms of this Agreement.

"Series A CVR Payment Amount" has the meaning set forth in Section 2.6.

"Series A CVR Payment Date" means any date a Series A CVR Payment Amount is paid by the Rights Agent to the Holders pursuant to Section 2.6.  [~~For the avoidance of doubt, there shall be a single Series A CVR Payment Date for the payment of each Series A CVR Payment Amount.~~]

"Series A CVR Register" has the meaning set forth in Section 2.4 (a).

"Series B Contingent Value Rights Agreement" means that certain Series B Contingent Value Rights Agreement, entered into as of February [●], 2021,2022 by and among (i) [●]American Stock Transfer & Trust Company, LLC, as rights agent, (ii) the CVR Issuer, and (iii) solely for purposes ofas expressly provided therein (and, for the avoidance of doubt, not with respect to any of the provisions of Article II thereof, except Section [4.2] thereof2.5(c)), the Equity Issuer.

"Series B CVRs" means, collectively, the rights of holders to receive a contingent cash payment pursuant to the terms of that certain Series B Contingent Value Rights Agreement.

"Shareholders Agreement" means the Equity Issuer's shareholders agreement.

"Subsequent Further Accelerated Relocation Payments" means any Further Accelerated Relocation Payments that are not Initial Further Accelerated Relocation Payments, in an amount not to exceed $355,000,000.

"Subsidiary" means a Person more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the CVR Issuer or by one or more other Subsidiaries, or by the CVR Issuer and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock, shares or other equity interests (including partnership interests) which ordinarily have voting power for the election of directors, managers, general partners or trustees, whether at all times or only so long as no senior class of stock, shares or other equity interests (including partnership interests) have such voting power by reason of any contingency.

"Tax" means all taxes, customs, tariffs, imposts, levies, duties, fees or other like assessments or charges of a similar nature, however denominated, imposed by a Governmental Authority, together with all interest, penalties and additions imposed with respect to such amounts.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Tax Costs" [Reserved]means (i) any liability for cash Taxes of any kind imposed on or with respect to any Debtor or Reorganized Debtor to the extent attributable to Further Accelerated Relocation Payments, (ii) the tax-effected value of any utilization or decrease of any existing Tax attribute of any Debtor or Reorganized Debtor, including, but not limited to, any net operating loss or Tax credit, to the extent attributable to Further Accelerated Relocation Payments, and (iii) the tax-effected value of any decrease in the amount of any deduction or Tax attribute realized or generated by any Debtor or Reorganized Debtor, including, but not limited to, any net operating loss or Tax credit, to the extent attributable to Further Accelerated Relocation Payments, in each case, determined on a "with and without" basis with respect to any amount received by any Debtor or Reorganized Debtor, treating any Further Accelerated Relocation Payments as the last item realized in the applicable taxable period and, in the case of clauses (ii) and (iii), calculating the tax-effected value by, in the case of any Tax attribute that reduces taxable income, (A) multiplying the amount of such Tax attribute by the applicable Tax rate in the year such Further Accelerated Relocation Payment is received and (B) solely in the case of any such Tax

**attribute for Luxembourg Tax purposes, multiplying the product of the calculation described in clause (A) by fifty percent (50%), without regard to any projected availability of Tax attributes or credits in future years, and, in each of clauses (i)-(iii), further increased by any costs and expenses reasonably attributable to determining the amounts described in clauses (i) through (iii) and subject to appropriate adjustment provisions to account for any subsequent audit adjustment affecting such calculation subject to, and in accordance with, Section 2.5(f) hereof.  For the avoidance of doubt, for purposes of the foregoing clauses, any liability for cash Taxes of any kind, the tax-effected value of any utilization or decrease of any existing Tax attribute, and the tax-effected value of any decrease in the amount of any deduction or Tax attribute realized or generated attributable to income in respect of any escrow established in connection with this Agreement shall be treated as satisfying one or more of the foregoing clauses (i)-(iii) (in accordance with the methodology for calculation set forth herein). For further clarity, the foregoing calculation shall be performed consistently with the following illustrative calculation.  Assume that Further Accelerated Relocation Payments result in a net increase of $100 of overall taxable income, of which $85 is allocable to Luxembourg and $15 is allocable to the United States, that the relevant Luxembourg income tax rate in the applicable tax period is 24.9%, and that the relevant United States income tax rate in the applicable period is 24% (on a combined federal/state basis).  With respect to the $85 of additional Luxembourg taxable income, assuming that the full $85 of Luxembourg taxable income is offset by existing Luxembourg NOLs, the relevant Tax Cost shall be $10.58, calculated by multiplying $85 of income by the 24.9% tax rate ($21.165) and further multiplying that calculation by 50%.  There shall be no further adjustment or modification to account for the fact that the Reorganized Debtors have incremental Luxembourg NOLs such that no additional cash tax cost is actually realized until later years.  With respect to the $15 of additional U.S. taxable income, the Tax Cost shall be $3.6, calculated by multiplying $15 of income by the blended federal and state rate of 24%, and shall be the same regardless of whether the Reorganized Debtors have sufficient NOLs, credits or other tax attributes to offset their federal and state income**, *For the avoidance of doubt, the* **foregoing calculation is simplified and shall not preclude appropriate adjustments to take account of tax laws as they exist at the time.**

"Termination Date" has the meaning set forth in Section 8.11.

"Transfer" means any sale, pledge, assignment, encumbrance or other transfer or disposition of any Series A CVR to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise.  "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings.  For the avoidance of doubt, the term "Transfer" includes a transfer of ~~Series A CVRs~~**Beneficial Interests** through DTC.

Section 1.2    Rules of Construction.  The words "hereof," "herein," "hereto" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The headings and captions contained herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified and references to clauses without a cross-reference to a Section or subsection are references to clauses within the

same Section or subsection. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meanings as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References (i) to "$" and "dollars" are to the currency of the United States and (ii) to "days" shall be to calendar days unless otherwise indicated. Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms. Except as required by Rule 14d-1(g)(3) promulgated by the SEC under the Exchange Act, when calculating the period of time before which, within which or following which any act is to be done or step taken, the date that is the reference date in beginning the calculation of such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

## ARTICLE II
## CONTINGENT VALUE RIGHTS

Section 2.1    Series A CVRs.

(a)    The Series A CVRs represent the rights of Holders to receive contingent payments pursuant to this Agreement. Pursuant to the Plan, the Series A CVRs shall be issued *pro rata* to holders of Allowed Unsecured Claims (as defined in the Plan) against Jackson and Allowed Unsecured Claims against Jackson Subsidiaries (as defined in the Plan), and each holder thereof shall be deemed to have received as of the Effective Date, one Series A CVR for each $[1,000.00] of Allowed Unsecured Claims against Jackson or Allowed Unsecured Claims against Jackson Subsidiaries held by such Holder as of the Effective Date, consistent with the Plan.

(b)    The Series A CVRs shall be distributed on the Effective Date in accordance with the terms of this Agreement and the Plan and without any further action of the CVR Issuer or any other Person. The Series A CVRs shall entitle each Holder to such Holder's *pro rata* share (based on the number of Series A CVRs held by such Holder as compared to the number of Series A CVRs Outstanding on the applicable Series A CVR Payment Date **(or any record date established by the CVR Issuer in accordance with this Agreement)**) of cash equal to one hundred percent (100%) of the Initial Further Accelerated Relocation Payments. The aggregate consideration distributed in respect of the Series A CVRs (including, for the avoidance of doubt, any cash distributed on account of Pre-Effective Date Further Acceleration Payments) shall not exceed the amount of the Initial Further Accelerated Relocation Payments. For the avoidance of doubt, (i) no fractional Series A CVRs shall be issued, and any such fractions will be rounded down or rounded up to the nearest $[1,000.00] of Allowed Unsecured Claims against Jackson or Allowed Unsecured Claims against Jackson Subsidiaries consistent with the Plan and (ii) no Series A CVR shall be issued to any Person prior to the Effective Date.

Section 2.2      Transferability.  The Series A CVRs or **any** Beneficial Interest shall be freely transferable without the prior consent of the CVR Issuer except as provided in this Section 2.2.  Notwithstanding any other provision of this Agreement, each Holder agrees that it shall not~~,~~ ~~directly or indirectly,~~ Transfer any of its Series A CVRs or Beneficial ~~Interest~~**Interests except**:

(a)      to the extent that the Series A CVRs constitute "securities" (as such term is defined under the ~~s~~**S**ection 2(a)(1) of the Securities Act),~~ except~~ as permitted under the Securities Act and other applicable federal law or state securities or blue sky laws, and then, with respect to a Transfer of Series A CVRs **or Beneficial Interests**, if requested by the CVR Issuer or the Rights Agent, as applicable, only upon delivery to the CVR Issuer of a written opinion of counsel in form and substance reasonably satisfactory to the CVR Issuer to the effect that such Transfer may be effected without registration under the Securities Act; *provided*, that **notwithstanding the foregoing**, such a legal opinion shall not be  required for any Transfer of Series A CVRs **or Beneficial Interests** that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the CVR Issuer has a good faith reason to believe that such Series A CVRs **or Beneficial Interests** are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the CVR Issuer or an "underwriter" (as such term is defined in the Securities Act) with respect to such Series A CVRs **or Beneficial Interests**;

(b)      ~~to the extent that~~ *~~the Series A CVRs constitute "securities" (as such term is defined under~~* ~~the section~~ *~~2(a)(1) of the Securities Act),~~* if such Transfer would **not** reasonably be expected to require the CVR Issuer to initiate a registration or qualification of ~~such~~**the** Series A CVRs pursuant to the Exchange Act ~~or any applicable federal or state securities or blue sky laws, or require the CVR Issuer to begin to file reports pursuant to the Exchange Act (as a result of the number of Holders of such Series A CVRs or equity securities or otherwise),~~ or any applicable federal or state securities or blue sky laws;

(c)      if such Transfer, upon consummation, would **not** result in the CVR Issuer having, in the aggregate, **either** (A) ~~1,000~~**1,900** or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act (determined, in each case, in the ~~Equity~~**CVR** Issuer's ~~sole~~**reasonable** discretion) **of any class of equity securities of the CVR Issuer**;

(d)      if such Transfer would **not** cause the CVR Issuer or any Subsidiary or Affiliate of the CVR Issuer to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(e)      if such Transfer would **not** cause the CVR Issuer or any Subsidiary or Affiliate of the CVR Issuer to be subject to regulation under the Investment Advisers Act of 1940**, as amended**.

The Series A CVRs have not been registered under the Securities Act, the Exchange Act, or state securities laws and will not be listed for trading on any securities exchange.  Any attempted or purported Transfer of all or a portion of the Series A CVRs **or Beneficial Interests** held by a

Holder in violation of this Section 2.2 shall be null and void and of no force or effect whatsoever, such purported Transferee shall not be treated as ~~an~~ **a H**own**ld**er of the Series A CVRs **or Beneficial Interests** for purposes of this Agreement or otherwise, and the CVR Issuer shall not register such Transfer.  **The restrictions under this Section 2.2(b), 2.2(c), 2.2(d), and 2.2(e) shall terminate automatically upon the effectiveness of a Listing.**

Section 2.3     Exemption from Securities Registration at Issuance.  To the extent that the Series A CVRs constitute "securities" (as such term is defined under the ~~s~~**S**ection 2(a)(1) of the Securities Act), the Series A CVRs shall be issued pursuant to ~~s~~**S**ection 1145 of the Bankruptcy Code; provided that the **Beneficial** Owner is not deemed to be an "underwriter" as defined in ~~s~~**S**ection 1145(b)(1) of the Bankruptcy Code.  **To the extent** *the Series A CVRs constitute "securities" (as such term is defined under* **Section** *2(a)(1) of the Securities Act)* **and are deemed not to have been issued pursuant to Section 1145 of the Bankruptcy Code, the Series A CVRs shall be issued in reliance upon an exemption from the registration requirement of Section 5 of the Securities Act provided by Section 4(a)(2) of the Securities Act.¶¶**

Section 2.4     Series A CVR Register; DTC; Global Security

(a)     The Rights Agent shall keep a register (the "Series A CVR Register") for the purpose of registering Series A CVRs and permitted Transfers thereof.  The Series A CVR Register shall initially show one position for Cede & Co. representing all of the Series A CVRs held by DTC on behalf of the Beneficial Owners holding through their respective DTC Participants. The Rights Agent shall have no responsibility whatsoever directly to the Beneficial Owners holding through their respective DTC Participants with respect to transfers of Series A CVRs.  Any Beneficial Owners holding through their respective DTC Participants may move their holdings of Series A CVRs directly to the Series A CVR Register only through the procedures established by the DTC.

(b)     The direct Transferee (*i.e.*, a Transferee that holds the Series A CVRs directly and not simply a Beneficial Interest in Series A CVRs registered in the name of Cede & Co.) of the Series A CVRs Transferred shall be bound by this Agreement as a Direct Owner.  Any indirect Transferee (*i.e.*, a Transferee that holds a Beneficial Interest in the Series A CVRs registered in the name of Cede & Co.) of Series A CVRs Transferred shall be bound by this Agreement as a Beneficial Owner.  Following a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa), the Rights Agent shall amend the Series A CVR Register to reflect the change in Direct Owners, and the CVR Issuer shall take any other appropriate action in connection therewith.

(c)     The CVR Issuer will enter into the Depository Agreement pursuant to which DTC will act as a securities depository for the Series A CVRs.  The Series A CVRs deposited with DTC will be represented by a Global Security (which may be a book entry security or consist of one or more certificates as required by DTC), which will be registered in the name of Cede & Co., as nominee for DTC or as DTC shall otherwise direct, and deposited with, or on behalf of, DTC.  No other certificates evidencing such Series A CVRs will be issued.  The Global Security shall be in the form attached hereto as Exhibit A-2 or described therein and shall represent such Series A CVRs as shall be specified therein, and may provide that it shall represent the aggregate amount of ~~o~~**O**utstanding Series A CVRs from time to time endorsed thereon and that the

¶

aggregate amount of oOutstanding Series A CVRs represented thereby may from time to time be increased or decreased.  As of the Effective Date, without the need for any action or consent of any Person, including the CVR Issuer, an initial Global Security shall be issued reflecting the number of Series A CVRs to be issued to Cede & Co. as of the Effective Date and shown on the Series A CVR Register.  Any Global Security shall be executed by an officer on behalf of the CVR Issuer. Any endorsement of a Global Security to reflect the amount, or any increase or decrease in the amount, of oOutstanding Series A CVRs represented thereby shall be made in such manner and upon instructions given by the CVR Issuer as specified in the Depository Agreement.

Section 2.5      [Determination of Further Accelerated Relocation Payments.

(a)      As promptly as practicable, following the receipt by the Applicable Intelsat Recipients of any Further Accelerated Relocation Payments after satisfaction of the Minimum Payment Condition and prior to the Termination Date, the CVR Issuer shall deliver to the Rights Agent a certificate (a "Further Accelerated Relocation Payments Certificate") setting forth in reasonable detail (i) the [Board of Directors]' **(or an Entity or Person designated by the Board of Directors (the "Board Designee's"))** calculation of the amount of such Further Accelerated Relocation Payments, (ii) the amount of such Further Accelerated Relocation Payments that constitute Initial Further Accelerated Relocation Payments and Subsequent Further Accelerated Relocation Payments and (iii) any material assumptions or adjustments made by the [Board of Directors] **(or the Board Designee)** in the calculation of such Further Accelerated Relocation Payments (including, without limitation, any applicable inclusion of interest, or netting of costs and expenses, associated with any Initial Distribution Escrow Funds, as set forth in Section 2.13 hereof).   Within [five (5)] Business Days of delivery of a Further Accelerated Relocation Payments Certificate to the Rights Agent, the Rights Agent shall mail a notice, by e-mail to the e-mail address that appears on the Series A CVR Register or, if no e-mail address appears on the Series A CVR Register, by first class mail to the Holders at their addresses as they appear on the Series A CVR Register, that includes a copy of the Further Accelerated Relocation Payments Certificate (a "Further Accelerated Relocation Payments Notice").   All determinations and calculations with respect to the calculation of any Further Accelerated Relocation Payments in the Further Accelerated Relocation Payments Certificate shall be reasonably made by the [Board of Directors] **(or the Board Designee, *provided* that such determinations and calculations are reviewed and approved by the Board of Directors)** in good faith, and such determinations shall be final, binding and conclusive on the Holders, absent manifest error or a Further Accelerated Relocation Payments Dispute Statement on the terms set forth in this Section 2.5.

(b)      In the event that Holders holding Series A CVRs representing at least 20% of the Outstanding Series A CVRs disagree with any of the determinations or calculations set forth in a Further Accelerated Relocation Payments Certificate (such Holders, the "Disputing Holders"), the Disputing Holders may, within ten (10) Business Days after receipt by the Disputing Holders of the Further Accelerated Relocation Payments Notice, deliver written notice to the CVR Issuer and the Rights Agent (a "Further Accelerated Relocation Payments Dispute Statement") setting forth in reasonable detail the determinations or calculations (the "Disputed Items") that the Disputing Holders dispute; *provided*, that Holders shall not have any right to challenge any of the determinations or calculations set forth in a Further Accelerated Relocation Payments Certificate (or submit a Further Accelerated Relocation Payments Dispute Statement) if such Further Accelerated Relocation Payments Certificate provides for the distribution of the maximum

¶

amounts distributable to the Holders under this Agreement.  Any determinations or calculations not specifically identified in the Further Accelerated Relocation Payments Dispute Statement shall be deemed to be final, binding and conclusive.  In the event that the CVR Issuer and the Rights Agent do not receive a Further Accelerated Relocation Payments Dispute Statement within such ten (10) Business Day period, then the Further Accelerated Relocation Payments Certificate shall be deemed to be final, binding and conclusive.

(c)      A representative of the Disputing Holders (such representative to be identified in the Further Accelerated Relocation Payments Dispute Statement and selected by **Disputing Holders who hold** a majority of **all Series A CVRs held by** the Disputing Holders), on the one hand, and the CVR Issuer [and the Equity Issuer], on the other hand, shall seek in good faith to resolve the Disputed Items for a period of ten (10) Business Days beginning on the date the CVR Issuer receives the Further Accelerated Relocation Payments Dispute Statement.  If the representative of the Disputing Holders, on one hand, and the CVR Issuer [and the Equity Issuer], on the other hand, are unable to resolve all of the Disputed Items during such ten (10)-Business Day period, then the CVR Issuer shall promptly engage an independent third-party financial, accounting, valuation, appraisal or other advisor selected by a majority of the Disputing Holders that is reasonably acceptable to the [Board of Directors] **or the Board Designee (as applicable)**) (an "Independent Advisor") to conduct a non-binding determination or calculation of the remaining Disputed Items.  The Independent Advisor shall be required to make any such non-binding determinations or calculations within thirty (30) days of the engagement of the Independent Advisor.  The [Board of Directors] **(or the Board Designee (as applicable))** shall consider in good faith any comments to the Disputed Items in the Further Accelerated Relocation Payments Certificate based on the determinations and calculations of the Independent Advisor.  The [Board of Directors] **(or the Board Designee (as applicable))** shall not be required to make any adjustments to its own determinations as a result of the Independent Advisor's comments, calculations, or determinations; *provided*, that, if the [Board of Directors] **(or the Board Designee (as applicable))** does make any such adjustments, it may not assign a value (i) higher than the greatest value for any Disputed Item calculated by the [Board of Directors] **(or the Board Designee (as applicable))** or the Independent Advisor (whichever is greater) or (ii) lower than the smallest value for such item calculated by [Board of Directors] **(or the Board Designee (as applicable))** or the Independent Advisor (whichever is smaller).  Notwithstanding anything to the contrary herein or in the Series B Contingent Value Rights Agreement, in no event shall the CVR Issuer be required to engage an Independent Advisor more than once with respect to the Further Accelerated Relocation Payments ~~for which the~~**contemplated by a single** Further Accelerated Relocation Payments Certificate ~~was delivered~~.  The CVR Issuer shall bear fifty percent (50%) of the cost and expense of the Independent Advisor (the "Independent Advisor Costs") and the other fifty percent (50%) of the Independent Advisor Costs shall be borne *pro rata* by the Holders (with such portion of the costs and expenses to be offset against the amount payable to Holders hereunder).  For the avoidance of doubt, in no instance shall any Holder be required to pay for its respective allocation of the Independent Advisor Costs other than by offset against the amounts payable to such Holder hereunder.

(d)      The Further Accelerated Relocation Payments Certificate, as modified to incorporate any comments pursuant to the prior paragraph (if applicable), is hereinafter referred to as a "Final Further Accelerated Relocation Payments Certificate".  Within [five (5)] Business Days following the completion of any Final Further Accelerated Relocation Payments Certificate,

the CVR Issuer shall distribute an amount of cash equal to the amount of the Further Accelerated Relocation Payments set forth in such certificate that constitute Initial Further Accelerated Relocation Payments (net of the Holders' portion of any costs and expenses of an Independent Advisor, if any) to the Rights Agent, for payment to the Holders in accordance with Section 2.6. For the avoidance of doubt, no Further Accelerated Relocation Payments that constitute Subsequent Further Accelerated Relocation Payments shall be distributed to Holders under this Agreement.

(e)     The CVR Issuer shall use commercially reasonable efforts to provide the Independent Advisor such information, cooperation and access as the Independent Advisor may reasonably request in connection with Section 2.5(c) (subject to customary confidentiality restrictions and access letters).

(f)     [In the event any examination or audit with respect to Tax issues results in an increase to a Tax Cost following the payment of any Initial Further Accelerated Relocation Payment **to the Holders**, such increase in Tax Cost shall reduce any future payment **to Holders** with respect to the Series A CVRs, and such reduction in future payment shall be the [sole] remedy for the CVR Issuer resulting from any such increase to a Tax Cost.  In the event any examination or audit with respect to Tax issues results in a decrease to a Tax Cost following the payment of any Initial Further Accelerated Relocation Payment **to the Holders**, such decrease in Tax Cost shall result in an increase in any future payments **to Holders** with respect to the Series A CVRs, and such increase shall be the sole remedy for any Holder resulting from any such decrease to a Tax Cost.]

Section 2.6     Payments of Series A CVR Payment Amount.  Within [five (5)] Business Days following receipt of any cash from the CVR Issuer for payment to the Holders (each, a "Series A CVR Payment Amount"), including pursuant to Section 2.5(d), **Section 2.5(f), and** Section 2.13 and [Section 2.14], the Rights Agent shall pay the applicable *pro rata* share of such Series A CVR Payment Amount to (a) each Holder holding its Series A CVRs directly on the Series A CVR Register (i) by check mailed to the address of such Holder as reflected on the Series A CVR Register as of the close of business on the last Business Day prior to such date or (ii) if such Holder is due a *pro rata* share of the Series A CVR Payment Amount in excess of ten thousand dollars ($10,000) and has provided the Rights Agent with wire transfer instructions in writing, by wire transfer of immediately available funds to the account specified in such instructions, and (b) Beneficial Owners of the Series A CVRs holding through their respective DTC Participants by sending a lump payment to DTC in respect of all such Series A CVRs.  The Rights Agent shall have no responsibilities whatsoever with regard to the distribution of payments by DTC to such Beneficial Owners.  The *pro rata* share of each Series A CVR Payment Amount due to each Holder shall be determined by multiplying the Series A CVR Payment Amount by a fraction (A) the numerator of which is the total number of Series A CVRs owned by such Holder on the Series A CVR Payment Date **(or any record date established by the CVR Issuer in accordance with this Agreement)** and (B) the denominator of which is the total number of Series A CVRs Outstanding on the Series A CVR Payment Date **(or such record date, as applicable)**.

Section 2.7     Record Date.  The CVR Issuer may set a record date for purposes of determining the identity of Holders entitled to (i) receive the Series A CVR Payment Amount or (ii) vote or consent to any action by vote or consent authorized or permitted under this CVR Agreement.

The record date with respect to any Series A CVR Payment shall be at least three (3**) Business Days prior to the Series A CVR Payment Date and no more than ten (10**) Business Days prior to the Series A CVR Payment Date.  If not set by the CVR Issuer prior to the first solicitation of a Holder of CVRs made by any Person in respect of any such action, or, in the case of any such vote, prior to such vote, the record date for such action shall be the later of ten (10) days prior to the first solicitation of such consent or the date of the most recent list of Holders furnished to the Rights Agent prior to such solicitation.  If a record date is fixed, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to receive the Series A CVR Payment Amount or take such action by vote or consent, whether or not such Persons continue to be Holders after such record date.  No such vote or consent shall be valid or effective if taken or made more than one hundred twenty (120) days after such record date.  The CVR Issuer shall provide Holders at least ~~ten (10)~~ Business Days' notice of any record date set pursuant to this Section 2.7.

Section 2.8     Payments on Series A CVRs.

(a)     The Rights Agent shall deduct and withhold, or cause to be deducted or withheld, from any amount payable pursuant to this Agreement, such amounts as are required to be deducted and withheld with respect to such payment under the Tax Code or any provision of state, local or foreign Tax Law; *provided*, that the Rights Agent shall (i) notify the relevant payee of any required withholding no later than five (5) ~~b~~**B**usiness ~~d~~**D**ays in advance of the date of the relevant payment, (ii) reasonably cooperate with such payee and its Affiliates in obtaining any available exemption or reduction, of, or otherwise minimizing, such withholding, and (iii) provide such payee with receipts from the relevant Governmental Authority evidencing the receipt of such deducted or withheld amount.  To the extent that amounts are so withheld and paid over to or deposited with the relevant Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Holder in respect of which such deduction and withholding was made.  The Rights Agent shall be entitled to solicit any appropriate forms or information, from Holders in order to determine the amount of such withholding, if any, and shall cooperate with the Holders to mitigate or eliminate any such withholding to the extent permitted by applicable law.

(b)     Neither the CVR Issuer nor the Rights Agent shall be liable to any Person in respect of the Series A CVR Payment Amount delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.  If, despite the CVR Issuer's and/or the Rights Agent's commercially reasonable efforts to deliver the Series A CVR Payment Amount to the applicable Holder, such Series A CVR Payment Amount has not been paid prior to two (2) years after the Series A CVR Payment Date (or immediately prior to such earlier date on which such Series A CVR Payment Amount would otherwise escheat to or become the property of any Governmental Authority), such Series A CVR Payment Amount shall, to the extent permitted by applicable Law, become the property of the CVR Issuer, free and clear of all claims or interest of any Person previously entitled thereto.

Section 2.9     No Voting, Dividends or Interest; No Equity or Ownership Interest in the CVR Issuer.

(a)      Neither the Holders (by virtue of their ownership of the Series A CVRs) nor the Series A CVRs shall have any rights common to stockholders of the CVR Issuer, including voting and dividend rights.  The Series A CVRs shall not represent an equity or ownership interest in the CVR Issuer or the Equity Issuer.

(b)      Except as set forth in Section 2.13 with respect to the Initial Distribution Escrow Funds, interest shall not accrue on any amounts that may be payable to a Holder.

(c)      Except as expressly set forth in this Agreement, the Series A CVRs shall not (i) be subject to any mandatory or optional redemption rights by the Holders or the CVR Issuer or the Reorganized Debtors, (ii) mature or trigger any right to payment by the Holders or the Reorganized Debtors in any amount or on any specific date, or (iii) be convertible into or exchangeable for any security or other interest in the CVR Issuer or the Reorganized Debtors.

Section 2.10      Ability to Abandon Series A CVR; CVR Issuer Acquisition of Series A CVRs.  A Holder may at any time, at such Holder's option, abandon all of such Holder's remaining rights in a Series A CVR by transferring such Series A CVR to the CVR Issuer without consideration therefor and such Series A CVR shall be cancelled and shall not be considered Outstanding for any purposes under this Agreement.  Nothing in this Agreement shall prohibit the CVR Issuer or any of its ~~a~~Affiliates from offering to acquire or acquiring any Series A CVRs for consideration from the Holders, in private transactions or otherwise, in its sole discretion.

Section 2.11      Expiration of Series A CVRs.  Each Series A CVR shall expire on the Termination Date without any further action of the CVR Issuer or any Holder and all rights of Holders hereunder shall immediately terminate upon such expiration other than the right to receive any Series A CVR Payment Amount for which, prior to the occurrence of the Termination Date:  (x) the CVR Issuer has received Initial Further Accelerated Relocation Payments, but (y) such Initial Further Accelerated Relocation Payments have not been distributed to Holders.

Section 2.12      Maximum Series A Payment Amount; No Distribution Until Satisfaction of Minimum Payment Condition.  The aggregate amount distributed in respect of the Series A CVRs ~~(including, for the avoidance of doubt, any cash distributed on account of Pre-Effective Date Further Accelerated Relocation Payments)~~ shall not exceed $65,000,000.  For the avoidance of doubt:  (a) no amounts shall be paid to the Holders under this Agreement until the Minimum Payment Condition has been satisfied; and (b) no amounts counted towards satisfaction of the Minimum Payment Condition shall ~~constitute Applicable Consideration or~~ be distributed under this Agreement.

Section 2.13      Escrow of Additional Acceleration Contract Consideration.  In the event that the Minimum Payment Condition has not been satisfied and the Applicable Intelsat Recipients actually receive cash consideration (that would, upon satisfaction of the Minimum Payment Condition, constitute Initial Further Accelerated Relocation Payments) pursuant to an Additional Acceleration Contract, then ~~such Applicable Intelsat Recipients~~**the CVR Issuer** shall deposit, or cause to be deposited (the "Initial Distribution Escrow Deposits"), within sixty (60) days of receipt of such cash consideration, into the Initial Distribution Escrow Account, an amount of cash equal to the amount of cash that the CVR Issuer would have been required to pay to the Holders pursuant to this Agreement had the Minimum Payment Condition been satisfied at the time such Applicable

Intelsat Recipients received such cash consideration (as determined in good faith by the Board of Directors).  In the event that the Minimum Payment Condition is satisfied prior to the Termination Date, the CVR Issuer shall promptly deliver written instructions to the ~~e~~**E**scrow ~~a~~**A**gent to release (a) any Initial Distribution Escrow Funds that constitute Initial Further Accelerated Relocation Payments (together with any interest accrued thereon, but reduced by the cost and expense of the Initial Distribution Escrow Account) to be distributed to the Rights Agent for further distribution to the Holders pursuant to <u>Section 2.6</u> and, (b) after giving effect to the foregoing release, any remaining Initial Distribution Escrow Funds to the CVR Issuer.  In the event that the Minimum Payment Condition is not satisfied prior to the Termination Date, the CVR Issuer shall promptly cause all remaining Initial Distribution Escrow Funds to be released to the CVR Issuer.¶

~~Section 2.14~~    ~~[Payment of Pre-Effective Date Further Accelerated Relocation Payments. On the Effective Date, the CVR Issuer shall distribute an amount of cash equal to $[●] (the "Pre-Effective Date Further Accelerated Relocation Payments") to the Rights Agent, for payment to the Holders in accordance with Section 2.6.~~ *~~For the avoidance of doubt, the~~* ~~amount of the Pre-Effective Date Further Accelerated Relocation Payments constitute Further Accelerated Relocation Payments and shall count towards the limitations specified in the definition thereof.]~~

## ARTICLE III
## THE RIGHTS AGENT

Section 3.1    <u>Certain Duties and Responsibilities</u>.  The Rights Agent shall not have any liability for any actions taken or not taken in connection with this Agreement, except to the extent of its fraud, willful misconduct, or gross negligence.

Section 3.2    <u>Certain Rights of Rights Agent</u>.  The Rights Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations may be read into this Agreement against the Rights Agent.  In addition:

(a)    the Rights Agent may rely and shall be protected and held harmless by the CVR Issuer in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    whenever the Rights Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Rights Agent may rely upon an Officer's Certificate, which certificate shall be full authorization and protection to the Rights Agent, and the Rights Agent shall, in the absence of fraud, gross negligence or willful misconduct of the Rights Agent or any of its Affiliates, incur no liability to anyone and shall be held harmless by the CVR Issuer for or in respect of any action taken, suffered or omitted to be taken by it under the provisions of this Agreement in reliance upon such certificate;

(c)    the Rights Agent may at any time consult with legal counsel satisfactory to it, and the Rights Agent shall incur no liability or responsibility to the CVR Issuer or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such counsel;

¶

(d)      the permissive rights of the Rights Agent to do things enumerated in this Agreement may not be construed as a duty;

(e)      the Rights Agent shall not be required to give any note or surety in respect of the execution of such powers or otherwise in respect of the premises;

(f)      the Rights Agent shall not be liable for or by reason of, and shall be held harmless by the CVR Issuer with respect to, any of the statements of fact or recitals contained in this Agreement or be required to verify the same, but all such statements and recitals are and shall be deemed to have been made by the CVR Issuer only;

(g)      the Rights Agent shall have no liability and shall be held harmless by the CVR Issuer in respect of the validity of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Rights Agent and the enforceability of this Agreement against the Rights Agent assuming the due execution and delivery hereof by the CVR Issuer); nor shall it be responsible for any breach by the CVR Issuer of any covenant or condition contained in this Agreement;

(h)      the CVR Issuer agrees to indemnify the Rights Agent for, and hold the Rights Agent harmless against, any loss, liability, claim, demands, suits or expense arising out of or in connection with the Rights Agent's duties under this Agreement, including the reasonable costs and expenses of defending the Rights Agent against any claims, charges, demands, suits or loss, unless such loss has been determined by a court of competent jurisdiction to be a result of the Rights Agent's fraud, gross negligence, or willful misconduct;

(i)      the CVR Issuer agrees (i) to pay the fees and expenses of the Rights Agent in connection with this Agreement as agreed upon in writing by the Rights Agent and the CVR Issuer on or prior to the date hereof, which agreement is set forth in [●],2021 letter agreement between the CVR Issuer and the Rights Agent (email being sufficient) and (ii) to reimburse the Rights Agent for all Taxes and governmental charges, reasonable and documented out-of-pocket expenses incurred by the Rights Agent in the execution of this Agreement (other than Taxes imposed on or measured by the Rights Agent's net income and franchise or similar Taxes imposed on it).  The Rights Agent shall also be entitled to reimbursement from the CVR Issuer for all reasonable and necessary out-of-pocket expenses paid or incurred by it, including reasonable legal fees of counsel, in connection with the administration and enforcement by the Rights Agent of its duties hereunder;

(j)      no provision of this Agreement shall require the Rights Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of its rights if there shall be reasonable grounds for believing that repayment of such funds or adequate indemnification against such risk or liability is not reasonably assured to it; and

(k)      no Holder shall be obligated to indemnify the Rights Agent for any services or actions under this Agreement and the Rights Agent shall not be entitled to deduct any sums from the Series A CVR Payment Amount in any circumstance except as provided in Section 2.8(a).

Section 3.3        Resignation and Removal; Appointment of Successor.

(a)        The Rights Agent may resign at any time by giving written notice thereof to the CVR Issuer specifying a date when such resignation shall take effect, which notice shall be sent at least sixty (60) days prior to the date so specified but in no event shall such resignation become effective until a successor Rights Agent has been appointed.  The CVR Issuer has the right to remove the Rights Agent at any time by a Board Resolution specifying a date when such removal shall take effect but no such removal shall become effective until a successor Rights Agent has been appointed.  Notice of such removal shall be given by the CVR Issuer to the Rights Agent, which notice shall be sent at least sixty (60) days prior to the date so specified.

(b)        If the Rights Agent provides notice of its intent to resign, is removed pursuant to Section 3.3(a) or becomes incapable of acting, the CVR Issuer shall, as soon as is reasonably practicable, appoint a qualified successor Rights Agent who, unless otherwise consented to in writing by the Majority of Holders, shall be a stock transfer agent of national reputation or the corporate trust department of a commercial bank of national reputation.  The successor Rights Agent so appointed shall, forthwith upon its acceptance of such appointment in accordance with Section 3.4, become the successor Rights Agent.

(c)        Promptly upon the delivery of any notice of resignation of a Rights Agent, removal of a Rights Agent or appointment of a successor Rights Agent, the CVR Issuer shall give notice of each such resignation and each such removal of a Rights Agent and each such appointment of a successor Rights Agent by mailing written notice of such event by first-class mail to the Holders as their names and addresses appear in the Series A CVR Register.  Each notice shall include the name and address of the successor Rights Agent.  If the CVR Issuer fails to send such notice within fifteen (15) days after acceptance of appointment by a successor Rights Agent in accordance with Section 3.4, the successor Rights Agent, within fifteen (15) days of such failure, shall cause the notice to be mailed at the expense of the CVR Issuer.

Section 3.4        Acceptance of Appointment by Successor.  Every successor Rights Agent appointed pursuant to Section 3.3(b) hereunder shall execute, acknowledge and deliver to the CVR Issuer and to the retiring Rights Agent an instrument accepting such appointment and a counterpart of this Agreement, and thereupon such successor Rights Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Rights Agent.  On request of the CVR Issuer or the successor Rights Agent, the retiring Rights Agent shall execute and deliver an instrument transferring to the successor Rights Agent all the rights, powers and trusts of the retiring Rights Agent.

**ARTICLE IV**
**COVENANTS**

Section 4.1        List of Holders.  The CVR Issuer shall furnish or cause to be furnished to the Rights Agent the names and addresses of the Direct Owners no later than ten (10) Business Days after the CVR Issuer receives notice of such Direct Owners' names and addresses**; *provided, that, notwithstanding* the foregoing, the CVR Issuer shall have no obligations pursuant to this sentence** *if the only Direct Owner is Cede & Co. at the Effective Date*.  The Rights Agent shall reflect such names and addresses on the Series A CVR Register and confirm the write up of the

Series A CVR Register and list of initial Direct Owners to the CVR Issuer promptly thereafter and, in any event, within five (5) Business Days of the receipt of such names and addresses from the CVR Issuer. ~~Notwithstanding~~ *the foregoing, the CVR Issuer shall have no obligations* ~~under this Section 4.1~~ *if the only Direct Owner is Cede & Co. at the Effective Date*.

Section 4.2     Efforts to Obtain Further Accelerated Relocation Payments.   The CVR Issuer and the Equity Issuer shall use commercially reasonable efforts to:

(a)     obtain Further Accelerated Relocation Payments; *provided* that this Section 4.2 shall not affect the requirement that no Further Accelerated Relocation Payments shall exist unless the Minimum Payment Condition has been satisfied; and

(b)     in the event Further Accelerated Relocation Payments are actually received by an Entity other than the CVR Issuer, implement such intercompany transactions as may be necessary in order for the CVR Issuer to satisfy its obligations under this Agreement.

Section 4.3     Nonassignability.   The Equity Issuer and the CVR Issuer shall not, and shall cause all of their applicable ~~controlled~~ Affiliates not to, assign the right to rec~~ei~~eve any consideration that would constitute Further Accelerated Relocation Payments to any Person unless such Person is an Affiliate and such assignment is made pursuant to Section 8.3.

**ARTICLE V
AMENDMENTS**

Section 5.1     Amendments without Consent of Holders.

(a)     Without the consent of any Holders or the Rights Agent, the CVR Issuer and the Equity Issuer (if such amendment would implicate a term of this Agreement applicable to the Equity Issuer) may enter into one or more amendments hereto, for any of the following purposes:

(i)     to evidence the succession of another Person to the CVR Issuer and the assumption by any such successor of the covenants of the CVR Issuer herein as provided in and subject to conformity with Section 8.3;

(ii)     to cure any ambiguity, to correct or supplement any provision herein that may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement; *provided* that, in each case, such provisions do not adversely affect the interests of any Holder without such adversely affected Holder's prior written consent;

(iii)     to evidence the succession of another Person as a successor Rights Agent and the assumption by any such successor of the covenants and obligations of the Rights Agent herein in accordance with Section 3.3 and Section 3.4; or

(iv)     any other amendments hereto, unless such amendment is adverse to the interests of any Holder (in which case such amendment shall not be effective against such adversely affected Holder without such adversely affected Holder's prior written consent but shall be effective against all of the other Holders who are not adversely affected).

(b)      If and only if a Holder agrees to renounce such Holder's rights under this Agreement in accordance with Section 2.10, without the consent of any other Holders, the CVR Issuer, the Equity Issuer and the Rights Agent, in the Rights Agent's sole and absolute discretion, at any time and from time to time, may enter into one or more amendments hereto, to reduce the number of Series A CVRs by the number of Series A CVRs renounced by such Holder in accordance with Section 2.10.

(c)      Promptly after the execution by the CVR Issuer and the Rights Agent of any amendment pursuant to the provisions of this Section 5.1, the CVR Issuer shall mail (or cause the Rights Agent to mail) a notice thereof by first class mail to the Holders at their addresses as they appear on the Series A CVR Register, setting forth such amendment.

Section 5.2      Amendments with the Consent of the Equity Issuer Board and Holders.

(a)      With the prior written consent of the Majority of Holders (whether evidenced in writing or taken at a meeting of the Holders), the CVR Issuer (when authorized by a Board Resolution that has been adopted by at least three (3) of four (4) of the Chief Executive Officer and the Minority Directors (as defined in the Shareholders Agreement)), the Equity Issuer, and the Rights Agent may enter into one or more amendments hereto for the purpose of adding, eliminating or changing any provisions of this Agreement,  provided that no such amendment may (i) disproportionately (when compared with other Holders), materially, and adversely affect the rights of any Holder, or (ii) impair any Holder's right to receive payment when required or in the amount required pursuant to this Agreement, in each case, without the prior written consent of such affected Holder.

(b)      Promptly after the execution by the CVR Issuer, the Rights Agent, and, if applicable, the Equity Issuer of any amendment pursuant to the provisions of this Section 5.2, the CVR Issuer shall mail (or cause the Rights Agent to mail) a notice thereof by first class mail to the Holders at their addresses as they appear on the Series A CVR Register, setting forth such amendment.

Section 5.3      Effect of Amendments.  Upon the execution of any amendment under this Article V, this Agreement shall be modified in accordance therewith, such amendment shall form a part of this Agreement for all purposes and the CVR Issuer, the Equity Issuer, the Rights Agent, and every Holder shall be bound thereby.

## ARTICLE VI
## REMEDIES OF THE RIGHTS AGENT ON EVENT OF DEFAULT

Section 6.1      Event of Default.  "Event of Default" with respect to the Series A CVRs, means each one of the following events which shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of Law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)      default by the CVR Issuer in failing to distribute to the Rights Agent a payment when required pursuant to Section 2.5(d), **Section 2.5(f), and** Section 2.13 and [Section 2.14], and continuance of such default for a period of [thirty (30) days] after there has been given, by

registered or certified mail, to the CVR Issuer and the Equity Issuer by the Rights Agent or to the CVR Issuer and the Rights Agent by any Holder, a written notice specifying such default or breach and requiring it to be remedied; or

(b)      material default in the performance, or material breach in any material respect, of any covenant or warranty of the CVR Issuer or Equity Issuer in respect of the Series A CVRs, and continuance of such default or breach for a period of thirty (30) days after there has been given, by registered or certified mail, to the CVR Issuer and the Equity Issuer by the Rights Agent or to the CVR Issuer and the Rights Agent by the Majority of Holders, a written notice specifying such default or breach and requiring it to be remedied.

Section 6.2      Collection by the Rights Agent; Payment Obligations.

(a)      The Rights Agent may, and upon written request of the Majority of Holders, shall, proceed to protect and enforce its rights and the rights of the Holders by such appropriate judicial proceedings as the Rights Agent shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Agreement or in aid of the exercise of any power granted herein, or to enforce any other remedy.

(b)      In case the CVR Issuer shall fail forthwith to pay any amounts due following an Event of Default, any Holder (at its own cost) and the Rights Agent may, and upon written request of the Majority of Holders the Rights Agent shall, institute any action or proceedings at Law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceedings to judgment or final decree, and may enforce any such judgment or final decree against the CVR Issuer or other obligor upon such Series A CVRs and collect in the manner provided by Law out of the property of the CVR Issuer or other obligor upon such Series A CVRs, wherever situated, the moneys adjudged or decreed to be payable; *provided however,* concurrently with any such written request, the Majority of Holders shall also provide indemnification to the Rights Agent in form and substance reasonably satisfactory to the Rights Agent.

(c)      Nothing herein contained shall be deemed to authorize the Rights Agent to authorize or consent to or vote for or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Series A CVRs, or the rights of any Holder thereof, or to authorize the Rights Agent to vote in respect of the claim of any Holder in any such proceeding.

(d)      All rights of action and of asserting claims under this Agreement, or under any of the Series A CVRs, may be enforced by the Rights Agent without the possession of any of the Series A CVRs or the production thereof and any trial or other proceedings instituted by the Rights Agent hereunder, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Rights Agent, each predecessor Rights Agent and their respective agents and attorneys, shall be for the ratable benefit of the Holders.

(e)      In any proceedings brought by the Rights Agent (and also any proceedings involving the interpretation of any provision of this Agreement to which the Rights Agent shall be a party) the Rights Agent shall be held to represent all the Holders, and it shall not be necessary to make any Holders parties to any such proceedings.

Section 6.3        [Application of Proceeds.  Any monies collected by the Rights Agent pursuant to this Article VI in respect of the Series A CVRs shall be applied in the following order at the date or dates fixed by the Rights Agent in connection therewith:

> FIRST:  To the payment of costs and expenses (including fees and costs incurred by the Rights Agent and its reasonable attorney's fees) incurred by the Rights Agent in connection with the exercise of its rights under Section 6.2 in respect of which monies have been collected, except as a result of its willful misconduct, fraud or gross negligence; and

> SECOND:  To the payment of the whole amount then owing and unpaid upon all the Series A CVRs and in case such monies shall be insufficient to pay in full the whole amount so due and unpaid upon the Series A CVRs, then to the payment of such amounts without preference or priority of any Series A CVR over any other Series A CVR, ratably to the aggregate of such amounts due and payable.]

Section 6.4        Delay or Omission Not Waiver of Default.  No delay or omission of the Rights Agent or of any Holder to exercise any right or power accruing upon any Event of Default occurring and continuing as aforesaid shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein; and every power and remedy given by this Agreement to the Rights Agent or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Rights Agent or by the Holders in accordance with the terms of this Agreement.

## ARTICLE VII
## INFORMATION AND CONFIDENTIALITY

Section 7.1        Reporting and Disclosure.  ¶

(a)        Subject to Section 7.2, Holders (other than Holders that are Competitors) shall be entitled to receive from the EquityCVR Issuer the following information until the EquityCVR Issuer becomes subject to the reporting requirements of the Exchange Act: [(i) within [●]65 days ([●]or 150 days in the case of the first fiscal quarter containing the Effective Date and 90 days in the case of the first full fiscal quarter after the Effective Date occurs) after the end of each of the first three fiscal quarters *ending after the Effective Date) following the conclusion* of each *of the* Equity Issuer's fiscal quartersyear (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal quarter ending after the Effective Date, quarterly unaudited consolidated financial statements of the EquityCVR Issuer and its Subsidiaries; and (ii) within [●]120 days ([●]or 135 days in the case of the first threefiscal year *ending after the Effective Date) following the conclusion* of each *of the* CVR Issuer's fiscal quartersyears ending after the Effective Date) days after (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the end of eachfirst fiscal year ending *after the Effective Date*, annual audited consolidated financial statements of the EquityCVR Issuer and its Subsidiaries].  Promptly after the initial report to Holders that is furnished *after the Effective Date* (clauses (i) and (ii) collectively, the "Financial Statements"); and (iii) the information if, as and when provided to the noteholders or trustee, as applicable, pursuant to Section 3.10(a) of the immediately preceding sentence, the Equity Issuer will use *commercially*

¶

~~reasonable efforts~~**New Indenture (or any substantially similar provision in connection with any amendment to the New Indenture or any refinancing indebtedness thereof), including, for the avoidance of doubt, the Financial Statements; *provided, however,* that if the CVR Issuer files the Financial Statements described in this Section 7.1(a) with the Securities and Exchange Commission, the requirement** to ~~furnish~~**deliver** the ~~business and financial reporting so that common shares of~~**Financial Statements pursuant to clauses (i) and (ii) shall be deemed satisfied. For the avoidance of doubt, the CVR Issuer may satisfy its obligations pursuant to this Section 7.1 with respect to financial information relating to the CVR Issuer by furnishing financial information relating to one of its direct or indirect parent entities which wholly owns** the ~~Equity~~**CVR** Issuer**; *provided* that the same is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent entity and its Subsidiaries, on the one hand, and the information relating the CVR Issuer and its Subsidiaries on a standalone basis, on the other hand. For the avoidance of doubt, reconciliation information that** may be ~~quoted~~**provided** pursuant to ~~the requirements of Rule 15c2-11 of the Exchange Act (the "Public Side Financial Reporting") and will thereafter use commercially reasonable efforts to maintain compliance with such requirements. Reasonably promptly~~**Section 3.10(a) of the New Indenture (or any substantially similar provision in connection with any refinancing indebtedness thereof) will be deemed to satisfy the foregoing sentence and the consolidating information referred to in the proviso in the preceding sentence need not be audited. Promptly** following the release of each of the quarterly unaudited financial statements, the ~~Equity~~**CVR** Issuer **or one of its Affiliates** will provide a video and/or a telephonic presentation (which may be a single presentation held together with other securityholders or holders of indebtedness of the ~~Equity~~**CVR** Issuer and its Affiliates) to the **Holders and their respective partners (including limited partners except for any Competitors), shareholders, members,** directors, officers, ~~members,~~ managers, employees, ~~affiliates, and agents~~**financing sources (including existing and bona fide prospective investors except for any Competitors), agents, counsel, accountants, consultants, investment advisors or other professionals or representatives, or its Affiliates or wholly owned subsidiaries** (collectively, "Representatives") ~~of Holders~~ to discuss the **CVR Issuer's (or the** Equity Issuer's **or the Affiliate producing such reporting pursuant to Section 7.1 hereto)** financial condition and results of operations, following which presentation the ~~Equity~~**CVR** Issuer will allow the Representatives of Holders to ask reasonable questions. Any participant in quarterly calls (including bona fide potential transferees permitted in accordance with the terms hereof) (A) shall not be a Competitor of the ~~Equity~~**CVR** Issuer and each Holder hereby represents and warrants to the same as to itself, its Representatives and its bona fide potential transferees that participate in such calls, and (B) shall be subject to Section 7.2; *provided,* that each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of Section 7.2 if such Representative or recipient were party to this Agreement. With respect to any recipient who is a bona fide potential transferee of ~~Equity Issuer's common stock~~**Series A CVRs**, the applicable Holder must first comply with Section 7.2 prior to sharing any such information. ¶

**(b)      The Company shall use commercially reasonable efforts to promptly post all information required by Section 7.1(a) on a website (which may be nonpublic, require a confidentiality acknowledgement, with such acknowledgement being deemed to satisfy the requirement for a non-disclosure agreement as set forth in Section 7.2 and shall be maintained, using** *commercially reasonable efforts***, by the CVR Issuer or a third party) (the "Holder Website") to which access will be given to the Holders and bona fide prospective**

¶

**investors or bona fide potential transferees (with the exception of Competitors) in the Series A CVRs.**

Section 7.2     Confidentiality.  The Right Agents and Holders hereby agree that any confidential or non-public information they receive **pursuant to this Agreement** from or on behalf of the ~~Equity~~**CVR** Issuer or any Affiliate of the ~~Equity~~**CVR** Issuer**, including the Financial Statements and any information actually provided pursuant to Section 7.1(a)(iii),** (the "Confidential Information"), shall: (a) not be used for any purpose other than for purposes permitted under this Agreement; (b) not be used directly or indirectly in any way that is for competitive purposes; and (c) be kept confidential by, and not be disclosed by, such Rights Agent and the Holders and its Representatives; *provided*, *however*, that any such Confidential Information may be disclosed only to their Representatives who (i) need to know such Confidential Information and (ii) are bound in writing to a non-disclosure agreement no less restrictive than this Section 7.2 **or are otherwise made aware of the confidentiality obligations set forth in this Section 7.2**.  It is understood that such Representatives shall be informed by the Rights Agent or the applicable Holder of the confidential nature of such Confidential Information, and such Rights Agent or Holder, as applicable, shall be responsible for any disclosure or use made by its Representatives in breach of obligations under this Agreement to the same extent as if such disclosure or use had been made directly by the Rights Agent or such Holder, as applicable. "Confidential Information" shall not include any information that is (i) publicly available other than because of a breach of this Section 7.2 by the Rights Agent or the Holders or any of their respective Representatives or (ii) is lawfully disclosed to the Rights Agent or Holders by sources (other than the ~~Equity~~**CVR** Issuer or its Affiliates) rightfully in possession of the Confidential Information.  If the Rights Agent, Holders or their respective Representatives are legally required or requested to disclose any Confidential Information, they shall in advance of such disclosure, unless otherwise prohibited by Law, promptly notify the ~~Equity~~**CVR** Issuer of such request or requirement so that ~~Equity~~**the CVR** Issuer may seek to avoid or minimize the required disclosure and/or obtain an appropriate protective order or other appropriate relief to ensure that any Confidential Information so disclosed is maintained in confidence to the maximum extent possible by the Person receiving the disclosure, or, in the ~~Equity~~**CVR** Issuer's discretion, to waive compliance with the provisions of this Agreement.  In any such case, the Rights Agent and the Holders agree to cooperate and use commercially reasonable efforts to avoid or minimize the required disclosure and/or obtain such protective order or other relief.  If, in the absence of a protective order or the receipt of a waiver hereunder, the Rights Agent, Holders or their respective Representatives are legally obligated to disclose any Confidential Information, they shall disclose only so much thereof to the party compelling disclosure as they believe in good faith, on the basis of advice of counsel, is required by Law.  The Rights Agent or the Holder, as applicable, shall give the ~~Equity~~**CVR** Issuer prior written notice of the specific Confidential Information that they believe they are required to disclose under such circumstances.  All Confidential Information disclosed by or on behalf of the ~~Equity~~**CVR** Issuer or any of its Affiliates shall be, and shall remain, the property of the ~~Equity~~**CVR** Issuer or such Affiliate.  For the avoidance of doubt, a Person which ceases to be a Holder shall continue to be subject to this Section 7.2 with respect to any Confidential Information received by such Holder or its Representatives under this Agreement for [   ]**12** months [after ~~receiving such Confidential Information~~][ceasing to be a Holder, at which point such Person will no longer be subject to this Section 7.2.

**ARTICLE VIII**
**OTHER PROVISIONS OF GENERAL APPLICATION**

Section 8.1       <u>Notices to Rights Agent, the CVR Issuer and the Equity Issuer</u>.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed given when delivered in person, by overnight courier, by electronic mail, or two (2) Business Days after being sent by registered or certified mail (postage prepaid, return receipt requested), as follows:

If to the Rights Agent, to it at:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attn: Corporate Actions /Intelsat CVR

Email: reorg_rm@astfinancial.com

*with a copy (which shall not constitute notice) to:*

American Stock Transfer & Trust Company, LLC
48 Wall Street, 22nd Floor
New York, NY 10005
Attention: Legal Department
Email: legalteamAST@astfinancial.com

If to the CVR Issuer or the Equity Issuer, to it at:

**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**
**4, rue Albert Borschette**
**L-1246 Luxembourg, Grand Duchy of Luxembourg**
Attention:       **Legal Department**
Email:       **Michelle.Bryan@Intelsat.com**

*with a copy (which shall not constitute notice) to:*

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:    Edward O. Sassower, P.C.
              Steven N. Serajeddini, P.C.
              Aparna Yenamandra
Email:        Edward.Sassower@Kirkland.com
              Steven.Serajeddini@Kirkland.com

Aparna.Yenamandra@Kirkland.com

The Rights Agent, the CVR Issuer or the Equity Issuer may specify a different address or facsimile number by giving notice in accordance with this Section 8.1.

Section 8.2    Notice to Holders.  Where this Agreement provides for notice to Holders, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Holder affected by such event, at the Holder's address as it appears in the Series A CVR Register, not later than the latest date, and not earlier than the earliest date, if any, prescribed for the giving of such notice.  In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.

Section 8.3    Successors and Assigns; Merger, Change of Control.

(a)    The CVR Issuer may assign any or all of its rights, interests and obligations hereunder to [(a) in its sole discretion and without the consent of any other party hereto, any of its Affiliates, but only (i) if the Board of Directors, including three of the four of the Chief Executive Officer and the Minority Directors (as defined in the Shareholders Agreement), **approves of such assignment to such Affiliate and the CVR Issuer** delivers to the Rights Agent ~~a Board~~**an Officer's** Certificate certifying that such Affiliate will be able to make any applicable payments pursuant to such agreement and (ii) for so long as it remains an Affiliate of the CVR Issuer,] or (b) with the prior written consent of the Majority of Holders, any other Person (any permitted assignee under clause (a) or (b), an "Assignee"), in each case, provided that the Assignee agrees to assume and be bound by all of the terms of this Agreement.  Any Assignee may thereafter assign any or all of its rights, interests and obligations hereunder in the same manner as the CVR Issuer pursuant to the prior sentence.  In connection with any assignment to an Assignee described in clause (a) above in this Section 8.3, the CVR Issuer shall agree to remain liable for the performance by each Assignee of all obligations of the CVR Issuer hereunder.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by each of the successors of the CVR Issuer and each Assignee.  Each of the successors of the CVR Issuer and Assignees shall expressly assume by an instrument supplemental hereto, executed and delivered to the Rights Agent, the due and punctual performance and observance of all of the covenants and obligations of this Agreement to be performed or observed by the CVR Issuer.  Any attempted assignment in violation of this Section 8.3 shall be void and of no effect.

(b)    The Equity Issuer and the CVR Issuer shall not consolidate, amalgamate, merge or combine with or into any other Entity in which the Equity Issuer or the CVR Issuer, as applicable, shall not be the surviving or continuing Entity in such consolidation, amalgamation, merger or combination, unless the surviving Entity in such consolidation, amalgamation, merger or combination shall assume all of the obligations of the Equity Issuer or the CVR Issuer, as applicable, under this Agreement.  This Agreement and the Series A CVRs shall survive any Change of Control.

Section 8.4    Benefits of Agreement.  Nothing in this Agreement, express or implied, shall give to any Person (other than the Rights Agent, the CVR Issuer and the Equity Issuer and their respective successors and Assignees, the Holders and their respective successors and permitted assigns) any benefit or any legal or equitable right, remedy or claim under this Agreement or under any covenant or provision herein contained, all such covenants and provisions being for the sole benefit of the foregoing.  The rights of Holders and their successors and permitted assigns are limited to those expressly provided in this Agreement.  Notwithstanding anything to the contrary contained herein, any Holder or Holder's successor or permitted assign may agree to renounce, in whole or in part, its rights under this Agreement by written notice to the Rights Agent, the CVR Issuer and the Equity Issuer, which notice, if given, shall be irrevocable

Section 8.5    Governing Law.  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.

Section 8.7    Submission to Jurisdiction.  Each party to this Agreement and each Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware) (together with the appellate courts thereof, the "Chosen Courts").  In connection with any claim arising out of or related to this Agreement, each party to this Agreement and each Holder hereby irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection that such Person may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the CVR Issuer or the Holder, (iv) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with Section 8.1, although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (v) agrees not to seek a transfer of venue on the basis that another forum is more convenient.  Notwithstanding anything herein to the contrary, each of the parties to this Agreement and each Holder agrees that any judgment issued by a Chosen Court may be recognized, recorded, registered or enforced in any jurisdiction in the world and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction.

Section 8.8    Waiver of Trial by Jury.  EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

Section 8.9    Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or

unenforceable.  The parties further agree to replace such invalid or unenforceable provision of this Agreement with a valid and enforceable provision that shall achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable provision.

Section 8.10    Counterparts and Signature.  This Agreement may be executed in two or more counterparts (including by facsimile or by an electronic scan delivered by electronic mail), each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties hereto and delivered to the other party, it being understood that the parties need not sign the same counterpart.

Section 8.11    Termination.  This Agreement and the Series A CVRs issued hereunder shall automatically terminate, without further action of any parties hereto, and be of no force or effect, and the parties hereto shall have no liabilities hereunder or with respect to any of the Series A CVRs, upon the earlier to occur of (a) the date on which Holders have received an aggregate amount equal to the maximum amount of payments on account of the Series A CVRs permitted hereunder, and (b) the later of (i) the Outside Date, and (ii) the date on which there is no obligation remaining pursuant to any Additional Acceleration Contract to pay Further Accelerated Relocation Payments to any Applicable Intelsat Recipient.  Such date that is the earlier to occur of the foregoing is referred to as the "Termination Date."

Section 8.12    Entire Agreement.  This Agreement contains the entire understanding of the parties hereto and thereto with reference to the transactions and matters contemplated hereby and thereby and supersedes all prior agreements, written or oral, among the parties with respect hereto and thereto.

Section 8.13    No Recourse.  This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties and then only in their capacities as such. Except to the extent named as a party, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present, or future direct or indirect stockholder, member, other direct or indirect equityholder, partner, manager, director, officer, employee, Affiliate or agent (collectively, the "Non-Recourse Parties") of any party to this Agreement or the Non-Recourse Parties of any Affiliate of any party to this Agreement, shall have any liability (whether in contract, tort, equity, or otherwise) for any of the covenants or agreements, or other obligations or liabilities of any of the parties under this Agreement or for any claim based upon, arising out of or related to this Agreement.  By accepting a Series A CVR, each Holder waives and releases all such liability against all Non-Recourse Parties.  The waiver and release are part of the consideration for the issue of the Series A CVRs.

Section 8.14    Conditions Precedent to Issuance of Series A CVRs.  The Series A CVRs shall not be issued prior to the satisfaction of all other conditions precedent to the effective date of the Plan (or waiver of such conditions in accordance with the terms of the Plan), including the condition precedent that the Settlement Order (as defined in the Plan) shall have been entered and not subject to any stay, and the Accelerated Relocation Payment Claims (as defined in the Plan) shall have been resolved pursuant to an order not subject to any stay, on the terms set forth in the Plan (or

such other terms that are acceptable to the Required Consenting Jackson Crossover Group Members (as defined in the Plan)).

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its duly authorized officers as of the day and year first above written.

CVR Issuer:

¶

[CVR Issuer]¶

**INTELSAT JACKSON HOLDINGS S.A.**

By: _____
Name: **José Toscano**
Title:   **Chairman and CEO**

Equity Issuer:¶

¶

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**
¶
[Equity Issuer]

By: _____
Name: **José Toscano**
Title:   **Delegate of the Board of Directors**

Rights Agent:

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC**

By: _____
Name:
Title:

32

EXHIBIT A-1


DIRECT OWNER LEGEND


TO THE EXTENT THESE SERIES A CVRS ARE SECURITIES, THESE SERIES A CVRS HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN "UNDERWRITER" AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

TO THE EXTENT THESE SERIES A CVRS ARE SECURITIES, THESE SERIES A CVRS HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH SERIES A CVRS IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE SERIES A CVRS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SERIES A CVR AGREEMENT OF [CVR ISSUER]**INTELSAT JACKSON HOLDINGS S.A.** (THE "CVR ISSUER"), DATED AS OF **FEBRUARY** [●], 20[●]**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SERIES A CVR AGREEMENT").  NO REGISTRATION OR TRANSFER OF THE CVR ISSUER MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING COMPLIANCE WITH THE SERIES A CVR AGREEMENT.

THE CVR ISSUER OR THE TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE SERIES A CVRS REPRESENTED HEREBY A COPY OF THE SERIES A CVR AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE SERIES A CVRS UPON WRITTEN REQUEST TO THE CVR ISSUER AT ITS PRINCIPAL PLACE OF BUSINESS.  THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE CVR ISSUER.


1

EXHIBIT A-2

FORM OF GLOBAL CERTIFICATE
-EVIDENCING-
SERIES A CVRS
-OF-¶

[CVR ISSUER]¶

[_____]¶

**INTELSAT JACKSON HOLDINGS S.A.**

UNLESS THIS GLOBAL CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO ~~THE   [CVR ISSUER]~~**INTELSAT JACKSON HOLDINGS S.A.** (THE "CVR ISSUER") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUIRED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE CVR ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THE SECURITIES REPRESENTED HEREBY WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "BANKRUPTCY CODE").   THE SECURITIES REPRESENTED HEREBY MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE CVR ISSUER IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CVR ISSUER AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE SERIES A CVRS REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE SERIES A CVR AGREEMENT OF THE ~~[CVR ISSUER]~~, DATED AS OF **FEBRUARY** [●], ~~20[●]~~**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SERIES A CVR AGREEMENT").   NO REGISTRATION OR TRANSFER OF SERIES A CVRS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING COMPLIANCE WITH THE SERIES A CVR AGREEMENT.   COPIES OF SUCH AGREEMENT ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE CVR ISSUER.   NO TRANSFER OF SERIES A CVRS WILL BE MADE ON THE BOOKS OF THE CVR ISSUER

1

UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE APPLICABLE TERMS OF THE SERIES A CVR AGREEMENT.

NO PERSON MAY BECOME A HOLDER OF SERIES A CVRS PURSUANT TO ANY TRANSFER OF SERIES A CVRS OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SERIES A CVR AGREEMENT.

This is to certify that CEDE & CO. is the owner and registered holder of this Certificate evidencing the ownership of the Series A CVRs set forth on the Schedule of Increases and Decreases attached hereto as <u>Schedule A</u>, each of which represents a Series A CVR.

At the request of the registered holder this Certificate may be exchanged for one or more Certificates issued to the registered holder in such denominations as the registered holder may request.

The registered holder of this Certificate is entitled at any time upon tender of this Certificate to the **CVR Issuer**, endorsed in blank or accompanied by all necessary instruments of assignment and transfer in proper form, at its principal office in **Luxembourg** and, upon payment of any tax or other governmental charges, to receive such holder's securities evidenced by this Certificate.

The CVR Issuer may deem and treat the person in whose name this Certificate is registered upon the books of the CVR Issuer as the owner hereof for all purposes and the CVR Issuer shall not be affected by any notice to the contrary.

**IN WITNESS WHEREOF**, the CVR Issuer has caused this Certificate to be executed in its name by the manual or electronic signature of one of its authorized signatories.

<div align="right">

**INTELSAT JACKSON HOLDINGS S.A.**

By: _____

**José Toscano**
**Chairman and CEO**

</div>



# SCHEDULE A
## SCHEDULE OF INCREASES AND DECREASES IN
## SERIES A CVRS

The following increases and decreases in the number of Series A CVRs evidenced by this Global Security have been made:

| Date | Amount of increases or decrease in number of Series A CVRs evidenced by this Global Security | Number of Series A CVRs evidenced by this Global Security following such increase or decrease | Signature of authorized signatory |
|------|-------|-------|-------|
|      |       |       |       |

1

## Exhibit I-1

**Series B CVR Agreement**

*Form of Execution Version*

## SERIES B CONTINGENT VALUE RIGHTS AGREEMENT

THIS SERIES B CONTINGENT VALUE RIGHTS AGREEMENT (this "Agreement") is entered into as of February [●], 2022 (the "Effective Date"), by and among (i) American Stock Transfer & Trust Company, LLC, as Rights Agent (the "Rights Agent"), (ii) Intelsat Jackson Holdings S.A., a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 149959 (the "CVR Issuer"), and (iii) solely as expressly provided herein (and, for the avoidance of doubt, not with respect to any of the provisions of Article II hereof, except Section 2.5(c)), Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 264124 (the "Equity Issuer").

## RECITALS

WHEREAS, on the Effective Date, the CVR Issuer and certain of its Affiliates emerged as the Reorganized Debtors in accordance with the Plan; and

WHEREAS, pursuant to the Plan, the Reorganized Debtors were required to issue the contingent value rights contemplated in this Agreement to certain holders of claims in exchange for their claims, on and subject to the terms contained in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the consummation of the transactions contemplated by the Plan, the CVR Issuer and Rights Agent agree, for the equal and proportionate benefit of the holders of Series B CVRs (collectively, the "Holders"), as follows:

## ARTICLE I
## DEFINITIONS; CERTAIN RULES OF CONSTRUCTION

Section 1.1    Definitions.    All capitalized terms used in this Agreement without definitions shall have the respective meanings ascribed to them in the Plan.  As used in this Agreement, the following terms shall have the following meanings:

"Accelerated Relocation Payments" means the accelerated relocation payments described in the C-Band Order that are allocated to the Debtors and/or Reorganized Debtors in an amount equal to $4,865,366,000.

"Additional Acceleration Contract" means a written contract between any of the Applicable Intelsat Recipients, on the one hand, and any Private Entity, on the other hand, that provides for the payment of Applicable Consideration, and that is entered into prior to the Outside Date.

"Affiliate" means, of any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity.  For purposes of this definition, "control," as used with respect to any Entity, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies

of such Entity, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition and Agreement, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.  Notwithstanding the foregoing, and for the avoidance of doubt, no Entity shall be an Affiliate of the Debtors, any Reorganized Debtors, the Equity Issuer, or the CVR Issuer solely because (a) it is a holder of New Common Stock of the Equity Issuer or (b) it is controlled by a holder of New Common Stock of the Equity Issuer.

"Agreement" has the meaning set forth in the Preamble.

"Allowed" has the meaning set forth in the Plan.

"Applicable Consideration" means any and all consideration, without duplication, that is actually received by any of the Applicable Intelsat Recipients, from time to time, from a Private Entity, solely to the extent such consideration is received in connection with, or directly related to, private negotiations authorized by the FCC in footnote 497 of the C-Band Order to accomplish clearing earlier than the deadlines established by the FCC in the C-Band Order of the Cleared Spectrum; *provided* that such consideration (A) shall only constitute Applicable Consideration to the extent that the Minimum Payment Condition has been satisfied (and, for the avoidance of doubt, any amounts actually received by the Applicable Intelsat Recipients and counted towards satisfaction of the Minimum Payment Condition shall not constitute Applicable Consideration), (B) shall be calculated net of, and be reduced by, any Tax Costs with respect thereto and (C) shall be reduced by all reasonable documented costs and expenses incurred by the Applicable Intelsat Recipients in seeking, obtaining or procuring such consideration (solely to the extent such costs and expenses are not reimbursed to the Applicable Intelsat Recipients through Expense Reimbursements); *provided, further,* that Applicable Consideration shall not include any portion of (w) any accelerated relocation payments provided under the C-Band Order to any other space station operator (each, an "Other FSS Operator"), including SES Americom, Inc., Eutelsat S.A., Telesat Canada, Star One S.A., or any of their respective Affiliates and subsidiaries, in the event of any consolidation, amalgamation, merger, combination or similar transaction involving the Applicable Intelsat Recipients and any of the Other FSS Operators, (x) any Expense Reimbursements, or (y) any Accelerated Relocation Payments.

"Applicable Intelsat Recipients" means (i) prior to the Effective Date, the Jackson Entities, and (ii) on and after the Effective Date, the Equity Issuer and its Affiliates.

"Assignee" has the meaning set forth in Section 8.3.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

"Beneficial Interest" means, solely for purposes of and as used in Sections 2.2, 2.3, 2.4 and 2.6 of Article II, with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Series B CVRs it Beneficially Owns.

"Beneficial Owner" means, solely for purposes of and as used in Sections 2.2, 2.3, 2.4 and 2.6 of Article II, any Person owning a securities entitlement with respect to Series B CVRs

2

registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been ultimately credited to any other Person's securities account. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.

"Board Designee" has the meaning give to such term in Section 2.5(a) hereof.

"Board of Directors" means the board of directors (or other applicable governing body) of the Equity Issuer.

"Board Resolution" means a copy of a resolution certified by a duly authorized officer of the Equity Issuer to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to Rights Agent.

"Business Day" means any day, other than a Saturday, Sunday, or other day on which commercial banks are authorized or required by law to be closed in New York, NY, USA or the Grand Duchy of Luxembourg.

"C-Band Order" means that certain Report and Order and Order of Proposed Modification issued by the FCC on March 3, 2020 in In the Matter of Expanding Flexible Use of the 3.7 to 4.2 GHz Band, GN Docket No. 18-122, as may be amended or modified with respect to the clearing of the Cleared Spectrum.

"Change of Control" means one or a series of related transactions, directly or indirectly following which: (a) a shareholder or a group of shareholders of the Equity Issuer or CVR Issuer (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), acting in concert, directly or indirectly have acquired the right to cast, at a general meeting of shareholders of the Equity Issuer or CVR Issuer, more than fifty (50) percent of the voting shares of the CVR Issuer; or (b) all or substantially all of the assets of the Equity Issuer and its Affiliates (taken as a whole and as measured by asset valuations or other fair market value determinations) are sold or otherwise disposed of (including by way of merger, purchase, amalgamation, consolidation, scheme of arrangement or other business combination transaction) in a single transaction or a series of transactions (whether or not related) to a Person other than an Affiliate of the CVR Issuer.

"Cleared Spectrum" means the 3.7-4.0 GHz band in the contiguous United States, licenses for which were auctioned by the FCC on December 8, 2020 through February 17, 2021 in Auction 107 and specifically excluding any other radio frequencies or locations outside the contiguous United States.

"Competitor" means a "Competitor of the Company" as defined in the Shareholders Agreement.

"CVR Issuer" has the meaning set forth in the Preamble.

"Debtors" means Intelsat S.A. and its affiliated debtors and debtors in possession in the chapter 11 cases jointly administered under Case No. 20-32299 (KLP).

3

"Depository Agreement" means the Blanket Issuer Letter of Representations from the CVR Issuer to DTC as the same may be amended or supplemented from time to time.

"Direct Owner" means any holder of Series B CVRs who is registered on the Series B CVR Register.

"Direct Owner Legend" means the legend on the account of each Holder of Series B CVRs held in book-entry on the Series B CVR Register in the form set forth on Exhibit A-1 hereto.

"DTC" means The Depository Trust Company or any successor thereto.

"DTC Participant" means any Person that is reflected on the books and records of DTC as having a direct interest in the Series B CVRs held of record by DTC.

"Effective Date" has the meaning set forth in the Preamble.

"Entity" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any company limited by shares, limited liability company or joint stock company), firm, society or other enterprise, association, organization or entity.

"Equity Issuer" has the meaning set forth in the Preamble.

"Escrow Agent" means American Stock Transfer & Trust Company, LLC, in its capacity as escrow agent as provided under Section 2.13.

"Event of Default" has the meaning set forth in Section 6.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Expense Reimbursements" means any and all payments received by any of the Applicable Intelsat Recipients on account of compensable relocation costs as described in the C-Band Order.

"FCC" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor Governmental Authority performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

"Financial Statements" has the meaning set forth in Section 7.1.

"Further Accelerated Relocation Payments" means any and all Applicable Consideration actually received by any Applicable Intelsat Recipient pursuant to an Additional Acceleration Contract, whether or not such Applicable Consideration is received before or after the Outside Date, not to exceed $420,000,000.  For the avoidance of doubt, the first $65,000,000 of Further Accelerated Relocation Payments are referred to as Initial Further Accelerated Relocation Payments and the remaining $355,000,000 of Further Accelerated Relocation Payments are referred to as Subsequent Further Accelerated Relocation Payments.

4

"Global Security" means the global certificate or certificates issued to DTC as provided in the Depository Agreement, each of which shall be in substantially the form attached hereto as Exhibit A-2.

"Governmental Authority" means any U.S. or non-U.S. (including Luxembourg) federal, state, provincial, local or other government or quasi-governmental, department, authority, court, tribunal, commission, instrumentality, regulatory body or self-regulatory body (including any securities exchange), or any political or other subdivision, department, agency or branch of any of the foregoing.

"Holders" has the meaning set forth in the Recitals.  A Person shall cease to be a Holder hereunder at such time as it ceases to hold, directly or indirectly, beneficial ownership of any Series B CVRs.

"Holder Website" has the meaning set forth in Section 7.1(b).

"Initial Distribution Escrow Account" means an interest-bearing escrow account established by the CVR Issuer with the Escrow Agent for the benefit of Holders.

"Initial Distribution Escrow Deposits" has the meaning set forth in Section 2.13.

"Initial Distribution Escrow Funds" means, at any time, the portion of the Initial Distribution Escrow Deposits then remaining in the Initial Distribution Escrow Account, plus all interest (if any) or other amounts earned thereon (if any).

"Initial Further Accelerated Relocation Payment" means the first $65,000,000 of any Further Accelerated Relocation Payments.

"Jackson" means Intelsat Jackson Holdings S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg.

"Jackson Entities" means, collectively, Intelsat Jackson Holdings S.A., a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 149959, and all of its direct and indirect subsidiaries, prior to the Effective Date.

"Law" means any foreign, federal, state, local or municipal laws, rules, judgments, orders, regulations, statutes, ordinances, codes, decisions, injunctions, orders, decrees or requirements of any Governmental Authority.

"Listing" means a listing of the Equity Issuer's securities resulting in the Equity Issuer being registered under Section 12(b) of the Exchange Act. "Majority of Holders" means, as of the time of determination, Holders of not less than a majority of the issued and Outstanding Series B CVRs.

"Minimum Payment Amount" means $4,865,366,000 (*i.e.*, the maximum amount of potential Accelerated Relocation Payments provided under the C-Band Order as of the Effective Date).

"Minimum Payment Condition" means that the Applicable Intelsat Recipients (on an aggregate basis) shall have actually received an aggregate amount of consideration (either (a) pursuant to the C-Band Order as Accelerated Relocation Payments, (b) from a third party as compensation for the efforts of the Applicable Intelsat Recipients to clear the Cleared Spectrum solely to the extent such consideration is in connection with or directly related to private negotiations authorized by the FCC in footnote 497 of the C-Band Order to accomplish earlier clearing than the deadlines established by the FCC in the C-Band Order of the Cleared Spectrum, or (c) a combination of consideration set forth in clauses (a) and (b) of this parenthetical) in an amount equal to the Minimum Payment Amount; provided, that (1) no amounts counted towards satisfaction of the Minimum Payment Condition shall constitute Applicable Consideration and (2) no Expense Reimbursements received by the Applicable Intelsat Recipients shall count towards satisfaction of the Minimum Payment Condition.

"New Common Stock" means ordinary shares of the Equity Issuer.

"New Indenture" means that certain indenture for 6.500% First Lien Secured Notes due 2030 dated January 27, 2022 between the CVR Issuer, the guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time.

"Non-Recourse Parties" has the meaning set forth in Section 8.13.

"Officer's Certificate" means a certificate signed by an authorized officer of the CVR Issuer, in his or her capacity as such an officer, and delivered to the Rights Agent.

"Outside Date" means the date that is the earlier of (i) the date on which the certification of accelerated relocation for Phase II of the Debtors or Reorganized Debtors, as applicable, is validated pursuant to the C-Band Order, and (ii) December 5, 2025 (or, in the case of this clause (ii), such later deadline for clearing the Cleared Spectrum as may be adopted pursuant to the C-Band Order).

"Outstanding" when used with respect to Series B CVRs means, as of the date of determination, all Series B CVRs theretofore authenticated and delivered under this Agreement, except Series B CVRs theretofore cancelled by the Rights Agent in accordance with this Agreement or delivered to the Rights Agent for cancellation in accordance with this Agreement; provided, that, for the avoidance of doubt, any Series B CVRs owned by the CVR Issuer or any Affiliate of the CVR Issuer (other than any Series B CVRs abandoned and cancelled pursuant to Section 2.10 hereof) shall be treated as Outstanding for all purposes under this Agreement, including, but not limited to, the calculation and distribution of a Series B CVR Payment Amount.

"Person" means any individual, Entity, including any Governmental Authority (or any department, agency or political subdivision thereof) and any syndicate or group that would be deemed to be a person under section 13(d)(3) of the Exchange Act.

6

"Plan" means the *Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates* filed by the Debtors on December 17, 2021 at Docket No. 3891 in Case No. 20-32299 (KLP) in the Bankruptcy Court, and confirmed by the Bankruptcy Court at Docket No. 3894 in Case No. 20-32299 (KLP), as amended, modified or supplemented.

"Private Entity" means an Entity that is not a Governmental Authority and that is not the clearinghouse appointed by the FCC contemplated by the C-Band Order or any other comparable administrative Entity selected by the FCC.  Notwithstanding the foregoing, and for the avoidance of doubt, to the extent the Applicable Intelsat Recipients enter into an Additional Acceleration Contract with a Private Entity, and the parties agree to utilize a Governmental Authority or administrative clearinghouse for processing payments earned under such Additional Acceleration Contract, such payments shall be deemed to have been made by a Private Entity.

"Rights Agent" has the meaning set forth in the Preamble or its successor and/or assigns.

"Reorganized Debtor" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

"Representatives" has the meaning set forth in Section 7.1.

"Required Consenting Holders" means, as of the time of determination, Holders of not less than 75% of the issued and Outstanding Series B CVRs."SEC" means the United States Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended.

"Series A Contingent Value Rights Agreement" means that certain Series A Contingent Value Rights Agreement, entered into as of February [●], 2022 by and among (i) American Stock Transfer & Trust Company, LLC, as rights agent, (ii) the CVR Issuer, and (iii) solely as expressly provided therein (and, for the avoidance of doubt, not with respect to any of the provisions of Article II thereof, except Section 2.5(c)), the Equity Issuer.

"Series A CVRs" means, collectively, the rights of holders to receive a contingent cash payment pursuant to the terms of that certain Series A Contingent Value Rights Agreement.

"Series A CVR Payment Condition" means that holders of the Series A CVRs have received 100% of all distributions they are entitled to receive under the Series A Contingent Value Rights Agreement.

"Series B CVRs" means, collectively, the rights of Holders to receive a contingent cash payment pursuant to the terms of this Agreement.

"Series B CVR Payment Amount" has the meaning set forth in Section 2.6.

"Series B CVR Payment Date" means any date a Series B CVR Payment Amount is paid by the Rights Agent to the Holders pursuant to Section 2.6.

"Series B CVR Register" has the meaning set forth in Section 2.4(a).

"Shareholders Agreement" means the Equity Issuer's shareholders agreement.

"Subsequent Further Accelerated Relocation Payments" means any Further Accelerated Relocation Payments that are not Initial Further Accelerated Relocation Payments, in an amount not to exceed $355,000,000.

"Subsidiary" means a Person more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the CVR Issuer or by one or more other Subsidiaries, or by the CVR Issuer and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock, shares or other equity interests (including partnership interests) which ordinarily have voting power for the election of directors, managers, general partners or trustees, whether at all times or only so long as no senior class of stock, shares or other equity interests (including partnership interests) have such voting power by reason of any contingency.

"Tax" means all taxes, customs, tariffs, imposts, levies, duties, fees or other like assessments or charges of a similar nature, however denominated, imposed by a Governmental Authority, together with all interest, penalties and additions imposed with respect to such amounts.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Tax Costs" means (i) any liability for cash Taxes of any kind imposed on or with respect to any Debtor or Reorganized Debtor to the extent attributable to Further Accelerated Relocation Payments, (ii) the tax-effected value of any utilization or decrease of any existing Tax attribute of any Debtor or Reorganized Debtor, including, but not limited to, any net operating loss or Tax credit, to the extent attributable to Further Accelerated Relocation Payments, and (iii) the tax-effected value of any decrease in the amount of any deduction or Tax attribute realized or generated by any Debtor or Reorganized Debtor, including, but not limited to, any net operating loss or Tax credit, to the extent attributable to Further Accelerated Relocation Payments, in each case, determined on a "with and without" basis with respect to any amount received by any Debtor or Reorganized Debtor, treating any Further Accelerated Relocation Payments as the last item realized in the applicable taxable period and, in the case of clauses (ii) and (iii), calculating the tax-effected value by, in the case of any Tax attribute that reduces taxable income, (A) multiplying the amount of such Tax attribute by the applicable Tax rate in the year such Further Accelerated Relocation Payment is received and (B) solely in the case of any such Tax attribute for Luxembourg Tax purposes, multiplying the product of the calculation described in clause (A) by fifty percent (50%), without regard to any projected availability of Tax attributes or credits in future years, and, in each of clauses (i)-(iii), further increased by any costs and expenses reasonably attributable to determining the amounts described in clauses (i) through (iii) and subject to appropriate adjustment provisions to account for any subsequent audit adjustment affecting such calculation subject to, and in accordance with, Section 2.5(f) hereof.  For the avoidance of doubt, for purposes of the foregoing clauses, any liability for cash Taxes of any kind, the tax-effected value of any utilization or decrease of any existing Tax attribute, and the tax-effected value of any decrease in the amount of any deduction or Tax attribute realized or generated attributable to income in respect of any escrow established in connection with this Agreement shall be treated as satisfying one or more of the foregoing clauses (i)-(iii) (in accordance with the methodology for

8

calculation set forth herein). For further clarity, the foregoing calculation shall be performed consistently with the following illustrative calculation. Assume that Further Accelerated Relocation Payments result in a net increase of $100 of overall taxable income, of which $85 is allocable to Luxembourg and $15 is allocable to the United States, that the relevant Luxembourg income tax rate in the applicable tax period is 24.9%, and that the relevant United States income tax rate in the applicable period is 24% (on a combined federal/state basis). With respect to the $85 of additional Luxembourg taxable income, assuming that the full $85 of Luxembourg taxable income is offset by existing Luxembourg NOLs, the relevant Tax Cost shall be $10.58, calculated by multiplying $85 of income by the 24.9% tax rate ($21.165) and further multiplying that calculation by 50%. There shall be no further adjustment or modification to account for the fact that the Reorganized Debtors have incremental Luxembourg NOLs such that no additional cash tax cost is actually realized until later years. With respect to the $15 of additional U.S. taxable income, the Tax Cost shall be $3.6, calculated by multiplying $15 of income by the blended federal and state rate of 24%, and shall be the same regardless of whether the Reorganized Debtors have sufficient NOLs, credits or other tax attributes to offset their federal and state income. For the avoidance of doubt, the foregoing calculation is simplified and shall not preclude appropriate adjustments to take account of tax laws as they exist at the time.

"Termination Date" has the meaning set forth in Section 8.11.

"Transfer" means any sale, pledge, assignment, encumbrance or other transfer or disposition of any Series B CVR to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise. "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings. For the avoidance of doubt, the term "Transfer" includes a transfer of Beneficial Interests through DTC.

Section 1.2    Rules of Construction. The words "hereof," "herein," "hereto" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The headings and captions contained herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified and references to clauses without a cross-reference to a Section or subsection are references to clauses within the same Section or subsection. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meanings as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References (i) to "$" and "dollars" are to the currency of the United States and (ii) to "days" shall be to calendar days unless otherwise indicated. Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms. Except as required by Rule 14d-1(g)(3) promulgated by the SEC under the Exchange Act, when calculating the period of time before which, within which or

9

following which any act is to be done or step taken, the date that is the reference date in beginning the calculation of such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

## ARTICLE II
## CONTINGENT VALUE RIGHTS

Section 2.1    Series B CVRs.

(a)    The Series B CVRs represent the rights of Holders to receive contingent payments pursuant to this Agreement.  Pursuant to the Plan, the Series B CVRs shall be issued in the following amounts:  (i) 67.5% *pro rata* to holders of Allowed Unsecured Claims (as defined in the Plan) against Jackson and Allowed Unsecured Claims against Jackson Subsidiaries (as defined in the Plan), and (ii) 32.5% *pro rata* to holders of Allowed Unsecured Claims against ICF, in each case consistent with the Plan.  Each holder thereof shall be deemed to have received as of the Effective Date, one Series B CVR for each $1,000.00 of Allowed Unsecured Claims against Jackson, Allowed Unsecured Claims against Jackson Subsidiaries, or Allowed Unsecured Claims against ICF held by such Holder as of the Effective Date, consistent with the Plan.

(b)    The Series B CVRs shall be distributed on the Effective Date in accordance with the terms of this Agreement and the Plan and without any further action of the CVR Issuer or any other Person.  The Series B CVRs shall entitle each Holder to such Holder's *pro rata* share (based on the number of Series B CVRs held by such Holder as compared to the number of Series B CVRs Outstanding on the applicable Series B CVR Payment Date  (or any record date established by the CVR Issuer in accordance with this Agreement)) of cash equal to one hundred percent (100%) of the Subsequent Further Accelerated Relocation Payments. The aggregate consideration distributed in respect of the Series B CVRs shall not exceed the amount of the Subsequent Further Accelerated Relocation Payments.  For the avoidance of doubt, (i) no fractional Series B CVRs shall be issued, and any such fractions will be rounded down or rounded up to the nearest $1,000.00 of Allowed Unsecured Claims against Jackson, Allowed Unsecured Claims against Jackson Subsidiaries, or Allowed Unsecured Claims against ICF, consistent with the Plan, and (ii) no Series B CVR shall be issued to any Person prior to the Effective Date.

Section 2.2    Transferability.  The Series B CVRs or any Beneficial Interest shall be freely transferable without the prior consent of the CVR Issuer except as provided in this Section 2.2. Notwithstanding any other provision of this Agreement, each Holder agrees that it shall not Transfer any of its Series B CVRs or Beneficial Interests except:

(a)    to the extent that the Series B CVRs constitute "securities" (as such term is defined under the Section 2(a)(1) of the Securities Act), as permitted under the Securities Act and other applicable federal law or state securities or blue sky laws, and then, with respect to a Transfer of Series B CVRs or Beneficial Interests, if requested by the CVR Issuer or the Rights Agent, as applicable, only upon delivery to the CVR Issuer of a written opinion of counsel in form and substance reasonably satisfactory to the CVR Issuer to the effect that such Transfer may be effected without registration under the Securities Act; *provided*, that notwithstanding the foregoing, such a legal opinion shall not be  required for any Transfer of Series B CVRs or Beneficial Interests that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of

10

the Bankruptcy Code, unless the CVR Issuer has a good faith reason to believe that such Series B CVRs or Beneficial Interests are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the CVR Issuer or an "underwriter" (as such term is defined in the Securities Act) with respect to such Series B CVRs or Beneficial Interests;

(b)     if such Transfer would not reasonably be expected to require the CVR Issuer to initiate a registration or qualification of the Series B CVRs pursuant to the Exchange Act or any applicable federal or state securities or blue sky laws;

(c)     if such Transfer, upon consummation, would not result in the CVR Issuer having, in the aggregate, either (A) 1,900 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under Regulation D of the Securities Act (determined, in each case, in the CVR Issuer's reasonable discretion) of any class of equity securities of the CVR Issuer;

(d)     if such Transfer would not cause the CVR Issuer or any Subsidiary or Affiliate of the CVR Issuer to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(e)     if such Transfer would not cause the CVR Issuer or any Subsidiary or Affiliate of the CVR Issuer to be subject to regulation under the Investment Advisers Act of 1940, as amended.

The Series B CVRs have not been registered under the Securities Act, the Exchange Act, or state securities laws and will not be listed for trading on any securities exchange. Any attempted or purported Transfer of all or a portion of the Series B CVRs or Beneficial Interests held by a Holder in violation of this Section 2.2 shall be null and void and of no force or effect whatsoever, such purported Transferee shall not be treated as a Holder of the Series B CVRs or Beneficial Interests for purposes of this Agreement or otherwise, and the CVR Issuer shall not register such Transfer. The restrictions under this Section 2.2(b), 2.2(c), 2.2(d), and 2.2(e) shall terminate automatically upon the effectiveness of a Listing.

Section 2.3     Exemption from Securities Registration at Issuance. To the extent that the Series B CVRs constitute "securities" (as such term is defined under the Section 2(a)(1) of the Securities Act), the Series B CVRs shall be issued pursuant to Section 1145 of the Bankruptcy Code; provided that the Beneficial Owner is not deemed to be an "underwriter" as defined in Section 1145(b)(1) of the Bankruptcy Code. To the extent the Series B CVRs constitute "securities" (as such term is defined under Section 2(a)(1) of the Securities Act) and are deemed not to have been issued pursuant to Section 1145 of the Bankruptcy Code, the Series B CVRs shall be issued in reliance upon an exemption from the registration requirement of Section 5 of the Securities Act provided by Section 4(a)(2) of the Securities Act.

Section 2.4     Series B CVR Register; DTC; Global Security

11

(a)      The Rights Agent shall keep a register (the "Series B CVR Register") for the purpose of registering Series B CVRs and permitted Transfers thereof.  The Series B CVR Register shall initially show one position for Cede & Co. representing all of the Series B CVRs held by DTC on behalf of the Beneficial Owners holding through their respective DTC Participants. The Rights Agent shall have no responsibility whatsoever directly to the Beneficial Owners holding through their respective DTC Participants with respect to transfers of Series B CVRs.  Any Beneficial Owners holding through their respective DTC Participants may move their holdings of Series B CVRs directly to the Series B CVR Register only through the procedures established by the DTC.

(b)      The direct Transferee (*i.e.*, a Transferee that holds the Series B CVRs directly and not simply a Beneficial Interest in Series B CVRs registered in the name of Cede & Co.) of the Series B CVRs Transferred shall be bound by this Agreement as a Direct Owner.  Any indirect Transferee (*i.e.*, a Transferee that holds a Beneficial Interest in the Series B CVRs registered in the name of Cede & Co.) of Series B CVRs Transferred shall be bound by this Agreement as a Beneficial Owner.  Following a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa), the Rights Agent shall amend the Series B CVR Register to reflect the change in Direct Owners, and the CVR Issuer shall take any other appropriate action in connection therewith.

(c)      The CVR Issuer will enter into the Depository Agreement pursuant to which DTC will act as a securities depository for the Series B CVRs.  The Series B CVRs deposited with DTC will be represented by a Global Security (which may be a book entry security or consist of one or more certificates as required by DTC), which will be registered in the name of Cede & Co., as nominee for DTC or as DTC shall otherwise direct, and deposited with, or on behalf of, DTC. No other certificates evidencing such Series B CVRs will be issued.  The Global Security shall be in the form attached hereto as Exhibit A-2 or described therein and shall represent such Series B CVRs as shall be specified therein, and may provide that it shall represent the aggregate amount of Outstanding Series B CVRs from time to time endorsed thereon and that the aggregate amount of Outstanding Series B CVRs represented thereby may from time to time be increased or decreased.  As of the Effective Date, without the need for any action or consent of any Person, including the CVR Issuer, an initial Global Security shall be issued reflecting the number of Series B CVRs to be issued to Cede & Co. as of the Effective Date and shown on the Series B CVR Register.  Any Global Security shall be executed by an officer on behalf of the CVR Issuer.  Any endorsement of a Global Security to reflect the amount, or any increase or decrease in the amount, of Outstanding Series B CVRs represented thereby shall be made in such manner and upon instructions given by the CVR Issuer as specified in the Depository Agreement.

Section 2.5      Determination of Further Accelerated Relocation Payments.

(a)      As promptly as practicable, following the receipt by the Applicable Intelsat Recipients of any Further Accelerated Relocation Payments after satisfaction of the Minimum Payment Condition and prior to the Termination Date, the CVR Issuer shall deliver to the Rights Agent a certificate (a "Further Accelerated Relocation Payments Certificate") setting forth in reasonable detail (i) the Board of Directors' (or an Entity or Person designated by the Board of Directors (the "Board Designee's")) calculation of the amount of such Further Accelerated Relocation Payments, (ii) the amount of such Further Accelerated Relocation Payments that

12

constitute Initial Further Accelerated Relocation Payments and Subsequent Further Accelerated Relocation Payments and (iii) any material assumptions or adjustments made by the Board of Directors (or the Board Designee) in the calculation of such Further Accelerated Relocation Payments (including, without limitation, any applicable inclusion of interest, or netting of costs and expenses, associated with any Initial Distribution Escrow Funds, as set forth in Section 2.13 hereof). Within five (5) Business Days of delivery of a Further Accelerated Relocation Payments Certificate to the Rights Agent, the Rights Agent shall mail a notice, by e-mail to the e-mail address that appears on the Series B CVR Register or, if no e-mail address appears on the Series B CVR Register, by first class mail to the Holders at their addresses as they appear on the Series B CVR Register, that includes a copy of the Further Accelerated Relocation Payments Certificate (a "Further Accelerated Relocation Payments Notice"). All determinations and calculations with respect to the calculation of any Further Accelerated Relocation Payments in the Further Accelerated Relocation Payments Certificate shall be reasonably made by the Board of Directors (or the Board Designee, *provided* that such determinations and calculations are reviewed and approved by the Board of Directors) in good faith, and such determinations shall be final, binding and conclusive on the Holders, absent manifest error or a Further Accelerated Relocation Payments Dispute Statement on the terms set forth in this Section 2.5.

(b)     In the event that Holders holding Series B CVRs representing at least 20% of the Outstanding Series B CVRs disagree with any of the determinations or calculations set forth in a Further Accelerated Relocation Payments Certificate (such Holders, the "Disputing Holders"), the Disputing Holders may, within ten (10) Business Days after receipt by the Disputing Holders of the Further Accelerated Relocation Payments Notice, deliver written notice to the CVR Issuer and the Rights Agent (a "Further Accelerated Relocation Payments Dispute Statement") setting forth in reasonable detail the determinations or calculations (the "Disputed Items") that the Disputing Holders dispute; *provided*, that Holders shall not have any right to challenge any of the determinations or calculations set forth in a Further Accelerated Relocation Payments Certificate (or submit a Further Accelerated Relocation Payments Dispute Statement) if such Further Accelerated Relocation Payments Certificate provides for the distribution of the maximum amounts distributable to the Holders under this Agreement. Any determinations or calculations not specifically identified in the Further Accelerated Relocation Payments Dispute Statement shall be deemed to be final, binding and conclusive. In the event that the CVR Issuer and the Rights Agent do not receive a Further Accelerated Relocation Payments Dispute Statement within such ten (10) Business Day period, then the Further Accelerated Relocation Payments Certificate shall be deemed to be final, binding and conclusive.

(c)     A representative of the Disputing Holders (such representative to be identified in the Further Accelerated Relocation Payments Dispute Statement and selected by Disputing Holders who hold a majority of all Series B CVRs held by the Disputing Holders), on the one hand, and the CVR Issuer and the Equity Issuer, on the other hand, shall seek in good faith to resolve the Disputed Items for a period of ten (10) Business Days beginning on the date the CVR Issuer receives the Further Accelerated Relocation Payments Dispute Statement. If the representative of the Disputing Holders, on one hand, and the CVR Issuer and the Equity Issuer, on the other hand, are unable to resolve all of the Disputed Items during such ten (10)-Business Day period, then the CVR Issuer shall promptly engage an independent third-party financial, accounting, valuation, appraisal or other advisor selected by a majority of the Disputing Holders that is reasonably acceptable to the Board of Directors or the Board Designee (as applicable))

13

(an "Independent Advisor") to conduct a non-binding determination or calculation of the remaining Disputed Items.  The Independent Advisor shall be required to make any such non-binding determinations or calculations within thirty (30) days of the engagement of the Independent Advisor.  The Board of Directors (or the Board Designee (as applicable)) shall consider in good faith any comments to the Disputed Items in the Further Accelerated Relocation Payments Certificate based on the determinations and calculations of the Independent Advisor.  The Board of Directors (or the Board Designee (as applicable)) shall not be required to make any adjustments to its own determinations as a result of the Independent Advisor's comments, calculations, or determinations; *provided*, that, if the Board of Directors (or the Board Designee (as applicable)) does make any such adjustments, it may not assign a value (i) higher than the greatest value for any Disputed Item calculated by the Board of Directors (or the Board Designee (as applicable)) or the Independent Advisor (whichever is greater) or (ii) lower than the smallest value for such item calculated by Board of Directors (or the Board Designee (as applicable)) or the Independent Advisor (whichever is smaller).  Notwithstanding anything to the contrary herein or in the Series A Contingent Value Rights Agreement, in no event shall the CVR Issuer be required to engage an Independent Advisor more than once with respect to the Further Accelerated Relocation Payments contemplated by a single Further Accelerated Relocation Payments Certificate.  The CVR Issuer shall bear fifty percent (50%) of the cost and expense of the Independent Advisor (the "Independent Advisor Costs") and the other fifty percent (50%) of the Independent Advisor Costs shall be borne *pro rata* by the Holders (with such portion of the costs and expenses to be offset against the amount payable to Holders hereunder).  For the avoidance of doubt, in no instance shall any Holder be required to pay for its respective allocation of the Independent Advisor Costs other than by offset against the amounts payable to such Holder hereunder.

(d)     The Further Accelerated Relocation Payments Certificate, as modified to incorporate any comments pursuant to the prior paragraph (if applicable), is hereinafter referred to as a "Final Further Accelerated Relocation Payments Certificate".  Within five (5) Business Days following the completion of any Final Further Accelerated Relocation Payments Certificate, the CVR Issuer shall distribute an amount of cash equal to the amount of the Further Accelerated Relocation Payments set forth in such certificate that constitute Subsequent Further Accelerated Relocation Payments (net of the Holders' portion of any costs and expenses of an Independent Advisor, if any) to the Rights Agent, for payment to the Holders in accordance with Section 2.6.  For the avoidance of doubt, no Further Accelerated Relocation Payments that constitute Initial Further Accelerated Relocation Payments shall be distributed to Holders under this Agreement.

(e)     The CVR Issuer shall use commercially reasonable efforts to provide the Independent Advisor such information, cooperation and access as the Independent Advisor may reasonably request in connection with Section 2.5(c) (subject to customary confidentiality restrictions and access letters).

(f)     In the event any examination or audit with respect to Tax issues results in an increase to a Tax Cost following the payment of any Subsequent Further Accelerated Relocation Payment to the Holders, such increase in Tax Cost shall reduce any future payment to Holders with respect to the Series B CVRs, and such reduction in future payment shall be the sole remedy for the CVR Issuer resulting from any such increase to a Tax Cost.  In the event any examination or audit with respect to Tax issues results in a decrease to a Tax Cost following the payment of

14

any Subsequent Further Accelerated Relocation Payment to the Holders, such decrease in Tax Cost shall result in an increase in any future payments to Holders with respect to the Series B CVRs, and such increase shall be the sole remedy for any Holder resulting from any such decrease to a Tax Cost.

Section 2.6    Payments of Series B CVR Payment Amount.  Within five (5) Business Days following receipt of any cash from the CVR Issuer for payment to the Holders (each, a "Series B CVR Payment Amount"), including pursuant to Section 2.5(d), Section 2.5(f), and Section 2.13 , the Rights Agent shall pay the applicable *pro rata* share of such Series B CVR Payment Amount to (a) each Holder holding its Series B CVRs directly on the Series B CVR Register (i) by check mailed to the address of such Holder as reflected on the Series B CVR Register as of the close of business on the last Business Day prior to such date or (ii) if such Holder is due a *pro rata* share of the Series B CVR Payment Amount in excess of ten thousand dollars ($10,000) and has provided the Rights Agent with wire transfer instructions in writing, by wire transfer of immediately available funds to the account specified in such instructions, and (b) Beneficial Owners of the Series B CVRs holding through their respective DTC Participants by sending a lump payment to DTC in respect of all such Series B CVRs.  The Rights Agent shall have no responsibilities whatsoever with regard to the distribution of payments by DTC to such Beneficial Owners.  The *pro rata* share of each Series B CVR Payment Amount due to each Holder shall be determined by multiplying the Series B CVR Payment Amount by a fraction (A) the numerator of which is the total number of Series B CVRs owned by such Holder on the Series B CVR Payment Date (or any record date established by the CVR Issuer in accordance with this Agreement) and (B) the denominator of which is the total number of Series B CVRs Outstanding on the Series B CVR Payment Date (or such record date, as applicable).

Section 2.7    Record Date.  The CVR Issuer may set a record date for purposes of determining the identity of Holders entitled to (i) receive the Series B CVR Payment Amount or (ii) vote or consent to any action by vote or consent authorized or permitted under this CVR Agreement. The record date with respect to any Series B CVR Payment shall be at least three (3) Business Days prior to the Series B CVR Payment Date and no more than ten (10) Business Days prior to the Series B CVR Payment Date.  If not set by the CVR Issuer prior to the first solicitation of a Holder of CVRs made by any Person in respect of any such action, or, in the case of any such vote, prior to such vote, the record date for such action shall be the later of ten (10) days prior to the first solicitation of such consent or the date of the most recent list of Holders furnished to the Rights Agent prior to such solicitation.  If a record date is fixed, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to receive the Series B CVR Payment Amount or take such action by vote or consent, whether or not such Persons continue to be Holders after such record date.  No such vote or consent shall be valid or effective if taken or made more than one hundred twenty (120) days after such record date.  The CVR Issuer shall provide Holders at least ten (10) Business Days' notice of any record date set pursuant to this Section 2.7.

Section 2.8    Payments on Series B CVRs.

(a)    The Rights Agent shall deduct and withhold, or cause to be deducted or withheld, from any amount payable pursuant to this Agreement, such amounts as are required to be deducted and withheld with respect to such payment under the Tax Code or any provision of state, local or foreign Tax Law; *provided*, that the Rights Agent shall (i) notify the relevant payee of any required

15

withholding no later than five (5) Business Days in advance of the date of the relevant payment, (ii) reasonably cooperate with such payee and its Affiliates in obtaining any available exemption or reduction, of, or otherwise minimizing, such withholding, and (iii) provide such payee with receipts from the relevant Governmental Authority evidencing the receipt of such deducted or withheld amount.  To the extent that amounts are so withheld and paid over to or deposited with the relevant Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Holder in respect of which such deduction and withholding was made.  The Rights Agent shall be entitled to solicit any appropriate forms or information, from Holders in order to determine the amount of such withholding, if any, and shall cooperate with the Holders to mitigate or eliminate any such withholding to the extent permitted by applicable law.

(b)      Neither the CVR Issuer nor the Rights Agent shall be liable to any Person in respect of the Series B CVR Payment Amount delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.  If, despite the CVR Issuer's and/or the Rights Agent's commercially reasonable efforts to deliver the Series B CVR Payment Amount to the applicable Holder, such Series B CVR Payment Amount has not been paid prior to two (2) years after the Series B CVR Payment Date (or immediately prior to such earlier date on which such Series B CVR Payment Amount would otherwise escheat to or become the property of any Governmental Authority), such Series B CVR Payment Amount shall, to the extent permitted by applicable Law, become the property of the CVR Issuer, free and clear of all claims or interest of any Person previously entitled thereto.

Section 2.9      No Voting, Dividends or Interest; No Equity or Ownership Interest in the CVR Issuer.

(a)      Neither the Holders (by virtue of their ownership of the Series B CVRs) nor the Series B CVRs shall have any rights common to stockholders of the CVR Issuer, including voting and dividend rights.  The Series B CVRs shall not represent an equity or ownership interest in the CVR Issuer or the Equity Issuer.

(b)      Except as set forth in Section 2.13 with respect to the Initial Distribution Escrow Funds, interest shall not accrue on any amounts that may be payable to a Holder.

(c)      Except as expressly set forth in this Agreement, the Series B CVRs shall not (i) be subject to any mandatory or optional redemption rights by the Holders or the CVR Issuer or the Reorganized Debtors, (ii) mature or trigger any right to payment by the Holders or the Reorganized Debtors in any amount or on any specific date, or (iii) be convertible into or exchangeable for any security or other interest in the CVR Issuer or the Reorganized Debtors.

Section 2.10      Ability to Abandon Series B CVR; CVR Issuer Acquisition of Series B CVRs.  A Holder may at any time, at such Holder's option, abandon all of such Holder's remaining rights in a Series B CVR by transferring such Series B CVR to the CVR Issuer without consideration therefor and such Series B CVR shall be cancelled and shall not be considered Outstanding for any purposes under this Agreement.  Nothing in this Agreement shall prohibit the CVR Issuer or any of its Affiliates from offering to acquire or acquiring any Series B CVRs for consideration from the Holders, in private transactions or otherwise, in its sole discretion.

16

Section 2.11     Expiration of Series B CVRs.  Each Series B CVR shall expire on the Termination Date without any further action of the CVR Issuer or any Holder and all rights of Holders hereunder shall immediately terminate upon such expiration other than the right to receive any Series B CVR Payment Amount for which, prior to the occurrence of the Termination Date:  (x) the CVR Issuer has received Subsequent Further Accelerated Relocation Payments, but (y) such Subsequent Further Accelerated Relocation Payments have not been distributed to Holders.

Section 2.12     Maximum Series B Payment Amount; No Distribution Until Satisfaction of Minimum Payment Condition.  The aggregate amount distributed in respect of the Series B CVRs shall not exceed $355,000,000.  For the avoidance of doubt:  (a) no amounts shall be paid to the Holders under this Agreement until both the Minimum Payment Condition and Series A CVR Payment Condition have been satisfied; and (b) no amounts counted towards satisfaction of the Minimum Payment Condition shall be distributed under this Agreement.

Section 2.13     Escrow of Additional Acceleration Contract Consideration.  In the event that the Minimum Payment Condition has not been satisfied and the Applicable Intelsat Recipients actually receive cash consideration (that would, upon satisfaction of the Minimum Payment Condition, constitute Subsequent Further Accelerated Relocation Payments) pursuant to an Additional Acceleration Contract, then the CVR Issuer shall deposit, or cause to be deposited (the "Initial Distribution Escrow Deposits"), within sixty (60) days of receipt of such cash consideration, into the Initial Distribution Escrow Account, an amount of cash equal to the amount of cash that the CVR Issuer would have been required to pay to the Holders pursuant to this Agreement had the Minimum Payment Condition been satisfied at the time such Applicable Intelsat Recipients received such cash consideration (as determined in good faith by the Board of Directors).  In the event that the Minimum Payment Condition and Series A CVR Payment Condition are satisfied prior to the Termination Date, the CVR Issuer shall promptly deliver written instructions to the Escrow Agent to release (a) any Initial Distribution Escrow Funds that constitute Subsequent Further Accelerated Relocation Payments (together with any interest accrued thereon, but reduced by the cost and expense of the Initial Distribution Escrow Account) to be distributed to the Rights Agent for further distribution to the Holders pursuant to Section 2.6 and, (b) after giving effect to the foregoing release, any remaining Initial Distribution Escrow Funds to the CVR Issuer.  In the event that the Minimum Payment Condition and Series A CVR Payment Condition are not satisfied prior to the Termination Date, the CVR Issuer shall promptly cause all remaining Initial Distribution Escrow Funds to be released to the CVR Issuer.

**ARTICLE III**
**THE RIGHTS AGENT**

Section 3.1     Certain Duties and Responsibilities.  The Rights Agent shall not have any liability for any actions taken or not taken in connection with this Agreement, except to the extent of its fraud, willful misconduct, or gross negligence.

Section 3.2     Certain Rights of Rights Agent.  The Rights Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations may be read into this Agreement against the Rights Agent.  In addition:

17

(a)      the Rights Agent may rely and shall be protected and held harmless by the CVR Issuer in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)      whenever the Rights Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Rights Agent may rely upon an Officer's Certificate, which certificate shall be full authorization and protection to the Rights Agent, and the Rights Agent shall, in the absence of fraud, gross negligence or willful misconduct of the Rights Agent or any of its Affiliates, incur no liability to anyone and shall be held harmless by the CVR Issuer for or in respect of any action taken, suffered or omitted to be taken by it under the provisions of this Agreement in reliance upon such certificate;

(c)      the Rights Agent may at any time consult with legal counsel satisfactory to it, and the Rights Agent shall incur no liability or responsibility to the CVR Issuer or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such counsel;

(d)      the permissive rights of the Rights Agent to do things enumerated in this Agreement may not be construed as a duty;

(e)      the Rights Agent shall not be required to give any note or surety in respect of the execution of such powers or otherwise in respect of the premises;

(f)      the Rights Agent shall not be liable for or by reason of, and shall be held harmless by the CVR Issuer with respect to, any of the statements of fact or recitals contained in this Agreement or be required to verify the same, but all such statements and recitals are and shall be deemed to have been made by the CVR Issuer only;

(g)      the Rights Agent shall have no liability and shall be held harmless by the CVR Issuer in respect of the validity of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Rights Agent and the enforceability of this Agreement against the Rights Agent assuming the due execution and delivery hereof by the CVR Issuer); nor shall it be responsible for any breach by the CVR Issuer of any covenant or condition contained in this Agreement;

(h)      the CVR Issuer agrees to indemnify the Rights Agent for, and hold the Rights Agent harmless against, any loss, liability, claim, demands, suits or expense arising out of or in connection with the Rights Agent's duties under this Agreement, including the reasonable costs and expenses of defending the Rights Agent against any claims, charges, demands, suits or loss, unless such loss has been determined by a court of competent jurisdiction to be a result of the Rights Agent's fraud, gross negligence, or willful misconduct;

(i)      the CVR Issuer agrees (i) to pay the fees and expenses of the Rights Agent in connection with this Agreement as agreed upon in writing by the Rights Agent and the CVR Issuer on or prior to the date hereof (email being sufficient) and (ii) to reimburse the Rights Agent for all Taxes and governmental charges, reasonable and documented out-of-pocket expenses incurred by

18

the Rights Agent in the execution of this Agreement (other than Taxes imposed on or measured by the Rights Agent's net income and franchise or similar Taxes imposed on it). The Rights Agent shall also be entitled to reimbursement from the CVR Issuer for all reasonable and necessary out-of-pocket expenses paid or incurred by it, including reasonable legal fees of counsel, in connection with the administration and enforcement by the Rights Agent of its duties hereunder;

(j)      no provision of this Agreement shall require the Rights Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of its rights if there shall be reasonable grounds for believing that repayment of such funds or adequate indemnification against such risk or liability is not reasonably assured to it; and

(k)      no Holder shall be obligated to indemnify the Rights Agent for any services or actions under this Agreement and the Rights Agent shall not be entitled to deduct any sums from the Series B CVR Payment Amount in any circumstance except as provided in Section 2.8(a).

Section 3.3      Resignation and Removal; Appointment of Successor.

(a)      The Rights Agent may resign at any time by giving written notice thereof to the CVR Issuer specifying a date when such resignation shall take effect, which notice shall be sent at least sixty (60) days prior to the date so specified but in no event shall such resignation become effective until a successor Rights Agent has been appointed. The CVR Issuer has the right to remove the Rights Agent at any time by a Board Resolution specifying a date when such removal shall take effect but no such removal shall become effective until a successor Rights Agent has been appointed. Notice of such removal shall be given by the CVR Issuer to the Rights Agent, which notice shall be sent at least sixty (60) days prior to the date so specified.

(b)      If the Rights Agent provides notice of its intent to resign, is removed pursuant to Section 3.3(a) or becomes incapable of acting, the CVR Issuer shall, as soon as is reasonably practicable, appoint a qualified successor Rights Agent who, unless otherwise consented to in writing by the Required Consenting Holders, shall be a stock transfer agent of national reputation or the corporate trust department of a commercial bank of national reputation. The successor Rights Agent so appointed shall, forthwith upon its acceptance of such appointment in accordance with Section 3.4, become the successor Rights Agent.

(c)      Promptly upon the delivery of any notice of resignation of a Rights Agent, removal of a Rights Agent or appointment of a successor Rights Agent, the CVR Issuer shall give notice of each such resignation and each such removal of a Rights Agent and each such appointment of a successor Rights Agent by mailing written notice of such event by first-class mail to the Holders as their names and addresses appear in the Series B CVR Register. Each notice shall include the name and address of the successor Rights Agent. If the CVR Issuer fails to send such notice within fifteen (15) days after acceptance of appointment by a successor Rights Agent in accordance with Section 3.4, the successor Rights Agent, within fifteen (15) days of such failure, shall cause the notice to be mailed at the expense of the CVR Issuer.

Section 3.4      Acceptance of Appointment by Successor. Every successor Rights Agent appointed pursuant to Section 3.3(b) hereunder shall execute, acknowledge and deliver to the CVR

19

Issuer and to the retiring Rights Agent an instrument accepting such appointment and a counterpart of this Agreement, and thereupon such successor Rights Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Rights Agent.  On request of the CVR Issuer or the successor Rights Agent, the retiring Rights Agent shall execute and deliver an instrument transferring to the successor Rights Agent all the rights, powers and trusts of the retiring Rights Agent.

## ARTICLE IV
## COVENANTS

Section 4.1    List of Holders.  The CVR Issuer shall furnish or cause to be furnished to the Rights Agent the names and addresses of the Direct Owners no later than ten (10) Business Days after the CVR Issuer receives notice of such Direct Owners' names and addresses; *provided*, that notwithstanding the foregoing, the CVR Issuer shall have no obligations pursuant to this sentence if the only Direct Owner is Cede & Co. at the Effective Date.  The Rights Agent shall reflect such names and addresses on the Series B CVR Register and confirm the write up of the Series B CVR Register and list of initial Direct Owners to the CVR Issuer promptly thereafter and, in any event, within five (5) Business Days of the receipt of such names and addresses from the CVR Issuer.

Section 4.2    Efforts to Obtain Further Accelerated Relocation Payments.  The CVR Issuer and the Equity Issuer shall use commercially reasonable efforts to:

(a)    obtain Further Accelerated Relocation Payments; *provided* that this Section 4.2 shall not affect the requirement that no Further Accelerated Relocation Payments shall exist unless the Minimum Payment Condition has been satisfied; and

(b)    in the event Further Accelerated Relocation Payments are actually received by an Entity other than the CVR Issuer, implement such intercompany transactions as may be necessary in order for the CVR Issuer to satisfy its obligations under this Agreement.

Section 4.3    Nonassignability.  The Equity Issuer and the CVR Issuer shall not, and shall cause all of their applicable Affiliates not to, assign the right to receive any consideration that would constitute Further Accelerated Relocation Payments to any Person unless such Person is an Affiliate and such assignment is made pursuant to Section 8.3.

## ARTICLE V
## AMENDMENTS

Section 5.1    Amendments without Consent of Holders.

(a)    Without the consent of any Holders or the Rights Agent, the CVR Issuer and the Equity Issuer (if such amendment would implicate a term of this Agreement applicable to the Equity Issuer) may enter into one or more amendments hereto, for any of the following purposes:

(i)    to evidence the succession of another Person to the CVR Issuer and the assumption by any such successor of the covenants of the CVR Issuer herein as provided in and subject to conformity with Section 8.3;

20

(ii)     to cure any ambiguity, to correct or supplement any provision herein that may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement; *provided* that, in each case, such provisions do not adversely affect the interests of any Holder without such adversely affected Holder's prior written consent;

(iii)     to evidence the succession of another Person as a successor Rights Agent and the assumption by any such successor of the covenants and obligations of the Rights Agent herein in accordance with Section 3.3 and Section 3.4; or

(iv)     any other amendments hereto, unless such amendment is adverse to the interests of any Holder (in which case such amendment shall not be effective against such adversely affected Holder without such adversely affected Holder's prior written consent but shall be effective against all of the other Holders who are not adversely affected).

(b)     If and only if a Holder agrees to renounce such Holder's rights under this Agreement in accordance with Section 2.10, without the consent of any other Holders, the CVR Issuer, the Equity Issuer and the Rights Agent, in the Rights Agent's sole and absolute discretion, at any time and from time to time, may enter into one or more amendments hereto, to reduce the number of Series B CVRs by the number of Series B CVRs renounced by such Holder in accordance with Section 2.10.

(c)     Promptly after the execution by the CVR Issuer and the Rights Agent of any amendment pursuant to the provisions of this Section 5.1, the CVR Issuer shall mail (or cause the Rights Agent to mail) a notice thereof by first class mail to the Holders at their addresses as they appear on the Series B CVR Register, setting forth such amendment.

Section 5.2     Amendments with the Consent of the Equity Issuer Board and Holders.

(a)     With the prior written consent of the Required Consenting Holders (whether evidenced in writing or taken at a meeting of the Holders), the CVR Issuer (when authorized by a Board Resolution that has been adopted by at least three (3) of four (4) of the Chief Executive Officer and the Minority Directors (as defined in the Shareholders Agreement)), the Equity Issuer, and the Rights Agent may enter into one or more amendments hereto for the purpose of adding, eliminating or changing any provisions of this Agreement,  provided that no such amendment may (i) disproportionately (when compared with other Holders), materially, and adversely affect the rights of any Holder, or (ii) impair any Holder's right to receive payment when required or in the amount required pursuant to this Agreement, in each case, without the prior written consent of such affected Holder.

(b)     Promptly after the execution by the CVR Issuer, the Rights Agent, and, if applicable, the Equity Issuer of any amendment pursuant to the provisions of this Section 5.2, the CVR Issuer shall mail (or cause the Rights Agent to mail) a notice thereof by first class mail to the Holders at their addresses as they appear on the Series B CVR Register, setting forth such amendment.

Section 5.3     Effect of Amendments.  Upon the execution of any amendment under this Article V, this Agreement shall be modified in accordance therewith, such amendment shall form a

21

part of this Agreement for all purposes and the CVR Issuer, the Equity Issuer, the Rights Agent, and every Holder shall be bound thereby.

## ARTICLE VI
## REMEDIES OF THE RIGHTS AGENT ON EVENT OF DEFAULT

Section 6.1     Event of Default.  "Event of Default" with respect to the Series B CVRs, means each one of the following events which shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of Law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     default by the CVR Issuer in failing to distribute to the Rights Agent a payment when required pursuant to Section 2.5(d), Section 2.5(f), and Section 2.13, and continuance of such default for a period of thirty (30) days after there has been given, by registered or certified mail, to the CVR Issuer and the Equity Issuer by the Rights Agent or to the CVR Issuer and the Rights Agent by any Holder, a written notice specifying such default or breach and requiring it to be remedied; or

(b)     material default in the performance, or material breach in any material respect, of any covenant or warranty of the CVR Issuer or Equity Issuer in respect of the Series B CVRs, and continuance of such default or breach for a period of thirty (30) days after there has been given, by registered or certified mail, to the CVR Issuer and the Equity Issuer by the Rights Agent or to the CVR Issuer and the Rights Agent by the Majority of Holders, a written notice specifying such default or breach and requiring it to be remedied.

Section 6.2     Collection by the Rights Agent; Payment Obligations.

(a)     The Rights Agent may, and upon written request of the Majority of Holders, shall, proceed to protect and enforce its rights and the rights of the Holders by such appropriate judicial proceedings as the Rights Agent shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Agreement or in aid of the exercise of any power granted herein, or to enforce any other remedy.

(b)     In case the CVR Issuer shall fail forthwith to pay any amounts due following an Event of Default, any Holder  and the Rights Agent may, and upon written request of the Majority of Holders the Rights Agent shall, institute any action or proceedings at Law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceedings to judgment or final decree, and may enforce any such judgment or final decree against the CVR Issuer or other obligor upon such Series B CVRs and collect in the manner provided by Law out of the property of the CVR Issuer or other obligor upon such Series B CVRs, wherever situated, the moneys adjudged or decreed to be payable; *provided however,* concurrently with any such written request, the Majority of Holders shall also provide indemnification to the Rights Agent in form and substance reasonably satisfactory to the Rights Agent.

(c)     Nothing herein contained shall be deemed to authorize the Rights Agent to authorize or consent to or vote for or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Series B CVRs, or the rights

22

of any Holder thereof, or to authorize the Rights Agent to vote in respect of the claim of any Holder in any such proceeding.

(d)    All rights of action and of asserting claims under this Agreement, or under any of the Series B CVRs, may be enforced by the Rights Agent without the possession of any of the Series B CVRs or the production thereof and any trial or other proceedings instituted by the Rights Agent hereunder, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Rights Agent, each predecessor Rights Agent and their respective agents and attorneys, shall be for the ratable benefit of the Holders.

(e)    In any proceedings brought by the Rights Agent (and also any proceedings involving the interpretation of any provision of this Agreement to which the Rights Agent shall be a party) the Rights Agent shall be held to represent all the Holders, and it shall not be necessary to make any Holders parties to any such proceedings.

Section 6.3    Application of Proceeds.    Any monies collected by the Rights Agent pursuant to this Article VI in respect of the Series B CVRs shall be applied in the following order at the date or dates fixed by the Rights Agent in connection therewith:

> FIRST:  To the payment of costs and expenses (including fees and costs incurred by the Rights Agent and its reasonable attorney's fees) incurred by the Rights Agent in connection with the exercise of its rights under Section 6.2 in respect of which monies have been collected, except as a result of its willful misconduct, fraud or gross negligence; and

> SECOND:  To the payment of the whole amount then owing and unpaid upon all the Series B CVRs and in case such monies shall be insufficient to pay in full the whole amount so due and unpaid upon the Series B CVRs, then to the payment of such amounts without preference or priority of any Series B CVR over any other Series B CVR, ratably to the aggregate of such amounts due and payable.

Section 6.4    Delay or Omission Not Waiver of Default.    No delay or omission of the Rights Agent or of any Holder to exercise any right or power accruing upon any Event of Default occurring and continuing as aforesaid shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein; and every power and remedy given by this Agreement to the Rights Agent or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Rights Agent or by the Holders in accordance with the terms of this Agreement.

## ARTICLE VII
## INFORMATION AND CONFIDENTIALITY

Section 7.1    Reporting and Disclosure.

(a)    Subject to Section 7.2, Holders (other than Holders that are Competitors) shall be entitled to receive from the CVR Issuer the following information until the CVR Issuer becomes subject to the reporting requirements of the Exchange Act: (i) within 65 days (or 150 days in the case of the first fiscal quarter containing the Effective Date and 90 days in the case of the first full

23

fiscal quarter after the Effective Date occurs) after the end of each of the first three fiscal quarters of each fiscal year (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal quarter ending after the Effective Date, quarterly unaudited consolidated financial statements of the CVR Issuer and its Subsidiaries; and (ii) within 120 days (or 135 days in the case of the first fiscal year ending after the Effective Date) following the conclusion of each of the CVR Issuer's fiscal years ending after the Effective Date (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal year ending after the Effective Date, annual audited consolidated financial statements of the CVR Issuer and its Subsidiaries (clauses (i) and (ii) collectively, the "Financial Statements"); and (iii) the information if, as and when provided to the noteholders or trustee, as applicable, pursuant to Section 3.10(a) of the New Indenture (or any substantially similar provision in connection with any amendment to the New Indenture or any refinancing indebtedness thereof), including, for the avoidance of doubt, the Financial Statements; *provided*, *however*, that if the CVR Issuer files the Financial Statements described in this Section 7.1(a) with the Securities and Exchange Commission, the requirement to deliver the Financial Statements pursuant to clauses (i) and (ii) shall be deemed satisfied. For the avoidance of doubt, the CVR Issuer may satisfy its obligations pursuant to this Section 7.1 with respect to financial information relating to the CVR Issuer by furnishing financial information relating to one of its direct or indirect parent entities which wholly owns the CVR Issuer; *provided* that the same is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent entity and its Subsidiaries, on the one hand, and the information relating the CVR Issuer and its Subsidiaries on a standalone basis, on the other hand.  For the avoidance of doubt, reconciliation information that may be provided pursuant to Section 3.10(a) of the New Indenture (or any substantially similar provision in connection with any refinancing indebtedness thereof) will be deemed to satisfy the foregoing sentence and the consolidating information referred to in the proviso in the preceding sentence need not be audited. Promptly following the release of each of the quarterly unaudited financial statements, the CVR Issuer or one of its Affiliates will provide a video and/or a telephonic presentation (which may be a single presentation held together with other securityholders or holders of indebtedness of the CVR Issuer and its Affiliates) to the Holders and their respective partners (including limited partners except for any Competitors), shareholders, members, directors, officers, managers, employees, financing sources (including existing and bona fide prospective investors except for any Competitors), agents, counsel, accountants, consultants, investment advisors or other professionals or representatives, or its Affiliates or wholly owned subsidiaries (collectively, "Representatives") to discuss the CVR Issuer's (or the Equity Issuer's or the Affiliate producing such reporting pursuant to Section 7.1 hereto) financial condition and results of operations, following which presentation the CVR Issuer will allow the Representatives of Holders to ask reasonable questions. Any participant in quarterly calls (including bona fide potential transferees permitted in accordance with the terms hereof) (A) shall not be a Competitor of the CVR Issuer and each Holder hereby represents and warrants to the same as to itself, its Representatives and its bona fide potential transferees that participate in such calls, and (B) shall be subject to Section 7.2; *provided,* that each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of Section 7.2 if such Representative or recipient were party to this Agreement. With respect to any recipient who is a bona fide potential

24

transferee of Series B CVRs, the applicable Holder must first comply with Section 7.2 prior to sharing any such information.

(b)      The Company shall use commercially reasonable efforts to promptly post all information required by Section 7.1(a) on a website (which may be nonpublic, require a confidentiality acknowledgement, with such acknowledgement being deemed to satisfy the requirement for a non-disclosure agreement as set forth in Section 7.2 and shall be maintained, using commercially reasonable efforts, by the CVR Issuer or a third party) (the "Holder Website") to which access will be given to the Holders and bona fide prospective investors or bona fide potential transferees (with the exception of Competitors) in the Series B CVRs.

Section 7.2      Confidentiality.   The Right Agents and Holders hereby agree that any confidential or non-public information they receive pursuant to this Agreement from or on behalf of the CVR Issuer or any Affiliate of the CVR Issuer, including the Financial Statements and any information actually provided pursuant to Section 7.1(a)(iii), (the "Confidential Information"), shall: (a) not be used for any purpose other than for purposes permitted under this Agreement; (b) not be used directly or indirectly in any way that is for competitive purposes; and (c) be kept confidential by, and not be disclosed by, such Rights Agent and the Holders and its Representatives; *provided*, *however*, that any such Confidential Information may be disclosed only to their Representatives who (i) need to know such Confidential Information and (ii) are bound in writing to a non-disclosure agreement no less restrictive than this Section 7.2 or are otherwise made aware of the confidentiality obligations set forth in this Section 7.2.  It is understood that such Representatives shall be informed by the Rights Agent or the applicable Holder of the confidential nature of such Confidential Information, and such Rights Agent or Holder, as applicable, shall be responsible for any disclosure or use made by its Representatives in breach of obligations under this Agreement to the same extent as if such disclosure or use had been made directly by the Rights Agent or such Holder, as applicable. "Confidential Information" shall not include any information that is (i) publicly available other than because of a breach of this Section 7.2 by the Rights Agent or the Holders or any of their respective Representatives or (ii) is lawfully disclosed to the Rights Agent or Holders by sources (other than the CVR Issuer or its Affiliates) rightfully in possession of the Confidential Information.  If the Rights Agent, Holders or their respective Representatives are legally required or requested to disclose any Confidential Information, they shall in advance of such disclosure, unless otherwise prohibited by Law, promptly notify the CVR Issuer of such request or requirement so that the CVR Issuer may seek to avoid or minimize the required disclosure and/or obtain an appropriate protective order or other appropriate relief to ensure that any Confidential Information so disclosed is maintained in confidence to the maximum extent possible by the Person receiving the disclosure, or, in the CVR Issuer's discretion, to waive compliance with the provisions of this Agreement.  In any such case, the Rights Agent and the Holders agree to cooperate and use commercially reasonable efforts to avoid or minimize the required disclosure and/or obtain such protective order or other relief.  If, in the absence of a protective order or the receipt of a waiver hereunder, the Rights Agent, Holders or their respective Representatives are legally obligated to disclose any Confidential Information, they shall disclose only so much thereof to the party compelling disclosure as they believe in good faith, on the basis of advice of counsel, is required by Law.  The Rights Agent or the Holder, as applicable, shall give the CVR Issuer prior written notice of the specific Confidential Information that they believe they are required to disclose under such circumstances.   All Confidential Information disclosed by or on behalf of the CVR Issuer or any of its Affiliates shall be, and shall remain, the property of the CVR Issuer or such Affiliate.  For the avoidance of doubt,

25

a Person which ceases to be a Holder shall continue to be subject to this <u>Section 7.2</u> with respect to any Confidential Information received by such Holder or its Representatives under this Agreement for 12 months after ceasing to be a Holder, at which point such Person will no longer be subject to this <u>Section 7.2</u>.

<div align="center">

**ARTICLE VIII**
**OTHER PROVISIONS OF GENERAL APPLICATION**

</div>

Section 8.1     <u>Notices to Rights Agent, the CVR Issuer and the Equity Issuer</u>.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed given when delivered in person, by overnight courier, by electronic mail, or two (2) Business Days after being sent by registered or certified mail (postage prepaid, return receipt requested), as follows:

If to the Rights Agent, to it at:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attn: Corporate Actions /Intelsat CVR

Email: reorg_rm@astfinancial.com

*with a copy (which shall not constitute notice) to:*

American Stock Transfer & Trust Company, LLC
48 Wall Street, 22nd Floor
New York, NY 10005
Attention: Legal Department
Email: <u>legalteamAST@astfinancial.com</u>

If to the CVR Issuer or the Equity Issuer, to it at:

Intelsat Emergence S.A. (to be renamed Intelsat S.A.)
4, rue Albert Borschette
L-1246 Luxembourg, Grand Duchy of Luxembourg
Attention:     Legal Department
Email:          Michelle.Bryan@Intelsat.com

*with a copy (which shall not constitute notice) to:*

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:     Edward O. Sassower, P.C.
                    Steven N. Serajeddini, P.C.
                    Aparna Yenamandra
Email:          Edward.Sassower@Kirkland.com

<div align="center">

26

</div>

Steven.Serajeddini@Kirkland.com
Aparna.Yenamandra@Kirkland.com

The Rights Agent, the CVR Issuer or the Equity Issuer may specify a different address or facsimile number by giving notice in accordance with this Section 8.1.

Section 8.2      Notice to Holders.  Where this Agreement provides for notice to Holders, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Holder affected by such event, at the Holder's address as it appears in the Series B CVR Register, not later than the latest date, and not earlier than the earliest date, if any, prescribed for the giving of such notice.  In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.

Section 8.3      Successors and Assigns; Merger, Change of Control.

(a)      The CVR Issuer may assign any or all of its rights, interests and obligations hereunder to (a) in its sole discretion and without the consent of any other party hereto, any of its Affiliates, but only (i) if the Board of Directors, including three of the four of the Chief Executive Officer and the Minority Directors (as defined in the Shareholders Agreement) approves of such assignment to such Affiliate and the CVR Issuer delivers to the Rights Agent an Officer's Certificate certifying that such Affiliate will be able to make any applicable payments pursuant to such agreement and (ii) for so long as it remains an Affiliate of the CVR Issuer, or (b) with the prior written consent of the Required Consenting Holders, any other Person (any permitted assignee under clause (a) or (b), an "Assignee"), in each case, provided that the Assignee agrees to assume and be bound by all of the terms of this Agreement.  Any Assignee may thereafter assign any or all of its rights, interests and obligations hereunder in the same manner as the CVR Issuer pursuant to the prior sentence.  In connection with any assignment to an Assignee described in clause (a) above in this Section 8.3, the CVR Issuer shall agree to remain liable for the performance by each Assignee of all obligations of the CVR Issuer hereunder.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by each of the successors of the CVR Issuer and each Assignee.  Each of the successors of the CVR Issuer and Assignees shall expressly assume by an instrument supplemental hereto, executed and delivered to the Rights Agent, the due and punctual performance and observance of all of the covenants and obligations of this Agreement to be performed or observed by the CVR Issuer.  Any attempted assignment in violation of this Section 8.3 shall be void and of no effect.

(b)      The Equity Issuer and the CVR Issuer shall not consolidate, amalgamate, merge or combine with or into any other Entity in which the Equity Issuer or the CVR Issuer, as applicable, shall not be the surviving or continuing Entity in such consolidation, amalgamation, merger or combination, unless the surviving Entity in such consolidation, amalgamation, merger or combination shall assume all of the obligations of the Equity Issuer or the CVR Issuer, as applicable, under this Agreement.  This Agreement and the Series B CVRs shall survive any Change of Control.

27

Section 8.4       Benefits of Agreement.   Nothing in this Agreement, express or implied, shall give to any Person (other than the Rights Agent, the CVR Issuer and the Equity Issuer and their respective successors and Assignees, the Holders and their respective successors and permitted assigns) any benefit or any legal or equitable right, remedy or claim under this Agreement or under any covenant or provision herein contained, all such covenants and provisions being for the sole benefit of the foregoing.  The rights of Holders and their successors and permitted assigns are limited to those expressly provided in this Agreement.  Notwithstanding anything to the contrary contained herein, any Holder or Holder's successor or permitted assign may agree to renounce, in whole or in part, its rights under this Agreement by written notice to the Rights Agent, the CVR Issuer and the Equity Issuer, which notice, if given, shall be irrevocable

Section 8.5       Governing Law.   THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.

Section 8.7       Submission to Jurisdiction.   Each party to this Agreement and each Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware) (together with the appellate courts thereof, the "Chosen Courts").  In connection with any claim arising out of or related to this Agreement, each party to this Agreement and each Holder hereby irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection that such Person may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the CVR Issuer or the Holder, (iv) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with Section 8.1, although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (v) agrees not to seek a transfer of venue on the basis that another forum is more convenient.  Notwithstanding anything herein to the contrary, each of the parties to this Agreement and each Holder agrees that any judgment issued by a Chosen Court may be recognized, recorded, registered or enforced in any jurisdiction in the world and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction.

Section 8.8       Waiver of Trial by Jury.   EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

Section 8.9       Severability.   If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

28

The parties further agree to replace such invalid or unenforceable provision of this Agreement with a valid and enforceable provision that shall achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable provision.

Section 8.10    Counterparts and Signature.  This Agreement may be executed in two or more counterparts (including by facsimile or by an electronic scan delivered by electronic mail), each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties hereto and delivered to the other party, it being understood that the parties need not sign the same counterpart.

Section 8.11    Termination.  This Agreement and the Series B CVRs issued hereunder shall automatically terminate, without further action of any parties hereto, and be of no force or effect, and the parties hereto shall have no liabilities hereunder or with respect to any of the Series B CVRs, upon the earlier to occur of (a) the date on which Holders have received an aggregate amount equal to the maximum amount of payments on account of the Series B CVRs permitted hereunder, and (b) the later of (i) the Outside Date, and (ii) the date on which there is no obligation remaining pursuant to any Additional Acceleration Contract to pay Further Accelerated Relocation Payments to any Applicable Intelsat Recipient.  Such date that is the earlier to occur of the foregoing is referred to as the "Termination Date."

Section 8.12    Entire Agreement.  This Agreement contains the entire understanding of the parties hereto and thereto with reference to the transactions and matters contemplated hereby and thereby and supersedes all prior agreements, written or oral, among the parties with respect hereto and thereto.

Section 8.13    No Recourse.  This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties and then only in their capacities as such. Except to the extent named as a party, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present, or future direct or indirect stockholder, member, other direct or indirect equityholder, partner, manager, director, officer, employee, Affiliate or agent (collectively, the "Non-Recourse Parties") of any party to this Agreement or the Non-Recourse Parties of any Affiliate of any party to this Agreement, shall have any liability (whether in contract, tort, equity, or otherwise) for any of the covenants or agreements, or other obligations or liabilities of any of the parties under this Agreement or for any claim based upon, arising out of or related to this Agreement.  By accepting a Series B CVR, each Holder waives and releases all such liability against all Non-Recourse Parties.  The waiver and release are part of the consideration for the issue of the Series B CVRs.

Section 8.14    Conditions Precedent to Issuance of Series B CVRs.  The Series B CVRs shall not be issued prior to the satisfaction of all other conditions precedent to the effective date of the Plan (or waiver of such conditions in accordance with the terms of the Plan), including the condition precedent that the Settlement Order (as defined in the Plan) shall have been entered and not subject to any stay, and the Accelerated Relocation Payment Claims (as defined in the Plan) shall have been resolved pursuant to an order not subject to any stay, on the terms set forth in the Plan (or

29

such other terms that are acceptable to the Required Consenting Jackson Crossover Group Members (as defined in the Plan)).

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its duly authorized officers as of the day and year first above written.

<div align="right">

CVR Issuer:

**INTELSAT JACKSON HOLDINGS S.A.**

By:_____
Name: José Toscano
Title: Chairman and CEO

Equity Issuer:

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**

By:_____
Name: José Toscano
Title:   Delegate of the Board of Directors

Rights Agent:

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC**

By:_____
Name:
Title:

</div>

31

EXHIBIT A-1


DIRECT OWNER LEGEND


TO THE EXTENT THESE SERIES B CVRS ARE SECURITIES, THESE SERIES B CVRS HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN "UNDERWRITER" AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

TO THE EXTENT THESE SERIES B CVRS ARE SECURITIES, THESE SERIES B CVRS HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH SERIES B CVRS IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE SERIES B CVRS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SERIES B CVR AGREEMENT OF INTELSAT JACKSON HOLDINGS S.A. (THE "CVR ISSUER"), DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SERIES B CVR AGREEMENT").  NO REGISTRATION OR TRANSFER OF THE CVR ISSUER MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING COMPLIANCE WITH THE SERIES B CVR AGREEMENT.

THE CVR ISSUER OR THE TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE SERIES B CVRS REPRESENTED HEREBY A COPY OF THE SERIES B CVR AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE SERIES B CVRS UPON WRITTEN REQUEST TO THE CVR ISSUER AT ITS PRINCIPAL PLACE OF BUSINESS.  THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE CVR ISSUER.


1

EXHIBIT A-2

FORM OF GLOBAL CERTIFICATE
-EVIDENCING-
SERIES B CVRS
-OF-

INTELSAT JACKSON HOLDINGS S.A.

UNLESS THIS GLOBAL CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO INTELSAT JACKSON HOLDINGS S.A. (THE "CVR ISSUER") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUIRED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE CVR ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THE SECURITIES REPRESENTED HEREBY WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "BANKRUPTCY CODE").  THE SECURITIES REPRESENTED HEREBY MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE CVR ISSUER IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CVR ISSUER AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE SERIES B CVRS REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE SERIES B CVR AGREEMENT OF THE CVR ISSUER, DATED AS OF FEBRUARY [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SERIES B CVR AGREEMENT").  NO REGISTRATION OR TRANSFER OF SERIES B CVRS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING COMPLIANCE WITH THE SERIES B CVR AGREEMENT.  COPIES OF SUCH AGREEMENT ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE CVR ISSUER.  NO TRANSFER OF SERIES B CVRS WILL BE MADE ON THE BOOKS OF THE CVR ISSUER UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE APPLICABLE TERMS OF THE SERIES B CVR AGREEMENT.

NO PERSON MAY BECOME A HOLDER OF SERIES B CVRS PURSUANT TO ANY TRANSFER OF SERIES B CVRS OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SERIES B CVR AGREEMENT.

1

This is to certify that CEDE & CO. is the owner and registered holder of this Certificate evidencing the ownership of the Series B CVRs set forth on the Schedule of Increases and Decreases attached hereto as Schedule A, each of which represents a Series B CVR.

At the request of the registered holder this Certificate may be exchanged for one or more Certificates issued to the registered holder in such denominations as the registered holder may request.

The registered holder of this Certificate is entitled at any time upon tender of this Certificate to the CVR Issuer, endorsed in blank or accompanied by all necessary instruments of assignment and transfer in proper form, at its principal office in Luxembourg and, upon payment of any tax or other governmental charges, to receive such holder's securities evidenced by this Certificate.

The CVR Issuer may deem and treat the person in whose name this Certificate is registered upon the books of the CVR Issuer as the owner hereof for all purposes and the CVR Issuer shall not be affected by any notice to the contrary.

**IN WITNESS WHEREOF**, the CVR Issuer has caused this Certificate to be executed in its name by the manual or electronic signature of one of its authorized signatories.

**INTELSAT JACKSON
HOLDINGS S.A**.

By: _____

José Toscano
Chairman and CEO

2

**SCHEDULE A**
**SCHEDULE OF INCREASES AND DECREASES IN**
**SERIES B CVRS**

The following increases and decreases in the number of Series B CVRs evidenced by this Global Security have been made:

| Date | Amount of increases or decrease in number of Series B CVRs evidenced by this Global Security | Number of Series B CVRs evidenced by this Global Security following such increase or decrease | Signature of authorized signatory |
|---|---|---|---|

1

## Exhibit I-2

**Redline to Series B CVR Agreement filed on October 19, 2021**

~~*Filing*~~*Form of Execution* Version

## SERIES B CONTINGENT VALUE RIGHTS AGREEMENT

THIS SERIES B CONTINGENT VALUE RIGHTS AGREEMENT (this "Agreement") is entered into as of **February** [●], ~~2021~~**2022** (the "Effective Date"), by and among (i) American Stock Transfer & Trust Company, LLC, as Rights Agent (the "Rights Agent"), (ii) Intelsat Jackson Holdings S.A., a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 149959 (the "CVR Issuer"), and (iii) solely ~~for purposes of Section 4.2, [●]~~**as expressly provided herein (and, for the avoidance of doubt, not with respect to any of the provisions of Article II hereof, except Section 2.5(c)),  Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette,  L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 264124** (the "Equity Issuer").

## RECITALS

WHEREAS, on the Effective Date, the CVR Issuer and certain of its Affiliates emerged as the Reorganized Debtors in accordance with the Plan; and

WHEREAS, pursuant to the Plan, the Reorganized Debtors were required to issue the contingent value rights contemplated in this Agreement to certain holders of claims in exchange for their claims, on and subject to the terms contained in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the consummation of the transactions contemplated by the Plan, the CVR Issuer and Rights Agent agree, for the equal and proportionate benefit of the holders of Series B CVRs (collectively, the "Holders"), as follows:

## ARTICLE I
## DEFINITIONS; CERTAIN RULES OF CONSTRUCTION

Section 1.1    Definitions.   All capitalized terms used in this Agreement without definitions shall have the respective meanings ascribed to them in the Plan.  As used in this Agreement, the following terms shall have the following meanings:

"Accelerated Relocation Payments" means the accelerated relocation payments described in the C-Band Order that are allocated to the Debtors and/or Reorganized Debtors in an amount equal to $4,865,366,000.

"Additional Acceleration Contract" means a written contract between any of the Applicable Intelsat Recipients, on the one hand, and any Private Entity, on the other hand, that provides for the payment of Applicable Consideration, and that is entered into prior to the Outside Date.

"Affiliate" means, of any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity. For purposes of this definition, "control," as used with respect to any Entity, means the possession,

directly or indirectly, of the power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement or otherwise.  For purposes of this definition and Agreement, the terms "controlling," "controlled by" and "under common control with" have correlative meanings.  Notwithstanding the foregoing, and for the avoidance of doubt, no Entity shall be an Affiliate of the Debtors, any Reorganized Debtors, or**the** Equity Issuer**, or the CVR Issuer** solely because (a) it is a holder of New Common Stock of the Equity Issuer or (b) it is controlled by a holder of New Common Stock of the Equity Issuer.

"Agreement" has the meaning set forth in the Preamble.

"Allowed" has the meaning set forth in the Plan.

"Applicable Consideration" means any and all consideration, without duplication, that is actually received by any of the Applicable Intelsat Recipients, from time to time, from a Private Entity, solely to the extent such consideration is received in connection with, or directly related to, private negotiations authorized by the FCC in footnote 497 of the C-Band Order to accomplish clearing earlier than the deadlines established by the FCC in the C-Band Order of the Cleared Spectrum; *provided* that such consideration (A) shall only constitute Applicable Consideration to the extent that the Minimum Payment Condition has been satisfied (and, for the avoidance of doubt, any amounts actually received by the Applicable Intelsat Recipients and counted towards satisfaction of the Minimum Payment Condition shall not constitute Applicable Consideration), (B) shall be calculated net of, and be reduced by, any Tax Costs with respect thereto and (C) shall be reduced by all reasonable documented costs and expenses incurred by the [Applicable Intelsat Recipients] in seeking, obtaining or procuring such consideration (solely to the extent such costs and expenses are not reimbursed to the Applicable Intelsat Recipients through Expense Reimbursements); *provided, further,* that Applicable Consideration shall not include any portion of (w) any accelerated relocation payments provided under the C-Band Order to any other space station operator (each, an "Other FSS Operator"), including SES Americom, Inc., Eutelsat S.A., Telesat Canada, Star One S.A., or any of their respective Affiliates and subsidiaries, in the event of any consolidation, amalgamation, merger, combination or similar transaction involving the Applicable Intelsat Recipients and any of the Other FSS Operators, (x) any Expense Reimbursements, or (y) any Accelerated Relocation Payments.

"Applicable Intelsat Recipients" means (i) prior to the Effective Date, the Jackson Entities, and (ii) on and after the Effective Date, the Equity Issuer and its Affiliates.

"Assignee" has the meaning set forth in Section 8.3.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division.

"Beneficial Interest" means, **solely for purposes of and as used in Sections 2.2, 2.3, 2.4 and 2.6 of Article II,** with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Series B CVRs it Beneficially Owns.

"Beneficial Owner" means**, solely for purposes of and as used in Sections 2.2, 2.3, 2.4 and 2.6 of Article II,** any Person owning a securities entitlement with respect to Series B CVRs registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been **ultimately** credited to any other Person's securities account. "Beneficially Owns" and "Beneficially Owned" shall have the correlative meanings.¶

¶

"Board ~~Certificate" means a certificate authorized by the Board of Directors and signed by any two members of the Board of Directors authorized to sign on behalf of the Board of Directors, in each case in his or her capacity as such a member of the Board of Directors, and delivered to the Rights Agent~~**Designee" has the meaning give to such term in Section 2.5(a) hereof**.

"Board of Directors" means the board of directors (or other applicable governing body) of the Equity Issuer.

"Board Resolution" means a copy of a resolution certified by a duly authorized officer of the Equity Issuer to have been duly adopted by the Board of Directors and to be in full force and effect on the date of such certification, and delivered to Rights Agent.

"Business Day" means any day, other than a Saturday, Sunday, or other day on which commercial banks are authorized or required by law to be closed in New York, NY, USA or the Grand Duchy of Luxembourg.

"C-Band Order" means that certain Report and Order and Order of Proposed Modification issued by the FCC on March 3, 2020 in In the Matter of Expanding Flexible Use of the 3.7 to 4.2 GHz Band, GN Docket No. 18-122, as may be amended or modified with respect to the clearing of the Cleared Spectrum.

"Change of Control" means one or a series of related transactions, directly or indirectly following which: (a) a shareholder or a group of shareholders of the Equity Issuer or CVR Issuer (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), acting in concert, directly or indirectly have acquired the right to cast, at a general meeting of shareholders of the Equity Issuer or CVR Issuer, more than fifty (50) percent of the voting shares of the CVR Issuer; or (b) all or substantially all of the assets of the Equity Issuer and its Affiliates (taken as a whole and as measured by asset valuations or other fair market value determinations) are sold or otherwise disposed of (including by way of merger, purchase, amalgamation, consolidation, scheme of arrangement or other business combination transaction) in a single transaction or a series of transactions (whether or not related) to a Person other than an Affiliate of the CVR Issuer.

"Cleared Spectrum" means the 3.7-4.0 GHz band in the contiguous United States, licenses for which were auctioned by the FCC on December 8, 2020 through February 17, 2021 in Auction 107 and specifically excluding any other radio frequencies or locations outside the contiguous United States.

¶

"Competitor" means a "Competitor of the Company" as defined in the Shareholders Agreement.

"CVR Issuer" has the meaning set forth in the Preamble.¶

**"Debtors" means Intelsat S.A. and its affiliated debtors and debtors in possession in the chapter 11 cases jointly administered under Case No. 20-32299 (KLP).**

"Depository Agreement" means the Blanket Issuer Letter of Representations from the CVR Issuer to DTC, dated as of [●], 20[●], as the same may be amended or supplemented from time to time.

"Direct Owner" means any holder of Series B CVRs who is registered on the books and records of the Rights Agent**Series B CVR Register**.

"Direct Owner Legend" means the legend on the account of each Holder of Series B CVRs held in book-entry on the books and records for the**Series B** CVR Issuer**Register in** the **form** set forth on Exhibit A-1 hereto.

"DTC" means The Depository Trust Company or any successor thereto.

"DTC Participant" means any Person that is reflected on the books and records of DTC as having a direct interest in the Series B CVRs held of record by DTC.

"Effective Date" has the meaning set forth in the Preamble.

"Entity" means any corporation (including any non-profit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any company limited by shares, limited liability company or joint stock company), firm, society or other enterprise, association, organization or entity.

"Equity Issuer" has the meaning set forth in the Preamble.

"Escrow Agent" means American Stock Transfer & Trust Company, LLC, in its capacity as escrow agent as provided under Section 2.13.

"Event of Default" has the meaning set forth in Section 6.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Expense Reimbursements" means any and all payments received by any of the Applicable Intelsat Recipients on account of compensable relocation costs as described in the C-Band Order.

"FCC" means the Federal Communications Commission, including any official bureau or division thereof acting on delegated authority, and any successor Governmental Authority performing functions similar to those performed by the Federal Communications Commission on the Effective Date.¶

**"Financial Statements" has the meaning set forth in Section 7.1.**

"Further Accelerated Relocation Payments" means any and all Applicable Consideration actually received by any Applicable Intelsat Recipient pursuant to an Additional Acceleration Contract, whether or not such Applicable Consideration is received before or after the Outside Date, not to exceed $420,000,000.  For the avoidance of doubt, the first $65,000,000 of Further Accelerated Relocation Payments are referred to as Initial Further Accelerated Relocation Payments and the remaining $355,000,000 of Further Accelerated Relocation Payments are referred to as Subsequent Further Accelerated Relocation Payments.

"Global Security" means the global certificate or certificates issued to DTC as provided in the Depository Agreement, each of which shall be in substantially the form attached hereto as Exhibit A-2.

"Governmental Authority" means any U.S. or non-U.S. (including Luxembourg) federal, state, provincial, local or other government or quasi-governmental, department, authority, court, tribunal, commission, instrumentality, regulatory body or self-regulatory body (including any securities exchange), or any political or other subdivision, department, agency or branch of any of the foregoing.

"Holders" has the meaning set forth in the Recitals.  A Person shall cease to be a Holder hereunder at such time as it ceases to hold, *directly or indirectly,* **beneficial ownership of** any Series B CVRs or Beneficial Interests.¶

**"Holder Website" has the meaning set forth in Section 7.1(b)**.

"Initial Distribution Escrow Account" means an interest-bearing escrow account established by the CVR Issuer with the Escrow Agent for the benefit of Holders.

"Initial Distribution Escrow Deposits" has the meaning set forth in Section 2.13.

"Initial Distribution Escrow Funds" means, at any time, the portion of the Initial Distribution Escrow Deposits then remaining in the Initial Distribution Escrow Account, plus all interest (if any) or other amounts earned thereon (if any).

"Initial Further Accelerated Relocation Payment" means the first $65,000,000 of any Further Accelerated Relocation Payments.

"Jackson" means Intelsat Jackson Holdings S.A., a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg.

"Jackson Entities" means, collectively, Intelsat Jackson Holdings S.A., a *société anonyme* existing under the laws of the Grand Duchy of Luxembourg, having its registered office at 4, rue Albert Borschette, L-1246 Luxembourg, Grand Duchy of Luxembourg, and registered with the *Registre de Commerce et des Sociétés* in Luxembourg under number B 149959, and all of its direct and indirect subsidiaries, prior to the Effective Date.

"Law" means any foreign, federal, state, local or municipal laws, rules, judgments, orders, regulations, statutes, ordinances, codes, decisions, injunctions, orders, decrees or requirements of any Governmental Authority.

"*Required Consenting*Listing" means a listing of the Equity Issuer's securities resulting in the Equity Issuer being registered under Section 12(b) of the Exchange Act. "Majority of Holders" means, as of the time of determination, Holders of not less than ~~75%~~a majority of the issued and Outstanding Series B CVRs.

"Minimum Payment Amount" means $4,865,366,000 (*i.e.*, the maximum amount of potential Accelerated Relocation Payments provided under the C-Band Order as of the Effective Date).

"Minimum Payment Condition" means that the Applicable Intelsat Recipients (on an aggregate basis) shall have actually received an aggregate amount of consideration (either (a) pursuant to the C-Band Order as Accelerated Relocation Payments ~~or~~, (b) from a third party as compensation for the efforts of the Applicable Intelsat Recipients to clear the Cleared Spectrum solely to the extent such consideration is in connection with or directly related to private negotiations authorized by the FCC in footnote 497 of the C-Band Order to accomplish earlier clearing than the deadlines established by the FCC in the C-Band Order of the Cleared Spectrum, or (c) a combination of consideration set forth in clauses (a) and (b) of this parenthetical) in an amount equal to the Minimum Payment Amount; provided, that (1) no amounts counted towards satisfaction of the Minimum Payment Condition shall constitute Applicable Consideration and (2) no Expense Reimbursements received by the Applicable Intelsat Recipients shall count towards satisfaction of the Minimum Payment Condition.

"New Common Stock" means ordinary shares of the Equity Issuer.

"New Indenture" means that certain indenture for 6.500% First Lien Secured Notes due 2030 dated January 27, 2022 between the CVR Issuer, the guarantors from time to time party thereto, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time.

"Non-Recourse Parties" has the meaning set forth in Section 8.13.

"Officer's Certificate" means a certificate signed by an authorized officer of the CVR Issuer, in his or her capacity as such an officer, and delivered to the Rights Agent.

"Outside Date" means the date that is the earlier of (i) the date on which the certification of accelerated relocation for Phase II of the Debtors or Reorganized Debtors, as applicable, is validated pursuant to the C-Band Order, and (ii) December 5, 2025 (or, in the case of this clause (ii), such later deadline for clearing the Cleared Spectrum as may be adopted pursuant to the C-Band Order).

"Outstanding" when used with respect to Series B CVRs means, as of the date of determination, all Series B CVRs theretofore authenticated and delivered under this Agreement, except Series B CVRs theretofore cancelled by the Rights Agent in accordance with this Agreement or delivered to the Rights Agent for cancellation in accordance with this Agreement; *provided*, that, for the avoidance of doubt, any Series B CVRs owned by the CVR Issuer or any Affiliate of the CVR Issuer (other than any Series B CVRs abandoned and cancelled pursuant to

Section 2.10 hereof) shall be treated as Outstanding for all purposes under this Agreement, including, but not limited to, the calculation and distribution of a Series B CVR Payment Amount.¶

"Owners" means, collectively, any Beneficial Owners and Direct Owners.

"Person" means any individual, Entity, including any Governmental Authority (or any department, agency or political subdivision thereof) and any syndicate or group that would be deemed to be a person under section 13(d)(3) of the Exchange Act.

"Plan" means the [●]*Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates* filed by the Debtors on [●]**December 17, 2021** at Docket No. [●]**3891** in Case No. 20-32299 (KLP) in the Bankruptcy Court, **and confirmed by the Bankruptcy Court at Docket No. 3894 in Case No. 20-32299 (KLP),** as amended, modified or supplemented.¶

["Pre-Effective Date Further Accelerated Relocation Payments" has the meaning set forth in Section 2.14.]

"Private Entity" means an Entity that is not a Governmental Authority and that is not the clearinghouse appointed by the FCC contemplated by the C-Band Order or any other comparable administrative eEntity selected by the FCC.  Notwithstanding the foregoing, and for the avoidance of doubt, to the extent the Applicable Intelsat Recipients enter into an Additional Acceleration Contract with a Private Entity, and the parties agree to utilize a Governmental Authority or administrative clearinghouse for processing payments earned under such Additional Acceleration Contract, such payments shall be deemed to have been made by a Private Entity.

"Rights Agent" has the meaning set forth in the Preamble or its successor and/or assigns.

"Reorganized Debtor" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.¶

¶

**"Representatives" has the meaning set forth in Section 7.1.**¶

**"***Required Consenting* **Holders" means, as of the time of determination, Holders of not less than** *75%* **of the issued and Outstanding Series B CVRs.**"SEC" means the United States Securities and Exchange Commission, or any other federal agency at the time administering the Securities Act or the Exchange Act.

"Securities Act" means the Securities Act of 1933, as amended.

"Series A Contingent Value Rights Agreement" means that certain Series A Contingent Value Rights Agreement, entered into as of **February** [●], 2021,**2022** by and among (i) [●]**American Stock Transfer & Trust Company, LLC**, as rights agent, (ii) the CVR Issuer, and (iii) solely for purposes of**as expressly provided therein (and, for the avoidance of doubt, not**

¶

**with respect to any of the provisions of Article II thereof, except** Section [4.2] thereof**2.5(c))**, the Equity Issuer.

"Series A CVRs" means, collectively, the rights of holders to receive a contingent cash payment pursuant to the terms of that certain Series A Contingent Value Rights Agreement.¶

**"Series A CVR Payment Condition" means that holders of the Series A CVRs have received 100% of all distributions they are entitled to receive under the Series A Contingent Value Rights Agreement.**

"Series B CVRs" means, collectively, the rights of Holders to receive a contingent cash payment pursuant to the terms of this Agreement.

"Series B CVR Payment Amount" has the meaning set forth in Section 2.6.

"Series B CVR Payment Date" means any date a Series B CVR Payment Amount is paid by the Rights Agent to the Holders pursuant to Section 2.6. [For the avoidance of doubt, there shall be a single Series B CVR Payment Date for the payment of each Series B CVR Payment Amount.]

"Series B CVR Register" has the meaning set forth in Section 4.2**2.4**(a).

"Shareholders Agreement" means the Equity Issuer's shareholders agreement.

"Subsequent Further Accelerated Relocation Payments" means any Further Accelerated Relocation Payments that are not Initial Further Accelerated Relocation Payments, in an amount not to exceed $355,000,000.

"Subsidiary" means a Person more than 50% of the outstanding voting stock of which is owned, directly or indirectly, by the CVR Issuer or by one or more other Subsidiaries, or by the CVR Issuer and one or more other Subsidiaries.  For purposes of this definition, "voting stock" means stock, shares or other equity interests (including partnership interests) which ordinarily have voting power for the election of directors, managers, general partners or trustees, whether at all times or only so long as no senior class of stock, shares or other equity interests (including partnership interests) have such voting power by reason of any contingency.

"Tax" means all taxes, customs, tariffs, imposts, levies, duties, fees or other like assessments or charges of a similar nature, however denominated, imposed by a Governmental Authority, together with all interest, penalties and additions imposed with respect to such amounts.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Tax Costs" [Reserved]**means (i) any liability for cash Taxes of any kind imposed on or with respect to any Debtor or Reorganized Debtor to the extent attributable to Further Accelerated Relocation Payments, (ii) the tax-effected value of any utilization or decrease of any existing Tax attribute of any Debtor or Reorganized Debtor, including, but not limited to, any net operating loss or Tax credit, to the extent attributable to Further Accelerated Relocation Payments, and (iii) the tax-effected value of any decrease in the amount of any**

¶

**deduction or Tax attribute realized or generated by any Debtor or Reorganized Debtor, including, but not limited to, any net operating loss or Tax credit, to the extent attributable to Further Accelerated Relocation Payments, in each case, determined on a "with and without" basis with respect to any amount received by any Debtor or Reorganized Debtor, treating any Further Accelerated Relocation Payments as the last item realized in the applicable taxable period and, in the case of clauses (ii) and (iii), calculating the tax-effected value by, in the case of any Tax attribute that reduces taxable income, (A) multiplying the amount of such Tax attribute by the applicable Tax rate in the year such Further Accelerated Relocation Payment is received and (B) solely in the case of any such Tax attribute for Luxembourg Tax purposes, multiplying the product of the calculation described in clause (A) by fifty percent (50%), without regard to any projected availability of Tax attributes or credits in future years, and, in each of clauses (i)-(iii), further increased by any costs and expenses reasonably attributable to determining the amounts described in clauses (i) through (iii) and subject to appropriate adjustment provisions to account for any subsequent audit adjustment affecting such calculation subject to, and in accordance with, Section 2.5(f) hereof.  For the avoidance of doubt, for purposes of the foregoing clauses, any liability for cash Taxes of any kind, the tax-effected value of any utilization or decrease of any existing Tax attribute, and the tax-effected value of any decrease in the amount of any deduction or Tax attribute realized or generated attributable to income in respect of any escrow established in connection with this Agreement shall be treated as satisfying one or more of the foregoing clauses (i)-(iii) (in accordance with the methodology for calculation set forth herein). For further clarity, the foregoing calculation shall be performed consistently with the following illustrative calculation.  Assume that Further Accelerated Relocation Payments result in a net increase of $100 of overall taxable income, of which $85 is allocable to Luxembourg and $15 is allocable to the United States, that the relevant Luxembourg income tax rate in the applicable tax period is 24.9%, and that the relevant United States income tax rate in the applicable period is 24% (on a combined federal/state basis).  With respect to the $85 of additional Luxembourg taxable income, assuming that the full $85 of Luxembourg taxable income is offset by existing Luxembourg NOLs, the relevant Tax Cost shall be $10.58, calculated by multiplying $85 of income by the 24.9% tax rate ($21.165) and further multiplying that calculation by 50%.  There shall be no further adjustment or modification to account for the fact that the Reorganized Debtors have incremental Luxembourg NOLs such that no additional cash tax cost is actually realized until later years.  With respect to the $15 of additional U.S. taxable income, the Tax Cost shall be $3.6, calculated by multiplying $15 of income by the blended federal and state rate of 24%, and shall be the same regardless of whether the Reorganized Debtors have sufficient NOLs, credits or other tax attributes to offset their federal and state income**_, For the avoidance of doubt, the_ **foregoing calculation is simplified and shall not preclude appropriate adjustments to take account of tax laws as they exist at the time.**

"Termination Date" has the meaning set forth in Section 8.11.

"Transfer" means any sale, pledge, assignment, encumbrance or other transfer or disposition of any Series B CVR to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise.  "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings.  For

the avoidance of doubt, the term "Transfer" includes a transfer of ~~Series B CVRs~~**Beneficial Interests** through DTC.

Section 1.2    Rules of Construction.   The words "hereof," "herein," "hereto" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The headings and captions contained herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified and references to clauses without a cross-reference to a Section or subsection are references to clauses within the same Section or subsection.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meanings as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  References (i) to "$" and "dollars" are to the currency of the United States and (ii) to "days" shall be to calendar days unless otherwise indicated.  Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms.  Except as required by Rule 14d-1(g)(3) promulgated by the SEC under the Exchange Act, when calculating the period of time before which, within which or following which any act is to be done or step taken, the date that is the reference date in beginning the calculation of such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

**ARTICLE II**
**CONTINGENT VALUE RIGHTS**

Section 2.1    Series B CVRs.

(a)    The Series B CVRs represent the rights of Holders to receive contingent payments pursuant to this Agreement.  Pursuant to the Plan, the Series B CVRs shall be issued in the following amounts: (i) 67.5% *pro rata* to holders of Allowed Unsecured Claims (as defined in the Pla~i~n) against Jackson and Allowed Unsecured Claims against Jackson Subsidiaries (as defined in the Plan), and (ii) 32.5% *pro rata* to holders of Allowed Unsecured Claims against ICF**, in each case consistent with the Plan**.  Each holder thereof shall be deemed to have received as of the Effective Date, one Series B CVR for each $~[~1,000.00~]~ of Allowed Unsecured Claims against Jackson, Allowed Unsecured Claims against Jackson Subsidiaries, or Allowed Unsecured Claims against ICF held by such Holder as of the Effective Date, consistent with the Plan.

(b)    The Series B CVRs shall be distributed on the Effective Date in accordance with the terms of this Agreement and the Plan and without any further action of the CVR Issuer or any other Person.  The Series B CVRs shall entitle each Holder to such Holder's *pro rata* share (based on the number of Series B CVRs held by such Holder as compared to the number of Series B

CVRs Outstanding on the applicable Series B CVR Payment Date **(or any record date established by the CVR Issuer in accordance with this Agreement)**) of cash equal to one hundred percent (100%) of the Subsequent Further Accelerated Relocation Payments. The aggregate consideration distributed in respect of the Series B CVRs ~~(including, for the avoidance of doubt, any cash distributed on account of Pre-Effective Date Further Acceleration Payments)~~ shall not exceed the amount of the Subsequent Further Accelerated Relocation Payments.  For the avoidance of doubt, (i) no fractional Series B CVRs shall be issued, and any such fractions will be rounded down or rounded up to the nearest $~~[1,000.00]~~ of Allowed Unsecured Claims against Jackson, Allowed Unsecured Claims against Jackson Subsidiaries, or Allowed Unsecured Claims against ICF, consistent with the Plan, and (ii) no Series B CVR shall be issued to any Person prior to the Effective Date.

Section 2.2      <u>Transferability</u>.  The Series B CVRs or **any** Beneficial Interest shall be freely transferable without the prior consent of the CVR Issuer except as provided in this <u>Section 2.2</u>.  Notwithstanding any other provision of this Agreement, each Holder agrees that it shall not *~~, directly or indirectly,~~* Transfer any of its Series B CVRs or Beneficial ~~Interest~~**Interests except**:

(a)      to the extent that the Series B CVRs constitute "securities" (as such term is defined under the ~~s~~**S**ection 2(a)(1) of the Securities Act), ~~except~~ as permitted under the Securities Act and other applicable federal law or state securities or blue sky laws, and then, with respect to a Transfer of Series B CVRs **or Beneficial Interests**, if requested by the CVR Issuer or the Rights Agent, as applicable, only upon delivery to the CVR Issuer of a written opinion of counsel in form and substance reasonably satisfactory to the CVR Issuer to the effect that such Transfer may be effected without registration under the Securities Act; *provided*, that **notwithstanding the foregoing**, such a legal opinion shall not be  required for any Transfer of Series B CVRs **or Beneficial Interests** that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the CVR Issuer has a good faith reason to believe that such Series B CVRs **or Beneficial Interests** are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the CVR Issuer or an "underwriter" (as such term is defined in the Securities Act) with respect to such Series B CVRs **or Beneficial Interests**;

(b)      ~~to the extent that the Series B~~ *~~CVRs constitute "securities" (as such term is defined under~~* ~~the section~~ *~~2(a)(1) of the Securities Act),~~* if such Transfer would **not** reasonably be expected to require the CVR Issuer to initiate a registration or qualification of ~~such~~**the** Series B CVRs pursuant to the Exchange Act ~~or any applicable federal or state securities or blue sky laws, or require the CVR Issuer to begin to file reports pursuant to the Exchange Act (as a result of the number of Holders of such Series B CVRs or equity securities or otherwise),~~ or any applicable federal or state securities or blue sky laws;

(c)      if such Transfer, upon consummation, would **not** result in the CVR Issuer having, in the aggregate, **either** (A) ~~1,000~~**1,900** or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) or (B) in the aggregate, more than 450 holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act) who do not satisfy the definition of an "accredited investor" within the meaning of Rule 501(a) under

Regulation D of the Securities Act (determined, in each case, in the ~~Equity~~**CVR** Issuer's ~~sole~~**reasonable** discretion) **of any class of equity securities of the CVR Issuer**;

(d)      if such Transfer would **not** cause the CVR Issuer or any Subsidiary or Affiliate of the CVR Issuer to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(e)      if such Transfer would **not** cause the CVR Issuer or any Subsidiary or Affiliate of the CVR Issuer to be subject to regulation under the Investment Advisers Act of 1940**, as amended**.

The Series B CVRs have not been registered under the Securities Act, the Exchange Act, or state securities laws and will not be listed for trading on any securities exchange.  Any attempted or purported Transfer of all or a portion of the Series B CVRs **or Beneficial Interests** held by a Holder in violation of this Section 2.2 shall be null and void and of no force or effect whatsoever, such purported Transferee shall not be treated as ~~an~~ **a H**~~own~~**ld**er of the Series B CVRs **or Beneficial Interests** for purposes of this Agreement or otherwise, and the CVR Issuer shall not register such Transfer.  **The restrictions under this Section 2.2(b), 2.2(c), 2.2(d), and 2.2(e) shall terminate automatically upon the effectiveness of a Listing.**

Section 2.3      Exemption from Securities Registration at Issuance.  To the extent that the Series B CVRs constitute "securities" (as such term is defined under the ~~s~~**S**ection 2(a)(1) of the Securities Act), the Series B CVRs shall be issued pursuant to ~~s~~**S**ection 1145 of the Bankruptcy Code; provided that the **Beneficial** Owner is not deemed to be an "underwriter" as defined in ~~s~~**S**ection 1145(b)(1) of the Bankruptcy Code. ¶~~Section 2.4~~  **To the extent the** Series B *CVRs constitute "securities" (as such term is defined under* **Section** *2(a)(1) of the Securities Act)* **and are deemed not to have been issued pursuant to Section 1145 of the Bankruptcy Code, the Series B CVRs shall be issued in reliance upon an exemption from the registration requirement of Section 5 of the Securities Act provided by Section 4(a)(2) of the Securities Act.**¶

**Section 2.4      Series B** CVR Register; DTC; Global Security

(a)      The Rights Agent shall keep a register (the "Series B CVR Register") for the purpose of registering Series B CVRs and permitted Transfers thereof.  The Series B CVR Register shall initially show one position for Cede & Co. representing all of the Series B CVRs held by DTC on behalf of the Beneficial Owners holding through their respective DTC Participants. The Rights Agent shall have no responsibility whatsoever directly to the Beneficial Owners holding through their respective DTC Participants with respect to transfers of Series B CVRs.  Any Beneficial Owners holding through their respective DTC Participants may move their holdings of Series B CVRs directly to the Series B CVR Register only through the procedures established by the DTC.

(b)      The direct Transferee (*i.e.*, a Transferee that holds the Series B CVRs directly and not simply a Beneficial Interest in Series B CVRs registered in the name of Cede & Co.) of the Series B CVRs Transferred shall be bound by this Agreement as a Direct Owner.  Any indirect Transferee (*i.e.*, a Transferee that holds a Beneficial Interest in the Series B CVRs registered in the name of Cede & Co.) of Series B CVRs Transferred shall be bound by this

Agreement as a Beneficial Owner.  Following a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa), the Rights Agent shall amend the Series B CVR Register to reflect the change in Direct Owners, and the CVR Issuer shall take any other appropriate action in connection therewith.

(c)      The CVR Issuer will enter into the Depository Agreement pursuant to which DTC will act as a securities depository for the Series B CVRs.  The Series B CVRs deposited with DTC will be represented by a Global Security (which may be a book entry security or consist of one or more certificates as required by DTC), which will be registered in the name of Cede & Co., as nominee for DTC or as DTC shall otherwise direct, and deposited with, or on behalf of, DTC.  No other certificates evidencing such Series B CVRs will be issued.  The Global Security shall be in the form attached hereto as Exhibit A-2 or described therein and shall represent such Series B CVRs as shall be specified therein, and may provide that it shall represent the aggregate amount of ~~o~~**O**utstanding Series B CVRs from time to time endorsed thereon and that the aggregate amount of ~~o~~**O**utstanding Series B CVRs represented thereby may from time to time be increased or decreased.  As of the Effective Date, without the need for any action or consent of any Person, including the CVR Issuer, an initial Global Security shall be issued reflecting the number of Series B CVRs to be issued to Cede & Co. as of the Effective Date and shown on the Series B CVR Register.  Any Global Security shall be executed by an officer on behalf of the CVR Issuer.  Any endorsement of a Global Security to reflect the amount, or any increase or decrease in the amount, of ~~o~~**O**utstanding Series B CVRs represented thereby shall be made in such manner and upon instructions given by the CVR Issuer as specified in the Depository Agreement.¶

Section 2.5      ~~[~~Determination of Further Accelerated Relocation Payments.

(a)      As promptly as practicable, following the receipt by the Applicable Intelsat Recipients of any Further Accelerated Relocation Payments after satisfaction of the Minimum Payment Condition and prior to the Termination Date, the CVR Issuer shall deliver to the Rights Agent a certificate (a "Further Accelerated Relocation Payments Certificate") setting forth in reasonable detail (i) the ~~[~~Board of Directors~~]~~' **(or an Entity or Person designated by the Board of Directors (the "Board Designee's"))** calculation of the amount of such Further Accelerated Relocation Payments, (ii) the amount of such Further Accelerated Relocation Payments that constitute Initial Further Accelerated Relocation Payments and Subsequent Further Accelerated Relocation Payments and (iii) any material assumptions or adjustments made by the ~~[~~Board of Directors~~]~~ **(or the Board Designee)** in the calculation of such Further Accelerated Relocation Payments (including, without limitation, any applicable inclusion of interest, or netting of costs and expenses, associated with any Initial Distribution Escrow Funds, as set forth in Section 2.13 hereof).  Within ~~[~~five (5)~~]~~ Business Days of delivery of a Further Accelerated Relocation Payments Certificate to the Rights Agent, the Rights Agent shall mail a notice, by e-mail to the e-mail address that appears on the Series B CVR Register or, if no e-mail address appears on the Series B CVR Register, by first class mail to the Holders at their addresses as they appear on the Series B CVR Register, that includes a copy of the Further Accelerated Relocation Payments Certificate (a "Further Accelerated Relocation Payments Notice").  All determinations and calculations with respect to the calculation of any Further Accelerated Relocation Payments in the Further Accelerated Relocation Payments Certificate shall be reasonably made by the ~~[~~Board of Directors~~]~~ **(or the Board Designee, _provided_ that such determinations and calculations are reviewed and approved by the Board of Directors)** in good faith, and such determinations shall

¶

be final, binding and conclusive on the Holders, absent manifest error or a Further Accelerated Relocation Payments Dispute Statement on the terms set forth in this Section 2.5.

(b)      In the event that Holders holding Series B CVRs representing at least 20% of the Outstanding Series B CVRs disagree with any of the determinations or calculations set forth in a Further Accelerated Relocation Payments Certificate (such Holders, the "Disputing Holders"), the Disputing Holders may, within ten (10) Business Days after receipt by the Disputing Holders of the Further Accelerated Relocation Payments Notice, deliver written notice to the CVR Issuer and the Rights Agent (a "Further Accelerated Relocation Payments Dispute Statement") setting forth in reasonable detail the determinations or calculations (the "Disputed Items") that the Disputing Holders dispute; *provided*, that Holders shall not have any right to challenge any of the determinations or calculations set forth in a Further Accelerated Relocation Payments Certificate (or submit a Further Accelerated Relocation Payments Dispute Statement) if such Further Accelerated Relocation Payments Certificate provides for the distribution of the maximum amounts distributable to the Holders under this Agreement.  Any determinations or calculations not specifically identified in the Further Accelerated Relocation Payments Dispute Statement shall be deemed to be final, binding and conclusive.  In the event that the CVR Issuer and the Rights Agent do not receive a Further Accelerated Relocation Payments Dispute Statement within such ten (10) Business Day period, then the Further Accelerated Relocation Payments Certificate shall be deemed to be final, binding and conclusive.

(c)      A representative of the Disputing Holders (such representative to be identified in the Further Accelerated Relocation Payments Dispute Statement and selected by **Disputing Holders who hold** a majority of **all Series B CVRs held by** the Disputing Holders), on the one hand, and the CVR Issuer [and the Equity Issuer], on the other hand, shall seek in good faith to resolve the Disputed Items for a period of ten (10) Business Days beginning on the date the CVR Issuer receives the Further Accelerated Relocation Payments Dispute Statement.   If the representative of the Disputing Holders, on one hand, and the CVR Issuer [and the Equity Issuer], on the other hand, are unable to resolve all of the Disputed Items during such ten (10)-Business Day period, then the CVR Issuer shall promptly engage an independent third-party financial, accounting, valuation, appraisal or other advisor selected by a majority of the Disputing Holders that is reasonably acceptable to the [Board of Directors] **or the Board Designee (as applicable)**) (an "Independent Advisor") to conduct a non-binding determination or calculation of the remaining Disputed Items.   The Independent Advisor shall be required to make any such non-binding determinations or calculations within thirty (30) days of the engagement of the Independent Advisor.  The [Board of Directors] **(or the Board Designee (as applicable))** shall consider in good faith any comments to the Disputed Items in the Further Accelerated Relocation Payments Certificate based on the determinations and calculations of the Independent Advisor. The [Board of Directors] **(or the Board Designee (as applicable))** shall not be required to make any adjustments to its own determinations as a result of the Independent Advisor's comments, calculations, or determinations; *provided*, that, if the [Board of Directors] **(or the Board Designee (as applicable))** does make any such adjustments, it may not assign a value (i) higher than the greatest value for any Disputed Item calculated by the [Board of Directors] **(or the Board Designee (as applicable))** or the Independent Advisor (whichever is greater) or (ii) lower than the smallest value for such item calculated by [Board of Directors] **(or the Board Designee (as applicable))** or the Independent Advisor (whichever is smaller).  Notwithstanding anything to the contrary herein or in the Series A Contingent Value Rights Agreement, in no event shall the CVR

Issuer be required to engage an Independent Advisor more than once with respect to the Further Accelerated Relocation Payments ~~for which the~~**contemplated by a single** Further Accelerated Relocation Payments Certificate ~~was delivered~~.  The CVR Issuer shall bear fifty percent (50%) of the cost and expense of the Independent Advisor (the "Independent Advisor Costs") and the other fifty percent (50%) of the Independent Advisor Costs shall be borne *pro rata* by the Holders (with such portion of the costs and expenses to be offset against the amount payable to Holders hereunder).  For the avoidance of doubt, in no instance shall any Holder be required to pay for its respective allocation of the Independent Advisor Costs other than by offset against the amounts payable to such Holder hereunder.

(d)      The Further Accelerated Relocation Payments Certificate, as modified to incorporate any comments pursuant to the prior paragraph (if applicable), is hereinafter referred to as a "Final Further Accelerated Relocation Payments Certificate".  Within [five (5)] Business Days following the completion of any Final Further Accelerated Relocation Payments Certificate, the CVR Issuer shall distribute an amount of cash equal to the amount of the Further Accelerated Relocation Payments set forth in such certificate that constitute Subsequent Further Accelerated Relocation Payments (net of the Holders' portion of any costs and expenses of an Independent Advisor, if any) to the Rights Agent, for payment to the Holders in accordance with Section 2.6.  For the avoidance of doubt, no Further Accelerated Relocation Payments that constitute ~~Subsequent~~**Initial** Further Accelerated Relocation Payments shall be distributed to Holders under this Agreement.

(e)      The CVR Issuer shall use commercially reasonable efforts to provide the Independent Advisor such information, cooperation and access as the Independent Advisor may reasonably request in connection with Section 2.5(c) (subject to customary confidentiality restrictions and access letters).

(f)      [In the event any examination or audit with respect to Tax issues results in an increase to a Tax Cost following the payment of any Subsequent Further Accelerated Relocation Payment **to the Holders**, such increase in Tax Cost shall reduce any future payment **to Holders** with respect to the Series B CVRs, and such reduction in future payment shall be the [sole] remedy for the CVR Issuer resulting from any such increase to a Tax Cost.  In the event any examination or audit with respect to Tax issues results in a decrease to a Tax Cost following the payment of any Subsequent Further Accelerated Relocation Payment **to the Holders**, such decrease in Tax Cost shall result in an increase in any future payments **to Holders** with respect to the Series B CVRs, and such increase shall be the sole remedy for any Holder resulting from any such decrease to a Tax Cost.]

Section 2.6      Payments of Series B CVR Payment Amount.  Within [five (5)] Business Days following receipt of any cash from the CVR Issuer for payment to the Holders (each, a "Series B CVR Payment Amount"), including pursuant to Section 2.5(d), **Section 2.5(f), and** Section 2.13 ~~and [Section 2.14]~~, the Rights Agent shall pay the applicable *pro rata* share of such Series B CVR Payment Amount to (a) each Holder holding its Series B CVRs directly on the Series B CVR Register (i) by check mailed to the address of such Holder as reflected on the Series B CVR Register as of the close of business on the last Business Day prior to such date or (ii) if such Holder is due a *pro rata* share of the Series B CVR Payment Amount in excess of ten thousand dollars ($10,000) and has provided the Rights Agent with wire transfer instructions in writing, by

wire transfer of immediately available funds to the account specified in such instructions, and (b) Beneficial Owners of the Series B CVRs holding through their respective DTC Participants by sending a lump payment to DTC in respect of all such Series B CVRs.  The Rights Agent shall have no responsibilities whatsoever with regard to the distribution of payments by DTC to such Beneficial Owners.  The *pro rata* share of each Series B CVR Payment Amount due to each Holder shall be determined by multiplying the Series B CVR Payment Amount by a fraction (A) the numerator of which is the total number of Series B CVRs owned by such Holder on the Series B CVR Payment Date **(or any record date established by the CVR Issuer in accordance with this Agreement)** and (B) the denominator of which is the total number of Series B CVRs Outstanding on the Series B CVR Payment Date **(or such record date, as applicable)**.

Section 2.7     Record Date.  The CVR Issuer may set a record date for purposes of determining the identity of Holders entitled to (i) receive the Series B CVR Payment Amount or (ii) vote or consent to any action by vote or consent authorized or permitted under this CVR Agreement.  The record date with respect to any Series B CVR Payment shall be at least three (3) Business Days prior to the **Series B CVR Payment Date and no more than ten (10) Business Days prior to the** Series B CVR Payment Date.  If not set by the CVR Issuer prior to the first solicitation of a Holder of CVRs made by any Person in respect of any such action, or, in the case of any such vote, prior to such vote, the record date for such action shall be the later of ten (10) days prior to the first solicitation of such consent or the date of the most recent list of Holders furnished to the Rights Agent prior to such solicitation.  If a record date is fixed, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to receive the Series B CVR Payment Amount or take such action by vote or consent, whether or not such Persons continue to be Holders after such record date.  No such vote or consent shall be valid or effective if taken or made more than one hundred twenty (120) days after such record date.  The CVR Issuer shall provide Holders at least ~~ten (10)~~ Business Days' notice of any record date set pursuant to this Section 2.7.

Section 2.8     Payments on Series B CVRs.

(a)     The Rights Agent shall deduct and withhold, or cause to be deducted or withheld, from any amount payable pursuant to this Agreement, such amounts as are required to be deducted and withheld with respect to such payment under the Tax Code or any provision of state, local or foreign Tax Law; *provided*, that the Rights Agent shall (i) notify the relevant payee of any required withholding no later than five (5) ~~b~~**B**usiness ~~d~~**D**ays in advance of the date of the relevant payment, (ii) reasonably cooperate with such payee and its Affiliates in obtaining any available exemption or reduction, of, or otherwise minimizing, such withholding, and (iii) provide such payee with receipts from the relevant Governmental Authority evidencing the receipt of such deducted or withheld amount.  To the extent that amounts are so withheld and paid over to or deposited with the relevant Governmental Authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Holder in respect of which such deduction and withholding was made.  The Rights Agent shall be entitled to solicit any appropriate forms or information, from Holders in order to determine the amount of such withholding, if any, and shall cooperate with the Holders to mitigate or eliminate any such withholding to the extent permitted by applicable law.

(b)      Neither the CVR Issuer nor the Rights Agent shall be liable to any Person in respect of the Series B CVR Payment Amount delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.  If, despite the CVR Issuer's and/or the Rights Agent's commercially reasonable efforts to deliver the Series B CVR Payment Amount to the applicable Holder, such Series B CVR Payment Amount has not been paid prior to two (2) years after the Series B CVR Payment Date (or immediately prior to such earlier date on which such Series B CVR Payment Amount would otherwise escheat to or become the property of any Governmental Authority), such Series B CVR Payment Amount shall, to the extent permitted by applicable Law, become the property of the CVR Issuer, free and clear of all claims or interest of any Person previously entitled thereto.

Section 2.9      <u>No Voting, Dividends or Interest; No Equity or Ownership Interest in the CVR Issuer.</u>

(a)      Neither the Holders (by virtue of their ownership of the Series B CVRs) nor the Series B CVRs shall have any rights common to stockholders of the CVR Issuer, including voting and dividend rights.  The Series B CVRs shall not represent an equity or ownership interest in the CVR Issuer or the Equity Issuer.

(b)      Except as set forth in <u>Section 2.13</u> with respect to the Initial Distribution Escrow Funds, interest shall not accrue on any amounts that may be payable to a Holder.

(c)      Except as expressly set forth in this Agreement, the Series B CVRs shall not (i) be subject to any mandatory or optional redemption rights by the Holders or the CVR Issuer or the Reorganized Debtors, (ii) mature or trigger any right to payment by the Holders or the Reorganized Debtors in any amount or on any specific date, or (iii) be convertible into or exchangeable for any security or other interest in the CVR Issuer or the Reorganized Debtors.

Section 2.10      <u>Ability to Abandon Series B CVR; CVR Issuer Acquisition of Series B CVRs.</u>  A Holder may at any time, at such Holder's option, abandon all of such Holder's remaining rights in a Series B CVR by transferring such Series B CVR to the CVR Issuer without consideration therefor and such Series B CVR shall be cancelled and shall not be considered Outstanding for any purposes under this Agreement.  Nothing in this Agreement shall prohibit the CVR Issuer or any of its ~~a~~**A**ffiliates from offering to acquire or acquiring any Series B CVRs for consideration from the Holders, in private transactions or otherwise, in its sole discretion.

Section 2.11      <u>Expiration of Series B CVRs.</u>  Each Series B CVR shall expire on the Termination Date without any further action of the CVR Issuer or any Holder and all rights of Holders hereunder shall immediately terminate upon such expiration other than the right to receive any Series B CVR Payment Amount for which, prior to the occurrence of the Termination Date:  (x) the CVR Issuer has received Subsequent Further Accelerated Relocation Payments, but (y) such Subsequent Further Accelerated Relocation Payments have not been distributed to Holders.

Section 2.12      <u>Maximum Series B Payment Amount; No Distribution Until Satisfaction of Minimum Payment Condition.</u>  The aggregate amount distributed in respect of the Series B CVRs ~~(including, for the avoidance of doubt, any cash distributed on account of Pre-Effective Date Further Accelerated Relocation Payments)~~ shall not exceed $~~65,000,000~~**355,000,000**.  For the

avoidance of doubt:  (a) no amounts shall be paid to the Holders under this Agreement until **both** the Minimum Payment Condition ~~has~~**and Series A CVR Payment Condition have** been satisfied; and (b) no amounts counted towards satisfaction of the Minimum Payment Condition shall ~~constitute Applicable Consideration or~~ be distributed under this Agreement.

Section 2.13    Escrow of Additional Acceleration Contract Consideration.  In the event that the Minimum Payment Condition has not been satisfied and the Applicable Intelsat Recipients actually receive cash consideration (that would, upon satisfaction of the Minimum Payment Condition, constitute Subsequent Further Accelerated Relocation Payments) pursuant to an Additional Acceleration Contract, then ~~such Applicable Intelsat Recipients~~**the CVR Issuer** shall deposit, or cause to be deposited (the "Initial Distribution Escrow Deposits"), within sixty (60) days of receipt of such cash consideration, into the Initial Distribution Escrow Account, an amount of cash equal to the amount of cash that the CVR Issuer would have been required to pay to the Holders pursuant to this Agreement had the Minimum Payment Condition been satisfied at the time such Applicable Intelsat Recipients received such cash consideration (as determined in good faith by the Board of Directors).  In the event that the Minimum Payment Condition ~~is~~**and Series A CVR Payment Condition are** satisfied prior to the Termination Date, the CVR Issuer shall promptly deliver written instructions to the ~~e~~**E**scrow ~~a~~**A**gent to release (a) any Initial Distribution Escrow Funds that constitute Subsequent Further Accelerated Relocation Payments (together with any interest accrued thereon, but reduced by the cost and expense of the Initial Distribution Escrow Account) to be distributed to the Rights Agent for further distribution to the Holders pursuant to Section 2.6 and, (b) after giving effect to the foregoing release, any remaining Initial Distribution Escrow Funds to the CVR Issuer.  In the event that the Minimum Payment Condition ~~is~~**and Series A CVR Payment Condition are** not satisfied prior to the Termination Date, the CVR Issuer shall promptly cause all remaining Initial Distribution Escrow Funds to be released to the CVR Issuer.

~~Section 2.14    [Payment of Pre-Effective Date Further Accelerated Relocation Payments. On the Effective Date, the CVR Issuer shall distribute an amount of cash equal to $[●] (the "Pre-Effective Date Further Accelerated Relocation Payments") to the Rights Agent, for payment to the Holders in accordance with Section 2.6.  *For the avoidance of doubt, the* amount of the Pre-Effective Date Further Accelerated Relocation Payments constitute Further Accelerated Relocation Payments and shall count towards the limitations specified in the definition thereof.]~~

## ARTICLE III
## THE RIGHTS AGENT

Section 3.1    Certain Duties and Responsibilities.  The Rights Agent shall not have any liability for any actions taken or not taken in connection with this Agreement, except to the extent of its fraud, willful misconduct, or gross negligence.

Section 3.2    Certain Rights of Rights Agent.  The Rights Agent undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations may be read into this Agreement against the Rights Agent.  In addition:

(a)    the Rights Agent may rely and shall be protected and held harmless by the CVR Issuer in acting or refraining from acting upon any resolution, certificate, statement, instrument,

opinion, report, notice, request, direction, consent, order or other paper or document reasonably believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)     whenever the Rights Agent shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Rights Agent may rely upon an Officer's Certificate, which certificate shall be full authorization and protection to the Rights Agent, and the Rights Agent shall, in the absence of fraud, gross negligence or willful misconduct of the Rights Agent or any of its Affiliates, incur no liability to anyone and shall be held harmless by the CVR Issuer for or in respect of any action taken, suffered or omitted to be taken by it under the provisions of this Agreement in reliance upon such certificate;

(c)     the Rights Agent may at any time consult with legal counsel satisfactory to it, and the Rights Agent shall incur no liability or responsibility to the CVR Issuer or to any Holder for any action taken, suffered or omitted by it absent gross negligence, willful misconduct, fraud or bad faith (each as determined by a final judgment of a court of competent jurisdiction) in accordance with the opinion or advice of such counsel;

(d)     the permissive rights of the Rights Agent to do things enumerated in this Agreement may not be construed as a duty;

(e)     the Rights Agent shall not be required to give any note or surety in respect of the execution of such powers or otherwise in respect of the premises;

(f)     the Rights Agent shall not be liable for or by reason of, and shall be held harmless by the CVR Issuer with respect to, any of the statements of fact or recitals contained in this Agreement or be required to verify the same, but all such statements and recitals are and shall be deemed to have been made by the CVR Issuer only;

(g)     the Rights Agent shall have no liability and shall be held harmless by the CVR Issuer in respect of the validity of this Agreement or the execution and delivery hereof (except the due execution and delivery hereof by the Rights Agent and the enforceability of this Agreement against the Rights Agent assuming the due execution and delivery hereof by the CVR Issuer); nor shall it be responsible for any breach by the CVR Issuer of any covenant or condition contained in this Agreement;

(h)     the CVR Issuer agrees to indemnify the Rights Agent for, and hold the Rights Agent harmless against, any loss, liability, claim, demands, suits or expense arising out of or in connection with the Rights Agent's duties under this Agreement, including the reasonable costs and expenses of defending the Rights Agent against any claims, charges, demands, suits or loss, unless such loss has been determined by a court of competent jurisdiction to be a result of the Rights Agent's fraud, gross negligence, or willful misconduct;

(i)     the CVR Issuer agrees (i) to pay the fees and expenses of the Rights Agent in connection with this Agreement as agreed upon in writing by the Rights Agent and the CVR Issuer on or prior to the date hereof, which agreement is set forth in [●],2021 letter agreement between the CVR Issuer and the Rights Agent **(email being sufficient)** and (ii) to reimburse the Rights Agent for all Taxes and governmental charges, reasonable and documented out-of-pocket expenses incurred by the Rights Agent in the execution of this Agreement (other than Taxes

imposed on or measured by the Rights Agent's net income and franchise or similar Taxes imposed on it).  The Rights Agent shall also be entitled to reimbursement from the CVR Issuer for all reasonable and necessary out-of-pocket expenses paid or incurred by it, including reasonable legal fees of counsel, in connection with the administration and enforcement by the Rights Agent of its duties hereunder;

(j)      no provision of this Agreement shall require the Rights Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of its rights if there shall be reasonable grounds for believing that repayment of such funds or adequate indemnification against such risk or liability is not reasonably assured to it; and

(k)      no Holder shall be obligated to indemnify the Rights Agent for any services or actions under this Agreement and the Rights Agent shall not be entitled to deduct any sums from the Series B CVR Payment Amount in any circumstance except as provided in Section 2.8(a).

Section 3.3      Resignation and Removal; Appointment of Successor.

(a)      The Rights Agent may resign at any time by giving written notice thereof to the CVR Issuer specifying a date when such resignation shall take effect, which notice shall be sent at least sixty (60) days prior to the date so specified but in no event shall such resignation become effective until a successor Rights Agent has been appointed.  The CVR Issuer has the right to remove the Rights Agent at any time by a Board Resolution specifying a date when such removal shall take effect but no such removal shall become effective until a successor Rights Agent has been appointed.  Notice of such removal shall be given by the CVR Issuer to the Rights Agent, which notice shall be sent at least sixty (60) days prior to the date so specified.

(b)      If the Rights Agent provides notice of its intent to resign, is removed pursuant to Section 3.3(a) or becomes incapable of acting, the CVR Issuer shall, as soon as is reasonably practicable, appoint a qualified successor Rights Agent who, unless otherwise consented to in writing by the [Required Consenting Holders], shall be a stock transfer agent of national reputation or the corporate trust department of a commercial bank of national reputation.  The successor Rights Agent so appointed shall, forthwith upon its acceptance of such appointment in accordance with Section 3.4, become the successor Rights Agent.

(c)      Promptly upon the delivery of any notice of resignation of a Rights Agent, removal of a Rights Agent or appointment of a successor Rights Agent, the CVR Issuer shall give notice of each such resignation and each such removal of a Rights Agent and each such appointment of a successor Rights Agent by mailing written notice of such event by first-class mail to the Holders as their names and addresses appear in the Series B CVR Register.  Each notice shall include the name and address of the successor Rights Agent.  If the CVR Issuer fails to send such notice within fifteen (15) days after acceptance of appointment by a successor Rights Agent in accordance with Section 3.4, the successor Rights Agent, within fifteen (15) days of such failure, shall cause the notice to be mailed at the expense of the CVR Issuer.

Section 3.4      Acceptance of Appointment by Successor.  Every successor Rights Agent appointed pursuant to Section 3.3(b) hereunder shall execute, acknowledge and deliver to the CVR

Issuer and to the retiring Rights Agent an instrument accepting such appointment and a counterpart of this Agreement, and thereupon such successor Rights Agent, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Rights Agent.  On request of the CVR Issuer or the successor Rights Agent, the retiring Rights Agent shall execute and deliver an instrument transferring to the successor Rights Agent all the rights, powers and trusts of the retiring Rights Agent.

**ARTICLE IV**
**COVENANTS**

Section 4.1      <u>List of Holders</u>.  The CVR Issuer shall furnish or cause to be furnished to the Rights Agent the names and addresses of the Direct Owners no later than ten (10) Business Days after the CVR Issuer receives notice of such Direct Owners' names and addresses**; *provided,* that notwithstanding** *the foregoing, the CVR Issuer shall have no obligations* **pursuant to this sentence** *if the only Direct Owner is Cede & Co. at the Effective Date*.  The Rights Agent shall reflect such names and addresses on the Series B CVR Register and confirm the write up of the Series B CVR Register and list of initial Direct Owners to the CVR Issuer promptly thereafter and, in any event, within five (5) Business Days of the receipt of such names and addresses from the CVR Issuer.  ~~Notwithstanding~~ ~~*the foregoing, the CVR Issuer shall have no obligations*~~ ~~under this Section 4.1~~ ~~*if the only Direct Owner is Cede & Co. at the Effective Date*~~.

Section 4.2      <u>Efforts to Obtain Further Accelerated Relocation Payments.</u>  The CVR Issuer and the Equity Issuer shall use commercially reasonable efforts to:

(a)      obtain Further Accelerated Relocation Payments; *provided* that this <u>Section 4.2</u> shall not affect the requirement that no Further Accelerated Relocation Payments shall exist unless the Minimum Payment Condition has been satisfied; and

(b)      in the event Further Accelerated Relocation Payments are actually received by an Entity other than the CVR Issuer, implement such intercompany transactions as may be necessary in order for the CVR Issuer to satisfy its obligations under this Agreement.

Section 4.3      <u>Nonassignability.</u>  The Equity Issuer and the CVR Issuer shall not, and shall cause all of their applicable ~~controlled~~ Affiliates not to, assign the right to rec~~ei~~eve any consideration that would constitute Further Accelerated Relocation Payments to any Person unless such Person is an Affiliate and such assignment is made pursuant to <u>Section 8.3</u>.

**ARTICLE V**
**AMENDMENTS**

Section 5.1      <u>Amendments without Consent of Holders</u>.

(a)      Without the consent of any Holders or the Rights Agent, the CVR Issuer and the Equity Issuer (if such amendment would implicate a term of this Agreement applicable to the Equity Issuer) may enter into one or more amendments hereto, for any of the following purposes:

(i)      to evidence the succession of another Person to the CVR Issuer and the assumption by any such successor of the covenants of the CVR Issuer herein as provided in and subject to conformity with Section 8.3;

(ii)      to cure any ambiguity, to correct or supplement any provision herein that may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement; *provided* that, in each case, such provisions do not adversely affect the interests of any Holder without such adversely affected Holder's prior written consent;

(iii)      to evidence the succession of another Person as a successor Rights Agent and the assumption by any such successor of the covenants and obligations of the Rights Agent herein in accordance with Section 3.3 and Section 3.4; or

(iv)      any other amendments hereto, unless such amendment is adverse to the interests of any Holder (in which case such amendment shall not be effective against such adversely affected Holder without such adversely affected Holder's prior written consent but shall be effective against all of the other Holders who are not adversely affected).

(b)      If and only if a Holder agrees to renounce such Holder's rights under this Agreement in accordance with Section 2.10, without the consent of any other Holders, the CVR Issuer, the Equity Issuer and the Rights Agent, in the Rights Agent's sole and absolute discretion, at any time and from time to time, may enter into one or more amendments hereto, to reduce the number of Series B CVRs by the number of Series B CVRs renounced by such Holder in accordance with Section 2.10.

(c)      Promptly after the execution by the CVR Issuer and the Rights Agent of any amendment pursuant to the provisions of this Section 5.1, the CVR Issuer shall mail (or cause the Rights Agent to mail) a notice thereof by first class mail to the Holders at their addresses as they appear on the Series B CVR Register, setting forth such amendment.

Section 5.2      Amendments with the Consent of the Equity Issuer Board and Holders.

(a)      With the prior written consent of the Required Consenting Holders (whether evidenced in writing or taken at a meeting of the Holders), the CVR Issuer (when authorized by a Board Resolution that has been adopted by at least three (3) of four (4) of the Chief Executive Officer and the Minority Directors (as defined in the Shareholders Agreement)), the Equity Issuer, and the Rights Agent may enter into one or more amendments hereto for the purpose of adding, eliminating or changing any provisions of this Agreement,  provided that no such amendment may (i) disproportionately (when compared with other Holders), materially, and adversely affect the rights of any Holder, or (ii) impair any Holder's right to receive payment when required or in the amount required pursuant to this Agreement, in each case, without the prior written consent of such affected Holder.

(b)      Promptly after the execution by the CVR Issuer, the Rights Agent, and, if applicable, the Equity Issuer of any amendment pursuant to the provisions of this Section 5.2, the CVR Issuer shall mail (or cause the Rights Agent to mail) a notice thereof by first class mail to the

Holders at their addresses as they appear on the Series B CVR Register, setting forth such amendment.

Section 5.3     Effect of Amendments.  Upon the execution of any amendment under this Article V, this Agreement shall be modified in accordance therewith, such amendment shall form a part of this Agreement for all purposes and the CVR Issuer, the Equity Issuer, the Rights Agent, and every Holder shall be bound thereby.

**ARTICLE VI
REMEDIES OF THE RIGHTS AGENT ON EVENT OF DEFAULT**

Section 6.1     Event of Default.  "Event of Default" with respect to the Series B CVRs, means each one of the following events which shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of Law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     default by the CVR Issuer in failing to distribute to the Rights Agent a payment when required pursuant to Section 2.5(d), **Section 2.5(f), and** Section 2.13 ~~and [Section 2.14]~~, and continuance of such default for a period of ~~[thirty (30) days]~~ after there has been given, by registered or certified mail, to the CVR Issuer and the Equity Issuer by the Rights Agent or to the CVR Issuer and the Rights Agent by any Holder, a written notice specifying such default or breach and requiring it to be remedied; or

(b)     material default in the performance, or material breach in any material respect, of any covenant or warranty of the CVR Issuer or Equity Issuer in respect of the Series B CVRs, and continuance of such default or breach for a period of thirty (30) days after there has been given, by registered or certified mail, to the CVR Issuer and the Equity Issuer by the Rights Agent or to the CVR Issuer and the Rights Agent by the ~~[Required Consenting~~**Majority of** Holders~~]~~, a written notice specifying such default or breach and requiring it to be remedied.

Section 6.2     Collection by the Rights Agent; Payment Obligations.

(a)     The Rights Agent may, and upon written request of the ~~[Required Consenting~~**Majority of** Holders~~]~~, shall, proceed to protect and enforce its rights and the rights of the Holders by such appropriate judicial proceedings as the Rights Agent shall deem most effectual to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Agreement or in aid of the exercise of any power granted herein, or to enforce any other remedy.

(b)     In case the CVR Issuer shall fail forthwith to pay any amounts due following an Event of Default, any Holder ~~(at its own cost)~~ and the Rights Agent may, and upon written request of the ~~[Required Consenting~~**Majority of** Holders~~]~~ the Rights Agent shall, institute any action or proceedings at Law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceedings to judgment or final decree, and may enforce any such judgment or final decree against the CVR Issuer or other obligor upon such Series B CVRs and collect in the manner provided by Law out of the property of the CVR Issuer or other obligor upon such Series B CVRs, wherever situated, the moneys adjudged or decreed to be payable; *provided*

*however,* concurrently with any such written request, the [Required Consenting**Majority of** Holders] shall also provide indemnification to the Rights Agent in form and substance reasonably satisfactory to the Rights Agent.

(c)      Nothing herein contained shall be deemed to authorize the Rights Agent to authorize or consent to or vote for or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Series B CVRs, or the rights of any Holder thereof, or to authorize the Rights Agent to vote in respect of the claim of any Holder in any such proceeding.

(d)      All rights of action and of asserting claims under this Agreement, or under any of the Series B CVRs, may be enforced by the Rights Agent without the possession of any of the Series B CVRs or the production thereof and any trial or other proceedings instituted by the Rights Agent hereunder, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Rights Agent, each predecessor Rights Agent and their respective agents and attorneys, shall be for the ratable benefit of the Holders.

(e)      In any proceedings brought by the Rights Agent (and also any proceedings involving the interpretation of any provision of this Agreement to which the Rights Agent shall be a party) the Rights Agent shall be held to represent all the Holders, and it shall not be necessary to make any Holders parties to any such proceedings.

Section 6.3      [Application of Proceeds.  Any monies collected by the Rights Agent pursuant to this Article VI in respect of the Series B CVRs shall be applied in the following order at the date or dates fixed by the Rights Agent in connection therewith:

> FIRST:  To the payment of costs and expenses (including fees and costs incurred by the Rights Agent and its reasonable attorney's fees) incurred by the Rights Agent in connection with the exercise of its rights under Section 6.2 in respect of which monies have been collected, except as a result of its willful misconduct, fraud or gross negligence; and

> SECOND:  To the payment of the whole amount then owing and unpaid upon all the Series B CVRs and in case such monies shall be insufficient to pay in full the whole amount so due and unpaid upon the Series B CVRs, then to the payment of such amounts without preference or priority of any Series B CVR over any other Series B CVR, ratably to the aggregate of such amounts due and payable.]

Section 6.4      Delay or Omission Not Waiver of Default.  No delay or omission of the Rights Agent or of any Holder to exercise any right or power accruing upon any Event of Default occurring and continuing as aforesaid shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or an acquiescence therein; and every power and remedy given by this Agreement to the Rights Agent or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Rights Agent or by the Holders in accordance with the terms of this Agreement.

**ARTICLE VII**
**INFORMATION AND CONFIDENTIALITY**

Section 7.1        Reporting and Disclosure.  ¶

**(a)**        Subject to Section 7.2, Holders (other than Holders that are Competitors) shall be entitled to receive from the ~~Equity~~**CVR** Issuer the following information until the ~~Equity~~**CVR** Issuer becomes subject to the reporting requirements of the Exchange Act: ~~[~~(i) within ~~[●]~~**65** days (~~[●]~~**or 150** days in the case **of the first fiscal quarter containing the Effective Date and 90 days in the case of the first full fiscal quarter after the Effective Date occurs) after the end of each** of the first three fiscal quarters *ending after the Effective Date) following the conclusion* of each *of the* ~~Equity Issuer's~~ fiscal ~~quarters~~**year (or if such day is not a Business Day, on the next succeeding Business Day) commencing with the first fiscal quarter** ending after the Effective Date, quarterly unaudited consolidated financial statements of the ~~Equity~~**CVR** Issuer and its Subsidiaries; and (ii) within ~~[●]~~**120** days (~~[●]~~**or 135** days in the case of the first ~~three~~**fiscal year** *ending after the Effective Date) following the conclusion* of each of the **CVR Issuer's** fiscal ~~quarters~~**years** ending after the Effective Date~~) days after~~ **(or if such day is not a Business Day, on the next succeeding Business Day) commencing with** the ~~end of each~~**first** fiscal year **ending** *after the Effective Date*, annual audited consolidated financial statements of the ~~Equity~~**CVR** Issuer and its Subsidiaries~~].~~  ~~Promptly after the initial report to Holders that is furnished~~ *after the Effective Date* **(clauses (i) and (ii) collectively, the "Financial Statements"); and (iii) the information if, as and when provided to the noteholders or trustee, as applicable,** pursuant to **Section 3.10(a) of** the ~~immediately preceding sentence, the Equity Issuer will use~~ *commercially reasonable efforts***New Indenture (or any substantially similar provision in connection with any amendment to the New Indenture or any refinancing indebtedness thereof), including, for the avoidance of doubt, the Financial Statements;** *provided, however,* **that if the CVR Issuer files the Financial Statements described in this Section 7.1(a) with the Securities and Exchange Commission, the requirement** to ~~furnish~~**deliver** the ~~business and financial reporting so that common shares of~~**Financial Statements pursuant to clauses (i) and (ii) shall be deemed satisfied. For the avoidance of doubt, the CVR Issuer may satisfy its obligations pursuant to this Section 7.1 with respect to financial information relating to the CVR Issuer by furnishing financial information relating to one of its direct or indirect parent entities which wholly owns** the ~~Equity~~**CVR** Issuer**;** *provided* **that the same is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent entity and its Subsidiaries, on the one hand, and the information relating the CVR Issuer and its Subsidiaries on a standalone basis, on the other hand.  For the avoidance of doubt, reconciliation information that** may be ~~quoted~~**provided** pursuant to ~~the requirements of Rule 15c2-11 of the Exchange Act (the "Public Side Financial Reporting") and will thereafter use commercially reasonable efforts to maintain compliance with such requirements.  Reasonably promptly~~**Section 3.10(a) of the New Indenture (or any substantially similar provision in connection with any refinancing indebtedness thereof) will be deemed to satisfy the foregoing sentence and the consolidating information referred to in the proviso in the preceding sentence need not be audited. Promptly** following the release of each of the quarterly unaudited financial statements, the ~~Equity~~**CVR** Issuer **or one of its Affiliates** will provide a video and/or a telephonic presentation (which may be a single presentation held together with other securityholders or holders of indebtedness of the ~~Equity~~**CVR** Issuer and its Affiliates) to the **Holders and their respective partners (including limited partners except for any**

¶

**Competitors), shareholders, members,** directors, officers, ~~members,~~ managers, employees, ~~affiliates, and agents~~**financing sources (including existing and bona fide prospective investors except for any Competitors), agents, counsel, accountants, consultants, investment advisors or other professionals or representatives, or its Affiliates or wholly owned subsidiaries** (collectively, "Representatives") ~~of Holders~~ to discuss the **CVR Issuer's (or the** Equity Issuer's **or the Affiliate producing such reporting pursuant to Section 7.1 hereto)** financial condition and results of operations, following which presentation the ~~Equity~~**CVR** Issuer will allow the Representatives of Holders to ask reasonable questions. Any participant in quarterly calls (including bona fide potential transferees permitted in accordance with the terms hereof) (A) shall not be a Competitor of the ~~Equity~~**CVR** Issuer and each Holder hereby represents and warrants to the same as to itself, its Representatives and its bona fide potential transferees that participate in such calls, and (B) shall be subject to Section 7.2; *provided,* that each Holder shall be liable for any action of its Representatives or recipients that would constitute a violation of Section 7.2 if such Representative or recipient were party to this Agreement. With respect to any recipient who is a bona fide potential transferee of ~~Equity Issuer's common stock~~**Series B CVRs**, the applicable Holder must first comply with Section 7.2 prior to sharing any such information. ¶

**(b)     The Company shall use commercially reasonable efforts to promptly post all information required by Section 7.1(a) on a website (which may be nonpublic, require a confidentiality acknowledgement, with such acknowledgement being deemed to satisfy the requirement for a non-disclosure agreement as set forth in Section 7.2 and shall be maintained, using** *commercially reasonable efforts***, by the CVR Issuer or a third party) (the "Holder Website") to which access will be given to the Holders and bona fide prospective investors or bona fide potential transferees (with the exception of Competitors) in the Series B CVRs.**

Section 7.2     Confidentiality.   The Right Agents and Holders hereby agree that any confidential or non-public information they receive **pursuant to this Agreement** from or on behalf of the ~~Equity~~**CVR** Issuer or any Affiliate of the ~~Equity~~**CVR** Issuer**, including the Financial Statements and any information actually provided pursuant to Section 7.1(a)(iii),** (the "Confidential Information"), shall: (a) not be used for any purpose other than for purposes permitted under this Agreement; (b) not be used directly or indirectly in any way that is for competitive purposes; and (c) be kept confidential by, and not be disclosed by, such Rights Agent and the Holders and its Representatives; *provided*, *however*, that any such Confidential Information may be disclosed only to their Representatives who (i) need to know such Confidential Information and (ii) are bound in writing to a non-disclosure agreement no less restrictive than this Section 7.2 **or are otherwise made aware of the confidentiality obligations set forth in this Section 7.2**.  It is understood that such Representatives shall be informed by the Rights Agent or the applicable Holder of the confidential nature of such Confidential Information, and such Rights Agent or Holder, as applicable, shall be responsible for any disclosure or use made by its Representatives in breach of obligations under this Agreement to the same extent as if such disclosure or use had been made directly by the Rights Agent or such Holder, as applicable. "Confidential Information" shall not include any information that is (i) publicly available other than because of a breach of this Section 7.2 by the Rights Agent or the Holders or any of their respective Representatives or (ii) is lawfully disclosed to the Rights Agent or Holders by sources (other than the ~~Equity~~**CVR** Issuer or its Affiliates) rightfully in possession of the Confidential Information.  If the Rights Agent, Holders or their respective Representatives are legally required

¶

or requested to disclose any Confidential Information, they shall in advance of such disclosure, unless otherwise prohibited by Law, promptly notify the ~~Equity~~**CVR** Issuer of such request or requirement so that ~~Equity~~**the CVR** Issuer may seek to avoid or minimize the required disclosure and/or obtain an appropriate protective order or other appropriate relief to ensure that any Confidential Information so disclosed is maintained in confidence to the maximum extent possible by the Person receiving the disclosure, or, in the ~~Equity~~**CVR** Issuer's discretion, to waive compliance with the provisions of this Agreement.  In any such case, the Rights Agent and the Holders agree to cooperate and use commercially reasonable efforts to avoid or minimize the required disclosure and/or obtain such protective order or other relief.  If, in the absence of a protective order or the receipt of a waiver hereunder, the Rights Agent, Holders or their respective Representatives are legally obligated to disclose any Confidential Information, they shall disclose only so much thereof to the party compelling disclosure as they believe in good faith, on the basis of advice of counsel, is required by Law.  The Rights Agent or the Holder, as applicable, shall give the ~~Equity~~**CVR** Issuer prior written notice of the specific Confidential Information that they believe they are required to disclose under such circumstances.  All Confidential Information disclosed by or on behalf of the ~~Equity~~**CVR** Issuer or any of its Affiliates shall be, and shall remain, the property of the ~~Equity~~**CVR** Issuer or such Affiliate.  For the avoidance of doubt, a Person which ceases to be a Holder shall continue to be subject to this <u>Section 7.2</u> with respect to any Confidential Information received by such Holder or its Representatives under this Agreement for [___]**12** months [after ~~receiving such Confidential Information~~][ceasing to be a Holder, at which point such Person will no longer be subject to this <u>Section 7.2</u>.

## ARTICLE VIII
## OTHER PROVISIONS OF GENERAL APPLICATION

Section 8.1     <u>Notices to Rights Agent, the CVR Issuer and the Equity Issuer</u>.  Any notice or other communication required or permitted hereunder shall be in writing and shall be deemed given when delivered in person, by overnight courier, by electronic mail, or two (2) Business Days after being sent by registered or certified mail (postage prepaid, return receipt requested), as follows:

If to the Rights Agent, to it at:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, New York 11219
Attn: Corporate Actions /Intelsat CVR

Email: reorg_rm@astfinancial.com

*with a copy (which shall not constitute notice) to:*

American Stock Transfer & Trust Company, LLC
48 Wall Street, 22nd Floor
New York, NY 10005
Attention: Legal Department
Email: <u>legalteamAST@astfinancial.com</u>

If to the CVR Issuer or the Equity Issuer, to it at:

[•]

[•]

[•]

**Intelsat Emergence S.A. (to be renamed Intelsat S.A.)**
**4, rue Albert Borschette**
**L-1246 Luxembourg, Grand Duchy of Luxembourg**
Attention:        [•]**Legal Department**
Email:             [•]**Michelle.Bryan@Intelsat.com**

*with a copy (which shall not constitute notice) to:*

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:        Edward O. Sassower, P.C.
                       Steven N. Serajeddini, P.C.
                       Aparna Yenamandra
Email:             Edward.Sassower@Kirkland.com
                       Steven.Serajeddini@Kirkland.com
                       Aparna.Yenamandra@Kirkland.com

The Rights Agent, the CVR Issuer or the Equity Issuer may specify a different address or facsimile number by giving notice in accordance with this Section 8.1.

Section 8.2        Notice to Holders.  Where this Agreement provides for notice to Holders, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Holder affected by such event, at the Holder's address as it appears in the Series B CVR Register, not later than the latest date, and not earlier than the earliest date, if any, prescribed for the giving of such notice.  In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.

Section 8.3        Successors and Assigns; Merger, Change of Control.

(a)        The CVR Issuer may assign any or all of its rights, interests and obligations hereunder to [(a) in its sole discretion and without the consent of any other party hereto, any of its Affiliates, but only (i) if the Board of Directors, including three of the four of the Chief Executive Officer and the Minority Directors (as defined in the Shareholders Agreement), **approves of such assignment to such Affiliate and the CVR Issuer** delivers to the Rights Agent a Board**an Officer's** Certificate certifying that such Affiliate will be able to make any applicable payments pursuant to such agreement and (ii) for so long as it remains an Affiliate of the CVR Issuer,] or (b) with the prior written consent of the [Required Consenting Holders], any other Person (any

permitted assignee under clause (a) or (b), an "Assignee"), in each case, provided that the Assignee agrees to assume and be bound by all of the terms of this Agreement.  Any Assignee may thereafter assign any or all of its rights, interests and obligations hereunder in the same manner as the CVR Issuer pursuant to the prior sentence.  In connection with any assignment to an Assignee described in clause (a) above in this Section 8.3, the CVR Issuer shall agree to remain liable for the performance by each Assignee of all obligations of the CVR Issuer hereunder.  This Agreement shall be binding upon, inure to the benefit of, and be enforceable by each of the successors of the CVR Issuer and each Assignee.  Each of the successors of the CVR Issuer and Assignees shall expressly assume by an instrument supplemental hereto, executed and delivered to the Rights Agent, the due and punctual performance and observance of all of the covenants and obligations of this Agreement to be performed or observed by the CVR Issuer.  Any attempted assignment in violation of this Section 8.3 shall be void and of no effect.

(b)      The Equity Issuer and the CVR Issuer shall not consolidate, amalgamate, merge or combine with or into any other Entity in which the Equity Issuer or the CVR Issuer, as applicable, shall not be the surviving or continuing Entity in such consolidation, amalgamation, merger or combination, unless the surviving Entity in such consolidation, amalgamation, merger or combination shall assume all of the obligations of the Equity Issuer or the CVR Issuer, as applicable, under this Agreement.  This Agreement and the Series B CVRs shall survive any Change of Control.

Section 8.4      Benefits of Agreement.  Nothing in this Agreement, express or implied, shall give to any Person (other than the Rights Agent, the CVR Issuer and the Equity Issuer and their respective successors and Assignees, the Holders and their respective successors and permitted assigns) any benefit or any legal or equitable right, remedy or claim under this Agreement or under any covenant or provision herein contained, all such covenants and provisions being for the sole benefit of the foregoing.  The rights of Holders and their successors and permitted assigns are limited to those expressly provided in this Agreement.  Notwithstanding anything to the contrary contained herein, any Holder or Holder's successor or permitted assign may agree to renounce, in whole or in part, its rights under this Agreement by written notice to the Rights Agent, the CVR Issuer and the Equity Issuer, which notice, if given, shall be irrevocable

Section 8.5      Governing Law.  THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.

Section 8.7      Submission to Jurisdiction.  Each party to this Agreement and each Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware) (together with the appellate courts thereof, the "Chosen Courts").  In connection with any claim arising out of or related to this Agreement, each party to this Agreement and each Holder hereby irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection that such Person may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the Chosen

Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the CVR Issuer or the Holder, (iv) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with Section 8.1, although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (v) agrees not to seek a transfer of venue on the basis that another forum is more convenient.  Notwithstanding anything herein to the contrary, each of the parties to this Agreement and each Holder agrees that any judgment issued by a Chosen Court may be recognized, recorded, registered or enforced in any jurisdiction in the world and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction.

Section 8.8     Waiver of Trial by Jury.  EACH PARTY HERETO HEREBY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

Section 8.9     Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.  The parties further agree to replace such invalid or unenforceable provision of this Agreement with a valid and enforceable provision that shall achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable provision.

Section 8.10    Counterparts and Signature.  This Agreement may be executed in two or more counterparts (including by facsimile or by an electronic scan delivered by electronic mail), each of which shall be deemed an original but all of which together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties hereto and delivered to the other party, it being understood that the parties need not sign the same counterpart.

Section 8.11    Termination.  This Agreement and the Series B CVRs issued hereunder shall automatically terminate, without further action of any parties hereto, and be of no force or effect, and the parties hereto shall have no liabilities hereunder or with respect to any of the Series B CVRs, upon the earlier to occur of (a) the date on which Holders have received an aggregate amount equal to the maximum amount of payments on account of the Series B CVRs permitted hereunder, and (b) the later of (i) the Outside Date, and (ii) the date on which there is no obligation remaining pursuant to any Additional Acceleration Contract to pay Further Accelerated Relocation Payments to any Applicable Intelsat Recipient.  Such date that is the earlier to occur of the foregoing is referred to as the "Termination Date."

Section 8.12    Entire Agreement.  This Agreement contains the entire understanding of the parties hereto and thereto with reference to the transactions and matters contemplated hereby and thereby and supersedes all prior agreements, written or oral, among the parties with respect hereto and thereto.

Section 8.13     No Recourse.  This Agreement may only be enforced against, and any claim or cause of action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties and then only in their capacities as such. Except to the extent named as a party, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present, or future direct or indirect stockholder, member, other direct or indirect equityholder, partner, manager, director, officer, employee, Affiliate or agent (collectively, the "Non-Recourse Parties") of any party to this Agreement or the Non-Recourse Parties of any Affiliate of any party to this Agreement, shall have any liability (whether in contract, tort, equity, or otherwise) for any of the covenants or agreements, or other obligations or liabilities of any of the parties under this Agreement or for any claim based upon, arising out of or related to this Agreement.  By accepting a Series B CVR, each Holder waives and releases all such liability against all Non-Recourse Parties.  The waiver and release are part of the consideration for the issue of the Series B CVRs.

Section 8.14     Conditions Precedent to Issuance of Series B CVRs.  The Series B CVRs shall not be issued prior to the satisfaction of all other conditions precedent to the effective date of the Plan (or waiver of such conditions in accordance with the terms of the Plan), including the condition precedent that the Settlement Order (as defined in the Plan) shall have been entered and not subject to any stay, and the Accelerated Relocation Payment Claims (as defined in the Plan) shall have been resolved pursuant to an order not subject to any stay, on the terms set forth in the Plan (or such other terms that are acceptable to the Required Consenting Jackson Crossover Group Members (as defined in the Plan)).

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its duly authorized officers as of the day and year first above written.

CVR Issuer:

¶

**[CVR Issuer]**¶

**INTELSAT JACKSON HOLDINGS S.A.**


By:_____
Name: **José Toscano**
Title: **Chairman and CEO**

Equity Issuer:¶

¶

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**
¶
**[Equity Issuer]**


By:_____
Name: **José Toscano**
Title:  **Delegate of the Board of Directors**

Rights Agent:

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC**


By:_____
Name:
Title:

32

EXHIBIT A-1


DIRECT OWNER LEGEND


TO THE EXTENT THESE SERIES B CVRS ARE SECURITIES, THESE SERIES B CVRS HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN "UNDERWRITER" AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

TO THE EXTENT THESE SERIES B CVRS ARE SECURITIES, THESE SERIES B CVRS HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH SERIES B CVRS IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE SERIES B CVRS ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SERIES B CVR AGREEMENT OF [CVR ISSUER]**INTELSAT JACKSON HOLDINGS S.A.** (THE "CVR ISSUER"), DATED AS OF **FEBRUARY** [●], 20[●]**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SERIES B CVR AGREEMENT").  NO REGISTRATION OR TRANSFER OF THE CVR ISSUER MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING COMPLIANCE WITH THE SERIES B CVR AGREEMENT.

THE CVR ISSUER OR THE TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE SERIES B CVRS REPRESENTED HEREBY A COPY OF THE SERIES B CVR AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE SERIES B CVRS UPON WRITTEN REQUEST TO THE CVR ISSUER AT ITS PRINCIPAL PLACE OF BUSINESS.  THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE CVR ISSUER.

1

EXHIBIT A-2

FORM OF GLOBAL CERTIFICATE
-EVIDENCING-
SERIES B CVRS
-OF-¶

[CVR ISSUER]¶

[_____]¶

**INTELSAT JACKSON HOLDINGS S.A.**

UNLESS THIS GLOBAL CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO ~~THE   [CVR ISSUER]~~**INTELSAT JACKSON HOLDINGS S.A.** (THE "CVR ISSUER") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUIRED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE CVR ISSUER, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THE SECURITIES REPRESENTED HEREBY WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "BANKRUPTCY CODE").  THE SECURITIES REPRESENTED HEREBY MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE ISSUER, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE CVR ISSUER IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE CVR ISSUER AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE SERIES B CVRS REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE SERIES B CVR AGREEMENT OF THE ~~[CVR ISSUER]~~, DATED AS OF **FEBRUARY** [●], ~~20[●]~~**2022** (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SERIES B CVR AGREEMENT").  NO REGISTRATION OR TRANSFER OF SERIES B CVRS MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH, INCLUDING COMPLIANCE WITH THE SERIES B CVR AGREEMENT.  COPIES OF SUCH AGREEMENT ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE CVR ISSUER.  NO TRANSFER OF SERIES B CVRS WILL BE MADE ON THE BOOKS OF THE CVR ISSUER

1

UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE APPLICABLE TERMS OF THE SERIES B CVR AGREEMENT.

NO PERSON MAY BECOME A HOLDER OF SERIES B CVRS PURSUANT TO ANY TRANSFER OF SERIES B CVRS OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SERIES B CVR AGREEMENT.

This is to certify that CEDE & CO. is the owner and registered holder of this Certificate evidencing the ownership of the Series B CVRs set forth on the Schedule of Increases and Decreases attached hereto as <u>Schedule A</u>, each of which represents a Series B CVR.

At the request of the registered holder this Certificate may be exchanged for one or more Certificates issued to the registered holder in such denominations as the registered holder may request.

The registered holder of this Certificate is entitled at any time upon tender of this Certificate to the **CVR Issuer**, endorsed in blank or accompanied by all necessary instruments of assignment and transfer in proper form, at its principal office in **Luxembourg** and, upon payment of any tax or other governmental charges, to receive such holder's securities evidenced by this Certificate.

The CVR Issuer may deem and treat the person in whose name this Certificate is registered upon the books of the CVR Issuer as the owner hereof for all purposes and the CVR Issuer shall not be affected by any notice to the contrary.

**IN WITNESS WHEREOF**, the CVR Issuer has caused this Certificate to be executed in its name by the manual or electronic signature of one of its authorized signatories.

**INTELSAT JACKSON HOLDINGS S.A.**

By: _____

**José Toscano**
**Chairman and CEO**

**¶SCHEDULE A**
**SCHEDULE OF INCREASES AND DECREASES IN**
**SERIES B CVRS**

The following increases and decreases in the number of Series B CVRs evidenced by this Global Security have been made:

| Date | Amount of increases or decrease in number of Series B CVRs evidenced by this Global Security | Number of Series B CVRs evidenced by this Global Security following such increase or decrease | Signature of authorized signatory |
|---|---|---|---|

1

## **Exhibit J-1**

**Rejected Executory Contract and Unexpired Lease List**

**Rejected Executory Contract and Unexpired Lease List**

Article V.B of the Plan provides as follows:

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan and the Rejected Executory Contract and Unexpired Leases List, as applicable.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as an Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Notwithstanding anything to the contrary in the Plan, the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely as to any Executory Contract or Unexpired Lease to which a HoldCo is a party, the Required Consenting HoldCo Creditors), or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

This Schedule J contains the Rejected Executory Contract and Unexpired Lease List.  In the schedule, cure amounts are aggregated for certain counterparties with whom the Debtors have multiple contracts and/or leases.

**<u>Schedule J-1</u>**

Schedule of Rejected
Executory Contracts and Unexpired Leases

| Rejected Executory Contracts | | | |
|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract |
| 1 | 5G Everywhere in America LLC<br>9714 Flint Hill Ct.<br>Vienna, VA  22181<br><br>SES Americom, Inc.<br>Chateau de Betzdorf<br>L-6815 Betzdorf, Luxembourg | Intelsat US LLC | Operating Manager Services Agreement, Dated: 09/20/2018 |
| 2 | Brunswick Group LLC<br>245 Park Avenue<br>New York, NY 10167 | Intelsat US LLC | Service Agreement, Dated: 4/22/2019 |
| 3 | LS telcom, Inc.<br>5021 Howerton Way, Suite E<br>Bowie, MD  20715 | Intelsat US LLC | Service Contract No. Intelsat-2017-1480, Dated: 01/12/2018 |
| 4 | National Economic Research Associates, Inc.<br>Marble Arch House, 66 Seymour Street<br>London, UK  W1H 5BT<br><br>SES Americom, Inc.<br>Chateau de Betzdorf<br>L-6815 Betzdorf, Luxembourg | Intelsat US LLC | Consulting Services Agreement, As Amended: 08/27/2019 |
| 5 | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY  10019-6064<br><br>SES Americom, Inc.<br>1129 20th Street, NW, #1000<br>Washington, DC 20036 | Intelsat US LLC | Engagement Letter, Dated: 8/15/2018 |

| Rejected Executory Contracts | | | |
|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract |
| 6 | RSM US LLP 1861 International Drive, Suite 400 McLean, VA  22102<br><br>SES Americom, Inc.<br>Chateau de Betzdorf<br>L-6815 Betzdorf, Luxembourg<br><br>Telesat Canada<br>1601 Telesat Court<br>Ottawa, Ontario, Canada K1B 5P4<br><br>Eutelsat S.A.<br>70 Rue Balard<br>75002 Paris Cedex 15, France<br><br>5G in America LLC<br>900 17th Street, NW, Suite 300<br>Washington, DC  20006 | Intelsat US LLC | Engagement Letter, Dated: 7/16/2019 |
| 7 | Teneo Strategy LLC<br>601 Lexington Avenue, 45th Floor<br>New York, NY  10022 | Intelsat S.A. | Engagement Letter, Dated: 09/25/2017 |
| 8 | The Boston Consulting Group AG (Switzerland)<br>Munstergasse 2<br>8001 Zurich, Switzerland<br><br>SES Americom, Inc.<br>Chateau de Betzdorf<br>L-6815 Betzdorf, Luxembourg | Intelsat US LLC | Engagement Letter, Dated: 09/21/2018 |
| 9 | Wiley Rein LLP<br>1776 K Street, NW<br>Washington, DC 20006<br><br>SES Americom, Inc.<br>Chateau de Betzdorf<br>L-6815 Betzdorf, Luxembourg | Intelsat US LLC | Engagement Letter, Dated: 10/11/2018 |

| Rejected Executory Contracts | | | |
|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract |
| 10 | Great Communications Pty Ltd<br>18A Keele Street, Collingwood<br>Victoria, 3066 Australia | Intelsat Global Sales & Marketing Ltd. | Business Reference Partner Agreement, Dated: 12/03/2018 |
| 11 | REDSATelital S.A. de C.V.<br>Calle Montecito 38<br>Piso 32 Oficina 5, CDMX 03810 | Intelsat Global Sales & Marketing Ltd. | Business Reference Partner Agreement, Dated: 06/20/2019 |
| 12 | AASONN, LLC<br>184 Shuman Blvd, Park Lake Center, Suite 530<br>Naperville, IL 60563 | Intelsat US LLC | Master Service Agreement, Dated: 10/14/2016 |
| 13 | GuideSpark, Inc.<br>1000 Elwell Court, #225<br>Palo Alto, CA 94303 | Intelsat US LLC | Master Subscription Agreement, Dated: 09/21/2011 |
| 14 | NAI Capital Inc.<br>4650 Von Karman Avenue<br>Newport Beach, CA 92660 | Intelsat US LLC | Exclusive Leasing Listing Agreement for Property at 1600 Forbes Way, Long Beach, CA 90810, As Amended: 10/03/2011 |
| 15 | Worldvu Development LLC<br>1400 Key Blvd<br>Arlington, VA 22209 | Intelsat US LLC | Real Property at Tysons Tower, Dated: 05/31/2017 |

**Exhibit J-2**

**Redline to Rejected Executory Contract and Unexpired Lease List
filed on October 19, 2021**

**Rejected Executory Contract and Unexpired Lease List**

Article V.B of the Plan provides as follows:

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan and the Rejected Executory Contract and Unexpired Leases List, as applicable.  Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty days after the effective date of such rejection.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary.

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as an Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Notwithstanding anything to the contrary in the Plan, the Debtors (with the consent of the Required Consenting Jackson Crossover Group Members and, solely as to any Executory Contract or Unexpired Lease to which a HoldCo is a party, the Required Consenting HoldCo Creditors), or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

This Schedule J contains the Rejected Executory Contract and Unexpired Lease List.  In the schedule, cure amounts are aggregated for certain counterparties with whom the Debtors have multiple contracts and/or leases.

**Schedule J-1**

Schedule of Rejected
Executory Contracts and Unexpired Leases

| | Rejected Executory Contracts | | |
|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract |
| 1 | 5G Everywhere in America LLC<br>9714 Flint Hill Ct.<br>Vienna, VA  22181<br><br>SES Americom, Inc.<br>Chateau de Betzdorf<br>L-6815 Betzdorf, Luxembourg | Intelsat US LLC | Operating Manager Services Agreement, Dated: 09/20/2018 |
| 2 | Brunswick Group LLC<br>245 Park Avenue<br>New York, NY 10167 | Intelsat US LLC | Service Agreement, Dated: 4/22/2019 |
| 3 | LS telcom, Inc.<br>5021 Howerton Way, Suite E<br>Bowie, MD  20715 | Intelsat US LLC | Service Contract No. Intelsat-2017-1480, Dated: 01/12/2018 |
| 4 | National Economic Research Associates, Inc.<br>Marble Arch House, 66 Seymour Street<br>London, UK  W1H 5BT<br><br>SES Americom, Inc.<br>Chateau de Betzdorf<br>L-6815 Betzdorf, Luxembourg | Intelsat US LLC | Consulting Services Agreement, As Amended: 08/27/2019 |
| 5 | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY  10019-6064<br><br>SES Americom, Inc.<br>1129 20th Street, NW, #1000<br>Washington, DC 20036 | Intelsat US LLC | Engagement Letter, Dated: 8/15/2018 |
| 6 | RSM US LLP 1861 International Drive, Suite 400<br>McLean, VA  22102 | Intelsat US LLC | Engagement Letter, Dated: 7/16/2019 |

| Rejected Executory Contracts | | | |
| --- | --- | --- | --- |
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract |
| | SES Americom, Inc.<br>Chateau de Betzdorf<br>L-6815 Betzdorf, Luxembourg<br><br>Telesat Canada<br>1601 Telesat Court<br>Ottawa, Ontario, Canada K1B 5P4<br><br>Eutelsat S.A.<br>70 Rue Balard<br>75002 Paris Cedex 15, France<br><br>5G in America LLC<br>900 17th Street, NW, Suite 300<br>Washington, DC  20006 | | |
| 7 | Teneo Strategy LLC<br>601 Lexington Avenue, 45th Floor<br>New York, NY  10022 | Intelsat S.A. | Engagement Letter, Dated: 09/25/2017 |
| 8 | ~~The Boeing Company, Inc.~~<br>~~McGuireWoods LLP c/o Douglas M. Foley~~<br>~~800 East Canal Street~~<br>~~Richmond, VA 23219-3916~~<br>~~dfoley@mcguirewoods.com~~<br><br>~~The Boeing Company, Inc.[1]~~ | ~~Intelsat Satellite LLC~~ | ~~Fixed Price Contract for the Intelsat 4-pack Satellite Program between Intelsat Satellite LLC and The Boeing Company (Contract No. Intelsat 04052009), dated as of July 10, 2009, as amended, amended and restated, and modified from time to time~~ |

[1] ~~The Debtors are negotiating with The Boeing Company and may remove one or more of the contracts with The Boeing Company from this rejection schedule if and when an agreement regarding the assumption of one or more of such contracts is reached.~~

| Rejected Executory Contracts | | | |
|---|---|---|---|
| **Reference No.** | **Counterparty** | **Debtor Counterparty** | **Description of Contract** |
| | 607 Lairport Street, Bldg 14 El Segundo, CA 90245 | | |
| 9 | The Boeing Company, Inc. McGuireWoods LLP c/o Douglas M. Foley Gateway Plaza 800 East Canal Street Richmond, VA 23219-3916 dfoley@mcguirewoods.com<br><br>The Boeing Company, Inc. acting through its Space & Intelligence Systems Division[2] 607 Lairport Street, Bldg 14 El Segundo, CA 90245 | Intelsat Satellite LLC | Fixed Price Contract for the Intelsat Epic Multi Satellite Program between Intelsat Satellite LLC and The Boeing Company, acting through its Space & Intelligence Systems Division, dated as of April 25, 2013, as amended, amended and restated, and modified from time to time |
| 108 | The Boston Consulting Group AG (Switzerland) Munstergasse 2 8001 Zurich, Switzerland | Intelsat US LLC | Engagement Letter, Dated: 09/21/2018 |

---

[2] The Debtors are represented by McDermott Will & Emery LLP on all matters related to contracts with The Boeing Company.

| | | Rejected Executory Contracts | | |
|---|---|---|---|
| **Reference No.** | **Counterparty** | **Debtor Counterparty** | **Description of Contract** |
| | SES Americom, Inc.<br>Chateau de Betzdorf<br>L-6815 Betzdorf, Luxembourg | | |
| ~~11~~9 | Wiley Rein LLP<br>1776 K Street, NW<br>Washington, DC 20006<br><br>SES Americom, Inc.<br>Chateau de Betzdorf<br>L-6815 Betzdorf, Luxembourg | Intelsat US LLC | Engagement Letter, Dated: 10/11/2018 |
| 1~~2~~0 | Great Communications Pty Ltd<br>18A Keele Street, Collingwood<br>Victoria, 3066 Australia | Intelsat Global Sales & Marketing Ltd. | Business Reference Partner Agreement, Dated: 12/03/2018 |
| 1~~3~~1 | REDSATelital S.A. de C.V.<br>Calle Montecito 38<br>Piso 32 Oficina 5, CDMX 03810 | Intelsat Global Sales & Marketing Ltd. | Business Reference Partner Agreement, Dated: 06/20/2019 |
| 1~~4~~2 | AASONN, LLC<br>184 Shuman Blvd, Park Lake Center, Suite 530<br>Naperville, IL 60563 | Intelsat US LLC | Master Service Agreement, Dated: 10/14/2016 |
| 1~~5~~3 | GuideSpark, Inc.<br>1000 Elwell Court, #225<br>Palo Alto, CA 94303 | Intelsat US LLC | Master Subscription Agreement, Dated: 09/21/2011 |
| 1~~6~~4 | NAI Capital Inc.<br>4650 Von Karman Avenue<br>Newport Beach, CA 92660 | Intelsat US LLC | Exclusive Leasing Listing Agreement for Property at 1600 Forbes Way, Long Beach, CA 90810, As Amended: 10/03/2011 |
| 1~~7~~5 | Worldvu Development LLC<br>1400 Key Blvd<br>Arlington, VA 22209 | Intelsat US LLC | Real Property at Tysons Tower, Dated: 05/31/2017 |

**Exhibit K-1**

**Assumed Executory Contract and Unexpired Lease List**

**Amended Assumed Executory Contract and Unexpired Lease List**

Article V.A of the Plan provides as follows:

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed by the Debtors or Reorganized Debtors, as applicable, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease: (1) was assumed, assumed and assigned, or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease Schedule.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Article V.C of the Plan provides as follows:

Unless otherwise agreed upon in writing by the Debtors or Reorganized Debtors, as applicable, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount including pursuant to the Plan must be filed, served, and actually received by the counsel to the Debtors and the U.S. Trustee on the Confirmation Objection Deadline or other deadline that may be set by the Court.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the

proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount. **For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease is proposed to be assumed in the Plan and the Assumed Executory Contract and Unexpired Lease List is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount (if any) in Cash on the Effective Date or in the ordinary course of business or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

The cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption in the event of a dispute regarding: (1) the amount of any payments to cure such a default; (2) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption.

The Debtor (with the consent of the Required Consenting Jackson Crossover Group Members and, solely as to any Executory Contract or Unexpired Lease to which a HoldCo is a party, the Required Consenting HoldCo Creditors) or the Reorganized Debtor, as applicable, shall be authorized to reject any executory contract or unexpired lease to the extent the Debtor (with the consent of the Required Consenting Jackson Crossover Group Members and, solely as to any Executory Contract or Unexpired Lease to which a HoldCo is a party, the Required Consenting HoldCo Creditors) or the Reorganized Debtor, as applicable, in the exercise of its sound business judgment, concludes that the amount of the cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the applicable Debtor's Estate or the Reorganized Debtor. Such rejected contracts, if any, shall be deemed as listed on the Rejected Executory Contract and Unexpired Lease List, if any.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

Unless otherwise rejected all contracts, including, for the avoidance of doubt, all employment agreements, to which Intelsat S.A. and/or Holdings SARL is a party shall be assumed and assigned by Intelsat S.A. and/or Holdings SARL (as the case may be) to: (a) if one or more other Debtors is a party to such contract, such other Debtor(s) that are party to such contract and the Equity Issuer; or (b) if Intelsat S.A. and/or Holdings SARL is the only party to such contract, the Equity Issuer.

This **Exhibit K** contains the Assumed Executory Contract and Unexpired Lease List. In the list, cure amounts are aggregated for certain counterparties with whom the Debtors have multiple contracts and/or leases. The aggregation of cure amounts shall not be deemed or construed as an admission or acknowledgment by any Debtor that it has any liability for such cure except to the extent it is obligated under an assumed contract to which it is a party. The assumption of an Executory Contract or Unexpired Lease shall include any amendment agreed to between the counterparty and the Debtors. Further, to the extent any Debtor actually pays a cure amount on behalf of another Debtor, all rights of subrogation, contribution, and reimbursement are expressly reserved.

[*Remainder of page intentionally left blank*]

**Amended Assumed Executory
Contracts and Unexpired Lease List**

| | Assumed Executory Contracts | | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| 1 | AboveNet Communications, Inc.<br>360 Hamilton Avenue<br>White Plains, New York 10601 | Intelsat US LLC f/k/a Intelsat Corporation | AboveNet Master Products and Services Agreement - Intelsat Contract 2010-0324, Dated: 04/30/2010 | $20,309.83 |
| 2 | ABS GLOBAL LTD<br>O'Hara House<br>3 Bermudian Road | Intelsat Global Sales and Marketing Ltd | Full-Time Service Agreement - Service Order No. 6812, Dated: 06/10/2019 | $18,106.47 |
| 3 | Alliance Executive Search LLC<br>1960 Old Gallows Road<br>Vienna, VA 22182 | Intelsat US LLC | Service Agreement No. intelsat-2019-0672, Dated: 05/07/2019 | $28,800.00 |
| 4 | Alpine Lawn and Janitorial Services<br>P.O Box 310<br>Fillmore, CA 93015 | Intelsat US LLC f/k/a Intelsat Corporation | Service Agreement No. INTELSAT-2017-0012 for Janitorial Services for Fillmore Facility, Dated: 01/17/2017 | $1,193.97 |
| 5 | APT Satellite Company Limited<br>22 Dai Kwai Street<br>Tai Po Industrial Estate<br>Tai Po, New Territories, Hong Kong | Intelsat Ventures S.A.R.L | Service Agreement, Dated: 01/01/2020 | $87,864.00 |
| 6 | Aricent Technologies Mauritius Limited<br>Temple Court 2, Labourdonnais Street<br>Port Louis, Mauritius<br>Copy to: 3979 Freedom Circle, Suite 059<br>Santa Clara, CA 95054 | Intelsat US LLC | Master Service Contract, Dated: 09/10/2018 | $276,943.00 |
| 7 | Joint-Stock Company "ASTEL"<br>Mametova Str., 67<br>050004 Almaty, Republic of Kazakhstan | Intelsat Service and Equipment LLC f/k/a Intelsat Service and Equipment Corporation | Host Services Contract No. INTELSAT-2008-0383 - GMS Hosting and Facilities Services, Dated: 09/11/2009 | $11,126.25 |
| 8 | Atlantic Technical Sources, INC.<br>4378 Watley Place<br>Hoschton, GA 30548 | Intelsat Global Sales and Marketing Ltd | Service Contract No. Intelsat-2015-0796, Dated: 10/30/2015 | $24,130.00 |

| | Assumed Executory Contracts | | | |
| --- | --- | --- | --- | --- |
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| 9 | Av-Comm Pty Ltd. Unit 24/9 Powells Road Brookvale New South Wales, Australia | Intelsat Global Sales and Marketing Ltd | Master Ordering Agreement, Dated: 03/23/2020 | $3,739.32 |
| 10 | Azercosmos Open Joint Stock Company 72 Uzeyir Hajibeyli AZ 1000 Baku, The Republic of Azerbaijan | Intelsat Global Sales and Marketing Ltd | Master Service Agreement, Dated: 2/26/2016; Service Order Numbers 3, 4, 5, 6, 7, 10 | $975,697.34 |
| 11 | BCOM Offshore SAL 40 Antonie Kazan Street Khoury Building Beirut, Lebanon | Intelsat US LLC f/k/a Intelsat Corporation | Master Ordering Agreement, Dated: 06/27/2018 | $36,371.00 |
| 12 | BT Americans Inc. 620 Eight Avenue New York, New York 10018, USA | Intelsat US LLC f/k/a Intelsat Corporation | Master Services Agreement, Dated: 12/16/2010 | $43,366.73 |
| 13 | Business Wire Inc. 101 California Street 20th Floor San Francisco, CA 94111 | Intelsat US LLC | Vendor Contract - Amendment 5 Discount Pricing Agreement, Dated: 07/11/2018 | $15,749.00 |
| 14 | CenturyLink 5281 Garton Rd Castle Rock, CO 80104 | Intelsat US LLC | Intercity Fiber Lease | $0.00 |
| 15 | Collabera, INC. 110 Allen Road, Basking Ridge, NJ 07920 | Intelsat US LLC | Service Agreement No. Intelsat-2018-1851 for Staffing Services, Dated: 11/01/2018 | $8,026.60 |
| 16 | Comcast Cable Communications Management, LLC 4100 E Dry Creek Road Centennial, CO 80129 | Intelsat US LLC | Comcast Enterprise Services Master Services Agreement, Dated: 05/15/2012; Master Service Agreement, Dated: 04/17/2020 | $22,722.42 |

| | Assumed Executory Contracts | | | |
| --- | --- | --- | --- | --- |
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| 17 | Commonwealth of Australia (represented by the Department of Defence (ABN 68 706 814 312)) Commonwealth of Australia, Sustainment Manager, BP1-1-095, 1 Molonglo Drive Brindabella Business Park, MAJURA ACT 2609. PO Box 7922 CANBERRA BC ACT 2610 | Intelsat Satellite LLC | Customer Contract No. 22550 and Contract No. C439262 | $0.00 |
| 18 | Daniel J Edelman Limited 105 Victoria Street London, SW1E 6QT | Intelsat US LLC | Service Agreement, PO 20200010, Dated: 11/1/2019 | $24,500.00 |
| 19 | EMCOR Services Aircond 400 Lake Ridge Drive SE Smyrna, GA 30082-5236 | Intelsat US LLC | Service Agreement No. Intelsat-2018-1732, Dated: 10/02/2018 | $42,768.68 |
| 20 | Emirates Telecommunication Corporation Sheikh Zayed Street Abu Dhabi, United Arab Emirates | Intelsat US LLC f/k/a Intelsat Global Service Corporation | Amendment No. 10 INTELSAT Monitoring Network Host Station Facilities & Services for Gulf Region - INTEL 2543, Dated: 12/31/2008 | $0.00 |
| 21 | Encompass Digital Media Uruguay S.A. Ruta 8 Km 17.500 Edificio CP91600, Republica Oriental del Uruguay | Intelsat Global Sales and Marketing Ltd | Leaseback Letter Agreement, Dated: 11/11/2016 | $140,400.00 |
| 22 | Equinix Operating Co. Inc. One Lagoon drive 4th Floor Rodwood City, CA 94065 | Intelsat US LLC f/k/a Intelsat Corporation | Master Services Agreement, Dated: 05/25/2012 | $22,531.64 |
| 23 | ETL Systems INC 560 Herndon Oky Ste 110 Hendon, VA 20170-5246 | Intelsat US LLC f/k/a Intelsat Corporation | Master Ordering Agreement No. 20161187, Dated: 12/14/2016 | $187,304.60 |
| 24 | Faegre Drinker Biddle & Reath LLP 1500 K Street NW Suite 1100 Washington, DC 20005 | Intelsat US LLC | Engagement Agreement, Dated: 05/07/2020 | $29,230.00 |

| | Assumed Executory Contracts | | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| 25 | General Dynamic SATCOM Technologies, INC. 4830 River Green Parkway, Suite 100 Duluth, Georgia 30096 | Intelsat US LLC | Master Ordering Ordering Agreement No. 2018-1507, Dated: 08/10/2018 | $76,009.28 |
| 26 | Globecast France 5 allee Gustave Eiffel 92136 Issy les Moulineaux Cedex, France | Intelsat Global Sales and Marketing Ltd | Service Agreement No 17028GCF, Dated: 03/01/2017 | $50,806.45 |
| 27 | Hawaiian Telcom Services Company, Inc. 1177 Bishop Street Honolulu, Hawaii 96813 | Intelsat US LLC f/k/a Intelsat Corporation | Telecommunications Services Agreement, Dated: 11/06/2008 | $597.82 |
| 28 | Hispasat S.A. Paseo de la Castellana 39 28046 Madrid, Spain | Intelsat Ventures S.A.R.L f/k/a Intelsat Operations S.A. | Strategic Cooperation Agreement, Dated: 02/19/2014 | $19,864.15 |
| 29 | Ignitec Inc. 1900 Reston Metro Plaza Suite 615 Reston, VA 20190 | Intelsat US LLC | Staffing Services Agreement No. Intelsat 2020-0001, Dated: 01/02/2020 | $14,560.00 |
| 30 | Impact Unlimited Inc. DBA Impact XM 250 Ridge Road Dayton, NJ 08810 | Intelsat US LLC f/k/a Intelsat Corporation | Master Ordering Agreement No. 2018-0208, Dated: 02/23/2018 | $138,124.87 |
| 31 | Interroute Communications Limited 21st floor 25 Canada Square London, E14 5LQ, UK | Intelsat US LLC f/k/a Intelsat Corporation | GTT MSA 2010-0881, Dated: 11/2/2016 | $27,969.54 |
| 32 | KTSAT Co. Ltd. 13F KT Seolleung Tower, 422 Teheran-ro, Gangnam-gu Seoul, Rebulic of Korea | Intelsat US LLC f/k/a Intelsat Global Service LLC Korea Branch | Host Services Contract No.INTELSAT-2019-0525 Hosting and Facilities Services Exhibit A Doc NO. SWN202557, Dated: 12/3/2019 | $326,095.31 |
| 33 | KVH Industries, Inc. 50 Enterprise Center Middletown, RI 02842 | Intelsat US LLC f/k/a Intelsat Corporation | Intelsatone Revenue Share Agreement, Dated: 05/10/2018 | $131,298.00 |
| 34 | Level 3 Communications LLC 1025 Eldorado Blvd. Broomfield, Colorado 80021 | Intelsat US LLC f/k/a Intelsat Corporation | Master Service Agreement, Dated: 10/31/2002 | $301,896.62 |

| | Assumed Executory Contracts | | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| 35 | Lewis PR, Inc.<br>200 Wheeler Road<br>Burlington, MA 01803 | Intelsat US LLC f/k/a Intelsat Corporation | Consulting Agreement Intelsat-2017-0021, Dated: 01/17/2017 | $21,263.74 |
| 36 | Lockheed Martin Australia PTY Limited<br>PO Box 4714<br>Kingston ACT 2604, Australia | Intelsat US LLC | Toss, TT&C, Drift And Deorbit Services Agreement 2019-1349, Dated: 10/10/2019 | $375,025.22 |
| 37 | Lockheed Martin Corporation<br>12257 South Wadsworth Blvd<br>Littleton, CO  80125 | Intelsat US LLC | TOSS Services Agreement, Dated: 09/23/20024 | $277,899.00 |
| 38 | Marston Nicholson Mayor<br>18 Rue Duphot<br>75001 Paris, France | Intelsat US LLC f/k/a Intelsat Global Service Corporation | Service Contract No. Intelsat-2005-0320, Dated: 7/6/2005 | $29,831.00 |
| 39 | Matrix Business Solutions Ltd.<br>10 Lilac Gardens<br>Bailing, London W5 4LD | Intelsat Global Sales and Marketing Ltd | Service Agreement No. Intelsat - PO# 20110011 for IT Support to Intelsat London UK Office, Dated: 01/12/2011 | $3,416.37 |
| 40 | MEASAT International (South Asia) Ltd<br>Suite 1206 12th Floor, The Core No 62<br>Ebene, Mauritius | Intelsat Ventures S.A.R.L | Service Order, Dated: 03/10/2020 | $13,868.00 |
| 41 | Microsoft Corporation<br>One Microsoft Way<br>Redmond, WA 98052 | Intelsat US LLC | Partner Agreement, Dated: 07/12/2019 | $31,102.48 |
| 42 | Montevideo teleport International (MTI) S.A.<br>Parque de Neocios y Technoloiga, Ruta 8 KM 17.500 Office 123<br>Uruguay | Intelsat Service and Equipment LLC | Host Services Contract No. INTELSAT-20151032, Dated: 01/01/2016 | $12,040.00 |
| 43 | MX1 CEE S.A.<br>district 4 35-37 Sos Oltenitei<br>Bucharest, 041293 | Intelsat Global Sales and Marketing Ltd | Addendum No 6 to Host Service Contract No. INTELSAT-2014-0616, Dated: 11/18/2019 | $61,458.45 |
| 44 | Neuco Limited<br>19 New Road<br>Brighton, East Sussex, BN1 1UF, UK | Intelsat Global Sales and Marketing Ltd | Staffing Service Agreement No. Intelsat 20200149, Dated: 02/12/2020 | $43,750.00 |

| | Assumed Executory Contracts | | | |
| --- | --- | --- | --- | --- |
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| 45 | NewSat Networks Pty Ltd<br>6 Riverside Quay<br>Southbank, Vic, 3006, Australia | Intelsat Global Sales and Marketing Ltd | NewSat Networks MSA, Dated: 7/27/2011 | $216,330.54 |
| 46 | Optus Satellite PTY Limited<br>1-7 Lyonpark Road<br>Macquarie Park, NSW 2113, Australia | Intelsat US LLC | Hosting and TT&C Services Contract No. INTELSAT-2018-1093, Dated: 01/01/2019 | $91,032.82 |
| 47 | Oracle America, Inc.<br>Attn: General Counsel<br>Legal Department<br>500 Oracle Parkway<br>Redwood Shores, CA 94065 | Intelsat US LLC | Oracle License and Services Agreement, Dated: 05/31/2012; Oracle Master Services Agreement Amendment One, Dated: 11/27/2019; Amendment No. 1 to Oracle Master Agreement, Dated: 11/29/2019; Oracle Master Services Agreement Amendment Two, Dated: 02/28/2020; Amendment No. 2 to Oracle Master Agreement, Dated: 02/28/2020 | $0.00 |
| 48 | Otis Elevator Company<br>711 E Ball Road, Suite 200<br>Anaheim, CA 92805 | Intelsat US LLC f/k/a Intelsat Corporation | Service Agreement for Elevator Preventative Maintenance Service Long Beach Facility, Dated: 03/07/2018 | $4,130.06 |
| 49 | Robinson & Cole LLP<br>1055 Washington Boulevard<br>Stamford, CT 06901-2249 | Intelsat US LLC f/k/a Intelsat Corporation | Engagement Agreement - Legal Services, Dated: 01/09/2017 | $3,833.33 |
| 50 | RSM US LLP<br>1861 International Drive Suite 400<br>Mclean VA 22102 | Intelsat US LLC | Master Services Agreement, Dated: 03/12/2019 | $19,679.43 |
| 51 | SecTek, Inc.<br>1930 Isaac Newton Square S.<br>Reston, VA 20190 | Intelsat US LLC | Service Contract No. Intelsat-2018-1705, Dated: 10/01/2018 | $9,108.23 |
| 52 | SED SYSTEMS, A DIVISION OF CALIAN LTD<br>18 Innovation Blvd<br>Saskatchewan, Canada S7K 3P7 | Intelsat US LLC f/k/a Intelsat Global Service LLC | Master Ordering Agreement No. 2012-1117, Dated: 03/01/2013 | $25,200.00 |
| 53 | SevOne, INC.<br>800 Boylston Street, 29th Floor<br>Boston, MA 02199 | Intelsat US LLC f/k/a Intelsat Corporation | Master Software License and Services Agreement, Dated: 10/30/2017 | $25,697.92 |

| | Assumed Executory Contracts | | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| 54 | Sharp Business Systems<br>1300 Wilson Blvd Suite 800<br>Arlington, VA 22209 | Intelsat US LLC f/k/a Intelsat Corporation | Customer Care Maintenance Agreement, Intelsat Contract 2017-1399, Dated: 11/09/2017 | $4,545.12 |
| 55 | Simplexgrinnell LLP<br>1501 Yamato Road<br>Boca Raton, FL 33431 | Intelsat US LLC f/k/a Intelsat Corporation | Master Ordering Agreement No. 2012-1046, Dated: 12/15/2012 | $44,338.76 |
| 56 | Software and Technology Parks of India<br>6th Floor, Cyber Park<br>Electronics City, Hosur Road<br>Bangalore, India 560 100 | Intelsat Service and Equipment LLC | 16th Amendment to Contract Intelsat-2006-0036, Dated: 12/1/2020 | $29,309.67 |
| 57 | Spark New Zealand Trading Limited<br>167 Victoria Street West<br>Auckland 1010, New Zealand | Intelsat Service and Equipment LLC | Wholesale Services Agreement, Dated: 9/10/2018 | $6,425.19 |
| 58 | Stephen Spengler<br>7900 Tysons One Place<br>McLean, VA 22102-5972, USA | Intelsat US LLC | Employment Agreement, Dated: 03/18/2013, as amended | $0.00 |
| 59 | Telefonica Servicios Audiovisuales S.A.U.<br>Distrito Telefonica, Ronda de la Communicacion<br>S/N 28050, Madrid, Spain | Intelsat Global Sales and Marketing Ltd | Host Services Contract No. Intelsat-2019-0793, Dated: 10/07/2019 | $11,141.57 |
| 60 | Telenor Satellite Broadcasting AS<br>Snaroyvein 30<br>N-1331 Fornebu, Oslo, Norway | Jackson Holdings S.A. f/k/a Intelsat LLC | Transponder Purchase Agreement, Dated: 09/18/2007 | $195,856.39 |
| 61 | Telstra Incorporated<br>40 Wall Street<br>New York, NY 10005 | Intelsat US LLC | Telstra Business Services Agreement, Dated: 06/25/2010 | $90,517.66[1] |

---

[1]   The cure amount listed for Telstra Incorporated reflects the total cure amount for invoices that came due prior to November 19, 2021.  All valid postpetition invoices will be paid per normal course.

| Assumed Executory Contracts | | | | |
|---|---|---|---|---|
| **Reference No.** | **Counterparty** | **Debtor Counterparty** | **Description of Contract** | **Cure Amount** |
| 62 | Therma LLC 26812 Vista Terrace Lake Forest, CA 92630 | Intelsat US LLC | HVAC Maintenance Service Agreement, Dated: 06/03/2019 | $25,451.00 |
| 63 | Trans World Radio PO Box 388 Bonaire, Caribbean Netherlands | Intelsat Service and Equipment LLC f/k/a Intelsat Service and Equipment Corporation | Host Service Contract No. INTELSAT-2018-0035, Dated: 02/12/2018 | $14,304.91 |
| 64 | TVC Communications LLC dba Satellite Engineering Group 10814 W. 78th Street Shawnee, KS 66214 | Intelsat US LLC | Master Services Agreement No. 2020-0127, Dated: 04/24/2020 | $227.79 |
| 65 | Warner Telecomm Ltd. 229 Yardley Way Pittsburg, PA 15206 | Intelsat US LLC | Service Agreement No. Intelsat-2018-0167, Dated: 02/01/2018 | $13,209.68 |
| 66 | Verizon Business Network Services Inc 22001 Loudoun County PKWY Ashburn, VA 20147 | Intelsat US LLC | Service and purchase agreement, Dated: 06/25/2014 | $64,734.40 |
| 67 | World Wide Technology, Inc. 60 Weldon Parkway St. Louis, MO 63043 | Intelsat US LLC f/k/a Intelsat Corporation | Master Ordering Agreement No. 2013-0585, Dated: 07/22/2013 | $3,200.00 |
| 68 | XipLink Inc. 4200 St. Laurent Blvd Suite 1010 Montreal, Quebec H2W 2R2, Canada | Intelsat US LLC | XipLink Software and Technical Assistance Center (TAC) Support Agreement, Dated: 01/31/2020 | $108,000.00 |
| 69 | XO Communications Services 11111 Sunset Hills Road Reston, VA 20190 | Intelsat US LLC f/k/a Intelsat Global Service Corporation | Carrier Services Agreement, Dated: 08/02/2007 | $19,913.29 |

**<u>Exhibit K-2</u>**

**Redline to Second Amended Assumed Executory Contract and Unexpired
Lease List filed on December 3, 2021**

**Amended Assumed Executory Contract and Unexpired Lease List**

Article V.A of the Plan provides as follows:

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases of the Debtors shall be deemed assumed by the Debtors or Reorganized Debtors, as applicable, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease: (1) was assumed, assumed and assigned, or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease Schedule.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

Article V.C of the Plan provides as follows:

Unless otherwise agreed upon in writing by the Debtors or Reorganized Debtors, as applicable, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount including pursuant to the Plan must be filed, served, and actually received by the counsel to the Debtors and the U.S. Trustee on the Confirmation Objection Deadline or other deadline that may be set by the

Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount. **For the avoidance of doubt, to the extent an Executory Contract or Unexpired Lease is proposed to be assumed in the Plan and the Assumed Executory Contract and Unexpired Lease List is not listed as having a related cure cost, any counterparty to such Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have consented to such assumption and deemed to release any Claim or Cause of Action for any monetary defaults under such Executory Contract or Unexpired Lease. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount (if any) in Cash on the Effective Date or in the ordinary course of business or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

The cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption in the event of a dispute regarding: (1) the amount of any payments to cure such a default; (2) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption.

The Debtor (with the consent of the Required Consenting Jackson Crossover Group Members and, solely as to any Executory Contract or Unexpired Lease to which a HoldCo is a party, the Required Consenting HoldCo Creditors) or the Reorganized Debtor, as applicable, shall be authorized to reject any executory contract or unexpired lease to the extent the Debtor (with the consent of the Required Consenting Jackson Crossover Group Members and, solely as to any Executory Contract or Unexpired Lease to which a HoldCo is a party, the Required Consenting HoldCo Creditors) or the Reorganized Debtor, as applicable, in the exercise of its sound business judgment, concludes that the amount of the cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the applicable Debtor's Estate or the Reorganized Debtor. Such rejected contracts, if any, shall be deemed as listed on the Rejected Executory Contract and Unexpired Lease List, if any.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the

effective date of assumption.  **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

~~Additionally, u~~Unless otherwise rejected~~,~~ all contracts, including, for the avoidance of doubt, all employment agreements,  to which Intelsat S.A. and/or Holdings SARL is a party shall be assumed and assigned by Intelsat S.A. ~~to either any~~and/or Holdings SARL (as the case may be) to: (a) if one or more other Debtors ~~that~~ is a party to such contract, ~~or,~~such other Debtor(s) that are party to such contract and the Equity Issuer; or (b) if Intelsat S.A. and/or Holdings SARL is the only party to such contract, the Equity Issuer.

This **<u>Exhibit K</u>** contains the Assumed Executory Contract and Unexpired Lease List.  In the list, cure amounts are aggregated for certain counterparties with whom the Debtors have multiple contracts and/or leases.  The aggregation of cure amounts shall not be deemed or construed as an admission or acknowledgment by any Debtor that it has any liability for such cure except to the extent it is obligated under an assumed contract to which it is a party.  The assumption of an Executory Contract or Unexpired Lease shall include any amendment agreed to between the counterparty and the Debtors.  Further, to the extent any Debtor actually pays a cure amount on behalf of another Debtor, all rights of subrogation, contribution, and reimbursement are expressly reserved.

[*Remainder of page intentionally left blank*]

**Amended Assumed Executory
Contracts and Unexpired Lease List**

| | Assumed Executory Contracts | | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| 1 | AboveNet Communications, Inc.<br>360 Hamilton Avenue<br>White Plains, New York 10601 | Intelsat US LLC f/k/a Intelsat Corporation | AboveNet Master Products and Services Agreement - Intelsat Contract 2010-0324, Dated: 04/30/2010 | $20,309.83 |
| 2 | ABS GLOBAL LTD<br>O'Hara House<br>3 Bermudian Road | Intelsat Global Sales and Marketing Ltd | Full-Time Service Agreement - Service Order No. 6812, Dated: 06/10/2019 | $18,106.47 |
| 3 | Alliance Executive Search LLC<br>1960 Old Gallows Road<br>Vienna, VA 22182 | Intelsat US LLC | Service Agreement No. intelsat-2019-0672, Dated: 05/07/2019 | $28,800.00 |
| 4 | Alpine Lawn and Janitorial Services<br>P.O Box 310<br>Fillmore, CA 93015 | Intelsat US LLC f/k/a Intelsat Corporation | Service Agreement No. INTELSAT-2017-0012 for Janitorial Services for Fillmore Facility, Dated: 01/17/2017 | $1,193.97 |
| 5 | APT Satellite Company Limited<br>22 Dai Kwai Street<br>Tai Po Industrial Estate<br>Tai Po, New Territories, Hong Kong | Intelsat Ventures S.A.R.L | Service Agreement, Dated: 01/01/2020 | $87,864.00 |
| 6 | Aricent Technologies Mauritius Limited<br>Temple Court 2, Labourdonnais Street<br>Port Louis, Mauritius<br>Copy to: 3979 Freedom Circle, Suite 059<br>Santa Clara, CA 95054 | Intelsat US LLC | Master Service Contract, Dated: 09/10/2018 | $276,943.00 |
| 7 | Joint-Stock Company "ASTEL"<br>Mametova Str., 67<br>050004 Almaty, Republic of Kazakhstan | Intelsat Service and Equipment LLC f/k/a Intelsat Service and Equipment Corporation | Host Services Contract No. INTELSAT-2008-0383 - GMS Hosting and Facilities Services, Dated: 09/11/2009 | $11,126.25 |
| 8 | Atlantic Technical Sources, INC.<br>4378 Watley Place<br>Hoschton, GA 30548 | Intelsat Global Sales and Marketing Ltd | Service Contract No. Intelsat-2015-0796, Dated: 10/30/2015 | $24,130.00 |
| 9 | Av-Comm Pty Ltd.<br>Unit 24/9 Powells Road | Intelsat Global Sales and Marketing Ltd | Master Ordering Agreement, Dated: 03/23/2020 | $3,739.32 |

| | Assumed Executory Contracts | | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| | Brookvale New South Wales, Australia | | | |
| 10 | Azercosmos Open Joint Stock Company 72 Uzeyir Hajibeyli AZ 1000 Baku, The Republic of Azerbaijan | Intelsat Global Sales and Marketing Ltd | Master Service Agreement, Dated: 2/26/2016; Service Order Numbers 3, 4, 5, 6, 7, 10 | $975,697.34 |
| 11 | BCOM Offshore SAL 40 Antonie Kazan Street Khoury Building Beirut, Lebanon | Intelsat US LLC f/k/a Intelsat Corporation | Master Ordering Agreement, Dated: 06/27/2018 | $36,371.00 |
| 12 | BT Americans Inc. 620 Eight Avenue New York, New York 10018, USA | Intelsat US LLC f/k/a Intelsat Corporation | Master Services Agreement, Dated: 12/16/2010 | $43,366.73 |
| 13 | Business Wire Inc. 101 California Street 20th Floor San Francisco, CA 94111 | Intelsat US LLC | Vendor Contract - Amendment 5 Discount Pricing Agreement, Dated: 07/11/2018 | $15,749.00 |
| 14 | CenturyLink 5281 Garton Rd Castle Rock, CO 80104 | Intelsat US LLC | Intercity Fiber Lease | $~~301,896.62~~0.00 |
| 15 | Collabera, INC. 110 Allen Road, Basking Ridge, NJ 07920 | Intelsat US LLC | Service Agreement No. Intelsat-2018-1851 for Staffing Services, Dated: 11/01/2018 | $8,026.60 |
| 16 | Comcast Cable Communications Management, LLC 4100 E Dry Creek Road Centennial, CO 80129 | Intelsat US LLC | Comcast Enterprise Services Master Services Agreement, Dated: 05/15/2012; Master Service Agreement, Dated: 04/17/2020 | $22,722.42 |
| 17 | Commonwealth of Australia (represented by the Department of Defence~~)~~ (ABN 68 706 814 312)) Commonwealth of Australia, Sustainment Manager, BP1-1-095, 1 Molonglo Drive Brindabella Business Park, MAJURA ACT 2609. PO Box 7922 CANBERRA BC ACT 2610 | Intelsat Satellite LLC | Customer Contract No. 22550 and Contract No. C439262 | $0.00 |

| | Assumed Executory Contracts | | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| 18 | Daniel J Edelman Limited 105 Victoria Street London, SW1E 6QT | Intelsat US LLC | Service Agreement, PO 20200010, Dated: 11/1/2019 | $24,500.00 |
| 19 | EMCOR Services Aircond 400 Lake Ridge Drive SE Smyrna, GA 30082-5236 | Intelsat US LLC | Service Agreement No. Intelsat-2018-1732, Dated: 10/02/2018 | $42,768.68 |
| 20 | Emirates Telecommunication Corporation Sheikh Zayed Street Abu Dhabi, United Arab Emirates | Intelsat US LLC f/k/a Intelsat Global Service Corporation | Amendment No. 10 INTELSAT Monitoring Network Host Station Facilities & Services for Gulf Region - INTEL 2543, Dated: 12/31/2008 | $0.00 |
| 21 | Encompass Digital Media Uruguay S.A. Ruta 8 Km 17.500 Edificio CP91600, Republica Oriental del Uruguay | Intelsat Global Sales and Marketing Ltd | Leaseback Letter Agreement, Dated: 11/11/2016 | $140,400.00 |
| 22 | Equinix Operating Co. Inc. One Lagoon drive 4th Floor Rodwood City, CA 94065 | Intelsat US LLC f/k/a Intelsat Corporation | Master Services Agreement, Dated: 05/25/2012 | $22,531.64 |
| 23 | ETL Systems INC 560 Herndon Oky Ste 110 Hendon, VA 20170-5246 | Intelsat US LLC f/k/a Intelsat Corporation | Master Ordering Agreement No. 20161187, Dated: 12/14/2016 | $187,304.60 |
| 24 | Faegre Drinker Biddle & Reath LLP 1500 K Street NW Suite 1100 Washington, DC 20005 | Intelsat US LLC | Engagement Agreement, Dated: 05/07/2020 | $29,230.00 |
| 25 | General Dynamic SATCOM Technologies, INC. 4830 River Green Parkway, Suite 100 Duluth, Georgia 30096 | Intelsat US LLC | Master Ordering Ordering Agreement No. 2018-1507, Dated: 08/10/2018 | $76,009.28 |
| 26 | Globecast France 5 allee Gustave Eiffel 92136 Issy les Moulineaux Cedex, France | Intelsat Global Sales and Marketing Ltd | Service Agreement No 17028GCF, Dated: 03/01/2017 | $50,806.45 |
| 27 | Hawaiian Telcom Services Company, Inc. 1177 Bishop Street Honolulu, Hawaii 96813 | Intelsat US LLC f/k/a Intelsat Corporation | Telecommunications Services Agreement, Dated: 11/06/2008 | $597.82 |
| 28 | Hispasat S.A. Paseo de la Castellana 39 | Intelsat Ventures S.A.R.L f/k/a Intelsat Operations S.A. | Strategic Cooperation Agreement, Dated: 02/19/2014 | $19,864.15 |

| | | Assumed Executory Contracts | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| | 28046 Madrid, Spain | | | |
| 29 | Ignitec Inc. 1900 Reston Metro Plaza Suite 615 Reston, VA 20190 | Intelsat US LLC | Staffing Services Agreement No. Intelsat 2020-0001, Dated: 01/02/2020 | $14,560.00 |
| 30 | Impact Unlimited Inc. DBA Impact XM 250 Ridge Road Dayton, NJ 08810 | Intelsat US LLC f/k/a Intelsat Corporation | Master Ordering Agreement No. 2018-0208, Dated: 02/23/2018 | $138,124.87 |
| 31 | Interroute Communications Limited 21st floor 25 Canada Square London, E14 5LQ, UK | Intelsat US LLC f/k/a Intelsat Corporation | GTT MSA 2010-0881, Dated: 11/2/2016 | $27,969.54 |
| 32 | KTSAT Co. Ltd. 13F KT Seolleung Tower, 422 Teheran-ro, Gangnam-gu Seoul, Rebulic of Korea | Intelsat US LLC f/k/a Intelsat Global Service LLC Korea Branch | Host Services Contract No.INTELSAT-2019-0525 Hosting and Facilities Services Exhibit A Doc NO. SWN202557, Dated: 12/3/2019 | $326,095.31 |
| 33 | KVH Industries, Inc. 50 Enterprise Center Middletown, RI 02842 | Intelsat US LLC f/k/a Intelsat Corporation | Intelsatone Revenue Share Agreement, Dated: 05/10/2018 | $131,298.00 |
| 34 | Level 3 Communications LLC 1025 Eldorado Blvd. Broomfield, Colorado 80021 | Intelsat US LLC f/k/a Intelsat Corporation | Master Service Agreement, Dated: 10/31/2002 | $~~264,742.69~~301,896.62 |
| 35 | Lewis PR, Inc. 200 Wheeler Road Burlington, MA 01803 | Intelsat US LLC f/k/a Intelsat Corporation | Consulting Agreement Intelsat-2017-0021, Dated: 01/17/2017 | $21,263.74 |
| 36 | Lockheed Martin Australia PTY Limited PO Box 4714 Kingston ACT 2604, Australia | Intelsat US LLC | Toss, TT&C, Drift And Deorbit Services Agreement 2019-1349, Dated: 10/10/2019 | $375,025.22 |
| 37 | Lockheed Martin Corporation 12257 South Wadsworth Blvd Littleton, CO  80125 | Intelsat US LLC | TOSS Services Agreement, Dated: 09/23/20024 | $277,899.00 |
| 38 | Marston Nicholson Mayor 18 Rue Duphot 75001 Paris, France | Intelsat US LLC f/k/a Intelsat Global Service Corporation | Service Contract No. Intelsat-2005-0320, Dated: 7/6/2005 | $29,831.00 |
| 39 | Matrix Business Solutions Ltd. 10 Lilac Gardens | Intelsat Global Sales and Marketing Ltd | Service Agreement No. Intelsat - PO# 20110011 for IT Support to Intelsat London UK Office, | $3,416.37 |

| | Assumed Executory Contracts | | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| | Bailing, London W5 4LD | | Dated: 01/12/2011 | |
| 40 | MEASAT International (South Asia) Ltd Suite 1206 12th Floor, The Core No 62 Ebene, Mauritius | Intelsat Ventures S.A.R.L | Service Order, Dated: 03/10/2020 | $13,868.00 |
| 41 | Microsoft Corporation One Microsoft Way Redmond, WA 98052 | Intelsat US LLC | Partner Agreement, Dated: 07/12/2019 | $31,102.48 |
| 42 | Montevideo teleport International (MTI) S.A. Parque de Neocios y Technoloiga, Ruta 8 KM 17.500 Office 123 Uruguay | Intelsat Service and Equipment LLC | Host Services Contract No. INTELSAT-20151032, Dated: 01/01/2016 | $12,040.00 |
| 43 | MX1 CEE S.A. district 4 35-37 Sos Oltenitei Bucharest, 041293 | Intelsat Global Sales and Marketing Ltd | Addendum No 6 to Host Service Contract No. INTELSAT-2014-0616, Dated: 11/18/2019 | $61,458.45 |
| 44 | Neuco Limited 19 New Road Brighton, East Sussex, BN1 1UF, UK | Intelsat Global Sales and Marketing Ltd | Staffing Service Agreement No. Intelsat 20200149, Dated: 02/12/2020 | $43,750.00 |
| 45 | NewSat Networks Pty Ltd 6 Riverside Quay Southbank, Vic, 3006, Australia | Intelsat Global Sales and Marketing Ltd | NewSat Networks MSA, Dated: 7/27/2011 | $216,330.54 |
| 46 | Optus Satellite PTY Limited 1-7 Lyonpark Road Macquarie Park, NSW 2113, Australia | Intelsat US LLC | Hosting and TT&C Services Contract No. INTELSAT-2018-1093, Dated: 01/01/2019 | $91,032.82 |
| 47 | Oracle America, Inc. Attn: General Counsel Legal Department 500 Oracle Parkway Redwood Shores, CA 94065 | Intelsat US LLC | Oracle License and Services Agreement, Dated: 05/31/2012; Oracle Master Services Agreement Amendment One, Dated: 11/27/2019; Amendment No. 1 to Oracle Master Agreement, Dated: 11/29/2019; Oracle Master Services Agreement Amendment Two, Dated: 02/28/2020; Amendment No. 2 to Oracle Master Agreement, Dated: 02/28/2020 | $0.00 |
| 48 | Otis Elevator Company 711 E Ball Road, Suite 200 Anaheim, CA 92805 | Intelsat US LLC f/k/a Intelsat Corporation | Service Agreement for Elevator Preventative Maintenance Service Long Beach Facility, Dated: 03/07/2018 | $4,130.06 |

| | | Assumed Executory Contracts | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| 49 | Robinson & Cole LLP<br>1055 Washington Boulevard<br>Stamford, CT 06901-2249 | Intelsat US LLC f/k/a Intelsat Corporation | Engagement Agreement - Legal Services, Dated: 01/09/2017 | $3,833.33 |
| 50 | RSM US LLP<br>1861 International Drive Suite 400<br>Mclean VA 22102 | Intelsat US LLC | Master Services Agreement, Dated: 03/12/2019 | $19,679.43 |
| 51 | SecTek, Inc.<br>1930 Isaac Newton Square S.<br>Reston, VA 20190 | Intelsat US LLC | Service Contract No. Intelsat-2018-1705, Dated: 10/01/2018 | $9,108.23 |
| 52 | SED SYSTEMS, A DIVISION OF CALIAN LTD<br>18 Innovation Blvd<br>Saskatchewan, Canada S7K 3P7 | Intelsat US LLC f/k/a Intelsat Global Service LLC | Master Ordering Agreement No. 2012-1117, Dated: 03/01/2013 | $25,200.00 |
| 53 | SevOne, INC.<br>800 Boylston Street, 29th Floor<br>Boston, MA 02199 | Intelsat US LLC f/k/a Intelsat Corporation | Master Software License and Services Agreement, Dated: 10/30/2017 | $25,697.92 |
| 54 | Sharp Business Systems<br>1300 Wilson Blvd Suite 800<br>Arlington, VA 22209 | Intelsat US LLC f/k/a Intelsat Corporation | Customer Care Maintenance Agreement, Intelsat Contract 2017-1399, Dated: 11/09/2017 | $4,545.12 |
| 55 | Simplexgrinnell LLP<br>1501 Yamato Road<br>Boca Raton, FL 33431 | Intelsat US LLC f/k/a Intelsat Corporation | Master Ordering Agreement No. 2012-1046, Dated: 12/15/2012 | $44,338.76 |
| 56 | Software and Technology Parks of India<br>6th Floor, Cyber Park<br>Electronics City, Hosur Road<br>Bangalore, India 560 100 | Intelsat Service and Equipment LLC | 16th Amendment to Contract Intelsat-2006-0036, Dated: 12/1/2020 | $29,309.67 |
| 57 | Spark New Zealand Trading Limited<br>167 Victoria Street West<br>Auckland 1010, New Zealand | Intelsat Service and Equipment LLC | Wholesale Services Agreement, Dated: 9/10/2018 | $6,425.19 |
| 58 | Stephen Spengler<br>7900 Tysons One Place<br>McLean, VA 22102-5972, USA | Intelsat US LLC | Employment Agreement, Dated: 03/18/2013, as amended | $0.00 |
| 59 | Telefonica Servicios Audiovisuales S.A.U. | Intelsat Global Sales and Marketing Ltd | Host Services Contract No. Intelsat-2019-0793, Dated: 10/07/2019 | $11,141.57 |

| | | Assumed Executory Contracts | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| | Distrito Telefonica, Ronda de la Communicacion S/N 28050, Madrid, Spain | | | |
| 60 | Telenor Satellite Broadcasting AS Snaroyvein 30 N-1331 Fornebu, Oslo, Norway | Jackson Holdings S.A. f/k/a Intelsat LLC | Transponder Purchase Agreement, Dated: 09/18/2007 | $195,856.39 |
| 61 | Telstra Incorporated 40 Wall Street New York, NY 10005 | Intelsat US LLC | Telstra Business Services Agreement, Dated: 06/25/2010 | $90,517.66[1] |
| 62 | Therma LLC 26812 Vista Terrace Lake Forest, CA 92630 | Intelsat US LLC | HVAC Maintenance Service Agreement, Dated: 06/03/2019 | $25,451.00 |
| 63 | Trans World Radio PO Box 388 | Intelsat Service and Equipment LLC f/k/a Intelsat Service and Equipment | Host Service Contract No. INTELSAT-2018-0035, Dated: 02/12/2018 | $14,304.91 |

---

[1] The cure amount listed for Telstra Incorporated reflects the total cure amount for invoices that came due prior to November 19, 2021. All valid postpetition invoices will be paid per normal course.

| | | Assumed Executory Contracts | | |
|---|---|---|---|---|
| Reference No. | Counterparty | Debtor Counterparty | Description of Contract | Cure Amount |
| | Bonaire, Caribbean Netherlands | Corporation | | |
| 64 | TVC Communications LLC dba Satellite Engineering Group 10814 W. 78th Street Shawnee, KS 66214 | Intelsat US LLC | Master Services Agreement No. 2020-0127, Dated: 04/24/2020 | $227.79 |
| 65 | Warner Telecomm Ltd. 229 Yardley Way Pittsburg, PA 15206 | Intelsat US LLC | Service Agreement No. Intelsat-2018-0167, Dated: 02/01/2018 | $13,209.68 |
| 66 | Verizon Business Network Services Inc 22001 Loudoun County PKWY Ashburn, VA 20147 | Intelsat US LLC | Service and purchase agreement, Dated: 06/25/2014 | $~~75,376~~4,734.~~40 2~~ |
| 67 | World Wide Technology, Inc. 60 Weldon Parkway St. Louis, MO 63043 | Intelsat US LLC f/k/a Intelsat Corporation | Master Ordering Agreement No. 2013-0585, Dated: 07/22/2013 | $3,200.00 |
| 68 | XipLink Inc. 4200 St. Laurent Blvd Suite 1010 Montreal, Quebec H2W 2R2, Canada | Intelsat US LLC | XipLink Software and Technical Assistance Center (TAC) Support Agreement, Dated: 01/31/2020 | $108,000.00 |
| 69 | XO Communications Services 11111 Sunset Hills Road Reston, VA 20190 | Intelsat US LLC f/k/a Intelsat Global Service Corporation | Carrier Services Agreement, Dated: 08/02/2007 | $19,913.2~~,607.6~~9 |

**<u>Exhibit L-1</u>**

**Schedule of Retained Causes of Action**

**Schedule of Retained Causes of Action**

Article IV.R of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all of the Debtors' rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than (1) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date and (2) the Causes of Action released by the Debtors pursuant to the Settlement Agreement, following entry of the Settlement Order and upon the effective date of such Settlement Agreement.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity (other than such Causes of Action specifically released pursuant to the Plan).** Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Notwithstanding any provisions regarding the release or exculpation of Claims or Causes of Action set forth in the Plan (including Article VIII of the Plan), if the Plan Toggle Event occurs, nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims. If the Plan Toggle Event occurs, nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims.

If the Plan is confirmed, unless otherwise released by the Plan or the Settlement, any and all Causes of Action held by Intelsat S.A. will be preserved and vested in the Equity Issuer.

Notwithstanding, and without limiting the generality of Article IV.R of the Plan, the following Exhibit L includes specific types of Causes of Actions expressly preserved by the Debtors and the

Reorganized Debtors, subject to the terms of the Plan and the information provided in this Exhibit L, including the following types of claims:

**I.      Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation, Possible Litigation, and Administrative Actions**

Unless otherwise released by the Plan or the Settlement, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial with the Debtors or Reorganized Debtors, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule L-1** attached hereto.

**II.     Claims Related to Tax Obligations**

Unless otherwise released by the Plan or the Settlement, the Debtors expressly reserve all Causes of Action against any taxing authority based in whole or in part upon any and all tax obligations of the Debtors or Reorganized Debtors or pursuant to which any Debtors or Reorganized Debtors has any rights whatsoever, including, without limitation, against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or the Reorganized Debtors, regardless of whether such Entity is specifically identified herein. Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule L-2** attached hereto.

**III.    Claims Related to Deposits/ Prepayments, Adequate Assurance Postings, and Other Collateral Postings**

Unless otherwise released by the Plan or the Settlement, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit, prepayment or collateral is specifically identified herein.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule L-3** attached hereto.

**IV.     Claims Related to Insurance Policies**

Unless otherwise released by the Plan or the Settlement, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtors or Reorganized Debtors is a party or pursuant to which any Debtors or Reorganized Debtors has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance

brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters. Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule L-4** attached hereto.

## V.     Claims Related to Claims Paid or Payable by Third Parties

Unless otherwise released by the Plan or the Settlement, any Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them.

## VI.    Claims Related to Contracts and Leases

Unless otherwise released by the Plan or the Settlement, the Debtors or Reorganized Debtors, as applicable, expressly reserve Causes of Action based in whole or in part upon any and all contracts, leases, joint operating agreements, and similar instruments, to which any of the Debtors or Reorganized Debtors is a party or pursuant to which any of the Debtors or Reorganized Debtors has any rights whatsoever (regardless of whether such contract or lease is specifically identified in the Plan, this Plan Supplement, or any amendments thereto), including without limitation all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors.

## Schedule L-1

### Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation, Possible Litigation, and Administrative Actions

| Reorganized Debtor | Case Title | Case Number | Court or Agency | Nature of Case | Status of Case |
|---|---|---|---|---|---|
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd.vs. Gerry's Information Technology (Pvt) Limited | Suit No. 938 of 2006 | High Court of Sindh in Karachi | Breach of Contract | Pending |
| Intelsat US LLC | Intelsat US LLC vs. VSAT Systems LLC | Case No.: 1:20-cv-01169 | United States District Court For the Southern District of New York | Breach of Contract | Pending |
| Intelsat US LLC | Phillip S. Morales, et al. vs. Intelsat Global Services Corp., et. Al. | Case No.: 1:04-cv-01044 | United States District Court District of Columbia | Ongoing Litigation | Pending |
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd. vs Information TV Private Limited | Case Nos.: BL-2020-00877 and BL-2020-00879 | High Courts of Justice, London | Ongoing Litigation | Pending |
| Intelsat US LLC | Intelsat US LLC vs Information Connectivity Solutions Limited (ICSL) | Awaiting case number | High Court of Lagos | Ongoing Litigation | Pending |
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd. vs Msrs Marufu and Nduna (directors of Triple Play Communications (Private) Limited | HC-5003-2019 | High Court of Zimbabwe | Ongoing Litigation | Pending |
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd. vs Supernet Limited | 21-civ-02486 | New York, USA | Breach of contract | Pending |
| Intelsat Global Sales & Marketing Ltd. and Intelsat US LLC | Supernet Limited vs. Intelsat Corporation and another defendant | 1898 of 2021 | Karachi, Pakistan | Recovery and Damages | Pending |

| Reorganized Debtor | Case Title | Case Number | Court or Agency | Nature of Case | Status of Case |
|---|---|---|---|---|---|
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd. vs Globacom Limited | LD/4225CMW/2021 | Lagos, Nigeria | Ongoing Litigation | Pending |
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd. vs Banexter and Netcom | N/A | High Court, London | Enforcement Actions in BVI and Nigeria | Pending |

**Schedule L-2**

**Claims Related to Tax Obligations**

| Reorganized Debtor | Case Title | Case Number | Court or Agency | Nature of Case | Status of Case |
|---|---|---|---|---|---|
| Intelsat US LLC | NYS Department of Taxation and Finance Audit of Intelsat US LLC | X186667159 | NYS Department of Taxation and Finance | Potential Tax Refund | Pending |
| Intelsat US LLC | State of NJ Department of Treasury Audit of Intelsat US LLC | N/A | State of New Jersey | Potential Tax Refund | Pending |
| Intelsat US LLC | Wisconsin Department of Revenue Audit of Intelsat US LLC | 1-734-142-464 | Wisconsin Department of Revenue | Potential Tax Refund | Pending |

**Schedule L-3**

**Claims Related to Deposits/ Prepayments,
Adequate Assurance Postings, and Other Collateral Postings**

| Reorganized Debtor | Counterparty | Total Amount or Value | Description |
|---|---|---|---|
| Intelsat Global Sales & Marketing Ltd. | Globecast France | $21,000 | Deposit |
| Intelsat Satellite LLC | ILS International Launch Svcs | $9,900,000 | Deposit |
| Intelsat Global Sales & Marketing Ltd. | MX1 (Formerly Rrsat) | $23,500 | Deposit |
| Intelsat US LLC | Southern California Edison Company | $258,000 | Deposit |
| Intelsat Satellite LLC | Space Exploration Technologies | $4,000,000 | Deposit |
| Intelsat US LLC | Georgia Power | $73,985 | Security Deposit |
| Intelsat US LLC | PG&E | $69,485 | Security Deposit |
| Intelsat US LLC | Prologis, L.P. | $14,758 | Security Deposit |
| Intelsat US LLC | Regus Business Centre (Mexico) | $5,373 | Security Deposit |
| Intelsat Global Sales & Marketing Ltd. | Sky Perfect JSAT Corporation | $26,334 | Security Deposit |
| Intelsat US LLC | Telehouse Europe | $18,792 | Security Deposit |
| Intelsat Global Sales & Marketing Ltd. | African Mobile Networks | $17,667,030 | Notes receivable |
| Intelsat US LLC | Kymeta | $5,400,000 | Notes receivable |
| Intelsat US LLC | Omnispace LLC | $255,812 | Notes receivable |
| Intelsat Jackson Holdings S.A. | Spaceflight | $51,011,111 | Notes receivable |

**Schedule L-4**

**Claims Related to Insurance Policies**

| Type of Policy Coverage | Insurance Carrier(s) | Policy Number |
|---|---|---|
| General Liability & Employee Benefits Liability (EBL) \| Automobile Liability & Physical Damage | Hartford Financial Services Group | 10UENHF9744 |
| Automobile Liability & Physical Damage | Hartford Financial Services Group | 10ABKI7528 |
| Workers' Compensation & Employer's Liability | Hartford Financial Services Group | 10WBAB5UV0 |
| Non-US General Liability & Employee Benefits Liability EBL \| Non-USA Contingent Automobile Liability \| Foreign Voluntary WC & Employer's Liability \| Non-USA Kidnap and Ransom | AIG Group | WS11013392 |
| Workers' Compensation - Defense Base Act | AIG Group | 64580120 |
| Umbrella | Hartford Financial Services Group | 10RHUHF9887 |
| Excess Liability | Liberty Mutual Group | ECO(20)58841075 |
| Property & Cargo | Factory Mutual | 1053342 |
| Property & Cargo | Factory Mutual | 1053340 |
| Property & Cargo | Factory Mutual | 1053341 |
| Property & Cargo | Factory Mutual | F20190600403 |
| Property & Cargo | Sanlam | 1394/4974 |
| Property & Cargo | Hyundai Marine & Fire Group | F20190450757 |
| Property & Cargo | Factory Mutual | 1053345 |
| Cargo/Transit \| War Risks | Hartford Financial Services Group | SF20CARZ042PL01 |
| Directors & Officers Liability | Lloyd's of London | B0509FINMW2000287 |

| Type of Policy Coverage | Insurance Carrier(s) | Policy Number |
|---|---|---|
| 1st Excess Directors & Officers Liability | Generali | B0509FINMW2000288 |
| 2nd Excess Directors & Officers Liability | Lloyd's of London | B0509FINMW2000292 |
| 3rd Excess Directors & Officers Liability | Lloyd's of London | B0509FINMW2000295 |
| 4th Excess Directors & Officers Liability | Lloyd's of London \| Allianz \| Great Lakes \| Volante | B0509FINMW2000301 |
| Directors & Officers Liability - Alpha Layer | Lloyd's of London | B0509FINMW2000290 |
| Excess Directors & Officers Liability (Side A) | Lloyd's of London | B0509FINMW2000315 |
| Fiduciary Liability Coverage | Berkshire Hathaway Specialty Insurance | B0509FINMW2000299 |
| Employment Practices Liability | Lloyd's of London | B0509FINMW2000376 |
| Crime Insurance | Lloyd's of London | B0509FINMW2000303 |
| Crime Insurance - 1st Excess | Lloyd's of London | B0509FINMW2000304 |
| Crime Insurance - 2nd Excess | Generali | B0509FINMW2000311 |
| Professional Liability (Cyber) | Lloyd's of London | B0509FINPB1900070 |
| Special Crime | Tokio Marine Group | B0509FINSK1800287 |
| Underground / Above Ground Storage Tank | Chubb Limited | USTG71163246002 |
| Business Travel Accident | Zurich | GTU0553302 |
| In Orbit coverage for Horizons-3e Satellite (JV owned satellite) | Aesir Space \| AmTrust \| Assure Space \| Atrium \| Beazley \| Elseco Limited \| Global \| HamiltonRe \| HDI \| Ingosstrakh \| Korean Re \| LRS \| Mitsui \| Munich Re \| Occam \| PartnerRe \| SATEC \| Sompo \| Starr (Hallmark) \| Starr Aviation \| Tokio Marine \| Watkins \| XL Catlin London \| XL Specialty | SPSPC1900346 |

| Type of Policy Coverage | Insurance Carrier(s) | Policy Number |
|---|---|---|
| In Orbit coverage for IS30 & IS31 Satellites | Allianz \| AmTrust \| Assure Space \| Atrium \| AXA XL Paris \| Beazley \| Elseco Limited \| Global \| HamiltonRe \| HDI \| Hiscox \| Ingosstrakh \| Kiln \| Korean Re \| LRS \| Mitsui \| Munich Re \| Occam \| PartnerRe \| Satec \| Scor \| Starr (Hallmark) \| Starr Aviation \| Swiss Re \| Watkins \| XL Specialty | SPSPC1900101 |
| Launch + 1-year In Orbit coverage for IS39 Satellite | Allianz \| Altitude Risk Partners \| ARTI \| Assure Space \| Beazley \| Chaucer \| Elseco Limited \| GIC \| Hannover \| Hiscox \| Ingosstrakh \| IRB \| Kiln \| Korean Re \| La Reunion Spatiale \| Mapfre \| Mitsui \| Munich Re \| PartnerRe \| Satec \| Scor \| Starr Aviation \| Starr Aviation - Hallmark \| Tokio Marine | SPSPC1900337 |
| In Orbit coverage for IS38 Satellite | Aesir Space \| Altitude Risk Partners \| Atrium Space Insurance Consortium \| AXA Corporate Solutions Assurance \| Azre Reinsureance OJSC \| Beazley Syndicate \| Elseco Limited \| Global Aerospace \| Hamilton Syndicate \| HDI Global Specialty SE \| MAPFRE Global Risks \| Munich Re Syndicate Ltd \| Occam Underwriting Limited \| PartnerRe Ireland Insurance \| Satec SRL \| Scor UK Company Ltd \| Starr Aviation \| Starr Indemnity & Liability Company \| XL Specialty Insurance | B0509AVNSK1900123 |
| Launch + 1-year In Orbit coverage for Galaxy 30 Satellite | Allianz \| Altitude Risk Partners \| Assure Space \| Beazley \| Chaucer \| GIC \| Hannover \| Ingosstrakh \| Korean Re \| La Reunion Spatiale \| MAPFRE \| Occam (Sciemus) \| PartnerRe \| Satec \| Sompo \| Starr Aviation \| Starr Hallmark \| Tokio Marine \| Watkins | SPSPC1900326 |
| In Orbit Coverage for IS-12 & IS-26 Satellites | Altitude Risk Partners \| Beazley \| Global Aerospace | SPSPC1800065 |

**<u>Exhibit L-2</u>**

**Redline to Amended Schedule of Retained Causes of Action filed on December 3, 2021**

**Schedule of Retained Causes of Action**

Article IV.R of the Plan provides as follows:

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all of the Debtors' rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than (1) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date and (2) the Causes of Action released by the Debtors pursuant to the Settlement Agreement, following entry of the Settlement Order and upon the effective date of such Settlement Agreement.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity (other than such Causes of Action specifically released pursuant to the Plan).** Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

Notwithstanding any provisions regarding the release or exculpation of Claims or Causes of Action set forth in the Plan (including Article VIII of the Plan), if the Plan Toggle Event occurs, nothing in the Non-TopCo Plan shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims. If the Plan Toggle Event occurs, nothing in the Settlement shall result in the release, discharge, or enjoin the prosecution of, any TopCo Guarantee Claims.

If the Plan is confirmed, unless otherwise released by the Plan or the Settlement, any and all Causes of Action held by Intelsat S.A. will be preserved and vested in the Equity Issuer.

Notwithstanding, and without limiting the generality of Article IV.R of the Plan, the following Exhibit L includes specific types of Causes of Actions expressly preserved by the Debtors and

the Reorganized Debtors, subject to the terms of the Plan and the information provided in this Exhibit L, including the following types of claims:

**I.      Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation, Possible Litigation, and Administrative Actions**

Unless otherwise released by the Plan or the Settlement, the Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial with the Debtors or Reorganized Debtors, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule L-1** attached hereto.

**II.     Claims Related to Tax Obligations**

Unless otherwise released by the Plan or the Settlement, the Debtors expressly reserve all Causes of Action against any taxing authority based in whole or in part upon any and all tax obligations of the Debtors or Reorganized Debtors or pursuant to which any Debtors or Reorganized Debtors has any rights whatsoever, including, without limitation, against or related to all Entities that owe or that may in the future owe money related to tax refunds to the Debtors or the Reorganized Debtors, regardless of whether such Entity is specifically identified herein.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule L-2** attached hereto.

**III.    Claims Related to Deposits/ Prepayments, Adequate Assurance Postings, and Other Collateral Postings**

Unless otherwise released by the Plan or the Settlement, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or any other type of deposit, prepayment or collateral is specifically identified herein.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule L-3** attached hereto.

**IV.     Claims Related to Insurance Policies**

Unless otherwise released by the Plan or the Settlement, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtors or Reorganized Debtors is a party or pursuant to which any Debtors or Reorganized Debtors has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto,

including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Schedule L-4** attached hereto.

## V.      Claims Related to Claims Paid or Payable by Third Parties

Unless otherwise released by the Plan or the Settlement, any Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors or Reorganized Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto.  Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Reorganized Debtors, as applicable, owe money to them.

## VI.     Claims Related to Contracts and Leases

Unless otherwise released by the Plan or the Settlement, the Debtors or Reorganized Debtors, as applicable, expressly reserve Causes of Action based in whole or in part upon any and all contracts, leases, joint operating agreements, and similar instruments, to which any of the Debtors or Reorganized Debtors is a party or pursuant to which any of the Debtors or Reorganized Debtors has any rights whatsoever (regardless of whether such contract or lease is specifically identified in the Plan, this Plan Supplement, or any amendments thereto), including without limitation all contracts and leases that are assumed pursuant to the Plan or were previously assumed by the Debtors.

### <u>Schedule L-1</u>

**Claims, Defenses, Cross-Claims,
and Counter-Claims Related to Litigation,
Possible Litigation, and Administrative Actions**

| Reorganized Debtor | Case Title | Case Number | Court or Agency | Nature of Case | Status of Case |
|---|---|---|---|---|---|
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd.vs. Gerry's Information Technology (Pvt) Limited | Suit No. 938 of 2006 | High Court of Sindh in Karachi | Breach of Contract | Pending |
| Intelsat US LLC | Intelsat US LLC vs. VSAT Systems LLC | Case No.: 1:20-cv-01169 | United States District Court For the Southern District of New York | Breach of Contract | Pending |
| Intelsat US LLC | Phillip S. Morales, et al. vs. Intelsat Global Services Corp., et. Al. | Case No.: 1:04-cv-01044 | United States District Court District of Columbia | Ongoing Litigation | Pending |
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd. vs Information TV Private Limited | Case Nos.: BL-2020-00877 and BL-2020-00879 | High Courts of Justice, London | Ongoing Litigation | Pending |
| Intelsat US LLC | Intelsat US LLC vs Information Connectivity Solutions Limited (ICSL) | Awaiting case number | High Court of Lagos | Ongoing Litigation | Pending |
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd. vs Msrs Marufu and Nduna (directors of Triple Play Communications (Private) Limited | HC-5003-2019 | High Court of Zimbabwe | Ongoing Litigation | Pending |
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd. vs Supernet Limited | 21-civ-02486 | New York, USA | Breach of contract | Pending |
| Intelsat Global Sales & Marketing Ltd. and Intelsat US LLC | Supernet Limited vs. Intelsat Corporation and another defendant | 1898 of 2021 | Karachi, Pakistan | Recovery and Damages | Pending |

| Reorganized Debtor | Case Title | Case Number | Court or Agency | Nature of Case | Status of Case |
|---|---|---|---|---|---|
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd. vs Globacom Limited | LD/4225CMW/2021 | Lagos, Nigeria | Ongoing Litigation | Pending |
| Intelsat Global Sales & Marketing Ltd. | Intelsat Global Sales & Marketing Ltd. vs Banexter and Netcom | N/A | High Court, London | Enforcement Actions in BVI and Nigeria | Pending |
| ~~Intelsat Satellite LLC (f/k/a Intelsat LLC)~~ | ~~Intelsat Satellite LLC (f/k/a Intelsat LLC) v. The Boeing Company and Boeing Satellite Systems, Inc.~~ | ~~Not Yet Filed~~ | ~~Not Yet Filed~~ | ~~Avoidance Action~~ | ~~Not yet Filed~~ |

**Schedule L-2**

**Claims Related to Tax Obligations**

| Reorganized Debtor | Case Title | Case Number | Court or Agency | Nature of Case | Status of Case |
|---|---|---|---|---|---|
| Intelsat US LLC | NYS Department of Taxation and Finance Audit of Intelsat US LLC | X186667159 | NYS Department of Taxation and Finance | Potential Tax Refund | Pending |
| Intelsat US LLC | State of NJ Department of Treasury Audit of Intelsat US LLC | N/A | State of New Jersey | Potential Tax Refund | Pending |
| Intelsat US LLC | Wisconsin Department of Revenue Audit of Intelsat US LLC | 1-734-142-464 | Wisconsin Department of Revenue | Potential Tax Refund | Pending |

## Schedule L-3

### Claims Related to Deposits/ Prepayments,
### Adequate Assurance Postings, and Other Collateral Postings

| Reorganized Debtor | Counterparty | Total Amount or Value | Description |
|---|---|---|---|
| Intelsat Global Sales & Marketing Ltd. | Globecast France | $21,000 | Deposit |
| Intelsat Satellite LLC | ILS International Launch Svcs | $9,900,000 | Deposit |
| Intelsat Global Sales & Marketing Ltd. | MX1 (Formerly Rrsat) | $23,500 | Deposit |
| Intelsat US LLC | Southern California Edison Company | $258,000 | Deposit |
| Intelsat Satellite LLC | Space Exploration Technologies | $4,000,000 | Deposit |
| ~~Intelsat Satellite LLC~~ | ~~The Boeing Company~~ | ~~$24,142,500~~ | ~~Deposit~~ |
| Intelsat US LLC | Georgia Power | $73,985 | Security Deposit |
| Intelsat US LLC | PG&E | $69,485 | Security Deposit |
| Intelsat US LLC | Prologis, L.P. | $14,758 | Security Deposit |
| Intelsat US LLC | Regus Business Centre (Mexico) | $5,373 | Security Deposit |
| Intelsat Global Sales & Marketing Ltd. | Sky Perfect JSAT Corporation | $26,334 | Security Deposit |
| Intelsat US LLC | Telehouse Europe | $18,792 | Security Deposit |
| Intelsat Global Sales & Marketing Ltd. | African Mobile Networks | $17,667,030 | Notes receivable |
| Intelsat US LLC | Kymeta | $5,400,000 | Notes receivable |
| Intelsat US LLC | Omnispace LLC | $255,812 | Notes receivable |
| Intelsat Jackson Holdings S.A. | Spaceflight | $51,011,111 | Notes receivable |

**Schedule L-4**

**Claims Related to Insurance Policies**

| Type of Policy Coverage | Insurance Carrier(s) | Policy Number |
|---|---|---|
| General Liability & Employee Benefits Liability (EBL) \| Automobile Liability & Physical Damage | Hartford Financial Services Group | 10UENHF9744 |
| Automobile Liability & Physical Damage | Hartford Financial Services Group | 10ABKI7528 |
| Workers' Compensation & Employer's Liability | Hartford Financial Services Group | 10WBAB5UV0 |
| Non-US General Liability & Employee Benefits Liability EBL \| Non-USA Contingent Automobile Liability \| Foreign Voluntary WC & Employer's Liability \| Non-USA Kidnap and Ransom | AIG Group | WS11013392 |
| Workers' Compensation - Defense Base Act | AIG Group | 64580120 |
| Umbrella | Hartford Financial Services Group | 10RHUHF9887 |
| Excess Liability | Liberty Mutual Group | ECO(20)58841075 |
| Property & Cargo | Factory Mutual | 1053342 |
| Property & Cargo | Factory Mutual | 1053340 |
| Property & Cargo | Factory Mutual | 1053341 |
| Property & Cargo | Factory Mutual | F20190600403 |
| Property & Cargo | Sanlam | 1394/4974 |
| Property & Cargo | Hyundai Marine & Fire Group | F20190450757 |
| Property & Cargo | Factory Mutual | 1053345 |
| Cargo/Transit \| War Risks | Hartford Financial Services Group | SF20CARZ042PL01 |

| Type of Policy Coverage | Insurance Carrier(s) | Policy Number |
|---|---|---|
| Directors & Officers Liability | Lloyd's of London | B0509FINMW2000287 |
| 1st Excess Directors & Officers Liability | Generali | B0509FINMW2000288 |
| 2nd Excess Directors & Officers Liability | Lloyd's of London | B0509FINMW2000292 |
| 3rd Excess Directors & Officers Liability | Lloyd's of London | B0509FINMW2000295 |
| 4th Excess Directors & Officers Liability | Lloyd's of London | Allianz | Great Lakes | Volante | B0509FINMW2000301 |
| Directors & Officers Liability - Alpha Layer | Lloyd's of London | B0509FINMW2000290 |
| Excess Directors & Officers Liability (Side A) | Lloyd's of London | B0509FINMW2000315 |
| Fiduciary Liability Coverage | Berkshire Hathaway Specialty Insurance | B0509FINMW2000299 |
| Employment Practices Liability | Lloyd's of London | B0509FINMW2000376 |
| Crime Insurance | Lloyd's of London | B0509FINMW2000303 |
| Crime Insurance - 1st Excess | Lloyd's of London | B0509FINMW2000304 |
| Crime Insurance - 2nd Excess | Generali | B0509FINMW2000311 |
| Professional Liability (Cyber) | Lloyd's of London | B0509FINPB1900070 |
| Special Crime | Tokio Marine Group | B0509FINSK1800287 |
| Underground / Above Ground Storage Tank | Chubb Limited | USTG71163246002 |
| Business Travel Accident | Zurich | GTU0553302 |
| In Orbit coverage for Horizons-3e Satellite (JV owned satellite) | Aesir Space | AmTrust | Assure Space | Atrium | Beazley | Elseco Limited | Global | HamiltonRe | HDI | Ingosstrakh | Korean Re | LRS | Mitsui | Munich Re | Occam | PartnerRe | SATEC | Sompo | Starr (Hallmark) | Starr Aviation | Tokio Marine | Watkins | XL Catlin London | XL Specialty | SPSPC1900346 |
| In Orbit coverage for IS30 | Allianz | AmTrust | Assure Space | Atrium | AXA XL Paris | Beazley | | SPSPC1900101 |

| Type of Policy Coverage | Insurance Carrier(s) | Policy Number |
|---|---|---|
| & IS31 Satellites | Elseco Limited | Global | HamiltonRe | HDI | Hiscox | Ingosstrakh | Kiln | Korean Re | LRS | Mitsui | Munich Re | Occam | PartnerRe | Satec | Scor | Starr (Hallmark) | Starr Aviation | Swiss Re | Watkins | XL Specialty | |
| Launch + 1-year In Orbit coverage for IS39 Satellite | Allianz | Altitude Risk Partners | ARTI | Assure Space | Beazley | Chaucer | Elseco Limited | GIC | Hannover | Hiscox | Ingosstrakh | IRB | Kiln | Korean Re | La Reunion Spatiale | Mapfre | Mitsui | Munich Re | PartnerRe | Satec | Scor | Starr Aviation | Starr Aviation - Hallmark | Tokio Marine | SPSPC1900337 |
| In Orbit coverage for IS38 Satellite | Aesir Space | Altitude Risk Partners | Atrium Space Insurance Consortium | AXA Corporate Solutions Assurance | Azre Reinsureance OJSC | Beazley Syndicate | Elseco Limited | Global Aerospace | Hamilton Syndicate | HDI Global Specialty SE | MAPFRE Global Risks | Munich Re Syndicate Ltd | Occam Underwriting Limited | PartnerRe Ireland Insurance | Satec SRL | Scor UK Company Ltd | Starr Aviation | Starr Indemnity & Liability Company | XL Specialty Insurance | B0509AVNSK1900123 |
| Launch + 1-year In Orbit coverage for Galaxy 30 Satellite | Allianz | Altitude Risk Partners | Assure Space | Beazley | Chaucer | GIC | Hannover | Ingosstrakh | Korean Re | La Reunion Spatiale | MAPFRE | Occam (Sciemus) | PartnerRe | Satec | Sompo | Starr Aviation | Starr Hallmark | Tokio Marine | Watkins | SPSPC1900326 |
| In Orbit Coverage for IS-12 & IS-26 Satellites | Altitude Risk Partners | Beazley | Global Aerospace | SPSPC1800065 |

**<u>Exhibit N-1</u>**

**Management Incentive Plan Documents**

This <u>Exhibit N-1</u> contains the following Management Incentive Plan Documents:

- <u>Exhibit N-1(i)</u>:     2022 Equity Incentive Plan

- <u>Exhibit N-1(ii)</u>:    Time-Based Restricted Stock Unit Award Agreement for Non-Management Employees

- <u>Exhibit N-1(iii)</u>:   Time-Based Restricted Stock Unit Award Agreement for Management Committee

- <u>Exhibit N-1(iv)</u>:   Performance-Based Restricted Stock Unit Award Agreement

- <u>Exhibit N-1(v)</u>:    LTIP Award Agreement

- <u>Exhibit N-1(vi)</u>:   MIP Pool Allocations (<u>Exhibit A</u> to the MIP Term Sheet)

**<u>Exhibit N-1(i)</u>**

**2022 Equity Incentive Plan**

## Intelsat Emergence S.A. (To Be Renamed Intelsat S.A.)
## 2022 Equity Incentive Plan

**1. Purpose**. The Intelsat Emergence S.A. (to be renamed Intelsat S.A.) 2022 Equity Incentive Plan (the "*Plan*") is intended to help Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a Luxembourg *société anonyme* (including any successor thereto, the "*Company*"), and its Affiliates (a) attract and retain key personnel by providing them the opportunity to acquire an equity interest in the Company or other incentive compensation measured by reference to the value of Common Stock or cash-based awards and (b) align the interests of key personnel with those of the Company's shareholders.

**2. Effective Date; Duration.** The Plan shall be effective as of [Date], 2022[1] (the "*Effective Date*"). The expiration date of the Plan, on and after which date no Awards may be granted, shall be the tenth anniversary of the Effective Date; provided, however, that such expiration shall not affect Awards then outstanding, and the terms and conditions of the Plan shall continue to apply to such Awards.

**3. Definitions.** The following definitions shall apply throughout the Plan.

(a) "*Affiliate*" means any person or entity that directly or indirectly controls, is controlled by or is under common control with the Company. The term "control" means the possession, directly or indirectly, of the power to direct the management and policies of such person or entity, whether through the ownership of voting or other securities, by contract or otherwise.

(b) "*Award*" means any Incentive Stock Option, Nonqualified Stock Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, Other Stock-Based Award, Cash-Based Award and/or Performance Compensation Award granted under the Plan.

(c) "*Beneficial Ownership*" has the meaning set forth in Rule 13d-3 promulgated under Section 13 of the Exchange Act.

(d) "*Board*" means the Board of Directors of the Company.

(e) "*Cash-Based Award*" means an Award granted under Section 10 of the Plan.

(f) "*Cause*" means the Company or an Affiliate having "cause" to terminate a Participant's employment or service due to the Participant's (i) willful misconduct or gross neglect of their duties; (ii) having engaged in conduct harmful (whether financially, reputationally or otherwise) to the Company or an Affiliate; (iii) failure or refusal to perform their duties; (iv) conviction of or guilty or no contest plea to a felony or any crime involving dishonesty or moral turpitude; (v) willful violation of the written policies of the Company or an Affiliate; (vi) misappropriation or misuse of Company or Affiliate funds or property or other act of personal dishonesty in connection with his employment; or (vii) willful breach of fiduciary duty. The determination of whether Cause exists shall be made by the Committee in its sole discretion.

---

[1] Note to Draft: To be the Emergence Date.

2

(g)    "***Change in Control***"[2] shall be deemed to occur upon any of the following events:

(i)    the acquisition by any Person of Beneficial Ownership of 50% or more (on a fully diluted basis) of either (A) the then outstanding shares of Common Stock, including Common Stock issuable upon the exercise of options or warrants, the conversion of convertible stock or debt, and the exercise of any similar right to acquire such Common Stock (the "***Outstanding Company Common Stock***"); or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote in the election of directors (the "***Outstanding Company Voting Securities***"); but excluding any acquisition by the Company or any of its Affiliates, or by any employee benefit plan sponsored or maintained by the Company or any of its Affiliates;

(ii)    a change in the composition of the Board such that members of the Board during any consecutive 12-month period (the "***Incumbent Directors***") cease to constitute a majority of the Board.  Any person becoming a director through election or nomination for election approved by a valid vote of at least two-thirds of the Incumbent Directors shall be deemed an Incumbent Director; provided, however, that no individual becoming a director as a result of an actual or threatened election contest, as such terms are used in Rule 14a-12 of Regulation 14A promulgated under the Exchange Act, or as a result of any other actual or threatened solicitation of proxies or consents by or on behalf of any person other than the Board shall be deemed to be an Incumbent Director;

(iii)    the approval by the shareholders of the Company of a plan of complete dissolution or liquidation of the Company; or

(iv)    the consummation of a reorganization, recapitalization, merger, consolidation, statutory share exchange or similar form of corporate transaction involving the Company (a "***Business Combination***"), or sale, transfer or other disposition of all or substantially all of the business or assets of the Company to an entity that is not an Affiliate of the Company (a "***Sale***"), unless immediately following such Business Combination or Sale:  (A) more than 50% of the total voting power of the entity resulting from such Business Combination or the entity that acquired that business or assets of the Company in such Sale (in either case, the "***Surviving Company***"), or the ultimate parent entity that has Beneficial Ownership of sufficient voting power to elect a majority of the board of directors (or analogous governing body) of the Surviving Company (the "***Parent Company***"), is represented by the Outstanding Company Voting Securities that were outstanding immediately prior to such Business Combination or Sale (or, if applicable, is represented by shares into which the Outstanding Company Voting Securities were converted pursuant to such Business Combination or Sale), and such voting power among the holders thereof is in substantially the same proportion as the voting power of the Outstanding Company Voting Securities among the holders thereof immediately prior to the Business Combination or Sale, (B) no Person (other than any employee benefit plan sponsored or maintained by the Surviving Company or the Parent Company), is or becomes the beneficial owner, directly or indirectly, of 50% or more of the total voting power of the outstanding voting securities eligible to elect members of the board

---

[2]    Note to Draft:  Definition to be updated to contain customary carveouts regarding post-emergence shareholders.

3

of directors (or the analogous governing body) of the Parent Company (or, if there is no Parent Company, the Surviving Company) and (C) at least a majority of the members of the board of directors (or the analogous governing body) of the Parent Company (or, if there is no Parent Company, the Surviving Company) following the consummation of the Business Combination or Sale were Board members at the time of the Board's approval of the execution of the initial agreement providing for such Business Combination or Sale.

(h)      "*Code*" means the U.S. Internal Revenue Code of 1986, as amended, and any successor thereto.  References to any section of the Code shall be deemed to include any regulations or other interpretative guidance under such section, and any amendments or successors thereto.

(i)      "*Committee*" means the Compensation Committee of the Board or subcommittee thereof or, if no such Compensation Committee or subcommittee exists, the Board.

(j)      "*Common Stock*" means the common shares, nominal value $0.01 per share, of the Company (and any stock or other securities into which such common shares may be converted or into which it may be exchanged).

(k)      "*Disability*" means cause for termination of a Participant's employment or service due to a determination that the Participant is disabled in accordance with a long-term disability insurance program maintained by the Company or a determination by the U.S. Social Security Administration that the Participant is totally disabled.

(l)      "*Eligible Person*" means any (i) individual employed by the Company or an Affiliate; provided, however, that no such employee covered by a collective bargaining agreement shall be an Eligible Person; (ii) director or officer of the Company or an Affiliate; (iii) consultant or advisor to the Company or an Affiliate who may be offered securities registrable on Form S-8 under the Securities Act; or (iv) any prospective employees, directors, officers, consultants or advisors who have accepted offers of employment or consultancy from the Company or its Affiliates.

(m)      "*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended, and any successor thereto.  References to any section of (or rule promulgated under) the Exchange Act shall be deemed to include any rules, regulations or other interpretative guidance under such section or rule, and any amendments or successors thereto.

(n)      "*Exit Event*" means either (i) a Change in Control or (ii) an Initial Public Offering.

(o)      "*Fair Market Value*" means, on a given date, (i) if the Common Stock is listed on a national securities exchange, the closing sales price of the Common Stock reported on such exchange on such date, or, if there is no such sale on that date, then on the last preceding date on which such a sale was reported; or (ii) if the Common Stock is not listed on any national securities exchange, the amount determined by the Committee in good faith to be the fair market value of the Common Stock based on an independent third party valuation of the Common Stock, with the Company to obtain such valuations on at least an annual basis, and with the first such valuation to be dated as of the first anniversary of the Effective Date.

(p)      "*Incentive Stock Option*" means an Option which is designated by the Committee as an incentive stock option as described in Section 422 of the Code.

(q)      "*Initial Public Offering*" means the initial public offering and sale to the public in a firm commitment underwriting of equity interests of the Company or any of its Subsidiaries (or any successor thereof) pursuant to an effective registration statement under the Securities Act, if, immediately thereafter, the Company or its applicable Subsidiary (or any successor thereof) has publicly held securities; provided, that, an Initial Public Offering shall not include any issuance of equity interests in any merger or other business combination and shall not include any registration of the issuance of equity interests to existing security holders or employees of the Company or its Subsidiaries on Form S-4 or Form S-8 (or any successor form adopted by the SEC).

(r)      "*Nonqualified Stock Option*" means an Option which is not designated by the Committee as an Incentive Stock Option.

(s)      "*NYSE*" means The New York Stock Exchange, Inc.

(t)      "*Option*" means an Award granted under Section 7 of the Plan.

(u)      "*Other Stock-Based Award*" means an Award granted under Section 10 of the Plan.

(v)      "*Performance Compensation Award*" means an Award designated by the Committee as a Performance Compensation Award pursuant to Section 11 of the Plan.

(w)      "*Performance Criteria*" shall mean the criterion or criteria that the Committee shall select for purposes of establishing the Performance Goal(s) for a Performance Period with respect to any Performance Compensation Award under the Plan.

(x)      "*Performance Formula*" shall mean, for a Performance Period, the one or more objective formulae applied against the relevant Performance Goal to determine, with regard to the Performance Compensation Award of a particular Participant, whether all, some portion but less than all, or none of the Performance Compensation Award has been earned for the Performance Period.

(y)      "*Performance Goals*" shall mean, for a Performance Period, the one or more goals established by the Committee for the Performance Period based upon the Performance Criteria.

(z)      "*Performance Period*" shall mean the one or more periods of time as the Committee may select, over which the attainment of one or more Performance Goals will be measured for the purpose of determining a Participant's right to, and the payment of, a Performance Compensation Award.

(aa)     "*Person*" has the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the shareholders of the Company in substantially the same proportions as their ownership of Common Stock of the Company.

(bb)     "*Restricted Stock*" means an Award of Common Stock, subject to certain specified restrictions, granted under Section 9 of the Plan.

5

(cc)    "**_Restricted Stock Unit_**" means an Award of an unfunded and unsecured promise to deliver shares of Common Stock, cash, other securities or other property, subject to certain specified restrictions, granted under Section 9 of the Plan.

(dd)    "**_Securities Act_**" means the U.S. Securities Act of 1933, as amended, and any successor thereto.  Reference in the Plan to any section of (or rule promulgated under) the Securities Act shall be deemed to include any rules, regulations or other interpretative guidance under such section or rule, and any amendments or successor provisions to such section, rules, regulations or guidance.

(ee)    "**_Stock Appreciation Right_**" or "**_SAR_**" means an Award granted under Section 8 of the Plan.

## 4.  Administration.

(a)    The Committee shall administer the Plan, and shall have the sole and plenary authority to:  (i) designate Participants; (ii) determine the type, size, and terms and conditions of Awards to be granted; (iii) determine the method by which an Award may be settled, exercised, canceled, forfeited, or suspended; (iv) determine the circumstances under which the delivery of cash, property or other amounts payable with respect to an Award may be deferred either automatically or at the Participant's or Committee's election; (v) interpret and administer the Plan and any Award; (vi) establish, amend, suspend, or waive any rules and regulations and appoint such agents as the Committee shall deem appropriate for the proper administration of the Plan; (vii) accelerate the vesting, delivery or exercisability of, payment for or lapse of restrictions on, or waive any condition in respect of, Awards; and (vii) make any other determination and take any other action that the Committee deems necessary or desirable for the administration of the Plan or to comply with any applicable law.  To the extent required to comply with the provisions of Rule 16b-3 promulgated under the Exchange Act (if applicable and if the Board is not acting as the Committee under the Plan), or any exception or exemption under the rules of the NYSE or any other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted, as applicable, it is intended that each member of the Committee shall, at the time he takes any action with respect to an Award under the Plan, be (A) a "non-employee director" within the meaning of Rule 16b 3 under the Exchange Act and/or (B) an "independent director" under the rules of the NYSE or any other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted ("**_Eligible Director_**").  However, the fact that a Committee member shall fail to qualify as an Eligible Director shall not invalidate any Award granted or action taken by the Committee that is otherwise validly granted or taken under the Plan.

(b)    The Committee may allocate all or any portion of its responsibilities and powers to any one or more of its members and may delegate all or any part of its responsibilities and powers to any person(s) selected by it, except for grants of Awards to persons who are non-employee members of the Board or otherwise are subject to Section 16 of the Exchange Act.  Any such allocation or delegation may be revoked by the Committee at any time.

(c)    As further set forth in Section 15(f) of the Plan, the Committee shall have the authority to amend the Plan and Awards to the extent necessary to permit participation in the Plan by Eligible Persons who are located outside of the United States on terms and conditions comparable to

those afforded to Eligible Persons located within the United States; provided, however, that no such action shall be taken without shareholder approval if such approval is required by applicable law or regulation.

(d)     Unless otherwise expressly provided in the Plan, all designations, determinations, interpretations, and other decisions regarding the Plan or any Award shall be within the sole discretion of the Committee, may be made at any time and shall be final, conclusive and binding upon all persons or entities, including, without limitation, the Company, any Affiliate, any Participant, any holder or beneficiary of any Award, and any shareholder of the Company.

(e)     No member of the Board, the Committee or any employee or agent of the Company (each such person, an "***Indemnifiable Person***") shall be liable for any action taken or omitted to be taken or any determination made with respect to the Plan or any Award hereunder (unless constituting fraud or a willful criminal act or omission).  Each Indemnifiable Person shall be indemnified and held harmless by the Company against and from any loss, cost, liability, or expense (including attorneys' fees) that may be imposed upon or incurred by such Indemnifiable Person in connection with or resulting from any action, suit or proceeding to which such Indemnifiable Person may be involved as a party, witness or otherwise by reason of any action taken or omitted to be taken or determination made under the Plan or any Award agreement and against and from any and all amounts paid by such Indemnifiable Person with the Company's approval (not to be unreasonably withheld), in settlement thereof, or paid by such Indemnifiable Person in satisfaction of any judgment in any such action, suit or proceeding against such Indemnifiable Person, and the Company shall advance to such Indemnifiable Person any such expenses promptly upon written request (which request shall include an undertaking by the Indemnifiable Person to repay the amount of such advance if it shall ultimately be determined as provided below that the Indemnifiable Person is not entitled to be indemnified); provided that the Company shall have the right, at its own expense, to assume and defend any such action, suit or proceeding and once the Company gives notice of its intent to assume the defense, the Company shall have sole control over such defense with counsel of recognized standing of the Company's choice.  The foregoing right of indemnification shall not be available to an Indemnifiable Person to the extent that a final judgment or other final adjudication (in either case not subject to further appeal) binding upon such Indemnifiable Person determines that the acts or omissions or determinations of such Indemnifiable Person giving rise to the indemnification claim resulted from such Indemnifiable Person's fraud or willful criminal act or omission or that such right of indemnification is otherwise prohibited by law or by the Company's Articles of Incorporation.  The foregoing right of indemnification shall not be exclusive of or otherwise supersede any other rights of indemnification to which such Indemnifiable Persons may be entitled under the Company's Articles of Incorporation, as a matter of law, individual indemnification agreement or contract or otherwise, or any other power that the Company may have to indemnify such Indemnifiable Persons or hold them harmless.

(f)     The Board may at any time and from time to time, grant Awards and administer the Plan with respect to such Awards.  In any such case, the Board shall have all the authority granted to the Committee under the Plan.

7

**5.  Grant of Awards; Emergence Grants; Shares Subject to the Plan; Limitations.**

(a)  The Committee may grant Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Other Stock-Based Awards, Cash-Based Awards and/or Performance Compensation Awards to one or more Eligible Persons.

(b)  Subject to Section 12 of the Plan, the following limitations apply to the grant of Awards:  (i) no more than 2,576,457 shares of Common Stock may be delivered in the aggregate pursuant to Awards; (ii) no more than 2,576,457 shares of Common Stock may be delivered in the aggregate pursuant to the exercise of Incentive Stock Options; and (iii) no more than $18,000,000 may be delivered in respect of Cash-Based Awards (the "Cash LTIP Pool").

(c)  On the Effective Date, subject to their continued employment with the Company or an Affiliate through the Effective Date, those members of management identified on Appendix A will be granted Awards under the Plan with an aggregate grant date value for each such Participant as of the Effective Date as set forth in Appendix A (such grants, the "Management Committee Emergence Grants").  Each Management Committee Emergence Grant shall be made as follows: (i) 50% in the form of Restricted Stock Units; and (ii) 50% in the form of performance-based Restricted Stock Units, in each case, in accordance with the forms of Award Agreements established for the Management Committee Emergence Grants.  On the Effective Date, subject to their continued employment with the Company or an Affiliate through the Effective Date, those key employees of the Company or one of its Affiliates who were selected by the Chief Executive Officer of the Company will be granted Awards under the Plan with an aggregate grant date value for each such Participant as of the Effective Date as determined by the Chief Executive Officer of the Company (such grants, the "Key Employee Emergence Grants" and, together with the Management Committee Emergence Grants, the "Emergence Grants").  Each Key Employee Emergence Grant shall be in the form of a combination of Restricted Stock Units and Cash-Based Awards, in each case, in accordance with the forms of Award Agreements established for the Key Employee Emergence Grants.  Notwithstanding any provision of the Plan to the contrary, to the extent that the terms of the Emergence Grants provide a Participant rights that are more favorable than those otherwise provided under the terms of the Plan, the provisions of such Emergence Grants shall control.  After the Emergence Grants are made as set forth herein, any shares of Common Stock that remain available for grants of Awards under the Plan may be granted to additional Eligible Persons by the Committee in its sole discretion.

(d)  Shares of Common Stock shall be deemed to have been used in settlement of Awards whether or not they are actually delivered or the Fair Market Value equivalent of such shares is paid in cash; provided, however, that if shares of Common Stock issued upon exercise, vesting or settlement of an Award, or shares of Common Stock owned by a Participant are surrendered or tendered to the Company in payment of the Exercise Price or any taxes required to be withheld in respect of an Award, such surrendered or tendered shares shall not become available for other Awards; provided, further, that in no event shall such shares increase the number of shares of Common Stock that may be delivered pursuant to Incentive Stock Options. If and to the extent all or any portion of an Award expires, terminates or is canceled or forfeited for any reason without the Participant having received any benefit therefrom, the shares covered by such Award or portion thereof shall again become available for other Awards.  For purposes of the foregoing sentence, a Participant shall not be deemed to have received any "benefit" (i) in the case of forfeited Restricted

Stock by reason of having enjoyed voting rights and dividend rights prior to the date of forfeiture or (ii) in the case of an Award canceled by reason of a new Award being granted in substitution therefor.

(e)     The Committee may grant Awards in assumption of, or in substitution for, outstanding awards previously granted by the Company or any Affiliate or an entity directly or indirectly acquired by the Company or with which the Company combines ("*Substitute Awards*"), and such Substitute Awards shall not be counted against the aggregate number of shares of Common Stock available for Awards; provided, further, that Substitute Awards issued or intended as "incentive stock options" within the meaning of Section 422 of the Code shall be counted against the aggregate number of Incentive Stock Options available under the Plan.

**6.  Eligibility.**  Participation shall be limited to Eligible Persons who have been selected by the Committee and who have entered into an Award agreement with respect to an Award granted to them under the Plan (each such Eligible Person, a "*Participant*").

**7.  Options.**

(a)     <u>Generally.</u>  All Options granted under the Plan shall be Nonqualified Stock Options unless the Award agreement expressly states otherwise.  Incentive Stock Options shall be granted only subject to and in compliance with Section 422 of the Code, and only to Eligible Persons who are employees of the Company and its Affiliates and who are eligible to receive an Incentive Stock Option under the Code.  If for any reason an Option intended to be an Incentive Stock Option (or any portion thereof) shall not qualify as an Incentive Stock Option, then, to the extent of such nonqualification, such Option or portion thereof shall be regarded as a Nonqualified Stock Option appropriately granted under the Plan.

(b)     <u>Exercise Price.</u>  The exercise price ("*Exercise Price*") per share of Common Stock for each Option shall not be less than 100% of the Fair Market Value of such share, determined as of the Date of Grant (provided that the Exercise Price may not be lower than the nominal value per share). Any modification to the Exercise Price of an outstanding Option shall be subject to the prohibition on repricing set forth in Section 14(b).

(c)     <u>Vesting, Exercise and Expiration</u>.  The Committee shall determine the manner and timing of vesting, exercise and expiration of Options.  The period between Date of Grant and the scheduled expiration date of the Option ("*Option Period*") shall not exceed ten years, unless the Option Period (other than in the case of an Incentive Stock Option) would expire at a time when trading in the shares of Common Stock is prohibited by the Company's securities trading policy or Company-imposed "blackout period", in which case the Option Period shall be automatically extended until the 30th day following the expiration of such prohibition (so long as such extension shall not violate Section 409A of the Code). The Committee may accelerate the vesting and/or exercisability of any Option, which acceleration shall not affect any other terms and conditions of such Option.

(d)     <u>Method of Exercise and Form of Payment.</u>  No shares of Common Stock shall be delivered pursuant to any exercise of an Option until the Participant has made payment in full to the Company of the Exercise Price and an amount equal to any U.S. Federal, state and local income and

employment taxes and non-U.S. income and employment taxes, social contributions and any other tax-related items required to be withheld.  Options may be exercised by delivery of written or electronic notice of exercise to the Company or its designee (including a third party administrator) in accordance with the terms of the Option.  The Exercise Price and all applicable required withholding taxes shall be payable (i) in cash, check, cash equivalent and/or shares of Common Stock valued at the Fair Market Value at the time the Option is exercised (including, pursuant to procedures approved by the Committee, by means of attestation of ownership of a sufficient number of shares of Common Stock in lieu of actual delivery of such shares to the Company); provided that such shares of Common Stock are not subject to any pledge or other security interest; or (ii) by such other method as the Committee may permit, including without limitation:  (A) in other property having a fair market value equal to the Exercise Price and all applicable required withholding taxes; (B) if there is a public market for the shares of Common Stock at such time, by means of a broker-assisted "cashless exercise" pursuant to which the Company is delivered a copy of irrevocable instructions to a stockbroker to sell the shares of Common Stock otherwise deliverable upon the exercise of the Option and to deliver promptly to the Company an amount equal to the Exercise Price and all applicable required withholding taxes; or (C) by means of a "net exercise" procedure effected by withholding the minimum number of shares of Common Stock otherwise deliverable in respect of an Option that are needed to pay for the Exercise Price and all applicable required withholding taxes. Notwithstanding the foregoing, unless otherwise determined by the Committee, if on the last day of the Option Period, the Fair Market Value exceeds the Exercise Price, the Participant has not exercised the Option, and the Option has not expired, such Option shall be deemed to have been exercised by the Participant on such last day by means of a "net exercise" procedure described above.  Any fractional shares of Common Stock shall be settled in cash.

(e)      Notification upon Disqualifying Disposition of an Incentive Stock Option.  Each Participant awarded an Incentive Stock Option under the Plan shall notify the Company in writing immediately after the date he makes a disqualifying disposition of any Common Stock acquired pursuant to the exercise of such Incentive Stock Option.  A disqualifying disposition is any disposition (including, without limitation, any sale) of such Common Stock before the later of (i) two years after the Date of Grant of the Incentive Stock Option or (ii) one year after the date of exercise of the Incentive Stock Option.  The Company may, if determined by the Committee and in accordance with procedures established by the Committee, retain possession, as agent for the applicable Participant, of any Common Stock acquired pursuant to the exercise of an Incentive Stock Option until the end of the period described in the preceding sentence, subject to complying with any instruction from such Participant as to the sale of such Common Stock.

(f)      Incentive Stock Option Grants to 10% Shareholders.  Notwithstanding anything to the contrary in this Section 7, if an Incentive Stock Option is granted to a Participant who owns stock representing more than ten percent of the voting power of all classes of stock of the Company or of a Subsidiary or a parent of the Company, the Option Period shall not exceed five years from the Date of Grant of such Option and the Option Price shall be at least 110% of the Fair Market Value (on the Date of Grant) of the shares subject to the Option.

(g)      $100,000 Per Year Limitation for Incentive Stock Options.  To the extent the aggregate Fair Market Value (determined as of the Date of Grant) of shares of Common Stock for which Incentive Stock Options are exercisable for the first time by any Participant during any

calendar year (under all plans of the Company) exceeds $100,000, such excess Incentive Stock Options shall be treated as Nonqualified Stock Options.

**8.   Stock Appreciation Rights (SARs).**

(a)      Generally.  Each SAR shall be subject to the conditions set forth in the Plan and the Award agreement.  Any Option granted under the Plan may include tandem SARs.  The Committee also may award SARs independent of any Option.

(b)      Strike Price.  The strike price ("*Strike Price*") per share of Common Stock for each SAR shall not be less than 100% of the Fair Market Value of such share, determined as of the Date of Grant (provided that the Strike Price may not be lower than the nominal value per share); provided, however, that a SAR granted in tandem with (or in substitution for) an Option previously granted shall have a Strike Price equal to the Exercise Price of the corresponding Option.  Any modification to the Strike Price of an outstanding SAR shall be subject to the prohibition on repricing set forth in Section 14(b).

(c)      Vesting and Expiration.  A SAR granted in tandem with an Option shall become exercisable and shall expire according to the same vesting schedule and expiration provisions as the corresponding Option.  A SAR granted independently of an Option shall vest and become exercisable and shall expire in such manner and on such date or dates determined by the Committee and shall expire after such period, not to exceed ten years, as may be determined by the Committee (the "*SAR Period*"); provided, however, that notwithstanding any vesting or exercisability dates set by the Committee, the Committee may accelerate the vesting and/or exercisability of any SAR, which acceleration shall not affect the terms and conditions of such SAR other than with respect to vesting and/or exercisability.  If the SAR Period would expire at a time when trading in the shares of Common Stock is prohibited by the Company's securities trading policy (or the Company-imposed "blackout period"), the SAR Period shall be automatically extended until the 30th day following the expiration of such prohibition (so long as such extension shall not violate Section 409A of the Code).

(d)      Method of Exercise.  SARs may be exercised by delivery of written or electronic notice of exercise to the Company or its designee (including a third party administrator) in accordance with the terms of the Award, specifying the number of SARs to be exercised and the date on which such SARs were awarded.  Notwithstanding the foregoing, if on the last day of the Option Period (or in the case of a SAR independent of an Option, the SAR Period), the Fair Market Value exceeds the Strike Price, the Participant has not exercised the SAR or the corresponding Option (if applicable), and neither the SAR nor the corresponding Option (if applicable) has expired, such SAR shall be deemed to have been exercised by the Participant on such last day and the Company shall make the appropriate payment therefor.

(e)      Payment.  Upon the exercise of a SAR, the Company shall pay to the Participant an amount equal to the number of shares subject to the SAR that are being exercised multiplied by the excess, if any, of the Fair Market Value of one share of Common Stock on the exercise date over the Strike Price, less an amount equal to any U.S. Federal, state and local income and employment taxes and non-U.S. income and employment taxes, social contributions and any other tax-related items required to be withheld.  The Company shall pay such amount in cash, in shares of Common Stock

valued at Fair Market Value, or any combination thereof, as determined by the Committee. Any fractional shares of Common Stock shall be settled in cash.

**9. Restricted Stock and Restricted Stock Units.**

(a)    Generally. Each Restricted Stock and Restricted Stock Unit grant shall be subject to the conditions set forth in the Plan and the Award agreement. The Committee shall establish restrictions applicable to such Restricted Stock and Restricted Stock Units, including the period over which the restrictions shall apply (the "***Restricted Period***"), and the time or times at which Restricted Stock or Restricted Stock Units shall become vested. The Committee may accelerate the vesting and/or the lapse of any or all of the restrictions on the Restricted Stock and Restricted Stock Units, which acceleration shall not affect any other terms and conditions of such Awards. No shares shall be issued at the time an Award of Restricted Stock Units is made, and the Company will not be required to set aside a fund for the payment of any such Award.

(b)    Stock Certificates; Escrow or Similar Arrangement. Upon the grant of Restricted Stock, the Committee shall cause share(s) of Common Stock to be registered in the name of the Participant and held in book-entry form subject to the Company's directions. In such event, the Committee may provide that such certificates shall be held by the Company or in escrow rather than delivered to the Participant pending vesting and release of restrictions, in which case the Committee may require the Participant to execute and deliver to the Company (i) an escrow agreement satisfactory to the Committee, if applicable, and (ii) the appropriate stock power (endorsed in blank) with respect to the Restricted Stock. If a Participant shall fail to execute and deliver the escrow agreement and blank stock power within the amount of time specified by the Committee, the Award shall be null and void. Subject to the restrictions set forth in this Section 9 and the Award agreement, the Participant shall have the rights and privileges of a shareholder as to such Restricted Stock, including without limitation the right to vote such Restricted Stock.

(c)    Restrictions; Forfeiture. Restricted Stock and Restricted Stock Units awarded to a Participant shall be subject to forfeiture until the expiration of the Restricted Period and the attainment of any other vesting criteria established by the Committee, and shall be subject to the restrictions on transferability set forth in the Award agreement. In the event of any forfeiture, all rights of the Participant to such Restricted Stock (or as a shareholder with respect thereto), and/or to such Restricted Stock Units, as applicable, including to any dividends and/or dividend equivalents that may have been accumulated and withheld during the Restricted Period in respect thereof, shall terminate without further action or obligation on the part of the Company.

(d)    Delivery of Restricted Stock and Settlement of Restricted Stock Units.

(i)    Upon the expiration of the Restricted Period and the attainment of any other vesting criteria, the restrictions set forth in the applicable Award agreement shall be of no further force or effect, except as set forth in the Award agreement. If an escrow arrangement is used, upon such expiration the Company shall deliver to the Participant or his beneficiary (via book entry notation or, if applicable, in stock certificate form) the shares of Restricted Stock with respect to which the Restricted Period has expired (rounded down to the nearest full share). Dividends, if any, that may have been withheld by the Committee and attributable to the Restricted Stock shall be distributed to the Participant in cash or in shares

of Common Stock having a Fair Market Value (on the date of distribution) equal to the amount of such dividends, upon the release of restrictions on such share.

(ii)      Unless otherwise provided by the Committee in an Award agreement, upon the expiration of the Restricted Period and the attainment of any other vesting criteria established by the Committee, with respect to any outstanding Restricted Stock Units, the Company shall deliver to the Participant, or his beneficiary (via book entry notation or, if applicable, in stock certificate form), one share of Common Stock (or other securities or other property, as applicable) for each such outstanding Restricted Stock Unit which has not then been forfeited and with respect to which the Restricted Period has expired and any other such vesting criteria are attained ("*Released Unit*"); provided, however, that, unless the relevant Award agreement expressly provides for settlement of the Restricted Stock Units in shares of Common Stock, the Committee may elect to (i) pay cash or part cash and part Common Stock in lieu of delivering only shares of Common Stock in respect of such Released Units or (ii) defer the delivery of Common Stock (or cash or part Common Stock and part cash, as the case may be) beyond the expiration of the Restricted Period if such extension would not cause adverse tax consequences under Section 409A of the Code.  If a cash payment is made in lieu of delivering shares of Common Stock, the amount of such payment shall be equal to the Fair Market Value of the Common Stock as of the date on which the Restricted Period lapsed with respect to such Restricted Stock Units.  To the extent provided in an Award agreement, the holder of outstanding Released Units shall be entitled to be credited with dividend equivalent payments (upon the payment by the Company of dividends on shares of Common Stock) either in cash or in shares of Common Stock having a Fair Market Value equal to the amount of such dividends, which accumulated dividend equivalents (and interest thereon, if applicable) shall be payable at the same time as the underlying Restricted Stock Units are settled following the release of restrictions on such Restricted Stock Units.

**10. Other Stock-Based and Cash-Based Awards.**

(a) The Committee may issue unrestricted Common Stock, rights to receive future grants of Awards, or other Awards denominated in Common Stock (including performance shares or performance units), under the Plan to Eligible Persons, alone or in tandem with other Awards, in such amounts as the Committee shall from time to time determine ("*Other Stock-Based Awards*").  Each Other Stock-Based Award shall be evidenced by an Award agreement which may include conditions, including, without limitation, the payment by the Participant of the Fair Market Value of such shares of Common Stock on the Date of Grant.

(b) The Committee may issue cash-based Awards under the Plan to Eligible Persons, alone or in tandem with other Awards, in such amounts as the Committee shall from time to time determine ("*Cash-Based Awards*"). Each Cash-Based Award shall be evidenced by an Award agreement that contains such conditions as determined by the Committee.

**11. Performance Compensation Awards.**

(a)      Generally.  The Committee shall have the authority, at or before the time of grant of any Award described in Sections 7 through 10 of the Plan, to designate such Award as a

Performance Compensation Award. In addition, the Committee shall have the authority to make an award of a cash bonus to any Participant and designate such Award as a Performance Compensation Award.

(b)      Discretion of Committee with Respect to Performance Compensation Awards. The Committee may select the length of a Performance Period, the type(s) of Performance Compensation Awards to be issued, the Performance Criteria used to establish the Performance Goal(s), the kind(s) and/or level(s) of the Performance Goals(s) and the Performance Formula. Within the first 90 days of a Performance Period (or such longer period as determined by the Committee), the Committee shall determine each of the matters enumerated in the immediately preceding sentence and record the same in writing (which may be in the form of minutes of a meeting of the Committee).

(c)      Performance Criteria. The Performance Criteria that will be used to establish the Performance Goal(s) may be based on the attainment of specific levels of performance of the Company (and/or one or more Affiliates, divisions or operational and/or business units, product lines, brands, business segments, administrative departments, units, or any combination of the foregoing) and shall be limited to the following: (i) net earnings or net income (before or after taxes); (ii) basic or diluted earnings per share (before or after taxes); (iii) net revenue or net revenue growth; (iv) gross revenue or gross revenue growth, gross profit or gross profit growth; (v) net operating profit (before or after taxes); (vi) return measures (including, but not limited to, return on investment, assets, capital, gross revenue or gross revenue growth, invested capital, equity, or sales); (vii) cash flow (including, but not limited to, operating cash flow, free cash flow, and cash flow return on capital), which may but are not required to be measured on a per share basis; (viii) earnings before or after taxes, interest, depreciation and/or amortization (including EBIT and EBITDA); (ix) gross or net operating margins; (x) share price (including, but not limited to, growth measures and total shareholder return); (xi) expense targets or cost reduction goals, general and administrative expense savings; (xii) margins; (xiii) enterprise value; (xiv) sales; (xv) shareholder return; (xvi) objective measures of personal targets, goals or completion of projects; (xvii) cost of capital, debt leverage year-end cash position or book value; or (xviii) strategic objectives, development of new product lines and related revenue, sales and margin targets, or international operations. Any one or more of the Performance Criteria may be stated as a percentage of another Performance Criteria, or a percentage of a prior period's Performance Criteria, or used on an absolute, relative or adjusted basis to measure the performance of the Company and/or one or more Affiliates as a whole or any divisions or operational and/or business units, product lines, brands, business segments, administrative departments of the Company and/or one or more Affiliates or any combination thereof, as the Committee may deem appropriate, or any of the above Performance Criteria may be compared to the performance of a group of comparator companies, or a published or special index that the Committee deems appropriate, or as compared to various stock market indices. The Committee also has the authority to provide for accelerated vesting, delivery and exercisability of any Award based on the achievement of Performance Goals pursuant to the Performance Criteria specified in this paragraph.

(d)      Modification of Performance Goal(s). The Committee may alter Performance Criteria without obtaining shareholder approval if applicable tax and/or securities laws so permit. The Committee may modify the calculation of a Performance Goal to reflect, without limitation, any of the following events: (i) asset write-downs; (ii) litigation or claim judgments or settlements; (iii) the effect of changes in tax laws, accounting principles, or other laws or regulatory rules affecting

reported results; (iv) any reorganization and restructuring programs; (v) extraordinary nonrecurring items as described in Accounting Standards Codification Topic 225-20 (or any successor pronouncement thereto) and/or in management's discussion and analysis of financial condition and results of operations appearing in the Company's annual report to shareholders for the applicable year; (vi) acquisitions or divestitures; (vii) any other specific unusual or nonrecurring events, or objectively determinable category thereof; (viii) foreign exchange gains and losses; (ix) discontinued operations and nonrecurring charges; and (x) a change in the Company's fiscal year.

(e)    Payment of Performance Compensation Awards.

(i)    *Payment*.  A Participant must be employed by or rendering services for the Company or an Affiliate on the last day of a Performance Period to be eligible for payment of a Performance Compensation Award for such period.

(ii)    *Limitation*.  A Participant shall be eligible to receive payment of a Performance Compensation Award only to the extent the Committee determines that the Performance Goals for such period are achieved; provided, however, that in the event of the termination of a Participant's employment or service by the Company other than for Cause within 12 months following a Change in Control, or due to the Participant's death or Disability, the Participant shall receive payment in respect of a Performance Compensation Award based on (1) actual performance through the date of termination as determined by the Committee, or (2) if the Committee determines that measurement of actual performance cannot be reasonably assessed, the assumed achievement of target performance as determined by the Committee, in each case, prorated based on the time elapsed from the date of grant to the date of termination of employment or service.

(iii)    *Certification*.  Following the completion of a Performance Period, the Committee shall review and certify in writing (which may be in the form of minutes of a meeting of the Committee) whether, and to what extent, the Performance Goals for the Performance Period have been achieved and, if so, calculate and certify in writing (which may be in the form of minutes of a meeting of the Committee) that amount of the Performance Compensation Awards earned for the period based upon the Performance Formula.  The Committee shall then determine the amount of each Participant's Performance Compensation Award actually payable for the Performance Period and, in so doing, may apply discretion to eliminate or reduce the size of a Performance Compensation Award. Unless otherwise provided in the applicable Award agreement, the Committee shall not have the discretion to (A) provide payment or delivery in respect of Performance Compensation Awards for a Performance Period if the Performance Goals for such Performance Period have not been attained; or (B) increase a Performance Compensation Award above the applicable limitations set forth in Section 6 of the Plan.

(f)    Timing of Award Payments.  Unless otherwise provided in the applicable Award agreement, Performance Compensation Awards granted for a Performance Period shall be paid to Participants as soon as administratively practicable following completion of the certifications required by this Section 11.  Any Performance Compensation Award that has been deferred shall not (between the date as of which the Award is deferred and the payment date) increase (i) with respect to a Performance Compensation Award that is payable in cash, by a measuring factor for each fiscal

year greater than a reasonable rate of interest set by the Committee or (ii) with respect to a Performance Compensation Award that is payable in shares of Common Stock, by an amount greater than the appreciation of a share of Common Stock from the date such Award is deferred to the payment date.  Unless otherwise provided in an Award agreement, any Performance Compensation Award that is deferred and is otherwise payable in shares of Common Stock shall be credited (during the period between the date as of which the Award is deferred and the payment date) with dividend equivalents (in a manner consistent with the methodology set forth in the last sentence of Section 9(d)(ii)).

**12. Changes in Capital Structure and Similar Events.**  In the event of (a) any dividend (other than regular cash dividends) or other distribution (whether in the form of cash, shares of Common Stock, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, split-off, spin-off, combination, repurchase or exchange of shares of Common Stock or other securities of the Company, issuance of warrants or other rights to acquire shares of Common Stock or other securities of the Company, or other similar corporate transaction or event (including, without limitation, a Change in Control) that affects the shares of Common Stock, or (b) unusual or nonrecurring events (including, without limitation, a Change in Control) affecting the Company, any Affiliate, or the financial statements of the Company or any Affiliate, or changes in applicable rules, rulings, regulations or other requirements of any governmental body or securities exchange or inter-dealer quotation service, accounting principles or law, such that in any case an adjustment is determined by the Committee to be necessary or appropriate, then the Committee shall make any such adjustments in such manner as it may deem equitable, including without limitation any or all of the following:  (i) adjusting any or all of (A) the number of shares of Common Stock or other securities of the Company (or number and kind of other securities or other property) which may be delivered in respect of Awards or with respect to which Awards may be granted under the Plan (including, without limitation, adjusting any or all of the limitations under Section 5 of the Plan) and (B) the terms of any outstanding Award, including, without limitation, the Exercise Price, Strike Price or any applicable performance measures; (ii) providing for a substitution or assumption of Awards (or awards of an acquiring company), accelerating the delivery, vesting and/or exercisability of, lapse of restrictions and/or other conditions on, or termination of, Awards or providing for a period of time (which shall not be required to be more than ten (10) days) for Participants to exercise outstanding Awards prior to the occurrence of such event (and any such Award not so exercised shall terminate upon the occurrence of such event); and (iii) cancelling any one or more outstanding Awards (or awards of an acquiring company) and causing to be paid to the holders thereof, in cash, shares of Common Stock, other securities or other property, or any combination thereof, the value of such Awards, if any, as determined by the Committee (which if applicable may be based upon the price per share of Common Stock received or to be received by other shareholders of the Company in such event), including without limitation, in the case of an outstanding Option or SAR, a cash payment in an amount equal to the excess, if any, of the Fair Market Value (as of a date specified by the Committee) of the shares of Common Stock subject to such Option or SAR over the aggregate Exercise Price or Strike Price of such Option or SAR, respectively (it being understood that, in such event, any Option or SAR having a per share Exercise Price or Strike Price equal to, or in excess of, the Fair Market Value of a share of Common Stock subject thereto may be canceled and terminated without any payment or consideration therefor); provided, however, that the Committee shall make an equitable or proportionate adjustment to outstanding Awards to reflect any "equity restructuring" (within the meaning of the Financial Accounting Standards Codification Topic 718 (or any successor pronouncement thereto).  Except as

otherwise determined by the Committee, any adjustment in Incentive Stock Options under this Section 12 (other than any cancellation of Incentive Stock Options) shall be made only to the extent not constituting a "modification" within the meaning of Section 424(h)(3) of the Code, and any adjustments under this Section 12 shall be made in a manner which does not adversely affect the exemption provided pursuant to Rule 16b-3 under the Exchange Act.  The Company shall give each Participant notice of an adjustment hereunder and, upon notice, such adjustment shall be conclusive and binding for all purposes.

**13. Effect of Change in Control.**  In the event of a Change in Control, notwithstanding any provision of the Plan to the contrary:

(a)     In the event a Participant's employment with the Company or an Affiliate is terminated by the Company or Affiliate without Cause (and other than due to death or Disability) on or within 12 months following a Change of Control, notwithstanding any provision of the Plan to the contrary, all Options and SARs held by such Participant shall become immediately exercisable with respect to 100% of the shares subject to such Options and SARs, and the Restricted Period (and any other conditions) shall expire immediately with respect to 100 percent of the shares of Restricted Stock and Restricted Stock Units and any other Awards held by such Participant (including a waiver of any applicable Performance Goals); provided that in the event the vesting or exercisability of any Award would otherwise be subject to the achievement of performance conditions, the portion of such Award that shall become fully vested and immediately exercisable shall be based on the assumed achievement of target performance as determined by the Committee and prorated for the number of days elapsed from the grant date of such Award through the date of termination.

(b)     In addition, the Committee may upon at least 10 days' advance notice to the affected persons, cancel any outstanding Award and pay to the holders thereof, in cash, securities or other property (including of the acquiring or successor company), or any combination thereof, the value of such Awards based upon the price per share of Common Stock received or to be received by other shareholders of the Company in the event.  Notwithstanding the above, the Committee shall exercise such discretion over any Award subject to Code Section 409A at the time such Award is granted.

The obligations of the Company under the Plan shall be binding upon any successor corporation or organization resulting from the merger, consolidation or other reorganization of the Company, or upon any successor corporation or organization succeeding to substantially all of the assets and business of the Company.

To the extent practicable, the provisions of this Section 13 shall occur in a manner and at a time which allows affected Participants the ability to participate in the Change in Control transaction with respect to the Common Stock subject to their Awards.

**14. Amendments and Termination.**

(a)     <u>Amendment and Termination of the Plan.</u>  The Board may amend, alter, suspend, discontinue, or terminate the Plan or any portion thereof at any time; provided, that no such amendment, alteration, suspension, discontinuation or termination shall be made without shareholder approval if such approval is necessary to comply with any tax or regulatory requirement applicable to the Plan (including, without limitation, as necessary to comply with any rules or requirements of

any securities exchange or inter-dealer quotation service on which the shares of Common Stock may be listed or quoted or for changes in GAAP to new accounting standards); provided, further, that any such amendment, alteration, suspension, discontinuance or termination that would materially and adversely affect the rights of any Participant or any holder or beneficiary of any Award theretofore granted shall not to that extent be effective without the consent of the affected Participant, holder or beneficiary, unless the Committee determines that such either is required or advisable in order for the Company, the Plan or the Award to satisfy any applicable law or regulation.  Notwithstanding the foregoing, no amendment shall be made to the last proviso of Section 14(b) without shareholder approval.

(b)      Amendment of Award Agreements.  The Committee may waive any conditions or rights under, amend any terms of, or alter, suspend, discontinue, cancel or terminate, any Award theretofore granted or the associated Award agreement, prospectively or retroactively (including after a Participant's termination of employment or service with the Company); provided that any such waiver, amendment, alteration, suspension, discontinuance, cancellation or termination that would materially and adversely affect the rights of any Participant with respect to any Award theretofore granted shall not to that extent be effective without the consent of the affected Participant unless the Committee determines that such either is required or advisable in order for the Company, the Plan or the Award to satisfy any applicable law or regulation; provided, further, that except as otherwise permitted under Section 12 of the Plan, if (i) the Committee reduces the Exercise Price of any Option or the Strike Price of any SAR, (ii) the Committee cancels any outstanding Option or SAR and replaces it with a new Option or SAR (with a lower Exercise Price or Strike Price, as the case may be) or other Award or cash in a manner which would either (A) be reportable on the Company's proxy statement or Form 10-K (if applicable) as Options which have been "repriced" (as such term is used in Item 402 of Regulation S-K promulgated under the Exchange Act), or (B) result in any "repricing" for financial statement reporting purposes (or otherwise cause the Award to fail to qualify for equity accounting treatment) or (iii) the Committee takes any other action which is considered a "repricing" for purposes of the shareholder approval rules of the applicable securities exchange or inter-dealer quotation service on which the Common Stock is listed or quoted, then, in the case of the immediately preceding clauses (i) through (iii), any such action shall not be effective without shareholder approval.

## 15. General.

(a)      Award Agreements; Other Agreements; Joinder to Shareholders Agreement.  Each Award under the Plan shall be evidenced by an Award agreement, which shall be delivered to the Participant and shall specify the terms and conditions of the Award and any rules applicable thereto. An Award agreement may be in written or electronic form and shall be signed (either in written or electronic form) by the Participant and a duly authorized representative of the Company.  The terms of any Award agreement, or any employment, change-in-control, severance or other agreement in effect with the Participant, may have terms or features different from and/or additional to those set forth in the Plan, and, unless expressly provided otherwise in such Award or other agreement, shall control in the event of any conflict with the terms of the Plan.  As a condition to receiving shares of Common Stock in respect of any Award, the Participant will be required to execute a joinder to the Company's Shareholders Agreement, and the relevant portions thereof will be provided to the Participant.

18

(b)      Nontransferability.

(i)      Each Award shall be exercisable only by a Participant during the Participant's lifetime, or, if permissible under applicable law, by the Participant's legal guardian or representative.  No Award may be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by a Participant other than by will or by the laws of descent and distribution and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or an Affiliate; provided that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance.

(ii)      Notwithstanding the foregoing, the Committee may permit Awards (other than Incentive Stock Options) to be transferred by a Participant, without consideration, subject to such rules as the Committee may adopt, to:  (A) any person who is a "family member" of the Participant, as such term is used in the instructions to Form S-8 under the Securities Act or any successor form of registration statements promulgated by the Securities and Exchange Commission (collectively, the "***Immediate Family Members***"); (B) a trust solely for the benefit of the Participant and their Immediate Family Members; (C) a partnership or limited liability company whose only partners or shareholders are the Participant and his Immediate Family Members; or (D) any other transferee as may be approved either (I) by the Board or the Committee, or (II) as provided in the applicable Award agreement; (each transferee described in clauses (A), (B), (C) and (D) above is hereinafter referred to as a "***Permitted Transferee***"); provided that the Participant gives the Committee advance written notice describing the terms and conditions of the proposed transfer and the Committee notifies the Participant in writing that such a transfer would comply with the requirements of the Plan.

(iii)      The terms of any Award transferred in accordance with the immediately preceding sentence shall apply to the Permitted Transferee and any reference in the Plan, or in any applicable Award agreement, to a Participant shall be deemed to refer to the Permitted Transferee, except that (A) Permitted Transferees shall not be entitled to transfer any Award, other than by will or the laws of descent and distribution; (B) Permitted Transferees shall not be entitled to exercise any transferred Option unless there shall be in effect a registration statement on an appropriate form covering the shares of Common Stock to be acquired pursuant to the exercise of such Option if the Committee determines, consistent with any applicable Award agreement, that such a registration statement is necessary or appropriate; (C) the Committee or the Company shall not be required to provide any notice to a Permitted Transferee, whether or not such notice is or would otherwise have been required to be given to the Participant under the Plan or otherwise; and (D) the consequences of the termination of the Participant's employment by, or services to, the Company or an Affiliate under the terms of the Plan and the applicable Award agreement shall continue to be applied with respect to the Permitted Transferee, including, without limitation, that an Option shall be exercisable by the Permitted Transferee only to the extent, and for the periods, specified in the Plan and the applicable Award agreement.

(c)      Dividends and Dividend Equivalents.  The Committee may provide a Participant as part of an Award with dividends or dividend equivalents, payable in cash, shares of Common Stock,

other securities, other Awards or other property, on a current or deferred basis, on such terms and conditions as may be determined by the Committee; provided, that no dividend equivalents shall be payable in respect of outstanding (i) Options or SARs or (ii) unearned Performance Compensation Awards or other unearned Awards subject to performance conditions other than or in addition to the passage of time; however, dividend equivalents may be accumulated in respect of unearned Awards and paid as soon as administratively practicable, but no more than 60 days, after such Awards are earned and become payable or distributable.

(d)      Tax Withholding.

(i)      A Participant shall be required to pay and the Company or any Affiliate shall have the right and is hereby authorized to withhold, from any cash, shares of Common Stock, other securities or other property deliverable under any Award or from any compensation or other amounts owing to a Participant, the amount of any required withholding taxes in respect of an Award, its exercise, or any payment or transfer under an Award or under the Plan and to take such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.

(ii)      Without limiting the generality of clause (i) above, the Committee may permit a Participant to satisfy, in whole or in part, the foregoing withholding liability by (A) payment in cash; (B) the delivery of shares of Common Stock owned by the Participant having a Fair Market Value equal to such withholding liability or (C) having the Company withhold from the number of shares of Common Stock otherwise issuable or deliverable pursuant to the exercise or settlement of the Award a number of shares with a Fair Market Value equal to such withholding liability.

(e)      No Claim to Awards; No Rights to Continued Employment.  No employee of the Company or an Affiliate, or other person, shall have any claim or right to be granted an Award under the Plan or, having been selected for the grant of an Award, to be selected for a grant of any other Award.  There is no obligation for uniformity of treatment of Participants or holders or beneficiaries of Awards.  The terms and conditions of Awards and the Committee's determinations and interpretations with respect thereto need not be the same with respect to each Participant and may be made selectively among Participants, whether or not such Participants are similarly situated.  Neither the Plan nor any action taken hereunder shall be construed as giving any Participant any right to be retained in the employ or service of the Company or an Affiliate, nor shall it be construed as giving any Participant any rights to continued service on the Board.

(f)      International Participants.  With respect to Participants who reside or work outside of the United States, the Committee may amend the terms of the Plan or appendices thereto, or outstanding Awards in order to conform such terms with or accommodate the requirements of local laws, procedures or practices or to obtain more favorable tax or other treatment for a Participant, the Company or its Affiliates.  Without limiting the generality of this subsection, the Committee is specifically authorized to adopt rules, procedures and sub-plans with provisions that limit or modify rights on death, disability, retirement or other termination of employment, available methods of exercise or settlement of an award, payment of income, social insurance contributions or payroll taxes, withholding procedures and handling of any stock certificates or other indicia of ownership

which vary with local requirements. The Committee may also adopt rules, procedures or sub-plans applicable to particular Affiliates or locations.

(g)      Beneficiary Designation.  A Participant's beneficiary shall be deemed to be his spouse (or domestic partner if such status is recognized by the Company and in such jurisdiction), or if the Participant is otherwise unmarried at the time of death, his estate, except to the extent a different beneficiary is designated in accordance with procedures that may be established by the Committee from time to time for such purpose.  Notwithstanding the foregoing, in the absence of a beneficiary validly designated under such Committee-established procedures and/or applicable law who is living (or in existence) at the time of death of a Participant residing or working outside the United States, any required distribution under the Plan shall be made to the executor or administrator of the estate of the Participant, or to such other individual as may be prescribed by applicable law.

(h)      No Rights as a Shareholder.  Except as otherwise specifically provided in the Plan or any Award agreement, no person shall be entitled to the privileges of ownership in respect of shares of Common Stock which are subject to Awards hereunder until such shares have been issued or delivered to that person.

(i)      Government and Other Regulations.

(i)      Nothing in this Plan shall be deemed to authorize the Committee or Board or any members thereof to take any action contrary to applicable law or regulation, or rules of the NYSE.

(ii)      The obligation of the Company to settle Awards in Common Stock or other consideration shall be subject to all applicable laws, rules, and regulations, and to such approvals by governmental agencies as may be required.  The Company shall be under no obligation to offer to sell or to sell, and shall be prohibited from offering to sell or selling, any shares of Common Stock pursuant to an Award unless such shares have been properly registered for sale pursuant to the Securities Act with the Securities and Exchange Commission or unless the Company has received an opinion of counsel, satisfactory to the Company, that such shares may be offered or sold without such registration pursuant to and in compliance with the terms of an available exemption.  The Company shall be under no obligation to register for sale under the Securities Act any of the shares of Common Stock to be offered or sold under the Plan.  The Committee shall have the authority to provide that all shares of Common Stock or other securities of the Company or any Affiliate delivered under the Plan shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the Plan, the applicable Award agreement, the U.S. Federal securities laws, or the rules, regulations and other requirements of the U.S. Securities and Exchange Commission, any securities exchange or inter-dealer quotation service upon which such shares or other securities of the Company are then listed or quoted and any other applicable Federal, state, local or non-U.S. laws, rules, regulations and other requirements, and, without limiting the generality of Section 9 of the Plan, the Committee may cause a legend or legends to be put on any such certificates of Common Stock or other securities of the Company or any Affiliate delivered under the Plan to make appropriate reference to such restrictions or may cause such Common Stock or other securities of the Company or any

21

Affiliate delivered under the Plan in book-entry form to be held subject to the Company's instructions or subject to appropriate stop-transfer orders.

(iii)     The Committee may cancel an Award or any portion thereof if it determines that legal or contractual restrictions and/or blockage and/or other market considerations would make the Company's acquisition of shares of Common Stock from the public markets, the Company's issuance of Common Stock to the Participant, the Participant's acquisition of Common Stock from the Company and/or the Participant's sale of Common Stock to the public markets, illegal, impracticable or inadvisable.  If the Committee determines to cancel all or any portion of an Award in accordance with the foregoing, unless prevented by applicable laws, the Company shall pay to the Participant an amount equal to the excess of (A) the aggregate Fair Market Value of the shares of Common Stock subject to such Award or portion thereof canceled (determined as of the applicable exercise date, or the date that the shares would have been vested or delivered, as applicable), over (B) the aggregate Exercise Price or Strike Price (in the case of an Option or SAR, respectively) or any amount payable as a condition of delivery of shares of Common Stock (in the case of any other Award). Such amount shall be delivered to the Participant as soon as practicable following the cancellation of such Award or portion thereof.

(j)     No Section 83(b) Elections Without Consent of Company.  No election under Section 83(b) of the Code or under a similar provision of law may be made unless expressly permitted by the terms of the applicable Award agreement or by action of the Committee in writing prior to the making of such election.  If a Participant, in connection with the acquisition of shares of Common Stock under the Plan or otherwise, is expressly permitted to make such election and the Participant makes the election, the Participant shall notify the Company of such election within ten days of filing notice of the election with the Internal Revenue Service or other governmental authority, in addition to any filing and notification required pursuant to Section 83(b) of the Code or other applicable provision.

(k)     No Trust or Fund Created.  Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate, on the one hand, and a Participant or other person or entity, on the other hand.  No provision of the Plan or any Award shall require the Company, for the purpose of satisfying any obligations under the Plan, to purchase assets or place any assets in a trust or other entity to which contributions are made or otherwise to segregate any assets, nor shall the Company maintain separate bank accounts, books, records or other evidence of the existence of a segregated or separately maintained or administered fund for such purposes.  Participants shall have no rights under the Plan other than as unsecured general creditors of the Company.

(l)     Reliance on Reports.  Each member of the Committee and each member of the Board (and their respective designees) shall be fully justified in acting or failing to act, as the case may be, and shall not be liable for having so acted or failed to act in good faith, in reliance upon any report made by the independent registered public accounting firm of the Company and its Affiliates and/or any other information furnished in connection with the Plan by any agent of the Company or the Committee or the Board, other than himself.

22

(m)     <u>Relationship to Other Benefits.</u>  No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement, profit sharing, group insurance or other benefit plan of the Company except as otherwise specifically provided in such other plan.

(n)     <u>Governing Law.</u>  The Plan shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware.

(o)     <u>Severability.</u>  If any provision of the Plan or any Award or Award agreement is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction or as to any person or entity or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, such provision shall be construed or deemed stricken as to such jurisdiction, person or entity or Award and the remainder of the Plan and any such Award shall remain in full force and effect.

(p)     <u>Obligations Binding on Successors.</u>  The obligations of the Company under the Plan shall be binding upon any successor corporation or organization resulting from the merger, consolidation or other reorganization of the Company, or upon any successor corporation or organization succeeding to all or substantially all of the assets and business of the Company.

(q)     <u>409A of the Code.</u>

(i)     It is intended that this Plan comply with Section 409A of the Code, and all provisions of this Plan shall be construed and interpreted in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A of the Code.  Each Participant is solely responsible and liable for the satisfaction of all taxes and penalties that may be imposed on or in respect of such Participant in connection with this Plan, including any taxes and penalties under Section 409A of the Code, and neither the Company nor any Affiliate shall have any obligation to indemnify or otherwise hold such Participant or any beneficiary harmless from such taxes or penalties.  With respect to any Award that is considered "deferred compensation" subject to Section 409A of the Code, references in the Plan to "termination of employment" (and substantially similar phrases) shall mean "separation from service" within the meaning of Section 409A of the Code.  For purposes of Section 409A of the Code, each of the payments that may be made in respect of any Award granted under the Plan is designated as a separate payment.

(ii)     Notwithstanding anything in the Plan to the contrary, if a Participant is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, no payments or deliveries in respect of any Awards that are "deferred compensation" subject to Section 409A of the Code shall be made to such Participant prior to the date that is six months after the date of such Participant's "separation from service" or, if earlier, the Participant's date of death.  All such delayed payments or deliveries will be paid or delivered (without interest) in a single lump sum on the earliest date permitted under Section 409A of the Code that is also a business day.

(iii)    In the event that the timing of payments in respect of any Award that would otherwise be considered "deferred compensation" subject to Section 409A of the Code would be accelerated upon the occurrence of (A) a Change in Control, no such acceleration shall be permitted unless the event giving rise to the Change in Control satisfies the definition of a change in the ownership or effective control of a corporation, or a change in the ownership of a substantial portion of the assets of a corporation pursuant to Section 409A of the Code and any Treasury Regulations promulgated thereunder or (B) a Disability, no such acceleration shall be permitted unless the Disability also satisfies the definition of "Disability" pursuant to Section 409A of the Code and any Treasury Regulations promulgated thereunder.

(r)    <u>Clawback/Forfeiture.</u>  Notwithstanding anything to the contrary contained herein, an Award agreement may provide that the Committee may cancel such Award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or violates a non-competition, non-solicitation, non-disparagement or non-disclosure covenant or agreement with the Company or any Affiliate, as determined by the Committee.  The Committee may also provide in an Award agreement that in such event, the Participant will forfeit any compensation, gain or other value realized thereafter on the vesting, exercise or settlement of such Award, the sale or other transfer of such Award, or the sale of shares of Common Stock acquired in respect of such Award, and must promptly repay such amounts to the Company.  The Committee may also provide in an Award agreement that if the Participant receives any amount in excess of what the Participant should have received under the terms of the Award for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company.  To the extent required by applicable law and/or the rules and regulations of the NYSE or other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, Awards shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into all outstanding Award agreements).

(s)    <u>No Representations Or Covenants With Respect To Tax Qualification.</u>  Although the Company may endeavor to (i) qualify an Award for favorable U.S. or non-U.S. tax treatment or (ii) avoid adverse tax treatment, the Company makes no representation to that effect and expressly disavows any covenant to maintain favorable or avoid unfavorable tax treatment. The Company shall be unconstrained in its corporate activities without regard to the potential negative tax impact on holders of Awards under the Plan.

(t)    <u>Expenses; Gender; Titles and Headings.</u>  The expenses of administering the Plan shall be borne by the Company and its Affiliates.  Masculine pronouns and other words of masculine gender shall refer to both men and women.  The titles and headings of the sections in the Plan are for convenience of reference only, and in the event of any conflict, the text of the Plan, rather than such titles or headings shall control.

*    *    *

24

As adopted by the Board of Directors of the Company on [Date], 2022.

**Exhibit N-1(ii)**

**Time-Based Restricted Stock United Award Agreement for Non-Management Employees**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**
**2022 EQUITY INCENTIVE PLAN**

**<u>TIME-BASED RESTRICTED STOCK UNIT AWARD AGREEMENT</u>**

THIS TIME-BASED RESTRICTED STOCK UNIT AWARD AGREEMENT (the "<u>Agreement</u>") is entered into as of [Grant Date], by and between Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* organized under the laws of Luxembourg (the "<u>Company</u>"), and [Participant Name] (the "<u>Participant</u>").

WHEREAS, the Company has adopted the Intelsat Emergence S.A. (to be renamed Intelsat S.A.) 2022 Equity Incentive Plan (as amended, the "<u>Plan</u>"), pursuant to which Restricted Stock Units ("<u>RSUs</u>") may be granted; and

WHEREAS, the Compensation Committee of the Board of Directors of the Company (the "<u>Committee</u>") has determined that it is in the best interests of the Company and its stockholders to grant the RSUs provided for herein to the Participant subject to the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

**1.      Grant of Restricted Stock Units.**

(a)      <u>Grant</u>. The Company hereby grants to the Participant a total of [Awards Granted] RSUs, on the terms and conditions set forth in this Agreement and as otherwise provided in the Plan.  The RSUs shall be credited to a separate book-entry account maintained for the Participant on the books of the Company.

(b)      <u>Incorporation by Reference.</u> The provisions of the Plan are incorporated herein by reference. Except as otherwise expressly set forth herein, this Agreement shall be construed in accordance with the provisions of the Plan and any interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan. Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Plan. The Committee shall have final authority to interpret and construe the Plan and this Agreement and to make any and all determinations under them, and its decision shall be binding and conclusive upon the Participant and the Participant's legal representative in respect of any questions arising under the Plan or this Agreement.  The Participant acknowledges that the Participant has received a copy of the Plan and has had an opportunity to review the Plan and agrees to be bound by all the terms and provisions of the Plan.

**2.      Vesting; Settlement.**  Except as may otherwise be provided herein, subject to the Participant's continued employment with the Company or an Affiliate, one-third of the RSUs (each, an "<u>Installment</u>") shall vest on each of the first three anniversaries of the Effective Date (each such date, a "<u>Vesting Date</u>").  Any fractional RSUs resulting from the application of the vesting schedule shall be aggregated and the RSUs resulting from such aggregation shall vest on

the final Vesting Date.  Upon vesting, the RSUs shall no longer be subject to cancellation pursuant to Section 4 hereof.  Each RSU shall be settled within 30 days following the applicable Vesting Date in shares of Common Stock.

3.      **Dividend Equivalents**.  In the event of any issuance of a dividend on the shares of Common Stock, including, without limitation, with respect to any cash or other distributions made on account of the CVRs (a "Dividend"), the Participant shall be credited, as of the payment date for such Dividend, with an amount, with respect to each RSU granted pursuant to this Agreement and outstanding as of the record date for such Dividend, equal to the amount of the Dividend per share (such amount, the "DER").  Each DER will be settled in cash (without the payment of interest) within 30 days following the Vesting Date of the RSU to which it relates.

4.      **Termination of Employment.**

        (a)      If, prior to the final Vesting Date and prior to a Change in Control, the Participant's employment with the Company and its Affiliates is terminated (i) by the Company or its Affiliate without Cause, (ii) due to the Participant's death or (iii) by the Company or its Affiliate due to the Participant's Disability (each, a "Qualifying Termination"), then the Participant will vest in a pro-rated portion of the Installment that was scheduled to vest on the next Vesting Date following the Qualifying Termination, effective as of the effective date of such Qualifying Termination.  Such pro-ration will be determined by multiplying (A) the number of RSUs comprising such Installment by (B) a fraction, the numerator of which is the total number of days that the Participant was employed by the Company or one of its Affiliates from the most recent Vesting Date (or, if no Vesting Date has elapsed, from the Effective Date) through the date of such Qualifying Termination, and the denominator of which is three hundred sixty-five (365).  Each RSU shall be settled within 30 days following the date of the Qualifying Termination in shares of Common Stock.  For the avoidance of doubt, such additional vesting upon a Qualifying Termination is in addition to any vesting that occurred prior to the Qualifying Termination.

        (b)      If the Participant's employment with the Company and its Affiliates terminates prior to the final Vesting Date for any reason other than as set forth in Section 4(a) or Section 6 hereof, all unvested RSUs shall be cancelled immediately, and the Participant shall not be entitled to receive any payments with respect thereto.  For the avoidance of doubt, the Participant shall remain entitled to have any vested, but not yet settled, RSUs be settled in shares of Common Stock in accordance with Section 2.

5.      **Rights as a Stockholder.** The Participant shall not be deemed for any purpose to be the owner of any shares of Common Stock underlying the RSUs unless, until and to the extent that (a) the Company shall have issued and delivered to the Participant the shares of Common Stock underlying the RSUs and (b) the Participant's name shall have been entered as a stockholder of record with respect to such shares of Common Stock on the books of the Company.  The Company shall cause the actions described in clauses (a) and (b) of the preceding sentence to occur promptly following settlement as contemplated by this Agreement, subject to compliance with applicable laws.  By executing this Agreement, the Participant shall be deemed to have executed a copy of the Company's Shareholders Agreement, effective as of [_____], 2022

(as may be amended, modified or supplemented from time to time), by and among the Company and its shareholders named therein (the "Shareholders Agreement"). The Participant agrees (i) to be bound by the Shareholders Agreement with respect to any shares of Common Stock issued to the Participant pursuant to this Agreement, (ii) that any shares of Common Stock issued to the Participant pursuant to this Agreement shall be subject to all of the terms and conditions contained in the Shareholders Agreement applicable to the Common Stock and (iii) that the Participant shall, upon such issuance, be treated as a Holder (as defined in the Shareholders Agreement) for all purposes under the Shareholders Agreement.

**6.      Change in Control.**  If, on or following a Change in Control, the Participant's employment with the Company and its Affiliates is terminated due to a Qualifying Termination, 100% of any unvested RSUs shall become immediately vested as of the effective date of such Qualifying Termination.  Each RSU shall be settled within 30 days following the date of termination in shares of Common Stock.

**7.      Compliance with Legal Requirements.**

(a)      Generally.  The granting and settlement of the RSUs, and any other obligations of the Company under this Agreement, shall be subject to all applicable U.S. federal, state and local laws, rules and regulations, all applicable non-U.S. laws, rules and regulations and to such approvals by any regulatory or governmental agency as may be required. The Participant agrees to take all steps the Committee or the Company determines are reasonably necessary to comply with all applicable provisions of U.S. federal and state securities law and non-U.S. securities law in exercising the Participant's rights under this Agreement.

(b)      Tax Withholding. Vesting and settlement of the RSUs shall be subject to the Participant satisfying any applicable U.S. federal, state and local tax withholding obligations and non-U.S. tax withholding obligations.  The Company shall have the right and is hereby authorized to withhold from any amounts payable to the Participant in connection with the RSUs or otherwise the amount of any required withholding taxes in respect of the RSUs, its settlement or any payment or transfer of the RSUs or under the Plan and to take any such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.  The Participant may elect to satisfy, and the Company may require the Participant to satisfy, in whole or in part, the tax obligations by withholding shares of Common Stock that would otherwise be deliverable to the Participant upon settlement of the RSUs with a Fair Market Value equal to such withholding liability or, if permitted by the Company, such higher amount determined using rates not exceeding the maximum statutory rate in the applicable jurisdiction(s).

**8.      Clawback.**  Notwithstanding anything to the contrary contained herein, the Committee may cancel the RSU award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or violates a non-competition, non-solicitation, non-disparagement or non-disclosure covenant or agreement with the Company or any Affiliate, as determined by the Committee.  In such event, the Participant

will forfeit any compensation, gain or other value realized thereafter on the vesting or settlement of the RSUs, the sale or other transfer of the RSUs, or the sale of shares of Common Stock acquired in respect of the RSUs, and must promptly repay such amounts to the Company.  If the Participant receives any amount in excess of what the Participant should have received under the terms of the RSUs for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company.  To the extent required by applicable law and/or the rules and regulations of the NYSE or other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, the RSUs shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into this Agreement).

9.      **Lock-up Agreement.** The Participant agrees that, in connection with any sale, on the Company's or any Holder's behalf, of Common Stock by the Company or a Holder to an underwriter for reoffering to the public (such offering, an "Underwritten Offering"), upon the request of the Company or the underwriters managing any public offering of the Company's securities, the Participant will not sell or otherwise dispose of any Common Stock without the prior written consent of the Company or such underwriters, as the case may be, for such reasonable period of time after the effective date of such Underwritten Offering as may be requested by such managing underwriters (but in no event to exceed six months following the effective date of such Underwritten Offering) and subject to all reasonable restrictions as the Company or the underwriters may specify. The Participant will enter into any agreement reasonably required by the underwriters to implement the foregoing.

10.      **Miscellaneous.**

(a)      Transferability. The RSUs may not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered (a "Transfer") by the Participant other than by will or by the laws of descent and distribution, pursuant to a qualified domestic relations order or as otherwise permitted under Section 15(b) of the Plan.  Any attempted Transfer of the RSUs contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the RSUs, shall be null and void and without effect.

(b)      Waiver. Any right of the Company contained in this Agreement may be waived in writing by the Committee. No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages. No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(c)     Section 409A.  The RSUs are intended to be exempt from, or compliant with, Section 409A of the Code. Notwithstanding the foregoing or any provision of the Plan or this Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Committee may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and (ii) maintain, to the maximum extent practicable, the original intent and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 10(c) does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the RSUs will not be subject to interest and penalties under Section 409A.

(d)     General Assets.  All amounts credited in respect of the RSUs to the book-entry account under this Agreement shall continue for all purposes to be part of the general assets of the Company.  The Participant's interest in such account shall make the Participant only a general, unsecured creditor of the Company.

(e)     Notices. Any notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax, pdf/email or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, to the attention of the Corporate Secretary at the Company's principal executive office.

(f)     Severability.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)     No Rights to Employment. Nothing contained in this Agreement shall be construed as giving the Participant any right to be retained, in any position, as an employee, consultant or director of the Company or its Affiliates or shall interfere with or restrict in any way the rights of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate or discharge the Participant at any time for any reason whatsoever.

(h)     Fractional Shares. In lieu of issuing a fraction of a share of Common Stock resulting from adjustment of the RSUs pursuant to Section 12 of the Plan or otherwise, the Company shall be entitled to pay to the Participant an amount in cash equal to the Fair Market Value of such fractional share.

(i)     Beneficiary. The Participant may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation.

(j)     <u>Successors</u>. The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

(k)     <u>Entire Agreement</u>. This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations and negotiations in respect thereto. No change, modification or waiver of any provision of this Agreement shall be valid unless the same be in writing and signed by the parties hereto, except for any changes permitted without consent under Sections 12 or 14 of the Plan.

(l)     <u>Governing Law and Venue</u>. This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, U.S.A., without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware, U.S.A.

(i)     <u>Dispute Resolution; Consent to Jurisdiction</u>.  All disputes between or among any Persons arising out of or in any way connected with the Plan, this Agreement or the RSUs shall be solely and finally settled by the Committee, acting in good faith, the determination of which shall be final.  Any matters not covered by the preceding sentence shall be solely and finally settled in accordance with the Plan, and the Participant and the Company consent to the personal jurisdiction of the United States Federal and state courts sitting in Wilmington, Delaware as the exclusive jurisdiction with respect to matters arising out of or related to the enforcement of the Committee's determinations and resolutions of matters, if any, related to the Plan or this Agreement not required to be resolved by the Committee.  Each such Person hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the last known address of such Person, such service to become effective 10 days after such mailing.

(ii)     <u>Waiver of Jury Trial</u>. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated (whether based on contract, tort or any other theory).  Each party hereto (A) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

(m)     <u>Headings; Gender</u>. The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement.  Masculine pronouns and other words of masculine gender shall refer to both men and women as appropriate.

(n)    <u>Counterparts.</u>   This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(o)    <u>Electronic Signature and Delivery</u>.   This Agreement may be accepted by return signature or by electronic confirmation.  By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by U.S. Securities and Exchange Commission rules (which consent may be revoked in writing by the Participant at any time upon three business days' notice to the Company, in which case subsequent prospectuses, annual reports and other information will be delivered in hard copy to the Participant).

(p)    <u>Electronic Participation in Plan</u>.   The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

IN WITNESS WHEREOF, this Agreement has been executed by the Company and the Participant as of the day first written above.

INTELSAT S.A.

By:    /s/ Michelle V. Bryan
Michelle V. Bryan
Executive Vice President, General Counsel and Chief Administrative Officer

Accepted on [Current Date]

[Participant Name]

**Exhibit N-1(iii)**

**Time-Based Restricted Stock United Award Agreement for Management Committee**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**
**2022 EQUITY INCENTIVE PLAN**

**<u>TIME-BASED RESTRICTED STOCK UNIT AWARD AGREEMENT FOR MANAGEMENT</u>**

THIS TIME-BASED RESTRICTED STOCK UNIT AWARD AGREEMENT FOR MANAGEMENT (the "<u>Agreement</u>") is entered into as of [Grant Date], by and between Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* organized under the laws of Luxembourg (the "<u>Company</u>"), and [Participant Name] (the "<u>Participant</u>").

WHEREAS, the Company has adopted the Intelsat Emergence S.A. (to be renamed Intelsat S.A.) 2022 Equity Incentive Plan (as amended, the "<u>Plan</u>"), pursuant to which Restricted Stock Units ("<u>RSUs</u>") may be granted; and

WHEREAS, the Compensation Committee of the Board of Directors of the Company (the "<u>Committee</u>") has determined that it is in the best interests of the Company and its stockholders to grant the RSUs provided for herein to the Participant subject to the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

**1.     Grant of Restricted Stock Units.**

(a)     <u>Grant</u>. The Company hereby grants to the Participant a total of [Awards Granted] RSUs, on the terms and conditions set forth in this Agreement and as otherwise provided in the Plan.  The RSUs shall be credited to a separate book-entry account maintained for the Participant on the books of the Company.

(b)     <u>Incorporation by Reference.</u> The provisions of the Plan are incorporated herein by reference. Except as otherwise expressly set forth herein, this Agreement shall be construed in accordance with the provisions of the Plan and any interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan. Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Plan. The Committee shall have final authority to interpret and construe the Plan and this Agreement and to make any and all determinations under them, and its decision shall be binding and conclusive upon the Participant and the Participant's legal representative in respect of any questions arising under the Plan or this Agreement.  The Participant acknowledges that the Participant has received a copy of the Plan and has had an opportunity to review the Plan and agrees to be bound by all the terms and provisions of the Plan.

**2.     Vesting; Settlement.**  Except as may otherwise be provided herein, subject to the Participant's continued employment with the Company or an Affiliate, one-third of the RSUs (each, an "<u>Installment</u>") shall vest on each of the first three anniversaries of the Effective Date (each such date, a "<u>Vesting Date</u>").  Any fractional RSUs resulting from the application of the

vesting schedule shall be aggregated and the RSUs resulting from such aggregation shall vest on the final Vesting Date.  Upon vesting, the RSUs shall no longer be subject to cancellation pursuant to Section 4 hereof.  Each RSU shall be settled within 30 days following the applicable Vesting Date in shares of Common Stock.

**3.     Dividend Equivalents**.  In the event of any issuance of a dividend on the shares of Common Stock, including, without limitation, with respect to any cash or other distributions made on account of the CVRs (a "Dividend"), the Participant shall be credited, as of the payment date for such Dividend, with an amount, with respect to each RSU granted pursuant to this Agreement and outstanding as of the record date for such Dividend, equal to the amount of the Dividend per share (such amount, the "DER").  Each DER will be settled in cash (without the payment of interest) within 30 days following the Vesting Date of the RSU to which it relates.

**4.     Termination of Employment.**

(a)     If, prior to the final Vesting Date and prior to a Change in Control, the Participant's employment with the Company and its Affiliates is terminated (i) by the Company or its Affiliate without Cause, (ii) by the Participant for Good Reason (as defined in the Participant's employment agreement with the Company or one of its Affiliates as in effect on the date of such termination), (iii) due to the Participant's death or (iv) by the Company or its Affiliate due to the Participant's Disability (each, a "Qualifying Termination"), then the Participant will vest in 100% of the Installment that was scheduled to vest immediately following the date of such Qualifying Termination, effective as of the effective date of such Qualifying Termination.  Each RSU shall be settled within 30 days following the date of the Qualifying Termination in shares of Common Stock.  For the avoidance of doubt, such additional vesting upon a Qualifying Termination is in addition to any vesting that occurred prior to the Qualifying Termination.

(b)     The Participant's RSUs that remain unvested following the treatment set forth in Section 4(a) hereof will remain outstanding for six months following the Participant's Qualifying Termination date (the "Tail Period") and eligible to vest upon the occurrence of an Exit Event during the Tail Period. If an Exit Event occurs during the Tail Period, 100% of the Participant's unvested RSUs will vest upon such Exit Event. If an Exit Event does not occur during the Tail Period, 100% of the Participant's unvested RSUs will terminate at the end of the Tail Period.

(c)     If the Participant's employment with the Company and its Affiliates terminates prior to the final Vesting Date for any reason other than as set forth in Section 4(a) hereof, all unvested RSUs shall be cancelled immediately and the Participant shall not be entitled to receive any payments with respect thereto.  For the avoidance of doubt, the Participant shall remain entitled to have any vested, but not yet settled, RSUs be settled in shares of Common Stock in accordance with Section 2.

**5.     Rights as a Stockholder.** The Participant shall not be deemed for any purpose to be the owner of any shares of Common Stock underlying the RSUs unless, until and to the extent that (a) the Company shall have issued and delivered to the Participant the shares of Common Stock underlying the RSUs and (b) the Participant's name shall have been entered as a stockholder of

record with respect to such shares of Common Stock on the books of the Company.   The Company shall cause the actions described in clauses (a) and (b) of the preceding sentence to occur promptly following settlement as contemplated by this Agreement, subject to compliance with applicable laws.   By executing this Agreement, the Participant shall be deemed to have executed a copy of the Company's Shareholders Agreement, effective as of [_____], 2022 (as may be amended, modified or supplemented from time to time), by and among the Company and its shareholders named therein (the "Shareholders Agreement"). The Participant agrees (i) to be bound by the Shareholders Agreement with respect to any shares of Common Stock issued to the Participant pursuant to this Agreement, (ii) that any shares of Common Stock issued to the Participant pursuant to this Agreement shall be subject to all of the terms and conditions contained in the Shareholders Agreement applicable to the Common Stock and (iii) that the Participant shall, upon such issuance, be treated as a Holder (as defined in the Shareholders Agreement) for all purposes under the Shareholders Agreement.

6.      **Change in Control.**   If, on or following a Change in Control, the Participant's employment with the Company and its Affiliates is terminated due to a Qualifying Termination, 100% of any unvested RSUs shall become immediately vested as of the effective date of such termination.   Each RSU shall be settled within 30 days following the date of termination in shares of Common Stock.

7.      **Compliance with Legal Requirements.**

(a)      Generally.   The granting and settlement of the RSUs, and any other obligations of the Company under this Agreement, shall be subject to all applicable U.S. federal, state and local laws, rules and regulations, all applicable non-U.S. laws, rules and regulations and to such approvals by any regulatory or governmental agency as may be required. The Participant agrees to take all steps the Committee or the Company determines are reasonably necessary to comply with all applicable provisions of U.S. federal and state securities law and non-U.S. securities law in exercising the Participant's rights under this Agreement.

(b)      Tax Withholding. Vesting and settlement of the RSUs shall be subject to the Participant satisfying any applicable U.S. federal, state and local tax withholding obligations and non-U.S. tax withholding obligations.   The Company shall have the right and is hereby authorized to withhold from any amounts payable to the Participant in connection with the RSUs or otherwise the amount of any required withholding taxes in respect of the RSUs, its settlement or any payment or transfer of the RSUs or under the Plan and to take any such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.   The Participant may elect to satisfy, and the Company may require the Participant to satisfy, in whole or in part, the tax obligations by withholding shares of Common Stock that would otherwise be deliverable to the Participant upon settlement of the RSUs with a Fair Market Value equal to such withholding liability or, if permitted by the Company, such higher amount determined using rates not exceeding the maximum statutory rate in the applicable jurisdiction(s).

8.      **Clawback.**   Notwithstanding anything to the contrary contained herein, the Committee may cancel the RSU award if the Participant, without the consent of the Company, has engaged

in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or materially violates a non-competition, non-solicitation, non-disparagement or non-disclosure covenant or agreement with the Company or any Affiliate, which violation is not cured, to the extent curable, within 15 days of the Participant's receipt of written notice thereof, as determined by the Committee.  In such event, the Participant will forfeit any compensation, gain or other value realized thereafter on the vesting or settlement of the RSUs, the sale or other transfer of the RSUs, or the sale of shares of Common Stock acquired in respect of the RSUs, and must promptly repay such amounts to the Company.  If the Participant receives any amount in excess of what the Participant should have received under the terms of the RSUs for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company.  To the extent required by applicable law and/or the rules and regulations of the NYSE or other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, the RSUs shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into this Agreement).

9.      **Lock-up Agreement**.  The Participant agrees that, in connection with any registration of the Company's securities, upon the request of the Company or the underwriters managing any public offering of the Company's securities, the Participant will not sell or otherwise dispose of any Common Stock without the prior written consent of the Company or such underwriters, as the case may be, for such reasonable period of time after the effective date of such registration as may be requested by such managing underwriters (but in no event to exceed six months following the effective date of such registration) and subject to all reasonable restrictions as the Company or the underwriters may specify. The Participant will enter into any agreement reasonably required by the underwriters to implement the foregoing.

10.     **Miscellaneous.**

(a)      Transferability. The RSUs may not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered (a "Transfer") by the Participant other than by will or by the applicable laws of descent and distribution, pursuant to a qualified domestic relations order or as otherwise permitted under Section 15(b) of the Plan.  Any attempted Transfer of the RSUs contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the RSUs, shall be null and void and without effect.

(b)      Waiver. Any right of the Company contained in this Agreement may be waived in writing by the Committee. No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages. No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(c)      Section 409A.  The RSUs are intended to be exempt from, or compliant with, Section 409A of the Code. Notwithstanding the foregoing or any provision of the Plan or this Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Committee may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and (ii) maintain, to the maximum extent practicable, the original intent and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 10(c) does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the RSUs will not be subject to interest and penalties under Section 409A.

(d)      General Assets.  All amounts credited in respect of the RSUs to the book-entry account under this Agreement shall continue for all purposes to be part of the general assets of the Company.  The Participant's interest in such account shall make the Participant only a general, unsecured creditor of the Company.

(e)      Notices. Any notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax, pdf/email or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, to the attention of the Corporate Secretary at the Company's principal executive office.

(f)      Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)      No Rights to Employment. Nothing contained in this Agreement shall be construed as giving the Participant any right to be retained, in any position, as an employee, consultant or director of the Company or its Affiliates or shall interfere with or restrict in any way the rights of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate or discharge the Participant at any time for any reason whatsoever.

(h)      Fractional Shares. In lieu of issuing a fraction of a share of Common Stock resulting from adjustment of the RSUs pursuant to Section 12 of the Plan or otherwise, the Company shall be entitled to pay to the Participant an amount in cash equal to the Fair Market Value of such fractional share.

(i)      Beneficiary. The Participant may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation.

(j)      <u>Successors</u>. The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

(k)      <u>Entire Agreement</u>. This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations and negotiations in respect thereto. No change, modification or waiver of any provision of this Agreement shall be valid unless the same be in writing and signed by the parties hereto, except for any changes permitted without consent under Sections 12 or 14 of the Plan.

(l)      <u>Governing Law and Venue</u>. This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, U.S.A., without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware, U.S.A.

(i)      <u>Dispute Resolution; Consent to Jurisdiction</u>.  All disputes between or among any Persons arising out of or in any way connected with the Plan, this Agreement or the RSUs shall be solely and finally settled by the Committee, acting in good faith, the determination of which shall be final.  Any matters not covered by the preceding sentence shall be solely and finally settled in accordance with the Plan, and the Participant and the Company consent to the personal jurisdiction of the United States Federal and state courts sitting in Wilmington, Delaware as the exclusive jurisdiction with respect to matters arising out of or related to the enforcement of the Committee's determinations and resolution of matters, if any, related to the Plan or this Agreement not required to be resolved by the Committee.  Each such Person hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the last known address of such Person, such service to become effective ten days after such mailing.

(ii)      <u>Waiver of Jury Trial</u>. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated (whether based on contract, tort or any other theory).  Each party hereto (A) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

(m)      <u>Headings; Gender</u>. The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement.  Masculine pronouns and other words of masculine gender shall refer to both men and women as appropriate.

(n)     Counterparts.  This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(o)     Electronic Signature and Delivery.  This Agreement may be accepted by return signature or by electronic confirmation.  By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by U.S. Securities and Exchange Commission rules (which consent may be revoked in writing by the Participant at any time upon three business days' notice to the Company, in which case subsequent prospectuses, annual reports and other information will be delivered in hard copy to the Participant).

(p)     Electronic Participation in Plan.  The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

IN WITNESS WHEREOF, this Agreement has been executed by the Company and the Participant as of the day first written above.

INTELSAT S.A.

By:   /s/ Michelle V. Bryan
      Michelle V. Bryan
      Executive Vice President, General Counsel and Chief Administrative Officer

Accepted on [Date]

[Participant Name]

**<u>Exhibit N-1(iv)</u>**

**Performance-Based Restricted Stock Unit Award Agreement**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**
**2022 EQUITY INCENTIVE PLAN**

**PERFORMANCE-BASED**
**RESTRICTED STOCK UNIT AWARD AGREEMENT**

THIS PERFORMANCE-BASED RESTRICTED STOCK UNIT AWARD AGREEMENT (the "Agreement") is entered into as of [Grant Date], by and between Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* organized under the laws of Luxembourg (the "Company"), and [Participant Name] (the "Participant").

WHEREAS, the Company has adopted the Intelsat Emergence S.A. (to be renamed Intelsat S.A.) 2022 Equity Incentive Plan (as amended, the "Plan"), pursuant to which performance-based Restricted Stock Units ("PSUs") may be granted; and

WHEREAS, the Compensation Committee of the Board of Directors of the Company (the "Committee") has determined that it is in the best interests of the Company and its stockholders to grant the PSUs provided for herein to the Participant subject to the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.      **Grant of Performance-Based Restricted Stock Units.**

(a)      Grant. The Company hereby grants to the Participant a targeted award of [Awards Granted] PSUs (the "Target Award"), on the terms and conditions set forth in this Agreement and as otherwise provided in the Plan.  The PSUs shall be credited to a separate book-entry account maintained for the Participant on the books of the Company.

(b)      Incorporation by Reference. The provisions of the Plan are incorporated herein by reference. Except as otherwise expressly set forth herein, this Agreement shall be construed in accordance with the provisions of the Plan and any interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan. Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Plan. The Committee shall have final authority to interpret and construe the Plan and this Agreement and to make any and all determinations under them, and its decision shall be binding and conclusive upon the Participant and his or her legal representative in respect of any questions arising under the Plan or this Agreement.  The Participant acknowledges that he or she has received a copy of the Plan and has had an opportunity to review the Plan and agrees to be bound by all the terms and provisions of the Plan.

2.      **Vesting; Settlement.**

(a)      Except as may otherwise be provided herein, the PSUs shall vest based on the equity value of the Company achieved (the "Achieved Company Equity Value") as of the Exit

Event or the Valuation Event(s) (as defined below), as applicable, as adjusted by the Performance Leverage Factor pursuant to the following table:

| Achieved Company Equity Value | Performance Leverage Factor |
|---|---|
| $7,250,000,000 or above | 200% |
| $4,350,000,000 | 50% |
| Below $4,350,000,000 | 0% |

If the Achieved Company Equity Value is in between $4,350,000,000 and $7,250,000,000, the Performance Leverage Factor will be determined using straight-line interpolation.

Except as set forth in Section 4, vesting of the PSUs is subject to the Participant's continued employment with the Company or an Affiliate through the date of the Exit Event or Valuation Event, as applicable (the "Vesting Date").  As soon as administratively practicable, and in any event within 30 days, after the Vesting Date, the Committee shall determine the Achieved Company Equity Value, and on the Vesting Date, the Participant shall be entitled to receive that number of PSUs (if any) equal to (i) the Target Award, multiplied by (ii) the applicable Performance Leverage Factor, less any PSUs previously settled under this Agreement.  Each PSU shall be settled within 60 days following the Vesting Date in shares of Common Stock.

(b)    If an Exit Event occurs, vesting of the PSUs will be determined upon the consummation of the Exit Event.  If the Exit Event is a Change in Control, the Achieved Company Equity Value will be determined based on the price per share of Common Stock paid in such Change in Control.  If the Exit Event is an Initial Public Offering, the Achieved Company Equity Value will be determined based on the initial price per share at which the shares of Common Stock are offered for sale in the Initial Public Offering. Any PSUs that do not vest in connection with such Exit Event will automatically terminate as of the date of such Exit Event.

(c)    If no Exit Event occurs prior to the fourth anniversary of the Effective Date, the Achieved Company Equity Value will be measured on each of the fourth and fifth anniversaries of the Effective Date (each, a "Valuation Event"), and the PSUs will vest in accordance with the framework set forth in this Agreement based on the Achieved Company Equity Value as of such Valuation Events (e.g., if the Achieved Company Equity Value is $4,350,000,000 as of the first Valuation Event, 50% of the Target Award will vest as of the fourth anniversary of the Effective Date, and if the Achieved Company Equity Value increases to $7,250,000,000 as of the second Valuation Event, an additional 150% of the Target Award will vest as of the fifth anniversary of the Emergence Date).  An independent third party appraiser shall determine the Achieved Company Equity Value in connection with each Valuation Event.  Any PSUs that remain unvested following either Valuation Event will remain outstanding and eligible to vest upon the occurrence of an Exit Event.

**3.**     **Dividend Equivalents**.  In the event of any issuance of any dividend on the shares of Common Stock, including, without limitation, with respect to any cash or other distributions made on account of the CVRs (a "Dividend"), the Participant shall be credited, as of the payment date for such Dividend, with an amount, with respect to each PSU granted pursuant to this Agreement and outstanding as of the record date for such Dividend (subject to subsequent adjustment by the Performance Leverage Factor), equal to the amount of the Dividend per share (such amount, the "DER").  Each DER will be settled in cash (without the payment of interest) within 60 days following the Vesting Date of the PSU to which it relates.

**4.**     **Termination of Employment.**

     (a)     If, on or after the 18-month anniversary of the Effective Date, but prior to the earlier of the date on which the PSUs have fully vested at maximum performance and an Exit Event, the Participant's employment with the Company and its Affiliates is terminated (i) by the Company or its Affiliate without Cause, (ii) by the Participant for Good Reason (as defined in the Participant's employment agreement with the Company or one of its Affiliates as in effect on the date of such termination), (iii) due to the Participant's death or (iv) by the Company or its Affiliate due to the Participant's Disability (each, a "Qualifying Termination"), the Participant's PSUs will remain outstanding and eligible to vest upon the occurrence of an Exit Event or the Valuation Events, in each case, based on actual performance achieved in connection therewith, and the number of PSUs that will vest based on such performance achievement will be pro-rated, with the pro-ration determined by multiplying (A) the total number of PSUs that would have vested had the Participant's employment not terminated prior to such Exit Event or Valuation Events by (B) a fraction, the numerator of which is the total number of days that the Participant was employed by the Company or its affiliates from the Effective Date through the Participant's Qualifying Termination date (not to exceed 1,095), and the denominator of which is 1,095, less any PSUs previously settled under this Agreement.  Each PSU shall be settled within 60 days following the Vesting Date in shares of Common Stock.  For the avoidance of doubt, such additional vesting upon a Qualifying Termination is in addition to any vesting that occurred prior to the Qualifying Termination.  There will be no pro-rated vesting upon a Qualifying Termination that occurs prior to the 18-month anniversary of the Effective Date.

     (b)     The Participant's PSUs that are unvested and remain unvested following the treatment set forth in Section 4(a) hereof will remain outstanding for six months following the Participant's Qualifying Termination date (the "Tail Period") and eligible to vest upon the occurrence of an Exit Event during the Tail Period based on achievement of the performance criteria set forth in this Agreement. If an Exit Event does not occur during the Tail Period, all unvested PSUs shall be cancelled immediately following the last day of the Tail Period, and the Participant shall not be entitled to receive any payments with respect thereto.

     (c)     If the Participant's employment with the Company and its Affiliates terminates for any reason other than as the result of a Qualifying Termination, all unvested PSUs shall be cancelled immediately, and the Participant shall not be entitled to receive any payments with respect thereto.

**5.**     **Rights as a Stockholder.** The Participant shall not be deemed for any purpose to be the owner of any shares of Common Stock underlying the PSUs unless, until and to the extent that (a) the Company shall have issued and delivered to the Participant the shares of Common Stock underlying the PSUs and (b) the Participant's name shall have been entered as a stockholder of record with respect to such shares of Common Stock on the books of the Company.  The Company shall cause the actions described in clauses (a) and (b) of the preceding sentence to occur promptly following settlement as contemplated by this Agreement, subject to compliance with applicable laws.  By executing this Agreement, the Participant shall be deemed to have executed a copy of the Company's Shareholders Agreement, effective as of [_____], 2022 (as may be amended, modified or supplemented from time to time), by and among the Company and its shareholders named therein (the "Shareholders Agreement"). The Participant agrees (i) to be bound by the Shareholders Agreement with respect to any shares of Common Stock issued to the Participant pursuant to this Agreement, (ii) that any shares of Common Stock issued to the Participant pursuant to this Agreement shall be subject to all of the terms and conditions contained in the Shareholders Agreement applicable to the Common Stock and (iii) that the Participant shall, upon such issuance, be treated as a Holder (as defined in the Shareholders Agreement) for all purposes under the Shareholders Agreement.

**6.**     **Compliance with Legal Requirements.**

(a)     Generally.  The granting and settlement of the PSUs, and any other obligations of the Company under this Agreement, shall be subject to all applicable U.S. federal, state and local laws, rules and regulations, all applicable non-U.S. laws, rules and regulations and to such approvals by any regulatory or governmental agency as may be required. The Participant agrees to take all steps the Committee or the Company determines are reasonably necessary to comply with all applicable provisions of U.S. federal and state securities law and non-U.S. securities law in exercising his or her rights under this Agreement.

(b)     Tax Withholding. Vesting and settlement of the PSUs shall be subject to the Participant satisfying any applicable U.S. federal, state and local tax withholding obligations and non-U.S. tax withholding obligations.  The Company shall have the right and is hereby authorized to withhold from any amounts payable to the Participant in connection with the PSUs or otherwise the amount of any required withholding taxes in respect of the PSUs, its settlement or any payment or transfer of the PSUs or under the Plan and to take any such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.  The Participant may elect to satisfy, and the Company may require the Participant to satisfy, in whole or in part, the tax obligations by withholding shares of Common Stock that would otherwise be deliverable to the Participant upon settlement of the PSUs with a Fair Market Value equal to such withholding liability or, if permitted by the Company, such higher amount determined using rates not exceeding the maximum statutory rate in the applicable jurisdiction(s).

**7.**     **Clawback.** Notwithstanding anything to the contrary contained herein, the Committee may cancel the PSU award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including

fraud or conduct contributing to any financial restatements or irregularities, or materially violates a non-competition, non-solicitation, non-disparagement or non-disclosure covenant or agreement with the Company or any Affiliate, which violation is not cured, to the extent curable, within 15 days of the Participant's receipt of written notice thereof, as determined by the Committee.  In such event, the Participant will forfeit any compensation, gain or other value realized thereafter on the vesting or settlement of the PSUs, the sale or other transfer of the PSUs, or the sale of shares of Common Stock acquired in respect of the PSUs, and must promptly repay such amounts to the Company.  If the Participant receives any amount in excess of what the Participant should have received under the terms of the PSUs for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company.  To the extent required by applicable law and/or the rules and regulations of the NYSE or other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, the PSUs shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into this Agreement).

**8.      Lock-up Agreement**.  The Participant agrees that, in connection with any registration of the Company's securities, upon the request of the Company or the underwriters managing any public offering of the Company's securities, the Participant will not sell or otherwise dispose of any Common Stock without the prior written consent of the Company or such underwriters, as the case may be, for such reasonable period of time after the effective date of such registration as may be requested by such managing underwriters (but in no event to exceed six months following the effective date of such registration) and subject to all reasonable restrictions as the Company or the underwriters may specify. The Participant will enter into any agreement reasonably required by the underwriters to implement the foregoing.

**9.      Miscellaneous.**

(a)      Transferability. The PSUs may not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered (a "Transfer") by the Participant other than by will or by the applicable laws of descent and distribution, pursuant to a qualified domestic relations order or as otherwise permitted under Section 15(b) of the Plan.  Any attempted Transfer of the PSUs contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the PSUs, shall be null and void and without effect.

(b)      Waiver. Any right of the Company contained in this Agreement may be waived in writing by the Committee. No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages. No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(c)      Section 409A.  The PSUs are intended to be exempt from, or compliant with, Section 409A of the Code. Notwithstanding the foregoing or any provision of the Plan or this

Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Committee may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and (ii) maintain, to the maximum extent practicable, the original intent and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 9(c) does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the PSUs will not be subject to interest and penalties under Section 409A.

(d)   General Assets.  All amounts credited in respect of the PSUs to the book-entry account under this Agreement shall continue for all purposes to be part of the general assets of the Company.  The Participant's interest in such account shall make the Participant only a general, unsecured creditor of the Company.

(e)   Notices. Any notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax, pdf/email or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, to the attention of the Corporate Secretary at the Company's principal executive office.

(f)   Severability.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)   No Rights to Employment. Nothing contained in this Agreement shall be construed as giving the Participant any right to be retained, in any position, as an employee, consultant or director of the Company or its Affiliates or shall interfere with or restrict in any way the rights of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate or discharge the Participant at any time for any reason whatsoever.

(h)   Fractional Shares. In lieu of issuing a fraction of a share of Common Stock resulting from adjustment of the PSUs pursuant to Section 12 of the Plan or otherwise, the Company shall be entitled to pay to the Participant an amount in cash equal to the Fair Market Value of such fractional share.

(i)   Beneficiary. The Participant may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation.

(j)      Successors. The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

(k)      Entire Agreement. This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations and negotiations in respect thereto. No change, modification or waiver of any provision of this Agreement shall be valid unless the same be in writing and signed by the parties hereto, except for any changes permitted without consent under Sections 12 or 14 of the Plan.

(l)      Governing Law and Venue. This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, U.S.A., without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware, U.S.A.

(i)      Dispute Resolution; Consent to Jurisdiction.   All disputes between or among any Persons arising out of or in any way connected with the Plan, this Agreement or the PSUs shall be solely and finally settled by the Committee, acting in good faith, the determination of which shall be final.   Any matters not covered by the preceding sentence shall be solely and finally settled in accordance with the Plan, and the Participant and the Company consent to the personal jurisdiction of the United States Federal and state courts sitting in Wilmington, Delaware as the exclusive jurisdiction with respect to matters arising out of or related to the enforcement of the Committee's determinations and resolution of matters, if any, related to the Plan or this Agreement not required to be resolved by the Committee.  Each such Person hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the last known address of such Person, such service to become effective ten (10) days after such mailing.

(ii)      Waiver of Jury Trial. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated (whether based on contract, tort or any other theory).  Each party hereto (A) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

(m)      Headings; Gender. The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement.  Masculine pronouns and other words of masculine gender shall refer to both men and women as appropriate.

(n)      Counterparts.   This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become

effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(o)    <u>Electronic Signature and Delivery</u>.  This Agreement may be accepted by return signature or by electronic confirmation.  By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by U.S. Securities and Exchange Commission rules (which consent may be revoked in writing by the Participant at any time upon three business days' notice to the Company, in which case subsequent prospectuses, annual reports and other information will be delivered in hard copy to the Participant).

(p)    <u>Electronic Participation in Plan</u>.  The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

IN WITNESS WHEREOF, this Agreement has been executed by the Company and the Participant as of the day first written above.

INTELSAT S.A.

By:    /s/ Michelle V. Bryan
       Michelle V. Bryan
       Executive Vice President, General Counsel and Chief Administrative Officer

Accepted on [Current Date]

[Participant Name]

**Exhibit N-1(v)**

**LTIP Award Agreement**

**INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)
2022 EQUITY INCENTIVE PLAN**

**LTIP AWARD AGREEMENT**

THIS LTIP AWARD AGREEMENT (the "Agreement") is entered into as of [Grant Date], by and between Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* organized under the laws of Luxembourg (the "Company"), and [Participant Name] (the "Participant").

WHEREAS, the Company has adopted the Intelsat Emergence S.A. (to be renamed Intelsat S.A.) 2022 Equity Incentive Plan (as amended, the "Plan"), pursuant to which Cash-Based Awards may be granted; and

WHEREAS, the Compensation Committee of the Board of Directors of the Company (the "Committee") has determined that it is in the best interests of the Company and its stockholders to grant the Cash-Based Award (the "LTIP Award") provided for herein to the Participant subject to the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.      **Grant of LTIP Award.**

(a)      Grant. The Company hereby grants to the Participant an LTIP Award in the total amount of [Awards Granted], on the terms and conditions set forth in this Agreement and as otherwise provided in the Plan.

(b)      Incorporation by Reference. The provisions of the Plan are incorporated herein by reference. Except as otherwise expressly set forth herein, this Agreement shall be construed in accordance with the provisions of the Plan and any interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan. Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Plan. The Committee shall have final authority to interpret and construe the Plan and this Agreement and to make any and all determinations under them, and its decision shall be binding and conclusive upon the Participant and the Participant's legal representative in respect of any questions arising under the Plan or this Agreement.  The Participant acknowledges that the Participant has received a copy of the Plan and has had an opportunity to review the Plan and agrees to be bound by all the terms and provisions of the Plan.

2.      **Vesting; Payout.**    Except as may otherwise be provided herein, subject to the Participant's continued employment with the Company or an Affiliate, one-third of the LTIP Award (each, an "Installment") shall vest on each of the first three anniversaries of the Effective Date (each such date, a "Vesting Date"). Each vested Installment shall be paid within 30 days following the applicable Vesting Date in cash, without regard to whether the Participant remains employed with the Company or an Affiliate following such Vesting Date.

**3.** **Termination of Employment.**

(a) If, prior to the final Vesting Date and prior to a Change in Control, the Participant's employment with the Company and its Affiliates is terminated (i) by the Company or its Affiliate without Cause, (ii) due to the Participant's death or (iii) by the Company or its Affiliate due to the Participant's Disability (each, a "Qualifying Termination"), then the Participant will vest in a pro-rated portion of the Installment that was scheduled to vest immediately following the date of such Qualifying Termination (the "Pro-Rated Installment"), effective as of the effective date of such Qualifying Termination. Such pro-ration will be determined by multiplying (A) the portion of the LTIP Award comprising the Installment by (B) a fraction, (x) the numerator of which is the total number of days that the Participant was employed by the Company or one of its Affiliates from the most recently elapsed Vesting Date or, if no Vesting Date has occurred, the Effective Date (with such number of days not to exceed 365) through the date of such Qualifying Termination, and (y) the denominator of which is 365. The Pro-Rated Installment shall be paid within 30 days following the date of the Qualifying Termination in cash. The unvested portion of the LTIP Award shall automatically terminate on the date of such Qualifying Termination. For the avoidance of doubt, such additional vesting upon a Qualifying Termination is in addition to any vesting that occurred prior to the Qualifying Termination.

(b) If the Participant's employment with the Company and its Affiliates terminates prior to the final Vesting Date for any reason other than as set forth in Section 3(a) or Section 4 hereof, the unvested portion of the LTIP Award shall be cancelled immediately, and the Participant shall not be entitled to receive any payments with respect thereto.

**4.** **Change in Control.** If, on or following a Change in Control, the Participant's employment with the Company and its Affiliates is terminated due to a Qualifying Termination, 100% of any unvested portion of the LTIP Award shall become immediately vested as of the effective date of such Qualifying Termination and be paid within 30 days following the date of termination in cash.

**5.** **Tax Withholding.** Vesting and payout of the LTIP Award shall be subject to the Participant satisfying any applicable U.S. federal, state and local tax withholding obligations and non-U.S. tax withholding obligations. The Company shall have the right and is hereby authorized to withhold from any amounts payable to the Participant in connection with the LTIP Award or otherwise the amount of any required withholding taxes in respect of the LTIP Award, any payment of the LTIP Award or under the Plan and to take any such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.

**6.** **Clawback.** Notwithstanding anything to the contrary contained herein, the Committee may cancel the LTIP Award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any

Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or violates a non-competition, non-solicitation, non-disparagement or non-disclosure covenant or agreement with the Company or any Affiliate, as determined by the Committee.  In such event, the Participant will forfeit any unpaid portion of the LTIP Award and must promptly repay any previously paid portions of the LTIP Award to the Company.  If the Participant receives any amount in excess of what the Participant should have received under the terms of the LTIP Award for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company.

**7.      Miscellaneous.**

(a)      <u>Transferability</u>. The LTIP Award may not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered (a "<u>Transfer</u>") by the Participant other than by will or by the laws of descent and distribution, pursuant to a qualified domestic relations order or as otherwise permitted under Section 15(b) of the Plan.  Any attempted Transfer of the LTIP Award contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the LTIP Award, shall be null and void and without effect.

(b)      <u>Waiver</u>. Any right of the Company contained in this Agreement may be waived in writing by the Committee. No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages. No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(c)      <u>Section 409A</u>.  The LTIP Award is intended to be exempt from, or compliant with, Section 409A of the Code. Notwithstanding the foregoing or any provision of the Plan or this Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Committee may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and (ii) maintain, to the maximum extent practicable, the original intent and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 7(c) does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the LTIP Award will not be subject to interest and penalties under Section 409A.

(d)      <u>General Assets</u>.  All amounts due in respect of the LTIP Award shall continue for all purposes to be part of the general assets of the Company.  The Participant's interest in the LTIP Award shall make the Participant only a general, unsecured creditor of the Company.

(e)      <u>Notices</u>. Any notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax,

pdf/email or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, to the attention of the Corporate Secretary at the Company's principal executive office.

(f)      Severability.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)      No Rights to Employment. Nothing contained in this Agreement shall be construed as giving the Participant any right to be retained, in any position, as an employee, consultant or director of the Company or its Affiliates or shall interfere with or restrict in any way the rights of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate or discharge the Participant at any time for any reason whatsoever.

(h)      Beneficiary. The Participant may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation.

(i)      Successors. The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

(j)      Entire Agreement. This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations and negotiations in respect thereto. No change, modification or waiver of any provision of this Agreement shall be valid unless the same be in writing and signed by the parties hereto, except for any changes permitted without consent under Sections 12 or 14 of the Plan.

(k)      Governing Law and Venue. This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, U.S.A., without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware, U.S.A.

(i)      Dispute Resolution; Consent to Jurisdiction.  All disputes between or among any Persons arising out of or in any way connected with the Plan, this Agreement or the LTIP Award shall be solely and finally settled by the Committee, acting in good faith, the determination of which shall be final.  Any matters not covered by the preceding sentence shall be solely and finally settled in accordance with the Plan, and the Participant and the Company consent to the personal jurisdiction of the United States Federal and state courts sitting in Wilmington, Delaware as the exclusive jurisdiction with respect to matters arising out of or related to the enforcement of the Committee's determinations and resolutions of matters, if any, related to the Plan or this Agreement not required to be resolved by the Committee.  Each such Person hereby irrevocably

consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the last known address of such Person, such service to become effective 10 days after such mailing.

(ii)     Waiver of Jury Trial. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated (whether based on contract, tort or any other theory).  Each party hereto (A) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

(l)     Headings; Gender. The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement.  Masculine pronouns and other words of masculine gender shall refer to both men and women as appropriate.

(m)     Counterparts.  This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(n)     Electronic Signature and Delivery.  This Agreement may be accepted by return signature or by electronic confirmation.  By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by U.S. Securities and Exchange Commission rules (which consent may be revoked in writing by the Participant at any time upon three business days' notice to the Company, in which case subsequent prospectuses, annual reports and other information will be delivered in hard copy to the Participant).

(o)     Electronic Participation in Plan.  The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

IN WITNESS WHEREOF, this Agreement has been executed by the Company and the Participant as of the day first written above.

INTELSAT S.A.


By:  /s/ Michelle V. Bryan
_____
Michelle V. Bryan
Executive Vice President, General
Counsel and Chief Administrative Officer


Accepted on [Current Date]

[Participant Name]

**Exhibit N-1(vi)**

**MIP Pool Allocations (Exhibit A to the MIP Term Sheet)**

**EXHIBIT A**

**MIP POOL ALLOCATIONS**

**Management Committee**

<u>MIP Allocations</u>

| Participant | Target Grant* | Max Grant* |
|---|---|---|
| Chief Executive Officer | 0.0276% | 0.0276% |
| Chief Financial Officer and Co-Chief Restructuring Officer | 0.1900% | 0.2850% |
| General Counsel, Chief Administrative Officer and Co-Chief Restructuring Officer | 0.1332% | 0.1999% |
| Chief Services Officer | 0.1291% | 0.1937% |
| Chief Technology Officer | 0.0745% | 0.1117% |
| Chief Strategy Officer | 0.0717% | 0.1076% |
| Surplus, to be reallocated** | 0.6986% | 1.0478% |
|  | **1.3247%** | **1.9733%** |
| ~192 Other Key Employees** | **1.0000% + $18 million Cash LTIP** ||

*Expressed as a percentage of the New TopCo Common Stock as of the Emergence Date, determined on a fully diluted and fully distributed basis.

**Unallocated insider amount to be allocated to new Chief Executive Officer and other insiders related to management role changes or new hires. The allocation among 192 other key employees to be determined at the discretion of the current Chief Executive Officer, Stephen Spengler, consistent with past practice.

1

**Exhibit N-2**

**Redline to Management Incentive Plan Documents filed on December 3, 2021**

This Exhibit N-2 contains the following Management Incentive Plan Documents:

- Exhibit N-2(i):  Redline to 2022 Equity Incentive Plan filed on December 3, 2021

- Exhibit N-2(ii):  Redline to Time-Based Restricted Stock Unit Award Agreement for Management Committee filed on December 3, 2021

- Exhibit N-2(iii):  Redline to Performance-Based Restricted Stock Unit Award Agreement filed on December 3, 2021

- Exhibit N-2(iv):  Redline to LTIP Award Agreement filed on December 3, 2021

**Exhibit N-2(i)**

**Redline to 2022 Equity Incentive Plan filed on December 3, 2021**

<p style="text-align:center">**[New TopCo]Intelsat Emergence S.A. (To Be Renamed Intelsat S.A.)**
**2022 Equity Incentive Plan**</p>

**1. Purpose**.  The [New TopCo]Intelsat Emergence S.A. (to be renamed Intelsat S.A.) 2022 Equity Incentive Plan (the "**_Plan_**") is intended to help [New TopCo]Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a Luxembourg *société anonyme* (including any successor thereto, the "**_Company_**"), and its Affiliates (a) attract and retain key personnel by providing them the opportunity to acquire an equity interest in the Company or other incentive compensation measured by reference to the value of Common Stock or cash-based awards and (b) align the interests of key personnel with those of the Company's shareholders.

**2. Effective Date; Duration.**  The Plan shall be effective as of [Date], 2022[1] (the "**_Effective Date_**").  The expiration date of the Plan, on and after which date no Awards may be granted, shall be the tenth anniversary of the Effective Date; provided, however, that such expiration shall not affect Awards then outstanding, and the terms and conditions of the Plan shall continue to apply to such Awards.

**3. Definitions.**  The following definitions shall apply throughout the Plan.

(a)    "**_Affiliate_**" means any person or entity that directly or indirectly controls, is controlled by or is under common control with the Company.  The term "control" means the possession, directly or indirectly, of the power to direct the management and policies of such person or entity, whether through the ownership of voting or other securities, by contract or otherwise.

(b)    "**_Award_**" means any Incentive Stock Option, Nonqualified Stock Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, Other Stock-Based Award, Cash-Based Award and/or Performance Compensation Award granted under the Plan.

(c)    "**_Beneficial Ownership_**" has the meaning set forth in Rule 13d-3 promulgated under Section 13 of the Exchange Act.

(d)    "**_Board_**" means the Board of Directors of the Company.

(e)    "**_Cash-Based Award_**" means an Award granted under Section 10 of the Plan.

(f)    "**_Cause_**" means the Company or an Affiliate having "cause" to terminate a Participant's employment or service due to the Participant's (i) willful misconduct or gross neglect of their duties; (ii) having engaged in conduct harmful (whether financially, reputationally or otherwise) to the Company or an Affiliate; (iii) failure or refusal to perform their duties; (iv) conviction of or guilty or no contest plea to a felony or any crime involving dishonesty or moral turpitude; (v) willful violation of the written policies of the Company or an Affiliate; (vi) misappropriation or misuse of Company or Affiliate funds or property or other act

---

[1]    Note to Draft: To be the Emergence Date.

Doc#: US1:6775546v14

of personal dishonesty in connection with his employment; or (vii) willful breach of fiduciary duty.  The determination of whether Cause exists shall be made by the Committee in its sole discretion.

(g)  "*Change in Control*"[2] shall be deemed to occur upon any of the following events:

(i)  the acquisition by any Person of Beneficial Ownership of 50% or more (on a fully diluted basis) of either (A) the then outstanding shares of Common Stock, including Common Stock issuable upon the exercise of options or warrants, the conversion of convertible stock or debt, and the exercise of any similar right to acquire such Common Stock (the "*Outstanding Company Common Stock*"); or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote in the election of directors (the "*Outstanding Company Voting Securities*"); but excluding any acquisition by the Company or any of its Affiliates, or by any employee benefit plan sponsored or maintained by the Company or any of its Affiliates;

(ii)  a change in the composition of the Board such that members of the Board during any consecutive 12-month period (the "*Incumbent Directors*") cease to constitute a majority of the Board.  Any person becoming a director through election or nomination for election approved by a valid vote of at least two-thirds of the Incumbent Directors shall be deemed an Incumbent Director; provided, however, that no individual becoming a director as a result of an actual or threatened election contest, as such terms are used in Rule 14a-12 of Regulation 14A promulgated under the Exchange Act, or as a result of any other actual or threatened solicitation of proxies or consents by or on behalf of any person other than the Board shall be deemed to be an Incumbent Director;

(iii)  the approval by the shareholders of the Company of a plan of complete dissolution or liquidation of the Company; or

(iv)  the consummation of a reorganization, recapitalization, merger, consolidation, statutory share exchange or similar form of corporate transaction involving the Company (a "*Business Combination*"), or sale, transfer or other disposition of all or substantially all of the business or assets of the Company to an entity that is not an Affiliate of the Company (a "*Sale*"), unless immediately following such Business Combination or Sale:  (A) more than 50% of the total voting power of the entity resulting from such Business Combination or the entity that acquired that business or assets of the Company in such Sale (in either case, the "*Surviving Company*"), or the ultimate parent entity that has Beneficial Ownership of sufficient voting power to elect a majority of the board of directors (or analogous governing body) of the Surviving Company (the "*Parent Company*"), is represented by the Outstanding Company Voting Securities that were outstanding immediately prior to such Business Combination or Sale (or, if applicable, is represented by shares into which the Outstanding Company Voting Securities were converted pursuant to such Business Combination or Sale), and such voting power among

---

[2]  Note to Draft:  Definition to be updated to contain customary carveouts regarding post-emergence shareholders.

the holders thereof is in substantially the same proportion as the voting power of the Outstanding Company Voting Securities among the holders thereof immediately prior to the Business Combination or Sale, (B) no Person (other than any employee benefit plan sponsored or maintained by the Surviving Company or the Parent Company), is or becomes the beneficial owner, directly or indirectly, of 50% or more of the total voting power of the outstanding voting securities eligible to elect members of the board of directors (or the analogous governing body) of the Parent Company (or, if there is no Parent Company, the Surviving Company) and (C) at least a majority of the members of the board of directors (or the analogous governing body) of the Parent Company (or, if there is no Parent Company, the Surviving Company) following the consummation of the Business Combination or Sale were Board members at the time of the Board's approval of the execution of the initial agreement providing for such Business Combination or Sale.

(h)    "*Code*" means the U.S. Internal Revenue Code of 1986, as amended, and any successor thereto.  References to any section of the Code shall be deemed to include any regulations or other interpretative guidance under such section, and any amendments or successors thereto.

(i)    "*Committee*" means the Compensation Committee of the Board or subcommittee thereof or, if no such Compensation Committee or subcommittee exists, the Board.

(j)    "*Common Stock*" means the common shares, nominal value $0.01 per share, of the Company (and any stock or other securities into which such common shares may be converted or into which it may be exchanged).

(k)    "*Disability*" means cause for termination of a Participant's employment or service due to a determination that the Participant is disabled in accordance with a long-term disability insurance program maintained by the Company or a determination by the U.S. Social Security Administration that the Participant is totally disabled.

(l)    "*Eligible Person*" means any (i) individual employed by the Company or an Affiliate; provided, however, that no such employee covered by a collective bargaining agreement shall be an Eligible Person; (ii) director or officer of the Company or an Affiliate; (iii) consultant or advisor to the Company or an Affiliate who may be offered securities registrable on Form S-8 under the Securities Act; or (iv) any prospective employees, directors, officers, consultants or advisors who have accepted offers of employment or consultancy from the Company or its Affiliates.

(m)    "*Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended, and any successor thereto.  References to any section of (or rule promulgated under) the Exchange Act shall be deemed to include any rules, regulations or other interpretative guidance under such section or rule, and any amendments or successors thereto.

(n)    "*Exit Event*" means either (i) a Change in Control or (ii) an Initial Public Offering.

(o)      "*Fair Market Value*" means, on a given date, (i) if the Common Stock is listed on a national securities exchange, the closing sales price of the Common Stock reported on such exchange on such date, or, if there is no such sale on that date, then on the last preceding date on which such a sale was reported; or (ii) if the Common Stock is not listed on any national securities exchange, the amount determined by the Committee in good faith to be the fair market value of the Common Stock based on an independent third party valuation of the Common Stock, with the Company to obtain such valuations on at least an annual basis, and with the first such valuation to be dated as of the first anniversary of the Effective Date.

(p)      "*Incentive Stock Option*" means an Option which is designated by the Committee as an incentive stock option as described in Section 422 of the Code.

(q)      "*Initial Public Offering*" means the initial public offering and sale to the public in a firm commitment underwriting of equity interests of the Company or any of its Subsidiaries (or any successor thereof) pursuant to an effective registration statement under the Securities Act, if, immediately thereafter, the Company or its applicable Subsidiary (or any successor thereof) has publicly held securities; provided, that, an Initial Public Offering shall not include any issuance of equity interests in any merger or other business combination and shall not include any registration of the issuance of equity interests to existing security holders or employees of the Company or its Subsidiaries on Form S-4 or Form S-8 (or any successor form adopted by the SEC).

(r)      "*Nonqualified Stock Option*" means an Option which is not designated by the Committee as an Incentive Stock Option.

(s)      "*NYSE*" means The New York Stock Exchange, Inc.

(t)      "*Option*" means an Award granted under Section 7 of the Plan.

(u)      "*Other Stock-Based Award*" means an Award granted under Section 10 of the Plan.

(v)      "*Performance Compensation Award*" means an Award designated by the Committee as a Performance Compensation Award pursuant to Section 11 of the Plan.

(w)      "*Performance Criteria*" shall mean the criterion or criteria that the Committee shall select for purposes of establishing the Performance Goal(s) for a Performance Period with respect to any Performance Compensation Award under the Plan.

(x)      "*Performance Formula*" shall mean, for a Performance Period, the one or more objective formulae applied against the relevant Performance Goal to determine, with regard to the Performance Compensation Award of a particular Participant, whether all, some portion but less than all, or none of the Performance Compensation Award has been earned for the Performance Period.

(y)      "*Performance Goals*" shall mean, for a Performance Period, the one or more goals established by the Committee for the Performance Period based upon the Performance Criteria.

(z)      "*Performance Period*" shall mean the one or more periods of time as the Committee may select, over which the attainment of one or more Performance Goals will be measured for the purpose of determining a Participant's right to, and the payment of, a Performance Compensation Award.

(aa)      "*Person*" has the meaning given in Section 3(a)(9) of the Exchange Act, as modified and used in Sections 13(d) and 14(d) thereof, except that such term shall not include (i) the Company or any of its subsidiaries, (ii) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or any of its Affiliates, (iii) an underwriter temporarily holding securities pursuant to an offering of such securities, or (iv) a corporation owned, directly or indirectly, by the shareholders of the Company in substantially the same proportions as their ownership of Common Stock of the Company.

(bb)      "*Restricted Stock*" means an Award of Common Stock, subject to certain specified restrictions, granted under Section 9 of the Plan.

(cc)      "*Restricted Stock Unit*" means an Award of an unfunded and unsecured promise to deliver shares of Common Stock, cash, other securities or other property, subject to certain specified restrictions, granted under Section 9 of the Plan.

(dd)      "*Securities Act*" means the U.S. Securities Act of 1933, as amended, and any successor thereto.  Reference in the Plan to any section of (or rule promulgated under) the Securities Act shall be deemed to include any rules, regulations or other interpretative guidance under such section or rule, and any amendments or successor provisions to such section, rules, regulations or guidance.

(ee)      "*Stock Appreciation Right*" or "*SAR*" means an Award granted under Section 8 of the Plan.

## 4. Administration.

(a)      The Committee shall administer the Plan, and shall have the sole and plenary authority to:  (i) designate Participants; (ii) determine the type, size, and terms and conditions of Awards to be granted; (iii) determine the method by which an Award may be settled, exercised, canceled, forfeited, or suspended; (iv) determine the circumstances under which the delivery of cash, property or other amounts payable with respect to an Award may be deferred either automatically or at the Participant's or Committee's election; (v) interpret and administer the Plan and any Award; (vi) establish, amend, suspend, or waive any rules and regulations and appoint such agents as the Committee shall deem appropriate for the proper administration of the Plan; (vii) accelerate the vesting, delivery or exercisability of, payment for or lapse of restrictions on, or waive any condition in respect of, Awards; and (vii) make any other determination and take any other action that the Committee deems necessary or desirable for the administration of the Plan or to comply with any applicable law.  To the extent required to comply with the provisions of Rule 16b-3 promulgated under the Exchange Act (if applicable and if the Board is

not acting as the Committee under the Plan), or any exception or exemption under the rules of the NYSE or any other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted, as applicable, it is intended that each member of the Committee shall, at the time he takes any action with respect to an Award under the Plan, be (A) a "non-employee director" within the meaning of Rule 16b 3 under the Exchange Act and/or (B) an "independent director" under the rules of the NYSE or any other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted ("*Eligible Director*"). However, the fact that a Committee member shall fail to qualify as an Eligible Director shall not invalidate any Award granted or action taken by the Committee that is otherwise validly granted or taken under the Plan.

(b)      The Committee may allocate all or any portion of its responsibilities and powers to any one or more of its members and may delegate all or any part of its responsibilities and powers to any person(s) selected by it, except for grants of Awards to persons who are non-employee members of the Board or otherwise are subject to Section 16 of the Exchange Act. Any such allocation or delegation may be revoked by the Committee at any time.

(c)      As further set forth in Section 15(f) of the Plan, the Committee shall have the authority to amend the Plan and Awards to the extent necessary to permit participation in the Plan by Eligible Persons who are located outside of the United States on terms and conditions comparable to those afforded to Eligible Persons located within the United States; provided, however, that no such action shall be taken without shareholder approval if such approval is required by applicable law or regulation.

(d)      Unless otherwise expressly provided in the Plan, all designations, determinations, interpretations, and other decisions regarding the Plan or any Award shall be within the sole discretion of the Committee, may be made at any time and shall be final, conclusive and binding upon all persons or entities, including, without limitation, the Company, any Affiliate, any Participant, any holder or beneficiary of any Award, and any shareholder of the Company.

(e)      No member of the Board, the Committee or any employee or agent of the Company (each such person, an "*Indemnifiable Person*") shall be liable for any action taken or omitted to be taken or any determination made with respect to the Plan or any Award hereunder (unless constituting fraud or a willful criminal act or omission).  Each Indemnifiable Person shall be indemnified and held harmless by the Company against and from any loss, cost, liability, or expense (including attorneys' fees) that may be imposed upon or incurred by such Indemnifiable Person in connection with or resulting from any action, suit or proceeding to which such Indemnifiable Person may be involved as a party, witness or otherwise by reason of any action taken or omitted to be taken or determination made under the Plan or any Award agreement and against and from any and all amounts paid by such Indemnifiable Person with the Company's approval (not to be unreasonably withheld), in settlement thereof, or paid by such Indemnifiable Person in satisfaction of any judgment in any such action, suit or proceeding against such Indemnifiable Person, and the Company shall advance to such Indemnifiable Person any such expenses promptly upon written request (which request shall include an undertaking by the Indemnifiable Person to repay the amount of such advance if it shall ultimately be determined as provided below that the Indemnifiable Person is not entitled to be indemnified); provided that the Company shall have the right, at its own expense, to assume and defend any such action, suit or

proceeding and once the Company gives notice of its intent to assume the defense, the Company shall have sole control over such defense with counsel of recognized standing of the Company's choice.  The foregoing right of indemnification shall not be available to an Indemnifiable Person to the extent that a final judgment or other final adjudication (in either case not subject to further appeal) binding upon such Indemnifiable Person determines that the acts or omissions or determinations of such Indemnifiable Person giving rise to the indemnification claim resulted from such Indemnifiable Person's fraud or willful criminal act or omission or that such right of indemnification is otherwise prohibited by law or by the Company's Articles of Incorporation.  The foregoing right of indemnification shall not be exclusive of or otherwise supersede any other rights of indemnification to which such Indemnifiable Persons may be entitled under the Company's Articles of Incorporation, as a matter of law, individual indemnification agreement or contract or otherwise, or any other power that the Company may have to indemnify such Indemnifiable Persons or hold them harmless.

(f)        The Board may at any time and from time to time, grant Awards and administer the Plan with respect to such Awards.  In any such case, the Board shall have all the authority granted to the Committee under the Plan.

**5.  Grant of Awards; Emergence Grants; Shares Subject to the Plan; Limitations.**

(a)        The Committee may grant Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Other Stock-Based Awards, Cash-Based Awards and/or Performance Compensation Awards to one or more Eligible Persons.

8

(b)        Subject to Section 12 of the Plan, the following limitations apply to the grant of Awards:  (i) no more than [――]³-2,576,457 shares of Common Stock may be delivered in the aggregate pursuant to Awards; (ii) no more than [――]⁴-2,576,457 shares of Common Stock may be delivered in the aggregate pursuant to the exercise of Incentive Stock Options; and (iii) no more than $18,000,000 may be delivered in respect of Cash-Based Awards (the "Cash LTIP Pool").

(c)        On the Effective Date, subject to their continued employment with the Company or an Affiliate through the Effective Date, those members of management identified on Appendix A will be granted Awards under the Plan with an aggregate grant date value for each such Participant as of the Effective Date as set forth in Appendix A (such grants, the "Management Committee Emergence Grants").  Each Management Committee Emergence Grant shall be made as follows: (i) 50% in the form of Restricted Stock Units; and (ii) 50% in the form of performance-based Restricted Stock Units, in each case, in accordance with the forms of Award Agreements established for the Management Committee Emergence Grants.  On the Effective Date, subject to their continued employment with the Company or an Affiliate through the Effective Date, those key employees of the Company or one of its Affiliates who were selected by the Chief Executive Officer of the Company will be granted Awards under the Plan with an aggregate grant date value for each such Participant as of the Effective Date as determined by the Chief Executive Officer of the Company (such grants, the "Key Employee Emergence Grants" and, together with the Management Committee Emergence Grants, the "Emergence Grants").  Each Key Employee Emergence Grant shall be in the form of a combination of Restricted Stock Units and Cash-Based Awards, in each case, in accordance with the forms of Award Agreements established for the Key Employee Emergence Grants. Notwithstanding any provision of the Plan to the contrary, to the extent that the terms of the Emergence Grants provide a Participant rights that are more favorable than those otherwise provided under the terms of the Plan, the provisions of such Emergence Grants shall control. After the Emergence Grants are made as set forth herein, any shares of Common Stock that remain available for grants of Awards under the Plan may be granted to additional Eligible Persons by the Committee in its sole discretion.

(d)        Shares of Common Stock shall be deemed to have been used in settlement of Awards whether or not they are actually delivered or the Fair Market Value equivalent of such shares is paid in cash; provided, however, that if shares of Common Stock issued upon exercise, vesting or settlement of an Award, or shares of Common Stock owned by a Participant are surrendered or tendered to the Company in payment of the Exercise Price or any taxes required to be withheld in respect of an Award, such surrendered or tendered shares shall not become available for other Awards; provided, further, that in no event shall such shares increase the

---

³  Note to Draft:  A number of shares equal to 3.26% of New TopCo Common Stock as of the Emergence Date, determined on a fully diluted and fully distributed basis, will be reserved for issuances to executives and key employees.  To be determined what additional number of shares will be added to the reserve for purposes of issuances to directors and other service providers.

⁴  Note to Draft:  A number of shares equal to 3.26% of New TopCo Common Stock as of the Emergence Date, determined on a fully diluted and fully distributed basis.

number of shares of Common Stock that may be delivered pursuant to Incentive Stock Options. If and to the extent all or any portion of an Award expires, terminates or is canceled or forfeited for any reason without the Participant having received any benefit therefrom, the shares covered by such Award or portion thereof shall again become available for other Awards.  For purposes of the foregoing sentence, a Participant shall not be deemed to have received any "benefit" (i) in the case of forfeited Restricted Stock by reason of having enjoyed voting rights and dividend rights prior to the date of forfeiture or (ii) in the case of an Award canceled by reason of a new Award being granted in substitution therefor.

(e)    The Committee may grant Awards in assumption of, or in substitution for, outstanding awards previously granted by the Company or any Affiliate or an entity directly or indirectly acquired by the Company or with which the Company combines ("*Substitute Awards*"), and such Substitute Awards shall not be counted against the aggregate number of shares of Common Stock available for Awards; provided, further, that Substitute Awards issued or intended as "incentive stock options" within the meaning of Section 422 of the Code shall be counted against the aggregate number of Incentive Stock Options available under the Plan.

**6.  Eligibility.**  Participation shall be limited to Eligible Persons who have been selected by the Committee and who have entered into an Award agreement with respect to an Award granted to them under the Plan (each such Eligible Person, a "*Participant*").

**7.  Options.**

(a)    <u>Generally.</u>  All Options granted under the Plan shall be Nonqualified Stock Options unless the Award agreement expressly states otherwise.  Incentive Stock Options shall be granted only subject to and in compliance with Section 422 of the Code, and only to Eligible Persons who are employees of the Company and its Affiliates and who are eligible to receive an Incentive Stock Option under the Code.  If for any reason an Option intended to be an Incentive Stock Option (or any portion thereof) shall not qualify as an Incentive Stock Option, then, to the extent of such nonqualification, such Option or portion thereof shall be regarded as a Nonqualified Stock Option appropriately granted under the Plan.

(b)    <u>Exercise Price.</u>  The exercise price ("*Exercise Price*") per share of Common Stock for each Option shall not be less than 100% of the Fair Market Value of such share, determined as of the Date of Grant (provided that the Exercise Price may not be lower than the nominal value per share).  Any modification to the Exercise Price of an outstanding Option shall be subject to the prohibition on repricing set forth in Section 14(b).

(c)    <u>Vesting, Exercise and Expiration</u>.  The Committee shall determine the manner and timing of vesting, exercise and expiration of Options.  The period between Date of Grant and the scheduled expiration date of the Option ("*Option Period*") shall not exceed ten years, unless the Option Period (other than in the case of an Incentive Stock Option) would expire at a time when trading in the shares of Common Stock is prohibited by the Company's securities trading policy or Company-imposed "blackout period", in which case the Option Period shall be automatically extended until the 30th day following the expiration of such prohibition (so long as such extension shall not violate Section 409A of the Code). The Committee may accelerate the

vesting and/or exercisability of any Option, which acceleration shall not affect any other terms and conditions of such Option.

(d)      Method of Exercise and Form of Payment.  No shares of Common Stock shall be delivered pursuant to any exercise of an Option until the Participant has made payment in full to the Company of the Exercise Price and an amount equal to any U.S. Federal, state and local income and employment taxes and non-U.S. income and employment taxes, social contributions and any other tax-related items required to be withheld.  Options may be exercised by delivery of written or electronic notice of exercise to the Company or its designee (including a third party administrator) in accordance with the terms of the Option.  The Exercise Price and all applicable required withholding taxes shall be payable (i) in cash, check, cash equivalent and/or shares of Common Stock valued at the Fair Market Value at the time the Option is exercised (including, pursuant to procedures approved by the Committee, by means of attestation of ownership of a sufficient number of shares of Common Stock in lieu of actual delivery of such shares to the Company); provided that such shares of Common Stock are not subject to any pledge or other security interest; or (ii) by such other method as the Committee may permit, including without limitation:  (A) in other property having a fair market value equal to the Exercise Price and all applicable required withholding taxes; (B) if there is a public market for the shares of Common Stock at such time, by means of a broker-assisted "cashless exercise" pursuant to which the Company is delivered a copy of irrevocable instructions to a stockbroker to sell the shares of Common Stock otherwise deliverable upon the exercise of the Option and to deliver promptly to the Company an amount equal to the Exercise Price and all applicable required withholding taxes; or (C) by means of a "net exercise" procedure effected by withholding the minimum number of shares of Common Stock otherwise deliverable in respect of an Option that are needed to pay for the Exercise Price and all applicable required withholding taxes.  Notwithstanding the foregoing, unless otherwise determined by the Committee, if on the last day of the Option Period, the Fair Market Value exceeds the Exercise Price, the Participant has not exercised the Option, and the Option has not expired, such Option shall be deemed to have been exercised by the Participant on such last day by means of a "net exercise" procedure described above.  Any fractional shares of Common Stock shall be settled in cash.

(e)      Notification upon Disqualifying Disposition of an Incentive Stock Option.  Each Participant awarded an Incentive Stock Option under the Plan shall notify the Company in writing immediately after the date he makes a disqualifying disposition of any Common Stock acquired pursuant to the exercise of such Incentive Stock Option.  A disqualifying disposition is any disposition (including, without limitation, any sale) of such Common Stock before the later of (i) two years after the Date of Grant of the Incentive Stock Option or (ii) one year after the date of exercise of the Incentive Stock Option.  The Company may, if determined by the Committee and in accordance with procedures established by the Committee, retain possession, as agent for the applicable Participant, of any Common Stock acquired pursuant to the exercise of an Incentive Stock Option until the end of the period described in the preceding sentence, subject to complying with any instruction from such Participant as to the sale of such Common Stock.

(f)      Incentive Stock Option Grants to 10% Shareholders.  Notwithstanding anything to the contrary in this Section 7, if an Incentive Stock Option is granted to a Participant who owns stock representing more than ten percent of the voting power of all classes of stock of the

Company or of a Subsidiary or a parent of the Company, the Option Period shall not exceed five years from the Date of Grant of such Option and the Option Price shall be at least 110% of the Fair Market Value (on the Date of Grant) of the shares subject to the Option.

(g)    $100,000 Per Year Limitation for Incentive Stock Options.  To the extent the aggregate Fair Market Value (determined as of the Date of Grant) of shares of Common Stock for which Incentive Stock Options are exercisable for the first time by any Participant during any calendar year (under all plans of the Company) exceeds $100,000, such excess Incentive Stock Options shall be treated as Nonqualified Stock Options.

## 8.  Stock Appreciation Rights (SARs).

(a)    Generally.  Each SAR shall be subject to the conditions set forth in the Plan and the Award agreement.  Any Option granted under the Plan may include tandem SARs.  The Committee also may award SARs independent of any Option.

(b)    Strike Price.  The strike price ("*Strike Price*") per share of Common Stock for each SAR shall not be less than 100% of the Fair Market Value of such share, determined as of the Date of Grant (provided that the Strike Price may not be lower than the nominal value per share); provided, however, that a SAR granted in tandem with (or in substitution for) an Option previously granted shall have a Strike Price equal to the Exercise Price of the corresponding Option.  Any modification to the Strike Price of an outstanding SAR shall be subject to the prohibition on repricing set forth in Section 14(b).

(c)    Vesting and Expiration.  A SAR granted in tandem with an Option shall become exercisable and shall expire according to the same vesting schedule and expiration provisions as the corresponding Option.  A SAR granted independently of an Option shall vest and become exercisable and shall expire in such manner and on such date or dates determined by the Committee and shall expire after such period, not to exceed ten years, as may be determined by the Committee (the "*SAR Period*"); provided, however, that notwithstanding any vesting or exercisability dates set by the Committee, the Committee may accelerate the vesting and/or exercisability of any SAR, which acceleration shall not affect the terms and conditions of such SAR other than with respect to vesting and/or exercisability.  If the SAR Period would expire at a time when trading in the shares of Common Stock is prohibited by the Company's securities trading policy (or the Company-imposed "blackout period"), the SAR Period shall be automatically extended until the 30th day following the expiration of such prohibition (so long as such extension shall not violate Section 409A of the Code).

(d)    Method of Exercise.  SARs may be exercised by delivery of written or electronic notice of exercise to the Company or its designee (including a third party administrator) in accordance with the terms of the Award, specifying the number of SARs to be exercised and the date on which such SARs were awarded.  Notwithstanding the foregoing, if on the last day of the Option Period (or in the case of a SAR independent of an Option, the SAR Period), the Fair Market Value exceeds the Strike Price, the Participant has not exercised the SAR or the corresponding Option (if applicable), and neither the SAR nor the corresponding Option (if

applicable) has expired, such SAR shall be deemed to have been exercised by the Participant on such last day and the Company shall make the appropriate payment therefor.

(e)    Payment.  Upon the exercise of a SAR, the Company shall pay to the Participant an amount equal to the number of shares subject to the SAR that are being exercised multiplied by the excess, if any, of the Fair Market Value of one share of Common Stock on the exercise date over the Strike Price, less an amount equal to any U.S. Federal, state and local income and employment taxes and non-U.S. income and employment taxes, social contributions and any other tax-related items required to be withheld.  The Company shall pay such amount in cash, in shares of Common Stock valued at Fair Market Value, or any combination thereof, as determined by the Committee.  Any fractional shares of Common Stock shall be settled in cash.

**9.  Restricted Stock and Restricted Stock Units.**

(a)    Generally.  Each Restricted Stock and Restricted Stock Unit grant shall be subject to the conditions set forth in the Plan and the Award agreement.  The Committee shall establish restrictions applicable to such Restricted Stock and Restricted Stock Units, including the period over which the restrictions shall apply (the "***Restricted Period***"), and the time or times at which Restricted Stock or Restricted Stock Units shall become vested.  The Committee may accelerate the vesting and/or the lapse of any or all of the restrictions on the Restricted Stock and Restricted Stock Units, which acceleration shall not affect any other terms and conditions of such Awards.  No shares shall be issued at the time an Award of Restricted Stock Units is made, and the Company will not be required to set aside a fund for the payment of any such Award.

(b)    Stock Certificates; Escrow or Similar Arrangement.  Upon the grant of Restricted Stock, the Committee shall cause share(s) of Common Stock to be registered in the name of the Participant and held in book-entry form subject to the Company's directions.  ~~The Committee also may cause a stock certificate registered in the name of the Participant to be issued.~~  In such event, the Committee may provide that such certificates shall be held by the Company or in escrow rather than delivered to the Participant pending vesting and release of restrictions, in which case the Committee may require the Participant to execute and deliver to the Company (i) an escrow agreement satisfactory to the Committee, if applicable, and (ii) the appropriate stock power (endorsed in blank) with respect to the Restricted Stock.  If a Participant shall fail to execute and deliver the escrow agreement and blank stock power within the amount of time specified by the Committee, the Award shall be null and void.  Subject to the restrictions set forth in this Section 9 and the Award agreement, the Participant shall have the rights and privileges of a shareholder as to such Restricted Stock, including without limitation the right to vote such Restricted Stock.

(c)    Restrictions; Forfeiture.  Restricted Stock and Restricted Stock Units awarded to a Participant shall be subject to forfeiture until the expiration of the Restricted Period and the attainment of any other vesting criteria established by the Committee, and shall be subject to the restrictions on transferability set forth in the Award agreement.  In the event of any forfeiture, all rights of the Participant to such Restricted Stock (or as a shareholder with respect thereto), and/or to such Restricted Stock Units, as applicable, including to any dividends and/or dividend

equivalents that may have been accumulated and withheld during the Restricted Period in respect thereof, shall terminate without further action or obligation on the part of the Company.

(d)      Delivery of Restricted Stock and Settlement of Restricted Stock Units.

(i)      Upon the expiration of the Restricted Period and the attainment of any other vesting criteria, the restrictions set forth in the applicable Award agreement shall be of no further force or effect, except as set forth in the Award agreement.  If an escrow arrangement is used, upon such expiration the Company shall deliver to the Participant or his beneficiary (via book entry notation or, if applicable, in stock certificate form) the shares of Restricted Stock with respect to which the Restricted Period has expired (rounded down to the nearest full share).  Dividends, if any, that may have been withheld by the Committee and attributable to the Restricted Stock shall be distributed to the Participant in cash or in shares of Common Stock having a Fair Market Value (on the date of distribution) equal to the amount of such dividends, upon the release of restrictions on such share.

(ii)      Unless otherwise provided by the Committee in an Award agreement, upon the expiration of the Restricted Period and the attainment of any other vesting criteria established by the Committee, with respect to any outstanding Restricted Stock Units, the Company shall deliver to the Participant, or his beneficiary (via book entry notation or, if applicable, in stock certificate form), one share of Common Stock (or other securities or other property, as applicable) for each such outstanding Restricted Stock Unit which has not then been forfeited and with respect to which the Restricted Period has expired and any other such vesting criteria are attained ("***Released Unit***"); provided, however, that, unless the relevant Award agreement expressly provides for settlement of the Restricted Stock Units in shares of Common Stock, the Committee may elect to (i) pay cash or part cash and part Common Stock in lieu of delivering only shares of Common Stock in respect of such Released Units or (ii) defer the delivery of Common Stock (or cash or part Common Stock and part cash, as the case may be) beyond the expiration of the Restricted Period if such extension would not cause adverse tax consequences under Section 409A of the Code.  If a cash payment is made in lieu of delivering shares of Common Stock, the amount of such payment shall be equal to the Fair Market Value of the Common Stock as of the date on which the Restricted Period lapsed with respect to such Restricted Stock Units.  To the extent provided in an Award agreement, the holder of outstanding Released Units shall be entitled to be credited with dividend equivalent payments (upon the payment by the Company of dividends on shares of Common Stock) either in cash or in shares of Common Stock having a Fair Market Value equal to the amount of such dividends, which accumulated dividend equivalents (and interest thereon, if applicable) shall be payable at the same time as the underlying Restricted Stock Units are settled following the release of restrictions on such Restricted Stock Units.

**10. Other Stock-Based and Cash-Based Awards.**

(a) The Committee may issue unrestricted Common Stock, rights to receive future grants of Awards, or other Awards denominated in Common Stock (including performance shares

or performance units), under the Plan to Eligible Persons, alone or in tandem with other Awards, in such amounts as the Committee shall from time to time determine ("*Other Stock-Based Awards*").  Each Other Stock-Based Award shall be evidenced by an Award agreement which may include conditions, including, without limitation, the payment by the Participant of the Fair Market Value of such shares of Common Stock on the Date of Grant.

(b) The Committee may issue cash-based Awards under the Plan to Eligible Persons, alone or in tandem with other Awards, in such amounts as the Committee shall from time to time determine ("*Cash-Based Awards*"). Each Cash-Based Award shall be evidenced by an Award agreement that contains such conditions as determined by the Committee.

## 11. Performance Compensation Awards.

(a)      Generally.  The Committee shall have the authority, at or before the time of grant of any Award described in Sections 7 through 10 of the Plan, to designate such Award as a Performance Compensation Award.  In addition, the Committee shall have the authority to make an award of a cash bonus to any Participant and designate such Award as a Performance Compensation Award.

(b)      Discretion of Committee with Respect to Performance Compensation Awards. The Committee may select the length of a Performance Period, the type(s) of Performance Compensation Awards to be issued, the Performance Criteria used to establish the Performance Goal(s), the kind(s) and/or level(s) of the Performance Goals(s) and the Performance Formula. Within the first 90 days of a Performance Period (or such longer period as determined by the Committee), the Committee shall determine each of the matters enumerated in the immediately preceding sentence and record the same in writing (which may be in the form of minutes of a meeting of the Committee).

(c)      Performance Criteria.  The Performance Criteria that will be used to establish the Performance Goal(s) may be based on the attainment of specific levels of performance of the Company (and/or one or more Affiliates, divisions or operational and/or business units, product lines, brands, business segments, administrative departments, units, or any combination of the foregoing) and shall be limited to the following:  (i) net earnings or net income (before or after taxes); (ii) basic or diluted earnings per share (before or after taxes); (iii) net revenue or net revenue growth; (iv) gross revenue or gross revenue growth, gross profit or gross profit growth; (v) net operating profit (before or after taxes); (vi) return measures (including, but not limited to, return on investment, assets, capital, gross revenue or gross revenue growth, invested capital, equity, or sales); (vii) cash flow (including, but not limited to, operating cash flow, free cash flow, and cash flow return on capital), which may but are not required to be measured on a per share basis; (viii) earnings before or after taxes, interest, depreciation and/or amortization (including EBIT and EBITDA); (ix) gross or net operating margins; (x) share price (including, but not limited to, growth measures and total shareholder return); (xi) expense targets or cost reduction goals, general and administrative expense savings; (xii) margins; (xiii) enterprise value; (xiv) sales; (xv) shareholder return; (xvi) objective measures of personal targets, goals or completion of projects; (xvii) cost of capital, debt leverage year-end cash position or book value; or (xviii) strategic objectives, development of new product lines and related revenue, sales and

margin targets, or international operations.  Any one or more of the Performance Criteria may be stated as a percentage of another Performance Criteria, or a percentage of a prior period's Performance Criteria, or used on an absolute, relative or adjusted basis to measure the performance of the Company and/or one or more Affiliates as a whole or any divisions or operational and/or business units, product lines, brands, business segments, administrative departments of the Company and/or one or more Affiliates or any combination thereof, as the Committee may deem appropriate, or any of the above Performance Criteria may be compared to the performance of a group of comparator companies, or a published or special index that the Committee deems appropriate, or as compared to various stock market indices.  The Committee also has the authority to provide for accelerated vesting, delivery and exercisability of any Award based on the achievement of Performance Goals pursuant to the Performance Criteria specified in this paragraph.

(d)     Modification of Performance Goal(s).  The Committee may alter Performance Criteria without obtaining shareholder approval if applicable tax and/or securities laws so permit.  The Committee may modify the calculation of a Performance Goal to reflect, without limitation, any of the following events:  (i) asset write-downs; (ii) litigation or claim judgments or settlements; (iii) the effect of changes in tax laws, accounting principles, or other laws or regulatory rules affecting reported results; (iv) any reorganization and restructuring programs; (v) extraordinary nonrecurring items as described in Accounting Standards Codification Topic 225-20 (or any successor pronouncement thereto) and/or in management's discussion and analysis of financial condition and results of operations appearing in the Company's annual report to shareholders for the applicable year; (vi) acquisitions or divestitures; (vii) any other specific unusual or nonrecurring events, or objectively determinable category thereof; (viii) foreign exchange gains and losses; (ix) discontinued operations and nonrecurring charges; and (x) a change in the Company's fiscal year.

(e)     Payment of Performance Compensation Awards.

(i)     *Payment*.  A Participant must be employed by or rendering services for the Company or an Affiliate on the last day of a Performance Period to be eligible for payment of a Performance Compensation Award for such period.

(ii)     *Limitation*.  A Participant shall be eligible to receive payment of a Performance Compensation Award only to the extent the Committee determines that the Performance Goals for such period are achieved; provided, however, that in the event of the termination of a Participant's employment or service by the Company other than for Cause  within 12 months following a Change in Control, or due to the Participant's death or Disability, the Participant shall receive payment in respect of a Performance Compensation Award based on (1) actual performance through the date of termination as determined by the Committee, or (2) if the Committee determines that measurement of actual performance cannot be reasonably assessed, the assumed achievement of target performance as determined by the Committee, in each case, prorated based on the time elapsed from the date of grant to the date of termination of employment or service.

(iii)     *Certification*.  Following the completion of a Performance Period, the Committee shall review and certify in writing (which may be in the form of minutes of a

meeting of the Committee) whether, and to what extent, the Performance Goals for the Performance Period have been achieved and, if so, calculate and certify in writing (which may be in the form of minutes of a meeting of the Committee) that amount of the Performance Compensation Awards earned for the period based upon the Performance Formula.   The Committee shall then determine the amount of each Participant's Performance Compensation Award actually payable for the Performance Period and, in so doing, may apply discretion to eliminate or reduce the size of a Performance Compensation Award.  Unless otherwise provided in the applicable Award agreement, the Committee shall not have the discretion to (A) provide payment or delivery in respect of Performance Compensation Awards for a Performance Period if the Performance Goals for such Performance Period have not been attained; or (B) increase a Performance Compensation Award above the applicable limitations set forth in Section 6 of the Plan.

(f)     Timing of Award Payments.  Unless otherwise provided in the applicable Award agreement, Performance Compensation Awards granted for a Performance Period shall be paid to Participants as soon as administratively practicable following completion of the certifications required by this Section 11.  Any Performance Compensation Award that has been deferred shall not (between the date as of which the Award is deferred and the payment date) increase (i) with respect to a Performance Compensation Award that is payable in cash, by a measuring factor for each fiscal year greater than a reasonable rate of interest set by the Committee or (ii) with respect to a Performance Compensation Award that is payable in shares of Common Stock, by an amount greater than the appreciation of a share of Common Stock from the date such Award is deferred to the payment date.   Unless otherwise provided in an Award agreement, any Performance Compensation Award that is deferred and is otherwise payable in shares of Common Stock shall be credited (during the period between the date as of which the Award is deferred and the payment date) with dividend equivalents (in a manner consistent with the methodology set forth in the last sentence of Section 9(d)(ii)).

**12. Changes in Capital Structure and Similar Events.**  In the event of (a) any dividend (other than regular cash dividends) or other distribution (whether in the form of cash, shares of Common Stock, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, split-off, spin-off, combination, repurchase or exchange of shares of Common Stock or other securities of the Company, issuance of warrants or other rights to acquire shares of Common Stock or other securities of the Company, or other similar corporate transaction or event (including, without limitation, a Change in Control) that affects the shares of Common Stock, or (b) unusual or nonrecurring events (including, without limitation, a Change in Control) affecting the Company, any Affiliate, or the financial statements of the Company or any Affiliate, or changes in applicable rules, rulings, regulations or other requirements of any governmental body or securities exchange or inter-dealer quotation service, accounting principles or law, such that in any case an adjustment is determined by the Committee to be necessary or appropriate, then the Committee shall make any such adjustments in such manner as it may deem equitable, including without limitation any or all of the following:  (i) adjusting any or all of (A) the number of shares of Common Stock or other securities of the Company (or number and kind of other securities or other property) which may be delivered in respect of Awards or with respect to which Awards may be granted under the Plan (including, without limitation, adjusting any or all of the limitations under Section 5 of the Plan) and (B) the terms of any outstanding Award, including, without limitation, the Exercise

Price, Strike Price or any applicable performance measures; (ii) providing for a substitution or assumption of Awards (or awards of an acquiring company), accelerating the delivery, vesting and/or exercisability of, lapse of restrictions and/or other conditions on, or termination of, Awards or providing for a period of time (which shall not be required to be more than ten (10) days) for Participants to exercise outstanding Awards prior to the occurrence of such event (and any such Award not so exercised shall terminate upon the occurrence of such event); and (iii) cancelling any one or more outstanding Awards (or awards of an acquiring company) and causing to be paid to the holders thereof, in cash, shares of Common Stock, other securities or other property, or any combination thereof, the value of such Awards, if any, as determined by the Committee (which if applicable may be based upon the price per share of Common Stock received or to be received by other shareholders of the Company in such event), including without limitation, in the case of an outstanding Option or SAR, a cash payment in an amount equal to the excess, if any, of the Fair Market Value (as of a date specified by the Committee) of the shares of Common Stock subject to such Option or SAR over the aggregate Exercise Price or Strike Price of such Option or SAR, respectively (it being understood that, in such event, any Option or SAR having a per share Exercise Price or Strike Price equal to, or in excess of, the Fair Market Value of a share of Common Stock subject thereto may be canceled and terminated without any payment or consideration therefor); provided, however, that the Committee shall make an equitable or proportionate adjustment to outstanding Awards to reflect any "equity restructuring" (within the meaning of the Financial Accounting Standards Codification Topic 718 (or any successor pronouncement thereto).   Except as otherwise determined by the Committee, any adjustment in Incentive Stock Options under this Section 12 (other than any cancellation of Incentive Stock Options) shall be made only to the extent not constituting a "modification" within the meaning of Section 424(h)(3) of the Code, and any adjustments under this Section 12 shall be made in a manner which does not adversely affect the exemption provided pursuant to Rule 16b-3 under the Exchange Act.   The Company shall give each Participant notice of an adjustment hereunder and, upon notice, such adjustment shall be conclusive and binding for all purposes.

**13. Effect of Change in Control.**  In the event of a Change in Control, notwithstanding any provision of the Plan to the contrary:

(a)      In the event a Participant's employment with the Company or an Affiliate is terminated by the Company or Affiliate without Cause (and other than due to death or Disability) on or within 12 months following a Change of Control, notwithstanding any provision of the Plan to the contrary, all Options and SARs held by such Participant shall become immediately exercisable with respect to 100% of the shares subject to such Options and SARs, and the Restricted Period (and any other conditions) shall expire immediately with respect to 100 percent of the shares of Restricted Stock and Restricted Stock Units and any other Awards held by such Participant (including a waiver of any applicable Performance Goals); provided that in the event the vesting or exercisability of any Award would otherwise be subject to the achievement of performance conditions, the portion of such Award that shall become fully vested and immediately exercisable shall be based on the assumed achievement of target performance as determined by the Committee and prorated for the number of days elapsed from the grant date of such Award through the date of termination.

(b)      In addition, the Committee may upon at least 10 days' advance notice to the affected persons, cancel any outstanding Award and pay to the holders thereof, in cash, securities or other property (including of the acquiring or successor company), or any combination thereof, the value of such Awards based upon the price per share of Common Stock received or to be received by other shareholders of the Company in the event.  Notwithstanding the above, the Committee shall exercise such discretion over any Award subject to Code Section 409A at the time such Award is granted.

The obligations of the Company under the Plan shall be binding upon any successor corporation or organization resulting from the merger, consolidation or other reorganization of the Company, or upon any successor corporation or organization succeeding to substantially all of the assets and business of the Company.

To the extent practicable, the provisions of this Section 13 shall occur in a manner and at a time which allows affected Participants the ability to participate in the Change in Control transaction with respect to the Common Stock subject to their Awards.

## 14. Amendments and Termination.

(a)      Amendment and Termination of the Plan.  The Board may amend, alter, suspend, discontinue, or terminate the Plan or any portion thereof at any time; provided, that no such amendment, alteration, suspension, discontinuation or termination shall be made without shareholder approval if such approval is necessary to comply with any tax or regulatory requirement applicable to the Plan (including, without limitation, as necessary to comply with any rules or requirements of any securities exchange or inter-dealer quotation service on which the shares of Common Stock may be listed or quoted or for changes in GAAP to new accounting standards); provided, further, that any such amendment, alteration, suspension, discontinuance or termination that would materially and adversely affect the rights of any Participant or any holder or beneficiary of any Award theretofore granted shall not to that extent be effective without the consent of the affected Participant, holder or beneficiary, unless the Committee determines that such either is required or advisable in order for the Company, the Plan or the Award to satisfy any applicable law or regulation.  Notwithstanding the foregoing, no amendment shall be made to the last proviso of Section 14(b) without shareholder approval.

(b)      Amendment of Award Agreements.  The Committee may waive any conditions or rights under, amend any terms of, or alter, suspend, discontinue, cancel or terminate, any Award theretofore granted or the associated Award agreement, prospectively or retroactively (including after a Participant's termination of employment or service with the Company); provided that any such waiver, amendment, alteration, suspension, discontinuance, cancellation or termination that would materially and adversely affect the rights of any Participant with respect to any Award theretofore granted shall not to that extent be effective without the consent of the affected Participant unless the Committee determines that such either is required or advisable in order for the Company, the Plan or the Award to satisfy any applicable law or regulation; provided, further, that except as otherwise permitted under Section 12 of the Plan, if (i) the Committee reduces the Exercise Price of any Option or the Strike Price of any SAR, (ii) the Committee cancels any outstanding Option or SAR and replaces it with a new Option or SAR (with a lower Exercise Price or Strike Price, as the case may be) or other Award or cash in a manner which

would either (A) be reportable on the Company's proxy statement or Form 10-K (if applicable) as Options which have been "repriced" (as such term is used in Item 402 of Regulation S-K promulgated under the Exchange Act), or (B) result in any "repricing" for financial statement reporting purposes (or otherwise cause the Award to fail to qualify for equity accounting treatment) or (iii) the Committee takes any other action which is considered a "repricing" for purposes of the shareholder approval rules of the applicable securities exchange or inter-dealer quotation service on which the Common Stock is listed or quoted, then, in the case of the immediately preceding clauses (i) through (iii), any such action shall not be effective without shareholder approval.

**15. General.**

(a)     Award Agreements; Other Agreements; Joinder to Shareholders Agreement. Each Award under the Plan shall be evidenced by an Award agreement, which shall be delivered to the Participant and shall specify the terms and conditions of the Award and any rules applicable thereto.  An Award agreement may be in written or electronic form and shall be signed (either in written or electronic form) by the Participant and a duly authorized representative of the Company.  The terms of any Award agreement, or any employment, change-in-control, severance or other agreement in effect with the Participant, may have terms or features different from and/or additional to those set forth in the Plan, and, unless expressly provided otherwise in such Award or other agreement, shall control in the event of any conflict with the terms of the Plan.  As a condition to receiving shares of Common Stock in respect of any Award, the Participant will be required to execute a joinder to the Company's Shareholders Agreement, and the relevant portions thereof will be provided to the Participant.

(b)     Nontransferability.

(i)     Each Award shall be exercisable only by a Participant during the Participant's lifetime, or, if permissible under applicable law, by the Participant's legal guardian or representative.  No Award may be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by a Participant other than by will or by the laws of descent and distribution and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or an Affiliate; provided that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance.

(ii)     Notwithstanding the foregoing, the Committee may permit Awards (other than Incentive Stock Options) to be transferred by a Participant, without consideration, subject to such rules as the Committee may adopt, to:  (A) any person who is a "family member" of the Participant, as such term is used in the instructions to Form S-8 under the Securities Act or any successor form of registration statements promulgated by the Securities and Exchange Commission (collectively, the "***Immediate Family Members***"); (B) a trust solely for the benefit of the Participant and their Immediate Family Members; (C) a partnership or limited liability company whose only partners or shareholders are the Participant and his Immediate Family Members; or (D) any other transferee as may be approved either (I) by the Board or the Committee, or (II) as provided in the applicable Award agreement; (each transferee described in clauses (A), (B), (C) and (D) above is

hereinafter referred to as a "***Permitted Transferee***"); provided that the Participant gives the Committee advance written notice describing the terms and conditions of the proposed transfer and the Committee notifies the Participant in writing that such a transfer would comply with the requirements of the Plan.

(iii)     The terms of any Award transferred in accordance with the immediately preceding sentence shall apply to the Permitted Transferee and any reference in the Plan, or in any applicable Award agreement, to a Participant shall be deemed to refer to the Permitted Transferee, except that (A) Permitted Transferees shall not be entitled to transfer any Award, other than by will or the laws of descent and distribution; (B) Permitted Transferees shall not be entitled to exercise any transferred Option unless there shall be in effect a registration statement on an appropriate form covering the shares of Common Stock to be acquired pursuant to the exercise of such Option if the Committee determines, consistent with any applicable Award agreement, that such a registration statement is necessary or appropriate; (C) the Committee or the Company shall not be required to provide any notice to a Permitted Transferee, whether or not such notice is or would otherwise have been required to be given to the Participant under the Plan or otherwise; and (D) the consequences of the termination of the Participant's employment by, or services to, the Company or an Affiliate under the terms of the Plan and the applicable Award agreement shall continue to be applied with respect to the Permitted Transferee, including, without limitation, that an Option shall be exercisable by the Permitted Transferee only to the extent, and for the periods, specified in the Plan and the applicable Award agreement.

(c)     <u>Dividends and Dividend Equivalents.</u>  The Committee may provide a Participant as part of an Award with dividends or dividend equivalents, payable in cash, shares of Common Stock, other securities, other Awards or other property, on a current or deferred basis, on such terms and conditions as may be determined by the Committee; provided, that no dividend equivalents shall be payable in respect of outstanding (i) Options or SARs or (ii) unearned Performance Compensation Awards or other unearned Awards subject to performance conditions other than or in addition to the passage of time; however, dividend equivalents may be accumulated in respect of unearned Awards and paid as soon as administratively practicable, but no more than 60 days, after such Awards are earned and become payable or distributable.

(d)     <u>Tax Withholding.</u>

(i)     A Participant shall be required to pay and the Company or any Affiliate shall have the right and is hereby authorized to withhold, from any cash, shares of Common Stock, other securities or other property deliverable under any Award or from any compensation or other amounts owing to a Participant, the amount of any required withholding taxes in respect of an Award, its exercise, or any payment or transfer under an Award or under the Plan and to take such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.

(ii)     Without limiting the generality of clause (i) above, the Committee may permit a Participant to satisfy, in whole or in part, the foregoing withholding liability by

(A) payment in cash; (B) the delivery of shares of Common Stock owned by the Participant having a Fair Market Value equal to such withholding liability or (C) having the Company withhold from the number of shares of Common Stock otherwise issuable or deliverable pursuant to the exercise or settlement of the Award a number of shares with a Fair Market Value equal to such withholding liability.

(e)    No Claim to Awards; No Rights to Continued Employment.  No employee of the Company or an Affiliate, or other person, shall have any claim or right to be granted an Award under the Plan or, having been selected for the grant of an Award, to be selected for a grant of any other Award.  There is no obligation for uniformity of treatment of Participants or holders or beneficiaries of Awards.   The terms and conditions of Awards and the Committee's determinations and interpretations with respect thereto need not be the same with respect to each Participant and may be made selectively among Participants, whether or not such Participants are similarly situated.  Neither the Plan nor any action taken hereunder shall be construed as giving any Participant any right to be retained in the employ or service of the Company or an Affiliate, nor shall it be construed as giving any Participant any rights to continued service on the Board.

(f)    International Participants.  With respect to Participants who reside or work outside of the United States, the Committee may amend the terms of the Plan or appendices thereto, or outstanding Awards in order to conform such terms with or accommodate the requirements of local laws, procedures or practices or to obtain more favorable tax or other treatment for a Participant, the Company or its Affiliates.  Without limiting the generality of this subsection, the Committee is specifically authorized to adopt rules, procedures and sub-plans with provisions that limit or modify rights on death, disability, retirement or other termination of employment, available methods of exercise or settlement of an award, payment of income, social insurance contributions or payroll taxes, withholding procedures and handling of any stock certificates or other indicia of ownership which vary with local requirements. The Committee may also adopt rules, procedures or sub-plans applicable to particular Affiliates or locations.

(g)    Beneficiary Designation.  A Participant's beneficiary shall be deemed to be his spouse (or domestic partner if such status is recognized by the Company and in such jurisdiction), or if the Participant is otherwise unmarried at the time of death, his estate, except to the extent a different beneficiary is designated in accordance with procedures that may be established by the Committee from time to time for such purpose.  Notwithstanding the foregoing, in the absence of a beneficiary validly designated under such Committee-established procedures and/or applicable law who is living (or in existence) at the time of death of a Participant residing or working outside the United States, any required distribution under the Plan shall be made to the executor or administrator of the estate of the Participant, or to such other individual as may be prescribed by applicable law.

(h)    No Rights as a Shareholder.  Except as otherwise specifically provided in the Plan or any Award agreement, no person shall be entitled to the privileges of ownership in respect of shares of Common Stock which are subject to Awards hereunder until such shares have been issued or delivered to that person.

(i)    Government and Other Regulations.

(i)      Nothing in this Plan shall be deemed to authorize the Committee or Board or any members thereof to take any action contrary to applicable law or regulation, or rules of the NYSE.

(ii)      The obligation of the Company to settle Awards in Common Stock or other consideration shall be subject to all applicable laws, rules, and regulations, and to such approvals by governmental agencies as may be required.  The Company shall be under no obligation to offer to sell or to sell, and shall be prohibited from offering to sell or selling, any shares of Common Stock pursuant to an Award unless such shares have been properly registered for sale pursuant to the Securities Act with the Securities and Exchange Commission or unless the Company has received an opinion of counsel, satisfactory to the Company, that such shares may be offered or sold without such registration pursuant to and in compliance with the terms of an available exemption.  The Company shall be under no obligation to register for sale under the Securities Act any of the shares of Common Stock to be offered or sold under the Plan.  The Committee shall have the authority to provide that all shares of Common Stock or other securities of the Company or any Affiliate delivered under the Plan shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the Plan, the applicable Award agreement, the U.S. Federal securities laws, or the rules, regulations and other requirements of the U.S. Securities and Exchange Commission, any securities exchange or inter-dealer quotation service upon which such shares or other securities of the Company are then listed or quoted and any other applicable Federal, state, local or non-U.S. laws, rules, regulations and other requirements, and, without limiting the generality of Section 9 of the Plan, the Committee may cause a legend or legends to be put on any such certificates of Common Stock or other securities of the Company or any Affiliate delivered under the Plan to make appropriate reference to such restrictions or may cause such Common Stock or other securities of the Company or any Affiliate delivered under the Plan in book-entry form to be held subject to the Company's instructions or subject to appropriate stop-transfer orders.

(iii)      The Committee may cancel an Award or any portion thereof if it determines that legal or contractual restrictions and/or blockage and/or other market considerations would make the Company's acquisition of shares of Common Stock from the public markets, the Company's issuance of Common Stock to the Participant, the Participant's acquisition of Common Stock from the Company and/or the Participant's sale of Common Stock to the public markets, illegal, impracticable or inadvisable.  If the Committee determines to cancel all or any portion of an Award in accordance with the foregoing, unless prevented by applicable laws, the Company shall pay to the Participant an amount equal to the excess of (A) the aggregate Fair Market Value of the shares of Common Stock subject to such Award or portion thereof canceled (determined as of the applicable exercise date, or the date that the shares would have been vested or delivered, as applicable), over (B) the aggregate Exercise Price or Strike Price (in the case of an Option or SAR, respectively) or any amount payable as a condition of delivery of shares of Common Stock (in the case of any other Award).  Such amount shall be delivered to the Participant as soon as practicable following the cancellation of such Award or portion thereof.

(j)      <u>No Section 83(b) Elections Without Consent of Company.</u>  No election under Section 83(b) of the Code or under a similar provision of law may be made unless expressly permitted by the terms of the applicable Award agreement or by action of the Committee in writing prior to the making of such election.  If a Participant, in connection with the acquisition of shares of Common Stock under the Plan or otherwise, is expressly permitted to make such election and the Participant makes the election, the Participant shall notify the Company of such election within ten days of filing notice of the election with the Internal Revenue Service or other governmental authority, in addition to any filing and notification required pursuant to Section 83(b) of the Code or other applicable provision.

(k)      <u>No Trust or Fund Created.</u>  Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate, on the one hand, and a Participant or other person or entity, on the other hand.  No provision of the Plan or any Award shall require the Company, for the purpose of satisfying any obligations under the Plan, to purchase assets or place any assets in a trust or other entity to which contributions are made or otherwise to segregate any assets, nor shall the Company maintain separate bank accounts, books, records or other evidence of the existence of a segregated or separately maintained or administered fund for such purposes.  Participants shall have no rights under the Plan other than as unsecured general creditors of the Company.

(l)      <u>Reliance on Reports.</u>  Each member of the Committee and each member of the Board (and their respective designees) shall be fully justified in acting or failing to act, as the case may be, and shall not be liable for having so acted or failed to act in good faith, in reliance upon any report made by the independent registered public accounting firm of the Company and its Affiliates and/or any other information furnished in connection with the Plan by any agent of the Company or the Committee or the Board, other than himself.

(m)      <u>Relationship to Other Benefits.</u>  No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement, profit sharing, group insurance or other benefit plan of the Company except as otherwise specifically provided in such other plan.

(n)      <u>Governing Law.</u>  The Plan shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware.

(o)      <u>Severability.</u>  If any provision of the Plan or any Award or Award agreement is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction or as to any person or entity or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, such provision shall be construed or deemed stricken as to such jurisdiction, person or entity or Award and the remainder of the Plan and any such Award shall remain in full force and effect.

24

(p)      Obligations Binding on Successors.  The obligations of the Company under the Plan shall be binding upon any successor corporation or organization resulting from the merger, consolidation or other reorganization of the Company, or upon any successor corporation or organization succeeding to all or substantially all of the assets and business of the Company.

(q)      409A of the Code.

(i)      It is intended that this Plan comply with Section 409A of the Code, and all provisions of this Plan shall be construed and interpreted in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A of the Code.  Each Participant is solely responsible and liable for the satisfaction of all taxes and penalties that may be imposed on or in respect of such Participant in connection with this Plan, including any taxes and penalties under Section 409A of the Code, and neither the Company nor any Affiliate shall have any obligation to indemnify or otherwise hold such Participant or any beneficiary harmless from such taxes or penalties.  With respect to any Award that is considered "deferred compensation" subject to Section 409A of the Code, references in the Plan to "termination of employment" (and substantially similar phrases) shall mean "separation from service" within the meaning of Section 409A of the Code. For purposes of Section 409A of the Code, each of the payments that may be made in respect of any Award granted under the Plan is designated as a separate payment.

(ii)      Notwithstanding anything in the Plan to the contrary, if a Participant is a "specified employee" within the meaning of Section 409A(a)(2)(B)(i) of the Code, no payments or deliveries in respect of any Awards that are "deferred compensation" subject to Section 409A of the Code shall be made to such Participant prior to the date that is six months after the date of such Participant's "separation from service" or, if earlier, the Participant's date of death.  All such delayed payments or deliveries will be paid or delivered (without interest) in a single lump sum on the earliest date permitted under Section 409A of the Code that is also a business day.

(iii)      In the event that the timing of payments in respect of any Award that would otherwise be considered "deferred compensation" subject to Section 409A of the Code would be accelerated upon the occurrence of (A) a Change in Control, no such acceleration shall be permitted unless the event giving rise to the Change in Control satisfies the definition of a change in the ownership or effective control of a corporation, or a change in the ownership of a substantial portion of the assets of a corporation pursuant to Section 409A of the Code and any Treasury Regulations promulgated thereunder or (B) a Disability, no such acceleration shall be permitted unless the Disability also satisfies the definition of "Disability" pursuant to Section 409A of the Code and any Treasury Regulations promulgated thereunder.

(r)      Clawback/Forfeiture.  Notwithstanding anything to the contrary contained herein, an Award agreement may provide that the Committee may cancel such Award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or violates a non-competition, non-solicitation, non-disparagement or non-disclosure covenant or agreement with the Company or any Affiliate, as determined by

the Committee.  The Committee may also provide in an Award agreement that in such event, the Participant will forfeit any compensation, gain or other value realized thereafter on the vesting, exercise or settlement of such Award, the sale or other transfer of such Award, or the sale of shares of Common Stock acquired in respect of such Award, and must promptly repay such amounts to the Company.  The Committee may also provide in an Award agreement that if the Participant receives any amount in excess of what the Participant should have received under the terms of the Award for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company.  To the extent required by applicable law and/or the rules and regulations of the NYSE or other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, Awards shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into all outstanding Award agreements).

(s)     No Representations Or Covenants With Respect To Tax Qualification.  Although the Company may endeavor to (i) qualify an Award for favorable U.S. or non-U.S. tax treatment or (ii) avoid adverse tax treatment, the Company makes no representation to that effect and expressly disavows any covenant to maintain favorable or avoid unfavorable tax treatment. The Company shall be unconstrained in its corporate activities without regard to the potential negative tax impact on holders of Awards under the Plan.

(t)     Expenses; Gender; Titles and Headings.  The expenses of administering the Plan shall be borne by the Company and its Affiliates.  Masculine pronouns and other words of masculine gender shall refer to both men and women.  The titles and headings of the sections in the Plan are for convenience of reference only, and in the event of any conflict, the text of the Plan, rather than such titles or headings shall control.

\*     \*     \*

As adopted by the Board of Directors of the Company on [Date], 2022.

As approved by the shareholders of the Company on [Date], 2022.

**Exhibit N-2(ii)**

**Redline to Time-Based Restricted Stock Unit Award Agreement
for Management Committee filed on December 3, 2021**

**[NEW TOPCO]INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)
2022 EQUITY INCENTIVE PLAN**

**TIME-BASED RESTRICTED STOCK UNIT AWARD AGREEMENT FOR
MANAGEMENT**

THIS TIME-BASED RESTRICTED STOCK UNIT AWARD AGREEMENT FOR MANAGEMENT (the "Agreement") is entered into as of [Grant Date], by and between [New TopCo]Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* organized under the laws of Luxembourg (the "Company"), and [Participant Name] (the "Participant").

WHEREAS, the Company has adopted the [New TopCo]Intelsat Emergence S.A. (to be renamed Intelsat S.A.) 2022 Equity Incentive Plan (as amended, the "Plan"), pursuant to which Restricted Stock Units ("RSUs") may be granted; and

WHEREAS, the Compensation Committee of the Board of Directors of the Company (the "Committee") has determined that it is in the best interests of the Company and its stockholders to grant the RSUs provided for herein to the Participant subject to the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

**1.     Grant of Restricted Stock Units.**

(a)     Grant. The Company hereby grants to the Participant a total of [Awards Granted] RSUs, on the terms and conditions set forth in this Agreement and as otherwise provided in the Plan.  The RSUs shall be credited to a separate book-entry account maintained for the Participant on the books of the Company.

(b)     Incorporation by Reference. The provisions of the Plan are incorporated herein by reference. Except as otherwise expressly set forth herein, this Agreement shall be construed in accordance with the provisions of the Plan and any interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan. Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Plan. The Committee shall have final authority to interpret and construe the Plan and this Agreement and to make any and all determinations under them, and its decision shall be binding and conclusive upon the Participant and the Participant's legal representative in respect of any questions arising under the Plan or this Agreement.  The Participant acknowledges that the Participant has received a copy of the Plan and has had an opportunity to review the Plan and agrees to be bound by all the terms and provisions of the Plan.

**2.     Vesting; Settlement.**  Except as may otherwise be provided herein, subject to the Participant's continued employment with the Company or an Affiliate, one-third of the RSUs (each, an "Installment") shall vest on each of the first three anniversaries of the Effective Date (each such date, a "Vesting Date").  Any fractional RSUs resulting from the application of the

vesting schedule shall be aggregated and the RSUs resulting from such aggregation shall vest on the final Vesting Date.   Upon vesting, the RSUs shall no longer be subject to cancellation pursuant to Section 4 hereof.  Each RSU shall be settled within 30 days following the applicable Vesting Date in shares of Common Stock.

**3.      Dividend Equivalents**.  In the event of any issuance of a dividend on the shares of Common Stock, including, without limitation, with respect to any cash or other distributions made on account of the CVRs (a "Dividend"), the Participant shall be credited, as of the payment date for such Dividend, with an amount, with respect to each RSU granted pursuant to this Agreement and outstanding as of the record date for such Dividend, equal to the amount of the Dividend per share (such amount, the "DER").  Each DER will be settled in cash (without the payment of interest) within 30 days following the Vesting Date of the RSU to which it relates.

**4.      Termination of Employment.**

        (a)      If, prior to the final Vesting Date and prior to a Change in Control, the Participant's employment with the Company and its Affiliates is terminated (i) by the Company or its Affiliate without Cause, (ii) by the Participant for Good Reason (as defined in the Participant's employment agreement with the Company or one of its Affiliates as in effect on the date of such termination), (iii) due to the Participant's death or (iv) by the Company or its Affiliate due to the Participant's Disability (each, a "Qualifying Termination"), then the Participant will vest in 100% of the Installment that was scheduled to vest immediately following the date of such Qualifying Termination, effective as of the effective date of such Qualifying Termination.  Each RSU shall be settled within 30 days following the date of the Qualifying Termination in shares of Common Stock.  For the avoidance of doubt, such additional vesting upon a Qualifying Termination is in addition to any vesting that occurred prior to the Qualifying Termination.

        (b)      The Participant's RSUs that remain unvested following the treatment set forth in Section 4(a) hereof will remain outstanding for six months following the Participant's Qualifying Termination date (the "Tail Period") and eligible to vest upon the occurrence of an Exit Event during the Tail Period. If an Exit Event occurs during the Tail Period, 100% of the Participant's unvested RSUs will vest upon such Exit Event. If an Exit Event does not occur during the Tail Period, 100% of the Participant's unvested RSUs will terminate at the end of the Tail Period.

        (c)      If the Participant's employment with the Company and its Affiliates terminates prior to the final Vesting Date for any reason other than as set forth in Section 4(a) hereof, all unvested RSUs shall be cancelled immediately and the Participant shall not be entitled to receive any payments with respect thereto.  For the avoidance of doubt, the Participant shall remain entitled to have any vested, but not yet settled, RSUs be settled in shares of Common Stock in accordance with Section 2.

**5.      Rights as a Stockholder.** The Participant shall not be deemed for any purpose to be the owner of any shares of Common Stock underlying the RSUs unless, until and to the extent that (a) the Company shall have issued and delivered to the Participant the shares of Common Stock underlying the RSUs and (b) the Participant's name shall have been entered as a stockholder of

record with respect to such shares of Common Stock on the books of the Company.  The Company shall cause the actions described in clauses (a) and (b) of the preceding sentence to occur promptly following settlement as contemplated by this Agreement, subject to compliance with applicable laws.  By executing this Agreement, the Participant shall be deemed to have executed a copy of the Company's Shareholders Agreement, effective as of [_____], 2022 (as may be amended, modified or supplemented from time to time), by and among the Company and its shareholders named therein (the "Shareholders Agreement"). The Participant agrees (i) to be bound by the Shareholders Agreement with respect to any shares of Common Stock issued to the Participant pursuant to this Agreement, (ii) that any shares of Common Stock issued to the Participant pursuant to this Agreement shall be subject to all of the terms and conditions contained in the Shareholders Agreement applicable to the Common Stock and (iii) that the Participant shall, upon such issuance, be treated as a Holder (as defined in the Shareholders Agreement) for all purposes under the Shareholders Agreement.

**6.     Change in Control.**   If, on or following a Change in Control, the Participant's employment with the Company and its Affiliates is terminated due to a Qualifying Termination, 100% of any unvested RSUs shall become immediately vested as of the effective date of such termination.  Each RSU shall be settled within 30 days following the date of termination in shares of Common Stock.

**7.     Compliance with Legal Requirements.**

(a)     <u>Generally</u>.  The granting and settlement of the RSUs, and any other obligations of the Company under this Agreement, shall be subject to all applicable U.S. federal, state and local laws, rules and regulations, all applicable non-U.S. laws, rules and regulations and to such approvals by any regulatory or governmental agency as may be required. The Participant agrees to take all steps the Committee or the Company determines are reasonably necessary to comply with all applicable provisions of U.S. federal and state securities law and non-U.S. securities law in exercising the Participant's rights under this Agreement.

(b)     <u>Tax Withholding</u>. Vesting and settlement of the RSUs shall be subject to the Participant satisfying any applicable U.S. federal, state and local tax withholding obligations and non-U.S. tax withholding obligations.  The Company shall have the right and is hereby authorized to withhold from any amounts payable to the Participant in connection with the RSUs or otherwise the amount of any required withholding taxes in respect of the RSUs, its settlement or any payment or transfer of the RSUs or under the Plan and to take any such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.  The Participant may elect to satisfy, and the Company may require the Participant to satisfy, in whole or in part, the tax obligations by withholding shares of Common Stock that would otherwise be deliverable to the Participant upon settlement of the RSUs with a Fair Market Value equal to such withholding liability or, if permitted by the Company, such higher amount determined using rates not exceeding the maximum statutory rate in the applicable jurisdiction(s).

**8.     Clawback.**  Notwithstanding anything to the contrary contained herein, the Committee may cancel the RSU award if the Participant, without the consent of the Company, has engaged

in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or materially violates a non-competition, non-solicitation, non-disparagement or non-disclosure covenant or agreement with the Company or any Affiliate, which violation is not cured, to the extent curable, within 15 days of the Participant's receipt of written notice thereof, as determined by the Committee. In such event, the Participant will forfeit any compensation, gain or other value realized thereafter on the vesting or settlement of the RSUs, the sale or other transfer of the RSUs, or the sale of shares of Common Stock acquired in respect of the RSUs, and must promptly repay such amounts to the Company. If the Participant receives any amount in excess of what the Participant should have received under the terms of the RSUs for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company. To the extent required by applicable law and/or the rules and regulations of the NYSE or other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, the RSUs shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into this Agreement).

**9. Lock-up Agreement**. The Participant agrees that, in connection with any registration of the Company's securities, upon the request of the Company or the underwriters managing any public offering of the Company's securities, the Participant will not sell or otherwise dispose of any Common Stock without the prior written consent of the Company or such underwriters, as the case may be, for such reasonable period of time after the effective date of such registration as may be requested by such managing underwriters (but in no event to exceed six months following the effective date of such registration) and subject to all reasonable restrictions as the Company or the underwriters may specify. The Participant will enter into any agreement reasonably required by the underwriters to implement the foregoing.

**10. Miscellaneous.**

(a)     Transferability. The RSUs may not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered (a "Transfer") by the Participant other than by will or by the applicable laws of descent and distribution, pursuant to a qualified domestic relations order or as otherwise permitted under Section 15(b) of the Plan. Any attempted Transfer of the RSUs contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the RSUs, shall be null and void and without effect.

(b)     Waiver. Any right of the Company contained in this Agreement may be waived in writing by the Committee. No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages. No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(c)      Section 409A. The RSUs are intended to be exempt from, or compliant with, Section 409A of the Code. Notwithstanding the foregoing or any provision of the Plan or this Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Committee may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and (ii) maintain, to the maximum extent practicable, the original intent and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 10(c) does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the RSUs will not be subject to interest and penalties under Section 409A.

(d)      General Assets. All amounts credited in respect of the RSUs to the book-entry account under this Agreement shall continue for all purposes to be part of the general assets of the Company. The Participant's interest in such account shall make the Participant only a general, unsecured creditor of the Company.

(e)      Notices. Any notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax, pdf/email or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, to the attention of the Corporate Secretary at the Company's principal executive office.

(f)      Severability. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)      No Rights to Employment. Nothing contained in this Agreement shall be construed as giving the Participant any right to be retained, in any position, as an employee, consultant or director of the Company or its Affiliates or shall interfere with or restrict in any way the rights of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate or discharge the Participant at any time for any reason whatsoever.

(h)      Fractional Shares. In lieu of issuing a fraction of a share of Common Stock resulting from adjustment of the RSUs pursuant to Section 12 of the Plan or otherwise, the Company shall be entitled to pay to the Participant an amount in cash equal to the Fair Market Value of such fractional share.

(i)      Beneficiary. The Participant may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation.

(j)      Successors. The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

(k)      Entire Agreement. This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations and negotiations in respect thereto. No change, modification or waiver of any provision of this Agreement shall be valid unless the same be in writing and signed by the parties hereto, except for any changes permitted without consent under Sections 12 or 14 of the Plan.

(l)      Governing Law and Venue. This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, U.S.A., without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware, U.S.A.

(i)      Dispute Resolution; Consent to Jurisdiction.  All disputes between or among any Persons arising out of or in any way connected with the Plan, this Agreement or the RSUs shall be solely and finally settled by the Committee, acting in good faith, the determination of which shall be final.   Any matters not covered by the preceding sentence shall be solely and finally settled in accordance with the Plan, and the Participant and the Company consent to the personal jurisdiction of the United States Federal and state courts sitting in Wilmington, Delaware as the exclusive jurisdiction with respect to matters arising out of or related to the enforcement of the Committee's determinations and resolution of matters, if any, related to the Plan or this Agreement not required to be resolved by the Committee.  Each such Person hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the last known address of such Person, such service to become effective ten days after such mailing.

(ii)      Waiver of Jury Trial. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated (whether based on contract, tort or any other theory).  Each party hereto (A) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

(m)      Headings; Gender. The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement.  Masculine pronouns and other words of masculine gender shall refer to both men and women as appropriate.

(n)      Counterparts.  This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(o)      Electronic Signature and Delivery.  This Agreement may be accepted by return signature or by electronic confirmation.  By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by U.S. Securities and Exchange Commission rules (which consent may be revoked in writing by the Participant at any time upon three business days' notice to the Company, in which case subsequent prospectuses, annual reports and other information will be delivered in hard copy to the Participant).

(p) Electronic Participation in Plan.  The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

IN WITNESS WHEREOF, this Agreement has been executed by the Company and the Participant as of the day first written above.

INTELSAT S.A.

By:     /s/ Michelle V. Bryan
        Michelle V. Bryan
        Executive   Vice   President,   General
        Counsel and Chief Administrative Officer

Accepted on [Date]

[Participant Name]

**Exhibit N-2(iii)**

**Redline to Performance-Based Restricted Stock Unit Award Agreement
filed on December 3, 2021**

[NEW TOPCO]INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)
**2022 EQUITY INCENTIVE PLAN**

**PERFORMANCE-BASED**
**RESTRICTED STOCK UNIT AWARD AGREEMENT**

THIS PERFORMANCE-BASED RESTRICTED STOCK UNIT AWARD AGREEMENT (the "Agreement") is entered into as of [Grant Date], by and between [New TopCo]Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* organized under the laws of Luxembourg (the "Company"), and [Participant Name] (the "Participant").

WHEREAS, the Company has adopted the [New TopCo]Intelsat Emergence S.A. (to be renamed Intelsat S.A.) 2022 Equity Incentive Plan (as amended, the "Plan"), pursuant to which performance-based Restricted Stock Units ("PSUs") may be granted; and

WHEREAS, the Compensation Committee of the Board of Directors of the Company (the "Committee") has determined that it is in the best interests of the Company and its stockholders to grant the PSUs provided for herein to the Participant subject to the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

**1.      Grant of Performance-Based Restricted Stock Units.**

(a)      Grant. The Company hereby grants to the Participant a targeted award of [Awards Granted] PSUs (the "Target Award"), on the terms and conditions set forth in this Agreement and as otherwise provided in the Plan.  The PSUs shall be credited to a separate book-entry account maintained for the Participant on the books of the Company.

(b)      Incorporation by Reference. The provisions of the Plan are incorporated herein by reference. Except as otherwise expressly set forth herein, this Agreement shall be construed in accordance with the provisions of the Plan and any interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan. Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Plan. The Committee shall have final authority to interpret and construe the Plan and this Agreement and to make any and all determinations under them, and its decision shall be binding and conclusive upon the Participant and his or her legal representative in respect of any questions arising under the Plan or this Agreement.  The Participant acknowledges that he or she has received a copy of the Plan and has had an opportunity to review the Plan and agrees to be bound by all the terms and provisions of the Plan.

**2.      Vesting; Settlement.**

(a)      Except as may otherwise be provided herein, the PSUs shall vest based on the equity value of the Company achieved (the "Achieved Company Equity Value") as of the Exit

Event or the Valuation Event(s) (as defined below), as applicable, as adjusted by the Performance Leverage Factor pursuant to the following table:

| Achieved Company Equity Value | Performance Leverage Factor |
|---|---|
| $7,250,000,000 or above | 200% |
| $4,350,000,000 | 50% |
| Below $4,350,000,000 | 0% |

If the Achieved Company Equity Value is in between $4,350,000,000 and $7,250,000,000, the Performance Leverage Factor will be determined using straight-line interpolation.

Except as set forth in Section 4, vesting of the PSUs is subject to the Participant's continued employment with the Company or an Affiliate through the date of the Exit Event or Valuation Event, as applicable (the "Vesting Date").  As soon as administratively practicable, and in any event within 30 days, after the Vesting Date, the Committee shall determine the Achieved Company Equity Value, and on the Vesting Date, the Participant shall be entitled to receive that number of PSUs (if any) equal to (i) the Target Award, multiplied by (ii) the applicable Performance Leverage Factor, less any PSUs previously settled under this Agreement.  Each PSU shall be settled within 60 days following the Vesting Date in shares of Common Stock.

(b)     If an Exit Event occurs, vesting of the PSUs will be determined upon the consummation of the Exit Event.  If the Exit Event is a Change in Control, the Achieved Company Equity Value will be determined based on the price per share of Common Stock paid in such Change in Control.  If the Exit Event is an Initial Public Offering, the Achieved Company Equity Value will be determined based on the initial price per share at which the shares of Common Stock are offered for sale in the Initial Public Offering. Any PSUs that do not vest in connection with such Exit Event will automatically terminate as of the date of such Exit Event.

(c)     If no Exit Event occurs prior to the fourth anniversary of the Effective Date, the Achieved Company Equity Value will be measured on each of the fourth and fifth anniversaries of the Effective Date (each, a "Valuation Event"), and the PSUs will vest in accordance with the framework set forth in this Agreement based on the Achieved Company Equity Value as of such Valuation Events (*e.g.*, if the Achieved Company Equity Value is $4,350,000,000 as of the first Valuation Event, 50% of the Target Award will vest as of the fourth anniversary of the Effective Date, and if the Achieved Company Equity Value increases to $7,250,000,000 as of the second Valuation Event, an additional 150% of the Target Award will vest as of the fifth anniversary of the Emergence Date).  An independent third party appraiser shall determine the Achieved Company Equity Value in connection with each Valuation Event.  Any PSUs that remain unvested following either Valuation Event will remain outstanding and eligible to vest upon the occurrence of an Exit Event.

**3.      Dividend Equivalents**.  In the event of any issuance of any dividend on the shares of Common Stock, including, without limitation, with respect to any cash or other distributions made on account of the CVRs (a "Dividend"), the Participant shall be credited, as of the payment date for such Dividend, with an amount, with respect to each PSU granted pursuant to this Agreement and outstanding as of the record date for such Dividend (subject to subsequent adjustment by the Performance Leverage Factor), equal to the amount of the Dividend per share (such amount, the "DER").  Each DER will be settled in cash (without the payment of interest) within 60 days following the Vesting Date of the PSU to which it relates.

**4.      Termination of Employment.**

(a)      If, on or after the 18-month anniversary of the Effective Date, but prior to the earlier of the date on which the PSUs have fully vested at maximum performance and an Exit Event, the Participant's employment with the Company and its Affiliates is terminated (i) by the Company or its Affiliate without Cause, (ii) by the Participant for Good Reason (as defined in the Participant's employment agreement with the Company or one of its Affiliates as in effect on the date of such termination), (iii) due to the Participant's death or (iv) by the Company or its Affiliate due to the Participant's Disability (each, a "Qualifying Termination"), the Participant's PSUs will remain outstanding and eligible to vest upon the occurrence of an Exit Event or the Valuation Events, in each case, based on actual performance achieved in connection therewith, and the number of PSUs that will vest based on such performance achievement will be pro-rated, with the pro-ration determined by multiplying (A) the total number of PSUs that would have vested had the Participant's employment not terminated prior to such Exit Event or Valuation Events by (B) a fraction, the numerator of which is the total number of days that the Participant was employed by the Company or its affiliates from the Effective Date through the Participant's Qualifying Termination date (not to exceed 1,095), and the denominator of which is 1,095, less any PSUs previously settled under this Agreement.  Each PSU shall be settled within 60 days following the Vesting Date in shares of Common Stock.  For the avoidance of doubt, such additional vesting upon a Qualifying Termination is in addition to any vesting that occurred prior to the Qualifying Termination.  There will be no pro-rated vesting upon a Qualifying Termination that occurs prior to the 18-month anniversary of the Effective Date.

(b)      The Participant's PSUs that are unvested and remain unvested following the treatment set forth in Section 4(a) hereof will remain outstanding for six months following the Participant's Qualifying Termination date (the "Tail Period") and eligible to vest upon the occurrence of an Exit Event during the Tail Period based on achievement of the performance criteria set forth in this Agreement. If an Exit Event does not occur during the Tail Period, all unvested PSUs shall be cancelled immediately following the last day of the Tail Period, and the Participant shall not be entitled to receive any payments with respect thereto.

(c)      If the Participant's employment with the Company and its Affiliates terminates for any reason other than as the result of a Qualifying Termination, all unvested PSUs shall be cancelled immediately, and the Participant shall not be entitled to receive any payments with respect thereto.

**5.**    **Rights as a Stockholder.** The Participant shall not be deemed for any purpose to be the owner of any shares of Common Stock underlying the PSUs unless, until and to the extent that (a) the Company shall have issued and delivered to the Participant the shares of Common Stock underlying the PSUs and (b) the Participant's name shall have been entered as a stockholder of record with respect to such shares of Common Stock on the books of the Company.   The Company shall cause the actions described in clauses (a) and (b) of the preceding sentence to occur promptly following settlement as contemplated by this Agreement, subject to compliance with applicable laws.  By executing this Agreement, the Participant shall be deemed to have executed a copy of the Company's Shareholders Agreement, effective as of [_____], 2022 (as may be amended, modified or supplemented from time to time), by and among the Company and its shareholders named therein (the "Shareholders Agreement"). The Participant agrees (i) to be bound by the Shareholders Agreement with respect to any shares of Common Stock issued to the Participant pursuant to this Agreement, (ii) that any shares of Common Stock issued to the Participant pursuant to this Agreement shall be subject to all of the terms and conditions contained in the Shareholders Agreement applicable to the Common Stock and (iii) that the Participant shall, upon such issuance, be treated as a Holder (as defined in the Shareholders Agreement) for all purposes under the Shareholders Agreement.

**6.**    **Compliance with Legal Requirements.**

(a)    Generally.  The granting and settlement of the PSUs, and any other obligations of the Company under this Agreement, shall be subject to all applicable U.S. federal, state and local laws, rules and regulations, all applicable non-U.S. laws, rules and regulations and to such approvals by any regulatory or governmental agency as may be required. The Participant agrees to take all steps the Committee or the Company determines are reasonably necessary to comply with all applicable provisions of U.S. federal and state securities law and non-U.S. securities law in exercising his or her rights under this Agreement.

(b)    Tax Withholding. Vesting and settlement of the PSUs shall be subject to the Participant satisfying any applicable U.S. federal, state and local tax withholding obligations and non-U.S. tax withholding obligations.   The Company shall have the right and is hereby authorized to withhold from any amounts payable to the Participant in connection with the PSUs or otherwise the amount of any required withholding taxes in respect of the PSUs, its settlement or any payment or transfer of the PSUs or under the Plan and to take any such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.   The Participant may elect to satisfy, and the Company may require the Participant to satisfy, in whole or in part, the tax obligations by withholding shares of Common Stock that would otherwise be deliverable to the Participant upon settlement of the PSUs with a Fair Market Value equal to such withholding liability or, if permitted by the Company, such higher amount determined using rates not exceeding the maximum statutory rate in the applicable jurisdiction(s).

**7.**    **Clawback.**  Notwithstanding anything to the contrary contained herein, the Committee may cancel the PSU award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any Affiliate while employed by or providing services to the Company or any Affiliate, including

fraud or conduct contributing to any financial restatements or irregularities, or materially violates a non-competition, non-solicitation, non-disparagement or non-disclosure covenant or agreement with the Company or any Affiliate, which violation is not cured, to the extent curable, within 15 days of the Participant's receipt of written notice thereof, as determined by the Committee.  In such event, the Participant will forfeit any compensation, gain or other value realized thereafter on the vesting or settlement of the PSUs, the sale or other transfer of the PSUs, or the sale of shares of Common Stock acquired in respect of the PSUs, and must promptly repay such amounts to the Company.  If the Participant receives any amount in excess of what the Participant should have received under the terms of the PSUs for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company.  To the extent required by applicable law and/or the rules and regulations of the NYSE or other securities exchange or inter-dealer quotation system on which the Common Stock is listed or quoted, or if so required pursuant to a written policy adopted by the Company, the PSUs shall be subject (including on a retroactive basis) to clawback, forfeiture or similar requirements (and such requirements shall be deemed incorporated by reference into this Agreement).

**8.**     **Lock-up Agreement**.  The Participant agrees that, in connection with any registration of the Company's securities, upon the request of the Company or the underwriters managing any public offering of the Company's securities, the Participant will not sell or otherwise dispose of any Common Stock without the prior written consent of the Company or such underwriters, as the case may be, for such reasonable period of time after the effective date of such registration as may be requested by such managing underwriters (but in no event to exceed six months following the effective date of such registration) and subject to all reasonable restrictions as the Company or the underwriters may specify. The Participant will enter into any agreement reasonably required by the underwriters to implement the foregoing.

**9.**     **Miscellaneous.**

(a)     Transferability. The PSUs may not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered (a "Transfer") by the Participant other than by will or by the applicable laws of descent and distribution, pursuant to a qualified domestic relations order or as otherwise permitted under Section 15(b) of the Plan.  Any attempted Transfer of the PSUs contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the PSUs, shall be null and void and without effect.

(b)     Waiver. Any right of the Company contained in this Agreement may be waived in writing by the Committee. No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages. No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(c)     Section 409A.  The PSUs are intended to be exempt from, or compliant with, Section 409A of the Code. Notwithstanding the foregoing or any provision of the Plan or this

Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Committee may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and (ii) maintain, to the maximum extent practicable, the original intent and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 9(c) does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the PSUs will not be subject to interest and penalties under Section 409A.

(d)     General Assets.  All amounts credited in respect of the PSUs to the book-entry account under this Agreement shall continue for all purposes to be part of the general assets of the Company.  The Participant's interest in such account shall make the Participant only a general, unsecured creditor of the Company.

(e)     Notices. Any notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax, pdf/email or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, to the attention of the Corporate Secretary at the Company's principal executive office.

(f)     Severability.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)     No Rights to Employment. Nothing contained in this Agreement shall be construed as giving the Participant any right to be retained, in any position, as an employee, consultant or director of the Company or its Affiliates or shall interfere with or restrict in any way the rights of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate or discharge the Participant at any time for any reason whatsoever.

(h)     Fractional Shares. In lieu of issuing a fraction of a share of Common Stock resulting from adjustment of the PSUs pursuant to Section 12 of the Plan or otherwise, the Company shall be entitled to pay to the Participant an amount in cash equal to the Fair Market Value of such fractional share.

(i)     Beneficiary. The Participant may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation.

(j)     Successors. The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

(k)     Entire Agreement. This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations and negotiations in respect thereto. No change, modification or waiver of any provision of this Agreement shall be valid unless the same be in writing and signed by the parties hereto, except for any changes permitted without consent under Sections 12 or 14 of the Plan.

(l)     Governing Law and Venue. This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, U.S.A., without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware, U.S.A.

(i)     Dispute Resolution; Consent to Jurisdiction.  All disputes between or among any Persons arising out of or in any way connected with the Plan, this Agreement or the PSUs shall be solely and finally settled by the Committee, acting in good faith, the determination of which shall be final.   Any matters not covered by the preceding sentence shall be solely and finally settled in accordance with the Plan, and the Participant and the Company consent to the personal jurisdiction of the United States Federal and state courts sitting in Wilmington, Delaware as the exclusive jurisdiction with respect to matters arising out of or related to the enforcement of the Committee's determinations and resolution of matters, if any, related to the Plan or this Agreement not required to be resolved by the Committee.  Each such Person hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the last known address of such Person, such service to become effective ten (10) days after such mailing.

(ii)     Waiver of Jury Trial. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated (whether based on contract, tort or any other theory).  Each party hereto (A) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

(m)     Headings; Gender. The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement.  Masculine pronouns and other words of masculine gender shall refer to both men and women as appropriate.

(n)     Counterparts.  This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become

effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(o)      <u>Electronic Signature and Delivery</u>.  This Agreement may be accepted by return signature or by electronic confirmation.  By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by U.S. Securities and Exchange Commission rules (which consent may be revoked in writing by the Participant at any time upon three business days' notice to the Company, in which case subsequent prospectuses, annual reports and other information will be delivered in hard copy to the Participant).

(p)      <u>Electronic Participation in Plan</u>.  The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

IN WITNESS WHEREOF, this Agreement has been executed by the Company and the Participant as of the day first written above.

INTELSAT S.A.

By:   /s/ Michelle V. Bryan

Michelle V. Bryan
Executive Vice President, General Counsel and Chief Administrative Officer

Accepted on [Current Date]

[Participant Name]

**Exhibit N-2(iv)**

**Redline to LTIP Award Agreement filed on December 3, 2021**

**[NEW TOPCO]INTELSAT EMERGENCE S.A. (TO BE RENAMED INTELSAT S.A.)**
**2022 EQUITY INCENTIVE PLAN**

**LTIP AWARD AGREEMENT**

THIS LTIP AWARD AGREEMENT (the "Agreement") is entered into as of [Grant Date], by and between [New TopCo]Intelsat Emergence S.A. (to be renamed Intelsat S.A.), a *société anonyme* organized under the laws of Luxembourg (the "Company"), and [Participant Name] (the "Participant").

WHEREAS, the Company has adopted the [New TopCo]Intelsat Emergence S.A. (to be renamed Intelsat S.A.) 2022 Equity Incentive Plan (as amended, the "Plan"), pursuant to which Cash-Based Awards may be granted; and

WHEREAS, the Compensation Committee of the Board of Directors of the Company (the "Committee") has determined that it is in the best interests of the Company and its stockholders to grant the Cash-Based Award (the "LTIP Award") provided for herein to the Participant subject to the terms set forth herein.

NOW, THEREFORE, for and in consideration of the premises and the covenants of the parties contained in this Agreement, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.      **Grant of LTIP Award.**

(a)     Grant. The Company hereby grants to the Participant an LTIP Award in the total amount of [Awards Granted], on the terms and conditions set forth in this Agreement and as otherwise provided in the Plan.

(b)     Incorporation by Reference. The provisions of the Plan are incorporated herein by reference. Except as otherwise expressly set forth herein, this Agreement shall be construed in accordance with the provisions of the Plan and any interpretations, amendments, rules and regulations promulgated by the Committee from time to time pursuant to the Plan. Any capitalized terms not otherwise defined in this Agreement shall have the definitions set forth in the Plan. The Committee shall have final authority to interpret and construe the Plan and this Agreement and to make any and all determinations under them, and its decision shall be binding and conclusive upon the Participant and the Participant's legal representative in respect of any questions arising under the Plan or this Agreement.  The Participant acknowledges that the Participant has received a copy of the Plan and has had an opportunity to review the Plan and agrees to be bound by all the terms and provisions of the Plan.

2.      **Vesting; Payout.**   Except as may otherwise be provided herein, subject to the Participant's continued employment with the Company or an Affiliate, one-third of the LTIP Award (each, an "Installment") shall vest on each of the first three anniversaries of the Effective Date (each such date, a "Vesting Date"). Each vested Installment shall be paid within 30 days following the applicable Vesting Date in cash, without regard to whether the Participant remains employed with the Company or an Affiliate following such Vesting Date.

**3.    Termination of Employment.**

(a)    If, prior to the final Vesting Date and prior to a Change in Control, the Participant's employment with the Company and its Affiliates is terminated (i) by the Company or its Affiliate without Cause, (ii) due to the Participant's death or (iii) by the Company or its Affiliate due to the Participant's Disability (each, a "Qualifying Termination"), then the Participant will vest in a pro-rated portion of the Installment that was scheduled to vest immediately following the date of such Qualifying Termination (the "Pro-Rated Installment"), effective as of the effective date of such Qualifying Termination.  Such pro-ration will be determined by multiplying (A) the portion of the LTIP Award comprising the Installment by (B) a fraction, (x) the numerator of which is the total number of days that the Participant was employed by the Company or one of its Affiliates from the most recently elapsed Vesting Date or, if no Vesting Date has occurred, the Effective Date (with such number of days not to exceed 365) through the date of such Qualifying Termination, and (y) the denominator of which is 365. The Pro-Rated Installment shall be paid within 30 days following the date of the Qualifying Termination in cash.  The unvested portion of the LTIP Award shall automatically terminate on the date of such Qualifying Termination. For the avoidance of doubt, such additional vesting upon a Qualifying Termination is in addition to any vesting that occurred prior to the Qualifying Termination.

(b)    If the Participant's employment with the Company and its Affiliates terminates prior to the final Vesting Date for any reason other than as set forth in Section 3(a) or Section 4 hereof, the unvested portion of the LTIP Award shall be cancelled immediately, and the Participant shall not be entitled to receive any payments with respect thereto.

**4.    Change in Control.**  If, on or following a Change in Control, the Participant's employment with the Company and its Affiliates is terminated due to a Qualifying Termination, 100% of any unvested portion of the LTIP Award shall become immediately vested as of the effective date of such Qualifying Termination and be paid within 30 days following the date of termination in cash.

**5.    Tax Withholding.** Vesting and payout of the LTIP Award shall be subject to the Participant satisfying any applicable U.S. federal, state and local tax withholding obligations and non-U.S. tax withholding obligations.  The Company shall have the right and is hereby authorized to withhold from any amounts payable to the Participant in connection with the LTIP Award or otherwise the amount of any required withholding taxes in respect of the LTIP Award, any payment of the LTIP Award or under the Plan and to take any such other action as the Committee or the Company deem necessary to satisfy all obligations for the payment of such withholding taxes.

**6.    Clawback.**  Notwithstanding anything to the contrary contained herein, the Committee may cancel the LTIP Award if the Participant, without the consent of the Company, has engaged in or engages in activity that is in conflict with or adverse to the interest of the Company or any

Affiliate while employed by or providing services to the Company or any Affiliate, including fraud or conduct contributing to any financial restatements or irregularities, or violates a non-competition, non-solicitation, non-disparagement or non-disclosure covenant or agreement with the Company or any Affiliate, as determined by the Committee.  In such event, the Participant will forfeit any unpaid portion of the LTIP Award and must promptly repay any previously paid portions of the LTIP Award to the Company.  If the Participant receives any amount in excess of what the Participant should have received under the terms of the LTIP Award for any reason (including without limitation by reason of a financial restatement, mistake in calculations or other administrative error), all as determined by the Committee, then the Participant shall be required to promptly repay any such excess amount to the Company.

**7.      Miscellaneous.**

(a)      <u>Transferability</u>. The LTIP Award may not be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered (a "<u>Transfer</u>") by the Participant other than by will or by the laws of descent and distribution, pursuant to a qualified domestic relations order or as otherwise permitted under Section 15(b) of the Plan.  Any attempted Transfer of the LTIP Award contrary to the provisions hereof, and the levy of any execution, attachment or similar process upon the LTIP Award, shall be null and void and without effect.

(b)      <u>Waiver</u>. Any right of the Company contained in this Agreement may be waived in writing by the Committee. No waiver of any right hereunder by any party shall operate as a waiver of any other right, or as a waiver of the same right with respect to any subsequent occasion for its exercise, or as a waiver of any right to damages. No waiver by any party of any breach of this Agreement shall be held to constitute a waiver of any other breach or a waiver of the continuation of the same breach.

(c)      <u>Section 409A</u>.  The LTIP Award is intended to be exempt from, or compliant with, Section 409A of the Code. Notwithstanding the foregoing or any provision of the Plan or this Agreement, if any provision of the Plan or this Agreement contravenes Section 409A of the Code or could cause the Participant to incur any tax, interest or penalties under Section 409A of the Code, the Committee may, in its sole discretion and without the Participant's consent, modify such provision to (i) comply with, or avoid being subject to, Section 409A of the Code, or to avoid the incurrence of taxes, interest and penalties under Section 409A of the Code, and (ii) maintain, to the maximum extent practicable, the original intent and economic benefit to the Participant of the applicable provision without materially increasing the cost to the Company or contravening the provisions of Section 409A of the Code. This Section 7(c) does not create an obligation on the part of the Company to modify the Plan or this Agreement and does not guarantee that the LTIP Award will not be subject to interest and penalties under Section 409A.

(d)      <u>General Assets</u>.  All amounts due in respect of the LTIP Award shall continue for all purposes to be part of the general assets of the Company.  The Participant's interest in the LTIP Award shall make the Participant only a general, unsecured creditor of the Company.

(e)      <u>Notices</u>. Any notices provided for in this Agreement or the Plan shall be in writing and shall be deemed sufficiently given if either hand delivered or if sent by fax, pdf/email

or overnight courier, or by postage paid first class mail. Notices sent by mail shall be deemed received three business days after mailing but in no event later than the date of actual receipt. Notices shall be directed, if to the Participant, at the Participant's address indicated by the Company's records, or if to the Company, to the attention of the Corporate Secretary at the Company's principal executive office.

(f)      Severability.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement and each other provision of this Agreement shall be severable and enforceable to the extent permitted by law.

(g)      No Rights to Employment. Nothing contained in this Agreement shall be construed as giving the Participant any right to be retained, in any position, as an employee, consultant or director of the Company or its Affiliates or shall interfere with or restrict in any way the rights of the Company or its Affiliates, which are hereby expressly reserved, to remove, terminate or discharge the Participant at any time for any reason whatsoever.

(h)      Beneficiary. The Participant may file with the Committee a written designation of a beneficiary on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation.

(i)      Successors. The terms of this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns, and of the Participant and the beneficiaries, executors, administrators, heirs and successors of the Participant.

(j)      Entire Agreement. This Agreement and the Plan contain the entire agreement and understanding of the parties hereto with respect to the subject matter contained herein and supersede all prior communications, representations and negotiations in respect thereto. No change, modification or waiver of any provision of this Agreement shall be valid unless the same be in writing and signed by the parties hereto, except for any changes permitted without consent under Sections 12 or 14 of the Plan.

(k)      Governing Law and Venue. This Agreement shall be construed and interpreted in accordance with the laws of the State of Delaware, U.S.A., without regard to principles of conflicts of laws thereof, or principles of conflicts of laws of any other jurisdiction which could cause the application of the laws of any jurisdiction other than the State of Delaware, U.S.A.

(i)      Dispute Resolution; Consent to Jurisdiction.  All disputes between or among any Persons arising out of or in any way connected with the Plan, this Agreement or the LTIP Award shall be solely and finally settled by the Committee, acting in good faith, the determination of which shall be final.  Any matters not covered by the preceding sentence shall be solely and finally settled in accordance with the Plan, and the Participant and the Company consent to the personal jurisdiction of the United States Federal and state courts sitting in Wilmington, Delaware as the exclusive jurisdiction with respect to matters arising out of or related to the enforcement of the Committee's determinations and resolutions of matters, if any, related to the Plan or this Agreement not required to be resolved by the Committee.  Each such Person hereby irrevocably

consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the last known address of such Person, such service to become effective 10 days after such mailing.

(ii) <u>Waiver of Jury Trial</u>. Each party hereto hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated (whether based on contract, tort or any other theory). Each party hereto (A) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (B) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

(l) <u>Headings; Gender</u>. The headings of the Sections hereof are provided for convenience only and are not to serve as a basis for interpretation or construction, and shall not constitute a part, of this Agreement. Masculine pronouns and other words of masculine gender shall refer to both men and women as appropriate.

(m) <u>Counterparts.</u> This Agreement may be executed in one or more counterparts (including via facsimile and electronic image scan (pdf)), each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

(n) <u>Electronic Signature and Delivery</u>. This Agreement may be accepted by return signature or by electronic confirmation. By accepting this Agreement, the Participant consents to the electronic delivery of prospectuses, annual reports and other information required to be delivered by U.S. Securities and Exchange Commission rules (which consent may be revoked in writing by the Participant at any time upon three business days' notice to the Company, in which case subsequent prospectuses, annual reports and other information will be delivered in hard copy to the Participant).

(o) <u>Electronic Participation in Plan</u>. The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

IN WITNESS WHEREOF, this Agreement has been executed by the Company and the Participant as of the day first written above.

INTELSAT S.A.

By:   /s/ Michelle V. Bryan
 Michelle V. Bryan
 Executive Vice President, General
 Counsel and Chief Administrative Officer

Accepted on [Current Date]

[Participant Name]

## Exhibit O

**Reorganized ISA S.A. Articles of Association**

**[Reorganized ISA S.A.]**

*Société Anonyme*

**Article 1. Form, Name**

There exists among the shareholder(s) and all those who may become owners of the Shares hereafter a company in the form of a *société anonyme*, under the name of "**[Reorganized ISA S.A.]**" (the "**Company**").

**Article 2. Duration**

The Company is established for an undetermined duration. Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the Company may be dissolved at any time by a resolution of the Shareholders adopted in the manner required for the amendment of these Articles.

**Article 3. Registered office**

**3.1**     The Company has its registered office in the City of Luxembourg, Grand Duchy of Luxembourg.

**3.2**     Within the same municipality, the registered office may be transferred by means of a decision of the Board. It may be transferred to any other municipality in the Grand Duchy of Luxembourg by means of a decision of the Board (in which case the Board shall have the power to amend these Articles accordingly) or a resolution of the General Meeting adopted in the manner required for an amendment of these Articles.

**3.3**     The Company may have offices and branches, both in Luxembourg and abroad.

**3.4**     In the event that the Board determines that extraordinary political, economic or social developments have occurred or are imminent that would interfere with the normal activities of the Company at its registered office, or with the ease of communications between such office and Persons abroad, the registered office may be temporarily transferred abroad until the complete cessation of these abnormal circumstances; such temporary measures shall have no effect on the nationality of the Company which, notwithstanding the temporary transfer of its registered office, will remain a Luxembourg company.

**Article 4. Purpose, Object**

**4.1**     The object of the Company is the holding of participations, in any form whatsoever, in Luxembourg and foreign companies, or other entities or enterprises, the acquisition by purchase, subscription, or in any other manner as well as the transfer by sale, exchange or otherwise of stock, bonds, debentures, notes and other securities or rights of any kind including interests in partnerships, and the holding, acquisition, disposal, investment in any manner (in), development, licensing or sub licensing of,

any patents or other intellectual property rights of any nature or origin as well as the ownership, administration, development and management of its portfolio. The Company may carry out its business through branches in Luxembourg or abroad.

**4.2**     The Company may further conduct or be involved in any way in, directly or indirectly, any satellite telecommunications or other telecommunications or communications related business in the broadest sense, including without limitation the owning and/or operation of satellites, teleports, any ground assets, and any related or connected activity.

**4.3**     The Company may borrow in any form and proceed to the private or public issue of shares, bonds, convertible bonds and debentures or any other securities or instruments it deems fit.

**4.4**     In a general fashion the Company may grant assistance (by way of loans, advances, guarantees or securities or otherwise) to companies or other enterprises or Persons in which the Company has an interest or which form part of the group of companies to which the Company belongs or any entity or Person as the Company may deem fit (including up-stream or cross-stream), take any controlling, management, administrative and/or supervisory measures and carry out any operation which it may deem useful in the accomplishment and development of its purposes.

**4.5**     Finally, the Company may perform all commercial, technical and financial or other operations, connected directly or indirectly in all areas in order to facilitate the accomplishment of its purpose.

**Article 5. Share capital**

**5.1**     Issued Share Capital

The Company has an issued share capital of [ ] [US Dollars] ([USD] [ ]) represented by a total of 402,500,001 (four hundred two million five hundred thousand one) fully paid common shares [each with a nominal value of [ ] ([USD] [ ])/without nominal value] (the "**Common Shares**") with such rights and obligations as set forth in the present Articles.

**5.2**     Authorised Share Capital

5.2.1     The authorised share capital of the Company (including the issued share capital) is set at [●][1] US Dollars (USD [●]) to be represented by [●] ([●]) Shares, each with a nominal value of [one US Dollar cent] (USD [0.01]).

---

[1] NTD :  Under Review

5.2.2    The authorised unissued share capital (and any authorisation granted to the Board in relation thereto) shall be valid for a period ending on the date which falls [five (5)] years after the extraordinary general meeting of shareholders of the Company held on **[***]**.

5.2.3    **[**Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the Board, or any delegate(s) duly appointed by the Board, may from time to time, during the period referred to in Article **[**5.2.2**]**, issue, in one or several times, Shares (or any rights, securities or other entitlement to Shares (including but not limited to convertible bonds or notes, warrants (including the Warrants) and options)) as it determines within the limits of the authorised unissued share capital.  Such issuance shall be final and valid on the date of issue (or any successive issue) of such Shares.  Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the terms and conditions of the subscription for the issued Shares (including the issue price and issuance against contributions in cash, contributions in kind or by way of incorporation of available reserves and as dividends or other distributions whether in lieu of cash dividend or other distribution payments or otherwise), and to which Person(s) (including employees or officers) such Shares are issued shall be determined by the Board in its discretion, without reserving for any statutory preferential or pre-emptive subscription rights to existing Shareholders (including in case of issue of shares by way of incorporation of reserves). The Board is authorised during the period referred to in Article **[5.2.2]** to suppress or limit any statutory preferential or pre-emptive subscription rights of existing Shareholders to the extent the Board deems such suppression or limitation advisable for any issue or issues of Shares (or any rights, securities or other entitlement to Shares) within the authorised unissued share capital and subject in all cases to and in observance of any and all undertakings agreed upon in the Shareholders Agreement.

The Board may allocate within the limits of the authorised unissued share capital, existing Shares or new Shares, including free of charge, to directors, officers and staff members of the Company, to the extent that such allocation is pursuant to a management incentive plan approved by the Board in accordance with the Shareholders Agreement[2]. The authorisation granted in this clause shall by operation of law, operates as a waiver by existing Shareholders of their preferential subscription right for the benefit of the recipients of such Shares allotted free of charge. The Board may determine the terms and conditions of such allocation, which may comprise a period after which the allocation is final and a minimum holding period during which the recipients must retain the Shares.**]**[3]

---

[2] NTD :  Under Review
[3] NTD :  Under Review

5.2.4      Upon an issue of Shares within the authorised unissued share capital pursuant to this Article 5.2 [and the applicable Shareholders Agreement], the Board or any delegate(s) duly appointed by the Board shall cause Article [5.1] to be amended accordingly.

**5.3**        The issued and/or authorised unissued share capital of the Company may be increased, reduced, amended or extended one or several times by a resolution of the General Meeting of Shareholders adopted in compliance with the quorum and majority rules applicable to the amendment of these Articles and subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement.

**5.4**        The Company may not issue fractional Shares and no fractions of Shares shall exist at any time. The Board shall be authorised at its discretion to provide for the payment of cash or the issuance of scrip in lieu of any fraction of a Share.

**5.5**        Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the Company may proceed to the repurchase of its own Shares and may hold Shares in treasury, each time subject to the conditions and within the limits laid down by law and it may proceed to the cancellation of all or part of the Shares held in treasury and the Board is authorised to record such cancellation and if it deems fit the corresponding reduction of share capital in the Articles.

**5.6**        Any share premium paid on the issue of Shares and/or contribution made to an account 115 (*apport en capitaux propres non rémunérés par des titres* of the Luxembourg chart of accounts) shall be freely distributable in accordance with the provisions of these Articles.

**5.7**        Each Holder that is a party to the Shareholders Agreement shall have the preemptive rights set out in the Shareholders Agreement in case of any issuance of Shares and/or other equity and debt securities.

**Article 6. Shares**

**6.1**        Shares

6.1.1        Shares of the Company are in registered form.

6.1.2        As regards Shares in registered form:[4]

(i)        A register of Shares will be kept at the registered office of the Company. Ownership of registered Shares will be established by inscription in the said register [or in the event separate registrars have been appointed pursuant to Article [6.1.3], such separate register]. Without prejudice to the conditions for transfer by book entry in the case provided for in Article [6.1.6] or as the case may be

---

[4] NTD : Under Review

applicable law, and subject to the provisions of **[**Article 9**]** and the applicable Shareholders Agreement, a transfer of registered Shares shall be carried out by means of a declaration of transfer entered in the relevant register, dated and signed by the transferor and the transferee or by their duly authorised representatives. The Company may accept and enter in the relevant register a transfer on the basis of correspondence or other documents recording the agreement between the transferor and the transferee.

(ii)        **[**The Company may appoint registrars in different jurisdictions who will each maintain a separate register for the registered Shares entered therein and the holders of Shares may elect to be entered in one of the registers and to be transferred from time to time from one register to another register. The Board may however impose transfer restrictions for Shares that are registered, listed, quoted, dealt in, or have been placed in certain jurisdictions in compliance with the requirements applicable therein. The transfer to the register kept at the Company's registered office may always be requested.**]**

(iii)        Subject to the provisions of Article **[6.1.6]** and Article **[9]**, the Company may consider the Person in whose name the registered Shares are registered in the register of Shareholders as the full owner of such registered Shares. The Company shall be completely free from any responsibility in dealing with such registered Shares towards third parties and shall be justified in considering any right, interest or claims of such third parties in or upon such registered shares to be non-existent, subject, however, to any right which such third party might have to demand the registration or change in registration of registered Shares. In the event that a holder of registered Shares does not provide an address to which all notices or announcements from the Company may be sent, the Company may permit a notice to this effect to be entered into the register(s) of Shareholders and such holder's address will be deemed to be at the registered office of the Company or such other address as may be so entered by the Company from time to time, until a different address shall be provided to the Company by such holder. The holder may, at any time, change his address as entered in the register(s) of Shareholders by means of written notification to the Company or the relevant registrar.

(iv)        All communications and notices to be given to a registered Shareholder shall be deemed validly made to the latest postal address or, if applicable, e-mail address communicated by the Shareholder to the Company.

(v)        Where Shares are recorded in the register(s) of Shareholders on behalf of one or more Persons in the name of a securities settlement system or the operator of such a system or in the name of a professional securities depositary or any other depositary (such systems, professionals or other depositaries being referred to hereinafter as "**Depositaries**") or of a sub-depositary designated by one or

more Depositaries, the Company - subject to having received from the Depositary with whom those Shares are kept in account a certificate, proxy or confirmation in proper form obtained from the bank, broker or other nominee established as the holder of record with the Depositary - will permit those Persons to exercise the rights attached to those Shares, including admission to and voting at General Meetings (to the extent the relevant Shares carry voting rights). The Board may determine the formal requirements with which such certificates or proxies must comply and the exercise of the rights in respect of such Shares may in addition be subject to the internal rules and procedures of the securities settlement system. Notwithstanding the foregoing, the Company may make dividend payments and any other payments in cash, Shares or other securities only to the Depositary or sub-depositary recorded in the register(s) or in accordance with its instructions, and such payment will effect full discharge of the Company's obligations.

6.1.3    The Shares are indivisible vis-à-vis the Company which will recognise only one holder per Share. In case a Share is held by more than one Person, the Persons claiming ownership of the Share will be required to name a single proxy to represent the Share vis-à-vis the Company. The Company has the right to suspend the exercise of all rights attached to such Share until one Person has been so appointed. The same rule shall apply in the case of a conflict between an usufructuary and a bare owner or between a pledgor and a pledgee.

**Article 7. Transfer of Shares**

Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, a Transfer of registered Shares shall be carried out by means of a declaration of transfer entered in the relevant register, dated and signed by the transferor and the transferee or by their duly authorised representatives or in accordance with the procedures of the Depository. The Company may accept and enter in the relevant register a Transfer on the basis of correspondence or other documents recording the agreement between the transferor and the transferee satisfactory to the Company.

**Article 8. Voting of Shares**

Each Share shall carry one vote unless otherwise provided for by these Articles or by law. The issuance of nonvoting shares is prohibited solely to the extent required by section 1123(a)(6) of chapter 11 of title 11 of the United States Code.

**Article 9. Drag-along rights**

**9.1**    If at any time a Holder or group of Holders who hold in the aggregate more than 66.7% of the then-outstanding Shares (a "**Dragging Shareholder**") proposes to Transfer 100% of the then outstanding Shares (other than to an Affiliate/Related Fund or in connection with an initial public offering

of the Company), or to otherwise effect a sale of the Company, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets, or otherwise, in each case to an unaffiliated bona fide third party purchaser (a "**Drag-along Sale**"), the Dragging Shareholder shall have the right to require that each other Holder (each, a "**Drag-along Shareholder**") participate in such transaction in the manner set forth in this Article 9 (except that, at the election of the Dragging Shareholder, a Drag-along Shareholder may be required to, if such Drag-along Shareholder is an employee of the Company or any of its Subsidiaries, rollover its Company Common Stock or other equity securities in customary amounts) if, and only if, (x) Major Consent Approval has been obtained and (y) 100% of the consideration for the Drag-Along Sale is paid in cash and/or publicly traded securities in the manner set forth in this Article 9. Notwithstanding anything to the contrary in these Articles, each Drag-along Shareholder shall (A) consent to, vote in favor of, raise no objection to and waive and refrain from exercising any appraisal or dissenter's rights claim or any claim of fiduciary breach (but not any claim that such Drag-along Sale is not being effected in accordance with the terms set forth in this Agreement) and (B) obtain any required consents and take any and all reasonably necessary action in furtherance of the Drag-along Sale as requested by and at the Company's expense.

**9.2**     The Dragging Shareholder shall exercise its rights pursuant to this Article 9 by delivering a written notice (the "Drag-along Notice") to the Company no later than 20 days prior to the closing date of such Drag-along Sale. The Company will promptly deliver a copy of the Drag-along Notice to each Drag-along Shareholder. The Drag-along Notice shall make reference to the Dragging Shareholder's rights and obligations hereunder and shall describe in reasonable detail: (A) the number of Shares to be sold by the Dragging Shareholder, if the Drag-along Sale is structured as a Transfer of Shares; (B) the identity of the third party purchaser; (C) the proposed date, time and location of the closing of the Drag-along Sale; (D) the per share purchase price and the other material terms and conditions of the Transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

**9.3**     The consideration to be received by a Drag-along Shareholder shall be the same form and amount of consideration per Share to be received by the Dragging Shareholder (or, if the Dragging Shareholder is given an option as to the form and amount of consideration to be received, the same option shall be given) and the terms and conditions of such Transfer shall, except as otherwise provided in the immediately succeeding sentence, be the same as those upon which the Dragging Shareholder Transfers its Shares. Any (A) representations and warranties to be made or provided by a Drag-along Shareholder in connection with such Drag-along Sale shall be limited to representations and warranties related to such

Drag-along Shareholder's authority, ownership and the ability to convey title to its Shares, and with respect thereto, shall be the same representations and warranties that the Dragging Shareholder makes or provides with respect to its Shares, (B) Drag-along Shareholder will not be required to agree to any non-competition or similar restrictions in connection with such Drag-along Sale, and (C) covenants, indemnities and agreements made by the Drag-along Shareholders shall be the same covenants, indemnities and agreements as the Dragging Shareholder makes or provides in connection with the Drag-along Sale, except that with respect to covenants, indemnities and agreements pertaining specifically to the Dragging Shareholder, the Drag-along Shareholder shall make the comparable covenants, indemnities and agreements pertaining specifically to itself; provided, that any indemnification obligation relating to the Company shall be (i) several and not joint and (ii) pro rata based on the consideration received by the Dragging Shareholder and each Drag-along Shareholder; provided, further, that in no event shall any indemnification obligation of a Drag-along Shareholder exceed the aggregate proceeds received by such Drag-along Shareholder in connection with the Drag-along Sale.

**9.4**    The fees and expenses of the Dragging Shareholder incurred in connection with a Drag-along Sale and for the benefit of all Holders as determined in good faith by the Board, excluding any Director appointed or nominated by any Dragging Shareholder or its Affiliates (it being understood that costs incurred by or on behalf of a Dragging Shareholder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Company or the third party purchaser, shall be shared by all the Holders on a pro rata basis, based on the aggregate consideration received by each Holder; provided, that no Holder shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Drag-along Sale.

**9.5**    Each Holder and the Company shall take all actions as may be reasonably necessary to consummate the Drag-along Sale, including entering into agreements, signing or making available the register of Shares and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Dragging Shareholder, subject to the terms and provisions of this Article 9.

**9.6**    The Dragging Shareholder shall have 120 days following the date of the Drag-along Notice in which to consummate the Drag-along Sale, on the terms set forth in the Drag-along Notice (which such 120 day period may be extended for a reasonable time not to exceed 180 days to the extent reasonably necessary to obtain any government approvals). If at the end of such period, the Dragging Shareholder has not completed the Drag-along Sale, the Dragging Shareholder may not then effect a transaction subject to this Article 9 without again fully complying with the provisions of this Article 9.

**Article 10. Management of the Company – Board**

**10.1** The Company shall be managed by a Board which is vested with the broadest powers to manage the business of the Company and to authorise and/or perform all acts of disposal, management and administration falling within the purposes of the Company. Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, in the event the Company has only one Shareholder, the Company may, at the option of the sole Shareholder, be managed by one Director as provided for by law and all provisions in the present Articles referring to the Board shall be deemed to refer to the sole Director who shall have all such powers as provided for by law and as set forth in the present Articles with respect to the Board.

**10.2** Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, all powers not expressly reserved by the law or by the Articles to the General Meeting shall be within the competence of the Board.

**10.3** Except as otherwise provided herein, by law or in the applicable Shareholders Agreement, the Board of the Company is authorised to take such action (by resolution or otherwise) and to adopt such provisions as shall be necessary, appropriate, convenient or deemed fit to implement the purpose of the Company.

**10.4** Any duties that are owed by a board of directors of an S.A. to an S.A. under Luxembourg law shall be owed by the Board to the Company; provided that this shall not grant any rights to the Company or any other Person that would not be afforded under Luxembourg law (including, without limitation, with respect to rights that are afforded under Luxembourg law only to holders of 10% or more of the Shares).

**Article 11. Composition of the Board**

**11.1** Except in case of a sole shareholder where the Company may be managed by a sole Director as set forth in Article **[**10.1**]**, the Company shall be managed by a Board composed of a minimum of (A) three Class A Directors and (B) two Class B Directors (other than any vacancy resulting from the death, retirement, resignation, dismissal, removal or otherwise of any Director in accordance with Section 2(c) or Section 2(g) of the Shareholders Agreement until such vacancy is filled in accordance with Section 2(a)(iii), Section 2(a)(iv) or Section 2(h) of the Shareholders Agreement, as applicable). Directors may be but do not need to be Shareholders of the Company.

**11.2** Appointment of Directors

Reorganized ISA S.A. – Articles of Association

11.2.1    The Directors are appointed by the General Meeting of Shareholders in accordance with the provisions of the Articles and the Shareholders Agreement so that the following individuals are elected and shall and continue to serve as the Class A Directors of the Board:

(i)    one individual proposed by the Cyrus Holder (or any Major Transferee to which such right is assigned by the Cyrus Holder pursuant to the Shareholders Agreement, so long as such Person (together with any Affiliates and Related Funds that hold Company Common Stock) holds the Minimum Threshold;

(ii)    one individual proposed by the Appaloosa Holder (or any Major Transferee to which such right is assigned by the Appaloosa Holder pursuant to the Shareholders Agreement, so long as such Person (together with any Related Funds that hold Company Common Stock) holds the Minimum Threshold;

(iii)    one individual proposed by the Designation Committee, so long as the Designation Committee Members in the aggregate (together with any Affiliates and Related Funds that hold Company Common Stock) hold the Minimum Threshold; provided, that such individual shall not be employed by or Affiliated with the Cyrus Holder;

(iv)    the Class B Directors shall consist of two individuals, each of whom (A) resides full time in Luxembourg, (B) is proposed by a majority vote of the Class A Directors, (C) is unaffiliated with any then-existing Holder holding more than 5% of the then-outstanding shares of Company Common Stock and (D) is approved by the affirmative vote of Holders holding more than 50% of the then-outstanding Company Common Stock; and

(v)    at each annual meeting of the shareholders of the Company at which a Nominating Shareholder is entitled to propose a Representative Director under Section 2(a)(iii) of the Shareholders Agreement, the Person(s) so proposed shall be elected or reelected, as applicable, at such meeting.

11.2.2    If a Nominating Shareholder ceases to hold at least the Minimum Threshold at any time following the Effective Date, (i) such Nominating Shareholder's Representative Director shall resign immediately from the Board and the resulting vacancy shall be filled in accordance with Section 2(h) of the Shareholders Agreement and (ii) thereafter such Nominating Shareholder shall no longer have the right to propose a Director for election under Section 2(a)(iii) of the Shareholders Agreement or to transfer such right of proposal to any Major Transferee. Notwithstanding any other provision herein, no Nominating Shareholder (including its Affiliates) shall at any time be entitled to propose more than one Director for election to the Board at any time under Section 2(a)(iii) of the Shareholders Agreement,

notwithstanding the amount of shares of Company Common Stock held by such Holder and its Affiliates; *provided*, *however*, that this sentence shall not restrict or limit in any respect the Cyrus Holder's right, as a member of the Designation Committee, to participate in the Designation Committee's selection and proposal of individuals for election to the Board from time to time pursuant to Section 2(a)(iii)(C) of the Shareholders Agreement.

11.2.3    A Nominating Shareholder (other than the Designation Committee), in such Nominating Shareholder's sole discretion, shall have the right to assign its rights under Section 2 of the Shareholders Agreement to a Major Transferee. In order to exercise such right, a Nominating Shareholder must (i) transfer to such Major Transferee at least the applicable amount of Company Common Stock to exercise such right (i.e., in the aggregate, the Minimum Threshold) and (ii) if the transfer provided for in subclause (i) of this Article 11.2.3 would not put such Nominating Shareholder below the Minimum Threshold, irrevocably assign the right to propose the Director(s) being assigned to the relevant Major Transferee (a "**Designation Right Assignment**"). If a Nominating Shareholder shall exercise such right, the Nominating Shareholder must deliver written notice thereof to the Company at or prior to effecting such transfer and the Company shall, within two (2) Business Days of receiving such notice, deliver written notice thereof to all of the other Nominating Shareholders.

11.2.4    The Company shall provide notice to each Nominating Shareholder at least **[**30**]** days prior to each annual meeting of the shareholders of the Company. Unless a Nominating Shareholder provides written notice to the Company no later than 20 days prior to such annual meeting (i) that a then-current Representative Director will not be proposed for reelection to the Board at such annual meeting of the shareholders of the Company (or such casting of votes in writing in lieu of such annual meeting) and (ii) identifies the individual such Nominating Shareholder proposes for election in place of such then-current Representative Director, such then-current Representative Director shall be automatically nominated for reelection to the Board at such annual meeting unless at the time of such meeting such Nominating Shareholder no longer has the right to nominate such Representative Director.

11.2.5    For purposes of determining satisfaction of any Holder thresholds in these Articles, the Company Common Stock held by any Holder shall be (i) calculated without giving effect to any management incentive dilution from any equity plan, incentive plan or similar arrangement of the Company (whether as a result of actually issued and outstanding shares of Company Common Stock or contingent instruments (e.g., options)) or dilution from other future-issued securities, including under the Warrants; and (ii) aggregated with shares of Company Common Stock held by its Affiliates and Related Funds.  Further, in connection with any Non-Conforming Issuance by the Company, any determination

made on or before the earlier of (x) the consummation of the issuance of New Securities to all subscribing Preemptive Rightholders pursuant to Section 7(b)(ii) and (y) of the Shareholders Agreement the expiration of the applicable offer period specified in Section 7(c)(ii) of the Shareholders Agreement shall exclude any shares of equity securities issued in connection with such Non-Conforming Issuance (the "**Dilution Principles**").

**11.3**     The Directors are appointed for a period not exceeding **[**six (6)**]** years and until their successors are elected. The Directors shall be eligible for re-election indefinitely.

**11.4**     A Director may be removed, with or without cause, at any time by the affirmative vote of one or more Shareholders holding more than 50% of the then-outstanding Company Common Stock; provided, that a Representative Director may only be removed upon the written request of his or her Nominating Shareholder (which request may be given with or without cause at any time). In such event, such Nominating Shareholder will request a resignation from its Representative Director. Each Shareholder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company or a Nominating Shareholder may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings) to the extent necessary in order to give effect to such Nominating Shareholder's removal of its Representative Director.

**11.5**     Subject to the provisions of article 441-2 of the Luxembourg Law, any vacancy on the Board resulting from the death, resignation, removal or otherwise of a Director shall be filled by a majority vote of the then-existing Board; provided, that the Board shall vote to fill any vacancy of a Representative Director, other than any vacancy resulting from the failure of a Nominating Shareholder (or Major Transferee) to meet the applicable Minimum Threshold as described in Section 2(c) of the Shareholders Agreement, with the replacement individual identified to the Board by the relevant Nominating Shareholder; provided, further, that the Board shall vote to fill any vacancy resulting from the failure of a Nominating Shareholder (or a Major Transferee) to meet the applicable Minimum Threshold as described in Section 2(c) with an individual who is unaffiliated with any then-existing Holder holding more than 5% of the then-outstanding shares of Company Common Stock.

**11.6**     One or more observers may be appointed in accordance with and pursuant to the provisions of the Shareholders Agreement. The rights and obligations of the observer(s) so appointed shall be set out in the Shareholders Agreement.

**11.7**     Subject to applicable law, each Director shall be entitled to reimbursement of reasonable, out of pocket expenses incurred in connection with its service as a Director.

### Article 12. Chairperson

**12.1**     The Board shall, to the extent required by law and otherwise may, appoint a chairperson of the Board in accordance with the provisions of the Shareholders Agreement. The chairperson shall preside over all meetings of the Board and of Shareholders. In the absence of the chairperson, another Director designated by the chairperson or, if none was designated by the chairperson, by the Board (or as applicable, the General Meeting) shall chair the relevant meeting.

**12.2**     In case of a tie, neither the chairperson nor any other Board member shall have a casting (tie breaking) vote.

### Article 13. Board Proceedings

**13.1**     The Board shall meet upon call by (or on behalf of) (i) any Director or (ii) the then-serving Chief Executive Officer of the Company, if any. The Board shall meet as often as required by the interests of the Company.

**13.2**     Notice of any meeting of the Board must be given by letter, telephone, facsimile transmission or e-mail to each Director at least (i) in the case of a physical meeting to be held in Luxembourg, at least **[**ten (10)**]** Business Days before the meeting, and (ii) in the case of any other meeting of the Board, at least **[**three (3)**]** Business Days before the meeting, except in the case of this clause (ii) in the case of an emergency, in which event twenty-four (24) hours' notice shall be sufficient. No convening notice shall be required for meetings held pursuant to a schedule previously approved by the Board and communicated to all Board members. A meeting of the Board may also be validly held without convening notice to the extent the Directors present or represented do not object and those Directors not present or represented (other than conflicted Directors) have waived the convening notice in writing, by fax, email or otherwise.

**13.3**     Any Director may act at any meeting of the Board by appointing in writing by letter or by cable, telegram, facsimile transmission or e-mail another Director as his proxy. A Director may represent more than one of the other Directors.

**13.4**     The quorum for the transaction of business of the Board at meetings of the Board shall require the attendance of (i) at least a majority of the Class A Directors then in office, which majority shall include the Representative Director of each of the Appaloosa Holder and the Cyrus Holder (if any), and (ii) at least one Class B Director; provided, that if a quorum is initially not met for two consecutive meetings due to the lack of attendance by the Representative Directors of the Appaloosa Holder and/or the Cyrus

Holder, a quorum at any subsequent meeting on the same or related subject shall only require (A) a majority of the Class A Directors then in office, and (B) at least one Class B Director. In the absence of a quorum at any such meeting, a majority of the Directors present and entitled to vote at such meeting may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present.

**13.5** Majorities

13.5.1    Each Director will have one vote with respect to each matter to be decided upon by the Board. Other than the Major Consent Matters, all matters of the Board shall be decided by the affirmative vote or written consent of at least (i) a majority of the Class A Directors and (ii) one Class B Director, in each case that is present or represented and voting at a properly called Board meeting that satisfies the quorum requirements set forth in the Shareholders Agreement and the provisions of these Articles; provided, that any action by written consent of the Board shall require the unanimous affirmative vote of all Directors then in office who are entitled to vote on such action.

13.5.2    Major Consent Matters put to the vote in a quorate meeting of the Board shall be passed only if approved by at least (i)(A) 66.7 % (i.e., 2 out of 3) of the Class A Directors then in office and entitled to vote on such matter, (B) at least one Class B Director, if any, and (C) Holders holding 75% of the then-outstanding shares of Company Common Stock or (ii) (A) 85% (i.e., 3 out of 3) of the Class A Directors then in office and entitled to vote on such matter and (B) at least one Class B Director, if any.

**13.6** Meetings of the Board may be held physically or, in all circumstances, by way of telephone conference call, video conference or similar means of communication which permit the participants to communicate with each other. A Director attending in such manner shall be deemed present at the meeting for as long as he is connected.

**13.7** The Board may also in all circumstances with unanimous consent of those Directors entitled to vote pass resolutions by circular means and written resolutions signed by all members of the Board entitled to vote will be as valid and effective as if passed at a meeting duly convened and held. Such signatures may appear on a single document or multiple copies of an identical resolution and may be evidenced by letters, cables, facsimile transmission or e-mail.

**13.8** The minutes of any meeting of the Board (or copies or extracts of such minutes which may be produced in judicial proceedings or otherwise) shall be signed by the chairperson of the Board, the chairperson (*ad hoc*) of the relevant meeting or by any two (2) Directors or as resolved at the relevant Board meeting or any subsequent Board meeting. Minutes or resolutions of the Board (or copies or extracts thereof) may further be certified by the secretary of the Board.

**Article 14. Delegation of power, committees, secretary**

**14.1** The Board may delegate the daily management of the business of the Company, as well as the power to represent the Company in its day-to-day business, to individual Directors or other officers or agents of the Company (with power to sub-delegate). In addition the Board may delegate the daily management of the business of the Company, as well as the power to represent the Company in its day-to-day business to an executive or other committee as it deems fit. The Board shall determine the conditions of appointment and dismissal as well as the remuneration and powers of any such Person or Persons so appointed.

**14.2** The Board may (but shall not be obliged to unless required by law) establish one or more committees (including an audit committee and a compensation committee) and for which it shall, if one or more of such committees are set up, appoint the members (who must be members of the Board), determine the purpose, powers and authorities as well as the procedures and such other rules as may be applicable thereto. The Board shall be in charge of the supervision of the activities of the committee(s).

**14.3** The Board may appoint a secretary of the Company who may be but does not need to be a member of the Board and determine his/her responsibilities, powers and authorities.

**Article 15. Binding Signature**

The Company will be bound by the joint signatures of any two Class A Directors and any one Class B Director or by the sole or joint signatures of any Person or Persons to whom such signatory power shall have been delegated by the Board. For the avoidance of doubt, for acts regarding the daily management of the Company, the Company will be bound by the sole signature of its Chief Executive Officer or any Person or Persons to whom such signatory power is delegated by the Board (with or without power of substitution).

**Article 16. [Liability of the Directors**

**16.1** The Directors are not held personally liable for the indebtedness or other obligations of the Company. As agents of the Company, they are responsible for the performance of their duties.

**16.2** Subject to the exceptions and limitations listed below, every Person who is, or has been, a director or officer of the Company or a direct or indirect Subsidiary of the Company shall be indemnified by the Company to the fullest extent permitted by law against liability and against all expenses reasonably incurred or paid by him in connection with any claim, action, suit or proceeding which he or she becomes involved as a party or otherwise by virtue of his or her being or having been such Director or officer and against amounts paid or incurred by him or her in the settlement thereof. The words "claim", "action", "suit" or "proceeding" shall apply to all claims, actions, suits or proceedings (civil, criminal or otherwise

including appeals) actual or threatened and the words "liability" and "expenses" shall include without limitation attorneys' fees, costs, judgments, amounts paid in settlement and other liabilities.

**16.3**    No indemnification shall be provided to any director or officer of the Company or a direct or indirect Subsidiary of the Company:

16.3.1    Against any liability to the Company or its Shareholders by reason of wilful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his or her office;

16.3.2    With respect to any matter as to which he/she shall have been finally adjudicated to have acted in bad faith and not in the interest of the Company (or as the case may be the relevant subsidiary); or

16.3.3    In the event of a settlement, unless the settlement has been approved by a court of competent jurisdiction or by the Board.

**16.4**    The Company shall, to the fullest extent permitted by law, purchase and maintain insurance on customary terms for the industry and size of the Company to protect any director, officer of Board observer of the Company or a direct or indirect Subsidiary of the Company to the maximum extent of the coverage available under such policy or policies against any expense, liability or loss, whether the Company would have the power to indemnify such person against such expense, liability or loss under these Articles or otherwise. The Company may also make other arrangements, including, but not limited to, providing a trust fund, letter of credit, or surety bond on behalf of a director or officer of the Company or a direct or indirect Subsidiary of the Company against any liability asserted against him/her or incurred by or on behalf of him/her in his/her capacity as a director or officer of the Company **[**or a direct or indirect Subsidiary of the Company**]**.

**16.5**    The right of indemnification herein provided shall be severable, shall not affect any other rights to which any director or officer of the Company or a direct or indirect Subsidiary of the Company may now or hereafter be entitled, shall continue as to a Person who has ceased to be such director or officer and shall inure to the benefit of the heirs, executors and administrators of such a Person. The right to indemnification provided herein is not exclusive and nothing contained herein shall affect any rights to indemnification to which corporate personnel, including directors and officers, may be entitled by contract or otherwise under law.

**16.6**    Expenses in connection with the preparation and representation of a defence of any claim, action, suit or proceeding of the character described in this Article shall be advanced by the Company prior to final disposition thereof upon receipt of an undertaking by or on behalf of the officer or director, to repay such amount if it is ultimately determined that he/she is not entitled to indemnification

under this Article.**]**

**Article 17. Conflicts of Interest**

**17.1**      No contract or other transaction between the Company and any other company or firm shall be affected or invalidated solely by the fact that any one or more of the Directors or officers of the Company is financially interested in, or is a director, associate, officer, agent, adviser or employee of such other company or firm. Subject to Article 17.2 and the applicable Shareholders Agreement, any Director or officer who serves as a director, officer or employee or otherwise of any company or firm with which the Company shall contract or otherwise engage in business shall not, by reason of such affiliation with such other company or firm only, be prevented from considering and voting or acting upon any matters with respect to such contract or other business.

**17.2**      In the case of a conflict of interest of a Director, within the meaning of article 441-7 of the Companies Law, such Director shall indicate such conflict of interest to the Board and shall not deliberate or vote on the relevant matter. Any conflict of interest arising at Board level shall be reported to the next General Meeting of Shareholders before any resolution is put to vote.

**17.3**      The day-to-day Director(s) or person(s) in charge of the day-to-day business of the Company, if any, are *mutatis mutandis* subject to this Article 17 of these Articles, provided that if only one (1) day-to-day director has been appointed and is in a situation of conflicting interests, the relevant decision shall be adopted by the Board.

**Article 18. Meetings of the Shareholders of the Company**

**18.1**      In the case of a plurality of Shareholders, any regularly constituted General Meeting shall represent the entire body of Shareholders. It shall have the broadest powers to order, carry out or ratify acts relating to all the operations of the Company.

**18.2**      In the case of a sole shareholder, the Sole Shareholder assumes all powers conferred to the General Meeting. In these Articles, as long as the Company has only one shareholder, any reference to decisions taken, or powers exercised, by the General Meeting shall be deemed to be a reference to decisions taken, or powers exercised, by the Sole Shareholder. The decisions taken by the Sole Shareholder are documented by way of minutes.

**18.3**      The annual General Meeting shall be held, in accordance with Luxembourg law, in Luxembourg at the address of the registered office of the Company or at such other place in Luxembourg as may be specified in the convening notice of the meeting within six (6) months of the end of the previous financial year.

**18.4**      The annual General Meeting may be held abroad if, in the absolute and final judgment of

the Board, exceptional circumstances so require.

**18.5**      Other General Meetings may be held at such place and time as may be specified in the respective convening notices of the meeting. Shareholders taking part in a meeting by conference call, through video conference or by any other means of communication allowing for their identification, allowing all Persons taking part in the meeting to hear one another on a continuous basis and allowing for an effective participation of all such Persons in the meeting, are deemed to be present for the computation of the quorums and votes, subject to such means of communication being made available at the place of the meeting.

**18.6**      General Meetings shall be convened in accordance with the provisions of law. If all of the Shareholders are present or represented at a general meeting of Shareholders, the General Meeting may be held without prior notice or publication.

**18.7**      Proposals from Shareholders for any General Meeting as to in particular without limitation regarding agenda items, resolutions or any other business, may only be made in compliance with the Company Law and these Articles and will only be accepted by the Company if required by the Company Law and these Articles.

**18.8**      Any Shareholder may be represented at a General Meeting by appointing as his or her proxy another Person, who need not be a Shareholder.

**18.9**      The Board may suspend the voting rights of Shareholders who are in material default of their obligations under the Articles or the applicable Shareholders Agreement, provided that prior to suspending such voting rights, the Board shall provide written notice to such Shareholders, setting forth in reasonable detail the alleged default(s), at least fourteen (14) calendar days prior to any General Meeting or other meeting of Shareholders for which the Board desires to suspend such Shareholder's voting rights.[5]

**18.10**     Shareholders of notes or bonds or other securities issued by the Company (if any) shall not, unless compulsorily otherwise provided for by law, be entitled to assist or attend General Meetings or receive notice thereof.

**Article 19. Quorum and majority, and amendment of the Articles**

**19.1**      Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, at any General Meeting of Shareholders other than a General Meeting convened for the purpose of amending the Company's Articles or voting on resolutions whose adoption is subject to the

---

[5] NTD :  Under Review

quorum and majority requirements for amendments of the Articles, no presence quorum is required and resolutions shall be adopted, irrespective of the number of Shares represented, by a simple majority of votes validly cast.

**19.2** At any extraordinary General Meeting of Shareholders for the purpose of amending the Company's Articles or voting on resolutions whose adoption is subject to the quorum and majority requirements for amendments of the Articles, the quorum shall be at least one half of the issued and outstanding Shares of the Company (other than Shares held by on behalf of the Company or a direct Subsidiary). If such quorum is not present, a second General Meeting may be convened at which there shall be no quorum requirement. Resolutions amending the Company's Articles or whose adoption is subject to the quorum and majority requirements for amendments of the Articles shall only be validly passed by a two thirds (2/3) majority of the votes validly cast at any such General Meeting, save as otherwise provided by law, the Articles and the Shareholders Agreement.

**Article 20. Accounting Year**

The accounting year of the Company shall begin on first of January and shall terminate on the thirty-first of December of each year.

**Article 21. Independent Auditor(s)**[6]

**21.1** The operations of the Company shall be supervised by a statutory auditor (*commissaire aux comptes*) who may but need not be a shareholder. Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the statutory auditor shall be elected by the General Meeting for a period ending at the next annual General Meeting or until a successor is elected. Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement, the statutory auditor in office may be removed at any time by the General Meeting with or without cause.

**21.2** In the event the thresholds set by law as to the appointment of an independent auditor (*réviseur d'entreprises agréé*) are met or otherwise required or permitted by law, the accounts of the Company shall (and in case only permitted but not required by law, may) be supervised by an independent auditor (*réviseur d'entreprises agréé*).

**Article 22. Distributions**

Subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement,

**22.1** From the annual net profits of the Company, five percent (5%) shall be allocated to a non-

---

[6] NTD : Under Review

distributable reserve as required by law. This allocation shall cease to be required as soon as, and as long as, such reserve amounts to ten percent (10 %) of the issued share capital of the Company.

**22.2** The General Meeting of Shareholders, upon recommendation of the Board, shall determine how the annual results of the Company will be disposed of in accordance with the provisions of the present Articles. The General Meeting of Shareholders may resolve to distribute any distributable net profits, reserves and/or share premium.

**22.3** Interim distributions (including for the avoidance of doubt, interim dividends) may be declared and paid (including by way of staggered payments) by the Board (including out of any share premium or other capital or other reserves) subject to observing the terms and conditions provided by law either by way of a cash distribution or by way of an in-kind distribution (including Shares).

**22.4** The distributions declared may be paid in [US Dollars] ([USD]) or any other currency selected by the Board and may be paid at such places and times as may be determined by the Board (subject to the resolutions of the General Meeting of Shareholders). The Board may make a final determination of the rate of exchange applicable to translate distributions of funds into the currency of their payment. Distributions may be made in specie (including by way of Shares).

**22.5** A distribution declared but not paid (and not claimed) on a Share after five years cannot thereafter be claimed by the holder of such Share and shall be forfeited by the holder of such Share, and revert to the Company. No interest will be paid on distributions declared and unclaimed which are held by the Company on behalf of holders of Shares.

**Article 23. Liquidation**

In the event of the dissolution of the Company for whatever reason or at whatever time (subject to and in observance of any and all undertakings agreed upon in the Shareholders Agreement), the liquidation will be performed by liquidators or by the Board then in office who will be endowed with the powers provided by articles 1100-4 et seq. of the Company Law. Once all debts, charges and liquidation expenses have been met, any balance resulting shall be paid to the holders of Shares in the Company in accordance with the provisions of these Articles.

**Article 24. Definitions**

| Affiliate | Means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any |

| | investment fund the primary investment advisor to which is such Person or an Affiliate thereof); provided that for purposes of these Articles, no Holder shall be deemed an Affiliate of the Company or any of its Subsidiaries. For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise; |
|---|---|
| Appaloosa Holder | Has the meaning ascribed to it in the Shareholders Agreement; |
| Approved Transferee | Has the meaning ascribed to it in the Shareholders Agreement; |
| Articles | Means the present articles of association of the Company as amended from time to time; |
| Beneficial Interests | Has the meaning ascribed to it in the Shareholders Agreement; |
| Benefical Ownership | Has the meaning ascribed to it in the Shareholders Agreement; |
| Board | Means the board of directors (*conseil d'administration)* of the Company; |
| Business Day | Means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York or Luxembourg, Grand Duchy of Luxembourg; |
| Company Common Stock | Has the meaning ascribed to it in the Shareholders Agreement; |
| Company Law | Means the Luxembourg law of 10th August 1915 on commercial companies as amended (and any replacement |

| | law thereof), as amended from time to time; |
|---|---|
| Cyrus Holder | Has the meaning ascribed to it in the Shareholders Agreement; |
| Designation Committee | Has the meaning ascribed to it in the Shareholders Agreement; |
| Designation Committee Members | Has the meaning ascribed to it in the Shareholders Agreement; |
| Designation Right Assignment | Has the meaning ascribed to it in the Shareholders Agreement; |
| Dilution Principles | Has the meaning ascribed to it in Article 10.2; |
| Director | Means a member of the Board; |
| Drag-along Sale | Has the meaning ascribed to it in Article 9.1; |
| Drag-along Shareholder | Has the meaning ascribed to it in Article 9.1; |
| Drag-along Notice | Has the meaning ascribed to it in Article 9.2; |
| Dragging Shareholder | Has the meaning ascribed to it in Article 9.1; |
| General Meeting | Means the general meeting of Shareholders; |
| Hold | Means, in respect of the Shares, direct ownership as a Shareholder and/or Beneficial Ownership of a Beneficial Interest in Shares. Derivative terms, including, without limitation, "Holder", should be interpreted accordingly and shall include, for the avoidance of doubt, the Cyrus Holder and the Appaloosa Holder. |
| Major Consent Matters | Has the meaning ascribed to it in the Shareholders Agreement; |
| Major Transferee | Means an Approved Transferee to which a Nominating Shareholder transfers any of its rights to designate a Director pursuant to the Shareholders Agreement; |
| Minimum Threshold | Means at least 15% of the then-outstanding Company Common Stock; |
| New Securities | Has the meaning ascribed to it in the Shareholders Agreement; |

Reorganized ISA S.A. – Articles of Association

| New Warrant Agreements | Has the meaning ascribed to it in the Shareholders Agreement; |
|---|---|
| Nominating Shareholder | Has the meaning ascribed to it in the Shareholders Agreement; |
| Non-Conforming Issuance | Has the meaning ascribed to it in the Shareholders Agreement; |
| Person | Means any individual, partnership, corporation, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof; |
| Preemptive Rightholder | Has the meaning ascribed to it in the Shareholders Agreement; |
| Representative Director | Means a Person elected as a Director upon proposal of a Nominating Shareholder in accordance with the terms of the Shareholders Agreement; |
| RCS Law | Means the law dated 19 December 2002 concerning the register of commerce and of companies as well as the accounting and the annual accounts of undertakings, as amended (and any replacement law thereof); |
| Related Fund | Means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (a) such Person or an Affiliate thereof, (b) the same investment manager, advisor or subadvisor as controls or manages such Person or (c) an Affiliate of such investment manager, advisor or subadvisor |
| Shareholder | Means a duly registered holder of Shares of the Company; |
| Shareholders Agreement | Means the Shareholders Agreement of the Company, dated as of [•] (as it may be amended, modified or supplemented from time to time in accordance with the terms thereof); |

| Shares | Means the Common Shares and any other shares (*actions*) of the Company; |
|---|---|
| Subsidiary | Means when used with respect to any Person, any corporation or other entity, whether incorporated or unincorporated, (a) of which such Person or any other Subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any Subsidiary of such Person do not have a majority of the voting interests in such partnership) or (b) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other entity is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries; |
| Transfer | Has the meaning ascribed to it in the Shareholders Agreement; and |
| Warrants | Has the meaning ascribed to it in the Shareholders Agreement. |

**Article 25. Applicable law and general provision**

**25.1**    **[**All matters not expressly governed by these Articles shall be determined in accordance with the applicable law and, subject to any non-waivable provisions of the law, with the Shareholders Agreement. In the event of any conflict between the terms and provisions of the Articles and those contained in the Shareholders Agreement, the terms and provisions of the Shareholders Agreement shall govern and control,**]** to the extent permitted by law.

**25.2**    **[**The competent Luxembourg courts shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a duty owed by any director or officer of the Company to the Company or the Company's Shareholders, (iii) any action asserting a claim against the Company arising pursuant to any provision of the Company Law and the RCS Law or the Company's Articles, and (iv) any action asserting a claim against

the Company with respect to its internal affairs, relationship with its Shareholders or other holders of interest, its directors, officers, or any action as to its Articles or other constitutional or governing documents. Notwithstanding the foregoing or anything to the contrary set forth in these Articles, the governing law and forum selection clauses in the applicable Shareholders Agreement and New Warrant Agreements shall be as set forth in such documents.**]**

**Exhibit P**

**Reorganized ISA S.A. Shareholders Agreement**

**SHAREHOLDERS AGREEMENT**

**OF**

**REORGANIZED ISA S.A.**

**Dated as of February [•], 2022**

## TABLE OF CONTENTS

**Page**

1. Definitions. ...................................................................................................... 1

2. Board of Directors............................................................................................. 7

   (a) Composition and Size ............................................................................. 7

   (b) Company Action ..................................................................................... 8

   (c) Minimum Threshold ................................................................................ 8

   (d) Assignment of Nominating Shareholder Rights ...................................... 8

   (e) Nomination of Directors........................................................................... 9

   (f) Board Size .............................................................................................. 9

   (g) Removal of Directors .............................................................................. 9

   (h) Vacancies on the Board .......................................................................... 9

   (i) Quorum................................................................................................... 9

   (j) Voting ....................................................................................................10

   (k) Chairperson ..........................................................................................10

   (l) Meetings of the Board ............................................................................10

   (m) Related Party Transactions....................................................................10

   (n) Governing Documents ...........................................................................11

   (o) Initial Directors ......................................................................................12

   (p) Board Observer .....................................................................................12

3. Information Rights; Confidentiality. .................................................................13

   (a) Information Rights..................................................................................13

   (b) Confidentiality .......................................................................................13

4. Transfer Restrictions. .....................................................................................15

   (a) Requirements for Transfer .....................................................................15

   (b) Schedule; DTC; Global Security............................................................16

   (c) New Issuances ......................................................................................17

5. Major Consent Matters. ..................................................................................17

   (b) Required Shareholder Approvals Under Luxembourg Law.....................19

6. Tag-along and Drag-along Rights....................................................................19

   (a) Drag-along Rights..................................................................................19

   (b) Tag-along Rights....................................................................................21

7. Future Issuance of Shares; Preemptive Rights................................................23

   (a) Offering Notice ......................................................................................23

   (b) Exercise ................................................................................................23

(c)    Non-Conforming Issuance ................................................................24

(d)    Closing................................................................................................25

(e)    Holders' Undertakings .....................................................................26

8.    Miscellaneous.................................................................................................26

(a)    Calculations ......................................................................................26

(b)    Termination .......................................................................................26

(c)    Remedies ...........................................................................................26

(d)    Amendment; Modification; Waivers ................................................27

(e)    Notices...............................................................................................27

(f)    Governing Law; Forum.....................................................................27

(g)    Successors and Assigns .....................................................................28

(h)    Waiver of Trial by Jury ....................................................................28

(i)    No Side Agreements ..........................................................................28

(j)    Severability .......................................................................................28

(k)    Business Days ....................................................................................29

(l)    Entire Agreement ..............................................................................29

(m)    Execution of Agreement; Counterparts ............................................29

(n)    Determination of Ownership.............................................................29

(o)    No Recourse .......................................................................................29

(p)    Third-Party Beneficiaries..................................................................29

(q)    Recapitalizations, Exchanges, etc.....................................................29

(r)    Headings; Section References............................................................30

(s)    Further Assurances............................................................................30

**REORGANIZED ISA S.A.**
**SHAREHOLDERS AGREEMENT**

This Shareholders Agreement (this "Agreement") is made and entered into as of [•], 2022 (the "Effective Date"), by and among (a) Reorganized ISA S.A. (f/k/a Intelsat S.A.), a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg, having its registered office in the City of Luxembourg, Grand Duchy of Luxembourg and registered with the Luxembourg Trade and Companies Register (*Registre de Commerce et des Sociétés de Luxembourg*) under number B [•] (the "Company"), (b) those certain shareholders of the Company who were issued shares of Company Common Stock under the Plan and are a party to this Agreement, as identified on their respective signature pages hereto, and (c) any Person who hereafter becomes a party to this Agreement (together with the Persons identified in subclause (b) above, collectively, the "Holders" and each, a "Holder").  The Company and the Holders are referred to collectively herein as the "Parties".

In consideration of the mutual covenants and agreements set forth herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Party, the Parties agree as follows:

**1.     Definitions.** As used in this Agreement, the following terms shall have the respective meanings set forth in this Section 1:

"Accelerated Purchaser" has the meaning set forth in Section 7(c).

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Related Fund of such Person); *provided,* that, no Holder shall be deemed an Affiliate of the Company or any of its Subsidiaries for purposes of this Agreement.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Anchorage Holder" means [Anchorage Capital Group LLC], together with its Affiliates and Related Funds that hold shares of Company Common Stock.

"Appaloosa Holder" means Palomino Master Ltd., Azteca Partners LLC and any of their respective Related Funds to whom shares of Company Common Stock are transferred pursuant to this Agreement.

"Approved Transferee" has the meaning set forth in Section 4(a).

"Articles" means the Articles of Association of the Company, as amended from time to time in accordance with the terms thereof and this Agreement.

"Beneficial Interest" means, with respect to any Beneficial Owner, the Securities Entitlement held by such Beneficial Owner in the shares of Company Common Stock it Beneficially Owns.

"<u>Beneficial Owner</u>" means any Person owning a Securities Entitlement with respect to shares of Company Common Stock registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which Securities Entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which Securities Entitlement has not been credited to any other Person's securities account. "<u>Beneficially Owns</u>" and "<u>Beneficially Owned</u>" shall have the correlative meanings.

"<u>Board</u>" means the board of directors of the Company.

"<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York or Luxembourg, Grand Duchy of Luxembourg.

"<u>Cede & Co.</u>" means Cede & Co., as nominee for DTC, or such other nominee as may be selected by DTC, as nominee for DTC, which as of the Effective Date, is the sole registered holder of Company Common Stock under this Agreement on behalf of the Beneficial Owners.

"<u>Chosen Courts</u>" has the meaning set forth in <u>Section 8(f)</u>.

"<u>Class A Directors</u>" has the meaning set forth in <u>Section 2(a)(i)</u>.

"<u>Class B Directors</u>" has the meaning set forth in <u>Section 2(a)(i)</u>.

"<u>Company</u>" has the meaning set forth in the preamble.

"<u>Company Common Stock</u>" means the common shares, nominal value $0.01 per share, in registered form, of the Company.

"<u>Company Common Stock Equivalent</u>" has the meaning set forth in <u>Section 7(a)</u>.

"<u>Confidential Information</u>" has the meaning set forth in <u>Section 3(b)(i)</u>.

"<u>Cyrus Holder</u>" means [Cyrus Capital Partners, L.P.], together with its Affiliates and Related Funds that hold shares of Company Common Stock.

"<u>Designation Committee</u>" means a committee consisting of each of the Anchorage Holder, the Cyrus Holder, the Discovery Holder, the GSAM Holder and the Whitebox Holder (each, a "<u>Designation Committee Member</u>" and, collectively, the "<u>Designation Committee Members</u>"); *provided,* that in the event a Designation Committee Member ceases to own or hold at least the Designation Committee Threshold, such Designation Committee Member shall immediately and automatically be removed from the Designation Committee and such Designation Committee Member shall have no further rights with respect to the Designation Committee.  All decisions and determinations of the Designation Committee shall require the affirmative vote or written consent of Designation Committee Members holding, in the aggregate, at least a majority of the outstanding shares of Company Common Stock held by all the Designation Committee Members; *provided*, that for so long as there are [three] or more Designation Committee Members on the Designation Committee, such decisions and determinations shall also require at least a majority in number of then-existing Designation Committee Members.

"<u>Designation Committee Threshold</u>" means at least 3% of the outstanding Company Common Stock.

"Designation Right Assignment" has the meaning set forth in Section 2(d).

"Depository Agreement" means the Blanket Issuer Letter of Representations from the Company to DTC, dated as of February [●], 2022, as the same may be amended or supplemented from time to time.

"Dilution Principles" has the meaning set forth in Section 8(a).

"Direct Owner" means any holder of Company Common Stock who is registered on the Company's Stock Register for the Company Common Stock.

"Direct Owner Legend" means the legend on the account of each Direct Owner set forth on **Exhibit D-1** hereto.

"Director" means any member of the Board.

"Discovery Holder" means [Discovery Capital Management, LLC], together with its Affiliates and Related Funds that hold shares of Company Common Stock.

"Drag-along Notice" has the meaning set forth in Section 6(a)(ii).

"Drag-along Sale" has the meaning set forth in Section 6(a)(i).

"Drag-along Shareholder" has the meaning set forth in Section 6(a)(i).

"Dragging Shareholder" has the meaning set forth in Section 6(a)(i).

"DTC" means The Depository Trust Company.

"DTC Participant" means any Person that is reflected on the books and records of DTC as having a direct interest in the Company Common Stock held of record by Cede & Co.

"Effective Date" has the meaning set forth in the preamble.

"Excess New Securities" has the meaning set forth in Section 7(b)(i).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Global Security" means the global certificate or certificates issued to DTC as provided in the Depository Agreement, each of which shall be in substantially the form attached hereto as **Exhibit D-2**.

"GSAM Holder" means Goldman Sachs Asset Management, L.P., solely in its capacity as manager or advisor to certain of its funds and accounts that hold shares of Company Common Stock, and not as principal.

"hold" means, in respect of the Company Common Stock, direct or indirect beneficial ownership of Company Common Stock.

"Holder" has the meaning set forth in the preamble. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Company Common Stock (including Beneficial Interests).

"Interested Appaloosa Transaction" has the meaning set forth in Section 2(m)(iii).

"Joinder" means a Joinder to this Agreement in substantially the form attached hereto as **Exhibit B**.

"Luxembourg Law" means the Luxembourg Law on commercial companies dated August 10, 1915.

"Major Consent Approval" has the meaning set forth in Section 5(a).

"Major Consent Matter" has the meaning set forth in Section 5(a).

"Major Transferee" means an Approved Transferee to which a Nominating Shareholder (other than the Designation Committee) transfers any of its rights to designate a Director pursuant to Section 2(d).

"Minimum Threshold" means at least 15% of the then-outstanding Company Common Stock.

"New Articles" has the meaning set forth in Section 2(m)(iii).

"New Issuance Notice" has the meaning set forth in Section 7(a).

"New Securities" has the meaning set forth in Section 7(a).

"New Warrant Agreement" means that certain agreement setting forth the full terms and conditions of the Warrants.

"Nominating Shareholder" means each of the Appaloosa Holder, the Cyrus Holder and the Designation Committee, (a) in the case of each of the Appaloosa Holder and the Cyrus Holder, so long as such Person (including any Major Transferee of such Person) holds at least the Minimum Threshold, and (b) in the case of the Designation Committee, so long as all the Designation Committee Members hold, in the aggregate, at least the Minimum Threshold.

"Non-Conforming Issuance" has the meaning set forth in Section 7(c).

"Non-Recourse Parties" has the meaning set forth in Section 8(o).

"Observer" has the meaning set forth in Section 2(p).

"Parties" has the meaning set forth in the preamble.

"Permitted Transfer" has the meaning set forth in Section 4(a).

"Person" means any individual, partnership, corporation, company, association, trust, joint venture, limited liability company, unincorporated organization, entity or division, or any government, governmental department or agency or political subdivision thereof.

"Plan" means the Fourth Amended Joint Chapter 11 Plan of Reorganization of Intelsat S.A. and its Debtor Affiliates filed by the Debtors on December 17, 2021 at Docket No. 3891 in Case No. 20-32299 (KLP) in the Bankruptcy Court, and confirmed by the Bankruptcy Court at Docket No. 3894 in Case No. 20-32299 (KLP), as amended, modified or supplemented.

"Plan Effective Date" means the date on which all conditions to consummation of the Plan have been satisfied in full or waived, in accordance with the terms of the Plan, and the Plan becomes effective.

"Preemptive Proportionate Percentage" has the meaning set forth in Section 7(b)(i).

"Preemptive Rightholder" has the meaning set forth in Section 7(a).

"Proposed Price" has the meaning set forth in Section 7(a).

"Proposed Transferee" has the meaning set forth in Section 6(b)(i).

"Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled or managed by (a) such Person or an Affiliate thereof, (b) the same investment manager, advisor or subadvisor as controls or manages such Person or (c) an Affiliate of such investment manager, advisor or subadvisor.

"Related Party Transaction" has the meaning set forth in Section 2(l).

"Reorganized Intelsat" has the meaning set forth in Section 2(m)(iii).

"Representative Director" means a Person elected as a Director upon proposal of a Nominating Shareholder in accordance with the terms of this Agreement.

"Representatives" of a Holder means its partners, shareholders, members, directors, officers, employees, agents, counsel, accountants, consultants, investment advisers or other professionals or representatives, or its Affiliates or wholly owned subsidiaries.

"Sale Notice" has the meaning set forth in Section 6(b)(ii).

"Securities Act" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Securities Entitlement" means a securities entitlement with respect to shares of Company Common Stock registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been ultimately credited to any other Person's securities account.

"Selling Shareholder" has the meaning set forth in Section 6(b)(i).

"Stock Register" has the meaning set forth in Section 4(b).

"Subject Purchaser" has the meaning set forth in Section 7(a).

"Subsidiary" means, when used with respect to any Person, any corporation or other entity, whether incorporated or unincorporated, (a) of which such Person or any other Subsidiary

of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any Subsidiary of such Person do not have a majority of the voting interests in such partnership) or (b) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other entity is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries.

"Tag-along Notice" has the meaning set forth in Section 6(b)(iii).

"Tag-along Period" has the meaning set forth in Section 6(b)(iii).

"Tag-along Sale" has the meaning set forth in Section 6(b)(i).

"Tag-along Seller" has the meaning set forth in Section 6(b)(iii).

"Tag-along Shareholder" has the meaning set forth in Section 6(b)(i).

"Transfer" means any sale, pledge, assignment, encumbrance or other transfer or disposition of any share of Company Common Stock [or Beneficial Interest] to any other Person, whether directly, indirectly, voluntarily, involuntarily, by operation of law, pursuant to judicial process or otherwise, other than (i) to a Related Fund of a transferring Holder; (ii) in connection with any *bona fide* mortgage, assignment, encumbrance or pledge to a financial institution in connection with any *bona fide* loan or debt transaction, including any lending or borrowing to or from brokers, banks, custodians or other financial institutions for the purpose of effecting margin transactions, but excluding any foreclosure or redemption thereof; (iii) with respect to any Holder that is an "investment company" registered under the Investment Company Act of 1940, as amended, or any publicly traded company whose securities are registered under the Exchange Act, any such transfer or other disposition of the passive ownership interests in such investment company or publicly traded company; or (iv) with respect to any Holder that is a private equity fund, hedge fund or similar vehicle, any such transfer or other disposition of any limited partnership or other similar non-control interest in any entity which is a pooled investment vehicle holding other material investments and which is an equityholder (directly or indirectly) of a Holder, or the change in control of any general partner, manager or similar Person of such entity. "Transferred," "Transfer" used as a verb, "Transferor" and "Transferee" shall have the correlative meanings.

"Transfer Agent" means American Stock Transfer & Trust, LLC.

"Warrant Agreement" means that certain Warrant Agreement, dated as of the date hereof, between the Company and American Stock Transfer & Trust, LLC, as warrant agent.

"Warrants" means the Warrants issued under the Warrant Agreement.

"Whitebox Holder" means [Whitebox Advisors LLC], together with its Affiliates and Related Funds that hold shares of Company Common Stock.

Unless the context requires otherwise: (a) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (b) references to Sections, paragraphs and subclauses refer to Sections, paragraphs and subclauses of this Agreement; (c) the terms "include," "includes," "including" or words of like import shall be deemed to be

-6-

followed by the words "without limitation"; (d) the terms "hereof," "herein" or "hereunder" refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) unless the context otherwise requires, the term "or" is not exclusive and shall have the inclusive meaning of "and/or"; (f) defined terms herein will apply equally to both the singular and plural forms and derivative forms of defined terms will have correlative meanings; (g) references to any law or statute shall be deemed to refer to such law or statute as amended or supplemented from time to time and shall include all rules and regulations and forms promulgated thereunder, and references to any law, rule, form or statute shall be construed as including any legal and statutory provisions, rules or forms consolidating, amending, succeeding or replacing the applicable law, rule, form or statute; (h) references to any Person include such Person and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns; and (i) references to "days" are to calendar days unless otherwise indicated. Each of the Parties hereto acknowledges that each Party was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction shall be raised or used in which the provisions of this Agreement shall be construed in favor or against any Party hereto because one is deemed to be the author thereof.

## 2.    **Board of Directors**.

(a)    <u>Composition and Size</u>. From and after the Effective Date, each Holder shall vote (or cause to be voted) all of the Company Common Stock held by such Holder and any other voting securities of the Company over which such Holder has voting control and, as the Company or a Nominating Shareholder may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings), so that:

(i)    immediately following approval of the New Articles at the extraordinary general meeting of the shareholders, the Board shall be divided into two classes: the Class A (the "<u>Class A Directors</u>") and the Class B (the "<u>Class B Directors</u>"). Prior to approval of the New Articles, the Board shall consist solely of the Class A Directors;

(ii)    the number of Directors constituting the Board shall be (A) three Class A Directors and (B) two Class B Directors (or, in each case, if such number of Directors is increased in accordance with <u>Section 5(a)(vii)</u>, such number of Directors as so increased), other than any vacancy resulting from the death, removal or resignation of any Director in accordance with <u>Section 2(c)</u>, <u>Section 2(d)</u> or <u>Section 2(g)</u> until such vacancy is filled in accordance with <u>Section 2(a)(iii)</u>, <u>Section 2(a)(iv)</u> or <u>Section 2(h)</u>, as applicable;

(iii)    the following individuals are elected and shall continue to serve as the Class A Directors of the Board:

(A)    one individual proposed by the Cyrus Holder (or any Major Transferee to which such right is assigned by the Cyrus Holder pursuant to <u>Section 2(d)</u>), so long as such Person (together with any Affiliates and Related Funds that hold Company Common Stock) holds the Minimum Threshold;

(B)    one individual proposed by the Appaloosa Holder (or any Major Transferee to which such right is assigned by the Appaloosa Holder pursuant to <u>Section 2(d)</u>), so long as such Person (together with any Related Funds that hold Company Common Stock) holds the Minimum Threshold; and

-7-

(C)      one individual proposed by the Designation Committee, so long as the Designation Committee Members in the aggregate (together with any Affiliates and Related Funds that hold Company Common Stock) hold the Minimum Threshold; *provided*, that such individual shall not be employed by or Affiliated with the Cyrus Holder;

(iv)      the Class B Directors shall consist of two individuals, each of whom (A) resides full time in Luxembourg, (B) is proposed by a [majority][1] vote of the Class A Directors, (C) is unaffiliated with any then-existing Holder holding more than 5% of the then-outstanding shares of Company Common Stock, and (D) is approved by the affirmative vote of Holders holding more than 50% of the then-outstanding Company Common Stock; and

(v)      at each annual meeting of the shareholders of the Company at which a Nominating Shareholder is entitled to propose a Representative Director under Section 2(a)(iii), the Person(s) so proposed shall be elected or reelected, as applicable, at such meeting.

(b)      Company Action. The Company shall take all actions necessary to cause the nomination of the Persons contemplated by Section 2(a), including causing such Persons to be included in the slate of nominees recommended by the Board to the Holders for election as Directors. Each Holder hereby irrevocably and unconditionally undertakes to vote its shares in favor of the election to the Board of the designees of the Nominating Shareholders pursuant to Section 2(a)(iii) or the removal from the Board of a Director in connection with Section 2(c), Section 2(d) or Section 2(g).

(c)      Minimum Threshold. If a Nominating Shareholder ceases to hold at least the Minimum Threshold at any time following the Effective Date, (i) such Nominating Shareholder's Representative Director shall resign immediately from the Board and the resulting vacancy shall be filled in accordance with Section 2(h) and (ii) thereafter such Nominating Shareholder shall no longer have the right to propose a Director for election under Section 2(a)(iii) or to transfer such right of proposal to any Major Transferee. Notwithstanding any other provision herein, no Nominating Shareholder (including its Affiliates) shall at any time be entitled to propose more than one Director for election to the Board at any time under Section 2(a)(iii), notwithstanding the amount of shares of Company Common Stock held by such Holder and its Affiliates; *provided*, *however*, that this sentence shall not restrict or limit in any respect the Cyrus Holder's right, as a member of the Designation Committee, to participate in the Designation Committee's selection and proposal of individuals for election to the Board from time to time pursuant to Section 2(a)(iii)(C).

(d)      Assignment of Nominating Shareholder Rights. A Nominating Shareholder (other than the Designation Committee), in such Nominating Shareholder's sole discretion, shall have the right to assign its rights under this Section 2 to a Major Transferee. In order to exercise such right, a Nominating Shareholder must (i) transfer to such Major Transferee at least the applicable amount of Company Common Stock to exercise such right (i.e., in the aggregate, the Minimum Threshold) and (ii) if the transfer provided for in subclause (i) of this Section 2(d) would not put such Nominating Shareholder below the Minimum Threshold, irrevocably assign the right to propose the Director(s) being assigned to the relevant Major Transferee (a "Designation Right Assignment"). If a Nominating Shareholder shall exercise such right, the Nominating Shareholder must deliver written notice thereof to the Company at or prior to effecting such transfer and the

---

[1] NTD: Under Review

Company shall, within two (2) Business Days of receiving such notice, deliver written notice thereof to all of the other Nominating Shareholders.

(e)     Nomination of Directors. The Company shall provide notice to each Nominating Shareholder at least 30 days prior to each annual meeting of the shareholders of the Company. Unless a Nominating Shareholder provides written notice to the Company no later than 20 days prior to such annual meeting (i) that a then-current Representative Director will not be proposed for reelection to the Board at such annual meeting of the shareholders of the Company (or such casting of votes in writing in lieu of such annual meeting) and (ii) identifies the individual such Nominating Shareholder proposes for election in place of such then-current Representative Director, such then-current Representative Director shall be automatically nominated for reelection to the Board at such annual meeting unless at the time of such meeting such Nominating Shareholder no longer has the right to nominate such Representative Director.

(f)     Board Size. In no event shall the authorized size of the Board be fewer than three Class A Directors, other than any vacancy resulting from the death, removal or resignation of any Director in accordance with Section 2(c) or Section 2(g) until such vacancy is filled in accordance with Section 2(a)(iii) or Section 2(h), as applicable. Any change in the authorized number of Class A Directors shall require Major Consent Approval. Following the approval of the New Articles, in addition to the requirements set forth above, the authorized size of the Board shall include at least one Class B Director at all times.

(g)     Removal of Directors. A Director may be removed, with or without cause, at any time by the affirmative vote of one or more Holders holding more than 50% of the then-outstanding Company Common Stock; provided, that a Representative Director may only be removed upon the written request of his or her Nominating Shareholder (which request may be given with or without cause at any time). In such event, such Nominating Shareholder will request a resignation from its Representative Director. Each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company or a Nominating Shareholder may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings) to the extent necessary in order to give effect to such Nominating Shareholder's removal of its Representative Director.

(h)     Vacancies on the Board. Subject to the provisions of article 441-2 of the Luxembourg Law, any vacancy on the Board resulting from the death, resignation, removal or otherwise of a Director shall be filled by a majority vote of the then-existing Board; provided, that the Board shall vote to fill any vacancy of a Representative Director, other than any vacancy resulting from the failure of a Nominating Shareholder (or Major Transferee) to meet the applicable Minimum Threshold as described in Section 2(c), with the replacement individual identified to the Board by the relevant Nominating Shareholder; provided, further, that the Board shall vote to fill any vacancy resulting from the failure of a Nominating Shareholder (or a Major Transferee) to meet the applicable Minimum Threshold as described in Section 2(c) with an individual who is unaffiliated with any then-existing Holder holding more than 5% of the then-outstanding shares of Company Common Stock.

(i)     Quorum. Following the approval of the New Articles, the quorum for the transaction of business of the Board at meetings of the Board shall require the attendance of (i) at least a majority of the Class A Directors then in office, which majority shall include the Representative

-9-

Director of each of the Appaloosa Holder and the Cyrus Holder (if any), and (ii) at least one Class B Director, if any; *provided,* that if a quorum is initially not met for two consecutive meetings due to the lack of attendance by the Representative Directors of the Appaloosa Holder and/or the Cyrus Holder, a quorum at any subsequent meeting on the same or related subject shall only require (A) a majority of the Class A Directors then in office, and (B) at least one Class B Director, if any. In the absence of a quorum at any such meeting, a majority of the Directors present and entitled to vote at such meeting may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present. For the avoidance of doubt, at any time (i) prior to the approval of the New Articles, and (ii) after the approval of the New Articles where all Class B Director seats are vacant, no Class B Directors shall be required for purposes of meeting the quorum requirements hereunder (assuming all other quorum requirements in this Section 2(i) have been satisfied).

(j)      Voting.  Each Director will have one vote with respect to each matter to be decided upon by the Board. Other than the Major Consent Matters, all matters of the Board shall be decided by the affirmative vote or written consent of at least (i) a majority of the Class A Directors and (ii) one Class B Director, if any, in each case that is present or represented and voting at a properly called Board meeting that satisfies the quorum requirements set forth in Section 2(i) and the provisions of the Articles; *provided,* that any action by written consent of the Board shall require the unanimous affirmative vote of all Directors then in office who are entitled to vote on such action. For the avoidance of doubt, at any time (i) prior to the approval of the New Articles, and (ii) after the approval of the New Articles where all Class B Director seats are vacant, no approvals or consents by any Class B Director shall be required hereunder.

(k)      Chairperson. The Chairperson of the Board (the "Chairperson") shall be selected by majority vote of the Directors then in office at each meeting of the board approving the annual accounts for the previous financial year, which vote shall include at least a majority of the Class A Directors then in office. The Chairperson shall preside at meetings of the Board and of the shareholders of the Company and exercise and perform such other powers and duties as may from time to time be assigned to him or her by the Board or as may be prescribed by this Agreement or the Articles. In the absence of the Chairperson, another Director designated by the Chairperson or, if none was designated by the Chairperson, by a majority of the Directors then in office, shall act as Chairperson.

(l)      Meetings of the Board. A meeting of the Board may be called at any time by any Director or by the then-serving Chief Executive Officer of the Company, if any.

(m)      Related Party Transactions.

(i)      Without prejudice to any necessary actions, steps or formalities required under applicable Luxembourg Law in case of a conflict of interest (as defined under Luxembourg Law), the Board shall take reasonable steps to cause the Company to enact controls so that the Company does not, and does not permit any of its Subsidiaries to, enter into any agreement, transaction or series of related transactions (or amendment or modification thereto) with any Director, any Affiliate of the Company or any Holder (or any of its Affiliates, Related Funds or portfolio companies (as the term is commonly used in the private equity industry) such Holder controls) (a "Related Party Transaction"), without either (A) the affirmative vote of a majority of the disinterested Directors, which must include at least a majority of the Class A Directors that are disinterested in the transaction (and in each case, excluding any Director who is (x) a Representative of, or (y) a Representative Director of, any Person with whom the Company or any of its Subsidiaries is proposing to enter into the Related Party Transaction (or amendment or

-10-

modification thereto) or any Affiliate thereof) or (B) the affirmative vote or written consent of one or more Holders holding at least 50% of the then-outstanding Company Common Stock (excluding any vote/consent by such interested Holder(s) and any shares of the Company Common Stock held by such interested Holder(s)), and in each case subject to all other requirements in this Agreement and the Articles necessary to effectuate an act of the Board or the Holders.

(ii)    The following shall not be deemed a Related Party Transaction: (A) any issuance of equity securities issued to a Preemptive Rightholder in accordance with Section 7, (B) any issuance of Company Common Stock in connection with the exercise of the Warrants, (D) any amendment, modification or supplement to the Warrant Agreement or waiver under the Warrant Agreement, or any calculation or other determination by the Board in accordance with the terms of the Warrant Agreement, (E) the purchase of conventional insurance products for the benefit of the Directors or the Company and its Subsidiaries in the ordinary course of business, (F) dividend payments or distributions to the Holders of Company Common Stock approved by the Board in compliance with Section 5(a)(ix), (G) any incurrence of debt that has been approved by the Board in compliance with Section 5(a)(x), and (H) the payment of reasonable and customary compensation and fees to, and indemnities provided for the benefit of, and reimbursement of expenses incurred by, officers, Directors or employees of the Company or any of its Subsidiaries in the ordinary course of business, in each case, as approved by the Board.

(iii)    All Related Party Transactions must be on arm's-length terms; *provided,* that approval by the Board of a Related Party Transaction in accordance with the terms of this Section 2(m) shall be deemed to be conclusive evidence that such Related Party Transaction is on arm's length terms.

(iv)    Notwithstanding anything to the contrary set forth herein, for so long as the Appaloosa Holder has designated one or more members to serve on the board of directors or similar board of Intelsat Emergence S.A. and/or its subsidiaries, or any successor or assign thereof (such entities, collectively, "Reorganized Intelsat"), any Director who is a Representative of the Appaloosa Holder, or is the Representative Director of the Appaloosa Holder, shall recuse himself or herself from any and all deliberations concerning, and shall abstain from voting on, any transaction that would reasonably be determined to have a material impact on Reorganized Intelsat, which determination shall be made in good faith by the Class A Directors (excluding any Director who is a Representative of the Appaloosa Holder, or is the Representative Director of the Appaloosa Holder) (such transaction, an "Interested Appaloosa Transaction").  To the extent that any Interested Appaloosa Transaction is also a Major Consent Matter as contemplated under Section 5, the Representative Director of the Appaloosa Holder shall not be entitled to vote on any such Major Consent Matter, and no approval, consent or vote of the Representative Director of the Appaloosa Holder shall be required under Section 5(a) for the Company to take any such action thereunder.

(n)    Governing Documents.

(i)    It is hereby acknowledged and agreed that the Parties desire to amend and restate the Articles in substantially the form attached hereto as **Exhibit D** (the "New Articles") as soon as reasonably practicable following the Effective Date and all Parties hereby agree to take all necessary steps to cause the New Articles to become so effective, including (A) the Company convening an extraordinary general meeting of the shareholders of the Company as soon as reasonably practicable following the Effective Date with an agenda item to consider, among other items, the New Articles, and (B) each Holder exercising its voting rights to pass the required

-11-

resolutions to approve the New Articles at such extraordinary general meeting or otherwise causing the New Articles to become effective.

(ii)      In the event of any conflict between the terms and provisions of this Agreement and those contained in the Articles or other similar governing documents of the Company, the terms and provisions of this Agreement shall govern and control to the maximum extent permitted by Luxembourg Law and all Parties to this Agreement shall take all necessary steps to cause the Articles to be amended to the greatest extent permitted by Luxembourg Law to resolve such conflict, including but not limited to, (A) the Company convening an extraordinary general meeting of the shareholders of the Company with an agenda item to consider such amendment, and (B) such shareholders exercising their voting rights to pass the required resolutions to amend the Articles accordingly.

(iii)      From the date of this Agreement until the date of adoption of the New Articles, the Parties undertake to ensure that, notwithstanding that such actions may be permitted by the Articles existing as of the date of this Agreement, they as Holders, and their Representative Directors, do not take any actions in violation of this Agreement or in violation of the New Articles as if such New Articles were already in effect, including (i) issuing new shares from the authorized share capital in violation of this Agreement or the New Articles, (ii) making any distributions in violation of this Agreement or the New Articles, including dividend payments, repayment of share premium or payment of reserves or any other distribution on shares, (iii) permitting any transfer of shares to any Person in violation of this Agreement or the New Articles, (v) issuing instruments convertible into shares, or by means of which the voting rights of shares are transferred or otherwise altered, in each case in violation of this Agreement or the New Articles, (vi) approving any merger, de-merger or other corporate action resulting in a change of control or change of share ownership in the Company, unless approved as a Major Consent Matter under Section 5(a)(ii), and (vii) taking or causing any action to be taken that would affect the ability of the Holders to vote to adopt the New Articles or otherwise causing a delay of the adoption of the New Articles.

(o)      Initial Directors. The initial Class A Directors shall be (i) [•], deemed proposed in accordance with Section 2(a)(iii)(A), (ii) [•], deemed proposed in accordance with Section 2(a)(iii)(B), and (iii) [•], deemed proposed in accordance with Section 2(a)(iii)(C). The initial Class B Directors shall be determined in accordance with Section 2(a)(iv).

(p)      Board Observer. Each Nominating Shareholder (other than the Designation Committee) shall have the right to designate one non-voting observer (each, an "Observer") to the Board for so long as such Holder remains a Nominating Shareholder. Each Nominating Shareholder may change the identity of its observer at any time and from time to time upon written notice to the Company. Each Observer will be entitled to attend and receive notice of all meetings of the Board and receive copies of all materials provided or made available to the Board in connection therewith; provided, that: (i) to the extent an Observer is not an employee of a Nominating Shareholder, such Observer shall enter into a non-disclosure agreement, substantially in the form set forth on **Exhibit A**; and (ii) the Company reserves the right to withhold any information and to exclude an Observer from any meeting or portion thereof if access to such information or attendance at such meeting would reasonably be expected to, based on advice of outside counsel, cause a waiver of the attorney-client privilege between the Company or any of its Subsidiaries and their respective counsel after taking all commercially reasonable steps to enter into arrangements to mitigate such loss of privilege (provided that all Observers in similar circumstances shall be treated equally in such determination). The right to designate an Observer is assignable or transferable only together with an assignment of such Nominating Shareholder's rights under Section 2(d). Any attempt to assign or transfer such right not in compliance with

-12-

<u>Section 2(d)</u> and this <u>Section 2(p)</u> shall be null and void *ab initio*. The Company shall take all action reasonably necessary, at its sole cost and expense, to ensure that each Observer is entitled to (x) insurance coverage on the same terms provided to the Company's officers and Directors either under the Company's policy or policies applicable to such officers and Directors, or under a supplemental policy, as provided under the Articles, (y) indemnification and reimbursement of expenses, on the same terms provided to the Company's officers and Directors under the Articles, and (z) any other supplemental indemnification and reimbursement of expense arrangements offered by the Company to its officers or Directors.

(q)      <u>Voting Forms</u>. Each shareholder may vote at a general meeting through a signed voting form sent by post, electronic mail, facsimile or any other means of communication to the Company's registered office or to the address specified in the convening notice. Shareholders may only use voting forms provided by the Company which contain at least the place, date and time of the meeting, the agenda of the meeting, the proposals submitted to the shareholders, as well as for each proposal three boxes allowing the shareholder to vote in favour thereof, against, or abstain from voting by ticking the appropriate box. Voting forms which, for a proposed resolution, do not show only (i) a vote in favour, (ii) a vote against the proposed resolution or (iii) an abstention are void with respect to such resolution. The Company shall only take into account voting forms received prior to the general meeting to which they relate.

**3.        Information Rights; Confidentiality.**

(a)      <u>Information Rights</u>.

(i)      The Company shall furnish to the Holders the [annual audited consolidated financial statements of the Company], and such other information, documents or records of the Company as is required under Luxembourg Law to be provided to registered shareholders, in each case as promptly as practicable and in any event within the time periods, if any, prescribed by Luxembourg Law.

(ii)      In addition to the information required to be delivered under <u>Section 3(a)(i)</u>, for so long as the Company has $100 million or more in assets (as determined in by the Board in its reasonable discretion and excluding the value of any "net operating losses" or other deferred tax attributes of the Company or its Subsidiaries), as soon as reasonably available, and in any event within 60 days after the end of each fiscal quarter (other than the last fiscal quarter of the fiscal year), the Company shall furnish to the Holders unaudited consolidated balance sheets and unaudited consolidated statements of income and cash flows for such fiscal quarter.

(b)      <u>Confidentiality</u>.

(i)      Each Holder acknowledges that any notices or information furnished, including verbally, pursuant to this Agreement (the "<u>Confidential Information</u>") is confidential and competitively sensitive. Each Holder shall use, and shall cause any Person to whom Confidential Information is disclosed by such Holder pursuant to <u>subclause (A)</u> below to use, the Confidential Information only in connection with its investment in the shares of Company Common Stock and not for any other purpose (including to disadvantage competitively the Company or any other Holder). Each Holder shall not disclose any Confidential Information to any Person, except that Confidential Information may be disclosed:

(A)      to the Holder's Representatives in the normal course of the performance of their duties for such Holder (it being understood that such Representatives

-13-

shall be informed by the Holder of the confidential nature of such information and shall be directed to treat such information in accordance with this Section 3(b));

(B)    to the extent required by applicable law, rule or regulation or requested by any regulatory or self-regulatory authority in connection with the conduct of its ordinary oversight activities; *provided,* that the Holder shall take reasonable steps to minimize the extent of any such required disclosure and give the Company prompt written notice of such request(s), to the extent practicable, and to the extent permitted by law so that the Company may, at its sole expense, seek an appropriate protective order or similar relief (and the Holder shall cooperate with such efforts by the Company, and shall in any event make only the minimum disclosure required by such law, rule or regulation and shall use reasonable best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such information);

(C)    to any Person to whom the Holder is contemplating a transfer of its shares of Company Common Stock permitted in accordance with the terms hereof; *provided,* that such Person is not prohibited from receiving such information pursuant to this Section 3 and, prior to such disclosure such potential transferee is advised of the confidential nature of such information and executes a non-disclosure agreement in a standard form previously approved by the Board for all such potential transferees and which agreement is independently enforceable by the Company;

(D)    to any regulatory authority or rating agency to which the Holder or any of its Affiliates is subject or with which it has regular dealings, solely (I) as long as such authority or agency is advised of the confidential nature of such information and (II) such information is provided as the result of a routine request not targeted to the Company or any of its Subsidiaries;

(E)    in connection with the Holder's or the Holder's Affiliates' normal fund raising, marketing, informational or reporting activities or to any bona fide prospective purchaser of the equity or assets of the Holder or the Holder's Affiliates, or prospective merger partner of the Holder or the Holder's Affiliates; *provided,* that prior to such disclosure, if any Confidential Information is shared with such Persons, the Persons to whom such information is disclosed are advised of the confidential nature of such information and are subject to customary confidentially obligations with respect to such information; or

(F)    if the prior written consent of the Company shall have been obtained.

(ii)    Nothing contained herein shall prevent the use (subject, to the extent possible, to a protective order) of Confidential Information in connection with the assertion or defense of any claim by or against the Company or the Holder. The restrictions contained in this Section 3(b) shall terminate 18 months following the date on which the Holder ceases to hold any shares of Company Common Stock.

(iii)    Confidential Information does not include: (A) information that is or becomes generally available to the public (including as a result of any information filed or submitted by the Company with the Securities and Exchange Commission) other than as a result of a disclosure by the Holder or its Representatives in violation of any confidentiality provision of this Agreement or any other applicable agreement, (B) information that is or was in the possession

-14-

of the Holder or its Representatives on a non-confidential basis prior to its disclosure to the Holder or its Representatives by the Company, or (C) information that was or becomes available to the Holder or its Representatives on a non-confidential basis from a source other than the Company, which source is or was (at the time of receipt of the relevant information) not, to the best of the Holder's or its Representatives' knowledge, bound by a confidentiality agreement with (or other confidentiality obligation to) the Company or another Person.

(c)     The Company shall provide to each Director and, subject to the limitations set forth in Section 2(p), each Observer, copies of any materials distributed or made available to any other Directors or Observers. For the avoidance of doubt, the foregoing shall in no way limit the Company's obligation to provide information to a Director pursuant to Luxembourg Law.  A Representative Director or Observer shall be entitled to share and discuss with the Representatives of the Nominating Shareholder that appointed such Representative Director or Observer any materials or other information obtained by such Person in such capacity, provided that such information is shared in the normal course of the performance of their duties for such Nominating Shareholder (it being understood that such Representatives shall be informed by such Director, Observer or Nominating Shareholder of the confidential nature of such information and shall be directed to treat such information in accordance with Section 3(b)).

**4.     Transfer Restrictions**.

(a)     Requirements for Transfer. The Company Common Stock [or any Beneficial Interest] shall be freely transferable except as provided in this Section 4(a). Notwithstanding any other provision of this Agreement, each Holder agrees that it shall not, directly or indirectly, Transfer any of its Company Common Stock or Beneficial Interest except where (x) the Transferee executes and delivers to the Company a Joinder, to the extent such Transferee is not already a party to this Agreement, and (y) such Transfer complies with subclauses (i) through (v) below (such Transfer that is in compliance with both subclauses (x) and (y), a "Permitted Transfer"):

(i)     such Transfer is permitted under the Securities Act and other applicable federal law or state securities or blue sky laws, and then, with respect to a Transfer of shares of Company Common Stock or any Beneficial Interest, if requested by the Board, only upon delivery to the Company of a written opinion of counsel in form and substance reasonably satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act; *provided*, that notwithstanding  the foregoing, such a legal opinion shall not be required for any Transfer of shares of Company Common Stock [or Beneficial Interest] that were issued under the Plan in reliance on the registration exemption provided by Section 1145 of the Bankruptcy Code, unless the Company has a good faith reason to believe that such shares of Company Common Stock [or Beneficial Interest] are "restricted securities" as such term is defined in Rule 144 under the Securities Act or that the Transferor may be an Affiliate of the Company or an "underwriter" (as such term is defined in the Securities Act) with respect to such Company Common Stock [or Beneficial Interest];

(ii)     such Transfer would not reasonably be expected to require the Company to initiate a registration or qualification of the Company Common Stock pursuant to the Exchange Act or any applicable federal or state securities or blue sky laws;

(iii)     such Transfer, upon consummation, would not result in the Company having more than 300 "holders of record" (as such concept is understood for purposes of Section 12(g) of the Exchange Act) of Company Common Stock on the first day of any fiscal year of the

Company, as determined by the Board in its reasonable discretion) of any class of equity securities of the Company;

(iv) such Transfer would not cause the Company or any Subsidiary or Affiliate of the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended; and

(v) such Transfer would not cause the Company or any Subsidiary or Affiliate of the Company to be subject to regulation under the Investment Advisers Act of 1940, as amended.

The Transferee of a Permitted Transfer being an "Approved Transferee". Any attempted or purported Transfer of all or a portion of the Company Common Stock [or Beneficial Interest] held by a Holder in violation of this Section 4(a) shall be null and void and of no force or effect whatsoever, such purported Transferee shall not be treated as a Holder of the Company Common Stock [or Beneficial Interest] for purposes of this Agreement or otherwise, and the Company shall not register such Transfer on the Stock Register.

(b) Schedule; DTC; Global Security.

(i) The Company shall keep a stock register (*registre des actions nominatives*) at its registered office (the "Stock Register") for the purpose of registering the Company Common Stock and Permitted Transfers thereof as well as any other relevant transactions relating to the Company Common Stock. The Stock Register shall initially show one position for Cede & Co. representing the shares of Company Common Stock held by DTC on behalf of the Beneficial Owners of Securities Entitlements holding through their respective DTC Participants, and one position for each of the Direct Owners. The Transfer Agent shall have no responsibility whatsoever directly to the Beneficial Owners of Securities Entitlements holding through their respective DTC Participants with respect to transfers of the Company Common Stock. Any Beneficial Owners of Securities Entitlements holding through their respective DTC Participants may move their holdings of Company Common Stock directly to the Stock Register only through the procedures established by the DTC.

(ii) No Transferee shall be entitled to the benefits and rights as a Holder, Direct Owner, Beneficial Owner or otherwise under this Agreement unless such Transferee shall have delivered to the Company an executed and acknowledged Joinder, unless such Transferee is already a party hereto. The direct Transferee (*i.e.*, a Transferee that holds the Company Common Stock registered on the Stock Register and not simply a Beneficial Interest in the Company Common Stock registered in the name of Cede & Co.) of the Company Common Stock Transferred shall be bound by this Agreement as a Direct Owner. Any indirect transferee (i.e., a Transferee that holds a Beneficial Interest in the Company Common Stock registered in the name of Cede & Co.) of Company Common Stock in accordance with this Section 4 shall be bound by this Agreement as a Beneficial Owner. Following such a Transfer in which a Beneficial Owner elects to hold as a Direct Owner (or vice versa), the Transfer Agent shall amend the Stock Register to reflect the change in Direct Owners, and the Company shall take any other appropriate action in connection therewith. Any Transferee will have no rights under this Agreement until it has delivered an executed Joinder to the Company or the Transfer Agent. A Transferor that is party to this Agreement shall not be relieved of any liability for a breach of the Transfer provisions hereunder.

(iii)     The Company will enter into the Depository Agreement pursuant to which DTC will act as a securities depository for the Company Common Stock. The Company Common Stock deposited with DTC will be represented by a Global Security (which may be a book-entry security or consist of one or more certificates as required by DTC), which will be registered in the name of Cede & Co., as nominee for DTC or as DTC shall otherwise direct, and deposited with, or on behalf of, DTC. No other certificates evidencing such Company Common Stock will be issued. The Global Security shall be in the form attached hereto as **Exhibit C-2** or described therein and shall represent such Company Common Stock as shall be specified therein, and may provide that it shall represent the aggregate amount of outstanding Company Common Stock from time to time endorsed thereon and that the aggregate amount of outstanding Company Common Stock represented thereby may from time to time be increased or decreased. As of the Effective Date, without the need for any action or consent of any Person, including the Company Common Stock, an initial Global Security shall be issued reflecting the number of shares of Company Common Stock to be issued to Cede & Co. as of the Effective Date. Any Global Security shall be executed by an authorized signatory of the Company. Any endorsement of a Global Security to reflect the amount, or any increase or decrease in the amount, of outstanding Company Common Stock represented thereby shall be made in such manner and upon instructions given by the Company as specified in the Depository Agreement.

(iv)     The Company will use commercially reasonable efforts to notate its register and records reflecting Transfer of the Company Common Stock made in compliance with this Section 4 on the Stock Register within seven Business Days from receipt of the applicable Joinder or notice of trade, as applicable, and the relevant Holder transferring Company Common Stock in accordance with Section 4(a) hereby grants an irrevocable power of attorney to the Company to record such transfer of Company Common Stock on its behalf.

(c)     New Issuances. No shares of equity securities (including any shares of Company Common Stock) shall be issued to any Person who is not a party to this Agreement (including upon the exercise of any options, warrants (including the Warrants) or other shares of equity securities issued to any Director, officer or employee of the Company under any employee benefit plan) unless and until such Person shall have executed and delivered to the Company a Joinder.

**5.    Major Consent Matters**.

(a)     The Company agrees not to engage in, and to cause its applicable Subsidiaries not to engage in, any of the following matters (the "Major Consent Matters") without the approval of at least (i) (A) two-thirds (66.7%) of the Class A Directors then in office and entitled to vote on such matter, (B) at least one Class B Director, if any, and (C) Holders holding 75% of the then-outstanding shares of Company Common Stock; or (ii) (A) 85% of the Class A Directors then in office and entitled to vote on such matter, and (B) at least one Class B Director, if any (the approvals under subclauses (i) or (ii), as applicable, the "Major Consent Approval"):

(i)     initiating, by application of the Company, or any decision or action of the shareholder(s), any voluntary bankruptcy proceedings, dissolution, winding up, liquidation, receivership or any other insolvency or restructuring proceedings in Luxembourg or any other jurisdiction in relation to the Company or Intelsat Investment Holdings S.à r.l.;

(ii)     any sale of the Company (including any change in control of the majority of voting interests in the Company, other than any transfer by the Holders in compliance with Section 6(b) to the extent that neither the Company nor any of its Subsidiaries is involved in such

-17-

transaction in a capacity other than implementing the transfer of equity securities in connection therewith and other actions ancillary thereto) or all or substantially all of its assets;

(iii)    conversion of the Company to another form of entity (other than in connection with an initial public offering);

(iv)    any redemption or repurchase of equity securities other than (A) pursuant to a *pro rata* offer to all holders of such class of equity securities or (B) of equity securities owned by employees of the Company in connection with termination of employment;

(v)    any election of the Company or any of its Subsidiaries to be taxed in a different manner or classified differently for tax purposes (including any change to the jurisdiction of organization or means of qualification for tax treaty benefits of the Company or any of its Subsidiaries);

(vi)    any amendment to the Articles, including any amendment to the Articles that would create additional authorized share capital, *provided, however*, that Major Consent Approval shall not be required for amendments to the Articles in connection with (A) issuances of Company Common Stock in compliance with Section 7 (subject to Section 5(a)(vii)), (B) issuances of Company Common Stock pursuant to the exercise of the Warrants, (C) a change of address in Luxembourg or (D) the New Articles;

(vii)    [the issuance of equity securities, options or other rights to acquire such equity securities, or convertible/exchangeable indebtedness, of the Company or any of its Subsidiaries, other than the issuance of Company Common Stock reserved for issuance pursuant to the exercise of the Warrants][2];

(viii)    any change in the size, voting or composition of the Board; *provided*, that such change shall not (A) reduce the size of the Board to less than three Class A Directors, (B) modify the consent or quorum rights of any Class A Director provided for in this Agreement, without the prior written consent of each affected Nominating Shareholder, or (C) modify the voting thresholds set forth in this Agreement;

(ix)    any type of dividend or distribution on equity securities, other than dividends and distributions from a wholly-owned Subsidiary of the Company to the Company or another wholly-owned Subsidiary thereof; *provided,* that in any event no non-*pro rata* dividends or distributions shall be permitted;

(x)    any incurrence of material debt, including any guarantees, or refinancing thereof by the Company or any of its Subsidiaries (other than an incurrence of convertible debt securities issued in compliance with Section 7);

(xi)    any commencement or settlement of any litigation or dispute with an expected value of more than $10 million; and

(xii)    any acquisition or disposition of assets or liabilities, or merger, consolidation, share exchange, business combination, joint venture or similar transaction

---

[2] NTD:  Inclusion of this as a Major Consent Item under review

-18-

involving the Company or any of its Subsidiaries, in a transaction that involves consideration (including assumed debt) or investments in excess of $20 million.

(b)   **Required Shareholder Approvals Under Luxembourg Law**. To the extent Luxembourg Law requires any shareholder approvals in addition to the Major Consent Approval in order to take any Major Consent Matter, each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting) to approve such Major Consent Matter following such Major Consent Approval. The Company shall take all necessary or desirable actions within its control (including calling special shareholder meetings) to facilitate the foregoing. Each Holder hereby irrevocably and unconditionally undertakes to, and grants an irrevocable proxy to any Director in office when the Holder's vote is to be cast to, on its behalf, vote its shares in favor of any such Major Consent Matter pursuant to this Section 5(b). For the avoidance of doubt, unless expressly set forth herein as a Major Consent Approval Matter, nothing herein shall limit the rights of the shareholders of the Company to approve extraordinary shareholder resolutions under Luxembourg Law.

**6.   Tag-along and Drag-along Rights.**

(a)   Drag-along Rights.

(i)   If at any time a Holder or group of Holders who hold in the aggregate more than 66.7% of the then-outstanding shares of Company Common Stock (a "Dragging Shareholder") proposes to Transfer 100% of the then outstanding shares of Company Common Stock (other than to an Affiliate/Related Fund or in connection with an initial public offering of the Company), or to otherwise effect a sale of the Company, whether through merger, consolidation, share exchange, business combination, sale or disposition of assets, or otherwise, in each case to an unaffiliated bona fide third party purchaser (a "Drag-along Sale"), the Dragging Shareholder shall have the right to require that each other Holder (each, a "Drag-along Shareholder") participate in such transaction in the manner set forth in this Section 6(a) on a pro rata basis (except that, at the election of the Dragging Shareholder, a Drag-along Shareholder may be required to (A) include all of its equity in such Drag-along Sale if such Drag-along Shareholder, together with its Affiliates, holds less than 1% of the Company's then-outstanding Company Common Stock or (B) if such Drag-along Shareholder is an employee of the Company or any of its Subsidiaries, rollover its Company Common Stock or other equity securities in customary amounts) if, and only if, (x) Major Consent Approval has been obtained and (y) 100% of the consideration for the Drag-Along Sale is paid in cash and/or publicly traded securities in the manner set forth in this Section 6(a). Notwithstanding anything to the contrary in this Agreement, each Drag-along Shareholder shall (A) consent to, vote in favor of, raise no objection to and waive and refrain from exercising any appraisal or dissenter's rights claim or any claim of fiduciary breach (but not any claim that such Drag-along Sale is not being effected in accordance with the terms set forth in this Agreement) and (B) obtain any required consents and take any and all reasonably necessary action in furtherance of the Drag-along Sale as requested by and at the Company's expense.

(ii)   The Dragging Shareholder shall exercise its rights pursuant to this Section 6(a) by delivering a written notice (the "Drag-along Notice") to the Company (A) no later than 20 days prior to the closing date of such Drag-along Sale. The Company will promptly deliver a copy

of the Drag-along Notice to each Drag-along Shareholder. The Drag-along Notice shall make reference to the Dragging Shareholder's rights and obligations hereunder and shall describe in reasonable detail: (A) the number of shares of Company Common Stock to be sold by the Dragging Shareholder, if the Drag-along Sale is structured as a Transfer of Company Common Stock; (B) the identity of the third party purchaser; (C) the proposed date, time and location of the closing of the Drag-along Sale; (D) the per share purchase price and the other material terms and conditions of the Transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

(iii)     The consideration to be received by a Drag-along Shareholder shall be the same form and amount of consideration per share of Company Common Stock to be received by the Dragging Shareholder (or, if the Dragging Shareholder is given an option as to the form and amount of consideration to be received, the same option shall be given) and the terms and conditions of such Transfer shall, except as otherwise provided in the immediately succeeding sentence, be the same as those upon which the Dragging Shareholder Transfers its Company Common Stock. Any (A) representations and warranties to be made or provided by a Drag-along Shareholder in connection with such Drag-along Sale shall be limited to representations and warranties related to such Drag-along Shareholder's authority, ownership and the ability to convey title to its Company Common Stock, and with respect thereto, shall be the same representations and warranties that the Dragging Shareholder makes or provides with respect to its Company Common Stock, (B) Drag-along Shareholder will not be required to agree to any non-competition or similar restrictions in connection with such Drag-along Sale, and (C) covenants, indemnities and agreements made by the Drag-along Shareholders shall be the same covenants, indemnities and agreements as the Dragging Shareholder makes or provides in connection with the Drag-along Sale, except that with respect to covenants, indemnities and agreements pertaining specifically to the Dragging Shareholder, the Drag-along Shareholder shall make the comparable covenants, indemnities and agreements pertaining specifically to itself; *provided*, that any indemnification obligation relating to the Company shall be (i) several and not joint and (ii) pro rata based on the consideration received by the Dragging Shareholder and each Drag-along Shareholder*; provided, further*, that in no event shall any indemnification obligation of a Drag-along Shareholder exceed the aggregate proceeds received by such Drag-along Shareholder in connection with the Drag-along Sale.

(iv)     The fees and expenses of the Dragging Shareholder incurred in connection with a Drag-along Sale and for the benefit of all Holders as determined in good faith by the Board, excluding any Director appointed or nominated by any Dragging Shareholder or its Affiliates (it being understood that costs incurred by or on behalf of a Dragging Shareholder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Company or the third party purchaser, shall be shared by all the Holders on a pro rata basis, based on the aggregate consideration received by each Holder; *provided*, that no Holder shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Drag-along Sale.

(v)     Each Holder and the Company shall take all actions as may be reasonably necessary to consummate the Drag-along Sale, including entering into agreements, signing or making available the register of Company Common Stock and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Dragging Shareholder, subject to the terms and provisions of this Section 6(a).

-20-

(vi)     The Dragging Shareholder shall have 120 days following the date of the Drag-along Notice in which to consummate the Drag-along Sale, on the terms set forth in the Drag-along Notice (which such 120 day period may be extended for a reasonable time not to exceed 180 days to the extent reasonably necessary to obtain any government approvals). If at the end of such period, the Dragging Shareholder has not completed the Drag-along Sale, the Dragging Shareholder may not then effect a transaction subject to this Section 6(a) without again fully complying with the provisions of this Section 6(a).

(b)     Tag-along Rights.

(i)     If at any time a Holder or group of Holders (the "Selling Shareholder") proposes to Transfer (other than to an Affiliate or as a Drag along Shareholder pursuant to a Drag Along Sale) at least 25% of the then-outstanding shares of Company Common Stock in any single transaction or series of related transactions to a purchaser (the "Proposed Transferee") and the Selling Shareholder cannot or has not elected to exercise its drag-along rights set forth in Section 6(a), each other Holder (each, a "Tag-along Shareholder") shall be permitted to participate in such Transfer (a "Tag-along Sale") on the terms and conditions set forth in this Section 6(b).

(ii)     Prior to the consummation of any such Transfer of Company Common Stock described in Section 6(b)(i), the Selling Shareholder shall deliver to the Company (and the Company shall promptly deliver to each other Holder) a written notice (a "Sale Notice") of the proposed Tag-along Sale subject to this Section 6(b) no later than 25 days prior to the closing date of the Tag-along Sale. The Sale Notice shall make reference to the Tag-along Shareholders' rights hereunder and shall describe in reasonable detail: (A) the aggregate number of shares of Company Common Stock the Proposed Transferee has offered to purchase; (B) the identity of the Proposed Transferee; (C) the proposed date, time and location of the closing of the Tag-along Sale; (D) the per share purchase price and the other material terms and conditions of the Transfer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and (E) a copy of any form of agreement proposed to be executed in connection therewith.

(iii)     Each Tag-along Shareholder may exercise its right to participate in a Transfer of Company Common Stock by the Selling Shareholder subject to this Section 6(b) by delivering to the Selling Shareholder a written notice (a "Tag-along Notice") stating its election to do so and specifying the number of shares of Company Common Stock to be Transferred by it no later than ten days after receipt of the Sale Notice (the "Tag-along Period"). Each Tag-along Shareholder that timely delivers a Tag-along Notice (a "Tag-along Seller") shall have the right to Transfer (in a Transfer subject to this Section 6(b)) up to the number of shares of Company Common Stock equal to the product of (x) the aggregate number of shares of Company Common Stock owned by the Tag-along Seller and (y) a fraction (A) the numerator of which is equal to the number of shares of Company Common Stock proposed to be sold by the Selling Shareholder in the Tag-along Sale, and (B) the denominator of which is equal to the number of shares of Company Common Stock owned by the Selling Shareholder. The Selling Shareholder shall attempt to have the Proposed Transferee in such Tag-along Sale agree to purchase all of the shares of Company Common Stock proposed to be sold in the Tag-along Sale; *provided*, that, if such Proposed Transferee does not agree to purchase all of the shares of Company Common Stock proposed to be sold in the Tag-along Sale, the number of shares of Company Common Stock to be sold in such Tag-along Sale shall be reduced pro rata.

(iv)     Each Tag-along Shareholder who does not deliver a Tag-along Notice in compliance with Section 6(b)(iii) above shall be deemed to have waived all of such Tag-along

-21-

Shareholder's rights to participate in such Transfer, and the Selling Shareholder shall (subject to the rights of any Tag-along Seller) thereafter be free to transfer to the Proposed Transferee its shares of Company Common Stock at a per share price that is no greater than the per share price set forth in the Sale Notice and on other same terms and conditions which are not materially more favorable to the Selling Shareholder than those set forth in the Sale Notice without any further obligation to the non-accepting Tag-along Shareholders.

(v)      Each Tag-along Seller shall receive the same consideration per share as the Selling Shareholder after deduction of such Tag-along Seller's proportionate share of the related expenses in accordance with Section 6(b)(vii) below.

(vi)      Each Tag-along Seller shall make or provide the same representations, warranties, covenants, indemnities and agreements as the Selling Shareholder makes or provides in connection with the Tag-along Sale (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to the Selling Shareholder, the Tag-along Seller shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to itself); *provided,* that all representations, warranties, and covenants shall be made by the Selling Shareholder and each Tag-along Seller severally and not jointly and any indemnification obligation of the Selling Shareholder and each Tag-along Seller shall be (i) several and not joint, and (ii) pro rata based on the consideration received by the Selling Shareholder and all of the Tag-along Sellers; *provided,* further, that in no event shall any indemnification obligation of the Selling Shareholder or a Tag-along Seller exceed the aggregate proceeds received by such Selling Shareholder or Tag-along Seller in connection with the Tag-along Sale.

(vii)      The fees and expenses of the Selling Shareholder incurred in connection with a Tag-along Sale and for the benefit of all Holders as determined in good faith by the Board, excluding any Director appointed or nominated by any Selling Shareholder or its Affiliates (it being understood that costs incurred by or on behalf of the Selling Shareholder for its sole benefit will not be considered to be for the benefit of all Holders), to the extent not paid or reimbursed by the Company or the Proposed Transferee, shall be shared by all Tag-along Sellers participating in the Tag-along Sale on a pro rata basis, based on the aggregate consideration received by each such Tag-along Seller; *provided,* that no Tag-along Seller shall be obligated to make or reimburse any out-of-pocket expenditure prior to the consummation of the Tag-along Sale.

(viii)      Each Tag-along Seller shall take all actions as may be reasonably necessary to consummate the Tag-along Sale, including entering into agreements, executing the register of Company Common Stock and delivering certificates and instruments, in each case consistent with the agreements being entered into and the certificates being delivered by the Selling Shareholder.

(ix)      The Selling Shareholder shall have 120 days following the expiration of the Tag-along Period in which to transfer the shares of Common Stock described in the Sale Notice and the shares to be sold by the Tag-along Sellers, on the terms set forth in the Sale Notice (which such 120 day period may be extended for a reasonable time not to exceed 180 days to the extent reasonably necessary to obtain any government approvals). If at the end of such 120 day period, the Selling Shareholder has not completed such transfer, the Selling Shareholder may not then effect a transfer of Company Common Stock subject to this Section 6(b) without again fully complying with the provisions of this Section 6(b).

(x)     If the Selling Shareholder transfers to the Proposed Transferee any of its shares of Company Common Stock in breach of this Section 6(b), then each Tag-along Shareholder shall have the right to transfer to the Selling Shareholder, and the Selling Shareholder undertakes to purchase from each Tag-along Shareholder, the number of shares of Company Common Stock that such Tag-along Shareholder would have had the right to transfer to the Proposed Transferee pursuant to this Section 6(b), for a per share amount and form of consideration and upon the terms and conditions on which the Proposed Transferee bought such Company Common Stock from the Selling Shareholder (subject to the restrictions in such terms and conditions set forth in this Section 6(b)), but without indemnity being granted by any Tag-along Shareholder to the Selling Shareholder; *provided,* that nothing contained in this Section 6(b) shall preclude any Holder from seeking alternative remedies against such Selling Shareholder as a result of its breach of this Section 6(b).

**7.      Future Issuance of Shares; Preemptive Rights.**

(a)     Offering Notice. Except for (i) options to subscribe for or purchase Company Common Stock or restricted stock which may be issued pursuant to any equity plan, incentive plan or similar arrangement of the Company, (ii) a stock split, stock dividend, reorganization or recapitalization applicable to all shares of Company Common Stock, (iii) the Warrants and any shares of Company Common Stock issuable upon exercise of the Warrants, (iv) equity securities of the Company issued in consideration of an acquisition, business combination, debt financing (whether pursuant to a stock purchase, asset purchase, merger or otherwise), strategic partnership or joint venture by the Company of another Person, approved by the Board and, to the extent required under Section 5, the Holders, (v) equity securities issued in an initial public offering and (vi) equity securities issued by any Subsidiary of the Company to the Company or to any other wholly owned Subsidiary of the Company, if any, if the Company or any of its Subsidiaries wishes to issue to any Person (A) any shares of Company Common Stock or other equity securities of the Company or any of its Subsidiaries, or (B) any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any shares of Common Stock or other equity securities of the Company or any of its Subsidiaries (the securities referenced in subclause (B) hereof, "Company Common Stock Equivalents", and all such securities referenced in subclauses (A) and (B) hereof, collectively, "New Securities", and such recipients of the New Securities, collectively, the "Subject Purchaser"), then the Company shall (or shall cause its applicable Subsidiary to) offer such New Securities to each of the Holders (other than Holders who receive Company Common Stock or Company Common Stock Equivalents under any equity plan, incentive plan or similar arrangement of the Company, and Holders of the Warrants to the extent they are unexercised) (each, a "Preemptive Rightholder", and collectively, the "Preemptive Rightholders") by sending written notice (the "New Issuance Notice") to the Preemptive Rightholders at least 15 Business Days prior to such issuance of New Securities, which New Issuance Notice shall state, in reasonable detail, the material terms and conditions of such issuance, including (x) the number of New Securities proposed to be issued and (y) the proposed issue price per security of the New Securities (the "Proposed Price"). Upon delivery of the New Issuance Notice, such offer shall be irrevocable unless and until the rights provided for in Section 7(b) shall have been waived or shall have expired.

(b)     Exercise.

(i)     For a period of ten Business Days following delivery of the New Issuance Notice pursuant to Section 7(a), each of the Preemptive Rightholders shall have the right, but not the obligation, to subscribe for its Preemptive Proportionate Percentage of the New Securities, at an issue price equal to the Proposed Price and upon the same terms and conditions set forth in

the New Issuance Notice. Each such Preemptive Rightholder shall have the right to subscribe for that percentage of the New Securities determined by dividing (x) the total number of shares of Company Common Stock then held by such Preemptive Rightholder exercising its rights under this Section 7(b) by (y) the total number of shares of Company Common Stock held by all of the Preemptive Rightholders (the "Preemptive Proportionate Percentage"). If any Preemptive Rightholder does not fully subscribe for the number or amount of New Securities that it is entitled to subscribe for pursuant to the preceding sentence, then each Preemptive Rightholder which elected to purchase New Securities shall have the right to subscribe for that percentage of the remaining New Securities not so subscribed for (for the purposes of this Section 7(b)(i), the "Excess New Securities") determined by dividing (x) the total number of shares of Company Common Stock then held by such fully participating Preemptive Rightholder by (y) the total number of shares of Company Common Stock then held by all fully participating Preemptive Rightholders who elected to purchase Excess New Securities.

(ii)     The right of each Preemptive Rightholder to subscribe for the New Securities under Section 7(a) shall be exercisable by delivering written notice of the exercise thereof, prior to the expiration of the ten Business Day period referred to in Section 7(b)(i) to the Company or its applicable Subsidiary, which notice shall state the amount of New Securities that such Preemptive Rightholder elects to purchase pursuant to Section 7(b)(i). The failure of a Preemptive Rightholder to respond within such ten Business Day period shall be deemed to be a waiver of such Preemptive Rightholder's rights under Section 7(b)(i); *provided*, that each Preemptive Rightholder may waive its rights under Section 7(b)(i) prior to the expiration of such ten Business Day period by giving written notice to the Company.

(c)     Non-Conforming Issuance. Notwithstanding the requirements herein, the Company may proceed with any issuance of New Securities to any Person (an "Accelerated Purchaser") prior to complying with the requirements of Section 7(a) and Section 7(b) if the Board determines in good faith that it is in the best interests of the Company to consummate such issuance or sale without having first complied with such provisions (such issuance, a "Non-Conforming Issuance"); *provided*, that the Company shall:

(i)     within 30 days following such Non-Conforming Issuance, offer, in writing, to issue to each Preemptive Rightholder its Preemptive Proportionate Percentage of the New Securities, at the same price and on the same terms and conditions with respect to such New Securities as the Accelerated Purchaser acquired in such Non-Conforming Issuance, which shall be effected either by (A) requiring that the Accelerated Purchaser sell down a portion of its New Securities (and, each Holder hereby agrees that if it is any such Accelerated Purchaser it will so sell down), (B) issuing additional New Securities to such Preemptive Rightholder or (C) a combination of (A) and (B), so long as such action effectively provides such Preemptive Rightholder with the opportunity to hold the same percentage of the total outstanding New Securities (after giving effect to the issuance of New Securities to all Preemptive Rightholders exercising such right) that such Preemptive Rightholder would have been entitled to purchase had this Section 7(c) not been invoked; and

(ii)     keep such offer open for a period of no less than ten Business Days, during which period, each Preemptive Rightholder may accept such offer by sending a written notice of exercise to the Company committing to subscribe for in accordance with the procedures set forth in Section 7(b), an amount of such New Securities (not to exceed the amount specified in the offer made pursuant to Section 7(c)(i));

*provided, further*, that (A) for all purposes under this Agreement but subject to applicable law, any issuance of New Securities to a Preemptive Rightholder pursuant to this Section 7(b)(ii) shall be deemed to have occurred on the date of the consummation of such Non-Conforming Issuance and (B) during the period commencing on the consummation of such Non-Conforming Issuance and ending on the earlier of (x) the consummation of the issuance of New Securities to a Preemptive Rightholder pursuant to this Section 7(b)(ii) and (y) the expiration of the ten Business Day period specified in subclause (ii) above, the New Securities issued pursuant to this Section 7(b)(ii) shall not be taken into account in calculating the Preemptive Proportionate Percentage of any Holder for any purposes under this Agreement.

(d)    Closing. The closing of the subscription for New Securities subscribed for by the Preemptive Rightholders under (i) Section 7(b) shall be held before a Luxembourg notary (solely to the extent required by Luxembourg Law) (A) on or between 15 and 30 Business Days after the giving of the New Issuance Notice pursuant to Section 7(a), if the Preemptive Rightholders elect to subscribe for all of the New Securities under Section 7(b), or (B) the date of the closing of the sale to the Subject Purchaser made pursuant to Section 7(a) if the Preemptive Rightholders elect to subscribe for some, but not all, of the New Securities under Section 7(b), (ii) Section 7(b)(ii) shall be held before a Luxembourg notary (solely to the extent required by Luxembourg Law) between 15 and 30 Business Days after the date of the offer specified under Section 7(c)(i), or (iii) in relation to both (i) and (ii), at such other time as the parties to the transaction may reasonably agree. At such closing, the Company shall (or shall cause its applicable Subsidiary to) record the subscription of New Securities by the relevant Preemptive Rightholders in its register of Company Common Stock and each relevant Preemptive Rightholder hereby grants irrevocable proxy to the Company to sign such register of Company Common Stock on its behalf, deliver certificates (to the extent that the Company or its applicable Subsidiary has certificated shares) representing the New Securities to the participating Preemptive Rightholders, and such New Securities shall be issued free and clear of all liens (other than those arising hereunder or pursuant to applicable law and those attributable to actions by the purchasers thereof) and the Company shall (or shall cause its applicable Subsidiary to) so represent and warrant, and further represent and warrant that such New Securities shall be, upon issuance thereof to the Preemptive Rightholders and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. Each Preemptive Rightholder subscribing for the New Securities shall deliver immediately prior to closing payment against delivery in full in immediately available funds for the New Securities subscribed for by him, her or it. At such closing, all of the parties to the transaction shall execute such additional documents as are otherwise necessary to effectuate the closing. Notwithstanding the foregoing, if the closing of a sale or issuance of New Securities is not consummated within a six-month period (plus such number of additional days (if any) necessary to allow the expiration or termination of all waiting periods under antitrust laws applicable to such sale) after the date upon which the New Issuance Notice is delivered or if the principal terms of such sale or issuance change such that the terms are, in the aggregate, less favorable in any material respect to the Preemptive Rightholders than those in the New Issuance Notice, then the restrictions provided for herein shall again become effective, and no issuance or sale of New Securities may be made thereafter by the Company or its applicable Subsidiary without again offering the same to the Preemptive Rightholders or issuers in accordance with this Section 7. Notwithstanding any other provision of this Section 7, there shall be no liability on the part of the Company, any of its Subsidiaries or any Holder to any Preemptive Rightholder arising from the failure of the Company or its applicable Subsidiary to consummate the sale of New Securities to the Subject Purchaser for any reason (*provided,* that the foregoing shall not prohibit any Preemptive Rightholder from raising or pursuing any claim that a purported issuance of New Securities does not comply with this Section 7 or this Agreement).

(e)      Holders' Undertakings. Each Holder shall vote (or cause to be voted) all of such Holder's Company Common Stock and any other voting securities of the Company over which such Holder has voting control and, as the Company may reasonably request in writing, shall take all other necessary or desirable actions within such Holder's control (including attendance at meetings in person or by proxy for purposes of obtaining a quorum and by casting votes in writing in lieu of such meeting), and the Company shall take all necessary or desirable actions within its control (including calling special board and shareholder meetings) in order to effect to any issuance proposed to be made by the Board to the relevant Preemptive Rightholders in accordance with this Section 7.

**8.      Miscellaneous.**

(a)      Calculations. For purposes of determining satisfaction of any Holder thresholds in this Agreement, the Company Common Stock held by any Holder shall be (i) calculated without giving effect to any management incentive dilution from any equity plan, incentive plan or similar arrangement of the Company (whether as a result of actually issued and outstanding shares of Company Common Stock or contingent instruments (e.g., options)) or dilution from other future-issued securities, including under the Warrants; and (ii) aggregated with shares of Company Common Stock held by its Affiliates and Related Funds.  Further, in connection with any Non-Conforming Issuance by the Company, any determination made on or before the earlier of (x) the consummation of the issuance of New Securities to all subscribing Preemptive Rightholders pursuant to Section 7(b)(ii) and (y) the expiration of the applicable offer period specified in Section 7(c)(ii) shall exclude any shares of equity securities issued in connection with such Non-Conforming Issuance (the "Dilution Principles").

(b)      Termination. The rights under this Agreement shall terminate automatically upon the earlier of (i) consummation of an initial public offering of Company Common Stock or Drag-along Sale, subject to compliance with all applicable provisions of this Agreement relating to the rights of Holders in connection with such transaction, and (ii) all issued and outstanding share of the Company Common Stock being owned by a single Person, together with its Related Funds; *provided, however,* that Section 3(b) shall survive any termination hereof in accordance with the terms thereof.

(c)      Remedies. In the event of a breach by the Company or a Holder of any of its obligations under this Agreement, the Company or the Holder, as the case may be, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement. The Parties agree that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate and shall waive any requirement for the posting of a bond. Each Party hereby irrevocably waives their rights to claim the benefit of the provisions of article 1142 of the Luxembourg Civil Code in case of breach of any of its obligations under this Agreement and acknowledges and agrees that the other Parties shall be entitled to the remedy of specific performance (*exécution forcée en nature*) of the defaulting Party's obligations thereunder in addition to any other recourse allowed by law. No failure or delay by any Person in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

-26-

(d)  <u>Amendments; Modifications; Waivers</u>. This Agreement may not be amended, altered, changed, waived or repealed in any respect (including, for the avoidance of doubt, by amendment, merger, consolidation or otherwise) [without Major Consent Approval/ [the prior written approval of Holders of a majority of the then-outstanding shares of Company Common Stock]; *provided* that no amendment may adversely affect a Holder relative to other Holders without such Holder's prior written consent. [Notwithstanding the foregoing, any amendment, modification or supplement to, or waiver of, Sections 2(f), 2(m), 5, 6 or 7 or this Section 8(d) shall require Major Consent Approval, in each case to the extent such amendment, modification or supplement is material and adverse to the Holders; provided, further, that any amendment, modification or supplement to, or waiver of, any specific right of a Holder to appoint, remove or replace a Director, assign its rights as a Nominating Shareholder, or appoint a Board Observer, in each case as contemplated under Section 2, shall require the affected Holder's prior written consent.] Any Holder may waive any of its rights under this Agreement, solely as to itself, without Major Consent Approval. Any amendment or waiver must specifically reference this Agreement, specify the provision(s) hereof that it is intended to amend or waive and further specify that it is intended to amend or waive such provision(s).[3]

(e)  <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed duly given (i) upon delivery, if served by personal delivery upon the Person for whom it is intended, (ii) on the third Business Day after the date mailed if delivered by registered or certified mail, return receipt requested, postage prepaid, (iii) on the following Business Day if delivered by a nationally-recognized, overnight, air courier or (iv) when delivered or, if sent after 5:00 p.m., New York City time, on the following Business Day if sent by facsimile transmission or email with electronic confirmation, in each case, to the address set forth on such Person's signature page hereto or to such other address as may be designated in writing, in the same manner, by such Person.

(f)  <u>Governing Law; Forum</u>. This Agreement and all disputes or controversies arising out of or relating to this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principles of conflicts of laws. Each of the Company and each Holder agrees that it shall bring any litigation with respect to any claim arising out of or related to this Agreement, exclusively in the Delaware Court of Chancery (and if jurisdiction in the Delaware Court of Chancery shall be unavailable, the Federal courts of the United States of America sitting in the State of Delaware) (together with the appellate courts thereof, the "<u>Chosen Courts</u>"). In connection with any claim arising out of or related to this Agreement, each of the Company and each Holder hereby irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection that such Person may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or as not having jurisdiction over either the Company or the Holder, (iv) agrees that service of process in any such action or proceeding shall be effective if notice is given in accordance with <u>Section 8(e)</u>, although nothing contained in this Agreement shall affect the right to serve process in any other manner permitted by law and (v) agrees not to seek a transfer of venue on the basis that another forum is more convenient. Notwithstanding anything herein to the contrary, (i) nothing in this <u>Section 8(f)</u> shall prohibit any party from seeking or obtaining orders for conservatory or interim relief from any court of competent jurisdiction and

---

[3] NTD: Under Review

(ii) each of the Company and each Holder agrees that any judgment issued by a Chosen Court may be recognized, recorded, registered or enforced in any jurisdiction in the world and waives any and all objections or defenses to the recognition, recording, registration or enforcement of such judgment in any such jurisdiction.

(g)   Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, successors, legal representatives, permitted assigns and Approved Transferees. The Company shall cause any successor or assign (whether by merger, consolidation, sale of assets or otherwise) to assume the obligations of the Company under this Agreement or enter into a new agreement with the Holders on terms substantially the same as this Agreement as a condition of any such transaction.

(h)   Waiver of Trial by Jury. EACH OF THE COMPANY AND EACH HOLDER ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PERSON HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH OF THE COMPANY AND EACH HOLDER CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) SUCH PERSON UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PERSON MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PERSON HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

(i)   No Side Agreements. Each Holder represents that, as of the Effective Date, all agreements with respect to the governance of the Company are as set forth in this Agreement, the Articles and the New Warrant Agreements and no other agreements or understandings (whether oral or written) with respect to the governance of the Company between or among such Holder, on the one hand, and any of the Company, its Directors or any other Holder, on the other hand, have been entered into or made.

(j)   Severability. The provisions of this Agreement shall be deemed severable. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (i) a suitable and equitable provision shall be substituted therefor to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (ii) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction; *provided*, *however*, that if any one or more of the provisions contained in this Agreement shall be determined to be excessively broad as to activity, subject, duration or geographic scope, it shall be reformed by limiting and reducing it to the minimum extent necessary, so as to be enforceable under applicable law.

(k)      <u>Business Days</u>. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall be a day other than a Business Day, then such action may be taken or such right may be exercised on the next succeeding Business Day.

(l)      <u>Entire Agreement</u>. This Agreement, together with the Articles and the New Warrant Agreements, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and supersedes any and all prior or contemporaneous discussions, agreements and understandings, whether oral or written, that may have been made or entered into by or among any of the Parties or any of their respective Affiliates relating to the transactions contemplated hereby.

(m)      <u>Execution of Agreement; Counterparts</u>. This Agreement may be executed and delivered (by facsimile, by electronic mail in portable document format (.pdf) or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

(n)      <u>Determination of Ownership</u>. In determining the Direct Owners of Company Common Stock hereunder for any purpose, the Company may rely solely on the records of the Transfer Agent for the Company Common Stock from time to time, or, if no such Transfer Agent exists, the Company's Stock Register.

(o)      <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Holders may be partnerships or limited liability companies, each Holder covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any of the Company's or any Holder's former, current or future direct or indirect equity holders, controlling Persons, shareholders, directors, officers, employees, agents, Affiliates, members, financing sources, managers, general or limited partners or assignees (and collectively, the "<u>Non-Recourse Parties</u>"), in each case other than the Company, the Holders or any of their permitted assigns under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Non-Recourse Parties, as such, for any obligation or liability of the Company or the Holders under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; *provided*, *however*, nothing in this <u>Section 8(o)</u> shall relieve or otherwise limit the liability of the Company or any Holder, as such, for any breach or violation of its obligations under this Agreement or such agreements, documents or instruments.

(p)      <u>Third-Party Beneficiaries</u>. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Company and the Holders and their respective successors and permitted assigns any rights, benefits or remedies of any nature whatsoever.

(q)      <u>Recapitalizations, Exchanges, etc</u>. The provisions of this Agreement shall apply to the full extent set forth herein with respect to (i) the Company Common Stock, (ii) any and all securities into which shares of Company Common Stock are converted, exchanged or substituted in any recapitalization or other capital reorganization by the Company and (iii) any and all equity securities of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in conversion of, in

-29-

exchange for or in substitution of, the Company Common Stock and shall be appropriately adjusted for any stock dividends, splits, reverse splits, combinations, recapitalizations and the like occurring after the Effective Date.

(r)     <u>Holder Votes</u>.  For the avoidance of doubt, nothing in this Agreement shall require any Holder to cast any votes as directed by the Company.

(s)     <u>Headings;  Section References</u>.  All  heading  references  contained  in  this Agreement are for convenience purposes only and shall not be deemed to limit or affect any of the provisions of this Agreement.

(t)     <u>Further Assurances</u>. Each Holder and the Company shall (and the Company shall cause its Subsidiaries to) do, execute and perform all such further acts, deeds, documents and things as may be reasonably required from time to time in order to implement all the provisions of this Agreement.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK,
SIGNATURE PAGES OF HOLDERS TO FOLLOW]*

IN WITNESS WHEREOF, the Parties have executed this Shareholders Agreement as of the date first written above.

REORGANIZED ISA, S.A.

By: _____
Name: _____
Title: _____

*[Signature Page to Shareholders Agreement]*

[HOLDER]

By: _____

Name: _____

Title: _____

Address: _____

_____

_____

Attention: _____

Email: _____

Phone: _____

with a copy (which shall not constitute notice)
to: _____

_____

_____

_____

_____

*[Signature Page to Shareholders Agreement]*

## EXHIBIT A

### *Form of Non-Disclosure Agreement*

[To come.]

**EXHIBIT B**

***Form of Joinder Agreement***

The undersigned hereby agrees, effective as of the date set forth below, to become a party to that certain Shareholders Agreement (as amended, restated and modified from time to time, the "Agreement"), dated as of [•], by and among [•], a *société anonyme* organized under the laws of the Grand Duchy of Luxembourg (the "Company"), and the shareholders [*and Beneficial Owners*] of the Company. The undersigned hereby agrees to be bound by all of the terms of the Agreement and shall hereafter be deemed to be, for all purposes of the Agreement, a party to the Agreement and a "Holder" (as defined in the Agreement). The undersigned hereby grants an irrevocable power of attorney to the Company to record the transfer of Company Common Stock on its behalf. This Joinder Agreement and all disputes or controversies arising out of or relating to this Joinder Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to principles of conflicts of laws. The address, facsimile number and email address to which notices may be sent to the undersigned are as follows:

Address:        _____

                _____

                _____

Phone No.:      _____

Email:          _____


Date:           _____


                                        **[ENTITY NAME]**


                                        By: _____

                                        Name: _____

                                        Title: _____

## **EXHIBIT C-1**

DIRECT OWNER LEGEND

THESE SHARES OF COMPANY COMMON STOCK HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145; PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE.

THESE SHARES OF COMPANY COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH SHARES OF COMPANY COMMON STOCK IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

THE SHARES OF COMPANY COMMON STOCK ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF [COMPANY] (THE "COMPANY"), DATED AS OF [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SHAREHOLDERS AGREEMENT"). NO REGISTRATION OR TRANSFER OF THE SHARES OF COMPANY COMMON STOCK ISSUABLE UPON EXERCISE OF SUCH SHARES MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH.

THE COMPANY OR THE TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE COMPANY COMMON STOCK REPRESENTED HEREBY A COPY OF THE SHAREHOLDERS AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF THE COMPANY COMMON STOCK UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS. THESE LEGENDS MAY NOT BE REMOVED WITHOUT THE WRITTEN CONSENT OF THE COMPANY.

**EXHIBIT C-2**

FORM OF GLOBAL SECURITY
-EVIDENCING-
SHARES OF COMMON STOCK
-IN-

[COMPANY]

[_____]

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO [COMPANY] (THE "COMPANY") OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUIRED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

THE SECURITIES REPRESENTED HEREBY WILL BE ISSUED PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SECTION 1145 OF TITLE 11 OF THE UNITED STATES CODE, 11 U.S.C. §§ 101–1532, AS AMENDED (THE "BANKRUPTCY CODE"). THE SECURITIES REPRESENTED HEREBY MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE COMPANY. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE OR AN AFFILIATE OF THE COMPANY, THEN THE SECURITIES MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED UNLESS (1) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW OR (2) THE COMPANY IS IN RECEIPT OF AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH DISPOSITION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE SECURITIES ACT AND OF ANY APPLICABLE STATE SECURITIES LAWS.

THE SHARES OF COMPANY COMMON STOCK REPRESENTED HEREBY ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE SHAREHOLDERS AGREEMENT OF THE COMPANY, DATED AS OF [●], 2022 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "SHAREHOLDERS AGREEMENT"). NO REGISTRATION OR TRANSFER OF THE COMPANY COMMON STOCK MAY BE MADE UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE

BEEN COMPLIED WITH. COPIES OF SUCH AGREEMENT ARE ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER OF SHARES OF COMPANY COMMON STOCK WILL BE MADE ON THE BOOKS OF THE COMPANY UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE APPLICABLE TERMS OF THE SHAREHOLDERS AGREEMENT.

ONLY PARTIES TO THE SHAREHOLDERS AGREEMENT ARE ENTITLED TO EXERCISE THE RIGHTS OF HOLDERS UNDER THE SHAREHOLDERS AGREEMENT.  NO PERSON MAY BECOME A HOLDER OF COMPANY COMMON STOCK PURSUANT TO ANY TRANSFER OF COMPANY COMMON STOCK OTHER THAN A TRANSFER THAT IS PERMITTED BY AND IN ACCORDANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT.

This is to certify that CEDE & CO. is the owner and registered holder of this Certificate evidencing the ownership of the shares of common stock set forth on the Schedule of Increases and Decreases attached hereto as Schedule A, each of which represents an undivided share of common stock in the Company.

At the request of the registered holder this Certificate may be exchanged for one or more Certificates issued to the registered holder in such denominations as the registered holder may request.

The registered holder of this Certificate is entitled at any time upon tender of this Certificate to the [____], endorsed in blank or accompanied by all necessary instruments of assignment and transfer in proper form, at its principal office in [_____] and, upon payment of any tax or other governmental charges, to receive such holder's Units evidenced by this Certificate.

 The Company may deem and treat the person in whose name this Certificate is registered upon the books of the Company as the owner hereof for all purposes and the Company shall not be affected by any notice to the contrary.

**IN WITNESS WHEREOF**, the Company has caused this Certificate to be executed in its name by the manual or facsimile signature of one of its authorized signatories.

[_____]

By:

## SCHEDULE A

## SCHEDULE OF INCREASES AND DECREASES IN
## SHARES OF COMPANY COMMON STOCK

The following increases and decreases in the number of shares of Company Common Stock evidenced by this Global Security have been made:

| Date | Amount of increases or decreases in number of shares evidenced by this Global Security | Number of shares evidenced by this Global Security following such increase or decrease | Signature of authorized signatory |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**<u>EXHIBIT D</u>**

***Form of New Articles***

[To come.]